**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STANLEY WRICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| JON BURGE, former Chicago Police Lieutenant; JOHN | ) | |
| BYRNE, former Chicago Police Sergeant; PETER | ) | |
| DIGNAN, former Chicago Police Detective; the Estate of | ) | |
| LEROY MARTIN, former Superintendent of the Chicago | ) | **JURY TRIAL DEMANDED** |
| Police Department; TERRY HILLARD, former | ) | |
| Superintendent of the Chicago Police Department; | ) | |
| THOMAS NEEDHAM, former aid to the Chicago Police | ) | |
| Department Superintendent; RICHARD M. DALEY, | ) | |
| former Mayor of the City of Chicago and former State's | ) | |
| Attorney of Cook County; GAYLE SHINES, former | ) | |
| Director of the Chicago Police Office of Professional | ) | |
| Standards; BERTINA LAMPKIN, former Cook County | ) | |
| Assistant State's Attorney; CITY OF CHICAGO; | ) | |
| COUNTY OF COOK, ILLINOIS; and the OFFICE OF | ) | |
| THE COOK COUNTY STATE'S ATTORNEY. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiff  STANLEY WRICE, for his complaint against JON BURGE, former Chicago

Police Lieutenant; JOHN BYRNE, former Chicago Police Sergeant; PETER DIGNAN, former

Chicago Police Detective; the Estate of  LEROY MARTIN, former Superintendent of the

Chicago Police Department; TERRY HILLARD, former Superintendent of the Chicago Police

Department; THOMAS NEEDHAM, former aid to the Chicago Police Department

Superintendent; RICHARD M. DALEY, former Mayor of the City of Chicago and former State's

Attorney of Cook County; GAYLE SHINES, former Director of the Chicago Police Office of

Professional Standards; BERTINA LAMPKIN, former Cook County Assistant State's Attorney;

CITY OF CHICAGO; COUNTY OF COOK, ILLINOIS; and the OFFICE OF THE COOK

COUNTY STATE'S ATTORNEY, alleges as follows:

## I. INTRODUCTION

1.      Plaintiff Stanley Wrice spent 31 years, three months, and two days in prison for a

crime that he did not commit.  Plaintiff was wrongfully convicted in 1983 of the rape and deviate

sexual assault of K.B. and sentenced to 100 years' imprisonment.  Plaintiff was charged with the

offenses after two notorious Area 2 police officers – Sergeant John Byrne and Detective Peter

Dignan – acting under the direct supervision of disgraced former Chicago Police Commander Jon

Burge (a convicted perjurer) sadistically tortured him into making a false confession that was

admitted against him at his 1983 trial.  Additionally, those same two Burge henchmen Byrne and

Dignan physically tortured Bobby Joe Williams, one of Plaintiff's co-arrestees, into falsely

implicating Plaintiff.  Mr. Williams was then coerced by Cook County State's Attorney Bertina

Lampkin into perjuring himself at Plaintiff's 1983 trial and testifying against Plaintiff.

2.      The miscarriage of justice in Plaintiff's case was not an isolated occurrence.

Rather, it was part of a pattern of systemic torture and physical abuse of African American

suspects at the Area 2 and Area 3 police headquarters.  Plaintiff's torture, wrongful prosecution

and false imprisonment occurred and continued because command personnel in the Chicago

Police Department; successive Superintendents of Police; Mayors of the City of Chicago,

including Richard M. Daley; Cook County and its State's Attorneys' Office concealed and

suppressed their knowledge of ongoing torture and physical abuse under Burge, blocked and

2

undercut efforts within the Chicago Police Department to expose and discipline offending officers, and refused to intervene to stop the continuing egregious and criminally unconstitutional misconduct. Plaintiff consistently maintained his innocence and that he was tortured, and forced to implicate himself, by Defendants Byrne and Dignan in the notorious basement of Area 2.

3.     Plaintiff seeks damages for the massive injuries inflicted upon him from the persons responsible for this egregious miscarriage of justice.

## II.  JURISDICTION AND VENUE

4.     This is a civil rights action brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1986 and the Constitution of the United States. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a). There is jurisdiction over Plaintiff's state law claims pursuant to the court's supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

5.     Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, formerly resided in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

## III.  PARTIES

6.     Plaintiff Stanley Wrice is a 60 year-old African-American man and citizen of the United States of America.

7.     Defendant Jon Burge was a duly appointed and sworn Chicago Police Lieutenant and was, from 1982 to 1986, the commanding officer of Chicago Police Area 2 Detective Violent Crimes Unit. In 1988, Burge was appointed Commander of Area 3 Detective Division by Defendant Martin and held this assignment until 1991, when he was suspended and, ultimately, fired by the Chicago Police Department for the torture and abuse of Andrew Wilson. Defendant

3

Burge engaged in a racially motivated pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives and supervisors under his command, including, but not limited to, the Police Officer Defendants named herein. Defendant Burge's wrongful actions took place in the course and scope of his employment. Burge was convicted in 2010 of perjury and obstruction of justice for lying about police torture at Area 2 during his tenure as Commander. Plaintiff sues Defendant Burge in his individual and official capacity.

8.      Defendant John Byrne was a duly appointed and sworn Chicago Police Sergeant in the Chicago Police Area 2 Detective Violent Crimes Unit from 1982 to 1986, and the direct supervisor of Defendant Dignan. From 1988 to 1991, Defendant Byrne was a sergeant in the Violent Crimes Unit of Area 3 Detective Violent Crimes Unit, and the direct supervisor of Defendant Dignan. Defendant Byrne, like Defendant Burge, engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives, including the Police Officer Defendants named herein. Defendant Byrne engaged in the conduct complained of in the course and scope of his employment. Plaintiff sues Defendant Byrne in his individual and official capacity.

9.      Defendant Peter Dignan was a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at the Area 2 Violent Crimes Unit under Defendant Burge's command who engaged in a pattern and practice of torture and brutality himself, and engaged in the conduct complained of in the course and scope of his employment. Plaintiff sues Defendant Dignan in his individual and official capacity.

10.     From 1987 to 1992, Defendant Leroy Martin was the Superintendent of Police for

4

the City of Chicago, and was responsible for the policies, practices, and customs complained of herein. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity. In 1983, he was Commander of the Area 2 Detective Division and was Defendant Burge's direct supervisor, and command supervisor of Defendant Byrne.

11.    From 1998 to 2004, Defendant Terry Hillard was the Superintendent of Police for the City of Chicago, and was responsible for the policies, practices, and customs complained of herein.  He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual and official capacity.

12.    From 1998 to 2002, Defendant Thomas Needham was counsel to, and administrative assistant for, Superintendent Terry Hillard, who was his direct supervisor.  He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual and official capacity.

13.    From 1981 to 1989 Defendant Richard M. Daley was the State's Attorney of Cook County and during that period was responsible for the policies, practices and customs of that office.  From 1989 to 2011, Defendant Daley was the Mayor of the City of Chicago and was the chief policymaker for the City of Chicago, its Police Department, City Council, and Police Board and was therefore responsible for the policies, practices, and customs complained of herein. Defendant Daley was acting in the scope of his employment at all times material to this complaint and is sued in his individual and official capacity.

14.    From 1990 to 1998, Defendant Gayle Shines was the Director of the Office of Professional Standards ("OPS") of the Chicago Police Department. Her direct supervisor was the Chicago Police Superintendent. She was appointed by Defendant Daley.  Defendant Shines was

acting in the scope of her employment at all times material to this complaint and is sued in her individual and official capacity.

15.     Defendant City of Chicago is an Illinois municipal corporation, and as such is responsible for the policies, practices, and customs of the Chicago Police Department, its Office of Professional Standards, its Personnel Division, its Detective Division, and its Superintendent of Police, as well as those of the Mayor, his Office, and his City Council, the Corporation Counsel and its Office, and the Chicago Police Board.  The City of Chicago is and/or was the employer of each of the Defendant Officers and Police and other city governmental officials at all material times to this complaint. The City of Chicago is responsible for the acts of the Defendant Officers and Defendant police and other city governmental officials while employed by the City of Chicago and while acting within the scope of their employment.

16.     Defendant Bertina Lampkin was an Assistant State's Attorney of Cook County who was assigned to the Criminal Trial Division and who was lead prosecutor in Plaintiff's May 1983 trial.  Defendant Lampkin engaged in the conduct complained of in the course and scope of her employment and she is sued in her individual and official capacity.

17.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office (hereinafter referred to as the "CCSAO") and the Cook County Board. At all times relevant to this action, Cook County and the CCSAO were responsible for the policies, practices, and customs of the CCSAO and the prosecutors working therein.  At certain times relevant to this action, Cook County and the Cook County State's Attorney's Office were the employers of Defendants Daley and Lampkin and are necessary parties to this lawsuit.

18.     At all times relevant to this action, each of the named individual defendants acted in the scope of his or her employment, and under the color of the laws, regulations, and customs of the State of Illinois. Each Defendant's actions constituted "state action" as defined under federal law. Each defendant is sued in his or her individual capacity.

## IV.  FACTUAL ALLEGATIONS

19.     In the early morning hours of September 9, 1982, 33-year-old K.B., a Caucasian woman, was sexually assaulted and burned over a two hour period in the attic of the home that Wrice shared with his brother Charles Wrice, sister Patricia Wrice, and Patricia's boyfriend, Bobby Joe Williams.  Plaintiff, Williams, Charles Wrice, Rodney Benson, Lee Holmes, and Michael Fowler, all Africa-American men, were arrested on September 9, 1982 for the assault. Plaintiff, Williams, Charles Wrice, Benson, Holmes, and Fowler were interrogated by Defendants Byrne and Dignan, and each of the men asserted that they were beaten by the Defendant Officers during the course of their interviews.  Plaintiff, Benson, Holmes, and Fowler were charged on September 10, 1982, with K.B.'s assault after they each made inculpatory statements about their participation in the offenses.

### *Plaintiff's Interrogation and Police Torture.*

20.     Prior to trial, in April of 1983, Plaintiff moved to suppress inculpatory statements he allegedly made to Defendants Byrne and Dignan and to Assistant State's Attorney Kenneth McCurry because the statements were made as a result of psychological, physical and mental coercion by the Defendant Officers.

21.     At the suppression hearing, Plaintiff testified that, after his arrest, he was taken to Area 2 Headquarters and placed in a second-floor room, where he was handcuffed to a ring on

the wall. Defendant Byrne and Defendant Dignan questioned him about what had happened at his house earlier that day. Plaintiff gave a statement but did not implicate himself.

22.     Defendant Dignan freed Plaintiff from the wall ring and told him that he (Defendant Dignan) was fixing to do some police brutality. Plaintiff was then taken to a room on a lower floor of Area 2 that had bars in it, and what appeared to be cells. Upon questioning by Defendant Byrne, Plaintiff repeated what he had told Defendant Byrne and Defendant Dignan upstairs.

23.     Defendant Byrne sat Plaintiff in a chair that was adjacent to a table and told Plaintiff that he was lying and hit him in the forehead with a flashlight that was 15 to 16 inches long. Defendant Dignan then struck Plaintiff across his right thigh with a piece of rubber, approximately 12 to 13 inches long, which was taped on both ends. Defendant Byrne and Defendant Dignan continued to question Plaintiff, striking him at random on his arms and thighs. Defendant Byrne told Plaintiff that they were about to return back upstairs; if he found out that Plaintiff was lying, he could expect the same thing.

24.     Sometime after returning upstairs, Defendant Byrne and Defendant Dignan took Plaintiff back downstairs, where Defendant Dignan struck him with a piece of rubber across his left thigh and his left arm, and Defendant Byrne repeatedly struck him with a flashlight on his right arm and once in his chest. The Defendant Officers both repeatedly called Plaintiff "nigger" while they were beating him.

25.     As Plaintiff tried to move his arm, Defendant Byrne made Plaintiff stand up. Defendant Byrne grabbed Plaintiff's hands and turned him around with his head facing the bars of a jail cell, handcuffed Plaintiff's arms above his head to the bars of the cell, and kicked

Plaintiff's legs apart. Defendant Byrne told Plaintiff that he was going show Plaintiff how it feels to be mistreated. Defendant Byrne hit Plaintiff repeatedly between his legs, and in his groin, with the flashlight. While Defendant Byrne hit Plaintiff in the groin area, Defendant Dignan hit Plaintiff between the legs in the groin with a piece of rubber. Plaintiff's legs buckled from the beating and he was dangling by his handcuffed arms during the blows. The Defendat Officers repeatedly called him racial slurs.

26.     Plaintiff was taken back upstairs, where he had a 20–minute conversation with Assistant State's Attorney McCurry, at which Dioguardi and Defendant Dignan were present. Plaintiff was not advised his constitutional right to an attorney or to remain silent, and Plaintiff only spoke to Defendant McCurry because he was afraid of Defendant Dignan and Defendant Byrne. Plaintiff could not remember exactly what he told McCurry because he was in so much pain from the beatings he suffered.

27.     Plaintiff presented medical testimony at his suppression hearing to corroborate his claim that he was tortured by Defendants Byrne and Dignan. Karem Ali Abdal–Aziz ("Alhazi') was a paramedic responsible for giving new inmates at the Cook County jail complete physical examinations and examined Plaintiff on September 10, 1982.

28.     According to Alhazi's written report, Plaintiff advised him of several injuries that occurred the day before. Alhazi personally observed, and noted on the intake sheet, that Plaintiff had multiple bruises on his right shoulder, left and right biceps, breastbone, right hand, and an injury to the left side of his skull. Alhazi stated that Plaintiff had so many bruises on his upper body that he could not mark them all on the intake sheet.

29.     Alhazi concluded that multiple blunt trauma caused Plaintiff's injuries.

30.     Dr. Stanley Harper, a physician with Cermak Health Services examined Plaintiff on September 15, 1982.  According to the doctor's examination notes, Plaintiff reported that he had been beaten across his back, hands and legs with a flashlight and billy club by Chicago police one week earlier.  He complained of pain in the groin, blood in his urine 24 to 48 hours after the beating, and burning or pain on urination. Dr. Harper noted multiple healing hematomas on defendant's left anterior leg. Dr. Harper's assessment, or clinical impression, was history of multiple blunt trauma.

31.     Chicago Police Lieutenant John Crane testified that there was a lower at Area 2 that contained two abandoned jail cells adjacent to the garage on the first floor.  The area could be accessed by going down the stairs from the second floor, then proceeding first through a wooden door, which was unlocked, and then a steel door, which was locked. Lieutenant Crane testified that the key to the metal door was kept behind the front desk on the first floor, which itself was behind a locked door.

32.     At the suppression hearing, Defendant Dignan and Defendant Byrne testified falsely regarding the events of Plaintiff's September 9, 1982 arrest and interrogation.

33.     Defendants Byrne and Dignan denied striking Plaintiff, hitting him with a flashlight or billy-club, threatening him, or abusing him in any manner.

34.      Defendant Byrne and Defendant Dignan stated that there was not an interrogation room in the basement of Area 2.

35.     Assistant State's Attorney McCurry stated that Plaintiff gave an oral unrecorded statement implicating himself in the offenses.  Defendant Dignan was in the room the entire time that Plaintiff was speaking to McCurry, and McCurry did not ask Plaintiff if his

10

statements were free of coercion.  McCurry did not memorialize Plaintiff's statement or record the conversation.

36.     Defendants Byrne and Dignan were not was confronted with other acts of similar torture and abuse that they had previously committed against other suspects while working in the Area 2 Violent Crimes Unit under Defendant Burge's supervision – specifically they were not asked about the February 1982 torture of Andrew Wilson.  This evidence had been suppressed and covered up by the Defendants.  No evidence or findings regarding the systemic Area 2 torture and abuse was available to or offered to Plaintiff.

37.     Despite the fact that he and two medical professionals testified regarding the physical beating and injuries Plaintiff received during his interrogation, the trial court found Defendants Byrne and Dignan "credible" in their denials of physically beating Plaintiff, and denied Plaintiff's motion to suppress his confession.

### *Plaintiff's Wrongful Conviction Based on His Coerced Confession, Manufactured Evidence, and Perjured Testimony .*

38.     The facts at the May 1983 trial established that at around 1:00 a.m. on September 9, 1982, K.B., who was intoxicated, got into a car driven by co-defendant Benson to get some more alcohol. Benson drove K.B. to the Wrice family home at 76th and Chappel in Chicago, a known "party home" in the area.  Co-defendants Benson, Holmes, and Fowler were all in the same gang. Benson, with permission from Williams, took K.B. upstairs one section of the attic. In the attic, K.B. said that three men sexually assaulted her and she was burned with certain items.  She was led outside around a few hours later and was taken to the hospital. K.B. could not identify the men who assaulted her.  No physical evidence connected Plaintiff to the assault.

39.     Plaintiff's false admissions, which were physically coerced, constructed and manufactured by Defendant Officers were presented to the prosecuting attorneys who relied upon and presented Plaintiff's knowingly false, coerced, and manufactured evidence throughout Plaintiff's prosecution.  Defendant Byrne falsely testified at Plaintiff's trial that Plaintiff implicated himself in the offenses and falsely testified that he did not beat Plaintiff or coerce him to provide an inculpatory statement. ASA McCurry testified that Plaintiff confessed to K.B.'s assault and that he was not aware that Plaintiff was beaten by the Defendant Officers.

40.     Plaintiff testified at his trial.  Plaintiff maintained his innocence and said that although he was aware that men, who were friends of Williams, were upstairs drinking and using drugs, he was not aware that K.B. was being assaulted and took no part in the offenses.  Plaintiff left the house at one point to call his fiancee, and when he returned, he fell asleep on the couch until he was awoken by loud noises in the attic.  Plaintiff then went upstairs and told everyone to leave.  Plaintiff testified that any inculpatory statements presented by the prosecution were the result of his torture at the hands of Defendants Byrne and Dignan.

41.     Other than Plaintiff's physically coerced confession, the other evidence implicating Plaintiff  in the offenses were the testimonies of State witnesses Kenny Lewis and Bobby Joe Williams.  Lewis was not listed on the police arrest reports as being in the Wrice home during K.B.'s assault and no witness placed him in the house that night.  Lewis, who was a friend of K.B., was discovered by Defendant Lampkin five days before Plaintiff's trial during Defendant Lampkin's preparation for trial.  Defendant Lampkin independently, and without the police or an investigator, walked the area of the crime scene, knocking on doors and looking for a witness.  Defendant Lampkin knocked on one door and Defendant Lampkin said that Mrs. Lois

Lewis said that her son Kenny Lewis was present at K.B.'s rape. Defendant Lampkin then had a conversation with Lewis, and he testified four days later that he saw Plaintiff burn and beat K.B. Unbeknownst to Plaintiff until 2014, Defendant Lampkin fabricated this meeting with Mrs. Lewis. Mrs. Lewis denies that she told any prosecutor that her son witnessed a gang rape and was unaware that her son was at the Wrice home on September 9, 1982.

42.     Bobby Joe Williams perjured himself at Plaintiff's 1983 trial when he implicated Plaintiff in the offenses. Williams testified that he saw Plaintiff have sex with K.B. and that Plaintiff told him that he burned K.B. Unbeknownst to Plaintiff until 2011, on September 9, 1982, when Williams was arrested for K.B.'s assault along, he was beaten by Defendants Byrne and Dignan during his interrogation and forced to implicate Plaintiff in K.B.'s assault. Also, unbeknownst to Plaintiff until 2011, on the date of Plaintiff's trial, Williams was coerced by Defendant Lampkin to falsely testify against Plaintiff at trial.

43.     Plaintiff was convicted in May of 1983 of the rape and deviate sexual assault of K.B. Plaintiff was sentenced to 100 years in prison.

44.     Six months after Plaintiff's trial, Defendant Lampkin arranged for Benson and Holmes to plead guilty to the aggravated battery of K.B. in exchange for a sentence of 30 months' probation. Fowler pled guilty to the aggravated battery of K.B. in exchange for a four-year sentence.

45.     Defendants Burge, Byrne, and Dignan, together with their co-conspirators, suppressed from the prosecutors who prosecuted Plaintiff, from the judges and juries who heard Plaintiff's motion to suppress and his trial, and from the prosecutors and judges who prosecuted and heard Plaintiff's appeals and post-conviction proceedings, that the admissions attributed to

him, and the statements from Bobby Joe Williams inculpating Plaintiff, were false and
unreliable, coerced through torture, constructed and manufactured by such Defendants and their
co-conspirators, and were the product of a pattern and practice of torture and abuse which they
commanded, supervised, and implemented.  Additionally, the Defendant Officers suppressed,
committed perjury about, and hid or destroyed the physical implements of this pattern and
practice of torture.

46.     On information and belief, Defendant Lampkin suppressed evidence
that Bobby Joe Williams' 1983 trial testimony implicating Plaintiff in the offenses was false and
on information and belief, Defendant Lampkin coerced Williams to produce his false inculpatory
testimony against Plaintiff.  On information and belief, Defendant Lampkin prepared and
presented the unreliable, constructed, and manufactured trial testimony of Kenny Lewis who
implicated Plaintiff in the offenses. Defendant Lampkin acted in an investigatory capacity when,
in preparation for Plaintiff's trial, she personally investigated Plaintiff's case and found and
secured a State witness for Plaintiff's trial.

### The Conspiracy to Torture and Abuse Suspects at Area 2 and Area 3 Police Headquarters and to Conceal and Cover-Up the Torture and Abuse.

47.     Plaintiff's torture and abuse was not an isolated incident of individual police
officer brutality and misconduct. Rather, the interrogation and torture of Plaintiff in pursuit of a
confession which was constructed by the Police Officer Defendants and fed to him after he was
broken, was part of a long-standing pattern and practice of similar acts of racially motivated
torture committed against African American men under the supervision, and with the
encouragement, participation and ratification of Defendants Burge and Byrne.  Burge and Byrne

supervised, encouraged, participated in, failed to prevent, and ratified the abuse of Plaintiff by the other Police Officer Defendant, as alleged above, as part of this pattern and practice.

48.     The earliest known torture in this pattern occurred on or about May 29, 1973, when Defendant Burge, then a detective on the Area 2 midnight shift, tortured African American suspect Anthony Holmes, using an electric shock box, suffocation, beating and racial epithets.

49.     The Chicago Police Department took no action to punish or restrain defendant Burge at that time. Over the next decade, Burge and other Area 2 detectives tortured many African American suspects, including Lawrence Poree, George Powell, Tony Thompson, Willie Porch, Ollie Hammonds, Derrick King, Michael Coleman, Sylvester Green, and Melvin Jones.

50.     In February 1982, the Superintendent of the Chicago Police Department, Richard Brzeczek, and the Mayor of the City of Chicago, Jane Byrne, placed Defendant Burge in charge of a manhunt for the killers of two white Chicago Police officers. In the course of that manhunt, Burge and other Area 2 detectives tortured a number of African American citizens, including Donald White, Roy Brown, Walter Johnson, Paul Mike, Alphonso Pinex, and Larry Milan, and abused and terrorized a large number of other African American citizens.

51.     On February 14, 1982, Defendant Burge and numerous Area 2 detectives arrested Andrew Wilson for the police officer murders. Throughout that day, Burge and other Area 2 detectives tortured Wilson, using the following techniques, among others: electric-shocking on the genitals, ears and other parts of the body with a black box and a second plug in electrical device; suffocating with a plastic bag; burning on a radiator; and beating. As fully set forth in paragraphs 54 and 55 below, Defendant States Attorney Daley, the then-Mayor of the City of Chicago, and the then-Superintendent of the Chicago Police Department all closely monitored

15

developments in the manhunt. All three learned from numerous sources of the widespread abuse during the manhunt, including the torture and abuse of Andrew Wilson and did nothing to prevent or stop that torture and abuse or to discipline, investigate, or otherwise bring to justice Burge and the other detectives who perpetrated it.

52.     As a direct and proximate result of the failure of Defendant Daley and Defendant Leroy Martin (who became Superintendent of the Chicago Police Department in 1987) to intervene, to discipline and to supervise, Defendants Burge, Byrne and other Area 2 Detectives tortured numerous additional African American suspects with electric shock, baggings, mock executions, and beatings, often while using racial epithets, in the period following Wilson's torture in February of 1982, including African American men: Shadeed Mumin, Michael Johnson, Lee Holmes, Rodney Benson, Eric Smith, Alonzo Smith, James Andrews, Reginald Mahaffey, Jerry Mahaffey, Gregory Banks, David Bates, Darrell Cannon, Leonard Hinton, Eric Smith, Leroy Orange, Leonard Kidd, Philip Adkins, Robert Billingsley, Stanley Howard, Alphonso Pinex, Thomas Craft, Lavert Jones, Lonza Holmes, Aaron Patterson, Madison Hobley, Michael Tillman, and Stephen Bell.

53.     The Police Officer Defendants also suppressed from Plaintiff and his counsel; the trial, appellate and post-conviction prosecutors; and the jurors and judges in Plaintiff's criminal proceeding, all of the facts regarding this extensive pattern of abuse and torture of African American men. These Defendants also suppressed the physical implements of the pattern and practice of torture used by them and other Area 2 detectives against numerous other victims of their pattern and practice of torture.

***Defendant Daley's Failure to Intervene and Concealment of Exculpatory Evidence is a Proximate Cause of Plaintiff's Coerced Confession and Wrongful Conviction.***

54. By no later than February 1982, Defendant Daley had direct, personal knowledge that Defendants Burge, Byrne, and Dignan and other Area 2 detectives committed acts of torture against African American suspects at Area 2. During the February 1982 manhunt described above in paragraphs 50 and 51, Defendant Daley closely monitored events, receiving regular reports from subordinates who, at various times, were at Area 2. Daley therefore knew or should have known of the abuses of African American citizens that occurred in the course of the manhunt, including, in particular, the abuse of Donald White, who was placed in protective custody by the Cook County State's Attorney's Office following acts of torture that Burge and his men perpetrated against him.

55. Defendant Daley was also informed of the arrest of Andrew Wilson on the morning of February 14, 1982. Throughout the day of February 14, as Wilson was tortured (frequently screaming in the course of the abuse), several high ranking Assistant State's Attorneys were present at Area 2. An Assistant State's Attorney assigned as a supervisor to the Felony Review Unit, ASA Larry Hyman, participated directly in the interrogation of Wilson, which occurred between sessions of torture at the hands of Burge and his men. Wilson explicitly informed Hyman that Burge and his men were torturing him. The high ranking members of the State's Attorney's Office present at Area 2 on February 14, 1982 knew or should have known that Wilson was being tortured. Those high ranking assistants were reporting directly to Defendant Daley and to the First Assistant State's Attorney at the time, Richard Devine. Neither Daley nor any of his top assistants did anything to halt or prevent the torture of Wilson.

17

56.     On or about February 17, 1982, Superintendent Brzeczek received a letter from Dr. John Raba, the Director of Medical Services at Cook County Jail, informing the Superintendent that medical examination of Andrew Wilson revealed unmistakable signs that Wilson had been abused while in police custody and demanding an investigation. After conferring with high ranking police command personnel (and chastising those present at Area 2 for allowing Wilson's torture to happen), the Superintendent wrote a letter to Defendant Daley, enclosing the Raba letter and advising Daley that, in light of the pending prosecution of Wilson, he would not investigate or otherwise pursue the matter without instructions from Daley.

57.     Defendant Daley received the Brzeczek letter (with its enclosure) and shared and discussed it with his First Assistant and other high level subordinates. He never responded to the letter.

58.     Defendant Daley and his subordinates were fully aware that Brzeczek's letter set forth criminal conduct by Burge and other Chicago police detectives and officers, and they knew or should have known that ASA Larry Hyman was complicit in this criminal conduct. They also knew that there was physical, medical, and testimonial evidence which supported the claim of physical abuse. Not only did Defendant Daley fail to instruct the Superintendent of Police to conduct a criminal and/or administrative investigation, but he also failed to conduct a criminal investigation of his own, and did not refer the evidence to an independent agency for investigation. Instead, on information and belief, Daley communicated to Dr. Raba, through unsued co-conspirator and County Board President George Dunne, that Dr. Raba " should not get involved" in the Wilson case, and subsequently, together with the Superintendent of Police, issued public commendations to Burge and his men.

18

59.     As a direct result of Defendant Daley's refusal to act, the Chicago Police Department, and its Office of Professional Standards indefinitely suspended all investigations into the allegations of torture and abuse made against Burge and his men, both by Wilson and Raba, and by the other African-American citizens who were tortured and abused during the manhunt.

60.     Throughout the manhunt, the arrest of Andrew Wilson, the receipt and discussions of the Brzeczek letter, and the decision not to contact Brzeczek or to investigate, Daley and his subordinates, on information and belief, generated memoranda, notes, and other written communications documenting these events and decisions.

61.     This documentation, including the original copy of the Brzeczek letter, which contained a received stamp from Defendant Daley, no longer exists, and, on further information and belief, was destroyed by or at the direction of Defendant Daley.

62.     Following Wilson's torture, in February 1982, seven months later, Plaintiff was tortured in September of 1982.  The Cook County State's Attorney's Office prosecuted Plaintiff in May of 1983.  But neither the Defendant Officers, the Cook County State's Attorney's Office, Defendant Daley nor Daley's subordinates disclosed specific exculpatory information within the possession of the office regarding the torture of Wilson and the specific knowledge of Defendant Daley and his high ranking subordinates as to the truth of Wilson's allegations.

63.     On information and belief, Defendant Daley's personal review of the Wilson case, and the cases preceding the Wilson case, revealed to him that African American men claimed to have been tortured by Burge, Byrne and/or his men at Area 2.

64.     The actions and inactions of Defendant Daley during the period from February

1982 through September 1982 in refusing and failing to investigate the actions of Defendants

Burge, Byrne, and Dignan and their confederates in the Wilson case and in suppressing the

exculpatory evidence in his possession and in the possession of the Office of the Cook County

State's Attorneys Office, proximately caused Plaintiff's torture and his physical abuse, Plaintiff's

wrongful conviction for crimes that he did not commit, and Plaintiff's wrongful incarceration.

### *Defendant Martin's Failure to Intervene and Concealment of Exculpatory Evidence is a Proximate Cause of Plaintiff's Unjust Incarceration.*

65. In January 1983, Defendant Martin becomes Commander of Area 2 and served as

Defendant Burge's direct supervisor and in charge of Defendants Byrne and Dignan. During the

year that Martin holds the post, numerous African American suspects are tortured at Area 2 under

Burge's direction and supervision by Defendants Byrne and Dignan, and other Area 2 detectives,

including Eric Smith (January 1983), Alonzo Smith (January 1983) and James Andrews (April

1983). Defendant Martin failed to initiate appropriate investigations or to discipline Burge in

connection with any of these cases.

66. On information and belief, Defendant Martin would have known about the police

torture allegations against Defendants Byrne and Dignan made by Plaintiff and Plaintiff's co-

defendants Lee Holmes, Rodney Benson, and Michael Fowler. Plaintiff and his co-defendants

each moved to suppress their inculpatory statements in late April/early May of 1983 and each

alleged that on September 9 or 10, 1982, they were taken to the basement of Area 2 by

Defendants Byrne and Dignan and beaten in order to secure their confessions. Defendant Martin

failed to initiate appropriate investigations or to discipline Defendants Byrne and Dignan in

connection with Plaintiff's case or Plaintiff's co-defendants' cases.

67.     In 1987, Martin was named Superintendent of the Chicago Police Department, a position that he continued to hold until 1992.  As Superintendent, possessing direct knowledge of Burge's practices from his time as Area 2 commander, Defendant Martin continued to fail to intervene, to supervise, discipline or otherwise act to prevent the ongoing misconduct of Burge and his men. Defendant Martin worked actively to conceal and suppress evidence of the pattern of torture, as is fully alleged in below.

68.     The actions and inactions of Defendant Martin during the period from 1983 through 1992, in refusing and failing to investigate the actions of Defendant Burge and his confederates and in suppressing the exculpatory evidence in his possession proximately caused Plaintiff's unjust incarcertaion.

### *The Actions and Inactions of Defendants Daley, Martin, Hillard, Needham and Shines to Conceal and Cover Up the Pattern of Torture under Burge Frustrated Plaintiff's Efforts to Exonerate Himself and Prolonged Plaintiff's Unjust Incarceration.*

69.     Following his conviction and 100 year sentence in 1983, Plaintiff languished in prison until December 12, 2013, when the Cook County Special Prosecutor agreed to dismiss all charges against him. The prosecutors dismissal of all charges against Plaintiff came after Cook County Judge Richard Walsh granted Plaintiff a new trial, finding that Defendants Byrne and Dignan committed perjury when they testified in 1983 that they did not beat Plaintiff to secure his inculpatory statement and after Judge Walsh ruled that the Cook County State's Attorneys Office and the City of Chicago were responsible for the conduct of Defendants Byrne and Dignan and that the evidence of police torture practices should have been disclosed to Plaintiff.

70.     Plaintiff's wrongful prosecution was continued, his exoneration was delayed and his imprisonment lasted far longer than it otherwise would have because, for many years,

Defendants Daley, Martin, Hillard, Needham and Shines, in conspiracy amongst themselves and with others, including the Police Officer Defendants, their confederates, and successive Police Superintendents and police command personnel, continued to make extraordinary efforts to suppress, conceal, and discredit exculpatory evidence regarding the pattern of torture and physical abuse of African American men by Chicago Police detectives under Burge's command.

71.     In 1989, Defendant Daley became the Mayor of the City of Chicago. In that capacity, Defendant Daley was directly responsible for the appointment of the Superintendent of the Chicago Police Department. Defendant Daley also had ultimate responsibility for the operations of the Police. Daley therefore had the duty to take all necessary steps to ensure the Department and its officers disclosed exculpatory information to victims of Defendant Burge and his men, including Plaintiff. In addition, Defendant Daley had an ongoing duty to disclose exculpatory information to Plaintiff and other Burge victims of which Defendant Daley had become personally aware while he was State's Attorney of Cook County.

72.     Defendant Daley did not disclose exculpatory information in his possession at any time from the date he resigned as State's Attorney of Cook County until the date Plaintiff was finally exonerated and released from prison on December 12, 2013.  Nor did Defendant Daley intervene at any time to direct the Chicago Police Department to disclose material exculpatory information in its possession regarding Burge or to conduct a thorough and appropriately aggressive investigation of Burge and the detectives who allegedly abused African American men while working under Burge's command and to follow through on the results of such an investigation.

73.     Rather than disclose exculpatory material and conduct appropriate investigations,

Defendants Daley, Martin, Hillard, Needham, Shines and other co-conspirators caused the Chicago Police Department to actively conceal and suppress information regarding the scope and extent of the torture and abuse of African American suspects that occurred under Burge. Their actions in this regard included, but are not limited to those alleged in paragraphs 68 through 83, below.

74.     In 1990 a report (hereinafter, the "Goldston Report") was prepared by Chicago Police OPS investigator Michael Goldston, which found that there was systemic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it. In November of 1991, the Goldston Report was supplemented with a finding that Defendants Burge, Byrne, and Dignan were the prime movers in this pattern of abuse and that they and two other Area 2 detectives had tortured Andrew Wilson. In a companion Report (the Sanders Report) the OPS found that Burge and two of his men tortured Andrew Wilson and recommended that they be fired.

75.     The Goldston Report, and the information it contained, was highly exculpatory for Plaintiff, who was tortured just seven months after Wilson and who filed his first post-conviction petition in April of 1991, claiming that his conviction was the product of police torture at the hands of Defendants Byrne and Dignan and requesting a new trial.

76.     Defendant Martin and other police command personnel delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, *inter alia*, by suppressing the findings that Wilson was tortured and by refusing to suspend, transfer or remove Burge either before, or for nearly a year after, the

Goldston Report's findings were first made known to them in November of 1990.

77.     Defendant Martin and other command personnel further delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, findings and conclusions set forth above, *inter alia*, by suppressing the findings that Wilson was tortured here was systematic abuse at Area 2, which implicated Defendants Martin, Burge, Byrne, Dignan, and other Area 2 detectives who worked under Burge's command.

78.     The Goldston Report and its findings were not publicly released until February 7, 1992, when Federal District Judge Milton I. Shadur ordered the release.

79.     On or before February 7, 1992, Defendant Daley was specifically informed or was otherwise aware of the Goldston Report findings of "systematic" Area 2 torture that was "condoned and participated in" by Area 2 command personnel. Defendant Daley knew or should have known that Defendant Martin was the commanding officer at Area 2 and Defendant Burge's direct supervisor during part of the time the Goldston Report found there to be "systematic" torture, and that Defendant Martin therefore had a motive and the intent to suppress and discredit the Goldston Report and its findings.

80.     Despite this and all that he previously knew about torture by Burge and his men, and despite the findings of the Goldston Report itself, Defendant Daley did not seek an independent federal investigation; direct Defendant Martin to initiate a criminal investigation or to open disciplinary proceedings against the Area 2 detectives, supervisors and command officers identified in the Goldston Report; or seek the prosecution of Burge and his confederates.

81.     Instead, in a joint effort with Defendant Martin, Defendant Daley sought to publicly discredit the Goldston Report and defend Martin's prior suppression of it, saying "these

24

are only allegations . . . rumors, stories, things like that." The intent and effect of these statements was to undermine the accuracy and validity of the Goldston Report's finding that the torture at Area 2 was "systematic" and participated in by command personnel.

82.     Even after learning of the findings in the Goldston Report, Defendant Martin, Defendant OPS Director Shines, and other command personnel, in violation of police regulations, refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock and abuse made by electric shock victim Melvin Jones against Defendant Burge.

83.     From 1989 to 1992, Defendants Daley and Martin, and their command subordinates, through several public hearings held by the Chicago City Council and the Chicago Police Board, and a report by Amnesty International, were given additional actual notice that Defendant Burge was the leader of a group of Chicago detectives that systematically tortured and abused African American suspects in order to obtain confessions in serious felony cases.

84.     In January of 1992, Defendant Martin admitted in a publicly filed pleading that there was an "astounding pattern or plan" on part of Burge and his confederates "to torture certain suspects, often with substantial criminal records, into confessing to crimes."

85.     In February 1993, the Chicago Police Board fired Defendant Burge for torturing Andrew Wilson. These findings became final in December 1995.

86.     In 1993 the OPS re-opened investigations into approximately 10 Area 2 torture cases. After an exhaustive re-investigation, which uncovered substantial new evidence in support of the allegations, OPS investigator Veronica Tillman sustained numerous allegations that Defendants Byrne and Dignan and Charles Grunhard, racially abused Darrell Cannon and

tortured him with a cattle prod. OPS supervisor Carmen Christia reviewed the findings and approved them.

87.     The OPS also entered sustained findings of torture and abuse against Defendants Byrne and Dignan in five other re-opened cases in 1993 and 1994, including in that of Plaintiff's co-defendant Lee Holmes' case finding that Holmes was tortured by Byrne and Dignan on September 9, 1982 during his interrogation for K.B.'s assault.

88.     From 1993 until 1998, Defendant Shines (who had previously been appointed by Defendant Daley) under pressure from her fellow Defendants and co-conspirators, suppressed these findings and the evidence which supported them by secreting the files in her personal office.

89.     In 1996, Defendant Daley, despite numerous allegations and sustained findings of torture and abuse against Defendant Dignan and meritoriously promoted Dignan to the police rank of lieutenant.

90.     In 1998, Defendants Hillard and Needham, with full knowledge that Defendants Burge, Byrne, Dignan and other Area 2 and Area 3 detectives participated in a pattern and practice of torture and abuse of suspects, including Plaintiff, violated police regulations and obstructed justice by overturning the OPS sustained findings in the six re-opened cases set forth above; by refusing to investigate other torture victims' claims that they had been tortured; by refusing to investigate Defendant Shines' suppression of evidence; and by suppressing these OPS files and findings from Plaintiff and other criminal defendants.

91.     On information and belief, Defendant Daley also personally insisted, from the time he became Mayor through the date he resigned as Mayor on May 16, 2011, that the City of

26

Chicago continue to finance the defense of Defendant Burge and Area 2 detectives who worked under Burge's command, despite his personal knowledge that Burge committed acts of torture against African American men while employed as a Chicago Police officer and condoned such acts by detectives under his command. Daley's insistence on defending Burge was contrary to the recommendation of Daley's senior staff that the City sue rather than defend Burge. The City of Chicago has continued to the present, despite Burge's convictions for perjury and obstruction of justice on June 28, 2010.

### *Defendants Byrne, Dignan, and Lampkin's Concealment of Exculpatory Evidence And Subordination of Perjury is the Proximate Cause of Plaintiff's Wrongful Conviction and Unjust Incarceration.*

92.     Mr. Williams was interrogated by Defendants Byrne and Dignan on September 9, 1982 at Area 2 about K.B.'s assault. Mr. Williams gave a statement to the Defendant Officers inculpating Plaintiff in the offenses. Mr. Williams' testimony inculpating Plaintiff was critical to the State's case against Plaintiff.

93.     Williams' September 1982 statements to Defendants Byrne and Dignan inculpating Plaintiff in K.B.'s assault were false and the product of police torture. Williams was beaten by Defendants Byrne and Dignan and forced to inculpate Plaintiff in the offenses. As the Defendant Officers were questioning him, they were beating Mr. Williams with a black flexible object in his legs and groin and told Mr. Williams, as they were hitting him, that he was going to make a statement implicating Plaintiff in K.B.'s assault.

94.     Mr. Williams implicated Plaintiff in K.B.'s assault and falsely testified at Plaintiff's 1983 trial that Plaintiff had sex with K.B. and took an iron upstairs to the attic because he was beaten by the Defendant Officers and because the Defendants threatened to charge him

27

with the crime. Defendants Byrne and Dignan's failure to disclose that they beat Williams into giving a false statement inculpating Plaintiff and there failure to disclose that they threatened Williams into testifying falsely against Plaintiff was the proximate cause of Plaintiff's wrongful conviction and incarceration.

95.     Defendant Lampkin was the lead prosecutor in the 1983 trial against the Plaintiff. As such, she was responsible for preparing the witnesses for trial, including State witness Bobby Joe Williams. Also as part of her preparation for Plaintiff's trial, Defendant Lampkin independently looked for witnesses by walking the scene of K.B.'s rape and knocking on doors to find a witness to testify against Plaintiff.

96.     Mr. Williams' 1983 trial testimony inculpating Plaintiff in K.B.'s assault was untrue. On May 13, 1983, Mr. Williams was driven to the courthouse at 26th and California and put in a room. Mr. Williams told Defendant Lampkin he did not want to testify against Plaintiff. Defendant Lampkin showed Williams graphic pictures of what was done to K.B. and then told Williams that if he did not testify against Plaintiff, he would be charged with the rape and beating of K.B. With the memory of the police beating in his mind and the threat of being charged with the crime, Mr. Williams did what Defendant Lampkin told him to do and testified falsely against Plaintiff. On information and belief, Defendant Lampkin's knowledge that Williams testimony was false and the State's admission of Williams' perjured testimony, as well as Defendant Lampkin's failure to disclose that Williams' trial testimony was coerced by her threats, was the proximate cause of Plaintiff's wrongful conviction and incarceration.

97.     By information and belief, Defendant Lampkin allowed the unreliable, constructed, and manufactured testimony of Kenny Lewis inculpating Plaintiff to be admitted

28

against Plaintiff at his trial. Mr. Lewis was not listed on the police reports as being present in the Wrice home during the offenses and no witness placed him in the house that night. Mr. Lewis was friends with K.B. Defendant Lampkin, acting as an investigator, several days before Plaintiff's trial, independently went to the crime scene to look for witnesses against Plaintiff. Defendant Lampkin stated that she knocked on many doors and then at one house near at 75th and Jeffrey, Defendant Lampkin stated that Mrs. Lois Lewis told her that her son Kenny witnessed K.B.'s rape. Defendant Lampkin, without assistance of the police, personally interviewed Kenny Lewis and then Lewis testified against Plaintiff several days later. Mrs. Lois Lewis, in 2014, denied that she spoke with a prosecutor about her son and did not tell anyone from the Cook County State's Attorneys Office that her son witnessed a gang rape. By information and belief, the testimony of Kenny Lewis was constructed and manufactured by Defendant Lampkin in order to wrongfully convict Plaintiff.

### *Plaintiff's Exoneration.*

98.     The concealment, obstruction and suppression of exculpatory information and continuing failure to investigate or discipline described above materially and significantly continued the wrongful prosecution of Plaintiff, substantially delayed Plaintiff's exoneration, and caused Plaintiff to face many additional years of unjust incarceration that he would not have endured if the obstruction, suppression and concealment had not occurred.

99.     On December 9 and 10, 2013, an evidentiary hearing was held on Plaintiff's post-conviction claims. On December 10, 2013, Judge Walsh granted Plaintiff's post-conviction petition, and ordered a new trial. Judge Walsh suppressed Plaintiff's confession and found that the State was responsible and liable for the conduct and perjured testimonies of Defendants

Byrne and Dignan. Judge Walsh found that the Defendant Officers committed perjury in 1983 when they testified that they did not beat Plaintiff to coerce his confession. Judge Walsh also found that the Defendant Officers tortured Bobby Joe Williams in order to secure his statements inculpating Plaintiff in K.B.'s assault, and that information of Defendant Officers torture practices should have been disclosed to the defense.

100.    On December 12, 2013, the State, through the Office of the Special Prosecutor Stuart A. Nudelman, dismissed all charges against Plaintiff.

### The Defendants' Misconduct Was Committed in Furtherance of a Conspiracy.

101.    All of the named individual defendants, acting jointly and with other police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in an ongoing course of conduct and joint action and otherwise conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights that continued through to his evidentiary hearing in 2013. By and through these overt acts set forth above, these defendants deprived and continue to deprive Plaintiff of those rights, including his right to be free from unreasonable arrest and seizure, wrongful confinement and imprisonment; his right to be free from involuntary self-incrimination and from interrogation techniques that "shock the conscience;" his right to access to the courts and to a fair and impartial trial; and his right to equal protection of the law, all as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### Plaintiff's Damages.

102.    Plaintiff spent more than 31 years in prison for a crime he did not commit. This time was emotionally, physically, and psychologically grueling and dehumanizing.

30

Plaintiff has suffered from constant fear and anxiety, deep depression, despair, rage, boredom and loneliness. Plaintiff also suffered from the loss of sustained contact with his children and grandchildren, and has been prevented from holding gainful employment or pursuing educational opportunities outside the prison walls. He continues to live under the effects of his isolation, incarceration, and depression. Additionally, Plaintiff continues to experience pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and post traumatic stress disorder from his torture and abuse and his years of wrongful incarceration.

### COUNT I
**(42 U.S.C. 1983 Claim for Deprivation of Right to Fair Trial and for Wrongful Conviction)**

103.    Plaintiff re-alleges all of the preceding paragraphs 1-102, and incorporates them in this count.

104.    Defendants Daley, Burge, Byrne, Dignan, Lampkin, and Martin, individually, jointly, and in conspiracy, caused the wrongful charging, prosecution, conviction, and imprisonment of Plaintiff. Additionally, these same Defendants, together with Defendants Shines, Hillard, and Needham, individually, jointly, and in conspiracy, caused the continuation of that wrongful conviction.

105.    These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts: purchasing, coercing, constructing and/or fabricating the false and totally unreliable inculpatory statements from Bobby Joe Williams, Plaintiff, and other witnesses, which formed the basis for Plaintiff's charging, prosecution and conviction; by withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that

these statements from Bobby Joe Williams and from Plaintiff were false, totally unreliable, constructed, purchased, and coerced; by suppressing, destroying and preventing the discovery and development of additional exculpatory torture findings and evidence, as well as other exculpatory evidence; by giving a false and incomplete version of events to prosecutors; by writing false reports and giving false statements and testimony; by improperly influencing the judges hearing Plaintiff's case, *inter alia*, by making false public statements; by obstructing and improperly influencing investigations which would have led to discovery of exculpatory evidence; by suppressing and attempting to discredit findings of individual and systematic torture and abuse; and by the additional wrongdoing that is set forth above in this Complaint.

106.    In engaging in the conduct described in the preceding paragraph, the Defendants named above thereby unconstitutionally deprived Plaintiff of his liberty and violated his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

107.    Additionally and/or alternatively, the Defendants named above failed to intervene to stop Plaintiff's wrongful prosecution, conviction, and resulting imprisonment despite having the opportunity and duty to do so.

108.    The actions of the Defendants Daley, Burge, Byrne, Dignan, Lampkin, Martin, Shines, Hillard and Needham in depriving Plaintiff of his right ot a fair trial and not to be wrongfully convicted and imprisoned, and additionally and/or alternatively, in failing to intervene to stop said violations, were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne,

32

Dignan, Lampkin, Martin, Shines, Hillard, and Needham, for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II
### (42 U.S.C. § 1983 Claim for False Arrest and Imprisonment)

109.    Plaintiff re-alleges all of the preceding paragraphs 1-108 and incorporates them in this count.

110.    The actions of Defendants Burge, Byrne, and Dignan, individually, jointly, and in conspiracy, in falsely arresting and imprisoning Plaintiff, and of these same Defendants, together with Defendants Daley, Lampkin, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, in continuing Plaintiff's imprisonment for 31 years, without probable cause, violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and deprived Plaintiff of liberty without due process of law.

111.    Additionally, Defendants Burge, Byrne, and Dignan, failed to prevent Plaintiff's wrongful arrest and resultant imprisonment despite having the opportunity and duty to do so, while Defendants Daley, Lampkin, Martin, Hillard, Needham and Shines failed to prevent the continuation of Plaintiff's wrongful arrest and resulting imprisonment despite having the opportunity and duty to do so.

112.    The actions of the Defendants in falsely imprisoning Plaintiff, continuing his false imprisonment, covering up their own misconduct, and/or failing to prevent the unlawful arrest and imprisonment, and/or its continuation were the direct and proximate cause of Plaintiff's

33

injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, Lampkin, Martin, Shines, Hillard, and Needham, for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT III
### (42 U.S.C. § 1983 Claim for Torture and Physical Abuse)

113.    Plaintiff re-alleges all of the preceding paragraphs 1-112 and incorporates them in this count.

114.    The actions of Defendants Byrne and Dignan in torturing and physically abusing Plaintiff and threatening him with additional torture and physical abuse, individually, jointly and in conspiracy violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizure.

115.    Defendants Burge, Byrne, and Dignan were aware of the torture and physical abuse of the Plaintiff, and participated in it by encouraging and/or allowing the torture and abuse to continue while having the obligation and duty to stop the torture. These Defendants had the opportunity and duty to intervene and prevent the torture and abuse of Plaintiff, *inter alia*, by reporting the abuse to superiors in the Chicago Police Department and the Cook County State's Attorney's Office, and failed to do so.

116.    Defendants Daley and Martin had repeatedly failed to intervene to stop and prevent Defendants Burge, Byrne, and Dignan and their co-conspirators from continuing their

34

coercive interrogations and torture tactics, *inter alia*, by exposing rather than covering-up this conduct, and by investigating, prosecuting, removing or otherwise disciplining the torturers and their supervisors when they first learned of their criminal conduct in 1982, before Plaintiff's arrest, and on numerous occasions subsequent thereto, despite having the opportunity and duty to do so, thereby constituting a failure to intervene and prevent Plaintiff's torture and abuse.

117.    The actions of the Defendants, individually, jointly and in conspiracy, in torturing and physically abusing Plaintiff, threatening to inflict further torture and physical abuse, and/or failing to stop or prevent Plaintiff's torture and abuse while having the opportunity and duty to do so, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, and Martin for compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT IV
### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

118.    Plaintiff re-alleges all of the preceding paragraphs 1-117, and incorporates them in this count.

119.    The actions of Defendants Burge, Byrne, and Dignan, individually, jointly, and in conspiracy, in coercively interrogating Plaintiff, and in using torture techniques which "shock the conscience" during Plaintiff's interrogation, resulted in false, coerced, and

35

fabricated admissions, and violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law.

120.    The actions of Defendants Burge, Byrne, and Dignan in using torture and other coercive techniques to interrogate Plaintiff, and/or in condoning and permitting the use of said techniques, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

121.    Defendants Daley and Martin had repeatedly failed to intervene to stop and prevent Defendants Burge, Byrne, Dignan and their co-conspirators from continuing their coercive interrogations and torture tactics, *inter alia*, by exposing rather than covering-up this conduct, and by investigating, prosecuting, removing or otherwise disciplining the torturers and their supervisors when they first learned of their criminal conduct in 1982 before Plaintiff's arrest, and on numerous occasions subsequent thereto.  These Defendants failed to intervene and prevent Plaintiff's torture, despite having the opportunity and duty to do so.

122.    The failure of Defendants Daley, Martin and their co-Defendants to intervene to stop Defendants Burge, Byrne, Dignan and their co-conspirators from continuing their coercive interrogations and torture tactics proximately caused Plaintiff's coercive interrogation by torture and his resultant injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, and Martin, for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT V
### (42 U.S.C. §§ 1985, 1986 Claim for Conspiracy)

123.     Plaintiff re-alleges all of the preceding paragraphs 1-122and incorporates them in this count.

124.     Defendants Daley, Burge, Byrne, Dignan, Lampkin, Martin, Shines, Needham, and Hillard, together with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit and the unconstitutional overt acts set forth in this Complaint.

125.     This conspiracy or conspiracies and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Plaintiff, who is African-American, and numerous other African American torture victims of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy. The Defendants named above also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment and 42 U.S.C. § 1985.

126.     Additionally or alternatively, Defendants Burge, Byrne, and Dignan, knowing that the above §1985 conspiracy to torture and wrongfully convict Plaintiff was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of that conspiracy, neglected and/or refused so to do, in violation of 42 U.S.C. § 1986.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from Defendants Daley, Burge, Byrne, Dignan, Lampkin, Martin, Shines, Needham, and Hillard, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and attorneys fees and whatever additional relief this Court deems equitable and just.

**COUNT VI**
**(42 U.S.C. § 1983 Monell Policy Claim against City of Chicago)**

127.     Plaintiff re-alleges all of the preceding paragraphs 1-126, and incorporates them in this count.

128.     The actions of Defendants Daley, Burge, Byrne, Dignan, and Martin as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago.

129.     At all times material to this complaint, Defendant City of Chicago, by and through its Police Department, Police Superintendents, Police Board, Mayors, City Council and/or the Corporation Counsel's Office had the following interrelated *de facto* policies, practices, and customs, which included, among others:

a)       conducting physically, psychologically or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain confessions and wrongful convictions, particularly the use of torture techniques under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3;

b)       manufacturing, fabricating, or using improper suggestive tactics to obtain false witness statements;

c)       filing false reports, and giving false statements and testimony about interrogations and confessions and fabricating or constructing parts or all of confessions; suppressing evidence concerning interrogations and confessions; pursuing and

38

obtaining wrongful prosecutions and false imprisonments on the basis of confessions obtained during these interrogations; denying suspects their right to full and fair access to the courts; and otherwise covering up the true nature of these interrogations and confessions particularly in circumstances where torture techniques were used by Area 2 and Area 3 detectives under the command and supervision, and with the active participation of Defendants Burge and Byrne;

d)      failing to videotape the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in a-b above;

e)      failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of torture and related abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercive questioning or interrogation of witnesses, suspects and arrestees, particularly persons who were tortured and or physically and/or psychologically abused during questioning. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the "repeater" Defendants Burge, Byrne, and Dignan, and all the other Area 2 and 3 detectives who were repeatedly accused of torturing and physically abusing suspects;

f)      perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above (*i.e.*, police torture and other unconstitutional and coercive interrogations at Area 2 and Area 3 under the command and supervision of Defendants Burge and Byrne), whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or to give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from internal discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have tortured or otherwise coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant, particularly in cases where torture techniques under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3, have been employed, most recently in the Government's investigation and prosecution of Jon Burge and the investigation of men under his command; and

g) covering up and suppressing evidence and findings, refusing to properly investigate, arrest and charge, continuing to finance Defendant Burge's defense and otherwise attempting to publicly and judicially defend his actions long after repeatedly acknowledging that he had committed repeated acts of torture, and after he had been indicted for lying about these acts, and otherwise obstructing justice in police torture cases, particularly those that arose at Area 2 and Area 3 under the supervision, and with the participation of, Defendant Burge.

130. The pattern and practice of torture and abuse at Area 2 and Area 3, the cover-up of that abuse and the wrongful prosecutions and convictions which resulted therefrom, were well known within Area 2 and Area 3 both before and after Plaintiff was tortured and wrongfully convicted, including by the command officers at Area 2, which included Defendants Burge and Martin, and Burge's successor, Phil Cline. This pattern and practice was also known to former Chicago Mayor Jane Byrne and to Defendant Daley (throughout his tenure as Mayor of Chicago) and to their respective Chiefs of Staff; to successive Police Superintendents, including Richard Brzeczek, Fred Rice, Defendant Martin, Matt Rodriguez, Defendant Hillard, and Phil Cline; to the successive OPS Directors, including Defendant Shines; to various Chicago Police Command Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke and Townsend; to Chiefs of Detectives, including William Hanhardt and Defendant Hillard; to the Chicago City Council and the Chicago Police Board, and to other policy making, command, and supervisory City and police personnel, some or all of whom participated in the cover-up and suppression of evidence, the wrongful prosecution and conviction of Plaintiff and other torture victims, and the denial of their full and fair access to the courts, *inter alia*, in the manner set forth in this complaint.

131. The interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; they encouraged, *inter alia*, the coercing of statements from suspects, witnesses and arrestees, by

torture and related abusive tactics and techniques, the construction and fabrication of confessions, admissions, statements, and other false witness evidence, the suppression and destruction of evidence of torture and other exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the State and Federal courts, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a direct and proximate cause of the unconstitutional acts committed by the named Defendants and their co-conspirators, and the injuries suffered by Plaintiff.

132. Additionally, the City of Chicago's failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel Defendants Burge, Byrne, Dignan, Martin, Shines, Hillard, and Needham was also done with deliberate indifference and likewise was a direct and proximate cause of the injuries to Plaintiff.

133. Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above by Chicago governmental and police policymakers, including, but not limited to, successive Police Superintendents, including Defendants Martin and Hillard, and their direct subordinates, including, but not limited to, Defendants Shines and Needham, and several Mayors, most notably Defendant Daley, who continues to deny his involvement in aid conduct to this day, establish that the constitutional violations alleged in this complaint were directly and proximately caused by the City of Chicago and its Police Department.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief

this Court finds equitable and just.

## COUNT VII
### (State Law Claim for False Arrest and False Imprisonment)

134.     Plaintiff re-alleges all of the preceding paragraphs 1-133, and incorporates them in this count.

135.     The arrest and imprisonment of Plaintiff, without probable cause, individually, jointly, and in conspiracy by Defendants Burge, Byrne, and Dignan, and its continuation by these Defendants, together with Defendants Daley, Lampkin, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, constituted the torts of false arrest and false imprisonment under Illinois law.

136.     Defendants' actions in arresting and imprisoning Plaintiff were willful and wanton.

WHEREFORE, Plaintiff demands compensatory damages against Defendants Daley, Burge, Byrne, Dignan, Lampkin, Martin, Shines, Hillard, and Needham, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, punitive damages, and such other and additional relief as this Court deems just and equitable.

## COUNT VIII
### (State Law Claim for Malicious Prosecution)

137.     Plaintiff re-alleges all of the preceding paragraphs 1-136, and incorporates them in this count.

138.     Defendants Burge, Byrne, and Dignan, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendants Daley, Lampkin, Martin, Shines, Hillard, and Needham,

individually, jointly, and in conspiracy, continued that prosecution without probable cause.

139.    The prosecution of Plaintiff was terminated in Plaintiff's favor.

140.    The Defendants' actions were done in a willful and wanton manner.

141.    The Defendants' actions directly and proximately caused the injury and damage to Plaintiff set forth above.

WHEREFORE, Plaintiff demands actual or compensatory damages against Defendants Daley, Burge, Byrne, Dignan, Lampkin, Martin, Shines, Hillard, and Needham, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, punitive damages, and such other and additional relief as this Court deems equitable and just.

## COUNT IX
### (State Law Claim for Intentional Infliction of Emotional Distress)

142.    Plaintiff re-alleges all of the preceding paragraphs 1-141, and incorporates them in this count.

143.    Defendants Daley, Burge, Byrne, Dignan, Lampkin, and Martin individually, jointly, and in conspiracy, engaged in extreme and outrageous conduct by, *inter alia*, torturing a false confession from Plaintiff and/or by failing to prevent or stop Plaintiff's torture, by constructing and fabricating the details of Plaintiff's confession, by admitting knowingly false testimony at his trial, manufacturing a witness against Plaintiff, and by procuring his prosecution, conviction, and 100 year sentence for a rape that he did not commit by means of Plaintiff's false confession, and other fabricated evidence.

144.    The Defendants named in the preceding paragraph, together with Defendants Hillard, Shines, and Needham, individually, jointly, and in conspiracy, engaged in additional

extreme and outrageous conduct by fabricating, coercing, and suppressing other evidence, by continuing Plaintiff's false imprisonment after procuring his wrongful conviction, by refusing to investigate or discipline the torturers, and by covering up all of their individual and conspiratorial actions as more fully alleged above in this Complaint.

145.    Defendants Daley, Burge, Byrne, Dignan, Lampkin, Martin, Shines, Needham, and Hillard intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

146.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was injured, and has experienced, and continues to experience, severe emotional distress, including nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression, and inability to focus or concentrate.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, Lampkin, Martin, Shines, Needham, and Hillard, for compensatory damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

## COUNT X
### (State Claim for Conspiracy)

147.    Plaintiff re-alleges all of the preceding paragraphs 1-146, and incorporates them in this count.

148.    Defendants Daley, Burge, Byrne, Dignan, Lampkin, Martin, Shines, Needham, and Hillard, with other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged and continue

to engage in a course of conduct, and otherwise jointly acted and/or conspired among and

between themselves to falsely imprison Plaintiff and/or to continue that imprisonment, to

maliciously prosecute Plaintiff and/or continue that prosecution, and to intentionally inflict

severe emotional distress on Plaintiff.

149.    In furtherance of this conspiracy or conspiracies, the Defendants named above,

together with their unsued co-conspirators, committed the overt acts set forth above.

150.    Said conspiracy or conspiracies were and are continuing in nature.

151.    Defendants' and their co-conspirators' overt acts, as set forth above, which were

committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute,

and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set

forth above.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from

Defendants Daley, Burge, Byrne, Dignan, Lampin, Martin, Shines, Needham, and Hillard, and,

because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff,

for punitive damages, plus the costs of this action and whatever additional relief this Court deems

equitable and just.

## COUNT XI
### (State Law Respondeat Superior Claim)

152.    Plaintiff re-alleges all of the preceding paragraphs 1-151, and incorporates them in

this count.

153.    Defendants Burge, Byrne, Dignan, Martin, Shines, Needham, and

Hillard were, at all times material to this complaint, employees of the Defendant City of Chicago;

were acting within the scope of their employment; and their acts, which violated state law, are

45

directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

154.    Defendant Daley, at the times specified in the complaint, was an employee of the Defendant City of Chicago; was acting at these times within the scope of his employment as a City employee; and his acts, which violated state law, are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff demands judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiff's state law claims, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT XII
### (745 ILCS 10/9-102 and Common Law Claims Against the City, County and CCSAO)

155.    Plaintiff re-alleges all of the preceding paragraphs 1-154, and incorporates them in this count.

156.    Defendant City of Chicago was the employer of Defendants Burge, Byrne,Dignan, Martin, Shines, Needham, and Hillard at all times relevant and material to this complaint.

157.    These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

158.    Additionally, Defendant City of Chicago was the employer of Defendant Daley at the times so specified in this complaint. Defendant Daley committed the acts alleged above under color of law and, during his employment with the City, in the scope of his employment as an employee of the City of Chicago.

159.    Defendant Cook County and the Cook County State's Attorneys Office was at all times material to this complaint the employer of Defendant Lampkin; additionally it was the

employer of Defendant Daley while he was State's Attorney of Cook County. Cook County is therefore responsible for any judgment entered against Defendant Lampkin and for any judgment entered against Defendant Daley for acts committed by him during said employment with the County, making the County a necessary party to this complaint. Defendants Lampkin and Daley committed the acts alleged above under color of law and, when so employed, in the scope of their employment as employees of Cook County and its Cook County State's Attorneys Office.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to law, demands judgment against the Defendants City of Chicago, Cook County and its Cook County State's Attorneys Office, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

Dated: August 4, 2014.

Respectfully submitted,

STANLEY WRICE
By: /s/ Jennifer Bonjean
One of his attorneys
Bonjean Law Group LLC
142 Joralemon Street, Suite 5A
Brooklyn, New York 11201
Tel: 917-566-3926
jenniferbonjean@gmail.com

**Plaintiff demands trial by jury on all counts.**