FILED
10/16/2015
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STANLEY WRICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No.   14 C 5934 |
| -vs- | ) |
| | ) |
| JON BURGE, former Chicago Police Lieutenant; JOHN | ) The Hon. Elaine E. Bucklo |
| BYRNE, former Chicago Police Sergeant; PETER | ) |
| DIGNAN, former Chicago Police Detective; the Estate of | ) |
| LEROY MARTIN, former Superintendent of the Chicago | ) |
| Police Department; and the CITY OF CHICAGO. | ) |
| | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

Plaintiff  STANLEY WRICE, for his complaint against JON BURGE, former Chicago Police Lieutenant; JOHN BYRNE, former Chicago Police Sergeant; PETER DIGNAN, former Chicago Police Detective; the Estate of  LEROY MARTIN, former Superintendent of the Chicago Police Department; and the CITY OF CHICAGO, alleges as follows:

## I.  INTRODUCTION

1. Plaintiff Stanley Wrice spent 31 years, three months, and two days in prison for a crime that he did not commit.  Plaintiff was wrongfully convicted in 1983 of the rape and deviate sexual assault of K.B. and sentenced to 100 years imprisonment.  Plaintiff was charged with the offenses after two notorious Area 2 police officers – Sergeant John Byrne and Detective Peter Dignan – acting under the direct supervision of disgraced former Chicago Police Commander Jon Burge (a convicted perjurer) sadistically tortured him into making a false confession that was admitted against him at his 1983 trial.  Additionally, those same two Burge henchmen Byrne and Dignan physically tortured Bobby Joe Williams, one of Plaintiff's co-arrestees, into falsely implicating Plaintiff.

2. The miscarriage of justice in Plaintiff's case was not an isolated occurrence.  Rather, it was part of a pattern of systemic torture and physical abuse of African American

1

suspects at the Area 2 and Area 3 police headquarters.  Plaintiff has consistently maintained his innocence and that he was tortured, and forced to implicate himself, by Defendants Byrne and Dignan, in the notorious basement of Area 2.

3.     Plaintiff seeks damages for the massive injuries inflicted upon him from the persons responsible for this egregious miscarriage of justice.

## II.  JURISDICTION AND VENUE

4.     This is a civil rights action brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1986 and the Constitution of the United States. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a). There is jurisdiction over Plaintiff's state law claims pursuant to the court's supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

5.     Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, formerly resided in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

## III.  PARTIES

6.     Plaintiff Stanley Wrice is a 61 year-old African-American man and citizen of Illinois and of the United States of America.

7.     Defendant Jon Burge was a duly appointed and sworn Chicago Police Lieutenant and  was, from 1982 to 1986, the commanding officer of Chicago Police Area 2 Detective Violent Crimes Unit. In 1988, Burge was appointed Commander of Area 3 Detective Division by Defendant Martin and held this assignment until 1991, when he was suspended and, ultimately, fired by the Chicago Police Department for the torture and abuse of Andrew Wilson. Defendant Burge engaged in a racially motivated pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives and supervisors under his command, including, but not limited to, the Police Officer Defendants named herein. Defendant Burge's wrongful actions took place in the course and scope of his employment. Burge was convicted in 2010 of perjury and obstruction of justice for lying about police torture at Area 2 during his tenure as Commander.  Plaintiff sues Defendant Burge his individual capacity.

8.     Defendant John Byrne was a duly appointed and sworn Chicago Police Sergeant

2

in the Chicago Police Area 2 Detective Violent Crimes Unit from 1982 to 1986, and the direct supervisor of Defendant Dignan. From 1988 to 1991, Defendant Byrne was a sergeant in the Violent Crimes Unit of Area 3 Detective Violent Crimes Unit, and the direct supervisor of Defendant Dignan. Defendant Byrne, like Defendant Burge, engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives, including the Police Officer Defendants named herein. Defendant Byrne engaged in the conduct complained of in the course and scope of his employment. Plaintiff sues Defendant Byrne in his individual capacity.

9. Defendant Peter Dignan was a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at the Area 2 Violent Crimes Unit under Defendant Burge's command who engaged in a pattern and practice of torture and brutality himself, and engaged in the conduct complained of in the course and scope of his employment. Plaintiff sues Defendant Dignan in his individual capacity.

10. From 1987 to 1992, Defendant Leroy Martin was the Superintendent of Police for the City of Chicago, and was responsible for the policies, practices, and customs complained of herein. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity. In 1983, he was Commander of the Area 2 Detective Division and was Defendant Burge's direct supervisor, and command supervisor of Defendant Byrne.

11. Defendant City of Chicago is an Illinois municipal corporation, and as such is responsible for the policies, practices, and customs of the Chicago Police Department, its Office of Professional Standards, its Personnel Division, its Detective Division, and its Superintendent of Police, as well as those of the Mayor, his Office, and his City Council, the Corporation Counsel and its Office, and the Chicago Police Board. The City of Chicago is and/or was the employer of each of the Defendant Officers and Police and other city governmental officials at all material times to this complaint. The City of Chicago is responsible for the acts of the Defendant Officers and Defendant police and other city governmental officials while employed by the City of Chicago and while acting within the scope of their employment.

12. At all times relevant to this action, each of the named individual defendants acted in the scope of his employment, and under the color of the laws, regulations, and customs of the

State of Illinois. Each Defendant's actions constituted "state action" as defined under federal law. Each defendant is sued in his individual capacity.

## IV.  FACTUAL ALLEGATIONS

13.     In the early morning hours of September 9, 1982, 33-year-old K.B., a Caucasian woman, was sexually assaulted and burned over a two hour period in the attic of the Wrice home that Plaintiff shared with his brother Charles Wrice, sister Patricia Wrice, and Patricia's boyfriend, Bobby Joe Williams.  K.B. was brought to the Wrice home, with her consent, by co-defendant Rodney Benson, to drink alcohol.  Benson knew K.B..  Plaintiff, Williams, Charles Wrice, Benson, Lee Holmes, and Michael Fowler, all Africa-American men, were arrested on September 9, 1982 for the assault, interrogated by Defendants Byrne and Dignan, which each beaten by the Defendant Officers during the course of their interviews.  Plaintiff, Benson, Holmes, and Fowler were charged on September 10, 1982, with K.B.'s assault after they each made inculpatory statements about their participation in the offenses.  Co-arrestee Bobby Joe Williams was identified by Chicago Police Sergeant Elbert Harris as being in K.B.'s presence earlier in the evening,  but he was not charged with the offenses.

### *Plaintiff's Interrogation and Police Torture.*

14.     Prior to trial, in April of 1983, Plaintiff moved to suppress inculpatory statements he allegedly made to Defendants Byrne and Dignan and to Assistant State's Attorney Kenneth McCurry because the statements were made as a result of psychological, physical and mental coercion by the Defendant Officers.

15.     At the suppression hearing, Plaintiff testified that, after his arrest, he was taken to Area 2 Headquarters and placed in a second-floor room, where he was handcuffed to a ring on the wall.  Defendants Byrne and Dignan questioned him about what had happened at his house. Plaintiff gave a statement that he was not present during K.B.'s assault and did not participate in the offenses.  Defendants Byrne and Dignan had interviewed K.B. at the hospital prior and knew all of the specific details of K.B.'s assault before interrogating Plaintiff.  Defendants Byrne and Dignan knew that K.B. could not identify her attackers.  The Officers also knew that Bobby Joe Williams – not Plaintiff – had been identified by Chicago Police Sergeant Elbert Harris as being in K.B.'s presence before the attack.

4

16.    Defendant Dignan freed Plaintiff from the wall ring and told him that he (Defendant Dignan) was fixing to do some police brutality.  Plaintiff was then taken to a room on a lower floor of Area 2 that had bars in it, and what appeared to be cells.  Upon questioning by Defendant Byrne, Plaintiff repeated what he had told Defendant Byrne and Defendant Dignan upstairs.  Plaintiff again told Defendants Byrne and Dignan that he was not present for K.B.'s assault and did not assault her.

17.    Defendant Byrne sat Plaintiff in a chair that was adjacent to a table and told Plaintiff that he was lying when he said that he did not assault K.B., and hit him in the forehead with a flashlight that was 15 to 16 inches long.  Defendant Dignan then struck Plaintiff across his right thigh with a piece of rubber, approximately 12 to 13 inches long, which was taped on both ends.  Defendant Byrne and Defendant Dignan continued to question Plaintiff, striking him at random on his arms and thighs.  Defendant Byrne told Plaintiff that they were about to return back upstairs; if he found out that Plaintiff was lying, he could expect the same thing.

18.    Sometime after returning upstairs, Defendant Byrne and Defendant Dignan took Plaintiff back downstairs, where Defendant Dignan struck him with a piece of rubber across his left thigh and his left arm, and Defendant Byrne repeatedly struck him with a flashlight on his right arm and once in his chest.  The Defendant Officers repeatedly called Plaintiff "nigger."

19.    Plaintiff tried to move his arm, and Defendant Byrne made Plaintiff stand up. Defendant Byrne grabbed Plaintiff's hands and turned him around with his head facing the bars of a jail cell, handcuffed Plaintiff's arms above his head to the bars of the cell, and kicked Plaintiff's legs apart.  Defendant Byrne told Plaintiff that he was going show Plaintiff how it feels to be mistreated.  Defendant Byrne hit Plaintiff repeatedly between his legs, and in his groin, with the flashlight.  While Defendant Byrne hit Plaintiff in the groin area, Defendant Dignan hit Plaintiff between the legs in the groin with a piece of rubber. Plaintiff's legs buckled from the beating and he was dangling by his handcuffed arms during the blows. The Defendant Officers repeatedly called him racial slurs.

20.    During the beating, Defendants Byrne and Dignan told Plaintiff to tell the State's Attorney that he assaulted K.B.  Defendants Byrne and Dignan, aware that Plaintiff did not assault K.B., fed Plaintiff relevant facts about the assault – which they had learned from K.B. – to

5

bolster Plaintiff's false confession. K.B. stated that she was assaulted by three men, but could not identify the men. Co-arrestee Bobby Joe Williams was identified by Chicago Police Sergeant Elbert Harris as being in K.B.'s presence earlier in the evening.

21. Plaintiff was then taken back upstairs by Defendants Byrne and Dignan so that he could speak to ASA McCurry and falsely confess to K.B.'s assault. During Plaintiff's 20–minute conversation with ASA McCurry, Defendant Dignan, along with another officer, never left the interrogation room. Defendant Dignan remained with Plaintiff while he was being questioned by ASA McCurry to ensure that Plaintiff would falsely tell the State's Attorney that he committed the offense. During this interview, Plaintiff was not advised his constitutional right to an attorney or to remain silent and ASA McCurry never asked Plaintiff if his confession was voluntary and never inquired if Plaintiff was treated fairly by the interrogating officers.

22. Plaintiff only confessed to ASA McCurry because he was afraid of Defendants Byrne and Dignan and because he believed that they would continue to beat him until he falsely confessed to the crimes. Plaintiff repeated the false story of his involvement in K.B.'s assault to the State's Attorney even though he had no personal knowledge of what happened to K.B. since he was not present for her assault and did not assault K.B.

23. Plaintiff presented medical testimony at his suppression hearing to corroborate his claim that he was tortured by Defendants Byrne and Dignan. Karem Ali Abdal–Aziz ("Alhazi') was a paramedic responsible for giving new inmates at the Cook County jail complete physical examinations and examined Plaintiff on September 10, 1982.

24. According to Alhazi's written report, Plaintiff advised him of several injuries that occurred the day before. Alhazi personally observed, and noted on the intake sheet, that Plaintiff had multiple bruises on his right shoulder, left and right biceps, breastbone, right hand, and an injury to the left side of his skull. Alhazi stated that Plaintiff had so many bruises on his upper body that he could not mark them all on the intake sheet. Alhazi concluded that multiple blunt trauma caused Plaintiff's injuries.

25. Dr. Stanley Harper, a physician with Cermak Health Services examined Plaintiff on September 15, 1982. Plaintiff reported that he had been beaten across his back, hands and legs with a flashlight and billy club by Chicago police one week earlier. He complained of pain

in the groin, blood in his urine 24 to 48 hours after the beating, and burning or pain on urination. Dr. Harper noted multiple healing hematomas on defendant's left anterior leg. Dr. Harper's assessment, or clinical impression, was history of multiple blunt trauma.

26.     Chicago Police Lieutenant John Crane testified that there was a lower at Area 2 that contained two abandoned jail cells adjacent to the garage on the first floor.  The area could be accessed by going down the stairs from the second floor, then proceeding first through a wooden door, which was unlocked, and then a steel door, which was locked. Lieutenant Crane testified that the key to the metal door was kept behind the front desk on the first floor, which itself was behind a locked door.

27.     At the suppression hearing, Defendants Byrne and Dignan Dignan testified falsely regarding the events of Plaintiff's September 9, 1982 arrest and interrogation.

28.     Defendants Byrne and Dignan denied striking Plaintiff, hitting him with a flashlight or billy-club, threatening him, or abusing him in any manner.  Defendants Byrne and Dignan falsely stated that there was not an interrogation room in the basement of Area 2.

29.     Assistant State's Attorney McCurry stated that Plaintiff gave an oral unrecorded statement implicating himself in the offenses.  Defendant Dignan was in the room the entire time that Plaintiff was speaking to McCurry.  ASA McCurry did not ask Plaintiff if his statements were free of coercion.  McCurry did not memorialize Plaintiff's statement.

30.     Defendants Byrne and Dignan were not was confronted with other acts of similar torture and abuse that they had previously committed against other suspects while working in the Area 2 Violent Crimes Unit under Defendant Burge's supervision – specifically they were not asked about the February 1982 torture of Andrew Wilson.  This evidence had been suppressed and covered up by the Defendants.  No evidence or findings regarding the systemic Area 2 torture and abuse was available to or offered to Plaintiff.

31.     Despite the fact that he and two medical professionals testified regarding the physical beating and injuries Plaintiff received during his interrogation, the trial court found Defendants Byrne and Dignan "credible" in their denials of physically beating Plaintiff, and denied Plaintiff's motion to suppress his confession.

### *Plaintiff's Wrongful Conviction Based on His Coerced Confession, Manufactured Evidence, and Perjured Testimony .*

32.     The facts at the May 1983 trial established that at around 1:00 a.m. on September 9, 1982, K.B., who was intoxicated, got into a car driven by co-defendant Benson to get some more alcohol. Benson, who knew K.B., drove her to the Wrice family home at 76th and Chappel in Chicago, a known "party home."  Co-defendants Benson, Holmes, and Fowler were all in the same gang.  Benson, with permission from Williams, took K.B. upstairs to one section of the attic.  In the attic, K.B. said that three men sexually assaulted her and she was burned.  She was led outside around a few hours later and was taken to the hospital. K.B. could not identify the men who assaulted her.  No physical evidence connected Plaintiff to the assault.

33.     Plaintiff's false admissions, which were physically coerced, constructed and manufactured by the Defendant Officers, were presented to the prosecuting attorneys who relied upon and presented this false, coerced, and manufactured evidence throughout Plaintiff's prosecution.  Defendants Byrne and Dignan fed Plaintiff details of the offenses to falsely implicate himself since the Defendant Officers had interviewed K.B. prior to interrogating Plaintiff, and knew the details of her assault.  Defendant Byrne falsely testified at Plaintiff's trial that Plaintiff implicated himself in the offenses and falsely testified that he did not beat Plaintiff or coerce him to provide a statement. ASA McCurry testified that Plaintiff confessed to K.B.'s assault and that he was not aware that Plaintiff was beaten by the Defendant Officers.

34.     Plaintiff testified at his trial that he was innocent. Plaintiff stated that he feared for his life during the beatings by Defendants Byrne and Dignan. Plaintiff did not recall falsely confessing to the crimes, but as a result of the torture he suffered at the hands of the Defendants Byrne and Dignan, and in fear of further beatings, he gave a false confession to ASA McCurry. Defendants Bryne and Dignan told Plaintiff what to say and to admit to assaulting K.B.  Plaintiff had no personal knowledge of K.B.'s assault and was fed the facts of the crime by Defendants Byrne and Dignan and was physically forced to falsely implicate himself in K.B.'s assault.

35.     Plaintiff testified that although he was aware that Bobby Joe Williams' friends, who were frequent guests to the shared Wrice house, were upstairs drinking and using drugs, he was not aware that K.B. was being assaulted and took no part in the offenses.  Plaintiff left the

house to call his fiancee, and when he returned, he fell asleep on the couch until he was awoken by loud noises. Plaintiff went upstairs and told everyone to leave.

36. Other than Plaintiff's physically coerced confession, the other evidence implicating Plaintiff in the offenses were the testimonies of State witnesses Kenny Lewis and Bobby Joe Williams. Lewis was not listed on the police arrest reports as being in the Wrice home during K.B.'s assault and no witness placed him in the house that night. Defendants Byrne and Dignan did not investigate or interview Lewis at any time, and had no knowledge when they arrested Plaintiff for K.B.'s assault that Lewis was present during the crime. Lewis, who was a friend of K.B. and her boyfriend, was discovered by Assistant State's Attorney Bertina Lampkin five days before Plaintiff's trial. Lewis stated that he saw Plaintiff strike and burn K.B. Lewis did not testify that he saw Plaintiff sexually assault K.B. Mr. Lewis died in 1997 and was never interviewed after Plaintiff's 1983 trial about his testimony.

37. Bobby Joe Williams perjured himself at Plaintiff's 1983 trial when he implicated Plaintiff in the offenses. Williams testified that he saw Plaintiff have sex with K.B. and that Plaintiff told him that he burned K.B. Unbeknownst to Plaintiff until 2011, on September 9, 1982, when Williams was arrested for K.B.'s assault he was beaten by Defendants Byrne and Dignan during his interrogation and forced to implicate Plaintiff in K.B.'s assault.

38. Mr. Williams' statements and subsequent testimony were the product of the beating that he suffered at the hands of Defendants Byrne and Dignan. Mr. Williams was brought to Area 2 as a suspect in K.B.'s assault and beaten by Defendants Byrne and Dignan. Mr. Williams was the only suspect actually identified by a Chicago police officer as being in K.B.'s company before her assault. Defendants Byrne and Dignan had interviewed K.B. before interrogating Mr. Williams and knew the facts of her assault before Mr. Williams' coerced interrogation. Mr. Williams denied his and Plaintiff's involvement in K.B.'s assault, but the Defendant Officers continued to beat him until he gave a false statement implicating Plaintiff in the crime. Mr. Williams was forced by Defendants Byrne and Dignan to tell the State's Attorney that he saw Plaintiff sexually assault K.B.. Mr. Williams was in fear of further beatings and of being charged with the crimes if he did not subsequently falsely testify to seeing Plaintiff assault K.B. at Plaintiff's 1983 trial.

39.     Plaintiff was convicted in May of 1983 of the rape and deviate sexual assault of K.B. Plaintiff was sentenced to 100 years in prison.

40.     Six months after Plaintiff's trial, ASA Lampkin arranged for Benson and Holmes to plead guilty to the aggravated battery of K.B. in exchange for a sentence of 30 months' probation.  Fowler pled guilty to the aggravated battery of K.B. in exchange for a four-year sentence.

41.     Defendants Burge, Byrne, Dignan**,** and Martin conspired to and suppressed from the prosecutors who prosecuted Plaintiff, from the judges and juries who heard Plaintiff's motion to suppress and his trial, and from the prosecutors and judges who prosecuted and heard Plaintiff's appeals and post-conviction proceedings, that the admissions attributed to him, and the statements from Bobby Joe Williams inculpating Plaintiff, were false and unreliable, coerced through torture, constructed and manufactured by such Defendants and were the product of a pattern and practice of torture and abuse which they commanded, supervised, and implemented. Additionally, the Defendants suppressed, committed perjury about, and hid or destroyed the physical implements of this pattern and practice of torture.

### *The Conspiracy to Torture and Abuse Suspects at Area 2 and Area 3 Police Headquarters and to Conceal and Cover-Up the Torture and Abuse.*

42.     Plaintiff's torture and abuse was not an isolated incident of individual police officer brutality and misconduct. Rather, the interrogation and torture of Plaintiff in pursuit of a confession which was wholly constructed by the Police Officer Defendants and fed to him after he was broken, was part of a long-standing pattern and practice of similar acts of racially motivated torture committed against African American men under the supervision, and with the encouragement, participation and ratification of Defendants Burge and Byrne.  Defendants Burge and Byrne supervised, encouraged, participated in, failed to prevent, and ratified the abuse of Plaintiff by the other Police Officer Defendant, as alleged above, as part of this pattern and practice.

43.     The earliest known torture in this pattern occurred on or about May 29, 1973, when Defendant Burge, then a detective on the Area 2 midnight shift, tortured African American suspect Anthony Holmes, using an electric shock box, suffocation, beating and racial epithets.

10

43.    The Chicago Police Department took no action to punish or restrain defendant Burge at that time. Over the next decade, Burge and other Area 2 detectives tortured many African American suspects, including Lawrence Poree, George Powell, Tony Thompson, Willie Porch, Ollie Hammonds, Derrick King, Michael Coleman, Sylvester Green, and Melvin Jones.

44.    In February 1982, the Superintendent of the Chicago Police Department, Richard Brzeczek, and the Mayor of the City of Chicago, Jane Byrne, placed Defendant Burge in charge of a manhunt for the killers of two white Chicago Police officers. In the course of that manhunt, Burge and other Area 2 detectives tortured a number of African American citizens, including Donald White, Roy Brown, Walter Johnson, Paul Mike, Alphonso Pinex, and Larry Milan, and abused and terrorized a large number of other African American citizens.

45.    On February 14, 1982, Defendant Burge and numerous Area 2 detectives arrested Andrew Wilson for the police officer murders. Throughout that day, Burge and other Area 2 detectives tortured Wilson, using the following techniques, among others: electric-shocking on the genitals, ears and other parts of the body with a black box and a second plug in electrical device; suffocating with a plastic bag; burning on a radiator; and beating. As fully set forth below, Defendant Leroy Martin, the then-Superintendent of the Chicago Police Department, closely monitored developments in the manhunt.  Defendant Martin learned of the widespread abuse during the manhunt, including the torture and abuse of Andrew Wilson and did nothing to prevent or stop that torture and abuse or to discipline, investigate, or otherwise bring to justice Burge and the other detectives who perpetrated it.

46.    As a direct and proximate result of the failure of Defendant Martin (who became Superintendent of the Chicago Police Department in 1987) to intervene, to discipline and to supervise, Defendants Burge, Byrne, Dignan and other Area 2 Detectives tortured numerous other African American suspects with electric shock, baggings, and beatings, often while using racial epithets, in the period following Wilson's torture in February of 1982, including African American men: Shadeed Mumin, Michael Johnson, Lee Holmes, Rodney Benson, Eric Smith, Alonzo Smith, James Andrews, Reginald Mahaffey, Jerry Mahaffey, Gregory Banks, David Bates, Darrell Cannon, Leonard Hinton, Eric Smith, Leroy Orange, Leonard Kidd, Philip Adkins, Robert Billingsley, Stanley Howard, Alphonso Pinex, Thomas Craft, Lavert Jones, Lonza

11

Holmes, Aaron Patterson, Madison Hobley, Michael Tillman, and Stephen Bell.

47.     The Police Officer Defendants also suppressed from Plaintiff and his counsel; the trial, appellate and post-conviction prosecutors; and the jurors and judges in Plaintiff's criminal proceeding, all of the facts regarding this extensive pattern of abuse and torture of African American men.

### Defendant Martin's Failure to Intervene and Concealment of Exculpatory Evidence is a Proximate Cause of Plaintiff's Unjust Incarceration.

48.     In January 1983, Defendant Martin becomes Commander of Area 2 and served as Defendant Burge's direct supervisor and in charge of Defendants Byrne and Dignan. During the year that Martin holds the post, numerous African American suspects are tortured at Area 2 under Burge's direction and supervision by Defendants Byrne and Dignan, and other Area 2 detectives, including Eric Smith (January 1983), Alonzo Smith (January 1983) and James Andrews (April 1983).  Defendant Martin failed to initiate appropriate investigations or to discipline Burge in connection with any of these cases.

49.     On information and belief, Defendant Martin would have known about the police torture allegations against Defendants Byrne and Dignan made by Plaintiff and Plaintiff's co-defendants Lee Holmes, Rodney Benson, and Michael Fowler. Plaintiff and his co-defendants each moved to suppress their inculpatory statements in late April/early May of 1983 and each alleged that on September 9 or 10, 1982, they were taken to the basement of Area 2 by Defendants Byrne and Dignan and beaten in order to secure their confessions. Defendant Martin failed to initiate appropriate investigations or to discipline Defendants Byrne and Dignan in connection with Plaintiff's case or Plaintiff's co-defendants' cases.

50.     In 1987, Martin was named Superintendent of the Chicago Police Department, a position that he continued to hold until 1992.  As Superintendent, possessing direct knowledge of Burge's practices from his time as Area 2 commander, Defendant Martin continued to fail to intervene, to supervise, discipline or otherwise act to prevent the ongoing misconduct of Burge and his men. Defendant Martin worked actively to conceal and suppress evidence of the pattern of torture, as is fully alleged in below.

51.     The actions and inactions of Defendant Martin during the period from 1983

12

through 1992, in refusing and failing to investigate the actions of Defendant Burge and his confederates and in suppressing the exculpatory evidence in his possession proximately caused Plaintiff's unjust incarceration.

***The Actions and Inactions of Defendant Martin and the Officer Defendants to Conceal and Cover Up the Pattern of Torture under Burge Frustrated Plaintiff's Efforts to Exonerate Himself and Prolonged Plaintiff's Unjust Incarceration.***

52.     Following his conviction and 100 year sentence in 1983, Plaintiff languished in prison until December 12, 2013, until Cook County Judge Richard Walsh granted Plaintiff a new trial, finding that Defendants Byrne and Dignan committed perjury when they testified in 1983 that they did not beat Plaintiff to secure his inculpatory statement and after ruling that the Cook County State's Attorneys Office and the City of Chicago were responsible for the conduct of Defendants Byrne and Dignan and that the evidence of police torture practices should have been disclosed to Plaintiff.

53.     The Cook County Special Prosecutor dismissed all charges against Plaintiff due to a lack of any reliable evidence of Plaintiff's guilt.  Illinois law specifically provides that the State may admit the prior sworn testimony of a deceased witness at a defendant's retrial.  Thus, the State could have proceeded to retrial on Plaintiff's case, and admitted the prior sworn testimony of deceased witness Kenny Lewis to seek a conviction, but the State forwent a retrial due to the impossibility of a conviction given that Plaintiff's false confession was suppressed and that Bobby Joe Williams fully recanted his prior perjured testimony implicating Plaintiff.

54.     Plaintiff's wrongful prosecution was continued, his exoneration was delayed and his imprisonment lasted far longer than it otherwise would have because, for many years, Defendant Martin, in conspiracy with the Police Officer Defendants, continued to make extraordinary efforts to suppress, conceal, and discredit exculpatory evidence regarding the pattern of torture and physical abuse of African American men by Chicago Police detectives under Burge's command.  The Defendants, acting together, formed a conspiracy with the knowledge and purpose of depriving Plaintiff, who is African-American, and numerous other African-American torture victims of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy.

13

55.     Rather than disclose exculpatory material and conduct appropriate investigations, Defendant Martin and the other co-conspirator Officer Defendants caused the Chicago Police Department to actively conceal and suppress information regarding the scope and extent of the torture and abuse of African American suspects that occurred under Burge. Their actions in this regard included, but are not limited to those alleged below.

56.     In 1990 a report (hereinafter, the "Goldston Report") was prepared by Chicago Police OPS investigator Michael Goldston, which found that there was systemic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it. In November of 1991, the Goldston Report was supplemented with a finding that Defendants Burge, Byrne, and Dignan were the prime movers in this pattern of abuse and that they and two other Area 2 detectives had tortured Andrew Wilson. In a companion Report (the Sanders Report) the OPS found that Burge and two of his men tortured Andrew Wilson and recommended that they be fired.

57.     The Goldston Report, and the information it contained, was highly exculpatory for Plaintiff, who was tortured just seven months after Wilson, and who filed his first post-conviction petition in April of 1991, claiming that his conviction was the product of police torture at the hands of Defendants Byrne and Dignan and requesting a new trial. Defendant Martin delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, *inter alia*, by suppressing the findings that Wilson was tortured and by refusing to suspend, transfer or remove Burge either before, or for nearly a year after, the Goldston Report's findings were first made known to them in November of 1990.

58.     Defendant Martin further delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, findings and conclusions set forth above, *inter alia*, by suppressing the findings that Wilson was tortured here was systematic abuse at Area 2, which implicated Defendants Martin, Burge, Byrne, Dignan, and other Area 2 detectives who worked under Burge's command.

59.     The Goldston Report and its findings were not publicly released until February 7,

14

1992, when Federal District Judge Milton I. Shadur ordered the release. Even after learning of the findings in the Goldston Report, Defendant Martin, in violation of police regulations, refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock and abuse made by electric shock victim Melvin Jones against Defendant Burge.

60.     From 1989 to 1992, Defendant Martin, and his command subordinates, through several public hearings held by the Chicago City Council and the Chicago Police Board, and a report by Amnesty International, were given additional actual notice that Defendant Burge was the leader of a group of Chicago detectives that systematically tortured and abused African American suspects in order to obtain confessions in serious felony cases.

61.     In January of 1992, Defendant Martin admitted in a publicly filed pleading that there was an "astounding pattern or plan" on part of Burge and his confederates "to torture certain suspects, often with substantial criminal records, into confessing to crimes."

62.     In February 1993, the Chicago Police Board fired Defendant Burge for torturing Andrew Wilson. These findings became final in December 1995.

63.     In 1993 the OPS re-opened investigations into approximately 10 Area 2 torture cases. After an exhaustive re-investigation, which uncovered substantial new evidence in support of the allegations, OPS investigator Veronica Tillman sustained numerous allegations that Defendants Byrne and Dignan racially abused Darrell Cannon and tortured him with a cattle prod. OPS supervisor Carmen Christia reviewed the findings and approved them.

64.     The OPS also entered sustained findings of torture and abuse against Defendants Byrne and Dignan in five other re-opened cases in 1993 and 1994, including in that of Plaintiff's co-defendant Lee Holmes' case finding that Holmes was tortured by Byrne and Dignan on September 9, 1982 during his interrogation for K.B.'s assault.

### Defendants Byrne and Dignan's Concealment of Exculpatory Evidence And Subordination of Perjury is the Proximate Cause of Plaintiff's Wrongful Conviction and Unjust Incarceration.

65.     Mr. Williams was a suspect in K.B.'s assault and was interrogated and beaten by Defendants Byrne and Dignan on September 9, 1982 at Area 2. Mr. Williams was put in a room on the second floor of Area 2 and handcuffed to a chair. Chicago Police Sergeant Elbert Harris

15

had identified Williams as being seen in K.B.'s company before her assault.

66.     Defendants Byrne and Dignan repeatedly hit Mr. Williams on his legs and in his groin with a black rubber object.  Defendants Byrne and Dignan told Mr. Williams the false story that Mr. Wrice assaulted K.B.. and demanded that Mr. Williams tell that story to the State's Attorney.  While Defendants Byrne and Dignan continued to beat Mr. Williams, they told him what to say to implicate Plaintiff.  Mr. Williams did not see Plaintiff assault K.B. and told Defendants Byrne and Dignan that he did not witness Plaintiff assault K.B.  Defendants Byrne and Dignan told Mr. Williams certain facts about the crime and beat him until be agreed to falsely implicate Plaintiff. Defendants Byrne and Dignan had interviewed K.B. prior to interrogating Williams and knew that she had not identified any of her attackers.

67.     When Mr. Williams finally agreed to falsely implicate Plaintiff in the offenses, Defendants Byrne and Dignan stopped beating him.  Mr. Williams gave a false statement to the State's Attorney inculpating Plaintiff in the offenses because he was afraid of continued beatings by the Officers and because they threatened to charge Mr. Williams with K.B.'s assault if he did not falsely state that Plaintiff sexually assaulted K.B.

68.     Mr. Williams testified falsely that Plaintiff assaulted K.B., because Defendants Byrne and Dignan beat him, ordered him to implicate Plaintiff, and because he was threatened with being charged with this crime.  Mr. Williams' testimony inculpating Plaintiff was critical to the State's case against Plaintiff and caused Plaintiff's wrongful conviction and incarceration.

69.     Defendants Byrne and Dignan failed to disclose that they beat Williams into giving a false statement inculpating Plaintiff and that they fed Williams the false story about Plaintiff's involvement for him to tell the State's Attorney.  Defendants Byrne and Dignan did not disclose that Mr. Williams stated prior to being tortured that did not see Plaintiff sexually assault K.B.  Defendants Byrne's and Dignan's failure to disclose that they beat and threatened Williams into falsely implicating Plaintiff was the proximate cause of Plaintiff's wrongful conviction and incarceration.

### *Plaintiff's Exoneration.*

70.     The concealment, obstruction and suppression of exculpatory information and continuing failure to investigate or discipline described above materially and significantly

continued the wrongful prosecution of Plaintiff, substantially delayed Plaintiff's exoneration, and caused Plaintiff to face many additional years of unjust incarceration that he would not have endured if the obstruction, suppression and concealment had not occurred.

71.     On December 9 and 10, 2013, an evidentiary hearing was held on Plaintiff's post-conviction claims.  On December 10, 2013, Judge Walsh granted Plaintiff's post-conviction petition, and ordered a new trial.  Judge Walsh suppressed Plaintiff's confession and found that the State was responsible and liable for the conduct and perjured testimonies of Defendants Byrne and Dignan.  Judge Walsh found that the Defendant Officers committed perjury in 1983 when they testified that they did not beat Plaintiff to coerce his confession.  Judge Walsh also found that the Defendant Officers tortured Bobby Joe Williams in order to secure his statements inculpating Plaintiff in K.B.'s assault, and that information of Defendant Officers torture practices should have been disclosed to the defense.

72.     On December 12, 2013, the State, through the Office of the Special Prosecutor Stuart A. Nudelman, dismissed all charges against Plaintiff asserting that due to the "unavailability of witnesses, witness recantations, and uncooperative witnesses," the State could meet its burden of proving Plaintiff's guilt beyond a reasonable doubt.  Illinois law allows for the prior sworn testimony of a deceased witness to be admitted as substantive evidence against a defendant at retrial.  State witness Kenny Lewis was a sworn witness Plaintiff's 1983 trial who was deceased in 1997.  Lewis testified that he saw Plaintiff hit and burn the K.B., but Lewis did not testify that he saw Mr. Wrice sexually assault K.B.  Had the State believed that the prior sworn testimony of Kenny Lewis was sufficient to convict Plaintiff of rape, the State could have retired Plaintiff with that evidence.  The State's refused to retry Plaintiff, and instead dismissed all charges, indicating Plaintiff's innocence.

### *The Defendants' Misconduct Was Committed in Furtherance of a Conspiracy.*

73.     All of the named individual Defendants, acting jointly and together reached an understanding, engaged in an ongoing course of conduct and joint action and otherwise conspired among and between themselves to deprive Plaintiff of his constitutional rights that continued through to his evidentiary hearing in 2013 where Defendants Byrne and Dignan testified at Plaintiff's evidentiary hearing, but refused to answer questions, invoking their rights against slf-

17

incrimination. By and through these overt acts set forth above, these Defendants deprived and continue to deprive Plaintiff of those rights, including his right to be free from unreasonable arrest and seizure, wrongful confinement and imprisonment; his right to be free from involuntary self-incrimination and from interrogation techniques that "shock the conscience;" his right to access to the courts and to a fair and impartial trial; and his right to equal protection of the law, all as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### *Plaintiff's Damages.*

74.     Plaintiff spent more than 31 years in prison for a crime he did not commit. This time was emotionally, physically, and psychologically grueling and dehumanizing. Plaintiff has suffered from constant fear and anxiety, deep depression, despair, rage, boredom and loneliness. Plaintiff also suffered from the loss of sustained contact with his children and grandchildren, and has been prevented from holding gainful employment or pursuing educational opportunities outside the prison walls. He continues to live under the effects of his isolation, incarceration, and depression. Additionally, Plaintiff continues to experience pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and post traumatic stress disorder from his torture and abuse and his years of wrongful incarceration.

### <u>COUNT I</u>
### (42 U.S.C. 1983 Claim for Deprivation of Right to Fair Trial and for Wrongful Conviction)

75.     Plaintiff re-alleges all of the preceding paragraphs, and incorporates them in this count.

76.     Defendants Burge, Byrne, Dignan, and Martin, individually, jointly, and in conspiracy, caused the wrongful charging, prosecution, conviction, and imprisonment of Plaintiff. Additionally, these same Defendants, individually, jointly, and in conspiracy, caused the continuation of that wrongful conviction.

77.     These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that the statements made by Bobby

Joe Williams implicating Plaintiff in the offenses were false and the product of torture at the hands of Defendants Byrne and Dignan. Defendants withheld from the prosecutors, Plaintiff, and the court that their abuse of Bobby Joe Williams was part of a pattern and practice of racially motivated police torture at Area 2, which they perpetrated and supervised; that they used implements of torture; and that they beat Bobby Joe Williams in order to obtain statements implicating Plaintiff. Plaintiff further alleges that this withheld exculpatory evidence was so exonerating that he would never have been convicted but for its suppression. Finally, he alleges that the suppression, fabrication, and coercion, together with the Defendants' deception and manipulation of the prosecution, violated Plaintiff's fundamental due process right to a fair trial, including his right to a fair hearing on his motion to suppress the inculpatory statements, a fair trial, and to fair post-trial proceedings.

78. Plaintiff is innocent of the crimes and was tortured by Defendants Byrne and Dignan to give a false inculpatory statement that was used against him at his trial which resulted in his wrongful conviction and incarceration for 31 years. Defendants Byrne and Dignan interviewed K.B. before Plaintiff's interrogation and thus knew the details of her assault and that she could not identify her attackers. So with the knowledge that Plaintiff was not involved in the assault, Defendants Byrne and Dignan fed him details of K.B.'s assault so that Plaintiff could falsely confess to State's Attorney McCurry.

79. There Defendants withheld from the prosecutors, Plaintiff, and the court the following information: (1) that their abuse of Plaintiff and Bobby Joe Williams was part of a pattern and practice of racially motivated police torture at Area 2, which they perpetrated and supervised; (2) that they used implements of torture; (3) that they tortured Plaintiff to in order to obtain a false inculpatory statements which they fed him during his torture; (4) that they beat Bobby Joe Williams in order to obtain statements falsely implicating Plaintifff and that they fed Williams details of the crime to falsely implicate Plaintiff ; (5) that Plaintiff's and Bobby Joe Williams' statements were false and that the Defendants knowingly fabricated these statements; and, (6) that they harbored an intent to frame Plaintiff.

80. Plaintiff further alleges that this withheld exculpatory evidence was so exonerating that he would never have been convicted but for its suppression. Plaintiff alleges

that the suppression, fabrication, and coercion, together with the Defendants' deception and manipulation of the prosecution, violated Plaintiff's fundamental due process right to a fair trial, including his right to a fair hearing on his motion to suppress the inculpatory statements, a fair trial, and to fair post-trial proceedings.

81.     Bobby Joe Williams' statements to the Defendant officers were false and the direct result of Byrne and Dignan beating and threatening him to secure evidence specifically against Plaintiff.  The Defendant Officers knew that Williams did not see Plaintiff assault K.B. but physically beat him so that he would implicate Plaintiff.  Williams' subsequent testimony at Plaintiff's trial was false and perjured, and based on his physically beaten statements to Defendants Byrne and Dignan.  Thus, Williams' statements to the police and resultant testimony were false and fabricated by these officers through beatings and torture in order to wrongfully convict and incarcerate Plaintiff.

82.     Plaintiff's and Bobby Joe Williams' statements to the police were false, totally unreliable, constructed, and coerced; by suppressing, destroying and preventing the discovery and development of additional exculpatory torture findings and evidence, as well as other exculpatory evidence; by giving a false and incomplete version of events to prosecutors; by writing false reports and giving false statements and testimony; by improperly influencing the judges hearing Plaintiff's case, *inter alia*, by making false public statements; by obstructing and improperly influencing investigations which would have led to discovery of exculpatory evidence; by suppressing and attempting to discredit findings of individual and systematic torture and abuse; and by the additional wrongdoing that is set forth above in this Complaint.

83.     These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts:  coercing, constructing and/or fabricating the false and totally unreliable inculpatory statements from Bobby Joe Williams, Plaintiff, and other witnesses, which formed the basis for Plaintiff's charging, prosecution and conviction;

84.     In engaging in the conduct described in the preceding paragraph, the Defendants named above thereby unconstitutionally deprived Plaintiff of his liberty and violated his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth

20

Amendment to the U.S. Constitution.

85.     Additionally and/or alternatively, the Defendants named above failed to intervene to stop Plaintiff's wrongful prosecution, conviction, and resulting imprisonment despite having the opportunity and duty to do so.

86.     The actions of the Defendants Burge, Byrne, Dignan, and Martin in depriving Plaintiff of his right to a fair trial and not to be wrongfully convicted and imprisoned, and additionally and/or alternatively, in failing to intervene to stop said violations, were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Burge, Byrne, Dignan, and Martin for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II
### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

87.     Plaintiff re-alleges all of the preceding paragraphs, and incorporates them into this count.

88.     The actions of Defendants Burge, Byrne, and Dignan, individually, jointly, and in conspiracy, in coercively interrogating Plaintiff, and in using torture techniques which "shock the conscience" during Plaintiff's interrogation, resulted in false, coerced, and fabricated admissions, and violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law.

89.     The actions of Defendants Burge, Byrne, and Dignan, in using torture and other coercive techniques to interrogate Plaintiff, and/or in condoning and permitting the use of said techniques, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

90.     Defendant Martin repeatedly failed to intervene to stop and prevent Defendants Burge, Byrne, and Dignan from continuing their coercive interrogations and torture tactics, *inter alia*, by exposing rather than covering-up this conduct, and by investigating,

21

prosecuting, removing or otherwise disciplining the torturers and their supervisors when they first learned of their criminal conduct in 1982 before Plaintiff's arrest, and on numerous occasions subsequent thereto. Defendant Martin failed to intervene and prevent Plaintiff's torture, despite having the opportunity and duty to do so.

91.     The failure of Defendant Martin to intervene to stop Defendants Burge, Byrne, Dignan from continuing their coercive interrogations and torture tactics proximately caused Plaintiff's coercive interrogation by torture and his resultant injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Burge, Byrne, Dignan, and Martin, for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT III
### (42 U.S.C. §§ 1985, 1986 Claim for Conspiracy)

92.     Plaintiff re-alleges all of the preceding paragraphs and incorporates them into this count.

93.     Prior to and following Plaintiff's conviction, Defendants Burge, Byrne, and Dignan acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to beat Plaintiff and then use his coerced confession to frame him for a crime he did not commit, thereby to depriving him of his constitutional rights, all as described in the various paragraphs of this Complaint. The Defendant Officers also beat and tortured Bobby Joe Williams in order to secure knowingly false statements implicating Plaintiff in the offenses so that these statements could be to be used to wrongfully convicted and incarcerate Plaintiff.

94.     In so doing, Defendants Byrne and Dignan along with co-conspirators Defendant Burge and Martin conspired to hide from Plaintiff evidence that would have supported his release and innocence, including information about Bobby Joe Williams' torture and false testimony as well as evidence that other African-American were tortured at Area 2 under the Commands of Defendants Burge and Martin. In addition, these co-conspirators agreed among

22

themselves to protect one another from liability for depriving Plaintiff of these rights.

95.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

96.     As described more fully above, each of the Defendants conspired, directly or indirectly, for the purpose of depriving Plaintiff of Equal Protection of the law.  In so doing, Defendants took actions in furtherance of this conspiracy, knowing that Plaintiff was innocent, causing injury to Plaintiff.

97.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

98.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs.

99.     This conspiracy or conspiracies and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Plaintiff, who is African-American, and numerous other African American torture victims of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy. The Defendants named above also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment and 42 U.S.C. § 1985.

100.     Additionally/alternatively, Defendants Burge, Byrne, Dignan, and Martin knowing that the above §1985 conspiracy to torture and wrongfully convict Plaintiff was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of that conspiracy, neglected and/or refused so to do, in violation of 42 U.S.C. § 1986.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from Defendants Burge, Byrne, Dignan, and Martin, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and attorneys fees and whatever additional relief this Court deems equitable and just

## COUNT IV
### (42 U.S.C. § 1983 *Monell* Policy Claim against City of Chicago)

101.    Plaintiff re-alleges all of the preceding paragraphs, and incorporates them into this count.

102.    The actions of Defendants Burge, Byrne, Dignan, and Martin as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago.

103.    At all times material to this complaint, Defendant City of Chicago, by and through its Police Department, Police Superintendents, Police Board, Mayors, City Council and/or the Corporation Counsel's Office had the following interrelated *de facto* policies, practices, and customs, which included, among others:

    a)    conducting physically, psychologically or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain confessions and wrongful convictions, particularly the use of torture techniques under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3;

    b)    manufacturing, fabricating, or using improper suggestive tactics to obtain false witness statements;

    c)    filing false reports, and giving false statements and testimony about interrogations and confessions and fabricating or constructing parts or all of confessions; suppressing evidence concerning interrogations and confessions; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions obtained during these interrogations; denying suspects their right to full and fair access to the courts; and otherwise covering up the true nature of these interrogations and confessions particularly in circumstances where torture techniques were used by Area 2 and Area 3 detectives under the command and supervision, and with the active participation of Defendants Burge and Byrne;

    d)    failing to videotape the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in a-b above;

    e)    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of torture and related abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or

24

improperly coercive questioning or interrogation of witnesses, suspects and arrestees, particularly persons who were tortured and or physically and/or psychologically abused during questioning. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the "repeater" Defendants Burge, Byrne, and Dignan, and all the other Area 2 and 3 detectives who were repeatedly accused of torturing and physically abusing suspects;

f)    perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above (*i.e.*, police torture and other unconstitutional and coercive interrogations at Area 2 and Area 3 under the command and supervision of Defendants Burge and Byrne), whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or to give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from internal discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have tortured or otherwise coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant, particularly in cases where torture techniques under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3, have been employed, most recently in the Government's investigation and prosecution of Jon Burge and the investigation of men under his command; and

g)    covering up and suppressing evidence and findings, refusing to properly investigate, arrest and charge, continuing to finance Defendant Burge's defense and otherwise attempting to publicly and judicially defend his actions long after repeatedly acknowledging that he had committed repeated acts of torture, and after he had been indicted for lying about these acts, and otherwise obstructing justice in police torture cases, particularly those that arose at Area 2 and Area 3 under the supervision, and with the participation of, Defendant Burge.

104.    The pattern and practice of torture and abuse at Area 2 and Area 3, the cover-up of that abuse and the wrongful prosecutions and convictions which resulted therefrom, were well known within Area 2 and Area 3 both before and after Plaintiff was tortured and wrongfully convicted, including by the command officers at Area 2, which included Defendants Burge and Martin, and Burge's successor, Phil Cline. This pattern and practice was also known to former Chicago Mayor Jane Byrne and to Mayor Daley and to their respective Chiefs of Staff; to

25

successive Police Superintendents, including Richard Brzeczek, Fred Rice, Defendant Martin, Matt Rodriguez, Terry Hillard, and Phil Cline; to the successive OPS Directors, including Gail Shines; to various Chicago Police Command Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke and Townsend; to Chiefs of Detectives, including William Hanhardt and Defendant Hillard; to the Chicago City Council and the Chicago Police Board, and to other policy making, command, and supervisory City and police personnel, some or all of whom participated in the cover-up and suppression of evidence, the wrongful prosecution and conviction of Plaintiff and other torture victims, and the denial of their full and fair access to the courts, *inter alia*, in the manner set forth in this complaint.

105.    The interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; they encouraged, *inter alia*, the coercing of statements from suspects, witnesses and arrestees, by torture and related abusive tactics and techniques, the construction and fabrication of confessions, admissions, statements, and other false witness evidence, the suppression and destruction of evidence of torture and other exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the State and Federal courts, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a direct and proximate cause of the unconstitutional acts committed by the named Defendants and their co-conspirators, and the injuries suffered by Plaintiff.

106.    Additionally, the City of Chicago's failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel Defendants Burge, Byrne, Dignan, and Martin, was also done with deliberate indifference and likewise was a direct and proximate cause of the injuries to Plaintiff.

107.    Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above by Chicago governmental and police policymakers, including, but not limited to, successive Police Superintendents, including Defendant Martin, establish that the constitutional violations alleged in this complaint were directly and proximately caused by the City of Chicago and its Police Department.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT V
### (State Law Claim for Malicious Prosecution)

108.     Plaintiff re-alleges all of the preceding paragraphs, and incorporates them in this count.

109.     Defendants Burge, Byrne, and Dignan, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendant Martin, individually, jointly, and in conspiracy, continued that prosecution and Plaintiff's wrongful conviction and incarceration without probable cause.

110.     Defendants Byrne and Dignan caused Plaintiff to be subjected to judicial proceedings for which they knew there was no probable cause.  These judicial proceedings were brought based Plaintiff's physically coerced confession.  Defendants Byrne and Dignan knew that Plaintiff did not participate in the offenses and knowingly forced Plaintiff to falsely confess to a crime he did not commit.  Defendants Byrne and Dignan also brought charges based on the statement of Bobby Joe Williams, who was physically coerced into falsely implicating Plaintiff in the crimes.  Defendants Byrne and Dignan, knowing that Mr. Williams did not witness Plaintiff assault K.B., told Mr. Williams that he would be charged with the crimes and continued to beat him until be agreed to falsely implicate Plaintiff in the offenses.

111.     Defendants Byrne and Dignan, with the approval of Defendants Burge and Martin, accused Plaintiff of sexually assaulting K.B., knowing those accusations to be false and without probable cause, and made these statements to prosecutors, exerting influence to institute and continue judicial proceedings against Plaintiff.

112.     Defendant Officers' statements regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and the product of physical and mental coercion. In so doing, Defendant Officers fabricated evidence and withheld exculpatory information.

113.     The prosecution of Plaintiff was terminated in Plaintiff's favor.  On December 10, 2013, Judge Walsh granted Plaintiff's post-conviction petition, and ordered a new trial.  On

December 12, 2013, the State dismissed all charges against Plaintiff asserting that due to the "unavailability of witnesses, witness recantations, and uncooperative witnesses," the State could meet its burden of proving Plaintiff's guilt beyond a reasonable doubt. Illinois law allows for the prior sworn testimony of a deceased witness to be admitted as substantive evidence against a defendant at retrial. Despite that the State could have retired Plaintiff and entered into evidence the prior sworn testimony of deceased witness Kenny Lewis, they did not do so, and instead dismissed all charges against Plaintiff. Lewis never saw Plaintiff sexually assault K.B., and thus his prior sworn testimony would have been insufficient to convict Plaintiff of rape charges. Thus, the charges were dismissed in a manner indicative of Plaintiff's innocence.

114. The Defendants' actions were done in a willful and wanton manner.

115. The Defendants' actions directly and proximately caused the injury and damage to Plaintiff set forth above.

WHEREFORE, Plaintiff demands actual or compensatory damages against Defendants Burge, Byrne, Dignan, and Martin, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, punitive damages, and such other and additional relief as this Court deems equitable and just.

## COUNT VI
### (State Claim for Conspiracy)

116. Plaintiff re-alleges all of the preceding paragraphs, and incorporates them in this count.

117. Defendants Burge, Byrne, Dignan, and Martin with other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to falsely imprison Plaintiff and/or to continue that imprisonment, to maliciously prosecute Plaintiff and/or continue that prosecution, and to intentionally inflict severe emotional distress on Plaintiff.

118. In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth above.

119. Said conspiracy or conspiracies were and are continuing in nature.

28

120.    Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from Defendants Burge, Byrne, Dignan, and Martin, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT VII
### (State Law Respondeat Superior Claim)

152.    Plaintiff re-alleges all of the preceding paragraphs, and incorporates them in this count.

153.    Defendants Burge, Byrne, Dignan, and Martin were, at all times material to this complaint, employees of the Defendant City of Chicago; were acting within the scope of their employment; and their acts, which violated state law, are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff demands judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiff's state law claims, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT VIII
### (745 ILCS 10/9-102 and Common Law Claims Against the City)

155.    Plaintiff re-alleges all of the preceding paragraphs, and incorporates them in this count.

156.    Defendant City of Chicago was the employer of Defendants Burge, Byrne, Dignan, and Martin at all times relevant and material to this complaint.

157.    These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to

law, demands judgment against the Defendants City of Chicago, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

## JURY DEMAND

Plaintiff, STANLEY WRICE, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: October 15, 2015.

Respectfully submitted,

STANLEY WRICE
By: /s/ Jennifer Bonjean
One of his attorneys

Jennifer Bonjean
Bonjean Law Group, PLLC
1000 Dean Street, Suite 422
Brooklyn, NY 11238
Tel:  917-566-3926

Heidi Linn Lambros
1169 South Plymouth Court, Unit 123
Chicago, IL  60605
Tel:  216-318-4087