| | | |
|---|---|---|
| STANLEY WRICE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14 CV 5934 |
| | ) | |
| v. | ) | |
| | ) | |
| JON BURGE, et al., | ) | Judge Elaine E. Bucklo |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS JON BURGE, JOHN BYRNE AND PETER DIGNAN'S RESPONSE TO DAVID PROTESS AND THE CHICAGO INNOCENCE CENTER'S MOTION FOR PROTECTIVE ORDER

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

RELEVANT LAW ...............................................................................................................6

ARGUMENT.........................................................................................................................6

    I.   Protess Cannot Show Good Cause Sufficient to Require the Entry of a
Protective Order Prohibiting the Dissemination of Documents and His
Deposition Testimony.....................................................................................................6

        A.   The Pendency of the Simon Case is Irrelevant to the Court's
Disposition of Protess and CIC's Motion ...........................................................8

        B.  Protess has not Identified any Real Harm That May Ensue Without
the Entry of a Protective Order ...........................................................................8

        C.  The Materials Protess Seeks to Protect are of High Importance to
Public Health and Safety......................................................................................13

    II.   Testimony Related to Protess' Investigations of Other Wrongful
Convictions is Relevant Because Evidence Indicates Protess'
Widespread Use of Unethical Tactics Resulted in False Recantations
in Plaintiff's Case...........................................................................................................15

        A.   Protess Has a History of Using Unethical Tactics to Procure
Witness Recantations............................................................................................16

        B.   There is Strong Evidence that the Witness Recantations in
Plaintiff's Case are Fraudulent.............................................................................19

    III.  Protess has Failed to Establish Good Cause to Deem his Deposition
Testimony or Permanently Enjoin the Dissemination of the Videotape
of his Deposition.............................................................................................................21

CONCLUSION.....................................................................................................................24

# TABLE OF AUTHORITIES

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................2

    *People v. Wrice, 406 Ill. App. 3d 43, 44 (Ill. App. 1st Dec 2, 2010)* ..............................4

    *People v. Wrice*, 962 N.E. 2d 934, 956 (Ill. 2012)........................................................5

RELEVANT LAW ..................................................................................................................

    Fed. R. Civ. P. 26(b) ....................................................................................................6

    *Martinez v. City of Chicago*, No. 09-5938, 2012 U.S. Dist. LEXIS 65386,
    *3 (U.S. Dist. N.D. Ill. M*ay 10, 2012) (*citing Jepson Inc. v. Makita Elec.
    Works, Lt*d., 30 F.3d 854, 858 (7th Cir. 1994)) ...........................................................6

    *Wiggins v. Burge*, 173 F.R.D. 226, 229 (N.D. Ill. 1997) ...........................................6

ARGUMENT ...........................................................................................................................6

I.      PROTESS CANNOT SHOW GOOD CAUSE SUFFICIENT TO
        REQUIRE THE ENTRY OF A PROTECTIVE ORDER
        PROHIBITING THE DISSEMINATION OF DOCUMENTS AND
        HIS DEPOSITION TESTIMONY ...........................................................................6

    *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37 (1984) ...........................................7

    *Bond v. Uteras*, 585 F.3d 1061, 1077-1078 (7th Cir. 2009) ....................................7

    *Wiggins v. Burge*, 173 F.R.D. 226, 228 (N.D. Ill. May 13, 1997) ...........................7

    A.  The Pendency of the Simon Case is Irrelevant to the Court's
         Disposition of Protess and CIC's Motion ..........................................................8

      *Simon v. Northwestern University, et al*., case number 15-cv-1433 ..................8

    B.  Protess has not Identified any Real Harm That May Insue Without
         the Entry of   a Protective Order ......................................................................8

      *Baxter Int'l, Inc. v. Abbott Laboratories*, 297 F.3d 544, 547 (2002)............9

      *Cox v. Sherman Capital LLC*, 2014 WL 5100701, at *1 (S.D. Ind. Oct. 10, 2014)......9

*Borniski v. Williamson*, 2005 WL 1260872 (N.D. Tex. May 17, 2005) ........................................9

*Scott v. Edinburg*, 101 F. Supp. 2d 1017 (N.D. Ill. 2000) ........................................10

*Escobar v. Foster*, 2000 WL 631312, at *2 (N.D.Ill. May 16, 2000)........................................10

*Bailey v. State of Maine Comm'n on Governmental Ethics & Election Practices*, 2011 WL 6444585, at *1 (D. Me. Dec. 19, 2011) ........................................10

*Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. 539, 546 (N.D. Ind. Aug. 6, 1991) ........................................12

*Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04-698, U.S. Dist. LEXIS 30420 at *11 (Ill. N.D. Jan. 19, 2005) ........................................12

C. The Materials Protess Seeks to Protect are of High Importance to Public Health and Safety........................................13

*Jacobson v. CBS Broad., Inc.*, 19 N.E. 3d 1165, 1175-1176 (Ill. App. 1st Sept. 30, 2014) ........................................13

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974) ........................................14

II. Testimony Related to Protess' Investigations of Other Wrongful Convictions is Relevant Because Evidence Indicates Protess' Widespread Use of Unethical Tactics Resulted in False Recantations in Plaintiff's Case........................................15

*See Vodak v. City of Chicago,* No. 03-2463, U.S. Dist. LEXIS 8235, at *15-16 (N.D. Ill. May 10, 2004) ........................................16

A. Protess Has a History of Using Unethical Tactics to Procure Witness Recantations ........................................16

B. There is Strong Evidence that the Witness Recantations in Plaintiff's Case are Fraudulent........................................19

III. PROTESS HAS FAILED TO ESTABLISH GOOD CAUSE TO DEEM HIS DEPOSITION TESTIMONY OR PERMANENTLY ENJOIN THE DISSEMINATION OF THE VIDEOTAPE OF HIS DEPOSITION ........................................21

*Paisley Park Enterprises, Inc.*, 54 F. Supp. 2d 347, 347-348 (S.D.N.Y. 1999)........................................22

*Hobley v. Burge*, 225 F.R.D. 221 (2004)........................................23

*Jennings v. Peters*, 162 F.R.D. 120, 123 (N.D. Ill. 1995) ........................................24

*Shultz v. Dart*, 2015 WL 4934552.................................................................................................... 24

*Felling v. Knight*, 2001 WL 1782360 (S.D. Ind. Dec. 21, 2001) ........................................................ 24

*City of Fairview Heights v. Orbitz, Inc.,* No. 3:05-840-DRH, U.S. Dist.
LEXIS (S.D. Ill. Apr. 11, 2007)............................................................................................ 24, 25

CONCLUSION......................................................................................................................................25

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STANLEY WRICE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14 CV 5934 |
| | ) | |
| v. | ) | |
| | ) | |
| JON BURGE, et al., | ) | Judge Elaine E. Bucklo |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS JON BURGE, JOHN BYRNE AND PETER DIGNAN'S RESPONSE TO DAVID PROTESS AND THE CHICAGO INNOCENCE CENTER'S MOTION FOR PROTECTIVE ORDER

Defendants Jon Burge, John Byrne and Peter Byrne, by and through their attorneys, respond to David Protess and the Chicago Innocence Center's ("CIC") Motion for Protective Order as follows.

## INTRODUCTION

Wide-spread public dissemination of the purported findings in his wrongful conviction investigations is David Protess' stock-in-trade. In fact, Protess publicly disseminates his version of the "facts" in the cases he investigates for the specific purpose of influencing public sentiment and exerting political pressure on the Cook County State's Attorney's Office. And he does so without regard to whom he embarrasses and without regard to the impact his actions may have on careers and reputations.

Indeed, in Plaintiff's underlying post-conviction proceedings, Protess did not hesitate to file in the Illinois Supreme Court, and publish on his website, an affidavit that accuses a sitting Illinois Appellate Court judge (who was the prosecutor in Plaintiff's criminal case) of suborning perjury by threatening to charge an innocent man with a crime the judge knew he did not commit

if he refused to "falsely" testify against Plaintiff and implicate Plaintiff in the brutal rape and torture of a woman identified as "K.B." Not only is that affidavit not credible on its face, the affiant, Bobby Joe Williams (a key player in this action), gave a sworn statement to the Special Prosecutor appointed to investigate allegations of torture in Area 2 *over twenty years after the crime and after he testified against Plaintiff* in which he testified that he was not coerced into implicating Plaintiff in the rape and brutalization of K.B.

Protess had other reasons to doubt Williams' affidavit. Specifically, Rodney Benson, one of Plaintiff's co-defendants in his criminal proceedings, gave *both* a sworn statement to the Special Prosecutor, and a subsequent deposition, in which he reaffirmed that Plaintiff "had sex with" K.B. and then brutally burned her with a carving fork. Benson's sworn statement and deposition testimony corroborated both Williams' trial testimony and sworn statement to the Special Prosecutor and cast serious suspicion on the veracity of the affidavit Protess procured from Williams. Undeterred by his prior testimony, Protess procured an affidavit from Benson in which Benson claimed that Plaintiff had no involvement in the rape and torture of K.B.

Defendants believe that the affidavits of Williams and Benson are false and were procured through unethical and suspect tactics. And, a substantial body of evidence has surfaced over the course of the past several years that supports Defendants' belief. Witnesses from whom Protess procured recantations in other criminal cases have since come forward alleging that Protess and his team of investigators used coercion in various forms—dangling young female college students as sexual bait, impersonating movie producers, promising book/movie deals, making cash payments, and promising convicted murderers their freedom from prison—to procure *false* recantations from them. That's right; these witnesses recanted their Protess procured recantations.

Remarkably, Protess himself wrote a book, "A Promise of Justice," in which he crowed about the tactics he uses, and has taught his team to use, in the course of his investigations. Apparently, Protess had no problem publicly disclosing the details of his tactics and investigations in his pursuit of fame and fortune. Now, however, Protess wants to shroud his investigations in secrecy and prevent Defendants from questioning him regarding these tactics and the allegations of fraudulent witness recantations.

Specifically, Protess asks the Court to treat as confidential and limit the dissemination of some 1800 emails in his possession and some 305 emails in CIC's possession all of which relate to Protess' investigation of Plaintiff's criminal case based on some vague claim that the emails are somehow "personal" and that he and his team had an expectation of privacy when they wrote the emails. He also asks the Court to limit the scope of his deposition to questions regarding his investigation of Plaintiff's case and to in effect permanently enjoin Defendants from disseminating the videotape of Protess' yet to be scheduled deposition.

Protess' request, however, fails as a matter of law and therefore should be denied.

## BACKGROUND

Plaintiff's civil rights complaint alleges Defendants former Chicago police officers Byrne and Dignan abused and tortured Plaintiff and others in order to procure Plaintiff's wrongful conviction in 1983 for the 1982 rape and torture of K.B. (See Dkt. #1, Pl's Compl., Counts I-IV.) Plaintiff also alleges a *Monell* claim against the City of Chicago based on his assertion that Byrne and Dignan's actions were consistent with a pattern and practice of abuse of African-American men in the Chicago Police Department, Area 2 ("Area 2"), under the direction of Jon Burge, which all Defendants conspired to cover up. (*Id.* at Count VI.)

In 2007, while still incarcerated, Plaintiff sought leave to file a third post-conviction petition based on new evidence contained in the 2006 Special Prosecutor's Report of his investigation into allegations of systemic police abuse of suspects at Area 2. The trial court determined that the information was not in fact new evidence and the Plaintiff appealed. *People v. Wrice*, 406 Ill. App. 3d 43, 44 (Ill. App. 1st Dec. 2, 2010). The Illinois Appellate Court found Wrice had in fact satisfied his burden, reversed the trial court and remanded the matter for an evidentiary hearing on Wrice's second post-conviction proceeding. *Id.* at 55. The State appealed to the Illinois Supreme Court.

While the case was pending in the Supreme Court, two *amici* briefs were filed in support of Plaintiff's post-conviction petition. One was filed by Protess, then a widely known Northwestern University Journalism professor and a self-proclaimed expert on wrongful convictions who, in his own words, has "researched and written about the problems of the criminal justice system . . . [and] documented numerous wrongful convictions that led to the exonerations of more than ten innocent prisoners . . . [several of which] involved cases in which suspects were tortured by Lt. John Burge or officers under his command." (Exhibit A, "Protess *Amicus* Brief"). The second *amicus* brief was filed by Locke Bowman of the Northwestern University Law School and Flint Taylor of the People's Law Office. (Exhibit B, "Taylor *Amicus* Brief".)[1]

The Protess *Amicus* Brief included three witness recantation affidavits that were obtained by individuals working under Protess' direction, each stating that their former testimony and/or statements implicating Wrice in crimes against K.B were false and had been coerced. (*See* Ex.

---

[1] The Taylor Amicus Brief did not opine on Wrice's guilt or innocence but advocated generally for review of any criminal case where the defendant alleges that he was subjected to torture by Jon Burge.

A, pp. 6-7, 9.) One of those witness recantations (Bobby Joe Williams) is featured prominently in Plaintiff's First Amended Complaint. (Dkt. #63, ¶¶37, 38, 41, 53, 65-83.)

On February 2, 2012, the Illinois Supreme Court granted Plaintiff's motion to file his third post-conviction petition based on the evidence contained in the Special Prosecutor's Report, and remanded the case to the trial court. *People v. Wrice*, 962 N.E. 2d 934, 956 (Ill. 2012). On remand, the trial court held an evidentiary hearing after which it ordered a new trial. (*See* Protess' Motion for Protective Order, Dkt. # 82, pp. 3-4 "Protess Mot.".) On December 12, 2013, the State dismissed all charges. (Dkt. #1, ¶ 100.)

As discussed below, a substantial body of information has surfaced in the past several years concerning illegal and coercive tactics that were routinely utilized by Protess and his designees to obtain information and recantations from witnesses in several cases, including Plaintiff's case. Defendants are entitled to explore Protess' conduct in relation to those other cases as well as Plaintiff's case to determine whether Protess fraudulently obtained witness recantations that led to the dismissal of charges against Plaintiff.

Also, Protess' complete immersion in the investigation of so-called "wrongful" convictions throughout the years, and the presence of substantial evidence supporting the allegations that he has routinely used unethical tactics to overturn convictions, undermine any claim Protess might otherwise have that good cause for a protective order exists to prevent the dissemination of discovery materials. Indeed, the public's interest in those materials easily outweighs any alleged privacy interests Protess may have. As such, Protess' motion must be denied.

**RELEVANT LAW**

Federal Rule of Civil Procedure 26(b) allows the discovery of "any nonprivileged matter

5

that is relevant to any party's claim or defense . . . " The information sought "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b). A court may issue a protective order limiting the scope of discovery "for good cause, [] to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . " In the absence of a protective order "parties to a lawsuit may disseminate materials obtained in discovery as they see fit." *Martinez v. City of Chicago*, No. 09-5938, 2012 U.S. Dist. LEXIS 65386, *3 (U.S. Dist. N.D. Ill. M*ay 10, 2012) (*citing Jepson Inc. v. Makita Elec. Works, Lt*d., 30 F.3d 854, 858 (7th Cir. 1994)). Further, "[i]n deciding whether good cause exists, the district court must balance the interests involved: the harm to the party seeking the protective order and the importance of disclosure to the public." *Id. citing Wiggins v. Burge*, 173 F.R.D. 226, 229 (N.D. Ill. 1997).

## ARGUMENT

I.    **Protess Cannot Show Good Cause Sufficient to Require the Entry of a Protective Order Prohibiting the Dissemination of Documents and His Deposition Testimony**

After six pages of speculation regarding how he thinks Defendants' counsel intends to use the email correspondence at issue, Protess argues that simply because he claims that the correspondence is personal, the Court should treat it as such. (Protess Mot., pp. 9-11.) Protess then argues that because a non-litigant has no right of access to unfiled discovery, Defendants should only be allowed to use the correspondence in this action and proposes a protective order that requires the correspondence to be filed under seal and permanently enjoins Defendants from disseminating the correspondence, regardless of whether the correspondence was ever filed in this action. (Id., Ex. C, para. 7.)

Protess, however, confuses a non-litigant's right to *access* unfiled discovery with a litigant's First Amendment right to free expression which includes the right to *disseminate* both filed and *unfiled* pre-trial discovery. And a court can only impinge on that right to disseminate

upon a showing of good cause. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37 (1984)(where "a protective order is entered on a showing of good cause as required by Rule 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment"); *see also Bond v. Uteras*, 585 F.3d 1061, 1077-1078 (7th Cir. 2009)("First Amendment concern raised by a protective order limiting disclosure of *unfiled* discovery is the effect such an order may have on a litigant's free-expression rights . . ." (emphasis original)).

Whether the discovery is filed or unfiled, Protess has not met his burden of showing good cause under Rule 26 that would require such an order. *See Wiggins v. Burge*, 173 F.R.D. 226, 228 (N.D. Ill. May 13, 1997). To determine whether good cause exists, the court balances "the harm to the party seeking the protective order and the importance of the disclosure to the public." *Id.* at 229 (*internal citations omitted*). Several factors may be used in assisting a court's determination of good cause: (1) privacy interests; (2) the importance of the information to the public health and safety; and (3) whether the person benefitting from the protective order is a public official. *Id.*

Here, the public's interest far outweighs any potential harm to Protess or others. First, Protess has not identified any cognizable privacy interests. Second, the information for which he seeks protection is highly important to the public health and safety.

**A. The Pendency Of The *Simon* Case Is Irrelevant To The Court's Disposition Of Protess And CIC's Motion.**

Protess supports his request to prohibit dissemination of the email correspondence at issue and to limit his deposition to questions surrounding the Plaintiff's case in part by speculating that defense counsel may seek to inappropriately circumvent a *de facto* stay of discovery in the *Simon v. Northwestern University, et al.*, case number 15-cv-1433 currently

pending in this District.  (Protess Mot. pp. 6-9, 15, *see also* Exhibit C, Simon Complaint.)

However, after Protess filed his motion, Judge Dow denied Protess' and Northwestern's Motions

to Dismiss in the *Simon* case, and denied the motion to stay discovery as moot.  (*See* Exhibit D,

Simon Order.)  Thus, Protess' arguments regarding the potential for improper use of the email

correspondence and his deposition in the *Simon* case are also moot.[2]

**B.  Protess Has Not Identified Any Real Harm That May Ensue Without The Entry Of A Protective Order.**

Protess argues that he, the Chicago Innocence Project and those with whom they

corresponded had "an expectation of privacy when they exchanged emails containing their

personal thoughts and impressions" and that the correspondence should be deemed confidential

because it is "personal," and because its dissemination may cause "embarrassment."  (Protess

Mot., pp. 9-10.)

However, as stated by the Seventh Circuit in a case cited by Protess, parties cannot

simply assert that a document is confidential because they "say so." *Baxter Int'l, Inc. v. Abbott*

*Laboratories*, 297 F.3d 544, 547 (2002).  Instead, parties must identify why a document should

be deemed confidential and how its disclosure would cause harm and whether the harm provides

"a legal justification for secrecy in litigation." *Id.*[3]

Nor do any of the other cases upon which Protess relies in any way support his

proposition that Chicago Innocence Project correspondence related to its investigation of

Plaintiff should be confidential.  For example, *Cox v. Sherman Capital LLC* simply indicates that

---

[2] Moreover, any information related to Protess and his methods of investigation would be equally discoverable in *Simon* and the case at hand.

[3] *Baxter* is a case involving a request to file an appellate record under seal and, while Protess cites the case for the proposition that secrecy is fine at the discovery stage, he fails to include the critical fact that the parties in Baxter entered into an *agreed* protective order in the lower court. *Id.* at  (Protess Mot., p. 6.)  Notwithstanding that agreement, the Seventh Circuit refused to allow the parties to file the record under seal without an adequate showing of good cause.

an *agreed* protective order issued allowing business correspondence to be marked confidential, with no other discussion.[4] 2014 WL 5100701, at *1 (S.D. Ind. Oct. 10, 2014). In addition, *Borniski v. Williamson*, 2005 WL 1260872 (N.D. Tex. May 17, 2005) is an employment case where plaintiff was terminated in part because of his personal use of company email. *Id.* at 13. At the conclusion of the case, the court entered a protective order shielding his "social security number, medical and health information, life history, employment history, financial information, sources of income and earnings information, family and associates' names and addresses and personal correspondence." *Id.* at *15. The documents at issue in *Borniski* are clearly personal in nature and are obviously distinguishable from the email correspondence at issue here.

Likewise, in *Scott v. Edinburg*, the documents protected in pre-trial discovery, psychological records, were indisputably of the sort traditionally protected and can in no way be analogized to Protess and CIC's email correspondence. 101 F. Supp. 2d 1017 (N.D. Ill. 2000). And, in *Escobar v. Foster*, the court entered a protective order on Chicago Police Department Complaint Registers ("CRs") because of the potential safety risk the disclosure of personal information contained therein would have on officers, complaining witnesses and the public. 2000 WL 631312, at *2 (N.D.Ill. May 16, 2000). The court also noted that the allegations in the CRs had not been proven and could have been false. *Id.*

---

[4] Like *Baxter*, *Cox* is a case in which the court had entered an *agreed* protective order governing the production of business records which included correspondence in its definition of confidential documents. 2014 WL 5100701, at *1 (S.D. Ind. Oct. 10, 2014). When certain defendants moved to file documents under seal based on general assertions that the documents were commercial in nature and otherwise highly sensitive the court denied the motion citing to *Baxter* and stating: "A motion asking to seal such information has 'no prospect of success' unless it analyzes "in detail, document by document, the propriety of secrecy, providing reasons and legal citations.' General assertions that the information is "commercial" or otherwise sensitive will not suffice." (internal citations omitted) *Id.* at *4.

Here, Protess has made no showing that any documents Defendants seek contain any personal information that is traditionally protected: identifiers, health information, family and associates, or bank accounts. The subpoena is specific:

> [A]ll correspondence or email messages between anyone acting on behalf of the Chicago Innocence Project, on the one hand, and Stanley Wrice, Bobby Joe Williams, Rodney Benson, or Michael Fowler on the other hand . . . all emails sent between and among David Protess, Kayla Bensing, Tania Karas, Lauren Kelleher, Kira Lerner, Christina Rosales, Quinn Thacker or Jamie Vailliancourt that refer or related to the investigation of the Stanley Wrice case in any aspect.

(Protess Mot., Ex. B.)

Nor, has Protess suggested any other reason why the information Defendants seek is entitled to protection. Thus, Protess' reliance on *Bailey v. State of Maine Comm'n on Governmental Ethics & Election Practices*, 2011 WL 6444585, at *1 (D. Me. Dec. 19, 2011), which Protess deems "exemplary" here is misplaced. In *Bailey*, the plaintiff was involved in an effort to smear the reputation of a political candidate. To that end, the plaintiff engaged in email correspondence with members of a political party and campaign staff none of whom were parties to the litigation. *See id*. Although the correspondence did not contain information which is traditionally subject to protection, it did contain ugly gossip as well as unflattering (and often vulgar) personal opinions and characterizations of individuals not involved in the litigation. *Id.* at 6. Because the email correspondence had absolutely no relevance to the case and because the individuals involved in the correspondence had no role in the litigation, the court entered an order protecting the correspondence to spare the non-parties embarrassment and harm to reputation. *See id*. at 6, 11.

In this case, however, any correspondence regarding the investigation of Plaintiff's case is highly relevant to defense of this action and may well be used to show that Plaintiff's claims here are in part a result of the fabrications of the Chicago Innocence Project. Furthermore,

neither Protess nor CIC claims that the correspondence they seek to protect consists of vulgar or unflattering gossip or otherwise inappropriate exchanges that have nothing to do with their investigation of Plaintiff's case and would be harmful to individuals not involved in the investigation. In fact, Protess has failed to articulate a single fact that would support his naked assertion that the email correspondence at issue is any way even remotely personal.

Nor does Protess' claim that he, CIC and their team had an expectation of privacy carry any weight. It's not even credible. To the contrary, given the enormously far-reaching (and public) consequences of Protess' investigations which include releasing convicted murders from prison and accusing police officers and prosecutors of unethical and illegal conduct, Protess, CIC and their team should fully expect that their work which includes their correspondence will be subject to strict and public scrutiny. Indeed, it is difficult to fathom what right Protess can craft that allows him to purposefully and with a clear agenda inject the results of his work into the public discourse while at the same time shielding that work from any public examination.

As for Protess' generalized claim that the potential dissemination of discovery materials will cause him or others embarrassment, he has again failed to establish good cause for the entry of a protective order. Protess has to do more than assert vague allegations of embarrassment; he must "clearly define the serious harm likely to result from public disclosure." *Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. 539, 546 (N.D. Ind. Aug. 6, 1991)(*citing Cipollone v. Liggett Group, Inc.*, 113 F.R.D. 86, 89 (D.N.J. 1986). "Generalized claims of embarrassment do not establish good cause." *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04-698, U.S. Dist. LEXIS 30420 at *11 (Ill. N.D. Jan. 19, 2005) (*citing Cippollone v. Liggett Group*, 785 F.2d 1108, 1121 (3rd Cir. 1986)).

But Protess not only fails to identify what the potentially embarrassing or sensitive information is, he also never clearly defines the harm he claims he and others will suffer if the information is disclosed. As such, Protess has utterly failed to meet his burden of establishing good cause and the Court, therefore, must deny his request for entry of a protective order. *Wauchop*, 138 F.R.D. at 546 (finding a party's claim that public disclosure of discovery would be harmful to its reputation insufficient for the entry of a "non-dissemination" protective order). Moreover, if Protess stands by the integrity of his investigation, Defendants are unaware of what potentially embarrassing information he seeks to protect. Nonetheless, Protess' generalized claim that he may be embarrassed by the potential dissemination of his discovery materials is not good cause for the entry of a protective order because the public's interest in the discovery materials outweighs any potential embarrassment that Protess may face.[5]

### C. The Materials Protess Seeks To Protect Are Of High Importance To Public Health And Safety.

Whether the purported harm to Protess arises out of his expectation of privacy in his correspondence, or any potential embarrassment, he cannot meet his burden of demonstrating good cause for a protective order. As shown below, Protess' privacy interests (and those of his students for that matter) should be diminished because he is a public person and should be subject to public scrutiny. Protess has spent years writing books and articles to bring allegations of wrongful convictions and police misconduct to the public's attention. He is partially credited with the abolition of the death penalty in Illinois. (*See* Exhibit E, Warden article, Sec. V.) His work has led to millions of taxpayer dollars being spent to resolve allegations of police misconduct.

---

[5] Defendants dispute the allegation that Protess' deposition was edited in any way in the movie "A Murder in the Park." Indeed, only two questions and answers were included. Further, assuming Protess disputes Defendants' belief that his investigative methodology leads to fraudulent witness recantations, if Defendants are not accurate in their belief, it remains to be seen what exactly could cause Protess embarrassment.

Much like an individual can be a "limited purpose public figure" when he has "thrust [him]sel[f] to the forefront of particular public controversies in order to influence the resolution of the issues involved," and thus lose some protection against defamatory statements, *see Jacobson v. CBS Broad., Inc*., 19 N.E. 3d 1165, 1175-1176 (Ill. App. 1st Sept. 30, 2014), Protess should not be entitled to the protections afforded a private citizen under Rule 26.  He has thrust himself into the public sphere and the public is entitled to scrutinize his investigative techniques.[6]  Indeed, Protess agrees that he is a public figure.  (Protess Mot. p. 13.)  And, in the event any "embarrassing" information comes to light *via* the sought discovery, Protess will surely have every opportunity to contest it.  *See Jacobson* at 1175, *citing Gertz v. Robert Welch, Inc*., 418 U.S. 323, 344 (1974) (finding the actual malice standard in defamation cases involving public figures justifiable because the public figure has "a realistic opportunity to counteract false statements").

Further, despite Protess' claim that the Chicago Innocence Project's "emails have no bearing on the public health and safety," much as "performance of police duties and investigations of their performance is a matter of great public importance," *Wiggins*, at 229, so too is the integrity of investigations into police duties and investigations.  Over the years, the People's Law Office has brought several cases against the Chicago Police Department regarding allegations of abuse in Area 2.  *Wiggins v. Burge* was one such case.  In *Wiggins*, various media outlets sought the release of Complaint Register (CR) files associated with Area 2.  Incidentally, one of the CRs was that of Plaintiff.  Judge Castillo released the documents from their confidential designation finding:

---

[6] Based on the same reasoning, regardless of Defendants' alleged motivation for contesting Protess' proposed protective order regarding use of his videotaped deposition, the public's interest outweighs any concerns Protess may have.  *See City of Fairview Heights v. Orbitz, Inc.,* No. 3:05-840-DRH, U.S. Dist. LEXIS (S.D. Ill. Apr. 11, 2007) (finding that plaintiff mayor's interest in preventing dissemination of embarrassing "sound bytes" from videotaped deposition during an election year outweighed by the public's interest in the information).

[T]here is an important public interest at stake –the health and welfare of the general public and the integrity of the police department. The public has a right to know how matters concerning their daily protection are being investigated and handled. If it were not for this type of public information, allegations of police torture might go unnoticed—seriously jeopardizing the safety of the community at large.[7]

Though Defendants do not agree that CRs should be open to the public, it is important to note that *Wiggins* dealt with the *very same* allegations of police misconduct alleged in Plaintiff's Complaint. These CRs and various related documents are decades old and have been in the public sphere since at least 1997 when *Wiggins* was decided. There have been countless lawsuits, news stories, blog entries and public comment made regarding the contents of these materials over the years. Protess himself has been a prime mover in promulgating the information.

Now, Defendants contend that the public has a right to "the other side" of the story. The simple fact is, Protess and his compatriots have been responsible for the extreme public interest in allegations of police misconduct in Area 2. Protess cannot now use Rule 26 to continue to cloak his investigations in secrecy. The public's interest in the integrity of the Chicago Police Department, and the integrity of those responsible for creating a cottage-industry of litigation out of "wrongful" convictions, far outweighs any supposed harm that may befall Protess.

## II. Testimony Related To Protess' Investigations Of Other Wrongful Convictions Is Relevant Because Evidence Indicates Protess' Widespread Use Of Unethical Tactics Resulted In False Recantations In Plaintiff's Case.

Protess also claims that the scope of his deposition should be limited to his investigation of Plaintiff's criminal case because testimony regarding his investigation of other cases is nothing more than a fishing expedition. (*See* Protess Mot. pp. 15-16.)

---

[7] At some point, the very documents at issue in *Wiggins*, as well other documents previously marked confidential in Area 2 cases were given to Plaintiff. He attached them to his first successive post-conviction petition in 2000. (Group Exhibit F.)

Three witness recantations procured by Protess' students in 2011, including the recantation of Bobby Joe Williams on June 11, 2011, however, were a central theme in Protess' *amicus* brief. (*See* Ex. A, p. 9.) Williams then testified in Plaintiff's evidentiary hearing on December 9, 2013 that Plaintiff was not in fact involved in the rape and torture of K.B., and that Williams had only originally testified to Plaintiff's involvement because he was beaten by Area 2 police officers until he implicated Plaintiff. (Group Exhibit G, Evidentiary Hearing, 12/9/13, pp. 4-17.)

The circuit court found that the fact that Williams was beaten by Area 2 police officers until he implicated Plaintiff should have been presented to the jury, and used that finding as part of the reason to grant a new trial. (Group Ex. G, 12/10/13, p. 3:14-19.) Defendants believe Williams testified truthfully in 1983 and that his recent recantation was the product of unethical tactics used by Protess, his students and the various organizations with which he associates.

Much as personnel records and complaint histories against police officers are relevant in cases alleging police misconduct to determine whether the officers have been involved in similar incidents, allegations of Protess' misconduct in similar situations are similarly relevant and, at a minimum, discoverable in the defense of Plaintiff's claims. *See Vodak v. City of Chicago,* No. 03-2463, U.S. Dist. LEXIS 8235, at *15-16 (N.D. Ill. May 10, 2004). Defendants should be entitled to explore Protess' illegal and unethical tactics in other cases to develop information in order to determine whether those same tactics were utilized to secure the recantations in Plaintiff's case, and thereby undermine Plaintiff's claims that he was wrongfully convicted.

**A. Protess Has A History Of Using Unethical Tactics To Procure Witness Recantations.**

In October 2014, evidence that Protess and his private investigator employed a "series of alarming tactics that were…coercive and absolutely unacceptable by law enforcement

standards," led the Cook County State's Attorney to vacate the murder conviction of Alstory Simon, after which the State's Attorney described Protess' "investigation" of the case as "deeply corroded and corrupt". (Ex. C, ¶5.)[8] The tactics included:

- Making promises to Simon's nephew to cause him to sign a false affidavit claiming Simon confessed to the murders (*Id.*, ¶87);

- Using promises of money and freedom to coerce Simon's nephew into convincing Simon's ex-wife to implicate him in the murders (*Id.*, ¶88);

- Offering Simon's ex-wife money and freedom for her nephew to make a false statement against Simon (*Id.*, ¶89).

And those tactics were by no means isolated to the *Simon* case. In 2009, Protess' investigation of Anthony McKinney, and his proclaimed innocence, became part of a highly publicized legal skirmish. (*See* Exhibit H, "The Professor and the Prosecutor.") Like Plaintiff's, McKinney's claim of innocence rested in part on a recantation of inculpatory testimony procured by Protess' students at Northwestern's Medill School of Journalism. The recanting witness, like Williams and Benson here, claimed he had been beaten until he provided detectives with inculpatory statements against McKinney. (Exhibit I, Partial McKinney Petition, p. 17.)

Amidst allegations that students bribed witnesses to recant, or otherwise engaged in unethical behavior, the Cook County State's Attorney's Office subpoenaed records related to student investigations of McKinney's claims. (*See* Ex. H, pp. 2-4.) Specifically, it was alleged that Protess paid witnesses and used female students to flirt with witnesses and garner their favor.

---

[8] As Protess himself notes, he is currently being sued in *Simon v. Northwestern University, et al.*, No. 15-cv-1433 (Dow, J.). Generally, Simon alleges that Protess used a smattering of illegal and coercive tactics to induce critical witnesses to give false statements in several of his "investigations" and that he "routinely and openly encouraged Medill students to use manipulation, trickery, and misleading information to cause witnesses to make statements." (Ex. C, ¶¶ 88-91, and 133.)

Initially, Northwestern refused to release the files and claimed they were subject to journalistic privilege. (*See* Exhibit J, "State's Attorney Actions Against Medill Called 'Overreaching'" at p. 2.) Ultimately, Protess was found to have hidden from Northwestern University that he had shared the allegedly privileged information with McKinney's counsel, thereby removing any privilege that Northwestern may have claimed in its attempt to quash the subpoena. Northwestern publicly stated that "review uncovered considerable evidence that Protess authorized the release of all student memos to Mr. McKinney's lawyers despite his repeated claims to the contrary; knew from the very beginning that doing so waived any claim of privilege; and *repeatedly provide false and misleading information to the lawyers and the dean*." (emphasis *added*)(Exhibit K, Northwestern Press Release 4/7/11.)

Interestingly, the *McKinney* case brought to light a memo regarding similar allegations against Protess stemming back to his investigation of the "Ford Heights Four" case, which not only resulted in a book deal for Protess and catapulted him onto the national stage, but paved the way for the creation of the Northwestern Medill Innocence Project and Center for Wrongful Conviction. (*See* Exhibit L, "Righting Wrongful Convictions, Northwestern Magazine, 1999, p. 3, *see also,* Exhibit H, pp. 2, 4.)[9]

The *McKinney* case adds yet another layer of taint to any investigation of which Protess has been a part. Importantly, Protess' tactics in McKinney of procuring witness statements favorable to his causes heighten Defendants' belief that Protess' involvement in any case resulting in witness recantations is relevant. As explained below, Defendants have reason to believe that statements that Protess and his students obtained from Bobby Joe Williams and

---

[9] Protess' 1998 book "A Promise of Justice," described his unethical tactics related that he, along with his investigator posing as a Hollywood producer, incented a witness to give them a statement in exchange for a movie deal, and ultimately gave the witness cash. He also described essentially using female students as bait to induce witness statements.

others were fraudulent and gained by unethical means—consistent with the mounting evidence that Protess' methodology as a whole is to use any means necessary to procure "new" testimony favorable to his manufacture of a "wrongful" conviction case.[10]  (*see* Ex. C, ¶133.)

## B. There Is Strong Evidence That The Witness Recantations In Plaintiff's Case Are Fraudulent.

Were the multiple allegations against Protess not enough to give rise to suspicion that his tactics and motives in each of his investigations are relevant to Plaintiff's case, a much more troubling piece of evidence is at issue.  Again, during Plaintiff's evidentiary hearing, Wrice's counsel mentions a second affidavit procured by Protess and his students, that of Rodney Benson.  (Group Ex. G, 12/9/12, p.11:19-24.)  Benson pled guilty to various felonies against K.B. and was sentenced to one year of supervised release and probation.  (Exhibit N, Benson Dep., pp. 11-12.)[11]  At the time, he gave a statement to police alleging Plaintiff's involvement in the crime.  (*Id*. at 53:1-8, 55:9-55:4.)  However, as Protess argued in his *amicus* brief, Benson recanted his former statements in 2011.  Specifically:

> Benson stated in his affidavit that "in the early morning hours ... I drove K.B.[,] the victim, to the Wrice home . . . took K.B. to the upstairs bedroom where I had sexual intercourse with her." Neither during the drive to the Wrice home nor when Benson was upstairs with K.B., did Benson ever see Stanley Wrice.

(Ex. A, p. 9, *internal citations omitted*.)

However, Benson's recantation should give the Court pause.  Three years earlier, in 2008, as part of a lawsuit filed by Darryl Cannon against the City of Chicago and Chicago Area

---

[10] A memo produced by the Chicago Innocence Project supports Defendants' belief that Protess' methods are engineered to make cases fit a pre-determined narrative of "wrongful" conviction.  It lays out why Wrice's case would be a good case for students to investigate a wrongful conviction.  (Exhibit M, Undated Stanley Wrice Case Summary.) The memo states that "there is plenty for students to do to investigate Wrice's possible innocence" (*Id*. p. 9), and seemingly directs them to interview witnesses to get them to change their statements: "three [of the witnesses] were tried and acquitted in this case.  The three men can't be tried twice, and have nothing to lose by telling our students the truth." (*Id*.)

[11] Exhibit N was entered as an Exhibit in Plaintiff's 12/9/13 evidentiary hearing.

2 detectives, attorneys from the People's Law Office and attorneys for City of Chicago deposed Rodney Benson regarding his allegations of torture at Area 2. With no incentive to lie, Benson testified that he was beaten by Area 2 detectives, yet confirmed that Plaintiff did have sex with K.B. (Ex. N, p. 26:19-21), that he saw Plaintiff taking a hot fork upstairs (*Id.*, p. 27:3-14), and that Plaintiff subsequently burned K.B. with it. (*Id.*, p. 28:1-6). He had provided a similar statement regarding the alleged abuse to the Special Prosecutor investigating abuse at Area 2 three years earlier. (*See* Exhibit O, pp. 10, 26, 32, 40-44.) However, Benson made no attempt to recant his statement against Plaintiff during that interview.

Benson's statements from both 2005 and 2008 confirm his previous statement against Wrice with no coercion. On both occasions, he was perfectly willing to discuss abuse at the hands of Area 2 detectives, yet never made any claims that his statements about Plaintiff's rape and torture of K.B. were untrue. Defendants believe that it was Protess and his students who coerced Benson's recantation by employing incentives of the kinds they utilized in Simon, McKinney, and the Ford Heights Four case. As a result, they should be permitted broad leeway to conduct discovery into the types of investigations conducted by Protess beyond the limited parameters of Plaintiff's case.

Further, Protess' contention that the circuit court judge did not actually cite the recantations in granting Plaintiff a new trial is of no consequence. Though Benson did not testify at the evidentiary hearing, his affidavit was mentioned repeatedly in Bonjean's opening. It cannot be said that mere mention of his affidavit did not impact the judge's finding that Plaintiff was entitled to another trial. In any event, Plaintiff's Complaint makes clear that he intends to make the witness recantations an integral part of his lawsuit.

David Protess has had a hand in creating the narrative surrounding Area 2 for the better part of two decades. Protess' testimony, documents, conversations with defense counsel, methodology, historical information regarding his investigations into the Chicago Police Department, and his instructions to students or employees are all relevant to the defense of this case. As such, his motion must be denied.

### III. Protess Has Failed To Establish Good Cause To Deem His Deposition Testimony Or Permanently Enjoin The Dissemination Of The Videotape Of His Deposition.

It is true that David Protess has injected himself into the limelight time and again throughout his career; however, he is not a public figure in the same sense as an elected official or a rock star. And while he flatters himself even as he casts aspersions on defense counsel, Protess has failed to identify any right sufficient to enable the Court to abridge Defendants' First Amendment right to disseminate information they obtain through discovery, including the videotape of his deposition.

As discussed above, while the Supreme Court has held that a litigant does not have a First Amendment right to receive information through pre-trial discovery, the litigant does have a First Amendment right to disseminate that information. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984). Thus, a court can only restrict that right upon a showing of good cause. *Id.* at 37. Although the *Seattle* majority opinion does not discuss the "good cause" found by the Washington Supreme Court in entering the protective order at issue in detail, Justice Brennan's concurring opinion (in which Justice Marshall joined) does. *Id.*

Specifically, the Washington Supreme Court found that disclosure of the identities of non-parties who were donors to a religious foundation (as well as financial information of plaintiffs the foundation, its leader and certain of its members) would violate the donors and the

plaintiffs' First Amendment rights to freedom of religion and freedom of association.[12]  *Id*.  To protect these constitutional rights, the Washington Supreme Court entered a protective order limited to the financial information of the plaintiffs and the identities of the donors.  *Id*.  As Justice Brennan puts it:  "[these rights] are sufficient to justify this protective order and to overcome the protections afforded free expression by the First Amendment."  *Id*.  The point is that Protess is not entitled to the relief he requests unless he establishes far more than simply his fear that the videotape of his deposition will be used to embarrass him.  And the very cases Protess cites to support this aspect of his request soundly defeat it.

For example, in *Paisley Park Enterprises, Inc.*, a rock star sued the owners and developers of a fan website for infringing on his copyrights and trademarks and usurping business opportunities the rock star would otherwise have.  54 F. Supp. 2d 347, 347-348 (S.D.N.Y. 1999).  Over the course of the litigation, the defendants were posting pleadings, the notice of the rock star's deposition and press releases concerning the case on the fan website.  *Id*. at 348. As such, the defendants were using the very litigation alleging infringement to continue profiting from the rock star's fame.  *Id*.  In an effort to stop defendants, the rock star asked the court to prohibit any video or audio recording of his deposition.  *Id*.  The court granted the request in order to protect the rock star's business interest in any recordings of his voice and his person. *Id*.  In short, the court was protecting the rock star's property rights.

Likewise, in *Hobley v. Burge***,** the court was protecting the constitutional rights of non-party deponents and not merely sparing them any embarrassment.  225 F.R.D. 221 (2004).  In *Hobley,* non-party police officers who were the subject of a criminal investigation moved the court for entry of a protective order prohibiting the dissemination of the videotapes of their

---

[12] The underlying defamation action against various news outlets was based on allegedly false reporting of the activities of the leader and members of a religious organization.  The reports at issue included accounts of sodomy, naked dancing, séances and other salacious activity by the leader and the members.

depositions throughout which they had asserted their Fifth Amendment rights. *Id*. at 222-223. According to the officers, the plaintiffs intended to release the videotapes to unfairly portray them as asserting their Fifth Amendment rights to conceal misconduct. *Id*. at 225.

The court agreed emphasizing that the depositions had not been filed with the court and that the officers had provided no information whatsoever about the litigation at hand and, therefore, refused to impose an additional cost on the officers' assertion of their constitutional right. *Id*. at 224-226. Again, while the court did discuss the media and sound bites, the "good cause" for prohibiting the dissemination was grounded in the need to protect the officers' constitutional rights and not in sparing them any embarrassment. *Id*. at 225-6. As the court put it: "There is no doubt that the public has a strong and proper interest in the *Hobley* and *Patterson* cases. However, it is also important to remember that what is at issue here is the assertion of a constitutionally-protected privilege." *Id*. at 226.

Similarly, in *Jennings v. Peters*, although the court entered an order prohibiting the dissemination of the videotape of a union official's deposition, it limited the duration of the prohibition to the day after which a union election was schedule to occur. 162 F.R.D. 120, 123 (N.D. Ill. 1995). The court emphasized that defendants' counsel did not ask any questions at the deposition that related to the litigation and agreed with the movant that the only purpose of disseminating the videotape would be to influence the outcome of the union election. *Id.* at 122 ("In the absence of a protective order, we would not be surprised to learn that Jennings' testimony had found its way into the union election campaign."). Again, the court's primary concern was not protecting the movant from embarrassment; it was protecting the fairness of the union election.

Finally, Protess cites *Dart* and *Felling* in support of his claim that embarrassment alone is sufficient to prohibit dissemination of the videotape of his deposition. These cases, however, are easily distinguishable. First, *Shultz v. Dart*, 2015 WL 4934552 involves the videotaped deposition of the Cook County Sheriff who was not involved in and had no first-hand knowledge of the facts at issue. Likewise, *Felling v. Knight*, 2001 WL 1782360 (S.D. Ind. Dec. 21, 2001) involves the nationally known coaches of a major state university's athletic team and they too had no involvement in or first-hand knowledge of the underlying facts. In both cases, high profile individuals were sued who had little to no involvement with the underlying facts of the litigation. Here, despite Protess' claim that he did not procure the affidavits in Plaintiff's case (Protess Mot. pp. 1, 3), he was clearly the moving force behind the investigation and he cannot now hide behind his college students' work.

Even if Protess could be likened to the defendants in *Dart* and *Felling*, there is no hard and fast rule that the risk of dissemination requires the entry of a protective order for a high profile deposition. *See City of Fairview Heights v. Orbitz, Inc.,* No. 3:05-840-DRH, U.S. Dist. LEXIS (S.D. Ill. Apr. 11, 2007) (finding that plaintiff mayor's interest in preventing dissemination of embarrassing "sound bytes" from videotaped deposition during an election year outweighed by the public's interest in the information).

In any event, it is particularly troublesome to afford David Protess that sort of consideration. Protess himself has caused the videotaping of extremely fragile and vulnerable human beings after engaging in reprehensible coercion targeted to their specific weaknesses. Those human beings had no lawyers fighting for or protecting them. They were simply a means to Protess' end. Protess then broadcast those videotapes on *national television* in pursuit of his agenda.

It is also troubling that Protess has disavowed any knowledge of the case he spent years investigating. Indeed, he even went so far as to say that *he* did not procure the affidavits that set Plaintiff free and gave rise to this action. (Mot., pp. 1, 3.) Is Mr. Protess really attempting to hide behind the college kids who were under his supervision and control?

## CONCLUSION

David Protess' fear of any inquiry into his tactics and practices is telling. He should welcome scrutiny and should want the public to know that his work is conducted with integrity and honesty. In any event, whether limited or not, Defendants have First Amendment rights even in unfiled pre-trial discovery. Protess has failed to offer legally sufficient good cause to justify the abridgement of those rights. His motion should therefore be denied.

Respectfully submitted,

/s/ *Julie K. Bisbee*
Attorney for Defendants Burge, Byrne and Dignan

Andrew M. Hale
Amy Hijjawi
Avi T. Kamionski
Shneur Nathan
Julie Bisbee
HALE LAW, LLC
53 W. Jackson Blvd., Suite 330
Chicago, IL  60604
(312) 341-9646

## CERTIFICATE OF SERVICE

I, Julie K. Bisbee, an attorney, hereby certify that on April 25, 2016, I have electronically filed the attached Response with the Court's CM/ECF system, which simultaneously sent an electronic copy of the same to all counsel of record.

/s/ *Julie K. Bisbee*