# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STANLEY WRICE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 5934 |
| | ) | |
| v. | ) | Judge Elaine E. Bucklo |
| | ) | |
| JON BURGE, *et al.*, | ) | Magistrate Judge Finnegan |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stanley Wrice filed this action in August 2014, asserting various federal and state claims in connection with his allegedly wrongful prosecution, conviction, and 30-year incarceration for the 1982 rape and deviate sexual assault of a victim referred to as "K.B." (*See* Doc. 1.)[1] Now before this Court are two discovery motions referred to this Court for decision by the district judge: (1) Motion by Non-Parties David Protess and Chicago Innocence Center (collectively, "Protess") for Entry of Protective Order, and (2) Motion to Quash Subpoenas or in the Alternative for a Protective Order of non-parties Kayla Bensing, Kira Lerner, Quinn Thacker, and Jaimie Vaillancourt (the "Students"). (Docs. 82, 84, 106, 112.) Both motions seek to quash or limit certain subpoenas served by Defendants seeking documents and depositions regarding the investigations conducted by these non-parties of the allegedly wrongful prosecutions and convictions of Plaintiff Wrice and other criminal defendants. For the reasons explained below, both motions are granted in part and denied in part.

---

[1] Following Judge Bucklo's dismissal of certain defendants named in Wrice's original complaint, an amended complaint followed, reciting similar claims against Former Chicago Police Lieutenant Jon Burge, former Chicago Police Sergeant John Byrne, former Police Detective Peter Dignan, the estate of former Chicago Police Superintendent Leroy Martin, and the City of Chicago. (Docs. 58-59, 63.)

## BACKGROUND

**I.    Wrice's Wrongful Conviction Allegations in this Case**

According to Wrice's complaint, on September 9, 1982, then 33-year-old K.B. was sexually assaulted and burned, over a two-hour period, in the attic of a home that Wrice shared with his brother and sister (Charles and Patricia Wrice) and his sister's boyfriend (Bobby Joe Williams).  (Doc. 63 ¶ 13.)  K.B. was allegedly brought to the Wrice home voluntarily by Rodney Benson, but could not identify the men who attacked her afterward.  (*Id.* at ¶¶ 13, 15.)  Wrice, his brother Charles, Williams, Benson, and two others (Lee Holmes and Michael Fowler) were arrested for K.B.'s assault on the day of the incident.  (*Id.* at ¶ 13.)  Bobby Joe Williams was identified by police as having been in K.B.'s presence earlier in the evening, but was not charged.  (*Id.*)  But Wrice, Benson, Holmes, and Fowler were each charged the next day, after each allegedly made inculpatory statements about their participation in the crime.  (*Id.*)

As for Wrice's confession, he alleges in this case (and similarly alleged prior to his criminal trial) that his inculpatory statements to Defendants Byrne, Dignan, and an Assistant State's Attorney ("ASA") "were made as a result of psychological, physical and mental coercion by the Defendant Officers."  (*Id.* at ¶¶ 14-15.)  According to his complaint, the Defendant Officers brutally beat and tortured Wrice, fed him facts about K.B.'s assault which the Defendant Officers learned from K.B. and which Wrice did not know, and coerced Wrice to confess to K.B.'s assault when interviewed by the ASA. (*Id.* at ¶¶ 14-34.)  Wrice further alleges that he only confessed to the ASA "because he was afraid of Defendants Byrne and Dignan and because he believed that they would continue to beat him until he falsely confessed to the crimes," so "he repeated the false story of his involvement in K.B.'s assault to the State's Attorney."  (*Id.* at ¶ 22.)

Although Wrice moved to suppress his confession, and presented medical testimony to corroborate his claim that he was tortured by Defendants Byrne and Dignan, those officers denied any such abuse, the trial court found their denials to be credible, and Wrice's confession was admitted at his criminal trial. (*Id.* at ¶¶ 14, 23-31, 36.) Additionally, the State introduced testimony from two witnesses—Bobby Joe Williams and Kenny Lewis. (*Id.* at ¶ 36.) According to Wrice, Lewis was then K.B.'s boyfriend and was only discovered by an ASA five days before Wrice's trial. (*Id.*) And although no witness had placed Lewis in the Wrice home on the night of K.B.'s assault, Lewis testified that he saw Wrice strike and burn K.B. (*Id.*) Wrice also alleges that "Bobby Joe Williams perjured himself at Plaintiff's 1983 trial when he implicated Plaintiff in the offenses," because (unbeknownst to Wrice at the time), "when Williams was arrested for K.B.'s assault he was beaten by Defendants Byrne and Dignan during his interrogation and forced to implicate Plaintiff in K.B.'s assault." (*Id.* at ¶¶ 37-38.)

In May 1983, Wrice was convicted of K.B.'s rape and deviate sexual assault and sentenced to 100 years in prison. (*Id.* at ¶ 39.) Benson, Holmes, and Fowler then pled guilty to aggravated battery of K.B., with Benson and Holmes sentenced to 30 months' probation, and Fowler to 4 years in prison. (*Id.* at ¶ 40.) Wrice remained in prison until December 2013, when the state court granted his third post-conviction petition and granted him a new trial, "finding that Defendants Byrne and Dignan committed perjury when they testified in 1983 that they did not beat Plaintiff to secure his inculpatory statement." (*Id.* at ¶ 52.) But the State declined to retry Wrice, after one of its witnesses (Lewis) had died (although Illinois law allowed introducing a deceased witness's prior sworn testimony at a retrial), and the other (Williams) had recanted. (*Id.* at ¶¶ 53, 72.) Williams' recantation is central to the motions now before the Court.

## II. Protess's Connection to this Case

Both sides agree that the work of non-party and movant David Protess in the area of investigating alleged wrongful convictions, as a journalist and former professor at Northwestern University, "is well known." (Doc. 82, at 13; Doc. 94, at 4: describing Protess as a "widely known Northwestern University Journalism professor and a self-proclaimed expert on wrongful convictions.") Protess formed the Chicago Innocence Project ("CHIP")—predecessor to the Chicago Innocence Center ("CIC"), which joins in his current motion—in 2011. (Doc. 82, at 1.) Protess explains in his motion that, at the time he founded CHIP, he and certain Northwestern journalism students under his supervision conducted an investigation into Wrice's 1983 conviction. (*Id* at 1.) Both sides also agree that, through this investigation, CHIP procured three "recantation affidavits" (Protess says the affidavits were provided to his students in his absence), which CHIP then submitted with an amicus brief in support of Wrice's third post-conviction petition before the Illinois Supreme Court. (*Id.* at 1-3; Doc. 94, at 4.)

One of the affidavits came from Bobby Joe Williams (Doc. 115-4, at 23), who Wrice alleges in this action was "forced" and "coerced" to implicate Wrice in K.B.'s assault with the same sort of beatings and torture that the Defendant Officers used to force Wrice himself to confess to the crime. (Doc. 63, ¶¶ 37-41.) The affidavit Williams gave CHIP, and which CHIP submitted to the Illinois Supreme Court in support of Wrice's post-conviction petition, alleged the same. (Doc. 115-4, at 23-24; Doc. 94-1, at 6-7.) The other two affidavits came from Benson and Fowler (Doc. 115-4, at 28-34), Wrice's co-defendants who pled guilty to assaulting K.B. The Benson and Fowler affidavits similarly claimed that they were abused by police during their interrogations, and denied any knowledge that Wrice was involved in K.B.'s assault. (*Id.*)

Defendants claim that the affidavits Williams and Benson gave CHIP "are false and were procured through unethical and suspect tactics" (Doc. 94, at 2), and that "relevant information was ultimately excluded from Fowler's affidavit." (Doc. 117, at 5.) Defendants base these assertions, in part, on prior statements by these witnesses in 2005 to a Special Prosecutor appointed to investigate allegations of torture in the Chicago police precinct (Area 2) where Wrice, Williams, Benson, and Fowler were allegedly beaten and tortured when interrogated about K.B.'s assault. (Doc. 94, at 2; Doc. 94-16, at 10, 26, 32, 40-44; Doc. 115-4, at 37-80, 84.) Contrary to the affidavits they later gave CHIP in 2011 (and which CHIP submitted to the Illinois Supreme Court in support of Wrice's post-conviction petition), Defendants assert that none of those witnesses made any exculpatory statements about Wrice when interviewed by the Special Prosecutor six years earlier in 2005. (Doc. 94, at 2.)

For instance, when Williams was asked by the Special Prosecutor if he told the officers anything new or different as a result of the beatings he endured during his interrogation, Williams answered "No, not that I can remember." (Doc. 115-4, at 59-60.) Benson similarly told the Special Prosecutor about the beatings inflicted by Defendants Byrne and Dignan, but never recanted statements he had made against Wrice during that interrogation. (Doc. 94-16, at 10, 26, 32, 40-44; Doc. 94-15, at 53-56.) On the contrary, three years later in 2008, Benson gave deposition testimony in a civil case reaffirming his incrimination of Wrice. (Doc. 94-15, at 26-28: stating that Wrice had sex with K.B. and then took a hot carving fork upstairs and burned her with it.) And Fowler said nothing about Wrice's guilt or innocence when he was interviewed by the Special Prosecutor in 2005, though the affidavit he gave CHIP six years later attested that he never saw Wrice threaten or harm K.B. (Doc. 115-4, at 33-34, 84.)

Although Fowler is now deceased (Doc. 117-21, at 3), Wrice has disclosed both Williams and Benson as witnesses in this action. (Doc. 115-4, at 87-88: listing Williams for "Matters related to his interrogation and torture suffered at the hands of Byrne and Dignan," and Benson for "Matters related to criminal charges brought against Plaintiff.") Defendants contend that the original statements of these witnesses incriminating Wrice "were in fact truthful," and "but for the questionable methods used by the Students and Protess," they would not have recanted those statements in the affidavits they gave to CHIP. (Doc. 117, at 12.) Defendants also claim that "a substantial body of information has surfaced in the past several years concerning illegal and coercive tactics that were routinely utilized by Protess and his designees to obtain information and recantations from witnesses in several cases, including Plaintiff's case." (Doc. 94, at 5.) According to Defendants, "Witnesses from whom Protess procured recantations in other criminal cases have since come forward alleging that Protess and his team of investigators used coercion in various forms—dangling young female college students as sexual bait, impersonating movie producers, promising book/movie deals, making cash payments, and promising convicted murderers their freedom from prison—to procure false recantations from them." (*Id*. at 2.)

III. **The *Simon* Litigation**

Similar allegations are currently being lodged against Protess in other litigation now pending in this district: *Simon v. Northwestern Univ.*, No. 15-cv-1433 (N.D. Ill. filed Feb. 17, 2015). The plaintiff in that case, Alstory Simon, filed that lawsuit against Protess, Northwestern University, and others in February 2015. *Id.* Although certain of Simon's claims were voluntarily dismissed as time-barred, several Counts against Protess and the University remain. *Simon v. Northwestern Univ.*, --- F. Supp. 3d ---,

6

2016 WL 1622614, at *9 (Apr. 22, 2016).  According to Judge Dow's recent decision denying their motion to dismiss those claims, Simon alleges that in late 1998, Protess, his investigator, and several of his Northwestern journalism students "began investigating the 1983 double-murder conviction of Anthony Porter," and soon thereafter "formulated a plan to fabricate evidence that would exonerate Porter for the murders." *Id.* at *2.  Simon alleges that their "primary tactic" was to "develop an alternate suspect, and that person was Plaintiff, Alstory Simon." *Id.*  According to Simon's allegations, Protess and his investigator and students "knowingly manufactured and fabricated four pieces of false evidence which they contended dismantled the case against Porter and proved that Simon committed the murders." *Id.*  As a result, Simon allegedly was indicted "based solely on the false evidence manufactured by the Northwestern Team," pled guilty at the insistence of a lawyer procured for him by Protess's investigator "free of charge,"  and was sentenced to 52 years in prison in September 1999. *Id.* at *3.

Years later, in 2005-2006, two of the witnesses from whom the Northwestern Team had procured affidavits incriminating Simon allegedly recanted their statements, "explaining that they provided false testimony based on promises made by Defendant Protess." *Id.* at *4.  A reinvestigation of Simon's conviction followed, and in October 2014, the state court vacated all charges against Simon, at the suggestion of the Cook County State's Attorney's Office. *Id.*  Explaining that decision, the Cook County State's Attorney issued a press release stating that the investigation by David Protess and his team "involved a series of alarming tactics that were not only coercive and absolutely unacceptable by law enforcement standards, they were potentially in violation of Mr. Simon's constitutionally protected rights." *Id.*  Simon's lawsuit against Protess, Northwestern, and others followed a few months later. *Id.*

## IV.    The Pending Motions

The *Simon* litigation bears heavily on Protess's motion for a protective order in this case, as he seeks to preclude Defendants from using in *Simon* any discovery they take from Protess in this action.  (Doc. 82, at 7-9.)  But that's not all.  Protess also seeks to limit the scope of his deposition in this case "to questions surrounding the investigation of Stanley Wrice's case" (as opposed to any other investigations in which Protess participated, including Simon's), and to prohibit dissemination of his deposition testimony, and of any "private correspondence" produced in response to the subpoenas Defendants have served, "beyond the instant litigation."  (*Id.* at 17.)  In support of these requests, Protess explains that Defendants' attorney here (Andrew Hale) also represents Simon in his lawsuit against Protess, causing Protess to fear that discovery sought from him in this action will be used in *Simon*.  (*Id.* at 7-9.)  He also explains that Mr. Hale has produced a documentary-style film about Simon's conviction and exoneration (entitled "Murder in the Park"), which Protess contends "includes videotaped deposition testimony from Protess, taken by Mr. Hale, from separate litigation unrelated to Alstory Simon, and which has been edited to smear Protess and cause him embarrassment."  (*Id.* at 3.)

The Students' motion, by contrast, seeks to quash altogether the document and deposition subpoenas that Defendants served upon them, arguing that they are "third parties who had, at most, tangential involvement with any issue in this case and no involvement with any relevant issue."  (Doc. 106, at 1.)  Alternatively, the Students similarly seek a protective order precluding any documents or testimony they produce from being disseminated outside of this litigation (*i.e.*, in the *Simon* litigation or for any other purpose).  (*Id.* at 10.)

For the reasons explained below, both of the motions now before the Court are granted in part and denied in part. Specifically, the Court rejects the Student's request to quash the subpoenas served upon them in their entirety, and also rejects Protess's request to limit his deposition to the subject matter of Wrice's prosecution, conviction, and reinvestigation. The Court grants, however, the requests made in both motions to preclude dissemination of the documents and deposition testimony produced by these non-parties outside of this litigation, with the caveat that Defendants will be permitted to use any discovery taken from Protess, CIC, and/or the Students in the *Simon* litigation solely to the extent allowed by court order in that litigation.

## ANALYSIS

### I.      Protess's Request to Limit the Scope of His Deposition

Protess's request to limit the scope of his deposition to "the investigation of Stanley Wrice's criminal case" rests on two misguided evidentiary objections: relevance and hearsay. Protess claims first that he "has not been identified as a witness and indeed is not aware of any matter relevant to this case as to which he could offer competent testimony." (Doc. 82, at 1.) That assertion is difficult to square with Wrice's disclosure of Protess as a witness "related to the investigation into Plaintiff's innocence." (Doc. 115-4, at 89.) Nor is that disclosure undermined by Protess's insistence that Wrice's counsel have nevertheless informed Protess "that they do not intend to depose him or present his testimony at trial." (Doc. 101, at 3.) What matters is whether Protess has discoverable information, not whether he will testify at trial. And as even Protess admits, "the investigations and subsequent legal proceedings which led to Wrice's release from custody," regarding which Protess admits he has at least second-hand knowledge, are plainly relevant to this case. (*Id.* at 13-14; Doc. 101, at 2 n.2.)

Protess's companion hearsay objection fails for similar reasons. According to Protess, "any knowledge or belief that he has with regard to whether Williams was in fact tortured is necessarily based on hearsay. Indeed, it is based on double hearsay, as Protess had no involvement with Williams beyond his students' procurement of Williams' affidavit." (Doc. 101, at 14.) But again, what matters is whether Protess has discoverable information; and information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b). Whether the information in Protess's possession is based solely on hearsay, or double hearsay, is thus beside the point. Even if Protess had no direct involvement with Williams or the other witnesses from whom affidavits were submitted in Wrice's post-conviction case (Benson and Fowler), it is undisputed that those affidavits were procured by the Students while working for Protess's CHIP organization and "under his supervision." (Doc. 82, at 1.) Indeed, Protess admits that the Benson and Fowler affidavits were "obtained" by "Protess **and** his students." (Doc. 101, at 2, emphasis added.) These connections are more than sufficient for Defendants to depose Protess about the circumstances surrounding all three affidavits.

Nor can there be any dispute that all three affidavits are relevant to Wrice's claims in the instant case. Even Protess admits that this lawsuit "is basically about whether Defendants tortured Stanley Wrice and Bobby Joe Williams … thereby coercing false statements and testimony that led to Wrice's 1983 conviction for rape and deviate sexual assault." (*Id*. at 1.) Wrice's complaint confirms that relevance, given its extensive allegations about Williams' torture, coerced implication of Wrice, and recantation. (Doc. 63 ¶¶ 37-38, 41, 53, 65-69.) Protess also concedes that "the subsequent conviction of Stanley Wrice and others" for K.B.'s assault (*i.e.*, Benson and Fowler) is similarly relevant. (Doc. 101, at 2 n.2.) And again, Wrice's complaint bears

out that relevance with allegations that Benson and Fowler were also beaten by Defendants when interrogated about K.B.'s assault (Doc. 63 ¶ 49), just as those witnesses alleged in the affidavits they provided to Protess and the Students.  (Doc. 115-4, at 28-34.)  Defendants are therefore entitled to question Protess about all three affidavits and the circumstances under which they were procured.[2]

The Court also agrees with Defendants that Protess's procurement of similar affidavits in other cases is likewise relevant and discoverable here, because it potentially bears on the methods used to procure affidavits from Williams, Benson, and Fowler. Protess argues against such leeway, insisting that "questions pertaining to other cases, including but not limited to the *Simon* case, are wholly irrelevant to the case at hand."  (Doc. 82, at 15.)  But as noted above, Defendants contend that "the affidavits of Williams and Benson are false" and were procured through the same "unethical and suspect tactics" that Protess allegedly used in three other cases in which he procured exonerating affidavits submitted in support of wrongful conviction claims:  *Simon* and two cases discussed at length in Simon's complaint, *People v. McKinney*, and the "Ford Heights Four" case.  (Doc. 94, at 2, 16-17; *see also* Doc. 1 in Case No. 15-cv-1433.) According to Defendants, certain witnesses who gave Protess exonerating statements in these cases (in some instances, recanting their earlier incriminating statements against the wrongful conviction plaintiff, as Williams did here) did so solely as a result of the unethical tactics of Protess and his Northwestern team.  (Doc. 94, at 15-17.)

---

[2]     The parties spend considerable time debating the relevance of these affidavits, given that the Illinois Supreme Court expressly declined to rely upon them when remanding Wrice's post-conviction petition for further proceedings, and that neither Benson nor Fowler testified on remand.  (Doc. 82, at 3-4 and n.1; Doc. 101, at 2 and n.1; Doc. 94, at 19.)  But as noted above, even Protess tacitly admits that the affidavits of all three witnesses are relevant in this action. And in any event, any dispute as to their relevance is immaterial to Protess's motion (though not to the Students' motion, as discussed below), since Protess does not oppose discovery "regarding Williams' affidavit, nor, for that matter, about the other two affidavits that Protess and his students obtained from Rodney Benson and Michael Fowler."  (Doc. 101, at 2.)

Specifically, Defendants point to allegations in *Simon* that Protess and his students promised an incarcerated witness money and freedom to induce him to sign a false affidavit incriminating Simon (and thereby exonerating Protess's client), and similarly promised the same witness's aunt money and freedom for her nephew to sign a false affidavit. (Doc. 94, at 16; Doc. 94-4 ¶¶ 87-89.) Defendants also cite allegations reportedly made by the Cook County State's Attorney in connection with the *McKinney* case that Protess "may have paid a witness to recant; that other students 'flirted' with witnesses, in effect, to persuade them to make incriminating statements; and that students may have been so driven to get an A that they twisted or suppressed evidence to suit their cause of freeing McKinney." (Doc. 94-9, at 3.)  Defendants also point to similar reporting of an internal State's Attorney's Office memo "apparently prepared in the aftermath of the so-called Ford Heights Four case," in which Protess and his students were alleged to have "engaged in a wide range of questionable conduct." (*Id.* at 5.)  And, finally, Defendants cite Protess's own book about the Ford Heights Four case (*A Promise of Justice*), which Defendants say details Protess's allegedly successful tactics for procuring such helpful testimony, including falsely posing as a Hollywood producer and promising a movie deal, "using female students as bait to induce witness statements," and cash payments. (Doc. 94, at 17 n.9.)

Protess counters that the Ford Heights Four case is "two-decades-old," and the "related internal-memorandum from the Cook County State's Attorney's Office [is] filled with 'unsubstantiated accusations' about the integrity of their investigation of that case." (Doc. 101, at 15.)  And, of course, Simon's allegations are similarly unproven.  But so are most allegations subject to discovery.  The point is, Defendants contend that Protess and the Students have a playbook for getting false affidavits, and that they used

it to procure false affidavits from Williams and Benson in order to argue Wrice's innocence. Since Defendants have articulated a basis to question the veracity of those affidavits (prior inconsistent statements by both Williams and Benson to the Special Prosecutor and in deposition testimony), Defendants are entitled to probe the methods that Protess and the Students used to procure them. And since Defendants have also articulated a basis to suggest that Protess and the Students developed and refined those methods in other cases (allegations of similar unethical tactics in three other cases), Defendants are also entitled to inquire about the affidavits obtained in those other cases and how they were gotten.

Perhaps anticipating that outcome, Protess mounts another evidentiary retort: "Even assuming *arguendo* that Defendants' baseless accusations were true, and Protess had persuaded individuals in *other* cases to provide false recantations, Protess' testimony to that effect would not be admissible *here*," because "Defendants simply cannot impeach Williams by introducing Protess' prior bad acts." (Doc. 101, at 14.) But again, admissibility is not a prerequisite to discoverability. And while Protess's prior bad acts may not be used to impeach Williams *per se*, they may shed light on the methods Protess and the Students allegedly used to procure a false affidavit from Williams. And since William's credibility is plainly at issue in this case—indeed, he is featured throughout Wrice's complaint and has been designated as a witness (Doc. 63, ¶¶ 1, 37-38, 41, 53, 65-69, 71, 77, 79, 81-83, 93-94, 110; Doc. 115-4, at 87)—any such methods actually used with Williams may indeed be heard by a jury one day.

## II. The Students' Motion to Quash

The foregoing discussion applies equally to the Students' claim that they "have nothing – neither documents nor testimony – that would likely lead to relevant

information in this case." (Doc. 106, at 4.) According to the exhibits attached to the Students' motion, Defendants appear to seek from each of the Students both deposition testimony and all documents, including email messages, "that refer or relate, in any way, to the investigation of the Stanley Wrice case." (Docs. 106-1 and 106-2.)[3] In support of those requests, Defendants assert that each of the Students participated, along with Protess, in an investigation into Wrice's claimed innocence of K.B.'s assault, and in the course of that investigation, had contact with one or more of Wrice, Williams, Benson, and/or Fowler. (Doc. 117, at 4-7.) The Students do not dispute their participation in that investigation, or that they had contacts with the foregoing witnesses during its course (as detailed below). Instead, they contend that "[a]ny investigation the Students performed regarding the identity of the person who actually committed the crime of which Stanley Wrice was convicted in the 1980s has nothing to do with whether Stanley Wrice was tortured by police officers – the heart of the claim at issue in this case." (Doc. 106, at 4.) Arguing from that premise, the Students insist that the information Defendants seek from them "does not bear on any material issue in the instant lawsuit," and that the document and deposition subpoenas directed at the Students therefore should be quashed in their entirety. The Court disagrees.

Although Wrice's complaint in this action does allege that he was tortured by police during his interrogation about K.B.'s assault, he also alleges "wrongful charging, prosecution, conviction, and imprisonment." (Doc.63 ¶ 83.) Specifically, Wrice claims that Defendants committed these violations "by committing or causing to be committed one or more of the following acts: coercing, constructing and/or fabricating the false

---

[3]     Although the Students attached document subpoenas directed at each of them (Doc. 106-2), they explain that Ms. Vaillancourt was not properly served with any subpoena. (Doc. 106, at 1 n.1.) Additionally, although the Students attached deposition subpoenas directed at Ms. Bensing, Ms. Lerner, and Ms. Thacker, the record appears to include only a Notice of Ms. Vaillaincourt's deposition, and no deposition subpoena directed to her. (Doc. 106-1.)

and totally unreliable inculpatory statements from Bobby Joe Williams, Plaintiff, and other witnesses, which formed the basis for Plaintiff's charging, prosecution and conviction." (*Id.*)  Particularly relevant to these allegations are the affidavits that Protess and the Students procured from Williams (claiming that he was tortured into implicating Wrice), Benson (claiming that he was beaten and falsely implicated Wrice), and Fowler (claiming that he was beaten and had no knowledge of Wrice's involvement in K.B.'s assault).   (Docs. 115-5, at 23-34.)   As explained above, Defendants contend that Williams' and Benson's affidavits "are false and were procured through unethical and suspect tactics" (Doc. 94, at 2), and that Fowler's affidavit excluded "relevant information." (Doc. 117, at 5.)  To the extent the Students have information bearing on the procurement of these affidavits (and the record indicates that they do), Defendants are entitled to explore it.

For example, Wrice himself disclosed Ms. Bensing, Ms. Lerner, and Ms. Thacker as witnesses "related to the investigation into Plaintiff's innocence," and listed "the investigatory file generated by the Chicago Innocence Center" among the documents bearing on his claims.  (Doc. 115-4, at 89, 95.)   Defendants also cite documents indicating that the Students had contact with Wrice, Williams, Benson, and Fowler. These documents show that arrangements were made for Kayla Bensing to interview Wrice, that she did interview Williams, and that she was involved in the efforts to procure affidavits from Fowler and Benson.  (Docs. 117-4 to 117-8.)  The record further indicates that Kira Lerner interviewed Fowler (Docs. 117-10 to 117-11) and Benson (Doc. 117-13), in addition to witnessing Williams' affidavit.  (Doc. 115-4, at 25.)  The documents also show that Quinn Thacker was scheduled to participate in interviewing Wrice (Doc. 117-4), and that she "was instrumental in getting in touch with" Williams

and "getting him to go on the record with his affadavit [*sic*]" (Doc. 117-18), although she later declined to give the Special Prosecutor a statement about her contacts with Williams. (Doc. 117-19.) And the record also shows that Jamie Vaillancourt interviewed Wrice (Doc. 117-22), had contacts with Fowler before he signed his affidavit, and witnessed it when he did. (*Id.*; Doc. 115-4, at 34; Doc. 117-20.)

To be sure, the Students dispute Defendants' characterization of these contacts (*e.g.*, that Williams "needed to be 'convinced'" to recant his prior testimony, that they "harassed or confused witnesses," and that they "withheld" information from the Special Prosecutor). (Doc. 124, at 4-5 and nn.2-3.) But the Students do not dispute that they did, in fact, interview Wrice, Williams, Benson, and Fowler, and participated in procuring the affidavits from the latter three. (*See* Doc. 110, at 4: admitting that "they interviewed witnesses.") Instead, the Students contend that the information they gained from these contacts is "inherently derivative and available from another source" (Doc. 110, at 4), because "the witnesses themselves are the best source of this information." (Doc. 124, at 6.) But Fowler is reportedly deceased. (Doc. 117-21.) And even the remaining witnesses are less able to speak to what the Students did and said to procure their affidavits than the Students themselves, not to mention the impeachment evidence that the Students may have, and which the witnesses may be unable or unwilling to admit.

Nor is the information that the Students have about their own interviews of these witnesses cumulative of Protess's testimony on that subject, as the Students now contend. Whereas the Students insist that "Protess also had contact with these witnesses" (*id.*), Protess asserts that the Students "obtained" the affidavits, and that he "was not present when the affidavits were provided." (Doc. 82, at 1, 3.) Given their mutual finger-pointing and the other circumstances presented here, the Court is

satisfied that Defendants have a need to depose Protess *and* the Students about all of their contacts with all of these witnesses.

For the same reasons, the Court rejects the Students' companion contention that the "only subject" about which they could provide competent testimony "would relate to the lessons taught by David Protess" (Doc. 110, at 5), and since he has already agreed to be deposed, that information is available from "Protess himself." (*Id.*; Doc. 124, at 6.) According to the Students, "he would be the source of any strategies given to the students on what methods, if any, to use in interviewing witnesses." (Doc. 124, at 6.) But here again, with Protess's methods in question (and in dispute), Defendants are entitled to ask both the teacher and his students about them, and about how (if at all) they were used with Williams, Benson, and Fowler. The Students may be deposed regarding all of these subjects, as well as their contacts with Plaintiff Wrice himself.

This ruling similarly disposes of the Students' assertion that their depositions would cause an undue burden. Although the Court granted the Students leave to supplement their argument regarding any burden the subpoenas might cause them, they persisted in contending that the information sought from them is "irrelevant," "collateral," and "available from another source." (Doc. 110, at 2-6.) Thus, they argue, "[b]ecause there is no relevance to their testimony, any burden is an undue burden." (*Id.* at 4.) As explained at length above, however, the Students have relevant (indeed, central) information on several subjects, including their contacts with Wrice, Williams, Benson, and Fowler; their procurement of affidavits from the latter three; the methods Protess taught them about interviewing such witnesses; and how those methods were used with those witnesses. Accordingly, adopting the Students' approach of balancing "the burdensomeness of the request against the relevance of the discovery sought" (*id.*

at 3), the Court concludes that the substantial relevance of the discovery sought from the Students plainly outweighs the inconvenience of their depositions.

In so holding, the Court is mindful that the Students are non-parties, who (under ordinary circumstances) should be spared inconvenience to the extent possible. But while their work on Wrice's case took place several years ago, the Students are hardly uninvolved non-parties, having played an active role in collecting the evidence on which Wrice relies for his claims here. Nor do the professional and personal circumstances (multiple jobs, burgeoning careers, and caring for family members) that the Students say will make their depositions difficult to prepare for, schedule, and attend (Doc. 110, at 6-7) render their depositions unreasonable. Such conflicts commonly occur in discovery, and Defendants' counsel are expected to work around them without Court intervention.[4] The only remaining issue, then, is the Students' understandable concern that their documents and deposition testimony may be disseminated or published outside of this litigation (Doc. 124, at 1), to which the Court now turns.

## III. The Requests of Protess and the Students to Prohibit Dissemination or Use of their Documents and Deposition Testimony Outside of this Litigation

In support of their request for a protective order precluding use or dissemination of their documents and deposition testimony outside of this lawsuit, Protess and the Students point to Mr. Hale's documentary film ("A Murder in the Park"), in which Protess's previous deposition testimony was used without his permission. (Doc. 82, at 5, 12; Doc. 124, at 1, 8-9. Fearing a sequel, they argue that a protective order is necessary to prevent similar commercial use or other publication of any discovery they provide in this case. (*Id.*) Protess also argues that Hale's dual role as Defendants'

---

[4]     Although the Students' motion also complained of the burden associated with producing responsive documents (Doc. 106, at 4), that issue appears to have been resolved, since they already "agreed to produce materials responsive to the Records Subpoenas," subject to a protective order requiring their confidential treatment. (Doc. 110, at 2.)

counsel here and the plaintiff's counsel in *Simon* (in which Protess has been sued) will lead to discovery in this case being used (or misused) in *Simon*. (Doc. 82, at 4-7.)

Defendants do not deny use of Protess's past deposition testimony in Hale's documentary film (Doc. 94, at 12 n.5); nor do they disavow any intention to use discovery produced by Protess and the Students in this case also in the *Simon* litigation. Instead, despite these concerns, Defendants argue that "Protess has failed to identify any right sufficient to enable the Court to abridge Defendants' First Amendment right to disseminate information they obtain through discovery, including the videotape of his deposition." (*Id.* at 20.) Again, the Court disagrees.

A.   **The Requirement of "Good Cause" to Restrict Dissemination of Discovery Materials under the First Amendment**

Defendants are correct that the First Amendment protects, to a certain degree, a litigant's right to disseminate discovery materials outside of the case in which they were produced. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32-37 (1984). But Supreme Court and Seventh Circuit authority make clear that this right is far from unfettered. "Although litigants do not surrender their First Amendment rights at the courthouse door, . . . those rights may be subordinated to other interests that arise in this setting." *Id.* at 32 n.18 (citation, internal quotation marks omitted); *Bond v. Utreras*, 585 F.3d 1061, 1076 (7th Cir. 2009) (acknowledging "the *limited* right of litigants under the First Amendment to 'disseminate information discovered in advance of trial'" (quoting *Seattle Times*, 467 U.S. at 34 (emphasis added))). As the Supreme Court explained in *Seattle Times*, that is because discovery "rarely takes place in public," and pretrial discovery materials (such as depositions and interrogatory answers) "are not public components of a civil trial." 467 U.S. at 32-33 and n.19. A court's continued control over such non-public materials therefore "does not raise the same specter of government censorship

that such control might suggest in other situations." *Id.*  Nor is it "the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Id.*

"In sum, judicial limitations on a party's ability to disseminate information discovered in advance of trial implicates the First Amendment rights of the restricted party to a far lesser extent than would restraints on dissemination of information in a different context." *Id.* at 34.  But even so, the First Amendment does require a "substantial governmental interest unrelated to the suppression of expression" to justify such a restraint.  *Id.*  Rule 26(c) furthers such a "substantial governmental interest," to the extent its "good cause" requirement is met.  *Id.*; *Utreras*, 585 F.3d at 1067, 1074.  Accordingly, "where, as in this case, a protective order is entered on a showing of good cause as required by Rule 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment."  *Seattle Times*, 467 U.S. at 37.

Defendants do not dispute this.  On the contrary, they acknowledge that a court may "restrict" a party's "First Amendment right to disseminate" information received in pre-trial discovery "upon a showing of good cause." (Doc.  94, at 6-7, 20, citing *Seattle Times.*)   Thus, notwithstanding Defendants' invocation of the First Amendment in opposition to the current motions, both sides agree that resolution of Protess's and the Students' request to restrict dissemination of the documents and deposition testimony they produce in this case depends simply upon their demonstration of "good cause" for such relief, as required under Fed. R. Civ. P. 26(c).  (*Id.*; Doc. 82, at 2, 5-15; Doc. 106, at 6-10.)  And as explained below, the Court concludes that Protess and the Students have met Rule 26(c)'s "good cause" requirement on two independent grounds:  (1) risk that the information they produce may be published to the detriment of their privacy and

reputations, and (2) risk that the information may be used without leave in the *Simon* litigation.  The Court addresses each argument, in turn.

**B.    Protess and the Students Have Demonstrated Good Cause for a Protective Order in this Case**

**1.    The Need to Protect Privacy and Reputational Interests**

Protess and the Students contend that good cause exists for a protective order in this case to safeguard their privacy interests in certain email correspondence which Protess describes as "personal," and to prevent embarrassment that might be caused by publication of their documents or depositions in a documentary film or otherwise. (Doc. 82, at 9-14; Doc. 106, at 7-8; Doc. 124, at 7-10.)  As to the latter concern, Protess points to reports of a planned sequel to Hale's "Murder in the Park" documentary, in which the discovery sought here might be used, if not protected. (Doc. 82, at 5.) Defendants, on the other hand, dispute that the requested documents "contain any personal information that is traditionally protected," such as "identifiers, health information, family and associates, or bank accounts."  (Doc. 94, at 10.)

*Seattle Times* makes clear that non-public information produced in discovery that may be "damaging to reputation and privacy" is subject to a court's restrictive powers. *Seattle Times*, 467 U.S. at 35.  As Defendants acknowledge, moreover, Rule 26(c) similarly allows for the protection of such information to spare "annoyance, embarrassment, oppression, or undue burden or expense."  (Do. 94, at 6.)  Accordingly, regardless of whether the requested documents contain information that is strictly confidential, "'[g]iven the 'extensive intrusion into the affairs of both litigants and third parties' that is both permissible and common in modern discovery, . . . the rules provide for the use of protective orders, entered for 'good cause,' to protect litigants and third parties from the 'annoyance, embarrassment, oppression, or undue burden or expense'

that may attend the discovery process." *Utreras*, 585 F.3d 1061, at 1067 (quoting *Seattle Times*, 467 U.S. at 30 *and* Fed. R. Civ. P. 26(c)).

Defendants nevertheless contend that privacy and reputational interests are insufficient to justify a protective order in this case, because "the public's interest in the discovery materials outweighs any potential embarrassment." (Doc. 94, at 12.) But here again, Supreme Court and Seventh Circuit precedent is against them. Following *Seattle Times*, Seventh Circuit case law holds that unfiled discovery materials "can be shielded from the public eye." *City of Greenville, Ill. v. Syngenta Crop Protection, LLC*, 764 F.3d 695, 697 (7th Cir. 2014) ("Once filed with the court, however, documents that affect the disposition of federal litigation are presumptively open to public view unless a statute, rule, or privilege justifies confidentiality." (brackets, ellipses omitted, quoting *In re Specht*, 622 F.3d at 701)); *Utreras*, 585 F.3d at 1075 ("The rights of the public kick in when material produced during discovery is filed with the court . . . and consequently the possibility exists that they could 'influence or underpin the judicial decision.'" (quoting *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002)). Obviously, no such judicial use has been made of the discovery sought from Protess and the Students, as it has yet to be produced.[5]

Nor have Defendants demonstrated any other public interest requiring disclosure of the documents or deposition testimony that Protess and the Students have been asked to provide. Indeed, Defendants themselves challenge their own argument that Protess "has thrust himself into the public sphere and the public is entitled to scrutinize his investigative techniques" (Doc. 94, at 13), when they argue just a few pages later

---

[5]     Moreover, as this Court recently explained in *Saunders v. City of Chi.*, 12-cv-9158, there is some question as to whether even filed discovery materials are presumptively open to public view if not considered by a court in connection with a substantive (non-discovery) motion. (*See* Doc. 405 in Case No. 12-cv-9158, at 4-7.)

that Protess "is not a public figure in the same sense as an elected official or a rock star" or other "high profile" individual who might require protection under Rule 26(c) to safeguard his public persona or related commercial interests. (*Id.* at 20-23.) It goes without saying that Defendants can't have it both ways. But in either case, their contention that "Protess and his compatriots have been responsible for the extreme public interest in allegations of police misconduct in Area 2," and the public now "has a right to 'the other side' of the story" (*id.* at 14) falls short.

For one thing, the "other side of the story" that Defendants seek to tell argues that Protess and his students have used "unethical and suspect tactics." (Doc. 94, at 2, 15-18.) Such accusations plainly attack their personal and professional reputations, would invade their privacy, and cause them embarrassment—all interests squarely warranting protection under *Seattle Times* and its progeny. And while Defendants are correct that some courts in this district have held a defendant *police officer's* reputational interest to be outweighed by the public's interest in "allegations of *police* misconduct" (*id.* at 13-14, emphasis added), other courts in this district have reached the opposite conclusion, distinguishing the very case law Defendants cite. *See Lane v. Salgado*, No. 13 C 3764, 2014 WL 889306, at *1-2 (N.D. Ill. Mar. 5, 2014) (declining to follow *Wiggins v. Burge*, 173 F.R.D. 226, 229 (N.D. Ill. 1997), and concurring with other decisions limiting disclosure of such information, in holding that the "substantial interest" in ensuring that the discovery process is not abused, as recognized in *Seattle Times*, "outweighs the public's interest in learning how a municipal government investigates police misconduct claims"). That result is all the more appropriate here, where Protess and the Students are neither public official defendants, nor even parties in this case.

As explained in *Lane*, however, this "does not necessarily mean" that Defendants "will not have the opportunity to publicly file and thereby publicize" the information sought here. *Lane*, 2014 WL 889306, at *2. "Evidence that is necessarily part of the decision-making process almost always should be available to the public in order for the public to understand why a court or jury made a decision. But there is a difference between the public's interest in evidence presented at a public trial and materials exchanged between the parties during the discovery process." *Id.* (internal quotation marks, citations omitted). It is impossible to know now, at this early discovery stage, whether the materials to be produced by Protess and the Students will later find their way into a public record when the merits are addressed in this case, or in *Simon*.

### 2. The Need to Prevent Unauthorized Use of Discovery in *Simon*

As discussed above, while Protess and the Students are non-parties here, Protess is a defendant in the *Simon* litigation, and Defendants' counsel here (Hale) represents the plaintiff who is suing Protess in *Simon*. These connections, Protess argues, make it "highly likely" that Defendants' counsel will use the discovery Protess and the Students produce here also in *Simon*, so they seek a protective order from this Court precluding any such dual use of the discovery they produce in this case. (Doc. 82, at 6.) To support that request, Protess pointed to motions to dismiss and for a stay of discovery he had filed in *Simon*, which he claimed imposed a "*de facto* stay of discovery" in that case. (*Id.*) Since the filing of Protess's motion for a protective order in this case, however, his motions to dismiss and for a stay in *Simon* have been denied, thereby allowing discovery in that case to proceed. (Doc. 94, at 8.) Therefore, Defendants argue, "Protess' arguments regarding the potential for improper use of the email correspondence and his deposition in the *Simon* case are also moot." (*Id.*)

But the allowance of discovery in *Simon* says nothing of whether this Court should restrict the dissemination of discovery produced in this case, much less moot Protess's and the Students' request for a protective order to prevent it. As Protess argues, there is no "right" under the Federal Rules "to use pretrial discovery in one case for the prosecution of another case." (Doc. 82, at 8, quoting *Sasu v. Yoshimura*, 147 F.R.D. 173, 176 (N.D. Ill. 1993) (citing *Seattle Times*, 467 U.S. at 32-34); *Acuna v. Rudzinski*, No. 00 C 5635, 2001 WL 1467529, at *5 (N.D. Ill. Nov. 16, 2001).) That is because Rule 26 "says nothing about discovery for the purpose of assisting attorneys or parties in other pending cases or for the purpose of collecting information for possible use in cases that might arise in the future." *Acuna*, 2001 WL 1467529, at *5.

So the question presented here, once again, is whether there is "good cause" to prohibit use of discovery produced in this case also in other litigation—namely, *Simon*. Defendants argue no, because "any information related to Protess and his methods of investigation would be equally discoverable in *Simon* and the case at hand." (Doc. 94, at 8 and n.2.) But that is not for this Court to say, much less sight unseen, and where the reputational and privacy interests of non-parties (*i.e.*, the Students) are concerned. Given those interests, which the Court has already concluded warrant an order prohibiting public dissemination of the discovery that Protess and the Students will produce in this case, the prudent course is to prohibit dissemination or use of that information outside of this case, subject to a court order in *Simon* allowing its use in that action. To the extent any party in *Simon* believes the information produced here is also relevant in that case, it may present those arguments to the *Simon* court at the appropriate time.

## **CONCLUSION**

For the reasons stated above, the Motion by Non-Parties David Protess and Chicago Innocence Center for Entry of Protective Order (Doc. 82) and the Motion to Quash Subpoenas or in the Alternative for a Protective Order on Behalf of Third Parties Kayla Bensing, Kira Lerner, Quinn Thacker, and Jaimie Vaillancourt (Doc. 106) are both granted in part and denied in part on the terms outlined in this Order.

ENTERED:

Dated: November 29, 2016

_____
Sheila Finnegan
United States Magistrate Judge