# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| STANLEY WRICE, | ) | |
| | ) | No. 14 C 5934 |
| Plaintiff, | ) | |
| | ) | The Honorable Elaine E. Bucklo |
| vs. | ) | |
| | ) | |
| JON BURGE, et al. | ) | Magistrate Judge Sheila M. Finnegan |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS BYRNE AND DIGNAN'S MOTION FOR SUMMARY JUDGMENT

Defendants John Byrne ad Peter Dignan, by their attorneys, pursuant to Federal Rule of Civil Procedure 56, hereby move this Court for summary judgment in their favor. In support thereof, defendants state:

## PROCEDURAL HISTORY

On September 25, 2015, this Court issued an extensive ruling on motions to dismiss filed by various defendants, including Byrne and Dignan. (Dkt. #59). Following that ruling, plaintiff filed a First Amended Complaint ("FAC") in an attempt to remedy certain deficient claims. (Dkt. #63). The remaining defendants moved to dismiss the amended claims in the FAC, which resulted in this Court's Order of February 8, 2016. (Dkt. #74). At this point, three claims from the FAC remain pending against defendants Byrne and Dignan: Count I, a due process claim, alleging both *Brady*-based liability and fabrication of evidence (specifically, fabrication of false statements from plaintiff and Bobby Joe Williams); Count II, a coercive interrogation claim; and, Count III, a conspiracy claim.

## STATEMENT OF FACTS

The relevant facts are set forth in defendants' Rule 56.1 Statement of Facts ("SOF") filed

concurrently with this motion.

## LEGAL STANDARD

A court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (Fed. R. Civ. P. 56(a)). The burden is on the moving party to identify those portions of the pleadings, depositions, and other discovery-related materials that demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must set forth specific facts, through affidavits or other materials, that demonstrate disputed material facts. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "Merely alleging a factual dispute cannot defeat the summary judgment motion." *Samuels v. Wilder*, 871 F.2d 1346, 1349 (7th Cir. 1989). "Conclusory allegations by the party opposing the motion cannot defeat the motion[;]" rather, "[t]he party opposing the motion must come forward with evidence of a genuine factual dispute." *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

A scintilla of evidence in support of the non-moving party's position is insufficient to avoid summary judgment. *Anderson*, 477 U.S. at 251. Further, reliance on unsupported speculation does not meet a non-moving party's burden of providing sufficient defense to a summary judgment motion. *Hedberg*, 47 F.3d at 931-32 ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is the primary goal of summary judgment") (emphasis in original); *see also Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012) (Viewing evidence in the light most favorable to the non-moving party "does not extend to drawing inferences that are supported by only speculation or conjecture"). At the summary judgment stage, "saying so doesn't make it so; summary judgment

may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact[.]" *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010).

## ARGUMENT

### I. PLAINTIFF'S COERCED CONFESSION CLAIMS ARE TIME-BARRED

Plaintiff alleges both a Fifth Amendment coerced confession claim and a Fourteenth Amendment coercive interrogation claim. Both claims are time-barred.

#### A. *Heck* Does Not Apply To Plaintiff's Fifth Amendment Claim Because There Was Other Evidence Sufficient To Support His Conviction

At the pleadings stage, this Court accepted that the *Heck* delayed accrual rule applied to plaintiff's Fifth Amendment claim in reliance on the allegation that the state court judge who ordered a new trial believed plaintiff's confession was central to his conviction such that evidence of coercion was enough to cast doubt on the validity of the resulting conviction. (Dkt. #59, 24-25). Specifically, this Court held that: "The centrality of Wrice's confession to the prosecution's case means that *Heck* barred him from bringing a coerced confession claim until his underlying conviction had been set aside." (*Id.* at 25). The Court also cited to case law that reiterates the well-established principle of law that the *Heck* delayed accrual rule only applies to a section 1983 claim if success on that claim would *necessarily* undermine the plaintiff's conviction or sentence. (*Id.*)[1] As such, whether a Fifth Amendment coerced confession claim is subject to deferred accrual under *Heck* is a case-by-case inquiry. (*Id.*). And where a plaintiff has adequately pleaded that the allegedly coerced statement was the central evidence used to convict him, dismissal at the pleading stage is not proper. *Patrick v. City of Chicago*, 103 F. Supp. 3d

---

[1] Under *Heck*, a civil claim may not be brought until the plaintiff's conviction is vacated or overturned *if* success on the claim would *necessarily* undermine the validity of the conviction. *Heck v. Humphrey*, 512 U.S. 477, 486 (1994).

907, 914 (N.D. Ill. 2015) ("Plaintiff's complaint alleges that his coerced confession was "the only evidence used against him at trial" and that no other evidence linked him to the murders. While Defendants insist that other evidence linked Plaintiff to the crime, the motion to dismiss stage is not the appropriate time for them to challenge the factual allegations of the complaint.")

However, if the record, once developed establishes that there was other evidence at trial which supported the plaintiff's conviction, a statute of limitations defense may be raised at the summary judgment stage. *Id.* ("if [record establishes] other evidence at trial in fact implicated Plaintiff, Defendants may raise the statute of limitations defense on summary judgment"); *see also Saunders v. City of Chicago*, 146 F. Supp. 3d 957, 967 (N.D. Ill. 2015) (because plaintiffs alleged that their coerced confessions was the only evidence implicating them at trial, defendants statute of limitations defense based on the inapplicability of Heck premature at the dismissal stage; however, "Defendants are free to re-raise this argument at the summary judgment stage should evidence surface indicating that Plaintiffs' incriminating statements did not figure prominently in their respective convictions and sentences, such that the invalidity of those confessions does not call Plaintiffs' convictions and sentences into question."). In an opinion issued after briefing was concluded on defendants' initial motion to dismiss, the Seventh Circuit confirmed that where there is other evidence supporting a conviction, delayed accrual under *Heck* does not apply to a §1983 claim based on the use of physically coerced inculpatory statements to obtain a conviction. *Hill v. Murphy,* 785 F.3d 242, 245-50 (2015) (use of a physically coerced inculpatory statement is subject to harmless error analysis for purposes of determining whether *Heck* deferred accrual rule applies; where other evidence supported the conviction, therefore, a section 1983 action based on the use of physically coerced, inculpatory statements to convict plaintiff not subject to *Heck* delayed accrual rule).

4

Here, although plaintiff alleged that his coerced statement was the central evidence used to convict him, the record at his criminal trial establishes that there was substantial other evidence that was more than sufficient to support his conviction.

Kenny Lewis' And Other Significant Testimony At Plaintiff's Trial

The testimony of eyewitness Kenny Lewis alone was sufficient to support plaintiff's conviction. Lewis testified at plaintiff's trial that on September 9, 1982, he arrived at plaintiff's home at approximately 1:00 a.m. (SOF, ¶ 20). After he entered the home, he went into the kitchen where he saw Kim and Lee Holmes and stayed in there talking with them. (*Id.*).

After about thirty minutes, Patricia Wrice came into the kitchen and asked where Bobby Joe Williams was. (*Id.* at ¶ 21). Kim told her that Williams was upstairs and that there was also a white woman upstairs too. (*Id.*) At that point, Williams came down the stairs leading into the kitchen, spoke to Patricia and went into Patricia's bedroom with her. (*Id.*) Lewis, Holmes and another person then went upstairs. (*Id.*)

When Lewis got upstairs, he saw the white woman on the bed, unclothed and there were no burns or other injuries on her body. (*Id.* at ¶ 22).

Lewis also saw plaintiff, Rodney Benson who he knew as "Span", Michael Fowler who he referred to as "Little Mike" and the "bicycle rider" upstairs around the bed. (*Id.* at ¶ 23). Lewis saw Benson, Fowler and the bicycle rider have sexual intercourse with the woman. (*Id.*).

After the bicycle rider had intercourse with the woman, Lewis heard the woman say "no" more than one time. (*Id.* at ¶ 24). As the woman was saying "no", plaintiff began hitting her. (*Id.*). Lewis intervened and pulled plaintiff off of the woman, plaintiff stopped hitting her and he (Lewis) went back downstairs into the kitchen where he saw Kim and Holmes. (*Id.*)

A short time later, plaintiff came downstairs and began picking up bottles while stating

that "he hated fucking white people". (*Id.* at ¶ 25). As plaintiff was picking up bottles, Lewis was taking the bottles from him. (*Id.*). Lewis then saw plaintiff pick up an iron that was on the stove. He took the iron away from plaintiff and plaintiff then went back upstairs. Lewis also saw a two-pronged fork on the stove. When the iron was on the stove, the stove was lit. (*Id.*)

After plaintiff returned upstairs, Lewis heard sounds of smacks and slaps coming from upstairs. (*Id.* at¶ 26). At that point, Patricia Wrice came back into the kitchen and said she was going to call the police. (*Id*). Lewis then went back upstairs and saw plaintiff beating the woman with his fists. (*Id.*).

Lewis intervened and pulled plaintiff off of the woman. Plaintiff broke loose from Lewis and began beating the woman a second time. Lewis again intervened, plaintiff again broke loose and began beating the woman a third time. (*Id.* at ¶ 27). By the third time Lewis pulled plaintiff off of her, the woman had stopped moving. (*Id.*).

Lewis then went back downstairs and left the house. "Butch," Benson, Fowler and Kim also left the house at that time. (*Id.* at ¶ 28). Plaintiff, Holmes and the bicycle rider were still in the house when Lewis left. (*Id.*). Lewis dropped off Butch at 75th and Clyde where he saw Benson and Kim but not Fowler. (*Id.*)

Lewis then went back to plaintiff's house where he saw Benson and Kim parked outside. Kim got into Lewis' truck and he took her to get some food. They returned about twenty minutes later because Kim was temporarily staying at plaintiff's home and Lewis went inside with Kim into the kitchen and talked with her for a while. (*Id.* at ¶ 29).

Lewis then went back upstairs to see if the woman was still there. (*Id.* at ¶ 30). The woman was still upstairs; she was not moving; and she had been burned "from head to toe." (*Id.*). The burn marks on the woman's breasts and legs were in the shape of an iron (*Id.*). Plaintiff and

the bicycle rider were the only other people upstairs with the woman at this time. (*Id.*).

Lewis then went back downstairs and a short time later, he heard plaintiff say, "where are you going?" (*Id.* at ¶ 31). Plaintiff then came downstairs, picked up a hot spoon off the stove and returned upstairs. (*Id*). Lewis then heard the woman say "why are you burning me?" (*Id.*). Shortly thereafter, Lewis heard the woman falling down the steps. (*Id.*).

Lewis then saw the woman and plaintiff standing on the back porch. (*Id.* at ¶ 32). Lewis heard plaintiff tell the woman that she was on Yates street and Lewis then saw plaintiff slap the woman and saw the woman fall. (*Id.*).

Other trial witnesses in addition to Kenny Lewis provided testimony that supported plaintiff's conviction. Charles Wrice, plaintiff's brother, also testified that he heard people running up and down the stairs while he was in his bedroom and came out to see what was going on. (SOF, ¶ 33). He went upstairs, saw plaintiff there and returned to his bedroom. (*Id.*).

Patricia Wrice, plaintiff's sister, testified that while she was in her bedroom in the early morning hours of September 9, 1982, she heard a lot of noise coming from the kitchen and people running up and down the stairs. (SOF, ¶¶ 34, 35). She also testified that she was very concerned about what was going on in the Wrice home; that she was so concerned she ordered everyone out; and that at one point started to get dressed so she could walk to the pay phone and call the police. (*Id.* at ¶ 36).

LaBrenda White, then an assistant state's attorney who also later became a judge, testified that at a meeting on April 25, 1983, Patricia told her and Justice Lampkin that when she was in the kitchen with Holmes, she heard a voice from upstairs say "suck my dick" and Holmes said to her "I think he is trying to make her suck his thing." (SOF, ¶ 37). Judge White also testified that during the meeting with Patricia, she took extensive notes and that Patricia

reviewed the notes and made corrections throughout. (*Id.*).

Detective Dioguardi testified that Patricia told him that Benson, Holmes, Fowler and Lemon were running up and down the stairs laughing and saying they had a girl upstairs and that she heard someone hitting someone upstairs. (SOF, ¶ 38).

Tying things all together, plaintiff himself testified that he went upstairs twice while K.B. was there. (SOF, ¶ 50).

Plaintiff's Allegedly Coerced Statement

Plaintiff has repeatedly alleged and testified that he never gave an inculpatory statement to Byrne and Dignan. (SOF, ¶ 12). And Byrne never testified that he did. (*Id.* at ¶ 57). Plaintiff has also alleged testified that he did not remember the statement he gave to McCurry until he saw the "record." (*Id.* at ¶ 14). Because, his statement to McCurry was oral, McCurry's testimony at plaintiff's trial is the only "record" (and evidence) of his statement to McCurry. (*Id.* at ¶ 18). That testimony establishes that plaintiff's statement, as compared to the overwhelming evidence set forth above, was not central to his conviction; indeed, any inculpatory facts in the statement were not even necessary to secure plaintiff's conviction.

McCurry testified at trial that plaintiff told him that, after K.B. was taken upstairs by Benson, he (plaintiff) went upstairs too and that Lee Holmes, Rodney Benson and Michael Fowler were in the room as well. (SOF, ¶ 19). Plaintiff stated that the bike rider was having sex with K.B. and that when he was finished, Benson had sex with K.B. (*Id.*) Plaintiff also told McCurry that Benson was slapping and hitting the woman and demanding oral sex while he was having intercourse with her. (*Id.*) At that time, Jeff came upstairs with a hot iron and Benson took that iron and burned the woman all over her body. (*Id.*) Finally, plaintiff stated that he took the iron away from Benson and dropped it, causing a burn on the woman's thigh. (*Id.*) In short, plaintiff gave a statement inculpating everyone *but* himself.

More importantly, plaintiff himself testified at his trial that he went upstairs twice when K.B. was there. (*Id.* at ¶ 50). His jury was instructed on the theory of accountably. (*Id.* at ¶ 58). The jury reasonably did not believe plaintiff's claims that he saw nothing unusual when he went upstairs or at any other time that night. His own sister and brother testified to chaos in their home and his sister even testified that she was so concerned about what was going on in plaintiff's house that night that she was going to get dressed and go to a phone booth to call the police. Between his siblings' testimony and the testimony regarding the horrific injuries K.B. sustained, no reasonable jury would have credited plaintiff's claim that all was well in the Wrice household that night. And given that plaintiff was 29 years old while the others in the house (except for Benson) were teenagers and that he admitted being upstairs twice, the jury undoubtedly would have convicted him on an accountability theory with or without the statement.

In In light of all the evidence introduced at the criminal trial, plaintiff's allegedly coerced statement that he grabbed an iron and dropped it causing a burn was hardly central to his conviction.

In any event, Kenny Lewis did testify to plaintiff's direct involvement in the brutal crimes against K.B. That testimony was sufficient to support plaintiff's conviction. *People v. Slim*, 127 Ill.2d 302, 307 (1989) ("the testimony of even a single eyewitness is sufficient to support a conviction"). As such, success on plaintiff's coerced interrogation claim would not have *necessarily* undermined the validity of his conviction had he brought it within two years of its use at trial. *O'Neill v. Burks*, 12 Fed. Appx. 407, 409 (7th Cir. 2001) ("Because the harmless error doctrine applies to coerced confessions, the district court erred in concluding that [plaintiff]'s claim is premature under the Supreme Court's decision in *Heck.*" (internal citations omitted)).

Because *Heck* does not apply here, the latest accrual date for plaintiff's coerced confession claim is the date his confession was introduced against him at his trial in May 1983. *Id.* ("Because [the coerced confession claim] was not barred by *Heck*, [plaintiff] was required to bring the claim immediately.");[2] *see also Chavez v. Martinez*, 538 U.S. 760, 773 (2003) (Fifth Amendment violation occurs when unlawfully procured statement is introduced at trial). And, the statute of limitations expired two years later in May of 1985. *Owens v. Okure*, 488 U.S. 235, 249-250 (Section 1983 does not have an independent statute of limitations; rather, it borrows the personal injury statute of limitations from the state in which the court is located); 735 ILCS 5/13-202 (Illinois' statute of limitations for a personal injury suit is two years). Accordingly, the Fifth Amendment claim in Count III is time barred and must be dismissed.

### B. Plaintiff's Fourteenth Amendment Coercive Interrogation Claim Accrued At The Time Of The Interrogation And Is Therefore Time-Barred

Plaintiff's Fourteenth Amendment coercive interrogation claim is also time-barred because the claim was actionable whether or not plaintiff confessed and whether or not any confession was used at trial. *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014) (a claim that "police tortured suspects during interrogation [accrues immediately], because that misconduct is actionable whether or not a suspect confesses, and whether or not any statement is used in evidence at trial."); *Gonzalez v. Entress*, 133 F.3d 551, 555 (7th Cir. 1998) (same). In fact, there is no substantive difference between this claim and the excessive force claim the Court previously dismissed and bringing the claim as a substantive due process claim does not change the accrual analysis. *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 756 (N.D. Ill. 2012).

---

[2] When a cause of action accrues is a matter of federal law. *Owens*, 488 U.S. at 249-250 (1989). "Under the traditional rule of accrual ... the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages." *Wallace v. Kato,* 549 U.S. 384, 391 (2007) (internal citations omitted); *see also* 54 C.J.S., Limitations of Actions § 112, p. 150 (2005).

## II. Defendants Are Entitled To Summary Judgment On Plaintiff's Fabrication Claims Because There Is No Evidence That They Knew Plaintiff's Or Williams' Statements Were False

This Court dismissed the fabrication claims as originally alleged because plaintiff failed to allege that defendants knew his or Williams' statements were false. (Dkt. #74, 2-3). The Court declined to dismiss plaintiff's amended fabrication claims because the Court found that his allegation that defendants knew the statements were false was sufficient to state a claim notwithstanding the lack of any facts alleged to support the allegation and that defendants must challenge plaintiff's proof on this allegation through summary judgment. (Dkt. #74, 4-5). Discovery has now concluded and plaintiff has failed to adduce any evidence to establish that Byrne and Dignan knew that his or Williams' statements were false.

As an initial matter, in the Seventh Circuit, a fabrication claim is only viable when the allegedly fabricated evidence was admitted against a plaintiff at trial and caused the plaintiff's conviction:

> A § 1983 claim requires a constitutional violation, and the due-process violation wasn't complete until the false confession was introduced at Avery's trial, *resulting in his conviction and imprisonment* for a murder he did not commit.

*Avery v. City of Milwaukee*, 847 F.3d 433, 442 (7th Cir. 2017) (emphasis added) (internal citations omitted). In short, a due process fabrication of evidence claim can arise only if the fabricated evidence is admitted at trial and *causes* the plaintiff's conviction. *Id.* at 443 (there must be an "unbroken causal chain [that] connects the acts of evidence fabrication to [plaintiff]'s wrongful conviction and imprisonment"). As discussed above, the allegedly fabricated statement which inculpated everyone but plaintiff cannot be said to have caused plaintiff's conviction, particularly in light of the other evidence presented at trial and the accountability instruction given to the jury.

Even if this statement could be said to have caused his conviction, however, plaintiff has failed to produce any evidence that Byrne and Dignan "knew" his statements to McCurry were false. To the contrary, Rodney Benson testified at his and plaintiff's joint suppression hearing that when he was upstairs with the girl, she was pulling her pants down and "several of us helped her pull her pants on down" and then he went downstairs for a minute. (SOF, ¶39). When he went back upstairs, he had intercourse with the woman; then Fowler had intercourse with the woman and then he (Benson) went back downstairs. (*Id.*). At some point thereafter, plaintiff came downstairs; put an iron on the stove; went back upstairs and then came down and said he had burned her. (*Id.* at ¶ 40). Benson went back upstairs to see and someone was having sex with the woman. (*Id.*). While he was upstairs, plaintiff came back up with the iron and Benson saw him burn the woman with the iron three times at which point, Benson left plaintiff's house. (*Id.*). He later returned to plaintiff's house to tell plaintiff to stop and get rid of the woman because they were going to end up killing her. (*Id.* at ¶ 41). Benson also testified that he told the ASA that he saw someone whose name he didn't know trying to force his penis into the woman's mouth and that plaintiff began punching the woman in the head. (*Id.*).

Likewise, Lee Holmes testified at his bond hearing that he gave a statement to police and the ASA. (SOF, ¶ 42). Holmes testified that he told police that Fowler, Benson and plaintiff raped K.B. (*Id.*). He also testified that he saw plaintiff burn K.B. with an iron and then beat her up when she refused to "let the dude on [the bike] — when she wouldn't suck his thing." (*Id.*). He further testified that the beating related to K.B.'s refusal to have oral sex happened before the burning and that he left after she had been burned twice. (*Id.*).

Thus, while there is an abundance of evidence pointing to plaintiff's guilt, there is no evidence in the record that would have led Byrne or Dignan to believe that plaintiff was innocent

or that the statement which he gave to McCurry was false. Accordingly, Byrne and Dignan are entitled to summary judgment on plaintiff's claim that they fabricated his statement to McCurry.

Furthermore, plaintiff admitted at his deposition that in fact Byrne and Dignan did not "feed" him the facts in the statement he made to McCurry. Specifically, plaintiff was questioned about each fact contained in the statement McCurry testified to and plaintiff admitted that not one of those facts, including the fact that he had dropped the iron on K.B., was fed to him by Byrne or Dignan:

> **Q.** Dignon [sic] and Byrne never told you to say that you saw the guy on the bike having sex with Karen Byron, correct?
> **A.** No, I don't remember.
> **Q.** And Dignon [sic] and Byrne never told you to say that you saw Rodney Benson having sex with Karen Byron, right?
> **A.** No.
> **Q.** And Dignon [sic] and Byrne never told you to say that you saw Benson slapping and hitting Karen Byron, right?
> **A.** No.
> **Q.** And Dignon [sic] and Byrne never told you to say that you saw Benson demanding Karen Byron to give him oral sex, right?
> **A.** No.
> **Q.** Dignon [sic] and Byrne never told you to say that Jeff brought an iron -- hot iron upstairs, right?
> **A.** No.
> **Q.** Dignon [sic] and Byrne never told you to say that Benson took an iron from Jeff, right?
> **A.** No.
> **Q.** And Dignon [sic] and Byrne never told you to say that Benson took an iron from Jeff and burned Karen 1 Byron over her body, did they?
> **A.** No.
> **Q.** And Dignon [sic] and Byrne never told you to say that you grabbed an iron

>from Benson and dropped it on Karen Byron, did they?
>
>**A.** No.

(SOF, ¶ 51). These admissions are fatal to plaintiff's claim that he was fed details of the crime and forced to regurgitate them.

Likewise, plaintiff has failed to adduce any evidence that Byrne and Dignan knew that Williams' statement was false. In fact, Williams' testimony was utterly consistent with that of Benson and Holmes. Specifically, Williams testified that in the early morning hours of September 9, 1982, he saw plaintiff go upstairs to the attic of the house at 7618 S. Chappel; he saw plaintiff engage in intercourse with K.B.; he saw plaintiff go into the kitchen, pick up a hot iron off of the stove, and go upstairs with the iron; he later saw plaintiff in the dining room of the Chappell house, and plaintiff told him he "burned that bitch." (SOF, ¶ 43).

Furthermore, Williams testified at his deposition intis case that he had had no contact with police whatsoever during the eight months between the time he was questioned and his testimony at trial. (*Id.* at ¶ 47). Williams also testified that when he agreed to meet with plaintiff's prosecutor, he had no idea he was going to testify at plaintiff's trial. Indeed, according to Williams, he was in a room in some building somewhere, a door was opened and he was thrust into a courtroom and onto the witness stand. (*Id.*).

Nonetheless, he managed to give highly detailed testimony that was consistent with the statements of Benson and Holmes. (See SOF, Ex. L). And when he was questioned about the facts contained in his testimony at trial at his deposition here, Williams was unable to remember whether a single inculpatory fact he testified to was fed to him by Byrne and Dignan. (SOF, ¶ 48). Even under Williams' revised version of events given decades after his questioning on September 9, 1982, his answers to police questions did not change after he was allegedly abused. (*Id.* at ¶ 44). And he testified that the answers he gave to Byrne and Dignan were about the same

14

individuals and subject matter as his testimony at plaintiff's trial. (*Id.*).

Thus, when put to his proof, plaintiff has failed to produce any evidence that Byrne and Dignan knew the statements plaintiff and Williams gave were false or that they fed facts to plaintiff and Williams and forced them to regurgitate them.

Accordingly, Byrne and Dignan are entitled to summary judgment on any fabrication claim based on plaintiff's statement to McCurry or Williams' testimony.

## Conclusion

For the foregoing reasons, Defendants John Byrne and Peter Dignan, respectfully ask this Court to grant their motion for summary judgment in its entirety in their favor and against plaintiff, and for any other relief this Court deems proper.

Date July 13, 2018                               Respectfully submitted,

                                                 By:   /s/ Amy A. Hijjawi
                                                       One of the Attorneys for Defendants
                                                       John Byrne and Peter Dignan

Andrew M. Hale
Amy A. Hijjawi
Jennifer Bitoy
HALE LAW LLC
53 W. Jackson Blvd., Suite 330
Chicago, IL 60604