# EXHIBIT 13

**In The Matter Of:**

*Wrice v.*

*Burge*

---

*Justice Bertina Lampkin*

*December 16, 2016*

---

*Rizman Rappaport*

*66 W. Mt. Pleasant Ave.*

*Livingston, N.J. 07039*

*(973)992-7650*

*reporters@rizmanrappaport.com*

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

--------------------------------------x

STANLEY WRICE, :
Plaintiff, :
v. : Case No.
JON BURGE, former Chicago Police : 14 C 5934
Lieutenant; JOHN BYRNE, former :
Chicago Police Sergeant; PETER :
DIGNAN, former Chicago Police :
Detective; the Estate of LEROY :
MARTIN, former Superintendent :
of the Chicago Police Department; :
and the CITY OF CHICAGO, :
Defendants. :

--------------------------------------x

Deposition of JUSTICE BERTINA LAMPKIN
Chicago, Illinois
Friday, December 16, 2016
9:52 A.M.

Reported by: Michael P. Hensley, CSR, RPR



Deposition of JUSTICE BERTINA LAMPKIN, held at the location of:

RICHARD J. DALEY CENTER
50 West Washington Street
3rd Floor
Chicago, Illinois 60602
312.443.5500

Pursuant to notice before Michael P. Hensley, a Certified Shorthand Reporter and Registered Professional Reporter in and for the State of Illinois.



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
JENNIFER BONJEAN, ESQUIRE
ASHLEY COHEN, ESQUIRE
BONJEAN LAW GROUP, PLLC
1000 Dean Street
Suite 422
Brooklyn, New York 11238
718.875.1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com

HEIDI LINN LAMBROS, ESQUIRE
OFFICE OF THE STATE APPELLATE DEFENDER
203 North LaSalle
24th Floor
Chicago, Illinois 60601
312.814.5472
heidilinnlambros@gmail.com



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANTS
JON BURGE, JOHN BYRNE, and PETER DIGNAN:
ANDREW M. HALE, ESQUIRE
HALE LAW LLC
53 West Jackson Boulevard
Suite 330
Chicago, Illinois 60604
312.870.6926
ahale@ahalelaw.com

ON BEHALF OF DEFENDANTS
CITY OF CHICAGO and ESTATE of LEROY MARTIN:
PAUL A. MICHALIK, ESQUIRE
DYKEMA GOSSETT PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606
312.627.2102
pmichalik@dykema.com

APPEARANCES CONTINUED

ON BEHALF OF THE DEPONENT:

THOMAS E. NOWINSKI, ESQUIRE
COOK COUNTY STATE'S ATTORNEY'S OFFICE
50 West Washington Street
Room 500
Chicago, Illinois 60602
312.603.4327
thomas.nowinski@cookcountyil.gov



CONTENTS


| EXAMINATION OF JUSTICE BERTINA LAMPKIN | PAGE |
|---|---|
| BY MS. BONJEAN | 7 |


EXHIBITS

(Attached to transcript.)


| JUSTICE BERTINA LAMPKIN DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Lampkin Exhibit 1 | Motion to suppress statements | 55 |
| Lampkin Exhibit 2 | September 10, 1982 bruise sheet | 67 |
| Lampkin Exhibit 3 | Outpatient progress note for Stanley Wrice | 73 |
| Lampkin Exhibit 4 | Letter by Richard Brzeczek on February 25th, 1982 | 81 |
| Lampkin Exhibit 5 | Specifications and certificate of conditions of probation sentence | 86 |




PROCEEDINGS

JUSTICE BERTINA LAMPKIN,
having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MS. BONJEAN:

Q. Good morning, Justice Lampkin.
A. Good morning.
Q. My name is Jennifer Bonjean, and I along with my -- members of my law firm represent the plaintiff in this matter, Stanley Wrice. Also with me is my co-counsel Heidi Lambros and my associate Ashley Cohen.
I don't know if anybody else wants to place appearances on the record but --
MR. HALE: I'm happy to. Andy Hale for defendants Jon Burge, Jack Byrne, and Peter Dignan.
MR. MICHALIK: Paul Michalik for defendants City of Chicago and estate of Leroy Martin.
MR. NOWINSKI: And Thomas Nowinski on behalf of the witness.
Q. Justice Lampkin, have you ever had your deposition taken before?
A. I don't think so.
Q. Okay. And I know -- I don't know if you remember, but I remember you testifying in the Stanley



Wrice postconviction matter. I was the attorney on that. I don't know if you remember that, but I just wanted to remind --
A. I certainly remember testifying. You look different, though.
Q. I'm sure I do.
A. You do.
Q. All right. So I'm just going to go through some ground rules. I'm sure it's all common knowledge, and I don't want to belabor it, but just so that we're on the same page.
Obviously, I'm going to ask you questions, and you're going to be giving answers. It's going to be recorded by the court reporter to my right. I'd ask that you be cognizant of answering orally. Obviously the court reporter can't take down nods or shakes or anything of that matter. It just seems common sense.
Secondly, not looking for you to speculate, just to the best of your knowledge. But if you are estimating or giving an approximation, I just ask that you indicate for the record that you have done so so the record is clear on that. Okay?
A. All right.
Q. Are you suffering from any physical issues that would make it difficult for you to sit here and give

testimony today?
A. I have a bad knee and --
Q. Okay.
A. -- other than that -- and I have some high blood pressure pills I take; so I may have to have a bathroom break, but other than that, I'm fine.
Q. Okay. Well, if at any point you would like to take a break, please indicate it. This is not a marathon. No need to muscle through unnecessarily. Just let me know and we can break for a few minutes. We tend to do that.
Did you review any documents in connection with your deposition here today?
A. Yes.
Q. Okay. Can you identify what documents you reviewed.
A. I got a disk with about 1,300 or so pages on it. And I did not get to review it all, but I reviewed some of it.
Q. Okay. And can you recall what specifically you reviewed?
A. No. I can't say. Because there was, as you know, lots of different documents; so I cannot say specifically which ones I reviewed.
Q. Okay. Did you happen to review your testimony



from the postconviction hearing?
A. Yes, of course.
Q. Did you happen to review any testimony from the trial proceedings? The original trial proceedings in this case?
A. I think I had portions of the transcripts but -- whatever is on the disk that has testimony on it, as much of that as I could get through, I read. It was clearly not all of the testimony.
Q. Sure.
A. And not even all of certain witnesses' testimony. Just parts of their testimony.
Q. Okay. Very good. Judge, is it okay if I -- how would you like to be addressed here today? I've never taken a deposition of a sitting appellate court justice. I don't know what your preference is.
A. You can call me Judge. That's fine.
Q. Judge feels a little more natural than Justice, but I do know there's a distinction, and I want to make sure you're okay with that.
A. I am completely fine with that.
Q. Okay. Great. When were you first elected to the Illinois Appellate Court? Or was it an appointment?
A. I was elected at this last election --
Q. Okay.



A. -- in November of 2016. I was appointed in September of 2009.
MR. HALE: I've got a dry throat; so I'm going to sit over here so I'm not distracting anybody with my coughing.
Q. So in September of 2009 you were appointed to the Appellate Court; correct?
A. Well, the word is really not "appointed." I was assigned --
Q. Okay.
A. -- the to the Appellate Court.
Q. And who was responsible, if you know, for assigning you to the Appellate Court?
A. The Supreme Court assigns you.
Q. And was that something that you apply for or indicate that you are interested in, or do they tap you without you actually --
A. It goes both ways.
Q. Gotcha. And did you indicate that you were interested in the Appellate Court position?
A. I absolutely did indicate that.
Q. And that assignment lasted until this most recent election that occurred in November of 2016?
A. Well, actually in 20- I think '14 one of our judges died who was in a run position, and I was placed



from the assigned position into the run position. So in order to stay on the Appellate Court, I would have to run in 20- -- for this 2016 election. And if I didn't get elected, I would go back to the trial court.
Q. I see. Okay. So the first run you had was for the November 2016 election?
A. Exactly, yes.
Q. Okay. What division do you currently sit on for the Appellate Court?
A. The Fifth Division.
Q. You haven't always been on the Fifth Division; right?
A. No.
Q. Okay. And you obviously were elected and --
A. Yes.
Q. Okay. Congratulations.
A. Thank you.
Q. I'm going to start going back a little bit in terms of time line. Did you grow up in the city of Chicago?
A. Yes.
Q. And was there a particular part of the city that you grew up in?
A. Different parts of the city, yeah.
Q. Okay. Did you attend high school in the city?

A. Yes.
Q. Okay. And you also, I assume, went to college after high school; correct?
A. Yes.
Q. Where did you go?
A. I went to Roosevelt University.
Q. Also in the city; right?
A. Yes.
Q. Were any of your family members, immediate family members, parents, did they work for the City in any capacity?
A. No. My dad was a lawyer, a defense lawyer --
Q. Okay.
A. -- for 40-plus years.
Q. Did he ever hold any elected office?
A. No. And I can't say that none of my relatives were city workers or anything like that. I don't know.
Q. Yeah. And I'm just focusing on your immediate family for the moment.
A. Okay.
Q. And what year did you graduate from Roosevelt University?
A. It's a strange kind of thing because I finished all of my coursework in '71, and then I didn't want to go to law school. My dad made me go to law school. And



so I went to law school in '71 starting at DePaul University and ended there in '74.
And I think I had one incomplete in college. So after I graduated from law school, amazingly, I finished that incomplete and got my undergraduate in '75 after I got my law degree in '74.
Q. Okay. Just to be clear, you started in -- strike that.
You went to Roosevelt University in '71; correct?
A. No.
Q. You graduated --
A. I went to Roosevelt in '67. I graduated -- well, I don't want to use the word "graduation" because I didn't march.
Q. Right. I understand.
A. But I finished all of my coursework in '71 except for one course, but I was able to go on into law school. And so once I completed law school, I went back to finish that course --
Q. Understood.
A. -- and got my degree.
Q. And did you start DePaul University in '71 or '72?
A. I started DePaul in '71.



Q. In '71. Okay. And you graduated in?
A. '74.
Q. In '74.
(Brief cell phone interruption.)
Q. And you received a JD from DePaul?
A. Yes.
Q. Did you have a particular area of study in your undergraduate years?
A. Political science.
(Brief cell phone interruption.)
Q. Now, upon graduation from DePaul University, did you -- with your juris doctorate, did you work anywhere?
A. I worked as an Assistant State's Attorney.
Q. You started working for the Cook County State's Attorney's office in 1974; is that correct?
A. Exactly.
Q. I think you mentioned that you didn't have an independent interest in going to law school. It was something your father wanted you to do; is that right?
A. Exactly.
Q. Were you one of the only women in law school at that time, or what was it like?
A. A different world, yes. Just in my section, I was in the C Section, and there were 67 people, I think, in the class. And 62 were white men, 4 were white



women, and me, an African-American female.
Q. Okay. In 1974 when you graduated, did you want to go work at the Cook County State's Attorney's Office, or how did you end up there?
A. My dad wanted me to work for him, and he was a defense lawyer. And people would call our house at 2:00 o'clock in the morning and 4:00 o'clock in the morning. And he would tell me about his clients my whole life.
And I did not want to live with people calling my house at 2:00 o'clock and 4:00 o'clock in the morning, my Dad always -- or me being gone all the time. So I just applied at the State's Attorney's Office.
Q. So did you have a passion for becoming a prosecutor, or was it more because of the lifestyle that it brought with it?
A. I had a passion for a paycheck.
Q. I appreciate that. Now, in 1974 -- was your father still living in '74?
A. Oh, yeah.
Q. What year did he pass?
A. My dad died in 2012.
Q. Oh, not too long ago. Now, do you recall who the Cook County State's Attorney was in '74?
A. Oh, gosh. I think Hanrahan had just gotten

kicked out, and it was a republican attorney. It's really nice because a republican hired me. I was very happy about it, but right now his name escapes me.
Q. And do you remember what your first assignment was when you joined the Cook County State's Attorney's Office?
A. The Appellate Division.
Q. Now, the Appellate Division would have been a position that involved you representing people who -- or representing the State after a conviction had been obtained; correct?
A. I would be representing the State not only but convictions, but there may have been a motion to suppress that was denied and state appeal hearings.
Q. Interlocutory appeals?
A. Exactly.
Q. You were writing briefs; correct?
A. I was writing briefs and arguing cases.
Q. Was that a typical first assignment for a new assistant in 1974?
A. I think more people went to traffic court first or to juvenile. But I liked reading the law, and so I got what I wanted which was great.
Q. How long did you stay in the Appellate Division?
A. About 18 months.



Q. And where did you go from the Appellate Division?
A. I'm pretty sure I went to the misdemeanor courtrooms.
Q. Trial courtrooms for misdemeanors?
A. Misdemeanor trials, yeah.
Q. And subsequent to your assignment in the misdemeanor courtrooms, do you remember where you went?
A. I'm pretty sure that the next thing would have been formal hearings.
Q. Do you know how long you were in misdemeanors?
A. Oh, gosh. No. I can't. I just forget.
Q. Okay. Do you recall who the next Cook County State's Attorney was after the republican that hired you?
A. Boy, if I thought these kind of historical facts were necessary, I guess I would have looked it up.
Q. It's okay.
A. I don't know who came after. I just don't recall.
Q. Okay.
A. I know at one point Daley was the State's Attorney; so he may have been next. On that, I'm not sure.
Q. After prelims, do you remember what your next



assignment was?
A. Probably it would have been the felony courtrooms.
Q. Okay. Now, do you remember what year it was that you became a felony courtroom trial assistant?
A. I'm thinking near the end of 1976 at 13th and Michigan. I know they had felony courtrooms there. That was my first felony courtroom.
Q. And after 13th and Michigan, I believe at some point you went to Markham; right?
A. Yes.
Q. Do you know how long you were at Markham in the Trial Division?
A. I either left there in late '79 or early '80. I'm not quite sure.
Q. In 1974 when you joined the Cook County State's Attorney's Office, do you have any recollection of how many women worked there as attorneys?
A. You mean in the whole office?
Q. Yeah. Approximately.
A. I'm sure it would have been less than ten percent.
Q. Okay. And I'm guessing, as an African-American woman, even obviously far less than ten percent?
A. Certainly.



Q. Do you know if there were any other African-American women who were hired previous to you?
A. Oh, certainly.
Q. Okay. And when you worked in Markham in the Felony Trial Division for that period of time, can I assume that you were one of a handful of women that worked there?
A. Yes.
Q. And were you one of a handful, if not the only African-American woman, who worked there in the Trial Division as an attorney?
A. You mean at the time I was there?
Q. Yeah.
A. I don't think there was another African-American woman there.
Q. And was the culture of the office at the time a very friendly place for African Americans, if you can speak to that?
A. I can only say -- I was the only one there.
Q. Right.
A. There was a bunch of guys around, and they were very nice to me. And so I had no problem moving up through the office. It was a matter of your skills, not the color of your skin. So I never felt any kind of prejudice resulting from the color of my skin or the

fact that I was a female. I think I was treated better than white females back then.
Q. Is that right?
A. Yes, absolutely.
Q. And did you ever feel that the culture of the office was as friendly towards -- let me strike that. It's a difficult question to ask.
Obviously, many of the accused that were coming through the system, they were African Americans. Would you agree with that?
A. Certainly.
Q. Okay. And did you feel at that time -- and again, I'm specifically talking about the Markham years.
A. Yeah. I assume you're talking about Markham.
Q. Right. Not withstanding how you personally felt treated, did you feel that there was a non-biased approach to prosecuting people of color during that period of time?
A. It was a different culture than it is now. State's Attorneys had a lot of discretion, and you could reduce cases if you wanted to. There were several courtrooms; so I can only speak to my courtroom.
Q. Sure.
A. And in my courtroom, they were always -- for the entire time I was there myself, there was two white men.



And I never got the sense that they were prejudiced against the defendants because of the color of their skin. I did not.
And I mean, I was there. I'm certainly sensitive to that. I have brothers and nephews and cousins; so I did not -- I didn't experience it. And I -- it certainly -- no one was saying anything like that in front of me.
Q. After Markham, where did you go?
A. I went to 26th Street. 26th and California.
Q. And would that have been in 1980?
A. As I said, it's either late '79 or '80 that I went to 26th Street. I'm not exactly sure of the date.
Q. Okay. And you would agree, I think, that somewhere maybe '80, '81, around that time, is when Richard Daley became the Cook County State's Attorney. Does that sound right?
A. I cannot --
Q. Okay.
A. I can't say when he became attorney because I don't remember the date.
Q. Sure. It speaks for itself. I just wasn't sure if you recall. Okay. So in '80 you went -- '79, '80 you went to 26th and Cal.
Did you have a specific assignment at 26th and



Cal?
A. Yes.
Q. And what was that assignment?
A. I was assigned to Thomas Fitzgerald's courtroom as his first chair.
Q. Did you hold a first chair position in Markham before you went to 26th Street?
A. Yes.
Q. Okay. And in those days, did they do third chair, second chair, first chair?
A. Right. First chair, second chair, and third chair.
Q. Okay. Did you hold a third chair position at any point? Did you start there?
A. 13th and Michigan, I started as a third chair. I worked very hard, and within months I became a second chair.
Q. Okay. And then it sounds like you pretty quickly went to first chair?
A. Yes.
Q. Okay. By the time you got to 26th Street, had you tried any murder cases, if you remember?
A. I am sure I had.
Q. Okay. Seems like people were able to move up the ranks a little more quickly back then. Would that



be fair to say?
A. Compared to today, it was the speed of light.
Q. Okay. So when you got to 26th Street, you were assigned to Judge Fitzgerald's courtroom; correct?
A. Yes.
Q. He wasn't the chief judge at the time?
A. No.
Q. Okay. And you were the first chair in the room; is that right?
A. Yes.
Q. How long were you assigned to Judge Fitzgerald's courtroom, if you remember?
A. I know that I left his courtroom in 1983.
Q. Okay.
A. I think it was either the beginning or the middle of June, something like that. I was promoted to a supervisor in the juvenile delinquency courtrooms on Hamilton.
Q. Prior to your assignment to Judge Fitzgerald's courtroom, it is correct to say you never did a stint in Felony Review; right?
A. I did for a very short period of time. I mean, I don't remember if it was before I went to Markham, it was between 13th and Michigan and Markham, or while I was in Markham.

Because they would take you out of your felony courtroom and send you for two or three months to Felony Review, and you would come back to trial; so I just don't remember that.
Q. Prior to going to 26th Street, did you receive -- let me strike that.
When you first came into the office, Cook County State's Attorney's Office, did Cook County State's Attorneys go through any particular type of training, or was it more just hands-on training in the courtroom type of thing?
A. Well, I started in appeals.
Q. Sure.
A. So in appeals they give you books of cases, and you start reading. You look at samples of the appellant's brief if you're the appellant or affiant. You look at reply briefs to see how they're written.
And there were either two or three supervisors in the State's Attorney's Office in the Appeals Division; so they would help you. They had something called a briefs out supervisor; so that supervisor would review your cases or help you if you had any issues.
Q. Okay. Now, during the period of time that we talked about -- from the time that you entered the office to, I'm going to say, you left Judge Fitzgerald's



courtroom in '83 -- did you receive training, informal or formal, regarding the reliability of confessions or issues related to confessions?
A. I am sure I did not.
Q. Okay. And would you agree, in those days, that confessions were seen often as sort of a gold standard of evidence or reliable evidence, or would you disagree with that?
MR. MICHALIK: Object to the form.
Q. You can answer, if you understand.
A. Okay. I really don't understand --
Q. Sure.
A. -- because of course I'm not -- I wasn't dealing with confessions --
Q. Sure.
A. -- from '74 to '83. If I had a case that had a confession, I would look at that case on an individual basis.
Q. Okay.
A. There was no norm on that. Everything was individual consideration.
Q. Okay. So you would agree, I think, that sometimes in cases where there was a confession, the accused would make an allegation that the confession was not voluntary. And I'm talking about in your trial



years up until you left Judge Fitzgerald's courtroom.
A. Are you talking about in my own personal cases?
Q. Yes.
A. Certainly there were cases.
Q. Okay. And when a defendant alleges that his confession is not voluntary, often motions to suppress are filed; correct?
A. Yes.
Q. There was a protocol or a process that you followed, either by virtue of training or just your own protocol, to determine whether or not a confession was, in fact, reliable?
A. Okay. I'm not quite sure what you mean by "reliable."
Q. Sure.
A. If there was a defendant in a courtroom and it was one of my cases, of course I read the entire police reports and every piece of paper there was on the case. I would certainly read the allegations.
Almost always you got a form motion filed by a defense lawyer, and the motion could be xeroxed and shared with 1,000 or 10,000 defendants. They all say the same thing. They all say that "I was arrested without probable cause" and they all say "I was not given my Miranda" and they all say that "I was subject



to psychological, physical, et cetera abuse."
Usually they did not specify how they were abused; so it was only once you heard the motion, once you heard their allegations in court -- and this is when witnesses would be questioned -- that you were able to know what they were actually claiming that happened.
Q. Understood. Was there an attitude at the time that you were a young trial attorney that -- an attitude by -- from the prosecutorial side that confessions could sometimes be coerced?
A. I can't speak for anybody else's attitude.
Q. Let me ask it this way: In your own mind when you were litigating cases, did you leave room for the possibility that sometimes confessions were coerced, or was that just something that you didn't think it happened and it didn't really have much merit to you?
A. That would certainly be a case-by-case decision that I would make. You look at a whole case and hear everything just like I do now as a judge.
Q. Sure.
A. But as a lawyer, the same thing. I looked at what people said. I looked at what all of the witnesses said, if things rung true or if they didn't, and made the determination that way as to whether or not I believed the allegation of the defendant. Of course it

wasn't my decision to make --
Q. Of course.
A. -- as to who to believe, but certainly I'd looked at the whole case.
Q. Right. Now, I think you testified just earlier that at some point you maybe did a short assignment in Felony Review --
A. Yes.
Q. -- prior to getting to Judge Fitzgerald's courtroom; correct?
A. I'm sure they didn't take me out of Judge Fitzgerald's courtroom to send me to Felony Review.
Q. Gotcha.
A. So it would have been sometime between 13th and Michigan. Actually, it could have been before 13th and Michigan. I'm not quite sure.
Q. Sure.
A. But at some point in time, I had a short stint in Felony Review, and I'm pretty sure it was no more than three months.
Q. Okay. Prior to your assignment in Felony Review, did the office give you any type of training specific to that assignment?
A. You mean prior to the day I started there?
Q. Well, strike that.



During this period of time you were working in the State's Attorney's Office, talking about pre-1983, do you remember whether or not, before an assistant was assigned to Felony Review, they received any type of specific training related to their duties in Felony Review?
A. I cannot remember that.
Q. Okay. How would you describe what your duties were in Felony Review, if you had to?
A. There were shifts of, I think, 12 hours that you work, I think. And I'm thinking now that it was three days on and three days off that you worked 12-hour shifts. And you were assigned to a different location depending on the needs of scheduling.
I remember sitting at 51st and Wentworth, and I remember sitting at, I think, Belmont and Western or Harrison and Kedzie. And I remember sitting at 26th and California.
So you'd sit there with a phone, and if the phone rang, if it was a rape case, a murder case, armed robbery -- I don't think they did drug cases then -- a police officer would say they had a case.
And it wouldn't come to me first. There was a central place where the phone calls went, and I think that was at 26th Street. And then you'd get called.



And when I say "you," I mean an Assistant State's Attorney would be called to the case.
And based upon what their needs were, you might go to the scene of a crime. You might go to a police station. You might go someplace to interview witnesses. You might review a search warrant.
Q. In serious cases, did Cook County State's Attorneys have to approve felony charges back -- and again, I'm talking during your time in the early 80s let's call it.
A. Okay. I can't say I was there in the early 80s because it could have been in the 70s.
Q. Fair enough. Let me refine the question. I'm just trying to lay a little foundation for my question so that at some point when we look at this record we know what time frame we're talking about.
A. Right.
Q. I know you don't remember exactly when you were in Felony Review, but I think you're pretty confident it was pre-1983; right?
A. Certainly.
Q. Okay. So whenever that --
A. I'm pretty certain that it's pre-1980 when I went to Judge Fitzgerald's courtroom.
Q. Fair enough. So whenever the time period was



before your assignment to Judge Fitzgerald's courtroom, do you recall whether it was a requirement for serious cases to be approved by the State's Attorneys?
A. I know, at least my recollection is so, that maybe I don't know if it was the lieutenant or the commander or somebody, they could always go over us.
Q. I see.
A. So if I approved something -- or I don't want to say "approve." If I disapproved something, if I didn't approve the charge, I'm pretty sure that someone in the police department could charge.
Q. Okay. That's what I was getting at. So when in Felony Review, you had a couple potentially different duties or roles that you would take up. I think you named a few.
Would you agree that the police department could call you and if they needed some assistance, whether it was getting approval on a case or just being involved in the investigation somehow, they could do that? Or was there a protocol? Or how did it work? That you were just on call for them for their needs, or did you have specific functions?
MR. HALE: Objection to form.
MR. MICHALIK: Join.
Q. If you understand.

Page 33

A. I think I do.
Q. Okay.
A. As I said, I had an assignment to go to a particular location every day, I think three days in a row, 12-hour shifts. And the police department wouldn't call me directly.
Q. Right.
A. They would call, I think, into a central office, and I'm not sure of that. But I think then I'd get a call that I'd say -- somebody's been arrested for armed robbery and the person is in custody and there are witnesses, and we'd like you to go to such and such a station and interview those witnesses and/or they're saying the defendant's willing to talk. Talk to the defendant.
Then I'd pack up my little notepad and get in my car and drive wherever it was, and I'd talk to the police officers, review any reports that they had and talk to whoever it was that was available for me to talk to.
Q. In that time period, you would agree you would have been a young State's Attorney; right?
A. Yes, I was. Yeah. Less than half my age now, but yeah.
Q. And oftentimes you would be dealing with

Page 34

seasoned detectives, I assume?
A. Certainly. And I wouldn't say like ancient of days.
Q. Right.
A. So no. There were people who were older than me, and there were people who were a little older than me. If you mean -- I mean if --
Q. You answered it fine. In a serious case, a murder case, usually -- again, we're talking in generalities. I know that there are exceptions. But often you would have a more seasoned detective than, like, a rookie on a murder case, I assume; correct?
MR. MICHALIK: Object to the form.
A. Yeah. I don't --
Q. Hard to say?
A. Yeah. Right. It's just hard to say. There would be detectives who were detectives for 2 years or 4 years or 20 years.
Q. How did the balance of power work, if you understand the question, when you went to Felony Review? Were you seen as -- was the Cook County State's Attorney seen as the person in charge, or was it more the detectives were in charge, if you understand my question?
A. I was in charge.

Page 35

Q. Okay.
A. I can only speak for me and how the detectives treated me. I can't even say that. I thought that the detectives treated my partners well too, that they listened to us, and they followed our instructions and directions. I don't remember anybody ever trying to go over my head. If I made a decision, that was the decision.
Q. I see. Now, one of your roles in Felony Review was, when asked, to take a confession; correct?
A. I wasn't asked to take any confession. I was asked to interview a defendant or someone who they wanted --
MR. HALE: Objection to form.
Q. One of your responsibilities, then, was to potentially take a statement of an accused; correct?
A. If the person was willing to talk to me after being Mirandized, I would absolutely talk to them.
Q. Okay. And in fact, you have taken statements from accused in the past; right?
A. Certainly.
Q. All right. Prior to your assignment in Felony Review, do you remember receiving any type of specialized or formal training in how to go about taking a statement of an accused?

Page 36

A. I don't remember if we had any particular training. I know that I had -- I was familiar with Miranda. I knew the Miranda warnings and adhered to them. They were to everybody. And if they wanted to talk, I took a statement; and if they didn't, I didn't take a statement.
Q. Was there any guideline or rule about whether or not to interview an accused in the presence of a detective who may have been previously questioning or interrogating the accused?
A. Say that again.
Q. Was there any rule or guideline that you were either mandated to follow or suggested to follow about interviewing an accused in the presence of a police detective?
A. Okay. I don't remember any guideline being given to me. I know that I would not sit down and talk to someone by myself. I would not do that. Certainly not in my initial conversation --
Q. Okay.
A. -- with them. If someone gave me a statement, made an admission, then I would always, after they did it, have the police officers leave the room and ask them how they had been treated by the police to assure myself that they were treated well.

Q. So your practice was that at some point you would ask a police officer to leave the room to make --
A. Always.
Q. Okay. And if a defendant had said to you, once the police officer had left the room, that "I had been mistreated" in some form or fashion, would you take any particular action?
A. I had only one person who said that they were mistreated, and they didn't say they were mistreated. They said the police officer took their shirt and they were cold, and I told the police officer, "Get them a" -- they took their shirt for evidence. I said, "Get them a shirt immediately," and they did.
Q. So in your time in Felony Review, you don't remember an instance -- and I know you weren't there very long -- in which, outside the presence of a police officer, an accused told you, "You know what? This statement I'm just making because I'm scared of police officers," or something of that nature?
A. That never happened.
Q. And if it had happened, what would you have done? Or was there a rule about how to proceed if somebody said --
A. I would have documented --
MR. HALE: Objection to incomplete hypothetical.



Lack of foundation.
A. I would have documented what they said, absolutely.
Q. I mean, my question is really was there any message from your office to not document something like that?
A. Of course not.
Q. Okay. You understood as your role as a prosecutor and your responsibilities as a prosecutor was that if somebody had told you they had been mistreated by the police, that you would, in fact, document it; correct?
A. I was not taught that by anyone other than myself. Who would do that? Who would not document it? My job is not -- my job was never to convict. My job was to do what was right.
Q. Understood. So at least your practice was that you would have documented that if someone --
A. If it had occurred, I would have documented it.
Q. Now, do you have a recollection of ever taking statements from either a witness for a defendant or a suspect at Area 2 when you were in Felony Review?
A. The one person with the shirt, it was a white male who was accused of killing a -- I can't remember if it was a white female or male. I can't remember. That



was one person.
And I remember taking a statement of an African American who had been accused of rape. And the only reason I remember it was because I gave him his Miranda rights, and he said, "Yes, I asked the B." And so I remember those two being in Area 2.
Q. That was at Area 2?
A. Yeah. I'm pretty sure that was in Area 2. It was a South Side case; so I'm pretty sure this was in Area 2.
Q. Those two cases that you referenced that you believe were Area 2, do you remember what location Area 2 was at that time? It moved at some point.
A. Well, because I'm saying this is before '83, I think they moved it in '82, '83. It would have been before that.
Q. The old location?
A. Yeah. It would have been the old one.
Q. Do you have a recollection of ever meeting Jon Burge prior --
A. Never.
Q. Hold on. I'm a little -- it's very natural to anticipate the question and --
A. Because this was asked before in 2013; so yeah.
Q. Okay. So you have no recollection of ever



meeting Jon Burge prior to 1983 or after 1983?
A. I have no recollection of ever meeting Jon Burge.
Q. Period?
A. Period.
Q. How about John Byrne?
A. John Byrne was on the Stanley Wrice case.
Q. Correct.
A. And that is the only time I remember -- or the first time I remember meeting him. If I met him before then, I have no recollection of it.
Q. You don't remember having any cases that involved John Byrne other than Stanley Wrice's case?
A. I don't have any recollection. Are you talking about when I was a State's Attorney?
Q. Yeah. I'm talking about pre-1983.
A. Okay. I don't.
Q. I'm not saying you should. I'm just -- if you have a recollection of ever having a case in which John Byrne was a police officer.
A. Yeah. I don't remember ever meeting John Byrne until he was in my courtroom or in my office on that case in 1980, probably '83 when he was in the office.
Q. And I'm going to ask the same question as to Peter Dignan. Do you have any recollection of ever

having met Peter Dignan prior to '83?
A. I have no recollection of meeting Peter Dignan prior to Stanley Wrice's case.
Q. Okay.
A. That came in '82.
Q. Right.
A. So sometime between '82 and '83 is when I first remember meeting Peter Dignan.
Q. Prior to 1983, do you remember ever hearing from anyone that the police officers of Area 2 had used physical abuse against suspects on a routine basis?
A. Not one word.
Q. No chatter, rumor, innuendo, or anything of that nature?
A. Nothing, as I said.
Q. Now, in 19- -- prior to 1983, did you know Howard Savage?
A. Yes. I knew Howard Savage. He was a defense lawyer, a wonderful defense lawyer.
Q. How did you know Howard Savage? Just how did you meet him? Let's start there.
A. I don't know how I met him. I was a member of the Cook County Bar Association which was predominantly African American, our association. I was active in the Bar Association from prior to becoming a lawyer, and



Howard Savage was a member of the Cook County Bar.
I know I had seen him in court. I know that he knew my father. I knew my dad knew him. So I don't know how I met him, but I knew him prior to him trying that case in '83.
Q. Were Howard Savage and your father friends?
A. They were certainly acquaintances. They knew each other. My dad worked; he didn't socialize.
Q. So do you have a recollection of ever seeing Howard Savage in your home growing up or anything of that nature?
A. No.
Q. Do you know whether Howard Savage and your father ever worked on a case together?
A. I don't know.
Q. Do you know how long you knew Mr. Savage prior to 1983?
A. I have not a clue.
Q. Okay. Had you ever socialized with Mr. Savage prior to 1983?
A. I may have gone to a Cook County Bar Association affair and he was there. If he was there and if I crossed paths -- our paths crossed, I certainly would have spoken to him.
Q. But you would not characterize your relationship



as a friendship that involved routine conversation?
A. Absolutely not.
Q. Did he have a wife, or do you know?
A. I don't have a clue.
Q. Okay. Do you have any instances in which Mr. Savage was on the defense side when you were a prosecutor prior to the Stanley Wrice matter?
A. I don't know.
Q. All right. I am going to draw your attention specifically to September-ish of 1981. Okay?
A. '81?
Q. Yes. '81 approximately.
A. Okay.
Q. I'm sorry. My apologies. September '82.
A. I was wondering. What happened in September of '81?
Q. September of '82. September of '82, you were assigned to Judge Fitzgerald's courtroom; correct?
A. I was in his courtroom in September of '82.
Q. And you were the first chair in his courtroom; correct?
A. And I was the first chair.
Q. And did you have a second chair?
A. Yes.
Q. And who was your second chair?



A. I believe at that time it was -- well, I am sure it was Terry Gillespie.
Q. Now, Mr. Gillespie testified that he thought he was the third chair. I don't know which one --
A. He may have been.
Q. He may have been; right?
A. He may have been. I don't know.
Q. Do you know whether there was another prosecutor assigned to that courtroom?
A. There would have been another prosecutor at some point.
Q. Okay. And do you recall, other than Terry Gillespie, who was assigned to the courtroom?
A. I am not sure who was the other chair. I thought Terry may have been the second chair by then, but he may not have been.
Q. You do remember that he worked on the Wrice matter with you; correct?
A. Absolutely.
Q. Okay. Would it be fair to say that whoever the other State's Attorney was in the courtroom, who we don't know, was not involved in the Wrice matter as far as you know; right?
A. I can't say they didn't order police reports for me or call witnesses or anything like that; so no, I

can't say. They didn't try the case.
Q. Right. Okay. Now, do you have a recollection of when you first learned about the Wrice case and how you learned about it?
A. Okay. I'm not quite sure what you're asking.
Q. Sure.
A. Are you saying when it came into my courtroom?
Q. Yeah. When it came into your courtroom, how did you -- it may have been something that was routine, but how did you first find out about the case?
A. This is how cases came into our courtroom: After a preliminary hearing or an indictment, usually three weeks to a month later, the case would go before a chief judge to an assignment to a courtroom.
On the day that the case was assigned to a courtroom, the case would come up to our -- to the particular courtroom, and then the defendant would be arraigned, and then there would be a date set for discovery.
Q. Okay. Do you have a recollection of having any knowledge about the Wrice matter prior to it coming into your courtroom?
A. Absolutely not.
Q. Okay. So the first time you learned about the Wrice matter was when it came into the courtroom, not in



any -- you weren't involved in any piece of the investigation prior to that; correct?
A. Absolutely. I was not involved in any piece of the investigation, period.
Q. Okay. Now, had you even heard about the case or anything prior to the assignment?
A. No.
Q. I want to go back one second. Do you have a recollection of hearing about the Andrew Wilson case prior to Stanley Wrice's case coming to your courtroom?
A. I don't -- I did not -- I mean, I don't now and I did not then. I can't say -- I can't say what I knew in '82.
Q. Sure.
A. You asked a similar question in 2013; so I looked up to see when Wilson -- because you asked a question. It was objected. It was sustained.
Q. It was sustained, but yeah.
A. So I was like, what does Andrew Wilson got to do with this case? So I just looked up his appeal. And, there was an appeal, and I read the appeal. So his case happened in '82, the same year that this case happened. But I didn't know that then or had no independent recollection of that happening at all.
Q. Yeah. There's no secret here. There's some



close proximity between Andrew Wilson's arrest and Mr. Wrice's arrest. I think it was nine months between the two.
A. I don't know. I know they were both in '82.
Q. Right.
A. I read that in the opinion.
Q. So in '82, it doesn't stick -- the Andrew Wilson case doesn't stick out in your head as something that made an impression in 1982?
A. The case made an impression. I didn't know it was in 1982. Certainly when you hear that two police officers had been gunned down, that makes an impression on you.
Q. So that's what I am trying to get at. You may have not remembered it was '82, but you do remember the Andrew Wilson case; correct?
A. I remember the allegation that two police officers were shot and killed --
Q. Okay.
A. -- by two brothers.
Q. Right.
A. And their name was Wilson.
Q. Andrew and Jacky Wilson; correct?
A. I didn't remember Jacky. I only remember the name Andrew.



Q. Okay. And in 1982 when this terrible crime happened, do you have a recollection of the manhunt that had gone on and it being either in the news or just in your own circle, remembering the talk about it?
A. I don't remember the talk -- anybody talking about it in particular. Certainly I would have heard something in the news. Whenever it happened, I would have remembered it then.
I don't remember when it happened independently, as I said, in looking at the report. But I had a courtroom with 250, 300, maybe 350 cases. I was concerned with the cases in my courtroom, not everything that was going on in the city of Chicago.
Q. No. I understand. And that's what I'm trying to get a flavor of. You would agree that the Wilson case was a high profile case or a high interest case?
A. It was a case that was on the TV.
Q. Right. And given the fact that there was some press coverage of this case where two officers were murdered, do you remember where the case was assigned to, for instance, when it came into the courtroom or came into the court building?
A. I have no idea where. I don't know whose courtroom it was in. I don't know who handled the case. I never knew that.

Page 49

Q. Sure. Do you have any recollection of hearing about allegations made by Andrew Wilson against Area 2 police officers regarding abuse at Area 2?
A. Only when I read it in the press, and this would have been after his appeal.
Q. Right.
A. So that's in the late 80s or the early 90s. I can't remember --
Q. Okay.
A. -- when that --
Q. Just to be clear, in 1982 when Mr. Wilson -- the Wilson brothers were arrested, you do not recall any discussion about abuse at Area 2; correct?
A. None whatsoever.
Q. And just so the record is clear, I think you testified earlier that prior to Mr. Wrice's case, you had never heard about abuse at Area 2 as it relates to anybody; correct?
A. As I said, the young man told me about them taking his shirt; so I knew that. I knew that. I had not heard of any abuse at Area 2. There was no discussion of that that I am aware of. I can't say -- there's no discussion. Nobody ever said anything to me, and I was a prosecutor, and there were -- yeah. I was there.

Page 50

Q. Fair enough. Now, in September of 1982, Mr. Wrice was arrested --
I think it was September 9th; right?
MS. LAMBROS: Yes.
Q. Do you know when the case came into Fitzgerald's courtroom?
A. Yeah. You asked me this the last time, and I said probably in October of 1982. I looked at this discovery that you all sent me, and there's a certified disposition in there. And it says the case came into our courtroom in November of 1982.
So the first time it actually came into my courtroom according to the certified record was, I think, November 8th, 1982. So that was the first time I could have ever known the case -- about the case being assigned to us.
Q. Okay. And in November of '82 when the case came into the courtroom, it wasn't just Stanley Wrice's case. There were co-defendants as well; correct?
A. Yes.
Q. And those co-defendants were Rodney Benson, Lee Holmes, and Michael Fowler. Does that sound familiar?
A. Yes.
Q. Do you remember what actions you took with the case when it first came into your courtroom, if any?

Page 51

A. I don't know if I was there on November 8th.
Q. I see.
A. So I can't say what happened to the case the very first time that it was up. Because it was a murder case and I was the first chair, eventually I would have taken the file and read everything in it and determined what was needed, what I needed to order.
So then I would have attached a note to -- for my second chair or my third chair to order whatever I thought needed to be ordered. If there were police reports, arrest report, if there was a photograph taken, a preliminary hearing transcript, a grand jury transcript.
If there was -- of course they didn't have DNA in '82, but if there was evidence technicians' reports, I would have had everything ordered. And then once everything came, I would have reviewed the file again and started to get the case ready so that I could give the discovery to each defendant's lawyers.
Q. At some point the defendants did appear with their attorneys in court; correct? Do you have a recollection of that, maybe not the first time but at some point?
A. Yeah. Certainly there were times when all four defendants and all four of their lawyers were in court

Page 52

at the same time.
Q. Okay. And do you remember who their attorneys were, or if I said the names, would it --
A. I know that Howard Savage was Rodney Benson's attorney. And I know that eventually Sydney Jones was Stanley Wrice's attorney. I don't recall Mike Fowler or Lee Holmes' attorneys' names. I know they all had separate attorneys.
Q. Okay. At some point did you become aware that the defendants were alleging that they had been mistreated by Area 2 police officers during the course of the investigation?
A. It was months after they came into my courtroom.
Q. And how did you find out for the first time?
A. Because they filed that boilerplate motion to quash arrest and suppress the evidence and suppress statements.
Q. When a -- in that -- at that time period -- or strike that.
When a defendant -- or when the defendants in this case filed their motion to suppress, what did you do as a prosecutor?
A. I don't know if all the defendants filed. Usually -- there's four defendants. I don't know if they all filed a motion to suppress.

Q. Well, we know Mr. Benson and Mr. Wrice did; correct?
A. All right. I'm --
Q. Well, I wasn't sure.
A. Yeah, exactly. But I don't want to say that all --
Q. Sure.
A. -- four did something I don't know they did.
Q. That's fine. I'm not --
A. Okay.
Q. Yeah. Please clarify or correct me if I'm making an assumption. It's not my goal. Sometimes I'm assuming you don't remember facts, and it's not -- it's not because you actually do because I know it's a long time ago, but absolutely correct me if I misstate something. It's not on purpose.
Do you remember Mr. Wrice filing a motion to suppress statements?
A. I remember a motion to suppress statements which was filed by his attorney.
Q. And same with Mr. Benson as well?
A. Yes.
Q. And do you remember what you did as a prosecutor in response to that motion to suppress statements?
A. They filed a motion to suppress statements, and



it was set for a hearing.
Q. Now -- go ahead. I'm sorry.
A. Okay. And so normally what I would have done -- and I don't know if I did it on this case -- is to ask that the motions be made more specific because they were boilerplate all the time.
If these were boilerplates, and I -- I don't have them; so I don't know what they said. But if they were boilerplate, when the case came up in front of me, I would have asked -- or up on a trial date -- I would have asked the trial judge to ask the defense lawyers to make the motions more specific.
Because if -- and this is just a hypothetical -- if one defendant came in contact with ten police officers, I don't want to call the whole police department or all ten officers.
If you're saying A, B, and C are the people who attacked you, then I want to know if it's at the home when you were arrested or on the street when you were arrested or in the police station; so I would have asked that those things be made more specific.
Some judges would ask the lawyers to make them more specific. And from getting that information, then you'd know what officers -- and then you'd also ask them "What are the allegations?" Sometimes judges would make



them tell us; sometimes they wouldn't.
Q. Understood.
A. And then if we knew what the allegations were, we would certainly ask the witnesses, "Did these things happen?" We'd ask them, "What happened?" And then ask them, "Did any of these things happen?" to find out what their story was.
And then they would be -- and then on the motion to suppress statements, the witnesses would be called and questioned.
(Lampkin Exhibit 1 was marked for identification and is attached to the transcript.)
Q. Judge, I'm handing you what has been marked as Lampkin 1. I'd ask you just to take a look at this and tell me if you recognize what has been marked as Lampkin 1.
A. It is a motion to -- well, it's a typed motion to suppress statements. Handwritten above it and there's "amended" and then the words "quash arrest" and "motion to" -- I'm going to read the way it's --
The only words that are typed on here are "Motion to suppress statements," and that's underlined. And it's two pages. And there is -- there's typed writing on it, and then there's handwritten writing on it.



And it is handwritten. It changes the title to "Amended motion to quash arrest and suppress statements and identification." That's the way I would read it.
Q. That's right.
A. And then, I mean, in the body of it there are lots of handwritten changes. So this is probably a motion to suppress statements and originally filed on a date prior to the stamped date on it which is December 23rd, 1982.
But on December 23rd, someone took the original motion to quash arrest -- I mean, motion to suppress statements and amended it on its face and filed it on December 23rd of 1982.
And there's handwritten amendments all over the first page and several lines on the second page that has handwritten --
Q. That's correct, I believe. Fair characterization.
I am going to draw your attention to Number 3 of this amended motion. And this amended motion relates to Rodney Benson; correct?
A. Yes.
Q. Okay. And I can assume that you read this motion before it was litigated; correct?
A. I certainly read this motion in 1982.

Q. Right. And there's an allegation that's set forth in --
A. Can I read it first?
Q. Absolutely.
A. Thank you.
Q. Take your time and let me know.
A. All right. I've read Number 3. The handwriting at the bottom of Number 3 is so small I can't read it.
Q. That's fine. Understood. I cannot read it either. But I want to just draw specifically -- draw your attention specifically to the typewritten part in Number 3. Okay?
A. Okay.
Q. Do you remember Mr. Benson alleging that he was beaten by officers at Area 2 with a black piece of rubber with tape on both ends and with a flashlight?
A. From reading the motion, certainly that's what it says, and I read the transcript; so that's what he is -- this is certainly his allegation.
Q. And do you recollect that Mr. Wrice made a similar allegation as it relates to the tape on both ends and being beaten with a flashlight?
A. Yes.
Q. Okay. Now, going back to the period of time, did it strike you as unusual or make any impression on



you that both defendants had made similar allegations about how they were beaten at Area 2?
A. Did it strike me as unusual?
Q. Yeah.
A. No. I had never had somebody say that this happened like this; so it didn't -- I mean, that was what their allegation was.
Q. Okay. And did you take -- what efforts did you take to determine whether -- strike that.
You testified earlier that one of your responsibilities -- and I think there was actually a rule of ethics, maybe it's 3.8 that deals with it. I don't know if that was enacted back in '81, but certainly you've testified that you recognize as a prosecutor that your job wasn't just to get a conviction back in 1982.
A. Ever.
Q. Right. Okay. And that you had an obligation to the people of the state of Illinois which also included the accused; correct?
A. Correct.
Q. Okay. So when an allegation like this was made by Mr. Benson and Mr. Wrice, did you take any -- or what efforts did you take to determine whether or not it was a truthful allegation?



A. When we had -- I mean, I questioned the police officers, certainly.
Q. Okay.
A. In preparation for a hearing on the motion to quash arrests and suppress statements and suppress identification, I would have questioned them and heard what they had to say.
Q. Did it concern you at the time -- and I'm using the word "concern," and all I mean by that is did it -- when I say "concern," what I mean is did it concern you about the reliability or the voluntariness of the statements, the fact that these were oral statements rather than memorialized in some other way? And I'm talking about Mr. Wrice and Mr. Benson's statements.
MR. HALE: Objection to form.
A. Okay. I don't know what you mean by "concern" to mean.
Q. Sure.
A. When I had -- I'd say, overwhelmingly, most statements at that time were oral. The rules weren't in place at that time that you have to videotape things. I don't even know if they had -- I'm sure they must have court stenographers available, but if a statement was given to an Assistant State's Attorney, then the Assistant State's Attorneys would give the defendant



options.
And I don't know if that was even available then. But normally a State's Attorney would give a defendant the option of memorializing a statement. You can leave it as an oral statement. You can have it written out and I'll let you review it and you can sign it, or we can call a court interpreter -- or not court interpreter but a court stenographer to take it down.
And I don't know if all those things were available in '82 or not. I know there was no videotaping or that kind of a thing, but my experience is that most statements at that time were oral statements.
Q. Do you recall that Mr. Wrice's statement was an oral statement --
A. Are you talking about Mr. Benson or --
Q. Yeah. No. I'm going to talk about Wrice for a second. You can put that down.
A. Okay. I just want to know what we're talking about.
Q. Yeah. That's fine. I'm going to get to Mr. Benson too.
Do you recall that Mr. Wrice's inculpatory statement that was attributed to him was an oral statement?

A. Well, there's a lot in that. I don't think he gave an inculpatory statement; so I don't view it that way.
Q. Okay.
A. But it was an oral statement.
Q. Okay. And do you recall that it was not signed by Mr. Wrice?
A. An oral statement could not possibly be signed, of course.
Q. Right. Well, we know this, but somebody reading it might -- I just want to make sure that --
A. I think anybody would say if somebody gave an oral statement, you don't sign something orally. If it's put to paper, then it's a written statement.
Q. Okay. A handwritten statement.
A. Right.
Q. But that's also misleading too because a lot of times accused don't actually handwrite the statement. They just sign it; right?
MR. HALE: Objection to form. Argumentative.
MS. BONJEAN: I'm not trying to be argumentative. I'm just trying to be clear that it --
A. A handwritten statement is a handwritten statement by someone.
Q. Right.



A. So that is different to me than an oral statement.
Q. Okay. So you do recall that Mr. Wrice's statement attributed to him was not ever signed by him; right?
A. There was an oral statement attributed to Stanley Wrice.
Q. Right. And there's no indication in the record, other than the police officers saying that he made the statement, that indicated that he had adopted this statement; right?
MR. HALE: Objection to form.
Q. You can answer.
A. State's Attorney also said he gave a statement.
Q. Right.
A. So it's not just the police. There was an Assistant State's Attorney too.
Q. And on that point, do you remember who the Assistant State's Attorney was there?
A. I don't know him. I remember the name from reading the transcript. His name was McCurry. I can't remember his first name.
Q. Did you know Mr. McCurry back then?
A. I don't believe I ever saw him before I called him for this case.



Q. All right. Did you ever ask Mr. McCurry why he did not obtain a handwritten statement from Mr. Wrice?
A. No, I did not.
Q. Did you ever ask him whether he had attempted to get a handwritten statement from Mr. Wrice?
A. I don't know if I did or not.
Q. And I'm going to ask the same question about Mr. Benson. Do you have a recollection that the statement attributed to Mr. Benson was also an oral statement?
A. I know from reading the parts of the record on this case that he gave an oral statement.
Q. Okay. Now, you would agree, would you not, that Mr. Benson and Mr. Wrice made similar allegations of misconduct by Mr. Byrne and Mr. Dignan -- or Sergeant Byrne and Officer Dignan?
A. I would agree that they both gave statements that were similar and very dissimilar.
Q. Okay. Well, let me just break this down. Would you agree that Mr. Wrice and Mr. Benson both alleged that they were beaten with a flashlight and a black piece of rubber with tape on either end?
A. Yeah. I'd have to go through it. Let me look at this. If you give me the other ones -- because I don't know if it was a black piece of rubber with tape



on both ends for both of them.
I have Rodney Benson's here.
Q. Right.
A. So if you just let me see the other one, I can tell you if it was the same.
Q. Yeah. I don't -- if you don't have an independent recollection, that's fine. I'll pull it up in a second.
A. I don't recall if it was exactly the same.
Q. Okay. Do you have a recollection of asking Mr. Byrne about the allegations that were made against him by Mr. Wrice and Mr. Benson?
A. I know I asked because it's in the transcript.
Q. Okay. I'm talking about prior to the motion to suppress. Do you remember having a conversation about it?
A. I know I would have. I certainly don't remember it. Anytime I put on a motion, any kind of motion, I would have talked to the witnesses prior to putting them on.
Q. Okay. And the reason, by the way, we haven't provided you with a copy of Mr. Wrice's is that much of the record, actually, the common law record doesn't exist anymore.
A. It's a tremendous amount of record as far as I'm

concerned --
Q. Right.
A. -- that is missing.
Q. Yeah. There's a good deal of the record that is missing. This is true. And that includes a copy of the original motion to suppress.
A. That's why I said I don't have an independent recollection that they were the same. I know that there was a lot of inconsistencies. That's why I wanted to see Stanley Wrice's.
Q. That's why what?
A. I wanted to see Stanley Wrice's motion.
Q. Right. I wish that I could provide it to you.
A. I wish you could too.
Q. But as you sit here today, you don't remember -- you remember there being some inconsistencies, but you don't remember the specifics or what was alleged by Mr. Wrice. Is that fair to say?
A. I don't remember if they both said a black piece of rubber with tape on both ends and with a flashlight.
Q. Okay. Now, did you have the opportunity to review medical records for Mr. Benson and Mr. Wrice when -- medical records that were prepared when they first came into the county?
A. I didn't know there were medical records until I



think we were -- we might have been involved in the motion to quash arrest and suppress statements when the lawyers said that there was medical records.
And then while we were conducting the motion to quash and suppress, there were records that were requested and subpoenaed, whatever, and some records were produced.
Q. Okay.
A. I haven't -- I don't think that I've gotten those records in that material that you gave. I'm not sure.
Q. When you say "you gave," I don't know -- I didn't --
A. Well, I assume you all have the same discovery.
Q. There's tens of thousands of pages of discovery, I think, fair to say. So I don't know -- there's much more than what you've been provided. I don't know what was given to you. I didn't prepare the disk for you just so you know.
A. All right. Well, I --
Q. That's why I asked at the beginning what you had reviewed.
A. I had less than 1,400 pages, and I only have parts of things. So I don't know what the whole record has. If you all give me the whole record, I will read



the whole record.
Q. We wouldn't expect you to read the whole record.
A. I would read the whole record if I was given the whole record.
MS. BONJEAN: Okay. I am going to mark -- hold on one second.
MR. HALE: Would this be an okay time to take a bathroom break?
MS. BONJEAN: Sure.
(A break was taken.)
(Lampkin Exhibit 2 was marked for identification and is attached to the transcript.)
BY MS. BONJEAN:
Q. Judge, I'm going to have you look at what's been marked as Lampkin 2. I don't know. It's not the world's best quality, but I think you can see the date up at the top of September 10th, 1982. This is what's been referred to as a bruise sheet, and you can see on the second page that Mr. Wrice signed it.
Do you remember reviewing this document in preparation for the motion to suppress?
A. First, I'd say this is a two-page document.
Q. Right.
A. And it doesn't have a title on it. I can't say --



Q. Okay.
A. -- if I had seen this. If I had the transcript and this, maybe I would have. But I cannot say -- if this was used at trial, then I certainly saw it. I just don't have any independent recollection of seeing this document.
Q. Sure. Without specifically referring to this document, do you remember there being medical testimony presented that -- in support of Mr. Wrice's claims that he had been injured by police officers?
A. I remember a person with, like, four names. Ali something something something, yeah, who was a -- somebody who worked at Cook County Jail. He worked at Cook County Jail.
And I don't know if he was -- I don't know if he was a trained EMT or something. He wasn't a doctor. I know that. And I remember reading his -- re-reading his testimony. It was part of the material.
Q. Okay.
A. And I know that somebody testified.
Q. Right.
A. I just don't -- I don't remember independently what they said.
Q. In preparation for the suppression hearing, Mr. Wrice's suppression hearing, you, I believe, said

you would have talked to the police officers; correct?
A. Yes.
Q. Okay. You would have reviewed whatever documents were available related to the allegations; correct?
A. This was not available prior to the time --
Q. Okay.
A. -- as I said --
Q. Right.
A. -- prior to the time that we went to hearing because it was during the hearing.
Q. Right.
A. That -- I can't remember -- I assume it was Mr. Wrice's attorney. Because I don't know if it was Mr. Benson's attorney too. We were doing both of their motions together.
Q. Right.
A. But they said there were medical records, and they hadn't gotten them. Well, I didn't know there were medical records until they said. And so during the course of this hearing, they produced -- of course they got something from Cook County Jail.
Q. Okay. Prior to trial we'll say, you were aware that there was -- there were medical records that were, at least from the defense perspective, corroborative of



Mr. Wrice's claim that he had been physically abused by Area 2 officers; correct?
A. Yeah. I knew that there was a document and records from Cook County Jail.
Q. Right.
A. And I'm not sure where else.
Q. Okay. And in making your assessment of whether or not the confession was voluntarily -- well, strike that.
I am assuming that you would not -- if you believed Mr. Wrice's confession was involuntary, you would not have offered it into evidence; right?
MR. HALE: Objection to form. Foundation.
A. I didn't think his confession was coerced.
Q. Okay. That's what I'm -- I assume that if you thought it was coerced, you would not have offered it into evidence against him; correct?
A. If I knew it was coerced, I would not have offered it into evidence. Absolutely not.
Q. Okay. And in making the assessment that, in your own mind, that this was not a coerced confession, what role did the physical evidence play in that, if that makes sense?
I mean, how did you think he got the injuries, or do you -- how did you feature that into your thinking



about whether the statement was coerced or not?
MR. HALE: Objection to form.
A. First, it's not my job -- I was not the trial judge -- to determine who I believed, but I believed the officers' testimony. And as I said, as to Mr. Benson and as to Mr. Wrice, there were, in my mind, major inconsistencies in what they said.
In addition, they had both inculpated the other person. Rodney said Stanley beat the hell out of her. I'm sorry for the use of that language because he didn't say that. That's the way I felt about it.
Rodney said Stanley beat her and burned her, and Stanley said Rodney beat her and burned her. And those guys rode in the cars together and they were in jail together, and I don't know how they got the injuries that they had.
I did not believe the police did it then. I don't believe they did it now. I don't believe that for a second.
Q. But you have no theory about how they got those injuries?
A. I don't know how they got the injuries. I know some of the injuries were -- I can't think of which one of them, but one of them talked about where they were beaten about their body, and there was only evidence of



injury on the leg or something.
I don't know how they got them. I have no clue. I know what they did to the victim. They could have done it to themselves.
Q. Well, drawing your attention to Lampkin 2, you can see in the remarks that there was bruises and trauma to the groin, at least that's reported here, and then on the --
A. I don't see that.
Q. The first --
A. I see that there's -- the word is "bruises" and then there's a slash "trauma" and then it says "to" -- I don't know if that line goes -- you know what? I know that that's not what that says.
I know that you're misreading that. Because I read the transcript, and there was -- the person who testified who had that long name said, "I never looked at the person's groin or his legs," so he couldn't possibly have said -- if this is his exhibit -- that there was bruises or trauma to his groin.
Q. Okay.
A. It couldn't say what you're saying it said.
Q. Okay.
A. And that's just --
Q. Well, I'm just reading from the document. I

wasn't there.
A. Yeah. I know. But if you've read your own records, you have no support for what you just said. Anybody --
Q. I have my client.
A. Yeah. I'm saying --
Q. I have my client.
A. The medical testimony that I had and the transcripts that I had said that there were -- that there was -- this person with the long name never looked at the defendant below -- I mean, chest up.
Q. Right.
A. Other than chest up. And there was a page or two from a doctor that said there was nothing visible in the groin.
Q. Right.
A. So it could not -- this couldn't -- I mean, bruises or trauma.
Q. I'm going to --
A. It looks like this is probably read downwards rather than across. You're reading across, and it probably reads down.
MS. BONJEAN: I'm going to have you mark this as well.
(Lampkin Exhibit 3 was marked for



identification and is attached to the transcript.)
Q. I'm going to ask that you look at what has been marked as Lampkin 3 which is, as you can see from the bottom, is an outpatient progress note with Stanley Wrice's name listed above it.
I will give you the opportunity just to review it.
A. All right. I've read as much of it as I can make out. It's a one-page document that at the bottom it says "Outpatient progress notes" at the bottom right. And on the bottom left the name of Stanley Wrice is printed, and below that a date of birth is printed.
Q. Okay. Now, I just want to sort of get to the heart of the matter. When you were litigating this case and before you went to trial, you were, as you testified, aware that there were allegations that -- from the defense side, that Mr. Wrice had suffered injuries at the hands of officers at Area 2; right?
A. Certainly.
Q. And you did not believe those allegations; correct?
A. I didn't believe them after I heard it.
Q. Right.
A. I don't know that until I hear it.
Q. Right. Well, prior to trial, you had heard the



allegations; correct?
A. Oh, yeah.
Q. So I'm talking about after the suppression hearing but prior to trial, you had heard the allegations and you didn't believe the allegations; correct?
A. Correct.
Q. Okay. And to this day, you don't believe the allegations, it sounds like?
A. I don't believe it.
Q. Okay.
A. I don't believe somebody would take a statement from Mr. Wrice in which he makes somebody else the offender and not himself, that they beat somebody up for him to say, "I didn't do it. Rodney did it." And that's his statement basically.
Q. Well, you would agree that they both made themselves fairly accountable even if they were pointing fingers.
A. I don't think that Stanley made himself accountable. Stanley said, "I went upstairs. Rodney was beating this person and burning them. I took the" -- what do you call it? -- "the iron away from him and dropped it on her." I read that as a mistake, trying to save her and he dropped it on her. That's



what I read.
Q. Well, you used it against him at trial; right?
A. I used the statement because he put himself upstairs. That's all.
Q. Right. So that made it inculpatory, the fact that he put himself at the scene of the incident.
A. Well, he's not -- it was something I put in, certainly. But you can be present at a crime and see it and still not be accountable.
Q. In any event, even in light of everything we know about Area 2 and the fact that Chicago Police Department has concluded that there was routine abuse going at Area 2, it's still your position that you do not credit Stanley Wrice's statement that he was abused at Area 2?
MR. HALE: Objection. Form. Foundation.
MR. MICHALIK: Argumentative.
A. There are -- there was a, I don't know, years and years long investigation. So clearly there was abuse at Area 2. Clearly some people were abused at Area 2, absolutely. I don't believe Stanley Wrice was.
Q. And you do know that Sergeant -- I get their ranks mixed up sometimes. But you are aware that Sergeant John Byrne and Peter Dignan were found to be two of the, for lack of a better word, main culprits in

beating confessions out of suspects?
A. I don't know that.
MR. HALE: Objection. Form. Foundation.
A. I don't know that.
Q. You don't. Okay. So you don't know that Byrne and Dignan were considered --
A. Considered by who?
Q. Well, by the Chicago Police Department.
MR. HALE: Objection. Form. Foundation.
Q. Michael Goldston.
MR. HALE: Objection. Form. Foundation.
Q. That they plead the Fifth Amendment in response to all those questions.
MR. HALE: Objection to form.
A. None of that material was given to me. I don't have -- I don't know who Goldston is. I don't know if the Chicago Police Department had found that those two people you named have abused people. I can't say they've never abused people. I don't believe they abused Stanley Wrice.
Q. And you don't believe they abused Rodney Benson, I assume, too; correct?
A. We could have a novel. I mean, I could be here all day talking about the inconsistencies of what Rodney Benson said and Stanley Wrice said. I don't believe



they -- one of the reasons why I don't believe -- and this is the only thing I can think of at this moment with Rodney Benson was Rodney Benson filed a motion for severance.
He didn't want to be tried with Stanley Wrice. But in that motion for severance, he said, "I didn't do anything. I had voluntary sex with this woman. Stanley beat her and Stanley burned her." That's in his motion to sever.
He said it freely and voluntarily; so I don't think they beat him to say something his lawyer then filed a motion for severance as the basis of. I just don't believe it.
It didn't make any sense to me, if he's saying that "they made me say it," why he then filed it in a motion for severance. That's just one of the things.
Q. You eventually became aware that Bobby Joe Williams had made allegations that he was beaten as well -- correct? -- at some point prior to the evidentiary hearing that was held in 2013?
A. I didn't know it until 2013.
Q. Did Bobby Joe Williams ever tell you that he was beaten by the police?
A. Absolutely not.
Q. Did Bobby Joe Williams ever tell you that the



statement that he had made that inculpated Stanley Wrice was a false statement?
A. He never said that.
Q. Did you have conversations with Mr. Bobby Joe Williams prior to putting him on the stand to testify in the State's case in chief?
A. I had at least two conversations with him. Probably more, but I had at least two conversations with him.
Q. And during those conversations that you just referenced, at any point did Bobby Joe Williams tell you that he had been beaten by any officer at Area 2?
A. He never said, ever.
Q. Did he ever tell you that he was fearful that he would be charged with this crime if he did not cooperate with the police investigation?
A. Absolutely not.
Q. Did he ever tell you that his testimony was not truthful testimony or his -- the testimony he was going to give at trial, prior to trial, was going to be false testimony?
A. Absolutely not.
Q. Did he ever tell you -- strike that.
Did you ever tell him that if he recanted his testimony, he could be subjecting himself to charges?



A. Of course not.
Q. Do you have an opinion about why Bobby Joe Williams made these allegations --
A. What allegations?
Q. -- subsequently?
A. What allegations?
MR. HALE: Objection to form.
A. You've given me a ton of them, possible allegations; so I am not sure which ones you're saying.
Q. Well, do you have any opinion or a theory about why Bobby Joe Williams later stated that his testimony was false?
MR. HALE: Objection to form.
A. I'm not sure what you're saying.
Q. Were you aware that Bobby Joe Williams recanted his testimony?
A. I am aware that he recanted his testimony.
Q. Okay. And are you aware that he has stated under oath in testimony and in affidavits that he was beaten by Area 2 police officers?
A. I don't know if he stated that in testimony and affidavits.
Q. Okay. And were you aware that in -- it was either sworn testimony or sworn statement, he has stated that the testimony he gave at Stanley Wrice's trial was

false testimony?
A. I'm aware that he said that.
Q. Okay.
A. I don't know how he said or what documents he said it.
Q. All right. And, again, do you have any theory about why he would say that at this juncture? When I say "this juncture," I mean at the juncture at which he made those sworn statements.
A. I don't know why. I certainly have theories, but I don't know why.
MS. BONJEAN: Okay. Would you mark this, please.
(Lampkin Exhibit 4 was marked for identification and is attached to the transcript.)
Q. Judge, I'm handing you what has been marked as Lampkin 4. I'm going to characterize it for you and then you can go ahead and look at it yourself.
This is a letter that was written by Richard Brzeczek on February 25th, 1982. He was the superintendent of the police department to Mr. Daley who was then the Cook County State's Attorney. And attached to it is another letter that was written to Mr. Brzeczek by a Dr. Raba from the Cermak Prison Health Services.
I'd just like you to take a look at it and tell



me if you've ever seen this letter before.
A. All right. Okay. I've got two pages: one dated February 25th of 1982, and the heading says "Office of the superintendent of Chicago police." And it says at the bottom signed "Sincerely, Richard J. Brzeczek, superintendent of police."
And the second one is -- the document says it's -- which has a -- it says -- let me just -- because there's more than one exhibit mark on there.
Q. Sure.
A. That's why I'm just making this record. Exhibit 4 is two pages. The first page only has the Exhibit 4 marker on it, but the second page has Deposition Exhibit Number 2 on it. And then another box with, I don't know, DL Number 1A.
It's dated February 17th, 1982, and it's to Richard Brzeczek from a Dr. John M. Raba, MD, Medical Director, Cermak Prison Health Services. I have not seen these documents.
Q. Okay. And having never seen these documents, just to be clear, you would not have seen these documents and did not see these documents at the time you prosecuted Stanley Wrice; correct?
A. Of course not.
Q. Okay. Had you heard about the letter that



Superintendent Brzeczek wrote to then Cook County State's Attorney Daley?
A. I did not.
Q. Okay. And is it fair to say that you also were unaware in and around the time in which you prosecuted Stanley Wrice that there had been allegations by Andrew Wilson and also a letter by a doctor that had seen Andrew Wilson that he had been the subject of brutality during his arrest -- or after his arrest at Area 2?
A. I have certainly -- as I said, I've never seen this. I have no knowledge of these documents.
Q. And would it be fair to say that when you spoke to Sergeant Byrne in preparation for the suppression hearing and then later for the trial, he never told you that he had used brutality against Mr. Wrice, Mr. Benson, or anybody else; correct?
A. Certainly not.
Q. Okay. Did Mr. Byrne ever tell you he had used brutality against anyone?
A. Certainly I wouldn't have been asking him about the world hypothetical.
Q. Sure.
A. I mean, I wasn't aware of this; so of course I wouldn't be asking him about Exhibit 4. I was asking him about this particular case and the allegations of



this particular case.
Q. Okay. And he never told you he had brutalized anyone in connection with the Wrice matter; correct?
A. Absolutely not.
Q. And same for Dignan. He never told you that he had brutalized anyone in connection with the Wrice matter; correct?
A. Of course not.
Q. Whether it be an accused or a witness?
A. Absolutely not.
Q. Okay. So you had absolutely no knowledge whatsoever that there was brutality that had been administered to any witness or any accused in the Wrice matter; correct?
MR. HALE: Objection. Form. Foundation.
A. Okay. You have to say that again.
Q. Okay. You had no knowledge or had -- strike that.
When you were preparing for trial, at no point did any officer -- Byrne, Dignan, or any of the other officers that had participated in the investigation or arrest of Mr. Wrice -- tell you that there had been brutality used in connection with this investigation; correct?
MR. HALE: Objection to form.

A. If you're talking about as to the alleged offenders -- is that what you're asking? Because I'm not sure what you're asking me.
Q. Okay. In your work on this case and in preparation, did any officer tell you that there was some brutality used against anyone involved in the case?
A. That's precise.
Q. Okay.
A. No, they didn't.
Q. Okay. Now, you did prosecute Stanley Wrice and get a conviction against Stanley Wrice, as you recall; correct?
A. The jury convicted him.
Q. Right.
A. But I prosecuted the case. One of the prosecutors, yes.
Q. Okay. And sub -- strike that.
You also -- was he the first defendant -- he was the first defendant -- well, he was the only defendant to be tried, but he was the first person whose case was resolved; is that right?
A. Right.
Q. Okay. And then subsequent to the conviction of Stanley Wrice, Mr. Benson's case was resolved; correct?
A. Right.



Q. And that was resolved by way of guilty plea; correct?
A. Correct.
Q. And then Mr. Benson received a term of probation; correct?
A. I don't remember. You'd have to show it to me.
Q. Okay.
(Lampkin Exhibit 5 was marked for identification and is attached to the transcript.)
(A discussion was held off the record.)
MR. NOWINSKI: You don't have a better copy?
MS. BONJEAN: I don't have a better copy.
Q. And I'm just going to ask that you look at Lampkin 5. I'm not going to ask that you read the whole thing because we are short on time.
And I'm just asking you if you can identify whether this refreshes your recollection about whether Rodney Benson received a sentence of probation with respect to his case.
A. Rodney Benson's name is written at the top of this, and that's my handwriting.
Q. Okay.
A. And I wrote that.
Q. And your signature is at the bottom; correct?
A. Well, if you let me finish, I was going to get



to the bottom. But I filled this out. So it says from what I can -- I can't read the crime. That's the problem. But it's "guilty of the crime of," and I can't read what it is. And then further on, it says "30 months." And at the --
Q. Well -- go ahead.
A. Okay. It says above that "Defendant sentenced to a period of probation of 30 months."
Q. Right. And then --
A. And then at the bottom, I signed it.
Q. Okay. Great. And you would agree that the case number at the top right written in is 82-8655; right?
A. Exactly.
Q. Okay. So do you remember that Mr. Benson got probation, or you don't have an independent recollection other than -- or are you just --
A. Yeah. See, I left 26th Street in June of '83. And this case was resolved in January -- according to this, January 18th of '84 in front of Judge Tom Hett. So I must have come back over and took the plea -- or I had to. I must have taken the plea, yeah.
Q. Okay. Do you know why the State agreed to a term of 30 months probation as it relates to Benson?
A. I can only guess. I mean, I was involved in it, I'm sure. So probably what the witness had -- the



victim, Karen Byron, had gone through in the first trial was the horrible things that the defense lawyers were saying to her what she had to go through.
Probably that Kenneth Lewis had provided an alibi in his testimony for Rodney Benson. He said at the time, when they left to go -- wherever they went, I think to get food or something -- there were no burn marks on the victim. And when they came back, the victim was burned. So Kenneth Lewis had provided a partial alibi for Rodney Benson.
So the case certainly wasn't as strong against him because neither -- what's his name? -- neither Bobby Joe or Kenneth Lewis had said that Benson beat the victim. I'm sure -- I mean, those are some of the things I'm thinking of off the top of my head were the reasons for this disposition.
Q. Do you know whether you were involved in the guilty pleas of Michael Fowler and/or Lee Holmes?
A. I was not.
Q. Okay. Do you know who the prosecutor was?
A. You'd have to -- if you have the sheet that said it, then I could read it, but I --
Q. Okay. You don't know?
A. Yeah. It happened -- I assume it happened after this.

Q. All right.
A. So I'm sure they wouldn't have called me back again. If they did, I would have -- my name would be on something.
Q. Did you make an attempt to call Mr. Benson as a witness against Stanley Wrice? I know he was still accused at that time, but were there any discussions about him testifying against Stanley Wrice?
A. I don't recall. I mean, if his lawyer had approached me for that, certainly would have been something that I would have considered. But I don't remember Howard Savage approaching me on that.
I remember Mr. Savage amending his answer to discovery on Rodney Benson's case and adding Kenneth Lewis after I told him what Kenneth Lewis said. And so I don't know.
Q. And you know that Karen Byron, of course, said that she was raped by three people; right?
MR. HALE: Objection. Form. Foundation.
A. She never said she was raped by three people.
Q. She didn't say she had three offenders?
A. She testified that three --
MR. HALE: Objection. Form. Foundation. Argumentative.
A. She said that three people sexually molested her



and somebody tried to get her to orally copulate her. She was knocked out. She doesn't say what happens, of course, while she's knocked out. She comes to. Okay. She doesn't -- so, no. She never said only three people raped her, never.
Q. Well, you would agree that she said three individuals assaulted her in some form or fashion; right?
A. No, I would not agree.
Q. Okay. Would you agree that she said at least three individuals assaulted her?
A. She didn't use those words that you're using.
Q. Okay. Well --
A. She said something like:
"One man got on top of me. Then another man got on top of me. Then another man got on top of me. And somebody tried to make me suck their dick. And I was being beaten and knocked out and burned, and I passed out. I fainted."
Q. Okay.
A. So no, I could never say what somebody -- nobody asked her, "Do you know when you came to, was anybody else on top of you?" That didn't happen.
Q. Well, putting aside what her exact words were, the understanding from what she communicated to the



police and what she communicated, I'm assuming, to you was that there was more than one person involved in the crimes that were committed against her; correct?
A. She didn't know who was burning her. She did say, "A man got on top of me and then another man got on top of me and then another man." I think that is what her testimony was, and I think that was what the reports were.
Because somebody tried to make her perform an act of oral copulation on her. She saw flames coming toward her. She was burned. She was beaten. She couldn't see who was burning her and beating her.
Q. Okay. But --
A. So she never said one person did it.
Q. No. But the takeaway from her testimony is that there were multiple people involved in the incident that resulted in her injuries. Would you agree with that?
A. I can't say in terms -- now, I can't say that multiple people were involved in burning her. I can't.
Q. I didn't ask you that question. I asked whether your takeaway was --
A. Well, you -- I don't know what you call the injuries. If you say sexual assault, yes.
Q. Okay.
A. She said that more than one person sexually



assaulted her.
Q. I was trying to use as broad a language as possible --
A. But you can't do that because she -- in my estimation, you're misrepresenting what she said.
Q. I'm not trying to represent what she said. I'm trying to clarify that her allegations were that at least three people had committed crimes against her in some form or fashion. Would you agree with that?
MR. HALE: Objection. Form. Foundation.
A. I agree that she said more than three people committed sexual assaults or attempted sexual assaults against her and that she was beaten and burned and brutalized and she did not say how many people were involved --
Q. Okay.
A. -- in that.
Q. Okay. And one of the individuals who was accused of assaulting her was Rodney Benson, yes?
A. Everybody was, I think, accused of the same offenses. They were all accused as either principals or as accountable people.
Q. And --
A. So they were all charged with the rape, the deviant sexual assault, the armed -- what is it? --

unlawful restraining. I forgot what the other charges were. They all were charged with the same thing as principals or as accountable people.
Q. And three of those people pled guilty to at least one offense for which they were charged; right?
A. I don't know. I can't read what he plead guilty to.
Q. Well, he didn't plead guilty to rape. I think we can assume that if he got probation.
A. That's why I said -- you just said one of the offenses was reduced charge. I don't know if there was a reduced charge here. I don't know because I can't read this.
Q. Okay. Let me clarify then. We know that three of the individuals pled guilty to either one of the charged offenses or some reduced charge connected with the assault of Ms. Byron; correct?
A. I know that Rodney Benson pled guilty, because I was there. The other two people would be just from me looking at --
Q. Fine.
A. -- the documents, and if you show me, I can certainly look at them.
Q. The documents can speak for themselves. But Mr. Benson, you do recollect, pled guilty to some --



either, again, some charge that he had been charged with or some reduced charge; correct?
A. Yes.
Q. Okay. And he received probation in exchange for his guilty plea; correct?
A. Correct.
Q. Okay. And did it concern you -- and I use the word "concern," but did it give you pause or make you reflect or make you think that whether it was appropriate that one co-defendant received 100 years and another got probation?
MR. HALE: Objection to form.
A. I tried Stanley Wrice. And then I was -- almost immediately because of this, they were going to promote me -- I was on my way to juvenile. I cannot say what would have happened with Rodney Benson or the other two defendants if I had stayed there.
I don't know these same dispositions would have been given to them. If you're asking me if I was willing to try all three of them, I was willing to try all three of them.
I don't know what the witnesses' feelings were about it after having gone through the trial of Stanley Wrice. I don't know. I don't know what anybody else's feelings were after I had left. I would have tried more



people, yes, but they wouldn't have gotten -- and I don't know what the other two guys got.
Q. I'll represent one got probation and the other one got --
Six years IDOC; is that right? Four years IDOC.
But be that as it may, specifically with respect to Mr. Benson, you did agree that he received a sentence of probation?
A. Yes.
Q. And would you agree that there is some disparity between 100 years sentence and a sentence of probation, is there?
A. I mean, you say things speak for themselves. Of course there is a difference between probation, and there is a difference in the evidence too.
Q. Well, did you think Mr. Benson was innocent? I mean, if he was innocent, why is he pleading to anything?
I'm trying to understand. When you say "the evidence," did you come to believe that he was actually not guilty of the crimes for which he was charged?
MR. HALE: Objection to form.
A. I believed that he had an alibi for the burning portion, Kenny Lewis, a witness that I believed his testimony. So it's certainly in that regard, he was



certainly a lot less culpable person.
Certainly there was a difference in the evidence because Rodney Benson talked to the lady on the street in front with the police officer. And there was testimony that she went with Rodney Benson freely.
There wasn't testimony that she had then agreed to go be carried into a house where people beat and burned and raped her. So yeah, the evidence was different. And I'm just -- this is just such a summary of so much.
Q. Well, I'm trying to understand why he got probation.
MR. HALE: Objection. Asked and answered. She gave you a long answer about that earlier.
MS. BONJEAN: Right. And I --
MR. HALE: She gave you all the factors why.
MS. BONJEAN: I understand. And I heard her testimony about that, and unfortunately it's still --
MR. HALE: You don't like her answer. She answered it.
MS. BONJEAN: I don't dislike or like answers, Mr. Hale.
MR. HALE: All right. So she gave --
MS. BONJEAN: It's not my job to like or dislike answers.

MR. HALE: She gave an answer; so that's the answer.
MS. BONJEAN: Okay. All right. And I am entitled to follow up and ask --
MR. HALE: You're not entitled to ask the same question again.
MS. BONJEAN: Okay. Well, I'm not. And if you would quit interrupting me, I would move on to another question.
MR. HALE: I'm making my objection.
MS. BONJEAN: Okay. Make your objection. Are you done?
MR. HALE: I am.
MS. BONJEAN: Great.
BY MS. BONJEAN:
Q. You brought up a point that the evidence was different, but no one placed Mr. Wrice with Ms. Byron; correct? On the street I'm talking about.
A. He did.
Q. You're talking about based on his statement that you said was not inculpatory?
A. His trial --
Q. Okay.
A. -- testimony, he said he was on the street. His trial testimony is that he went to the liquor store with



Rodney and Bobby Joe. And he went in the liquor store, and when he came out of the liquor store, the police officer was at the car with Rodney Benson and Bobby. So yes, he put himself there.
Q. He put himself at the liquor store, but she left with Rodney; right?
A. Yes, exactly. She left with Rodney.
Q. Okay. She left with Rodney. So in your mind, that testimony actually supports your theory that Benson was less culpable?
A. No. I didn't say he was less culpable.
Q. Well, if he's not less culpable, then why is it that you would have agreed to reduce his charges and give him probation?
MR. HALE: Objection. Asked and answered.
A. Okay. Sorry. I said some of the reasons.
Q. Okay.
A. The evidence was certainly stronger on Stanley. Then we had Bobby Joe's statement with Kenneth Lewis' statement. And we had Rodney saying the defendant did all of those violent things and him saying that his sex with her was consensual. That was what his testimony was.
She testified that she agreed to go with somebody in a car, and the next thing she knew, she was



someplace else. She was drunk out of her mind. If you think of -- and those are just some of the things.
If you think of some of the things that if Rodney was being tried along with Kenneth saying that he left, certainly the case was not as strong against Rodney.
Q. Okay. So your belief is that the evidence was stronger against Mr. Wrice than Mr. Benson?
A. Of course.
Q. All right. Let's talk about Kenny Lewis if we can quickly. I don't want to make you have to come back. It's up to you.
A. Okay. I'm not coming back again unless a court orders me to because this is the second time you've had me here. So I'm -- I mean, I testified in 2013 and now; so --
Q. With all due respect, Justice, the State called you as a witness in 2013. I didn't call you as a witness?
MR. HALE: Well, for the record, because I saw the e-mails, you were notified of the time constraints today, and you agreed to proceed. So you agreed by that, and that's --
MS. BONJEAN: Well, listen. We can litigate that at some -- this was the lead prosecutor on the



case.
MR. HALE: No, I mean but -- if you didn't --
MS. BONJEAN: I don't think that a judge is going to --
MR. HALE: When they told you she had to be out of here at a certain time, if you didn't want to do it, you shouldn't have done it. You agreed to it.
MS. BONJEAN: You know what? Mr. Hale --
MR. HALE: You agreed to it.
MS. BONJEAN: There is something called trying to be courteous, and that's what I was trying to do.
Now, sometimes as you know with your --
MR. HALE: I'm just telling you that's the record.
MS. BONJEAN: -- being an experienced attorney that you are that sometimes testimony doesn't go as quickly as sometimes you anticipate or hope it will go. It's just how the name of the game is. Okay?
I was trying to accommodate Justice Lampkin as best as I could, and I'm going to continue to do that but not to the detriment of my client. Okay?
Now, if we can go through this quickly, I will happily try to do it as fast as I can.
BY MS. BONJEAN:
Q. And I will try not to repeat anything you've

already testified to, Judge.
You testified that you found, previously, Mr. Lewis because you had gone to check out the scene of where the Wrice residence was. Is that fair to say?
A. That's part of it. I went to see not just where the Wrice residence was. I wanted to see the entire area, 75th and Jeffery where she -- the liquor store was, where she lived, the relationship to the place where Rodney Benson parked his car just east of that.
I wanted to see the locations where the house was, the Wrice house. I wanted to go down the alley, all of those things that I did. And they were at Chappel. The corner of Chappel is where this little restaurant is, and so that's where I walked down the street.
Q. All right. And you went alone; correct?
A. I don't recall anyone being with me.
Q. Okay. And can you just remind me how it was that you decided to knock on the door of the Lewis residence.
A. I randomly knocked on some doors.
Q. Did you knock on any other doors that day?
A. I don't know how many doors I knocked on.
Q. Okay. But your recollection is that you were knocking on other doors, not that you specifically



targeted the Lewis residence; correct?
A. Of course I didn't target the Lewis residence. I didn't know the Lewis residence.
Q. Okay. And you -- when you did knock on the door of the Lewis residence, you were greeted by a woman that lived in the house; correct?
A. I didn't know she lived there. A female opened the door.
Q. Okay. Did she identify herself as the owner of the home?
A. I didn't ask her if she owned the home.
Q. Okay. Can you tell me how the conversation went.
A. I don't remember exactly what was said. I know I told her that an incident had occurred in the -- on Chappel, an assault, and I was just trying to find out if anybody knew anything or heard anything.
Q. Okay. And did she respond to that?
A. She said her son was there.
Q. And her son was Kenny Lewis; correct?
A. She did say, "And my son is Kenny Lewis."
I said, "Who is your son?"
And she said, "Kenny Lewis."
I said, "Where is he?"
She said, "He's at work."



I said, "Can you ask him to call me?"
She said she would. I gave her either a card or my phone number, whatever, for Kenny Lewis to call me.
Q. And you eventually had a conversation with Kenny Lewis face to face?
A. Yes.
Q. Did Mr. Lewis indicate in that conversation that he had been a witness to the crimes that occurred at the Wrice residence against Ms. Byron?
A. Whatever he testified to, every word of his testimony at the trial was what he told me.
Q. Did he receive any benefit whatsoever, whether it was a candy bar to a million dollars, in exchange for his testimony?
A. Not a penny.
Q. Okay. Were you aware that Mr. Lewis had a friendship or relationship with Mr. Wrice's girlfriend?
A. With Mr. Wrice's --
MR. HALE: Objection to foundation.
Q. Yes.
A. Was I aware?
Q. Had you ever heard of that before?
A. I have never heard for one second that Kenny Lewis had any relationship -- you're saying to Stanley Wrice's girlfriend?



Q. Mm-hmm.
A. I've never heard that until this moment.
Q. Have you ever heard the name Jennifer in connection with this case?
A. The defendant, I think, testified that his girlfriend's name was Jennifer. That's the person he supposedly went to call while the burning and stuff went on.
Q. Okay. And as you sit here today, you have no knowledge that Jennifer and Kenny Lewis were friends; correct?
A. I never heard that until this moment that you said that.
Q. Now, just give me a couple minutes and I will be able to conclude this for you.
Did you ever ask Mr. Lewis why he did not come forward earlier to give -- provide information about this crime?
A. He didn't come forward. I just found him.
Q. Okay.
A. Now, you mean did I ask -- I don't have a clue if I asked him. I probably did not ask him.
Q. What factors featured into your thinking that he was such a credible witness, if you remember?
A. I heard him. I talked to him. I heard what he

said. He was a young man, and I think he was 19 or 20, something like that. He wasn't old. Maybe 21. And people were in and out of that house, and he said he was the person who was in and out of that house two or three times a week.

I mean, I got the impression from everybody from the whole case that was the place to go if you were hanging out and doing what you weren't supposed to be doing as a young person. That was the place to be.

And he said it. He knew everybody. He named the people. Some of what he said was consistent with what Bobby said or what I read from what the other people had said in the case. I found him to be a very credible witness.

Q. Did it trouble you that no one else had said he was there that night?

A. I don't know if anybody else had said he was there that night. I would have to read all the pages of the reports that I -- you said there's thousands of pages. As I said, I've read or had given to me a little over 1,300 pages. I can't say no one said he was there.

Q. Okay. Do you remember anyone saying that he was there? Any witness or any accused or anyone?

A. I don't know. I don't recall what had happened 33 years ago. If I had all the reports, I would be able



to read them all and tell you if anyone had mentioned anyone.

Q. Okay. And you agree that there were quite a few people that were in that house that night; correct?

A. Yes.

Q. And a number of them were interviewed in connection with the investigation; right?

A. I don't know if everybody was interviewed, but I know Patricia Wrice was interviewed. I know Kim wasn't interviewed.

Q. Right. Charles Wrice was interviewed.

A. Charles Wrice was interviewed. Jennifer, I don't -- I never saw -- heard a last name for her. I don't even think I heard her name until the trial; so we never got a last name. So I don't think she was interviewed.

There was somebody named Lemon, at least my recollection. There were other names of people that were said or spoken of being there in or out. There was an unknown person or two. There was the bicycle rider. All these people were not interviewed, yes.

Q. And Mr. Lewis, since presumably you would -- strike that.

You would agree that Mr. Lewis was not someone who had been interviewed prior to you finding him;



correct?

A. There was no police report that I saw saying he had been interviewed prior to that.

Q. And you don't, as you sit here today, remember whether any other witness had mentioned that Kenny Lewis was present that evening?

A. I cannot say if they had.

MS. BONJEAN: I have nothing further for the judge.

MR. MICHALIK: No questions.

MR. HALE: No questions from me.

MR. NOWINSKI: We'll reserve, please.

THE REPORTER: Transcript order for you?

MS. BONJEAN: Yes. Electronic and printed.

THE REPORTER: And any copy orders, Counsel?

MR. HALE: I'll take a copy, electronic.

(Off the record at 12:14 P.M.)



ACKNOWLEDGMENT OF DEPONENT

I, JUSTICE BERTINA LAMPKIN, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct, and complete transcription of the testimony given by me and any corrections appear on the attached errata sheet signed by me.

____________ ____________________

(DATE) (SIGNATURE)

CERTIFICATE OF SHORTHAND REPORTER

I, Michael P. Hensley, Registered Professional Reporter for the State of Illinois, CSR No. 84-4846, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Michael P. Hensley, CSR, RPR

## A


**able (5)**
14:18;23:24;28:5;104:15;105:25
**above (3)**
55:18;74:5;87:7
**absolutely (18)**
11:21;21:4;35:18;38:3;43:2;44:19;45:23;46:3;53:15;57:4;70:19;76:21;78:24;79:17,22;84:4,10,11
**abuse (8)**
28:1;41:11;49:3,13,17,21;76:12,20
**abused (8)**
28:3;70:1;76:14,20;77:18,19,20,21
**accommodate (1)**
100:19
**according (2)**
50:13;87:18
**accountable (5)**
75:18,21;76:9;92:22;93:3
**accused (20)**
21:8;26:24;35:16,20,25;36:8,10,14;37:17;38:24;39:3;58:20;61:18;84:9,13;89:7;92:19,20,21;105:23
**acknowledge (1)**
108:4
**ACKNOWLEDGMENT (1)**
108:1
**acquaintances (1)**
42:7
**across (2)**
73:21,21
**act (1)**
91:10
**action (1)**
37:7
**actions (1)**
50:24
**active (1)**
41:24
**actually (11)**
11:17,24;28:6;29:15;50:12;53:14;58:11;61:18;64:23;95:20;98:9
**adding (1)**
89:14
**addition (1)**
71:8
**addressed (1)**
10:14
**adhered (1)**
36:3
**administered (1)**
84:13
**admission (1)**
36:22
**adopted (1)**
62:10
**affair (1)**
42:22
**affiant (1)**
25:16
**affidavits (2)**
80:19,22
**African (4)**
20:17;21:9;39:2;41:24
**African-American (5)**
16:1;19:23;20:2,10,14
**again (11)**
21:13;31:9;34:9;36:11;51:17;81:6;84:16;89:3;94:1;97:6;99:13
**against (19)**
22:2;41:11;49:2;64:11;70:17;76:2;83:15,19;85:6,11;88:11;89:6,8;91:3;92:8,13;99:5,8;103:9
**age (1)**
33:23
**ago (3)**
16:23;53:15;105:25
**agree (22)**
21:10;22:14;26:5,22;32:16;33:21;48:15;63:13,17,20;75:17;87:11;90:6,9,10;91:17;92:9,11;95:7,10;106:3,24
**agreed (8)**
87:22;96:6;98:13,24;99:22,22;100:7,9
**ahead (3)**
54:2;81:18;87:6
**Ali (1)**
68:11
**alibi (3)**
88:5,10;95:23
**allegation (9)**
26:24;28:25;47:17;57:1,19,21;58:7,22,25
**allegations (23)**
27:19;28:4;49:2;54:25;55:3;58:1;63:14;64:11;69:4;74:16,20;75:1,5,5,9;78:18;80:3,4,6,9;83:6,25;92:7
**alleged (3)**
63:20;65:18;85:1
**alleges (1)**
27:5
**alleging (2)**
52:10;57:14
**alley (1)**
101:11
**Almost (2)**
27:20;94:13
**alone (1)**
101:16
**along (2)**
7:9;99:4
**always (7)**
12:11;16:12;21:24;27:20;32:6;36:22;37:3
**amazingly (1)**
14:4
**amended (5)**
55:19;56:2,12,20,20
**amending (1)**
89:13
**Amendment (1)**
77:12
**amendments (1)**
56:14
**American (2)**
39:3;41:24
**Americans (2)**
20:17;21:9
**amount (1)**
64:25
**ancient (1)**
34:2
**and/or (2)**
33:13;88:18
**Andrew (10)**
46:9,19;47:1,7,16,23,25;49:2;83:6,8
**Andy (1)**
7:15
**answered (4)**
34:8;96:13,20;98:15
**anticipate (2)**
39:23;100:17
**anymore (1)**
64:24
**apologies (1)**
43:14
**appeal (5)**
17:14;46:20,21,21;49:5
**appeals (4)**
17:15;25:12,14,19
**appear (2)**
51:20;108:7
**appearances (1)**
7:14
**appellant (1)**
25:16
**appellant's (1)**
25:16
**appellate (12)**
10:15,23;11:7,11,13,20;12:2,9;17:7,8,24;18:1
**applied (1)**
16:13
**apply (1)**
11:15
**appointed (3)**
11:1,6,8
**appointment (1)**
10:23
**appreciate (1)**
16:18
**approach (1)**
21:17
**approached (1)**
89:10
**approaching (1)**
89:12
**appropriate (1)**
94:10
**approval (1)**
32:18
**approve (3)**
31:8;32:9,10
**approved (2)**
32:3,8
**Approximately (2)**
19:20;43:12
**approximation (1)**
8:20
**area (28)**
15:7;38:22;39:6,7,8,10,12,13;41:10;49:2,3,13,17,21;52:11;57:15;58:2;70:2;74:18;76:11,13,15,20,21;79:12;80:20;83:9;101:7
**arguing (1)**
17:18
**Argumentative (4)**
61:20,22;76:17;89:24
**armed (3)**
30:20;33:10;92:25
**around (3)**
20:21;22:15;83:5
**arraigned (1)**
45:18
**arrest (11)**
47:1,2;51:11;52:16;55:19;56:2,11;66:2;83:9,9;84:22
**arrested (6)**
27:23;33:10;49:12;50:2;54:19,20
**arrests (1)**
59:5
**Ashley (1)**
7:12
**aside (1)**
90:24
**assault (4)**
91:23;92:25;93:17;102:16
**assaulted (3)**
90:7,11;92:1
**assaulting (1)**
92:19
**assaults (2)**
92:12,12
**assessment (2)**
70:7,20
**assigned (13)**
11:9;12:1;23:4;24:4,11;30:4,13;43:18;44:9,13;45:15;48:20;50:16
**assigning (1)**
11:13
**assignment (16)**
11:22;17:4,19;18:7;19:1;22:25;23:3;24:19;29:6,21,23;32:1;33:3;35:22;45:14;46:6
**assigns (1)**
11:14
**assistance (1)**
32:17
**Assistant (9)**
15:13;17:20;19:5;30:3;31:1;59:24,25;62:17,19
**associate (1)**
7:12
**Association (4)**
41:23,24,25;42:21
**assume (12)**
13:2;20:6;21:14;34:1,12;56:23;66:14;69:13;70:15;77:22;88:24;93:9
**assuming (3)**
53:13;70:10;91:1
**assumption (1)**
53:12
**assure (1)**
36:24
**attached (8)**
51:8;55:12;67:12;74:1;81:15,22;86:9;108:7
**attacked (1)**
54:18
**attempt (1)**
89:5
**attempted (2)**
63:4;92:12
**attend (1)**
12:25
**attention (4)**
43:9;56:19;57:11;72:5
**attitude (3)**
28:7,8,11
**attorney (28)**
8:1;15:13;16:24;17:1;18:14,23;20:11;22:16,20;28:8;31:2;33:22;34:21;40:15;44:21;52:5,6;53:20;59:24;60:3;62:14,17,

19;69:14,15;81:22;83:2;100:15
**attorneys (9)** 19:18;21:20;25:9;31:8;32:3;51:21;52:2,8;59:25
**attorneys' (1)** 52:7
**Attorney's (8)** 15:15;16:3,13;17:5;19:17;25:8,19;30:2
**attributed (4)** 60:24;62:4,6;63:9
**available (6)** 33:19;59:23;60:2,10;69:4,6
**aware (14)** 49:22;52:9;69:23;74:16;76:23;78:17;80:15,17,18,23;81:2;83:23;103:16,21
**away (1)** 75:23

## B

**back (17)** 12:4,18;14:19;21:2;23:25;25:3;31:8;46:8;57:24;58:13,16;62:23;87:20;88:8;89:2;99:12,13
**bad (1)** 9:2
**balance (1)** 34:19
**Bar (5)** 41:23,25;42:1,21;103:13
**based (2)** 31:3;97:20
**basically (1)** 75:16
**basis (3)** 26:18;41:11;78:12
**bathroom (2)** 9:5;67:8
**beat (8)** 71:9,12,13;75:14;78:8,11;88:13;96:7
**beaten (12)** 57:15,22;58:2;63:21;71:25;78:18,23;79:12;80:20;90:18;91:11;92:13
**beating (3)** 75:22;77:1;91:12
**became (5)** 19:5;22:16,20;23:16;78:17
**become (1)** 52:9
**becoming (2)** 16:14;41:25
**beginning (2)** 24:15;66:21
**behalf (1)** 7:19
**belabor (1)** 8:10
**belief (1)** 99:7
**Belmont (1)** 30:16
**below (2)** 73:11;74:12
**benefit (1)** 103:12
**Benson (40)** 50:21;53:1,21;56:21;57:14;58:23;60:16,22;63:8,9,14,20;64:12;65:22;71:5;77:21,25;78:3,3;83:16;86:4,18;87:14,23;88:5,10,13;89:5;92:19;93:18,25;94:16;95:7,16;96:3,5;98:3,9;99:8;101:9
**Benson's (7)** 52:4;59:14;64:2;69:15;85:24;86:20;89:14
**BERTINA (2)** 7:2;108:3
**best (3)** 8:19;67:16;100:20
**better (4)** 21:1;76:25;86:11,12
**bicycle (1)** 106:20
**birth (1)** 74:12
**bit (1)** 12:18
**black (4)** 57:15;63:21,25;65:19
**blood (1)** 9:4
**Bobby (13)** 78:17,22,25;79:4,11;80:2,11,15;88:12;98:1,3,19;105:12
**body (2)** 56:5;71:25
**boilerplate (3)** 52:15;54:6,9
**boilerplates (1)** 54:7
**BONJEAN (26)** 7:6,9;61:21;67:5,9,13;73:23;81:12;86:12;96:15,17,21,24;97:3,7,11,14,15;99:24;100:3,8,10,15,24;107:8,14
**books (1)** 25:14
**both (14)** 11:18;47:4;57:16,21;58:1;63:17,20;64:1,1;65:19,20;69:15;71:8;75:17
**bottom (9)** 57:8;74:4,9,10,11;82:5;86:24;87:1,10
**box (1)** 82:14
**Boy (1)** 18:16
**break (6)** 9:6,8,10;63:19;67:8,10
**Brief (3)** 15:4,10;25:16
**briefs (4)** 17:17,18;25:17,21
**broad (1)** 92:2
**brothers (3)** 22:5;47:20;49:12
**brought (2)** 16:16;97:16
**bruise (1)** 67:18
**bruises (4)** 72:6,11,20;73:18
**brutality (6)** 83:8,15,19;84:12,23;85:6
**brutalized (3)** 84:2,6;92:14
**Brzeczek (5)** 81:20,23;82:6,17;83:1
**building (1)** 48:22
**bunch (1)** 20:21
**Burge (4)** 7:16;39:20;40:1,3
**burn (1)** 88:7
**burned (8)** 71:12,13;78:8;88:9;90:18;91:11;92:13;96:8
**burning (6)** 75:22;91:4,12,19;95:23;104:7
**Byrne (14)** 7:16;40:6,7,13,20,21;63:15,16;64:11;76:24;77:5;83:13,18;84:20
**Byron (5)** 88:1;89:17;93:17;97:17;103:9

## C

**Cal (2)** 22:24;23:1
**California (2)** 22:10;30:18
**call (18)** 10:17;16:6;31:10;32:17,21;33:6,8,10;44:25;54:15;60:7;75:23;89:5;91:22;99:18;103:1,3;104:7
**called (8)** 25:21;30:25;31:2;55:9;62:24;89:2;99:17;100:10
**calling (1)** 16:10
**calls (1)** 30:24
**came (22)** 18:19;25:7;41:5;45:7,8,11,25;48:21,22;50:5,10,12,17,25;51:17;52:13;54:9,14;65:24;88:8;90:22;98:2
**can (40)** 9:10,15,20;10:17;20:5,17,19;21:22;26:10;35:2;56:23;57:3;60:5,5,6,7,18;62:13;64:4;67:16,18;72:6;74:3,8;76:8;78:2;81:18;86:16;87:2,24;93:9,22,24;99:11,24;100:22,23;101:18;102:12;103:1
**candy (1)** 103:13
**capacity (1)** 13:11
**car (4)** 33:17;98:3,25;101:9
**card (1)** 103:2
**carried (1)** 96:7
**cars (1)** 71:14
**case (80)** 10:5;26:16,17;27:18;28:18;29:4;30:20,20,22;31:2;32:18;34:8,9,12;39:9;40:7,13,19,23;41:3;42:5,14;45:1,3,10,13,15,16;46:5,9,10,20,21,22;47:8,10,16;48:16,16,16,17,19,20,24;49:16;50:5,10,15,15,17,18,25;51:3,5,18;52:21;54:4,9;62:25;63:12;74:14;79:6;83:25;84:1;85:4,6,15,20,24;86:19;87:11,18;88:11;89:14;99:5;100:1;104:4;105:7,13;109:12
**case-by-case (1)** 28:17
**cases (18)** 17:18;21:21;23:22;25:14,22;26:23;27:2,4,17;28:13;30:21;31:7;32:3;39:11;40:12;45:11;48:11,12
**cause (1)** 27:24
**cell (2)** 15:4,10
**central (2)** 30:24;33:8
**Cermak (2)** 81:24;82:18
**certain (3)** 10:11;31:23;100:6
**certainly (41)** 8:4;19:25;20:3;21:11;22:4,7;27:4,19;28:17;29:3;31:21;34:2;35:21;36:18;42:7,23;47:11;48:6;51:24;55:4;56:25;57:17,19;58:14;59:2;64:17;68:4;74:19;76:8;81:10;83:10,17,20;88:11;89:10;93:23;95:25;96:1,2;98:18;99:5
**CERTIFICATE (1)** 109:1
**certified (2)** 50:9,13
**certify (1)** 109:6
**cetera (1)** 28:1
**chair (23)** 23:5,6,10,10,10,11,11,12,13,15,17,19;24:8;43:20,22,23,25;44:4,14,15;51:5,9,9
**changes (2)** 56:1,6
**Chappel (3)** 101:13,13;102:16
**characterization (1)** 56:18
**characterize (2)** 42:25;81:17
**charge (10)** 32:10,11;34:22,23,25;93:11,12,16;94:1,2
**charged (7)** 79:15;92:24;93:2,5,16;94:1;95:21
**charges (4)**

31:8;79:25;93:1;
98:13
**Charles (2)**
106:11,12
**chatter (1)**
41:13
**check (1)**
101:3
**chest (2)**
73:11,13
**Chicago (7)**
7:18;12:20;48:13;
76:11;77:8,17;82:4
**chief (3)**
24:6;45:14;79:6
**circle (1)**
48:4
**City (9)**
7:17;12:19,22,24,25;
13:7,10,17;48:13
**claim (1)**
70:1
**claiming (1)**
28:6
**claims (1)**
68:9
**clarify (3)**
53:11;92:7;93:14
**class (1)**
15:25
**clear (6)**
8:22;14:7;49:11,15;
61:22;82:21
**clearly (3)**
10:9;76:19,20
**client (3)**
73:5,7;100:21
**clients (1)**
16:8
**close (1)**
47:1
**clue (4)**
42:18;43:4;72:2;
104:21
**co-counsel (1)**
7:12
**co-defendant (1)**
94:10
**co-defendants (2)**
50:19,21
**coerced (7)**
28:10,14;70:14,16,
18,21;71:1
**cognizant (1)**
8:15
**Cohen (1)**
7:12
**cold (1)**
37:11
**college (2)**
13:2;14:3
**color (4)**
20:24,25;21:17;22:2
**coming (5)**
21:8;45:21;46:10;
91:10;99:13
**commander (1)**
32:6
**committed (3)**
91:3;92:8,12
**common (3)**
8:9,17;64:23
**communicated (2)**
90:25;91:1
**Compared (1)**
24:2
**complete (1)**
108:5
**completed (1)**
14:19
**completely (1)**
10:21
**concern (7)**
59:8,9,10,10,16;94:7,
8
**concerned (2)**
48:12;65:1
**conclude (1)**
104:15
**concluded (1)**
76:12
**conducting (1)**
66:4
**confession (11)**
26:17,23,24;27:6,11;
35:10,11;70:8,11,14,21
**confessions (7)**
26:2,3,6,14;28:9,14;
77:1
**confident (1)**
31:19
**Congratulations (1)**
12:16
**connected (1)**
93:16
**connection (6)**
9:12;84:3,6,23;
104:4;106:7
**consensual (1)**
98:22
**consideration (1)**
26:21
**considered (3)**
77:6,7;89:11
**consistent (1)**
105:11
**constraints (1)**
99:21
**contact (1)**
54:14
**continue (1)**
100:20
**conversation (6)**
36:19;43:1;64:15;
102:12;103:4,7
**conversations (4)**
79:4,7,8,10
**convict (1)**
38:15
**convicted (1)**
85:13
**conviction (4)**
17:10;58:15;85:11,
23
**convictions (1)**
17:13
**Cook (20)**
15:14;16:3,24;17:5;
18:13;19:16;22:16;
25:7,8;31:7;34:21;
41:23;42:1,21;68:13,
14;69:22;70:4;81:22;
83:1
**cooperate (1)**
79:15
**copulate (1)**
90:1
**copulation (1)**
91:10
**copy (6)**
64:22;65:5;86:11,12;
107:15,16
**corner (1)**
101:13
**corrections (1)**
108:7
**corroborative (1)**
69:25
**coughing (1)**
11:5
**COUNSEL (3)**
7:5;107:15;109:11
**County (21)**
15:14;16:3,24;17:5;
18:13;19:16;22:16;
25:7,8;31:7;34:21;
41:23;42:1,21;65:24;
68:13,14;69:22;70:4;
81:22;83:1
**couple (2)**
32:13;104:14
**course (22)**
10:2;14:18,20;26:13;
27:17;28:25;29:2;38:7;
51:14;52:11;61:9;
69:21,21;80:1;82:24;
83:23;84:8;89:17;90:3;
95:14;99:9;102:2
**coursework (2)**
13:24;14:17
**court (23)**
8:14,16;10:15,23;
11:7,11,13,14,20;12:2,
4,9;17:21;28:4;42:2;
48:22;51:21,25;59:23;
60:7,7,8;99:13
**courteous (1)**
100:11
**courtroom (44)**
19:5,8;21:22,24;
23:4;24:4,12,13,20;
25:2,10;26:1;27:1,16;
29:10,12;31:24;32:1;
40:22;43:18,19,20;
44:9,13,21;45:7,8,11,
14,16,17,22,25;46:10;
48:11,12,21,24;50:6,
11,13,18,25;52:13
**courtrooms (7)**
18:4,5,8;19:3,7;
21:22;24:17
**cousins (1)**
22:6
**coverage (1)**
48:19
**credible (2)**
104:24;105:14
**credit (1)**
76:14
**crime (7)**
31:4;48:1;76:8;
79:15;87:2,3;104:18
**crimes (4)**
91:3;92:8;95:21;
103:8
**crossed (2)**
42:23,23
**CSR (2)**
109:4,23
**culpable (4)**
96:1;98:10,11,12
**culprits (1)**
76:25
**culture (3)**
20:16;21:5,19
**currently (1)**
12:8
**custody (1)**
33:11

**D**

**dad (7)**
13:12,25;16:5,12,22;
42:3,8
**Daley (4)**
18:22;22:16;81:21;
83:2
**date (9)**
22:13,21;45:18;
54:10;56:8,8;67:16;
74:12;108:13
**dated (2)**
82:3,16
**day (6)**
29:24;33:4;45:15;
75:8;77:24;101:22
**days (6)**
23:9;26:5;30:12,12;
33:4;34:3
**deal (1)**
65:4
**dealing (2)**
26:13;33:25
**deals (1)**
58:12
**December (3)**
56:9,10,13
**decided (1)**
101:19
**decision (4)**
28:17;29:1;35:7,8
**defendant (19)**
27:5,16;28:25;33:15;
35:12;37:4;38:21;
45:17;52:20;54:14;
59:25;60:4;73:11;
85:18,19,19;87:7;
98:20;104:5
**defendants (12)**
7:16,17;22:2;27:22;
51:20,25;52:10,20,23,
24;58:1;94:17
**defendant's (2)**
33:14;51:19
**defense (10)**
13:12;16:6;27:21;
41:18,19;43:6;54:11;
69:25;74:17;88:2
**degree (2)**
14:6,22
**delinquency (1)**
24:17
**denied (1)**
17:14
**department (8)**
32:11,16;33:5;54:16;
76:12;77:8,17;81:21
**DePaul (5)**
14:1,23,25;15:5,11
**depending (1)**
30:14
**DEPONENT (1)**
108:1
**deposition (5)**
7:22;9:13;10:15;
82:14;109:5
**describe (1)**
30:8
**detective (3)**
34:11;36:9,15
**detectives (6)**
34:1,17,17,23;35:2,4
**determination (1)**
28:24
**determine (4)**
27:11;58:9,24;71:4
**determined (1)**
51:6
**detriment (1)**
100:21
**deviant (1)**
92:25
**dick (1)**
90:17

died (2)
11:25;16:22
difference (3)
95:14,15;96:2
different (10)
8:5;9:23;12:24;15:23;21:19;30:13;32:13;62:1;96:9;97:17
difficult (2)
8:25;21:7
Dignan (11)
7:16;40:25;41:1,2,8;63:15,16;76:24;77:6;84:5,20
direction (1)
109:9
directions (1)
35:6
directly (1)
33:6
Director (1)
82:18
disagree (1)
26:7
disapproved (1)
32:9
discovery (6)
45:19;50:9;51:19;66:14,15;89:14
discretion (1)
21:20
discussion (4)
49:13,22,23;86:10
discussions (1)
89:7
disk (3)
9:17;10:7;66:18
dislike (2)
96:21,24
disparity (1)
95:10
disposition (2)
50:10;88:16
dispositions (1)
94:18
dissimilar (1)
63:18
distinction (1)
10:19
distracting (1)
11:4
division (11)
12:8,10,11;17:7,8,24;18:2;19:13;20:5,11;25:20
DL (1)
82:15
DNA (1)
51:14
doctor (3)
68:16;73:14;83:7
doctorate (1)
15:12
document (11)
38:5,11,14;67:20,22;68:6,8;70:3;72:25;74:9;82:7
documented (4)
37:24;38:2,18,19
documents (12)
9:12,15,23;69:4;81:4;82:19,20,22,22;83:11;93:22,24
dollars (1)
103:13
done (6)
8:21;37:22;54:4;72:4;97:12;100:7
door (3)
101:19;102:4,8
doors (4)
101:21,22,23,25
down (9)
8:16;36:17;47:12;60:8,18;63:19;73:22;101:11,14
downwards (1)
73:20
Dr (2)
81:24;82:17
draw (4)
43:9;56:19;57:10,10
drawing (1)
72:5
drive (1)
33:17
dropped (2)
75:24,25
drug (1)
30:21
drunk (1)
99:1
dry (1)
11:3
due (1)
99:17
duly (1)
7:3
during (9)
21:17;25:23;30:1;31:9;52:11;69:11,20;79:10;83:9
duties (3)
30:5,8;32:14

E

earlier (5)
29:5;49:16;58:10;96:14;104:17
early (4)
19:14;31:9,11;49:7
east (1)
101:9
efforts (2)
58:8,24
either (15)
19:14;22:12;24:15;25:18;27:10;36:13;38:21;48:3;57:10;63:22;80:24;92:21;93:15;94:1;103:2
elected (5)
10:22,24;12:4,14;13:15
election (4)
10:24;11:23;12:3,6
Electronic (2)
107:14,16
else (8)
7:13;70:6;75:13;83:16;90:23;99:1;105:15,17
else's (2)
28:11;94:24
e-mails (1)
99:21
employed (1)
109:11
EMT (1)
68:16
enacted (1)
58:13
end (3)
16:4;19:6;63:22
ended (1)
14:2
ends (4)
57:16,22;64:1;65:20
enough (3)
31:13,25;50:1
entered (1)
25:24
entire (3)
21:25;27:17;101:6
entitled (2)
97:4,5
errata (1)
108:7
escapes (1)
17:3
estate (1)
7:18
estimating (1)
8:20
estimation (1)
92:5
et (1)
28:1
ethics (1)
58:12
even (9)
10:11;19:24;35:3;46:5;59:22;60:2;75:18;76:10;106:14
evening (1)
107:6
event (1)
76:10
eventually (4)
51:5;52:5;78:17;103:4
everybody (5)
36:4;92:20;105:6,10;106:8
evidence (17)
26:7,7;37:12;51:15;52:16;70:12,17,19,22;71:25;95:15,20;96:2,8;97:16;98:18;99:7
evidentiary (1)
78:20
exact (1)
90:24
Exactly (11)
12:7;15:16,20;17:16;22:13;31:18;53:5;64:9;87:13;98:7;102:14
EXAMINATION (1)
7:5
examined (2)
7:3;108:4
except (1)
14:18
exceptions (1)
34:10
exchange (2)
94:4;103:13
Exhibit (11)
55:11;67:11;72:19;73:25;81:14;82:9,12,13,14;83:24;86:8
exist (1)
64:24
expect (1)
67:2
experience (2)
22:6;60:11
experienced (1)
100:15

F

face (3)
56:12;103:5,5
fact (8)
21:1;27:12;35:19;38:11;48:18;59:12;76:5,11
factors (2)
96:16;104:23
facts (2)
18:16;53:13
fainted (1)
90:19
fair (11)
24:1;31:13,25;44:20;50:1;56:17;65:18;66:16;83:4,12;101:4
fairly (1)
75:18
false (4)
79:2,20;80:12;81:1
familiar (2)
36:2;50:22
family (3)
13:9,10,19
far (3)
19:24;44:22;64:25
fashion (3)
37:6;90:7;92:9
fast (1)
100:23
father (5)
15:19;16:19;42:3,6,14
fearful (1)
79:14
feature (1)
70:25
featured (1)
104:23
February (3)
81:20;82:3,16
feel (3)
21:5,12,16
feelings (2)
94:22,25
feels (1)
10:18
felony (23)
19:2,5,7,8;20:5;24:21;25:1,2;29:7,12,19,21;30:4,5,9;31:8,19;32:13;34:20;35:9,22;37:14;38:22
felt (3)
20:24;21:15;71:11
female (4)
16:1;21:1;38:25;102:7
females (1)
21:2
few (3)
9:10;32:15;106:3
Fifth (3)
12:10,11;77:12
file (2)
51:6,17
filed (13)
27:7,20;52:15,21,23,25;53:20,25;56:7,12;78:3,12,15
filing (1)
53:17
filled (1)
87:1
financial (1)
109:12
find (4)
45:10;52:14;55:6;102:16
finding (1)
106:25
fine (9)

9:6;10:17,21;34:8;53:9;57:9;60:21;64:7;93:21
**fingers (1)** 75:19
**finish (2)** 14:20;86:25
**finished (3)** 13:23;14:4,17
**firm (1)** 7:10
**first (41)** 7:3;10:22;12:5;17:4,19,21;19:8;23:5,6,10,11,19;24:8;25:7;30:23;40:10;41:7;43:20,22;45:3,10,24;50:12,14,25;51:4,5,22;52:14;56:15;57:3;62:22;65:24;67:22;71:3;72:10;82:12;85:18,19,20;88:1
**Fitzgerald's (12)** 23:4;24:4,11,19;25:25;27:1;29:9,12;31:24;32:1;43:18;50:5
**flames (1)** 91:10
**flashlight (4)** 57:16,22;63:21;65:20
**flavor (1)** 48:15
**focusing (1)** 13:18
**follow (3)** 36:13,13;97:4
**followed (2)** 27:10;35:5
**follows (1)** 7:4
**food (1)** 88:7
**foregoing (3)** 108:4;109:5,6
**forget (1)** 18:12
**forgot (1)** 93:1
**form (27)** 26:9;27:20;32:23;34:13;35:14;37:6;59:15;61:20;62:12;70:13;71:2;76:16;77:3,9,11,14;80:7,13;84:15,25;89:19,23;90:7;92:9,10;94:12;95:22
**formal (3)** 18:10;26:2;35:24
**forth (1)** 57:2
**forward (2)** 104:17,19
**found (5)** 76:24;77:17;101:2;104:19;105:13
**foundation (12)** 31:14;38:1;70:13;76:16;77:3,9,11;84:15;89:19,23;92:10;103:19
**four (6)** 51:24,25;52:24;53:8;68:11;95:5
**Fowler (3)** 50:22;52:6;88:18
**frame (1)** 31:16
**freely (2)** 78:10;96:5
**friendly (2)** 20:17;21:6
**friends (2)** 42:6;104:10
**friendship (2)** 43:1;103:17
**front (4)** 22:8;54:9;87:19;96:4
**functions (1)** 32:22
**further (2)** 87:4;107:8

**G**

**game (1)** 100:18
**gave (15)** 36:21;39:4;61:2,12;62:14;63:12,17;66:10,12;80:25;96:14,16,23;97:1;103:2
**generalities (1)** 34:10
**Gillespie (3)** 44:2,3,13
**girlfriend (2)** 103:17,25
**girlfriend's (1)** 104:6
**given (12)** 27:25;36:17;48:18;59:24;66:18;67:3;77:15;80:8;94:19;105:20;108:6;109:7
**giving (2)** 8:13,20
**goal (1)** 53:12
**goes (2)** 11:18;72:13
**gold (1)** 26:6
**Goldston (2)** 77:10,16
**Good (4)** 7:7,8;10:13;65:4
**gosh (2)** 16:25;18:12
**Gotcha (2)** 11:19;29:13
**graduate (1)** 13:21
**graduated (5)** 14:4,12,13;15:1;16:2
**graduation (2)** 14:14;15:11
**grand (1)** 51:12
**Great (4)** 10:22;17:23;87:11;97:14
**greeted (1)** 102:5
**grew (1)** 12:23
**groin (4)** 72:7,18,20;73:15
**ground (1)** 8:9
**grow (1)** 12:19
**growing (1)** 42:10
**guess (2)** 18:17;87:24
**guessing (1)** 19:23
**guideline (3)** 36:7,12,16
**guilty (11)** 86:1;87:3;88:18;93:4,6,8,15,18,25;94:5;95:21
**gunned (1)** 47:12
**guys (3)** 20:21;71:14;95:2

**H**

**HALE (45)** 7:15,15;11:3;32:23;35:14;37:25;59:15;61:20;62:12;67:7;70:13;71:2;76:16;77:3,9,11,14;80:7,13;84:15,25;89:19,23;92:10;94:12;95:22;96:13,16,19,22,23;97:1,5,10,13;98:15;99:20;100:2,5,8,9,13;103:19;107:11,16
**half (1)** 33:23
**Hamilton (1)** 24:18
**handful (2)** 20:6,9
**handing (2)** 55:13;81:16
**handled (1)** 48:24
**hands (1)** 74:18
**hands-on (1)** 25:10
**handwrite (1)** 61:18
**handwriting (2)** 57:7;86:21
**Handwritten (11)** 55:18,24;56:1,6,14,16;61:15,23,23;63:2,5
**hanging (1)** 105:8
**Hanrahan (1)** 16:25
**happen (5)** 9:25;10:3;55:5,6;90:23
**happened (17)** 28:6,16;37:20,21;43:15;46:22,22;48:2,7,9;51:3;55:5;58:6;88:24,24;94:16;105:24
**happening (1)** 46:24
**happens (1)** 90:2
**happily (1)** 100:23
**happy (2)** 7:15;17:3
**hard (3)** 23:16;34:15,16
**Harrison (1)** 30:17
**head (3)** 35:7;47:8;88:15
**heading (1)** 82:3
**Health (2)** 81:24;82:18
**hear (3)** 28:18;47:11;74:24
**heard (22)** 28:3,4;46:5;48:6;49:17,21;59:6;74:22,25;75:4;82:25;96:17;102:17;103:22,23;104:2,3,12,25,25;106:13,14
**hearing (16)** 10:1;41:9;45:12;46:9;49:1;51:12;54:1;59:4;68:24,25;69:10,11,21;75:4;78:20;83:14
**hearings (2)** 17:14;18:10
**heart (1)** 74:14
**Heidi (1)** 7:12
**held (2)** 78:20;86:10
**hell (1)** 71:9
**help (2)** 25:20,22
**Hensley (2)** 109:3,23
**hereby (2)** 108:3;109:6
**herself (1)** 102:9
**Hett (1)** 87:19
**high (5)** 9:4;12:25;13:3;48:16,16
**himself (7)** 75:14,20;76:3,6;79:25;98:4,5
**hired (3)** 17:2;18:14;20:2
**historical (1)** 18:16
**hold (5)** 13:15;23:6,13;39:22;67:5
**Holmes (2)** 50:22;88:18
**Holmes' (1)** 52:7
**home (4)** 42:10;54:18;102:10,11
**hope (1)** 100:17
**horrible (1)** 88:2
**hours (1)** 30:10
**house (9)** 16:6,11;96:7;101:10,11;102:6;105:3,4;106:4
**Howard (9)** 41:17,18,20;42:1,6,10,13;52:4;89:12
**hypothetical (3)** 37:25;54:13;83:21

**I**

**idea (1)** 48:23
**identification (7)** 55:12;56:3;59:6;67:12;74:1;81:15;86:9
**identify (3)** 9:15;86:16;102:9
**IDOC (2)** 95:5,5

**Illinois (3)**
10:23;58:19;109:4
**immediate (2)**
13:9,18
**immediately (2)**
37:13;94:14
**impression (5)**
47:9,10,12;57:25;
105:6
**incident (3)**
76:6;91:16;102:15
**included (1)**
58:19
**includes (1)**
65:5
**incomplete (3)**
14:3,5;37:25
**inconsistencies (4)**
65:9,17;71:7;77:24
**inculpated (2)**
71:8;79:1
**inculpatory (4)**
60:23;61:2;76:5;
97:21
**independent (6)**
15:18;46:23;64:7;
65:7;68:5;87:15
**independently (2)**
48:9;68:22
**indicate (6)**
8:21;9:8;11:16,19,
21;103:7
**indicated (1)**
62:10
**indication (1)**
62:8
**indictment (1)**
45:12
**individual (2)**
26:17,21
**individuals (4)**
90:7,11;92:18;93:15
**informal (1)**
26:1
**information (2)**
54:23;104:17
**initial (1)**
36:19
**injured (1)**
68:10
**injuries (8)**
70:24;71:15,21,22,
23;74:18;91:17,23
**injury (1)**
72:1
**innocent (2)**
95:16,17
**innuendo (1)**
41:13
**instance (2)**
37:15;48:21
**instances (1)**
43:5
**instructions (1)**
35:5
**interest (3)**
15:18;48:16;109:12
**interested (2)**
11:16,20
**Interlocutory (1)**
17:15
**interpreter (2)**
60:7,8
**interrogating (1)**
36:10
**interrupting (1)**
97:8
**interruption (2)**
15:4,10
**interview (4)**
31:5;33:13;35:12;
36:8
**interviewed (10)**
106:6,8,9,10,11,12,
16,21,25;107:3
**interviewing (1)**
36:14
**into (24)**
12:1;14:18;25:7;
33:8;45:7,8,11,21,25;
48:21,22;50:5,10,12,
18,25;52:13;65:24;
70:12,17,19,25;96:7;
104:23
**investigation (9)**
32:19;46:2,4;52:12;
76:19;79:16;84:21,23;
106:7
**involuntary (1)**
70:11
**involved (15)**
17:9;32:18;40:13;
43:1;44:22;46:1,3;
66:1;85:6;87:24;88:17;
91:2,16,19;92:15
**iron (1)**
75:23
**issues (3)**
8:24;25:22;26:3

## J

**Jack (1)**
7:16
**Jacky (2)**
47:23,24
**Jail (5)**
68:13,14;69:22;70:4;
71:14
**January (2)**
87:18,19
**JD (1)**
15:5
**Jeffery (1)**
101:7
**Jennifer (5)**
7:9;104:3,6,10;
106:12
**job (6)**
38:15,15,15;58:15;
71:3;96:24
**Joe (10)**
78:17,22,25;79:4,11;
80:2,11,15;88:13;98:1
**Joe's (1)**
98:19
**John (7)**
40:6,7,13,19,21;
76:24;82:17
**Join (1)**
32:24
**joined (2)**
17:5;19:16
**Jon (4)**
7:16;39:19;40:1,2
**Jones (1)**
52:5
**Judge (25)**
10:13,17,18;24:4,6,
11,19;25:25;27:1;
28:19;29:9,11;31:24;
32:1;43:18;45:14;
54:11;55:13;67:14;
71:4;81:16;87:19;
100:3;101:1;107:9
**judges (3)**
11:25;54:22,25
**juncture (3)**
81:7,8,8
**June (2)**
24:16;87:17
**juris (1)**
15:12
**jury (2)**
51:12;85:13
**JUSTICE (8)**
7:2,7,21;10:15,18;
99:17;100:19;108:3
**juvenile (3)**
17:22;24:17;94:15

## K

**Karen (2)**
88:1;89:17
**Kedzie (1)**
30:17
**Kenneth (7)**
88:4,9,13;89:14,15;
98:19;99:4
**Kenny (10)**
95:24;99:10;102:20,
21,23;103:3,4,23;
104:10;107:5
**kicked (1)**
17:1
**killed (1)**
47:18
**killing (1)**
38:24
**Kim (1)**
106:9
**kind (5)**
13:23;18:16;20:24;
60:11;64:18
**knee (1)**
9:2
**knew (18)**
36:3;41:18;42:3,3,3,
4,7,16;46:12;48:25;
49:20,20;55:3;70:3,18;
98:25;102:17;105:10
**knock (3)**
101:19,22;102:4
**knocked (5)**
90:2,3,18;101:21,23
**knocking (1)**
101:25
**knowledge (7)**
8:9,19;45:21;83:11;
84:11,17;104:10
**known (1)**
50:15

## L

**Lack (2)**
38:1;76:25
**lady (1)**
96:3
**Lambros (2)**
7:12;50:4
**LAMPKIN (17)**
7:2,7,21;55:11,14,
16;67:11,15;72:5;
73:25;74:3;81:14,17;
86:8,14;100:19;108:3
**language (2)**
71:10;92:2
**last (4)**
10:24;50:7;106:13,
15
**lasted (1)**
11:22
**late (3)**
19:14;22:12;49:7
**later (3)**
45:13;80:11;83:14
**law (12)**
7:10;13:25,25;14:1,
4,6,18,19;15:18,21;
17:22;64:23
**lawyer (10)**
13:12,12;16:6;27:21;
28:21;41:19,19,25;
78:11;89:9
**lawyers (6)**
51:19,25;54:11,22;
66:3;88:2
**lay (1)**
31:14
**lead (1)**
99:25
**learned (3)**
45:3,4,24
**least (10)**
32:4;38:17;69:25;
72:7;79:7,8;90:10;
92:8;93:5;106:17
**leave (4)**
28:13;36:23;37:2;
60:5
**Lee (3)**
50:21;52:7;88:18
**left (13)**
19:14;24:13;25:25;
27:1;37:5;74:11;87:17;
88:6;94:25;98:5,7,8;
99:5
**leg (1)**
72:1
**legs (1)**
72:18
**Lemon (1)**
106:17
**Leroy (1)**
7:18
**less (8)**
19:21,24;33:23;
66:23;96:1;98:10,11,
12
**letter (5)**
81:19,23;82:1,25;
83:7
**Lewis (26)**
88:4,9,13;89:15,15;
95:24;99:10;101:3,19;
102:1,2,3,5,20,21,23;
103:3,5,7,16,24;
104:10,16;106:22,24;
107:5
**Lewis' (1)**
98:19
**lieutenant (1)**
32:5
**life (1)**
16:9
**lifestyle (1)**
16:15
**light (2)**
24:2;76:10
**liked (1)**
17:22
**line (2)**
12:19;72:13
**lines (1)**
56:15
**liquor (5)**
97:25;98:1,2,5;101:7
**listed (1)**
74:5
**listen (1)**
99:24
**listened (1)**
35:5

**litigate (1)**
99:24
**litigated (1)**
56:24
**litigating (2)**
28:13;74:14
**little (9)**
10:18;12:18;23:25;
31:14;33:16;34:6;
39:22;101:13;105:20
**live (1)**
16:10
**lived (3)**
101:8;102:6,7
**living (1)**
16:19
**location (4)**
30:13;33:4;39:12,17
**locations (1)**
101:10
**long (12)**
16:23;17:24;18:11;
19:12;24:11;37:16;
42:16;53:14;72:17;
73:10;76:19;96:14
**look (14)**
8:4;25:15,17;26:17;
28:18;31:15;55:14;
63:23;67:14;74:2;
81:18,25;86:13;93:23
**looked (9)**
18:17;28:21,22;29:4;
46:16,20;50:8;72:17;
73:10
**looking (3)**
8:18;48:10;93:20
**looks (1)**
73:20
**lot (5)**
21:20;61:1,17;65:9;
96:1
**lots (2)**
9:23;56:6

## M

**main (1)**
76:25
**major (1)**
71:6
**makes (3)**
47:12;70:23;75:13
**making (6)**
37:18;53:12;70:7,20;
82:11;97:10
**male (2)**
38:24,25
**man (8)**
49:19;90:15,15,16;
91:5,5,6;105:1
**mandated (1)**
36:13
**manhunt (1)**
48:2
**many (4)**
19:18;21:8;92:14;
101:23
**marathon (1)**
9:9
**march (1)**
14:15
**mark (4)**
67:5;73:23;81:12;
82:9
**marked (10)**
55:11,13,15;67:11,
15;73:25;74:3;81:14,
16;86:8
**marker (1)**
82:13
**Markham (10)**
19:10,12;20:4;21:13,
14;22:9;23:6;24:23,24,
25
**marks (1)**
88:8
**Martin (1)**
7:18
**material (3)**
66:10;68:18;77:15
**matter (13)**
7:11;8:1,17;20:23;
43:7;44:18,22;45:21,
25;74:14;84:3,7,14
**may (13)**
9:5;17:13;18:23;
36:9;42:21;44:5,6,7,15,
16;45:9;47:14;95:6
**maybe (8)**
22:15;29:6;32:5;
48:11;51:22;58:12;
68:3;105:2
**McCurry (3)**
62:21,23;63:1
**MD (1)**
82:17
**mean (34)**
19:19;20:12;22:4;
24:22;27:13;29:24;
31:1;34:7,7;38:4;
46:11;56:5,11;58:6;
59:1,9,10,16,17;70:24;
73:11,17;77:23;81:8;
83:23;87:24;88:14;
89:9;95:13,17;99:15;
100:2;104:21;105:6
**medical (10)**
65:22,23,25;66:3;
68:8;69:18,20,24;73:8;
82:17
**meet (1)**
41:21
**meeting (7)**
39:19;40:1,2,10,21;
41:2,8
**member (2)**
41:22;42:1
**members (3)**
7:10;13:9,10
**memorialized (1)**
59:13
**memorializing (1)**
60:4
**men (2)**
15:25;21:25
**mentioned (3)**
15:17;106:1;107:5
**merit (1)**
28:16
**message (1)**
38:5
**met (4)**
40:10;41:1,22;42:4
**Michael (5)**
50:22;77:10;88:18;
109:3,23
**MICHALIK (7)**
7:17,17;26:9;32:24;
34:13;76:17;107:10
**Michigan (6)**
19:7,9;23:15;24:24;
29:15,16
**middle (1)**
24:16
**might (6)**
31:3,4,5,6;61:11;
66:1
**Mike (1)**
52:6
**million (1)**
103:13
**mind (5)**
28:12;70:21;71:6;
98:8;99:1
**minutes (2)**
9:10;104:14
**Miranda (4)**
27:25;36:3,3;39:4
**Mirandized (1)**
35:18
**misconduct (1)**
63:15
**misdemeanor (3)**
18:3,6,8
**misdemeanors (2)**
18:5,11
**misleading (1)**
61:17
**misreading (1)**
72:15
**misrepresenting (1)**
92:5
**missing (2)**
65:3,5
**misstate (1)**
53:15
**mistake (1)**
75:24
**mistreated (5)**
37:6,9,9;38:10;52:11
**mixed (1)**
76:23
**Mm-hmm (1)**
104:1
**molested (1)**
89:25
**moment (4)**
13:19;78:2;104:2,12
**month (1)**
45:13
**months (9)**
17:25;23:16;25:2;
29:20;47:2;52:13;87:5,
8,23
**more (19)**
10:18;16:15;17:21;
23:25;25:10;29:19;
34:11,22;54:5,12,21,
23;66:17;79:8;82:9;
91:2,25;92:11;94:25
**morning (5)**
7:7,8;16:7,8,12
**most (3)**
11:22;59:19;60:12
**motion (39)**
17:13;27:20,21;28:3;
52:15,21,25;53:17,19,
24,25;55:8,17,17,20,
22;56:2,7,11,11,20,20,
24,25;57:17;59:4;
64:14,18,18;65:6,12;
66:2,4;67:21;78:3,6,8,
12,16
**motions (4)**
27:6;54:5,12;69:16
**move (2)**
23:24;97:8
**moved (2)**
39:13,15
**moving (1)**
20:22
**much (6)**
10:8;28:16;64:22;
66:16;74:8;96:10
**multiple (2)**
91:16,19
**murder (5)**
23:22;30:20;34:9,12;
51:4
**murdered (1)**
48:20
**muscle (1)**
9:9
**must (3)**
59:22;87:20,21
**myself (4)**
21:25;36:18,24;
38:14

## N

**name (20)**
7:9;17:3;47:22,25;
62:20,21,22;72:17;
73:10;74:5,11;86:20;
88:12;89:3;100:18;
104:3,6;106:13,14,15
**named (4)**
32:15;77:18;105:10;
106:17
**names (4)**
52:3,7;68:11;106:18
**natural (2)**
10:18;39:22
**nature (3)**
37:19;41:14;42:11
**near (1)**
19:6
**necessary (1)**
18:17
**need (1)**
9:9
**needed (4)**
32:17;51:7,7,10
**needs (3)**
30:14;31:3;32:21
**neither (3)**
88:12,12;109:11
**nephews (1)**
22:5
**new (1)**
17:19
**news (2)**
48:3,7
**next (5)**
18:9,13,23,25;98:25
**nice (2)**
17:2;20:22
**night (3)**
105:16,18;106:4
**nine (1)**
47:2
**Nobody (2)**
49:23;90:21
**nods (1)**
8:16
**non-biased (1)**
21:16
**none (3)**
13:16;49:14;77:15
**nor (1)**
109:11
**norm (1)**
26:20
**normally (2)**
54:3;60:3
**note (2)**
51:8;74:4
**notepad (1)**
33:16
**notes (1)**
74:10
**notified (1)**
99:21
**novel (1)**

77:23
**November (7)**
11:1,23;12:6;50:11,
14,17;51:1
**Nowinski (4)**
7:19,19;86:11;
107:12
**Number (9)**
56:19;57:7,8,12;
82:14,15;87:12;103:3;
106:6

## O

**oath (1)**
80:19
**Object (2)**
26:9;34:13
**objected (1)**
46:17
**Objection (27)**
32:23;35:14;37:25;
59:15;61:20;62:12;
70:13;71:2;76:16;77:3,
9,11,14;80:7,13;84:15,
25;89:19,23;92:10;
94:12;95:22;96:13;
97:10,11;98:15;103:19
**obligation (1)**
58:18
**obtain (1)**
63:2
**obtained (1)**
17:11
**Obviously (5)**
8:12,15;12:14;19:24;
21:8
**occurred (4)**
11:23;38:19;102:15;
103:8
**o'clock (4)**
16:7,7,11,11
**October (1)**
50:8
**off (4)**
30:12;86:10;88:15;
107:17
**offender (1)**
75:14
**offenders (2)**
85:2;89:21
**offense (1)**
93:5
**offenses (3)**
92:21;93:11,16
**offered (3)**
70:12,16,19
**office (21)**
13:15;15:15;16:3,13;
17:6;19:17,19;20:16,
23;21:6;25:7,8,19,25;
29:22;30:2;33:8;38:5;
40:22,23;82:4
**officer (14)**
30:22;37:2,5,10,11,
17;40:20;63:16;79:12;
84:20;85:5;96:4;98:3;
109:5
**officers (21)**
33:18;36:23;37:19;
41:10;47:12,18;48:19;
49:3;52:11;54:15,16,
24;57:15;59:2;62:9;
68:10;69:1;70:2;74:18;
80:20;84:21
**officers' (1)**
71:5
**often (3)**
26:6;27:6;34:11
**oftentimes (1)**
33:25
**old (3)**
39:17,18;105:2
**older (2)**
34:5,6
**once (5)**
14:19;28:3,3;37:4;
51:16
**one (46)**
11:24;14:3,18;15:21;
18:22;20:6,9,19;22:7;
27:17;35:9,15;37:8;
38:23;39:1,18;41:12;
44:4;46:8;54:14;58:10;
64:4;67:6;71:23,24;
78:1,16;82:2,7,9;
85:15;90:15;91:2,14,
25;92:18;93:5,10,15;
94:10;95:3,4;97:17;
103:23;105:15,21
**one-page (1)**
74:9
**ones (3)**
9:24;63:24;80:9
**only (21)**
15:21;17:12;20:9,19,
19;21:22;28:3;35:2;
37:8;39:3;40:9;47:24;
49:4;55:21;66:23;
71:25;78:2;82:12;
85:19;87:24;90:4
**opened (1)**
102:7
**opinion (3)**
47:6;80:2,10
**opportunity (2)**
65:21;74:6
**option (1)**
60:4
**options (1)**
60:1
**oral (14)**
59:12,20;60:5,12,15,
24;61:5,8,13;62:1,6;
63:9,12;91:10
**orally (3)**
8:15;61:13;90:1
**order (5)**
12:2;44:24;51:7,9;
107:13
**ordered (2)**
51:10,16
**orders (2)**
99:14;107:15
**original (3)**
10:4;56:10;65:6
**originally (1)**
56:7
**otherwise (1)**
109:13
**out (26)**
17:1;25:1,21;29:11;
45:10;47:8;52:14;55:6;
60:6;71:9;74:9;77:1;
87:1;90:2,3,18,19;
98:2;99:1;100:5;101:3;
102:16;105:3,4,8;
106:19
**outcome (1)**
109:13
**outpatient (2)**
74:4,10
**outside (1)**
37:16
**over (6)**
11:4;32:6;35:7;
56:14;87:20;105:21
**overwhelmingly (1)**
59:19
**own (6)**
27:2,10;28:12;48:4;
70:21;73:2
**owned (1)**
102:11
**owner (1)**
102:9

## P

**pack (1)**
33:16
**page (7)**
8:11;56:15,15;67:19;
73:13;82:12,13
**pages (9)**
9:17;55:23;66:15,23;
82:2,12;105:18,20,21
**paper (2)**
27:18;61:14
**parents (1)**
13:10
**parked (1)**
101:9
**part (4)**
12:22;57:11;68:18;
101:5
**partial (1)**
88:10
**participated (1)**
84:21
**particular (10)**
12:22;15:7;25:9;
33:4;36:1;37:7;45:17;
48:6;83:25;84:1
**parties (1)**
109:12
**partners (1)**
35:4
**parts (4)**
10:12;12:24;63:11;
66:24
**pass (1)**
16:21
**passed (1)**
90:18
**passion (2)**
16:14,17
**past (1)**
35:20
**paths (2)**
42:23,23
**Patricia (1)**
106:9
**Paul (1)**
7:17
**pause (1)**
94:8
**paycheck (1)**
16:17
**penny (1)**
103:15
**people (37)**
15:24;16:6,10;17:9,
21;21:17;23:24;28:22;
34:5,6;54:17;58:19;
76:20;77:18,18,19;
89:18,20,25;90:4;
91:16,19;92:8,11,14,
22;93:3,4,19;95:1;
96:7;105:3,11,13;
106:4,18,21
**percent (2)**
19:22,24
**perform (1)**
91:9
**period (13)**
20:5;21:18;24:22;
25:23;30:1;31:25;
33:21;40:4,5;46:4;
52:18;57:24;87:8
**person (20)**
33:11;34:22;35:17;
37:8;38:23;39:1;68:11;
71:9;72:16;73:10;
75:22;85:20;91:2,14,
25;96:1;104:6;105:4,9;
106:20
**personal (1)**
27:2
**personally (1)**
21:15
**person's (1)**
72:18
**perspective (1)**
69:25
**Peter (6)**
7:16;40:25;41:1,2,8;
76:24
**phone (6)**
15:4,10;30:19,20,24;
103:3
**photograph (1)**
51:11
**physical (4)**
8:24;28:1;41:11;
70:22
**physically (1)**
70:1
**piece (7)**
27:18;46:1,3;57:15;
63:22,25;65:19
**pills (1)**
9:5
**place (7)**
7:13;20:17;30:24;
59:21;101:8;105:7,9
**placed (2)**
11:25;97:17
**PLAINTIFF (2)**
7:5,10
**play (1)**
70:22
**plea (4)**
86:1;87:20,21;94:5
**plead (3)**
77:12;93:6,8
**pleading (1)**
95:17
**pleas (1)**
88:18
**please (4)**
9:8;53:11;81:13;
107:12
**pled (4)**
93:4,15,18,25
**PM (1)**
107:17
**point (18)**
9:7;18:22;19:10;
23:14;29:6,18;31:15;
37:1;39:13;44:11;
51:20,23;52:9;62:18;
78:19;79:11;84:19;
97:16
**pointing (1)**
75:18
**police (47)**
27:17;30:22;31:4;
32:11,16;33:5,18;
36:14,23,24;37:2,5,10,
11,16,18;38:11;40:20;
41:10;44:24;47:11,17;
49:3;51:10;52:11;
54:14,15,20;59:1;62:9,
16;68:10;69:1;71:17;

76:11;77:8,17;78:23;
79:16;80:20;81:21;
82:4,6;91:1;96:4;98:2;
107:2
**Political (1)**
15:9
**portion (1)**
95:24
**portions (1)**
10:6
**position (8)**
11:20,25;12:1,1;
17:9;23:6,13;76:13
**possibility (1)**
28:14
**possible (2)**
80:8;92:3
**possibly (2)**
61:8;72:19
**postconviction (2)**
8:1;10:1
**potentially (2)**
32:13;35:16
**power (1)**
34:19
**practice (2)**
37:1;38:17
**pre-1980 (1)**
31:23
**pre-1983 (3)**
30:2;31:20;40:16
**precise (1)**
85:7
**predominantly (1)**
41:23
**preference (1)**
10:16
**prejudice (1)**
20:25
**prejudiced (1)**
22:1
**preliminary (2)**
45:12;51:12
**prelims (1)**
18:25
**preparation (5)**
59:4;67:21;68:24;
83:13;85:5
**prepare (1)**
66:18
**prepared (1)**
65:23
**preparing (1)**
84:19
**presence (3)**
36:8,14;37:16
**present (2)**
76:8;107:6
**presented (1)**
68:9
**press (2)**
48:19;49:4
**pressure (1)**
9:5
**presumably (1)**
106:22
**pretty (9)**
18:3,9;23:18;29:19;
31:19,23;32:10;39:8,9
**previous (1)**
20:2
**previously (2)**
36:9;101:2
**principals (2)**
92:21;93:3
**printed (3)**
74:12,12;107:14
**Prior (35)**
24:19;25:5;29:9,21,
24;35:22;39:20;40:1;
41:1,3,9,16,25;42:4,16,
20;43:7;45:21;46:2,6,
10;49:16;56:8;64:14,
19;69:6,10,23;74:25;
75:4;78:19;79:5,20;
106:25;107:3
**Prison (2)**
81:24;82:18
**probable (1)**
27:24
**Probably (10)**
19:2;40:23;50:8;
56:6;73:20,22;79:8;
87:25;88:4;104:22
**probation (14)**
86:5,18;87:8,15,23;
93:9;94:4,11;95:3,8,11,
14;96:12;98:14
**problem (2)**
20:22;87:3
**proceed (2)**
37:22;99:22
**proceedings (2)**
10:4,4
**process (1)**
27:9
**produced (2)**
66:7;69:21
**Professional (1)**
109:3
**profile (1)**
48:16
**progress (2)**
74:4,10
**promote (1)**
94:14
**promoted (1)**
24:16
**prosecute (1)**
85:10
**prosecuted (3)**
82:23;83:5;85:15
**prosecuting (1)**
21:17
**prosecutor (12)**
16:15;38:9,9;43:7;
44:8,10;49:24;52:22;
53:23;58:15;88:20;
99:25
**prosecutorial (1)**
28:9
**prosecutors (1)**
85:16
**protocol (3)**
27:9,11;32:20
**provide (2)**
65:13;104:17
**provided (4)**
64:22;66:17;88:4,9
**proximity (1)**
47:1
**psychological (1)**
28:1
**pull (1)**
64:7
**purpose (1)**
53:16
**put (8)**
60:18;61:14;64:18;
76:3,6,7;98:4,5
**putting (3)**
64:19;79:5;90:24

## Q

**quality (1)**
67:16
**quash (7)**
52:16;55:19;56:2,11;
59:5;66:2,5
**quickly (5)**
23:19,25;99:11;
100:17,22
**quit (1)**
97:8
**quite (5)**
19:15;27:13;29:16;
45:5;106:3

## R

**Raba (2)**
81:24;82:17
**randomly (1)**
101:21
**rang (1)**
30:20
**ranks (2)**
23:25;76:23
**rape (4)**
30:20;39:3;92:24;
93:8
**raped (4)**
89:18,20;90:5;96:8
**rather (2)**
59:13;73:21
**read (36)**
10:8;27:17,19;46:21;
47:6;49:4;51:6;55:20;
56:3,23,25;57:3,7,8,9,
18;66:25;67:2,3;72:16;
73:2,20;74:8;75:24;
76:1;86:14;87:2,4;
88:22;93:6,13;105:12,
18,20;106:1;108:4
**reading (10)**
17:22;25:15;57:17;
61:10;62:21;63:11;
68:17;72:25;73:21;
109:10
**reads (1)**
73:22
**ready (1)**
51:18
**really (5)**
11:8;17:2;26:11;
28:16;38:4
**reason (2)**
39:4;64:21
**reasons (3)**
78:1;88:16;98:16
**recall (18)**
9:20;16:23;18:13,20;
22:23;32:2;44:12;
49:12;52:6;60:14,23;
61:6;62:3;64:9;85:11;
89:9;101:17;105:24
**recanted (3)**
79:24;80:15,17
**receive (3)**
25:6;26:1;103:12
**received (7)**
15:5;30:4;86:4,18;
94:4,10;95:7
**receiving (1)**
35:23
**recent (1)**
11:23
**recognize (2)**
55:15;58:14
**recollect (2)**
57:20;93:25
**recollection (28)**
19:17;32:4;38:20;
39:19,25;40:2,11,14,
19,25;41:2;42:9;45:2,
20;46:9,24;48:2;49:1;
51:22;63:8;64:7,10;
65:8;68:5;86:17;87:15;
101:24;106:18
**record (24)**
7:14;8:21,22;31:15;
49:15;50:13;62:8;
63:11;64:23,23,25;
65:4;66:24,25;67:1,2,3,
4;82:11;86:10;99:20;
100:14;107:17;109:7
**recorded (1)**
8:14
**records (12)**
65:22,23,25;66:3,5,6,
10;69:18,20,24;70:4;
73:3
**reduce (2)**
21:21;98:13
**reduced (5)**
93:11,12,16;94:2;
109:9
**referenced (2)**
39:11;79:11
**referred (1)**
67:18
**referring (1)**
68:7
**refine (1)**
31:13
**reflect (1)**
94:9
**refreshes (1)**
86:17
**regard (1)**
95:25
**regarding (2)**
26:2;49:3
**Registered (1)**
109:3
**related (4)**
26:3;30:5;69:4;
109:11
**relates (4)**
49:17;56:20;57:21;
87:23
**relationship (4)**
42:25;101:8;103:17,
24
**relatives (1)**
13:16
**reliability (2)**
26:2;59:11
**reliable (3)**
26:7;27:12,14
**remarks (1)**
72:6
**remember (75)**
7:25,25;8:2,4;17:4;
18:8,25;19:4;22:21;
23:22;24:12,23;25:4;
30:3,7,15,16,17;31:18;
35:6,23;36:1,16;37:15;
38:24,25;39:2,4,6,12;
40:9,10,12,21;41:8,9;
44:17;47:15,17,24,24;
48:5,9,20;49:8;50:24;
52:2;53:13,17,19,23;
57:14;62:18,20,22;
64:15,17;65:16,16,17,
19;67:20;68:8,11,17,
22;69:13;86:6;87:14;
89:12,13;102:14;
104:24;105:22;107:4
**remembered (2)**
47:15;48:8
**remembering (1)**
48:4
**remind (2)**

8:3;101:18
**repeat (1)**
100:25
**reply (1)**
25:17
**report (3)**
48:10;51:11;107:2
**reported (1)**
72:7
**reporter (6)**
8:14,16;107:13,15;
109:1,4
**reports (8)**
27:18;33:18;44:24;
51:11,15;91:7;105:19,
25
**represent (3)**
7:10;92:6;95:3
**representing (3)**
17:9,10,12
**republican (3)**
17:1,2;18:14
**requested (2)**
66:6;109:10
**requirement (1)**
32:2
**re-reading (1)**
68:17
**reserve (1)**
107:12
**residence (8)**
101:4,6,20;102:1,2,3,
5;103:9
**resolved (4)**
85:21,24;86:1;87:18
**respect (3)**
86:19;95:6;99:17
**respond (1)**
102:18
**response (2)**
53:24;77:12
**responsibilities (3)**
35:15;38:9;58:11
**responsible (1)**
11:12
**restaurant (1)**
101:14
**restraining (1)**
93:1
**resulted (1)**
91:17
**resulting (1)**
20:25
**review (26)**
9:12,18,25;10:3;
24:21;25:3,22;29:7,12,
19,22;30:4,6,9;31:6,19;
32:13;33:18;34:20;
35:9,23;37:14;38:22;
60:6;65:22;74:6
**reviewed (7)**
9:16,18,21,24;51:17;
66:22;69:3
**reviewing (1)**
67:20
**Richard (4)**
22:16;81:19;82:5,17
**rider (1)**
106:20
**right (92)**
8:8,14,23;12:12;
13:7;14:16;15:19;17:3;
19:10;20:20;21:3,15;
22:17;23:11;24:9,21;
29:5;31:17,20;33:7,22;
34:4,16;35:20,22;
38:16;41:6;43:9;44:6,
23;45:2;47:5,21;48:18;
49:6;50:3;53:3;56:4;
57:1,7;58:18;61:10,16,
19,25;62:5,8,11,15;
63:1;64:3;65:2,13;
66:20;67:23;68:21;
69:9,12,17;70:5,12;
73:12,16;74:8,10,18,
23,25;76:2,5;81:6;
82:2;85:14,21,22,25;
87:9,12,12;89:1,18;
90:8;93:5;95:5;96:15,
23;97:3;98:6;99:10;
101:16;106:7,11
**rights (1)**
39:5
**robbery (2)**
30:21;33:11
**rode (1)**
71:14
**Rodney (32)**
50:21;52:4;56:21;
64:2;71:9,12,13;75:15,
21;77:21,24;78:3,3;
86:18,20;88:5,10;
89:14;92:19;93:18;
94:16;96:3,5;98:1,3,6,
7,8,20;99:4,6;101:9
**role (2)**
38:8;70:22
**roles (2)**
32:14;35:9
**rookie (1)**
34:12
**room (5)**
24:8;28:13;36:23;
37:2,5
**Roosevelt (4)**
13:6,21;14:9,13
**routine (4)**
41:11;43:1;45:9;
76:12
**row (1)**
33:5
**RPR (1)**
109:23
**rubber (4)**
57:16;63:22,25;
65:20
**rule (4)**
36:7,12;37:22;58:12
**rules (2)**
8:9;59:20
**rumor (1)**
41:13
**run (4)**
11:25;12:1,3,5
**rung (1)**
28:23

## S

**same (18)**
8:11;27:23;28:21;
40:24;46:22;52:1;
53:21;63:7;64:5,9;
65:8;66:14;84:5;92:20;
93:2;94:18;97:5;108:5
**samples (1)**
25:15
**Savage (13)**
41:17,18,20;42:1,6,
10,13,16,19;43:6;52:4;
89:12,13
**save (1)**
75:25
**saw (6)**
62:24;68:4;91:10;
99:20;106:13;107:2
**saying (19)**
22:7;33:14;39:14;
40:18;45:7;54:17;62:9;
72:22;73:6;78:14;80:9,
14;88:3;98:20,21;99:4;
103:24;105:22;107:2
**scared (1)**
37:18
**scene (3)**
31:4;76:6;101:3
**scheduling (1)**
30:14
**school (10)**
12:25;13:3,25,25;
14:1,4,19,19;15:18,21
**science (1)**
15:9
**search (1)**
31:6
**seasoned (2)**
34:1,11
**second (18)**
23:10,11,16;43:23,
25;44:15;46:8;51:9;
56:15;60:18;64:8;67:6,
19;71:19;82:7,13;
99:14;103:23
**Secondly (1)**
8:18
**secret (1)**
46:25
**section (2)**
15:23,24
**seeing (2)**
42:9;68:5
**seems (2)**
8:17;23:24
**send (2)**
25:2;29:12
**sense (4)**
8:17;22:1;70:23;
78:14
**sensitive (1)**
22:5
**sent (1)**
50:9
**sentence (4)**
86:18;95:7,11,11
**sentenced (1)**
87:7
**separate (1)**
52:8
**September (10)**
11:2,6;43:14,15,17,
17,19;50:1,3;67:17
**September-ish (1)**
43:10
**Sergeant (4)**
63:16;76:22,24;
83:13
**serious (3)**
31:7;32:2;34:8
**Services (2)**
81:24;82:18
**set (3)**
45:18;54:1;57:1
**sever (1)**
78:9
**several (2)**
21:21;56:15
**severance (4)**
78:4,6,12,16
**sex (2)**
78:7;98:21
**sexual (4)**
91:23;92:12,12,25
**sexually (2)**
89:25;91:25
**shakes (1)**
8:16
**shared (1)**
27:22
**sheet (3)**
67:18;88:21;108:7
**shifts (3)**
30:10,13;33:5
**shirt (5)**
37:10,12,13;38:23;
49:20
**short (4)**
24:22;29:6,18;86:15
**SHORTHAND (1)**
109:1
**shot (1)**
47:18
**show (2)**
86:6;93:22
**side (4)**
28:9;39:9;43:6;
74:17
**sign (3)**
60:6;61:13,19
**signature (2)**
86:24;108:13
**signed (7)**
61:6,8;62:4;67:19;
82:5;87:10;108:7
**signing (1)**
109:10
**similar (5)**
46:15;57:21;58:1;
63:14,18
**Sincerely (1)**
82:5
**sit (8)**
8:25;11:4;12:8;
30:19;36:17;65:15;
104:9;107:4
**sitting (4)**
10:15;30:15,16,17
**Six (1)**
95:5
**skills (1)**
20:23
**skin (3)**
20:24,25;22:3
**slash (1)**
72:12
**small (1)**
57:8
**socialize (1)**
42:8
**socialized (1)**
42:19
**somebody (17)**
32:6;37:23;38:10;
58:5;61:10,12;68:13,
20;75:12,13,14;90:1,
17,21;91:9;98:25;
106:17
**somebody's (1)**
33:10
**somehow (1)**
32:19
**someone (8)**
32:10;35:12;36:18,
21;38:18;56:10;61:24;
106:24
**someplace (2)**
31:5;99:1
**sometime (2)**
29:14;41:7
**sometimes (10)**
26:23;28:10,14;
53:12;54:25;55:1;
76:23;100:12,16,17
**somewhere (1)**
22:15
**son (4)**

102:19,20,21,22
**sorry (4)** 43:14;54:2;71:10; 98:16
**sort (2)** 26:6;74:13
**sound (2)** 22:17;50:22
**sounds (2)** 23:18;75:9
**South (1)** 39:9
**speak (6)** 20:18;21:22;28:11; 35:2;93:24;95:13
**speaks (1)** 22:22
**specialized (1)** 35:24
**specific (8)** 22:25;29:23;30:5; 32:22;54:5,12,21,23
**specifically (9)** 9:20,24;21:13;43:10; 57:10,11;68:7;95:6; 101:25
**specifics (1)** 65:17
**specify (1)** 28:2
**speculate (1)** 8:18
**speed (1)** 24:2
**spoke (1)** 83:12
**spoken (2)** 42:24;106:19
**stamped (1)** 56:8
**stand (1)** 79:5
**standard (1)** 26:6
**Stanley (39)** 7:11,25;40:7,13; 41:3;43:7;46:10;50:18; 52:6;62:7;65:10,12; 71:9,12,13;74:4,11; 75:20,21;76:14,21; 77:20,25;78:5,7,8; 79:1;80:25;82:23;83:6; 85:10,11,24;89:6,8; 94:13,23;98:18;103:24
**start (5)** 12:18;14:23;23:14; 25:15;41:21
**started (7)** 14:7,25;15:14;23:15; 25:12;29:24;51:18
**starting (1)** 14:1
**State (7)** 17:10,12,14;58:19; 87:22;99:17;109:4
**stated (4)** 80:11,18,21,24
**statement (45)** 35:16,25;36:5,6,21; 37:18;39:2;59:23;60:4, 5,14,15,24,25;61:2,5,8, 13,14,15,18,23,24; 62:2,4,6,10,11,14;63:2, 5,9,10,12;71:1;75:12, 16;76:3,14;79:1,2; 80:24;97:20;98:19,20
**statements (23)** 35:19;38:21;52:17; 53:18,19,24,25;55:9, 18,22;56:2,7,12;59:5, 12,12,14,20;60:12,13; 63:17;66:2;81:9
**State's (31)** 15:13,14;16:3,13,24; 17:5;18:14,22;19:16; 21:20;22:16;25:8,8,19; 30:2;31:1,7;32:3; 33:22;34:21;40:15; 44:21;59:24,25;60:3; 62:14,17,19;79:6; 81:22;83:2
**station (3)** 31:5;33:13;54:20
**stay (2)** 12:2;17:24
**stayed (1)** 94:17
**stenographer (1)** 60:8
**stenographers (1)** 59:23
**stenographically (1)** 109:8
**stick (2)** 47:7,8
**still (5)** 16:19;76:9,13;89:6; 96:18
**stint (2)** 24:20;29:18
**store (5)** 97:25;98:1,2,5;101:7
**story (1)** 55:7
**strange (1)** 13:23
**Street (13)** 22:10,13;23:7,21; 24:3;25:5;30:25;54:19; 87:17;96:3;97:18,24; 101:15
**strike (13)** 14:8;21:6;25:6; 29:25;52:19;57:25; 58:3,9;70:8;79:23; 84:17;85:17;106:23
**strong (2)** 88:11;99:5
**stronger (2)** 98:18;99:8
**study (1)** 15:7
**stuff (1)** 104:7
**sub (1)** 85:17
**subject (2)** 27:25;83:8
**subjecting (1)** 79:25
**subpoenaed (1)** 66:6
**subsequent (2)** 18:7;85:23
**subsequently (1)** 80:5
**suck (1)** 90:17
**suffered (1)** 74:17
**suffering (1)** 8:24
**suggested (1)** 36:13
**summary (1)** 96:9
**superintendent (4)** 81:21;82:4,6;83:1
**supervisor (3)** 24:17;25:21,21
**supervisors (1)** 25:18
**support (2)** 68:9;73:3
**supports (1)** 98:9
**supposed (1)** 105:8
**supposedly (1)** 104:7
**suppress (23)** 17:14;27:6;52:16,16, 21,25;53:18,19,24,25; 55:9,18,22;56:2,7,11; 59:5,5,64:15;65:6; 66:2,5;67:21
**suppression (4)** 68:24,25;75:3;83:13
**Supreme (1)** 11:14
**sure (52)** 8:6,9;10:10,20;18:3, 9,24;19:15,21;21:23; 22:13,22,22;23:23; 25:13;26:4,12,15; 27:13,15;28:20;29:11, 16,17,19;32:10;33:9; 39:8,9;44:1,14;45:5,6; 46:14;49:1;53:4,7; 59:18,22;61:11;66:11; 67:9;68:7;70:6;80:9, 14;82:10;83:22;85:3; 87:25;88:14;89:2
**suspect (1)** 38:22
**suspects (2)** 41:11;77:1
**sustained (2)** 46:17,18
**sworn (4)** 7:3;80:24,24;81:9
**Sydney (1)** 52:5
**system (1)** 21:9

**T**

**takeaway (2)** 91:15,21
**talk (13)** 33:14,14,17,19,19; 35:17,18;36:5,17;48:4, 5;60:17;99:10
**talked (6)** 25:24;64:19;69:1; 71:24;96:3;104:25
**talking (20)** 21:13,14;26:25;27:2; 30:2;31:9,16;34:9; 40:14,16;48:5;59:14; 60:16,19;64:14;75:3; 77:24;85:1;97:18,20
**tap (1)** 11:16
**tape (5)** 57:16,21;63:22,25; 65:20
**target (1)** 102:2
**targeted (1)** 102:1
**taught (1)** 38:13
**technicians' (1)** 51:15
**telling (1)** 100:13
**ten (4)** 19:21,24;54:14,16
**tend (1)** 9:11
**tens (1)** 66:15
**term (2)** 86:4;87:23
**terms (2)** 12:19;91:18
**terrible (1)** 48:1
**Terry (3)** 44:2,12,15
**testified (16)** 7:3;29:5;44:3;49:16; 58:10,14;68:20;72:17; 74:16;89:22;98:24; 99:15;101:1,2;103:10; 104:5
**testify (1)** 79:5
**testifying (3)** 7:25;8:4;89:8
**testimony (42)** 9:1,25;10:3,7,9,12, 12;68:8,18;71:5;73:8; 79:18,19,19,21,25; 80:11,16,17,19,21,24, 25;81:1;88:5;91:7,15; 95:25;96:5,6,18;97:24, 25;98:9,22;100:16; 103:11,14;108:5,6; 109:7,8
**theories (1)** 81:10
**theory (4)** 71:20;80:10;81:6; 98:9
**thereafter (1)** 109:9
**thinking (5)** 19:6;30:11;70:25; 88:15;104:23
**third (6)** 23:9,11,13,15;44:4; 51:9
**Thomas (2)** 7:19;23:4
**though (1)** 8:5
**thought (6)** 18:16;35:3;44:3,15; 51:10;70:16
**thousands (2)** 66:15;105:19
**three (22)** 25:2,18;29:20;30:11, 12;33:4;45:13;89:18, 20,21,22,25;90:4,6,11; 92:8,11;93:4,14;94:20, 21;105:4
**throat (1)** 11:3
**times (3)** 51:24;61:18;105:5
**title (2)** 56:1;67:24
**today (8)** 9:1,13;10:14;24:2; 65:15;99:22;104:9; 107:4
**together (4)** 42:14;69:16;71:14, 15
**told (11)** 37:11,17;38:10;

49:19;83:14;84:2,5;
89:15;100:5;102:15;
103:11
**Tom (1)**
87:19
**ton (1)**
80:8
**took (7)**
36:5;37:10,12;50:24;
56:10;75:22;87:20
**top (10)**
67:17;86:20;87:12;
88:15;90:15,16,16,23;
91:5,6
**toward (1)**
91:11
**towards (1)**
21:6
**traffic (1)**
17:21
**trained (1)**
68:16
**training (8)**
25:9,10;26:1;27:10;
29:22;30:5;35:24;36:2
**transcript (14)**
51:12,13;55:12;
57:18;62:21;64:13;
67:12;68:2;72:16;74:1;
81:15;86:9;107:13;
109:6
**transcription (1)**
108:6
**transcripts (2)**
10:6;73:9
**trauma (4)**
72:6,12,20;73:18
**treated (6)**
21:1,16;35:3,4;
36:24,25
**tremendous (1)**
64:25
**trial (31)**
10:4,4;12:4;18:5;
19:5,13;20:5,10;25:3;
26:25;28:8;54:10,11;
68:4;69:23;71:3;74:15,
25;75:4;76:2;79:20,20;
80:25;83:14;84:19;
88:1;94:23;97:22,25;
103:11;106:14
**trials (1)**
18:6
**tried (9)**
23:22;78:5;85:20;
90:1,17;91:9;94:13,25;
99:4
**trouble (1)**
105:15
**true (4)**
28:23;65:5;108:5;
109:7
**truthful (2)**
58:25;79:19
**try (5)**
45:1;94:20,20;
100:23,25
**trying (17)**
31:14;35:6;42:4;
47:14;48:14;61:21,22;
75:25;92:2,6,7;95:19;
96:11;100:10,11,19;
102:16
**TV (1)**
48:17
**two (23)**
21:25;25:2,18;39:6,
11;47:3,11,17,20;
48:19;55:23;73:14;
76:25;77:17;79:7,8;
82:2,12;93:19;94:16;
95:2;105:4;106:20
**two-page (1)**
67:22
**type (5)**
25:9,10;29:22;30:4;
35:23
**typed (3)**
55:17,21,23
**typewriting (1)**
109:9
**typewritten (1)**
57:11
**typical (1)**
17:19

## U

**unaware (1)**
83:5
**under (2)**
80:19;109:9
**undergraduate (2)**
14:5;15:8
**underlined (1)**
55:22
**Understood (6)**
14:21;28:7;38:8,17;
55:2;57:9
**unfortunately (1)**
96:18
**University (6)**
13:6,22;14:2,9,23;
15:11
**unknown (1)**
106:20
**unlawful (1)**
93:1
**unless (1)**
99:13
**unnecessarily (1)**
9:9
**unusual (2)**
57:25;58:3
**up (25)**
12:19,23;16:4;18:17;
20:22;23:24;27:1;
32:14;33:16;42:10;
45:16;46:16,20;51:4;
54:9,10;64:7;67:17;
73:11,13;75:14;76:23;
97:4,16;99:12
**upon (2)**
15:11;31:3
**upstairs (2)**
75:21;76:4
**use (5)**
14:14;71:10;90:12;
92:2;94:7
**used (8)**
41:10;68:4;76:2,3;
83:15,18;84:23;85:6
**using (2)**
59:8;90:12
**Usually (4)**
28:2;34:9;45:12;
52:24

## V

**victim (5)**
72:3;88:1,8,9,14
**videotape (1)**
59:21
**videotaping (1)**
60:11
**view (1)**
61:2
**violent (1)**
98:21
**virtue (1)**
27:10
**visible (1)**
73:14
**voluntarily (2)**
70:8;78:10
**voluntariness (1)**
59:11
**voluntary (3)**
26:25;27:6;78:7

## W

**walked (1)**
101:14
**wants (1)**
7:13
**warnings (1)**
36:3
**warrant (1)**
31:6
**way (10)**
28:12,24;55:20;56:3;
59:13;61:3;64:21;
71:11;86:1;94:15
**ways (1)**
11:18
**week (1)**
105:5
**weeks (1)**
45:13
**Wentworth (1)**
30:15
**weren't (4)**
37:15;46:1;59:20;
105:8
**Western (1)**
30:16
**what's (3)**
67:14,17;88:12
**whatsoever (3)**
49:14;84:12;103:12
**whenever (3)**
31:22,25;48:7
**wherever (2)**
33:17;88:6
**white (6)**
15:25,25;21:2,25;
38:23,25
**whole (13)**
16:9;19:19;28:18;
29:4;54:15;66:24,25;
67:1,2,3,4;86:14;105:7
**whose (2)**
48:23;85:20
**wife (1)**
43:3
**Williams (8)**
78:18,22,25;79:5,11;
80:3,11,15
**willing (4)**
33:14;35:17;94:20,
20
**Wilson (13)**
46:9,16,19;47:7,16,
22,23;48:15;49:2,11,
12;83:7,8
**Wilson's (1)**
47:1
**wish (2)**
65:13,14
**within (1)**
23:16
**without (3)**
11:17;27:24;68:7
**withstanding (1)**
21:15
**witness (14)**
7:20;38:21;84:9,13;
87:25;89:6;95:24;
99:18,19;103:8;
104:24;105:14,23;
107:5
**witnesses (9)**
28:5,22;31:5;33:12,
13;44:25;55:4,9;64:19
**witnesses' (2)**
10:11;94:22
**woman (5)**
19:24;20:10,15;78:7;
102:5
**women (5)**
15:21;16:1;19:18;
20:2,6
**wonderful (1)**
41:19
**wondering (1)**
43:15
**word (8)**
11:8;14:14;41:12;
59:9;72:11;76:25;94:8;
103:10
**words (4)**
55:19,21;90:12,24
**work (9)**
13:10;15:12;16:3,5;
30:11;32:20;34:19;
85:4;102:25
**worked (12)**
15:13;19:18;20:4,7,
10;23:16;30:12;42:8,
14;44:17;68:13,13
**workers (1)**
13:17
**working (2)**
15:14;30:1
**world (2)**
15:23;83:21
**world's (1)**
67:16
**Wrice (58)**
7:11;8:1;40:7;43:7;
44:17,22;45:3,21,25;
50:2;53:1,17;57:20;
58:23;59:14;60:17;
61:7;62:7;63:2,5,14,
20;64:12;65:18,22;
67:19;71:6;74:11,17;
75:13;76:21;77:20,25;
78:5;79:1;82:23;83:6,
15;84:3,6,13,22;85:10,
11,24;89:6,8;94:13,24;
97:17;99:8;101:4,6,11;
103:9;106:9,11,12
**Wrice's (24)**
40:13;41:3;46:10;
47:2;49:16;50:18;52:6;
60:14,23;62:3;64:22;
65:10,12;68:9,25;
69:14;70:1,11;74:5;
76:14;80:25;103:17,
18,25
**writing (4)**
17:17,18;55:24,24
**written (7)**
25:17;60:6;61:14;
81:19,23;86:20;87:12
**wrote (2)**
83:1;86:23

## X

**xeroxed (1)**
27:21

## Y

**year (4)**
13:21;16:21;19:4;46:22
**years (14)**
13:14;15:8;21:13;27:1;34:17,18,18;76:18,19;94:10;95:5,5,11;105:25
**young (5)**
28:8;33:22;49:19;105:1,9

## 1

**1 (3)**
55:11,14,16
**1,000 (1)**
27:22
**1,300 (2)**
9:17;105:21
**1,400 (1)**
66:23
**10,000 (1)**
27:22
**100 (2)**
94:10;95:11
**10th (1)**
67:17
**12 (1)**
30:10
**12:14 (1)**
107:17
**12-hour (2)**
30:12;33:5
**13th (6)**
19:6,9;23:15;24:24;29:14,15
**14 (1)**
11:24
**17th (1)**
82:16
**18 (1)**
17:25
**18th (1)**
87:19
**19 (1)**
105:1
**19- (1)**
41:16
**1974 (5)**
15:15;16:2,18;17:20;19:16
**1976 (1)**
19:6
**1980 (2)**
22:11;40:23
**1981 (1)**
43:10
**1982 (16)**
47:9,11;48:1;49:11;50:1,8,11,14;56:9,13,25;58:16;67:17;81:20;82:3,16
**1983 (7)**
24:13;40:1,1;41:9,16;42:17,20
**1A (1)**
82:15

## 2

**2 (31)**
34:17;38:22;39:6,7,8,10,12,13;41:10;49:2,3,13,17,21;52:11;57:15;58:2;67:11,15;70:2;72:5;74:18;76:11,13,15,20,21;79:12;80:20;82:14;83:9
**2:00 (2)**
16:7,11
**20 (2)**
34:18;105:1
**20- (2)**
11:24;12:3
**2009 (2)**
11:2,6
**2012 (1)**
16:22
**2013 (6)**
39:24;46:15;78:20,21;99:15,18
**2016 (4)**
11:1,23;12:3,6
**21 (1)**
105:2
**23rd (3)**
56:9,10,13
**250 (1)**
48:11
**25th (2)**
81:20;82:3
**26th (12)**
22:10,10,13,24,25;23:7,21;24:3;25:5;30:17,25;87:17

## 3

**3 (6)**
56:19;57:7,8,12;73:25;74:3
**3.8 (1)**
58:12
**30 (3)**
87:5,8,23
**300 (1)**
48:11
**33 (1)**
105:25
**350 (1)**
48:11

## 4

**4 (7)**
15:25;34:17;81:14,17;82:12,13;83:24
**4:00 (2)**
16:7,11
**40-plus (1)**
13:14

## 5

**5 (2)**
86:8,14
**51st (1)**
30:15

## 6

**62 (1)**
15:25
**67 (2)**
14:13;15:24

## 7

**70s (1)**
31:12
**71 (7)**
13:24;14:1,9,17,23,25;15:1
**72 (1)**
14:24
**74 (7)**
14:2,6;15:2,3;16:19,24;26:16
**75 (1)**
14:5
**75th (1)**
101:7
**79 (3)**
19:14;22:12,23

## 8

**80 (5)**
19:14;22:12,15,23,23
**80s (3)**
31:9,11;49:7
**81 (5)**
22:15;43:11,12,16;58:13
**82 (15)**
39:15;41:5,7;43:14,17,17,19;46:13,22;47:4,7,15;50:17;51:15;60:10
**82-8655 (1)**
87:12
**83 (9)**
26:1,16;39:14,15;40:23;41:1,7;42:5;87:17
**84 (1)**
87:19
**84-4846 (1)**
109:4
**8th (2)**
50:14;51:1

## 9

**90s (1)**
49:7
**9th (1)**
50:3