```
                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION
```

Stanley Wrice,                    )
                                  )
         Plaintiff,               )
                                  )
                                  )
    v.                            )   No. 1:14-cv-5934
                                  )
Jon Burge, John Byrne, and        )
Peter Dignan,                     )
                                  )
         Defendants.              )

Memorandum Opinion and Order

In the early morning hours of September 9, 1982, several men viciously brutalized an intoxicated woman, KB, in Stanley Wrice's second-floor attic.[1] Over the course of the night, KB was sexually assaulted, beaten, and burned with an iron and other objects over her face, neck, breasts, legs, and buttocks. Wrice was in the house that night, and he went upstairs at least twice, where he saw KB on a bed accompanied by several of Wrice's acquaintances. Wrice maintains, however, that he neither saw, nor heard, nor suspected that anything was amiss, and that he was not involved in KB's

---

[1] The record reflects that the second floor was accessed from a stairway leading up from the kitchen. Wrice 2017 Dep. at 445:8-9. Wrice testified that the second floor consisted of a large room that was often used to entertain friends, and that he slept in one part of the room while other members of his family slept in another part. *Id*. at 46:11-15, 177:8-182:2.

attack. Nevertheless, when police officers descended upon his house later that morning, Wrice was among the individuals arrested and taken for questioning at Area 2 Police Headquarters, where defendant Burge and officers under his command are now known to have engaged in a decades-long practice of torturing suspects to extract statements. *See generally U.S. v. Burge*, 711 F.3d 803, 807-08 (7th Cir. 2013) (affirming Burge's perjury conviction for lying about his knowledge of and participation in "horrific" abuse).

In this action, Wrice claims to have been a victim of such torture during his questioning at Area 2 on September 9, 1982. He further claims that defendants' brutality coerced him into making an incriminating statement to ASA Kenneth McCurry that was later used against him at his trial in violation of his Fifth Amendment privilege against self-incrimination and his Fourteenth Amendment right to due process. He also alleges that defendants violated his due process rights by fabricating evidence used to convict him. Specifically, he claims that defendants "fed" him inculpatory facts they knew to be false and made him repeat those facts to McCurry, who testified to them at his trial. Wrice seeks damages for these constitutional violations pursuant to 42 U.S.C. § 1983 against three individuals: former police lieutenant Jon Burge (now

2

deceased),[2] retired sergeant John Byrne, and retired detective Peter Dignan.[3] Wrice also seeks to hold defendants liable under § 1983 for conspiring to violate his constitutional rights.

Before me are two motions for summary judgment. The first, filed by defendants Byrne and Dignan ("the officer defendants") and joined by defendant Burge, argues that Wrice's coerced confession claims are time-barred and that his fabrication of evidence claim lacks evidentiary support. In addition, Burge argues separately that he is not subject to liability under § 1983 because there is no evidence that he was personally involved in the alleged constitutional violations or that he participated in a conspiracy to violate Wrice's constitutional rights. For the reasons that follow, both motions are denied.

I.

Wrice and three other individuals alleged to have been present in the Wrice home on September 9, 1982—Michael Fowler, Lee Holmes, and Rodney Benson—were charged with multiple offenses arising out

---

[2] Burge's status in this case is currently uncertain. Wrice has moved to substitute Burge's brother, Jeffrey Burge, as executor of Burge's putative estate, but Jeffrey has objected to the motion and the issue remains unresolved. Neither party suggests, however, that the open question of this defendant's status in the case precludes my resolution of the issues currently before me.
[3] The original and amended complaints name additional defendants and assert a number of other claims, but in decisions issued on September 25, 2015 and February 8, 2016, I dismissed several defendants and narrowed plaintiff's claims to those discussed in this opinion.

of KB's attack. Wrice's case was severed from his co-defendants' and tried before a jury in May of 1983. Several witnesses testified about Wrice's role in the charged offenses. These included Kenny Lewis, a neighbor who testified that he was at the Wrice home on the night in question and saw Wrice beat KB with his fists. Lewis also testified that he saw Wrice take a hot spoon from the kitchen to the attic, then heard KB ask, "why are you burning me?" The state's witnesses also included Bobby Joe Williams, the then-boyfriend of Wrice's sister, Patricia. Williams was also present on the night and testified that he saw Wrice engage in sexual intercourse with KB; saw Wrice take a hot iron from the kitchen to the attic; and heard Wrice say later that they had "burned that bitch." The state also presented the testimony of ASA McCurry, who testified about statements Wrice made to him while in custody at Area 2.

Wrice testified in his own defense.[4] He stated that on the night in question, he twice went into the attic, where he saw Benson and several other people, including a woman seated on a bed. According to Wrice, he told these people to stay away from the area of the attic in which he slept, as he was in the process

---

[4] The transcript of Wrice's trial testimony is attached as Exhibit 16 to the officer defendants' summary judgment motion. All citations to his testimony in this section are drawn from that transcript, and the page numbers referenced are those generated by the CM/ECF system.

of building a partition and did not want his construction materials disturbed. He then returned downstairs and left the house to call his fiancé from a nearby payphone. Thirty to forty minutes later, he returned home and went to sleep in the living room. Wrice testified that he was awakened by a woman named Kim, who told him that people were fighting upstairs. He returned to the attic, where he saw KB, Benson, Holmes, Fowler, and another man he did not know, and ordered everyone out. Wrice saw Benson leave the house with KB, then he returned to sleep in the living room. He was awakened by the arrival of police officers later that morning.

Wrice also testified about his interrogation at Area 2. He stated that defendants Byrne and Dignan began the questioning by asking him to "tell them what happened" at his house that night. After Wrice told them "what [he] knew," Byrne hit him in the head with a flashlight and Dignan hit him with a rubber object, asking him "things like who burned the lady, who raped the lady and things like this." Wrice Trial Testimony at 48-50. Wrice "kept telling [Dignan] I don't know who was raped, I don't know who was burned," and that he had already told the officers everything he knew. But the officers continued hitting him and asking him questions. *Id*.

Wrice testified that he was taken to another room. On the way there, he saw Williams crying; he later saw Benson crying and limping. *Id*. at 51-52. Thereafter, Dignan and Byrne resumed their interrogation. Wrice testified:

5

> [T]hey started telling me that I was lying, that Rodney
> Benson had told the truth and that I burned the lady and
> that I done this, I done that with the lady. And I kept
> telling them that I didn't. They started beating me again
> with the same thing, piece of rubber and a flashlight.

*Id*. at 55. Wrice stated that throughout further beatings, he "kept telling them I didn't have nothing to do with none of that that happened. I didn't know what was happening up them stairs." Wrice testified that he could not recall what else, if anything, he told the officers. *Id*. at 56-58.

Wrice testified that he then spoke to ASA McCurry in the presence of Byrne and Dignan, and repeated "the same thing that I had told Detective Dignan and Sergeant Byrne earlier about what happened from the time I went to the store to the time I came back home." Wrice told the jury that ASA McCurry "started asking me what happened," and that he could not remember what else was said. Wrice testified that after the state's attorney left, Byrne returned and told Wrice to "tell him [i.e., the state's attorney] what you know." The state's attorney then returned and asked whether Wrice had anything else to say. Wrice testified: "[o]nly thing I told him was, no." *Id*. at 59.

Wrice's defense also included the testimony of his sister, Patricia Wrice, and his brother, Charles Wrice. At the conclusion of the trial, the jury convicted Wrice of rape and deviate sexual assault, and the judge sentenced him to a total of sixty years of confinement. Thereafter, Wrice's co-defendants pled guilty to

6

lesser charges and received significantly lower sentences: Lee Holmes and Rodney Benson each received a sentence of 30 months' probation, while Michael Fowler was sentenced to four years in prison. *See* Byrne and Dignan's L.R. 56.1 Response, Exh. 19, 20.

On December 10, 2013, a state court sitting in post-conviction proceedings set aside Wrice's conviction and granted him a new trial based on his unrebutted testimony "that he was tortured to get him to make a confession" while in custody at Area 2. The state declined to retry Wrice based on its determination that in light of the death of one of its witnesses (presumably Kenny Lewis), and the recantation of the trial testimony of another (presumably Bobby Joe Williams), it could not prove Wrice's guilt beyond a reasonable doubt.

II.

Defendants first argue that Wrice's coerced confession claims under the Fifth and Fourteenth Amendments are time-barred because the record establishes that neither claim is subject to the deferred-accrual rule of *Heck v. Humphrey*, 512 U.S. 447 (1994). The gravamen of the Fifth Amendment claim is that the use of plaintiff's coerced confession at trial violated his right against self-incrimination. I denied defendants' motion to dismiss this claim as untimely, explaining that Wrice's allegations regarding the centrality of his confession to the state's case at trial indicated that *Heck* barred him from asserting this claim until his

conviction was set aside. *Wrice v. Burge*, 187 F. Supp. 3d 939 (N.D. Ill. 2015) ("*Wrice I*"). Defendants ask me to revisit the timeliness question on summary judgment, arguing that the record developed in discovery establishes that contrary to Wrice's allegations, his coerced confession did not figure prominently in the state's case. In defendants' view, because other evidence supported Wrice's conviction, his claim does not *necessarily* impugn the validity of his conviction and thus is outside the scope of *Heck*. For this argument, defendants point to cases such as *Hill v. Murphy*, 785 F.3d 242, 245-50 (7th Cir. 2015), in which the court suggested that *Heck* issues are subject to a case-by-case, fact-intensive analysis. But whatever traction defendants' argument finds in those cases, the Seventh Circuit has since unequivocally rejected the fact-intensive analysis they endorse in favor of a categorical approach rooted in the plaintiff's "legal theory of relief." *Johnson v. Winstead*, 900 F.3d 428, 438 (7th Cir. 2018).

In *Johnson*, the Seventh Circuit acknowledged that its prior decisions had "sent mixed signals on the methodological question." *Id*. at 437-38 (citing *Hill*, *supra*, and *Matz v. Klotka*, 769 F.3d 517 (7th Cir. 2014), as examples of a facts-based approach, and *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014), and *Johnson v. Dossey*, 515 F.3d 778, 781-82 (7th Cir. 2008), as examples of a categorical approach). Reasoning that "the need for clear rules is especially acute" in the context of limitations law, the *Johnson*

8

court resolved the ambiguity in its previous decisions in favor of the categorical approach, which it concluded offers "greater consistency in evaluating *Heck* questions." *Id*. at 439. Applying this approach, the court held that "*Heck*'s rule of deferred accrual applies to § 1983 claims for violation of the Fifth Amendment right against self-incrimination." *Id*. *Johnson* is thus fatal to defendant's attack on the timeliness of Wrice's coerced confession claim under the Fifth Amendment.

Defendants' argument that Wrice's Fourteenth Amendment coerced interrogation claim is untimely fares no better. It is well-settled that "[t]he use in a state criminal trial of a defendant's confession obtained by coercion—whether physical or mental—is forbidden by the Fourteenth Amendment." *Payne v. State of Ark.*, 356 U.S. 560, 561 (1958). As the very formulation of the rule makes clear, the due process violation occurs, if at all, when the confession is used to obtain a conviction at trial. Accordingly, defendants' insistence that "there is no substantive difference between this claim and the excessive force claim," which plaintiff previously conceded is untimely, *see Wrice I*, at 953 (dismissing excessive force claim with prejudice based on Wrice's concession), does not survive scrutiny. Unlike his excessive force claim, but like his self-incrimination claim, Wrice's due process claim accrued *at trial*, when the state introduced his coerced statement to support his conviction. Accordingly, it was *Heck*-

9

barred until his conviction was set aside. *See Johnson*, 900 F.3d at 436 ("constitutional violations...that occur at trial...fall within the *Heck* rule.").

Moving on to Wrice's fabrication of evidence claim, defendants articulate two arguments: First, they insist that the evidence does not support the conclusion that Byrne and Dignan *knew* the statements Wrice claims they "fed" to him and to Bobby Williams were false. Second, they assert that the statements ASA McCurry attributed to Wrice cannot reasonably be said to have *caused* Wrice's conviction because the statements were predominantly exculpatory and because other evidence supported the conviction. Neither argument entitles defendants to summary judgment.

As I have previously explained, the Seventh Circuit has delineated an important distinction between "genuine fabrication of evidence" claims and claims that challenge "coercive interrogation techniques." *Wrice I* at 952-53 (distinguishing *Whitlock v. Brueggemann*, 682 F.3d 567, 579 (7th Cir. 2012) (fabrication of evidence), *inter alia*, from *Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014), and *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) (coercive interrogation)). Indeed, I initially dismissed Wrice's fabrication of evidence claim based on his failure to plead that defendants had told "Wrice or Williams what to say [about the victim's attack] knowing that the

10

information was false." *Id*. at 952. Wrice corrected that pleading deficiency in his First Amended Complaint. In defendants' view, however, the evidentiary record does not substantiate his amended allegations. While the issue is close, I conclude that when all of the evidence is construed in Wrice's favor—which necessarily includes leaving all credibility determinations to the factfinder— the record is minimally sufficient to entitle Wrice to a trial.

The Seventh Circuit held in *Whitlock* that "a police officer who manufactures false evidence against a criminal defendant violates the due process clause if the evidence is later used to deprive the defendant of her liberty in some way." 682 F.3d at 580. Later, however, the court clarified that "coerced" witness testimony is distinct from "false" or "fabricated" testimony. *Fields*, 740 F.3d at 1110. In *Fields*, the court observed that these terms:

> mean three different things. Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.

*Id.* In *Petty*, the court reiterated the importance of this terminological and cautioned litigants against the talismanic use of phrases such as "manufactured false evidence" to "transform a coercion case into an evidence fabrication case." 754 F.3d at 423.

11

On the whole, the record in this case bears a close resemblance to *Fields* and *Petty*. Like the plaintiff in *Fields*, Wrice "accuses the defendants of having coerced witnesses to give testimony that the defendants (as well as the witnesses) knew to be false." *Fields*, 740 F.3d at 1109. Also like the *Fields* plaintiff, Wrice tends to use "'coerced,' 'fabricated,' and 'false' testimony interchangeably to mean testimony procured by [a defendant] who knows it's false." *Id*. at 1110. And like the plaintiff in *Petty*, Wrice claims that defendants coerced a witness (Williams in this case) to give false evidence by threatening him with charges and by pressuring him to identify Wrice as one of the victim's assailants, among other tactics. Nevertheless, Wrice relies almost exclusively on *Whitlock* and fails to grapple with—or even to mention—the similarities between his case and *Fields* or *Petty*.

Wrice insists that the officers "fed him details" about the crime to parrot to ASA McCurry, but it is difficult to discern from his submissions exactly which "details" he claims defendants coerced him into repeating. Nevertheless, the testimony of record contains a handful of excerpts that, if believed by the jury, could support a verdict in plaintiff's favor on his fabrication claim. For example, after globally recanting his trial testimony incriminating Wrice in 2011, Bobby Joe Williams testified at his 2017 deposition that after he told officers at Area 2 that he

12

"never went upstairs" and "didn't know what happened upstairs at all," officers beat him and told him "if I didn't tell the story like this, that they were going to charge me." Williams 2017 Dep. at 82. Specifically, Williams testified:

> They were telling me how it happened, and they were telling me that's what I was going to say. ... That I seen Stanley; I seen him with an iron; that he burnt the bitch.

*Id*. at 80.

Similarly, Wrice testified at his 2017 deposition that after he denied any involvement in the attack while in custody at Area 2, defendants beat him and told him: "Rodney Benson said you lying. He said you burned the woman. When you get upstairs and talk to the state's attorney, you going to tell them you burned that lady." Wrice 2017 Dep., Byrne and Dignan's Mot., Exh. 4 at 271:20-22. *See also* Wrice Trial Testimony at 55 ("they started telling me that I was lying, that Rodney Benson had told the truth and that I burned the lady"). According to ASA McCurry, Wrice thereafter confessed to him that he had indeed burned the victim. McCurry Trial Testimony, Byrne and Dignan's Mot., Exh. 5 at 21.

One interpretation of this evidence, of course, is that Rodney Benson in fact told the officers that Wrice had burned the victim; and that the officers, crediting Benson's account, coerced Wrice and Williams into corroborating it. That interpretation might support a coercion claim, but it would not, without more, support

13

a fabrication claim, even assuming Benson's own testimony was coerced. *See Fields*, 740 F.3d at 1110 (coerced testimony may be true or false). The problem with that interpretation, however, is that Benson, too, has since denied that he made any inculpatory statements while in custody at Area 2. In his 2017 deposition, Benson testified that he did not then tell any officers "anything but, 'I didn't do nothing; I didn't see nothing.'" Pl.'s L.R. 56.1 Stmt., Exh 4 at 76. And while defendants offer a host of reasons to doubt the credibility of Williams's recantation and to question the veracity of either Williams's or Benson's 2017 testimony in light of the record as a whole, their arguments fall squarely within the province of the jury.

Defendants' second argument—that the allegedly fabricated witness testimony cannot be said to have *caused* Wrice's conviction because other evidence supports the conviction—requires little discussion. The only authority defendants cite for this argument is *Avery v. City of Milwaukee*, 847 F.3d 433, 422 (7th Cir. 2017), a case in which the Seventh Circuit *reinstated* the plaintiff's fabrication of evidence claim after concluding that the district court's post-trial decision setting aside the jury's verdict in favor of the plaintiff on that claim was legally flawed. Nothing about *Avery* supports defendants' position here. To the contrary, the court's observation that because "[f]alsified evidence will *never* help a jury perform its essential truth-seeking

14

function...convictions premised on deliberately falsified evidence will always violate the defendant's right to due process" strongly favors Wrice. *Id*. at 439 (original emphasis).[5]

I now turn briefly to Burge's separate motion for summary judgment and conclude that there is no merit to its core argument: that because there is no evidence that Burge personally participated in Wrice's beating, he cannot be held liable for the alleged constitutional violations. While it is true that the doctrine of *respondeat superior* does not support liability under § 1983, evidence that a supervisor knew about, condoned, facilitated, approved, or turned a "blind eye" to constitutional violations is sufficient to establish personal involvement in the unconstitutional conduct. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). A jury could reasonably conclude, on this record, that Burge was at the helm of an abusive "interrogation regime" at the time of Wrice's arrest. *See United States v. Burge*, 711 F.3d 803, 806 (7th Cir. 2013) ("overwhelming evidence" supported jury's conclusion that Burge "presided over" torture regime). Moreover, in addition to evidence that Burge directed a general practice of coercive interrogation, Rodney Benson

---

[5] The officer defendants do not articulate any argument for granting summary judgment in their favor on Wrice's claim under *Brady v. Maryland*, 373 U.S. 83 (1963), which they acknowledge asserts a separate theory of Fifth Amendment liability, nor do they address plaintiff's conspiracy claims.

15

testified that Burge and Byrne were the officers who arrested him at his mother's house on September 9, 1982, suggesting that Burge was involved in investigating the specific crimes with which Wrice and his co-defendants were charged. Finally, Burge asserted his Fifth Amendment privilege against self-incrimination at his deposition in this case, and a jury is entitled to draw an adverse inference from his silence. *See Harris v. City of Chicago*, 266 F.3d 750, 753 (7th Cir. 2001).

III.

For the foregoing reasons, defendants' motions for summary judgment are denied.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: February 26, 2019

16