# EXHIBIT 2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | |
| ) | |
| *Respondent,* ) | Certificate of Innocence |
| ) | Case No. 82C865503 |
| v. ) | |
| ) | |
| STANLEY WRICE, ) | Hon. Thomas Byrne |
| ) | Judge Presiding |
| *Petitioner.* ) | |
| ) | |

## ORDER

Petitioner, Stanley Wrice, requests that this Court grant him a Certificate of Innocence pursuant to 735 ILCS 5/2-702. He filed his petition in this Court on May 15, 2014. This Court heard arguments after the parties filed their pleadings in this matter. After a careful review of all pleadings, supporting documentation, previous decisions in the courts of review and the common law record, this Court concludes that petitioner has failed to meet his burden.

## BACKGROUND and PROCEDURAL HISTORY

This case has a lengthy history, both in the courts of this state and in the public eye. In 1983, petitioner was convicted by a jury of committing the rape and deviate sexual assault of the victim ("K.B."). He was sentenced to 100 years' incarceration with the Illinois Department of Corrections ("IDOC"). In brief, petitioner filed his second successive post-conviction petition in 2007 while still incarcerated in the Illinois Department of Corrections. In that petition he cited the 2006 Report of the Special State's Attorney, which conclusively found that police brutality occurred at certain times at Area 2 and Area 3 Chicago police headquarters, and supported his claim that he was physically coerced into making a statement by police officers at Area 2. The trial court denied petitioner leave to file a successive petition for post-conviction relief, but on appeal the Appellate Court reversed

**EXHIBIT 1**

and remanded. The State appealed the ruling of the Appellate Court, but the Supreme Court essentially agreed with the Appellate Court and remanded the post-conviction petition for second-stage proceedings. Judge Clay advanced petitioner's claims of coercion and actual innocence to a third stage evidentiary hearing.[1]

Accordingly, the Honorable Richard F. Walsh held a third stage evidentiary hearing on December 10, 2013. Based on petitioner's assertion that he was physically coerced into making a statement, and the use of that statement against him at his original trial, Judge Walsh granted petitioner a new trial.[2] On December 12, 2013, the State dismissed the indictment against petitioner, citing its belief that, in light of the witness recantations and deaths, the criminal burden could not be met upon retrial. Following the ruling of Judge Walsh and the decision by the State to dismiss the charges, petitioner is now in a posture to argue that he is actually innocent of the crimes for which he was imprisoned.

The Illinois Supreme Court wrote the operative factual background in its 2012 ruling on the trial court's denial of petitioner's pro se successive postconviction petition. Following will be a truncated recitation of the facts that are relevant to this decision as recounted by the Illinois Supreme Court in its opinion, *People v. Wrice*, 2012 IL 1110860:

In the early morning hours of September 9, 1982, 33-year-old K.B. was sexually assaulted, beaten, and burned. Several men, including petitioner, were implicated in the attack, which occurred in the attic of petitioner's Chicago residence. Petitioner, then 28 years old, was charged with numerous offenses, including rape and deviate sexual assault.

---

[1] Judge Clay recused herself from the proceedings and the case was transferred to Judge Richard Walsh.
[2] Judge Walsh denied petitioner's claim of actual innocence, stating: "The only one...I'm going to deny, is the issue of actual innocence...I can't sit here and say that [the] evidence in all probability would change the jury's verdict because I really don't know what the rest of the evidence is. I've been handed a book full of statements. I've read some of them. So based upon that I'm going to deny the claim of actual innocence." (Petitioner's Exhibit 4 at p. 2-4)

2

**EXHIBIT 1**

The State's evidence showed that on September 8, 1982, K.B., an admitted alcoholic, spent the day drinking with two friends at the apartment she shared with her boyfriend, Gene Edwards. The apartment was above a liquor store, located at 75th Street and South Jeffrey Street in Chicago, where Gene worked. A little after midnight, when the alcohol was exhausted, K.B.'s friends had left, and Gene was asleep, K.B. left the apartment intending to go to a friend's house on Paxton Street. K.B. testified that as she walked down 75th Street, a car with some black men inside pulled up to her; one of the men asked if she needed a lift. K.B. declined the offer. The next thing she remembered was being in the car.

Testimony established that the driver of the vehicle was Rodney Benson (also known as "Span"). Benson, petitioner, and Bobby Joe Williams had driven from petitioner's home, located on the 7600 block of South Chappel Street, to the liquor store at 75th and Jeffrey streets to pick up beer. The men noticed K.B. staggering down 75th Street and, according to Williams, stopped to see what was wrong. Chicago Police Sergeant Elbert Harris, who was on patrol in the area, saw the group and stopped to investigate. Sergeant Harris noticed the smell of alcohol emanating from K.B. and that her speech was slurred. Harris asked K.B. if she needed to go to the hospital or the police station. K.B. told Harris that the men were helping her and that they were going to take her to a friend's house. After determining that the men were going to take K.B. where she wanted to go, Harris made a note of the license plate number and left.

According to Williams, after Benson drove off with K.B., he, petitioner, and an unidentified black male with a bicycle walked back to petitioner's home. Williams testified that shortly after arriving there, Benson pulled up to the rear of petitioner's home. Benson carried K.B. to the attic, which was accessed by a staircase off of the kitchen. There, a bed was located under two small windows, which allowed in light from the streetlights. The attic had no other source of light.

3

**EXHIBIT 1**

K.B. testified that she was repeatedly raped, beaten and burned by a group of black men. Specifically, K.B. testified that one of the men punched her in the face, causing her to fall onto the bed. Three men in succession then had vaginal intercourse with her. A fourth man demanded oral sex. When K.B. refused, the man punched her, knocking her to the floor, and then punched her again. At some point, the man put his penis in her mouth. K.B. next remembered seeing flames coming at her face and being burned on her face and body, including her breasts. K.B. did not recognize her attackers, and she made no in-court identification of petitioner as one of the men who assaulted her.

Williams testified that after Benson took K.B. upstairs, petitioner and the bicycle rider went upstairs. Williams was also present in the attic from time to time as were Michael Fowler (also known as "Little Mike"), Lee Holmes, and Kenneth Lewis. Williams and Lewis both testified that they saw Benson, followed by Fowler, have sexual intercourse with K.B. Williams also testified that he saw petitioner having sexual intercourse with K.B., and saw petitioner hitting her. Williams further testified that he heard Holmes tell K.B. to "set her face out," meaning to suck his penis. Lewis testified that he also saw the bicycle rider have sexual intercourse with K.B., and that he heard K.B. say "no" more than once.

Lewis further testified that, at one point in the evening, petitioner came downstairs from the attic and picked up a hot iron from the stove. Lewis took the iron from petitioner. After petitioner went back upstairs, Lewis heard "smacks and slaps." Lewis went upstairs and saw petitioner beating K.B. with his fist. Three times Lewis pulled petitioner off of K.B. Lewis said K.B. was not moving; he thought she was dead. Lewis left petitioner's home for about 20 minutes to get some barbecue. When he returned, Lewis went to the attic and saw that K.B. was "burned from head to toe" and that there were iron marks on her breasts and legs. Later, Lewis saw petitioner come downstairs, retrieve a hot spoon from the stove, and return upstairs. Lewis heard K.B. say, "Why are you

**EXHIBIT 1**

burning me?" Williams similarly testified that he saw petitioner pick up a hot iron from the kitchen stove and go upstairs. The next morning, petitioner told Williams they "burned that bitch." Medical testimony established that K.B. suffered second and third degree burns to her face, neck, chest, breasts, thighs, back, and buttocks, in addition to extensive bruising, particularly to her lower extremities.

K.B. further testified that during her ordeal, she passed out from the pain, later coming to on the floor. She then recalled hearing a man say, "Get the bitch out of here before we get a murder beef," or something to that effect. K.B. remembered a man dressing her and carrying her under her arms to the stairs. Her next recollection was being outside. K.B., not knowing where she was and her eyes swollen, crawled to the alley and made her way toward a light, which she later discovered was a gas station.

George Wilson, who was working the midnight shift at the gas station at 76th and Jeffrey streets on September 9, 1982, testified that he saw a white woman walking toward the station at 3 a.m. or 3:30 a.m. When she finally made her way to the station, he noticed that her eyes were bruised and her mouth was swollen and bloody. Wilson called police.

Investigation led police to petitioner's home, where they arrived at about 4:30 a.m. Petitioner's sister, Patricia Wrice, allowed police to enter. Other persons were present in the home, including petitioner, Charles Wrice (petitioner's brother), and Williams (Patricia Wrice's boyfriend). Once inside, police noticed a "burning odor" in the house, which was stronger in the kitchen. Police saw charred debris on the kitchen sink and on the floor, including a rolled-up paper that was burned. In the attic, police saw additional charred matter, and recovered a metal carving fork with a burnt tip, and a steam iron without the cord. The hole pattern on the steam iron matched many of the burn marks on K.B. Police also recovered from the attic a broken wooden hanger and certain

5

**EXHIBIT 1**

articles of clothing, including panties and a shoe, that belonged to K.B. As a result of their investigation that morning, police arrested several persons, including petitioner

The parties stipulated that police were unable to lift any prints off of the iron, hanger or fork recovered from the attic of petitioner's home; the hanger had human blood, but the blood type could not be determined; the panties had blood, but whether it was human could not be determined; the fork and the iron did not have human blood; the tip of the fork was burned, and the tip was discolored either from chemicals or heat. Finally, the parties stipulated that the vaginal smears obtained from K.B. did not reveal the presence of spermatozoa.

Petitioner testified in his defense that on September 8, 1982, he arrived home from work at about 10:45 p.m. Williams was at the house and Benson arrived about an hour later. The three men drove to the liquor store at 75th and Chappel streets in Benson's vehicle. While Benson looked for parking, petitioner went into the liquor store and bought beer and cigarettes. When he left the store, he saw K.B. sitting in the front passenger seat of Benson's car, which was parked in the Chicken Coop restaurant lot. Williams and Sergeant Harris were also there. Petitioner testified that K.B. had a black eye, and that Harris asked K.B. whether she wanted to go to the hospital or police station. K.B. told Harris no; she was going with Benson. Harris then left in his patrol car.

According to petitioner, Benson drove off with K.B. and he and Williams walked back to petitioner's house. A man with a bicycle, whom petitioner earlier saw speaking with K.B. and Benson, followed behind petitioner and Williams. Shortly after Williams and petitioner arrived back at petitioner's home, Williams answered a knock at the back door and called to petitioner. Petitioner saw Benson, K.B., and the bicycle rider on the back porch. Williams asked petitioner if they could go upstairs and get high. Petitioner told Williams he would have to clear it with Patricia Wrice, but when petitioner returned to the living room, he heard people going upstairs. Petitioner followed and saw Benson and K.B. sitting on the bed. The attic was dark and petitioner could not see who else

6

**EXHIBIT 1**

was there, but he heard Fowler's voice. After cautioning everyone not to mess up the area of the attic where he was doing some construction, petitioner went downstairs to the living room.

After listening to Patricia argue with Williams about the late-night company, petitioner left to call his fiancé, Jennifer. Petitioner went to a nearby phone booth because his home did not have a telephone. Petitioner spoke to Jennifer for 30 to 45 minutes. When petitioner returned home, he fell asleep on the living room couch. Sometime later, Kim, a friend of Patricia Wrice, awakened petitioner and told him that the people in the attic were fighting. Petitioner went upstairs and saw Benson, Fowler, Holmes, and the bicycle rider. Another person was present but petitioner could not see who it was. When petitioner told everyone to leave, Benson grabbed him. Petitioner broke free, found a hammer, and everyone ran downstairs. When petitioner reached the kitchen, the only people he saw were Benson and K.B. Benson and petitioner had a brief exchange and then Benson left with K.B.

Patricia Wrice, petitioner's sister, testified she first became aware that a woman was upstairs when she was in the kitchen, sometime after midnight, and heard the woman say, "Get off of me, you can't fuck. Send the next one on." Patricia then saw Benson running down the stairs zipping his pants. During this time, petitioner was in the living room. Patricia told Benson and Fowler, who was also in the kitchen, to leave, which they did. Shortly thereafter, petitioner left to call Jennifer. Patricia returned to her bedroom and heard someone coming into the house. Patricia saw Benson and another man carrying a white woman out the door. Patricia denied telling investigators that she heard someone hitting another person upstairs, or that she heard someone on the second floor say, "You are going to suck my dick," or words to that effect.

The jury, which was instructed on the principle of accountability, found petitioner guilty of armed violence, two counts of aggravated battery, deviate sexual assault, unlawful restraint, and rape. The aggravated battery convictions merged with the armed violence conviction, and the trial court

7

EXHIBIT 1

sentenced petitioner to an extended 60-year term for rape, a consecutive 40-year term for deviate sexual assault, a concurrent 70-year term for armed violence, and a concurrent 5-year term for unlawful restraint.

## ANALYSIS

A Certificate of Innocence provides an avenue for innocent persons who have been wrongly convicted of crimes in Illinois and subsequently imprisoned to obtain relief through a petition in the Court of Claims. The petition shall request a Certificate of Innocence finding that the petitioner was innocent of all offenses for which he or she was incarcerated. 735 ILCS 5/2-702(b)(West 2014). A person is entitled to a certificate of innocence if he can prove by a preponderance of the evidence that:

> (1) the petitioner was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;
>
> (2) (A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed, or, if a new trial was ordered *** the petitioner was not retried and the indictment or information dismissed***;
>
> (3) the petitioner is innocent of the offenses charged in the indictment or information***;
>
> (4) the petitioner did not by his or her own conduct voluntarily cause or bring about his or her conviction.
>
> 735 ILCS 5/2-702(g) (West 2014).
>
> If the court finds that the petitioner is entitled to a judgment, it shall enter a certificate of innocence finding that the petitioner was innocent of all offenses for which he or she was incarcerated.
>
> 735 ILCS 5/2-702(h) (West 2014).

In the instant petition, the first two prongs of the statute are clearly satisfied and the parties have not contested them. The State has not argued that petitioner is ineligible for a certificate of innocence under the fourth prong. The crux of this Court's analysis will focus on whether petitioner

**EXHIBIT 1**

is able to demonstrate the third prong—that he demonstrate by a preponderance of evidence that he is innocent of the offenses charged in indictment No. 82C8655.

Because the issue of whether petitioner's statement was the result of police coercion has already been decided, this Court will focus only on the facts and testimony that are relevant for disposition of petitioner's legal action in his Petition for a Certificate of Innocence where the burden is upon him to affirmatively demonstrate his innocence. Petitioner's alleged inculpatory statements have not been considered in this decision.

I.    "Innocent of all offenses for which he was incarcerated"

The State argued that petitioner is not entitled to seek relief under Section 2-702 because he is not "innocent of **all** offenses for which he was incarcerated" (emphasis added). Petitioner was simultaneously serving a sentence for an act of violence he committed while in custody at Pontiac Correctional Center on his sentence in this case. In 1985 he entered a plea of guilty to armed violence, a class X felony, in Livingston County. He received a sentence of 12 years, which was to be served consecutively to his 100 year sentence in this case. Petitioner is presently serving his sentence of mandatory supervised release (also known as parole) related to his 1985 conviction.

It is not necessary for this Court to decide whether or not petitioner's subsequent conviction precludes him from receiving his Certificate of Innocence because he has failed to meet his burden of proving that he was innocent in the matter of K.B.'s attack and his petition must be denied on its merits.

II.    Petitioner's Claim of Innocence

It is undisputed that in the early morning hours of September 9, 1982, K.B. was sexually assaulted, beaten and burned in petitioner's upstairs attic bedroom at 7618 S. Chappel Avenue while he was home. Petitioner and his two younger siblings lived at the Wrice household after his mother

EXHIBIT 1

and father passed away. Testimony established that the household was known as a "party house" and was frequently used for entertaining members of certain Chicago gangs.

Evidence showing that the crime occurred in the house was recovered from petitioner's bedroom. The evidence consisted of charred paper matter, a metal carving fork with a burnt tip and a clothes-iron. The carpeting in petitioner's bedroom was burned in the shape of the iron. The hole pattern on the steam iron matched the burn marks on K.B. Police also recovered articles of the victim's clothing in the attic bedroom including a brassier, panties and a shoe.

The victim, K.B. suffered greatly in petitioner's attic bedroom at the hands of four attackers.[3] Dr. Lewis testified that he found bruises on K.B.'s body from head to toe. (T.R. at 1179) Her face was swollen, her right eye partially closed. (T.R. at 1179) She had bruising on her neck, two long burns on her chin, burns around the corners of her mouth, burns to her chest, her nipple, her right breast had a third degree burn, over 100 bruises on her legs, burns on her thighs in the shape of an iron. (T.R. at 1179-1181) K.B.'s worst injuries were to her upper back, where she suffered third degree burns in the shape of an iron, and additional burns on her lower back, also in the shape of an iron. (T.R. at 1183) Her deepest burns were on her buttocks in the shape of an iron. (T.R. at 1183) She also had burns that were not in the shape of an iron on her inner thighs. (T.R. at 1183)

At trial, the State's evidence against petitioner consisted primarily of witness testimony from Bobby-Joe Williams and Kenny Lewis. The victim, K.B., also testified, but she was unable to identify any of her attackers. Petitioner introduced the testimony of his brother and sister, Charles and Patricia. He also took the witness stand and testified in his defense.

---

[3] Petitioner inaccurately argues that there were only three perpetrators of the crime against K.B. and, because three men pled guilty, petitioner must be innocent. See Petition for Certificate of Innocence at ¶139. It is not clear how petitioner determined that only three men were involved in the assault on K.B. She testified that she had sex with three men, a fourth demanded oral sex and began to beat her when she refused. (T.R. at 1068, *Wrice*, 2012 IL 111860, ¶16) K.B. clearly had difficulty recalling the attack, but there is no support in the record that only three men were involved in the assault.

**EXHIBIT 1**

The State also introduced evidence against petitioner by offering his alleged statements as reported by Assistant State's Attorney McCurry and Detective Byrne. Due to the judicial findings that petitioner's statement was coerced, petitioner's suppressed statement has not been considered in this decision.

In this proceeding on the Petition for a Certificate of Innocence, petitioner has attached—among other documents—the affidavits of Bobby Joe Williams and co-defendant Michael Fowler. Petitioner has also attached transcripts from petitioner's third stage evidentiary hearing before Judge Walsh. In its response brief, the State has attached as the primary rebuttal evidence the deposition testimony of Rodney Benson, petitioner's co-defendant, which was taken in the civil rights case of *Darrell Cannon v. Jon Burge*. The State also tendered the common law record which contains the testimony from petitioner's motion to suppress statements, the complete trial record, and all post-trial arguments and sentencing. This Court has carefully considered all documents attached with the pleadings in this action.

Neither party called a witness in the instant proceeding. The Court examined all "new" evidence in the context of the original trial testimony and the common law record. The relevant portions of the common law record and this Court's analysis of the attached documentation in the context of the common law record will follow. It is clear that petitioner has failed to meet his burden based on the documentation and evidence presented.

i. **Kenny Lewis**

The trial testimony of Kenny Lewis is a clear focal point in this innocence proceeding. Kenny Lewis was a witness for the State and testified that he was at petitioner's home on the evening of September 9, 1982. He testified that he witnessed petitioner assault K.B. in the attic bedroom. Lewis is long-deceased, and at no time prior to his death did he recant his testimony in this case. His testimony standing alone can defeat petitioner's assertion that he is actually innocent

11

**EXHIBIT 1**

of this crime. Because of the damaging nature of Lewis's testimony, petitioner has asked this Court to conclude that he cannot be believed for a number of reasons.

    a.   Trial Testimony

At trial, Lewis testified that he was approximately 18 years old on September 9, 1982 and that he lived about one city block from petitioner. (T.R. at 913, 914) He knew petitioner and his family for approximately ten years. (T.R. at 914) He was acquainted with petitioner, but considered himself friends of Charles and Patricia (who were closer in age to him). (T.R. at 914) On September 9, he arrived at petitioner's house at 1:00am (T.R. at 919) He talked with Kim, Holmes and Patricia and another unidentified individual. (T.R. at 924) After Patricia asked where Williams was, Williams came downstairs to the kitchen and they went into Patricia's room. (T.R. at 925) Lewis, Holmes and the third person then went upstairs to the dark attic. (T.R. at 927)

Once upstairs, Lewis saw K.B. laying naked on petitioner's bed. (T.R. at 928) Petitioner, Benson, Fowler and the bicycle rider were also present in petitioner's upstairs bedroom. (T.R. at 929) He observed Benson and then Fowler and then the bicycle rider have sex with K.B. (T.R. at 930) At some point after the bicycle rider had sex with K.B. she began to object and said "no" more than once. (T.R. at 931) Petitioner then hit K.B. several times, but Lewis pulled him off of her and then left the room to go downstairs to the kitchen. (T.R. at 932) While in the kitchen he heard "movements" upstairs. (T.R. at 933)

Petitioner then came downstairs and began picking up bottles and cursing "white people." (T.R. at 934) Lewis would take the bottles away from petitioner and he would then pick up another. (T.R. at 935) An iron and a two-pronged fork were on the lit stove. (T.R. at 936). Petitioner then picked up the iron. (T.R. 936) Lewis took the iron from him and petitioner returned upstairs. (T.R. at 937)

12

**EXHIBIT 1**

After petitioner got back upstairs, Lewis testified that he heard "smacks and slaps" from the attic. (T.R. at 937) Patricia then came out of the bedroom and said she was going to call the police. (T.R. at 937) Lewis went back upstairs to the attic and saw petitioner beating K.B. in the dark. (T.R. at 938) Lewis tried to pull him off of her three times, but petitioner kept going back and attacking her. (T.R. at 939) He then noticed that the victim was not moving and believed that she might be dead. (T.R. at 938-939)

Lewis, Butch, Benson, Fowler and Kim then left petitioner's house. (T.R. at 939) Petitioner, the bicycle rider and Holmes were still at petitioner's house. (T.R. at 941) Lewis dropped off Butch and came back and saw Benson and Kim sitting in Benson's car. (T.R. at 941) He then took Kim in his car to get barbeque chicken. (T.R. at 944) He returned to the home with Kim and went upstairs to the attic bedroom. (T.R. at 945) K.B. was still lying on the bed and was burned "from head to toe." (T.R. at 946) Petitioner and the bicycle rider were the only others in the room at that time. (T.R. at 947) After noticing the burns on K.B., Lewis returned to the kitchen. (T.R. at 948) Petitioner returned to the kitchen and pulled a hot spoon from the lit stove. (T.R. at 948) He returned upstairs, and a few minutes later Lewis heard the victim say "why are you burning me?" (T.R. at 949) He later heard someone fall down the stairs and saw K.B. on the ground level in her clothing. (T.R. at 949) Next thing he remembered K.B. and petitioner on the back porch of petitioner's house. (T.R. at 950) He heard petitioner tell K.B. that she was on Yates and then slapped her in the back. (T.R. at 951) After witnessing this, Lewis returned home. (T.R. at 951)

Lewis also testified about the circumstances surrounding his being called as a witness for the state. He indicated that he had not been contacted in this case until four or five days before trial. (T.R. at 952) He knew that Justice Bernita Lampkin, then acting as an Assistant State's Attorney, came to his house earlier that week, and that she had discovered him as a witness. (T.R. at 952) He did not know Justice Lampkin for more than those four or five days before trial. (T.R. at 952)

13

**EXHIBIT 1**

b. <u>The Determination of Weight to be Given to the Testimony of Kenny Lewis</u>

Petitioner strongly urges this court to completely disregard the trial testimony of Lewis as a complete fabrication. Initially, he suggests that Lewis was not present at the Wrice home and could not be telling the truth about what he saw on September 9, 1982. According to petitioner, Lewis's testimony is entirely unbelievable in its substance. He also challenges the circumstances surrounding the discovery of Lewis as a witness on the eve of trial.

The trial testimony of Lewis is believable for many reasons. He never made any allegations that his statement was coerced or that he was threatened into testifying for the State. He never recanted his testimony in the 15 years following trial. He was not a subject of the investigation into this crime. Lewis may be the only eye-witness at petitioner's criminal trial to testify without any identifiable self-interest.

The common law record demonstrates conclusively that Lewis must have been present at the Wrice home on September 9, 1982. First, Charles Wrice testified that Lewis was at Wrice home that evening. (T.R. at 1378) Benson also listed Lewis as a witness, which is understandable based on Lewis's trial testimony. Aside from Charles (and the inference from Benson's decision to call Lewis as a witness), Williams, Patricia and petitioner did not explicitly identify Lewis as one of the individuals present in the home on September 9, 1982. But there were many individuals present in the home that evening and not all of them were discussed or identified at trial. For example, the record presented to this Court shows that a man named Butch, Charles' girlfriend Mildred Dyson, and another man named Jeffrey—like Lewis—are only mentioned a few times. Patricia testified that there were "numerous" people at the house that night, which was normal. (T.R. at 1416) Williams referred to a group of people in the kitchen of the house while petitioner and Holmes were upstairs with K.B., but did not recall exactly who was present. (T.R. at 1018) Petitioner made reference to the many people at the home that evening in his testimony and acknowledged that at times he was

14

**EXHIBIT 1**

unsure who was present. (T.R. at 1456, 1459, 1467) The mere fact that Lewis was not discussed during the trial testimony of Williams, Patricia or petitioner does not mean that he was not present in the house.

Also persuasive to this Court in demonstrating the presence of Lewis at petitioner's home is petitioner's silence at trial regarding Lewis's testimony. Lewis testified in the State's case and gave damaging testimony that directly implicated petitioner in this crime. Several days later petitioner put on his defense. At no time during the defense did petitioner—or any of the other defense witnesses—testify that Lewis was lying when he testified that he was present in the home on that evening. (See T.R. at 1470 (indicating that petitioner knew Lewis and saw him testify—petitioner did not indicate at that time that Lewis was not present or was lying about what he saw)). During closing arguments, defense counsel argued that Lewis was not a credible witness, and not that he was absent from the house on Chappel in the early morning of September 9, 1982. The presence of Lewis at the home on September 9, 1982, has not been carefully examined or disputed at any point prior to this innocence proceeding.

The similarity of Lewis's testimony with other witnesses at trial, the testimony found in the common law record and also with Benson's 2008 testimony support this Court's determination that Lewis was present in petitioner's home on that evening and testified truthfully about petitioner's involvement in this crime. Lewis confirmed the identity of the individuals present at the Wrice home on September 9, 1982. (T.R. at 927) Lewis also confirmed the presence of the unknown bicycle rider, who was not a regular visitor to the Wrice household and was unknown to all others until the night of the assault on K.B. (T.R. at 929, 941, 947) He corroborated that Benson was the first man to have sex with the victim in petitioner's bedroom. (T.R. at 930, 1014, State's Exhibit G at p. 26) He placed Williams in that upstairs bedroom early in the evening, confirming Williams' trial testimony. (T.R. at 925, 1012, 1014) He then confirmed the testimony of Williams, Patricia and

15

EXHIBIT 1

petitioner when he testified that Williams came downstairs and then went into Patricia's bedroom. (T.R. at 927, 1015-1016, 1404, 1461) He corroborated Patricia's testimony that she came out of her bedroom and kicked the men out of the house. (T.R. at 937, 1401)

Lewis then confirmed that the men left the house for a period of time and others at the home went with them. Specifically, both men testified that Kim and Fowler were included in the group that left the home, and Patricia testified that she kicked Benson and Fowler out. (T.R. at 939, 1401 and State's Exhibit G. at p. 30) According to both Lewis and Benson, three men, including petitioner, Holmes and the bicycle rider, remained in petitioner's bedroom. (T.R.941, and also State's Exhibit G. at p. 30) The testimonies of Lewis and Benson both agree that Benson left the house and got into his car with Kim and Fowler. (T.R. at 942, State's exhibit F at p. 30, 114) After taking Fowler home, Lewis saw Benson and Kim back at the house on Chappel. (T.R. at 945, State's Exhibit G. at p. 31)

Like Benson, Lewis indicated that petitioner instigated the violence against K.B. and started abusing K.B. before Patricia kicked the men out of the house. (T.R. at 932-939, State's Exhibit G. at p. 28, 112) Benson and Lewis individually made attempts to get petitioner to stop abusing the victim. (T.R. at 938, 947-49, and also State's Exhibit G. at p. 28, 30, 102) In his 2008 testimony, Benson noted that K.B. was "not very conscious" which is similar to Lewis's testimony that she was not moving and he believed she was dead. (T.R. at 939, State's Exhibit G. at p. 29) Benson testified that he saw petitioner with a heated fork before Patricia kicked the men out, which corroborates Lewis's testimony that he saw petitioner try to pick up a fork and an iron from the stove, but he took the iron from petitioner before he went upstairs. (T.R. at 936, State's Exhibit G. at p. 31-32)

Many of the details in Lewis's testimony are also found in the testimony of the other witnesses from that evening. He was discovered as a witness by the State four or five days before trial commenced. At the beginning of the proceedings the State moved to exclude witnesses. (T.R. at

16

**EXHIBIT 1**

909) There is no evidence that Lewis learned the details of this crime through any improper channels. These sequential and specific details corroborate the testimony of others and lead this Court to conclude that Lewis was present in the home and witnessed this crime. Lewis testified that petitioner participated in this crime. His testimony is believable and entirely defeats petitioner's declaration of innocence.

Petitioner has attempted to discredit the testimony of Lewis by claiming that it is implausible. For example, petitioner argues that Lewis's testimony that he went to get barbeque chicken with Kim after seeing K.B. unconscious upstairs is unbelievable. However, a careful review of the transcripts presented in this proceeding reveal that Lewis's testimony is chronologically supported and logical. He testified that he returned to petitioner's house after dropping off Butch. (T.R. at 941) Meanwhile, Benson and Kim decided to return to the house to try again to get petitioner to stop torturing K.B. (State's Exhibit G at p. 114) Kim was sitting in the car with Benson when Lewis returned to the house on Chappel. (T.R. at 941) Kim then came to Lewis's car and they went for barbeque chicken. (T.R. at 944) Benson then went into the house for about 10 minutes to try to get petitioner to stop. (State's exhibit G at p. 114-115) When that failed, Benson went home.[4] (State's Exhibit G at p. 114-115) Kim and Lewis returned to the house about 15-20 minutes later after getting the barbeque chicken. (T.R. at 945) Petitioner was still upstairs. Lewis did not testify that he saw Benson when he returned, but only that he saw the bicycle rider and petitioner in the upstairs bedroom. (T.R. at 947) Benson and Lewis both testified that the unknown man with the bicycle and petitioner were the only two men in the upstairs bedroom during this time period. (T.R. at 947, State's Exhibit G at p. 116) Lewis's testimony is chronologically consistent with Benson's

---

[4] Benson indicated that he "dropped Kim off somewhere" after his brief foray into the Wrice household to dissuade petitioner from continuing his assault on K.B. Benson's testimony is slightly inconsistent with Lewis here because Lewis testified that Kim was with him at the barbeque restaurant at this time. Kim was temporarily living at the Wrice household. Benson's assertion nearly thirty years later that he "dropped [her] off somewhere" after he talked to petitioner a second time is an inconsistency relating to a minor detail.

17

**EXHIBIT 1**

testimony and supports his story that he went for barbeque chicken with Kim. The extent of the corroboration between Lewis's trial testimony and Benson's recollection of the crime in 2008 lends credibility to the testimony of both.

Petitioner also argues that Lewis testified that he witnessed petitioner pick up a hot iron from the stove, but failed to testify who lit the stove. There was no testimony relating to who lit the stove. However, there is no doubt that the stove was lit and used to heat the implements of torture used against the victim. Petitioner is the only individual identified in the record picking up items off the stove to take upstairs. This minor factual omission by Lewis does not speak to his credibility.

Petitioner also argues that Lewis cannot be believed because he never reported the crime to the police. By this standard, none of the witnesses can be believed because nobody reported the crime that occurred that evening, including Williams, Fowler and Benson, who have all signed affidavits in this proceeding. This aspect of Lewis's testimony does not undermine his recollection of events when he testified at trial.

The attacks petitioner has levied against Lewis testimony are unpersuasive. The corroboration between Lewis's testimony and the other testimony before this Court is compelling. Petitioner has not presented any evidence to demonstrate that the testimony of Lewis is not true.

The credibility of Lewis as a witness is bolstered by his acknowledgment that a terrible crime occurred in petitioner's bedroom and the fact that he provided specific details of what transpired. His observations are important because other testimony at trial, primarily petitioner's testimony, and to some extent the testimony of Patricia, indicated that nothing unusual occurred in the house that evening. The difference in testimony speaks directly to the credibility of the witnesses because it is certain that K.B. was beaten and tortured in petitioner's attic bedroom. She suffered severe burns from a clothes-iron and fork. She was bruised from head to toe. Dr. Lewis described the injuries suffered by the victim and the extensive burning over her body with detail. Lewis's testimony

18

**EXHIBIT 1**

conforms with common sense observations one would expect at a crime scene of this nature. Lewis's account of what transpired on that evening is more credible than, for example, petitioner's testimony that he never saw, heard or smelled anything unusual in his upstairs bedroom on that night.

Finally, petitioner attacks the circumstances surrounding the State's discovery of Lewis as an eyewitness on the eve of trial. He argues that Lewis's appearance as a witness is simply too convenient to be believed and that Justice Lampkin must be lying about how she ultimately located Lewis when she testified at petitioner's third stage evidentiary hearing in front of Judge Walsh in December, 2013.

Justice Lampkin testified at petitioner's evidentiary hearing that she was canvassing the neighborhood. She went to Chappel and walked up and down the street knocking on doors. She came to Lewis's home, and knocked. Lewis's mother answered the door and told Justice Lampkin that Lewis had been at the Wrice home when K.B. was raped. Lewis was not home, but Mrs. Lewis told Justice Lampkin that her son would contact the Assistant State's Attorney, and he did. (See transcript of the evidentiary hearing before Judge Walsh, Dec. 10, 2013 at pp. 15-35).[5]

Petitioner has attached with his petition an affidavit from private investigator William Dorsch (and inexplicably not from Mrs. Lewis herself) who avers that he spoke to Mrs. Lewis and she said that Justice Lampkin, acting as an Assistant State's Attorney, never contacted her at her home regarding this case, that she was not aware that Lewis had testified against petitioner in his criminal trial, and that she did not know anything about the criminal trial against petitioner. This affidavit is not useful. Petitioner offers no explanation why he was unable to obtain an affidavit from Mrs. Lewis herself and instead relies on the affidavit of Dorsch.

---

[5] Petitioner argues that Justice Lampkin's account is simply unbelievable because no mother would implicate her own son in a crime of this nature. This court disagrees with petitioner's characterization of the evidence.

**EXHIBIT 1**

However, even accepting the affidavit as true, Mrs. Lewis's inability to recollect the circumstances surrounding her deceased son's participation and cooperation with the State in this criminal prosecution does not mean that Lewis did not testify truthfully 30 years ago at petitioner's trial. The affidavit of Investigator Dorsch does not advance petitioner's claim of innocence because it does not speak to the veracity of Lewis's trial testimony, but only demonstrates that Mrs. Lewis does not remember Justice Lampkin coming to her home and knocking on her door over 30 years ago or that her son testified at petitioner's trial, which he most certainly did.

In fact, the evidence before this Court, through the direct testimony of Justice Lampkin in December 2013, supports the conclusion that Lewis was telling the truth when he testified against petitioner. This Court believes that Justice Lampkin was truthful when she stated that she located Lewis as a witness while canvassing the neighborhood. Her story is not implausible or unbelievable. Petitioner entirely fails to show that any impropriety was involved in obtaining Lewis's testimony against petitioner or that Lewis's testimony was untrue.

Justice Lampkin's account of how she discovered Lewis as a witness is bolstered by his consistent trial testimony. He verified that Justice Lampkin contacted him only four or five days before trial. (T.R. at 952) He knew that Justice Lampkin came to his house earlier that week, and also knew how she discovered him as a witness. (T.R. at 952) He did not know Justice Lampkin for more than those four or five days before trial. (T.R. at 952) Moreover, it is not as if the discovery of Lewis was completely unexpected or mysterious. Benson, a charged co-defendant, had listed Lewis as a witness, but eventually pled guilty. Lewis's connection to this case as an eyewitness is rock-solid.

No evidence exists to support petitioner's threadbare assertion that Justice Lampkin improperly located and somehow coerced Lewis into testifying against petitioner. Petitioner infers that Justice Lampkin worked with Lewis to fabricate his trial testimony. He is asking this Court to find that Justice Lampkin fabricated evidence in 1983 and perjured herself in 2013 without anything

20

**EXHIBIT 1**

more than pure speculation. These serious allegations lack a scintilla of supporting evidence. The evidence does not support petitioner's attack on the testimony of Lewis.

### ii. Bobby-Joe Williams

Petitioner has also attached the recantation affidavit of Bobby-Joe Williams with his petition. At trial, Bobby-Joe Williams testified for the State and implicated petitioner in this crime. He is the father of petitioner's niece and nephew.

#### a. 1983 Trial Testimony

Williams was the boyfriend of seven years to petitioner's sister, Patricia, and the father of her two children. (T.R. at 981-986) He was approximately 20 years old in 1982 and lived with Patricia at petitioner's address on Chappel. (T.R. at 981)

Williams testified that on the evening of September 8, 1982, he was at petitioner's home with several other individuals, including petitioner, Charles, Patricia, Kim and Mildred, when Rodney Benson came over (T.R. at 989-990). Williams told Benson it was his birthday and they decided to go to the liquor store to buy beer. (T.R. at 992-993) Petitioner joined them. (T.R. at 993) The three men got into Rodney Benson's car and drove to the liquor store at 75th and Jeffrey. (T.R. at 995) They purchased beer and got back into the car and drove down 75th street. (T.R. at 997-998)

The men noticed a white female "staggering" down the street and stopped in the parking lot of the Chicken Coop to see what was going on. (T.R. at 1000) Petitioner and Benson spoke with her for a little bit and helped her into the car. (T.R. at 1001) She was intoxicated and had a black eye. (T.R. at 1002) Sergeant Harris pulled up to the men and asked K.B. whether she wanted to go to the hospital. (T.R. at 1004-1005) K.B. declined and indicated that the men were going to help her get to a friend's house. (T.R. at 1006) Sergeant Harris asked Benson if he would make sure she got there, and then left. (T.R. at 1006) Benson drove off with K.B. in his car and Williams and petitioner

21

**EXHIBIT 1**

walked back to petitioner's home, and were followed by an unknown man with a bicycle. (T.R. at 1007).

Back at petitioner's home, he was talking with the unknown man with a bicycle when Benson drove up behind the house. (T.R. at 1008) Petitioner and the unknown man went to the rear of the house and Williams entered the front door. (T.R. at 1009) He walked to the rear of the house and saw Benson carrying K.B. toward the stairs that led up to petitioner's bedroom. (T.R. at 1009) Petitioner and the unknown man followed them into the kitchen through the rear door. (T.R. at 1010) Benson carried K.B. up the stairs, and petitioner and the bicycle rider followed. (T.R. at 1012) Williams went up the stairs several minutes later. (T.R. at 1012)

Once upstairs in the unlit room, Williams was able to see Benson having sex with K.B. on petitioner's bed, which was under a pair of windows. (T.R. at 1014) Petitioner, Holmes, Benson and Williams were the only men in the room. (T.R. at 1014) Williams next saw "Little Mike" have sex with K.B. on petitioner's bed. (T.R. at 1014) Williams then went back downstairs to the kitchen, and ultimately to Patricia's bedroom. (T.R. at 1015-1016)

Williams left the bedroom and went to petitioner's room less than half an hour later while Patricia was asleep. (T.R. at 1017) While upstairs he saw petitioner having sex with K.B. and ultimately went back downstairs. (T.R. at 1020) Petitioner came down shortly after and retrieved an iron from the stove. (T.R. at 1021) Williams returned to his room and went to sleep. (T.R. at 1021) When he woke up sometime later to use the restroom, he saw petitioner in the dining room sitting on a love seat. (T.R. at 1022, 1023) Petitioner told Williams "he had—they had burned that bitch." (T.R. at 1023)

**EXHIBIT 1**

b. <u>William's January 2005 Testimony to the Special Prosecutor</u>

In 2005, Williams spoke to the Special Prosecutor's office. Robert Boyle and  was appointed

by Presiding Judge Paul P. Biebel, Jr. in 2002 to investigate allegations of criminal activity at Areas 2

and 3 police headquarters. During that interview, the following colloquy occurred:

> **Q.** After they struck you, what happened next?
> **A.** I was – I told them the same thing that they were asking me, without hesitation at
> that time.
> **Q.** One part of the statement that OPS took down was after the officers, quote, got
> their story, they left Mr. Williams in the room for approximately half an hour. This
> "got their story" I mean, is your recollection that you told them anything different
> after you were hit than before you were hit or give them any additional facts?
> **A.** No, not that I can remember.
> **Q.** And were they asking you not only about yourself, but about other people who
> were in the house at the time that the victim was at the house?
> **A.** Yes.
> **Q.** And were some of these things the things you were testifying about what you saw
> in the upstairs at the Wrice house that you testified about at the trial in the Stanley
> Wrice case?
> **A.** Right.
> (State's Exhibit H. at p. 23-24)

In 2005, Williams was invited by the Special Prosecutor to recant his statements to detectives

at Area 2. Not only did he not recant, but Williams unequivocally stated that the fact that he was hit

by the detectives did not influence his testimony at trial. In 2005, it is clear to this Court that

Williams believed that petitioner committed this crime.

c. <u>2011 Affidavit for the Chicago Innocence Project</u>

In 2011, nearly 30 years after this incident, Williams prepared a two-page affidavit for the

Chicago Innocence Project. In that affidavit he recanted his previous trial testimony that implicated

petitioner in the crime. He alleges that he was tortured at Area 2 and fed a statement to tell to the

Assistant State's Attorney. Justice Lampkin (although not mentioned by name) allegedly threatened

to charge him with the crime if he did not testify against petitioner, and he was afraid to tell the

truth. He did not state that his testimony implicating petitioner in this case was false in 2004 because

the Special Prosecutor never asked him about what happened in the Wrice home. He further stated

23

**EXHIBIT 1**

that he only came forward nearly 30 years later because no one ever asked him about his testimony in this case, he did not know whom to contact to correct his mistake and it bothered him that petitioner was wrongfully incarcerated.

### d. 2013 Testimony at Petitioner's Post-Conviction Evidentiary Hearing

Williams testified in 2013 in petitioner's third-stage evidentiary hearing held pursuant to the Post-Conviction Hearing Act. In front of Judge Walsh, Williams indicated that in 1982 he was arrested and taken to Area 2 police headquarters where he was beaten by detectives. (Transcript of December 9, 2013, at pp. 8-11) There he signed a statement implicating petitioner in this crime. (Transcript of December 9, 2013, at p. 11) He recanted his prior trial testimony, indicating that it was untruthful. (Transcript of December 9, 2013, at pp. 13-14) He also testified that prior to trial he met with a "black lady" who is now known to be Justice Lampkin. (Transcript of December 9, 2013, at p. 16) He told her that he was reluctant to testify against petitioner. (Transcript of December 9, 2013, at p. 16) At that point Justice Lampkin told him "that [he] needed to go ahead and do – testify against [petitioner], because they have – charges can come up against [him]." (Transcript of December 9, 2013, at p. 16)

### e. Williams' affidavit and testimony at the evidentiary hearing do not establish petitioner's innocence.

The recantation affidavit of Williams suffers fatal defects as it relates to petitioner's ability to meet his burden and prove his innocence. Initially, the timing of Williams' affidavit is damning. At no time prior to the successive post-conviction proceedings in 2012 under this indictment number has Williams offered to recant his testimony implicating petitioner in this crime. In fact, he spoke with the office of the Special Prosecutor in 2005 and with the Office of Professional Standards, and when asked specifically about his testimony, never informed either office that his testimony sent an "innocent" man to prison. He never recanted, even when he was specifically questioned about his

24

**EXHIBIT 1**

testimony (supra, II(ii)(b)). Neither the Office of the Special Prosecutor nor the Office of Professional Standards had any interest in the criminal litigation against petitioner. Williams had no incentive to maintain his allegedly false testimony at that time.

Williams' story is not logical. Petitioner is the uncle to Williams' two now adult children and had a seven year relationship with Patricia.[6] Even after petitioner was incarcerated, Williams and Patricia continued to be parents to their children and certainly shared some form of relationship. Common sense indicates that Patricia would have known how to contact the father of her children. There is an inexplicable failure on the part of both petitioner and Williams to seek to correct Williams' allegedly false trial testimony until nearly 30 years later. Williams' statement that he did not know who to talk to is not believable. He spoke to two organizations, the Office of the Special Prosecutor and the Office of Professional Standards, who would have undoubtedly been able to direct Williams to assistance. Moreover, Williams could have reached out to a private attorney or any of the celebrated legal clinics in this city. His lack of motivation to correct his allegedly false testimony for nearly 30 years where he claims that his "conscience bothered him" is certainly noteworthy.

He has only come forward with his affidavit recanting his trial testimony in anticipation of the litigation surrounding petitioner's post-conviction petition. In fact, it was not until 2011 when he was contacted by the Chicago Innocence Project that he changed his story. His affidavit was prepared nearly 30 years after the crime occurred. The circumstances surrounding his recantation affidavit are certainly suspicious in light of Williams' prior inconsistent testimony as it relates to this case.

In his affidavit Williams also claims that he was coerced into giving his statement. Other organizations have found his testimony of physical coercion credible, and that assertion is not

---

[6] Williams testified that he had a seven year relationship with Patricia at the time of petitioner's trial. It is not known how long the relationship continued after the trial.

**EXHIBIT 1**

questioned by this Court. However, Williams' credible assertion that he was coerced does not speak to petitioner's guilt or innocence in this proceeding. As Williams stated in 2005, the statement that he gave before he was hit and after he was hit was the same statement. (State's Exhibit H. at 23-24) The credibility of the physically coerced statement of Williams is unrelated to petitioner's allegation that he is actually innocent. It does not necessarily mean that Williams' testimony was not true.

Additionally, Williams cannot be believed in his affidavit because his assertion that he was forced to testify against petitioner prior to trial is not credible. He claims that Justice Lampkin—then acting as an Assistant State's Attorney—threatened to charge him with the crime if he did not testify against petitioner. Justice Lampkin testified at petitioner's evidentiary hearing on his post-conviction petition and stated that she spoke with Williams at least twice before petitioner's trial. (Pet. Exhibit 3, p. 15) Patricia and a "prover" for Justice Lampkin were also present for those conversations. (Pet. Exhibit 3, p. 15) Williams told Justice Lampkin what happened on September 9, 1982 in petitioner's home. (Pet. Exhibit 3, p. 16) Williams did not say that his statement was coerced. (Pet. Exhibit 3, p. 16-17) Williams never told Justice Lampkin that his testimony was untrue. (Pet. Exhibit 3, p. 17) She never threatened to charge Williams with the crime if he did not testify. (Pet. Exhibit 3, p. 19) Justice Lampkin also met with Williams before trial, and he did not tell her that his testimony was false. (Pet. Exhibit 3, p. 20) At the second meeting before petitioner's trial Justice Lampkin did not threaten to charge Williams with the crime if he did not testify. (Pet. Exhibit 3, p. 20)

Petitioner asks this Court to find that Justice Lampkin lied on the witness stand based on the recantation affidavit of Williams' that he produced at the request of the Chicago Innocence Project nearly 30 years after this crime occurred. Petitioner has no additional evidence to support his conclusory allegation that Justice Lampkin was lying. Petitioner has provided no legitimate reason for this Court to disbelieve Justice Lampkin's sworn testimony. When faced with this decision concerning the weight of the evidence, the issue is simple. This Court concludes that Justice

**EXHIBIT 1**

Lampkin did not threaten Williams or otherwise forced him to implicate petitioner in this crime at his trial, and that Williams did so of his own free will. Williams was not telling the truth in his affidavit and his statement is incredible in light of the rest of the record. Williams' affidavit is of little value in affirmatively demonstrating petitioner's innocence.

### iii. Michael Fowler

Petitioner has also attached the affidavit of Michael Fowler, a co-defendant. Fowler did not testify during petitioner's criminal trial. He pled guilty to the aggravated battery of the K.B. and received a sentence of four years' incarceration. In his one-and-a-half page affidavit, Fowler stated that in the early morning hours of September 9, 1982, he was in the upstairs bedroom area of the Wrice home. On September 10, 1982 police took him to Area 2 and beat him in the head with a telephone book. He averred that petitioner was never present in the early morning hours upstairs while Fowler was up there, and at no time did he see petitioner harm or threaten K.B. in any way.

Fowler's affidavit does little for petitioner's assertion of innocence. First, Fowler is not a believable affiant. He does not dispute his role in the crime he helped commit. He actively participated in the sexual assault and violent attack on K.B. It is impossible to give Fowler's sworn testimony any weight because his criminal conduct in this case demonstrates poor character that directly impacts his credibility.

More importantly, Fowler's statement is directly contradicted by petitioner's own testimony and other testimony at trial. It is undisputed that petitioner was in his upstairs attic bedroom on September 9, 1982. According to petitioner's own testimony he was upstairs on two occasions and made his presence known, telling the guests to avoid the construction and then later to kick out the visitors forcefully with a hammer. (T.R. at 1459, 1467) He specifically testified that he kicked Fowler out of the upstairs room. (T.R. at 1467) Lewis, Williams and Charles also all testified that petitioner was upstairs in the room on that evening. Benson always maintained until 2011 that petitioner was in

27

**EXHIBIT 1**

the upstairs bedroom and committed these crimes. This Court believes their testimony for those many reasons discussed in the preceding pages. The inconsistency of Fowler's affidavit with the other testimony in this case casts doubt on the veracity of his affidavit. The affidavit is of little evidentiary value for petitioner as he attempts to meet his burden in this proceeding.[7]

### iv. Robert Benson

Neither party has relied heavily upon Robert Benson's testimony in this case. He is another of petitioner's co-defendants who ultimately pled guilty to unlawful restraint and aggravated battery. Benson and petitioner argued for separate trials before Benson's plea because his theory at trial would have implicated petitioner in this crime. (See Benson's Motion for Severance filed December 23, 1982) He indicated in that motion that petitioner came downstairs and heated an iron twice and went back upstairs saying that petitioner was going to make K.B. "give him some head." (See Benson's Motion for Severance).

Benson also testified in 1983 during his motion to quash arrest, suppress evidence and suppress statements. During the hearing on that motion he testified that petitioner attacked and burned K.B. in the upstairs room on September 9, 1982 (See Transcript of the proceeding on Benson/Wrice Motion to Quash Arrest, Suppress Evidence and Statements, May 3, 1983 at p. 98-100). Benson ultimately pled guilty and never testified. He served a sentence of 30 months.

In 2005, Benson spoke to the Office of the Special Prosecutor during an investigation on police brutality under Commander Burge. At that time Benson did not tell the Special Prosecutor that he had lied to detectives. He never indicated that his statements to police and prosecutors may have assisted in the wrongful imprisonment of petitioner.

---

[7] Petitioner argues that Fowler's affidavit demonstrates petitioner's innocence because the State stipulated to it as evidence. While it is true that Fowler's affidavit is evidence, it is for this Court to determine the weight and significance of that evidence.

**EXHIBIT 1**

In 2008 he gave a statement in the case of *Cannon v. Burge* and again implicated petitioner in this crime.[8] His 2008 testimony is consistent with his pre-trial testimony at his motion to quash and suppress, it is consistent with his factual assertion of petitioner's guilt to support his motion for a severance and his interview with the Special Prosecutor's office in 2005. In fact, it was not until 2011 that Benson completely recanted his prior testimony in an affidavit obtained by the Chicago Innocence Project for purposes of petitioner's post-conviction hearing.

The testimony of Benson in the *Cannon v. Burge* case is compelling. Benson had absolutely no incentive in 2008 to give false testimony. In fact, Benson's testimony arguably would have been stronger if he had indicated to the attorneys who were present that police detectives at Area 2 had caused him to falsely implicate petitioner in a crime. Benson had already pled guilty in this crime and would not have been subject to any further criminal prosecution for his truthful testimony (and, in fact, could have faced consequences for perjuring himself under oath). He had nothing to fear from petitioner, who was incarcerated for what would have been the remainder of his natural life.

In brief, Benson's 2008 testimony indicated that he saw K.B. in front of the liquor store at 75th and Jeffery on the night of September 8, 1982. (State's Exhibit G. at pp. 18, 21) Benson took K.B. to the upstairs room in petitioner's house and had sexual intercourse with her. (State's Exhibit G. at pp. 25-26) Benson saw petitioner have sex with K.B. (State's Exhibit G. at p. 26) Benson went downstairs and later saw petitioner heat a fork on the stove. (State's Exhibit G. at pp. 26-27, 108, 110) He returned upstairs and witnessed someone having sex with K.B. (State's Exhibit G. at p. 108) Benson saw petitioner come upstairs with a carving fork and burn K.B. three times. State's Exhibit G. at pp. 28,108) Petitioner burned K.B. on the side of her breast. (State's Exhibit G. at p. 110) Benson told petitioner to stop. (State's Exhibit G. at p. 28) Petitioner told Benson to mind his

---

[8] The State attached a copy of that transcript to its objection to the certificate of innocence as State's Exhibit G.

**EXHIBIT 1**

"fucking business."(State's Exhibit G. at p. 28) Benson, Fowler and Kim then left petitioner's house. (State's Exhibit G. at p. 30)

Benson and Kim returned to the house and again asked petitioner to stop abusing K.B. (State's Exhibit G. at p. 30). The house smelled like burning flesh. (State's Exhibit G. at p. 30-31, 116-117) Benson went upstairs and saw the bike rider having sex with K.B. (State's Exhibit G. at p. 116) Benson told petitioner that he needed to get K.B. out of the house, but petitioner responded, "fuck you. Mind your own business."(State's Exhibit G. at p. 32) Benson then left petitioner's house and went home.

Nearly thirty years after the crime Benson's recollection remained strong and his testimony was relatively specific and consistent with his other testimony that appears in the common law record. (See Transcript of the proceeding on Benson/Wrice Motion to Quash Arrest, Suppress Evidence and Statements, May 3, 1983 at p. 98-100) Moreover, Benson's 2008 testimony strongly corroborates Lewis's trial testimony (see discussion in II(i)(b), *supra*). His consistency with the other testimony is compelling. While Benson has now recanted that testimony, his recantation is wholly unreliable in light of the other consistent testimony he has given implicating petitioner in this crime and the circumstances surrounding his recantation.

v. **Patricia Wrice**

Patricia testified for the defense one day before petitioner gave his testimony, and petitioner was present in the courtroom for her testimony. There are significant inconsistencies between their testimonies. At trial, Patricia stated that petitioner had his friends, Benson, Fowler and Holmes over on the evening of September 8, 1982. (T.R. at 1416) She was in her bedroom around midnight when she heard Fowler knock on Charles's door. (T.R. at 1399) She heard people making lots of noise in the kitchen and went out to see who it was. (T.R. at 1399) She also saw Holmes in the kitchen. (T.R. at 1400) She heard a voice from upstairs say "Get off me, you can't fuck. Bring the next one on."

**EXHIBIT 1**

(T.R. at 1400) Benson ran down the steps, zipping his pants up. (T.R. at 1400) She then told Benson and Fowler to get out. (T.R. at 1401)

Petitioner was in the front room. (T.R. at 1401) Patricia asked Williams to tell everyone to leave. (T.R. at 1402) Petitioner then left to call his fiancée. (T.R. at 1403) Patricia went back to her room, and heard Benson come into the house 15 minutes later. (T.R. at 1404) Benson went back upstairs and Patricia was in the bedroom with Williams for an unknown period of time. (T.R. at 1404) She left her room once again and saw Benson and a second man carrying K.B. out the back door. (T.R. at 1406) She did not see anything unusual about the victim as she left the house.

The State impeached Patricia's testimony with prior inconsistent statements she made to detectives and State's attorneys throughout the investigatory process that were inconsistent with her trial testimony. Specifically, the State impeached her with testimony that she heard people running up and down the stairs to petitioner's bedroom and that she heard someone being beaten. (T.R. at 1422)

### vi. Charles Wrice

Charles Wrice, petitioner' brother, also testified for the defense. Charles was not an eye witness to the crime because he was in his bedroom for most of the night with his girlfriend, Mildred. He testified that petitioner, Patricia, Williams, Benson, Fowler and Holmes were in the home that night. (T.R. at 1376) Charles believed Kenny Lewis to be present but "didn't really see Kenny Lewis." (T.R. at 1378) None of the individuals in that home were guests of Charles or Patricia. (T.R. at 1377-1378)

Significantly, Charles testified to the following:

> Q: Now, Charles, at some point in time, while you were in that house, you heard people running up and down the stairs didn't you?
> A. Yes.
> Q. And you came out of your room, didn't you?
> A. Yes, ma'am.
> Q. And when you came out of your room, [petitioner] was upstairs too, wasn't he?

**EXHIBIT 1**

A. Yes.
Q. And when you went back into your room, you continued to hear that noise, those people running up and down the stairs, didn't you?
A. Yes.
(T.R. at 1378)

Charles' testimony is relevant here for two reasons. First, he acknowledges that there was significant commotion in the house relating to K.B.'s presence in the upstairs in the attic bedroom. The individual(s) responsible for burning K.B. had to run down the stairs to heat the iron/fork and run back upstairs. Logically, this required many trips based on the extensive injuries inflicted upon K.B. Charles' testimony discredits petitioner's assertion that he did not notice anything unusual in his home that evening. Second, Charles' testimony places petitioner upstairs during the period of time that Charles testified that he heard the commotion of people running up and down the stairs. Petitioner's own brother places him at the scene of this crime.

### vii. Petitioner's Testimony

#### i. Trial testimony

The bulk of petitioner's prior testimony related to his innocence arises in the context of his trial testimony from 1983. He discussed the circumstances surrounding his previous three convictions for armed robbery, and took responsibility for one of them (saying that he pled guilty to the other two because it would not impact the length of his sentence and he would avoid the hassle of challenging the charges). (T.R. at 1441) On September 9, 1982, petitioner returned home from work at approximately 11:00pm. (T.R. at 1442) Patricia, Kim and Williams were present. (T.R. at 1443) Benson came over to see Williams on his birthday. (T.R. 1444) The three men then went to the liquor store in Benson's car. (T.R. at 1446) Petitioner went into the liquor store and when he came back he did not immediately see Benson's car because he had moved the car to the parking lot of the Chicken Coop. (T.R. at 1446-1447) Williams, Benson and K.B. were at Benson's car talking to a police officer. (T.R. at 1447) Petitioner walked over, overheard the conversation, and told Officer

32

**EXHIBIT 1**

Harris that he lived on Chappel. (T.R. at 1451) The officer then drove off. (T.R. 1452) Benson and K.B. also drove off in Benson's car and petitioner and Williams walked toward petitioner's home. (T.R. at 1452)

On the walk back to petitioner's home, the man on the bike followed them. (T.R. at 1454) When they returned to the house the man with the bike continued past the house and turned onto the railroad tracks. (T.R. at 1455) About ten minutes after petitioner arrived at home there was a knock at the back door. (T.R. at 1455) Williams answered the back door and asked petitioner to come to the kitchen. (T.R. at 1456) Petitioner went to the kitchen and saw Benson, K.B. and the man with the bike on the back porch. (T.R. at 1456) He could hear the voices of people he could not see from the kitchen. (T.R. at 1456) Williams told petitioner they were going to go upstairs to the attic bedroom and get high. (T.R. at 1457) Petitioner allegedly told Williams he would have to clear it with Patricia, and petitioner returned to the front room of the home. (T.R. at 1457) He heard people going up the stairs to the second floor attic bedroom. (T.R. at 1457)

Petitioner followed the people upstairs to his bedroom and saw Benson sitting on the bed with K.B. (T.R. at 1459) He also saw the man with the bike in the bedroom and heard Fowler's voice. (T.R. at 1459) He had claimed he had a conversation with everyone up there and directed them not to go toward the part of the room where he was constructing a wall. (T.R. at 1459) He allegedly went back downstairs. (T.R. at 1460)

Petitioner claimed he saw Williams and Patricia in the dining room. (T.R. at 1460) He then sat in the front room with Kim for about 20 minutes. (T.R. at 1461) He heard Williams and Patricia arguing about Williams having company over in the middle of the night. (T.R. at 1461) Then Williams and Patricia went to her bedroom. (T.R. at 1461) Petitioner testified that he then left the home to make a call to his fiancé, Jennifer Scott, from the pay-phone in the alley. (T.R. at 1463) He

**EXHIBIT 1**

alleged that he spoke to her for half an hour to forty-five minutes and then came back in the house. (T.R. at 1463) Williams and Patricia were still arguing. (T.R. at 1464)

Petitioner then went to Patricia's bedroom and saw that they were fighting. (T.R. at 1465) He claimed he took their daughter and went to the front room with her. (T.R. at 1465) He claims that he fell asleep. (T.R. at 1465) Kim woke him some time later to tell him that people were fighting in his bedroom. (T.R. at 1466) He then went back upstairs for the second time that evening. (T.R. at 1466) Petitioner saw Benson, Fowler, Holmes, the unknown man with a bike, and another unidentified individual up there. (T.R. at 1467) He ostensibly shouted at everyone to get out of his house. (T.R. at 1467) Benson grabbed him, and he broke loose and got a hammer. (T.R. at 1467) A lot of people then ran down the stairs. (T.R. at 1467) Petitioner claimed that he followed them down the stairs and when he got to the kitchen he only saw Benson and K.B. (T.R. at 1467) He allegedly argued with Benson while K.B. was standing next to him. (T.R. at 1467) He believed there were others on the porch but they could not see him and he could not see them because of where they were standing. (T.R. at 1467) He then told Benson it would be his last night at petitioner's house. (T.R. at 1467) Benson then threatened petitioner. (T.R. at 1467) According to petitioner, Benson and K.B. then left out the back door. (T.R. at 1471)

Petitioner closed the back door and returned to the kitchen. (T.R. at 1472) He claimed that he spoke with Patricia in the kitchen after everyone left. (T.R. at 1472) Petitioner allegedly told Patricia that she should not have guests over because she had kids and because petitioner was getting married in about four weeks. (T.R. at 1472) He then returned to the living room and fell asleep on the couch with Patricia's daughter. (T.R. at 1473) The police arrived shortly thereafter. (T.R. at 1473)

On cross examination petitioner recounted that he, Benson and Fowler all worked for the same man, Mr. Collins. (T.R. at 1504) He testified that on that night he never saw anything heating

34

EXHIBIT 1

on the stove or smelled anything burning. (T.R. at 1520) Petitioner did not hear people going up and

down the stairs. (T.R. at 1520) There was no way for a person to heat an iron or a fork or light paper

without a match without using the stove in the kitchen. (T.R. at 1534) Patricia and Williams were

arguing for the entire time petitioner was on the phone in the alley with his fiancé. (T.R. at 1521)

After Kim woke petitioner to alert him of a fight upstairs, he went up there and did not see

anyone fighting and did not smell anything burning. (T.R. at 1523) He saw K.B. sitting on his bed,

but did not notice any burning or bruising on her body. (T.R. at 1523) Specifically, petitioner

testified:

> Q. When you went up there, even though there wasn't a fight going on, you told
> everybody to get the hell out, right?
> A. Yes, I did.
> Q. But there was nothing wrong was there, Mr. Wrice?
> A. Evidently had to be something—no, it wasn't, at that time, no.
> Q. Then you grabbed a hammer and ran everybody down the stairs?
> A. Yes, I did.
> Q. Did Karen Byron run down the steps, too?
> A. I don't know how she got down the steps. (T.R. at 1523)

Petitioner also said that his sister was wrong when she testified that petitioner was not

present when K.B. left the house, and that Benson and the bicycle rider carried her out the back

door. (T.R. at 1527) Patricia was wrong when she said in her testimony that she asked petitioner to

get the people out of the house. (T.R. at 1532) And she was wrong when she stated that her two kids

were with her in her bedroom when police came to the house that morning because one of her kids

was with petitioner in the living room.[9] (T.R. at 1533)

 ii. <u>Petitioner's trial testimony is unbelievable.</u>

Petitioner relies on his prior testimony from 1983 to support his claim of innocence. His

own self-serving testimony at his trial is unbelievable and does not establish his innocence. His

---

[9] In his motion to quash arrest, suppress statements and evidence, petitioner contradicted himself and indicated that
Patricia's children were in her bedroom and not with him in the front room. (See transcripts of Mot. to Quash and
Suppress, May 3, 1983 at p. 130)

**EXHIBIT 1**

primary defense was that he was unaware that a crime was committed in his home on September 9. His testimony contrasts sharply with the other testimony at trial and in the common law record that indicated that petitioner personally assaulted and beat K.B. His testimony was impeached by other witnesses and his description of the events defies common sense.

Petitioner's account of how K.B. got into his room in the first place is suspicious. The State argued that petitioner's decision to allow a group of young adults into his bedroom for them to "get high" is not believable. Petitioner argues that his conduct in that regard is not unusual because it would be normal for a group of individuals to seek seclusion to "get high." But this explanation does not make sense where there were no adult figures in the home.[10] The guests would have had the same freedom to "get high" in the dark living room, or any other room in that house. At 28 years old, the oldest resident of the house on Chappel, petitioner could have allowed the guests to "get high" virtually anywhere in the home. His proffered reason for allowing the guests into his bedroom of all places is suspicious, and speaks to petitioner's knowledge of what occurred that early-morning.[11]

Petitioner also argued that the upstairs bedroom was not his exclusive property, and could have been used as common space because it was a large room with his bed on one side and an open area on the other. His argument that he had no control over the "common area" in his upstairs bedroom is unpersuasive and irrelevant. According to petitioner, the first time he went upstairs was shortly after the group arrived at the home. He allegedly warned them to stay away from his construction project. Petitioner saw Benson was on petitioner's bed with the victim. (T.R. at 1458) Clearly petitioner knew the guests were partying in his bedroom area—on his bed—and not in the

---

[10] The Wrice household was known in the community as a party home for members of the El Rukn and Black Stones gangs. (See State's Exhibit G. at p. 33)

[11] Petitioner argues that the State is seeking to implicate petitioner in this crime on a theory of accountability. This Court is unconcerned with petitioner's accountability as it relates to criminal consequences. The only question before this Court is whether petitioner is able to demonstrate his innocence. His strategy of deniability speaks to his credibility as a witness, and not his criminal culpability.

**EXHIBIT 1**

alleged common area. [12] And yet, petitioner allowed the group to remain in his room and only issued a warning that they avoid the wall he was constructing. He did not suggest the group find another location to "get high." Petitioner's assertion that the visitors were using common area is clearly rebutted by petitioner's own testimony. He knew that his friends were using his upstairs bed that evening for their activities and he allowed them to remain.

Petitioner also testified that he was not present in the home for 30-45 minutes that evening while he talked to his fiancé on a pay-phone near the house. He failed to prove-up this assertion at trial (or during this innocence proceeding) even though his fiancé was present in the courtroom and would have been available to testify. His self-serving assertion that he had an alibi and was not present during the crime is, therefore, completely unsupported. Patricia is the only witness to testify that petitioner called his fiancé that evening, but she was unable to account for the duration of his phone conversation. His claim that he was not present is rebutted by virtually all other trial testimony. There is no credible evidence to support petitioner's assertion that he was not present during the crime in the household in the early morning hours of September 9, 1982.

Petitioner's account of how he chased the guests out of his room is illogical. He testified that he did not smell burning, see any injuries to the victim or notice anything unusual occurring in his bedroom. [13] Despite not having a stated reason to get angry, he yelled at his guests to get out of his room. Petitioner got into an altercation with Benson and then chased the remaining men out of his house with a hammer. He threatened Benson as Benson and K.B. walked out of the back door through the lighted kitchen. Petitioner never stated why he was angry and why he needed to chase the men out of his house. His alleged conduct is unusual and suspicious. He has never stated why he

---

[12] Much of the evidence, including the victim's shoe and underwear, the iron and fork, charred materials, was located in the vicinity of petitioner's bed.
[13] It is undisputed that the victim received third degree burns in that attic bedroom. Shortly after this incident an evidence technician recovered burnt debris from the bedroom, a clothing iron that matched the burn-marks on the victim and a piece of burned carpeting.

37

**EXHIBIT 1**

felt the need to allegedly chase the men out of the house. Without any explanation, this Court is led to conclude that petitioner was either lying about chasing the men out of the home or attempting to conceal his knowledge that a crime was committed in his bedroom.

It is also implausible that petitioner did not see anything unusual about the victim, K.B., at that time. He alleges that he did not see anything because K.B. had her arm around Benson's neck and was facing away from him as the two men argued in the kitchen. (T.R. at 1527) Petitioner's testimony here defies common sense given the nature of the trauma sustained by the victim in this crime. It is uncontested that K.B. left that house with severe physical injuries covering most of her body. K.B. was clothed as she left petitioner's home, but even her clothing did not cover all of her injuries. Two unbiased witnesses testified about the appearance of her injuries. George Wilson—the gas station attendant who found K.B. outside his station shortly after she was released from petitioner's house—testified that the first thing he noticed about K.B. was her bruised eyes and bleeding and swollen mouth. (T.R. at 1644) Dr. Lewis testified the he found bruises on K.B.'s body from head to toe. (T.R. at 1179) Her face was swollen, her right eye partially closed. (T.R. at 1179) She had bruising on her neck, two long burns on her chin, burns around the corners of her mouth, over 100 bruises on her legs. Petitioner's assertion that he did not notice anything unusual about the victim as she left the house speaks strongly to his lack of credibility.

In the early morning hours of September 9, 1982, K.B. suffered terrible injuries all over her body, including third degree burns. The implements of K.B.'s injuries were found in petitioner's bedroom, on his nightstand, and in the kitchen sink near the stairwell up to his attic room. K.B.'s personal effects were also found in his bedroom. Petitioner was in the home during—even accepting his testimony that he was on the phone with his fiancé for a period of time—the assault on K.B. It is simply inconceivable that he would not smell the charred flesh or the scent of burning paper, hear the sounds of the violent assault, hear the commotion of individuals running downstairs to heat the

38

**EXHIBIT 1**

clothes-iron and metal fork and to light paper on fire. He claims he did not see anything unusual about K.B. while she was upstairs—or as he allegedly threatened Benson in the lighted kitchen as Benson left the home with K.B. on his arm. Petitioner asks this Court to reject the compelling eye-witness testimony of the others, to deny the strong physical and circumstantial evidence in this case, and ignore common sense in order to accept his story that he did not know that anything unusual occurred in his bedroom on September 9, 1982. The Court is unwilling to do this.

III.  Petitioner's Burden

The petitioner has the burden of proof in this proceeding and must affirmatively demonstrate his innocence. A finding of not guilty and a finding of actual innocence are not the same. See *People v. Fields*, 2011 IL App (1st) 100169. As this is a civil proceeding, the burden is proof by a preponderance of the evidence. The standard for "a preponderance of the evidence is evidence that renders a fact more likely than not." *People v. Brown*, 229 Ill. 2d 374 (2008) (quoting *People v. Urdiales*, 225 Ill. 2d 354, 430 (2007)). "A proposition proved by a 'preponderance of the evidence' is one that has been found to be more probably true than not true." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 191 (2005). Stated differently, this Court must deny relief "where it believes only that it is as likely as not that the [petitioner] qualifies." *People v. Wilhoite*, 228 Ill. App. 3d 12, 15 (1st Dist. 1991).

> **a. Prior findings during post-conviction proceedings do not support petitioner's claim of innocence.**

Throughout the proceedings, petitioner has emphasized that the findings of the Illinois Supreme Court, Judge Clay and later Judge Walsh control this Court's decision. In none of those proceedings did any court address petitioner's contention that he is actually innocent of these offenses. Judge Clay found that petitioner had pled sufficient facts to warrant a third stage post-

**EXHIBIT 1**

conviction hearing on his claim of actual innocence.[14] At petitioner's third stage evidentiary hearing, Judge Walsh explicitly refused to rule on petitioner's actual innocence claim, finding that he could grant a new trial on other grounds. The State then dismissed the indictment. No prior court has had the opportunity to rule on petitioner's factual claim that he is actually innocent.

### b. Petitioner has failed to meet his burden.

The onus is on petitioner to affirmatively demonstrate his innocence, and he must meet his burden by a preponderance of the evidence. Petitioner's primary evidence of innocence was presented in the form of the two affidavits of Williams and Fowler. The affidavits cannot be given much weight, and in light of the common law record, do not support petitioner's assertion that he is innocent.

Williams' delay in coming forward with this new testimony impacts the weight to be given his assertion. It was not until petitioner first raised his claim of actual innocence in 2011 that Williams changed his story, despite having ample opportunities to do so over the years. His affidavit consists of a bald assertion of innocence without any detail. The sworn statement fails to lend any support to petitioner's assertion of innocence. Finally, Williams was not believable when he stated that Justice Lampkin threatened to charge him with the crime if he did not testify against petitioner. His affidavit is entirely unbelievable.

Fowler's affidavit suffers from the same lack of specificity, is contradicted by petitioner's own testimony, and is unreliable because Fowler's character is questionable in light of his active participation in this crime. The affidavits from family members and convicted co-defendants do little for petitioner in meeting his burden in this proceeding. These two affidavits are nothing more than

---

[14] Judge Clay's finding that petitioner had made a "substantial showing" of a claim of actual innocence is a term of art, not a conclusion as to the merits of petitioner's innocence claim. Substantial showing merely means that the allegations, taken as true "show" a constitutional violation. It is a measure of the legal sufficiency of the petition's unproven well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief. See *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). Nothing has been proven.

40

**EXHIBIT 1**

threadbare, untimely and untrustworthy declarations of petitioner's innocence. Nothing contained in these affidavits assists this Court in reconciling the strong circumstantial evidence, the eye-witness testimony at petitioner's trial, and the physical evidence recovered from petitioner's bedroom which powerfully points to his guilt.

Petitioner argues that there is no physical evidence linking him to this crime—no DNA or fingerprint evidence. His definition of "physical evidence" is entirely too narrow. There is no doubt that K.B. was sexually assaulted, beaten and burned in petitioner's upstairs bedroom by a group of men. Yet, not one fingerprint was recovered and no semen was found. The lack of "physical evidence," as defined by petitioner, does not speak to his guilt or innocence, but merely speaks to the undeveloped state of forensic science in 1982. The evidence—circumstantial, physical and testimonial—is plentiful.

The circumstantial evidence of petitioner's guilt is convincing. Petitioner was with Benson and Williams when they picked up the victim. Benson brought K.B. back to petitioner's home, and petitioner allowed Benson to take her up to petitioner's bedroom. Petitioner saw Benson and K.B. on his bed. Petitioner acknowledges that he was in the home while the crime was committed. Charles testified that petitioner was upstairs in his bedroom at the scene of the crime. Circumstantial evidence places petitioner at the crime scene and indicates that he possessed a significant amount of knowledge about what was occurred in his bedroom on September 9, 1982.

The physical evidence recovered shows that K.B. was tortured, burned, and beaten in petitioner's attic bedroom. George Wilson found K.B. shortly after she was released from petitioner's home. Police officers, evidence technicians, and detectives arrived at petitioner's home within hours. Technicians recovered the clothing iron that caused K.B.'s third degree burns on her thighs, breasts, legs, and stomach in petitioner's bedroom. The iron had burned a hole in the carpet. The fork used to burn K.B.'s mouth was found on petitioner's dresser. The victim's clothing was

41

**EXHIBIT 1**

recovered in petitioner's bedroom. The physical evidence recovered from petitioner's bedroom is entirely incompatible with petitioner's assertion of innocence.

Further, the credible eye-witness testimony in this case corroborates the circumstantial evidence of petitioner's guilt and explains the physical evidence recovered in his bedroom. Lewis's testimony alone is enough to defeat petitioner's assertion that he is innocent without more from petitioner in terms of affirmative evidence of his innocence. Lewis credibly testified that petitioner was responsible for the attack on K.B.

Petitioner has argued that Lewis's testimony is unreliable, that Lewis was not at petitioner's home on the night of the crime, and that Justice Lampkin is guilty of a fabricating evidence in a conspiracy to keep petitioner locked up for this crime. Petitioner's arguments were unpersuasive. The trial testimony of Kenny Lewis remains unimpeached.

Lewis's testimony is compelling because it is corroborative of much of the additional evidence presented at petitioner's trial and in the years following. The consistencies in Lewis's testimony support this Court's determination that Lewis was present at petitioner's house on September 9, 1982 and witnessed petitioner assault K.B. He had no involvement in the criminal prosecution, no known incentive to fabricate testimony against petitioner, was not threatened, and never recanted his testimony before he died fifteen years later in 1997.

Benson's testimony in his deposition in the case of *Cannon v. Burge* further defeats petitioner's assertion of innocence. Benson had no incentive to maintain his allegedly false testimony at that point in time, and yet maintained an account of what occurred in petitioner's home on September 9, 1982, that was consistent with his testimony prior to trial and also trial testimony from other witnesses nearly 30 years prior. That testimony was, importantly, consistent with Lewis's account. Both men identify petitioner as one of K.B.'s aggressor.

42

**EXHIBIT 1**

Petitioner asks this Court to entirely disregard Justice Lampkin's December 2013 testimony and find that she willingly perjured herself and fabricated testimony against petitioner at trial. According to petitioner, Justice Lampkin threatened Williams and forced him to testify against petitioner. Allegedly, Justice Lampkin also located Kenny Lewis and convinced him to testify against petitioner and implicate him in this crime. His argument lacks a scintilla of supporting evidence. Petitioner's conspiracy theory involving Justice Lampkin is simply unsubstantiated speculation.

Finally, petitioner's assertion that he was present in the home on September 9, 1982, but did not see anything unusual, smell anything unusual or notice any commotion on the steps leading to the upstairs bedroom runs contrary to common human experience. It is undisputed that K.B. was sexually assaulted and tortured in his upstairs bedroom. Her injuries were extensive and severe. Every witness at trial acknowledged that something unusual occurred that evening. Those unusual events led Patricia to kick the men out of the house and threaten to call the police. The commotion on the stairs forced Charles to come out into the kitchen to see what was going on. Williams, Benson and Lewis all witnessed what occurred in the upstairs bedroom on September 9, 1982. Lewis and Benson both left the house, but returned to try to convince petitioner to stop assaulting K.B. and he refused. George Wilson immediately noticed bruising to K.B.'s face and the blood coming out of her mouth. Yet petitioner did not notice anything unusual as he inexplicably chased the men from his home with a hammer. He is asking this court to put aside common sense and believe a story that is highly implausible.

Those arguments presented in support of his petition for a Certificate of Innocence are entirely unpersuasive. After careful study of all documents presented to this Court and an extensive review of the common law record, this Court is led to conclude that **petitioner is most likely guilty of this crime.** While the evidence may be insufficient for the State to convict petitioner

43

**EXHIBIT 1**

beyond a reasonable doubt at a criminal trial, that is not the decision this Court is asked to make. See *Fields*, 2011 IL App (1st) 100169.

This Court can conclusively state that the evidence does not show that petitioner is innocent of this crime. He has failed to demonstrate by a preponderance of the evidence that he is deserving of a Certificate of Innocence and his petition must be denied.

## CONCLUSION

Based on the foregoing analysis and after a careful review of the evidence presented pursuant to 735 ILCS 5/702, this Court finds that petitioner has not met his burden of affirmatively demonstrating his actual innocence by a preponderance of the evidence. Therefore, the petitioner's request for a Certificate of Innocence is hereby DENIED.

**ENTERED**

OCT 16 2014

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

ENTERED:

Thomas J. Byrne 1997

Hon. Thomas J. Byrne
Circuit Court of Cook County
Criminal Division

**DATED:** October 16, 2014

44

**EXHIBIT 1**