1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   STANLEY WRICE,                    )
                                       )
 4                    Plaintiff,       )
     -vs-                              )   Case No. 14 C 5934
 5                                     )
     JOHN BYRNE, former Chicago        )   Chicago, Illinois
 6   Police Sergeant, et al.,          )   February 20, 2020
                                       )   10:02 a.m.
 7                    Defendants.      )
                                       )
 8                             VOLUME 1
 9              TRANSCRIPT OF PROCEEDINGS - TRIAL
        BEFORE THE HONORABLE HARRY D. LEINENWEBER and a jury
10
     APPEARANCES:
11   For the Plaintiff:      MS. JENNIFER A. BONJEAN
                             MS. ASHLEY BLAIR COHEN
12                           Bonjean Law Group PLLC
                             467 Saint Johns Place
13                           Brooklyn, NY 11238
                             (718) 875-1850
14
                             MS. HEIDI LINN LAMBROS
15                           1169 S. Plymouth Court, Suite 123
                             Chicago, IL  60604
16                           (216) 318-4087

17   For the Individual
     Defendants:             MR. ANDREW M. HALE
18                           MR. SCOTT J. JEBSON
                             MS. JENNIFER BITOY
19                           Hale & Monico LLC
                             53 W. Jackson Boulevard, Suite 330
20                           Chicago, IL  60604
                             (312) 341-9646
21
     Court Reporter:
22
               KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
23                     Official Court Reporter
                     United States District Court
24          219 South Dearborn Street, Suite 1426
                     Chicago, Illinois  60604
25             Telephone:   (312) 435-5569
               Kathleen_Fennell@ilnd.uscourts.gov
```

1

2
APPEARANCES:    (Continued)

3
For Defendant
City of Chicago:         MS. CARYN L. JACOBS

4
Department of Law, City of Chicago
121 North LaSalle Street,  City Hall
Suite 600

5
Chicago, IL  60602
(312) 744-5128

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings heard in open court:)

2           THE COURT:  Appearances.

3           THE CLERK:  14 C 5934, Wrice v. Byrne.

4           MS. BONJEAN:  Good morning, Your Honor.  Jennifer

5   Bonjean, B-o-n-j-e-a-n, on behalf of the plaintiff, Stanley

6   Wrice.

7           MS. LAMBROS:  Good morning.  Heidi Linn Lambros,

8   L-a-m-b-r-o-s, on behalf of plaintiff, Stanley Wrice.

9           MS. COHEN:  Good morning, Your Honor.  Ashley Cohen,

10  C-o-h-e-n, on behalf of plaintiff, Stanley Wrice.

11          MR. JEBSON:  Good morning, Judge.  Scott Jebson on

12  behalf of the defendants.

13          MR. HALE:  Good morning, Your Honor.  Andy Hale on

14  behalf of the defendants.

15          MS. JACOBS:  Caryn Jacobs on behalf of the

16  defendants.

17          MS. BITOY:  Good morning, Your Honor.  Jennifer Bitoy

18  on behalf of the defendants.

19          MR. HALE:  Your Honor, we have our clients John Byrne

20  and Peter Dignan in the courtroom as well.

21          THE COURT:  Okay.  What about Ms. Hijjawi?

22          MR. HALE:  Two flat tires this morning unfortunately.

23          THE COURT:  Pardon?

24          MR. HALE:  Two flat tires on the way to downtown, so

25  she'll be here as soon as she can.

1      THE COURT:  Okay.

2      Ready for jury selection?

3      MR. JEBSON:  We are, Judge.  We just have a few small

4   issues.

5      The first one, it's come to our attention that

6   plaintiff's counsel has held a press conference in the lobby

7   of this building.  And we're certainly not trying to stifle

8   the press or free speech.  However, it's one thing to comment

9   with a question from the press.  It's quite another to have a

10   press conference in the lobby of the building the morning that

11   potential jurors will be walking through the very place that

12   Ms. Bonjean is having press conferences which completely

13   poison and implode the entire venire.

14      So, Judge, we would ask two things.  First, in terms

15   of picking the jury today that the jury is questioned whether

16   or not they have heard anything about the case, but a little

17   further, anything about the case while in the lobby.  You

18   know, it's -- whenever there is a press conference, everyone

19   moves towards the press conference.

20      And the other thing we would ask, Judge, is no more

21   press conferences being held in the lobby of this building

22   where the jurors will be walking in every morning.

23      MS. BONJEAN:  May I respond, Your Honor?

24      THE COURT:  Yes.

25      MS. BONJEAN:  Your Honor, it is not the plaintiff's

1      fault that this is a case of great public interest.  The idea

2      that we are holding press conferences and creating interest in

3      the first case involving Area 2 detectives in maybe 25 years

4      is not of our making.

10:04:30    5      Now, I did not see that they moved for any type of

6      gag order or anything of that nature, and we're, of course,

7      free to speak about this.  We're not trying to taint a jury

8      pool, but there's interest in the case.  And until the Court

9      tells us otherwise, we certainly feel that we have the right

10:04:47   10     to respond to that interest.

11     THE COURT:  All right.  Well, I'll tell you

12     otherwise.  Do not do so when the jurors might be coming in

13     and out of the courthouse, which means prior to the start of

14     the trial and after the conclusion of the trial.  So let's not

10:05:04   15     do that.  Okay.

16     MS. BONJEAN:  Judge, I take it --

17     THE COURT:  I'll inquire because one of the questions

18     I ask is if they have heard, seen, or read anything about this

19     lawsuit and see what they say.

10:05:23   20     MR. JEBSON:  Thank you, Judge.

21     The second quick thing is regarding the statement of

22     the case.  And I know we haven't seen it yet, but --

23     THE COURT:  Let me pass it out.

24     MR. JEBSON:  Sure.

10:05:33   25     THE COURT:  It's pretty innocuous.  It's basically

1    what I -- make sure, one to Ms. -- yeah.

2         The plaintiff, Stanley Wrice, alleges that he was

3    wrongfully convicted for the 1982 rape of Darren -- I think I

4    got the name wrong.  What's her name again?

10:05:55    5         MR. HALE:  Karen.

6         THE COURT:  Misspelled her name.  Karen Byron.  The

7    defendants are former Chicago Police Sergeant John Byrne and

8    Detective Peter Dignan.  Plaintiff served 31 years before his

9    conviction was vacated in 2013.  He was granted a new trial,

10:06:10   10   but the state of Illinois chose not to retry him.  Plaintiff

11   contends that the defendant officers used coercive

12   interrogation techniques against him and other witnesses for

13   purposes of extracting false and fabricated testimony.  He

14   further contends the resulting false and fabricated testimony

10:06:27   15   violated his constitutional rights to a fair trial, and he

16   seeks money damages.  The defendants deny that they violated

17   plaintiff's constitutional rights and deny his claim for

18   damages against them.

19        What I will do is I will preface this statement with

10:06:41   20   a statement this is my statement and not the statement of

21   either side, and it's based upon -- just to give the juror,

22   the potential jurors an understanding of what the case is

23   about rather than an accurate description of the case.

24        MR. JEBSON:  Judge, we would just add one small

10:07:05   25   addition.

1      At the end of the sentence that his conviction was

2  vacated in 2013 that it have the additional language "without

3  a finding that the plaintiff was guilty or innocent."  And

4  here's the reason why, Judge, because without that language,

10:07:21  5  the jury will automatically assume as lay people that when a

6  conviction is vacated, there has been some sort of

7  determination that he is exonerated or found not guilty.  By

8  putting that there was no finding either way, there's no

9  prejudice to either side.  And what this does, it clears up

10:07:39  10  any ambiguity, and it prevents the unfair prejudice to the

11  defendants where the jury will likely --

12      THE COURT:  Well, except you're going to be

13  expounding in detail in your opening statements about what the

14  case is about.  And as I'm saying, this is just -- just what

10:07:57  15  happened.

16      MS. JACOBS:  Your Honor, this is not --

17      THE COURT:  But the failure to issue a certificate of

18  innocence is something that seems to me that is not -- is

19  certainly not admissible in the case.  The fact that his

10:08:13  20  conviction was vacated of course is.  So I'm going to -- that

21  portion I'm not going to change.

22      MS. BONJEAN:  Judge, we would also propose that this

23  statement include that while the state of Illinois did choose

24  to retry him, the charges were dismissed.  That's the legal

10:08:30  25  action that took place, and this jury should know that the

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:08:43 | 5 |

charges were dismissed.  It wasn't -- "chose not to retry him"
is I believe ambiguous, and it's not --

       THE COURT:  I think this is clear enough.

       MS. JACOBS:  Your Honor, just --

       THE COURT:  That gives you something to say in your
opening statements.

       MS. JACOBS:  Your Honor, just as a comment, it is not
an element of any of the claims that there be a favorable
termination or any termination of --

       THE COURT:  I'm not changing it.  I'm going to give
it this way.

       MS. JACOBS:  All right.  Well, we believe that it's
both or none.  In other words, if this comes in, the denial of
this certificate --

       THE COURT:  If both sides object to it, that means
it's got to be --

       MS. JACOBS:  Denial of the certificate of innocence
should come in.

       THE COURT:  All right.  Anyway, I'm going to issue
that.

       Anything else before we get the jurors?

       MR. JEBSON:  One last thing, Judge.

       THE COURT:  Yeah.

       MR. JEBSON:  The plaintiffs sent over last Thursday a
revised exhibit list.  So their first exhibit list was over

1   200 exhibits.  The revised one was over 100.  And when we got

2   their list, the original list, we printed out all their

3   exhibits, put stickers on them.

4           The problem is when they submitted their revised

10:09:35    5   list, they changed all the numbers.  So we immediately asked

6   the plaintiff's attorneys to send us an index so we can see

7   which one corresponds with the old one to see if there's

8   any -- if they're trying to admit any new exhibits because it

9   takes way too much time.  It should not be our burden to do

10:09:55    10  this, to go through every single new exhibit and try to find

11  through the 200 --

12          THE COURT:  Is there a key that you can give them?

13          MS. BONJEAN:  We could try to do that.  We tried to

14  limit the exhibit list based on, of course, the Court's

10:10:07    15  rulings *in limine* and the fact that Jon Burge was no longer a

16  defendant in the case.  We were trying to make it easier.  We

17  will try to address that, but --

18          THE COURT:  All right.  Well, work on it.  Help them

19  out with your new numbering system.

10:10:26    20          Anything else?

21          MR. JEBSON:  No.  Thank you, Judge.

22          MS. BONJEAN:  Judge, from the plaintiff's side, we

23  have a couple of things.

24          I know we are endeavoring to get through jury

10:10:35    25  selection today, to have a jury selected and to be ready to do

1  opening remarks by the end of the day certainly, and we are

2  prepared to do that.

3      That being said, I am slightly concerned because we

4  have a number of outstanding issues that are going to require

10:10:49   5  some work.  For instance, these summaries that came up

6  yesterday.  We did get the summaries over to the other side as

7  quickly as we could.  And they have I guess redlined them but

8  really in some instances just rewrote them.  Some of them were

9  complete revisions, and my understanding was that, again, it's

10:11:13  10  our burden, we're putting this case in, that they would point

11  out if they felt we did not include a material fact that would

12  be an appropriate thing to do to point that out.  But they've

13  changed language to their liking, and they've also occluded

14  out, for instance, here's direct examination and here's

10:11:33  15  cross-examination, which, from our estimation, is not really a

16  summary.

17      So we're still at odds about these summaries, and

18  that is going to take some work to get through.  We're closer.

19  We are definitely closer than we were before, but I am

10:11:45  20  concerned about that.

21      Secondly, yesterday the defendants indicated that

22  they're now going to call the co-defendants in the case,

23  Benson and Fowler, and that's fine.  The problem is is that

24  this testimony is going to come in via prior depositions,

10:12:06  25  apparently.  And last time I looked at a final pretrial order,

1    they fairly much objected to every portion that we wanted to

2    designate, and I think we had our objections as well.  These

3    are important witnesses ultimately on this issue, and there's

4    a lot of work that needs to be done.

10:12:23    5    And so I am concerned.  I hope -- I want to hopefully

6    get through jury selection, but I just -- I am concerned about

7    opening statements and having some clarity about what and what

8    is not coming in.

9    THE COURT:  Well, the statements of the witnesses at

10:12:44    10    the trial, there shouldn't be a lot.  I mean, I saw the

11    redlined.  You did them in the first person now, right?

12    MS. BONJEAN:  We did do that.

13    THE COURT:  And then what they claim should be

14    changed they should have then designated alongside so that I

10:13:00    15    could make the decision whether or not to change anything.

16    I read your submissions, and they seem to be fairly

17    clear.  But how are you -- let me -- let me ask another way.

18    If we finish the opening statements today, is there a witness

19    that you could call?

10:13:23    20    MS. BONJEAN:  There is.  There is a witness I would

21    call.  My preference would be to work this afternoon if we get

22    through the jury selection and start openings tomorrow.

23    Again, I would defer to the Court.

24    THE COURT:  No, no, no.  We're going to do openings

10:13:37    25    today.

| | |
|---|---|
| 1 | MS. BONJEAN:  Okay. |
| 2 | MR. HALE:  That would be my preference too. |
| 3 | THE COURT:  Pardon? |
| 4 | MR. HALE:  That's my preference too, openings today. |

10:13:42     5     THE COURT:  Yeah.  We're going to do openings today.

6     And if we finish in time, which we may or may not, I

7  would prefer if you had a witness you could put on.  And then

8  tomorrow -- and we have the weekend to work on all the stuff

9  too.  But I don't want to waste time because, you know, trying

10:14:01    10  to get jurors for two weeks or more is not the easiest thing

11  in the world.

12     MR. HALE:  We did confer yesterday, Your Honor, and

13  plaintiff's counsel told me that if they -- if we had time to

14  call one witness today, they would call Magnolia Wrice who is

10:14:17    15  here today.  We're prepared to cross her.

16     MS. BONJEAN:  We have a witness.

17     THE COURT:  All right.  Fine.

18     MS. BONJEAN:  We're prepared, Judge.

19     THE COURT:  Let's do that.

10:14:22    20     You want to get the jurors for me?

21     MS. JACOBS:  Your Honor, may I just make a comment

22  about the summaries?  We did spend an enormous amount of time

23  doing a redline.  You have to understand that just reading the

24  witness statement plain doesn't tell you anything about the

10:14:35    25  accuracy of the witness statement.  You have to think of the

1  witness statement next to the trial transcript.

2          THE COURT:  Well, we read the transcript yesterday.

3          MS. JACOBS:  Right, next to the trial transcript.

4  And, I mean, I have about 50 examples here.  I'm not going to

10:14:49  5  go into them --

6          THE COURT:  Good.

7          MS. JACOBS:  -- unless you want me to.

8          THE COURT:  No, I don't.

9          MS. JACOBS:  But I will give you an offer of proof

10:14:55  10  about how they took out key information that is important to

11  our case.

12          THE COURT:  All right.  Then put it in.

13          MS. JACOBS:  That's what I did.

14          THE COURT:  That's the whole idea behind the

10:15:03  15  cooperation.

16          MS. JACOBS:  I did a redlined.

17          THE COURT:  You put in what they left out.

18          MS. JACOBS:  Right.  But they also did things like

19  they took 90 percent of the description of the injuries of the

10:15:12  20  plaintiff out of the doctor's statement.  We did not --

21          THE COURT:  Put it in.

22          MS. JACOBS:  I did put it in.  Let me finish.

23          We did not just redo our summaries.  Our summaries

24  were one-tenth of the trial.  We did not redo the summaries.

10:15:30  25  The summaries here are a fraction of what our summaries were.

1    We took Your Honor's interest and brevity to heart.  We don't

2    agree with it.  We're against it, but we took it to heart.

3    But we have to be able to get our case in --

4            THE COURT:  All right.

10:15:42  5            MS. JACOBS:  -- including details that are very

6    impeaching of the Wrice family witnesses, including Stanley

7    Wrice.

8            So I am at the Court's service.  I am willing to be

9    with the Court or the Court's law clerks, with Ms. Bonjean if

10:15:58 10   you need us to work it out in that way.  But this is crit- --

11   of critical importance to us --

12           THE COURT:  All right.

13           MS. JACOBS:  -- because this is what happened at the

14   trial.

10:16:06 15           THE COURT:  I understand that.  Just cooperate and do

16   what I asked you to do.

17           MS. JACOBS:  I did redline.  We gave them everything.

18           MS. BONJEAN:  Judge, I'm sorry.

19           THE COURT:  That's all I asked you to do.

10:16:14 20           MS. BONJEAN:  Judge, we actually tried to have this

21   conversation over a week ago and they just refused.  So now --

22           THE COURT:  Technically -- wait, wait, wait.

23           MS. JACOBS:  That is not true.

24           THE COURT:  That's water over the bridge.  I've

10:16:23 25   already told them that was wrong for them not to do that.  But

1    let's get it done.

2            So anyway, let's proceed.

3            MS. JACOBS:  Your Honor, our summaries were finished

4    first.

10:16:32    5            THE COURT:  All right.  Fine.

6            MS. JACOBS:  Our summaries were finished 12 days ago.

7            THE COURT:  All right.  Okay.  So we're going to have

8    jury selection as soon as we get the jurors up here.  So we'll

9    stand at ease until the jurors are here.

10:16:44    10            MR. JEBSON:  Thank you, Your Honor.

11        (Recess.)

12        (Prospective jurors enter.)

13            THE COURT:  Good morning, ladies and gentlemen.

14    You've been called here to participate in jury selection in a

10:36:13    15    case entitled Stanley Wrice v. John Byrne and Peter Dignan.

16            I'm going to give you a short statement about what

17    the case is about, and it's not binding on either party.  It's

18    my impression of what the case is about, but I merely want to

19    alert you to the subject matter of the case, so it's not

10:36:38    20    binding on either side if they may wish to disagree with any

21    portion of a statement.

22            The plaintiff, Stanley Wrice, alleges that he was

23    wrongfully convicted for the 1982 rape of Karen Byron.  The

24    defendants are former Chicago Police Sergeant John Byrne and

10:36:59    25    Detective Peter Dignan.

1        Plaintiff served 31 years before his conviction was

2   vacated in 2013.  He was granted a new trial, but the state of

3   Illinois chose not to retry him.

4        Plaintiff contends that defendant officers used

5   coercive interrogation techniques against him and another

6   witness for the purpose of extracting false and fabricated

7   testimony.

8        He further contends that the resulting false and

9   fabricated testimony violated his constitutional rights to a

10  fair trial for which he seeks money damages.  The defendants

11  deny that they violated plaintiff's constitutional right and

12  deny his claim for damages against him.

13       Now, I'm going to introduce to you the participants

14  in the case.

15       The plaintiff is represented by Ms. Jennifer Bonjean.

16  Would you introduce the people at your table?

17       MS. BONJEAN:  Yes, Your Honor.

18       Good morning, ladies and gentlemen.  My name is

19  Jennifer Bonjean, and with me are my colleagues and fellow

20  attorneys Ashley Cohen, Heidi Lambros, and our client,

21  Stanley Wrice.

22       THE PLAINTIFF:  Good morning, everybody.

23       THE COURT:  Good morning.

24       The defendants are in court and their attorneys.

25       And, Mr. Jebson, do you want to introduce the people

1    at your table?

2            MR. JEBSON:  Yes, Judge.

3            Good morning, everyone.  I represent the defendants

4    John Byrne and Peter Dignan, and along with myself, Andy Hale,

5    Caryn Jacobs, and Jennifer Bitoy.

6            Thank you.

7            THE COURT:  To complete the introductions, my name is

8    Judge Harry Leinenweber.  I've been assigned to this case.

9            The lady on my left is Ms. Kelly Fitzgerald.  She's

10   the court reporter who takes down what is said.

11           And the lady on my right is Ms. Melanie Foster, and

12   she is the Clerk of Court assigned to this court.

13           One of the issues, or one of the questions that all

14   potential jurors want to know at the time that -- for jury

15   selection is how long this case will take to try.  And I've

16   been advised -- and I have no way of knowing for certain, but

17   I'm advised the case should take approximately two weeks,

18   which would mean the rest of this week, next week, and at

19   least a portion or some of the following week.

20           I want to emphasize that jury -- participation is an

21   important civil right and civil obligation, which if you

22   recall your civics classes, is one of the your obligations as

23   a citizen to serve as a juror if you're called to do so.

24           Having said that, I appreciate the fact that many

25   people, or some people certainly are probably not in a

1  financial position where they could devote two weeks or more

2  of time.  So having -- I will say that if you believe that

3  serving on the jury in this case would be an imposition for

4  either health reasons or monetary reasons and so forth, I will

10:40:09  5  certainly listen to your request to be excluded.  I won't

6  guarantee that I will grant it.  However, I would also like to

7  point out that if you're excused from service in this case,

8  that doesn't excuse you from further service as a juror.  And

9  you may be called to appear in another courtroom where a judge

10:40:33  10  is not as kindly as I am and you end up maybe worse off by not

11  participating.  However, I do appreciate the fact that you are

12  citizens and that you have lives outside of this courtroom, so

13  I will consider excuses if it would pose a real financial or

14  physical or health hardship on you.

10:40:57  15          Would you all rise and be sworn, please.

16      (Prospective jurors duly sworn.)

17          THE COURT:  Now, please be seated.

18          Now, we're going to start jury selection in a moment,

19  and I want to explain just a few things about it.

10:41:21  20          First of all, as you've taken an oath, you will be

21  under oath.  It's important -- I will conduct the questioning.

22  It's important that you answer verbally to my questions.  In

23  other words, don't go "uh-huh" or "uh-uh" because on a written

24  record, it's very difficult to tell which "uh-huh" and "uh-uh"

10:41:39  25  means.  They're very close.  So in other words, please

1    verbalize your answers.

2            Now, the reason why that you will be required to

3    submit to questioning, and I don't want to exaggerate the fact

4    that tough or rough, but the purpose -- the lawyers have a

10:42:01   5    right and an obligation, a right under the statutes and

6    federal statutes, in which we are in a federal court, to

7    excuse jurors who have a potential bias or other

8    disqualification; and, also, they're entitled to excuse a

9    certain number of jurors without having to justify to the

10:42:24  10    Court why they don't want them.  These are rights that are

11    granted by statute.  But in order for them to exercise their

12    rights intelligently, they have to know something about you.

13    Hence, it's my obligation to ask questions to the potential

14    jurors so that they will have some background to measure you,

10:42:45  15    whether they wish to exercise their statutory right.  So it's

16    important.

17            Now, having said that, most of the information I'm

18    going to seek is just pure biographical and also what some of

19    your experiences have been and matters that may touch upon

10:43:09  20    this particular case.  So I don't want to scare you into

21    thinking that we're going to bare you completely open.  That's

22    not the case at all.  I will do the questioning and then you

23    must answer out loud and verbally.

24            Okay.  So we will now proceed.  We're going to select

10:43:41  25    nine jurors.  That may sound like an unusual number, but this

1    is a civil case, not a criminal case, so we will select nine

2    of you to serve as jurors in this particular case.

3          Now, you'll see that there's six seats in the front

4    row.  So the first name called, please occupy the chair

5    closest to me in the front row, and second, third, fourth and

6    fifth and sixth on down the line.  And seventh, eight, ninth,

7    the second row, the first chair and then on down.

8          So would you call the first nine, please.

9          THE CLERK:  Marina Bertog, Darren Burgener, David

10   Gomez, Jill Johnson, Michael Arend, Yan Cao, Liguora

11   Utterback, Edith Anguiano, and Claudia Gaona.

12         THE COURT:  I miscounted the seats.  There's seven.

13   That's fine.

14         All right.  We'll start out, the first lady is Marina

15   Bertog.  Is that how you pronounce the name?

16         PROSPECTIVE JUROR:  Yes, that's correct.

17         THE COURT:  Okay.  Where do you live?

18         PROSPECTIVE JUROR:  I live in Arlington Heights,

19   Illinois.

20         THE COURT:  And what is your age?

21         PROSPECTIVE JUROR:  I'm 30 years old.

22         THE COURT:  And what is your educational background?

23         PROSPECTIVE JUROR:  I have a bachelor's in finance.

24         THE COURT:  And what is your business or occupation?

25         PROSPECTIVE JUROR:  I am a project manager and a

1    business development specialist.

2         THE COURT:  Could you give us a little more detail on

3    what you do?

4         PROSPECTIVE JUROR:  Sure.  So I work for an online

5    retail company, and I help them with their operational

6    challenges.  So I put together -- I manage various types of

7    projects to ensure process improvements.

8         THE COURT:  What type of projects?

9         PROSPECTIVE JUROR:  Primarily focused on process

10   improvements, so ensuring that the operations are the most

11   efficient and effective.  So setting up various new

12   technologies for the company, working on training

13   documentation used for new employees and the like.

14        THE COURT:  Is that what you used to refer to as an

15   efficiency expert?

16        PROSPECTIVE JUROR:  Kind of.

17        THE COURT:  Are you married?

18        PROSPECTIVE JUROR:  I am.

19        THE COURT:  What does your spouse do?

20        PROSPECTIVE JUROR:  He is a marketing manager for a

21   nonprofit in the city.

22        THE COURT:  And what is the purpose?

23        PROSPECTIVE JUROR:  It's Future Founders.  They work

24   with young entrepreneurs.

25        THE COURT:  Okay.  Would you have any problem with

1    serving in this case?

2         PROSPECTIVE JUROR:  No.

3         THE COURT:  Okay.  Have you or any family member or

4    close friend been employed in police-type work?

10:47:40  5    PROSPECTIVE JUROR:  Yes.  My ex brother-in-law is a

6    commander in Deerfield Police.

7         THE COURT:  Deerfield?

8         PROSPECTIVE JUROR:  Mm-hmm.

9         THE COURT:  Okay.  Do you get together with him often

10:47:50  10    or occasionally or never or what?

11        PROSPECTIVE JUROR:  To see my nephew, yes.

12        THE COURT:  Okay.  Have you personally ever received

13    any training in police work?

14        PROSPECTIVE JUROR:  No.

10:48:00  15    THE COURT:  Have you ever studied or has any event

16    ever been the subject of false confessions?

17        PROSPECTIVE JUROR:  No.

18        THE COURT:  Now, have you read or heard any criticism

19    of the Chicago Police Department particularly with respect to

10:48:19  20    treatment of minorities?

21        PROSPECTIVE JUROR:  Just in the news.

22        THE COURT:  Pardon?

23        PROSPECTIVE JUROR:  Just in the news.

24        THE COURT:  Okay.  And is there anything that you

10:48:31  25    would have difficulty putting out of your mind if -- I should

1 probably explain the question that I'm trying to get at this
2 way.

3 You may have read some criticism of the Chicago
4 Police Department that may or may not be justified depending
10:48:47 5 on the source, and obviously we don't know what the source is.
6 But the important thing is that you should not consider any of
7 that as -- if you are a juror in this case because what you
8 should consider, if you're called upon to decide this
9 particular case, solely on the evidence that's brought to you
10:49:08 10 here in court. Would you have any difficulty doing that?

11 PROSPECTIVE JUROR: No.

12 THE COURT: Okay. Have you personally had a negative
13 or positive experience with a police officer?

14 PROSPECTIVE JUROR: No.

10:49:20 15 THE COURT: Now, you may -- there may be police
16 officers testifying in this case, and there may be lay
17 witness -- well, obviously there will be lay witnesses who
18 testify in this case. The law requires that you use the same
19 tests in evaluating the testimony of a witness in this case no
10:49:42 20 matter what their role or what their particular job is. Now,
21 that's not to mean everybody is the same believability, but
22 the point of the matter is that when we talk to somebody,
23 particularly somebody we don't know, we try to make -- we
24 sometimes are required to make some kind of evaluation of what
10:50:01 25 they're telling us is hokum or whether it's the truth or

1    whatever.

2            So we use a test.  Now, the law requires, allows you

3    to use whatever tests you feel are appropriate in determining

4    the believability of a particular witness, but the law does

5    require that you use the same tests.  And obviously how people

6    pass the test would depend on how believable they are to you,

7    but the question is in other words, just because somebody

8    might be a police officer, somebody else might be a judge or

9    something like that does not in and of itself make them more

10   believable than anybody else.  It's a factor obviously you

11   would consider.  But as long as you consider the same factors,

12   are you willing to do that?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Do you understand my question?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Sometimes I get a little wrapped up and

17   it's difficult for me to express exactly what I'm trying to

18   get at.

19           Have you seen, read, or heard anything about this

20   particular case?

21           PROSPECTIVE JUROR:  No, I have not.

22           THE COURT:  Okay.  There may have been something,

23   discussion in the lobby of the courthouse.  Did you witness

24   any of that?

25           PROSPECTIVE JUROR:  No.

1    THE COURT:  Okay.  Now, there's been a lot in the

2 paper about the subject of sexual assaults recently.  In fact,

3 there's a trial going on in New York and so forth.  This case

4 in part involves allegations of the subject of sexual assault.

10:51:39    5 Is there anything about this subject that would prevent you

6 from deciding this case on the evidence you hear in court

7 rather than what you may have read outside of court concerning

8 this subject?

9    PROSPECTIVE JUROR:  No.

10:51:49    10    THE COURT:  Okay.  Now, the defendants in this case

11 will be invoking their constitutional rights not to testify.

12 At the end of the case, I, the Court, will instruct you how

13 you should consider this.  And will you follow the Court's

14 instructions on this subject?

10:52:09    15    PROSPECTIVE JUROR:  Yes.

16    THE COURT:  Okay.  Now, the plaintiff is seeking

17 money damages in this case.  He has the burden of proof.  If

18 he proves his case, would you have any hesitation in awarding

19 him money damages?

10:52:21    20    PROSPECTIVE JUROR:  No.

21    THE COURT:  If, on the other hand, he fails to prove

22 his case, would you have any hesitation in finding in favor of

23 the defendants?

24    PROSPECTIVE JUROR:  No.

10:52:29    25    THE COURT:  And have you or your family member ever

1    been charged with or convicted of a serious crime?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Have you been a crime victim?

4              PROSPECTIVE JUROR:  No.

10:52:39    5    THE COURT:  Have you ever been a party to a civil

6    lawsuit?  I'll just expound a little bit on that.  A civil

7    lawsuit is just there's the party bringing the suit are the

8    plaintiffs, and the parties being sued are the defendants.

9    Have you ever been a participant in a civil lawsuit?

10:52:58    10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Okay.  Have you been on jury duty before?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Have you served in the military?

14             PROSPECTIVE JUROR:  No, I have not.

10:53:09    15             THE COURT:  What is your source of news?  What do you

16   rely on, any particular sources?  Newspapers?

17             PROSPECTIVE JUROR:  Typically, yes.

18             THE COURT:  Pardon?

19             PROSPECTIVE JUROR:  Typically newspapers.

10:53:22    20             THE COURT:  What specific ones?  Is there one you

21   rely on most at all, or is there --

22             PROSPECTIVE JUROR:  Not one in particular.  I read

23   NPR and *Wall Street Journal*.  That's about it.

24             THE COURT:  Okay.  Now, the next question I want to

10:53:44    25   expound a little bit because I don't intend to do this to

1  every other person.  But what I mean is the question is will

2  you follow the law as I instruct you even if you disagree with

3  it?

4  　　　　Now, the background of this is that this is a jury

5  trial, and the jury is the factfinders.  The judge presides

6  over the trial but tells the jury what the law is.  Now,

7  oftentimes the juror will say that's kind of a dumb law, which

8  it may or may not be depending upon the circumstances, but if

9  it is the law, then it's up to the judge to say that the

10  jurors must follow the law even if you disagree with it.  Is

11  there any reason you wouldn't follow my instructions even if

12  you disagree with them?

13  　　　　PROSPECTIVE JUROR:  No.

14  　　　　THE COURT:  Is there any reason you can tell us which

15  prevents you from being a fair and impartial juror in this

16  case?

17  　　　　PROSPECTIVE JUROR:  No.

18  　　　　THE COURT:  Okay.  Thank you.

19  　　　　The next gentleman is Darren "BURJ"-ner?

20  　　　　PROSPECTIVE JUROR:  "BURG"-ner.

21  　　　　THE COURT:  Burgener.

22  　　　　Where do you live, sir?

23  　　　　PROSPECTIVE JUROR:  Clarendon Hills, Illinois.

24  　　　　THE COURT:  How old are you?

25  　　　　PROSPECTIVE JUROR:  48 years old.

1      THE COURT:  What is your educational background?

2      PROSPECTIVE JUROR:  I have a Bcomm in commerce and an

3  MBA from the University of Chicago.

4      THE COURT:  And what is your business or occupation?

10:54:58   5      PROSPECTIVE JUROR:  I'm a chief financial officer of

6  a telecommunications company in Chicago.

7      THE COURT:  Okay.  What company is it?

8      PROSPECTIVE JUROR:  It's called Access One.

9      THE COURT:  Okay.  Are you married?

10:55:09   10      PROSPECTIVE JUROR:  I am.

11      THE COURT:  And what does your spouse do?

12      PROSPECTIVE JUROR:  She's an endodontist.

13      THE COURT:  Okay.

14      PROSPECTIVE JUROR:  A dentist.

10:55:17   15      THE COURT:  Can you -- do you have any problem

16  serving in this case?

17      PROSPECTIVE JUROR:  I will have to reschedule some

18  prearranged travel, but other than that --

19      THE COURT:  It can be done?

10:55:27   20      PROSPECTIVE JUROR:  It can be.

21      THE COURT:  We appreciate if you would.

22      PROSPECTIVE JUROR:  Yeah, it can be done.

23      THE COURT:  Okay.  All right.  Have you or any family

24  member or close friend been employed in police work?

10:55:40   25      PROSPECTIVE JUROR:  No.

1          THE COURT:  Have you personally received any training

2     in police work?

3          PROSPECTIVE JUROR:  I have not.

4          THE COURT:  Have you ever studied the subject of

5     false confessions?

6          PROSPECTIVE JUROR:  I have not.

7          THE COURT:  Have you read or heard any criticism of

8     the Chicago Police Department particularly with respect to the

9     treatment of minorities?

10          PROSPECTIVE JUROR:  I have read news articles, yes.

11          THE COURT:  Is there anything that you read that you

12     could not put out of your mind in deciding this case based

13     upon the evidence you hear here in the courtroom?

14          PROSPECTIVE JUROR:  No, there is not.

15          THE COURT:  Okay.  So there's nothing that stands out

16     that's so important to you that it would override what you

17     hear in court; is that correct?

18          PROSPECTIVE JUROR:  That's correct.

19          THE COURT:  Okay.  Have you personally had a negative

20     or positive experience with a police officer?  Now, obviously

21     if we get a ticket, we could say that's negative.  But what

22     I'm talking about, have you ever felt that you were mistreated

23     by a policeman or lack of respect or that sort of thing?

24          PROSPECTIVE JUROR:  Nothing that comes to mind, sir.

25          THE COURT:  Okay.  Will you use the same tests in

1   evaluating the testimony of lay witnesses that you use for

2   police or any other type of witness?

3           PROSPECTIVE JUROR:  Yes.

4           THE COURT:  Okay.  Have you read, seen, or heard

5   anything about this particular lawsuit?

6           PROSPECTIVE JUROR:  No, I have not.

7           THE COURT:  Did you happen to hear anything in the

8   lobby of the courtroom this morning about the case?

9           PROSPECTIVE JUROR:  No, I did not.

10          THE COURT:  Okay.  Now, there's been a lot in the

11  news about the subject of sexual assaults.  I assume you read

12  about things of that subject; is that correct?

13          PROSPECTIVE JUROR:  I have read news articles, yes.

14          THE COURT:  Okay.  Now, this case in part involves

15  the subject of sexual -- alleged sexual assault.  Is there

16  anything about that subject that would prevent you from

17  deciding the case and the evidence you hear in court rather

18  than what you may have read or thought about or heard about

19  outside of the courtroom?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Okay.  The defendants in this case will

22  be invoking their constitutional right not to testify.  The

23  Court and -- the Court will instruct you at the end of the

24  case how you should consider this.  Will you follow my

25  instructions on this subject?

1    PROSPECTIVE JUROR:  Yes, I will.

2    THE COURT:  The plaintiff is seeking money damages in

3 this case.  He has the burden of proof.  If he proves his

4 case, would you have any hesitation in awarding him damages?

5    PROSPECTIVE JUROR:  No.

6    THE COURT:  And the reverse, if he fails to prove his

7 case, would you have any hesitation in finding in favor of the

8 defendants?

9    PROSPECTIVE JUROR:  No.

10    THE COURT:  Have you or a family member ever been

11 charged with or convicted of a serious crime?

12    PROSPECTIVE JUROR:  No.

13    THE COURT:  Have you been a crime victim?

14    PROSPECTIVE JUROR:  No.

15    THE COURT:  Have you been a party to a civil lawsuit?

16    PROSPECTIVE JUROR:  No, sir.

17    THE COURT:  Okay.  Have you been on jury duty before?

18    PROSPECTIVE JUROR:  No.

19    THE COURT:  Have you served in the military?

20    PROSPECTIVE JUROR:  I have not.

21    THE COURT:  What is your main source of news?

22    PROSPECTIVE JUROR:  I read *The Wall Street Journal*

23 and listen to NPR newsletter.

24    THE COURT:  Will you follow the law as I instruct you

25 even if you disagree with it?

1    PROSPECTIVE JUROR:  Yes.

2    THE COURT:  Is there any reason you couldn't be a

3 fair and impartial juror in this case?

4    PROSPECTIVE JUROR:  No.

10:58:46  5    THE COURT:  Thank you.

6    The next gentleman, David Gomez?

7    PROSPECTIVE JUROR:  Good morning, sir.

8    THE COURT:  Okay.  Where do you live, sir?

9    PROSPECTIVE JUROR:  South side of Chicago.

10:58:55  10    THE COURT:  How old are you?

11    PROSPECTIVE JUROR:  33 years old.

12    THE COURT:  And what is your educational background?

13    PROSPECTIVE JUROR:  High school diploma.

14    THE COURT:  And your business or occupation?

10:59:04  15    PROSPECTIVE JUROR:  I'm a forklift driver, and on

16 days off, I'm a Chicago scaffold builder.

17    THE COURT:  Okay.  You married?

18    PROSPECTIVE JUROR:  No, sir.

19    THE COURT:  Would serving pose any problems to you?

10:59:21  20    PROSPECTIVE JUROR:  To be honest, I just started my

21 job as a forklift driver, so I can't really miss days off.  We

22 get eight points, and then we get terminated.

23    THE COURT:  Your employer cannot terminate you for

24 purposes of having served on a jury, but --

10:59:42  25    PROSPECTIVE JUROR:  Financially-wise.

1    THE COURT:  Financially you would have a difficulty?

2    PROSPECTIVE JUROR:  Yes.

3    THE COURT:  I'll excuse you, sir.  Thank you.

4    PROSPECTIVE JUROR:  Thank you.

10:59:55   5    THE CLERK:  Sir, you could go back down to the second

6    floor where we started at, and they'll give you further

7    instructions.

8    PROSPECTIVE JUROR:  Thank you.

9    THE COURT:  The next lady is Jill Johnson; is that

11:00:07   10   right?

11   PROSPECTIVE JUROR:  Yes.

12   THE COURT:  Where do you live?

13   PROSPECTIVE JUROR:  I live in Batavia, Illinois.

14   THE COURT:  And how old are you?

11:00:16   15   PROSPECTIVE JUROR:  47.

16   THE COURT:  What is your educational background?

17   PROSPECTIVE JUROR:  I have a Master's in education.

18   THE COURT:  And your employment?

19   PROSPECTIVE JUROR:  I am a third grade teacher.

11:00:25   20   THE COURT:  All right.  And are you married?

21   PROSPECTIVE JUROR:  I am.

22   THE COURT:  And what does your spouse do?

23   PROSPECTIVE JUROR:  This is a good question.  The

24   best I could understand is that he sells online research from

11:00:38   25   social media.  He tries to explain it.  He does a good job.

1      THE COURT:  Would you have any problem serving as a

2  juror in this case?

3      PROSPECTIVE JUROR:  No.

4      THE COURT:  Have you, any family member or close

5  friend ever been employed in police work?

6      PROSPECTIVE JUROR:  No.

7      THE COURT:  Have you personally ever received any

8  training in police work?

9      PROSPECTIVE JUROR:  No.

10      THE COURT:  Have you ever studied the subject of

11  false confessions?

12      PROSPECTIVE JUROR:  No.

13      THE COURT:  Now, have you read or heard any criticism

14  of the Chicago Police Department particularly with respect to

15  treatment of minorities?

16      PROSPECTIVE JUROR:  Just on the news.

17      THE COURT:  Is there anything that you read or heard

18  that you would not be able to put out of your mind in deciding

19  this case since the -- this case should be decided solely on

20  the evidence as produced here in court rather than what you

21  may have read outside of the courtroom?  Do you have any

22  problem doing that?

23      PROSPECTIVE JUROR:  No.

24      THE COURT:  Okay.  Have you personally had a negative

25  or positive experience with a police officer?

1        PROSPECTIVE JUROR:  No.

2        THE COURT:  Will you use the same tests in evaluating

3  the testimony of lay witnesses that you use for police and

4  other witnesses?

11:01:57  5        PROSPECTIVE JUROR:  I have no problem with that.

6        THE COURT:  Okay.  Have you read, seen, or heard

7  anything about this lawsuit?

8        PROSPECTIVE JUROR:  No.

9        THE COURT:  Including did you hear anything this

11:02:12  10  morning perhaps in the court -- in the lobby of the

11  courthouse?

12        PROSPECTIVE JUROR:  No.

13        THE COURT:  Okay.  Now, concerning the subject of

14  sexual assault that's been in the news recently, I take it you

11:02:25  15  probably read about that; is that correct?

16        PROSPECTIVE JUROR:  I don't know anything specific

17  going on.

18        THE COURT:  Okay.  So in other words, my point is

19  that there's been -- there's a case going on in New York.

11:02:38  20        PROSPECTIVE JUROR:  No, I don't know about that.

21        THE COURT:  But there's nothing that stands out in

22  your mind that would prevent you from deciding this case from

23  the evidence that you hear in court rather than what possibly

24  you may have read; is that correct?

11:02:51  25        PROSPECTIVE JUROR:  Correct.

1    THE COURT:  Okay.  Now, the defendants in this case

2  will be invoking their constitutional right not to testify,

3  and the Court will instruct you at the end of the case how you

4  should consider this.  Will you follow my instructions on this

11:03:03  5  subject?

6    PROSPECTIVE JUROR:  Yes.

7    THE COURT:  The plaintiff is seeking money damages in

8  this case.  He has the burden of proof.  If he proves his

9  case, would you have any hesitation in awarding him damages?

11:03:13  10    PROSPECTIVE JUROR:  No.

11    THE COURT:  If he fails to prove his case, would you

12  have any hesitation in finding in favor of the defendants?

13    PROSPECTIVE JUROR:  No.

14    THE COURT:  Have you or family members been charged

11:03:25  15  with or convicted of a serious crime?

16    PROSPECTIVE JUROR:  No.

17    THE COURT:  Have you been a crime victim?

18    PROSPECTIVE JUROR:  No.

19    THE COURT:  Have you been a party to a civil lawsuit,

11:03:35  20  plaintiff or a defendant?

21    PROSPECTIVE JUROR:  No.

22    THE COURT:  Have you been on jury duty before?

23    PROSPECTIVE JUROR:  No.

24    THE COURT:  Have you served in the military?

11:03:41  25    PROSPECTIVE JUROR:  No.

1      THE COURT:  What is your source of news?

2      PROSPECTIVE JUROR:  I usually just watch the news on

3  TV, Channel 5 or Channel 9.

4      THE COURT:  Okay.  Will you follow the law as I

5  instruct you even if you might disagree with it?

6      PROSPECTIVE JUROR:  Yes.

7      THE COURT:  Is there any reason you couldn't be a

8  fair and impartial juror in this case?

9      PROSPECTIVE JUROR:  No.

10      THE COURT:  The next gentleman is Michael Arend?

11      PROSPECTIVE JUROR:  Yes, sir.

12      THE COURT:  Where do you live, sir?

13      PROSPECTIVE JUROR:  Streamwood, Illinois.

14      THE COURT:  How old are you?

15      PROSPECTIVE JUROR:  59.

16      THE COURT:  What is your educational background?

17      PROSPECTIVE JUROR:  Some college.

18      THE COURT:  And what is your business or occupation?

19      PROSPECTIVE JUROR:  I'm a graphic artist.  I do

20  presentations and proposals, clean them up for clients.

21      THE COURT:  Okay.  Are you married?

22      PROSPECTIVE JUROR:  No, divorced.

23      THE COURT:  What does your former wife do?

24      PROSPECTIVE JUROR:  I'm not sure anymore.

25      THE COURT:  Okay.

11:03:55

11:04:04

11:04:13

11:04:22

11:04:37

1    PROSPECTIVE JUROR:  Being honest.

2    THE COURT:  Have you, family member, or close friend,

3  excuse me, ever been employed in police work?

4    PROSPECTIVE JUROR:  No, sir.

11:04:47  5    THE COURT:  Have you received any training in police

6  work?

7    PROSPECTIVE JUROR:  No.

8    THE COURT:  Have you ever studied the subject of

9  false confessions?

11:04:54  10    PROSPECTIVE JUROR:  No, I haven't.

11    THE COURT:  Have you read or heard any criticisms of

12  the Chicago Police Department, particularly with respect to

13  minorities?

14    PROSPECTIVE JUROR:  Just some of the general things,

11:05:03  15  nothing specific.

16    THE COURT:  Is there anything you read or heard that

17  you couldn't put out of your mind and decide this case solely

18  on what you hear here in the courtroom?

19    PROSPECTIVE JUROR:  No.

11:05:11  20    THE COURT:  Have you personally had a negative or

21  positive experience with a police officer?

22    PROSPECTIVE JUROR:  I have not.

23    THE COURT:  Will you use the same tests in evaluating

24  the testimony of lay witnesses that you use for police?

11:05:26  25    PROSPECTIVE JUROR:  Yes.

1      THE COURT:  Have you read, seen, or heard anything
2   about this lawsuit?
3      PROSPECTIVE JUROR:  No, I haven't.
4      THE COURT:  Including did you hear anything like
5   today in the courthouse?
6      PROSPECTIVE JUROR:  I've heard nothing today.
7      THE COURT:  Okay.  Now, turning to the subject of
8   sexual assaults.  Have you read about that in the newspapers?
9      PROSPECTIVE JUROR:  No, I have not.
10      THE COURT:  Is there anything about that subject that
11   would prevent you from deciding this case solely on the
12   evidence you hear here in court?
13      PROSPECTIVE JUROR:  No, it would not.
14      THE COURT:  Okay.  Now, the defendants in this case
15   will be invoking their constitutional rights not to testify.
16   The Court will instruct you at the end of the case how you
17   should consider this.  Will you follow my instructions on this
18   subject?
19      PROSPECTIVE JUROR:  Yes, I will.
20      THE COURT:  The plaintiff is seeking money damages in
21   this case.  He has the burden of proof.  If he fails to prove
22   his case, would you have any hesitation -- excuse me -- if he
23   proves his case, would you have any hesitation in awarding him
24   damages?
25      PROSPECTIVE JUROR:  No.

1    THE COURT:  If he fails to prove his case, would you

2  have any hesitation in finding in favor of the defendants?

3    PROSPECTIVE JUROR:  No.

4    THE COURT:  Have you or family members ever been

11:06:28    5  charged with or convicted of a serious crime?

6    PROSPECTIVE JUROR:  We have not.

7    THE COURT:  Have you been a crime victim?

8    PROSPECTIVE JUROR:  No.

9    THE COURT:  Have you been a party to a civil lawsuit?

11:06:38    10    PROSPECTIVE JUROR:  No, sir.

11    THE COURT:  Have you ever served on a jury before?

12    PROSPECTIVE JUROR:  No.

13    THE COURT:  Have you served in the military?

14    PROSPECTIVE JUROR:  No.

11:06:45    15    THE COURT:  What is your source of news?

16    PROSPECTIVE JUROR:  General TV, Internet.  Not much.

17  I don't do a whole lot of news.

18    THE COURT:  All right.  Will you follow the law as I

19  instruct you even if you disagree with it?

11:06:57    20    PROSPECTIVE JUROR:  Yes.

21    THE COURT:  Any reason you couldn't be fair?

22    PROSPECTIVE JUROR:  No.

23    THE COURT:  I may not have asked you, would you have

24  any severe problems serving in this case?

11:07:03    25    PROSPECTIVE JUROR:  No.

1       THE COURT:  Okay.  Thank you.

2       PROSPECTIVE JUROR:  Thank you.

3       THE COURT:  The next person is Yan Cao?  Did I

4   pronounce it right?

5       PROSPECTIVE JUROR:  Sort of.

6       THE COURT:  Why don't you just tell me how you say

7   it.

8       PROSPECTIVE JUROR:  You probably could put an accent

9   between -- in the second letter, like "TOU."

10      THE COURT:  "KOU."  Is that close?

11      PROSPECTIVE JUROR:  Yeah.

12      THE COURT:  Okay.  Where do you live?  Excuse me.

13  Where do you live?

14      PROSPECTIVE JUROR:  I live in Naperville, Illinois.

15      THE COURT:  And how old are you?

16      PROSPECTIVE JUROR:  41.

17      THE COURT:  What is your educational background?

18      PROSPECTIVE JUROR:  I have a Ph.D. in engineering.

19      THE COURT:  Okay.  And what is your business or

20  occupation?

21      PROSPECTIVE JUROR:  I'm actually engineering in

22  Argonne National Laboratory.

23      THE COURT:  Okay.  Are you actually employed at the

24  University of Chicago then?

25      PROSPECTIVE JUROR:  As a contract.  It's a

11:07:14
11:07:28
11:07:39
11:07:47
11:07:58

 1  subcontract.

 2          THE COURT:  All right.  Are you married?

 3          PROSPECTIVE JUROR:  Yes.

 4          THE COURT:  What does your spouse do?

 5          PROSPECTIVE JUROR:  He is a physicist in the medical

 6  device field.

 7          THE COURT:  Okay.  Would you have any severe problems

 8  in serving in this case?

 9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Okay.  Have you or any family member or

11  close friend ever been employed in police work?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Okay.  Have you personally ever received

14  any training in police work?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Have you ever studied the subject of

17  false confessions?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Have you read or heard any criticism of

20  the Chicago Police Department, particularly with respect to

21  treatment of minorities?

22          PROSPECTIVE JUROR:  From the news.

23          THE COURT:  Okay.  Is there anything that you may

24  have read or heard that you would find difficult to put out of

25  your mind and decide this case solely on the evidence that you

1    hear in the Court?

2         PROSPECTIVE JUROR:  No, I have not.

3         THE COURT:  Okay.  Have you personally had a negative

4    or positive experience with a police officer?

11:09:05    5         PROSPECTIVE JUROR:  No, I don't.

6         THE COURT:  Will you use the same tests in evaluating

7    the testimony of lay witnesses that you use for police?

8         PROSPECTIVE JUROR:  Yes, sir.

9         THE COURT:  Have you read, seen, or heard anything

11:09:17    10   about this lawsuit?

11        PROSPECTIVE JUROR:  No.

12        THE COURT:  Did you by any chance hear anything in

13   the lobby of the courthouse today?

14        PROSPECTIVE JUROR:  No.

11:09:25    15        THE COURT:  Okay.  Have you heard or read about the

16   subject of sexual assault recently?

17        PROSPECTIVE JUROR:  Not much.

18        THE COURT:  Okay.  At whatever level that you may

19   have heard or read about, is there anything about that subject

11:09:41    20   which prevents you from deciding this case solely on the

21   evidence you hear in court --

22        PROSPECTIVE JUROR:  No.

23        THE COURT:  -- rather than what you may have read or

24   heard outside of court?

11:09:49    25        PROSPECTIVE JUROR:  No.

1        THE COURT:  Okay.  The defendants in this case will

2   be invoking their constitutional right not to testify.  The

3   Court will instruct you at the end of the case how you should

4   consider this.  Will you follow my instructions on this

5   subject?

6        PROSPECTIVE JUROR:  Yes, I will.

7        THE COURT:  The plaintiff is seeking money damages in

8   this case.  He has the burden of proof.  If he proves his

9   case, would you have any hesitation in awarding him money

10  damages?

11       PROSPECTIVE JUROR:  No, I don't.

12       THE COURT:  If he fails to prove his case, would you

13  have any hesitation in finding in favor of defendants?

14       PROSPECTIVE JUROR:  No.

15       THE COURT:  Have you or a family member ever been

16  charged with or convicted of a serious crime?

17       PROSPECTIVE JUROR:  No.

18       THE COURT:  Have you been a crime victim?

19       PROSPECTIVE JUROR:  No.

20       THE COURT:  Have you ever been a party to a civil

21  lawsuit as a plaintiff or a defendant?

22       PROSPECTIVE JUROR:  No.

23       THE COURT:  Have you ever been on jury duty before?

24       PROSPECTIVE JUROR:  No.

25       THE COURT:  Have you served in the military?

11:10:03
11:10:13
11:10:21
11:10:30
11:10:40

45

1        PROSPECTIVE JUROR:  No.

2        THE COURT:  What is your source of news?

3        PROSPECTIVE JUROR:  NPR most of the time, but

4  sometimes I read the *USA Today* or BBC News.

11:10:53  5        THE COURT:  Will you follow the law as I instruct you

6  even if you disagree with it?

7        PROSPECTIVE JUROR:  Say it again.

8        THE COURT:  Will you follow -- at the end of the

9  case, as I explained a little bit earlier, I will instruct the

11:11:04  10  jury as to the law applicable to this case.  Sometimes the

11  juror -- it doesn't have to be a juror, but sometimes people

12  say that's not a very good law.  But if it is the law and if I

13  instruct you it is the law, it would be your obligation as a

14  juror to follow the law.  Are you willing to do that?

11:11:23  15        PROSPECTIVE JUROR:  Yes, sir.

16        THE COURT:  Is there any reason you couldn't be a

17  fair and impartial juror in this case?

18        PROSPECTIVE JUROR:  No.

19        THE COURT:  Okay.

11:11:28  20        The next, Liguora Utterback?

21        PROSPECTIVE JUROR:  Yes, that's correct.

22        THE COURT:  Did I pronounce it correct?

23        PROSPECTIVE JUROR:  Yes, Liguora.

24        THE COURT:  Where do you live?

11:11:41  25        PROSPECTIVE JUROR:  Libertyville.

1    THE COURT:  And how old are you?

2    PROSPECTIVE JUROR:  64.

3    THE COURT:  What is your educational background?

4    PROSPECTIVE JUROR:  Bachelor of Science in psych.

11:11:50    5    THE COURT:  And your business or occupation?

6    PROSPECTIVE JUROR:  I'm a special ed teacher.

7    THE COURT:  And what is your marital status?

8    PROSPECTIVE JUROR:  I'm separated.

9    THE COURT:  Okay.  What does your former husband do,

11:12:00   10   if you know?

11   PROSPECTIVE JUROR:  He was in commodities, and now

12   he's selling mattresses.

13   THE COURT:  Okay.

14   PROSPECTIVE JUROR:  Yeah.

11:12:05   15   THE COURT:  Would you have any difficulty serving on

16   this jury?

17   PROSPECTIVE JUROR:  No.

18   THE COURT:  Okay.  Have you or a family member or

19   close friend been employed in police work?

11:12:18   20   PROSPECTIVE JUROR:  No.

21   THE COURT:  Have you received any training in police

22   work?

23   PROSPECTIVE JUROR:  No.

24   THE COURT:  Have you ever studied the subject of

11:12:27   25   false confessions?

 1          PROSPECTIVE JUROR:  No.

 2          THE COURT:  Have you read or heard any criticisms of

 3     the Chicago Police Department, particularly with respect to

 4     treatment of minorities?

11:12:35     5          PROSPECTIVE JUROR:  Yes.

 6          THE COURT:  Can you put whatever you read or heard

 7     out of your mind and decide the case solely on the evidence

 8     you hear in court?

 9          PROSPECTIVE JUROR:  Yes.

11:12:46     10          THE COURT:  Okay.  Have you personally had a negative

 11     or positive experience with a police officer?

 12          PROSPECTIVE JUROR:  No.

 13          THE COURT:  Will you use the same tests in evaluating

 14     the testimony of lay witnesses that you use for police

11:12:59     15     officers or other witnesses?

 16          PROSPECTIVE JUROR:  Yes.

 17          THE COURT:  Have you read, seen, or heard anything

 18     about this lawsuit?

 19          PROSPECTIVE JUROR:  No, not this one.

11:13:10     20          THE COURT:  Okay.  And specifically did you happen to

 21     hear anything in the lobby of the courthouse today?

 22          PROSPECTIVE JUROR:  No.

 23          THE COURT:  Okay.  Have you read or heard about the

 24     subject of sexual assault recently?

11:13:23     25          PROSPECTIVE JUROR:  You know, Harvey Weinstein, et

1   cetera, and #MeToos, but not the Chicago police.

2   THE COURT:  The so-called #MeToo movement so on and

3   so forth?

4   PROSPECTIVE JUROR:  Yes.

11:13:35  5   THE COURT:  Is there anything you may have read or

6   heard about the subject of sexual assault that would prevent

7   you from deciding the case on the evidence you hear in court

8   rather than what you may have heard outside the courtroom?

9   PROSPECTIVE JUROR:  No.

11:13:48  10   THE COURT:  Defendants in this case will be invoking

11   their constitutional rights not to testify.  The Court will

12   instruct you at the end of the case how you are to consider

13   this.  Will you follow the instructions on this subject?

14   PROSPECTIVE JUROR:  Yes.

11:13:59  15   THE COURT:  The plaintiff is seeking money damages in

16   this case, and he has the burden of proof.  If he proves his

17   case, would you have any hesitation in awarding him damages?

18   PROSPECTIVE JUROR:  No.

19   THE COURT:  If he fails to prove his case, would you

11:14:10  20   have any hesitation in finding in favor of the defendants?

21   PROSPECTIVE JUROR:  No.

22   THE COURT:  Have you or a family member ever been

23   charged with or convicted of a serious crime?

24   PROSPECTIVE JUROR:  No.

11:14:20  25   THE COURT:  Have you been a crime victim?

1    PROSPECTIVE JUROR:  No.

2    THE COURT:  Have you been a party to a civil lawsuit?

3    PROSPECTIVE JUROR:  No.

4    THE COURT:  Have you been on jury duty before?

11:14:30    5    PROSPECTIVE JUROR:  No.

6    THE COURT:  Have you ever served in the military?

7    PROSPECTIVE JUROR:  No.

8    THE COURT:  What is your source of news?

9    PROSPECTIVE JUROR:  Talk radio.

11:14:39    10    THE COURT:  Okay.  And specific, any --

11    PROSPECTIVE JUROR:  You know, I like AM 560.

12    THE COURT:  Okay.  Would you follow the law as I

13    instruct you even if you disagree with it?

14    PROSPECTIVE JUROR:  Yes.

11:14:51    15    THE COURT:  Is there any reason you couldn't be a

16    fair and impartial juror?

17    PROSPECTIVE JUROR:  No.

18    THE COURT:  Thank you.

19    The next person is, you are Edith Anguiano?

11:15:07    20    PROSPECTIVE JUROR:  Yes.

21    THE COURT:  Did I pronounce it right?

22    PROSPECTIVE JUROR:  Correct.

23    THE COURT:  Where do you live?

24    PROSPECTIVE JUROR:  Chicago.

11:15:12    25    THE COURT:  How old are you?

|  |  |
|---|---|
| 1 | PROSPECTIVE JUROR:  37. |
| 2 | THE COURT:  What is your educational background? |
| 3 | PROSPECTIVE JUROR:  High school diploma. |
| 4 | THE COURT:  And what is your business or occupation? |
| 5 | PROSPECTIVE JUROR:  Homeland security. |
| 6 | THE COURT:  And what -- do you serve here in Chicago? |
| 7 | PROSPECTIVE JUROR:  Yes. |
| 8 | THE COURT:  Specifically would you expound a little |
| 9 | bit on your duties? |
| 10 | PROSPECTIVE JUROR:  I work for TSA at O'Hare Airport. |
| 11 | THE COURT:  At the O'Hare? |
| 12 | PROSPECTIVE JUROR:  Yes. |
| 13 | THE COURT:  We have TSA here at the courthouse, but |
| 14 | you're at O'Hare? |
| 15 | PROSPECTIVE JUROR:  Yes. |
| 16 | THE COURT:  How long have you been with TSA? |
| 17 | PROSPECTIVE JUROR:  17 years. |
| 18 | THE COURT:  Okay.  Are you one of the persons when |
| 19 | we -- we have to show our license to when we go? |
| 20 | PROSPECTIVE JUROR:  No. |
| 21 | THE COURT:  Okay.  Are you married? |
| 22 | PROSPECTIVE JUROR:  No. |
| 23 | THE COURT:  Would you have any problem serving? |
| 24 | PROSPECTIVE JUROR:  No. |
| 25 | THE COURT:  Okay.  Now, TSA is a form of police work. |

11:15:18
11:15:30
11:15:41
11:15:55
11:16:06

1    Have you, family member, close friend been employed in police
2    work?
3           PROSPECTIVE JUROR:  Yes.
4           THE COURT:  Other than yourself?
5           PROSPECTIVE JUROR:  Yes.
6           THE COURT:  Who would that be?
7           PROSPECTIVE JUROR:  My cousin.
8           THE COURT:  And what does he do?
9           PROSPECTIVE JUROR:  A police officer.
10          THE COURT:  For whom?
11          PROSPECTIVE JUROR:  Chicago police.
12          THE COURT:  Okay.  Can you tell us where he serves or
13   what's his rank or whatever?
14          PROSPECTIVE JUROR:  He just started maybe a year ago.
15   I'm not sure which district he works at.
16          THE COURT:  Okay.  You talk to your cousin often
17   about police work?
18          PROSPECTIVE JUROR:  I see him on holidays and stuff,
19   but we don't talk about his job.
20          THE COURT:  Okay.  So you wouldn't have any problem
21   serving?
22          PROSPECTIVE JUROR:  No.
23          THE COURT:  Chicago police officers are parties to
24   this lawsuit.  Would that pose any problem to you?
25          PROSPECTIVE JUROR:  No.

1          THE COURT:  Okay.  Have you personally received --

2    well, obviously you've received training in this TSA agent.

3    Could you describe a little bit about what your training in

4    police work consists of?

5          PROSPECTIVE JUROR:  I X-ray bags for explosives.

11:17:25

6          THE COURT:  Okay.  Have you received any other type

7    of training other than just that type of --

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  How about have you ever studied the

10   subject of false confessions?

11:17:49

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Now, have you read or heard any

13   criticisms of the Chicago Police Department particularly with

14   respect to treatment of minorities?

15         PROSPECTIVE JUROR:  Yes, I have read.

11:17:58

16         THE COURT:  Is there anything that you read or heard

17   that you would not be able to put out of your mind when you

18   decide this case and decide this case on the evidence you hear

19   here in court?

20         PROSPECTIVE JUROR:  No.

11:18:14

21         THE COURT:  Have you personally had a negative or

22   positive experience with a police officer?

23         PROSPECTIVE JUROR:  Several negative experiences.

24         THE COURT:  Pardon?

25         PROSPECTIVE JUROR:  Negative experiences.

11:18:22

1   THE COURT:  Specifically with Chicago police or other

2   police?

3   PROSPECTIVE JUROR:  Chicago.

4   THE COURT:  Can you -- when did these occur?

11:18:35   5   PROSPECTIVE JUROR:  My early twenties, I got pulled

6   over several occasions, treated unfairly, accused of being a

7   drug dealer and other things.

8   MR. HALE:  Your Honor, are we able to do this at

9   sidebar?

11:18:51   10   THE COURT:  Just a minute.

11   That experience, does that pose you difficulty in

12   serving as a juror in this case?

13   PROSPECTIVE JUROR:  No.

14   THE COURT:  I forget how old you say you are.  How

11:19:15   15   long ago was that?

16   PROSPECTIVE JUROR:  My early twenties, about 15 years

17   ago or so.

18   THE COURT:  Okay.  So can we rest assured that's

19   water over the dam?

11:19:27   20   PROSPECTIVE JUROR:  Yes.

21   THE COURT:  That would not affect you one iota?  Was

22   there more than one incident?

23   PROSPECTIVE JUROR:  Yes, a couple.

24   THE COURT:  What was the other one?

11:19:36   25   PROSPECTIVE JUROR:  They're the same, same thing,

1     just pulled over, treated unfairly.

2            THE COURT:  And they were all about 15 years ago?

3            PROSPECTIVE JUROR:  Yes.

4            THE COURT:  So not recently?  You haven't had any

11:19:45   5     negative experience recently?

6            PROSPECTIVE JUROR:  No.

7            THE COURT:  Will you use the same test in evaluating

8     the testimony of lay witnesses that you use for the police?

9            PROSPECTIVE JUROR:  Yes.

11:19:59   10            THE COURT:  Have you read, seen or heard anything

11     about this lawsuit?

12            PROSPECTIVE JUROR:  No.

13            THE COURT:  Did you happen to hear anything in the

14     lobby of the courthouse today about the lawsuit?

11:20:08   15            PROSPECTIVE JUROR:  No.

16            THE COURT:  Okay.  Have you heard or read about the

17     subject of sexual assault recently?

18            PROSPECTIVE JUROR:  No.

19            THE COURT:  All right.  Is there anything about that

11:20:20   20     subject that would make it difficult for you to decide this

21     case solely on the evidence you hear in the court?

22            PROSPECTIVE JUROR:  No.

23            THE COURT:  The defendants in this case will be

24     invoking their constitutional right not to testify, and the

11:20:32   25     Court will instruct you at the end of the case how you should

1   consider this.  Will you follow the Court's instructions on

2   this subject?

3           PROSPECTIVE JUROR:  Yes.

4           THE COURT:  Okay.  The plaintiff is seeking money

11:20:42   5   damages in this case for which he has the burden of proof.  If

6   he proves his case would you have any hesitation in awarding

7   him damages?

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  If he fails to prove his case, would you

11:20:52   10   have any hesitation in finding in favor of the defendants?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Have you or a family member ever been

13   charged with or convicted of a serious crime?

14          PROSPECTIVE JUROR:  No.

11:21:01   15          THE COURT:  Have you been a crime victim?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Have you been a party to a civil lawsuit?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Have you been on jury duty before?

11:21:09   20          PROSPECTIVE JUROR:  Grand jury.

21          THE COURT:  Okay.  And when was that?

22          PROSPECTIVE JUROR:  2012.

23          THE COURT:  Okay.  Obviously this is a civil lawsuit,

24   and the burden of proof is -- you will be instructed on --

11:21:26   25   obviously a grand jury you're looking at an entirely different

1   type of thing.  You understand that, I assume?

2             PROSPECTIVE JUROR:  Yes.

3             THE COURT:  Have you served in the military?

4             PROSPECTIVE JUROR:  No.

11:21:37   5             THE COURT:  What is your source of news?

6             PROSPECTIVE JUROR:  Newspaper.

7             THE COURT:  What ones specifically?

8             PROSPECTIVE JUROR:  *Chicago Sun-Times* and the

9   *Tribune*.

11:21:48   10            THE COURT:  Okay.  Will you follow the law as I

11  instruct you even if you disagree with it?

12            PROSPECTIVE JUROR:  Yes.

13            THE COURT:  Is there any reason you couldn't be a

14  fair and impartial juror in this case?

11:21:56   15            PROSPECTIVE JUROR:  No.

16            THE COURT:  Thank you.

17            The next person is Claudia Gaona?

18            PROSPECTIVE JUROR:  You got it.

19            THE COURT:  Did I pronounce it right?

11:22:06   20            PROSPECTIVE JUROR:  Yes.

21            THE COURT:  Where do you live?

22            PROSPECTIVE JUROR:  I live in Elgin, Illinois.

23            THE COURT:  How old are you?

24            PROSPECTIVE JUROR:  39.

11:22:11   25            THE COURT:  What is your educational background?

1    PROSPECTIVE JUROR:  Some college.

2    THE COURT:  And what is your business or occupation?

3    PROSPECTIVE JUROR:  I work for a healthcare

4    organization doing financial counseling for patients.

11:22:24    5    THE COURT:  Okay.  Are you married?

6    PROSPECTIVE JUROR:  Yes.

7    THE COURT:  What does your spouse do?

8    PROSPECTIVE JUROR:  He does research and development

9    for a manufacturing company.

11:22:34    10    THE COURT:  What type of manufacturing?

11    PROSPECTIVE JUROR:  Plastics.

12    THE COURT:  Okay.  Would you have a problem serving

13    on this jury?

14    PROSPECTIVE JUROR:  No.

11:22:42    15    THE COURT:  Okay.  Have you or a family member or

16    close friend ever been employed in police-type work?

17    PROSPECTIVE JUROR:  No.

18    THE COURT:  Have you personally received any training

19    in police work?

11:22:57    20    PROSPECTIVE JUROR:  No.

21    THE COURT:  Have you ever studied the subject of

22    false confessions?

23    PROSPECTIVE JUROR:  No, I haven't.

24    THE COURT:  Have you read or heard any criticism of

11:23:07    25    the Chicago Police Department, particularly with respect to

58

1    treatment of minorities?

2           PROSPECTIVE JUROR:  Just what's on the news.

3           THE COURT:  All right.  Is there anything that you

4    read or heard in the news that you would not be able to put

11:23:19    5    out of your mind if you were a juror in this case and prevents

6    you from deciding the case solely on the evidence you hear in

7    court?

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  Okay.  Have you personally had a negative

11:23:30    10   or positive experience with a police officer?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Will you use the same tests in evaluating

13   the testimony of lay witnesses that you use for police?

14          PROSPECTIVE JUROR:  Yes.

11:23:42    15          THE COURT:  Have you read, seen, or heard anything

16   about this lawsuit?

17          PROSPECTIVE JUROR:  No, I haven't.

18          THE COURT:  And did you happen to overhear anything

19   in the lobby today in the courthouse?

11:23:54    20          PROSPECTIVE JUROR:  No, nothing.

21          THE COURT:  Have you read, heard about the subject of

22   sexual assault recently?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Okay.  Is there anything about the

11:24:06    25   subject of sexual assault that would prevent you from deciding

 1   this case solely on the evidence you hear in court?

 2           PROSPECTIVE JUROR:  No.

 3           THE COURT:  The defendants in this case will be

 4   invoking their constitutional right not to testify.  I will

11:24:22   5   instruct you, the jury, at the end of the case how they should

 6   consider this.  Will you follow my instructions on this

 7   subject if you're a juror?

 8           PROSPECTIVE JUROR:  Yes.

 9           THE COURT:  The plaintiff is seeking money damages in

11:24:33  10   this case.  He has the burden of proof.  If he proves his

11   case, would you have any hesitation in awarding him damages?

12           PROSPECTIVE JUROR:  No.

13           THE COURT:  If he fails to prove his case, would you

14   have any hesitation in finding in favor of the defendants?

11:24:46  15           PROSPECTIVE JUROR:  No.

16           THE COURT:  Have you or a family member ever been

17   charged with or convicted of a serious crime?

18           PROSPECTIVE JUROR:  No.

19           THE COURT:  Have you been a crime victim?

11:24:54  20           PROSPECTIVE JUROR:  No.

21           THE COURT:  Have you been a party to a civil lawsuit?

22           PROSPECTIVE JUROR:  No.

23           THE COURT:  Have you been on jury duty before?

24           PROSPECTIVE JUROR:  No.

11:25:01  25           THE COURT:  Have you served in the military?

1          PROSPECTIVE JUROR:  I have not.

2          THE COURT:  What is your source of news?

3          PROSPECTIVE JUROR:  TV, CNN, NBC.

4          THE COURT:  Okay.  Will you follow the law as I

11:25:14  5  instruct you even if you disagree with it?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Any reason you couldn't be a fair and

8  impartial juror in this case?

9          PROSPECTIVE JUROR:  No.

11:25:20  10  THE COURT:  Would you call one more, please.

11          THE CLERK:  Abigail Zaleski.

12          THE COURT:  Good morning.

13          PROSPECTIVE JUROR:  Good morning.

14          THE COURT:  You are Abigail Zaleski?

11:25:46  15  PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Where do you live?

17          PROSPECTIVE JUROR:  In the Edison Park neighborhood

18  of Chicago.

19          THE COURT:  How old are you?

11:25:52  20  PROSPECTIVE JUROR:  39.

21          THE COURT:  What is your educational background?

22          PROSPECTIVE JUROR:  I have a BS in communications.

23          THE COURT:  And what is your business or occupation?

24          PROSPECTIVE JUROR:  I am a commercial real estate

11:26:01  25  broker.

1       THE COURT:  All right.  Are you married?

2       PROSPECTIVE JUROR:  Yes.

3       THE COURT:  What does your spouse do?

4       PROSPECTIVE JUROR:  He's in corporate finance at Bank

5   of America.

6       THE COURT:  Okay.  Would you have a problem with

7   serving in this case?

8       PROSPECTIVE JUROR:  So outside of some planned work

9   travel next week, which I can get out of, but my husband also

10  travels for business.  So as long as it's during business

11  hours, that should not be a problem.

12      THE COURT:  So you would be able -- your travel

13  requirements you could set aside temporarily?

14      PROSPECTIVE JUROR:  I believe so, yeah.

15      THE COURT:  All right.  Have you, family member, or

16  close friend ever been employed in police work?

17      PROSPECTIVE JUROR:  Not my immediate family, but we

18  have some family friends that are current police detectives in

19  Chicago --

20      THE COURT:  Okay.

21      PROSPECTIVE JUROR:  -- that we go on holiday with.

22      THE COURT:  Okay.  They're police detectives?

23      PROSPECTIVE JUROR:  Yes.

24      THE COURT:  Chicago police detectives?

25      PROSPECTIVE JUROR:  Yes.

1      THE COURT:  Do you -- I take it if you travel with
2  them, you talk to them a lot?
3      PROSPECTIVE JUROR:  Yep.  We -- our kids are growing
4  up together.  We went to college with -- we went just on
5  vacation last weekend with two police detectives.
6      THE COURT:  You discuss police work with them?
7      PROSPECTIVE JUROR:  I don't.  I'm sure I listen, but
8  I don't have any biased opinion.
9      THE COURT:  Let me ask you this.  Would there be any
10  embarrassment or whatever -- actually, the defendants in this
11  case are Chicago police officers.  Would you have any problem
12  sitting as a juror in this case?  Would you feel
13  embarrassed --
14      PROSPECTIVE JUROR:  No.
15      THE COURT:  -- or pressure to find one way or
16  another?
17      PROSPECTIVE JUROR:  No, sir.
18      THE COURT:  Okay.  Have you personally received any
19  training in police work?
20      PROSPECTIVE JUROR:  No.
21      THE COURT:  Have you ever studied the subject of
22  false confessions?
23      PROSPECTIVE JUROR:  No.
24      THE COURT:  Have you read or heard any criticism of
25  the Chicago Police Department, particularly with respect to

11:27:13
11:27:25
11:27:36
11:27:44
11:27:52

1  minorities?

2         PROSPECTIVE JUROR:  Yes.

3         THE COURT:  Is there anything that you read or heard

4  that you would find difficult to put out of your mind when you

5  decide this case, and would you be able to decide this case

6  solely on the evidence you hear in court?

7         PROSPECTIVE JUROR:  Yes, I would be able to fairly.

8         THE COURT:  Okay.  Have you personally had a negative

9  or positive experience with a police officer?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Will you use the same tests in evaluating

12  the testimony of lay witnesses that you use for police

13  officers?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Have you read, seen, or heard anything

16  about this lawsuit?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Did you happen to overhear anything in

19  the lobby of the courthouse about this lawsuit?

20         PROSPECTIVE JUROR:  No, sir.

21         THE COURT:  Okay.  Have you read, heard about the

22  subject of sexual assault recently?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  Is there anything -- this case involves

25  the subject of sexual assault.  Is there anything about the

11:28:04

11:28:21

11:28:30

11:28:41

11:28:58

1    subject which would prevent you from deciding this case solely

2    on the evidence you hear in court rather than what you may

3    have read or heard outside of the courtroom?

4              PROSPECTIVE JUROR:  No.

11:29:09    5    THE COURT:  The defendants in this case will be

6    invoking their constitutional right not to testify, and at the

7    conclusion of the case, I will instruct you as to how you

8    should consider this.  Will you follow my instructions on this

9    subject?

11:29:23    10              PROSPECTIVE JUROR:  Yes.

11              THE COURT:  Now, the plaintiff is seeking money

12    damages in this case.  He has the burden of proof.  If he

13    proves his case, would you have any hesitation in awarding him

14    damages?

11:29:31    15              PROSPECTIVE JUROR:  No.

16              THE COURT:  If he fails to prove his case, will you

17    have any hesitation in finding in favor of the defendants?

18              PROSPECTIVE JUROR:  No.

19              THE COURT:  Have you or a family member ever been

11:29:42    20    charged with or convicted of a serious crime?

21              PROSPECTIVE JUROR:  No.

22              THE COURT:  Have you been a crime victim personally?

23              PROSPECTIVE JUROR:  No.

24              THE COURT:  Have you been a party to a civil lawsuit?

11:29:51    25              PROSPECTIVE JUROR:  No.

1    THE COURT:  Have you been on jury duty before?

2    PROSPECTIVE JUROR:  No.

3    THE COURT:  Have you served in the military?

4    PROSPECTIVE JUROR:  No.

11:29:58  5    THE COURT:  And what is your source of news?

6    PROSPECTIVE JUROR:  *The Journal* and MSNBC.

7    THE COURT:  Okay.  Will you follow the law as I

8    instruct you even if you disagree with it?

9    PROSPECTIVE JUROR:  Yes.

11:30:11  10    THE COURT:  Any reason you couldn't be a fair and

11    impartial juror?

12    PROSPECTIVE JUROR:  No.

13    THE COURT:  Lawyers, would you please give me your --

14    MR. HALE:  Could we have a sidebar, please?

11:30:23  15    THE COURT:  Yes.

16    (Sidebar.)

17    MR. JEBSON:  Judge, would it be possible at sidebar

18    to ask further questions of Juror No. 8 regarding her negative

19    experience with the police?  It's always having those gut

11:30:55  20    reactions when they have negative experience with the police

21    when they're asking to put that aside.  They always say "yes,"

22    but after further questioning, I found that we flush it out a

23    lot of times --

24    THE COURT:  Well, she flushed it out pretty full I

11:31:08  25    thought, saying it was 15 years ago, two occasions she was

1  accused of being a drug dealer or something.  I think

2  that's -- I don't think she can flush it out much more than

3  that.  It's a long time ago.

4         MR. JEBSON:  It was the immediacy of how she answered

5  the question.  Without any hesitation, it was yes, I have.

6         THE COURT:  I know.  I respect that.  But she

7  answered the question.  I don't know how I can go further on

8  that.

9         Anything else?

10        MR. JEBSON:  Two things, Judge.

11        When you've asked the venire if they have ever had a

12  negative or positive experience, we would like if you could

13  expand to have they, friends, friends, close friends or family

14  ever had a negative experience, and the more important

15  question is, do they have a negative opinion about the police

16  because there's plenty of people that have either positive or

17  negative experiences with the police but have a very negative

18  opinion about the police.  And that would not -- that

19  information would not come out with the questions that were

20  asked.  It could be a question to the general venire, if the

21  Court pleases, just to follow up whether anyone has a negative

22  opinion of the police.  Because I'm worried --

23        THE COURT:  Specifically Chicago police?

24        PROSPECTIVE JUROR:  Law enforcement in general.

25        MS. BONJEAN:  I have no objection if the Court wishes

1    to do that.

2            I do have my own couple of questions.

3            THE COURT:  All right.

4            MS. BONJEAN:  As to Michael Arend, Juror No. 5, he

5    did not indicate what actual news he watched.  He just said

6    TV, I think.  And I was hoping the Court could inquire whether

7    or not he could identify where his source of news is from.

8            THE COURT:  If I could have your pen for one second.

9    I didn't bring one down.

10           MS. BONJEAN:  Sure.

11           THE COURT:  Okay.  What else?

12           MS. BONJEAN:  And as to Abigail Zaleski, I would ask

13   that the Court inquire further.  She seemed to, from my

14   perspective, hesitate in response to questions about her

15   ability to find in favor of the plaintiff.  And because of her

16   relationships with police officers and vacationing with them,

17   her kids growing up, I would ask that the Court specifically

18   ask whether or not she would have any issue viewing the

19   testimony of a police officer the same or --

20           THE COURT:  I already asked that question, would you

21   use the same tests --

22           MS. BONJEAN:  Yeah.  I --

23           THE COURT:  -- which is the proper law.  It's not --

24   you know, they're no more believable by virtue of the fact if

25   they are the police or not.

11:32:53

11:33:23

11:33:46

1    MS. BONJEAN:  Right.

2        THE COURT:  But they use the same -- I already went

3    through that pretty heavily, I think.

4        MS. BONJEAN:  Okay.

11:34:01    5        THE COURT:  But I will -- Mr. Arend, and then you

6    want to know whether -- what was your specific question?

7        MR. JEBSON:  The question is does you, a family

8    member, or close friend have a negative opinion about law

9    enforcement.  It's the opinion part that has not come out.

11:34:19   10        THE COURT:  All right.  I'll ask that.  Thank you.

11      (End of sidebar.)

12        THE COURT:  One question, Mr. Arend.  Apparently I

13    didn't follow up.  Could you give a little more detail what

14    your source of news is?

11:34:42   15        PROSPECTIVE JUROR:  I watch some TV, but I'm not a

16    big news person to know what's true or false.  I don't do a

17    lot.  I don't read the newspapers.

18        THE COURT:  What TV station, if any, do you

19    specifically --

11:34:59   20        PROSPECTIVE JUROR:  I flip around to the general; 2,

21    5, 7.

22        THE COURT:  You don't have any specific source?

23        PROSPECTIVE JUROR:  Correct.

24        THE COURT:  Okay.  And the last question for all of

11:35:08   25    you, are there any of you that either personally or in your

1   family or very close friends who you feel have negative

2   attitudes towards police in general?  Is there anybody

3   indicating yes?  Everybody indicates no?

4          PROSPECTIVE JUROR:  No.

11:35:30  5          THE COURT:  All right.  Thank you.

6          MR. JEBSON:  We have a procedural question.  Could we

7   have a quick sidebar, please?

8          THE COURT:  Sure.

9     (Sidebar.)

11:39:19  10         MR. JEBSON:  Judge, we would move for cause to strike

11   Juror No. 8, the woman with numerous police, negative police

12   opinions.  I know she said she could be fair, but the fact

13   that the way she answered the tone --

14         THE COURT:  That's the purpose of a peremptory

11:39:36  15  challenge.

16         MS. JACOBS:  Well, Your Honor, just to note, she

17   clearly believes it's because of her race, so it goes right

18   into this case.  She's going to have a bias.  You know, she

19   said --

11:39:49  20         THE COURT:  Maybe, but she said she doesn't.

21         MS. JACOBS:  She said she was treated unfairly.  She

22   was pulled over.

23         THE COURT:  15 years ago.

24         Anyway, the request for cause is denied.

11:39:57  25         MR. JEBSON:  Okay.

1      THE COURT:  Do you have your --

2      MS. BONJEAN:  We put three down?

3      THE COURT:  You get up to three.

4      MS. BONJEAN:  We don't have to use all three.

11:40:09   5      THE COURT:  No, you don't have to use all three.

6      MS. BONJEAN:  Okay.

7      THE COURT:  I mean, this is just the first round.  We

8   will replace -- have you got your --

9      MS. BONJEAN:  No, give me one second, Judge.

11:40:16   10      THE COURT:  All right.

11         (End of sidebar.)

12      THE COURT:  All right.  Mr. Arend, Ms. Utterback,

13   Ms. Anguiano, and Ms. Zaleski will be excused.  Thank you.

14      THE CLERK:  If your name was called, please go back

11:41:29   15   down to the second floor where we began.  They will give you

16   further instruction.

17      THE COURT:  Would you swear in the five remaining?

18      THE CLERK:  Please stand and raise your right hand.

19         (Jurors sworn.)

11:41:52   20      THE COURT:  Would you folks just move to the back

21   row, please.

22         And then call four more, please.

23      THE CLERK:  Shreyas Pandya, P-a-n-d-y-a; Stacy Roth,

24   Jennifer Kitchen, and Oliver Juarez.

11:42:50   25      THE COURT:  The first gentleman, you are Shreyas

| | |
|---|---|
| 1 | Pandya? |
| 2 | PROSPECTIVE JUROR:  Yes. |
| 3 | THE COURT:  Did I pronounce that correctly? |
| 4 | PROSPECTIVE JUROR:  Yeah. |
| 5 | THE COURT:  Where do you live, sir? |
| 6 | PROSPECTIVE JUROR:  Bartlett. |
| 7 | THE COURT:  How old are you? |
| 8 | PROSPECTIVE JUROR:  63. |
| 9 | THE COURT:  What is your educational background? |
| 10 | PROSPECTIVE JUROR:  High school degree, college. |
| 11 | THE COURT:  Okay.  What is your business or |
| 12 | occupation? |
| 13 | PROSPECTIVE JUROR:  Job. |
| 14 | THE COURT:  What do you do? |
| 15 | PROSPECTIVE JUROR:  Doing accounting. |
| 16 | THE COURT:  Who do you work for?  Do you work for |
| 17 | your business or yourself or customers or clients or what? |
| 18 | PROSPECTIVE JUROR:  For the nonprofit organization, |
| 19 | church. |
| 20 | THE COURT:  What is the organization? |
| 21 | PROSPECTIVE JUROR:  BAPS church.  It's a religious |
| 22 | organization. |
| 23 | THE COURT:  Okay.  What's the name of the |
| 24 | organization again? |
| 25 | PROSPECTIVE JUROR:  BAPS. |

11:42:57 (line 5)
11:43:04 (line 10)
11:43:19 (line 15)
11:43:36 (line 20)
11:43:50 (line 25)

1        THE COURT:  Okay.  What church is that affiliated

2   with?

3        PROSPECTIVE JUROR:  I don't understand.

4        THE COURT:  Okay.  You said it's a religious

11:44:03   5   organization.  My question was what branch of religion?

6        PROSPECTIVE JUROR:  Indian.

7        THE COURT:  Indian.  Okay.  Are you married?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  What does your spouse do?

11:44:17  10        PROSPECTIVE JUROR:  She take cooking and babysitting.

11        THE COURT:  Okay.  Would you have a problem sitting

12   as a juror in this case?

13        PROSPECTIVE JUROR:  Yeah.  I have to give the right

14   to my spouse for her work.  And I'm also taking medications,

11:44:43  15   taking insulin.  So it's very hard for me to wake up in the

16   morning and physical problems, some cause of muscle stiffness.

17        THE COURT:  I'll excuse you, sir.  Thank you.

18        THE CLERK:  Go back downstairs to the second floor.

19        THE COURT:  You are Stacy Roth; is that correct?

11:45:00  20        PROSPECTIVE JUROR:  Yes, sir.

21        THE COURT:  Where do you live?

22        PROSPECTIVE JUROR:  I live in Wilmington, Illinois.

23        THE COURT:  How old are you?

24        PROSPECTIVE JUROR:  43.

11:45:07  25        THE COURT:  What is your educational background?

1      PROSPECTIVE JUROR:  Some college.

2      THE COURT:  What is your business or occupation?

3      PROSPECTIVE JUROR:  I am the secretary at an

4  elementary school.

11:45:14   5      THE COURT:  Are you married?

6      PROSPECTIVE JUROR:  I am.

7      THE COURT:  What does your spouse do?

8      PROSPECTIVE JUROR:  He is a route salesman for

9  Hinckley Springs water.

11:45:21  10      THE COURT:  All right.  Would you be able to serve on

11  this jury?

12      PROSPECTIVE JUROR:  Yes.

13      THE COURT:  Okay.  Have you, family member, or close

14  friend ever been employed in police work?

11:45:30  15      PROSPECTIVE JUROR:  No.

16      THE COURT:  Okay.  Have you received any training in

17  police work?

18      PROSPECTIVE JUROR:  No.

19      THE COURT:  Have you ever studied the subject of

11:45:40  20  false confessions?

21      PROSPECTIVE JUROR:  No.  I have never studied it.

22      THE COURT:  Okay.  Do you know anything about it?

23      PROSPECTIVE JUROR:  Well, we actually had an incident

24  in our small town a few years ago where a gentleman that I

11:45:53  25  know was forced into a false confession.  And later they found

1   the correct -- the correct person that did the crime, and he
2   was awarded a large sum of money.

3              THE COURT:  Okay.  Did you study that subject, the
4   case closely, or just were aware of it?

11:46:15
5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  What was your involvement, if any, in the
7   case?

8              PROSPECTIVE JUROR:  Well, it was his young daughter
9   was taken from his home and murdered, and so we were looking
11:46:27
10  for her actively.  His kids are the same age as my kids.

11             THE COURT:  Okay.  Does that experience in any way,
12  shape or form make it difficult for you to sit on this case?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Okay.  When did this happen again?

11:46:52
15             PROSPECTIVE JUROR:  Oh, goodness.  I would say
16  probably ten years ago.

17             THE COURT:  Okay.  Now, have you read or heard about
18  criticism of the Chicago Police Department with respect to
19  treatment of minorities?

11:47:10
20             PROSPECTIVE JUROR:  Yes, just from the news.

21             THE COURT:  Is there anything that you read or heard
22  that you would not be able to put out of your mind in deciding
23  this case?

24             PROSPECTIVE JUROR:  No.

11:47:22
25             THE COURT:  Okay.  In other words, the case should be

1    decided on the evidence you hear in court, not on what you --

2              PROSPECTIVE JUROR:  Correct.

3              THE COURT:  -- may have heard.

4              Also, would you -- the subject of false confession in

11:47:41    5    this particular case, if that -- would you use -- would you be

6    able to put that out of your mind and decide this case?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Okay.  Because what your experience is is

9    not evidence in this case.  You understand that?

10             PROSPECTIVE JUROR:  (Nodding).

11             THE COURT:  Okay.  Have you personally had a negative

12   or a positive experience with a police officer?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Have you, your family, have anybody in

11:48:11    15   your family or yourself have a negative opinion of police in

16   general?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Okay.  Will you use the same tests in

19   evaluating the testimony of lay witnesses that you use for

11:48:22    20   police?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Have you read, seen, or heard anything

23   about this lawsuit?

24             PROSPECTIVE JUROR:  No.

11:48:27    25             THE COURT:  Specifically did you happen to hear

1  anything in the lobby of the courthouse about this case?

2          PROSPECTIVE JUROR:  No, I did not.

3          THE COURT:  Okay.  Have you read, heard about the

4  subject of sexual assault recently?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  This case in part involves the subject of

7  sexual assault.  Is there anything about this subject that

8  would prevent you from deciding this case on the evidence you

9  hear in court rather than what you had may have heard or read

10  outside of the courtroom?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  The defendants in this case will be

13  invoking their constitutional right not to testify.  The Court

14  will instruct you at the end of the case how you should

15  consider this.  Will you follow the Court's instructions on

16  this subject?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  The plaintiff is seeking money damages in

19  this case, and he has the burden of proof.  If he proves his

20  case, would you have any hesitation in awarding him damages?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  If he fails to prove his case, would you

23  have any hesitation in finding in favor of the defendant?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Have you or a family member ever been

11:48:39

11:48:54

11:49:04

11:49:15

11:49:25

1    charged with or convicted of a serious crime?

2         PROSPECTIVE JUROR:  No.

3         THE COURT:  Have you been a crime victim?

4         PROSPECTIVE JUROR:  No, sir.

11:49:35   5         THE COURT:  Have you been a party to a civil lawsuit?

6         PROSPECTIVE JUROR:  No.

7         THE COURT:  Have you been on jury duty before?

8         PROSPECTIVE JUROR:  No.

9         THE COURT:  Have you served in the military?

11:49:43   10        PROSPECTIVE JUROR:  No.

11        THE COURT:  Can you tell us your source of news?

12        PROSPECTIVE JUROR:  Mostly just the Internet, Yahoo!,

13   whatever.  I don't try to look at it very often.

14        THE COURT:  Okay.  Have you -- let's see.  Will you

11:50:02   15   follow the law as I instruct you even if you disagree with it?

16        PROSPECTIVE JUROR:  Yes.

17        THE COURT:  Is there any reason you couldn't be a

18   fair and impartial juror in this case?

19        PROSPECTIVE JUROR:  No.

11:50:09   20        THE COURT:  All right.  The next lady is Jennifer

21   Kitchen.

22        PROSPECTIVE JUROR:  Yes.

23        THE COURT:  Where do you live?

24        PROSPECTIVE JUROR:  In West Town, Chicago.

11:50:17   25        THE COURT:  How old are you?

1    PROSPECTIVE JUROR:  32.

2    THE COURT:  Okay.  What is your educational

3  background?

4    PROSPECTIVE JUROR:  Bachelor's in design and

5  marketing.

6    THE COURT:  And what your business or occupation?

7    PROSPECTIVE JUROR:  I currently actually just quit my

8  job, but I was working in marketing at a technology company.

9    THE COURT:  What was the company?  What type of

10  business was the company in that you --

11    PROSPECTIVE JUROR:  HR technology.

12    THE COURT:  Okay.  Are you married?

13    PROSPECTIVE JUROR:  Yes.

14    THE COURT:  What does your spouse do?

15    PROSPECTIVE JUROR:  He is a hotel developer.

16    THE COURT:  Okay.  Have you, your family member, or

17  close friend been employed in police work?

18    PROSPECTIVE JUROR:  No.

19    THE COURT:  Have you personally received any training

20  in police work?

21    PROSPECTIVE JUROR:  No.

22    THE COURT:  How about the subject of false

23  confessions, have you ever studied that?

24    PROSPECTIVE JUROR:  No.

25    THE COURT:  I should have asked you this.  Would you

1    have a problem serving as a juror in this case?

2            PROSPECTIVE JUROR:  Yes.  I'm going through some

3    pretty heavy grieving.  I lost a full-term pregnancy recently,

4    and I'm leaving town to be with family next week.

11:51:37    5            THE COURT:  All right.  I'll excuse you.  Thank you.

6            Next gentleman is Oliver Juarez?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Where do you live, sir?

9            PROSPECTIVE JUROR:  Plainfield, Illinois.

11:51:58    10            THE COURT:  How old are you?

11            PROSPECTIVE JUROR:  21.

12            THE COURT:  What is your educational background?

13            PROSPECTIVE JUROR:  Associate's in science, working

14    my way to a Bachelor's in engineering, mechanical engineering,

11:52:07    15    if that matters.

16            THE COURT:  What is your business or occupation?

17            PROSPECTIVE JUROR:  Currently on vacation, going back

18    on Monday.  I work as a manager at Arby's, delivery for

19    Jimmy John's.

11:52:18    20            THE COURT:  Would you have difficulty serving in this

21    case?

22            PROSPECTIVE JUROR:  Somewhat.  On March 6th, I have a

23    plane ticket to Miami.  And then from there, I got to go pick

24    up my father from Mexico for a road trip.  Not a road trip,

11:52:34    25    but like bring him back.

1    THE COURT:  Let me see.  Today is the 20th.

2    PROSPECTIVE JUROR:  So as long as it doesn't

3 intervene with that, then I'll be all good.  I would check my

4 calendar, but I can't pull up my own.

11:52:50    5    THE COURT:  So you need to be finished by the 6th of

6 March?

7    PROSPECTIVE JUROR:  Yes.

8    THE COURT:  What day of the week is that?

9    THE CLERK:  That's a Friday, 15 days from today.

11:53:03    10    THE COURT:  Let me see the lawyers for just a brief

11 sidebar.

12    (Sidebar.)

13    THE COURT:  We have any difficulty finishing by then?

14    MR. HALE:  No, we'll be done by then.

11:53:20    15    THE COURT:  Okay.

16    (End of sidebar.)

17    THE COURT:  I've been advised that we expect to be

18 finished by that time.  So that's okay for you to serve; is

19 that right, sir?

11:53:32    20    PROSPECTIVE JUROR:  Yeah.

21    THE COURT:  Okay.  Have you, family member, or close

22 friend ever been employed in police work?

23    PROSPECTIVE JUROR:  My friend is working right now

24 for the JDC police department, so right now he's in training.

11:53:48    25 I mean, I have two of my friends' fathers are in the police

1    force, I guess, for Joliet.

2         THE COURT:  What police force are your friends'

3    fathers in?  Your friends' fathers --

4         PROSPECTIVE JUROR:  They're just regular police

11:54:06    5    officers for Joliet.

6         THE COURT:  Where?  Oh, Joliet.  Not Chicago, just

7    Joliet; is that right?

8         PROSPECTIVE JUROR:  Yes, Joliet.

9         THE COURT:  Is there anything about that friendship

11:54:18   10    that would make it embarrass you to sit as a juror in this

11    case involving police?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Okay.  Have you personally received any

14    training in police work?

11:54:29   15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Have you ever studied the subject of

17    false confessions?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Have you heard about criticisms of the

11:54:40   20    Chicago Police Department particularly with respect to

21    treatment of minorities?

22         PROSPECTIVE JUROR:  Yes, in the news.

23         THE COURT:  Is there anything that you read or heard

24    that you would not be able to put out of your mind which would

11:54:51   25    prevent you from deciding this case solely on the evidence you

1    hear in court?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Okay.  Have you personally had a negative

4    or positive experience with a police officer?

11:55:02    5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Is there anybody in your family,

7    including yourself, that has a negative opinion of police in

8    general?

9          PROSPECTIVE JUROR:  No.

11:55:13    10          THE COURT:  Okay.  Will you use the same tests in

11   evaluating the testimony of lay witnesses that you use for

12   police?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  All right.  Have you read, seen, or heard

11:55:26    15   anything about this case?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Did you overhear anything in the lobby of

18   the courthouse today about the case?

19          PROSPECTIVE JUROR:  No.

11:55:34    20          THE COURT:  Okay.  Have you heard or read about the

21   subject of sexual assault?

22          PROSPECTIVE JUROR:  Have I heard or read?

23          THE COURT:  Yeah.  Recently have you read about the

24   subject?

11:55:46    25          PROSPECTIVE JUROR:  Yes.

1    THE COURT:  This case in part involves the subject of

2    sexual assault.  Is there anything about this subject that

3    would prevent you from deciding this case on the evidence you

4    hear in court rather than what you may have read or heard?

5    PROSPECTIVE JUROR:  No.

6    THE COURT:  Okay.  The defendants in this case will

7    be invoking their constitutional right not to testify, and the

8    Court, I will instruct you at the end of the case how you

9    should consider this.  Will you follow the Court's instruction

10   on this subject?

11   PROSPECTIVE JUROR:  Yes.

12   THE COURT:  Now, the plaintiff is seeking money

13   damages in this case for which he has the burden of proof.  If

14   he proves his case, would you have any hesitation in awarding

15   him damages?

16   PROSPECTIVE JUROR:  No.

17   THE COURT:  If he fails to prove his case, would you

18   have any hesitation in finding in favor of the defendants?

19   PROSPECTIVE JUROR:  No.

20   THE COURT:  Have you or family members ever been

21   charged with or convicted of a serious crime?

22   PROSPECTIVE JUROR:  No.

23   THE COURT:  Have you been a crime victim?

24   PROSPECTIVE JUROR:  No.

25   THE COURT:  Have you been party to a civil lawsuit?

11:55:59

11:56:13

11:56:24

11:56:30

11:56:39

1      PROSPECTIVE JUROR:  No.

2      THE COURT:  Have you been on jury duty before?

3      PROSPECTIVE JUROR:  No.

4      THE COURT:  Have you served in the military?

11:56:52    5      PROSPECTIVE JUROR:  No.

6      THE COURT:  What is your source of news?

7      PROSPECTIVE JUROR:  *Fox News*, CNN, and then whatever

8  is on Snapchat, so NBC, Barstool Sports, *Washington Post*.

9      THE COURT:  Okay.  Will you follow the law as I

11:57:07   10  instruct you even if you disagree with it?

11      PROSPECTIVE JUROR:  Yes.

12      THE COURT:  Any reason you couldn't be a fair and

13  impartial juror in this case?

14      PROSPECTIVE JUROR:  No.

11:57:14   15      THE COURT:  Would you call two more, please.

16      PROSPECTIVE JUROR:  Eruch Rustomji, R-u-s-t-o-m-j-i,

17  and Antonina North.

18      THE COURT:  Is it "UR"-ik Rustomji?  How do you

19  pronounce it, sir?

11:57:46   20      PROSPECTIVE JUROR:  "AIR"-ch Rustomji.

21      THE COURT:  Where do you live, sir?

22      PROSPECTIVE JUROR:  Hoffman Estates.

23      THE COURT:  How old are you?

24      PROSPECTIVE JUROR:  52.

11:57:54   25      THE COURT:  What is your educational background?

| | |
|---|---|
| 1 | PROSPECTIVE JUROR: I have a Master's in computer |
| 2 | science. |
| 3 | THE COURT: And your business or occupation? |
| 4 | PROSPECTIVE JUROR: I'm an IT engineer at a |
| 11:58:02  5 | pharmaceutical company. |
| 6 | THE COURT: Are you married? |
| 7 | PROSPECTIVE JUROR: Yes, but I'm going through a |
| 8 | divorce right now. |
| 9 | THE COURT: What does your spouse currently do? |
| 11:58:12  10 | PROSPECTIVE JUROR: She's a teacher at a local |
| 11 | elementary school. |
| 12 | THE COURT: Okay. Would you have a problem serving |
| 13 | as a juror in this case? |
| 14 | PROSPECTIVE JUROR: Yes. Because of the divorce case |
| 11:58:23  15 | going on, we have a hearing on Monday at the state courthouse, |
| 16 | and I'm scheduled to be -- |
| 17 | THE COURT: All right. I'll excuse you, sir. Thank |
| 18 | you. |
| 19 | He should go down? |
| 11:58:40  20 | THE CLERK: Yes, to the second floor. |
| 21 | THE COURT: The next lady, you are Antonina North? |
| 22 | PROSPECTIVE JUROR: Yes. |
| 23 | THE COURT: Where do you live? |
| 24 | PROSPECTIVE JUROR: Roselle, Illinois. |
| 11:58:50  25 | THE COURT: How old are you? |

1      PROSPECTIVE JUROR:  22.

2      THE COURT:  What is your educational background?

3      PROSPECTIVE JUROR:  I have a bachelor's in

4  journalism.

11:58:56      5      THE COURT:  What is your business or occupation?

6      PROSPECTIVE JUROR:  I'm a PR account coordinator.

7      THE COURT:  What are your duties?

8      PROSPECTIVE JUROR:  I work with franchises.  So I do

9  media relations.  It's just all getting them publicity and

11:59:14    10  press.

11      THE COURT:  Okay.  Are you married?

12      PROSPECTIVE JUROR:  No.

13      THE COURT:  Would you have difficulty serving on this

14  jury?

11:59:20    15      PROSPECTIVE JUROR:  No.

16      THE COURT:  Okay.  Have you or a family member or

17  close friend been employed in police-type work?

18      PROSPECTIVE JUROR:  No.

19      THE COURT:  Have you received any training in police

11:59:32    20  work?

21      PROSPECTIVE JUROR:  No.

22      THE COURT:  Have you ever studied the subject of

23  false confessions?

24      PROSPECTIVE JUROR:  No.

11:59:38    25      THE COURT:  Have you read or heard about criticisms

1    of the Chicago Police Department with respect to treatment of
2    minorities?

3               PROSPECTIVE JUROR:  Yes, just in the news.

4               THE COURT:  Is there anything that you read or heard
5    that you would not be able to put out of your mind and decide
6    this case solely on the evidence you hear in court?

7               PROSPECTIVE JUROR:  No.

8               THE COURT:  Okay.  Have you personally had a negative
9    or a positive experience with a police officer?

10              PROSPECTIVE JUROR:  No.

11              THE COURT:  Do you or your family have a negative
12    opinion of police in general?

13              PROSPECTIVE JUROR:  No.

14              THE COURT:  Will you use the same tests in evaluating
15    the testimony of lay witnesses that you use for testing the
16    testimony of police?

17              PROSPECTIVE JUROR:  Yes.

18              THE COURT:  Okay.  Have you read, seen, or heard
19    anything about this lawsuit?

20              PROSPECTIVE JUROR:  No.

21              THE COURT:  Did you happen to hear anything in the
22    lobby of the courthouse today about this lawsuit?

23              PROSPECTIVE JUROR:  No.

24              THE COURT:  Have you read or heard about the subject
25    of sexual assault?

11:59:52  (line 5)
12:00:07  (line 10)
12:00:21  (line 15)
12:00:36  (line 20)
12:00:48  (line 25)

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Is there -- this case in part involves

3   the subject of sexual -- alleged sexual assault.  Is there

4   anything about this subject that prevents you from deciding

5   this case and the evidence you hear in court rather than what

6   you may have read or heard outside of the Court?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  The defendants in this case will be

9   invoking their constitutional right not to testify, and the

10  Court will instruct you at the end of the case how you should

11  consider this.  Will you follow my instructions on this

12  subject?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  The plaintiff is seeking money damages in

15  this case for which he has the burden of proof.  If he proves

16  his case, would you have any hesitancy in awarding him

17  damages?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  If he fails to prove his case, would you

20  have any hesitancy in finding in favor of the defendants?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Have you or a family member ever been

23  charged with or convicted of a serious crime?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  Have you been a crime victim?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Did you say yes?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Okay.  Have you been a party to a civil

12:01:47   5   lawsuit?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Have you been on jury duty before?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Have you served in the military?

12:01:55   10          PROSPECTIVE JUROR:  No.

11          THE COURT:  What is your source of news?

12          PROSPECTIVE JUROR:  Variety TV, NBC, MSNBC, *Wall*

13   *Street Journal*.

14          THE COURT:  Okay.  Will you follow the law as I

12:02:07   15   instruct you even if you don't agree with it?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Is there any reason you couldn't be a

18   fair and impartial juror in this case?

19          PROSPECTIVE JUROR:  No.

12:02:13   20          THE COURT:  Okay.

21          Would you call one more, please.

22          PROSPECTIVE JUROR:  Noreen Emerson.

23          THE COURT:  Good afternoon.  You are Noreen Emerson;

24   is that correct?

12:02:43   25          PROSPECTIVE JUROR:  Yes.

1       THE COURT:  Where do you live?

2       PROSPECTIVE JUROR:  Naperville.

3       THE COURT:  How old are you?

4       PROSPECTIVE JUROR:  56.

12:02:48    5       THE COURT:  What is your educational background?

6       PROSPECTIVE JUROR:  I have a Bachelor's in economics.

7       THE COURT:  And what is your business or occupation?

8       PROSPECTIVE JUROR:  I am a sales compensation

9   designer for a telecommunications company.

12:02:59   10       THE COURT:  Are you married?

11       PROSPECTIVE JUROR:  Yes.

12       THE COURT:  What does your spouse do?

13       PROSPECTIVE JUROR:  He is a sales manager at a car

14   dealership.

12:03:07   15       THE COURT:  Okay.  Would you have difficulty serving

16   on the jury in this case?

17       PROSPECTIVE JUROR:  No.

18       THE COURT:  Okay.  Have you, family member, or close

19   friend been employed in police work?

12:03:21   20       PROSPECTIVE JUROR:  My husband's cousin is a retired

21   Illinois state trooper, and I have two uncles that were with

22   the FBI.

23       THE COURT:  Okay.  Are they still with the FBI?

24       PROSPECTIVE JUROR:  No.

12:03:30   25       THE COURT:  Okay.  They're all retired?

1    PROSPECTIVE JUROR:  One left years ago, and the other
2    retired.
3    THE COURT:  Okay.  Have you personally received any
4    training in police work?
5    PROSPECTIVE JUROR:  No.
6    THE COURT:  Have you ever studied the subject of
7    false confessions?
8    PROSPECTIVE JUROR:  No.
9    THE COURT:  Have you read or heard criticisms of the
10   Chicago Police Department with respect to treatment of
11   minorities?
12   PROSPECTIVE JUROR:  Yes.
13   THE COURT:  Is there anything that you read or heard
14   that you would be unable to put out of your mind and that
15   would prevent you from deciding this case solely on the
16   evidence you hear in court?
17   PROSPECTIVE JUROR:  No.
18   THE COURT:  Okay.  Have you personally had a negative
19   or positive experience with police officers?
20   PROSPECTIVE JUROR:  Only positive experiences.
21   THE COURT:  Okay.  Could you tell us what your --
22   PROSPECTIVE JUROR:  In driving, my vehicle was hit by
23   another vehicle and called the police.  Also we had an
24   incident where my son and his daughter were followed to their
25   house, and someone was yelling at them, and we called the

1   police. So all positive in terms of their responsiveness.

2   THE COURT: I take it then you and your family do not

3   have a negative opinion of police in general.

4   PROSPECTIVE JUROR: Correct.

12:04:41  5   THE COURT: Okay. Will you use the same tests in

6   evaluating the testimony of lay witnesses that you use for the

7   police?

8   PROSPECTIVE JUROR: Yes.

9   THE COURT: Have you read, seen, or heard anything

12:04:50  10  about this lawsuit?

11   PROSPECTIVE JUROR: No.

12   THE COURT: Did you hear anything in the lobby of the

13   courthouse today by any chance?

14   PROSPECTIVE JUROR: No.

12:04:59  15  THE COURT: Have you read or heard about the subject

16   of sexual assault recently?

17   PROSPECTIVE JUROR: Yes.

18   THE COURT: Now, this case involves an allegation of

19   sexual assault. Is there anything about this subject that

12:05:11  20  would prevent you from deciding this case on the evidence you

21   hear in court rather than what you may have read or heard

22   outside of the Court?

23   PROSPECTIVE JUROR: No.

24   THE COURT: The defendants in this case will be

12:05:21  25  invoking their constitutional right not to testify, and I will

1    instruct the jury at the end of the case how they should

2    consider this.  Will you follow my instructions on this

3    subject if you are a juror?

4              PROSPECTIVE JUROR:  Yes.

12:05:32    5              THE COURT:  The plaintiff is seeking money damages in

6    this case in which he has the burden of proof.  If he proves

7    his case, would you have any hesitancy in awarding him

8    damages?

9              PROSPECTIVE JUROR:  No.

12:05:42    10              THE COURT:  If he fails to prove his case, would you

11    have any hesitation in finding in favor of the defendants?

12              PROSPECTIVE JUROR:  No.

13              THE COURT:  Have you or a family member been charged

14    with or convicted of a serious crime?

12:05:53    15              PROSPECTIVE JUROR:  No.

16              THE COURT:  Have you been a crime victim?

17              PROSPECTIVE JUROR:  No.

18              THE COURT:  Have you been a party to a civil lawsuit?

19              PROSPECTIVE JUROR:  No.

12:05:57    20              THE COURT:  Have you been on jury duty before?

21              PROSPECTIVE JUROR:  No.

22              THE COURT:  Have you served in the military?

23              PROSPECTIVE JUROR:  No.

24              THE COURT:  Could you tell us your source of news?

12:06:06    25              PROSPECTIVE JUROR:  TV, WGN, CNN, and then online

1    newspaper, *Chicago Tribune*, *Daily Herald*.

2              THE COURT:  Okay.  Will you follow the law as I

3    instruct you even if you don't agree with it?

4              PROSPECTIVE JUROR:  Yes.

12:06:18    5    THE COURT:  Any reason you couldn't be fair and

6    impartial?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Thank you.

9              Lawyers, give me your suggestions.

12:06:27   10    MR. JEBSON:  Judge, quick sidebar, please.

11         (Sidebar.)

12              MR. JEBSON:  Judge, Juror No. 12 is the woman with

13   the close friend who was awarded a large sum of money on a

14   lawsuit.

12:06:52   15    THE COURT:  Mm-hmm.

16              MR. JEBSON:  The alleged coerced confession.  It

17   doesn't make a difference if she says that she can set that

18   aside because the reality is she could never.  This is why,

19   Judge.  She said she has -- her daughters are friends with

12:07:08   20   this person's children.  The defense is already starting off

21   at a disadvantage because she is no question to be inclined to

22   think any claim of a coerced confession has some merit.  So

23   the defendants always start behind the 8-ball and have to go

24   over that hurdle just to get her back to being fair, so they

12:07:33   25   could never get a fair trial from this jury.  Even if she

| | |
|---|---|
| 1 | wants to be fair and even if she says she could be fair, given |
| 2 | her experience, she said she was heavily involved.  It's not |
| 3 | something she heard on the news.  She was heavily involved. |
| 4 | MS. BONJEAN:  Judge, we don't disagree on this one. |
| 12:07:50  5 | THE COURT:  It's agreed.  I'll excuse her.  That |
| 6 | was which one? |
| 7 | MS. COHEN:  No. 12. |
| 8 | THE COURT:  All right. |
| 9 | (End of sidebar.) |
| 12:08:11  10 | THE COURT:  Ms. Roth, we'll excuse you. |
| 11 | Call one more, please. |
| 12 | PROSPECTIVE JUROR:  Andrea Brockert. |
| 13 | THE COURT:  Good afternoon.  You are Andrea Brockert? |
| 14 | PROSPECTIVE JUROR:  Yes, "AN"-dre-a. |
| 12:08:47  15 | THE COURT:  Where do you live? |
| 16 | PROSPECTIVE JUROR:  Glen Ellyn. |
| 17 | THE COURT:  How old are you? |
| 18 | PROSPECTIVE JUROR:  36. |
| 19 | THE COURT:  What is your educational background? |
| 12:08:55  20 | PROSPECTIVE JUROR:  Some college. |
| 21 | THE COURT:  And what is your business or occupation? |
| 22 | PROSPECTIVE JUROR:  I'm a yoga instructor. |
| 23 | THE COURT:  Are you married? |
| 24 | PROSPECTIVE JUROR:  Engaged. |
| 12:09:08  25 | THE COURT:  What does your spouse -- or fiancé do? |

1    PROSPECTIVE JUROR:  He works in insurance benefits.

2    THE COURT:  Would you have a problem serving as a

3  juror in this case?

4    PROSPECTIVE JUROR:  I only get paid if I work, and

12:09:25    5  our wedding is in two months.  And it would be difficult to

6  lose two weeks of income for sure for us.

7    THE COURT:  Okay.  I'll excuse you.  Thank you.

8    PROSPECTIVE JUROR:  Thank you.

9    THE COURT:  Call one more, please.

12:09:39   10    THE CLERK:  Mary Crout.

11    THE COURT:  You are Mary Crout?

12    PROSPECTIVE JUROR:  That's correct, Your Honor.

13    THE COURT:  Where do you live?

14    PROSPECTIVE JUROR:  Chicago Ridge, Illinois.

12:10:03   15    THE COURT:  How old are you?

16    PROSPECTIVE JUROR:  58.

17    THE COURT:  What is your educational background?

18    PROSPECTIVE JUROR:  I have a Bachelor's degree in

19  recreation administration, and a Master's in public

12:10:11   20  administration.

21    THE COURT:  And your business or occupation?

22    PROSPECTIVE JUROR:  I'm the safety coordinator and

23  the aquatic supervisor for the Oak Lawn Park District.

24    THE COURT:  Are you married?

12:10:20   25    PROSPECTIVE JUROR:  Yes, I am.

1    THE COURT:  What does your spouse do?

2    PROSPECTIVE JUROR:  He's a maintenance manager of an

3 ink manufacturing plant.

4    THE COURT:  Can you serve on this jury?

12:10:31 5    PROSPECTIVE JUROR:  Yes.

6    THE COURT:  Have you or any family member or close

7 friends been employed in police work?

8    PROSPECTIVE JUROR:  Officer Conrad Garrett was my

9 nephew's best friend, and my niece is currently engaged to a

12:10:41 10 Chicago police officer.

11    THE COURT:  Okay.  Is there anything about those

12 relationships you think might affect your ability to be fair

13 in this case?

14    PROSPECTIVE JUROR:  No.

12:10:47 15    THE COURT:  All right.  Have you personally received

16 any training in police work?

17    PROSPECTIVE JUROR:  No, I have not.

18    THE COURT:  What about the subject of false

19 confessions, have you ever studied that?

12:10:58 20    PROSPECTIVE JUROR:  No, I have not.

21    THE COURT:  Have you read or heard any criticism of

22 the Chicago Police Department with respect to their treatment

23 of minorities?

24    PROSPECTIVE JUROR:  Just what you see on the news.

12:11:09 25    THE COURT:  Is there anything you read or heard you

1    would not be able to put out of your mind and decide this case

2    solely on the evidence you hear in court?

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  Have you personally had a negative or

12:11:18   5    positive experience with a police officer?

6           PROSPECTIVE JUROR:  No.

7           THE COURT:  Have your family in general have -- does

8    anybody in your family have a negative opinion of police in

9    general?

12:11:30   10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Okay.  Will you use the same tests in

12   evaluating the testimony of lay witnesses that you use for

13   police?

14          PROSPECTIVE JUROR:  Yes.

12:11:38   15          THE COURT:  Have you read, seen, or heard anything

16   about this lawsuit?

17          PROSPECTIVE JUROR:  No, I have not.

18          THE COURT:  Did you -- excuse me -- by any chance

19   overhear anything about this lawsuit in the lobby of the

12:11:53   20   courthouse today?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Have you read or heard about the subject

23   of sexual assault recently?

24          PROSPECTIVE JUROR:  Yes.

12:11:59   25          THE COURT:  This case in part involves the subject of

1    alleged sexual assault.  Is there anything about this subject

2    which prevents you from deciding the case solely on the

3    evidence you hear in court?

4              PROSPECTIVE JUROR:  No.

12:12:11    5    THE COURT:  You could put out whatever you may have

6    read or --

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Okay.  The defendants in this case will

9    be invoking their constitutional right not to testify, and the

12:12:22    10   Court will instruct you at the end of the case how you should

11   consider this.  Will you follow the Court's instructions on

12   this subject?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  The plaintiff is seeking money damages in

12:12:35    15   this case for which he has the burden of proof.  If he proves

16   his case, would you have any hesitation in awarding him

17   damages?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  If he fails to prove his case, would you

12:12:43    20   have any hesitation in finding in favor of the defendants?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  Have you or any family member ever been

23   charged with or convicted of a serious crime?

24             PROSPECTIVE JUROR:  My son has a felony possession of

12:12:54    25   heroin.

1    THE COURT:  How long ago did that happen?

2    PROSPECTIVE JUROR:  He just got out of jail three

3  weeks ago.  He's currently in treatment.

4    THE COURT:  Is there anything about that experience

5  which could possibly affect you in this case?

6    PROSPECTIVE JUROR:  No.

7    THE COURT:  Do you believe he was treated all right

8  in the prosecution?

9    PROSPECTIVE JUROR:  Yes.

10    THE COURT:  All right.  Have you been a crime victim

11  personally?

12    PROSPECTIVE JUROR:  Just a hit and run.

13    THE COURT:  Have you been a party to a civil lawsuit?

14    PROSPECTIVE JUROR:  No, I have not.

15    THE COURT:  Have you been on jury duty before?

16    PROSPECTIVE JUROR:  Yes, I have.

17    THE COURT:  When and where?

18    PROSPECTIVE JUROR:  It was about almost 30 years ago

19  in Markham courthouse, criminal case.

20    THE COURT:  What was the charge, do you remember?

21    PROSPECTIVE JUROR:  Smash and grab of an elderly

22  woman.

23    THE COURT:  All right.  Have you served in the

24  military?

25    PROSPECTIVE JUROR:  No.

1       THE COURT:  What is your source of news?

2       PROSPECTIVE JUROR:  I watch WGN, NBC, ABC.  I

3  occasionally read the *Tribune*.

4       THE COURT:  Will you follow the law as I instruct you

5  even if you don't agree with it?

6       PROSPECTIVE JUROR:  Yes.

7       THE COURT:  Any reason you couldn't be fair?

8       PROSPECTIVE JUROR:  No.

9       THE COURT:  Thank you.

10       Okay.  Your choices.

11       MS. BONJEAN:  One second, Judge.

12     (Counsel conferring.)

13       THE COURT:  All right.  Ms. Emerson, you may be

14  excused, please.

15       Call one more, please.

16       THE CLERK:  Jacqueline Williams.

17       THE COURT:  Swear these three in too, please.

18     (Jurors duly sworn.)

19       THE COURT:  Good afternoon.  You are Jacqueline

20  Williams; is that correct?

21       PROSPECTIVE JUROR:  Yes, sir.

22       THE COURT:  Where do you live?

23       PROSPECTIVE JUROR:  Olympia Fields, Illinois.

24       THE COURT:  Speak a little closer to the microphone,

25  please.

1  PROSPECTIVE JUROR:  Olympia Fields, Illinois.

2  THE COURT:  How old are you?

3  PROSPECTIVE JUROR:  61.

4  THE COURT:  What is your educational background?

5  PROSPECTIVE JUROR:  Some college.

6  THE COURT:  And what do you do for a living?

7  PROSPECTIVE JUROR:  Retired financial typesetter.

8  THE COURT:  What were your -- time setter?

9  PROSPECTIVE JUROR:  Typesetter.

10  THE COURT:  Typesetter.

11  PROSPECTIVE JUROR:  Preparing electronic documents

12  for the Securities and Exchange Commission.

13  THE COURT:  Thank you.

14  Are you married?

15  PROSPECTIVE JUROR:  Divorced.

16  THE COURT:  What does your former husband do?

17  PROSPECTIVE JUROR:  He's retired.

18  THE COURT:  And what did he do before he retired?

19  PROSPECTIVE JUROR:  Instrument engineer.

20  THE COURT:  Okay.  Will you be able to serve as a

21  juror in this case?

22  PROSPECTIVE JUROR:  Yes, sir.

23  THE COURT:  Okay.  Have you or any family member or

24  close friend employed in police work?

25  PROSPECTIVE JUROR:  No.

1    THE COURT:  Okay.  Have you personally received any
2  training in police work?
3    PROSPECTIVE JUROR:  No.
4    THE COURT:  Have you ever studied the subject of
5  false confessions?
6    PROSPECTIVE JUROR:  No, sir.
7    THE COURT:  Have you read or heard any criticisms of
8  the Chicago Police Department with respect to their treatment
9  of minorities?
10    PROSPECTIVE JUROR:  Yes.
11    THE COURT:  Is there anything about what you read or
12  heard that would prevent you from deciding this case solely on
13  the evidence that you hear in court?
14    PROSPECTIVE JUROR:  No, sir.
15    THE COURT:  Okay.  Have you personally had a negative
16  or positive experience with a police officer?
17    PROSPECTIVE JUROR:  No.
18    THE COURT:  Do you or your family have a negative
19  opinion of police in general?
20    PROSPECTIVE JUROR:  No.
21    THE COURT:  Okay.  Will you use the same tests in
22  evaluating the testimony of lay witnesses that you use for
23  police?
24    PROSPECTIVE JUROR:  Yes.
25    THE COURT:  Have you read, seen, or heard anything

12:20:35
12:20:45
12:20:58
12:21:05
12:21:13

1    about this lawsuit?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Did you happen to overhear anything in

4    the lobby of the courthouse today about this lawsuit?

12:21:25    5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Okay.  Have you heard or read about the

7    subject of sexual assault recently?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Is there anything -- this case in part

12:21:35    10   involves the subject of sexual assault.  Is there anything

11   about this -- alleged sexual assault.  Is there anything about

12   this subject that would prevent you from deciding this case on

13   the evidence you hear in court rather than what you've heard?

14             PROSPECTIVE JUROR:  No.

12:21:50    15             THE COURT:  Okay.  The defendants in this case will

16   be invoking their constitutional right not to testify, and the

17   Court will instruct you at the end of the case how you should

18   consider this.  Will you follow the Court's instructions on

19   this subject?

12:22:02    20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  The plaintiff is seeking money damages in

22   this case for which he has the burden of proof.  If he proves

23   his case, would you have any hesitation in awarding him

24   damages?

12:22:13    25             PROSPECTIVE JUROR:  No.

1          THE COURT:  If he fails to prove his case, would you

2    have any hesitancy in finding in favor of the defendants?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Have you or a family member been charged

5    with or convicted of a serious crime?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Have you been a crime victim?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Have you been a party to a civil lawsuit?

10         PROSPECTIVE JUROR:  No, sir.

11         THE COURT:  Have you been on jury duty before?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Have you served in the military?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  What is your source of news?

16         PROSPECTIVE JUROR:  Probably NPR and what I read on

17   the Internet.

18         THE COURT:  Okay.  Will you follow the law as I

19   instruct you even if you disagree with it?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Any reason you couldn't be a fair and

22   impartial juror in this case?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Okay.

25         Choice, please.

1          Can you write up your choice?

2          MS. BONJEAN:  Did we use our three?

3          MR. HALE:  The plaintiff used all three.

4          MS. BONJEAN:  We used our three, Judge.

12:24:07  5          THE COURT:  Let's have a sidebar just quickly.

6      (Sidebar.)

7          THE COURT:  This juror is okay with you then?

8          MS. BONJEAN:  We're out.  It depends on what their

9  strike is.

12:24:19  10          THE COURT:  They did not strike.

11          MS. BONJEAN:  Okay.

12          THE COURT:  Okay.  So we've completed jury selection.

13          MR. JEBSON:  Yes.

14          MS. BONJEAN:  Yes.

12:24:27  15      (End of sidebar.)

16          THE COURT:  All right.  Would you please swear in...

17          THE CLERK:  Ms. Williams, Judge?

18          THE COURT:  Yes, Ms. Williams.

19      (Juror duly sworn.)

12:24:44  20          THE COURT:  Members of the jury, we have now

21  completed jury selection.

22          And so they go down?

23          THE CLERK:  Yes, go back to the second floor where we

24  all started.  They'll give you further instructions.

12:24:55  25          THE COURT:  We're going to suspend now.  You folks

1    have been selected.  In a few moments, Ms. Foster, the clerk,

2    will show you where the jury room is, which will be your home,

3    in effect, while you're here, and it will be locked while

4    you're here so you can leave your possessions in the jury

5    room.  There's a few instructions which I need to go over with

6    you and then we'll break for lunch.  When you come back from

7    lunch, we'll have the opening statements of the case which the

8    lawyers will then explain to you what this case is really all

9    about in much greater detail than what I furnished to you.

10   Now, a few things is please don't discuss this case

11   amongst yourselves or with anybody else, including your

12   family, until the case is over, or at least obviously at the

13   time that you get the case as a jury you will discuss the case

14   among yourselves, but please don't do so until you've heard

15   all the evidence in the case.  And it's very important that

16   you do not talk to people outside of the courtroom, including

17   your family and friends, about the case because the experience

18   is if you do, they may try to give you advice about what their

19   knowledge about the subject is.  And as I've made relatively

20   clear, I think this case should be decided solely on what you

21   hear in the courtroom, not what you may have heard outside of

22   the courthouse.

23   Now, a few other things is please do not use the

24   social media to discuss your service in this case.  Once the

25   case is over and you reached your decision, you will be free

1    to do whatever you wish as far as the case is concerned, but

2    please do not get on Facebook or anything else and explain to

3    your friends what you're doing and how interesting it is or

4    uninteresting, as the case may be.  So please do not do that,

5    and do not allow anybody to ask you questions or talk to you

6    about the case.  And if anybody attempts to do so, please let

7    me know, and I will make sure that it stops because, again,

8    you are solely to decide this case on the evidence which you

9    hear from the witness stand, will be right over here, during

10    the course of this particular trial.

11    So we will suspend now until, we'll make it a quarter

12    to 2:00, and then at that time you'll hear the opening

13    statements of the lawyers.

14    So, Ms. Foster, would you show them the jury room.

15    MR. HALE:  Your Honor, could we just have a quick

16    sidebar real quick, just for one second?

17    (Sidebar.)

18    MR. HALE:  We didn't read the list of witnesses in

19    the case to the prospective venire.  And I think even maybe we

20    just should now just to make sure nobody knows anybody that's

21    in the --

22    THE COURT:  I wish you had given me the list.  I

23    would have read them before.  I think it's a little late now

24    since they've been sworn in, so I don't think that will be a

25    problem.

1        MR. HALE:  Okay.  Fair enough.

2     (End of sidebar.)

3        THE COURT:  All right.  Thank you.

4     (Jury exits.)

5        THE COURT:  I will suspend now until a quarter to

6  2:00 and then we'll hear the opening statements from you.  I

7  think we should be able to get to some evidence this

8  afternoon.  It was much -- I thought we would have more people

9  requesting to be excused than we did.

10        So we'll see you at a quarter to 2:00.

11     (Lunch recess had from 12:30 p.m. to 1:45 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

12:28:37

12:28:55

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   STANLEY WRICE,                    )
                                       )
 4                    Plaintiff,       )
     -vs-                              )   Case No. 14 C 5934
 5                                     )
     JOHN BYRNE, former Chicago        )   Chicago, Illinois
 6   Police Sergeant, et al.,          )   February 20, 2020
                                       )   1:45 p.m.
 7                    Defendants.      )
                                       )
 8                               VOLUME 1
                     TRANSCRIPT OF PROCEEDINGS - TRIAL
 9       BEFORE THE HONORABLE HARRY D. LEINENWEBER and a jury

10
     APPEARANCES:
11   For the Plaintiff:      MS. JENNIFER A. BONJEAN
                             MS. ASHLEY BLAIR COHEN
12                           Bonjean Law Group PLLC
                             467 Saint Johns Place
13                           Brooklyn, NY 11238
                             (718) 875-1850
14
                             MS. HEIDI LINN LAMBROS
15                           1169 S. Plymouth Court, Suite 123
                             Chicago, IL  60604
16                           (216) 318-4087

17   For the Individual
     Defendants:             MR. ANDREW M. HALE
18                           MR. SCOTT J. JEBSON
                             MS. JENNIFER BITOY
19                           Hale & Monico LLC
                             53 W. Jackson Boulevard, Suite 330
20                           Chicago, IL  60604
                             (312) 341-9646
21
     Court Reporter:
22
                      KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
23                           Official Court Reporter
                          United States District Court
24                 219 South Dearborn Street, Suite 1426
                          Chicago, Illinois  60604
25                   Telephone:   (312) 435-5569
                     Kathleen_Fennell@ilnd.uscourts.gov
```

APPEARANCES:   (Continued)

For Defendant
City of Chicago:          MS. CARYN L. JACOBS
                         Department of Law, City of Chicago
                         121 North LaSalle Street,  City Hall
                         Suite 600
                         Chicago, IL  60602
                         (312) 744-5128

1      (Proceedings had in open court:)

2            THE COURT REPORTER:  All rise.

3            THE COURT:  Please be seated.

4            Get the jury, please.

01:48:27    5            MR. JEBSON:  Judge, just a few things before the jury

6      comes out.

7            THE COURT:  What now?

8            MR. JEBSON:  I promise I'll be quick, Judge.  I just

9      want to make sure that Ms. Bonjean does not mention certain

01:48:33   10      things that are currently in dispute that are unresolved by

11      Your Honor.

12            Number one, the sentencing of the co-defendants.

13      That is in dispute.  It's our position that's not relevant.

14      Your Honor has not ruled on that.  So, that should not be

01:48:44   15      mentioned in opening.

16            MS. BONJEAN:  Judge, they haven't filed a motion, and

17      it's on their final pretrial order.  And if they wanted to bar

18      it, they should have filed a motion.  And this is really --

19      talk about trial by ambush.  It's on their final pretrial

01:48:56   20      order.  They didn't even file a motion to bar it.  They were

21      going to admit their final statements of conviction.  I don't

22      know how they --

23            THE COURT:  What's the other point?

24            MR. JEBSON:  The other thing is, Judge, Ms. Bonjean

01:49:06   25      filed a motion for you to rule on the jury instruction on

1  materiality prior to opening statement.  You said that you'd

2  give us a chance to respond.  It's obviously improper to

3  mention the law anyways in the opening statement.  So, we want

4  to make sure that no --

01:49:19

5  THE COURT:  What is your -- I forget, when did I give

6  you the response time?

7  MR. JEBSON:  You -- I think -- you said before the

8  jury instruction conference.  But we will have that filed by

9  tomorrow.

01:49:28

10  MS. BONJEAN:  You ordered -- Judge, you entered an

11  order saying that our --

12  THE COURT:  Well, here's the thing on the law.  That

13  you should probably not comment on the law anyway because

14  that's -- in the opening statements.  So, keep away from that.

01:49:41

15  The other one, I'm not going to make any instruction

16  on.

17  All right.  You ready for the jury?

18  MR. JEBSON:  I'm sorry, Judge, I'll be very quick, I

19  promise.

01:49:48

20  One of the co-defendants, the allegations of the

21  abuse, one of them is the allegation that one of the defendant

22  officers used a lighter and lit his penis and testicles on

23  fire.  And it's our position that that would not be admissible

24  under any theory.

01:50:05

25  THE COURT:  Well, it may or may not be.  I don't

1     know.  If anybody -- when you make an opening statement,

2     you're telling the jury what you expect the evidence to show.

3     And if I exclude it, then they look good.  So --

4              MS. BONJEAN:  Well --

01:50:19
5              THE COURT:  -- you can do whatever -- you know, I'm

6     not going to --

7              MS. BONJEAN:  Judge, if I could respond.  You already

8     ruled on this and I -- I mean, so --

9              THE COURT:  I'm not going to instruct you on that.

01:50:25
10    So, you do what you want on it and if --

11             MS. BONJEAN:  But, Judge, if I could just point out,

12    this Court -- we did -- we did this.  We filed a motion for

13    clarification.  There was a reason we did that.  We were

14    trying to be conscientious and make sure that we were --

01:50:37
15    understood what the Court's rulings were prior to opening

16    statement.  And we got a ruling.

17             THE COURT:  All right.

18             MS. BONJEAN:  And the Court said that evidence of

19    abuse related to the co-defendants in this case was part of

01:50:45
20    the investigation and it was admissible.  And now five minutes

21    past the start of opening statements, there is a suggestion

22    that somehow this is unresolved.

23             THE COURT:  I'm not going to instruct you on your

24    opening statement.  You give your opening statement and if --

01:51:00
25    I've always said, is motions in limine are on an incomplete

1    record and they are subject to change, you know, upon more

2    evidence.

3         But at this particular point, I don't see any basis

4    to revisit those.  So, we're going to -- I'm not going to

5    instruct you.

6         So, let's bring the jury in.  Let's get started.

7         Joe, can you get the jury for us, please.

8    (Jury in.)

9         THE COURT:  Please be seated.

10        Good afternoon, ladies and gentlemen.

11        You're about to hear opening statements by the

12   parties, as I alluded to before we broke for lunch.  This is

13   the opportunity the lawyers have to lay out for you what they

14   believe the evidence will show during the course of the trial.

15   The intention at this time is not for them to argue the case,

16   but to predict for you what they believe the evidence will

17   show.

18        And at the end of the case, of course, it's up to the

19   jury to determine whether or not what the lawyers said was

20   actually testified during the course of the trial.  Because

21   the lawyers are not witnesses in the case.  So, they cannot

22   provide evidence.  So, what the lawyer says is not itself

23   evidence.

24        However, the opening statement is designed to be

25   helpful to you by giving you an overview, particularly insofar

1    as oftentimes the evidence does not come in in a perfectly

2    logical or chronological order.  So, it's helpful to have this

3    overview so that when a witness testifies to something, you

4    have an understanding where it fits in the scheme of things.

5          The plaintiff has the burden of proof, so the

6    plaintiff goes first in virtually every aspect of the case,

7    including the opening statement.  After the plaintiff gives

8    her opening statement, the defense will give its opening

9    statement and, then, we'll start calling witnesses.

10         So, Ms. Bonjean, you may give the opening statement

11   for the plaintiff.

12         MS. BONJEAN:  Thank you, Your Honor.

13         OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

14   BY MS. BONJEAN:

15         Good afternoon, ladies and gentlemen, counsel for the

16   defendants, Your Honor.

17         37 years ago almost to the day, Stanley Wrice, the

18   plaintiff in this case, was wrongfully convicted of the rape

19   and aggravated battery of a woman named Karen Byron.  He stood

20   in a courtroom, not very dissimilar to this one, and stood

21   before a judge when that judge sentenced him to 100 years in

22   prison for a crime he did not commit.

23         Now, it would take 31 years before that grave

24   miscarriage of justice was corrected, when a different judge

25   vacated his convictions and the State of Illinois dismissed

1    all charges against him.  For 31 years of what amounted to a
2    life sentence, Mr. Wrice woke up every morning and went to bed
3    every night in a prison cell, terrified he would never come
4    home to see his family or embrace his children ever again.
01:56:05    5    And in 2013, he walked out of those prison doors, a maximum
6    security prison where he spent his 31 years' incarceration, a
7    free man.

8         Now, they say that in every life there comes a day of
9    reckoning.  And that, ladies and gentlemen, is what this case
01:56:28    10   is about.  It's about holding the men accountable who denied
11   justice to Mr. Wrice and, in the process, denied justice to
12   the victim in this case, Karen Byron.  And the men who are
13   responsible for committing these acts are the defendants in
14   this case.  The defendants, their names are John Byrne and
01:56:55    15   Peter Dignan.

16        And John Byrne and Peter Dignan are former Chicago
17   police officers.  They were assigned to a police station on
18   the south side of Chicago known as Area 2 Violent Crimes.  And
19   sometimes we just refer to it as Area 2.  And what the
01:57:20    20   evidence is going to show is that Peter Dignan and John Byrne
21   framed Stanley Wrice for this terrible, horrific crime while
22   they let the true perpetrators get a slap on the wrist.

23        MR. JEBSON:  Objection, Judge.

24        THE COURT:  Overruled.  This is the opening
01:57:46    25   statement.

1      MS. BONJEAN:  Thank you, Your Honor.

2   BY MS. BONJEAN:

3            Rather than conduct a real investigation, a bona fide

4   investigation, the evidence is going to show that these

01:57:56    5   detectives engaged in rampant misconduct in order to pin the

6   case on Stanley Wrice.

7            And how did they do that?  Well, they did it in a

8   number of ways.  One way they did it is by using extreme

9   physical coercion to force Stanley Wrice to confess to a crime

01:58:18   10   he didn't commit.

11            Now, I am not talking about some garden-variety

12   beating.  I am talking about a coordinated, systemic beating

13   that took place in a secret area of this police station.  A

14   part of the police station where no one could come save

01:58:38   15   Stanley Wrice.

16            And they took him to this abandoned area.  And it was

17   a lockup with abandoned cells that wasn't used anymore.  And

18   they had him handcuffed.  And they handcuffed him above his

19   head.  They had him facing away from them, handcuffed to the

01:58:57   20   cells.  And they proceeded to beat him with a large black

21   flashlight and a homemade instrument that was kind of like a

22   rubber billy club or a hose.  It was flexible, but very hard.

23   It had tape on it.  It was not standard-issue equipment from

24   the Chicago Police Department.  It was something that they

01:59:25   25   made for the specific purpose of beating Stanley Wrice and

1  other men like Stanley Wrice.

2         MR. HALE:  Objection.

3         THE COURT:  Overruled.

4         MS. JACOBS:  Foundation.

5  BY MS. BONJEAN:

6         And they didn't just do this for fun, although they

7  probably did get some fun out of it because during the

8  course --

9         MR. HALE:  Objection.

10 BY MS. BONJEAN:

11        -- of this investigation and this interrogation, they

12 repeatedly used the N-word against Mr. Wrice.  Then again,

13 this is 1982, ladies and gentlemen.  And it's been a long time

14 ago, but even back then it was not okay to use the N-word.

15 And they used it against Stanley Wrice during the course of

16 this interrogation.

17        And the purpose of this interrogation was to get him

18 to confess to committing acts he did not do.  And these

19 officers knew that he had not done them.

20        Now, their misconduct didn't stop with Stanley Wrice.

21 They used the same tactics against a witness in the case.  A

22 young man who ultimately testified at the trial.  And you're

23 going to hear more about this even in the course of this

24 opening statement.  But they used this tactic against a

25 witness in order to force him to falsely implicate Stanley

Opening Statement - Bonjean

1    Wrice.  He was beaten with the same unique object that we've

2    discussed -- this rubber, bendable, flexible billy club,

3    hose-like instrument.  And they beat him in order to implicate

4    Stanley Wrice so he would falsely say Stanley Wrice did this.

02:01:10

5              That's not all.  These officers, you are going to

6    hear, had done this previously.  This was not just an isolated

7    case.  It wasn't just a unique case.  This was part of a

8    practice that they used back in 1982, and to coerce

9    specifically African American men into committing -- into

02:01:36

10   admitting to crimes they did not commit by using these

11   terrible tactics.  And you will find, ladies and gentlemen,

12   that when the officers used these terrible tactics during the

13   course of this investigation, there was no way to get at the

14   truth because the investigation was so tainted by these

02:01:58

15   terrible acts.

16             Now, there's something else you need to know.  The

17   defendant officers in this case are going to take the stand

18   and testify.  And when they do, and when they are confronted

19   with the fact that they have done these terrible things, they

02:02:19

20   are not going to deny it.  They are not going to say, no, we

21   didn't do that, we would never do that.  They are going to

22   invoke their Fifth Amendment right on the grounds that it may

23   incriminate them.  That is what they're going to say to every

24   single question asked of them.

02:02:36

25             When they are asked whether they beat Stanley Wrice

1    and made him falsely confess, they are going to invoke their

2    Fifth Amendment right on the grounds that it may incriminate

3    them.

4         And when they are asked if they beat this witness

02:02:51    5    into falsely implicating Stanley Wrice, they are going to say,

6    I invoke my Fifth Amendment rights on the grounds it may

7    incriminate me.

8         And when they are asked about other occasions in

9    which they have done this exact same conduct using the same

02:03:07    10   exact types of instruments, they are going to invoke their

11   Fifth Amendment rights on the grounds that it may incriminate

12   them.

13        So, ladies and gentlemen, at this point I want to

14   just pause and take a breather and, again, reintroduce myself.

02:03:20    15   My name is Jennifer Bonjean -- I know you were introduced to

16   us earlier, but sometimes it's good to do a reintroduction --

17   and my team, Ashley Cohen, another attorney that I work with,

18   and Heidi Lambros, an attorney who I work with; and, together

19   we proudly represent Stanley Wrice, who sits at the end of the

02:03:38    20   table.

21        And I can speak for all of us here that we're very

22   grateful for your service.  We understand the sacrifices that

23   are involved in serving on a jury, and we're grateful for your

24   time.  And it's not lost on us what you give up to be here.

02:03:57    25        We also want to say that your service is particularly

1       commendable because this case is going to involve some very,

2       very ugly facts, some very disturbing facts, facts that are

3       going to stir us emotionally.  And not just because of what

4       happened to Stanley Wrice and the other people, but what

02:04:14    5    happened to the victim in this case is going to horrify you.

6       It horrifies everybody.  And we know that this is not for the

7       faint of heart, and we are thankful that you are here to serve

8       as these juries.  And we are confident you will do so

9       honorably.

02:04:34    10       So, as the Judge said, my statements are not

11      evidence.  I'm just here to hopefully give you a road map of

12      what we believe the evidence will show.  And to do this, we

13      have to go back about three decades; so, in 1982.

14              Now, some of us remember 1982.  I do.  It was a long

02:04:55    15   time ago.  It was a different time.  It was a time when there

16      were no cell phones.  People used pay phones.  People didn't

17      have computers in their houses.  You could still smoke in

18      restaurants and bars.  It was also a time of financial

19      difficulties for a lot of people, and that was certainly the

02:05:11    20   case for Mr. Wrice.

21              Mr. Wrice in September of 1982 lived on the south

22      side of Chicago.  He lived in a community known as the South

23      Shore, and it is a community that is predominantly African

24      American, or was back then.  And he pretty much grew up there.

02:05:31    25   And he grew up in one of those typical Chicago bungalow-style

1    homes, if you've seen them.

2            And this is a home where he grew up with his ten

3    siblings and a single mother.  His mother's name is Maddie Sue

4    Wrice.  And they were not wealthy people.  They weren't rich

5    people.  But they were a very close-knit family, all of these

6    siblings.  And Maddie Sue was the matriarch, the rock of this

7    family who did everything she can to keep a roof over their

8    heads and food in their mouths and keep them on the straight

9    and narrow.

10           Now, in the late '70s, Maddie Sue passed.  And that

11   was a huge hardship to the Wrice family.  She was their rock.

12   And the siblings, they sort of fell apart after she passed.

13           Now, I would like to focus you in a little bit on the

14   exact date of what we're here about today, and that is

15   September 8th, 1982.  In September 8th of 1982, Stan was

16   living -- and sometimes I call him Stan; sometimes I call him

17   Stanley -- he was living in his childhood home.  This was that

18   bungalow home.  In fact, I'm going to hopefully give you the

19   opportunity to see it now if we get -- the electronics

20   all works correctly.

21           MS. BONJEAN:  Judge, may we show --

22           THE COURT:  You may.

23           MS. BONJEAN:  Thank you.

24   BY MS. BONJEAN:

25           So, this was Stanley Wrice's family home.  You can

Opening Statement - Bonjean

124

1   see the 1982 car right there.  And this was, again, a typical

2   style home on the south side of Chicago.

3           MS. BONJEAN:  Let's see the back of the house.

4   BY MS. BONJEAN:

02:07:33

5           This is where there was a kitchen and a back -- a

6   back porch that led into a kitchen and this backyard area.

7           And Stanley lived there with a number of his

8   siblings.  He lived there with his brother, Charles Wrice, who

9   was 24 years old -- and at this time, I should point out

02:07:49

10  Stanley was 28 years old in September of 1982.  28.

11          And his brother was Charles Wrice.  He had a

12  sister -- a younger sister -- who was 20 years old, and her

13  name was Patricia Wrice.  And she lived in the home.  She

14  lived there with her two young children.

02:08:10

15          And Stan and Charles and Patricia had a couple of

16  older siblings, Magnolia and Rose, who did not live in the

17  house.  They sort of moved out after their mother had passed.

18  But they would come back from time to time to check on things.

19          And you're going to hear testimony from Magnolia

02:08:26

20  Wrice.  And what she's going to tell you is that when she

21  would come back to the house, she started getting very

22  concerned.  The house was falling into disrepair.  It was

23  being foreclosed on.  The bills were not getting paid.  It was

24  pretty much falling apart.

02:08:42

25          And she had another big concern when she would come

1    back to the house; and, that was, the house had sort of turned

2    into a party house.  A lot of traffic, neighbors, people in

3    the neighborhood coming by, friends of friends.  It was a

4    place where young people congregated to drink and smoke and

02:09:07    5    carry on, and where they could do so without supervision.

6    What they could not do in their home where their mother was,

7    this was the house they could go to.

8         And a lot of communities have that one house.  Every

9    community has that one house.  And if you're a parent of a

02:09:22    10    teenager, you never want your kid at that one house but --

11    because they're unsupervised.  And that is what the Wrice

12    residence was at that time.  Just a fact.

13        And Stanley, although he was 28 years old, he wasn't

14    the father figure of the house.  He was an older sibling and

02:09:38    15    he wasn't much for supervision.  He had siblings who had their

16    own friends.  He had his friends, friends of friends.  And

17    that was sort of the vibe of the house.  And Magnolia would

18    come home and reprimand them, but it didn't really do much

19    good.

02:09:54    20        Now, there were also some constant fixtures in the

21    house, people who were there all the time.  Of course Charles,

22    but Charles had a significant other, Mildred, who was there.

23    And Patricia had a boyfriend.  His name is Bobby Joe Williams,

24    and he was about 20 years old, as well.  And they had two kids

02:10:13    25    together.  And although he didn't, I guess, live there, he

Opening Statement - Bonjean

1    stayed there most nights.  It was that sort of situation.

2         And Bobby Joe, by the way, is that witness I talked

3    about earlier today.

4         So, Bobby Joe was there.  And, then, there were kind

02:10:31   5    of friends of the Wrice siblings that were there pretty

6    regularly.  And I want to identify four of them for you:

7    Rodney Benson, Michael Fowler, Lee Holmes, and Kenny Lewis.

8    These were four individuals who lived in the neighborhood and

9    who hung out at the Wrice residence.  And Rodney Benson was

02:11:01   10   like 24 years old, and the other three were teenagers -- 18,

11   19 years old.  And they would congregate at the Wrice

12   residence pretty regularly.

13        Now, I want to draw you in even closer to September

14   8th, 1982, and tell you what happened that day.  Stanley Wrice

02:11:21   15   had worked on September 8th, 1982.  He came home from work at

16   about 11:00 o'clock at night.  And when he got home, the house

17   was bustling with activity.  There were his siblings, their

18   significant others, and there was a random woman named Kim in

19   the house, who he didn't know.  He had never seen her before

02:11:41   20   and, frankly, has never seen her again.

21        And this, again, is not uncommon in the Wrice

22   residence.  Unclear who she was.  Whether she was a friend of

23   Patricia's or somebody.  But this was a woman who was in the

24   house.  And he came home to find it was a pretty normal night

02:11:58   25   in the Wrice house.

1      Now, Rodney Benson came over to the house about 45

2   minutes later.  So, we have another person.  And Rodney and

3   Bobby Joe and Stan decide to go out to the liquor store.  And

4   I actually would love to show you an aerial map so you can

02:12:14   5   have some context of the area.

6      MS. BONJEAN:  Judge, may we show it?

7      THE COURT:  You may.

8      MS. BONJEAN:  Thank you.

9   BY MS. BONJEAN:

02:12:26   10      So, if you look down at the bottom of this

11   demonstrative exhibit, this is the aerial map -- there you

12   go -- you will see that 7618 South Chappel Avenue is the Wrice

13   home.  And it's on 76th and Chappel.  And that is the house

14   you've seen a photo of.

02:12:49   15      And Rodney and Stanley and Bobby Joe decide to go

16   over to the liquor store, which you will see here is really

17   just about a block-and-a-half away.  It's called Jeffrey

18   Liquors or something like that.  It was on 75th and Jeffrey.

19      And the three men got into Rodney's car, and they

02:13:11   20   drove to the liquor store.  And Stan will tell you there's no

21   parking on 75th, so he sort of hopped out and went into the

22   store to get some beer and smokes and -- which is what they

23   did pretty regularly at the Wrice residence, probably a

24   nightly activity -- and when he came out, Rodney wasn't there.

02:13:30   25   He didn't know where he had gone, so he started walking back

1  to his house.  And as he walked back to his house, he came by

2  a parking lot and he saw Rodney's car parked there.  And he

3  stopped and looked and something caught his eye, in that there

4  was a woman sitting in the passenger seat of Rodney Benson's

5  car.

6          Now, this woman was a white woman.  And it stuck

7  out -- she stuck out a lit bit because it was a predominantly

8  African American community but not -- you know, not entirely,

9  not like unheard of.  But it was something that caught his

10  eye.  And she was sitting in the passenger seat.

11          And this was a woman that lived above the liquor

12  store.  Her name was Karen Byron.  And I'm going to tell you

13  right now Karen Byron is deceased.  I think she died maybe

14  about 15 years ago.  So, we're not going to have the benefit

15  of her testimony.  But she has previously testified, so you'll

16  have the benefit of that.  But she was the victim in this

17  case.  So, there's no mystery about that.

18          And when Stan was walking by, he noticed Bobby Joe

19  was hanging out and there was another guy with a bicycle.

20  They were sort of congregated in this parking lot.

21          And Stan did not know Karen Byron, but she lived just

22  down the block and lived above the liquor store.  So, she was

23  a familiar face.  Someone he had seen before.  Didn't know her

24  necessarily by name.  Her boyfriend worked in the liquor

25  store.  Stan went to the liquor store pretty regularly.  So,

Opening Statement - Bonjean

1    she was someone that was -- he knew from the neighborhood.

2           Now, when Stan was coming by, there was also someone

3    else approaching the area and it was a police officer.  It was

4    a patrol officer -- not the defendants in this case, but a

02:15:23   5    patrol officer by the -- a sergeant -- a sergeant who was on

6    patrol.  I should make that clear.  It wasn't just -- he

7    wasn't a patrol -- it was a sergeant who was on patrol.  And

8    his name is Elbert Harris.  And he is still alive, and he is

9    going to testify and tell you about what happened when he

02:15:37  10    drove by.

11           And he saw this group congregated by Rodney Benson's

12    car and it caught his eye.  So much so that he wrote down

13    Rodney Benson's license plate.  And he approached and he

14    noticed that the woman was not in good shape.  She was slumped

02:15:57  15    down.  She was -- had a strong odor of alcohol.  She was

16    slurring her words.  She just wasn't in a great place.

17           And you are going to hear testimony -- or you're

18    going to hear evidence -- during the course of this trial that

19    Karen Byron was suffering from a very serious disease of

02:16:19  20    alcoholism.  She was the type of alcoholic that got up in the

21    morning and drank until she went to bed.  And these are her

22    words.  This is something she, if she was alive, would tell

23    you.  And she drank till there was nothing left to drink.  And

24    she had been an alcoholic for years.  And she was sort of in a

02:16:41  25    constant state of this intoxication.

Opening Statement - Bonjean

1    Now, I do not tell you this in any way to disparage

2  her or to judge her or to suggest that what happened to her,

3  later when you hear about this, she had any fault in.  Quite

4  the opposite.  The exact opposite.  People in that condition

02:17:00  5  are vulnerable.  And she was very, very vulnerable.  There's

6  no question about it.  But it is important information to have

7  for piecing together this story, and you will need it to do

8  that.

9    Now, Sergeant Harris asked her, ma'am, are you okay?

02:17:18  10  She didn't look very good.

11    He said, can I take you to the hospital?

12    And she said, no, no, no, I'm fine.  You know, I'm

13  going to go to a friend's house.

14    And Rodney Benson said, I'll take her to the

02:17:29  15  hospital.  I'll take her to the hospital.

16    And Sergeant Harris said, okay, you sure?  You sure

17  you're okay?

18    And she said, yes, I'm fine.

19    She grew -- she was from this neighborhood.  So, he

02:17:41  20  went on his way.

21    And Stan and Bobby Joe then started walking back to

22  the Chappel residence and Rodney Benson -- I should mention

23  that Elbert Harris will tell you there was someone in the

24  backseat of Rodney Benson's car; and, he didn't know who, but

02:17:56  25  there was someone back there -- and that when Stan and Bobby

1   Joe started walking back to Chappel, Rodney Benson took off in

2   the car.

3            Now, Bobby Joe, Stan, they go back to the house.

4   They're hanging out.  And some period of time later, maybe 15

02:18:15   5   minutes, Rodney Benson shows up, again.  And he comes in the

6   back like he frequently did.  And he was with a gaggle of

7   teenagers.  He was with Lee Holmes, Michael Fowler, a guy

8   named Lemon, a guy named Jeff Ellis.  The testimony, ladies

9   and gentlemen, is extraordinarily -- you'll judge for

02:18:41   10   yourself.  But you will hear about 15 different names of

11   people who were in this house that night.  Lots of young

12   teenage boys.

13            And Rodney Benson said -- came in and he says, I'm

14   going to go upstairs and, you know, use the attic.

02:19:00   15            And he did that.  And these young people followed up

16   there.

17            Now, I want to talk about this attic.  The defendants

18   are likely -- I don't want to predict their case.  They're

19   going to tell you that this was Stanley Wrice's bedroom; he

02:19:17   20   slept there every night; this was his bedroom.  The evidence

21   is not going to show that.  It's going to show the exact

22   opposite of that.

23            It is true that Stanley Wrice had used the attic in

24   the past.  It is true that his siblings had stayed up there at

02:19:32   25   various points.  But this attic and this house was in such

1    disrepair that there was no electricity up there; there was no

2    gas up there; and, it kind of became a den of, you know,

3    partying.

4    Stan actually was trying to fix up half of it.  And

02:19:47    5    I'd like to show you some pictures.

6    MS. BONJEAN:  Judge, may I show the jury the photos?

7    THE COURT:  As far as I know, as long as they're

8    admissible, there's no objection to them, you may do so, yeah.

9    MS. BONJEAN:  Yes, Judge.  These were all introduced

02:20:06    10    at the criminal trial.  I believe there's --

11    MR. HALE:  No objection.

12    MS. BONJEAN: -- the defense has no objection.

13    THE COURT:  All right, fine.  Go ahead.  You don't

14    have to ask as long as --

02:20:11    15    MS. BONJEAN:  Okay.

16    THE COURT:  -- you can assure me that there's no

17    objection.

18    MS. BONJEAN:  Thank you.

19    BY MS. BONJEAN:

02:20:15    20    So, this was one-half of the attic.  This was an area

21    where Stan was sort of trying to clean things up the best he

22    could.  You could see the house is not in great condition, the

23    windows, et cetera.  And there was no electricity up there.

24    And, then, there was -- you can see there's like --

02:20:36    25    it's sort of a makeshift drywall, bed's put over on the side.

1    And, then, on the other side of the attic -- the other side of

2    the attic -- was an area where Patricia Wrice used to sleep.

3    But then she went down to a first-floor bedroom, and this

4    became the place where people hung out.

02:20:58    5    And it is not pleasant.  You can take a look at it.

6    This was the place where the kids threw their garbage and

7    their beer bottles, and they smoked up there and their beer

8    buds and -- everything.

9    The defendants will try to tell you this was Stanley

02:21:16    10   Wrice's bedroom.  Ladies and gentlemen, not the case.  Stanley

11   Wrice did not sleep in this bedroom.  This was the place where

12   the kids from the neighborhood and other people congregated to

13   drink and party and maybe do other things.

14   Now, where Stanley was sleeping at the time was on

02:21:36    15   the couch in his front room.  And, in fact, that's exactly

16   where he was sleeping when the police arrived at the house in

17   the morning hours of September 9th, 1982.  He was sleeping on

18   his couch.

19   Now, I want to get back to -- now that you have a

02:22:01    20   visual, Rodney Benson takes Karen Byron up to the attic.  And

21   you will hear testimony that -- from Charles Wrice, who will

22   tell you at one point he walked Mildred out and he heard her

23   asking about a drink or something of that nature.  You're

24   going to hear testimony that -- from potentially a number of

02:22:34    25   people -- that, you know, Karen Byron had gone there

1   voluntarily; that she went there because she wanted to have

2   drinks.

3         Now, ladies and gentlemen, the bottom line is what

4   happened to her was not consensual.  It was not voluntary.

02:22:54   5   Whether she went there or not to have drinks is beside the

6   point entirely, frankly.  So, I want that to be clear.

7         But Rodney Benson took her up there.  Michael Fowler

8   was there, Lee Holmes was there, a number of other people.

9   And Rodney Benson is going to say, yeah, I had sex with her.

02:23:15   10   I had consensual sex with her.  And, then, other people had

11   consensual sex with her.

12         And Rodney Benson, ladies and gentlemen, at the end

13   of this, you will know, was the ringleader behind all of this.

14         Now, Stan will tell you he did -- when they first

02:23:32   15   went up there, he came up and he checked in and he said, stay

16   over on this side; don't go over on the other side.

17         And it was dark.  Again, this is about 1:00 in the

18   morning, ladies and gentlemen.  There's very little light

19   coming in.  There's no electricity upstairs.  There's some

02:23:46   20   light maybe from a streetlight out in the -- from the windows.

21         And he says, stay off the other side; I'm trying to

22   fix that up.

23         And he sees the woman up there.  She does not seem to

24   be in distress, but she is still very intoxicated, as he had

02:24:04   25   seen her earlier.  And he went back downstairs.

1        Now, at a certain point, Stanley left the house. He

2  went down to the pay phone to call his girlfriend. His

3  girlfriend Jennifer, who is the mother of his three children.

4  And he was gone for a little bit of time.

02:24:25    5        He came back. And he came back through the front

6  door. And when he came in the house, he could hear laughter,

7  people running up and down. But, again, this was not unusual

8  in the Wrice residence. There were, again, a dozen people

9  there. Again, not unusual.

02:24:44  10        And he hears Bobby Joe and Patricia arguing in their

11  bedroom. And he actually goes in and he scoops up one of

12  their kids and brings her out onto the couch. And Kim is out

13  there in the front room, too. And he has his quart of beer

14  and he falls asleep.

02:25:03  15        And, then, the next thing he remembers -- not so

16  long -- how long he's asleep -- Kim is waking him up and she

17  said, they're fighting upstairs, they're fighting upstairs.

18        And Stan gets up. He goes back up there. And all

19  these young people start running down. He sees Rodney Benson,

02:25:21  20  and Rodney Benson is holding up this woman who is clearly not

21  in good shape. Her head is hanging down. He doesn't get a

22  look at her face. It's very dark. She is clothed, but

23  disheveled.

24        And Stan says, get the hell out of here. Get out of

02:25:37  25  this house.

1    And that's what Rodney Benson does, with Lee Holmes

2    and Michael Fowler.

3    Now, I want to mention someone else who was there.  A

4    fellow named Kenny Lewis.  And he was --

02:25:53    5    MS. BONJEAN:  Can we show the --

6    BY MS. BONJEAN:

7    He lived down the street.  Kenny Lewis is deceased

8    now, but he lived down the street.  And he testified that he

9    arrived there about 1:00 o'clock.

02:26:11    10    And, ladies and gentlemen, you are going to find out

11    that Kenny Lewis ended up being the star witness against

12    Mr. Wrice at his trial.  He is going to tell you an improbable

13    story that you will be able to judge for yourself.  But what

14    he didn't mention was that he raped the woman in the attic.

02:26:35    15    What he didn't mention is that he was one of the perpetrators

16    of the crime.  Then he left.  Oh, he has -- you will have the

17    benefit of his testimony.  I'm not going to go through it, but

18    the story that he gives at Mr. Wrice's trial is just

19    unbelievable.  And, in any event, he was another person there.

02:27:04    20    So, when Rodney Benson and Lee Holmes and Michael

21    Fowler and Kenny Lewis leave, they put Karen Byron, basically,

22    in the alley somewhere behind the house.  And this poor woman

23    staggers over to a gas station, where she is able to get some

24    assistance from a gas station attendant to be able to go to

02:27:27    25    the hospital.  And he tells -- when he first sees her, she's

1    very disheveled.  She has her clothes on, but she looks

2    terrible.  She's beat up.

3          And at the hospital, we find out something even

4    worse.  Karen Byron has been burned with an iron that bears

02:27:51    5    the resemblance of a clothing iron.  And she's burned over 20

6    percent of her body.  She has second-degree burns.  She has

7    third-degree burns.  It's absolutely horrifying.

8          And we know that she was in an incredibly -- just the

9    intoxication, she was in an incredibly compromised state.

02:28:26   10    There was pain, I'm sure.

11          And make no mistake about it, none of us -- not her,

12    not her, not him -- deny that that is what happened to the

13    victim in this case.  There is going to be a lot of time spent

14    on her injuries.  And we are not going to minimize those

02:28:55   15    injuries.  You wouldn't possibly be able to.  But I want you

16    all to know that this case is not about Karen Byron's

17    injuries.  And this is why:  Because none of us dispute the

18    injuries.  It's not in dispute that she suffered those

19    horrific, horrific injuries.  That she was burned.  All of it.

02:29:19   20          What is in dispute is whether or not the defendant

21    officers framed the wrong person for that terrible crime

22    because it was his house and it was his attic.  That is in

23    dispute.

24          And, you, ladies and gentlemen, maybe -- at the close

02:29:45   25    of this case, you may be mad that people -- that Stanley Wrice

1    was so permissive in his house, but you will not find that he

2    was responsible for these terrible crimes.

3          And this case isn't about Stanley Wrice's guilt or

4    innocence.  That's not what you're here for.  The State of

02:30:02  5    Illinois dismissed all charges against Mr. Wrice.  What you

6    are here to decide is whether or not his trial was a fair

7    trial.  And it was not.

8          And what you are here to decide is whether or not

9    these officers used improper misconduct to frame someone

02:30:21  10    because -- who knows?  His house.  He's the older guy.  We

11    won't know because they won't answer the questions.  They will

12    invoke their Fifth Amendment rights.

13          Now, what the evidence is not going to show -- one

14    thing -- well, you think -- what you're going to find out is

02:30:51  15    that -- and it's not surprising.  A woman shows up in a

16    hospital room with burns -- second-degree and third-degree

17    burns -- all over her body, police are probably going to show

18    up pretty quickly.  She lives in the neighborhood.  They're

19    going find out where this happened.  And they did.  They did.

02:31:05  20          Maybe a couple hours later they are knocking on the

21    Wrice residence.  And that includes the defendants in this

22    case, Sergeant John Byrne and Peter Dignan, and another

23    detective by the name of Detective Dioguardi.  And they are

24    banging.  And they come in the house and Stan, again, is

02:31:24  25    sleeping on the couch.  Patricia's in her bedroom with Bobby

1    Joe.  Charles is in his bedroom.  Kim is there.

2         And they come in and they, of course, put everybody

3    in handcuffs.  Understandable.  They put them in the living

4    room.  And they say, we're going to search this place.

5         And they did exactly that.  And they went up to the

6    attic.  And guess what they found?  A mother lode of evidence.

7    More evidence than anyone could possibly conceive in plain

8    view.  We'll show you, ladies and gentlemen, what they found.

9         MS. BONJEAN:  Ash, want to pull up some of the

10   pictures.

11   BY MS. BONJEAN:

12        Right there in plain view, an iron.  A beer bottle.

13        MS. BONJEAN:  Go ahead, Ash.

14   BY MS. BONJEAN:

15        The victim's undergarments, her underwear right

16   there.  A hanger that may or may not have been used in some

17   way.

18        MS. BONJEAN:  Go ahead, Ash.

19   BY MS. BONJEAN:

20        Her bra right there.

21        Evidence.

22        Her shoe is there, too.  Right there.  Her shoe.

23        You are not going to hear from any witnesses that

24   said Stanley Wrice picked up this evidence and threw it in the

25   garbage or hid it or anything of that nature.  And as much as

1    all of us wish that night ended differently, it doesn't change

2    the fact that he did not know what was going on up there.

3    They were partying.  It was a terrible situation.  But you

4    know that because anyone who would have -- anyone who

02:33:17    5    participated in his own house of doing this or knew it

6    happened would take that evidence and get rid of it.  But it

7    was right there in plain sight for the police to come get.

8        Now, interesting, no physical or forensic evidence

9    attaches Mr. Wrice to this crime.  They dusted all of these

02:33:40    10    items for fingerprints.  And it's almost incredible that his

11    fingerprints aren't on any of it.  It's his house.  Like the

12    iron, he may have used the iron.  Probably not.  But maybe his

13    sister's fingerprints would be on there.  No fingerprints.

14    That bottle that you saw, they dusted that.  There was a

02:33:56    15    fingerprint on there.  Doesn't attach to Mr. Wrice.  Nobody

16    bothered to find out really who it was associated with.

17        So, the physical evidence did not connect Mr. Wrice

18    to the crime.  But his house.

19        Now, after the police came to the Wrice residence,

02:34:21    20    they took everybody to Area 2.  And now I want to focus in a

21    little bit about what happened at the Area 2 police station.

22        Before we get there, one thing I omitted is that

23    Elbert Harris, the sergeant we talked about earlier, he's gone

24    to the hospital and he, of course, recognizes this woman from

02:34:54    25    earlier.  And he says, I jotted down that guy's license plate

1    number.  And he gives it to the detectives and they're able to

2    track down Rodney Benson.

3         Now, where was Rodney Benson?  He was at his mother's

4    house.  And -- but they pick him up and they bring him back to

02:35:12    5    the Wrice residence.  And, then, they bring everybody in the

6    house -- Charles Wrice, Patricia Wrice, Bobby Joe Williams,

7    Stanley, Rodney Benson -- they take them to Area 2.

8         Now, ladies and gentlemen, it is not going to be a

9    far inference for you.  You will hear evidence about how these

02:35:32   10    officers regularly used the N-word against suspects in this

11    case and others, and did so against Stanley Wrice, which is a

12    word that would -- fair inference of their views on people of

13    color.  And the victim here was a white woman.  And that

14    cannot be overlooked about how these officers felt about this

02:35:57   15    crime.

16         And they had every right to be outraged.  Who

17    wouldn't be?  But that's what made it more important that they

18    got it right.  That they got it right.  Not just for him, but

19    for her.

02:36:18   20         So, what do they do?  They talk to Stanley Wrice in

21    an interview room on the second floor of the Area 2 police

22    station.  And you are going to hear that he told them

23    everything he knew.  He didn't say, I exercise my Fifth

24    Amendment right, like those officers are going to do.  He

02:36:35   25    said, this is what I know.  I saw the woman.  She was at my

1   house.  Rodney Benson brought her there.  Yes, I saw Michael

2   Fowler there.  I saw Lee Holmes.

3       He tells them the whole story about seeing her at the

4   liquor store.  He tells them everything.  He's got nothing to

02:36:52   5   hide.

6       And those detectives, they say, thank you.  And,

7   then, they go interview Rodney Benson, who's in custody, get

8   some more facts from him.

9       And here's something really important you need to

02:37:09   10   understand, ladies and gentlemen.  These detectives had

11   already gathered so much information about this case, they

12   knew from the sergeant that the woman was with these -- some

13   of these men earlier.  They knew that -- where the crime scene

14   was, all the evidence was there.  They knew what her injuries

02:37:30   15   were.  They knew she had been burned.  They knew she had been

16   assaulted.  She had been sexually assaulted.  They knew all of

17   this.  And they had already pieced the narrative together, and

18   they wanted to get Stanley Wrice because it was his house and

19   that is an easy conviction.  It's just an easy way to close

02:37:52   20   the case, particularly if the victim is not naming who the

21   offenders are or who cannot name the offenders.

22       And you're going to find out that the victim in this

23   case, she testified at a trial and she was unable to make any

24   identifications at that trial of who the perpetrators were.

02:38:11   25       And, frankly, you know, the police officers, you

Opening Statement - Bonjean

143

1    know, not -- when the victim -- 1982, if the victim was not

2    identifying or was unable to testify about who was -- did

3    this, you know, who we going to get?  The guy whose house it

4    is, right?

02:38:37    5         MR. HALE:  Objection, Your Honor.

6         THE COURT:  Overruled.

7    BY MS. BONJEAN:

8         So, they spoke to Rodney Benson.  And, then, they

9    went and spoke to Bobby Joe Williams.

02:38:49    10        And Bobby Joe Williams was a 20-year-old kid, scared

11   out of his mind, had not been in police custody.  And they say

12   to him, they tell Bobby Joe -- and Bobby Joe's going to

13   testify.  And they're going to -- they told him, tell us what

14   happened.

02:39:07    15        And he says, I was out at the liquor store.  I saw

16   the woman.  People came in the house.  I went to bed in

17   Patricia's room.

18        And they said, you must have heard something.

19        He's like, I really didn't.  There was noise.  We

02:39:20    20   didn't hear anything.  I swear.  I was -- I had nothing to do

21   with this, and I -- I have no explanation for what happened to

22   her.  But I just can't -- I can't tell you anything more than

23   that.

24        And they said, you're lying and we know Stan did it,

02:39:35    25   and you're going to say Stan did it.  You're going to say --

1           And he's like, I can't say that.  I wasn't -- I

2  wasn't up there.  I cannot say that Stan did it.

3           And you know what they did?  They took out their

4  little black flexible object and they started beating Bobby

02:39:51    5  Joe about his legs, his extremities.  And they kept feeding

6  him the information:  We already know what happened, Bobby.

7  So, you can either get on this program or you can get charged

8  and continue to get beaten.

9           That was the way Bobby Joe understood it.  He's going

02:40:11   10  to tell you that.  And this went on and on.  He was only 20

11  years old.

12           And it wasn't just the beating that scared the

13  bejesus out of him.  It was the fact that he might be charged

14  for this terrible crime because they were threatening, you

02:40:29   15  either get on our team or you get on Stanley Wrice's team.

16  You can choose, son.

17           That's what they told him, essentially.  I'm

18  paraphrasing.

19           And, eventually, Bobby Joe succumbed.  He's going to

02:40:44   20  tell you that he did.  And he falsely implicated Stanley

21  Wrice.  Not only falsely implicated him, but then went to

22  Stanley's trial and falsely testified against him.  Didn't see

23  much of the Wrice family after that or the mother of his

24  children.  He will tell you how heartbreaking it was.  He was

02:41:10   25  a child really in his own mind.  20 is an adult, but still a

1    young man.  You have to understand in 1982, you will hear an

2    African American man in these conditions was just a scary,

3    scary thing for him.

4              MR. HALE:  Objection.  No foundation.

5    BY MS. BONJEAN:

6              Bobby Joe --

7              THE COURT:  Overruled.

8    BY MS. BONJEAN:

9              -- will testify how afraid he was that he would be

10   continued to be beaten and that he would continue -- that he

11   would be charged.

12             So, then, what do they do?  They know that maybe this

13   isn't enough evidence.  So, they go back to Stanley Wrice and

14   they say, we know the truth, Stan.  You did it.  He's like,

15   you burned the woman.

16             And he said, I did not burn the woman.

17             They said, yes, you did.

18             And he continued to deny it over and over again.

19             They said, you know what we're going to do?  We're

20   fixing to introduce you to some police brutality.

21             Exact words:  We're going to introduce you to some

22   police brutality because that's how we do it at Area 2.

23             And they took Stanley handcuffed.  They took him to a

24   secret area that was off a garage, a place where no one was

25   supposed to be.  You're going to hear testimony from the trial

1    of a lieutenant who actually oversaw Area 2 and said this

2    thing had a steel door with a lock; no one was supposed to be

3    in there.

4              And Stanley was taken there.  Again, out of earshot

02:42:49   5    of anyone who might care enough to intervene.  I'm not sure

6    anybody would have, but certainly took that out of the range

7    of possibilities that some supervisor would say, hey, what's

8    going on in there?  Don't do that.

9              And Sergeant Byrne, he likes a flashlight.  That's

02:43:07  10    his instrument of choice.  And Peter Dignan likes that

11    blackjack, that homemade rubber object we were talking about.

12    It has a lot of different names and people describe it

13    differently, but similar enough to know it's the same thing.

14              And they took him there and they said, yeah, you're

02:43:24  15    going to tell us.  You're going to tell -- you're not going to

16    tell us, you're going to tell the state's attorney that you

17    burned the woman.

18              And he said, no, I'm not going to tell the state's

19    attorney I burned the woman.  I did not burn the woman.

02:43:36  20              And they said, oh, yes, you are.

21              And they handcuffed him.  They handcuffed him above

22    his arms to these abandoned cells.  They kicked his legs

23    apart.  And this was after Byrne hit him in the face --

24    head -- with this flashlight.  And, then, they used the

02:43:59  25    flashlight and this rubber object to beat him about his

1    extremities, groin area -- extremities -- body area and in his

2    groin, repeatedly striking him in his groin.  And Stanley's

3    going to tell you that he wanted to fold over in pain, but he

4    couldn't because they were -- he was basically strung up.

02:44:25    5    And this beating went on for some time, and then they

6    took him back upstairs to the interview rooms.  They said,

7    you're going to talk to that state's attorney and you're going

8    to tell her you burned the woman.

9    And, ladies and gentlemen, you're going to hear that

02:44:45   10    they didn't just do that to Stanley Wrice.  They did it to

11    Rodney Benson, too.  Took him to the same place.  Now, Rodney

12    and Stan are separated in interview rooms, and they take them

13    separately to this secret spot.  And they do the same thing

14    with Rodney Benson.  This is how they're conducting an

02:45:11   15    investigation.

16    Stan makes it clear, I am not telling the state's

17    attorney.

18    They take him -- and the state's attorney is there.

19    The state's attorney is there.  They want him to give a

02:45:21   20    statement to the state's attorney.  And he won't do it, so

21    they bring him back down.  They bring him back down to the

22    basement a second time, and it happens again.  And eventually,

23    Stan says, fine, fine, I'll tell whatever I need to say to

24    make this end.

02:45:41   25    And, so, Stan goes in and he talks to an assistant

1    state's attorney by the name of Kenneth McCurry.  Kenneth

2    McCurry is deceased, but he did testify.  And what's important

3    is that -- he will tell you -- is that he had been speaking to

4    the detectives.  He had been going back in and out of rooms.

02:46:01    5    And when he got to Stanley, he testifies that Stanley admitted

6    to him -- first Stanley denied any involvement, and then the

7    second time admitted that he had done this, that he had burned

8    the woman.

9          Now, there's no hand -- there's -- written statement.

02:46:25    10   Stanley didn't sign anything.  But Assistant State's Attorney

11   McCurry says that Stanley made that admission to him, and

12   Assistant State's Attorney McCurry testified to the jury that

13   was deciding his guilt, oh, yes, Stanley Wrice told me he

14   burned her.

02:46:49    15         He did not write down any of the questions or answers

16   that were given, and he actually didn't even have any notes to

17   provide; but, he testified to the jury that Stanley did this.

18   And Stanley will tell you, I went in there and I just agreed.

19   When he said, did you burn the woman, I said, yes.

02:47:06    20         And guess who else was in there?  Those detectives.

21   Peter Dignan, who loves his blackjack, was in there.  And he

22   said, I just kept looking at him because I know if I tell that

23   state's attorney that I wasn't beaten, that state's attorney's

24   leaving and I'm stuck here and I'm going back to that area.

02:47:24    25         So, yes, he told the state's attorney, yes.  When the

1    state's attorney said, did you do this, he agreed.

2         Now, after this went on, Stanley and Rodney Benson

3    were charged with rape, deviate sexual -- a number of crimes

4    but for shorthand, rape, deviate sexual assault, aggravated

5    battery.  Terrible, terrible crimes.

6         And the following day the police officers go and they

7    look for Lee Holmes and Michael Fowler, and Michael Fowler --

8    and they're arrested.  Lee Holmes and Michael Fowler are

9    arrested the following day.  And, ultimately, all four men are

10   charged.  The same tactics are used with all four men, this

11   type of misconduct.  And I'm not going to belabor it, but you

12   get it.

13        And, ladies and gentlemen, of these four people, only

14   one maintained his innocence and went to trial.  And that was

15   Stanley Wrice.  He consistently maintained his innocence.  He

16   said, I didn't do this.  I was beaten.

17        And he went to trial and got a hundred years.

18        The three co-defendants, they all pled guilty.  They

19   pled guilty to aggravated battery.  Two of them got probation.

20   Probation.  And one of them got four years.  Stanley Wrice, he

21   said he was innocent and he went to trial.  He got a hundred

22   years.

23        So, I want to talk to you briefly -- it's not been

24   briefly, but I don't have too much longer.

25        But the defendants said then -- and I'm talking about

1    the defendants Byrne and Dignan.  The defendants said then

2    that Stanley was lying about being beaten.  And I guess

3    they're going to say he's lying now, although they're not

4    going to say it from their own mouths.  But their attorneys

5    are going to say it.

02:49:53

6         But we know one thing.  Stanley Wrice, you know what

7    he did the day he got out of Area 2 custody and into jail

8    after his charges?  He went to see a doctor.  And I want to

9    show the medical records that were prepared at the Cermak

10   Health Center on September 10th.  He was arrested on September

02:50:17

11   9th.  By the time he's processed in, it's September 10th.

12        This is a medical record.  It's an intake form for

13   Stanley Wrice.  And you can see the date:  September 10th,

14   1982.  And it says bruises, trauma to groin.  Stanley tells

15   him he was urinating blood.  And, then, on the next page, you

02:50:52

16   see -- you see these bruise marks, the one on the forehead.

17   Defendants are going to say he lied about being hit in the

18   forehead, but here it is.  Groin area, legs, extremities,

19   notably places mostly that can be concealed.

20        So, Stanley has actual medical evidence that

02:51:23

21   corroborates his claims.  But it didn't stop the defendants

22   from lying at trial.  They say he's a liar.  They not only

23   lied and said he was lying about the beating, Sergeant Byrne

24   told the jury that there was no area where there were

25   abandoned cells; it didn't even exist; figment of his

02:51:41

1    imagination.

2           Of course, we know that's just a complete falsehood.

3    It exists.  A lieutenant from Area 2 said it exists.  There

4    are photos of it existing.  He just lied.

02:52:02    5           So, what was the evidence -- and I want to touch on

6    that quickly -- that was used against Stanley Wrice to convict

7    him?  And that, ultimately, is going to be an important part

8    of your analysis because you are going to be asked a number of

9    things:  Whether or not Mr. Wrice was physically coerced into

02:52:19   10    making a statement that inculpated himself and whether that

11    statement was used against him at a trial.  And you're also

12    going to be asked whether or not the defendant officers

13    fabricated evidence or, essentially, assisted in the

14    fabrication of evidence, caused this fabrication that was

02:52:37   15    presented at Mr. Wrice's trial and that was used to convict

16    him.

17           And, so, the evidence at trial consisted really of

18    three major sources of evidence:  Stanley Wrice's own

19    confession, which was fabricated, product of physical coercion

02:52:58   20    and false.

21           Bobby Joe Williams' testimony.  He was a key witness,

22    and he's going to tell you that it was all a lie and I wish I

23    knew then what I know now.  But I did and I was a scared kid.

24    Again, fabricated by the police officers because it was fed to

02:53:19   25    him and beaten from him, and then he went and testified to it.

1        And even the prosecution didn't know this.  Because

2   these guys were so afraid that these police officers would

3   come back and charge them, they stuck with the program.

4        And, then, Kenny Lewis, one of the culprits, one of

5   the individuals who Mike Fowler says had sex with the woman --

6   and I say had sex; that's what Michael Fowler says -- one of

7   the guys who raped the woman becomes the prosecution's star

8   witness against Stanley Wrice.  And you know when he shows up?

9   On the eve of trial.  Four days before trial.  He's not

10  identified as a witness, and then all of a sudden he's their

11  star witness.  He didn't tell anyone that he actually raped

12  Karen Byron.  I don't think he told the prosecutor.  He kept

13  that to himself.  Maybe he did.  I don't know.  You're going

14  to hear from the prosecutor who prosecuted this case, so --

15       So, that was the evidence.  Kenny Lewis's testimony

16  even without that fact was absurd, and you're going to have an

17  opportunity to examine it yourself.

18       You're also going to get to hear from Stanley Wrice's

19  brother Charles.  He's going to tell you about his experience

20  at Area 2.  Charles was --

21            MR. JEBSON:  Objection.

22            MS. BONJEAN:  Yes?

23            MR. JEBSON:  Objection, Judge.  Motion in limine.

24            MS. BONJEAN:  Unaware of any motion in limine

25  regarding Charles.

1    THE COURT:  I don't recall.  What motion in limine?

2    MR. JEBSON:  It was No. 1 and 2 relating to Charles.

3    MS. BONJEAN:  Judge, you know what?  Just so I

4    don't -- the jury will hear the evidence at some point.

02:55:10    5    THE COURT:  All right.

6    MS. BONJEAN:  I will move on.  We do not need to --

7    THE COURT:  All right, fine.  That's good.

8    MS. BONJEAN:  -- belabor that point, although I don't

9    agree.  But we'll move on.

02:55:22    10   BY MS. BONJEAN:

11       So, as I said, at the end of this case, you're not

12   here to decide who is guilty or innocent, although you will

13   know.  You know who the ringleader was and you know who the

14   guys -- there were other people up there.  There were other

02:55:35    15   people that may have had culpability in all this.  That is

16   possible.  Stanley Wrice was not one of those individuals.

17   And no matter how many times the defendants tell you about how

18   terrible Karen Byron's injuries are, it doesn't make him more

19   culpable.  And that's what you have to keep in mind.  And

02:55:51    20   that's what I meant earlier when I said this is a case that's

21   going to stir your emotions, because it is emotional.

22       Now, at the close of this case, we are going to be

23   asking you to find in our favor, Stanley Wrice's favor.  We're

24   going to be asking you to award him damages for his pain and

02:56:26    25   suffering as a result of the atrocities really that were

1    committed against him.

2         And when I say Stanley Wrice had atrocities committed

3    against him, that does not mean that Karen Byron didn't have

4    atrocities committed against her.  I just want to drive home

02:56:42    5    that point.  We're not engaging in that type of false

6    equivalency.  One has nothing to do with the other.  What is

7    at issue here is that Stanley Wrice was wrongfully convicted,

8    and the defendant officers caused that wrongful conviction in

9    a number of ways.

02:57:03    10        And at the end of this, we are going to ask you to

11   award him significant damages for the 31 years of his life he

12   spent in prison, where he lost everything.  The hardships of

13   prison you will hear about from Stanley, what it means to be

14   in a maximum security prison every day -- the loss of privacy,

02:57:30    15   having to live in a cell, the sounds, the loneliness, the

16   sadness.  No one -- people stop visiting eventually.  You're

17   all on your own -- and, also, what was deprived of him from

18   being a free man.  The little pleasures in life.  Going to

19   your kids' birthday parties or -- and even people that, you

02:57:54    20   know -- he had no relationship with his kids.  Zero.

21        And I want to point out that Stan does not profess to

22   be an angel.  Never said he was.  He had a difficult

23   relationship with the mother of his children.  He had just had

24   his third child with her before this happened.  So, this is

02:58:19    25   not to say that this was a perfect situation.

1       But at the end of the day, there are rules to follow.
2   And we rely on law enforcement to get it right and do the
3   right things and not engage in this barbaric conduct.  And
4   that's what the evidence is going to show they did.  Because
5   they were too intent on closing their case that they wanted
6   him.  They got their hundred years.  The other guys, probation
7   will do.  Tells you what they thought of Karen Byron.

8       So, at the close of this, ladies and gentlemen, we're
9   going to ask you to return a verdict.  And, as I said earlier
10  today, in every life there comes a day of reckoning.  And we
11  hope that with this verdict, you hold the defendant officers
12  accountable for the grave miscarriage of justice they caused
13  to everyone.

14      THE COURT:  We'll take a 15-minute recess and we'll
15  have the opening statement of the defendants.  So, at 3:15.

16      (Brief recess.)

17      THE COURT:  Please be seated.

18      Mr. Hale, you may address the jury on behalf of the
19  defendants.

20      OPENING STATEMENT ON BEHALF OF THE DEFENDANTS

21      MR. HALE:  Thank you, Your Honor.

22      It's all right here, the actual physical evidence
23  from 1982 that's been impounded in court.  We got the box.  We
24  opened it up today.  And we're going to find out what's
25  inside.  And I'm going to show you what's inside.

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 156 of 240 PageID #:18206
Opening statement - defendants
156

1       This may look like an ordinary iron.  And on most

2   days, it was an ordinary iron but on September 8th, 1982, this

3   iron, this is the iron, became an instrument of torture used

4   by the man sitting right down there in front of you.  This

03:17:43   5   iron right here, Stanley Wrice, because there was no

6   electricity upstairs in the bedroom, in his bedroom -- and

7   counsel said, "Oh, defendants are going to tell you that that

8   was Stanley Wrice's bedroom."

9       No.  Stanley Wrice is going to tell you in his own

03:18:06   10   words because he already has that that was his bedroom.  He

11   took this iron, the Wrice family iron, that he and only he

12   knew was in his house, and he went downstairs, and he turned

13   on the stove, and the flames came up.  And what did he do?  He

14   put the iron on there.  And then when the iron was burning

03:18:35   15   hot, he walked upstairs and he took this iron, this iron, and

16   he pressed it all over Karen Byron's body.

17       Now, let's pause.  Karen Byron was gang raped.  It

18   was horrific.  She was beaten.  It was horrific.  She had 100

19   bruises from her head to her toes.  You're going to hear this.

03:19:04   20   And if that wasn't enough, Stanley Wrice took this family iron

21   from his house and multiple times, think about this, would

22   have gone down those stairs, heated it up on the stove with

23   that big flame, when it was burning hot went upstairs and

24   burned Karen Byron on her breast, on her back, on her

03:19:32   25   buttocks, burns so deep, third-degree burns, which means it

1   went all the way through the skin.  And she had to have skin
2   grafts, skin from her leg taken and put on her breast, on her
3   back, on her buttocks.

4         This iron was an instrument of torture and was used
5   over and over again.  And what the doctor will tell you and
6   what the police officers will tell you that responded to the
7   scene, these little holes in the back of the iron where the
8   steam comes out, that was the mark on Karen Byron's body.
9   Those holes were on her body, so they knew she had been burned
10  with an iron.

11        And we're going to talk about what Stanley Wrice knew
12  or didn't know.  I'm just giving you a preview right now.  But
13  when we go through and talk about the extent of Karen Byron's
14  injuries and what would have had to have happened to her, how
15  long it would have taken, all the trips up and down the
16  stairs, all the things that would have had to have been done
17  to her, the noise involved in the beating, the noise from
18  doing it, the noise from her, Stanley Wrice is going to tell
19  you, he's going to tell each one of you, "I had no idea.  I
20  didn't see anything.  I didn't hear anything.  I didn't smell
21  anything.  And I didn't do anything."  That's going to be his
22  story.

23        And we're going to go through the injuries, not for
24  sympathy but to show you, when you look at what was done to
25  this woman and the effort that was put into this, the torture

1   with this iron and other objects, you're going to decide, do I

2   believe him when he's telling you, he's going to want you to

3   believe he had no idea that this was going on in the room he

4   admits he slept in in his house on the second floor.  It is

03:21:52   5   undisputed, undisputed this happened at his house.  It's

6   undisputed it happened on the second floor.  And his own

7   testimony, I'm going to show it to you, out of his mouth, he

8   admits he slept upstairs.

9         This iron.  And there's more in here.  We're going to

03:22:12   10   get into it.  There's burned paper.  This is from 1982.  This

11   is from 1982.  Lighting paper on the stove and taking it

12   upstairs as torches to burn Karen Byron on her body, to burn

13   her.

14         A coat hanger, this is recovered from the bedroom in

03:22:38   15   1982, a coat hanger that is now broken in half and, the

16   evidence will show, was used to beat Karen Byron on her body.

17   And we're going to walk through this evidence.  I mean,

18   it's -- we've got Karen Byron's shoe from 1982 right here.

19         And what you heard counsel say, oh, the evidence was

03:23:09   20   just left up there in the room.  Yeah, you know why?  Because

21   the police came about an hour after this happened, and nobody

22   had time to get rid of any of the evidence.  The police got

23   there that night.  We're going to walk through the chronology.

24   They got there that night.  Yeah, thank God, all this stuff

03:23:27   25   was still there.  All the evidence was recovered in his

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 159 of 240 PageID #:18209
Opening statement - defendants
159

1    bedroom.  We're going to walk through all that evidence.

2          Stanley Wrice was properly charged.  He was properly

3    convicted.  You heard evidence that his conviction was

4    vacated.  There's been no finding that he's innocent.  He

03:23:52    5    hasn't been exonerated.  You're going to decide, the nine of

6    you, the nine of you are going to decide whether you believe

7    him that he saw nothing, heard nothing, smelled nothing, did

8    nothing, had no idea this was going on, or you're going to

9    believe the evidence against him at trial which was

03:24:14    10    overwhelming that Stanley Wrice did this.

11          And the evidence at trial came from primarily two men

12    in the house that night.  Kenny Lewis who lived down the

13    block, we're going to walk through his testimony.  He is now

14    deceased, so we're going to show you his testimony from the

03:24:35    15    criminal trial that was given under oath.  You're going to

16    hear that as substantive evidence.

17          You're also going to -- we're going to present to you

18    Bobby Joe Williams' testimony from the trial that came in as

19    evidence against Stanley Wrice.  Bobby Joe Williams, who had

03:24:51    20    two kids at the time with Stanley's sister Patricia, so he was

21    at the house all the time.  He testified too against Stanley

22    Wrice.

23          And I'm going to get into it a little bit, his story

24    now.  He's going to tell you now, this jury today, "You know

03:25:12    25    what, it was all a lie.  I didn't know who to talk to these

1    past 40 years.  I didn't know who to go to.  I didn't know

2    what to do."

3         Let's pause there.  He's got two kids with Patricia

4    Wrice.  All right.  He's going to tell you now, "I didn't know

03:25:30  5    what to do for 40 years.  Who do I talk to?  Where do I go?"

6         You're going to get to see that testimony.  We're

7    going to show you, Bobby Joe Williams' original testimony was

8    compelling, was true, and was powerful.  And we're going to

9    present that testimony to you.  And this is not a case

03:25:55  10   about -- it's not a case about a physical beating.  It's not a

11   case about excessive force.  That's not a claim.

12        The claim is, Stanley Wrice is claiming to you that

13   he was beaten and forced to confess and that the confession

14   was used against him at trial.  So that's two things to think

03:26:15  15   about when you hear all the evidence:  Did he confess, and was

16   the confession, the alleged confession, used against him at

17   trial?

18        And in the second part of his claim -- and I'm

19   talking in broad strokes.  The second part of his claim is

03:26:30  20   going to be, "Oh, you know what, Bobby Joe Williams, he was

21   beaten, and his testimony was actually false.  It wasn't true,

22   and nobody told us that.  And they should have told me and my

23   lawyer that they beat Bobby Joe Williams."

24        And we're going to show you that that's fraud, that

03:26:51  25   that's a complete fraud.  Bobby Joe Williams' testimony in

1    front of you in this case to this jury is a complete fraud,

2    and we're going to show you that.  But that's his claim.

3    That's his claim:  He was forced to confess.  It was used

4    against him at trial.  And essentially, Bobby Joe Williams was

03:27:06    5    also beaten and falsely implicated in the trial.

6         It's not about an excessive force case.  It's not

7    about just getting beaten.  That's what he has to prove to

8    you.  That's what he has to prove to you in his case.  Okay.

9    And you're going to hear about the two, Kenny Lewis and Bobby

03:27:25    10    Joe Williams being the main witnesses against him.

11         And I'm going to walk through with you now and give

12    you a preview of what the case is about, but in a nutshell,

13    what you heard the plaintiff say was, Stanley Wrice had

14    nothing to do with it, had no idea it was even going on in his

03:27:39    15    house and was framed.  She said framed, forced to confess.

16         We're going to show you decisively in the case that

17    the police got the right guy who's sitting in court today.  He

18    was properly charged.  He was properly convicted.  And the

19    evidence against him was overwhelming, that he didn't confess.

03:28:00    20    There was no confession used against him at trial.  And Bobby

21    Joe Williams' testimony at the original trial in 1983 was

22    true, was powerful and persuasive.  And what Bobby Joe

23    Williams is going to tell you in this case is a fraud.  That's

24    what the case is about in a nutshell.

03:28:17    25         Let's now walk through, and I'm going to give you a

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 162 of 240 PageID #:18212
Opening statement - defendants
162

1    preview of what the case is about.  You've all got screens in

2    front of you.  Some of this, I'm going to tell you right now,

3    it's going to be a little bit graphic because of the nature of

4    the injuries.

03:28:31    5    MS. BONJEAN:  Objection.  Can we --

6    MR. HALE:  I'm going to talk about the torture of

7    Karen Byron.  Karen Byron was tortured.

8    MS. BONJEAN:  I have not seen -- this was not --

9    Judge, I have an objection if we could have a quick sidebar.

03:28:56    10    (Proceedings heard at sidebar:)

11    MS. BONJEAN:  You are putting something up you've

12    never shown me.

13    MR. HALE:  I've got an opening PowerPoint

14    presentation.

03:29:04    15    MS. BONJEAN:  Judge, you gave an order --

16    THE COURT:  I thought you were going to show what the

17    graphics you were --

18    MR. HALE:  I've got to put the text of all my slides

19    on the screen?  It's like giving her my opening statement.

03:29:13    20    THE COURT:  What exactly is the --

21    MR. HALE:  I've got text of what witnesses said.

22    I've got crime scene photos.

23    MS. BONJEAN:  Objection --

24    MR. HALE:  I mean, otherwise, I'm essentially giving

03:29:21    25    her my opening statement which I don't think I have to do.

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 163 of 240 PageID #:18213
Opening statement - defendants
163

1        MS. BONJEAN:  The judge ordered that.

2        MR. HALE:  I don't think he did.

3        THE COURT:  Well, the graphics, you were supposed to.

4    I don't know what -- is this evidence that's going to be

5    admitted during the trial?

6        MR. HALE:  It's my little signpost about what I see

7    the evidence -- it's graphic sometimes.  It just talks about

8    witnesses, who they were, what they said.  It's nothing --

9    it's nothing that she can object to.  It's no different than

10   if I said it.

11       MS. BONJEAN:  Well, if it wasn't anything I could

12   object to, maybe he should have shown it, and we could have

13   done that.  I showed him my exhibits.  I talked to him, and we

14   had multiple --

15       MR. HALE:  I --

16       MS. BONJEAN:  Please.

17       At multiple times, he could have said to me, "Oh,

18   Jennifer, I have some things for you to look at, and let me

19   get your feedback."

20       And this court absolutely told both of us that if

21   you're going to use something in opening and it's not a piece

22   of evidence --

23       THE COURT:  Tell the other side, yes.

24       MR. HALE:  Well, here's the difference.  I'm using

25   things that are admitted in evidence.  And if I have

1　　transition --

2　　　　　THE COURT:  If you're going to use evidence, as long

3　　as it's going to be certain it's going into evidence, then you

4　　can use it.

03:30:17

5　　　　　MR. HALE:  If I have a slide that says "Stanley Wrice

6　　is a liar," why do have I to show that to her?

7　　　　　MS. BONJEAN:  Judge --

8　　　　　MR. HALE:  It's a slide that says Stanley Wrice lied.

9　　　　　THE COURT:  Well, that's not evidence.

10　　　　MR. HALE:  I mean, I don't --

11　　　　THE COURT:  That's not evidence.

12　　　　MR. HALE:  Right.  I don't have to give her my

13　　opening statement.

14　　　　THE COURT:  No, no -- well, sort of you do when

03:30:32

15　　you're going to use graphics.  So you can use evidence but

16　　not -- you shouldn't just -- first of all, that's

17　　argumentative.  You're not supposed to argue at the opening

18　　statement.

19　　　　MR. HALE:  Well, I think we all agree that she was

03:30:46

20　　tortured.  I don't think that's argumentative.

21　　　　THE COURT:  No, nobody is going to argue that.  She

22　　says that.  I mean, just what exactly is --

23　　　　MR. HALE:  I've got slides.  I've got crime scene

24　　photos.  I've got testimony, what witnesses said.  I've got

03:30:58

25　　video clips --

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 165 of 240 PageID #:18215
Opening statement - defendants
165

1          THE COURT:  These are all evidence in the case?  You

2     can use evidence in the case.

3          MS. BONJEAN:  Judge, I'm sorry.  I can't respond

4     having not seen it.  It is not fair.  This is just not fair.

03:31:07     5     If you want to take a break and let me look, that's fine.

6          THE COURT:  How long does it take?  I don't want to

7     take a break if I can avoid it.

8          MR. HALE:  Well, I've got quite a bit.

9          MS. BONJEAN:  It's just not fair.

03:31:15    10          MR. HALE:  I've got a whole PowerPoint deck.  I've

11     got video depositions.  I've got testimony of the witnesses.

12          MS. BONJEAN:  Are you kidding me?

13          THE COURT:  As long as this is evidence in the

14     case --

03:31:23    15          MR. HALE:  It is.

16          THE COURT:  -- then you can use it in the opening

17     statement --

18          MR. HALE:  Right.

19          THE COURT:  -- so you don't --

03:31:27    20          MS. BONJEAN:  I don't know it's evidence in the case.

21     There are objections to portions of deposition testimony.  If

22     I -- Judge, I cannot be more vehement right now that it is

23     absolute -- talk about a trial by ambush.  Pulling out

24     excerpts potentially and just cherry picking portions of

03:31:41    25     deposition testimony that may be objectionable that we have

1  objections to on our final pretrial order that have not been
2  resolved --

3        THE COURT:  Well, if there's any objection to it,
4  then you shouldn't use --

5        MR. HALE:  I don't think there is.

6        MS. JACOBS:  It's Stanley Wrice's own testimony.
7  Your Honor, this woman lied and said that --

8        THE COURT:  Wait.

9        MS. JACOBS:  -- Kenny Lewis raped the victim --

10       THE COURT:  Hold on.  Hold on.  All I'm trying to get
11  is, is there anything -- this is testimony of Stanley Wrice?

12       MR. HALE:  Right.  I've got testimony of Stanley
13  Wrice.  I've got testimony.  I've got blowups of what was said
14  at the criminal trial.  This is -- this is evidence I'm going
15  to present during the case, and I'm putting it in a visual
16  format in addition to saying it.

17       MS. BONJEAN:  This is also an end run around about
18  the Court's ruling about summaries.  So now they're pulling
19  out little excerpts from the trial transcripts.

20       THE COURT:  I think you probably should go on without
21  doing that.

22       MR. HALE:  I'm not going to be able to.  I've got a
23  whole presentation.

24       MS. BONJEAN:  He should have shown me.  He didn't
25  show me for a reason.

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 167 of 240 PageID #:18217
Opening statement - defendants
167

1          MR. HALE:  I've got a whole presentation -- no, I

2     didn't think I had to.  I've done this in every one of my

3     trials --

4          MS. BONJEAN:  This is outrageous.

03:32:41    5          THE COURT:  As long as -- I still -- you've cherry

6     picked stuff out; is that right?

7          MR. HALE:  Sure, yes.

8          MS. JACOBS:  It's all evidence.

9          MR. HALE:  It's all evidence.

03:32:49    10          MS. BONJEAN:  It's not evidence.  The trial

11     transcripts aren't evidence.  That is the whole point.

12          MR. HALE:  It's witnesses.  It's what Stanley Wrice

13     said at trial.  It's what Kenneth McCurry said at trial.  It's

14     what Stanley Wrice said at his deposition.

03:33:01    15          MS. BONJEAN:  And it's ambush.  It's absolutely

16     ambush.

17          MR. HALE:  It's not.

18          THE COURT:  Why wouldn't you have shown it to her?

19          MR. HALE:  I didn't know --

03:33:06    20          MS. BONJEAN:  We know why.

21          THE COURT:  I said if you're going to use a

22     demonstrative, give it to show them.

23          MR. HALE:  If you've got a demonstrative like she

24     has, that's different.

03:33:14    25          MS. BONJEAN:  And I showed it to you and asked you.

1       MR. HALE:  What could you object to Stanley Wrice's

2   criminal trial testimony?  How can you object to that?

3       MS. BONJEAN:  Because you're just telling me what's

4   there.

03:33:22   5       MR. HALE:  I don't have to tell you.

6       MS. BONJEAN:  Okay.  So how can I object?  Well, I

7   don't know how I can object because I don't know what's there.

8       MS. JACOBS:  You didn't show us your openings.

9       MR. HALE:  Right.

03:33:29   10      THE COURT:  Well --

11      MS. BONJEAN:  Oh, my God, this is --

12      THE COURT:  -- I don't want to waste more -- we've

13  got to get through this.

14      MR. HALE:  I've got a whole presentation.

03:33:34   15      MS. BONJEAN:  I -- Judge, this is so improper and

16  it's so unfair.

17      MS. JACOBS:  It's not improper.

18      THE COURT:  Here's what we'll do.  Go ahead and do

19  it, and then if there's objection to it, I'll --

03:33:42   20      MS. BONJEAN:  Oh, my God.

21      THE COURT:  -- rule to strike it.

22      (Proceedings heard in open court:)

23      THE COURT:  Proceed.  Go ahead.

24      MR. HALE:  September 8, 1982, that's the date we're

03:34:02   25  talking about.  So keep in mind, this happened almost 40 years

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 169 of 240 PageID #:18219
Opening statement - defendants
169

1    ago, September 8th, 1982.

2         Karen Byron was an alcoholic.  She lived in Stanley

3    Wrice's neighborhood.  Her testimony was on September 8th, she

4    left her house to go visit some friends.  She was walking down

03:34:20    5    75th Street.  Some guys asked her if she wanted a ride.  She

6    said, "No, thank you."  And the next thing she remembers,

7    she's in the car, and the next thing she remembers is steep

8    steps, going up steps.

9         And then what she'll tell you is, she was taken to,

03:34:44    10   we now know, 7618 South Chappel.  This is the Wrice home, a

11   small Chicago bungalow on the south side.  At that time,

12   Stanley Wrice's parents were deceased.  He was living there

13   with his younger sister Patricia and his younger brother

14   Charles.

03:35:02    15       There were ten -- he had ten siblings.  Two of them

16   were living with him.  He's 28.  They're going to try to tell

17   you that this was just, you know, some kind of place that

18   anybody could come and go.  Stanley Wrice lived there with his

19   brother and his sister.  It was a house.  Let's be clear.

03:35:22    20   Karen Byron was not raped, beaten, and burned in a public park

21   or in a vacant building.  She was raped, beaten, and burned in

22   Stanley Wrice's bedroom at 7618 South Chappel.

23       What Karen Byron testified to was --

24       MS. BONJEAN:  Objection, Judge.

03:35:43    25       MR. HALE:  She said, "I said" --

```
 1              MS. BONJEAN:  Objection.

 2              MR. HALE:  This is her testimony from the trial.

 3              MS. BONJEAN:  Judge, this --

 4              MR. HALE:  This is exactly what she said.

 5              MS. BONJEAN:  You know what, I'll withdraw the

 6  objection.

 7              THE COURT:  All right.

 8              MS. BONJEAN:  Go right ahead, Mr. Hale.

 9              THE COURT:  Go ahead.

10              MR. HALE:  Let's make no bones about, Karen Byron

11  didn't know where she was going and didn't want to be there.

12              She said, "I said, you know, what now?  I knew I was

13  in trouble then.  They had me up there.  Then the one said,

14  oh, he said something about a drink.  I forgot what he said.

15  He said, there ain't no drink."  You can read the next part.

16  That's what he said.  That was her testimony at the criminal

17  trial.

18              And then she testified that she was raped by one man,

19  raped by a second man, and then raped again by a third man.

20  That was her testimony at the criminal trial.  She then said,

21  these are quotes from her testimony, "Another man grabbed my

22  hair."

23              MS. BONJEAN:  Judge --

24              MR. HALE:  "He was" --

25              MS. BONJEAN:  I'd like to voice an objection.  This
```

03:35:54
03:35:58
03:36:17
03:36:41
03:36:52

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 171 of 240 PageID #:18221
Opening statement - defendants
171

1    just defies the Court's orders about how this is being

2    presented.  I mean --

3            MR. HALE:  This is a direct summary of some of her

4    testimony.

5            THE COURT:  All right.  Just verbalize her testimony,

6    and don't put it up.  Proceed.

7            MR. HALE:  Can we just show it so I can see it

8    without the jury seeing it?

9            So she testified -- so I can see it on our screen.

10            Somebody grabbed her head and wanted her -- I'm going

11    to say it in a polite way.  He wanted oral sex from her.  She

12    said, "No, I'm not.  You're going to have to kill me."  And

13    then she said she got punched, and then she said she got

14    knocked to the floor and punched again.

15            And let's pause again.  I'm going to take a lot of

16    time-outs and pause.  When you hear about punches and knocked

17    to the floor and things like that, think if it's realistic for

18    somebody who is allegedly not in the bedroom, they're

19    downstairs, if they're really not going to hear any of this

20    going on.  Okay.

21            Because what Stanley Wrice is going to tell you is,

22    "I first went upstairs.  I just checked it out.  Everything

23    was cool.  I walked -- I just wanted to make sure they didn't,

24    like, damage these walls I'm building up there.  It was cool.

25    I went back downstairs for 20 minutes.  I then went down" --

1    at 1:00 in the morning, mind you.  We're going to get to this.

2        At 1:00 in the morning, "Oh, I'm going to go down the

3    alley to the phone booth and call my fiancée."  We're going to

4    talk about that.  He had to make this urgent call at 1:00 in

03:38:28    5    the morning.  Then he comes back to the house and fall asleep.

6        So when we hear this testimony about punched, beaten,

7    burned, think to yourselves whenever you hear that, is it

8    realistic that somebody, even if they were downstairs, okay,

9    which --

03:38:48    10        MS. BONJEAN:  Judge, this sounds an awful lot like a

11    closing argument.

12        THE COURT:  Yes, this is argument, so just tell the

13    facts.

14        MR. HALE:  You're going to have -- you're going to

03:38:55    15    have to assess the credibility of Stanley Wrice when he tells

16    you he didn't know anything was going on in the house.

17        Karen Byron is going to then say she saw fire.  She

18    saw torches.  And she's going to tell you, you're going to

19    hear her testimony -- she's not going to tell you because

03:39:15    20    she's not here -- "They were burning me."  That's what she

21    testified to, seeing torches and they were burning her.  And

22    the torches she saw, the evidence will show, was the paper

23    they were lighting in the kitchen and bringing upstairs

24    because there's no electricity on the second floor.

03:39:38    25        And what Karen Byron testified to during this is

1    hearing laughter, voices and laughter.  Karen Byron kept

2    talking about voices and laughter and getting called names.

3    And again, you're going to have to assess, is it credible that

4    somebody wouldn't know anything was going on on the second

03:40:00    5    floor?

6               I'd ask permission to show pictures of the bedroom.

7               MS. BONJEAN:  No objection.

8               MR. HALE:  If I could show it to the jury.

9               THE COURT:  Yes.  Any picture that's in evidence

03:40:13    10   that -- or has not been objected to can be used.

11              MR. HALE:  This is the second floor bedroom.

12   Pictures were taken that morning after the police came to the

13   house.  And the Chicago police crime processing unit gathered

14   evidence and took photographs.  This is where Karen Byron was

03:40:33    15   upstairs in Stanley Wrice's bedroom.  You can see what it

16   looked like.  Here's a picture of the area near the bed.

17   Counsel already showed you the shoe there.  That's Karen

18   Byron's shoe that's on the carpet there.

19              There's the picture of the iron next to an Old

03:40:56    20   Milwaukee beer bottle.  And you'll hear evidence that Stanley

21   Wrice, when he went to the liquor store, he'll tell you he

22   always drank Old Milwaukee beer.  He's going to buy a quart of

23   beer.  There's a beer bottle right next to the iron on the

24   second floor.

03:41:15    25              Here's another picture of upstairs, a two-pronged

1    fork.  You're going to hear evidence about this two-pronged

2    fork being used in the torture of Karen Byron.

3          You see a red hat there on the dresser.  Bobby Joe

4    Williams testified at the criminal trial, was asked what was

5    Stanley wearing when he walked to the liquor store?  He said,

6    "The one thing I remember was he was wearing a red hat."

7    There's the red hat right there, Stanley Wrice's red hat on

8    the dresser upstairs in the bedroom by the iron, by the bed.

9    There's a close-up of the bed of how it looked that morning.

10         There's the broken hanger.  I actually showed you the

11   original here a minute ago.

12         There's the kitchen sink.  That's how the kitchen

13   sink looked that morning when the police came and took their

14   photographs.  And there was, you'll hear testimony there was

15   burnt paper in the sink, charred, burned newspaper in the

16   sink.

17         We can now just have these slides stay here so I can

18   just -- without the jury seeing them.

19         Karen Byron then testified that she got taken to the

20   Loyola burn center.  She was there for 30 days.  Now I want to

21   talk about her injuries.  And this is again why it's important

22   because Stanley Wrice is going to tell you he saw nothing, he

23   heard nothing, he smelled nothing, he did nothing.

24         Dr. Nolan Lewis testified at the trial.  He's going

25   to testify in our case.  He's going to talk about her face,

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 175 of 240 PageID #:18225
Opening statement - defendants
175

1  two long burns on the right side of her face.  I actually had

2  to type this up because there were -- I wanted to remember all

3  the things he testified to.

4          Her right cheek, linear burns.  Her right eye,

5  partially closed.  Her mouth, burns across the corner of her

6  mouth.  Her neck, bruising with burns.  The left side of her

7  chest extending to her breast, a large burn area in the

8  configuration of a clothing iron.  A second-degree burn,

9  numerous bruises extending to her buttocks.

10         The right side of her chest, the right breast over

11  the nipple, another burn in the shape of an iron.  A

12  third-degree burn which he explained goes all the way through

13  the skin.  Her lower extremities, Dr. Lewis said, were covered

14  with a large number of small bruises, some as big as quarters

15  and some as big as a dime.  Her thighs had bruises to the

16  front.  Her right thigh had a long linear bruise that was

17  different from all the other bruises.  It was a large, wide

18  bruise five inches by two inches on her right thigh.

19         Her upper back and thigh area had third-degree burns,

20  not in the shape of an iron, so something else caused those

21  burns, not an iron.  Her left knee had a large bruise two

22  inches in diameter, circular in shape.  Her upper back had

23  many burn areas in a configuration of a clothing iron.

24         Third-degree burns, burns over 80 percent of her

25  back.  Her lower back had long marks seven inches long.  She

1    was hit with a long, narrow object, possibly the wooden coat

2    hanger.  Abrasions as though she was dragged across something

3    rough or something was dragged across her.  Her buttocks had

4    deep burns in the configuration again of an iron.

03:44:58    5    Her left arm had burns on the upper and lower arm.

6    Her hand had bruises all the way down.  Her vagina and anus,

7    there were burns on the inner aspect of her thighs not from an

8    iron.  And she had third-degree burns on her breast, back, and

9    buttocks where she needed skin grafting.

03:45:22    10    That's what happened in Stanley Wrice's bedroom on

11    September 8th and 9th, 1982.  So what does Stanley Wrice want

12    you to believe?  Heard no evil, saw no evil, didn't see

13    anything, didn't hear anything.

14    And let's talk about the -- his alibi.  So part of

03:45:50    15    the time he says he's home, didn't hear anything when he's

16    home, didn't know anything unusual was going on upstairs.

17    He's going to tell you at 1:00 o'clock, he left the house to

18    walk down the alley to a phone booth to call somebody he calls

19    his fiancée, a woman named Jennifer Scott.

03:46:09    20    Well, you're going to hear from Jennifer Scott in

21    this courtroom.  She's going to testify.  She's going to tell

22    you, "No, there was no phone call at 1:00 in the morning.  No,

23    I wasn't his fiancée.  No.  In fact, he was physically abusive

24    to me."  She had kids with him that she will tell you were the

03:46:31    25    product of rape and she was -- Stanley Wrice was physically

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 177 of 240 PageID #:18227
Opening statement - defendants
177

1    abusive to her.

2          MS. BONJEAN:  Objection.  Judge, objection.  We need

3    a sidebar.

4          THE COURT:  I don't think this is part of any motion

5    in limine.

6          MS. BONJEAN:  It was, Judge.

7          MR. HALE:  You denied it.

8          THE COURT:  What motion?  What motion was it?  Oh,

9    here it is.

10         (Pause.)

11         THE COURT:  You only -- this part, I overruled it.

12   The motion in limine does not --

13         MS. BONJEAN:  Judge --

14         THE COURT:  So overruled.

15         MR. HALE:  Jennifer Scott will also tell you that not

16   only was there no phone call, not his fiancée, all the

17   physical abuse, what's going to be undisputed is, Jennifer

18   Scott was not called as a witness at the trial.  So Stanley

19   Wrice's story was, "I made this phone call to my fiancée at

20   1:00 in the morning."

21         Jennifer Scott actually watched part of the trial.

22   She was there.  She's going to talk about that.  Stanley

23   Wrice's attorneys, they never called her to the stand to

24   corroborate this phone call.  The evidence is going to show

25   that's because there was no phone call at 1:00 in the morning

1    when he is taking himself out of the house conveniently for 45

2    minutes.

3          So let's pause.  Your Honor, I would ask permission

4    to play video clips of Mr. Wrice's deposition.

03:49:02    5          MS. BONJEAN:  Judge --

6          THE COURT:  I think, just summarize it.  Don't --

7          MR. HALE:  So we'll keep the screen just showing for

8    me, not the jury.

9          Mr. Wrice is going to deny hitting Jennifer Scott.

03:49:20   10    We're going to show you a letter he wrote her where he talked

11    about, after he had stopped hitting her, he used the phrase,

12    "After I stopped hitting you."  We're going to show you that.

13          Mr. Wrice is going to deny ever sending Jennifer

14    Scott a threatening letter.  We're going to show you the

03:49:43   15    letter he sent her shortly after he got convicted.  And in

16    that letter to Jennifer Scott --

17          MS. BONJEAN:  Judge, this is also part of a motion in

18    limine.

19          THE COURT:  I don't believe it was.

03:49:53   20          MS. BONJEAN:  Yes, it was, Judge.  I'm sorry.

21          THE COURT:  I'm looking at the ruling.

22          MS. BONJEAN:  It's No. -- Judge, on Page 10, motion

23    to bar -- just Page 10, No. 4.  I mean...

24          THE COURT:  "The defendants may introduce letters

03:50:20   25    between Wrice and Scott if the letters include any evidence to

1    suggest the veracity" --

2         MS. BONJEAN:  Yes.  He's not talking about the

3    veracity of the alibi here, Judge.  If we could have a

4    sidebar, it would be easier to have this conversation at

03:50:34    5    sidebar.

6         (Proceedings heard at sidebar:)

7              MS. BONJEAN:  Judge --

8              MS. JACOBS:  She's not --

9              MS. BONJEAN:  It's my motion, Judge --

03:50:49    10         THE COURT:  Wait.  They can't do it both.

11         MS. BONJEAN:  Judge, he's talking --

12         THE COURT:  I'm just reading what this says.

13         MS. BONJEAN:  You said that the letters can come in

14    if it related to the alibi.  He's talking about prior bad acts

03:50:59    15    of hitting her and him denying it.  This is a gross violation

16    of the motion in limine.  Frankly, we should move for a

17    mistrial.

18              THE COURT:  Wait.  Hold on a minute.  "The Court is

19    aware that Scott's testimony on Wrice's abuse presents such a

03:51:10    20    risk and may inflame the jurors.  Nevertheless, evidence of

21    the nature of their relationship is relevant because it bears

22    on the jury's assessment of the alibi presented at trial."

23              MS. BONJEAN:  The alibi.

24              MR. HALE:  Right.

03:51:21    25              MS. HIJJAWI:  Exactly.  She hates him.  She's not his

1    fiancée.  It's a fraud.

2         THE COURT:  Quiet.

3         MS. BONJEAN:  But the letters, Judge, the letter

4    doesn't relate to anything related to the alibi.

03:51:32    5         MS. HIJJAWI:  It absolutely --

6         MS. BONJEAN:  So, Judge, we understood the ruling to

7    be that if he's going to get up here and say that they have

8    this great relationship and they want to say the reason she --

9    what is the connection --

03:51:42    10        MS. HIJJAWI:  You already --

11        MS. BONJEAN:  Can you please stop interrupting me?

12        MS. HIJJAWI:  You already said that she was --

13        THE COURT:  Wait, hold on.  Don't argue with each

14   other.  I will -- go ahead.

03:51:50    15        MS. BONJEAN:  Judge, you know, this is why it should

16   have been shown to me ahead of time so we could have worked

17   this out.  And this is really kind of disgusting what's

18   happening in front of the jury right in front of them.  It's

19   really unfair.

03:52:01    20        THE COURT:  "Scott may testify as she did at the

21   deposition that she cut all ties with Wrice" --

22        MS. BONJEAN:  Right.

23        THE COURT:  -- "once their third child was born, and

24   Scott can explain why she had cut off ties."

03:52:10    25        MS. BONJEAN:  Yes.  But letters to --

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 181 of 240 PageID #:18231
Opening statement - defendants
181

1      THE COURT:  "However, will closely monitor the

2  subject of the testimony to ensure that it does not become too

3  prejudicial."  So let's move on on this.  Don't ...

4      MR. HALE:  You had said that we could run this

03:52:21   5  motion, that we could introduce this letter and these portions

6  of the letter.  You said --

7      THE COURT:  Only related to the false alibi.

8      MS. BONJEAN:  The alibi.

9      MR. HALE:  Right.  This all --

03:52:28  10      THE COURT:  So anyway, let's wait until the trial to

11  do that.  Let's move on with this.  Just don't quote from the

12  letter.

13      (Proceedings heard in open court:)

14      MR. HALE:  So we're going to present evidence when we

03:52:51  15  hear from Mr. Wrice.  You're going to hear from Jennifer

16  Scott.  So you don't have to hear it from my voice.  You don't

17  have to hear it from my mouth.  You're going to hear it from

18  Stanley Wrice's mouth.  You're going to hear it from Jennifer

19  Scott's mouth, but you are definitely going to hear about this

03:53:04  20  threatening letter that Stanley sent to Jennifer after denying

21  never having sent her a threatening letter.

22      When Stanley Wrice says after he made this 1:00 a.m.

23  phone call to Jennifer Scott that she denies, he comes back to

24  the house, and he says, "Apparently, I fell asleep."  He fell

03:53:30  25  asleep.  So his story is going to be, "Yeah, there's all these

1    guys upstairs.  I don't know what they're doing.  I can't hear

2    them.  I can't see them.  I can't smell anything."

3           He just fell asleep.  And then he's going to tell you

4    that he got woken up at some point and was told there were

03:53:47    5    people fighting up there, that he went up there.  There was

6    nobody fighting.  And he kicked everybody out.

7           So let's pause there again.  Stanley Wrice will admit

8    to you, admit to you that he was upstairs twice.  He first

9    went up, he says, to check everything out to make sure it's

03:54:07    10    okay, and he went upstairs to kick everybody out.  So he's

11    going to admit to you he was up there twice.  But despite

12    being up there twice, he's going to continue to tell you he

13    never saw anything amiss, never saw any injuries on Karen

14    Byron, nothing looked unusual, nothing to be concerned about,

03:54:30    15    just everything looked normal.  That's going to be his

16    testimony to you, ladies and gentlemen.

17           And then he's going to tell you, after he kicks

18    everybody out and they come down the stairs, he's going to

19    tell you the kitchen light was on.  The kitchen light was on.

03:54:48    20    He saw Karen Byron.  He's going to tell you, "I thought she

21    was drunk."  That's what he's going to tell you and want you

22    to believe:  "I thought she was drunk."  And he's going to

23    tell you, "I really couldn't see her face."

24           And the reason I read you all of those injuries is

03:55:07    25    because I want you to keep in mind how Karen Byron must have

1  looked when she was leaving Stanley Wrice's bedroom and house.

2  He testified, "I thought she was drunk."

3       And it's not only Stanley Wrice.  His brother Charles

4  is there.  His sister Patricia is there.  And the whole three

03:55:33  5  Wrices are going to tell you the same thing:  None of them saw

6  anything.  None of them heard anything.  None of them smelled

7  anything.  "We didn't know," not just Stanley but his brother

8  Charles who testified on his behalf at the criminal trial who

9  is going to come into this court and his sister Patricia who

03:55:56  10  testified for him in his criminal trial and may or may not

11  come into this court.

12       And not only did he not hear or see anything,

13  Patricia and Charles are also going to say, "We never saw any

14  injuries on Karen Byron either."  Nobody saw anything from the

03:56:14  15  Wrice family.

16       But let's compare that to what happened when Karen

17  Byron was thrown out of the Wrice house.  And she will tell

18  you she was outside and she crawled.  She was crawling towards

19  a light in the distance which turned out to be a gas station.

03:56:36  20  And she crawled towards that light, and she made it there.

21  And when she got to that gas station, there was a man working

22  there, a man by the name of George Wilson who testified at the

23  criminal trial.

24       And he said, and he testified upon seeing Karen

03:56:51  25  Byron, her eyes were bruised.  Her mouth was swollen and

1     bleeding.  This is what he observed.  And then they called the

2     police, and a female African-American patrol officer showed

3     up, Frankie Peters, showed up to this gas station a block from

4     Stanley Wrice's house.  And she said it looked like the lady

03:57:12   5     was beaten up.  It looked like her lips were cut.

6           And Frankie Peters testified that Karen Byron pulled

7     up her shirt and she could -- Frankie Peters could see the

8     iron burns on her back and her buttocks.  And the injuries

9     were so obvious to George Wilson and Frankie Peters, they

03:57:30   10    immediately drove her to the hospital, first to Jackson Park

11    Hospital.  She was transferred to Loyola burn center.  That's

12    what happened in Stanley Wrice's bedroom on September 8th and

13    9th, 1982.

14          Let's talk about the witnesses.  You heard a little

03:57:48   15    bit about it in the plaintiff's presentation.  Two guys in the

16    house that night, Kenny Lewis, 19 years old, lived down the

17    block.  I told you he's deceased.  Kenny Lewis will testify,

18    "I observed Stanley beating the woman."  That's what he

19    testified to.  He said he tried to stop Stanley, tried to pull

03:58:10   20    him off her, and then Stanley would go back and start beating

21    Karen Byron again.  And this happened two or three times.  And

22    Kenny Lewis testified to that.

23          He also testified that Stanley Wrice said -- excuse

24    my language, but I've got to just say it the way it was said

03:58:30   25    in the trial transcript.  "Stanley said he hated fucking white

1    people."

2         Kenny Lewis testified to that.  Kenny Lewis said he

3    left the house, came back, and when he came back, he went

4    upstairs, saw Karen Byron and said, "I thought she was dead."

03:58:47    5    He said he thought she was dead.  And he said he saw that she

6    had been burned from head to toe.

7         And you heard the medical testimony.  And Dr. Lewis

8    will tell you she was burned from head to toe.  And Kenny

9    Lewis will say he saw the iron marks on Karen Byron's body.

03:59:05    10    He testified to that.

11         And he also testified to seeing Stanley Wrice taking

12    a hot spoon off the stove.  He testified to this at the

13    criminal trial, too, Kenny Lewis.  And then he heard her

14    falling down the steps.  He testified to that.  And then he

03:59:23    15    said when Karen Byron was basically about to get outside, he

16    saw Stanley Wrice slap her, and she fell.  He testified to

17    that.

18         And then witness number two is Bobby Joe Williams who

19    we've talked about, the boyfriend of Patricia Wrice.  He's 21

03:59:42    20    years old, two kids with Patricia.  He testified he saw -- he

21    went upstairs, and he saw Stanley having sex with Karen Byron.

22    He testified to that.  He also testified that he saw Stanley

23    Wrice pick the iron up off the stove and go upstairs.  Bobby

24    Joe Williams testified to that, too.

04:00:05    25         And then he said later that night --

1      MS. BONJEAN:  Judge, I'm going to object --

2      MR. HALE:  -- when he was downstairs --

3      MS. BONJEAN:  I'm going to object.  This is all

4    testimony that is out-of-court statements.  Mr. Hale is

04:00:17    5    already -- for substantive purposes, Bobby Joe is going to be

6    here.  He's not an unavailable witness.  This is for

7    substantive purposes.  The trial testimony is certainly

8    relevant for context but --

9      THE COURT:  Well, he can -- as long as he will assure

04:00:31   10    me that the witness will testify to this.

11      MS. BONJEAN:  The witness is not going to testify to

12    this.  This is --

13      THE COURT:  Okay.  Then --

14      MR. HALE:  We're going to confront the witness with

04:00:38   15    his testimony that was given --

16      MS. BONJEAN:  Yes.  He's arguing the substantive --

17      THE COURT:  Okay.  Let's move on.  I'll sustain the

18    objection to this statement for this -- at this point in the

19    opening statement.

04:00:51   20      MR. HALE:  Based on the testimony of Kenny Lewis,

21    Bobby Joe Williams, Stanley Wrice testified -- so the jury had

22    the ability to believe or disbelieve his testimony about not

23    hearing anything, going down the alley, making the phone

24    call -- he got convicted; sentenced, as you heard, to 100

04:01:11   25    years in prison.

1    Bobby Joe Williams now, as I mentioned, had a

2 different story.  He's going to come in here and tell you none

3 of it was true.  He didn't know who to contact.  I mentioned

4 this in my introduction.  He's going to tell you, "I didn't

5 know who to go to."

6    So picture this.  He's going to tell you, "The police

7 beat me.  I was forced to give this false testimony against

8 Stanley Wrice."  And to make the chronology, he's injured by

9 the police.  He has no contact with the police for eight

10 months until the criminal trial.  The police had no more

11 contact with him.

12    He's called to court.  He's going to tell you that he

13 met with the prosecutor, Bertina Lampkin, and that he was

14 tricked.  Basically, he went in to meet with her.  He walked

15 through a doorway -- this is what he's going to tell you.  He

16 walked through a doorway and all of a sudden, now he is in a

17 courtroom.  Walking through that door and having a meeting

18 and, oh, take the witness stand.

19    And he's going to tell you, "I came through this

20 door, and I just was in a court, and I had to give this false

21 testimony" that he gave in detail, in detail, in detail.

22    He's going to tell you that Bertina Lampkin who

23 prosecuted the case -- and you're going to hear Bertina

24 Lampkin come in.  He's going to say, "Bertina Lampkin told me

25 that if I didn't point the finger at Stanley, she was going to

1　charge me."

2　　　　And Bertina Lampkin -- who, by the way, now is an

3　appellate court judge here in Chicago -- is going to tell you

4　in no uncertain terms that that was a lie.  She never

04:02:49　5　threatened Bobby Joe Williams.  She met with him on several

6　occasions.  She went over his testimony.  He was forthright.

7　He was remorseful.

8　　　　She's going to tell you that none of that was true,

9　that Bobby Joe Williams told her what happened, and she

04:03:05　10　presented that testimony to the criminal jury.  Bertina

11　Lampkin is going to testify in this courtroom to those things.

12　　　　Bobby Joe Williams is also going to tell you in his

13　"40 years later" story that he never went upstairs.  Well,

14　we're going to show you testimony directly from Stanley

04:03:30　15　Wrice's mouth where not only did he see Bobby Joe Williams go

16　upstairs, but Stanley Wrice himself is going to tell you out

17　of his own mouth that when he went upstairs, he saw Bobby Joe

18　Williams.  So you're going to have to assess the credibility

19　of Bobby Joe Williams when he tells you now he never went

04:03:49　20　upstairs.

21　　　　We're going to skip over a few of these parts.

22　　　　Here is the other thing about Bobby Joe Williams to

23　keep in mind.  The story now is, "I didn't know who to talk to

24　all these years."  Let's go back to the criminal trial.  When

04:04:12　25　he's on the stand, he testifies.  Bertina Lampkin puts him on

1    as a witness, and he testifies against Stanley Wrice.

2         Stanley Wrice's lawyer then is cross-examining Bobby

3    Joe Williams, and he says, "Hey," words to the effect, "I

4    called you on the phone, right, and I wanted to talk to you?"

04:04:30
5         He says, "Yeah."

6         He says, "But you wouldn't talk to me, would you?"

7         "No, I wouldn't."

8         You're going to have to assess if that sounds like

9    somebody who was forced to give false testimony or somebody

04:04:43
10   who gave truthful testimony but just didn't feel like talking

11   to Stanley Wrice's attorney.  But that's the testimony he gave

12   at the criminal trial.

13        And another point.  Picture this.  Bobby Joe Williams

14   is telling you that this is not true, that he falsely

04:05:06
15   implicated Stanley Wrice in 1982.  But what's going to be

16   undisputed is, during the entire time Stanley Wrice was in

17   prison for 31 years, Stanley never reaches out to Bobby Joe,

18   and Bobby Joe never reaches out to Stanley.  There's no

19   discussion about, "Hey, why did you say I did all these

04:05:27
20   horrible things when I didn't?"

21        "Hey, the police beat me.  I'm sorry."

22        There's no communication between these two for 31

23   years.  That's undisputed.

24        Let's talk about the alleged beating that Mr. Wrice

04:05:45
25   claims he suffered at the police station.  He first -- the

1    State's Attorney testified at the criminal trial, when he met

2    with Stanley Wrice, and he met him face to face in an

3    interview room, he saw nothing unusual about Stanley Wrice's

4    physical appearance.  That's Kenneth McCurry, the State's

5    Attorney.  We're going to present that testimony to you.

04:06:04

6        And then Stanley Wrice, when he first goes to Cook

7    County Jail, he's seen by a paramedic on September 10th.

8    You'll hear evidence that he is self-reporting injuries to

9    that paramedic.  And then five days later, on September 15th,

10   he sees a doctor, a real doctor.  He sees Dr. Stanley Harper.

04:06:19

11       And Dr. Stanley Harper will testify -- he testified

12   at the criminal trial -- that he looked at Stanley Wrice's

13   entire body head to toe.  No bruises on the head.  No bruises

14   on the neck.  No bruises on the back.  No bruises on the right

15   arm.  No bruises on the left arm.  No bruises on the left

04:06:38

16   hand.  No bruises on the right hand.  No bruises on the back

17   of the right leg.  No bruises on the back of the left leg.  No

18   bruises on the front of the right leg.  No bruises on the

19   bottom of the right leg.  No bruises on the upper portion of

20   the left leg.

04:06:55

21       He saw bruising in one area:  The lower left leg

22   between the knee and the ankle, the shinbone.  It's the only

23   place he saw bruising.  And you'll hear evidence, that's one

24   place Stanley Wrice never even claimed he allegedly got hit by

25   the police officers.

04:07:12

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 191 of 240 PageID #:18241
Opening statement - defendants
191

1      And then you're going to hear evidence -- and I'm

2  going to skip this.  We'll show this during Mr. Wrice's

3  cross-examination.  He's going to tell you he got hit in the

4  forehead with a flashlight.  And he was asked, "Were you hit

04:07:28    5  hard?"

6      And he answered, "Seriously hard," with a flashlight

7  with batteries in it, wham, right in the forehead.  And we're

8  going to show you -- I'd like permission to show his mugshot.

9      Your Honor, if I have permission to show Stanley

04:07:45   10  Wrice's mugshot to the jury.

11      THE COURT:  All right.

12      MR. HALE:  Here's his mugshot taken --

13      MS. BONJEAN:  Judge, I assume Mr. Hale has the

14  foundation for this mugshot.  Go ahead.

04:07:57   15      MR. HALE:  -- taken after his alleged beating.  You

16  can see there's no injuries on his face, no marks on his

17  forehead.  And, in fact, you're going to see this when I

18  cross-examine Mr. Wrice at trial, this trial, he is -- he has

19  denied that this is even him.  He will tell you that this

04:08:17   20  isn't even him in the mugshot.  And you're going to have to

21  assess that testimony when we go through that, when he denies

22  that the mugshot is actually him.

23      And I contend to you, the evidence will show the

24  reason he's saying the mugshot is not him is because he knows

04:08:36   25  it shows no injuries and it doesn't support his claim of being

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 192 of 240 PageID #:18242
Opening statement - defendants
192

1   mistreated by the police.

2         And we're also going to talk about whether the

3   bruises he had on his leg, there's other explanations for

4   those.  Kenny Lewis said over three times, he was struggling

04:09:01   5   with Wrice pulling him off Karen Byron upstairs in that dark

6   bedroom.  You're going to hear evidence of what was going on

7   up there.

8         But now I want to talk about the crux of the case.

9   We've talked about what happened at the house.  We've talked

04:09:17   10   about Stanley Wrice's version of events, how he didn't know

11   what was going on, but this is the crux of the case because

12   his legal claim is he was beaten, forced to confess, and then

13   the confession -- this is the important part -- was used

14   against him at trial.  Okay.

04:09:32   15         And we're going to walk through this in detail during

16   the trial, and we're going to show you exactly what Stanley

17   Wrice testified to because you're going to hear vague -- even

18   in the plaintiff's opening statement, you heard vague

19   references, well, he just -- he told them all what they wanted

04:09:51   20   to hear.  He told them, "Yeah, you know, I did it, you know."

21         MS. BONJEAN:  Judge, this is argument again.  He's

22   addressing --

23         MR. HALE:  I'll move on.

24         THE COURT:  Move on.  Don't argue.

25         MR. HALE:  Here's the thing --

1    THE COURT:  Just present the evidence as you see it.

2    MR. HALE:  We actually have -- we're going to have

3  court transcripts of exactly what Stanley Wrice said.  We

4  don't have to guess.  We don't have to wonder.  We're going to

04:10:11    5  summarize what he testified to.  We're going to show you that

6  he never confessed and he's going to -- we're going to show

7  you his testimony.

8    He's going to say, "I got to the police station on

9  the second floor.  I told them I had nothing to do with it."

04:10:26  10  We're going to show you that testimony.  He's going to claim

11  he was taken downstairs and beaten.

12    And then he's going to tell you, we're going to show

13  you the testimony, "I went back upstairs.  I told them I still

14  had nothing to do with it."  And then he's going to claim he

04:10:42  15  got taken back downstairs and he goes back upstairs.  And

16  we're going to show you his criminal trial testimony.  He's

17  going to say, "I told them I have nothing to do with it."

18    And then he's going to tell you, we're going to show

19  you his criminal trial testimony.  He's going to say he talked

04:11:00  20  to the State's Attorney and told him he had nothing to do with

21  it, and then he's going to deny talking to the State's

22  Attorney a second time.

23    So we're going to show you exactly what he said.  We

24  don't have to guess.  And when you hear Stanley Wrice on the

04:11:15  25  stand being asked questions, be listening for, what is he

1    claiming he said.  We're going to show it to you.  The

2    evidence is going to show that he never confessed, and there

3    was no confession used against him at the trial.

4            Kenneth McCurry is going to -- we're going to show

04:11:36   5    you his testimony from the criminal trial because he's

6    deceased, the State's Attorney.  His testimony is, "The first

7    time I talked to Stanley Wrice, he told me he had nothing to

8    do with it.  I told him, 'Well, we've heard other things.

9    You're going to get charged.'"

04:11:53   10   And then McCurry testified, a little bit later

11   Stanley Wrice, he was told, wanted to talk to him.  State's

12   Attorney McCurry goes back to talk to Wrice, and Wrice now

13   says in words to this effect, "I was upstairs.  This guy Jeff

14   brought an iron upstairs.  Then Rodney Benson had it.  And

04:12:17   15   Rodney Benson was burning Karen Byron.  And I grabbed that

16   iron from Rodney Benson, got it away from him, then I dropped

17   it on Karen Byron."

18           Now, he's going to deny, Stanley Wrice denied at the

19   trial saying that.  McCurry testified to it.  But the point

04:12:39   20   here for this trial is legally, it wasn't a confession.  Even

21   what McCurry said which Wrice denied saying was not a

22   confession because what he was saying was, "I tried to be the

23   hero.  I tried to stop Rodney Benson from burning her.  I

24   grabbed the iron from Benson, and then I dropped it on Karen

04:13:01   25   Byron."

1    So you're going to hear evidence and we're going to

2    go through this in detail with Stanley Wrice, that he didn't

3    confess and there was no confession used against him at trial.

4    And that's their main claim.  And I'll save the time now of

04:13:17   5    walking through all the testimony which I was going to do, but

6    I'm just going to give you a preview, that I'm going to show

7    to you exactly what we said.  So we can skip over that part.

8    The second part of the claim, I've already talked

9    about Bobby Joe Williams, how we're going to show you that his

04:13:36   10   1983 criminal trial testimony was truthful and that you should

11   not believe the story he's going to tell you now in this

12   court.

13   And so then what I also want to talk about is one

14   other thing.  We're going to show you what McCurry testified

04:13:56   15   to that Stanley Wrice said about grabbing the iron and taking

16   it.  And McCurry testified to basically what the interview

17   with Stanley Wrice was.  And we're going to show you that

18   Stanley Wrice, when we took his deposition, for every one of

19   those statements that McCurry testified to in court, we asked

04:14:16   20   Stanley Wrice, "Did the defendants Dignan and Byrne make you

21   say that?"

22   "No."

23   And we go to the next statement that McCurry said.

24   "Did defendants Dignan and Byrne make you say that?"

04:14:28   25   "No."

1    Every single thing McCurry testified to at trial

2    that, by the way, Wrice denies, Stanley Wrice has admitted the

3    defendants did not make him say.  So even if it was said,

4    there's no liability for the defendants, and we're going to

04:14:44    5    show you that.  And I can skip these parts.

6    You're going to hear at the criminal trial Stanley

7    Wrice is claiming that he got beaten by two police officers,

8    Sergeant Byrne and Detective Dignan.  It's undisputed,

9    Detective Dignan did not testify at the criminal trial, did

04:15:13    10    not offer any testimony against Stanley Wrice.  We're going to

11    show you Sergeant Byrne's testimony.  Sergeant Byrne's

12    testimony was essentially --

13    MS. BONJEAN:  Judge, Sergeant Byrne is going to be

14    pleading the Fifth Amendment.  So Mr. Hale is --

04:15:29    15    THE COURT:  Objection sustained on this.

16    MR. HALE:  Can I reword it?

17    MS. HIJJAWI:  Judge, can we have a sidebar on this?

18    THE COURT:  I think you -- well --

19    MR. HALE:  I'll just state it in a different way,

04:15:36    20    Your Honor.  It's what the criminal testimony was.

21    MS. BONJEAN:  Judge, and that's part of the problem.

22    MS. HIJJAWI:  Your Honor, it's in the summary.

23    THE COURT:  Well, my recollection is that I ruled

24    that since -- you can't testify this way when you are not

04:15:50    25    going to testify at the trial.  So objection sustained at this

1    time.

2           MS. HIJJAWI:  Your Honor, it's actually in the

3    summary I just got from the plaintiff's counsel.  And this has

4    nothing to do with the beatings.

5           THE COURT:  Well, objection sustained.  For the

6    purposes of the opening statement, stay away from this.

7           MR. HALE:  I'm almost done here.  Just give me ten

8    more minutes, and I'll wrap this up.  I just want to make sure

9    I can go walk through a preview of what's going to come down

10   the road.

11          We're going to present evidence to you that Stanley

12   Wrice was not interested in finding out what happened on the

13   second floor.  He's going to tell you, right, he's going to

14   tell you he had nothing to do with it.  "I didn't know what

15   was going on.  It was all these other guys," right, that he

16   now has gone to prison for.  He's been charged.  He's facing

17   serious charges.

18          We're going to show you evidence that he's in a paddy

19   wagon with Benson and Fowler.  He doesn't talk with them

20   about, "Hey, what happened upstairs?  What was going on?  What

21   were you guys doing to Karen Byron?"

22          He didn't talk to them in the paddy wagon, at the

23   lockup with these guys.  It's not like he's going to present

24   to you, "Hey, I just got charged with this horrible crime.

25   What were you guys doing up there?  I'm not going down for

1  this."

2        He doesn't talk to them at all about what happened to

3  Karen Byron.  There's this woman Kim in the house.  He doesn't

4  try to talk to Kim.  There's a guy, you're going to hear about

04:17:35  5  this bicycle rider that nobody really knows who he was that's

6  upstairs, never tried to find out who the bicycle rider was.

7  Never talks to Bobby Joe Williams about it.  Never talks to

8  anybody to try to find out what happened upstairs.

9        And the evidence is going to show that is because he

04:17:54  10  knows what happened upstairs because he did it.  He did it,

11  and he knows.  He wants you to believe that --

12        MS. BONJEAN:  Judge, this is argument.

13        MR. HALE:  The evidence is going to show, Stanley

14  Wrice's story is some guys that were not even his friends were

04:18:21  15  allowed to go into his house to the second floor where he

16  slept.  They somehow got hold of a Wrice family iron.  They

17  somehow lit newspaper downstairs, repeatedly burned Karen

18  Byron, raped her, and that he never saw it, heard it, smelled

19  it, or did anything, nothing.

04:18:49  20        He's going to tell you that he was beaten into

21  confessing.  And we're going to show you he didn't confess,

22  and there was no confession used against him at trial.  And

23  we're going to show you that Bobby Joe Williams' original

24  testimony when he met with Bertina Lampkin, the State's

04:19:13  25  Attorney, was truthful, was courageous, was honest, and that

1   his testimony to the criminal jury was truthful and powerful.

2         MS. BONJEAN:  Judge, he is relying on prior testimony

3   for a criminal trial for substantive use that he is not --

4   it's not a good faith basis.  He knows what Bobby Joe Williams

04:19:34   5   is going to say.

6         THE COURT:  Wait a minute.

7         That is argument, so let's --

8         MR. HALE:  I'll move on, Your Honor.

9         I appreciate your patience.  We're going to have a

04:19:49  10   lot more evidence to present to you through witnesses.

11   Stanley Wrice is going to take the stand.  We're going to

12   present the testimony.  We're going to go through it.  But I

13   wanted to give you a preview of what the evidence will show.

14         What the evidence will show is, Stanley Wrice

04:20:03  15   committed these horrible crimes.  He was properly convicted.

16   He wasn't framed.  He wasn't forced to confess.  And Bobby Joe

17   Williams wasn't beaten into confessing.  And at the end of the

18   evidence, we're going to ask that you return a verdict for the

19   defendants.  Thank you.

04:20:21  20         THE COURT:  Thank you.

21         Do you have a witness?

22         MS. BONJEAN:  I do, Judge.

23         THE COURT:  Okay.  Call your first witness.

24      (Pause.)

04:21:35  25         THE COURT:  Right up here, ma'am, right around here.

| | |
|---|---|
| 1 | Please raise your right hand. |
| 2 | (Witness sworn.) |
| 3 | THE WITNESS:  Yes, sir. |
| 4 | THE COURT:  Please be seated.  Speak directly into |
| 04:21:54  5 | that microphone so that everybody hears you, please. |
| 6 | You may question the witness. |
| 7 | MS. BONJEAN:  Sorry.  My apologies. |
| 8 | MAGNOLIA WRICE, PLAINTIFF'S WITNESS, SWORN |
| 9 | DIRECT EXAMINATION |
| 04:22:13  10 | BY MS. BONJEAN: |
| 11 | Q.  Good afternoon. |
| 12 | A.  Good afternoon. |
| 13 | Q.  Ma'am, could you please introduce yourself to the ladies |
| 14 | and gentlemen of the jury? |
| 04:22:20  15 | A.  Yes.  My name is Magnolia Wrice, W-r-i-c-e. |
| 16 | Q.  And, Ms. Wrice, are you married? |
| 17 | A.  No. |
| 18 | Q.  How old are you? |
| 19 | A.  63. |
| 04:22:36  20 | Q.  And where do you currently reside? |
| 21 | A.  9721 south on Green Street, Chicago, Illinois 60643. |
| 22 | Q.  And who is that man sitting over there? |
| 23 | A.  That's my brother Stanley Wrice. |
| 24 | Q.  Now, do you currently work, Ms. Wrice? |
| 04:22:54  25 | A.  Yes, ma'am. |

1  Q.  And can you tell us where it is that you work?

2  A.  The Department of Human Services, Illinois Department of

3  Human Services.

4  Q.  And what do you do for them?

04:23:04  5  A.  I'm a human service case manager.

6  Q.  And how long have you worked for the Department of Human

7  Services?

8  A.  This year in July, it will be 31 years.

9  Q.  Do you have any children?

04:23:16  10  A.  Yes, I do.  One daughter, one child.

11  Q.  What about grandchildren?

12  A.  Two grandbabies, two boys.

13  Q.  Now, Ms. Wrice, where did you grow up?

14  A.  Oh, south side of Chicago.

04:23:28  15  Q.  And does the neighborhood have a name?

16  A.  Ooh.  No, I don't know the name.

17  Q.  South Shore maybe?

18  A.  Maybe South Shore.  76th and Chappel.

19  Q.  Okay.  And did you attend high school?

04:23:43  20  A.  Yes, South Shore High School.

21  Q.  What year did you graduate?

22  A.  1975.

23  Q.  And how about any college?  Did you have any college?

24  A.  Yes, I have some college experiences, junior colleges.

04:23:54  25  Kennedy-King College.  I went to Mister Business School,

M. Wrice - direct by Bonjean

202

1   Harold Washington College, different off and on.

2   Q.  Now, when you were in high school or even after high

3   school, where did you live?

4   A.  When I was in high school, I lived at 7618 South Chappel.

04:24:13   5   Q.  7618 South Chappel?

6   A.  Yes.

7   Q.  And can you tell the ladies and gentlemen of the jury with

8   whom you lived at that address?

9   A.  My mom and my ten brothers and sisters.

04:24:22   10   Q.  What was your mom's name?

11   A.  Maddie Sue Wrice.

12   Q.  Now, you said you had ten brothers and sisters, right?

13   A.  Yes.

14   Q.  Where do you fall in the mix?

04:24:31   15   A.  I'm the oldest sister.

16   Q.  Okay.  Are you older or younger than Stanley Wrice?

17   A.  Younger.

18   Q.  Okay.  And is Stanley Wrice your oldest brother or

19   somewhere --

04:24:41   20   A.  He's, I want to say, the third oldest brother.

21   Q.  All right.  Now, I would like to show you an exhibit of,

22   it's --

23        MS. BONJEAN:  I think it's Defendant's Exhibit 43,

24   Judge.  It's one that we've already looked at.

04:25:08   25        THE COURT:  Okay.  You may publish it.

| | |
|---|---|
| 1 | MS. BONJEAN:  Thank you. |
| 2 | BY MS. BONJEAN: |
| 3 | Q.  Ms. Wrice, can you tell us what that is? |
| 4 | A.  That is our home. |
| 5 | Q.  Okay.  And is that where you lived at 76th and Chappel? |
| 6 | A.  Yes. |
| 7 | Q.  And I'm going to show you the back of the house if you |
| 8 | might. |
| 9 | Ma'am, was that the back of your house on Chappel? |
| 10 | A.  Looks to be, yes. |
| 11 | Q.  Okay.  Now, back in September of 1982, were you living |
| 12 | full-time or living at the house at all? |
| 13 | A.  No.  I left. |
| 14 | Q.  Okay.  So when did you actually move out of the house? |
| 15 | A.  I want to say maybe the end of '79 or at the beginning of |
| 16 | '80, in the '80s, no later than the '80. |
| 17 | Q.  And what prompted you to move out of the house? |
| 18 | A.  My mom passing.  I couldn't take it no more.  And I needed |
| 19 | to be on my own, and we had no money.  Like, it was a |
| 20 | hardship, my mom.  I couldn't... |
| 21 | Q.  Let me ask you this.  What was it like growing up in this |
| 22 | house with ten children? |
| 23 | A.  Ten brothers and sisters? |
| 24 | Q.  Yes. |
| 25 | A.  Very trying, but we did it.  We all grew up.  Mom was very |

04:25:18
04:25:34
04:25:50
04:26:09
04:26:16

M. Wrice - direct by Bonjean

1    strict on all of us.  We all had chores.  We all played,

2    laughed, cried, school, chores, typical Brady Bunch.

3    Q.  And how would you describe your relationship with Stanley

4    Wrice, your brother?

04:26:34    5    A.  Just about all of us, like I said, everything we did, we

6    did together.  We tried to play and laugh together.  A lot of

7    us wanted to ourselves a lot, but we all stuck together and

8    played cards or did little things together.

9    Q.  Now, you said at some point after your mother died, you

04:26:49    10   moved out, right?

11   A.  Yes.

12   Q.  Did things change at the house after your mother died?

13   A.  After I moved out?

14   Q.  Yes.  Did the house sort of change?

04:26:58    15   A.  Sort of go -- yeah.

16   Q.  Can you describe how that happened?

17   A.  Well, like said, there was no upkeeping really.  There was

18   no money coming in the house, I'm assuming.  And basically,

19   everybody was venturing off, going to their own spaces trying

04:27:11    20   to find themselves.  And we were grown.  Most of us were

21   grown.

22   Q.  Now, in September of 1982, who lived in the house?

23   A.  Who I think was left was Patricia Wrice, that's my sister;

24   Charles Wrice; and Stanley Wrice.

04:27:25    25   Q.  Okay.  And where --

1  A.  I can't say if the other ones were still there.  I don't
2  think they were still there.
3  Q.  And from time to time, did you come back to the house?
4  A.  Yeah, I would come back maybe on the weekends or something
04:27:36  5  when I could get some money because, like I say, I was out
6  there then on my own.  Yeah, I would come back just to see how
7  everything was going, if everybody was okay.  I still had two
8  little nieces and nephews that were there, so Patricia's
9  children.
04:27:48  10  Q.  So Patricia had children in the house, right?
11  A.  Yes.  She had a boy and a girl, baby boy and a baby girl.
12  Q.  Now, when you would come back to the house and sort of
13  check on things, did you notice that the house had changed in
14  its condition?
04:28:01  15  A.  Yeah.  Like I said, it was still not being upkept like it
16  was.  When Mom was there, we all had chores, like I said.  The
17  boys had to make sure the windows were washed.  The girls were
18  going to make sure the floors and -- you know, but it looked
19  like it wasn't being done, like.
04:28:14  20  Q.  And were there other people in the house when you would
21  come back on the weekends apart from just your siblings?
22  A.  Yes.
23  Q.  Well, first, I want to talk about, did your siblings have
24  significant others?
04:28:26  25  A.  Yes.

1  Q.  First of all, who -- did Charles have a girlfriend?

2  A.  Charles, yes.  He had Mildred, Mildred Dyson, I want to

3  say.

4  Q.  Okay.

04:28:35  5  A.  I know it was Mildred.

6  Q.  And what about Patricia?  Did she have a boyfriend?

7  A.  Patricia, yes, she had Bobby Joe.

8  Q.  And who is Bobby Joe?

9  A.  Bobby Joe is the father of her children.

04:28:44  10  Q.  And did you see Bobby Joe at the house a lot?

11  A.  Well, he was there with her, yeah, and the babies every

12  time I would go.  So like I said, I didn't go too often, but

13  when I was there, they were there.  He was there, yes.

14  Q.  And what about Stanley?  Did Stanley have a girlfriend?

04:28:56  15  A.  Yes.  It was Jennifer, Jennifer Scott.  Yes, she lived

16  down the street from us.

17  Q.  And do you have any nieces and nephews related to Jennifer

18  and Stanley?

19  A.  Yes.  They have three children, three daughters.

04:29:06  20  Q.  Okay.  And was Jennifer Scott someone you saw at the house

21  pretty regularly?

22  A.  Yeah, she was there.  They were a couple, so she was

23  there, yeah.

24  Q.  Now, I want to talk about, apart from the people who you

04:29:26  25  saw that were in your family or significant others, did you

|  |  |  |
|--|--|--|
| | 1 | sometimes come and see unfamiliar faces at the house? |
| | 2 | A.  Yeah.  That's another thing what triggered me to stop |
| | 3 | coming so much is because I started seeing a lot of people |
| | 4 | that didn't -- I didn't know, so... |
| 04:29:41 | 5 | Q.  And why did that concern you? |
| | 6 | A.  Because it looks like it was being a party scene or |
| | 7 | something going on.  It's too -- it got too busy for me.  I |
| | 8 | don't know.  And I was on a whole another page.  I was trying |
| | 9 | to get myself together so I could get money in the pockets and |
| 04:29:55 | 10 | do some other stuff, a foundation. |
| | 11 | Q.  Now, did you know a person by the name of Kenny Lewis? |
| | 12 | A.  Yes.  He stayed down the block on 75th Street, 75th and |
| | 13 | Chappel. |
| | 14 | Q.  And was he someone you would see at the house pretty |
| 04:30:10 | 15 | regularly? |
| | 16 | A.  Yes, he was there.  He would be there, yeah. |
| | 17 | Q.  Now, you were -- you were not in the house on September |
| | 18 | 8th or 9th of 1982, correct? |
| | 19 | A.  No.  No, I wasn't in there then. |
| 04:30:23 | 20 | Q.  Did you have -- I'm going to show you, did you ever live |
| | 21 | in the attic or sleep in the attic? |
| | 22 | A.  When my mom was there, the girls did, yes.  The girls were |
| | 23 | upstairs. |
| | 24 | Q.  I want to show you a picture of the attic in September of |
| 04:30:37 | 25 | 1982.  It's Defendant's 48. |

1    Defendant's 48, I'm having you look at, Ms. Wrice.

2  Do you recognize that?

3  A.  No.

4    MR. HALE:  Judge, I think it's 46.

04:30:59  5    MS. BONJEAN:  46?  My apologies.  Defendant's 46.

6    THE COURT:  Yes, that's what it says on it.

7  BY MS. BONJEAN:

8  Q.  Is that what the attic --

9  A.  No.

04:31:09  10  Q.  I'm sorry?

11  A.  I'm sorry.  No.

12  Q.  Is that what the attic looked like when you were living

13  there?

14  A.  No, ma'am, uh-uh.

04:31:19  15  Q.  Now you can take that down.

16    Now, did there come a time when you learned that

17  Stanley had been charged with a serious crime?

18  A.  Yes.  I think I heard it on the news.  I was at school.  I

19  didn't -- I heard about an incident.  They didn't say he was

04:31:43  20  charged.  It was on, somebody on 76th and Jeffrey was brutally

21  hurt or something, and I was at school.

22  Q.  Okay.  And at some point, did you learn that Stanley Wrice

23  was convicted of the crimes --

24  A.  Yes.

04:31:57  25  Q.  -- for which he was charged?

M. Wrice - direct by Bonjean

209

1    A.  Yes.

2    Q.  Now, after Stanley was convicted, did you have an

3    opportunity to stay in contact with him?

4    A.  Well, letters, and I saw him.  I think I saw him once

04:32:13    5    at -- when he first went to Joliet, Joliet prison, Stateville,

6    when they first put him in.

7    Q.  And that was shortly after he was convicted?

8    A.  I couldn't say for sure what year it was, but I know it

9    was when they put him in, locked him up, put him in there.

04:32:29    10   Q.  And who did you go to visit him with?

11   A.  With my sister Crystal.

12   Q.  And tell us what that experience was like.

13   A.  Oh, it was the worst thing I've ever seen in my life.  It

14   was like I was sitting in a room with prisoners all around in

04:32:41    15   jail cells, and they were just hollering.  And it was like a

16   cage.  It was very uncomfortable, very, very uncomfortable.  I

17   didn't like it.

18   Q.  And did you have any opportunities to visit him during his

19   entire incarceration?

04:32:55    20   A.  No, no.  I didn't have the funds, so I didn't have the

21   resources to get back and forth to the facility.

22   Q.  Did you try to stay in contact with him?

23   A.  Yes.  We wrote letters, cards when we could.

24   Q.  Was it hard to stay in contact?

04:33:09    25   A.  Yeah, because he was moved so much.  I couldn't get --

1    sometimes I'd get letters back.  Sometimes we would not get it

2    back, and you lose contact.  So like I said, I was focusing on

3    getting myself together, so I had to do that, too.

4    Q.  And was Stanley in different parts of the state when he

5    was incarcerated?

6    A.  I can't remember that.  That's been -- that was a long

7    while ago.  I can't remember that.

8    Q.  I mean, in different parts of the state of Illinois?

9    A.  Like another facility, right?

10   Q.  Yes.

11   A.  Yes.

12   Q.  Do you know how many facilities he was in?

13   A.  I want to say, the ones I know, I think it was three that

14   I know:  Pontiac, Menard, and Statesville.  Those are the ones

15   that I can remember.

16   Q.  And did you have a car?

17   A.  No, no.  I either walked or took the bus.  No.  I guess I

18   moved out there with nothing because mom had just left.

19   Q.  I want to talk about Stanley since he's been released from

20   prison in 2013.  Okay.  Have you had a chance to spend time

21   with him since then?

22   A.  We spend time but it's still like he's, I want to say,

23   depressed, in a state of depression.  All of us will be at a

24   gathering, and he may go off into a room by himself.  And

25   we're -- we happen to look around, where is he?  Where did he

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 211 of 240 PageID #:18261
M. Wrice - direct by Bonjean
211

1    go?  He's downstairs in the basement in a room.  It's as if

2    he's waiting for someone to come and tell him to come out like

3    he was still locked up, I guess.

4    Q.  Like he was still locked up?

04:34:37    5    A.  Yes.

6    Q.  Does your family still get together for gatherings?

7    A.  Yes.

8    Q.  What types of events?

9    A.  Barbecues, maybe birthdays on occasions, different things.

04:34:45    10   We had a few funeral services, you know, that family members

11   passed.

12   Q.  Is Stanley the man now that he was when you knew him

13   growing up?

14   A.  No.  Like I say, he's a little bit withdrawn, to himself a

04:34:58    15   lot, yeah.

16   Q.  What happens when Stanley is around a bunch of people,

17   from your observations?

18   A.  Oh, like I say, he goes into a state of depression to

19   maybe even start crying sometimes, and we don't know why.  He

04:35:10    20   would just break out and start crying.  So I can't get in your

21   head.  Maybe he's missing what he's seeing.  I don't know.

22        Like I say, we try to talk with him, but it's a

23   depression thing, it looks like to me.  I can't speak for

24   others, but it looks like he may be going through whatever

04:35:25    25   happened, yeah.

1    MS. BONJEAN:  One second.

2    THE COURT:  Is that it?

3    MS. BONJEAN:  Oh, one second, Judge.

4    THE COURT:  Okay.

04:35:38   5   BY MS. BONJEAN:

6    Q.  Ms. Wrice, did you ever see Jennifer Scott and Stanley

7    argue or fight or anything like that?

8    A.  No.  I wasn't around them much like that, but then when I

9    did see them, no, they were very playful, no, like a couple.

04:35:53   10   I didn't see anything.

11   MS. BONJEAN:  Thank you.

12   THE COURT:  Cross-examine?

13   MS. BITOY:  Yes, Your Honor.

14                   CROSS-EXAMINATION

15   BY MS. BITOY:

16   Q.  Good afternoon, Ms. Wrice.

17   A.  Good afternoon.

18   Q.  You've already established that you weren't present at

19   that 7618 South Chappel on September 8th or 9th of 1982; is

04:36:16   20   that correct?

21   A.  Yes, ma'am.

22   Q.  So you have no personal knowledge as to what happened on

23   the night that Karen Byron was tortured?

24   A.  No, ma'am, I do not.

04:36:22   25   Q.  And you testified that you moved out of the family home in

Case: 1:14-cv-05934 Document #: 575 Filed: 03/10/20 Page 213 of 240 PageID #:18263
M. Wrice - cross by Bitoy
213

1  1979 after your mother passed away, correct?

2  A.  If not '79, maybe the next year, but I know I left soon

3  after she passed.

4  Q.  Okay.  And had your father also passed at that time?

04:36:35  5  A.  My father had been passed.  He had been passed since I was

6  eight years old, so he's been gone.

7  Q.  And when you moved out, you took your belongings with you,

8  correct?

9  A.  Whatever I had, whatever little stuff I could remember

04:36:45  10  that I had, I had, yes.

11  Q.  And your sister Rose was also not living at 7618 South

12  Chappel in September of 19- --

13  A.  No, I think she left as well and took her children with

14  her, yeah.

04:36:55  15  Q.  Okay.  So if Mr. Wrice had testified that you were living

16  at 7618 South Chappel --

17         MS. BONJEAN:  Objection, Judge.  That is not an

18  appropriate question, "if Mr. Wrice had testified."  What

19  is -- I'll let her finish it, but it's going to be an

04:37:10  20  objectionable question.

21         MS. BITOY:  If Mr. --

22         THE COURT:  Put the question.

23  BY MS. BITOY:

24  Q.  If Mr. Wrice had testified at his criminal trial that you

04:37:17  25  were living at 7618 South Chappel at the time of his trial,

1    that would not be accurate, correct?

2    A.  Correct.

3    Q.  And if Mr. Wrice had testified at his criminal trial that

4    your possessions were still at 7618 South Chappel in September

04:37:33    5    of 1982, that also would not be accurate, correct?

6    A.  No, it would not.

7    Q.  Now, you testified that there were 11 of you living in the

8    house, brothers and sisters when you were there, right?

9    A.  Yes, ma'am.

04:37:48    10    Q.  Okay.  Did you have -- and you didn't have separate

11    bedrooms, right?

12    A.  No.  It was like the girls were upstairs, and the boys

13    were downstairs in the basement or even on the first floor.

14    Q.  And you had sort of pallets and sections --

04:37:58    15    A.  Yes.

16    Q.  -- to sort of separate?

17    A.  Pallets, cots, sections for the girls.  We would share,

18    yeah.

19    Q.  You had separate living areas, correct?

04:38:04    20    A.  Like I say, it was one big living area, but we all had

21    beds, separate little...

22    Q.  And you and your five sisters shared the upstairs attic

23    area, right?

24    A.  Yes, ma'am.

04:38:13    25    Q.  I'd like to show you Defendant's Exhibit No. 47.

1    A.  Uh-huh.

2         MS. BITOY:  I'm sorry.  May I please publish this

3    photo?

4         THE COURT:  Is there objection to this?

04:38:46    5         MS. BONJEAN:  There's no objection.

6         THE COURT:  As long as there's no objection and it's

7    listed in the pretrial order, you may use them without

8    offering.

9         MS. BONJEAN:  No, I have no objection.  I just needed

04:38:50    10   to see it.  Okay.  Thank you.

11        THE COURT:  Any exhibit that's listed in the pretrial

12   order to which there was not an objection may be used without

13   having to prove it up.  Just use it, identify it, and proceed.

14   So go ahead.

04:39:05    15        MS. BITOY:  Thank you, Your Honor.

16   BY MS. BITOY:

17   Q.  Ms. Wrice, does this photo depict the upstairs area of

18   your home at 7618 South Chappel?

19   A.  I don't -- I'm sorry.  I don't -- this doesn't look like

04:39:17    20   our upstairs.

21   Q.  This doesn't look like the upstairs attic?

22   A.  No.  Like I say, when we were there, when my mom was

23   living, we all had pallets.  I mean, the girls were upstairs.

24   We had separate -- this is, no.

04:39:29    25   Q.  I'm sorry.  Can you repeat that?

1   A.  This is dirty.  I'm sorry.

2   Q.  This is an upstairs -- this is a photograph of the

3   upstairs area at 7618 South Chappel that was taken in

4   September of 1982.  Do you recognize that --

5   A.  No.

6   Q.  -- in this photograph?

7   A.  This was taken in 1982?

8   Q.  Yes, ma'am.

9   A.  I wasn't there then.

04:39:48  10   Q.  Do you recognize this as being the upstairs attic of your

11   home at 7618 South Chappel?

12   A.  No, ma'am.

13   Q.  So you don't recognize this?

14   A.  I'm trying to see.  No, no, ma'am.  No, ma'am.

04:40:04  15   Q.  I'd like to show you Defendant's Exhibit No. 47 -- I'm

16   sorry, 48.

17         MS. BONJEAN:  Yes, no objection.

18         THE COURT:  As long as there's no objection, you

19   don't have to -- just show them, identify it so that the

04:40:30  20   record will show what you're showing.

21   BY MS. BITOY:

22   Q.  Ms. Wrice, this is another photograph that was taken at

23   7618 South Chappel.  This is the second floor area.  Do you

24   recognize this area?

04:40:39  25   A.  No.

1   Q.  So you have no recollection of this being the upstairs

2   area --

3   A.  No.

4   Q.  -- of your home at 7618 South Chappel?

04:40:47   5   A.  I can't, no, I can't make that out, no, ma'am.

6   Q.  I think you testified -- you testified that you are aware

7   who Jennifer Scott is, correct?

8   A.  Yes.

9   Q.  Okay.  And Jennifer Scott knew your sister Crystal; is

04:41:05   10   that correct?

11   A.  She went to school with my sister Crystal.

12   Q.  And at the times you saw Jennifer Scott at your house or

13   at 7618 South Chappel, that would have been prior to 1979 when

14   you were still living there, correct?

04:41:16   15   A.  When we were in school.

16   Q.  And at that time, your sister Crystal was also living at

17   the house, correct?

18   A.  Yes.

19   Q.  Ms. Wrice, you're unaware that Mr. -- you're unaware that

04:41:28   20   Mr. Wrice was violent with Jennifer Scott; is that correct?

21   A.  He was filing?

22   Q.  Violent, violent.

23   A.  Oh.

24   Q.  Are you unaware that Mr. Wrice was violent with Jennifer

04:41:37   25   Scott?

1  A.  Yes, I'm very unaware of that.  I didn't see any of that.

2  Q.  Are you unaware, you're also unaware that Mr. Wrice hit

3  Jennifer Scott?

4      MS. BONJEAN:  Judge, I'm going to object to this,

04:41:46  5  "you are unaware."

6      THE COURT:  Yes.  Objection -- she said she's

7  unaware, so let's move on.

8  BY MS. BITOY:

9  Q.  Okay.  You don't know that Mr. Wrice raped Jennifer Scott?

04:41:55  10     MS. BONJEAN:  Objection, Judge.

11     THE COURT:  Objection sustained.

12     MS. BONJEAN:  My gosh.

13 BY MS. BITOY:

14 Q.  You don't -- you've never witnessed any abuse by Jennifer

04:42:06  15 Scott from Mr. Wrice; is that correct?

16 A.  No, I haven't.

17 Q.  Okay.  Now, you took Gail Scott -- which is Mr. Wrice's

18 daughter with Jennifer Scott, correct?

19 A.  Yes, ma'am.

04:42:16  20 Q.  You took her to visit Mr. Wrice right before he was

21 released from prison, correct?

22 A.  Yes, ma'am.

23 Q.  How old was Gail at the time?

24 A.  Oh, I couldn't tell you.  We hadn't seen 'em in years, so

04:42:27  25 I don't really -- didn't know their birth dates.

M. Wrice - cross by Bitoy

219

```
 1  Q.  She wasn't a child, though, right?

 2  A.  No, she wasn't a child then.

 3  Q.  She was an adult at the time?

 4  A.  They were adults now.  Then when they found us, they were

 5  adults, yes.

 6  Q.  And prior to you taking Gail to visit Mr. Wrice in prison,

 7  she hadn't seen him since she was a baby, right?

 8  A.  Right.

 9  Q.  And the reason she hadn't seen her father in 31 years is

10  because Mrs. Wrice -- Mr. Wrice's daughters with Jennifer

11  Scott were estranged from the Wrice family; isn't that true?

12  A.  Yes, ma'am.  We didn't see them at all.

13  Q.  They were estranged from the Wrice family?

14  A.  "Estranged" meaning?

15  Q.  They had no contact with the Wrice family?

16  A.  She had no contact.

17  Q.  And you're also aware that Jennifer Scott's mother didn't

18  want her to be with Mr. Wrice back in 1982 also, correct?

19  A.  That was -- that was my assumption, yes.

20  Q.  And but it's your opinion that Jennifer Scott wanted to be

21  with Mr. Wrice?

22  A.  Yes, ma'am.

23  Q.  You believe they had a consensual relationship?

24  A.  Yes, ma'am.

25          MS. BONJEAN:  Judge, I'm going to object to this
```

1    whole line of questioning which frankly does go to the motion

2    in limine which has just been --

3            THE COURT:  Well, it's -- I think you've covered the

4    subject, so let's move on.

5            MS. BITOY:  Okay.  No problem, Your Honor.

6    BY MS. BITOY:

7    Q.  At some point in 1982, you heard that your brother had

8    been arrested, correct?

9    A.  Yes, ma'am.

10   Q.  What was your understanding of what Mr. Wrice had been

11   arrested for?

12   A.  I didn't know.  I didn't know what had happened.  I had --

13   Q.  You had no idea?

14   A.  Nobody had told me anything that had happened.  Like I

15   said, I hadn't been to the house, so I wouldn't know.

16   Q.  What was your -- what was your understanding of the nature

17   of the crime?

18           MS. BONJEAN:  Judge, she said she didn't know.

19           THE COURT:  Objection sustained.

20           MS. BONJEAN:  It's outside the scope.

21           THE COURT:  Objection sustained.

22   BY MS. BITOY:

23   Q.  Okay.  You never got in contact with your brother Stanley

24   Wrice between the time of his arrest and the time of his

25   criminal trial, correct?

M. Wrice - cross by Bitoy

221

1    A.  I didn't see him until he went to Joliet, correct.

2    Q.  Okay.  And you never spoke to your sister Patricia Wrice

3    in 1982 about what happened in the house?

4    A.  No.

04:44:31    5    Q.  Okay.  You never spoke to Bobby Joe Williams, her

6    boyfriend, about what happened in the house the night that

7    Mr. Wrice was arrested --

8    A.  No, ma'am.

9    Q.  -- correct?

04:44:39    10    A.  No, I did not.

11    Q.  And you never attended any part of Mr. Wrice's criminal

12    trial, correct?

13    A.  No, ma'am.  That is correct.

14    Q.  Stanley Wrice was found guilty at his criminal trial,

04:44:50    15    correct?

16    A.  To my knowledge, he went to jail.

17    Q.  Do you know who Kenny Lewis is?

18    A.  He was a neighbor in the neighborhood.

19    Q.  Were you aware that Kenny Lewis testified against Stanley

04:45:02    20    Wrice at his criminal trials?

21    A.  No, ma'am.  Like I say, I had no knowledge of what

22    happened, period.

23         MS. BONJEAN:  Judge, all these questions about her,

24    about -- she wasn't even there.

04:45:09    25         THE COURT:  All right.  She has now said she didn't

1    talk, have knowledge of what happened, period.  So let's move

2    on.

3           MS. BITOY:  Sure.

4    BY MS. BITOY:

04:45:19    5    Q.  During Mr. Wrice's 31 years in prison, you visited him

6    twice; is that correct?

7    A.  Yes, ma'am.

8    Q.  Okay.  And when you visited Mr. Wrice in prison, you never

9    discussed the circumstances that led him to being arrested,

04:45:31    10    correct?

11    A.  No, ma'am.

12    Q.  You never brought it up?

13    A.  No, ma'am.

14    Q.  And he never brought it up?

04:45:36    15    A.  No, ma'am.

16    Q.  And Stanley Wrice never told you that he was beaten by

17    police, correct?

18    A.  No, he did not.

19    Q.  And since Mr. Wrice was re -- has been released from

04:45:46    20    prison, you don't speak to him very often, right?

21    A.  Well, he doesn't -- we have a cell phone, but we can't get

22    him.

23    Q.  I'm sorry.  Can you repeat that one more time?

24    A.  He has a cell phone, but we can't get him.  The babies

04:45:57    25    always have the phone.

1  Q.  So you don't speak to him very often?

2  A.  Not on the regular because I work, and I live in a whole

3  another state.  He's not in Illinois right now.

4  Q.  And you also don't see Mr. Wrice very often?

04:46:10  5  A.  No.  I don't see a lot of my siblings right now.

6  Q.  And you would describe your relationship with Mr. Wrice as

7  distant?

8  A.  We're distant but we're still close.

9          MS. BITOY:  If I may just have a moment, Your Honor.

04:46:23  10         THE COURT:  Redirect.  Anything further?

11         MS. BONJEAN:  Just one --

12         MS. BITOY:  Just one moment, Your Honor.

13         MS. BONJEAN:  Okay.

14      (Pause.)

04:46:54  15         THE COURT:  Anything further?

16         MS. BITOY:  No, Your Honor.  Thank you.

17         MS. BONJEAN:  One question, Judge.

18         THE COURT:  All right.  One question.

19         MS. BONJEAN:  Thank you.  I think it's one.

20                    REDIRECT EXAMINATION

21  BY MS. BONJEAN:

22  Q.  Ms. Wrice, that second time you went to go see Stanley,

23  who did you go with?

24  A.  Gail Scott.

04:47:06  25  Q.  And how -- and who is Gail Scott?

1    A.  That's his daughter, his middle daughter.

2    Q.  Do you know when the last time Stanley had seen his middle

3    daughter?

4    A.  It was 30-some years ago, I'm assuming.  He was locked up.

04:47:18    5    Q.  And how was that -- how was that visit?

6    A.  Oh, it was very emotional, very emotional.  A lot of

7    crying, a lot of -- he cried with me first because he hadn't

8    seen me in a while either.  And I had to step back and say

9    that he broke down.  Even the guards were crying.  It was --

04:47:33    10   Q.  Thank you.

11   A.  -- very emotional.

12           THE COURT:  You can step down.

13         (Witness excused.)

14           THE COURT:  Members of the jury -- anything further

04:47:37    15   today?  If not, we're going to suspend until 10:00 o'clock

16   tomorrow morning.  Try to be in the jury room about five

17   minutes to 10:00 so we can start promptly at 10:00.

18           There are a couple of -- one of the things I didn't

19   instruct you earlier today was, please do not get on the

04:47:58    20   internet and try to do any research as to this case.  Don't

21   Google the names of anybody you heard.  And just stay off the

22   internet as far as this case is concerned.

23           And so again, don't discuss the case with anybody.

24   Don't read newspapers.  Don't listen to the TV or radio.  At

04:48:16    25   least when I say, "don't read newspapers," concerning the

1  case.  You can obviously read newspapers and you can watch

2  television but don't -- try to avoid any kind of discussion of

3  the case.  And don't discuss the case with anybody.  And stay

4  off social media.  And again, don't do any research.

04:48:32  5  Have a nice evening.  We'll see you tomorrow morning.

6  (Proceedings heard in open court.  Jury out.)

7  THE COURT:  Is there anything anybody wants to put on

8  the record?

9  MS. BONJEAN:  Yes, Judge.  The defendants continue to

04:50:06  10  elicit something that they don't have a good faith basis to

11  elicit in the first place, that Stanley Wrice raped Jennifer

12  Scott.  What this Court held is that --

13  THE COURT:  Yes, I think he -- what I wrote was --

14  where is it?

04:51:23  15  What I wrote was, "The Court is aware that Scott's

16  testimony about Wrice's abuse presents such a risk that

17  putting in a bad light suggests propensity to commit violent

18  crimes against women may inflame the jury's passion.

19  Nevertheless, the evidence of the nature of their relationship

04:51:43  20  is relevant because it bears on the jury's assessment of the

21  alibi Wrice presented at the time of his trial.

22  Therefore, Scott may testify as she did at her

23  deposition that she cut all ties with Wrice once her third

24  child was born -- once her third child was born.  And Scott

04:52:06  25  can explain why she had cut off ties with Wrice.  However, the

1    Court will closely monitor the subject of the testimony to

2    ensure that it not become too prejudicial.

3         And I think the fact that they had a very sour

4    relationship is sufficient.  So I don't think anything more

5    should come of this.  I don't think the fact that the child

6    was the product of rape is relevant to the issue of the -- of

7    his alibi.

8         MS. BONJEAN:  Judge, I'd also point out that that's

9    not what she testified to.  She --

10        THE COURT:  I don't know.  I mean --

11        MS. HIJJAWI:  The --

12        MS. BONJEAN:  Let me finish, please.

13        THE COURT:  Wait.  I want to make one other comment

14   before you continue on.  Both sides have a tendency to talk

15   over each other, which does two things.  One, it makes it very

16   difficult for the court reporter to get an accurate record.

17   And if there is an appeal in this case, it's helpful to have

18   an accurate record, and if you're talking over each other, we

19   can't do that.

20        I asked -- actually, I didn't ask.  I think I told

21   you that if you have any objection to what anybody says, you

22   present that objection to me, not to them.  That goes for both

23   sides.  In other words, don't tell the other guy, side to shut

24   up or do anything else.  If you feel that -- and I will

25   conduct the trial, and I'll try to do the best job I can to

1   control everybody so that everybody -- this case goes
2   smoothly, as smoothly as possible.

3          So but anyway, so proceed again about your point
4   about Scott.

04:53:38   5   MS. BONJEAN:  Yes.  So, Judge, during the deposition
6   of Jennifer Scott, she considered -- because of her age which
7   the Court excluded, she considered it statutory rape because
8   of her age.  She made some vague comments that he had been
9   sexually violent with her with no background, but she never
04:53:58   10   said he raped her.

11          And so this is actually a misstatement, or that her
12   children were products of rape.  She never said that.

13          MS. HIJJAWI:  Your Honor, if I may, she actually said
14   that she was raped.  She said that she was 14 years old.  It
04:54:15   15   was the summer after eighth grade.

16          THE COURT:  I've excluded the age, so that's out.
17   I'm going to exclude the fact of rape.  I think it's already
18   come in, that you said that she worried that he raped her.
19   Anyway, I think we're going too far, but I'll wait and see
04:54:36   20   what she testifies to.

21          MR. JEBSON:  Judge, can we just be heard, please?
22   Can we just be heard on this?  Judge, it just seems like
23   plaintiff's counsel, she just keeps trying to reargue rulings.

24          THE COURT:  Well, it's 404(b) material, propensity
04:54:54   25   evidence, which is excludable.  Now, to the extent that it

1    affects the alleged alibi that she supposedly is supplying,

2    then that portion is admissible, but we have to temper it only

3    to the fact that obviously, they do not get along at all and

4    so --

04:55:26    5    MS. JACOBS:  Your Honor, the ruling was that evidence

6    of the nature -- and we made it very clear in our motion in

7    limine that this was rape and so did they.  The evidence --

8    the nature of their relationship is relevant because there

9    is --

04:55:37    10    THE COURT:  It is.  Their relationship --

11    MS. JACOBS:  The jury's assessment of the alibi --

12    THE COURT:  May I please talk first?

13    What I said was, and I'm reading from it, "And Scott

14    can explain why she had cut off ties with Wrice.  However, the

04:55:54    15    Court will closely monitor this subject of testimony to ensure

16    that it does not become too prejudicial."

17    And I think if you're starting to talk about

18    statutory rape and rape that that becomes very prejudicial, so

19    I'm going to exclude that.  So ...

04:56:11    20    MS. JACOBS:  Your Honor, your ruling was very clear

21    that the rape could come in.  We fronted it in our --

22    THE COURT:  Where?  Where did I say the rape could

23    come in?

24    MS. JACOBS:  You said that, "The Court is aware that

04:56:20    25    the testimony about Wrice's abuse presents such a risk to

1   inflate the jurors.  Nevertheless, evidence of the nature of

2   their relationship is relevant."

3          The nature of their relationship --

4          THE COURT:  All right.

04:56:31   5          MS. JACOBS:  The nature of this relationship --

6          THE COURT:  All right.  I'm modifying that to exclude

7   now the word "rape" and "statutory rape."  You can testify to,

8   it was abusive and leave it go at that.  So that's -- anyway,

9   that's that.

04:56:49  10          MS. HIJJAWI:  Your Honor, if I could just give you

11   what Ms. Scott actually testified to because --

12          THE COURT:  I've heard enough of it.

13          MS. HIJJAWI:  Well, I don't --

14          THE COURT:  You people just keep going on and on and

04:56:58  15   on about it once I rule.  We'll never get done with this case.

16   So I'm going to truncate this argument.  I've ruled, and

17   that's that.  Now --

18          MS. HIJJAWI:  Your Honor, the witness -- Ms. Bonjean

19   asked the witness if they were a couple, and she said they

04:57:11  20   were a couple.  And she characterized the relationship in a

21   certain way.

22          THE COURT:  Well --

23          MS. HIJJAWI:  The jury now has --

24          THE COURT:  You can -- you can certainly say they're

04:57:18  25   not a couple without saying, committed statutory rape.  So I

1    have ruled, and that's enough.

2            MS. HIJJAWI:  But Judge --

3            THE COURT:  Now, what else?  Anything else?

4            MS. BONJEAN:  Nothing from the plaintiff.

04:57:26    5            THE COURT:  Anything else?

6            MR. JEBSON:  There is, Judge.  In terms of defendant

7    Byrne's testimony, I just ask that, Judge, you re-review your

8    ruling on this motion in limine --

9            THE COURT:  Byrne's testimony is not coming in.  It

04:57:39   10    can be offered by the defendant -- excuse me.

11            MS. BONJEAN:  The plaintiff.

12            THE COURT:  Wait a minute.  Take that back.  The

13    plaintiff can offer Byrne's testimony but you can't.

14            MR. JEBSON:  Judge, that is absolutely inconsistent

04:57:50   15    with your ruling in your order.

16            THE COURT:  What?

17            MR. JEBSON:  You ruled that it comes in for a number

18    of reasons.  Number one, it comes in under *Brady* because he

19    testified at the criminal trial and this jury is allowed, they

04:58:01   20    have to make the determination whether or not they fabricated,

21    the alleged fabricated evidence or suppressed evidence would

22    have had an effect on the jury in the criminal case.

23    Therefore --

24            THE COURT:  Where did I say that his testimony can

04:58:17   25    come in on that?

1    MR. JEBSON:  It says it right in your ruling, Judge.

2    THE COURT:  What page?

3    MS. JACOBS:  Your Honor, while he's looking that up,

4 another thing that's relevant is that Byrne did not testify at

04:58:32 5 the criminal trial to any inculpatory statement that Wrice

6 made.  Byrne testified only that Wrice told him he was

7 upstairs, that he was not involved in the rape.

8    THE COURT:  What does that have to do with what we're

9 talking about?

04:58:46 10    MS. JACOBS:  That's very important because --

11    THE COURT:  What does that have to do with what we're

12 talking about?

13    MS. JACOBS:  It has to do with what we're talking

14 about because their allegation is that Byrne had this whole

04:58:55 15 scheme to fabricate a confession and to fabricate words

16 coming --

17    THE COURT:  What does that have to do with what we're

18 talking about?  We're talking about whether or not the

19 defendant can offer Byrne's testimony at the criminal trial

04:59:07 20 into this case.

21    MS. JACOBS:  Right.  And the argument -- the

22 argument --

23    THE COURT:  And if you can show me where I said you

24 can because it's my understanding that a person who takes the

04:59:17 25 Fifth Amendment cannot offer testimony in another forum

1       because --

2               MS. JACOBS:  That's only in the same case.

3               THE COURT:  And now the plaintiff can offer it as an

4       admission against -- or admission because almost anything that

04:59:28    5   a person says is an admission if they think it is.

6               MS. JACOBS:  Your Honor, that's only in the same

7       case.  That's the sword and shield.  This testimony was

8       offered 38 years ago in a completely different proceeding in

9       which Mr. Byrne was not a party.  Mr. Byrne was a witness, and

04:59:45   10   all he testified to was that Stanley Wrice made an exculpatory

11      statement to him.

12              They are now claiming that Mr. Byrne is an evil

13      fabricator of evidence.  And it is very relevant to his

14      defense that he never took the stand at the criminal trial and

05:00:05   15   testified to anything inculpatory by Stanley Wrice.  His

16      testimony was extremely benign and, in fact, simply recited

17      Stanley Wrice's denial of involvement.

18              THE COURT:  All right.  If they offer his testimony,

19      you can point that out.

05:00:17   20           MS. JACOBS:  Okay.  Thank you, Your Honor.

21              MS. BONJEAN:  Judge, he denied beating him, so now

22      he's going to get on the stand --

23              MS. JACOBS:  We won't put that --

24              THE COURT:  Only the plaintiff can offer testimony

05:00:26   25   from Byrne.

1    MR. JEBSON:  Judge, I have it right here.

2    THE COURT:  What?  What page?

3    MR. JEBSON:  It's Page 14.

4    (Pause.)

05:01:15   5    THE COURT:  "But a witness who invokes his Fifth

6    Amendment privilege against self-incrimination is unavailable

7    to be called as a witness only by parties other than himself."

8    MR. JEBSON:  Which in this case there's another

9    defendant.

05:01:26   10    MS. BONJEAN:  That's the theory?

11    MR. JEBSON:  That is -- that is the theory that we

12    argued in our motion in limine which Your Honor agreed with.

13    THE COURT:  That's what I -- no, I just ruled.

14    MS. BONJEAN:  My understanding, Judge, was that if he

05:01:41   15    testifies to something -- on things such as, "I am Sergeant

16    Byrne, this is my name," there are innocuous things he

17    testified to.  But if he's going to take a position, he's

18    going to invoke his Fifth Amendment right to a question that

19    he answered at trial and they're trying to use it

05:02:03   20    substantively, that is improper.  That is classic.  That is

21    the exact circumstance under which they cannot use it.

22    You can't back-door his substantive testimony when

23    he's invoking the Fifth.  This is black letter law.

24    MR. JEBSON:  He is unavailable to the other

05:02:19   25    defendant.  That is black letter law.  There's no question.

1    There's another defendant.  He gets to use prior testimony

2    when that witness is unavailable.

3            In this case, because Sergeant Byrne is invoking the

4    Fifth Amendment, he is unavailable to defendant Dignan.  So

05:02:36    5    defendant Dignan has the absolute right to use that testimony.

6    And in addition to that, the testimony comes in whole because

7    there is a materiality claim in both the fabrication claim and

8    the *Brady* claim.  So it comes in for two independent reasons.

9            MS. JACOBS:  Your Honor, there was a criminal trial

05:02:54    10   in this case.  The point of this whole case is that there was

11   a criminal trial, and if we change one or two little things,

12   the result would be different.  Okay, Your Honor.  So they're

13   going to say, fine, Byrne testifies but, you know, there's

14   going to be more Brady that came in.

05:03:11    15           Now, the fact is, at the criminal trial, Stanley

16   Wrice testified for pages about his abuse.  And he was --

17   Byrne was cross-examined by Stanley Wrice's lawyer about the

18   abuse.  The jury didn't buy it.  That's fine.  But the fact is

19   that all came into the criminal trial, and this whole case is

05:03:31    20   about, there was a criminal trial.  The criminal trial comes

21   in.  That's the evidence.

22           And now let's see if the result would have been

23   different if Bobby Joe Williams testified differently or if

24   Wrice's little fake confession about dropping the iron

05:03:48    25   accidentally after he's trying to save Karen Byron didn't come

1   in.  Okay.  That's it.  The criminal trial has to come in in

2   order to prove their coerced confession and their fabrication

3   claim.  If it doesn't come in, it's reversible error.

4          MS. BONJEAN:  Judge, Ms. Jacobs' assessment of the

05:04:07   5   law is not consistent with the Seventh Circuit's holding on

6   these things.  We can demonstrate materiality in any number of

7   ways.  *Jiménez* says that.  And we have already agreed to bring

8   in the entire criminal trial through summaries.  That does not

9   mean that they can end-run their Fifth Amendment invocations

05:04:24   10   by trying to make denials that they won't make from the stand.

11   And that is what is improper.

12          There is no court -- there is nothing, and she has

13   not cited a single bit of authority that says you have to

14   bring in every single word because one thing could have been

05:04:38   15   different and it could have made -- that's not the standard.

16   In fact, this court already ruled.

17          MS. JACOBS:  That is --

18          MR. JEBSON:  Judge, in this case --

19          THE COURT:  Wait.  She's --

05:04:48   20          MS. BONJEAN:  This Court --

21          THE COURT:  Somebody interrupted counsel.  I said,

22   please do not do that.

23          MS. BONJEAN:  This court, we already discussed what

24   the materiality standard is.  And I know they want to revisit

05:05:01   25   the issue at the close and prior to jury instructions, but we

1    have cited U.S. Supreme Court law.  It's not as Ms. Jacobs

2    represents here.  The U.S. Supreme Court has said what the

3    materiality standard is.

4            And *Jiménez* talks about how we're not going to

5    force-feed a jury every single bit of evidence that went down

6    at the trial.  That's not what we're determining here.  It's

7    not like -- I'm not going to belabor the point, but our

8    position, we've stated it.  I'm not going to belabor the

9    point.

10            MS. JACOBS:  The jury trial happened.  The claim is

11   that if the confession --

12            THE COURT:  What are we talking about?  What do you

13   want to read of Byrne's testimony?

14            MS. JACOBS:  Well, they've already summarized, Your

15   Honor.  And I'm fine with their summary.  So I don't even know

16   what we're arguing about but --

17            THE COURT:  Are you planning to use the summary?

18            MS. JACOBS:  Yes.  They gave us a big summary of

19   Byrne's testimony, and here it is.

20            THE COURT:  Wait, wait, wait.  I'm asking counsel.

21            Are you planning to introduce the summary?

22            MS. BONJEAN:  I am planning on using portions of it.

23   But where he makes denials about beating Stanley Wrice, that

24   is not appropriate because when I ask him that question when

25   he takes the stand, he's going to invoke the Fifth Amendment.

05:05:16
05:05:30
05:05:42
05:05:54
05:06:07

1   But there are aspects that I believe, and I think that is

2   consistent with what the Court's order was.  If everyone

3   remembers, I did raise that and said it was confusing to me,

4   and I was asking for clarification.  And my reading of the

05:06:19   5   Court's order is that on questions that he would invoke the

6   Fifth to --

7   THE COURT:  All right.  Here's what we'll do.  When

8   you finish the summary of Byrne's testimony, I'll take a look

9   at it and decide what can come in and what won't come in.

05:06:34   10   MS. BONJEAN:  Very good.

11   THE COURT:  So there's no sense arguing -- but

12   finish -- and by the way, where are you on the summaries?

13   MS. JACOBS:  I had sent the redlines last night.

14   THE COURT:  Have you given them back to counsel so

05:06:45   15   that she can look at them and then give them to me.

16   MS. BONJEAN:  Judge --

17   THE COURT:  Give them to me tomorrow, and we'll take

18   a look at them over the weekend.

19   MS. BONJEAN:  Judge, that's fine.  Like I said this

05:06:53   20   morning, we got them late yesterday.  That's fine.  We turned

21   it around quickly.

22   THE COURT:  All right.

23   MS. BONJEAN:  But they --

24   THE COURT:  What I --

05:07:00   25   MS. BONJEAN:  You'll have to look at it.

1        THE COURT:  Since you want to do them, not

2   necessarily right in order, do them on a rolling fashion.  And

3   give them to me when you finish one so I can look at it and

4   decide whether -- you know, whether they're correct that they

05:07:16   5   need to have -- there are additions or deletions.

6        MS. BONJEAN:  So, Judge --

7        MS. JACOBS:  Your Honor, I tried to, in my summaries

8   on the more important ones, I tried to put a comment box as to

9   why this has to come in.  For example --

05:07:30   10        THE COURT:  That's fine.  That's fine.  That's what

11   you're supposed to have done.  And I'll look at it and I'll

12   rule on it.  That's what I'm here for, to rule on.  So you --

13        MS. BONJEAN:  Judge, our -- I'm sorry.

14        THE COURT:  Submit the -- your proposals together in

05:07:46   15   a redline version so that I can see what each side says, and I

16   will decide what comes in.  All right.

17        MS. JACOBS:  Your Honor, I think they should send it

18   back to me first because I might be able to reduce the

19   disagreements.  For instance --

05:07:58   20        THE COURT:  Well, you're supposed to.

21        MS. JACOBS:  Right.

22        THE COURT:  Supposedly, you can get together.  You'll

23   have the whole weekend to get together on most of them.  But

24   if you can get them to me, then I can rule so then they can go

05:08:08   25   in.  So I will take it --

1      MS. JACOBS:  So --

2      THE COURT:  Unless there's no disagreement then,

3  which I wouldn't think in most of these.

4      MS. BONJEAN:  Well, Judge --

05:08:17    5      MS. JACOBS:  So Ms. Bonjean will get back to me, and

6  then we can try to decide --

7      THE COURT:  Right.

8      MS. JACOBS:  -- if we can negotiate.

9      THE COURT:  Right.

05:08:25   10      MS. BONJEAN:  Can I -- can Ms. Bonjean -- I'd like to

11  take a position here.  We do have a fundamental difference,

12  Ms. Jacobs and I, the other side, and this is it.  And the

13  Court is going to have to ultimately rule on this,

14  unfortunately, because we're not going to have a meeting of

05:08:38   15  the minds.

16      THE COURT:  That's why I'm here, to rule on when

17  there's disagreement.

18      MS. BONJEAN:  Our position is, it's our burden.  We

19  are putting in every witness.  We do not believe, and we

05:08:48   20  wholeheartedly object to multiple iterations of descriptions

21  of these injuries.  It is -- doesn't make it more material

22  just because you repeat it four times.  The fact that --

23      THE COURT:  I may agree with you, but let me take a

24  look at what you have.

05:09:02   25      MS. BONJEAN:  Very good.

240

1        THE COURT:  All right.

2        MS. BONJEAN:  Yes, Judge.

3        THE COURT:  All right.

4        MR. HALE:  Can we get a list of witnesses for

05:09:07    5    tomorrow?

6        THE COURT:  Yes.  Who are the witnesses tomorrow?

7        MS. BONJEAN:  I will let them know before I leave.  I

8    want to collect my thoughts, if I might.

9        THE COURT:  All right.  Very good.  Have a nice

05:09:15   10    evening.  We'll see you in the a.m.

11        MS. BONJEAN:  Thank you, Judge.

12        (Proceedings adjourned from 5:15 p.m. to 10:00 a.m.)

13                    C E R T I F I C A T E

14        We, Kelly Fitzgerald, Joseph Rickhoff, and Judith
     Walsh, do hereby certify that the foregoing is a complete,
15    true, and accurate transcript of the proceedings had in the
     above-entitled case before the Honorable HARRY D. LEINENWEBER,
16    one of the judges of said court, at Chicago, Illinois, on
     February 20, 2020.

17

18    /s/ Kelly Fitzgerald                February 21, 2020
     /s/ Joseph Rickhoff                 February 21, 2020
     /s/ Judith A. Walsh                 February 21, 2020

19

20    Official Court Reporters
     United States District Court
     Northern District of Illinois
21    Eastern Division

22

23

24

25