```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   STANLEY WRICE,                    )
                                       )
 4                  Plaintiff,         )
     -vs-                              )   Case No. 14 C 5934
 5                                     )
     JOHN BYRNE, former Chicago        )   Chicago, Illinois
 6   Police Sergeant, et al.,          )   February 21, 2020
                                       )   9:58 a.m.
 7                  Defendants.        )
                                       )
 8                              VOLUME 2
                      TRANSCRIPT OF PROCEEDINGS - TRIAL
 9       BEFORE THE HONORABLE HARRY D. LEINENWEBER and a jury

10
     APPEARANCES:
11   For the Plaintiff:      MS. JENNIFER A. BONJEAN
                             MS. ASHLEY BLAIR COHEN
12                           Bonjean Law Group PLLC
                             467 Saint Johns Place
13                           Brooklyn, NY 11238
                             (718) 875-1850
14
                             MS. HEIDI LINN LAMBROS
15                           1169 S. Plymouth Court, Suite 123
                             Chicago, IL  60604
16                           (216) 318-4087

17   For the Individual
     Defendants:             MR. ANDREW M. HALE
18                           MR. SCOTT J. JEBSON
                             MS. JENNIFER BITOY
19                           Hale & Monico LLC
                             53 W. Jackson Boulevard, Suite 330
20                           Chicago, IL  60604
                             (312) 341-9646
21
     Court Reporter:
22
                 KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
23                     Official Court Reporter
                     United States District Court
24            219 South Dearborn Street, Suite 1426
                     Chicago, Illinois  60604
25              Telephone:   (312) 435-5569
                Kathleen_Fennell@ilnd.uscourts.gov
```

1    APPEARANCES:   (Continued)

2
     For Defendant
3    City of Chicago:        MS. CARYN L. JACOBS
                             Department of Law, City of Chicago
4                            121 North LaSalle Street, City Hall
                             Suite 600
5                            Chicago, IL  60602
                             (312) 744-5128
6
     Also Present:          MR. NICK BENYO
7                           Senior Litigation Consultant
                            Magna Legal Services
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

243

1    (Proceedings heard in open court, jury out:)

2        THE COURT:  Good morning.  There were two motions

3    filed overnight, and I'm prepared to rule on them.

4        The first one is the plaintiff's motion to admit

09:58:55    5    Circuit Judge Walsh's finding in light of defendant's argument

6    that plaintiff was properly convicted and that defendant did

7    not confess.

8        Judge Walsh did not make such a finding.  He made an

9    observation but did not make a finding.  But on the other

09:59:13    10   hand, the issue of whether there should be a certificate of

11   innocence was not litigated is my understanding.

12       MS. JACOBS:  It was litigated.

13       MS. BONJEAN:  Judge -- it's my motion.  If I may.  If

14   I may.

09:59:24    15       We're not looking for Judge Walsh's ruling as to

16   anything about innocence.  What Judge Walsh did rule is that

17   he found that the statement was coerced.  He suppressed it and

18   granted him a new trial.  He did make that finding.  That's

19   how Mr. Wrice got a new trial.

09:59:44    20       So when Mr. Hale gets up and argues to this jury that

21   it was a proper conviction, that there was no confession, that

22   is just -- we have to be able to rebut that.  And Walsh's

23   finding -- I'm not talking about innocence.  We're not trying

24   to get anything in about innocence.  I'm not even objecting

09:59:56    25   about the innocence.  I'm objecting about the "properly

1    convicted."  There was a finding he was not properly

2    convicted.  That's why we're all here today.  If he was

3    properly convicted, we wouldn't be in this courtroom.  We

4    wouldn't have had standing to even bring a federal civil

5    rights lawsuit if he was properly convicted.  I mean, I guess

6    if the judge had not made a finding that his statement was the

7    product of physical coercion, it is unlikely we would be here

8    today.

9            MR. JEBSON:  Good morning, Judge.

10           Judge, there was no opening the door.  The defendants

11   are allowed to tell the jury in the opening statement what the

12   evidence is going to show.  Our theory of the case is that he

13   was properly convicted, that there was no fabricated evidence,

14   there is no -- nothing to suppress.  And even if arguably

15   there was, which we deny, but if the jury was to believe it,

16   that the jury properly convicted him even if you took out that

17   fabricated evidence or not --

18           THE COURT:  Well, plaintiff is allowed to present --

19           MS. BONJEAN:  I'm sorry.  There was a witness in

20   here, Judge.  I didn't mean to walk away from the bench.

21           THE COURT:  Okay.  You could certainly argue and

22   present evidence that he was not properly convicted.  That's

23   the issue in the case.

24           MS. BONJEAN:  Right.  And Judge Walsh's finding that

25   he wasn't properly convicted, the suggestion is that how did

1   he miraculously appear?  You know, they're pushing.  They're

2   pushing.  And it's fine to say there's no finding he wasn't

3   found innocent, although that's even objectionable because

4   even a certificate of innocence is not exactly what they

5   profess it to be, but I'm talking --

10:01:22

6       THE COURT:  Well, the point of the matter is that

7   they're attempting to prove that he was properly convicted in

8   the case.  That's their position.  It's your position that he

9   was not properly convicted, and that's what we're litigating.

10  So --

10:01:35

11      MS. BONJEAN:  Well --

12      THE COURT:  You certainly can present evidence and

13  arguments that he was not -- you know, that he was beaten or

14  whatever it is, the position you took.

15      So the motion is denied.

10:01:46

16      The other motion is concerning Gregory Banks.  That

17  motion, that's a reiteration of the motion that's been made

18  several times.  And specifically there's a -- if I can get the

19  right case.  That's *Ruiz-Cortez*.  The *Thompson* case

20  specifically held on page -- it's an obliterated page.  But

10:02:12

21  anyway, the fact that subsequent evidence of fabrication is

22  admissible as relevant to the issue of whether or not the

23  specifically claimed fabrication was more likely true than not

24  true, and that the specific case, the evidence that was

25  authorized in *Thompson* had to do with the planting of a gun

10:02:56

1    and falsely arrested by the same officer three years after the

2    trial in -- for Thompson, which Thompson appealed.  So that

3    evidence was as stated -- the evidence presents he engaged in

4    the same kind of misconduct in 2005, is powerful

5    circumstantial evidence that he was involved in the pattern of

6    abuse of power by SOS officers dating back to Thompson's

7    arrest in 2002.

8         So it's not -- it's not evidence of *Brady*, but it's

9    evidence that the *Brady* evidence that is more likely true than

10   not true.  So that motion is denied.

11        MS. JACOBS:  Your Honor, we agree with you that it's

12   not *Brady*, and we think it only comes in otherwise as

13   propensity, improper propensity.

14        THE COURT:  Well, all I could tell you is that you

15   could take that up with the Seventh Circuit because they --

16   thinks otherwise.  So the motion is denied.

17        Ready for the jury?

18        MS. BONJEAN:  Judge --

19        MS. JACOBS:  Your Honor, I have something I need to

20   address this morning that's important.

21        At 6:00 last night, 6:16, we received a list of

22   witnesses for today.  They include two beat cops, Frankie

23   Peters and Elbert Harris.  Both testified at trial.  We

24   provided Ms. Bonjean with summaries of their testimony ten

25   days ago.  When we got her summaries recently, she did not

1    summarize them.

2         We know that Elbert Harris has zero recollection,

3    zero recollection of the events.  And we know that Frankie

4    Peters has some recollection of the events but not a full

5    recollection.  Their trial testimony obviously would come in

6    because it's an element of the claims, and it's also past

7    recollection recorded as well as recorded testimony.

8         We believe there is no point, zero, no point in

9    calling these witnesses now and having them bumble through

10   trying to remember what they said at the criminal trial 38

11   years ago when the whole point of the testimony is to show

12   what the criminal trial heard.

13        The point of calling them can only be an improper

14   purpose, which is to elaborate on what the criminal trial

15   heard or did not hear which is false, fake universe that is

16   not relevant to the fabricated confession and coerced

17   confession claims.  They're going to maybe try to do a better

18   cross than Stanley Wrice's lawyer did back in 1983.  They're

19   maybe going to ask new questions.  They're maybe going to

20   float new theories.  They're maybe going to introduce new

21   facts, none of which is relevant to the universe that matters

22   here, which is the criminal trial, minus the allegedly tainted

23   evidence.  None of it is relevant to that universe.  It is,

24   therefore, clearly a stealth, malicious prosecution case with

25   which they cannot have because they do not have a favorable

1    termination.

2         It's also a stealth ineffective assistance of counsel

3    case.  Stanley Wrice repeatedly filed ineffective assistance

4    of counsel claims.

10:06:07    5    So this exam -- I don't know that she's going to do

6    it, but if it's bumbling through their trial testimony, that

7    is a waste of the Court's time.  We should just read their

8    summaries.  I would read their testimony, as you know, Judge,

9    but I understand you have ruled.

10:06:25   10    THE COURT:  Why wasn't the summaries adequate?

11        MS. BONJEAN:  Judge, I thought the ruling was we

12   could call live witnesses.  Maybe we should just leave the

13   courtroom and they could try both of our cases for us because

14   I'm very confused why --

10:06:38   15   THE COURT:  I'm just asking you a question.  Is it --

16        MS. BONJEAN:  Because it's cumulative.

17        THE COURT:  It would be quicker to read a summary

18   than to put the witness on the stand and submit to direct and

19   cross-examination.

10:06:47   20   MS. BONJEAN:  Because we --

21        MS. JACOBS:  The --

22        THE COURT:  Wait.  Just a second.

23        MS. BONJEAN:  I can't litigate this way.  I cannot

24   litigate -- I can't even get a word in edgewise.

10:06:54   25   THE COURT:  Well, you are right now because I told

 1  her not to talk.  Go ahead.

 2          MS. BONJEAN:  I have a case to put on.  In case

 3  anyone hadn't noticed, they may be arguing that my client is

 4  guilty, and maybe that might be relevant at this trial.

 5          THE COURT:  Wait.  Wait.

 6          MS. BONJEAN:  Right.

 7          THE COURT:  We're on whether or not you should call a

 8  witness --

 9          MS. BONJEAN:  Who has personal knowledge about

10  investigating this case who is --

11          THE COURT:  -- or use the summary.  What's the matter

12  with the summary?  That's my only question.  The summary that

13  may be more appropriate.

14          MS. BONJEAN:  According to who?  Again, can I try my

15  case?  I have a witness to put on.  If they can't remember,

16  they can be refreshed.  And, in fact, I'm not -- Judge, please

17  let me make my point.

18          Here's the thing.  This whole summary thing, this

19  whole trial thing, it is relevant.  The Seventh Circuit has

20  said it's relevant.  But I am not obligated to do it the way

21  Ms. Jacobs wants me to do it or --

22          THE COURT:  All I'm asking you -- and I -- it's your

23  trial, and you can present your case any way you want.  All

24  I'm asking you is does it make more sense to read the summary

25  than to put someone on the stand who may have an -- and have

10:07:06
10:07:14
10:07:27
10:07:45
10:08:03

1  to repeatedly refresh their recollection?  That's all I'm

2  asking.

3          MS. BONJEAN:  It's one of two things.  That may be

4  the case and we have to refresh his recollection.  That's

5  possible.  But these witnesses are relevant for matters

6  outside of just --

7          THE COURT:  Of course they're relevant, but there's

8  two ways to present it.  One is by the summary of what they

9  actually testified to, or the other is to call them.

10          MS. BONJEAN:  Right.  And I'm permitted to -- if I

11  want to ask more questions or cross-examine them more, am I

12  not permitted to do that?  I mean, again, this is a case where

13  the whole opening argument was my client is guilty.

14          THE COURT:  Okay.  I'm not telling you how you have

15  to do it.  All I asked was wouldn't that make more sense to do

16  it that way.  If you want to do it the other way, that's fine.

17  Go ahead.

18          MS. JACOBS:  Well, Your Honor --

19          MS. BONJEAN:  That's the way I would like to do it.

20          MS. JACOBS:  Your Honor, we think if she goes beyond

21  the trial testimony for these witnesses as to which there is

22  no taint of coercion, there is no taint of --

23          THE COURT:  Well --

24          MS. JACOBS:  There's no taint of anything having to

25  do with the case now.

1    THE COURT:  Just wait.

2    MS. JACOBS:  We think she should not be allowed to go

3    beyond the trial testimony.

4    THE COURT:  Wait.  Okay.  Wait.

10:09:11    5    If it's a motion, the motion is denied.  You can

6    present it any way you want.  I would suggest you probably do

7    it by the summary, but that's up to you.

8    So anyway, ready for the jury?

9    MS. BONJEAN:  Judge --

10:09:20    10    MS. JACOBS:  Your Honor, I just want to preserve my

11    objection for appeal --

12    THE COURT:  Your objection is preserved.

13    MS. JACOBS:  -- that we object to all questions

14    beyond the criminal trial.

10:09:27    15    THE COURT:  Your objection is preserved.

16    MS. JACOBS:  Thank you, Your Honor.

17    THE COURT:  Call your next witness.

18    MS. BONJEAN:  Judge, hold on.  Judge, please.  I have

19    a motion to make too.  Can I make motions too, or is it just

10:09:37    20    them?

21    THE COURT:  What motion now?

22    MS. BONJEAN:  The motion is for a mistrial because

23    these -- the defense has falsely, has in bad faith asked a

24    question yesterday about whether Stanley Wrice raped his

10:09:48    25    girlfriend.  They did not -- and they asked the question of

1    Stanley Wrice's sister in bad faith.  And the --

2          THE COURT:  You objected.  I sustained the objection.

3    I'll instruct the jury to disregard it, and we will not go

4    into it.  I already ruled on that.

5          So let's proceed.  Call your next witness.

6          MS. BONJEAN:  Judge, if we could have an instruction

7    to the jury to disregard that because it is not relevant

8    even --

9          THE COURT:  All right.  I will.  Okay.

10         MS. BONJEAN:  And the mistrial is denied, I assume?

11         THE COURT:  Pardon?

12         MS. BONJEAN:  My motion for mistrial is denied, I

13   assume?

14         THE COURT:  Your motion is denied.

15         MS. BONJEAN:  Thank you.

16         Judge, I'm sorry.  One other issue.  We do have our

17   first witness to put on.  After that, though, we would like to

18   read in the summary of Karen Byron's testimony.  We sent it to

19   the Court.  They were back and forth.  There's not much in

20   dispute anymore.

21         THE COURT:  All right.

22         MS. JACOBS:  Your Honor, we got their summary this

23   morning at 9:25.  I haven't even gotten a printout yet.  She

24   sent us her summary.

25         THE COURT:  All right.  Who is your next -- let's get

Harris - direct

253

1   started because we'll never get done.

2         MS. JACOBS:  The summary is improper.  So we -- you

3   told us we have an entitlement to go through --

4         THE COURT:  I'll make the determination of whether it

10:11:03  5   is or not.

6         Bring your witness in.

7      (Jury enters.)

8         THE COURT:  Good morning, members of the jury.  We're

9   ready to proceed.

10:11:51  10         One thing.  Yesterday, the witness, Magnolia Wrice,

11   mentioned --

12         MS. BONJEAN:  Not the witness, Judge.  The witness

13   didn't mention it.

14         THE COURT:  The question had to do with the subject

10:12:03  15   of rape.  And I sustained the objection, and I'm asking you to

16   disregard that comment.  It was part of the question.

17         Call your next witness, please.

18         MS. BONJEAN:  The plaintiff calls former Sergeant

19   Elbert Harris.

10:12:38  20         THE COURT:  Right up here, please.

21      (Witness sworn.)

22         THE COURT:  Please be seated.  Please speak directly

23   into the microphone, sir.

24      ELBERT HARRIS, PLAINTIFF'S WITNESS, DULY SWORN,

25              DIRECT EXAMINATION

Harris - direct

254

|      |                                                              |
|------|--------------------------------------------------------------|
| 1    | BY MS. BONJEAN:                                               |
| 2    | Q.  Good morning, Mr. Harris.                                 |
| 3    | A.  Good morning.                                             |
| 4    | Q.  Could you introduce yourself to the ladies and gentlemen  |
| 5    | of the jury.                                                  |
| 6    | A.  My name is Elbert Harris.  I'm a retired Chicago police   |
| 7    | officer.                                                      |
| 8    | Q.  Sir, how long have you been retired from the Chicago      |
| 9    | Police Department?                                            |
| 10   | A.  26 years.                                                 |
| 11   | Q.  You've been retired 26 years?                             |
| 12   | A.  Right.                                                    |
| 13   | Q.  What year did you retire from the Chicago Police          |
| 14   | Department?                                                   |
| 15   | A.  '93, '94.                                                 |
| 16   | Q.  '93, '94.  And what year did you start with the Chicago   |
| 17   | Police Department?                                            |
| 18   | A.  '64, 1964.                                                |
| 19   | Q.  And what was your highest rank in the department when you |
| 20   | retired?                                                      |
| 21   | A.  Sergeant.                                                 |
| 22   | Q.  Now, where do you live now?  Generally where do you live? |
| 23   | Do you live in the city of Chicago?                           |
| 24   | A.  Now?                                                      |
| 25   | Q.  Yes.                                                      |

10:13:11 (line 5)
10:13:21 (line 10)
10:13:28 (line 15)
10:13:43 (line 20)
10:13:56 (line 25)

1    A.  Yes, in Chicago, south side.

2    Q.  Okay.  And did you do any work that was not police work

3    after you retired?

4              MR. HALE:  Objection.  Relevance.

5              THE COURT:  Overruled.

6              But let's move on.

7              MS. BONJEAN:  That's fine.

8    BY MS. BONJEAN:

9    Q.  You can answer.  He overruled.

10   A.  Yes.

11   Q.  Okay.  What type of work?

12   A.  I drove a bus for the CTA.

13   Q.  Okay.  Now, sir, I want to draw your attention back to

14   September of 1982.  Do you recall whether you were, in fact, a

15   Chicago police officer at that time?

16   A.  Yes, I was.

17   Q.  And where were you assigned?

18   A.  The 4th District, Chicago, on the southeast side of

19   Chicago.

20   Q.  And do you remember the address of that police station?

21   A.  At that time it was 103rd and Luella.  I don't remember

22   the specific address.

23   Q.  Okay.  And do you recall back in 1982 how long you had

24   been a Chicago police officer?

25   A.  Say that again?

Harris - direct

256

1  Q.  Back in 1982, how long had you been a Chicago police

2  officer?

3  A.  I don't know.  18, 19 years, I guess.  I don't remember.

4  I would have to do the math.

10:15:19    5  Q.  I think that's right, sounds about right.

6          And what was your rank at the time in September of

7  1982?

8  A.  Sergeant.

9  Q.  And tell the ladies and gentlemen of the jury, what's a

10:15:30   10  sergeant?  What are the duties and responsibilities of a

11  sergeant?

12  A.  Well, it's really called a supervising sergeant.  There

13  are various ranks.  Patrolman is the lower rank, detectives

14  and various others, but then the sergeant.  And the sergeant

10:15:50   15  kind of supervises what the patrolmen do, supervising what

16  supervisors do.  You kind of see what they're doing and

17  whether it's done correctly during the tour of duty.

18  Q.  And were you a supervisor of patrol officers?

19  A.  Yes.

10:16:11   20  Q.  Okay.  Now, was there a police station known as Area 2

21  violent crimes?

22  A.  Well, that's -- that's a station, but it's not really a

23  police district; but, yes, there is Area 2 violent crimes.

24  Q.  Could you describe the difference between the district you

10:16:28   25  worked in and Area 2 violent crimes?

1    A.  Well --

2           MR. HALE:  Objection.  Relevance.

3           THE COURT:  Overruled.

4    BY THE WITNESS:

5    A.  The district station from which I worked, police officers

6    work out of that, work out of that station.  But the area,

7    that's where detectives, various kinds of auto theft,

8    homicide, that's where the detectives work.

9    BY MS. BONJEAN:

10   Q.  And what is the difference between a detective and a

11   patrol officer?

12   A.  Various incidents take place during the day.  And on a

13   regular day, just routine incidents take place, and the police

14   officer investigates that.  When it's something of a more

15   serious nature, then they call for the detectives, and that's

16   when they respond.

17   Q.  Okay.  And detectives investigate serious crimes, would

18   you say?

19   A.  Right.

20   Q.  Now, on September 8, 1982, you testified you were a

21   supervising sergeant out of the 4th District, right?

22   A.  That's right.

23   Q.  Do you happen to recall what shift or hours you were

24   working that night?

25   A.  11:00 to 7:00.

Harris - direct

258

1   Q.  Okay.

2   A.  11:00 p.m., 7:00 a.m.

3   Q.  All right.  So is that called the midnight shift or

4   anything?

10:18:01   5   A.  Right.

6   Q.  And how would you have been dressed that evening?

7   A.  In uniform, whatever the uniform of the day.  But it would

8   have been a regular police uniform.

9   Q.  Would you be wearing a different color shirt than patrol

10:18:19   10   officers?

11   A.  Yes.

12   Q.  And what color shirt would that be?

13   A.  A white shirt.

14   Q.  And as a supervising sergeant, did you conduct parole

10:18:28   15   yourself?

16   A.  Well, yes.  I guess you could say yes, I do patrol.

17   Q.  And what's involved in that?

18   A.  The area that I was working on that particular night, I

19   don't remember how many.  I don't remember the specific

10:18:52   20   jurisdiction, but you drive around and see what of any unusual

21   nature may be taking place.  And that's what I was doing.

22   Q.  Okay.  And were you in a marked car or an unmarked car?

23   A.  Marked.

24   Q.  And did detectives drive marked cars or unmarked cars?

10:19:13   25   A.  Unmarked.

1    Q.  Unmarked, right?

2    A.  Unmarked, yes.

3    Q.  And were you working -- do you recall in September of 1982

4    whether you were working with any type of partner or working

10:19:20   5    by yourself?

6    A.  I was working alone.

7    Q.  Okay.  Now, I would like to draw your attention, Sergeant,

8    to the very early morning of September 9th, like around

9    midnight, in 1982, okay.  And to the extent that you have an

10:19:38   10   independent recollection, you can testify; but if you need to

11   refresh your recollection, will you let me know?

12   A.  Okay.

13   Q.  All right.  So on September 8, 1982, you said you started

14   your shift at 11:00 p.m., right?

10:19:53   15   A.  Right.

16   Q.  And do you recall whether or not you were patrolling, in

17   your patrol car patrolling sometime around midnight on

18   September 9, 1982?

19   A.  Right.

10:20:08   20   Q.  Is that correct?

21   A.  That's correct.

22   Q.  And do you recall specifically what area you were in

23   around midnight on September 9, 1982?

24   A.  On 75th Street, which is the northern edge of the

10:20:22   25   4th District, 75th Street.

Harris - direct

260

1   Q.  And do you recall what intersection would have been around

2   there?

3   A.  Well, I don't know specifically where I started, but

4   probably somewhere around -- I don't remember specifically

10:20:40   5   where it started, but I was westbound.  I remember I was

6   westbound on 75th Street.

7   Q.  So you recall being -- you recall being westbound on 75th?

8   A.  Yes.

9   Q.  And at some point, did you come across Chappel?

10:20:53   10   A.  Yes, I would have had -- yes.

11   Q.  Okay.  Could you harken back to this time and describe

12   75th and Chappel, that area over there, back in 1982?  Do you

13   have a strong recollection of what it looked like or

14   characterize it?

10:21:11   15   A.  Not -- not really.

16   Q.  Do you know if there were any businesses there in that

17   area at 75th?

18   A.  I really can't remember specifically.

19   Q.  Okay.  Can you recollect what the demographic makeup was

10:21:30   20   of that area on 75th and Chappel?

21   A.  Say that again?

22   Q.  Do you recall what the demographic or racial makeup was of

23   that area back in --

24   A.  It was predominantly black.

10:21:41   25   Q.  Now, do you have a recollection of coming to the area of

Harris - direct

261

|  | |  |
|---|---|---|
| | 1 | 75th and Chappel and something catching your attention back on |
| | 2 | September 9, 1982 at about midnight-ish? |
| | 3 | A.  Yes. |
| | 4 | Q.  What do you recall? |
| 10:22:00 | 5 | A.  I recall seeing a vehicle with several people in it on the |
| | 6 | south side -- no -- yeah, on the south side of the street, |
| | 7 | south side heading southbound on I guess it would have been |
| | 8 | Chappel.  I don't remember specifically if it was Chappel, but |
| | 9 | it was on 75th Street and the intersecting street. |
| 10:22:30 | 10 | Q.  Okay.  And was the car parked? |
| | 11 | A.  Yes. |
| | 12 | Q.  And do you recall what color the car was? |
| | 13 | A.  Do I recall? |
| | 14 | Q.  Yeah. |
| 10:22:37 | 15 | A.  Do I recall what? |
| | 16 | Q.  The color of the car? |
| | 17 | A.  No. |
| | 18 | Q.  Do you have a clear recollection of this night, by the |
| | 19 | way? |
| 10:22:43 | 20 | A.  Say it again? |
| | 21 | Q.  Do you have a clear recollection of the evening? |
| | 22 | A.  Not really. |
| | 23 | Q.  It's a long time ago, right? |
| | 24 | A.  Long. |
| 10:22:51 | 25 | Q.  Okay.  But you recall specifically seeing this car parked |

Harris - direct

262

1    and a number of people inside of it; is that right?

2    A.  Yes.

3    Q.  Okay.  And was there something unusual that drew your

4    attention to a car parked with these people inside of it?

10:23:05  5  A.  Yes.

6    Q.  And what was that?

7    A.  There was -- it was a white woman and a couple of black

8    men.  That was a little bit unusual in this area in that

9    the -- as I said before, it's predominantly a black

10:23:29  10  neighborhood.  So that was a little -- that was a little

11   unusual at that time of the night.

12   Q.  And as you were approaching -- well, strike that.

13           Did you stop your police vehicle?

14   A.  Well, initially I was headed westbound on 75th Street, and

10:23:49  15  I -- as I observed this then I turned around and came back to

16   that location.  And I did stop it, yes.

17   Q.  Okay.  And why did you drive past and turn around and come

18   back?

19   A.  Well, it was a little unusual and a little cause for a

10:24:05  20  concern.

21   Q.  And did you do anything else after you stopped your car in

22   terms of -- well, you got out of your car, right?

23   A.  Right.

24   Q.  Did you notate anything after you got out of the car?

10:24:20  25  A.  Well, as I said, that the number of people and the

Harris - direct

263

1   racial -- I got out of the car.

2           And I'm not sure what that question was again.  Could

3   you repeat that?

4   Q.  Sure.

5           Did you write down the license plate of the car?

6   A.  Oh, yes.  Yes.  That was prior to my getting out of my

7   vehicle, yes.

8   Q.  Okay.  So when you first observed the car, you wrote down

9   the license plate?

10  A.  When I turned around and came back and prior to getting

11  out, I noted the license number.

12  Q.  Okay.  And where did you write that license plate number

13  down?

14  A.  I carry a clipboard, and it has various assignments and

15  whatever is on it.  But that -- the license plate number

16  was -- I jotted that down on the clipboard.

17  Q.  And then you stopped your car, right?

18  A.  Right.

19  Q.  Okay.  And after you got out of your car, what did you do,

20  to the best of your recollection?

21  A.  I went over and spoke with the occupants of the car to see

22  if there was anything obviously amiss.  And there seemed not

23  to have been, but that was -- that was the extent of the

24  conversation, pretty much.

25  Q.  Could you describe the condition of the -- do you remember

Harris - direct

264

| | |
|---|---|
| 1 | what the condition was of the woman who was sitting in the |
| 2 | car? |
| 3 | A.  Not -- not really.  Not specifically.  But she seemed to |
| 4 | have -- well, I don't know if she was, but there was an odor |
| 5 | of alcohol in the car. |
| 6 | Q.  There was a what? |
| 7 | A.  An odor of alcohol in the car or coming from the car. |
| 8 | Q.  Okay.  Now, would anything refresh your recollection about |
| 9 | her specific condition at the time that you approached the |
| 10 | car? |
| 11 | A.  Specific condition of? |
| 12 | Q.  Would anything -- let me back up a second. |
| 13 | Did you testify at a criminal trial in this case, |
| 14 | related to this case, do you know? |
| 15 | A.  Yes. |
| 16 | Q.  Okay.  And would that testimony refresh your recollection |
| 17 | about her condition when you approached the car? |
| 18 | A.  The testimony would be the testimony.  I don't know that |
| 19 | it would necessarily refresh my memory at this time. |
| 20 | Q.  Sure. |
| 21 | A.  But whatever the testimony was is what it was. |
| 22 | Q.  Okay.  Well, I'm going to have you look at -- |
| 23 | (Counsel conferring.) |
| 24 | BY MS. BONJEAN: |
| 25 | Q.  Mr. Harris, I'm going to have you look at Plaintiff's |

10:26:11

10:26:25

10:26:34

10:26:52

10:27:21

Harris - direct

265

```
         1   Exhibit 61A for identification purposes only, okay, and it's
         2   going to show up on the screen right there.
         3          Do you see your name at the top of the page, sir?
         4   A.  Say it again.
10:27:41 5   Q.  Do you see your name at the top of the page there?
         6   A.  Yes.
         7   Q.  Okay.  And I'm going to then have you look at page -- it
         8   would be 1218, the middle of the page, if you could take a
         9   look.  And let me know when you're there.
10:28:09 10  A.  I see it.
         11  Q.  Okay.  And if you could please read down to the bottom to
         12  the middle of -- or down to the bottom and the next page, let
         13  me know when you're finished.
         14  A.  Line 21?
10:28:26 15  Q.  Starting on page 1218 at page 10, read to the bottom, and
         16  then we'll have you look at the next page.  And let me know
         17  when you're ready to turn it.
         18  A.  Okay.  I see that.
         19  Q.  Okay.  Now, does this refresh your recollection of how the
10:29:00 20  woman was seated in the car?
         21  A.  Not actually.  It says that she was seated -- sitting
         22  slumped down in the seat.
         23  Q.  Okay.
         24  A.  But I don't recall what that actually describes.
10:29:18 25  Q.  Okay.  Do you remember her slurring her words?
```

1  A.  Do I remember?

2  Q.  Her slurring her words?

3  A.  Not really.

4  Q.  Okay.  You said you remembered the smell of -- the odor of

10:29:28   5  alcohol?

6  A.  Coming from the car, yes.

7  Q.  Did you ask the woman anything?

8  A.  Yes, I did ask her.  I don't remember the specific --

9  specifically what I asked her, but it was the essence of

10:29:47  10  whether everything was okay.  She seemed to indicate that she

11  was I guess fairly comfortable with whatever the circumstances

12  were.  But I don't remember specifically what would I ask her,

13  no.

14  Q.  Okay.  You don't remember what she looked like at the

10:30:07  15  time, correct, I mean, her physical appearance?

16  A.  Not really.

17  Q.  Other than being a white woman, right?

18  A.  Right.

19  Q.  If the woman had indicated that she was in distress, would

10:30:19  20  you have responded in some way?

21  A.  Yes.

22  Q.  That's why you stopped in the first place, right?

23  A.  Right.

24  Q.  Did you have -- do you remember having any conversations

10:30:32  25  with any of the men that were with her?

1    A.  One of them was a -- he was a younger guy.  And I remember

2    asking him about his age because of the odor of alcohol.  The

3    others were apparently of legal drinking age, but he didn't

4    seem to have been.  And I did have -- I remember having a

5    conversation with him, and that conversation included his

6    having recently celebrated a birthday.  I do remember.  I do

7    remember that.

8    Q.  Okay.  Do you remember asking any of the other men that

9    you saw any other questions?

10   A.  No, not really.

11   Q.  Okay.  Now, were you able to determine who the driver was

12   of that car?

13   A.  No.

14   Q.  Now, after making this assessment, where did you go?

15   A.  Well, I went on about patrolling for the remainder of the

16   morning.

17   Q.  Okay.  But you left, and you didn't arrest anyone, right?

18   A.  No.

19   Q.  There was nothing that caused you to believe that anyone

20   had committed a crime, correct?

21   A.  (No audible response).

22   Q.  Now, did something come to your attention later, or I

23   guess later in that day but it would have been the early

24   morning hours of September 9, 1982, as it relates to this

25   woman that you saw in the car?

Harris - direct

268

1    A.  Yes.

2    Q.  And what did you find out?

3    A.  I don't recall the time, but I received a call to go to

4    Jackson Park Hospital, I believe it was -- had to do with a --

10:32:36    5    I believe the call was that there was a rape victim.  I'm not

6    certain, but I know that there was a request for a supervisor

7    to meet the officers at the Jackson Park Hospital, and it was

8    something -- I believe the call was a rape victim.

9    Q.  Do you recall what time it was that you went, or

10:32:59   10   approximately what time it was?

11   A.  No.  Not specifically, no.

12   Q.  Do you know how many hours it was past the time that you

13   saw her?

14   A.  Not really.

10:33:07   15   Q.  Did there come a time when you figured out that the woman

16   that -- who was the rape victim was the same woman that you

17   had seen earlier?

18   A.  Yes.  When I responded to the hospital, went into the

19   emergency room, I recognized the face of the person who was in

10:33:30   20   the emergency room as the same one that I've seen on the

21   street earlier.

22   Q.  Okay.  And you actually saw her in the emergency room?

23   A.  Yes.

24   Q.  And could you describe what her face looked like when you

10:33:44   25   saw her, if you remember?

Harris - direct

269

1   A.  I remember that it was bruised, but I don't remember

2   specifically what it looked like.

3   Q.  Okay.  And after figuring out that this was the same woman

4   that you saw earlier, what, if anything, did you do with that

10:34:03   5   information?

6   A.  I don't recall what I specifically did with that

7   information, but the -- in that this was a serious crime, the

8   detectives were called.  I don't know if it had to do -- that

9   didn't really have to do with my having seen her earlier.  It

10:34:30  10   was just because of the nature of this particular incident

11   that the detectives were called.

12   Q.  This wouldn't have been a crime that you would personally

13   investigate, right?

14   A.  No.

10:34:39  15   Q.  This would have been something that the detectives from

16   whatever violent crimes area were in charge of that area would

17   come to, right?

18   A.  Right.

19   Q.  Did you see the detectives at any point?

10:34:49  20   A.  I'm sure that I did, but I don't recall.

21   Q.  Okay.  Do you recall whether or not you gave the

22   detectives or anyone the license plate number you had written

23   down?

24   A.  Yes.  Yes, I did.

10:35:02  25   Q.  And why did you do that?

Harris - direct

1    A.  Well, in that this person had been in a car at a

2    relatively short time or a short distance of a span of time

3    earlier, there was a possibility of whatever had taken place

4    that brought her into this condition may have had something to

5    do with when she was in that car, or maybe people who were in

6    the car had some information in regards to it.  But I did give

7    them the license number --

8    Q.  Okay.

9    A.  -- of the car I had seen her in earlier.

10   Q.  Now, at approximately 5:30-ish, do you recall being

11   assigned to go somewhere else in connection with this

12   incident?

13   A.  Yes, I went to -- I don't recall the specific address, but

14   I did go to an address.  I believe it had to do with where the

15   car -- where the license plate to the car was registered.  I'm

16   not certain about that.  But I did receive a call to go to a

17   location.  I don't remember the specific address.

18   Q.  And did you go there?

19   A.  Yes.

20   Q.  And can you tell us what you recall about what you did

21   when you got there?

22   A.  I'm not certain which officers were there, whether it was

23   the patrol officer or the detectives, but I did go into the

24   house at that location.  There were people there.  I don't

25   remember now who was there.  But there were people, and we

Harris - direct

271

|  | 1 | went into the house.  And then on the first floor and then |
|  | 2 | into the attic, I do recall having done that. |
|  | 3 | Q.  Okay.  And could you describe -- do you remember the |
|  | 4 | condition of the attic? |
| 10:37:02 | 5 | A.  Only it was -- there seems to have been debris strewn in |
|  | 6 | and around the entire room. |
|  | 7 | Q.  And did you find evidence that a crime had been committed |
|  | 8 | up there? |
|  | 9 | A.  Well, not actually because it was -- because it was dark |
| 10:37:27 | 10 | at that time and not very well lit so I couldn't tell that -- |
|  | 11 | it wasn't obvious that a crime had been committed. |
|  | 12 | Q.  When you went up there, you said it was dark, right? |
|  | 13 | A.  Right. |
|  | 14 | Q.  Was there any electricity up there? |
| 10:37:46 | 15 | A.  I don't think so.  I remember that I used the flashlight |
|  | 16 | in order to see whatever I was able to see.  There may have |
|  | 17 | been electricity, but I don't recall having turned the light |
|  | 18 | on or the light being on. |
|  | 19 | Q.  And you said you remember it being dark? |
| 10:38:00 | 20 | A.  Yes. |
|  | 21 | Q.  So dark that you really couldn't determine whether there |
|  | 22 | was anything of evidentiary significance in the area? |
|  | 23 | A.  No, not really.  No. |
|  | 24 | Q.  Do you remember what items you were able to make out in |
| 10:38:18 | 25 | the room at the time? |

1    A.  It seems as though there was like beer cans or -- I

2    believe some kind of -- some kind of alcoholic -- I believe

3    beer cans is what I recall seeing.  There may have been some

4    other things, but I remember the beer cans there.

10:38:42    5    Q.  Did you notice any odor or anything?

6    A.  Not really.

7    Q.  Do you remember seeing any of the detectives at the house?

8    A.  The detectives, I am not sure if they were there at that

9    time.  I saw the detectives at various times during the night,

10:39:06   10    but whether they were there on that -- at that time when I

11    first went to the house or not, I don't recall.

12    Q.  Now, you said you used a flashlight up in the attic,

13    correct?

14    A.  Right.

10:39:17   15    Q.  What type of flashlight was that?  What type of flashlight

16    was it?  Was it like a police-issued flashlight?

17    A.  No.  No.

18    Q.  It was your own flashlight?

19    A.  My own flashlight.

10:39:32   20    Q.  Okay.  What color was it?

21    A.  I have no idea.

22    Q.  Okay.  Why did you have a flashlight on you?

23    A.  Pardon?

24    Q.  Why did you have a flashlight on you?

10:39:40   25    A.  Because sometimes when you're working midnights, you go

Harris - direct

273

| | |
|---|---|
| 1 | into places where there is no light, and you need some |
| 2 | artificial, some type of artificial light. |
| 3 | Q.  It's not uncommon to have a flashlight on you as a police |
| 4 | officer, right? |
| 5 | A.  No. |
| 6 | Q.  A flashlight keeps you safe too, doesn't it? |
| 7 | A.  Keeps me safe? |
| 8 | Q.  Well, you could see in a dark area if you need to, right? |
| 9 | A.  Okay. |
| 10 | Q.  Now, at some point do you remember there being the light |
| 11 | coming up and there being natural daylight so you could make |
| 12 | out what was in the attic? |
| 13 | A.  Later in the morning, I went back.  I don't remember |
| 14 | specifically why I went back now, but, yes, I did go back |
| 15 | later.  It was lighter, and you could see better.  I don't |
| 16 | remember at this point specifically what I saw, but I know the |
| 17 | lighting was better when I went back the second time. |
| 18 | Q.  Okay.  Do you think some photographs would help you |
| 19 | recollect what you saw? |
| 20 | A.  I doubt it. |
| 21 | Q.  Well, let's try.  Tell me if it refreshes your |
| 22 | recollection about what you actually saw that night; okay? |
| 23 | A.  Okay. |
| 24 | Q.  Sergeant, I'm going to have you look at what's been marked |
| 25 | as Defendant's Exhibit 46; okay? |

10:39:59 (line 5)
10:40:08 (line 10)
10:40:30 (line 15)
10:40:49 (line 20)
10:41:11 (line 25)

| | |
|---|---|
| 1 | A.  I see 46. |
| 2 | Q.  Does that look familiar to you? |
| 3 | A.  No. |
| 4 | Q.  This doesn't stick out in your head in any way, right? |
| 10:41:27  5 | A.  Not at all. |
| 6 | Q.  Okay.  Sergeant, do you remember taking the names down of |
| 7 | all of the individuals that were in that house that you went |
| 8 | to? |
| 9 | A.  Did I take down the names? |
| 10:41:54  10 | Q.  Right. |
| 11 | A.  I don't have any recollection of that at all. |
| 12 | Q.  Is that something you would have done? |
| 13 | A.  No. |
| 14 | Q.  No?  Do you remember preparing any reports or anything in |
| 10:42:04  15 | connection with your work on this case, if you want to call it |
| 16 | that? |
| 17 | A.  Say that again? |
| 18 | Q.  Do you recall preparing any police reports or any types of |
| 19 | reports in connection with your activities related to this |
| 10:42:18  20 | case? |
| 21 | A.  No.  I signed a report, but I didn't prepare it. |
| 22 | Q.  You signed a report? |
| 23 | A.  Right. |
| 24 | Q.  And what type of report was that? |
| 10:42:27  25 | A.  The preliminary investigation, the patrol officers |

Harris - direct

1  prepare.

2  Q.  Mm-hmm.

3  A.  Then I sign.  I sign their report.

4  Q.  Gotcha.

10:42:41  5  A.  But I didn't actually prepare it.

6  Q.  So as a supervising sergeant, you signed the patrol

7  officer's report?

8  A.  Right.

9  Q.  All right.  And I take it you didn't interview any of the

10:42:55  10  witnesses or suspects in this case, correct?

11  A.  No.

12  Q.  Okay.  Do you remember whether there was a woman --

13  whether there were women that were in the house when you came

14  in the house?

10:43:06  15  A.  I don't recall.

16  Q.  Okay.  And have you ever worked at Area 2?

17  A.  No.

18  Q.  You've never -- have you ever been a detective?

19  A.  Yes.

10:43:20  20  Q.  Oh, when were you a detective?

21  A.  Roughly '69 through '76.

22  Q.  Okay.

23  A.  But that was not at Area 2.

24  Q.  What area were you at?

10:43:35  25  A.  I was at Area 3, which is at 39th and California, and

Harris - cross

276

```
            1   Area 1, 51st and Wentworth.
            2   Q.  Did you carry a rubber hose on you when you were doing
            3   your work as a detective?
            4           MR. HALE:  Objection.  Relevance.
10:43:54    5           THE COURT:  Objection sustained.
            6   BY MS. BONJEAN:
            7   Q.  Did you carry a gun on you?
            8   A.  Yes.
            9   Q.  Did you carry any weapons other than police-issued
10:44:02   10   weapons?
           11   A.  Weapons, no.
           12   Q.  All right.
           13           MS. BONJEAN:  I have nothing further.
           14           THE COURT:  Cross-examine.
10:44:25   15                   CROSS-EXAMINATION
           16   BY MR. HALE:
           17   Q.  Good morning, Sergeant Harris.
           18   A.  Good morning.
           19   Q.  I want to walk through with you some of the events that
10:44:33   20   you were just talking about.
           21           You did -- you were called to testify at
           22   Stanley Wrice's criminal trial in 1993, correct?
           23   A.  Right.
           24           MS. JACOBS:  '83.
10:44:49   25   BY MR. HALE:
```

Harris - cross

277

1   Q.  1983, correct?  I'm sorry.

2   A.  Yes.

3   Q.  1983.  I got the wrong date.  Correct?

4   A.  Correct.

10:44:54   5   Q.  And you were asked questions by both the state and then

6   also by Stanley Wrice's attorney, correct?

7   A.  I believe so, yes.

8   Q.  And you answered those questions truthfully, correct?

9   A.  Yes.

10:45:08   10   Q.  And to the best of your ability, right?

11   A.  Right.

12   Q.  And in 1983, this would have been -- it was the summer of

13   '83, less than a year after the crimes had been committed,

14   correct?

10:45:21   15   A.  Correct.

16   Q.  As you sit here today, is it fair to say you don't

17   remember every question and answer you gave at the criminal

18   trial?

19   A.  That's correct.

10:45:30   20   Q.  Okay.  And is it fair to say you don't know every single

21   topic you testified to and exactly how you answered each

22   question you were asked?

23   A.  That's correct.

24          MR. HALE:  And, Your Honor, we would be asking, the

10:45:45   25   defense would be asking to move into evidence at some point a

Harris - cross

278

1    summary of Sergeant Harris's entire criminal trial testimony.

2            MS. BONJEAN:  Judge, I would object to the extent

3    that it's cumulative to whatever Mr. Harris has testified to.

4    And they certainly can --

10:46:04    5            THE COURT:  Well, to the extent that it's past

6    recollection recorded and so forth, the defendants are

7    entitled to present evidence in their case.  So the objection

8    will be overruled.

9            But do you wish to proceed now with that?

10:46:23    10           MR. HALE:  I will ask a few more questions based on

11   the questions that were asked.

12           THE COURT:  All right.

13   BY MR. HALE:

14   Q.  Sir, you mentioned that when you approached, you said the

10:46:34    15   neighborhood was predominantly African American, correct --

16   A.  Right.

17   Q.  -- near 75th and Chappel?

18           You saw this white female by the car with these black

19   men.  Did you take down -- I think you said you took down the

10:46:46    20   license plate right away of the car?

21   A.  Pretty much, yeah, right away.

22   Q.  And did you do so because you thought maybe there was

23   something going on here potentially?

24   A.  No.

10:47:02    25   Q.  Why did you take the license plate down?

1    A.  That's customary for me.

2    Q.  Okay.

3    A.  Whenever I get out of the car, I don't know what's going

4    to eventually happen.  So I write down the license plate

10:47:18    5    number or anything else that may -- that I deem kind of may be

6    beneficial at a subsequent time.

7    Q.  Okay.  And when you approached the car, the woman's legs,

8    you observed that they were on the ground, right, not entirely

9    in the car; is that so?

10:47:37   10    A.  Yes.

11    Q.  And you had mentioned when you saw her, when you observed

12    the woman, you said she was slumped down in the car, correct?

13    A.  Well, that's what -- that's what the testimony -- I don't

14    recall her being -- I don't recall at this point that she was

10:47:57   15    slumped down.

16           MR. HALE:  If we could pull up from the trial

17    testimony page 1219, lines 4 through 5, and just show it to

18    the witness on the screen.

19    BY MR. HALE:

10:48:10   20    Q.  I want to see if I could refresh your recollection of the

21    testimony.

22           Did you get a chance to read it?  Is it before you?

23    A.  I see that.

24    Q.  Does that refresh your recollection that you testified at

10:48:22   25    the criminal trial that she was sitting slumped down in the

1  car?

2  A.  I see that, but does it reflect -- but does it refresh my

3  memory that she was slumped down?  I couldn't say.  I don't

4  know what -- at this point I don't know how that would

10:48:42   5  accurately describe how she was sitting.  But if it says

6  slumped down, then I guess she was slumped down.

7  Q.  Okay.  And you observed that the woman's voice appeared to

8  be slurred, correct?

9  A.  Well, that's what the testimony says, yes, it was slurred.

10:49:01  10  Q.  Right.  And would you like to see that testimony?  I don't

11  want to --

12  A.  No, I'm not questioning it, but, you know --

13  Q.  Okay.  So there was testimony that her voice was slurred.

14  And do you remember testifying that was a strong odor of

10:49:17  15  alcohol coming from her?

16  A.  Coming from the car.  I don't remember that I said it was

17  coming from her.  I remember that it was coming from the car

18  because I was concerned about all of the people who had

19  been -- who were in the car and may have been drinking.  That

10:49:37  20  was one of the things about the young guy.

21  Q.  If I could see if I could refresh your recollection with

22  your testimony with page 1220, lines 2 through 4.

23      After having read that, does your refresh your

24  recollection that your testimony was there was a strong odor

10:50:02  25  of alcohol coming from her?

Harris - cross

281

1    A.  It doesn't really reflect my -- that's the testimony.  If

2    I said it at that time then it's probably the case.  But at

3    this point, I don't recall that there was a strong odor of

4    alcohol.

10:50:18    5    Q.  Right.  And when you testified in 1983, obviously the

6    event was much fresher in your mind than today, right?

7    A.  Much.

8    Q.  Okay.

9    A.  Much.

10:50:25    10    Q.  Okay.  And do you recall that one of the persons indicated

11    to you that they were trying to help the lady?

12    A.  Yes.

13    Q.  Okay.  And did -- do you recall that the woman indicated

14    to you that they were trying to get her to her girlfriend's

10:50:51    15    house?

16    A.  I remember that they were trying to help her, but I

17    don't -- at this point I don't recall where they were trying

18    to get her to.

19    Q.  If I could see if I could refresh your recollection, let's

10:51:04    20    look at page 1221, lines 1 through 5 and lines 10 through 14.

21    A.  I see the testimony.

22    Q.  So does that refresh your recollection that you testified

23    that the woman indicated they were trying to help her, that

24    they were trying to get her to a girlfriend's house?

10:51:40    25    A.  You're saying does it refresh my recollection at this

Harris - cross

282

1  point?

2  Q.  Right.

3  A.  No, not really.

4      MR. HALE:  And I would offer the testimony as

10:51:53  5  substantive evidence, Your Honor.

6      MS. BONJEAN:  Judge, I'm going to object to this

7  point.  I have -- it's probably something that --

8      THE COURT:  Let's have a sidebar.

9      (Sidebar.)

10:52:10  10     THE COURT:  If we're going to rely upon the testimony

11  that was given at the trial because these witnesses don't

12  remember, it's just a huge waste of time to put them on the

13  stand when we can read the summary.  I appreciate you don't

14  want to do that, but --

10:52:25  15     MS. BONJEAN:  It's not that I don't want to do it.

16  There's other things that I want to prove.  I have the right

17  to do that with people who have first-hand knowledge.

18     THE COURT:  What have you gotten out of him other

19  than the fact that he doesn't have any memory?  But the

10:52:38  20  record, his testimony is basically what you're trying to get

21  out, I would assume.  I don't know what else you want out of

22  him.

23     MS. BONJEAN:  Okay.  Well, Judge -- last -- Judge,

24  you made an order regarding us putting in summaries.

10:52:50  25     THE COURT:  Yeah.

Harris - cross

283

1        MS. BONJEAN:  And you said for witnesses you're not
2   going to call live.  Now, this may come as a surprise --
3        THE COURT:  Hold on.  All I'm saying is that it seems
4   to me a huge waste of time.  I'm thinking about getting a
10:53:01
5   ruling, and I have I think it's under Rule 611 that I can
6   order that it's a waste of time if you're -- if all you're
7   going to get out of the witness is what he testified to at the
8   criminal trial, let's do the summary of the testimony.
9        MS. BONJEAN:  Okay.  So you're asking me to pre-try
10:53:17
10  my case so you can make a ruling about whether or not there's
11  going to be something additional I want to get out.
12       THE COURT:  Well, what did you get out of him that
13  you can't get out of the summary?
14       MS. BONJEAN:  Well, as it turns out, police officers
10:53:28
15  don't talk to me about what they remember.  I spoke to him.
16  He said he had some recollection.  I mean, I don't know until
17  he gets on the stand.  I spent no time with the man.  So if
18  they had information, which I think they did, that he had no
19  recollection, they could have --
10:53:41
20       THE COURT:  Well, they just told you the two other
21  witnesses you want called have no recollection.
22       MS. BONJEAN:  No, she told me -- actually the witness
23  that I spoke to that is next on our list told us she does
24  remember.
10:53:50
25       THE COURT:  All right.  Well --

1        MS. JACOBS:  She remembers pieces of it.

2        MS. BONJEAN:  Okay.  Well, if there's anything they

3   want to supplement, that is their right in their

4   case-in-chief.

5        THE COURT:  I know.  But I'm just saying that it

6   seems to me this has been somewhat of a waste of time, that

7   basically what you got out is what -- basically what they have

8   gotten out is what was in the record.

9        MS. BONJEAN:  I mean, isn't that -- okay.  I feel

10  like I'm getting both my hands tied behind my back because

11  last time -- hold on.  Please, can I finish?  I was told --

12       THE COURT:  Who said -- I didn't say anything.

13  Nobody said anything.

14       MS. BONJEAN:  I just get constantly interrupted.

15       THE COURT:  Who?  Nobody interrupted you.

16       MS. BONJEAN:  What I'm saying, Judge, is this Court

17  ruled and has ruled that the trial evidence -- I have to put

18  in the trial evidence to demonstrate materiality.  Fine.  I

19  get it.  I'm putting it in.  Now I'm being told I have to do

20  it in a specific way, and, you know, I just don't think that's

21  fair.

22       THE COURT:  It just takes forever to -- when they say

23  I don't remember what they said.  Okay.  Here's what you

24  testified to at the trial.  Does that refresh your

25  recollection?  Not really.

1    MS. BONJEAN:  Well, I wouldn't have known until he

2    came on the stand today.  So, you know --

3        THE COURT:  I appreciate that.  But they've told you,

4    and they're officers of the Court --

10:54:53    5        MS. BONJEAN:  They told me this morning.

6        THE COURT:  -- the two other witnesses.  I don't know

7    if this one --

8        MS. BONJEAN:  Them being officers of the Court do not

9    mean anything to me, with all due respect.  They have lied.

10:55:03    10        THE COURT:  Well, it means something to me.  And if

11    they don't --

12        MS. BONJEAN:  That's fine.  But them giving a

13    representation to me, I'm sorry, doesn't mean much to me, with

14    all due respect.

10:55:10    15        MS. COHEN:  There's only one other witness that would

16    not remember according --

17        MS. BONJEAN:  To them.

18        MS. COHEN:  -- to them, who told us --

19        MS. BONJEAN:  Who told me she does remember.

10:55:19    20        THE COURT:  All right.  Well, let's finish this

21    witness.  What --

22        MR. HALE:  Ten more minutes, I'll be done.

23        THE COURT:  All right.  Fine.

24        (End of sidebar.)

10:55:29    25        THE COURT:  Proceed.

Harris - cross

1           MR. HALE:  Okay.  Thank you, Your Honor.

2  BY MR. HALE:

3  Q.  Just a few more minutes, Sergeant Harris, if you could

4  bear with me.

10:55:42   5         You testified at the criminal trial, correct, that

6  you did not notice any injuries on the woman's face when you

7  saw her, correct?  Right?

8  A.  Right.  When I saw her initially?

9  Q.  Initially.

10:56:01  10  A.  Right.

11  Q.  And then after this encounter that you already testified

12  about, making your observations, taking down the license

13  plate, you then went back to your routine patrol, correct?

14  A.  Right.

10:56:11  15  Q.  Okay.  And then you talked about the assignment you got.

16  You got an assignment about 3:45 in the morning, correct, to

17  go to the hospital?

18  A.  Yes.

19  Q.  And you went into the emergency room?

10:56:20  20  A.  Right.

21  Q.  And you had been -- you were responding to a call of a

22  rape victim at the hospital, correct?

23  A.  Correct.

24  Q.  You didn't know who that victim was before you showed up,

10:56:31  25  correct?

Harris - cross

287

1    A.  No.

2    Q.  When you got to the hospital, you realized the woman you

3    saw at the hospital was the woman you had seen --

4    A.  Correct.

10:56:39    5    Q.  -- in the parking lot, right?

6    A.  Right.

7    Q.  Okay.  Now, when you saw that woman, you actually observed

8    her at the hospital, right?

9    A.  Right.

10:56:48    10    Q.  And when you saw her at the hospital, you saw that there

11    were bruises over her entire face, correct?

12    A.  Right.

13    Q.  And she had not had those bruises earlier, correct?

14    A.  That's correct.

10:57:07    15    Q.  And then you spoke with the detectives and told them that

16    this woman had been in the presence of these individuals you

17    had seen earlier that night, correct?

18    A.  Correct.

19    Q.  All right.  You received another assignment about 5:30 in

10:57:21    20    the morning, correct?

21    A.  Correct.

22    Q.  And that's when you went to the house at 7618 South

23    Chappel?

24    A.  Correct.

10:57:30    25    Q.  All right.  And you went inside the house, and you saw

1   some young men in the house, correct?

2   A.  Correct.

3   Q.  You saw -- one of the men you actually recognized from the

4   parking lot encounter, correct?

10:57:41   5   A.  I believe so, yes.  Yes.

6   Q.  And you noticed that there were -- there was garbage and

7   beer cans strewn all about the kitchen, on the sink, and on

8   the back porch, correct?

9   A.  Correct.

10:57:57   10   Q.  And you noticed that the top of the sink was littered with

11   garbage, correct?

12   A.  Yes.

13   Q.  And you also noticed there was charred material as though

14   paper or something had been burned?

10:58:10   15   A.  I -- at this point I don't recall that.  If it's in the

16   testimony, but I don't recall it at this time.

17   Q.  Let me see if I could just refresh your recollection.

18          If we could pull up page 1232, lines 21 through 22.

19   A.  I see that.

10:58:42   20   Q.  Does that refresh your recollection that you testified

21   there was charred material as though paper or something had

22   been burned?

23   A.  It does not refresh my memory at this time that I recall.

24   Do I recall that?  I don't remember that.

10:59:03   25   Q.  But you see the testimony before you?

Harris - cross

1    A.  I see the testimony, yes.

2    Q.  Okay.  And then you went up to the second floor, correct?

3    A.  That's correct.

4    Q.  And you saw a mattress under a window?

10:59:11    5    A.  At this point I don't recall that.

6    Q.  If I could refresh your recollection with page 1234, lines

7    1 through 3.

8    A.  Yes.

9    Q.  Does that refresh your recollection that you testified

10:59:30    10    that you saw a mattress under a window?

11    A.  I testified to it, yes.

12    Q.  And then you went back downstairs, and you spoke to two

13    patrol officers, Frankie Peters and her partner, I don't know

14    if I'm pronouncing this correctly.  It's spelled B-l-a-c --

10:59:51    15    A.  Blancher.

16    Q.  Blancher?

17    A.  Blancher.

18    Q.  You went downstairs and spoke to Officer Peters and

19    Blancher and told them to call an evidence technician, right?

11:00:01    20    A.  That's right.

21    Q.  Okay.  And then after giving those instructions to

22    Officer Peters and Blancher, you went back on your patrol,

23    correct?

24    A.  Right.

11:00:12    25    Q.  And there's one more segment.  You return to the second

Harris - cross

290

1   floor about 6:00 in the morning when it was now light out,

2   correct?

3   A. Right.

4   Q. All right. And you notice clothing in disarray all over

11:00:25   5   the floor, correct?

6   A. Correct.

7   Q. And beer bottles, an iron, ladies' panties and a bra,

8   correct?

9   A. Yes.

11:00:43   10      MR. HALE: If I could have a minute, Your Honor.

11     (Counsel conferring.)

12   BY MR. HALE:

13   Q. And like I said earlier, Sergeant Harris, you were called

14   as a witness at the criminal trial, and you were asked

11:01:02   15   questions; and you answered those questions truthfully and

16   accurately, correct?

17   A. Yes.

18   Q. Okay.

19      MR. HALE: Thank you, Sergeant Harris.

11:01:09   20      THE COURT: Anything further?

21      MR. HALE: I don't, Your Honor. Thank you.

22      MS. BONJEAN: I just have one question for

23   Sergeant Harris.

24               REDIRECT EXAMINATION

11:01:17   25   BY MS. BONJEAN:

Harris - redirect

1    Q.  Mr. Harris, you just testified that when you came to the

2    Chappel house, you recognized one of the individuals from the

3    parking lot.  Do you remember?

4    A.  Yes.

11:01:29    5    Q.  You just testified to that with -- do you remember that

6    question being asked by the attorney saying when you went

7    there you recognized one of the people?

8    A.  Right.

9    Q.  Was it the young guy that you had questioned about?

11:01:46    10    A.  I don't remember which one, but it was someone there that

11    I recognized from before.  But I don't remember which one.

12    Q.  Okay.  I'm going to have you look at real quickly, if you

13    would...

14        MS. BONJEAN:  Pull out 1231.

11:02:16    15        MR. HALE:  I'm sorry.  What was the page number?

16        MS. BONJEAN:  It's the original Bates stamp, but

17    1231.

18        Okay.  If you could pull out that question, Ash.

19    BY MS. BONJEAN:

11:02:42    20    Q.  Do you remember being asked whether you recognize the

21    young male, the young black male that you had seen at 75th and

22    Chappel, and that he was the person that had told you about

23    having just had a birthday?

24    A.  Right, yes.

11:02:55    25    Q.  And that's the person that you recognized in that house?

Taylor - direct

292

```
          1    A.  Yes.
          2    Q.  Okay.
          3              MS. BONJEAN:  I have nothing further.
          4              THE COURT:  You can step down.
11:03:01  5              Call your next witness, please.  Who is your next
          6    witness?
          7              MS. BONJEAN:  Frankie Peters.
          8              THE COURT:  Right up here, ma'am.  Up here.
          9              MS. BONJEAN:  We need you on the witness stand.
11:04:14  10             THE COURT:  Right up.  Thank you.
          11             Please raise your right hand.
          12         (Witness sworn.)
          13             THE COURT:  You may question the witness.
          14        FRANKIE A. TAYLOR, PLAINTIFF'S WITNESS, DULY SWORN,
          15                     DIRECT EXAMINATION
          16   BY MS. BONJEAN:
          17   Q.  Good morning, Ms. Peters.
          18   A.  Good morning.
          19   Q.  Do you go by Ms. Taylor or Ms. Peters?
11:04:35  20   A.  I'm Taylor now.  I was Peters then.
          21   Q.  Okay.  And could you introduce yourself to the ladies and
          22   gentlemen of the jury.
          23   A.  Good morning.  My name is Frankie A. --
          24             THE COURT:  Could you speak closer to the microphone,
11:04:48  25   please.
```

|  | 1 | THE WITNESS:  Good morning.  My name is Frankie A. |
|  | 2 | Taylor.  My name was Peters at that particular time. |
|  | 3 | BY MS. BONJEAN: |
|  | 4 | Q.  And do you live in the city of Chicago, ma'am? |
| 11:04:58 | 5 | A.  Yes. |
|  | 6 | Q.  And do you work presently? |
|  | 7 | A.  No. |
|  | 8 | Q.  Are you retired? |
|  | 9 | A.  Yes. |
| 11:05:03 | 10 | Q.  And from where are you retired? |
|  | 11 | A.  Chicago Police Department. |
|  | 12 | Q.  And what year did you retire from the Chicago Police |
|  | 13 | Department? |
|  | 14 | A.  2009. |
| 11:05:16 | 15 | Q.  How long did you work for the Chicago Police Department? |
|  | 16 | A.  32 years. |
|  | 17 | Q.  And what -- what was your highest rank in the Chicago |
|  | 18 | Police Department? |
|  | 19 | A.  Patrolman. |
| 11:05:23 | 20 | Q.  So you worked as a Chicago police officer for 32 years and |
|  | 21 | consistently as a patrol officer, correct? |
|  | 22 | A.  Yes. |
|  | 23 | Q.  And what are your responsibilities as a patrol officer? |
|  | 24 | A.  Your responsibility was to receive calls and go out and |
| 11:05:42 | 25 | handle the calls that you received. |

1 Q. Okay. Now, in September of 1982, were you a patrol

2 officer with the Chicago Police Department?

3 A. Yes, I was.

4 Q. And do you recall where you were assigned at that time?

11:05:58  5 A. The 4th police district.

6 Q. Okay. Where was that located?

7 A. 2255 East 103rd Street.

8 Q. And who was your supervising sergeant in September of

9 1982?

11:06:10  10 A. Sergeant Elbert Harris.

11 Q. Did you see him here earlier?

12 A. Yes, I did.

13 Q. Now, did you have a partner back on September 8th of 1982?

14 A. Yes.

11:06:26  15 Q. Who was your partner?

16 A. His last name was Blancher. I can't remember his first

17 name.

18 Q. Okay. As a patrol officer, did you wear a uniform or

19 plainclothes?

11:06:40  20 A. We wore a uniform.

21 Q. And did you drive a marked squad car or unmarked?

22 A. Marked.

23 Q. Now, specifically I want to draw your attention to the

24 early morning hours of September 9, 1982. I know that's a

11:06:57  25 long time ago. Do you have an independent recollection of at

Taylor - direct

295

1   least some of that morning?

2   A.  Some of it.

3   Q.  Okay.  And do you recall what your -- I will let you

4   know -- if there's anything that you don't remember, you need

11:07:11   5   a report or your prior testimony to refresh your recollection,

6   just let me know; okay?

7   A.  Okay.

8   Q.  Have you had a chance to look at your prior testimony?

9   A.  Yes.

11:07:25   10  Q.  Okay.  And do you remember giving testimony about an

11  incident that occurred on September 9th of 1982?

12  A.  Yes.

13  Q.  And where was that testimony given?  Do you remember what

14  court?

11:07:37   15  A.  In court.

16  Q.  Criminal court?

17  A.  Criminal court.

18  Q.  All right.  Now, what was your assignment on September 9,

19  1982?

11:07:43   20  A.  I was patrolling.  My beat number was 411.  And I was just

21  out on patrol.

22  Q.  And does that mean you were driving around looking to see

23  if there was anything that required a response?

24  A.  Just driving around, mm-hmm, on patrol.

11:08:01   25  Q.  And if you got a call, you would respond to it?

Taylor - direct

296

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And did you get a call on September 9, 1982? |
| 3 | A. Yes. |
| 4 | Q. What do you recall about that call? |
| 11:08:13 5 | A. We got a call to go to the Shell gas station on 76th and |
| 6 | Jeffrey. |
| 7 | Q. All right. And do you recall what the nature or why -- |
| 8 | what the call was for, why you were going there? |
| 9 | A. I think it was a robbery victim. |
| 11:08:40 10 | Q. That was your understanding? |
| 11 | A. Yes. |
| 12 | Q. Okay. When you got to that -- did you get to that |
| 13 | location? |
| 14 | A. Yes. |
| 11:08:49 15 | Q. And when you got there, what did you see? |
| 16 | A. When we got to the gas station, we was met by the gas |
| 17 | station attendant who told us that he had a lady who needed |
| 18 | the police. |
| 19 | Q. Okay. And did you actually then go and see the woman that |
| 11:09:06 20 | needed your assistance? |
| 21 | A. Yes, we got out the squad car and went inside the gas |
| 22 | station where we were met by the lady. |
| 23 | Q. Okay. Did you know the woman? |
| 24 | A. No. |
| 11:09:15 25 | Q. Did you recognize her? |

Taylor - direct

297

1   A.  No.

2   Q.  Okay.  Could you describe what you saw when you first --

3   when you saw the woman, describe what her appearance was.

4   A.  Her appearance was she was very disheveled.  Her hair, her

11:09:31   5   face looked like somebody had beat her.  Her lips was swollen,

6   and she was just a mess.

7   Q.  Okay.  And did you say anything to her when you saw her?

8   A.  I asked her what happened.

9   Q.  And what did she say?

11:09:49   10   A.  She -- well, she was sitting down, but she stood up and

11   she said, "Those men raped and burnt me."

12   Q.  Okay.  She said -- I'm sorry.  Go ahead.

13   A.  That's what she said to us.

14   Q.  Did she say anything else other than, "Those men raped and

11:10:09   15   burnt me"?

16   A.  No.  She stood up at this point and pulled her shirt back,

17   and we saw burnt marks of an iron on her body, and the iron

18   looked like a steam iron had been placed on her back.  And she

19   sort of like pulled down her pants, and you could see it going

11:10:32   20   all down her pants, her behind.

21   Q.  So when she pulled up her shirt, you could see the

22   injuries?

23   A.  Yes, you can, the actual imprint of an iron.

24   Q.  Okay.  And when she did this, who else was there beside

11:10:50   25   you?

Taylor - direct

298

1   A.  My partner.

2   Q.  Okay.  And this was in the gas station?

3   A.  Yes.

4   Q.  Okay.  Now, did she describe the men who had done this?

11:10:56  5   A.  No, she didn't describe the men.

6   Q.  Did she --

7   A.  All she said was "those men."

8   Q.  Okay.  Did she tell you any descriptions about the men

9  that had done that to her?

11:11:06  10  A.  No.

11  Q.  Now, after observing those burn injuries, where did you

12  go?

13  A.  Well, we said we need to put her in the car and take her

14  to the hospital because she was in such pain.  She was

11:11:25  15  moaning.  So we said we needed to take her to the hospital.

16  Q.  Did you do that?

17  A.  Yes, we put her in the car to take her to the hospital,

18  but we at first were going to drive her around to show us

19  where she thought she came from.  So we asked her, what

11:11:41  20  direction did you come from, and she pointed to the direction

21  she came from towards the back alley of this gas station that

22  was closed.  She pointed from that direction.  So we just

23  said, okay, we'll take her on to the hospital so we can make

24  our notification and let her see a doctor.  And then we'll

11:12:05  25  come back and investigate.

Taylor - direct

299

|  |  |  |
|--|--|--|
| | 1 | Q. Okay. And do you recall making a report in this case? |
| | 2 | A. Yes. |
| | 3 | Q. Okay. Did you have a chance to look at your report? |
| | 4 | A. Yes. |
| 11:12:15 | 5 | Q. Okay. Did the woman tell you how she actually ended up |
| | 6 | getting in a car with someone? |
| | 7 | A. She said that -- can I see the report? |
| | 8 | Q. Yes, absolutely. |
| | 9 | (Counsel conferring.) |
| 11:12:48 | 10 | BY MS. BONJEAN: |
| | 11 | Q. Plaintiff's Exhibit 17 for identification purposes. It's |
| | 12 | going to come up on the screen there. |
| | 13 | A. Okay. |
| | 14 | Q. Let me know if you need us to pull any part out. |
| 11:13:08 | 15 | A. I'm good. |
| | 16 | Q. Did she tell you how she came to be in a place where this |
| | 17 | happened? |
| | 18 | A. She was walking down the street when she was asked if she |
| | 19 | needed a ride home. |
| 11:13:18 | 20 | Q. Okay. And how many people asked her if she needed a ride |
| | 21 | home, according to her? |
| | 22 | A. I don't think she said how many. I think she said a male |
| | 23 | asked her if she needed a ride home. |
| | 24 | Q. A male asked her? |
| 11:13:29 | 25 | A. Mm-hmm. |

Taylor - direct

300

1    Q.  Did she say a male -- did she describe him in any way?

2    A.  No, she didn't.

3    Q.  She said he was a black man, I assume, right?

4    A.  Right.

11:13:42   5    Q.  Okay.  And was she able to tell you the exact location

6    where she was taken?

7    A.  No.

8    Q.  Okay.  Now, did she tell you that there were multiple men

9    who had sex with her?  Or I don't know what word she used.

11:14:04   10   A.  Yes.

11   Q.  Okay.

12       (Counsel conferring.)

13   BY MS. BONJEAN:

14   Q.  The woman also told you that the man that asked -- said he

11:14:22   15   would take her for a ride, she said she wanted to drink also,

16   correct?

17   A.  Yes.

18   Q.  And she told you she was an alcoholic, right?

19   A.  Yes.

11:14:33   20   Q.  Now, did the woman tell you how she had been raped

21   upstairs in an attic?

22   A.  No.

23   Q.  What did she say?

24   A.  Well, basically to me she just was saying that those men

11:14:47   25   raped and burnt her.

Taylor - direct

301

1   Q.  Okay.  But I'm going to have you look at your report.  Did

2   she say that they had taken turns having sex with her?  Is

3   that what she told you?

4   A.  Yes.

11:15:24    5   Q.  And did she tell you that when she was burnt she fainted

6   actually?

7   A.  Yes.

8   Q.  Now, after you had this conversation with her -- well,

9   strike that.

11:15:38    10      Did you call someone at some point after you had your

11  interaction with her?

12  A.  I called over to my sergeant to meet us at the hospital.

13  Q.  Okay.  And did he do that?

14  A.  Yes, he did.

11:15:48    15  Q.  Okay.  Now, did you get another assignment at some point?

16  A.  Okay.  I also called for the detectives to let them know

17  what we had over at the hospital.

18  Q.  Okay.  So were you the first person to let the detective

19  division know there was a woman who had been raped and burned

11:16:06    20  and that was in the emergency room?

21  A.  Yes.

22  Q.  All right.  And detectives responded?

23  A.  Yes.

24  Q.  Okay.  Now, did you get an assignment to go somewhere else

11:16:14    25  at some point?

Taylor - direct

302

1    A.  Oh, yes.  Later on while we was at the hospital still

2    doing our investigations, the detectives called us to meet

3    them at the house, at --

4    Q.  I'm sorry.  I didn't mean to interrupt you.  To have you

11:16:33    5    meet over at a house?

6    A.  A house, mm-hmm.

7    Q.  Did you know the significance of the house?

8    A.  No.

9    Q.  They just told you to come to an address?

11:16:40    10   A.  They told us to meet them over there.

11   Q.  Okay.  And did you do that?

12   A.  Yes.

13   Q.  And did you go alone, or did you go with someone?

14   A.  I went with my partner.

11:16:51    15   Q.  All right.  And would this have been about 4:30 in the

16   morning sound about right?

17   A.  Yes, about 4:30.

18   Q.  Okay.  Still dark outside?

19   A.  It was dark.

11:17:01    20   Q.  All right.  Now, when you got to the house, could you

21   describe what you saw when you arrived?

22   A.  Okay.  When we arrived in the house, we went in, and the

23   detective had people handcuffed.  About four guys and two

24   girls were handcuffed in the house when we got there.

11:17:28    25   Q.  You recall four men and two women, right?

Taylor - direct

303

1    A.  Yes.

2    Q.  And did you happen to get the names of all the

3    individuals?

4    A.  No, I didn't.

11:17:36    5    Q.  Okay.  And why did you not take down the names of the

6    individuals who were in custody in the living room?

7    A.  I didn't take the names down because at this point the

8    detectives are in charge.

9    Q.  Okay.  That wouldn't have been your job, right?

11:17:48   10    A.  No.

11    Q.  Was it your job to interview any of the women or the men

12    that were there?

13    A.  No, I had turned my preliminary investigation over to the

14    detectives.

11:17:58   15    Q.  Okay.  So, now, do you know why you were called to the

16    home?  Do you know what your purpose was in being called to

17    home?

18    A.  I'm assuming they called me and my partner over to the

19    house because I said the lady had been burnt.  And they want

11:18:21   20    us to come over there and see if we see anything.

21    Q.  Okay.  And do you know how long the detectives were there

22    before you got there?

23    A.  No.

24    Q.  Okay.  And what were the detectives doing when you got

11:18:33   25    there, if you recall?

Taylor - direct

304

| | | |
|---|---|---|
| | 1 | A.  I can't recall. |
| | 2 | Q.  All right.  Do you recall the house, like what it looked |
| | 3 | like? |
| | 4 | A.  It was a bungalow. |
| 11:18:43 | 5 | Q.  All right.  And when you get there and entered the house, |
| | 6 | did you -- what did you do once you went inside the house? |
| | 7 | A.  I went in and looked around.  I mean, I just started |
| | 8 | looking around. |
| | 9 | Q.  And do you recall being with Sergeant Byrne when you were |
| 11:19:05 | 10 | in the house? |
| | 11 | A.  Mm-hmm. |
| | 12 | Q.  Is that a yes? |
| | 13 | A.  Yes. |
| | 14 | Q.  Did you have any prior work experience with Sergeant |
| 11:19:12 | 15 | Byrne? |
| | 16 | A.  No, first time ever seeing him. |
| | 17 | Q.  And did you ever see him again? |
| | 18 | A.  No. |
| | 19 | Q.  Only time? |
| 11:19:17 | 20 | A.  I'm assuming that would have been the only time, or if I |
| | 21 | saw him in court for the case.  But other than that, no. |
| | 22 | Q.  Now, did you and Sergeant Byrne start looking around the |
| | 23 | house? |
| | 24 | A.  Yes. |
| 11:19:41 | 25 | Q.  And where did you go? |

Taylor - direct

305

1   A.  We went into the kitchen.  I think he went into the

2   kitchen with me.

3   Q.  Okay.  I'm going to show you some pictures and see if you

4   recall these pictures; okay?

11:19:57   5   A.  Okay.

6           (Counsel conferring.)

7   BY MS. BONJEAN:

8   Q.  First can I have you look at Defendant's Exhibit 43.

9           Do you recognize the house?

11:20:16   10   A.  Not really.  I can't remember.

11   Q.  It looks like a lot of bungalows, right?

12   A.  Yes.

13   Q.  How about let's try the kitchen.

14           MS. COHEN:  Exhibit 39.

11:20:37   15   BY MS. BONJEAN:

16   Q.  Defense Exhibit 39.

17           Do you remember that?

18   A.  Oh, yeah, the dirty kitchen.

19   Q.  You remember the dirty kitchen?

11:20:42   20   A.  Yeah.

21   Q.  And was that the way the kitchen looked when you went into

22   it?

23   A.  The sink was piled with dishes and burnt paper, newspaper.

24   Q.  Okay.  Anything else you recall?

11:20:54   25   A.  No.

Taylor - direct

306

1   Q.  Okay.  After observing the kitchen, did you go upstairs

2   anywhere?

3   A.  We went upstairs, yes.

4   Q.  Okay.

11:21:06   5          MS. COHEN:  Exhibit 46.

6   BY MS. BONJEAN:

7   Q.  Have you look at Defense Exhibit 46.

8          Do you remember that?

9   A.  Oh, yeah, the dirty bedroom.

11:21:15   10   Q.  Yeah.  Could you describe what you saw in there?

11   A.  A bed with a whole lot of stuff laying around the bed.

12   There was a dresser in there too.

13   Q.  Yeah, I'll show you that in a second.  You remember the

14   dresser as well?

11:21:32   15   A.  Mm-hmm.  Yes.

16   Q.  Okay.  Do you remember beer bottles in there?

17   A.  It was clutter, so it could have been beer bottles, yes.

18   Q.  Clothes strewn all over the place?

19   A.  Mm-hmm, clothes.

11:21:46   20   Q.  Other types of debris?

21   A.  Yes.

22   Q.  Okay.  Is this a fair reflection of what you recall when

23   you saw that?

24   A.  Fairly.

11:21:53   25   Q.  Okay.

Taylor - direct

307

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|           | 1  | MS. BONJEAN:  The dresser.                                    |
|           | 2  | MS. COHEN:  Exhibit 51, Defendant's Exhibit 51.              |
|           | 3  | BY MS. BONJEAN:                                              |
|           | 4  | Q.  I'm going to show you Defendant's Exhibit 51.            |
| 11:22:01  | 5  | Do you remember the dresser?                                 |
|           | 6  | A.  Yes.                                                      |
|           | 7  | Q.  Okay.  Now, when you first went up to the attic, what were |
|           | 8  | the lighting conditions?                                      |
|           | 9  | A.  It was dark, dusk, dawn.  It was beginning to get light   |
| 11:22:18  | 10 | outside, but the detective had a flashlight.                 |
|           | 11 | Q.  Was it Sergeant Byrne with you or the detective?         |
|           | 12 | A.  Sergeant Byrne.                                           |
|           | 13 | Q.  He was a detective, but he was a supervisor, right?      |
|           | 14 | A.  Right.  Right.                                            |
| 11:22:32  | 15 | Q.  So Sergeant Byrne had a detective -- had a flashlight with |
|           | 16 | him, correct?                                                 |
|           | 17 | A.  Yes, mm-hmm.                                              |
|           | 18 | Q.  And did you have a flashlight with you?                  |
|           | 19 | A.  No.                                                       |
| 11:22:39  | 20 | Q.  Okay.  Were you able to see without a flashlight with any |
|           | 21 | detail in that area?                                          |
|           | 22 | A.  I can't recall.  Not really.                             |
|           | 23 | Q.  Okay.  Did you eventually leave the attic?              |
|           | 24 | A.  I left.                                                   |
| 11:22:57  | 25 | Q.  Okay.  Did you leave Sergeant Byrne up there?          |

Taylor - direct

308

1    A.  No, I think Sergeant Byrne came behind me.

2    Q.  Okay.  And then what did you do after you came down from

3    the attic?

4    A.  I went back downstairs, and I can't recall what I did at

5    that particular moment.  I can't recall.

6    Q.  Did there come a time when you went back upstairs?

7    A.  Yes, I did.  I went back upstairs.

8    Q.  Okay.  And did you have -- and what prompted you to go

9    back upstairs?

10   A.  I can't recall, but I did go back upstairs.

11   Q.  Was it light -- was it more light out?

12   A.  It was -- yeah, it had -- the daylight had start coming

13   in.

14   Q.  Okay.  And at that point, did you know that there was a

15   crime scene upstairs?

16   A.  Yes.

17   Q.  Okay.  And did you go up there to take inventory of

18   potential evidence?

19   A.  Yes, I went upstairs to look again with my sergeant.

20   Q.  Okay.  And do you know if there were any lab people or

21   people that came and collected the evidence?

22   A.  No.  At that particular time, they had not collected

23   evidence.

24   Q.  Okay.  Were you responsible for photographing the

25   evidence?

Taylor - direct

309

```
            1   A.  No.
            2   Q.  Okay.  But you would agree that the evidence was right out
            3   there in plain view, right?
            4   A.  Right in plain view.
11:24:23    5       (Counsel conferring.)
            6   BY MS. BONJEAN:
            7   Q.  I'm going to have you look at Defendant's Exhibit 38.
            8       Do you remember seeing that iron just right there?
            9   A.  Yes.
11:24:47   10   Q.  Okay.  Beer bottle right there?
           11   A.  Yes.  Yes.
           12   Q.  Do you recall seeing the victim's underwear and bra up
           13   there?
           14   A.  I recall seeing a pair of underwear.
11:25:05   15   Q.  Okay.  I'm going to show you --
           16       MS. COHEN:  52.
           17   BY MS. BONJEAN:
           18   Q.  Defense Exhibit 52.
           19       Do you remember seeing that?
11:25:15   20   A.  Yes.
           21   Q.  Do you recall seeing a broken hanger right there?
           22   A.  I don't recall the hanger, but I recall seeing the
           23   underwear.
           24   Q.  Right.  Do you know whether there was any significance to
11:25:27   25   the hanger?
```

Taylor - direct

310

1   A.  Pardon me?

2   Q.  Do you know if there was any significance to the hanger,

3  evidentiary significance?

4   A.  No.

11:25:34  5   Q.  I mean, did the woman tell you that she was beat with a

6  hanger or anything like that?

7   A.  No.

8   Q.  Okay.  Do you recall seeing a bra up there?

9   A.  Yes.

11:25:48  10   Q.  I'll have you look at Defendant's Exhibit 53.

11   A.  Yes.

12   Q.  Okay.  This looks as you recall it, right?

13   A.  Yes.

14   Q.  Do you recall seeing a woman's shoe up there?

11:26:05  15   A.  Yes.

16   Q.  Defense Exhibit 45, and we're going to pull that out.

17       Do you recall seeing that shoe?

18   A.  Yes.

19   Q.  That was right there in plain view, right?

11:26:14  20   A.  Mm-hmm.  Yes, it was.

21   Q.  And did you -- do you recall ever determining whether or

22  not that shoe belonged to the victim?

23   A.  No, I don't recall.

24   Q.  Okay.  But you remember seeing that, correct?

11:26:24  25   A.  Yes.

Taylor - direct

311

```
                1   Q.  None of that stuff is in a trash bag hiding anywhere,
                2   right?  That was right out in plain view, correct?
                3   A.  Yes.
                4   Q.  How long were you in the house, do you know, total?
11:26:41        5   A.  Maybe an hour total, or an hour and a half.  I'm not for
                6   sure.
                7   Q.  And were the individuals who were in the living room there
                8   the entire time?
                9   A.  They were there the entire time.
11:27:00       10   Q.  And did you transport any of them eventually?
               11   A.  No.
               12   Q.  You didn't transport anyone?
               13   A.  No.
               14   Q.  After you left the house, did you ever go back to the
11:27:10       15   house?
               16   A.  No.
               17   Q.  Did you go to Area 2?
               18   A.  No.
               19   Q.  Okay.  Where did you go?
11:27:14       20   A.  To 103rd.
               21   Q.  Okay.
               22   A.  It was getting close to me getting off of work.
               23   Q.  Okay.  So your shift was about to come to an end?
               24   A.  Yes, and I had completed my investigation.
11:27:25       25   Q.  And did you take any other actions with this case after
```

Taylor - cross

312

1  that?

2  A.  Pardon me?

3  Q.  Did you take any other investigative actions with the case

4  after leaving the house?

11:27:35  5  A.  No.

6  Q.  But you did testify at the criminal trial, correct?

7  A.  Yes.

8  Q.  You testified to what you testified to here today,

9  correct?

11:27:42  10  A.  Yes.

11       MS. BONJEAN:  Okay.  I have nothing further.

12       THE COURT:  We'll take a 15-minute recess, and we'll

13  have the cross-examination.

14       (Jury exits.)

11:36:25  15       (Recess.)

16                   CROSS-EXAMINATION

17  BY MS. JACOBS:

18  Q.  Good morning, Ms. Taylor.

19  A.  Good morning.

11:47:05  20  Q.  My name is Caryn Jacobs, and I represent the defendants.

21       Directing your attention to the police work that you

22  did in connection with the attack on Karen Byron, do you

23  recall testifying at the trial of the rape and murder -- rape

24  and --

11:47:26  25       MS. BONJEAN:  Objection.  There's no murder involved

Taylor - cross

1    here.

2    BY MS. JACOBS:

3    Q.  Of the rape and beating and burning of Karen Byron?

4    A.  Yes.

11:47:33    5    Q.  And do you remember being recently provided with a copy of

6    that testimony by the plaintiff's counsel in this case?

7    A.  Yes.

8    Q.  And did you review it in connection with coming to court

9    today?

11:47:47    10    A.  Yes.

11    Q.  And you answered a lot of questions at that trial as to

12    what you observed and what you noticed in the course of that

13    call to the gas station, correct?

14    A.  Yes.

11:48:04    15    Q.  And you answered similar questions about going to the

16    house and going to the hospital, right?

17    A.  Yes.

18    Q.  And when you gave all that testimony at trial, did you

19    testify truthfully and accurately in response to all of those

11:48:19    20    questions?

21    A.  Yes.

22    Q.  And were the facts of your testimony fresh in your mind at

23    that time?

24    A.  Yes.

11:48:25    25    Q.  That time was only a few months after the event versus

Taylor - cross

314

1   today, which is close to 38 years later, correct?

2   A.  Correct.

3   Q.  Okay.  Do you remember every detail about the facts you

4   observed and testified about sitting here today?

11:48:42  5         MS. BONJEAN:  I'm going to object to the compound

6   nature of that question.

7         THE COURT:  Overruled.

8         You can answer.

9   BY THE WITNESS:

11:48:47  10   A.  Yes.

11   BY MS. JACOBS:

12   Q.  But some of the details you don't recall, such as some of

13   the photographs you testified you didn't recall in your direct

14   exam; is that right?

11:48:57  15   A.  That's correct.

16   Q.  Okay.  So some of the details you recall, and some of them

17   you don't; is that correct?

18   A.  Correct.

19   Q.  Okay.  Now, incidentally, you recall testifying on direct

11:49:08  20   about Karen Byron pointing you towards the alley when you

21   asked her where did you come from?

22   A.  That's correct.

23   Q.  Okay.  But you didn't go to the alley --

24   A.  No.

11:49:20  25   Q.  -- and investigate where she directed you; is that

Taylor - cross

315

1  correct?

2  A.  Correct.  We were going to go later after we got her to a

3  hospital.

4  Q.  So whether or not Karen Byron could have directed you to

11:49:32  5  the exact location of the house in the alley, you never found

6  out because you took her directly to the hospital; is that

7  correct?

8  A.  That's correct.

9  Q.  Okay.  And why did you take her directly to the hospital

11:49:44  10  rather than conducting an investigation of where she had been

11  burned and beaten and raped?

12  A.  Because she was in pain, and she was moaning in pain.  So

13  we felt that we should just go and take her to the hospital.

14  Q.  Okay.  And she was repeatedly saying to you, "These men

11:50:05  15  raped and burned me," wasn't she?

16  A.  Yes.

17  Q.  And you noticed that she was in severe pain at the gas

18  station, correct?

19  A.  Correct.

11:50:18  20  Q.  And then when you took her to the trauma center at the

21  Jackson Park Hospital, you noticed she was still in severe

22  pain; is that right?

23  A.  Yes, she was.

24  Q.  So did you do a full-fledged investigative interview of

11:50:32  25  Karen Byron when she was writhing in pain?

Taylor - cross

316

1 A. No.

2 Q. Okay. Now, do you recall that when you came to the house

3 at 7618 South Chappel that some detectives were there?

4 A. Yes.

11:51:01  5 Q. And do you remember those detectives' names?

6 A. Not offhand.

7 Q. Do you recall that there were detectives at Jackson Park

8 Hospital?

9 A. Yes, I think the detectives did come to the hospital

11:51:17 10 first.

11 Q. And you recall that those -- the names of those detectives

12 were Detectives Dignan and Dioguardi?

13 A. Yes.

14 Q. Now, you recall that Ms. Bonjean showed you a picture of

11:51:34 15 the kitchen sink in the house that you observed when you

16 visited the house that morning, correct?

17 A. Yes.

18 Q. And that was the morning of September 9, 1982, correct?

19 A. Correct.

11:51:47 20 Q. And do you recall that in addition to burnt paper, there

21 were newspapers that had been rolled up and were burned laying

22 in the sink?

23 A. Yes.

24 Q. Now, next to the sink, do you recall that there was a

11:52:06 25 stairway, a little stairway?

Taylor - cross

317

1    A.  Yes.

2    Q.  Your testimony was that it was a little stairway.  Do you

3    recall saying a little stairway?

4    A.  I can't recall.

11:52:23    5         MS. JACOBS:  Could we show the witness, please, DX

6    293 at page 5034, the Q and A at lines 1 through 4.

7    BY MS. JACOBS:

8    Q.  Could you take a look at that testimony and then tell me

9    whether it refreshes your recollection as to whether you

11:52:45    10   testified:  "All right.  Next to the sink, it was some stairs,

11   stairway, a little stairway"?

12   A.  Yes.

13   Q.  Okay.  And what did you mean when you said "a little

14   stairway"?

11:53:03    15   A.  It wasn't -- what I meant when I said "a little stairway"

16   was it wasn't a -- real large.  I think only one person could

17   go up at a time when I said "little stairway."

18   Q.  Okay.  So it was a small stairway going up to an attic; is

19   that right?

11:53:21    20   A.  Going up to the attic.

21   Q.  Was it a full-fledged second floor, or was it more of a

22   short second floor?

23   A.  I can't remember.

24   Q.  Okay.  And you went up the stairs sometime that morning

11:53:37    25   with Sergeant Byrne; is that right?

Taylor - cross

318

1    A.  Yes.

2    Q.  Okay.  I would like to show you what has been marked as DX

3    20, which was marked PX 28 at the criminal trial.

4         I don't know if you want to take a look at it.

11:54:01    5    Should I hand it to you?  Do you remember that this was the

6    iron that you saw in the house on September 9, 1982?

7    A.  Yes.  Yes.

8    Q.  And that iron was lying on the floor in the bedroom?

9    A.  Yes, it was.

11:54:24   10    Q.  And it was lying on the floor at the bedroom when you went

11    up to the bedroom.  That was the position it was in when you

12    went into the bedroom, correct?

13    A.  Yes.

14    Q.  Now, I would like to show you what's been marked People's

11:54:42   15    Exhibit -- what was marked People's Exhibit 36 at the trial

16    and what we've marked Defendant's Exhibit 123.

17         Seeing this shoe in person, does it refresh your

18    recollection that that's the shoe that you saw at the house on

19    September 9, 1982?

11:55:12   20    A.  Yes.

21    Q.  I would like to now show you DX 122, which was marked at

22    trial as PX 39, which are the beige panties.  This one might

23    be a little harder.

24         Do you remember that those were the panties you saw

11:55:38   25    at the Chappel house on September 9, 1982?

Taylor - cross

319

1    A.  Yes.

2    Q.  And, finally, I would like to show you DX Exhibit 121,

3    which is PX 29.

4          Can you tell me what this is?

11:56:00    5    A.  It's a two-prong fork.

6    Q.  And do you recall that that was the fork that was on the

7    dresser in the attic room on September 9, 1982?

8    A.  Yes.

9    Q.  When you observed Karen Byron at the gas station, did she

11:56:22    10   have any marks on her face that were -- or marks that you

11   observed that appeared to be from that fork?

12   A.  Yes.

13   Q.  Could you tell us what you recall?

14   A.  I recall she had black dots over her body.  And I was

11:56:46    15   saying to myself, looked like she had been burned with a fork.

16          MS. BONJEAN:  I object to what she was saying to

17   herself.

18   BY THE WITNESS:

19   A.  I thought --

20   BY MS. JACOBS:

21   Q.  Go ahead.

22          THE COURT:  Wait.  Wait a second.

23          MS. BONJEAN:  She can testify to her observations.

24          THE COURT:  Well, technically just what you observed,

11:57:11    25   not what you were saying to yourself.

Taylor - cross

320

1    Proceed.

2   BY MS. JACOBS:

3   Q.  You could testify as to what you observed about fork marks

4   on Karen Byron.

11:57:22    5    MS. BONJEAN:  Objection, Judge.  She didn't say

6   anything about fork marks, and that's an improper question.

7    THE COURT:  Wait.  Wait.

8    What she said was black dots.  So rephrase the

9   question using her language.

11:57:33   10   BY MS. JACOBS:

11   Q.  Could you -- I'm going to ask a different question.

12    Do you recall what you observed on Karen Byron

13   relating to the fork?

14    MS. BONJEAN:  Objection.

11:57:45   15    THE COURT:  Overruled.  She can answer.  It's

16   cross-examination.

17   BY THE WITNESS:

18   A.  I saw black dots on her body, circled around her body,

19   looking like she may have been burnt with a fork.

11:58:00   20   BY MS. JACOBS:

21   Q.  Okay.  Now, I would like to be -- I would like to ask that

22   you be shown DX 40, which was PX 7 at the criminal trial.

23    MS. JACOBS:  And I think this can be published to the

24   jury.

11:58:28   25   BY MS. JACOBS:

Taylor - cross

1   Q.  Could you tell us what this is?

2   A.  It's a fork sitting on the dresser.

3   Q.  And there's a red hat on it?

4   A.  Yes.

11:58:38  5   Q.  So a red hat and a fork are sitting on this dresser?

6   A.  Yes.

7   Q.  And do you recall observing this in the upstairs area when

8  you were at the house on September 9, 1982?

9   A.  Yes.

11:58:49  10   Q.  And, finally, I would like to ask you to look at DX 42,

11  which is PX 4.

12       Do you recall that this is the back porch of the

13  house at 7618 South Chappel on or about the day of

14  September 8, 1982?

11:59:23  15   A.  I can't recall.

16   Q.  But you did -- you were able to recall and testify about

17  that at your criminal trial; is that right?

18   A.  Yes, I was.

19   Q.  And that was truthful testimony at the time; is that

11:59:34  20  right?

21   A.  Yes.

22       MS. JACOBS:  Just one moment, please.

23     (Counsel conferring.)

24  BY MS. JACOBS:

11:59:52  25   Q.  You remember seeing Karen Byron at the gas station that

Taylor - cross

322

1   night on September 9, 1982; is that right?

2   A.  Correct.

3   Q.  Why do you remember that?

4   A.  Because -- why do I remember seeing her?

12:00:09  5   Q.  Yes.  Why do you remember this event so well?

6   A.  I would --

7         MS. BONJEAN:  I'm going to object.

8         THE COURT:  She could -- the original question about

9   the event so well, why does she remember, she can answer.

12:00:27  10         Go ahead.

11   BY THE WITNESS:

12   A.  I remember because it was a white girl, and I was

13   wondering at this particular time why would a white girl be on

14   76th and Jeffrey at that time of the morning looking like she

12:00:46  15   was looking.  So it stood out in my mind.

16   BY MS. JACOBS:

17   Q.  And did it stand out in your mind the iron marks all over

18   her body?

19   A.  Oh, yes.  I mean, you don't every day see somebody with

12:01:01  20   burnt marks going down their backs and their behind.  And you

21   can actually see the imprint of the iron with the circles from

22   the iron embedded in her body.

23   Q.  And the circles from the iron were where the steam came

24   out; is that right?

12:01:16  25   A.  Yeah, like it was a steam iron.

Taylor - cross

323

1   Q.  Would anyone who had looked at Karen Byron in the

2   condition you saw her at the gas station be able to say that

3   she looked normal?

4           MS. BONJEAN:  I'm going to object to would anyone be

12:01:33    5   able to say in the condition.  It's not an appropriate

6   question.

7           MS. JACOBS:  Your Honor, the defendant said she

8   looked normal.  So I'm entitled to ask the question.

9           MS. BONJEAN:  She's not allowed to be an expert on

12:01:48    10   the credibility of my client.  That's for the jury.

11           THE COURT:  Wait a minute.  She has answered the

12   question.  Let's move on.

13   BY MS. JACOBS:

14   Q.  Would anyone who looked at Karen Byron --

12:02:00    15           MS. BONJEAN:  Objection.

16           MS. JACOBS:  I haven't asked the question yet,

17   Ms. Bonjean.

18   BY MS. JACOBS:

19   Q.  Would anyone who looked at Karen Byron at the gas station

12:02:07    20   on September 8th -- I'm sorry -- on September 9, 1982 be able

21   to say that there was nothing unusual about the way she

22   looked?

23           MS. BONJEAN:  Again, I'm going to object to what

24   anybody would say.

12:02:19    25           THE COURT:  That's -- she's already testified what

1   she observed and that it was clear, so I think that's

2   sufficient.  Objection is sustained.

3          Anything further?

4   BY MS. JACOBS:

12:02:31  5   Q.  Yes.  Did she look normal to you that night?

6   A.  No.

7          THE COURT:  Anything further?

8          MS. BONJEAN:  Yes.

9          MS. JACOBS:  Nothing further, Your Honor.

12:02:42  10          THE COURT:  Okay.  Proceed.

11                    REDIRECT EXAMINATION

12   BY MS. BONJEAN:

13   Q.  Ms. Taylor, you testified that when you gave your

14   testimony at the criminal trial, it was accurate, right?

12:02:56  15   A.  Yes.

16   Q.  Truthful, correct?

17   A.  Truthful, to my knowledge.

18   Q.  As complete as you could be, right?

19   A.  Yes.

12:03:05  20   Q.  Okay.  You weren't withholding any information, right?

21   A.  No.

22   Q.  Okay.  And isn't it true that you didn't mention anything

23   about seeing black dots at the trial?

24   A.  I did not.  I did not, but they were there.  That's why I

12:03:17  25   thought the fork was important --

Taylor - redirect

325

| | | |
|---|---|---|
| | 1 | Q. Okay. |
| | 2 | A. -- when I got back to the house, and we were going through |
| | 3 | the house. |
| | 4 | Q. Okay. But you didn't actually -- |
| 12:03:28 | 5 | A. I didn't put it in my report. |
| | 6 | Q. You didn't put it in your report, right? |
| | 7 | A. No. |
| | 8 | Q. You didn't testify about it, correct? |
| | 9 | A. No, I was never asked about it. |
| 12:03:35 | 10 | Q. Well, that's not true, ma'am. You were asked about your |
| | 11 | observations of her injuries, right? |
| | 12 | A. Okay. |
| | 13 | Q. Would you like to see your testimony? |
| | 14 | A. Okay. |
| 12:03:44 | 15 | Q. Let's pull up -- okay. I'm going to have you look at your |
| | 16 | testimony. It's at page 1109. |
| | 17 | A. Mm-hmm. |
| | 18 | Q. And you were asked: |
| | 19 | "Q. Could you describe her appearance when you first |
| 12:04:11 | 20 | observed her at the gas station?" |
| | 21 | A. Right. |
| | 22 | Q. And you answer: |
| | 23 | "All right. Her face was -- looked like someone had |
| | 24 | beater her up about the face. Her lips looked like they |
| 12:04:25 | 25 | had been cut up. Her hair was standing all over her head. |

Taylor - redirect

326

1  She  had on a blouse, and it looked like it was dirty, and it

2  was  opened up.  And her pants, she had on some blue jeans."

3       Do you see that?

4  A.  I see it.

12:04:37  5  Q.  Okay.

6  A.  I see it.

7  Q.  And that's what you first saw when you went to the gas

8  station, right?

9  A.  Yes.

12:04:40  10  Q.  And you didn't actually see the burns until she lifted up

11  her shirt, right?

12  A.  Right, when she showed them to me.

13  Q.  Right.  When she lifted them up and showed them to you,

14  correct?

12:04:46  15  A.  Mm-hmm.

16  Q.  And she also took her pants down a little bit?

17  A.  Mm-hmm.  Because she said she had been burnt.

18  Q.  Right.  She told you she had been burnt.  But you didn't

19  know that until she told you, right?

12:04:55  20  A.  No, I didn't know she had been burnt until she told me.

21  Q.  Right.  Until she actually removed her clothing and showed

22  you, right?

23  A.  Right.

24  Q.  Okay.  And I'm going to have you look at the next page, if

12:05:10  25  you would.

Taylor - redirect

327

```
          1   A.  Okay.

          2   Q.  Okay.  Do you see that?

          3        And this testimony depicts what you remember seeing

          4   when she showed you her burns, right?

12:05:25  5   A.  Mm-hmm.

          6   Q.  And, again, you didn't mention anything about seeing any

          7   black dots, right?

          8   A.  No, I didn't.  I didn't.

          9   Q.  Okay.  All right.  And you didn't put it in your report,

12:05:35  10  correct?

          11  A.  No.

          12  Q.  Is that right?

          13  A.  Right.

          14  Q.  The first time you're mentioning anything about thinking

12:05:41  15  those black dots had something to do with the fork is here

          16  today in this courtroom 37 years later, right?

          17  A.  Okay.  Yes.

          18  Q.  That's correct, right?

          19  A.  Yes.

12:05:50  20  Q.  Okay.

          21        THE COURT:  Anything further?

          22        MS. BONJEAN:  One last thing.

          23        THE COURT:  All right.

          24  BY MS. BONJEAN:

12:05:56  25  Q.  I'm going to have you look at your report one last time.
```

| | | |
|---|---|---|
| | 1 | MS. COHEN:  Plaintiff's Exhibit 17. |
| | 2 | BY MS. BONJEAN: |
| | 3 | Q.  Plaintiff's Exhibit 17. |
| | 4 | Is that your report, ma'am? |
| 12:06:11 | 5 | A.  Yes, it is. |
| | 6 | Q.  I would like you to please look at your report on the |
| | 7 | first page, and the second page when you're done.  And could |
| | 8 | you tell me where it was that you notated that Karen Byron |
| | 9 | told you, "Those men raped and burnt me"? |
| 12:06:39 | 10 | MS. BONJEAN:  Go to the next page, Ash. |
| | 11 | (Counsel conferring.) |
| | 12 | THE WITNESS:  Okay. |
| | 13 | BY MS. BONJEAN: |
| | 14 | Q.  Is it in there? |
| 12:07:06 | 15 | A.  No, it's not in mine. |
| | 16 | Q.  Okay.  And I'm not -- |
| | 17 | MS. JACOBS:  Hold on.  Let her finish. |
| | 18 | BY MS. BONJEAN: |
| | 19 | Q.  Go ahead.  I'm sorry. |
| 12:07:12 | 20 | A.  No, it's not down in the narrative part. |
| | 21 | Q.  Okay.  And I'm not suggesting she wasn't raped, but those |
| | 22 | words that you testified to -- |
| | 23 | A.  Mm-hmm. |
| | 24 | Q.  -- are not in your report, right? |
| 12:07:20 | 25 | A.  No, it's not in the narrative. |

Taylor - redirect

329

1    Q.  Okay.  And, again, you did notate on the top of the report

2    that this was a rape, right?

3    A.  Yes.

4    Q.  Okay.  And there's no question that this was a rape,

12:07:33    5    right?

6    A.  Right.

7    Q.  Okay.  But those words didn't appear in your narrative;

8    isn't that correct?

9    A.  Correct.

12:07:37    10    Q.  Now, just one last thing.  Ms. Byron told you -- did she

11    tell you what prompted the burning based on what you have

12    written here or what you reported?

13    A.  I think -- no, let me rephrase.

14          They got upset with her because she wouldn't do

12:08:04    15    something else that they wanted her to do.

16    Q.  Oral sex?

17    A.  Yeah.

18    Q.  Thank you.

19          MS. BONJEAN:  I have nothing further.

12:08:12    20          THE COURT:  You can step down.

21          MS. JACOBS:  Your Honor, I have a brief --

22          THE COURT:  All right.  Quickly.

23                    RECROSS-EXAMINATION

24    BY MS. JACOBS:

12:08:19    25    Q.  Ms. Taylor.

1  A.  Yes.

2  Q.  Were you telling the truth at the trial --

3  A.  Yes, I was.

4  Q.  -- when you said Ms. Byron repeatedly said, "Those men

5  raped and burned me"?

6  A.  Yes, I was.

7        MS. JACOBS:  I have nothing further.

8        THE COURT:  Okay.  You can step down.

9        Call your next witness.

10       MS. BONJEAN:  Judge, we want to do the summaries,

11  so --

12       MS. JACOBS:  Your Honor, we haven't even seen them.

13       THE COURT:  Okay.  I'm going to -- I'll have them, a

14  whole slew of them ready for you at -- when we -- after the

15  noon break.  So call one witness, if you can.

16       MS. BONJEAN:  I can't, Judge, until those

17  summaries -- I really can't until the summaries are completed.

18  And I --

19       THE COURT:  Which one do you want to put up?

20       MS. JACOBS:  Your Honor, do you have our redlines?

21       THE COURT:  Which one do you want to put on?  A bunch

22  of them have been --

23       MS. BONJEAN:  Yes, we put --

24       MS. JACOBS:  I don't think Your Honor has our

25  redlines.

1    THE COURT:  Yes, I do.  I've got a bunch of redline

2    ones I've already gone through.

3         Which ones do you want to --

4         MS. BONJEAN:  So we wanted to read Karen Byron's and

12:09:18    5    at least George Wilson's at this time.  And we --

6         THE COURT:  You want Karen Byron and who else?

7         MS. BONJEAN:  George Wilson, Judge, and Jim Sanders,

8    whenever the Court is ready to rule on that.

9         THE COURT:  Okay.  Byron -- Karen Byron's is not

12:09:39    10    available at this precise moment, but let's see.  George

11    Wilson is.  And what was the other one?

12         MS. BONJEAN:  Jim Sanders, Judge.

13         MS. JACOBS:  Your Honor, I would like to request a

14    sidebar.

12:10:10    15    THE COURT:  All right.

16    (Sidebar:)

17         MS. JACOBS:  Your Honor, you are about to put into

18    evidence at a major trial where the City is exposed to

19    millions of dollars of liability that none of us have had a

12:10:29    20    chance to read --

21         THE COURT:  What do you mean?  You commented on it.

22         MS. JACOBS:  I haven't seen her new draft.

23         MS. BONJEAN:  That's not true.  You were sent that.

24         MS. JACOBS:  It was sent this morning at 9:30.

12:10:36    25    THE COURT:  All right.  Here's -- my ruling has been

332

1    that as far as these are concerned that all of the objections

2    were that it was unnecessary, and that seems to me that's more

3    trouble than it's worth.  So I'm overruling those objections.

4    We'll read them the way they were submitted.

12:10:53    5              MS. JACOBS:  Your Honor, I don't think you have our

6    redline.  Whatever you --

7              THE COURT:  Yes, I do.

8              MS. JACOBS:  Whatever you have -- I don't know what

9    you have.

12:10:58    10             THE COURT:  Whatever you have right there.

11             MS. JACOBS:  This is my redline I gave to the --

12             THE COURT:  That's what I have.

13             MS. JACOBS:  We've never provided this to you.

14             THE COURT:  Yes, you have.

15             MS. JACOBS:  We were supposed to --

16             THE COURT:  Somehow I got it.  So you can go ahead

17   and read it.

18             MS. BONJEAN:  I didn't omit anything.

19             MS. JACOBS:  Your Honor, if I could see what you have

12:11:13    20   so I can confirm that you have our redline.

21             THE COURT:  What I have done is these particular

22   ones, the objections were that it was unnecessary.  And it

23   seems to me that that's --

24             MS. JACOBS:  Right.  But our redline has

12:11:29    25   explanations.

333

1        THE COURT:  I know.

2        MS. JACOBS:  Do you have our explanations?

3        THE COURT:  Yes, I do.

4        MS. JACOBS:  For example, we need to know if the

5   torch is coming in because that's key evidence for us.

6        THE COURT:  The what?

7        MS. JACOBS:  The torch.  She said the torch came in.

8   They took it out.

9        MS. BONJEAN:  We're not doing Karen Byron.  We're not

10  doing Karen Byron right now.

11       MR. HALE:  I wonder if we could do this without the

12  jury sitting here.

13       THE COURT:  Well, that's -- do the other ones.  We'll

14  hold Karen Byron's up.  All right.

15       (End of sidebar.)

16       MS. BONJEAN:  Judge, are you reading them, or how did

17  you want us to read them?

18       THE COURT:  I want you to read them.

19       And I will explain to the jury, several of the

20  witnesses that testified at the trial back in 1982 are not

21  available, either have passed away or beyond the subpoena

22  power of the Court.  So I have ruled that their testimony can

23  be summarized and read to you, the summaries, so that you will

24  know what those witnesses testified to.  The alternative was

25  to read an extensive question and answer which would take, in

1    my judgment, a considerable amount of time.  And these

2    witnesses testified the way they did, and so it seemed to me

3    and I've ruled that these summaries can be presented to you.

4         So you may present the summaries.

12:12:55    5    MS. BONJEAN:  Judge, do we have a copy of your final

6    version?  If we could get that.

7         THE COURT:  Which one do you -- okay.  There's Karen

8    Byron, and what other one did you want?

9         MS. BONJEAN:  Karen Byron and George Wilson.  But I

12:13:12    10   think -- well, I don't know if they still have an objection.

11        THE COURT:  Pardon?

12        MS. BONJEAN:  I think they still have an objection to

13   us reading Karen Byron's in at this juncture, so maybe after

14   lunch.  But we could do George Wilson.

12:13:23    15   THE COURT:  George Wilson, yes, here's -- and what

16   other one?

17        MS. BONJEAN:  Jim Sanders, Judge, if that one is

18   prepared.

19        THE COURT:  Here they are.  Give a copy to --

12:13:50    20   MR. JEBSON:  Thank you.

21        THE COURT:  All right.

22        Go ahead.

23        MS. COHEN:  You ready, Your Honor?

24        THE COURT:  Yes.

12:14:09    25   Proceed.

1     MS. COHEN:  George Wilson testified to the following

2  on May 18, 1983 at Stanley Wrice's criminal trial:

3     "My name is George Wilson.  On September 9, 1982, I

4  worked as a gas station attendant at the Shell station on 76th

5  and Jeffrey Boulevard between the hours of midnight to

6  7:00 a.m.  The gas station was located on the northeast corner

7  of the intersection at 76th and Jeffrey.  There are

8  streetlights at the intersection.

9     "At approximately 3:00 or 3:30 a.m., I saw a lady

10  walking down the street by the closed-down gas station that

11  was on the southeast corner of the intersection.  The woman

12  was walking north on Jeffrey toward me.  I noticed that she

13  was a white lady, and she was walking like she was a little

14  tipsy.  I noticed that when she reached the tire rack she

15  looked like she was feeling her way along the tire rack.

16     "I walked out and caught hold of her.  I noticed her

17  eyes were pretty bruised and her mouth was swollen and

18  bleeding.  She said she needed my help.  I took her inside and

19  gave her a seat.  She said she was hurting.  She asked for a

20  pop.  I gave her one, and called the police who arrived

21  approximately five to ten minutes later.

22     "She told me she had been burned.  When the police

23  arrived, one of them asked her what had happened.  And she

24  told him she had been burned, and she wanted to show the

25  officers where she had been burned, but they took her word for

12:14:25
12:14:42
12:15:01
12:15:21
12:15:38

1    it.  The police took her in the squad car.  The woman's name

2    was Karen Byron."

3         Jim Sanders testified to the following at Mr. Wrice's

4    criminal trial on May 16, 1983:

5         "I am Officer Jim Sanders, and I was an evidence lab

6    technician for the Chicago Police Department in 1982.  My

7    duties with the Chicago Police Department were to search crime

8    scenes for evidence, dust for fingerprints and to take

9    photographs.  I was trained to search for, collect, and

10   preserve evidence.

11        "My partner, Officer Veleigh, and I went to the house

12   at 7618 South Chappel at approximately 8:15 a.m. on the

13   morning of September 9, 1982.

14        "I went to the attic of the home where I observed a

15   bed, a dresser of drawers and a lot of clothing in disarray

16   around the floor and on the bed.  I observed some clothing on

17   the bed, a piece of broken coat hanger and burnt debris.

18   Around the bed I observed some clothing, some ladies'

19   undergarments, and a shoe.  Also on the floor was an iron,

20   beer bottle and another piece of broken coat hanger.  There

21   was an indication that the carpet had been scorched.

22        "People's Exhibit No. 14 is a photo of the attic area

23   of the house at 7618 South Chappel, including a green wall

24   where the stairs lead from the kitchen up to the attic.

25   Directly behind the wall is a chest of drawers.

1       "People's Exhibit No. 11 is a photo of the overall

2  view of the west end of the attic.  There is a piece of broken

3  hanger, a pair of panties, and a shoe.  The photo also

4  depicted a charred area on the carpeting.

12:17:47  5       "People's Exhibit No. 5 is a photo of a coat hanger

6  on the door, the charred area, the lady's shoe, the panties,

7  the bra, and to the right is a beer bottle and an iron.  In

8  the right of the exhibit is a chest of drawers against the

9  walls.  The brown area that is just below the shoe in the

12:18:10  10  photograph, there is burned debris on the floor.

11       "People's Exhibit No. 6 is a photo of the chest of

12  drawers against the wall.  In the photo is a large wooden

13  fork.

14       "People's Exhibit No. 10 is a close-up photo of the

12:18:32  15  bed with the burnt debris and the piece of a wooden coat

16  hanger.  Sanders collected the burnt debris into a can.

17       "People's Exhibit No. 12 is a photo of an iron and a

18  beer bottle.  Also depicted in the photo is a charred spot on

19  the carpeting, a broken coat hanger and a lady's underpants.

12:18:54  20       "People's Exhibit No. 16 is a photo of the west end

21  of the attic at 7618 South Chappel.

22       "Plaintiff's Exhibit No. 35 is the debris that was

23  removed from the bed in the attic.

24       "People's Exhibit No. 38 is the piece of a coat

12:19:13  25  hanger that was recovered from 7618 South Chappel.

Sanders - summary

338

1        "People's Exhibit No. 37 is the piece of the coat

2    hanger recovered from the floor at 7618 South Chappel.

3        "People's Exhibit No. 39 is the pair of panties that

4    came from the attic bedroom at 7618 South Chappel.

12:19:36    5        "People's Exhibit No. 36 is a shoe recovered from the

6    attic at 7618 South Chappel.

7        "People's Exhibit No. 29 is the fork that was removed

8    from the top of the dresser.

9        "People's Exhibit No. 28" --

12:19:54   10        MR. JEBSON:  Judge, it says "recovered," not

11   "removed."

12        I think you misread it.

13        MS. COHEN:  I said "recovered."

14        MR. JEBSON:  I thought you said "removed."

12:20:05   15        MS. COHEN:  Oh, okay.

16        THE COURT:  "Recovered."

17        MS. COHEN:  (Reading:)

18        "People's Exhibit No. 29 is the fork that was

19   recovered from the top of the dresser.

12:20:11   20        "People's Exhibit No. 28 is the iron that was

21   recovered from the attic floor.

22        "People's Exhibit No. 9 is a photo of the east end of

23   the attic.

24        "People's Exhibit No. 2 is a photo of the top of the

12:20:23   25   sink area in the kitchen that depicts a piece of charred

1    paper.  There was also a burned cartoon depicted in the photo.

2            "People's Group Exhibit No. 34" --

3            MR. JEBSON:  I think it's "carton."

4            MS. COHEN:  (Reading:)

12:20:39  5            "There was also a burned carton depicted in the

6    photo.

7            "People's Group Exhibit No. 34 is two pieces of paper

8    that were recovered from the sink at 7618 South Chappel.

9            "People's Exhibit No. 15 is the bra that was on the

12:20:59  10   floor of the bedroom.

11           "I dusted the broken wooden coat hanger, the seam

12   iron, and the fork.  I was unable to recover any fingerprints

13   from those items.

14           "I dusted the beer bottle and recovered fingerprints.

12:21:16  15  We could not establish the identity of the person to whom

16   those fingerprints belonged."

17           THE COURT:  Okay.  You want to call your next witness

18   in?

19           MS. BONJEAN:  Judge, we really would like to do

12:21:27  20  Karen Byron before we call the next witness.

21           THE COURT:  All right.  We have done Karen Byron, so

22   you can pass these.

23           You can go ahead and read it.

24           MS. BONJEAN:  Oh.  And, Judge, we could do Christina

12:21:52  25  Kokocinskin if you have it.

1      THE COURT:  All right.

2      MS. BONJEAN:  Karen Byron testified to the following

3  at Mr. Wrice's criminal trial on May 16, 1983:

4      "My name is Karen Byron.  I am not married.  I am

12:22:23  5  divorced.  My ex-husband is not in the courtroom.

6      "I was 32 years old in September 1982.  I lived in a

7  studio apartment at 7503 South Jeffrey Boulevard in Chicago,

8  Illinois with my boyfriend Gene Edwards.  We lived above the

9  Jeffrey Liquor Store where Gene worked.

12:22:46  10     "On the morning of September 8, 1982, Gene went to

11  work at the liquor store.  At around 8:30 or 9:00, two of my

12  friends, Patricia and Roy, came to my apartment.  We spent the

13  entire day drinking alcohol, and Patricia and Roy left my

14  apartment around 8:00 p.m.

12:23:08  15     "I am an alcoholic and have been an alcoholic since

16  1979.  I drank every day until there is nothing left to drink.

17     "On the evening of September 8, 1982, after Gene fell

18  asleep, I noticed that there were no drinks left in the house.

19  So I got dressed and left to go to Patricia and Roy's

12:23:31  20  apartment.  I was wearing a pair of beige slacks, beige

21  blouse, beige bra and panties and burgundy open-toe, open-heel

22  shoes.

23     "I was walking down 75th Street when a car pulled up

24  with some men in it who asked if I wanted a ride.  I do not

12:23:52  25  recall how many men were in the car.  I said 'no, thank you'

1    and stated that I was just going to Paxton Street.

2              "The next thing I remember is being in a car.  I

3    don't know how I got in the car.  The car was going the wrong

4    way, and I said to them, 'You are going the wrong way.'

5    Another male passenger in the vehicle said, 'We aren't going

6    the wrong way.  We are just getting a drink.'

7              "The guy driving the car pulled into an alley, and I

8    did not know where we were.  The next thing I remember is

9    steep steps and that it was dark.  I do not recall whether I

10   was walking or being carried.  I recall standing up in a room

11   with a bed and two windows and the dresser, and I saw the

12   light coming through the window.  There were no other lights

13   on in the room.

14             "As I was standing there, I saw men.  They were

15   black.  I then said, 'What now?'  I knew I was in trouble

16   then.  They had me up there.  Then the one said -- he said

17   something about a drink.  He said -- I forget what he said.

18   'There ain't no drink, bitch.  We are going to fuck.'  That's

19   what he said.  'Bitch, bitch,' then he punched me in the face.

20             "After the man punched me in the face, I fell on the

21   bed.  There was a man on top of me having vaginal intercourse

22   with me.  I could tell other people were in the room because I

23   heard voices and laughter.  After the man got off me, another

24   man got on me and had intercourse with me.  I could still hear

25   laughter and voices in the room.  Then another man got on top

Byron - summary

1    of me and had intercourse with me.

2         "After the third man had intercourse with me, I

3    lifted my head and saw a bunch of men that I could not

4    recognize.  I heard one person say, 'Let's get out of here.

12:25:52    5    We don't want no part of this.'

6         "After the third man got off of me, another man

7    grabbed my hair and my head and said, 'Suck my dick, bitch.'

8    I said, 'No, I am not.  You are going to kill me first.'  Then

9    the man punched me out.

12:26:10   10         "The same man knocked me to the floor and punched me

11    again.  I heard all of the laughter and the voices.  He then

12    put his penis in my mouth, and I hit him.  I still heard

13    voices" --

14              MR. JEBSON:  No.  No.

12:26:24   15              THE COURT:  Excuse me.  "He hit me."

16              MS. COHEN:  "He hit me."  I apologize.

17         "I still heard voices and laughter in the room.

18         "The next thing I remember is there was fire and

19    torches.  The fire was in the same room I was in.  Fire was

12:26:37   20    scattered about the room.  The fire was coming at my face.

21         "The next thing I remember is they were burning me.

22    I can't tell you where I was being burned at that time, but I

23    know they had them on my face, my face with the fire and on my

24    body.  I heard laughter and voices and heard them calling me

12:26:58   25    'white honky bitch' and someone said something about his

1   grandfather was picking cotton for the white people or
2   something like that.

3        "Then something hit my back.  I felt pain.  They were
4   burning me.  There was more than one person in the room when I
5   was being burned.

6        "At some point the burning stopped.  I was on the
7   floor when I came to.  When I came to on the floor, there was
8   still more than one person up there.  I heard one man say,
9   'Get her out of here.  Get the bitch out of here before we get
10  a murder beef,' or something like that.  When that was said,
11  my face was already beat up.  My eye was shut.  My eye was
12  opened a little bit.  When I heard that, I was thinking to
13  myself, don't get up, don't ever move again.

14       "I recall a man pulling up my slacks and putting my
15  blouse on.  There was still more than one man in the room.
16  One of the men had me from under my arms on the steps.

17       "The next thing I remember is waking up on the ground
18  outside the house.  I crawled to an alley and reached a
19  cyclone fence and saw a light.  I crawled toward the light
20  which was a gas station.  A man came out of the gas station,
21  picked me up, put something over me, and all I remember saying
22  was, 'Can I have a Coke.'  And he gave me a Coke, and called
23  the police.

24       "The police arrived at the gas station and took me to
25  Jackson Park Hospital.  I was later transferred to Loyola burn

1    center where I received skin grafts for my burns, and I was in

2    the burn center for a month.  They put me in a real, real high

3    tub and just medicated the body and then bandaged me and

4    changed the dressing twice a day.

5            "I had skin graft surgery.  They took skin grafts off

6    my legs and put them on my back and breasts and my stomach and

7    my buttocks, my right buttocks.  I have scars today from where

8    I was burned and will have these scars for life.

9            "None of the men in the room was my husband.

10           "Plaintiff's Exhibit 39 depicts the panties I was

11   wearing on September" --

12           MR. JEBSON:  Judge, that's "People's."

13           MS. COHEN:  "People's."  Sorry.

14           "People's Exhibit 39 depicts the panties I was

15   wearing on September 8, 1982, and People's Exhibit 36 depicts

16   the shoe I was wearing.

17           "People's Exhibit 39 shows a tear in the leg of the

18   panties that was not there when I put them on on September 8,

19   1982.

20           Stanley Wrice's counsel, Sidney Jones, elicited

21   testimony on cross-examination, which is summarized as

22   follows:

23           "During" --

24           THE COURT:  Just read the -- start with, "When the

25   automobile pulled up."

1      MS. COHEN:  I'm sorry, Judge.  What did you say?

2      THE COURT:  Pardon?

3      MS. COHEN:  I'm sorry.  I didn't hear what you said.

4      THE COURT:  Don't read the highlighted portion.  Just

5  the, "When the automobile pulled up."

6      MS. COHEN:  Oh, okay.

7      "When the automobile pulled up, I don't know how many

8  men were in the car.  I never said I got in the car.  I don't

9  recall how I got in the car.  I don't remember seeing a black

10 police sergeant or him asking me if I was all right.  I don't

11 recall telling him that I wanted to go to a friend's house.

12      "I drank wine this morning.  Gene, Lawrence, Harvey,

13 and I shared a pint of wine at about 9:00 a.m.  After that I

14 had nothing more to drink.  I was here, and I had about four

15 or five cups of coffee.  Immediately before testifying, I had

16 water.

17      "I did not have a bruise under my eye when these men

18 came to me in the automobile."

19      At Mr. Wrice's criminal trial, the parties stipulated

20 to the testimony of Christine Kokocinskin.

21      "In September 1982, Chicago Police Department

22 microanalyst Christine Kokocinskin received two smear

23 specimens marked vaginal/cervical, and one swab marked

24 vaginal.  The swabs were taken from the vagina of Karen Byron

25 while she was at Jackson Park Hospital.

1          "Ms. Kokocinskin would testify that she received one

2     carving fork, which is People's Exhibit No. 29.  She also

3     received two sections of a hanger which are the same exhibits

4     as People's Exhibit No. 37 and 38, and that she received an

5     iron, which is People's Exhibit No. 28.  She also received one

6     pair of panties, which is People's Exhibit No. 39.  She also

7     received one shoe, which is People's Exhibit No. 36.

8          "Ms. Kokocinskin would testify that she took the

9     smear specimen and a swab specimen and conducted certain tests

10    on those items and that those tests indicated that the swab

11    and smear specimens from Karen Byron's vagina did not reveal

12    the presence of spermatozoa.

13         "She would also testify that she conducted test

14    result -- tests on the carving fork and that her tests

15    indicated that the carving fork did not have blood on it.  The

16    tip of the fork was burnt and the metal was discolored, either

17    from chemicals being added to the fork or from heat being

18    added to the tip of the fork.

19         "She would also testify that wooden hanger had a

20    reddish brown stain on the wooden portion of the hanger.  She

21    conducted chemical tests on the stain which revealed it was

22    human blood.  Because of the amount of blood, she cannot

23    determine the blood type.  She also conducted tests on the

24    iron, and those tests were negative for blood.

25         "Further tests of the iron revealed the presence of

Kokocinskin - summary

347

1  carbon-like substances adhering to scattered areas of the
2  iron.

3         "She would further testify that she conducted tests
4  on the panties, that there was blood on the panties.  There
5  was an insufficient amount of blood to determine whether it
6  was human blood or the blood type.  There was no blood on the
7  shoe.

8         "The People and defendant Wrice further stipulated
9  and agree that Stanley Wrice was 29 years old in May 1983."

10         THE COURT:  All right.

11         Call your next witness then.

12         MR. JEBSON:  Your Honor, could we have a quick
13  sidebar?  It will take 20 seconds.

14     (Sidebar.)

15         MR. JEBSON:  Thank you, Judge.

16         I just wanted to preserve our objection to using the
17  summaries.  We would offer the testimony.  I just didn't want
18  to waive it.

19         THE COURT:  By the way, my ruling -- I'll just make
20  the ruling that all of my rulings on the motions *in limine* in
21  my pretrial rulings, you do not have to reassert them.  They
22  are preserved.

23         MR. JEBSON:  Okay.

24         THE COURT:  All right.

25         Next witness?

```
                1        MS. BONJEAN:  Yes.
                2          (End of sidebar.)
                3              THE COURT:  Right around here, sir.
                4              Please raise your right hand.
12:35:26        5          (Witness sworn.)
                6              THE COURT:  You may question the witness.
                7            CHARLES WRICE, PLAINTIFF'S WITNESS, DULY SWORN,
                8                    DIRECT EXAMINATION
                9    BY MS. BONJEAN:
12:35:38       10    Q.  Good afternoon.
               11    A.  Good afternoon.
               12    Q.  Could you introduce yourself to the ladies and gentlemen
               13    of the jury, sir.
               14    A.  Good afternoon.  My name is Charles Wrice.
12:35:49       15    Q.  And, Mr. Wrice, how old are you?
               16    A.  61.
               17    Q.  And are you married, sir?
               18    A.  No.
               19    Q.  Do you have any children?
12:35:56       20    A.  Yes, ma'am.
               21    Q.  How many?
               22    A.  Four.
               23    Q.  Okay.  And do you have any grandchildren?
               24    A.  Yes.
12:36:03       25    Q.  How many?
```

C. Wrice - direct

349

1  A.  Eight.

2  Q.  And where do you currently reside?

3  A.  Excuse me?

4  Q.  Where do you currently reside?

12:36:10  5  A.  In Calumet City, 136 Mason Street, Calumet City.

6  Q.  And who do you live with?

7  A.  I live alone.

8  Q.  You live alone?

9  A.  Yes, ma'am.  I live by myself.

12:36:20  10  Q.  And do you presently work?

11  A.  Yes.

12  Q.  And what type of work do you do?

13  A.  Security.

14  Q.  Security?

12:36:25  15  A.  Yes.

16  Q.  And for what types of establishments do you do security?

17  A.  It's ATB.  It's like we are mobile patrol for CHA homes.

18  Q.  For CHA homes?

19  A.  Yes.

12:36:39  20  Q.  And do you have to wear a uniform for that?

21  A.  Yes.

22  Q.  Do you have to -- do you carry a weapon?

23  A.  Yes.

24  Q.  Okay.  How long have you been doing that?

12:36:49  25  A.  It's been three years now.

C. Wrice - direct

350

1  Q.  Okay.  And what were you doing before that?

2  A.  I was working at another security company called SDG.

3  Q.  And how long have you been working in security?

4  A.  Since 2014.

12:37:04  5  Q.  2014?

6  A.  Yes.

7  Q.  And what's your highest level of education?

8  A.  11th grade.

9  Q.  Okay.  Did you drop out of high school?

12:37:11  10  A.  Yes.

11  Q.  Did you get a GED or anything?

12  A.  No.

13  Q.  Okay.  So what high school did you attend?

14  A.  South Shore High School.

12:37:19  15  Q.  And I want to draw your attention to your high school days

16  I guess.  Where were you living?

17  A.  I lived at 70 -- 7618 Chappel.

18  Q.  Okay.  Was that on 76th and Chappel?

19  A.  Yes.

12:37:36  20  Q.  And with whom did you live at 76th and Chappel?

21  A.  I was on the first floor, one of the rooms on the first

22  floor.

23  Q.  If you could please keep your voice up and talk slowly and

24  into the mic; okay?

12:37:50  25  A.  Yes.

1   Q.  Okay.  With whom did you live at 76th and Chappel?

2   A.  My brother Stanley Wrice, my sister Magnolia Wrice,

3   Patricia Wrice, and Rose Wrice.

4   Q.  I'm talking, sir, before 1982.  I'm talking about when you

5   were growing up.

6   A.  Oh.  My mother, my two older brothers.

7   Q.  How many children did you have -- I mean, how many

8   children were in the house?

9   A.  At the time I think --

10  Q.  How many siblings do you have?  Let's just start there.

11  A.  It's 11 of us total.

12  Q.  Okay.  And you had a mother, right?

13  A.  Yes.

14  Q.  And your mother passed; is that correct?

15  A.  Yes.

16  Q.  What year did she pass?

17  A.  In '79, 1979.

18  Q.  Okay.  And prior to your mother passing, where did you and

19  your family live?

20  A.  7618 Chappel.

21  Q.  All right.  And could you tell us what -- were you a

22  close-knit family?

23  A.  Yes.

24  Q.  Okay.  Describe it for me.

25  A.  There was so many of us.  We had to be a close-knit

C. Wrice - direct

352

1  family.  We was a close-knit family.  We didn't do too much of

2  anything without the other.

3  Q.  What's that?

4  A.  So one could do pretty much nothing without the other.

12:39:06  5  Q.  Okay.  And did you have an older brother named

6  Stanley Wrice?

7  A.  Yes.

8  Q.  How much older is he than you?

9  A.  I'm not really sure.  I want to say like three years, four

12:39:16  10  years, something like that.

11  Q.  Three or four years?

12  A.  Yes, I'm not sure.

13  Q.  And what was your relationship with your brother like

14  growing up?

12:39:22  15  A.  It was good.  It was great.  He was a great brother.  He

16  was there for me all the time.  He kept me out of a lot of

17  trouble.  If it wasn't for him, I wouldn't be in the spot I am

18  today.  I wouldn't be where I am today.  He kept me away from

19  all the negativity out on the street, all the gangbanging.  He

12:39:45  20  was a great brother.

21  Q.  Okay.  And you were his younger brother, right?

22  A.  Yes, I'm the youngest.

23  Q.  At some point your mother passed, right?

24  A.  Yes.

12:39:56  25  Q.  Okay.  And tell us how that impacted you and your

C. Wrice - direct

1    siblings.

2    A.   It really impacted us real bad because she was like the

3    head of the family.  She was a single mother.  It was just us.

4    She was taking care of all of us.  And when she passed away,

5    everybody was so devastated.  It was just hard to go on, just

6    too much to take.

7    Q.   Did some of your siblings then move out of the Chappel

8    house?

9    A.   Excuse me.  I didn't hear you.

10   Q.   Did some of your siblings then move out of the Chappel

11   house?

12   A.   Yes.  My two older brothers, they moved out.

13   Q.   Okay.  And who was responsible -- let me ask you this.

14   Was this a house that you rented or that your mother paid

15   money to towards a bank?

16   A.   Yes, she paid a mortgage to the bank.

17   Q.   So it was a house that was owned and she had a mortgage;

18   is that right?

19   A.   Yes, ma'am.

20   Q.   And after your mother passed, who was responsible for

21   making payments on the mortgage?

22   A.   The two oldest brothers.

23   Q.   Okay.  Now, at some point you said that your siblings,

24   some of your siblings moved out, right?

25   A.   Yes.

C. Wrice - direct

354

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
|          | 1  | Q.  And I want to draw your attention specifically to                    |
|          | 2  | September of 1982.  How many siblings were living in the home            |
|          | 3  | at Chappel?                                                               |
|          | 4  | A.  It was four.  Four.                                                   |
| 12:41:11 | 5  | Q.  Okay.  And who were they?                                            |
|          | 6  | A.  Myself, Stanley Wrice, Magnolia Wrice -- no, there was               |
|          | 7  | five.  Me, Stanley, Magnolia, Patricia, and Rose Wrice.                  |
|          | 8  | Q.  Okay.  Were Magnolia and Rose there all the time, or did             |
|          | 9  | they come back and forth?                                                 |
| 12:41:27 | 10 | A.  They came back and forth.  They wasn't there all the time.           |
|          | 11 | Q.  Okay.  Who was there 100 percent of the time?                       |
|          | 12 | A.  It was Patricia, myself, and Stanley.                                |
|          | 13 | Q.  Okay.  But did Rose and Magnolia come back from time to              |
|          | 14 | time?                                                                      |
| 12:41:44 | 15 | A.  Yes.                                                                  |
|          | 16 | Q.  Now, I want to show you a photograph, Defendant's Exhibit            |
|          | 17 | 43.                                                                       |
|          | 18 | Do you recognize that photograph?                                        |
|          | 19 | A.  Yes.                                                                  |
| 12:42:14 | 20 | Q.  What is that a photograph of?                                        |
|          | 21 | A.  My house, 7618 South Chappel.                                        |
|          | 22 | Q.  Is that pretty much how it looked in September of 1982?             |
|          | 23 | A.  Yes, ma'am.                                                           |
|          | 24 | Q.  Okay.  I'm going to show you the rear of the house and              |
| 12:42:24 | 25 | tell me if you recognize that.                                          |

```
              1         MS. COHEN:  Exhibit 42, defense.

              2         MS. BONJEAN:  Defendant's Exhibit 42.

              3    BY MS. BONJEAN:

              4    Q.  Do you recognize that photograph?

12:42:33      5    A.  Yes, it's the back of the house.

              6    Q.  Okay.  And is there a back porch back there?

              7    A.  Yes, ma'am.  As soon as you go up the stairs, it's the

              8    back porch right there.

              9    Q.  And where, if you went through the back porch, would it

12:42:45     10    bring you?

             11    A.  Straight into the kitchen.

             12    Q.  Okay.  Now, back in September of '82, did you have a

             13    significant other, a girlfriend?

             14    A.  Yes, I had a girlfriend.

12:43:02     15    Q.  And did Patricia have a boyfriend?

             16    A.  Yes.

             17    Q.  Okay.  And who was that?

             18    A.  Bobby Joe was her boyfriend.

             19    Q.  Did they have any children together?

12:43:13     20    A.  Yes, ma'am, they had two children.

             21    Q.  Are those your niece and nephew?

             22    A.  Yes, my niece and nephew.

             23    Q.  Okay.  Do you remember what their names are?

             24    A.  Excuse me?

12:43:21     25    Q.  Their names?
```

1    A.   Robert and Keisha.

2    Q.   Okay.  And back in September of 1982, how old were they,

3    roughly?

4    A.   I would say about infants, maybe about 3, 4, something

12:43:37    5    like that, 5, around.

6    Q.   Younger than 5?

7    A.   Yes.

8    Q.   Did Stanley have a girlfriend?

9    A.   Yes.

12:43:44   10    Q.   What was Stanley's girlfriend's name?

11    A.   Jennifer.

12    Q.   All right.  Now, back in September of 1982, all of these

13    individuals that you just mentioned, were they people that

14    were in the house on a regular basis?

12:43:56   15    A.   Yes.

16    Q.   Okay.  How often was Mildred there?

17    A.   Magnolia?

18    Q.   I'm sorry.  My apologies.  Your girlfriend, what --

19    A.   Mildred?

12:44:06   20    Q.   Yeah, Mildred.

21    A.   She was there often.  She would come over.

22    Q.   And what about Bobby Joe?

23    A.   Yeah, he was there pretty often too.  Yes.

24    Q.   His kids were there, right?

12:44:16   25    A.   Yes.

C. Wrice - direct

357

1   Q.  Did he spend nights there?

2   A.  Yes.

3   Q.  Did he also have another home?

4   A.  Yes.

12:44:20   5   Q.  Okay.  And who was in the other home that he had, if you

6   know?

7   A.  I believe it was his parents.

8   Q.  Okay.  And what about Jennifer, did she spend nights

9   there?

12:44:28   10   A.  Yes, ma'am.

11   Q.  And did you see her there pretty regularly?

12   A.  Yes, she was there pretty regularly too.

13   Q.  Okay.  And, by the way, did you ever see Stanley

14   physically abuse Jennifer?

12:44:40   15   A.  No, ma'am.

16   Q.  Did they argue sometimes?

17   A.  Yes, they argued.

18   Q.  How would you describe the arguments?

19   A.  It was just like an argument like me and my girlfriend

12:44:50   20   would have about something, maybe.  I'm not sure what it would

21   be about, but, yeah, just like an argument.

22   Q.  Okay.  And did Jennifer's mother approve of this

23   relationship?

24   A.  No.

12:45:00   25           MR. JEBSON:  Objection.  Foundation.

C. Wrice - direct

358

| | |
|---|---|
| 1 | THE COURT: Overruled. I'll let it stand. |
| 2 | Go ahead. |
| 3 | MR. JEBSON: I'm sorry. I didn't hear the answer, |
| 4 | Judge. |
| 5 | THE COURT: "No." |

12:45:09

BY MS. BONJEAN:

6

7  Q.  Did her mother approve of the relationship?

8  A.  No, I don't think so.

9  Q.  Okay.  Was it a source of conflict sometimes?

10  A.  Yes.

12:45:17

11  Q.  Okay.  Did sometimes Jennifer come to the house when she

12  was not supposed to?

13  MR. JEBSON: Objection.  Leading.

14  THE COURT: Overruled.

12:45:29

15  BY MS. BONJEAN:

16  Q.  You can answer.

17  A.  Yes.

18  Q.  Okay.  And --

19  THE COURT: But don't lead him.

12:45:37

20  MS. BONJEAN: I'm not.

21  THE COURT: All right.

22  MS. BONJEAN: I'm not trying to.

23  BY MS. BONJEAN:

24  Q.  Mr. Wrice, did you ever see Stanley prevent her from

12:45:44

25  leaving his house or anything of that nature?

1  A.  No, ma'am.

2  Q.  Okay.  Now, back in September of 1982, what condition was

3  the house in at that time?

4  A.  It was not in good -- it was kind of running down because

12:46:01  5  my mother passing away.  It wasn't in the best of condition.

6  Q.  Not in good condition?

7  A.  No.

8  Q.  And were the bills getting paid?

9  A.  No.

12:46:09  10  Q.  Was the mortgage getting paid?

11  A.  No.

12  Q.  And during this period of time, were you working?

13  A.  Yes.

14  Q.  How often?  How many hours were you working a week, say?

12:46:24  15  A.  I want to say maybe 80 hours, something like that, a week,

16  yes.

17  Q.  Were you working a lot at the time?

18  A.  Yes, I was working quite a bit at the time.

19  Q.  Do you remember where you were working during this time in

12:46:35  20  your life?

21  A.  I was working at Collins Workshop.

22  Q.  Anywhere else?

23  A.  I was working at -- just working at a Walgreens, working

24  at Walgreens and then working for Collins Workshop.

12:46:51  25  Q.  And these questions I'm asking you are from 37 years ago

C. Wrice - direct

360

1  at least, I think.  Do you remember everything about this time

2  period in your life with detail?

3  A.  No, ma'am, I don't.

4  Q.  Are you doing your best to remember?

12:47:05  5  A.  The best that I can, yes.

6  Q.  But during this time period, can you describe whether or

7  not there were other people that hung out at your home during

8  this time, September of 1982?

9  A.  Yeah, there was quite a few of them running in and out.

12:47:30  10  I'm not sure of all of the names, but I know it's -- like

11  Kenny Lewis used to come by.

12  Q.  Okay.  And who is Kenny Lewis?

13  A.  He's one of the neighbors from down the street.  My mother

14  and his mother was good friends.

12:47:45  15  Q.  Okay.  And do you remember how old Kenny was?

16  A.  No, ma'am, I don't.

17  Q.  Was he younger than you?

18  A.  I think so.

19  Q.  Okay.  And what about Rodney Benson, did you see him in

12:47:56  20  the house pretty regularly?

21  A.  I seen him in the house from time to time, yes.

22  Q.  Okay.  What about Michael Fowler?

23  A.  Whom?

24  Q.  Michael Fowler.

12:48:08  25  A.  Yes, ma'am.

C. Wrice - direct

361

1    Q.  Did you know him as Little Mike?

2    A.  I didn't really know him that good.  I just know his name.

3    Q.  Okay.  You could recognize him though?

4    A.  Yes, I could.

12:48:17    5    Q.  What about Lee Holmes, you know him, right?

6    A.  Yes.

7    Q.  And did you see him in the house?

8    A.  Yes.

9    Q.  And were there other times where there were people you

12:48:27    10   didn't recognize in your home?

11   A.  Yes.

12   Q.  And what was -- what were these people doing in your house

13   when they would come by?

14   A.  They would come over and drink, I guess, be going up and

12:48:41    15   drinking, up and down the stairs drinking.

16   Q.  Drinking upstairs you said?

17   A.  Yes, ma'am.

18   Q.  And did you hang out drinking with them?

19   A.  No.  No, ma'am.  No.

12:48:50    20   Q.  Were you -- did you try to avoid all that?

21   A.  Yes, I did.  Yes.

22   Q.  Okay.  And where did you hang out in your home when these

23   types of parties were going on?

24   A.  I stayed in my room.

12:49:06    25   Q.  Okay.  And where was your room at that time?

1   A.  It was on the first floor.  As you come in in the living

2   room, it's two rooms side by side.  It was a bathroom, and my

3   room was on -- I want to say on the left side.

4   Q.  Did you have that bedroom to yourself?

12:49:28   5   A.  Yes, ma'am.

6   Q.  And what about -- was there another bedroom on that floor?

7   A.  Yes, right across from me.

8   Q.  Okay.  And who occupied that bedroom?

9   A.  Patricia.

12:49:39   10   Q.  All right.  Now, I want to ask you, when you first come

11   into the house from the front, where did you walk into?

12   A.  The living room.

13   Q.  And was there a dining room adjacent to that?

14   A.  Yes, there's a dining room there.

12:49:53   15   Q.  And then what about the bedrooms, did they come after?

16   A.  The bedroom is right there.  When you go into the dining

17   room, the bedroom is right there.

18   Q.  Okay.  And where was the kitchen located?

19   A.  Right as soon as you go through the dining room, the

12:50:05   20   kitchen was right there.

21   Q.  Was the kitchen in the rear of the house would you say?

22   A.  Yes.

23   Q.  All right.  Now, Mr. Wrice, I want to ask you about the

24   attic of the Wrice residence, or your residence in 1982; okay.

12:50:21   25   A.  Yes.

1    (Counsel conferring.)

2  BY MS. BONJEAN:

3  Q.  In September --

4    (Counsel conferring.)

12:50:53    5  BY MS. BONJEAN:

6  Q.  Okay.  Mr. Wrice, in September of '42, what was this area

7  used for, to the best of your knowledge?

8    MS. COHEN:  Jenny, you said '42.

9    MS. BONJEAN:  Huh?

12:51:12   10    MS. COHEN:  You said '42.  '82.

11  BY THE WITNESS:

12  A.  I remember everybody was partying in there and drinking.

13  BY MS. BONJEAN:

14  Q.  Was Stanley using this as his bedroom in September -- or

12:51:21   15  September 9th of 1982?

16  A.  No, ma'am.

17  Q.  Now, putting aside what the defendants think of

18  Mr. Wrice --

19    MR. JEBSON:  Objection to the form of that question.

12:51:33   20    THE COURT:  The objection is sustained.

21    Just ask the question.

22  BY MS. BONJEAN:

23  Q.  I'm going to show you -- where was Stanley Wrice sleeping

24  in September of 1982?  Let's just be specific.  September 9th

12:51:44   25  of 1982?

C. Wrice - direct

364

1    A.  On the living room couch.

2    Q.  Okay.  And do you know whether he intended to use this

3    area as his bedroom or this part of the attic?

4    A.  No.

12:51:54  5    Q.  Okay.  I'm going to have you look at another photo.

6            Okay.  I'm going to show you Exhibit 47.  Sorry.

7    Wrong one.

8            Do you see that part of the attic?

9    A.  Yes.

12:52:14  10   Q.  And what was going on in that part of the attic back in

11   September of 1982?

12   A.  Stanley was fixing it up.

13   Q.  And had this attic been used as a bedroom prior to this

14   time period?

12:52:27  15   A.  No, not to my knowledge.

16   Q.  Okay.  But as children I'm talking about, did you guys

17   sometimes sleep up there?

18   A.  Yes, as children.  Yes.

19   Q.  But in September of 1982, this was not being used as a

12:52:43  20   bedroom, correct?

21   A.  No.

22   Q.  Do you know why sometimes people have referred to it as

23   a -- Stan's bedroom?

24           MR. JEBSON:  Objection.  Calls for speculation.

12:52:58  25           THE COURT:  Overruled.

1    BY THE WITNESS:

2    A.  No.

3    BY MS. BONJEAN:

4    Q.  Okay.  Was he using it to fix it up?  Was he fixing it up?

12:53:02   5    A.  No, he's fixing it up.

6    Q.  Now, I want to draw your attention --

7            THE COURT:  Are you going into a new area?

8            MS. BONJEAN:  Yes.

9            THE COURT:  Why don't we suspend for lunch until

12:53:19  10   2:00.

11       (Lunch recess was had from 12:58 p.m. to 2:00 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3   STANLEY WRICE,                    )
                                       )
 4                   Plaintiff,        )
     -vs-                              )  Case No. 14 C 5934
 5                                     )
     JOHN BYRNE, former Chicago        )  Chicago, Illinois
 6   Police Sergeant, et al.,          )  February 21, 2020
                                       )  2:00 p.m.
 7                   Defendants.       )
                                       )
 8                              VOLUME 2
 9                    TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE HARRY D. LEINENWEBER and a jury
10
     APPEARANCES:
11   For the Plaintiff:      MS. JENNIFER A. BONJEAN
                             MS. ASHLEY BLAIR COHEN
12                           Bonjean Law Group PLLC
                             467 Saint Johns Place
13                           Brooklyn, NY 11238
                             (718) 875-1850
14
                             MS. HEIDI LINN LAMBROS
15                           1169 S. Plymouth Court, Suite 123
                             Chicago, IL  60604
16                           (216) 318-4087

17   For the Individual
     Defendants:             MR. ANDREW M. HALE
18                           MR. SCOTT J. JEBSON
                             MS. JENNIFER BITOY
19                           Hale & Monico LLC
                             53 W. Jackson Boulevard, Suite 330
20                           Chicago, IL  60604
                             (312) 341-9646
21
     Court Reporter:
22
                    KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
23                         Official Court Reporter
                         United States District Court
24              219 South Dearborn Street, Suite 1426
                        Chicago, Illinois  60604
25                  Telephone:  (312) 435-5569
                  Kathleen_Fennell@ilnd.uscourts.gov
```

1
2    APPEARANCES:   (Continued)

3    For Defendant
     City of Chicago:          MS. CARYN L. JACOBS
4                              Department of Law, City of Chicago
                               121 North LaSalle Street, City Hall
5                              Suite 600
                               Chicago, IL  60602
6                              (312) 744-5128

7    Also Present:            MR. NICK BENYO
                              Senior Litigation Consultant
8                             Magna Legal Services

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C. Wrice - direct

368

1      (Proceedings heard in open court.  Jury out.)

2          THE COURT REPORTER:  All rise.

3          THE COURT:  The witness can get back up here and

4      we'll bring in the jury.

02:01:32    5      (Jury in.)

6          THE COURT:  Good afternoon, ladies and gentlemen.

7          You may proceed with Mr. Wrice's direct questioning.

8          MS. BONJEAN:  Thank you, Your Honor.

9      CHARLES WRICE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

10              DIRECT EXAMINATION - Resumed

11     BY MS. BONJEAN:

12     Q.  Mr. Wrice, we were talking about the time period of

13     September of 1982, and you testified that a number of people

14     would sometimes be in the home at the Wrice residence at that

02:01:54   15     time, correct?

16     A.  Yes.

17     Q.  Okay.  I'm just reorienting you.

18          Specifically, you testified that Michael Fowler and

19     Lee Holmes and Rodney Benson and Kenny Lewis were in the house

02:02:07   20     from time to time, right?

21     A.  Yes.

22     Q.  Okay.

23          Would you consider -- would you say Stan was friends

24     with these people?

02:02:15   25     A.  Yes.

C. Wrice - direct

369

1    Q.  Okay.

2         And how -- when you say friends, what do you mean by

3    friends?

4    A.  Somewhat like associates, people that comes over from time

02:02:29  5    to time that live in the neighborhood.

6    Q.  People that live in the neighborhood?

7    A.  Yes, ma'am.

8    Q.  Did Stan tell them to get out when they would come over?

9    A.  No.

02:02:39  10   Q.  All right.

11        And going specifically to September 8th -- well, let

12   me ask you this:  Were these the types of friends you would

13   call if you were like in a jam or needed help?

14   A.  No.

02:02:49  15   Q.  Now, going specifically to September 8th of 1982 -- okay?

16   A.  Yes.

17   Q.  -- did there come a time when you were in your home in the

18   evening at the 76th and Chappel residence?

19   A.  Yes.

02:03:11  20   Q.  Okay.

21        And did you have a visitor?

22   A.  Yes.

23   Q.  And who was that?

24   A.  My girlfriend, Mildred Dyson.

02:03:17  25   Q.  And when Mildred came over, did you spend some time with

C. Wrice - direct

370

1    her?

2    A.  Yes.

3    Q.  Now, did you ever go to the liquor store with Bobby Joe

4    and Stan and Rodney?

02:03:28    5    A.  No.

6    Q.  Did you spend much time at the liquor store?

7    A.  No.

8    Q.  And during the course of the evening, did you see some of

9    these faces or some of the people that we mentioned -- that I

02:03:42    10    mentioned earlier?  Michael Fowler, for example?

11    A.  Yes.

12    Q.  Okay.

13          What about Lee Holmes?

14    A.  Yes.

02:03:47    15    Q.  And how about Kenny Lewis?

16    A.  Yes.

17    Q.  You think you saw him?

18          MR. JEBSON:  Objection.  Asked and answered.

19          THE COURT:  Overruled.

20    BY MS. BONJEAN:

21    Q.  If you remember.

22    A.  I can't really remember.

23    Q.  Okay.

24          And what about Rodney Benson?

02:04:06    25    A.  Yes.

C. Wrice - direct

371

1  Q.  Now, did there come a time in the evening when Mildred

2  left the home?

3  A.  Yes.

4  Q.  And do you recall approximately -- and, again, I know this

02:04:20  5  is many, many years ago -- what time that was?

6  A.  I can't remember exactly what time it was.

7  Q.  Was it after midnight?

8  A.  I want to say yes.

9  Q.  Okay.

02:04:39  10       Did there come -- and after you -- sometime after

11  midnight; is that fair to say?

12  A.  Yes.

13  Q.  Okay.

14       And when she left, did you do anything?

02:04:48  15  A.  Yes.

16  Q.  Did you walk her to the door or anything like that?

17  A.  Yes, I walked her to the door, made sure she got in her

18  car.

19  Q.  Okay.

02:04:58  20       And, then, what did you do?

21  A.  I left, I came back and went to the kitchen.

22  Q.  Okay.

23  A.  And --

24  Q.  And -- I'm sorry.

02:05:06  25       And in the kitchen, what did you -- did you hear

1   anything?

2   A.  Yes.  I heard a young lady asking for some --

3          MR. JEBSON:  Objection.

4   BY THE WITNESS:

02:05:15   5   A.  -- cigarettes and a beer.

6          MR. JEBSON:  Objection.  It's hearsay.

7          THE COURT:  Just not -- this is a verbal act, not for

8   the truth.  I don't know what -- it's not for the truth.

9          MS. BONJEAN:  It's also part of the trial record

02:05:26   10   that --

11          MR. JEBSON:  I don't believe it is.

12          THE COURT:  Wait a minute.  I overruled the

13   objection.

14          MS. BONJEAN:  Okay.

15   BY MS. BONJEAN:

16   Q.  Did you hear anything?

17   A.  Yes.

18   Q.  What did you hear?

19   A.  I heard someone asking for cigarettes and the beer.

02:05:39   20   Q.  A beer?

21   A.  Yes.

22   Q.  And was it specifically a beer you heard?

23   A.  Yes, I think she said a beer.

24   Q.  Okay.

02:05:46   25          And did the voice stick out to you in any way?

C. Wrice - direct

373

1    A.  It stick out because it sounded like a white female.

2    Q.  Okay.

3            And before you heard that, did you hear any people

4    coming in the house?

02:06:04    5    A.  Before I heard that, yes.

6    Q.  Okay.  Explain that.

7    A.  Yes.  I heard people coming in and out, going up and down

8    the stairs.  And, then, Stanley came in.  He went up the

9    stairs after I heard the young lady saying something about a

02:06:19    10   beer and some cigarettes.

11   Q.  Okay.

12           And what did you do then?

13   A.  I went back in my room, closed the door, laid down.

14   Q.  And what time was that at about?

02:06:26    15   A.  It was between maybe about 12:00 and 1:00 o'clock.

16   Q.  Okay.

17           Before 1:00 o'clock?

18   A.  Yes.

19   Q.  All right.

02:06:33    20           Now, when you heard this activity upstairs at that

21   time, did you hear any distress?

22   A.  No.

23   Q.  Okay.

24           Did it seem like the woman was needing help at that

02:06:45    25   time?

C. Wrice - direct

374

```
          1   A.  No.
          2   Q.  I mean, were you paying a lot of attention really?
          3   A.  No.
          4   Q.  Okay.
02:06:49  5        Did you hear a woman screaming at that time or
          6   anything?
          7   A.  No.
          8   Q.  Okay.
          9        Did anything stick out to you as particularly
02:06:56 10   troubling, right?
         11   A.  No.
         12   Q.  Okay.
         13        Now, after you went into your bedroom, what did you
         14   do?
02:07:09 15   A.  Watched a little TV and went to sleep.
         16   Q.  Okay.
         17        Did you hear activity going on?
         18   A.  Yes.  There was activity going up and down the stairs.
         19   Q.  Okay.
02:07:17 20        Did it strike you as unusual?
         21   A.  No.
         22   Q.  Did it make you want to go check it out?
         23   A.  No.
         24   Q.  Okay.
02:07:24 25        And did you eventually fall asleep?
```

C. Wrice - direct

375

1  A.  Yes.

2  Q.  Now, when is the next time you remember being woken up?

3  A.  I had a knock on my bedroom door that morning by Kim, and

4  then I opened up the door and that's when I saw detectives.

02:07:45  5  Q.  Okay.

6  Now, Kim.  Who's Kim?

7  A.  I think she's a friend -- I'm not sure who she was.  I'm

8  not sure.  She was just at the house.  I'm not sure who she

9  was a friend of.  I --

02:07:57  10  Q.  You don't know?

11  A.  No.  I didn't know her.

12  Q.  Did you know her last name?

13  A.  No.

14  Q.  Did you recognize her face?

02:08:02  15  A.  No.

16  Q.  Had you ever seen her before?

17  A.  Yes.  I saw her once before in the house.

18  Q.  Okay.

19  A.  I didn't know who she was.

02:08:13  20  Q.  Did you have any conversations with her?

21  A.  No.

22  Q.  Did you ever see her after that?

23  A.  No.

24  Q.  All right.

02:08:20  25  Now, you said that the next thing you remember are

C. Wrice - direct

376

| | |
|---|---|
| 1 | the detectives knocking on your door, right? |
| 2 | A.  It was Kim knocked on the door. |
| 3 | Q.  Oh, Kim knocking on the door. |
| 4 | During the course of the night, did you ever hear a |
| 5 | woman screaming? |
| 6 | A.  No. |
| 7 | Q.  And did you ever hear anyone crying out for help or |
| 8 | anything like that? |
| 9 | A.  No. |
| 10 | Q.  Okay. |
| 11 | You eventually came to find out that a woman was |
| 12 | badly injured in the attic of your home, right? |
| 13 | A.  Yes. |
| 14 | Q.  And that she had been raped and burned up in the attic, |
| 15 | right? |
| 16 | A.  Yes. |
| 17 | Q.  Okay. |
| 18 | Now, how -- can you explain -- do you know why -- |
| 19 | MS. BONJEAN:  Strike that. |
| 20 | BY MS. BONJEAN: |
| 21 | Q.  Some people will say, how could you not hear what was |
| 22 | going on?  It's just unbelievable, right? |
| 23 | MR. JEBSON:  Objection to the form of the question. |
| 24 | THE COURT:  Objection sustained. |
| 25 | Just ask the question. |

02:08:39

02:08:49

02:09:01

02:09:19

1  BY MS. BONJEAN:

2  Q.  Did you hear her at any point?

3  A.  No.

4  Q.  If you had heard a woman screaming up there, would you

5  have done something?

6  A.  Yes.  I would have went and investigated, see what was

7  going on.

8  Q.  Sir, had you ever even been arrested before in your life?

9  A.  No.

10  Q.  And after that knife -- after that night, have you ever

11  been arrested?

12  A.  No.

13  Q.  Okay.

14       Now, let's go back to when Kim knocked on your door.

15  Tell me what happened after that.

16  A.  The detectives came in, they handcuffed me and put me in

17  the living room on the floor.

18  Q.  Okay.

19       And who was there?

20  A.  It was Bobby Joe and my sister Patricia and Stanley Wrice.

21  Q.  Okay.

22       Was Kim there, also?

23  A.  Yeah, she was still there.

24  Q.  And what about the kids?  Do you remember them?  Where

25  were they?

C. Wrice - direct

378

```
         1   A.  Yeah, there was Keisha and Robert.
         2   Q.  Were they --
         3   A.  Two little kids.
         4   Q.  Were they in the living room, also?
02:10:21 5        If you don't remember --
         6   A.  I don't remember.
         7   Q.  Okay.
         8        And do you recall how long you were in that living
         9   room area before you were taken out?
02:10:34 10  A.  Maybe about four hours, I want to say.  I'm not really
         11  sure.  About four hours.
         12  Q.  Four hours?
         13  A.  Yes.
         14  Q.  And what was going on while you were in that living room?
02:10:47 15  A.  The detectives was upstairs checking, doing something
         16  upstairs in the attic.  I'm not sure exactly what they was
         17  doing, but they was up in the attic.
         18  Q.  And you said eventually you found out something terrible
         19  had happened to a woman up there.  Who told you that
02:11:03 20  information?
         21  A.  One of the detectives at the police station.
         22  Q.  Okay.
         23       And did you know before that what had allegedly
         24  happened up there?
02:11:12 25  A.  No.
```

C. Wrice - direct

379

1  Q.  So, you were in the living room area for some period of

2  time, it sounds like, right?

3  A.  Yes.

4  Q.  And were you handcuffed the entire time?

02:11:23  5  A.  Yes.

6  Q.  Okay.

7      Did you ever eventually leave the living room area?

8  A.  Yes.

9  Q.  And where did you go?

02:11:27  10  A.  To the hospital.  It was in the police car.  We went to

11  the hospital.

12  Q.  Okay.

13      And who did you ride in the police car with, if you

14  remember?

02:11:36  15  A.  I can't really remember.  I think it was Bobby Joe.

16  Q.  Okay.

17      Did you ever see Stan or Rodney Benson at any point

18  prior to going to the hospital?  You said Stan.  Did you see

19  Rodney Benson prior to going to the hospital?

02:11:58  20  A.  No.

21  Q.  Did you see him at some point that evening?

22  A.  Yes, I saw him some point.

23  Q.  Okay.

24  A.  Yes.

02:12:03  25  Q.  Do you remember when exactly?

1    A.  I think I saw him at the police station.

2    Q.  Okay.

3         And did Stan and Rod- -- did Stan or Rodney Benson

4    ride in the police car to the hospital with you?

02:12:19    5    A.  No.

6    Q.  Okay.

7         Now, after you were at the hospital, were you taken

8    anywhere else?

9    A.  Yes, to the police station.

02:12:26    10   Q.  Okay.

11        And do you remember where that police station was

12   located?

13   A.  I think it was on Cottage Grove, 90-something and Cottage

14   Grove.

02:12:38    15   Q.  Okay.

16        Had you ever been there before?

17   A.  No.

18   Q.  Okay.

19        And when you were brought to the police station,

02:12:45    20   where did you go?

21   A.  I think I went through -- went through the side door and

22   went up a couple flights of stairs.

23   Q.  And who brought you up there?  Do you know?

24   A.  Nah, I think it was just two detectives.  I'm not sure who

02:13:00    25   they was.

C. Wrice - direct

381

1    Q.  Okay.

2          As you sit here today, do you even remember their

3    names?

4    A.  No.

02:13:04  5    Q.  And where did the detectives take you once they brought

6    you up the stairs?

7    A.  Into a interviewing room.

8    Q.  Okay.

9          And were you handcuffed?

02:13:17  10   A.  Yes.

11   Q.  Okay.

12         And did you see any other individuals at the Area 2

13   police station or the police station at 91st and Cottage Grove

14   that you knew?

02:13:29  15   A.  At the time I was there?

16   Q.  Yeah.  Who did you see there?

17   A.  I saw Rodney Benson.

18   Q.  Was Bobby Joe there?

19   A.  Yes, Bobby Joe was there.  Wait, when is this -- yeah,

02:13:49  20   Bobby Joe was there.

21   Q.  How about Stan?

22   A.  Yes, he was there.

23   Q.  Patricia?

24   A.  Excuse me?  Yes, she was there, also.

02:13:56  25   Q.  Okay.

1    Anyone else that you can remember as you sit here

2  today?

3  A.  No.

4  Q.  Okay.

02:14:00  5    Now, did there come a time when you heard anything

6  unusual while you were sitting in the interview there --

7  interview room?

8  A.  It sounded like I heard Stanley Wrice hollering.

9  Q.  Hollering?

02:14:15  10  A.  Yes, hollering downstairs.

11  Q.  Okay.

12    And did -- after you heard what you thought was

13  Stanley Wrice hollering, did any detectives come into the

14  interview room with -- where you were?

02:14:25  15  A.  Yes, I believe so.

16  Q.  Okay.

17    And what, if anything -- did you ask the detective

18  about your brother hollering or did he say anything about it?

19  A.  No.

02:14:37  20  Q.  Okay.

21    And tell me what, if anything, happened when -- once

22  the detectives came into the interview room?  What did they

23  say to you; what did you say to them?

24  A.  They was trying to get me to say that Stanley Wrice was

02:14:50  25  upstairs.  And I didn't know anything about it.  I just told

C. Wrice - direct

383

1   them everything I knew.  I didn't know anything.

2   Q.  And did they seem like they believed you?

3   A.  No.

4   Q.  And what did they want you to say?

02:15:04   5   A.  They wanted me to say that -- that he was upstairs and he

6   had something to do with somebody being raped and burnt.

7   Q.  Okay.

8        And what did you say in response to that?

9   A.  I said, no, I had no idea.  I didn't know nothing about

02:15:16   10   it.

11   Q.  And at some point, did the detectives take you out of that

12   interview room to another location?

13        MR. JEBSON:  Objection.  Leading.

14        THE COURT:  Overruled.

15   BY THE WITNESS:

16   A.  Yes.

17   BY MS. BONJEAN:

18   Q.  Okay.

19        And can you tell the ladies and gentlemen of the jury

02:15:32   20   where you were taken?

21   A.  I was taken downstairs to a room.  It was like a empty

22   jail cell downstairs.  And they handcuffed me and my legs in

23   the chair.

24   Q.  Okay.

02:15:47   25        And do you know what the chair looked like?  Do you

1    remember it?

2    A.  I think it's a wooden chair.  I'm not sure.

3    Q.  All right.

4         And how did -- can you describe for the ladies and

02:15:55    5    gentlemen of the jury how they handcuffed you to the chair?

6    A.  By my feet.  By my ankles and the feet.  And, then, they

7    have it handcuff right there (indicating) to the chair.

8    Q.  Kind of like hog-tied you a little bit?

9    A.  Yes.

02:16:08   10    Q.  Like down?

11    A.  Yes.

12    Q.  Like your wrists to your ankles?  How is that?

13         MR. JEBSON:  Objection.  Leading.

14    BY MS. BONJEAN:

02:16:17   15    Q.  Maybe you -- here, let's get a chair.  Do you mind --

16         MS. BONJEAN:  If that's okay, Judge?

17         THE COURT:  Sure.  Go ahead.

18    BY MS. BONJEAN:

19    Q.  You said a wooden chair.  It didn't look like this, right?

02:16:35   20         Can you describe for the ladies and gentlemen of the

21    jury how they handcuffed you?

22    A.  Yeah, they handcuffed my legs like this (indicating).

23         THE COURT:  You have to speak up, though.

24    BY MS. BONJEAN:

02:16:43   25    Q.  Can you --

1   A.  I'm sorry.  Yes, they had me handcuffed down here

2   (indicating) to my ankles.

3   Q.  Okay.

4           MS. BONJEAN:  And may the record reflect he's

02:16:53   5   grabbing kind of at the lower part of his ankles?

6           THE COURT:  All right.

7           MS. BONJEAN:  Okay.  You can go back up now.

8       (Witness resumes witness stand.)

9   BY MS. BONJEAN:

02:17:13   10   Q.  How did it make you feel when they handcuffed you that

11   way?

12   A.  Really, really made me feel so bad.  I didn't know what to

13   think.  I didn't know what to feel.  I didn't -- really didn't

14   -- just didn't know what was going on.  I was still trying to

02:17:26   15   find out what's going on.  I was scared.  I was scared.

16   Q.  And did they tell you down there that they wanted you to

17   say something about Stanley?

18   A.  Yes.

19   Q.  Okay.

02:17:40   20           And did you continue to tell them that you weren't up

21   there, you can't give them any information?

22   A.  Yes.  I had no idea what was going on.  I didn't know

23   anything.

24   Q.  You were trying to protect Stanley, right?

02:17:50   25   A.  No, no.

| | |
|---|---|
| 1 | MR. JEBSON: Objection. Leading. |
| 2 | MS. BONJEAN: Fine. |
| 3 | THE COURT: That is leading. Let him -- |
| 4 | MS. BONJEAN: I will withdraw it. I apologize. |
| 02:17:55 5 | THE COURT: All right. |
| 6 | BY MS. BONJEAN: |
| 7 | Q. Mr. Wrice, did one of the detectives begin to hit you with |
| 8 | anything during the course of their questioning of you? |
| 9 | A. Yes. |
| 02:18:04 10 | Q. Can you describe the instrument that you were being hit |
| 11 | with? |
| 12 | A. Like some kind of rubber hose. It's wrapped up in |
| 13 | black -- something that was real black, wrapped up and it's |
| 14 | like a hose like (indicating). |
| 02:18:18 15 | Q. Had you ever seen anything like that before? |
| 16 | A. No. |
| 17 | Q. And can you tell the ladies and gentlemen of the jury |
| 18 | where they struck you with that? |
| 19 | A. They were striking me on my genitals and in my -- on my |
| 02:18:31 20 | legs. |
| 21 | Q. And how did it make you feel when they were striking you |
| 22 | in your genitals? |
| 23 | A. It made me feel real bad. I urinated a little bit on |
| 24 | myself. |
| 02:18:44 25 | Q. Were you scared? |

1    A.  Yes, very scared.

2    Q.  Did -- eventually, were you able to leave?

3    A.  Yes.  Eventually, they took me back upstairs in the room.

4    Q.  You weren't taken back -- were you ever taken back down

02:19:03    5    there?

6    A.  No.

7    Q.  Now, do you remember there being a time when you saw a man

8    in a suit there?

9    A.  Yes.

02:19:15    10    Q.  Okay.

11        Where were you when you saw the man in the suit?

12    A.  It's on the stairway.

13    Q.  Okay.

14        And did you hear that man say something?

02:19:23    15    A.  Yes.

16    Q.  And what did he say?

17    A.  He said, charge both the brothers.

18    Q.  What did he say?

19    A.  Charge both the brothers.

02:19:31    20    Q.  Okay.

21        But were you charged?  You weren't charged, though?

22    A.  Oh, no.  No, ma'am.

23    Q.  Okay.

24    A.  No.

02:19:41    25    Q.  Did you -- what did that make you feel when you heard

C. Wrice - direct

388

1   charge both the brothers?

2   A.  I was so scared.  I didn't -- I was terrified.

3   Q.  Okay.

4   A.  Yeah.

02:19:50   5   Q.  And did you eventually, though, get to leave?

6   A.  Yes.

7   Q.  All right.

8        And after you left the police station, where did you

9   go?

02:19:58   10   A.  I went back home.

11   Q.  Who did you go home with?

12   A.  Two of the detectives dropped us off at home.

13   Q.  Okay.

14        And the same detectives or different detectives?

02:20:10   15   A.  No.

16   Q.  Different ones?

17   A.  Sorry, I didn't hear you.

18   Q.  Different detectives?

19   A.  Yes.

02:20:15   20   Q.  Okay.

21        And was -- who was with you?

22   A.  My sister Patricia.

23   Q.  Okay.

24        Now, did there come a time when you saw the same

02:20:23   25   detectives who had taken you to that room again?

C. Wrice - direct

389

| | |
|---|---|
| 1 | A.  No. |
| 2 | Q.  Okay. |
| 3 | Did there come a time when there were some detectives |
| 4 | who came to your house again? |
| 02:20:33   5 | MR. JEBSON:  Objection.  Relevance. |
| 6 | BY THE WITNESS: |
| 7 | A.  Yes. |
| 8 | THE COURT:  I don't know what's the -- |
| 9 | MS. BONJEAN:  It's relevant to the investigation. |
| 02:20:41   10 | THE COURT:  Pardon? |
| 11 | MS. BONJEAN:  It's relevant to the investigation. |
| 12 | THE COURT:  All right.  Overruled. |
| 13 | BY MS. BONJEAN: |
| 14 | Q.  Did you answer the door? |
| 02:20:48   15 | A.  No, I didn't. |
| 16 | Q.  Why not? |
| 17 | A.  I was scared they was coming back to get me and take me |
| 18 | back. |
| 19 | Q.  And what were you scared about that they would come back |
| 02:20:57   20 | and pick you up? |
| 21 | A.  They pick me up and charge me with something, take me to |
| 22 | jail. |
| 23 | Q.  Okay. |
| 24 | A.  I didn't -- |
| 02:21:04   25 | Q.  And -- I'm sorry, go ahead. |

C. Wrice - direct

390

1   A.  I'm sorry.

2        I didn't know what was going on.  I thought they was

3   coming back to get me.

4   Q.  And what happened after you didn't answer the door?

02:21:11   5   A.  I didn't answer the door.  After, they broke the glass --

6   the top glass -- and reached in the inside and opened up the

7   door and came in.

8   Q.  Okay.

9        And did you eventually talk to the detective after

02:21:20   10   they broke in the house?

11   A.  Yes.

12   Q.  And what did they want you to do?

13   A.  They wanted me to take them to someone house to find out

14   where a certain person lived at.

02:21:27   15   Q.  Okay.

16        And did you cooperate?

17   A.  Yes.

18   Q.  Okay.

19        And do you remember if that person -- who that person

02:21:34   20   was?

21   A.  Not offhand.  I think it was Larry.

22   Q.  Larry?

23   A.  I can't --

24   Q.  Well --

02:21:48   25   A.  I can't remember who it was.

C. Wrice - direct

391

| | |
|---|---|
| 1 | Q. Was it Kenny Lewis? |
| 2 | MR. JEBSON: Objection. |
| 3 | BY THE WITNESS: |
| 4 | A. No. |
| 5 | MR. JEBSON: Leading. |
| 6 | MS. BONJEAN: No, I'm not -- I'm asking him if it was |
| 7 | these people. |
| 8 | MR. JEBSON: Judge, he just said -- |
| 9 | THE COURT: Objection overruled. |
| 10 | MR. JEBSON: -- Larry. |
| 11 | THE COURT: Objection overruled. |
| 12 | MS. BONJEAN: Okay. |
| 13 | BY MS. BONJEAN: |
| 14 | Q. You know who Kenny Lewis is, right? |
| 15 | A. Yes. |
| 16 | Q. Did they take you to Kenny Lewis's? |
| 17 | A. No. |
| 18 | Q. Okay. |
| 19 | You don't remember the name exactly? |
| 20 | A. No. |
| 21 | Q. Did it begin with an "L"? |
| 22 | A. I want to say yes, but I'm not sure. Yes. |
| 23 | Q. Okay. Fair enough. I'm not going to -- I'm not going to |
| 24 | badger you. |
| 25 | After you left the police station and you and |

02:21:54 (line 5)
02:22:01 (line 15)
02:22:06 (line 20)
02:22:18 (line 25)

C. Wrice - direct

392

| | |
|---|---|
| 1 | Patricia went to your home, did Stanley come with you? |
| 2 | A.  No. |
| 3 | Q.  Where did he go? |
| 4 | A.  He stayed at the police station. |
| 02:22:37  5 | Q.  Okay. |
| 6 | And did he ever come home again till 2013? |
| 7 | A.  No. |
| 8 | Q.  Now, back then you didn't have cell phones, right? |
| 9 | A.  No. |
| 02:22:51  10 | Q.  Okay. |
| 11 | And did you have an opportunity to testify at Stan's |
| 12 | trial? |
| 13 | A.  Yes. |
| 14 | Q.  All right. |
| 02:23:01  15 | Now, the abuse you suffered in -- at Area 2, do you |
| 16 | recall the first time you told somebody about that? |
| 17 | A.  I think someone had called and left me a message on my |
| 18 | phone, and I called them back.  But I can't remember when. |
| 19 | Q.  Do you remember what year it was? |
| 02:23:30  20 | A.  No.  I think it was 2005, I want to say. |
| 21 | Q.  Do you remember the exact date? |
| 22 | A.  No, ma'am. |
| 23 | Q.  Would anything refresh your recollection about what date |
| 24 | that was? |
| 02:23:41  25 | A.  Yes, if I could see the paper, some kind of paperwork. |

1  Q.  Okay.  Let me see if I can help you.

2      (Brief pause.)

3  BY MS. BONJEAN:

4  Q.  I'm going to show you Exhibit 9-A for identification

5  purposes only, okay?

6          Can you take a look at that, sir?

7          MS. BONJEAN:  It's just for ID.

8          THE COURT:  This is not in evidence, right?

9          MS. BONJEAN:  No, no, it's just for ID.

10         THE COURT:  Yeah, okay.

11         MS. BONJEAN:  Actually, it's just for refreshing his

12  recollection about a date.

13         THE COURT:  Oh, all right.

14         MS. BONJEAN:  Okay.

15  BY MS. BONJEAN:

16  Q.  Have you had --

17         MS. BONJEAN:  He has it.

18         THE COURT:  Do you have it?

19         THE WITNESS:  No.

20         THE COURT:  Yeah, display it on his monitor.

21  BY MS. BONJEAN:

22  Q.  Sir, take a look at that, please.  Does that refresh your

23  recollection about when you made a -- when you returned a

24  phone call to someone in 2005?

25  A.  Yes, ma'am.

C. Wrice - direct

394

1    Q.  And what date was that?

2    A.  February the 8th, 2005.

3    Q.  Okay.

4         MS. BONJEAN:  You can take it down.

5    BY MS. BONJEAN:

6    Q.  And do you remember who these people were that called you?

7    A.  No.  No, not offhand.  They called -- it was a gentleman,

8    I think, called; left me a message; and, I gave him a call

9    back.

02:25:27    10    Q.  Did he say what he wanted to talk to you about?

11         MR. JEBSON:  Objection.

12    BY THE WITNESS:

13    A.  About Stanley Wrice.

14         MS. BONJEAN:  It's not -- it's not for the truth.

02:25:34    15         THE COURT:  Overruled.

16    BY MS. BONJEAN:

17    Q.  Did he say what he wanted to talk to you about?

18    A.  He wanted to talk about Stanley Wrice, my brother.

19    Q.  And what about Stanley Wrice?

02:25:43    20    A.  About the abuse that he had suffered.

21    Q.  About the abuse, he said?

22    A.  Yes.

23    Q.  Okay.

24         And did you, in fact, call him back?

02:25:49    25    A.  Yes, I did.

C. Wrice - direct

395

```
          1    Q.  And did you tell him about what happened to you?
          2    A.  Yes.
          3    Q.  Is that the first time you told somebody?
          4    A.  Yes.
02:25:58  5    Q.  Why was that the first time you told anybody about what
          6    happened to you at Area 2?
          7    A.  I was still so actually scared -- I mean, I was so scared
          8    I couldn't really talk about it too much to anybody.
          9    Q.  And what were you scared of?
02:26:17  10   A.  I wasn't sure whether I was still -- the police still was
          11   gonna come and try to arrest me or something.  I wasn't really
          12   sure.
          13   Q.  Okay.
          14        And how did it make you feel that this had happened
02:26:34  15   to you?
          16   A.  Made me feel really, really bad.  I got in --
          17        MR. JEBSON:  Objection.  Relevance.
          18        MS. BONJEAN:  It's definitely relevant as to when he
          19   told.
02:26:46  20        THE COURT:  All right.  Overruled.
          21        You can answer.
          22   BY THE WITNESS:
          23   A.  It made me feel really, really bad.  I felt I did
          24   something wrong, but I really didn't.  I felt really bad.  I
02:26:57  25   really was scared.  I was so scared I couldn't -- didn't know
```

C. Wrice - direct

396

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | what to do.                                                          |
|       | 2  | BY MS. BONJEAN:                                                      |
|       | 3  | Q.  And was that information that you were proud to share to         |
|       | 4  | anybody, that that had happened?                                    |
| 02:27:09 | 5  | A.  No.                                                            |
|       | 6  | Q.  Why not?                                                        |
|       | 7  | A.  Because I was too embarrassed of it actually, too.  But,         |
|       | 8  | no, I did not want to tell anything -- anybody about.               |
|       | 9  | Q.  And did you even talk to your brother about it?                  |
| 02:27:22 | 10 | A.  No.                                                           |
|       | 11 | Q.  Do you regret not talking to your brother about it?             |
|       | 12 | A.  Yes.                                                            |
|       | 13 | Q.  Do you feel like you should have talked to him about it?         |
|       | 14 | A.  I feel like I should have talked to him about it.               |
| 02:27:40 | 15 |         MS. BONJEAN:  Okay.  One second.                          |
|       | 16 |    (Brief pause.)                                                   |
|       | 17 | BY MS. BONJEAN:                                                     |
|       | 18 | Q.  Sir, did there come a time when you actually went and sat       |
|       | 19 | for a more extended interview with those people that had            |
| 02:28:07 | 20 | called you?                                                       |
|       | 21 | A.  Yes.  They had called me.  I came downtown.  Someone had        |
|       | 22 | me come to the office somewhere downtown.  We sat and we            |
|       | 23 | talked.                                                             |
|       | 24 | Q.  Okay.                                                           |
| 02:28:18 | 25 |         And were they interested in talking about your            |

C. Wrice - cross

397

| | |
|---|---|
| 1 | experience at Area 2? |
| 2 | A.  No.  He totally went around everything that happened to |
| 3 | me.  He just wanted to talk about Stanley. |
| 4 | Q.  Okay. |

02:28:28     5        MS. BONJEAN:  All right.  I have nothing further.

6        THE COURT:  Mr. Jebson, you may cross-examine the

7   witness.

8        MR. JEBSON:  Thank you, Judge.

9                   CROSS-EXAMINATION

10  BY MR. JEBSON:

11  Q.  Good afternoon, Mr. Wrice.

12  A.  Good afternoon, sir.

13  Q.  I want to start off asking you some questions where your

14  brother's attorney started, with talking about the house that

02:28:42    15  you grew up in, okay?

16  A.  Yes.

17  Q.  So, that's at 7618 Chappel?

18  A.  Yes.

19  Q.  And at the time, in 1982, your brother Stanley Wrice was

02:28:56    20  the oldest adult living in that house?

21  A.  Yes.

22  Q.  He was at least four years older than you?

23  A.  Yes, I think so.

24  Q.  He was almost 30 in 1982, right?

02:29:13    25  A.  I think so, yeah.  I didn't know exactly how old he was.

C. Wrice - cross

398

1  Q.  Now, you talked about the parties that were going on in

2  that home.  I want to ask you some questions about that, okay?

3  A.  Okay.

4  Q.  Now, there was a lot of parties going on in that house; is

02:29:28  5  that what you're saying?

6  A.  No.

7  Q.  Well, your brother Stan had a lot of people coming over at

8  his house, right?

9  A.  Yes, a lot of people.

02:29:39  10  Q.  And some of those people included his friends, right?

11  A.  Yes.

12  Q.  That included Rodney Benson?

13  A.  Yes.

14  Q.  That included Michael Fowler?

02:29:53  15  A.  Yes.

16  Q.  That included Lee Holmes?

17  A.  Yes.

18  Q.  In fact, you saw those individuals over at your house

19  numerous times, right?

02:30:04  20  A.  Yes.

21  Q.  And they weren't your friends, were they?

22  A.  No.

23  Q.  They were your brother's friends, right?

24  A.  Yes.

02:30:12  25  Q.  In fact, you only saw them in passing, right?

1   A.  Yes.

2   Q.  Now, you told your brother's attorney that you are very

3   close with your brother Stanley Wrice?

4   A.  Yes.

02:30:33   5   Q.  You have been close with him your whole life, right?

6   A.  Yes.

7   Q.  You were close with him on -- in September of 1982?

8   A.  Yes.

9   Q.  You were close with him when he went to trial for these

02:30:50   10   crimes in May of 1983?

11   A.  Yes.

12   Q.  You were close with him when he got released from prison,

13   right?

14   A.  Yes.

02:31:04   15   Q.  You've continually to become -- to stay close with him?

16   A.  Yes.

17   Q.  And you want to do everything in your power to help your

18   brother Stanley Wrice, right?

19   A.  I don't understand the question.

02:31:19   20   Q.  Well, isn't it true that from the day that your brother

21   got arrested for these crimes, you have tried to help him out

22   any way you can, right?

23   A.  No, all I did was tell the truth of what I saw.

24   Q.  Okay.  Well, let's talk about that.

02:31:37   25          Stanley Wrice's criminal defense attorney called you

1  as a witness at his trial, right?

2  A.  Yes, I think so.  It's been so long ago.

3  Q.  Well, are you telling this jury that you forget whether or

4  not you testified on behalf of your brother at --

02:31:54  5  A.  I testified, yes.

6  Q.  Okay.

7       And you testified because Stanley Wrice's criminal

8  defense attorney asked you if you would testify, right?

9  A.  Yes.

02:32:03  10  Q.  In fact, you spoke with Stanley Wrice's criminal defense

11  attorney before you took the stand to testify, right?

12  A.  Yes.

13  Q.  You met with him numerous times to go over your testimony,

14  didn't you?

02:32:14  15  A.  Not numerous times, no.

16  Q.  Well, you met with him before your testimony, right?

17  A.  Yes.

18  Q.  And you talked about your testimony?

19  A.  Yes.

02:32:21  20  Q.  And isn't it true -- well, let me ask you this:  At the

21  criminal trial, you are called as a witness by Stanley Wrice's

22  criminal defense attorney and, then, you are cross-examined by

23  the prosecutor, right?

24  A.  Yes.

02:32:37  25  Q.  And the prosecutor is also known as an assistant state's

1  attorney.  You know that, right?

2  A.  No.

3  Q.  Well, if I told you that's what they're called, do you

4  have any reason to disagree with me?

02:32:48  5  A.  No.

6  Q.  So, you know the prosecutor that prosecuted Stanley Wrice?

7  A.  Yes.

8  Q.  In fact, you have spoken -- she has approached you or she

9  did approach you before you testified at the criminal trial,

02:33:03  10  right?

11  A.  I don't recall.

12  Q.  Her name is Bertina Lampkin, the prosecutor, right?

13  A.  I don't recall what her name is.

14  Q.  Well, do you remember testifying at your criminal -- let

02:33:18  15  me ask you this:  Do you remember two months before your

16  brother's criminal trial the prosecutor, Bertina Lampkin,

17  coming up to you and asking you if you would talk to her?  Do

18  you remember that?

19  A.  Sir, it's so long ago I don't remember.

02:33:39  20  Q.  Okay.

21      Well, isn't it true that Bertina Lampkin, the

22  prosecutor, actually brought it out when she was cross-

23  examining you that she tried to talk to you before the trial

24  and you refused to talk to her?

02:33:53  25      Do you remember that?

1    A.  No, I do not.

2    Q.  Well, let's see if we can refresh your recollection.

3    We're going to show you your criminal trial testimony, Page

4    1373, Line 16, to 1374, Line 13, please.

02:34:10    5    MR. JEBSON:  Your Honor, could we please have the

6    screen for the witness?

7    THE COURT:  Sure.

8    (Brief pause.)

9    MR. JEBSON:  Do you need the lines again?

02:34:52    10    That is Line 16 on 1373 to Line 13 on 1374.

11    MS. BONJEAN:  If it would help, we would stipulate

12    that Mr. Wrice declined to speak to the person who was

13    prosecuting his brother.

14    MR. JEBSON:  Your Honor, I would like to question the

02:35:19    15    witness and --

16    THE COURT:  You may go ahead.  Ask him a question.

17    MR. JEBSON:  Sure.

18    THE COURT:  Refreshing his recollection.

19    MR. JEBSON:  Thank you, Judge.

20    BY MR. JEBSON:

21    Q.  Sir, have you had an opportunity to look at your criminal

22    trial testimony when Prosecutor Lampkin cross-examined you

23    about her trying to talk to you and you refusing to talk to

24    her?

02:35:42    25    A.  I don't recollect.

1    Q.  Well, you would agree that at your criminal trial, that's

2    exactly what happened, right?  The pr- --

3           MS. BONJEAN:  Objection.  He says he doesn't

4    recollect.  And just like this did not refresh some people's

02:35:54    5    recollections that testified before him --

6           THE COURT:  All right.  If it doesn't refresh his

7    recollection, then --

8           MR. JEBSON:  Judge --

9           MS. BONJEAN:  And it was Stanley's criminal trial,

02:36:03   10    not his.

11           MR. JEBSON:  Your Honor, this is --

12           MS. BONJEAN:  They're not all the same.

13           MR. JEBSON:  Your Honor, this is substantive evidence

14    through -- for the materiality issue, which comes in beyond

02:36:12   15    just refreshing recollection.

16           THE COURT:  You're using this to refresh his

17    recollection, though.  And if you want to use it for some

18    other reason --

19           MS. BONJEAN:  His -- the summary's already coming

02:36:19   20    into evidence, Judge.  It's a non-issue.

21           MR. JEBSON:  Judge, the summary is not being used

22    for --

23           THE COURT:  All right.  Well, we are -- he says he

24    doesn't remember this conversation with Ms. Lampkin.  So, move

02:36:32   25    on.

1    MR. JEBSON:  Okay.  Then, Judge, I'll go on to

2    impeachment.

3    BY MR. JEBSON:

4    Q.  Sir, isn't it true -- let me get your trial testimony.

02:36:44    5    MS. BONJEAN:  We just stipulated he declined to

6    speak.

7    THE COURT:  They stipulated that he didn't talk to

8    her, he declined to talk to her.  So --

9    MR. JEBSON:  Okay.  Thank you, Judge.

02:36:52    10    THE COURT:  -- I don't think they need to go farther

11    than that.

12    MR. JEBSON:  Thank you.

13    BY MR. JEBSON:

14    Q.  In fact, when you refused to talk -- let me ask you if you

02:36:59    15    remember this, sir:  When you refused to talk to the

16    prosecutor, do you remember her saying, well, then can I have

17    your address so I can serve you with a subpoena since you

18    won't talk to me?  Do you remember her telling you that?

19    A.  No, sir.

02:37:14    20    Q.  Let's see if we can refresh your recollection.  That is

21    Page 1375, Line 15, to 1375, Line 24.

22    (Brief pause.)

23    THE COURT:  All right.  Ask him the question if that

24    refreshes his recollection.

25    BY MR. JEBSON:

1   Q.  Sir, have you read that?

2   A.  Excuse me, what I'm -- which one I'm reading?

3   Q.  1375, Line 13.

4   A.  They got Line 15, 16, 17, 18 up here.

02:38:06  5   Q.  Yeah, you see it?

6      (Brief pause.)

7         MS. BONJEAN:  I'm not sure what it's refreshing.

8         THE COURT:  Whether or not this conversation occurred

9  in the courtroom, I guess --

02:38:32  10         MR. JEBSON:  Yes.

11         THE COURT:  -- if he remembers this.

12  BY THE WITNESS:

13   A.  Yeah, I just see my address up here.  I don't see anything

14  above that.

02:38:38  15         MR. JEBSON:  1375, 15 to 24.

16         MS. BONJEAN:  Judge, I think -- he doesn't remember

17  his testimony.  And it's just transcripts.

18         THE COURT:  Does it refresh your recollection?

19  BY THE WITNESS:

02:38:53  20   A.  This is 15, 16, 17.  No, I don't --

21         THE COURT:  Okay.  Let's move on.

22         MR. JEBSON:  Okay.

23  BY MR. JEBSON:

24   Q.  Well, isn't it -- I'm going to -- isn't it true that at

02:39:01  25  your brother's criminal trial, you were asked the following

1   questions and you gave the following answers:

2          "Question:  And when I talked to you -- "

3          And this is the prosecutor asking you these

4   questions.

02:39:14
5          "Question:  And when I talked to you over a

6   month-and-a-half ago, you told me that you were moving that

7   week, didn't you?

8          "Answer:  Yes.

9          "Question:  And I asked you for the address where you

02:39:25
10  were moving, didn't I?

11         "Answer:  Yes.

12         "Question:  So that I could subpoena you because you

13  wouldn't talk to me; isn't that right?

14         "Answer:  Yes."

02:39:36
15         Isn't it true that you were asked those questions by

16  the prosecutor at your brother's criminal trial and you gave

17  those answers?

18  A.  No, sir, I don't remember those.

19  Q.  I'm not asking you if you remember them.  Isn't --

02:39:49
20         THE COURT:  He says he doesn't remember, so he can't

21  say.  So, let's move on.

22         MS. BONJEAN:  And we've already stipulated --

23         THE COURT:  Wait, wait, wait.

24         Just move on.

25  BY MR. JEBSON:

C. Wrice - cross

407

1    Q.  Now, I want to ask you some questions about what your

2    brother's attorney asked you on direct examination regarding

3    what you heard upstairs.

4            Now, you would agree that at some point the night in

02:40:18    5    question, September 8th through September 9th, that you were

6    home at that -- you were at your home?

7    A.  Yes.

8    Q.  And Mildred came over?

9    A.  Yes.

02:40:26   10    Q.  And you and Mildred went into your bedroom, right?

11    A.  Yes.

12    Q.  And when you went into your bedroom, you knew that your

13    brother Stanley was at the house, right?

14    A.  Yes.

02:40:40   15    Q.  But when you went into your bedroom with Mildred, you

16    didn't see Stanley Wrice downstairs, did you?

17    A.  I was in the room.  I didn't see anybody downstairs.

18    Q.  I'm saying before you went into your bedroom, you did not

19    see Stanley Wrice downstairs, did you?

02:40:55   20    A.  No.

21    Q.  Because Stanley Wrice was upstairs, wasn't he?

22    A.  I did not see him upstairs, sir.

23    Q.  Okay.  Well, we'll get to that in a second.  Let's talk

24    about the layout of this house, okay?

02:41:07   25            You would agree that this is a very, very small

C. Wrice - cross

408

1   bungalow house?

2   A.  Yes.

3   Q.  And it would be fair to characterize it as a tiny, tiny

4   house, right?

02:41:23   5   A.  I wouldn't say tiny, but, yeah, it's a small house.

6   Q.  For instance, you walk in the front door, you are

7   immediately in the living room?

8   A.  Correct.

9   Q.  You walk a few more feet, you're in the dining room?

02:41:34   10  A.  Yes.

11  Q.  You walk a few more feet, you're in the kitchen?

12  A.  Yes.

13  Q.  And between the front door and the kitchen, you have two

14  bedrooms?

02:41:42   15  A.  Yes.

16  Q.  One on the left and one on the right?

17  A.  Yes.

18  Q.  Yours is on the left, Patricia was on the right?

19  A.  Yes.

02:41:49   20  Q.  Stanley Wrice's bedroom was upstairs, right?

21  A.  No.  He was sleeping on the couch -- living room couch.

22  Q.  Now, you gave a deposition in this case, right?

23  A.  Yes, I think so.

24  Q.  A deposition -- you came down to an office -- lawyer's

02:42:14   25  office -- our office -- and we asked you some questions, there

1    was a court reporter there, and you were under oath.

2          Do you remember that?

3    A.  Yes.

4    Q.  That was in 2016, right?

02:42:26    5    A.  Yes, I think so.

6    Q.  And you knew that -- before you answered questions, you

7    knew that you were being placed under oath, right?

8    A.  Yes.

9    Q.  And you knew that you had to tell the truth?

02:42:36    10   A.  Yes.

11   Q.  And you, in fact -- did you tell the truth?

12   A.  Yes.

13   Q.  Okay.

14         So, your answers in your deposition, you are telling

02:42:43    15   this jury, was truthful?

16   A.  Yes.

17   Q.  And just like there's a court reporter right here taking

18   down everything that you're saying, at the deposition there

19   was also a court reporter, right?

02:42:53    20   A.  Yes.

21   Q.  And do you remember being asked questions at your

22   deposition about whether or not your brother Stanley Wrice,

23   whether or not his bedroom was upstairs?  Do you remember

24   those questions?

02:43:13    25   A.  No.

C. Wrice - cross

410

1    Q.  Okay.

2         Well, isn't it true that you testified at your

3    deposition that Stanley Wrice, his bedroom was actually

4    upstairs in the attic?  Isn't that what you testified under

5    oath?

6    A.  Yes, his bedroom was up in the attic.

7    Q.  Okay.

8         So, now --

9    A.  But he wasn't --

10   Q.  His bedroom --

11        MS. BONJEAN:  Let him finish.

12        MR. JEBSON:  Judge, I'm happy to let him finish.  I

13   thought he was finished.

14   BY MR. JEBSON:

15   Q.  Are you finished answering --

16   A.  No.

17   Q.  -- the question?

18   A.  He was up there working on his bedroom.  He wasn't

19   actually sleeping upstairs.

20   Q.  Sir, didn't you tell this jury about a half-hour ago from

21   questions from your brother's attorney whether or not Stanley

22   Wrice's bedroom was upstairs, and you told this jury --

23   A.  It was a --

24   Q.  -- no?

25   A.  -- a room upstairs, but it wasn't -- this wasn't even a

1    bed in the room.  It was just a vacant room up there that he

2    was trying to fix up into a bedroom.

3    Q.  So, let me ask you the question again.

4         Was Stanley Wrice's bedroom, back in September of

02:44:10    5    1982, was it his bedroom in the attic upstairs?

6    A.  No.

7    Q.  Let me turn to your deposition, Page 43, Line 9.

8         MS. BONJEAN:  Not impeaching, Judge.  Objection.

9         THE COURT REPORTER:  I can't hear you, ma'am.

02:44:38   10         MS. BONJEAN:  Judge, this is an objection.  It's not

11    impeaching because the foundation is not there, the time

12    frame.

13         MR. JEBSON:  Judge, it's clearly impeaching.

14         MS. BONJEAN:  No, he --

02:44:47   15         THE COURT:  Well, go ahead.  Proceed to do what

16    you're doing.

17         MR. JEBSON:  Thank you.

18    BY MR. JEBSON:

19    Q.  Sir, isn't it true you were asked this question and you

02:44:54   20    gave this answer at your deposition in 2016 under oath:

21         "Question:  Whose bedroom was upstairs?

22         "Answer:  It was Stanley's bedroom upstairs and my

23    sister Magnolia, but I think she was moved out already.  His

24    bedroom was upstairs.  Actually, we had a couple more people

02:45:16   25    there when we were still living in the home, still had stuff

1    upstairs.  So, he was staying upstairs at that time.  So, I'm

2    not sure if he was the only one staying up there at that time,

3    because my sisters were probably coming back and forth picking

4    up their belongings or something like that.  I'm not sure.

5    But he did.  He definitely stayed upstairs.  He slept

6    upstairs."

7          Isn't it true that you were asked that question and

8    you gave that answer under oath?

9          MS. BONJEAN:  Still objection.  Not impeaching

10   because no time frame set on that.

11         THE COURT:  Overruled.  He can respond.

12   BY THE WITNESS:

13   A.  Yeah, he was upstairs, but he wasn't --

14   BY MR. JEBSON:

15   Q.  I just asked --

16         THE COURT:  Wait.

17   BY MR. JEBSON:

18   Q.  I just asked --

19         THE COURT:  Let him answer the questions.

20         MR. JEBSON:  I'm sorry.

21         THE COURT:  Go ahead.

22   BY THE WITNESS:

23   A.  He was staying upstairs.  He was moving into my sister's

24   room and she was moving out.  He was fixing up the room.

25   There wasn't enough bedrooms up there for him to stay up there

C. Wrice - cross

413

1       in September the 8th.  He was sleeping on the front-room

2       couch.

3       BY MR. JEBSON:

4       Q.  Okay.  Well, let's look at Defendants' Exhibit 48.  It's a

02:46:26    5   picture that's already in evidence.  We are looking at the

6       upstairs room that we've just been talking about, right?

7       A.  Yes, sir.  Yes, sir.

8       Q.  Now, you would agree that's the way it looked on

9       September -- around the time of September 8th and 9th of 1982?

02:46:45   10           MR. HALE:  Scott?

11           MR. JEBSON:  Judge, I would ask that this be

12      published to the jury.

13           THE COURT:  It's in evidence, isn't it?

14           MR. JEBSON:  It is, Judge.

02:46:51   15           THE COURT:  Yeah, you can publish anything in

16      evidence.

17      BY MR. JEBSON:

18      Q.  I'm sorry, let me ask the question again because the jury

19      is just now looking at it.

02:47:03   20           Would you agree, sir, that Defendants' Exhibit 48 is

21      a picture of the bedroom that was upstairs in that house on

22      September 8th and 9th of 1982?

23      A.  Yes, that's the room that he was working on.

24      Q.  Okay.

02:47:19   25           Now, do you see there's two windows at the back of

C. Wrice - cross

414

1    that room?

2    A.  Yes.

3    Q.  Do you see the pictures above those windows?

4    A.  Yes.

02:47:35    5    MR. JEBSON:  If we can zoom in on that, please.

6    BY MR. JEBSON:

7    Q.  Those are pictures of women scantily dressed.

8    MS. BONJEAN:  Oh, my gosh.  Objection, Judge.  It's a

9    house full of eleven people.

02:47:46    10   THE COURT:  Wait a minute.  Wait.

11   Objection sustained.

12   BY MR. JEBSON:

13   Q.  This wasn't your room, was it?

14   A.  No.

02:48:03    15   Q.  So, let's --

16   MR. JEBSON:  We can take that off.

17   BY MR. JEBSON:

18   Q.  Let me go back to your testimony about when you and

19   Mildred go into the bedroom.  And when you go in the bedroom,

02:48:18    20   by the way, September 8th going into the 9th, you close the

21   door, right?

22   A.  Yes.

23   Q.  Because that was your practice, right?

24   A.  Yes.

02:48:28    25   Q.  So, when you -- you were in there, you close the door, and

C. Wrice - cross

415

```
             1   you're watching TV?

             2   A.  Yes.

             3   Q.  You and Mildred?

             4   A.  Yes.

02:48:32     5   Q.  And there came a time where it was so loud outside of your

             6   bedroom that you heard people running up and down the stairs?

             7   A.  Yes.

             8   Q.  That's with your door closed and your TV on?

             9   A.  Yes.

02:48:49    10   Q.  And your bedroom door is right next to the kitchen, right?

            11   A.  Pretty close to the kitchen, yes.

            12   Q.  We're talking a matter of feet, right?

            13   A.  Yes.

            14   Q.  And when we're in the kitchen, it's just a few steps up to

02:49:07    15   that bedroom attic, right?

            16   A.  Yes.

            17   Q.  So, can we agree that it is a very short distance

            18   between -- well, let me ask you this:  So, we have the

            19   kitchen, the dining room is the next room, then the living

02:49:25    20   room, right?

            21   A.  Yes.

            22   Q.  We can agree that the living room -- is that where the

            23   couch is?

            24   A.  Yes, in the living room.

02:49:34    25   Q.  We can agree that the living room where the couch is is
```

C. Wrice - cross

416

```
            1   very close to that kitchen?

            2           MS. BONJEAN:  Objection.

            3           THE COURT:  Well, it's not necessarily agree.

            4           Is that correct?

02:49:50    5           THE WITNESS:  No, it's not that close to the kitchen.

            6   BY MR. JEBSON:

            7   Q.  Well, it's just a few feet from the living room to the

            8   kitchen, right?

            9   A.  A few feet as, what?  Five, ten --

02:49:58   10           MS. BONJEAN:  Objection.

           11   BY THE WITNESS:

           12   A.  -- fifteen feet?

           13           MS. BONJEAN:  He's misstating.  He first said his

           14   bedroom to the kitchen.  Now he's in the living room to the

02:50:03   15   kitchen.  He's trying to confuse the witness.

           16           THE COURT:  No, it's --

           17           MR. JEBSON:  I'm not trying to --

           18           THE COURT:  He's talking about the kitchen and the

           19   living room, I thought.

02:50:09   20           But go ahead.

           21   BY MR. JEBSON:

           22   Q.  A few feet from the couch in the living room to the

           23   kitchen?

           24   A.  I want to say maybe about -- maybe ten feet.

02:50:22   25   Q.  Now, when you heard this -- this noise with people running
```

1    up and down the stairs with your door closed, TV on, it was so

2    loud that you actually left your bedroom to see what was going

3    on, right?

4    A.  No.

02:50:38    5    Q.  Did you leave your bedroom after hearing this noise?

6    A.  No.

7    Q.  What did you do?

8    A.  I didn't leave the room until -- till my girlfriend left.

9    Q.  So, you're saying that you were in your room from the

02:51:03   10    first time -- let me ask you this:  When you go into the room

11    to watch TV with Mildred, did you ever leave the room and come

12    back?

13    A.  No.

14    Q.  Let's look at your trial testimony.

02:51:37   15         Isn't it true that on cross-examination from the

16    prosecutor, Bertina Lampkin, on Page 1379 starting at Line 1,

17    asked you the following questions and you gave the following

18    answers at your brother's criminal trial under oath:

19         "Question:  Now, Charles, at some point in time while

02:51:56   20    you were in that house, you heard people running up and down

21    the stairs, didn't you?

22         "Answer:  Yes.

23         "Question:  And you came out of your room, didn't

24    you?

02:52:06   25         "Answer:  Yes, ma'am."

1        That's what you testified under oath, isn't it?

2    A.  I don't recall that.

3    Q.  Well, isn't it true that's exactly what happened, just

4    like you testified in your criminal trial?  You heard this

02:52:26   5    going on when you were in your bedroom and you came outside

6    your bedroom?

7    A.  No.  I didn't come outside the bedroom till my girlfriend

8    left.

9    Q.  Okay.

02:52:35   10        So, you're saying that what you testified under oath

11   at your brother's criminal trial is not true?

12   A.  Sir, I don't remember that.

13        MS. BONJEAN:  Objection.  It's not even impeaching.

14   It's not impeaching to what he is -- it's not inconsistent

02:52:46   15   with what he's saying.

16        MR. JEBSON:  Judge, I would object to the speaking

17   objections.  It's clearly impeaching.

18        THE COURT:  Well, he's not using it for impeachment,

19   as I understand it.  I understand that that's not -- I don't

02:52:56   20   know if you're using it to refresh his recollection.

21        MR. JEBSON:  I'm using it to directly impeach his

22   testimony that he never came out of his house.

23        MS. BONJEAN:  Objection.  He didn't say that, though.

24        MR. JEBSON:  Came out of his room.

02:53:08   25        MS. BONJEAN:  So, it's not even --

|  | 1 | THE COURT:  Wait.  Just a minute. |

1           THE COURT:  Wait.  Just a minute.

2               (Brief pause.)

3           THE COURT:  He didn't say -- I'm not sure what the

4       objection is.  He didn't say, what?

02:53:31   5           MS. BONJEAN:  He testified on direct, and he

6       testified here, that he did come out of his room to walk his

7       girlfriend out multiple times.  And, then, he also test- --

8       so, it's not impeaching that he never left his room.

9           THE COURT:  His testimony here today has been that

02:53:45  10      way, that he stayed in his room except when he took his

11      girlfriend out.

12              Now, you're attempting, by using this trial

13      testimony, to indicate that there was another time he came

14      out; is that right?

02:54:01  15          MR. JEBSON:  That's right, Judge.  That's right.

16          THE COURT:  All right.

17          MS. BONJEAN:  Only it's not impeaching because it has

18      no foundation in it, but he can --

19          MR. JEBSON:  Judge --

02:54:07  20          MS. BONJEAN:  -- carry on.

21          MR. JEBSON:  Judge, I will continue on in terms of

22      his trial testimony.

23      BY MR. JEBSON:

24      Q.  So, I'm on the same page, 1379.

02:54:14  25          MS. BONJEAN:  I'm going to object to him just reading

C. Wrice - cross

1   his trial testimony in.  He should ask the man questions and

2   impeach like you're supposed to do.

3          THE COURT:  Well, just read the testimony, and then

4   ask him if he said that.  I guess that's --

02:54:33    5          MR. JEBSON:  1379, Lines 1 through 15, please.

6   BY MR. JEBSON:

7   Q.  Question -- again, this is on cross-examination by Bertina

8   Lampkin, the prosecutor at your brother's criminal trial:

9          "Question:  Now, Charles, at some point in time while

02:54:55   10   you were in that house, you heard people running up and down

11   the stairs, didn't you?

12          "Answer:  Yes.

13          "Question:  And you came out of your room, didn't

14   you?

02:55:05   15          "Answer:  Yes, ma'am.

16          "Question:  And when you came out of the room,

17   Stanley was upstairs, too, wasn't he?

18          "Answer:  Yes.

19          "Question:  And you went back into your room, didn't

02:55:17   20   you?

21          "Answer:  Yes.

22          "Question:  And when you went back into your room,

23   you continued to hear the noise of those people running up and

24   down the stairs, didn't you?

02:55:28   25          "Answer:  Yes."

| | |
|---|---|
| 1 | That's what you testified on cross-examination by the |
| 2 | prosecutor at the criminal trial, isn't it? |
| 3 | A.  I don't remember that, sir. |
| 4 | Q.  Well, you're looking right at it.  That is what -- |
| 5 | MS. BONJEAN:  We -- |
| 6 | BY MR. JEBSON: |
| 7 | Q.  That's what the transcript -- |
| 8 | THE COURT:  All right, wait.  He said he didn't |
| 9 | remember it.  So, let's go on. |

02:55:44

10          MS. BONJEAN:  We stipulate the transcripts are what

11     they are.

12          THE COURT:  He read it in the record.  Let's go.

13     BY MR. JEBSON:

14     Q.  Stanley Wrice was upstairs when you heard these noises of

02:55:59

15     people running up and down the stairs and you came out of your

16     room.  He was upstairs, wasn't he?

17     A.  No.

18     Q.  So, what I just read, you are saying, is incorrect, right?

19     A.  I don't remember that, sir.

02:56:14

20          THE COURT:  All right.  We've been through this.

21     Let's move on.  The record says what it is.

22          MR. JEBSON:  Thank you.

23     BY MR. JEBSON:

24     Q.  Now, at some point, you did walk your girlfriend Mildred

02:56:28

25     to her car?

1    A.  Yes.

2    Q.  And to get to her car, you walk out of your bedroom -- and

3    she was parked in the front of the house?

4    A.  Yes.

02:56:36    5    Q.  So, you walked out, you walked a few feet, you opened the

6    front door, and you walked her out, right?

7    A.  Yes.

8    Q.  And when you walked her out, you then walked back into the

9    house a few feet and you went back into your bedroom?

02:56:49    10    A.  No.  I went to the kitchen area first.

11    Q.  So, to get to the kitchen, you walked through the living

12    room, the dining room and then into the kitchen?

13    A.  Yes, sir.

14    Q.  And when you did that, you did not see Stanley Wrice, did

02:57:01    15    you?

16    A.  Yes.  When I was in the kitchen, I heard the young lady

17    saying something about her beer and cigarettes.  And that's

18    when he walked upstairs.

19    Q.  Okay.

02:57:07    20          Well, let's look at your testimony again, your

21    deposition.

22          So, you're saying that when you -- just so the jury's

23    clear, you're saying when you came back into your house, when

24    you went into the kitchen, you are saying you saw Stanley

02:57:49    25    Wrice?

1  A.  Yes.

2  Q.  Okay.

3          MR. JEBSON:  Page 44, Lines 15 to 21.

4  BY MR. JEBSON:

02:57:54  5  Q.  Isn't it true at your deposition in 2016 under oath, you

6  were asked these questions and you gave these answers:

7          "Question:  Did you -- I think I asked you, when you

8  left the house taking Mildred, if you saw anyone in the dining

9  room or in the living room.  When you came in, did you see

02:58:24  10  anyone in the dining room or living room?

11          "Answer:  No.

12          "What about in the kitchen?

13          "Answer:  No.  I didn't see anybody in the kitchen."

14          You were asked those questions and you gave those

02:58:38  15  answers, right?

16  A.  Yes.  But I didn't see anybody in the kitchen.  He had

17  walked past me.  He had came in the kitchen and walked

18  upstairs.  He wasn't already in the kitchen.

19  Q.  I'm sorry?

02:58:47  20  A.  He was not already in the kitchen.  He had came in from

21  the outside somewhere and went upstairs.

22  Q.  Okay.

23          But you testified under oath at your deposition that

24  no one was in the kitchen, right?

02:59:00  25  A.  When I walked to the -- when I walked her out, I walked in

1    the kitchen.  There was no one in the kitchen.  And, then, he

2    walked past and he went up in the kitchen and -- I seen the

3    young lady -- I heard the young lady saying something about a

4    beer and cigarette.

02:59:14    5    Q.  You didn't testify to any of that in your deposition --

6             MS. BONJEAN:  Objection, Judge.  That's not a proper

7    way to impeach.

8             THE COURT:  Correct.  Sustained.

9    BY MR. JEBSON:

02:59:22    10   Q.  So, let's talk about this statement that you just

11   mentioned and you told your brother's attorney on direct

12   examination.

13            You say when you're in the kitchen, you hear a woman

14   say that, I want cigarettes and a drink?  What was it again?

02:59:37    15   A.  Yes.  Where's my cigarettes -- where's my cigarettes and

16   my drink?

17   Q.  Now, when you testified at your criminal trial --

18            MS. BONJEAN:  Can he please stop saying it's his

19   criminal trial.  Not all African American people have been on

02:59:48    20   trial for crimes.  He's a different man.

21            THE COURT:  Wait a minute.

22            Yeah, it's not his criminal trial.

23   BY MR. JEBSON:

24   Q.  Your brother's criminal trial.  You remember when you

02:59:59    25   testified, you wanted to make sure when you spoke to your

1    brother's attorney that you gave him all the information that

2    you knew about this case so he would be prepared to ask you

3    any questions, right?

4    A.  To the best of my ability, yes.

03:00:15    5    Q.  Now, you would agree that never once during your testimony

6    in your brother's criminal trial, never once did you ever give

7    any testimony about hearing anyone upstairs asking for

8    cigarettes or a drink?

9              MS. BONJEAN:  I'm going to object, Judge.  That's not

03:00:35    10    proper impeachment.  Question, answer --

11              THE COURT:  It's not necessarily impeachment.  He's

12    asking him whether he did or not and --

13              MS. BONJEAN:  No, he said testified.

14              THE COURT:  You can answer the question.

15    BY THE WITNESS:

16    A.  Can you repeat the question?

17    BY MR. JEBSON:

18    Q.  Sure.

19              When you testified at your brother's criminal trial,

03:00:50    20    you never once testified that you heard a woman upstairs ask

21    for cigarettes or a drink.  You never testified to that, did

22    you?

23    A.  Yes, I believe I did.

24    Q.  Let me give you a copy --

03:01:02    25    A.  I'm not sure.

1  Q.  -- of your trial testimony.  It's only 16 pages long.

2      (Document tendered.)

3  BY MR. JEBSON:

4  Q.  And if you can please direct me to where it is you believe

5  that you testified to anything remotely about hearing a woman

6  ask for a cigarette or a drink while you were in the kitchen

7  or at any time.  Any time.

8      THE COURT:  Can we agree he wasn't asked that and he

9  didn't testify to that so we don't spend time?  I mean, I

10 assume --

11     MS. BONJEAN:  He wasn't asked the question, Judge.

12 So --

13 BY THE WITNESS:

14 A.  Yeah, it wasn't in here.

15     THE COURT:  It wasn't asked.  So --

16 BY MR. JEBSON:

17 Q.  Well, you were asked at your brother's criminal trial what

18 you saw and what you heard, right?

19     MS. BONJEAN:  Objection, Judge.  Can he please

20 point -- it's not appropriate.

21     THE COURT:  We've been through this.  We agree that

22 he wasn't asked that and he didn't give that statement at his

23 brother's criminal trial.  So, let's move on.

24 BY MR. JEBSON:

25 Q.  Well, sir, you test- -- your brother's attorney stipulated

1    that you didn't testify to that, but you just told this

2    jury --

3           MS. BONJEAN:  No, I didn't stipulate to that.  I said

4    we stipulated that the question was not asked and he did not

5    answer that question.

6           THE COURT:  Right.  That's what we're saying.  That

7    that question was not asked of him and he didn't give that

8    answer at the criminal trial.

9           MR. JEBSON:  Judge, I -- we do not stipulate that

10   that was not asked.  He was asked repeatedly what he saw and

11   what he heard.

12   BY MR. JEBSON:

13   Q.  But my point is, sir, didn't you just tell this jury that

14   you did, in fact, testify to that at your brother's criminal

15   trial?

16   A.  No, I didn't at -- ons- -- no.

17   Q.  Now, let's talk about this testimony that you are saying

18   today about when you went to the police station, you're saying

19   that you heard your brother hollering.

20          Do you remember that?

21   A.  I said it sound like my brother that was hollering.

22   Q.  You never testified to that at your brother's criminal

23   trial either, did you?

24   A.  I was never asked.

25   Q.  You were never -- so, let me ask you this:  Did you

1    tell -- when you met with your brother's criminal defense

2    attorney before you testified, did you ever tell him, by the

3    way, I heard my brother hollering at the police station?  Did

4    you ever tell him that?

03:03:29    5    A.  No.

6    Q.  Why not?

7    A.  I was never asked.

8    Q.  Wait.  You want -- so, you're telling this jury the reason

9    why you didn't tell Stanley Wrice's criminal defense attorney

03:03:41    10    when you met with him that you heard him hollering, you're

11    saying you didn't tell him that because he didn't ask you

12    that?

13    A.  I said it sounded like him was hollering.  I wasn't for

14    sure it was him hollering.  It sounded like him.

03:03:51    15    Q.  But you never -- when you met with his criminal defense

16    attorney, you never brought up anything.  I think I may have

17    heard someone yelling.  You never even said that, did you?

18    A.  No.

19    Q.  And your explanation of why you didn't tell him that is

03:04:07    20    because Stanley Wrice's criminal defense attorney didn't

21    specifically ask you, by the way, did you hear anyone

22    hollering?  That's your explanation?

23    A.  No, it's not.  I didn't -- I didn't know for sure who it

24    was.  I couldn't tell him somebody's hollering.

03:04:21    25    Q.  You told this jury on direct examination that the person

1    you heard hollering was your brother Stanley Wrice?

2    A.  No, I said it sound like him that was hollering.

3    Q.  Okay.

4         So, now you're saying that you're not even sure if

5    you heard Stanley Wrice, yet --

6    A.  I'm not sure who it was hollering.  I said it sounded like

7    him was hollering downstair.

8    Q.  In fact, you have testified under oath in the past that

9    you didn't recognize the voice, did you?

10   A.  No.

11   Q.  Have you ever testified under oath -- well, let me ask you

12   this:  At your deposition -- you said that you heard someone

13   hollering in 2016 at your deposition.  You said you heard

14   someone hollering, right?

15        MS. BONJEAN:  Judge, can he --

16        THE COURT:  Read him the questions and answers if

17   you're going to impeach.

18   BY MR. JEBSON:

19   Q.  Did you -- at your deposition, is it true --

20        MS. BONJEAN:  Can I get a page and line number?

21        MR. JEBSON:  It's just a question right now.  It's

22   just a question.

23        MS. BONJEAN:  Six-hour deposition, did he say -- I

24   mean, there should be a page and a question and then answer.

25        THE COURT:  Just let him ask the question.

C. Wrice - cross

430

1    BY MR. JEBSON:

2    Q.  Did you --

3    A.  No, I don't remember.

4    Q.  Okay.  Page 67 of your deposition, Line 14 to 24.

5            THE COURT:  Okay.  Ask him if he -- that was his

6    testimony.

7    BY MR. JEBSON:

8    Q.  Isn't it true, sir, that you were asked these questions in

9    2016 at your deposition and you gave these answers under oath:

10           "Question:  Aside from the hollering, what made you

11   think this was because -- what made you say it sounded like

12   someone was getting beaten?  Did you hear hitting or anything

13   like that?

14           MS. BONJEAN:  How is this impeaching, Judge?

15           MR. JEBSON:  Judge, I can't even get the question

16   out.

17           THE COURT:  Wait.  Let him --

18           MS. BONJEAN:  Okay.

19           THE COURT:  -- finish.

20   BY MR. JEBSON:

21   Q.  "Answer:  No.  I didn't hear hitting.  Just the way they

22   sounded, the voice sounded when they -- like they was in pain.

23           "Question:  But you didn't hear any words?

24           "Answer:  No.

25           "Question:  Did you recognize the voice?

1       "Answer:  No, I did not."

2       Isn't it true you gave those answers to those

3  questions under oath?

4       That was your testimony at your deposition, right?

03:07:33    5       Sir?

6  A.  I don't remember.

7  Q.  Okay.

8       Well, let me ask you about this:  You did go in -- on

9  September 8th, before Mildred came over, you did go in -- you

03:07:54  10  were in your kitchen, right?  At some point?

11  A.  At some point, I think.  At some point, I think.

12  Q.  And when you were in the kitchen, you didn't see any burnt

13  paper in the sink, did you?

14  A.  No.

03:08:07  15  Q.  Let me show you what's been marked as Defendants' Exhibit

16  127.

17       You did not -- when you went into the kitchen on

18  September 8th into September 9th, you did not see this burned

19  paper in the kitchen, did you?

03:08:32  20  A.  No.

21  Q.  And you didn't burn this paper, did you?

22  A.  No.

23  Q.  So, if this paper was found in the Wrice home on September

24  9th, 1982, you did not do this, did you?

03:08:48  25  A.  No.

1  Q.  So, someone else in that house did this and it wasn't you,

2  right?

3  A.  I'm not sure who did it, but it was not me.

4  Q.  You never used paper as torches, have you?

03:09:06  5  A.  Excuse me, I didn't hear you.

6  Q.  You never used burnt paper as a torch, have you?

7  A.  No.

8  Q.  That's not something you would do, is it?

9  A.  No.

03:09:33  10  Q.  Now, I want to talk about when you were taken to the

11  police station.  Now, you were taken to the police station --

12  at least what you testified at your brother's criminal trial,

13  you were taken to the station with your brother Stan, Bobby

14  Joe Williams and Rodney, right?

03:09:51  15  A.  Yes.

16  Q.  And isn't it true that you testified at your brother's

17  criminal trial that when you were taken to the station, you

18  noticed that Stan, Bobby Joe Williams and Rodney Benson were

19  crying?

03:10:08  20  A.  On the way out.

21  Q.  On the -- I'm saying when you went to the police station,

22  they were crying, right?

23  A.  I can't recall.

24  Q.  Okay.  Well, let's see if we can refresh your --

25  A.  No.

C. Wrice - cross

433

1   Q.  -- recollection.

2         Your brother's criminal trial, your testimony, Page

3   1370, Line 3 to 16.  If you can please take a look at that and

4   let me know when you've done -- when you're finished reading

03:10:43   5   that, please.

6         (Brief pause.)

7   BY THE WITNESS:

8   A.  No, I don't recall saying that they was crying when we all

9   went to the police station.

03:11:24   10   BY MR. JEBSON:

11   Q.  Well, you would agree that, according to your testimony at

12   your brother's criminal trial, you said when you were taken to

13   the police station, you saw that Bobby Joe, your brother and

14   Rodney Benson, it looked like to you that they had been

03:11:36   15   crying, right?

16         MS. BONJEAN:  Judge, I'm going to object.  He's

17   completely omitted the first part, and it's just out of

18   context and not impeaching and not fair.

19         THE COURT:  Well, read, "Okay.  And, sir, when you

03:11:48   20   were taken to the police station, was there anything unusual

21   about the conditions of Bobby Joe Williams, Stanley Wrice or

22   Rodney Benson?

23         "Looked like they had been crying."

24         Do you remember testifying to that?

03:11:59   25         THE WITNESS:  No, not when they went to -- not when

1    we all went to the police station, no.  I don't remember

2    testifying to that.

3    BY MR. JEBSON:

4    Q.  But did you tell the truth when you testified at your

5    brother's criminal trial?

6    A.  Excuse me, I didn't hear you.

7    Q.  Did you tell the truth when you testified at your

8    brother's criminal trial?

9    A.  To the best of my ability, sir, yes, I did.

10          THE COURT:  Okay.  Let's move on.

11   BY MR. JEBSON:

12   Q.  Now, you also testified at your brother's criminal trial

13   that you believe that you saw Kenny Lewis at the house, right?

14   A.  Yes, I think I saw him at the house.

15   Q.  You saw Kenny Lewis at your house and your brother's

16   house.  That's what you testified to at your brother's

17   criminal trial, right?

18   A.  I didn't see him there.  I heard -- I didn't see him at

19   the house, no.

20   Q.  But you believe that he was there?

21   A.  I believe he was there.

22   Q.  Now, you also testified that -- today, to this jury --

23   that you saw Rodney Benson in the police station, right?

24   A.  Yes.

25   Q.  Let's go to your deposition.  Page 79, Line 2, to 79, Line

C. Wrice - cross

435

1  4.

2          Isn't it true you were asked this question and you

3  gave this answer under oath at your 2016 deposition?

4          "Question:  Did you ever see Rodney Benson at the

03:13:35  5  police station?

6          "Answer:  No."

7          That's what you testified to under oath at your

8  deposition, right?

9  A.  I don't recall that.

03:13:45  10  Q.  Well, that's what -- you're looking at your dep- -- you

11  look at your testimony.

12  A.  Yes, I'm looking dead at it, sir.

13  Q.  That's what it says, right?

14  A.  That's what it says.

03:13:54  15          THE COURT:  All right.

16  BY MR. JEBSON:

17  Q.  And, sir, you testified to this jury that -- well, let me

18  ask you this:  Did you see Bobby Joe Williams at the police

19  station?

03:14:07  20  A.  Yes.

21  Q.  Your deposition again, Page 78, Line 16 to 18.

22          Isn't it true at your deposition you were asked this

23  question and you gave this answer under oath:

24          "Question:  Did you ever see Bobby Joe Williams at

03:14:43  25  the police station?

1     "Answer:  No."

2  A.  I saw him as I was leaving -- as we was getting ready to

3  leave from the police station.  When I was getting ready to be

4  taken home by the detectives, I was sitting over on the side

03:14:54     5  and they -- he walked past me.  They had -- he had walked

6  past.

7  Q.  My only question, sir, is:  At your deposition, were you

8  asked -- isn't it true you were asked, "Did you ever see Bobby

9  Joe Williams at the police station?"

03:15:06    10     "Did you ever see Bobby Joe Williams at the police

11  station?"

12     "Answer:  No."

13     That's what you testified under oath at your

14  deposition, right?

03:15:13    15  A.  Yes, I don't remember that, sir.  I seen him.

16     THE COURT:  All right.

17  BY MR. JEBSON:

18  Q.  Did you see Stanley Wrice at the police station?

19  A.  Yes.  As I was -- as they was getting ready to leave, I

03:15:26    20  was getting ready to be taken home with the detectives.  They

21  walked -- they walked him right past me.

22  Q.  You're saying Stanley Wrice walked right past you?

23  A.  Him and Bobby Joe.

24  Q.  At the police station?

03:15:35    25  A.  Yes.

C. Wrice - cross

437

1  Q.  Your deposition again, Page 78, Line 23, to 79, Line 1.

2          Isn't it true you were asked this question at your

3  deposition and you gave this answer:

4          "Question:  Okay.  Did you ever see Stanley Wrice at

03:15:56  5  the police station?

6          "Answer:  No."

7          That's what you testified at your deposition, right?

8  A.  Yes.  I don't remember that, but I did definitely see him.

9  Q.  So, you're saying -- you're telling this jury now that you

03:16:10  10  saw Stanley Wrice as you were leaving the station walking by

11  you?  Is that what you're saying?

12  A.  Yeah.  I was -- yes.  I was sitting down there waiting for

13  the detectives to take me home.

14  Q.  Let's look at your testimony at your brother's criminal

03:16:25  15  trial.  That's 1372, Line 11, to 1373, Line 3, please.

16          MS. BONJEAN:  I'm sorry, where are you starting?

17          MR. JEBSON:  I'm starting at 1372, Line 11, to 1373,

18  Line 3.

19  BY MR. JEBSON:

03:16:58  20  Q.  Sir, isn't it true that you gave this testimony at your

21  brother's criminal trial:

22          "Question:  And, sir, did you ultimately leave the

23  police station?

24          "Answer:  Yes.

03:17:07  25          "Question:  Okay.  When you left the police station,

1    with whom did you leave?

2           "Answer:  Patricia Wrice and Bobby Williams.

3           "Question:  Okay.  And when you left with Patricia

4    Wrice and Bobby Williams, was there anything unusual about the

5    conditions of Bobby Williams?

6           "Answer:  Yes.  Looked like he'd been -- he was

7    crying, also.

8           "Question:  Sir, did you have an opportunity to see

9    Stanley Wrice walking or standing?

10          "Question:  Stanley Wrice, did you see Stanley Wrice

11   walking or standing?

12          "Answer:  No, sir."

13          That's what you testified under oath at your

14   brother's criminal trial, right?

15   A.  Don't remember that, sir.

16   Q.  I'm sorry?

17   A.  No, I don't remember that.

18   Q.  But that's what you testified to, though?

19   A.  No, I don't remember that.

20   Q.  You're looking at the transcript, though, right?

21   A.  Yes, sir, I am.

22   Q.  And you agree that's what it says?

23          THE COURT:  All right.  He's given his answer.  Let's

24   move on.

25   BY MR. JEBSON:

C. Wrice - cross

1  Q.  Sir, did you -- you said that -- you told this jury today

2  that you saw Mike Fowler at your house?

3  A.  Yes, on occasions.

4  Q.  I'm talking about the night in question.

03:18:21  5  A.  Yes.

6  Q.  Your deposition, Line 39, 14 to 16.

7          MS. BONJEAN:  I'm sorry, where?

8          MR. JEBSON:  39, Line 14 to 16.

9  BY MR. JEBSON:

03:18:37  10  Q.  Isn't it true at your deposition you were asked this

11  question and gave this answer:

12          "Question:  Okay.  Do you remember if Mike Fowler was

13  at your house?

14          "Answer:  No.  I can't recall."

03:18:45  15          That's what you said at your deposition in 2016,

16  right?

17  A.  I can't recall, sir.

18  Q.  Well, that's what your -- that's what the test- -- that's

19  what the transcript of your deposition says, right?

03:19:00  20  A.  Yes, that's what it says.

21  Q.  And you told this jury that you remember seeing Rodney

22  Benson at your house on September 8th or 9th, right?

23  A.  Can you repeat that?

24  Q.  Did you see Rodney Benson at your house on September 8th

03:19:16  25  or 9th?

1    A.  Yes.

2    Q.  Your deposition, Line 112 --

3            MS. BONJEAN:  What Page?

4            MR. JEBSON:  I'm sorry, Page 112, Line 2 to 7.

5    BY MR. JEBSON:

6    Q.  At your deposition in 2016, isn't it true that you

7    asked -- you were asked this question and you gave this

8    answer:

9            "Question:  So, the time period between September of

03:19:44  10    1982 to May of 1983 -- "

11           MS. BONJEAN:  Judge, this is clearly referencing

12    after the incident.  September of '92 to May of '93, do you

13    recall seeing Rodney Benson?  That is not impeaching.

14           MR. JEBSON:  Judge, it encompasses --

03:19:59  15           THE COURT:  Overruled.

16           You can ask him whether he gave that testimony.

17           MR. JEBSON:  Sure.

18    BY MR. JEBSON:

19    Q.  Isn't it true at your deposition you gave -- you were

03:20:05  20    asked this question, you gave these answers under oath:

21           "Question:  So, the time period between September,

22    1982, to May, 1983, do you recall seeing Rodney Benson?

23           "Answer:  No.

24           "Question:  So, you don't recall him ever coming to

03:20:19  25    the house?

1       "Answer:  No."

2           That's what you said under oath at your deposition,

3   right?

4   A.  No, I don't recall that.

03:20:27    5   Q.  Well, that's what the trans- --

6   A.  He was at my house a lot.

7   Q.  That's what the transcript says, right?

8   A.  Yes, that's what it says.

9   Q.  Okay.

03:20:37    10          So, let's talk about your testimony about how you

11  claim that you were hit at the police station.

12          Now, you claim that you were in the basement.  Is

13  that when you were saying when you were hit?

14  A.  No, sir, I wasn't in the basement.

03:20:57    15  Q.  You were not in the basement?

16  A.  No.

17  Q.  Okay.

18          Let's look at -- so, you're saying that you were

19  never in the basement when you were hit?

03:21:06    20  A.  They took me down a flight of stairs.  It was empty jail

21  cells there and a chair.

22  Q.  You've given different stories about you being hit, the

23  location, haven't you?

24          MS. BONJEAN:  Is that a question?  He's given

03:21:21    25  different stories?

1    THE COURT:  Yes, that's a question.  Has he ever

2    given different stories.

3         Go ahead.  You can answer that.

4    BY THE WITNESS:

03:21:27    5    A.  Not to my knowledge, sir.

6    BY MR. JEBSON:

7    Q.  Well, you said you didn't say basement.  Let's look at

8    your deposition, Page 107, Line 14, to 107, Line 16.

9         Again, your testimony at your deposition in 2016:

03:21:46   10         "Question:  Okay.  Can you describe where you were in

11   the police station when you were being hit?

12         "Answer:  They took me down to a basement."

13         That's what you testified under oath regarding where

14   you claimed you were when you were hit, right?

03:22:06   15   A.  Yes, that's what it says.

16   Q.  Well, that's what you said under oath, isn't it?

17   A.  I don't recall that.

18   Q.  So, now you're telling this jury today, I was never taken

19   down to -- that's not where I was hit; I wasn't taken to a

03:22:21   20   basement.  Right?

21   A.  No, that's not what I'm telling the jury.

22   Q.  Okay.

23        But that's what you told -- that's what you said

24   under oath in 2016, right?

03:22:37   25   A.  Cannot remember.

C. Wrice - cross

443

1    Q.  Well, that's what the transcript says, right?

2    A.  That's what the transcript says.

3    Q.  From your deposition?

4    A.  Yes.

03:22:45    5    Q.  Now, let's talk about who you told about this alleged

6    beating that you are claiming happened.

7            You never told or discussed with Patricia these

8    allegations that you're making about you being hit at the

9    police station, right?

03:23:06    10   A.  Correct.

11   Q.  And you were close with Patricia, right?

12   A.  Patricia -- which Patricia?

13   Q.  Patricia Wrice, your sister.

14   A.  Oh, yes, I never told her anything.

03:23:18    15   Q.  You're close with her?

16   A.  Yes.

17   Q.  In fact, let's walk through this.  You claim you're hit at

18   the police station.  You then -- you were then -- you go home

19   with Patricia, right?

03:23:31    20   A.  Uh-huh.

21   Q.  You're in the same car with her?

22   A.  Yes.

23   Q.  You get home.  You say nothing to Patricia that night,

24   right?

03:23:40    25   A.  No.

C. Wrice - cross

444

1  Q.  You don't tell Patricia anything in 1982 about this?

2  A.  No.

3  Q.  Or 1983?

4  A.  No.

03:23:47  5  Q.  '84, '85, '86?

6  A.  No.

7  Q.  You never, ever tell Patricia Wrice about anything about

8  these allegations, right?

9  A.  No.

03:23:56  10  Q.  Let's talk about Stanley Wrice's attorney, the person you

11  met with before you testified on behalf of your brother.  You

12  went to his office, right?

13  A.  Yes, I think so.

14  Q.  So, you sat down and you had a conversation with him?

03:24:16  15  A.  Yes.

16  Q.  You knew that your brother was claiming that he was hit by

17  the police, right?

18  A.  I didn't know that at first, no.

19  Q.  Well, when did you find that out?

03:24:27  20  A.  I never find out till, I guess, recently.

21  Q.  What do you mean recently?  Like, when?

22  A.  I didn't know anything about him being beaten at first,

23  but I think his lawyer in 20-something -- 200-something --

24  that's when his lawyers -- gentleman called me up.  And I

03:24:45  25  called him back and I went to the office.  And, then, he asked

1    me -- he asked me a lot of questions.  He had told me.

2    Q.  I just want to make sure I'm understanding your testimony.

3    I'm trying to figure out when you are saying you first heard,

4    ever, that your brother was making allegations -- your brother

5    Stanley Wrice was making allegations -- that he was hit at the

6    police station.  When is the first time you ever learned of

7    that?

8    A.  I think it was 2025 -- 2005.

9    Q.  Your brother was convicted in 1983, right?

10   A.  I think so.

11   Q.  And you're saying that you didn't hear anything, any

12   allegations from your brother or from anybody, regarding him

13   being -- his claiming he was being hit until 2005?

14   A.  Yes.

15            THE COURT:  I think we'll take a recess now for 15

16   minutes.

17            MR. JEBSON:  Thank you.

18          (Brief recess.)

19            THE COURT:  Please be seated.

20            You may continue your cross-examination.

21            MR. JEBSON:  Thank you, Judge.

22   BY MR. JEBSON:

23   Q.  Mr. Wrice, I'll just bring everyone back to the area that

24   we were discussing.  Okay?

25   A.  Yes.

C. Wrice - cross

446

1   Q.  I was asking you about when you first learned of any claim

2   by your brother Stanley Wrice that he was hit, and I think you

3   said the first time you ever heard of that claim was in 2005?

4   A.  Yes.

03:46:42   5   Q.  Okay.  Now, and you told us that when you met with Stanley

6   Wrice's criminal defense attorney before you testified at his

7   criminal trial, you never mentioned anything to him about your

8   claim that you're saying today that you were hit by the

9   police?

03:46:58   10   A.  Yes.

11   Q.  You never told him that?

12   A.  No.

13   Q.  And you say you never told Patricia, right?

14   A.  Right.

03:47:08   15   Q.  You never told any prosecutor that?

16   A.  No.

17   Q.  You never consulted with your own attorney about that?

18   A.  No.

19   Q.  And you told --

03:47:18   20       MS. BONJEAN:  Objection.  What do you mean, his

21   attorney?

22       MR. JEBSON:  He hired an attorney, he never hired an

23   attorney to say --

24       THE COURT:  I don't know.  Stay away from attorneys.

03:47:28   25   You'll get into...

1      MS. BONJEAN:  It's also misleading.

2   BY MR. JEBSON:

3   Q.  You told this jury today that the first time you mentioned

4   this claim of yours that you were hit was in 2005?

03:47:43   5   A.  Yes, sir.

6   Q.  Now, isn't it true that you were asked multiple times at

7   your deposition when the first time you ever told anyone,

8   anyone about this claim about you being hit?  You remember

9   that, right?

03:48:01   10   A.  No, I don't recall that.

11   Q.  Well, isn't it true, sir, that you testified at your

12   deposition that you said that in 2016 that that was the first

13   time in your deposition that you were making this claim?

14   A.  No, sir, I don't recall that.

03:48:20   15   Q.  Okay.  Well, let's look at your deposition, Page 107, 9,

16   to 107, 13, please.

17      Sir, isn't it true that you were asked this question

18   and you gave this answer at your deposition in 2016:

19   "Question:  Is today the first time you told anybody about

03:48:48   20   what happened to you in the basement?

21      "Answer:  Yes.

22      "Question:  At the police station.

23      "Answer:  Yeah."

24      That's what you testified under oath, that the first

03:49:00   25   time you ever made any mention of this beating that you're

1    saying was in 2016 at your deposition, right?

2    A.  No, I don't recall that.

3    Q.  Well, you say you don't recall.  That is what the

4    transcript of your deposition says, right?

03:49:15    5    A.  Yes, sir, that's what it says.

6    Q.  Are you saying that the court reporter transcribed it

7    wrong?

8    A.  I don't recall that, sir.

9    Q.  I'm asking you.  All these times when I've pulled up your

03:49:26   10    testimony, you're saying you don't recall, are you saying that

11    whoever typed it up did it wrong?  Is that what you're saying?

12    A.  No, sir, I'm not -- that's not what I said.  I just said I

13    don't recall this.

14    Q.  So you concede that when I've shown you transcripts of

03:49:41   15    your testimony, you are agreeing that you actually did testify

16    to that at that time, right?

17    A.  Sir, I'm still trying to remember what was happening --

18    Q.  That's not my question.

19    A.  -- 13 years ago, 20 years ago.

03:49:53   20    Q.  You agree that when I've shown you testimony from your

21    deposition or your criminal trial testimony, your brother's

22    criminal trial testimony, just to be clear, you're not saying

23    the court reporter transcribed your testimony wrong?  You're

24    not saying that, are you?

03:50:09   25    A.  No, I guess not.

1  Q.  In terms of when you claim that you first told anyone

2  about this, this claim of yours that you were hit in 2005, I

3  just read you in your deposition where you said that that was

4  the first time at your deposition you're making this claim,

5  you were asked multiple times in your deposition to make sure

6  you understood that you are saying the first time you ever

7  mentioned this was at your deposition, right?

8  A.  I don't recall that, sir.

9  Q.  Well, let's look at a different part of your deposition,

10  Page 126, Line 22 to 127, Line 5.  Again, this is the same

11  deposition in 2016.

12  "Question:  Mr. Wrice, you testified today that when you were

13  at the police station, at some point an officer brought you to

14  a basement where you were subjected to some physical violence,

15  correct?

16        "Answer:  Yes.

17        "Question:  Okay.  And you conceded that you didn't

18  disclose that prior to today, right?

19        "Answer:  Yes."

20        That's what you testified under oath at your 2016

21  deposition, right?

22  A.  I don't agree with that, sir.

23  Q.  Well, you would agree that that is what the transcript

24  from your deposition says?

25  A.  That's what it says, sir.

C. Wrice - cross

1    Q.  I've accurately read the question and answer, haven't I?

2    A.  Yes, but I don't recall that.

3    Q.  Let's talk about this claim of yours that you were beat.

4    You said it wasn't in the basement now.  You're saying that

03:51:55    5    today.  How many people were in the room with you when you

6    claim that you were beat?

7    A.  Two.

8    Q.  At your deposition again, Line -- Page 107, Line 14, to

9    Page 108, Line 16.

03:52:30    10           MS. BONJEAN:  What was the page?

11    BY MR. JEBSON:

12    Q.  At Page 107, Line 14 to 108, Line 16.  It just takes a

13    second to come up, Mr. Wrice.

14           Okay.  I'm going to read from your, do you see

03:53:15    15    where -- your deposition testimony, where there's boxes around

16    it, the question and answers?

17    A.  Yes.

18    Q.  Okay.  I'm going to read this to you.  Isn't it true that

19    you were asked these questions at your 2016 deposition and you

03:53:28    20    gave these answers, question, Line 14:

21    "Okay.  Can you describe where you were in the police station

22    when you were being hit?

23           "Answer:  They took me down to a basement.

24           "Question:  Okay.

03:53:41    25           "Answer:  They took me downstairs, sat me in a chair.

1        "Question:  Okay.  What kind of chair?

2        "Answer:  It was a wooden chair.

3        "Question:  Were you handcuffed?

4        "Answer:  Yes.

03:53:52    5        "Question:  How were you handcuffed?

6        "Question:  My hands were handcuffed actually behind

7   my back and my legs to the chair.

8        "Question:  So you're making some gestures here.  So

9   your hands were handcuffed in front of you or behind you?

03:54:07   10        "Answer:  They were from -- they were handcuffed

11  behind me.

12        "Question:  Okay."

13        "My feet were to the chair."

14        "Question:  Both feet?

03:54:18   15        "Answer:  Just one.

16        "Question:  Just one?  Can you describe what you saw

17  around you?

18        "Answer:  I can't really remember.  I can't remember

19  what was around me.

03:54:29   20        "Question" --

21        MS. BONJEAN:  "Exactly what was around me."

22  BY MR. JEBSON:

23  Q.     "Exactly what was around me.

24  "Question:  Okay.  How many officers did you say were --

03:54:37   25        "Answer:  It was one officer down there with me."

C. Wrice - cross

452

|      |    |                                                                    |
|------|----|--------------------------------------------------------------------|
|      | 1  | That's what you testified in your deposition, right?               |
|      | 2  | One officer, not two?                                              |
|      | 3  | A.  I don't remember.  I know I said "they took me                 |
|      | 4  | downstairs."                                                       |
| 03:54:52 | 5  | Q.  That wasn't my question.  You would agree that at your      |
|      | 6  | deposition under oath, you said it was one officer, not two        |
|      | 7  | that you just told this jury, right?                               |
|      | 8  | A.  I said it was "they."                                          |
|      | 9  | Q.  Would you like me to read that last part?                      |
| 03:55:06 | 10 | A.  No, sir.  I see it.                                         |
|      | 11 | Q.  It says, "Answer, it was one officer down there with me,"      |
|      | 12 | right?  That's what it says?                                       |
|      | 13 | A.  It doesn't -- I don't remember that.                          |
|      | 14 | Q.  You may -- you would agree that's what the transcript          |
| 03:55:19 | 15 | says, right?                                                    |
|      | 16 | A.  Yes.                                                          |
|      | 17 | Q.  And you're not saying the court reporter got it wrong, are     |
|      | 18 | you?                                                               |
|      | 19 | A.  I'm not sure.                                                 |
| 03:55:24 | 20 | Q.  So you're saying the court reporter may have typed that     |
|      | 21 | wrong?                                                             |
|      | 22 | A.  Sir, I'm not sure who got it wrong.                           |
|      | 23 | Q.  So you're saying one possibility is the court reporter,        |
|      | 24 | instead of writing "two," wrote "one officer"?                     |
| 03:55:36 | 25 | A.  I'm not sure what happened, sir.                            |

        1    Q.  So that's -- you're saying that could have happened?

        2    A.  I'm not sure what happened, sir.

        3    Q.  Okay.  Now, we just read a part of your deposition about

        4    how you were handcuffed.  Isn't it true, when you demonstrated

03:55:50 5    to this jury about a half hour ago, you had your hands

        6    demonstrating to this jury in front of you --

        7    A.  Yes.

        8    Q.  -- right?

        9         Okay.  You would agree that what I just read from

03:56:02 10   your sworn testimony under oath, you said at your deposition

        11   you were handcuffed behind you, right?

        12   A.  Yes, that's what it says but --

        13        MS. BONJEAN:  Objection.  That's not what --

        14   objection.  That's not what it says at all.

03:56:16 15        MR. JEBSON:  Okay.  I'll read it, Judge.

        16   BY MR. JEBSON:

        17   Q.  Isn't it true, sir, that you were asked these questions

        18   and you gave these answers under oath at your deposition:

        19   "Question:  Can you describe where you were in the police

03:56:25 20   station when you were being hit?

        21        "Answer:  They took me down to a basement.

        22        "Question:  Okay.

        23        "Answer:  They took me downstairs, sat me in a chair.

        24        "Question:  Okay.  What kind of chair?

03:56:37 25        "Answer:  It was a wooden chair.

1        "Question:  Were you handcuffed?

2        "Answer:  Yes."

3        "How were you handcuffed?"

4        "My hands -- my hands handcuffed here, actually

03:56:48  5  behind my back and my legs to the chair."

6        "Question:  So you're making some gesture here.  So

7  your hands, were they handcuffed in front of you or behind

8  you?

9        "Answer:  They were handcuffed behind me."

03:57:08  10        Right?

11  A.  I don't recall that, sir.

12  Q.  Well, I know you keep saying you don't recall that, but

13  you would agree, that is what you -- the transcript of your

14  deposition says what you said under oath, right?

03:57:21  15  A.  That's what the transcript says.

16  Q.  Okay.  Now, is this a situation where you got it wrong or

17  the court reporter got it wrong?

18  A.  That's what it says, sir.

19  Q.  I know.  I'm asking you.  I know what it says.  But are

03:57:32  20  you telling this jury that you're saying two different things,

21  or are you saying the court reporter must have typed it down

22  wrong?

23  A.  I'm saying I'm not sure what happened, sir.

24  Q.  Okay.  How long, in terms of this claim that you were

03:58:05  25  beat, how long were you beat?

C. Wrice - cross

```
 1  A.  I can't recall how long I was down there.

 2  Q.  No.  My question is how long --

 3  A.  I --

 4  Q.  I'm sorry.  My question isn't how long were you down

 5  there.  My question is:  How long are you claiming to this

 6  jury that you were beat?

 7  A.  I can't recall exactly how long it was, sir.

 8  Q.  Well, was it more than one minute?

 9  A.  Yes.

10  Q.  Was it more than five minutes?

11  A.  Yes.

12  Q.  Was it more than 20 minutes?

13  A.  Yes.

14  Q.  Was it more than an hour?

15  A.  No, not to my knowledge, no.

16  Q.  Was it a couple of hours?

17  A.  No.

18  Q.  So let's make sure we're on the same page.  So you are not

19  saying that you were beat for a couple of hours?

20  A.  No.

21  Q.  Let's go to your deposition, Page 72, Line 21 to 73, Line

22  12.

23        Okay.  Do you see it in front of you, sir, your

24  deposition --

25  A.  Yes.
```

03:58:16  (line 5)
03:58:29  (line 10)
03:58:40  (line 15)
03:58:51  (line 20)
03:59:31  (line 25)

C. Wrice - cross

456

1   Q.  -- transcript from 2016?

2         Isn't it true you were asked these questions and gave

3   these answers under oath in 2016:

4   "Question:  So he took you into what you think was a basement?

03:59:42  5         "Answer:  Yes.

6         "Question:  Was anyone else there?

7         "Answer:  No.

8         "Question:  What happened next?

9         "Answer:  Well, he had my hands in handcuffs.  He had

03:59:55  10  took like some black duct tape, tied it up to, I'm not sure,

11   maybe like a black ball or something.  I'm not sure what it

12   was.

13         "Question:  Okay."

14         Continuing with the answer:

04:00:10  15         "Answer:  Then he started hitting me, beating me in

16   my legs with the ball, beating me all over my legs.  Then he

17   took it and he hit me in my groin.  And he kept beating me and

18   beating me, I want to say, well over, like, an hour or two, a

19   couple of hours."

04:00:29  20         That's what you testified in your deposition, right,

21   "a couple of hours"?

22   A.  I'm not sure how long it took, sir.

23   Q.  That's not my question.  My question is:  When you were

24   under oath at your deposition in 2016, you testified that you

04:00:50  25  were beat for a couple of hours?

C. Wrice - cross

1  A.  I'm not really sure how long it was.

2  Q.  You would agree that your deposition transcript says that

3  your answer was you were beat for a couple hours?

4  A.  Yes, that's what it says.

04:01:02  5  Q.  Okay.  Now, is this a situation where you got it wrong or

6  the court reporter got it wrong?

7  A.  I'm not sure what happened, sir.

8  Q.  Now, you said that when you were -- your claim that you

9  were beat, that the officers were trying to -- let me ask you,

04:01:47  10  did they ask you about Stanley Wrice?  Did they say anything

11  about Stanley Wrice?

12  A.  Yes.

13  Q.  So it's your testimony that the officer was asking you

14  about a specific person, in this case Stanley Wrice, right?

04:01:59  15  A.  Yes.

16  Q.  Okay.  Let's go to your deposition, Page 109, Line 21 to

17  109, Line 23, question, your deposition again:

18  "Did the officer ever ask you about anyone specific?

19          "Answer:  No."

04:02:22  20          MS. BONJEAN:  That's -- where are you?

21          MR. JEBSON:  I'm on 109, Line 21 to 109, Line 23.

22  BY MR. JEBSON:

23  Q.  That's --

24  A.  No, I don't remember that.

04:02:38  25  Q.  But you agree that was your sworn testimony at your

C. Wrice - cross

458

1  deposition?

2  A.  Yes, it's in the deposition.

3  Q.  So your deposition, you said the officer didn't ask you

4  about anyone specific, right?

04:02:51   5  A.  That's what it said in the deposition.

6  Q.  But now you're telling the jury that the officer was

7  asking about someone else, right?

8  A.  Yes.

9  Q.  So what's the truth, what you said in your deposition or

04:03:00  10  what you're telling this jury now?

11  A.  What I just told the jury now.

12  Q.  So what you say in your deposition, is that a lie?

13         MS. BONJEAN:  It's not --

14         THE WITNESS:  Sir, I don't recall that.

04:03:11  15         MS. BONJEAN:  It's not in context.  Objection.  It's

16  not impeaching.

17         THE COURT:  Well, if it is, but I'll let it stand.

18  BY MR. JEBSON:

19  Q.  Now, when you were -- what exactly was -- now you're

04:03:27  20  saying that the officer is talking about Stanley Wrice.  I

21  think you said that the officer wanted you to tell you that --

22  wanted you to say that Stanley burned the woman?

23  A.  Raped and burned the woman.

24  Q.  Raped and burned the woman.  So you're saying that the

04:03:43  25  officer, when he was beating you, was telling you what -- what

|          | 1  | went on upstairs, and he wanted you to say that it was Stanley |

1    went on upstairs, and he wanted you to say that it was Stanley

2    Wrice that did this?

3    A.  Yes.

4    Q.  Upstairs, right?

04:03:57    5    A.  Yes.

6    Q.  Let's go to your deposition, Page 109, Line 18 to 109,

7    Line 20.  "Question" --

8            MS. BONJEAN:  Judge, if he could start at Line 10,

9    that would --

04:04:14    10            MR. JEBSON:  Judge, if she wants to read parts of the

11    deposition --

12            THE COURT:  Go ahead.  Read it from 10.  It will be

13    quicker.

14    BY MR. JEBSON:

04:04:20    15    Q.        "Question:  Did the officer ever say what was going

16        on upstairs?

17            "Answer:  No, he didn't."

18        Isn't it -- that's what you testified at your

19    deposition, right?

04:04:29    20    A.  Yes, that's what it says here, but they didn't ask me

21    about what was going on upstairs.

22    Q.  That's what the transcript says from your deposition,

23    right?

24    A.  Yes, sir.

04:04:41    25    Q.  And you're saying the officer had explained to you what

C. Wrice - cross

460

1    had happened upstairs, and he wanted you to blame Stanley

2    Wrice?

3    A.  Yes.

4    Q.  Your deposition again, 109, Line 24 to 110, Line 2:

04:04:58  5    "Question:  Did the officer explain to you what had happened

6    to the woman in your house?

7            "Answer:  No."

8            That's what you said at your deposition, right?

9    A.  That's what it says here but, yes, he did explain it to

04:05:12  10   me.  That's how I found out what happened.

11   Q.  Well, that's what you're saying now, right?

12   A.  He explained it to me, yes.

13   Q.  Okay.  But at your deposition, you would agree that you

14   said something completely different?

04:05:22  15   A.  It says something different.

16   Q.  So and I want to make sure I understood your testimony on

17   direct examination, if I heard it correctly.  Your

18   testified -- you testified that after you were beat, according

19   to you, that the police then drove you home?

04:05:46  20   A.  Yes.  Yes, they did.

21   Q.  So they beat you and they gave you a ride home?

22   A.  It wasn't the same police officer, sir.

23   Q.  And you had no problem getting in the police car, a police

24   officer's car after you claim you just got beat up for a

04:06:08  25   couple of hours.  That's what you're telling this jury, right?

1    A.   Yes.  They took me home.

2    Q.   You had -- and you had no problem with that?

3    A.   No.  I had no other choice.

4    Q.   How far away is the police station from your house?

04:06:24    5    A.   It was quite a ways.

6    Q.   How far?

7    A.   I was on 7618, and this is on 91st and Cottage Grove.

8    Q.   Now, when you get home, Mildred comes over?

9    A.   Sorry.  I didn't hear you.

04:06:40    10   Q.   Sure.  According to you, the police drive you home, right?

11   After they beat you for a couple hours, the police drive you

12   home.  And when you get home, Mildred comes over shortly

13   thereafter?

14   A.   Yes.

04:06:51    15   Q.   Okay.  And when Mildred comes over, you never tell Mildred

16   that you were just beat at the police station, did you?

17   A.   No.

18   Q.   In fact, what you did is you took a bath and you went to

19   sleep?

04:07:03    20   A.   Yes.

21   Q.   You never sought any medical attention whatsoever after

22   what you claim to be a beating for a couple of hours, right?

23   A.   No.

24   Q.   And you would even describe -- well, let me ask you this.

04:07:18    25   Did you have any injuries?

1    A.  No.

2    Q.  So you were beat for a couple hours, and you had no

3    injuries?

4    A.  No, just a little swelling.

04:07:28  5    Q.  Just a little sweating?

6    A.  Swelling.

7    Q.  Swelling.  Let me go back really quickly to your testimony

8    when you said you heard someone hollering.  Now -- first you

9    said it was Stanley Wrice, but now you're saying you don't

04:07:53  10   know if it was Stanley Wrice, right?

11   A.  I said I'm not sure who it was.  I heard someone

12   hollering.  Could have been him.  It sounded like him, but I

13   wasn't sure who it was.

14   Q.  They were hollering.  How were they hollering?

04:08:07  15   A.  Like they was getting beat or something.

16   Q.  Where were you when you claim you heard this hollering?

17   A.  I was in the, one of the examination, the interview rooms.

18   Q.  This is on the second floor, right?

19   A.  Yes, sir, I think so.

04:08:19  20   Q.  So two floors -- so if there is a basement, you have the

21   second floor, the first floor, and then the basement, right?

22   A.  Yes.

23   Q.  Okay.  And it's your testimony to this jury that you heard

24   hollering, right?

04:08:32  25   A.  Yes.

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
|          | 1  | Q.  And by the way, the second floor, you said it's interview    |
|          | 2  | rooms.  There's a bunch of interview rooms, right?               |
|          | 3  | A.  Yes.                                                         |
|          | 4  | Q.  So it's not just one?                                        |
| 04:08:41 | 5  | A.  Correct.                                                     |
|          | 6  | Q.  There's a long line of them, right?                          |
|          | 7  | A.  Yes.                                                         |
|          | 8  | Q.  And there's a lot of people on that floor, right?           |
|          | 9  | A.  Yes, I think so.                                             |
| 04:08:50 | 10 | Q.  Yes.  There's other police officers, right?                 |
|          | 11 | A.  I think so, yes.                                             |
|          | 12 | Q.  There's prosecutors walking around, right?                  |
|          | 13 | A.  I think so, yes.  I didn't --                               |
|          | 14 | Q.  They -- I'm sorry?                                           |
| 04:09:03 | 15 | A.  I said yes, I think so.                                      |
|          | 16 | Q.  And there's also civilians walking around the second        |
|          | 17 | floor, right?                                                   |
|          | 18 | A.  I would assume so.  I guess so, sir.  I don't know.         |
|          | 19 | Q.  Well, you saw a lot of people walking around that area?     |
| 04:09:13 | 20 | A.  I didn't see a lot of people walking around there.          |
|          | 21 | There's probably people walking around, but I didn't see a lot  |
|          | 22 | of people walking around.                                       |
|          | 23 | Q.  There's also just private criminal defense attorneys        |
|          | 24 | walking around, too, right?                                     |
| 04:09:22 | 25 | MS. BONJEAN:  Objection.  He doesn't -- how would he            |

1    know --

2         THE WITNESS:  I don't know.

3         MS. BONJEAN:  -- whether someone is a private

4    criminal defense attorney?

04:09:29    5         THE COURT:  He probably wouldn't.  He says he doesn't

6    know.

7    BY MR. JEBSON:

8    Q.  It's fair to say there were people walking around the

9    second floor, right?

04:09:38    10   A.  Yes.

11   Q.  Now, I want to talk just briefly about this.  You said

12   that after you were taken home that the police broke into your

13   house?

14   A.  Yes.

04:09:49    15   Q.  Broke into your house?

16   A.  Yes.

17   Q.  Okay.  Let's talk about this.  So you're at home.  And

18   according to you, the police break the window to your door,

19   right?

04:10:01    20   A.  Yes.

21   Q.  They reach in, right?

22   A.  Yes.

23   Q.  And you see them open the door, and they come into your

24   house?

04:10:10    25   A.  Yes.

1  Q.  And you claim that when they come in, you talked to them

2  for about ten minutes?

3  A.  Excuse me.  I couldn't understand the question.

4  Q.  Sure.  According to you, after the police break into your

04:10:24  5  house that they come in and you talk with them for about ten

6  minutes, right?

7  A.  Yes.

8  Q.  And you told the jury that they were looking for Larry.

9  That's what you said, right, Larry?

04:10:40  10  A.  I can't recall who they was looking for.

11  Q.  But you threw out the name Larry, right?

12  A.  I can't recall who they was looking for.

13  Q.  Do you recall what your testimony was earlier today to

14  this jury?

04:10:49  15  A.  I said they wanted me to take them somewhere to find

16  someone, but I couldn't recall what his name was.

17  Q.  I understand that, but do you remember telling this jury

18  that you believe the name was Larry?  Do you remember saying

19  that to this jury?

04:11:03  20  A.  Perhaps.  I'm not -- I can't recall that.

21  Q.  And according to your story, you get into the police car

22  after they break into your house and you drive down to some

23  apartment building, right?

24  A.  Yes.

04:11:16  25  Q.  And according to you, the police go into this apartment

1   building, they leave you in their police car, right?

2   A.  Yes.

3   Q.  All by yourself?

4   A.  Yes.

04:11:26  5   Q.  And they come back to the police car, right?

6   A.  Yes.

7   Q.  And then you drive back to your house, right?

8   A.  Yes.

9   Q.  And you go in your home and you fall asleep, right?

04:11:37  10  A.  Yes.

11  Q.  You never see these officers again?

12  A.  No.

13  Q.  And according to you, these officers that you claim broke

14  into your house, you never saw them before earlier that night,

04:11:46  15  right?

16  A.  No.

17  Q.  That was the first time you saw these officers?

18  A.  Yes.

19  Q.  So you had no idea who these officers were?

04:11:51  20  A.  No.

21  Q.  You had no -- it must have been a shock to you that they

22  were breaking into your house, right?

23  A.  Yes.

24  Q.  Okay.  So my last area of inquiry with you, Mr. Wrice, is

04:12:19  25  you said that before you went to the police station, you went

C. Wrice - cross

467

1    to the hospital, right?

2    A.  Yes.

3    Q.  And when you went to the hospital, you went up to a

4    certain floor, right?

04:12:31    5    A.  Yes.

6    Q.  And according to you, you go into the room, there's police

7    there, right?

8    A.  Yes, I think police are in there, yes.

9    Q.  And you see a woman in the room?

04:12:44    10    A.  Yes.

11    Q.  She's laying in a bed?

12    A.  Yes.

13    Q.  You get very close to her, right next to her, right?

14    A.  I'm not sure how close I was, sir.

04:12:52    15    Q.  Well, let me see -- I'm going to show your deposition

16    testimony, see if that refreshes your recollection.  Okay?

17    Page 61, please, Line 4 to 61, Line 10.  So just read that to

18    yourself, please, and let me know when you're done.

19        (Pause.)

04:13:34    20        MS. BONJEAN:  61?

21        MR. JEBSON:  Yes, 61.

22    BY MR. JEBSON:

23    Q.  Have you had a chance to look at it?

24    A.  Yes, I'm looking at it.

04:13:50    25    Q.  Okay.  If you read to yourself the first part of your

|     |                                                                     |
| --- | ------------------------------------------------------------------- |
| 1   | first answer where it says "they," just read that to yourself.      |
| 2   | A.  Which one?                                                       |
| 3   | Q.  "They took me," do you see it where it starts, your first       |
| 4   | answer?                                                              |

04:14:02

|     |                                                                     |
| --- | ------------------------------------------------------------------- |
| 5   | A.  Okay.                                                           |
| 6   | Q.  Just read that to your -- right there, just read that to        |
| 7   | yourself.                                                           |
| 8   |         Does that refresh your recollection of how close you        |
| 9   | got to this woman when she was laying on the bed?                   |

04:14:14

|     |                                                                     |
| --- | ------------------------------------------------------------------- |
| 10  | A.  Yes.                                                            |
| 11  | Q.  Okay.  According to you, you were right next to her bed,        |
| 12  | right?                                                              |
| 13  | A.  Yes.                                                            |
| 14  | Q.  And according to you, you're telling this jury that you        |

04:14:27

|     |                                                                     |
| --- | ------------------------------------------------------------------- |
| 15  | didn't observe -- it appeared to you that she was not injured       |
| 16  | in any way, right?                                                  |
| 17  |         MS. BONJEAN:  When did he say that?  Objection.             |
| 18  |         MR. JEBSON:  I'm asking.  Okay.  Let me ask you this.       |
| 19  |         MS. BONJEAN:  Objection.  He never testified --            |

04:14:39

|     |                                                                     |
| --- | ------------------------------------------------------------------- |
| 20  |         THE COURT:  Wait, wait, wait.                               |
| 21  |         MR. JEBSON:  I'll withdraw the question, Judge.             |
| 22  | BY MR. JEBSON:                                                      |
| 23  | Q.  I'll ask you directly:  Did you notice any injuries to         |
| 24  | this woman when you were brought up to her right next to her       |

04:14:48

|     |                                                                     |
| --- | ------------------------------------------------------------------- |
| 25  | bed?  Did you notice any injuries to her?                           |

1   A.  Yes.

2   Q.  Let's go to your deposition.  You have testified

3   differently to that question in the past under oath, haven't

4   you?

04:15:01   5   A.  Not to my knowledge.

6   Q.  Okay.  Well --

7   A.  It was over 30 years ago, sir.

8   Q.  Well, your deposition wasn't over 30 years ago, was it?

9   A.  No, it wasn't.

04:15:08   10   Q.  Your deposition was a few years ago, right, 2016?

11   A.  Yes.

12   Q.  Let's look at what you said in 2016 regarding this issue,

13   Page 63, Line 14 to 63, Line 16, please.  Isn't it true that

14   in 2016, you were asked this question, you gave this answer

04:15:35   15   under oath:

16   "When you saw the woman in the hospital room, did you observe

17   that she was injured in any way?

18           "Answer:  No."

19           That's what you testified under oath to that question

04:15:47   20   in 2016, right?

21   A.  No, I don't recall that.

22   Q.  I'm not asking if you recall it.  I'm asking, isn't that

23   what the transcript --

24   A.  That's what's in here, sir.

04:16:01   25   Q.  That's what the transcript says that you gave the answer

1    to, right?

2    A.  Yes, that's what it says.

3    Q.  The transcript -- the transcript says, the question is,

4    "When you saw the woman in the hospital room, did you observe

04:16:11    5    that she was injured in any way?"

6            The transcript says your answer was "No," right?

7    A.  Yes, that's what it says.

8    Q.  So on this question, who got it wrong, sir?  Was it you,

9    or was it the court reporter?

04:16:26    10    A.  Sir, it could have been me that got it wrong.

11    Q.  Sir, isn't it true that the reason why you gave that

12    answer at your deposition is you were trying to portray a

13    scenario where Karen Byron really wasn't that injured that

14    night.  Isn't that what you were trying to convey?

04:16:50    15    A.  No.

16    Q.  Well, do you have an explanation, sir, why in the world

17    did you answer "no" to that question in 2016?

18    A.  I don't recall answering "no," sir.

19    Q.  Because that wouldn't make any sense, would it, answering

04:17:04    20    that question that way, would it?  That wouldn't make any

21    sense?

22    A.  No, it wouldn't.

23    Q.  Because she was severely injured, wasn't she?

24    A.  I don't know how severely injured she was.

04:17:20    25    Q.  Well, let me ask you, now today you're saying that she was

1  injured, you saw injuries?

2  A.  I'm saying I don't know.

3  Q.  Now you're saying you don't know?

4  A.  I don't know how severely injured she was.

04:17:30  5  Q.  Let me ask you this:  What did you observe when you were

6  walked up right next to her in the bed?

7  A.  It's been so long ago.  I think she had some bruises on

8  her face.  That's all I saw, was her face.

9  Q.  How many bruises?

04:17:42  10  A.  I have no idea.

11  Q.  More than one?

12  A.  I really can't remember.

13  Q.  Where were the bruises, where on her face?

14  A.  I can't remember, sir.

04:17:49  15  Q.  Did it appear -- well, did you have any -- did it -- let

16  me ask you this.

17          When you saw her laying in that bed with bruises,

18  you're saying bruises on her face, did you know what had

19  happened to her?

04:18:01  20  A.  No, I did not.

21  Q.  So did anyone -- so you had no information what had

22  happened to her?

23  A.  No, I didn't know what happened to her.

24  Q.  You didn't know whether or not she fell down because she

04:18:11  25  was drunk or because she was beaten, raped, and burned?

1    You're saying you don't know one way or the other?

2    A.  No, sir, I don't know what happened to her.

3    Q.  When is the first time you found out that Karen Byron was

4    gang raped, beaten, and burned?  When did you first find that

04:18:28    5    out?

6    A.  When the officer told me at the police station that she

7    had been raped and burnt.

8    Q.  Now, finally, sir, going back to where I started, in terms

9    of these -- this party house that you described, you told me

04:18:46    10    that Stanley Wrice had his friends over, right?

11            MS. BONJEAN:  Objection to foundation.

12            THE WITNESS:  They --

13            MS. BONJEAN:  Ever, that night?

14            MR. JEBSON:  In 1982.

04:18:58    15            THE COURT:  Yes.  Okay.

16    BY MR. JEBSON:

17    Q.  Stanley Wrice had friends over for parties, right?

18    A.  There was guys coming over that day.

19    Q.  And he was the one having the parties, right?

04:19:10    20    A.  Not to my knowledge.  It's just most of the people from

21    the neighborhood was coming by sometime.

22    Q.  But he was the one that were friends with these

23    individuals, right?

24    A.  He knew most of them, like.

04:19:25    25            MR. JEBSON:  That's all I have at this time, Judge.

1    Thank you.

2         THE COURT:  Redirect?

3                  REDIRECT EXAMINATION

4    BY MS. BONJEAN:

04:19:33    5    Q.  Charles, when you came out of your bedroom after the

6    officer or Kim was knocking on it, you've testified you had no

7    knowledge about what had happened, right?

8    A.  Yes.  I had no knowledge what was happening.

9    Q.  Did you ever see any white woman or any woman other than

04:19:52    10   Mildred and your siblings and Kim in the house that night?

11   A.  No.

12   Q.  And had you ever seen this woman on the street?

13   A.  No.

14   Q.  And you went to -- you were brought to a hospital, right?

04:20:04    15   A.  Yes.

16   Q.  And when you walked in the hospital room, did you have any

17   idea why you were even being brought there?

18   A.  No, ma'am, I didn't.

19   Q.  Were you confused?

04:20:12    20   A.  Yes, very confused.

21   Q.  Did they say, "We're taking you to the hospital to look at

22   this woman that was injured in your attic" and give you an

23   explanation for why they were bringing you there?

24        MR. JEBSON:  Objection.  Leading the witness.

25   BY THE WITNESS:

1  A.  No.

2        THE COURT:  All right.  This is redirect.  She can

3  get a little more leeway to speed through things.  Go ahead.

4  Overruled.

5  BY MS. BONJEAN:

6  Q.  Was it -- was it confusing?

7  A.  Yes, it was.

8  Q.  Okay.  And when you first walked in the room, did you

9  notice anything unusual?  I'm talking about the hospital room.

10 A.  No.

11 Q.  Okay.  Did -- were her -- was her body showing?

12 A.  No.

13 Q.  What did she have on, if you remember?

14 A.  I'm not sure if she had on a gown.  I'm not really sure

15 what she had on.

16 Q.  Okay.  And you're admitting and acknowledging that when

17 you got close to her, you saw the bruises, right?

18 A.  Yes.

19 Q.  Now, Mr. Jebson asked you a number of questions, and I

20 want to go through a few of these.  First of all, he pointed

21 you to Page 77 of your deposition -- and I'm not sure it was

22 Page 77.

23       But do you remember that when Mr. Jebson suggested to

24 you that you had told -- the first time you've ever told

25 anybody that you saw Rodney Benson and Stan at the police

1  station was here to this jury today.  Do you remember he

2  suggested that?

3  A.  Yes.

4  Q.  Okay.  And he point -- he read you a little, tiny portion

04:21:59  5  of your deposition testimony trying to demonstrate that this

6  is the first time that you are saying that, right?

7  MR. JEBSON:  Objection to the form of the question.

8  THE COURT:  Overruled.  Go ahead.

9  BY MS. BONJEAN:

04:22:11  10  Q.  Right?

11  A.  Yes.

12  Q.  Okay.  I would like to point you to -- can we put up

13  Charles Wrice's trial testimony?

14  I'm going to point you to the testimony you gave at

04:22:23  15  Stanley's criminal trial back in 1983, Page 1371.

16  MR. JEBSON:  Thank you.

17  BY MS. BONJEAN:

18  Q.  Let me know when you see it.

19  Okay.  Sir, do you remember being asked these

04:22:48  20  questions and giving these answers?

21  A.  It's not up here.

22  Q.  "Question, and sir" -- let me back up.  This would be

23  testimony from your -- you gave testimony at the 1983 trial,

24  right?

04:22:58  25  A.  Yes.

1    Q.  Okay.

2    "Question:  And, sir, while you were at the police station,

3    did you have occasion to see your brother Stanley Wrice?

4         "Answer:  Yes, sir, I did."

5         "And where was your brother Stanley when you saw

6    him?"

7         "He was across the room in the next room from me.

8         "Question:  I will have to ask you to speak up."

9    "Question:  Okay.  Charles, I am going to stand way back here

10   so that you will speak more loudly so that these people will

11   hear you.  When you saw your brother Stanley across from you,

12   was there anything unusual about him?

13        "Answer:  Yes, look like he had been crying or was

14   crying."

15        And going down a couple more lines, 1372, just hold

16   there for a second.

17        Do you remember when Mr. Jebson suggested that the

18   first time you were telling anybody that you had seen Rodney

19   Benson at the police station was here to these juries for the

20   first time?  Do you remember that?

21   A.  Yes.

22   Q.  Okay.  And were you asked this question --

23        MR. JEBSON:  I'm sorry, Judge.  I object to the form

24   of the question.  That's mischaracterizing what I did.  I

25   impeached him with his deposition testimony, that he's telling

1    different stories.

2         MS. BONJEAN:  We'll get to the deposition testimony.

3         THE COURT:  This will go quicker if you just go ahead

4    and read the portion you wish to point out to him.

04:24:21    5    BY MS. BONJEAN:

6    Q.  Back in 1983, you were asked the question and gave this

7    answer:

8    "Question:  Okay.  And sir, did you have occasion to see

9    Rodney Benson?

04:24:29    10         "Answer:  Yes, when I came out of the room and talked

11   to the district attorney.

12         "Question:  And when you saw Rodney Benson, was there

13   anything different about him than from the time that you were

14   transported to the police station?"

04:24:39    15         "Yes.  Look like he had been crying, also."

16   "Sir, the question was:  Was there anything different about

17   him from the time that you were transported to the police

18   station?"

19         "Yes.  Look like he had been crying."

04:24:57    20         Right?

21   A.  Yes.

22   Q.  You were never -- you didn't testify that he was crying on

23   the way to the police station, correct?

24   A.  Yeah --

04:25:04    25         MR. JEBSON:  Objection --

| | |
|---|---|
| 1 | THE WITNESS:  -- no. |
| 2 | MR. JEBSON:  -- that mischaracterizes the testimony. |
| 3 | MS. BONJEAN:  Well, shall we keep going? |
| 4 | THE COURT:  Keep going. |
| 04:25:19  5 | MS. BONJEAN:  Okay.  Now let's look at Page 1371 of |
| 6 | your deposition. |
| 7 | MS. COHEN:  Of the trial? |
| 8 | MS. BONJEAN:  What is that? |
| 9 | MS. COHEN:  1371 of the trial? |
| 04:25:39  10 | MS. BONJEAN:  112. |
| 11 | BY MS. BONJEAN: |
| 12 | Q.  Do you remember when Mr. Jebson asked you, I think he |
| 13 | pointed out one portion of your deposition testimony -- I |
| 14 | can't remember exactly where it was -- about Bobby Joe |
| 04:26:03  15 | Williams.  You saw Bobby Joe Williams at the police station. |
| 16 | You testified to that today, correct? |
| 17 | A.  Yes. |
| 18 | Q.  And you also testified to that at your deposition, right? |
| 19 | A.  Yes. |
| 04:26:12  20 | Q.  Okay.  Page 112, tell me if you see the questions there at |
| 21 | Line 11: |
| 22 | "Question:  You testified that you saw Bobby Joe Williams at |
| 23 | the police station, right? |
| 24 | "Answer:  Yes. |
| 04:26:25  25 | "Question:  And that he looked like he had been |

1    crying?

2        "Answer:  Yes."

3        Do you see that?

4    A.  Yes.

04:26:30   5    Q.  Okay.  Now, Mr. Jebson pointed out a section of your

6    deposition where he -- Page 112, please.

7        When he asked you about that period of time in

8    September 1982 to May 1983, do you recall seeing Rodney

9    Benson, and you said no.  Do you remember him asking you that?

04:27:02   10   A.  Yes.

11   Q.  And he was suggesting that you were lying or you were

12   telling -- you're telling the jury for the first time that you

13   saw Rodney Benson in the house that night?

14   A.  Yes.

04:27:11   15       MR. JEBSON:  Objection, Judge.  That's

16   mischaracterizing what I did.  I pointed out he's telling

17   different stories at different times.

18   BY MS. BONJEAN:

19   Q.  Okay.  Sir, one question before that, what -- were you

04:27:22   20   asked this question:

21   "Question:  Do you recall a time after Stanley's arrest but

22   prior to his trial seeing Rodney Benson?

23       "Answer:  Can you repeat that?"

24   "So the time period between September of '82 to May of 1983,

04:27:40   25   do you recall seeing Rodney Benson?

1    "Answer:  No."

2    Do you see that?

3    A.  Yes.

4    Q.  This question was clearly asking you about the time after

04:27:47    5    Stanley's arrest, right?

6    A.  Yes.

7    MR. JEBSON:  Objection.  Leading the witness.

8    MS. BONJEAN:  It's --

9    THE COURT:  Well, it was to point out where it was.

04:27:58    10   We'll just let it stand.

11   BY MS. BONJEAN:

12   Q.  Okay.  Now, this business about being beaten for two

13   hours, first of all, were you nervous during your deposition?

14   A.  Yes, I was.

04:28:21    15   Q.  Are you nervous right now?

16   A.  Yes.

17   Q.  Okay.  How long were you in the police station in total

18   about?

19   A.  Total of hours, I want to say maybe about two to three

04:28:38    20   hours, I think two hours.

21   Q.  Okay.  So the whole time you were there was about two

22   hours, right?

23   A.  Yes.

24   Q.  Okay.  And you said the beating itself where you were

04:28:47    25   actually being hit was what?  You're estimating, right?

C. Wrice - redirect

1   A.  Yeah, I was estimating.  I didn't know exactly how long

2   was it.

3   Q.  Okay.  And how many people were actually beating you, like

4   hitting you with the instrument?

04:29:00   5   A.  It was one guy beating me, but it was two guys down there.

6   Q.  Okay.  How many people brought you down there?

7   A.  Two.

8   Q.  Okay.  Now, did you have any reason to hire an attorney as

9   Mr. Jebson asked you earlier?

04:29:15   10   A.  No.

11   Q.  And if you hadn't hired an attorney -- did you have any

12   reason to hire an attorney to tell him about what had happened

13   to you?

14   A.  No.

04:29:27   15   Q.  Now, explain for the ladies and gentlemen of the jury why

16   you didn't tell anybody.

17   A.  I was so scared.  I was terrified.  I was scared as hell.

18   I was scared of anything -- I just was so scared, I just

19   didn't tell anybody anything.

04:29:46   20   Q.  Okay.

21   A.  I was terrified.

22   Q.  And did you want to tell on the police?

23   A.  I'm sorry.  I didn't --

24   Q.  Were you scared to tell on the police?

04:29:55   25   A.  Oh, yes.

1    Q.  And why?

2    A.  Because I was afraid they would come back and retaliate

3    against me or even come back and take me to jail.

4    Q.  And, sir, did you have conversations with Stan about what

5    had happened to you and what had happened to him?

6    A.  I'm sorry?

7    Q.  Did you have conversations in the jail about what had

8    happened to you and what had happened to him?

9    A.  No.

10   Q.  Was that a subject of conversation you had with him?

11   A.  No.

12   Q.  Do you recall even how many times you went to the jail?

13   A.  I can't recall how many times, but I went a few times, but

14   no, I didn't -- we didn't talk about that.

15   Q.  And is this something you would have talked about on

16   recorded lines, phone calls?

17   A.  No.

18   Q.  Okay.  Did you even have a cell phone at that time?

19   A.  No.

20   Q.  Because there was no cell phone, right?

21   A.  No.

22   Q.  Was there a house phone?

23   A.  No.

24   Q.  Okay.  And because you were actually a witness at the

25   trial, were you able to even sit through the testimony of any

C. Wrice - redirect

483

1    of the trial?

2    A.  No.

3    Q.  I want to ask you, you were asked some questions about,

4    you never identified -- you never told anyone before today

04:31:09    5    when you were before this jury that you were told by the

6    officers what to say.  Do you remember that?

7    A.  Yes.

8    Q.  Okay.  I'm going to point you to Page 109 of your

9    deposition testimony.  Do you remember when Mr. Jebson started

04:31:22   10    the question with, "Did the officer ever ask you about anyone

11    specific," and you said, "No."  Do you remember that?

12    A.  Yes.

13    Q.  Okay.  About six lines up there at Line 10 -- okay.

14    Actually, Line 1.

04:31:45   15           MS. COHEN:  Do you want to start --

16    BY MS. BONJEAN:

17    Q.        "Question:  So were you saying anything while you

18        were being hit with the object?

19    "Answer:  I was just saying I don't know what was going on.  I

04:31:53   20    was just telling him, 'What do I do?  What do I do?'  He said,

21    'You were upstairs.  You were upstairs.'  And I wasn't

22    upstairs.  I didn't know what was going on.  I was not

23    upstairs.  They trying to make me say like I was upstairs

24    watching everything that was going on.

04:32:06   25           "Question:  Upstairs where?

| | | |
|---|---|---|
| | 1 | "Answer:  Upstairs where?  I guess where everyone |
| | 2 | was, whatever what was going on.  I have no idea. |
| | 3 | "Question:  So was the officer telling you to say |
| | 4 | anything specific? |
| 04:32:16 | 5 | "Answer:  He's just trying to force me to say that I |
| | 6 | was upstairs and I seen what was going on.  'You know what was |
| | 7 | going on.  You know what was going on.'" |
| | 8 | Right?  Do you see those questions? |
| | 9 | A.  Yes. |
| 04:32:27 | 10 | Q.  And you kept saying, "I wasn't there," right? |
| | 11 | A.  Yes. |
| | 12 | Q.  Okay.  And apart from Stanley Wrice, was he trying to get |
| | 13 | you to identify other people up there, do you remember? |
| | 14 | A.  No. |
| 04:32:37 | 15 | Q.  Now, sir, you testified today that you were brought |
| | 16 | downstairs, right? |
| | 17 | A.  Yes. |
| | 18 | Q.  Do you know if it was a basement or where it was? |
| | 19 | A.  I'm not sure where it was, no. |
| 04:33:18 | 20 | Q.  Have you described it as going downstairs and as a |
| | 21 | basement? |
| | 22 | MR. JEBSON:  Objection. |
| | 23 | BY THE WITNESS: |
| | 24 | A.  Yes, going downstairs. |
| 04:33:25 | 25 | MR. JEBSON:  Objection.  Leading the witness. |

C. Wrice - redirect

485

BY MS. BONJEAN:

Q.   Okay.  Well, we can look at the deposition.  Give me one second.

And on this point, while we're looking for that other piece of deposition, did you ever say you knew where the hollering was coming from?  Did you know where the hollering was coming from?

A.   No.

Q.   Did you ever suggest it was coming from any specific place or tell anyone, "I definitely heard it coming from a particular place"?

A.   No.

Q.   All right.  And, sir, I want to ask you -- okay.  I want to draw your attention to Page 72.  Now, when you were asked when you were taken out of the interview room where you went, isn't it true that you told during your deposition that you went downstairs, correct?

A.   Yes.

Q.   And you couldn't recall how many stairs you went down; isn't that right?

A.   Yes.

Q.   Okay.  So when you're saying "basement," are you suggesting that it was in some subbasement, or do you have any idea where you were taken really?

A.   No, ma'am.

1  Q.  You know you went from the second floor down some stairs,

2  right?

3  A.  Yes.

4          MS. BONJEAN:  Give me one second.

04:35:49  5  BY MS. BONJEAN:

6  Q.  Mr. Wrice, have you testified multiple times in connection

7  with this?

8  A.  I'm sorry, ma'am?

9  Q.  Have you testified multiple times over the last 30 years

04:36:01  10  in connection with this?

11  A.  Yes.

12  Q.  Okay.  And are you trying your best to remember everything

13  from 30 years ago?

14  A.  I'm trying my best to remember everything.  It's so hard.

04:36:10  15  Q.  Okay.  And have you been told a lot of information in the

16  last 30 years, too?

17  A.  Yes.

18  Q.  And is it hard to keep some of these things straight a

19  little bit?

04:36:20  20  A.  Yes, very hard.

21  Q.  Now, you testified earlier, and you looked at a document,

22  you did tell some people back in 2005 about this, didn't you?

23  A.  Yes.

24  Q.  And do you remember whether they were -- you said they

04:36:36  25  were investigating the Stanley Wrice case, right?

1  A.  Yes.

2  Q.  So when you did testify at your deposition about it, that

3  really was the first time you told about what had happened to

4  you, correct?

04:36:47  5  A.  Yes.

6      MR. JEBSON:  Objection.  Leading the witness.

7  BY MS. BONJEAN:

8  Q.  Okay.  What did you tell the guys on the phone, the

9  investigators on the phone that called you in 2005?  What did

04:36:56  10  you tell them?

11  A.  I told them that I had been beaten, too.

12  Q.  Okay.  And did they want you to elaborate on what had

13  happened?

14  A.  No.  He just asked -- he just wanted to know what happened

04:37:10  15  with Stanley Wrice.

16  Q.  Okay.  And did you go down to some offices downtown and

17  give a full statement about what had happened?

18  A.  Yes.

19  Q.  Okay.  And did they want to hear about your experience or

04:37:23  20  what you knew about Stanley Wrice's claims?

21  A.  What I knew about --

22      MR. JEBSON:  Objection.

23      THE WITNESS:  -- Stanley Wrice's claim.

24      MR. JEBSON:  Asked and answered multiple times.

04:37:31  25      THE COURT:  Overruled.  Let's move on.

1    MS. BONJEAN:  I think that's it.

2    No, we have nothing further.

3    THE COURT:  Anything further?

4    MR. JEBSON:  No, Judge.  Thank you.

04:37:48 5    THE COURT:  All right.  You can step down.

6   (Witness excused.)

7    THE COURT:  I think the time of day, we will suspend

8 until 10:00 o'clock Monday.  Please, my same instructions.  Do

9 not do any independent investigation.  Don't discuss the case.

04:38:01 10 Don't read about it.  And don't listen to any accounts on the

11 radio or television about it.

12    So have a nice weekend.  And we'll see you Monday

13 morning at 10:00 o'clock.  Try to be there at five to 10:00 so

14 we can start promptly.

04:39:40 15   (Proceedings heard in open court.  Jury out.)

16    THE COURT:  All right.  You will give a list of

17 Monday's witnesses to the defense when?  Now or --

18    MS. BONJEAN:  I mean, I've got to catch my breath and

19 think and --

04:39:53 20    THE COURT:  Well, by --

21    MS. BONJEAN:  You tell me when, and I'll give it to

22 them.

23    THE COURT:  By 6:00 o'clock.

24    MR. HALE:  That's fine, Judge.

04:39:59 25    THE COURT:  And what did you want from them?

1       MS. BONJEAN:  Just the summaries that they submitted

2  to you without my comments.

3       MS. JACOBS:  They're the same ones I submitted to you

4  three days ago.

04:40:08    5       THE COURT:  You have submitted, what you submitted to

6  me were --

7       MS. JACOBS:  I gave to her three days ago.

8       MS. BONJEAN:  Okay.

9       THE COURT:  All right.  And so we will get together

04:40:13   10  at 10 minutes to 10:00 on Monday.  If you have comments or

11  objections or whatever it is or comments, make sure I get them

12  by 8:00 a.m. Monday.

13       MS. BONJEAN:  Sure, Judge.  I'd be happy to.  I

14  was --

04:40:26   15       THE COURT:  Yes.  Just make sure they're in -- given

16  to me.

17       MS. BONJEAN:  I would have liked to have done this

18  three weeks ago.  So, you know, and I'm trying to also prepare

19  every day for trial, and I'm having to catch up with these

04:40:40   20  summaries that should have been done a long time ago.  So I'm

21  doing my best.

22       MS. JACOBS:  We got the summaries in to you before

23  they did, Your Honor.

24       THE COURT:  Well --

04:40:48   25       MS. JACOBS:  Also, I would like to say that I have

1    only received four secondary summaries --

2          THE COURT:  All right.

3          MS. JACOBS:  -- from Ms. Bonjean.  We got them at

4    9:30.  So if the Court has additional ones, she should send

04:40:58  5    them to us.

6          THE COURT:  All right.  Would you send your comments

7    to Benjamin Harris -- Benjamin, underscore -- here.  Would

8    you -- that's my law clerk.

9          MS. BONJEAN:  We will.  If they're sending things to

04:41:20  10   the Court or giving things that we should be cc.'d on, that's

11   what we gave them that courtesy.

12         THE COURT:  All right.  Whatever --

13         MS. JACOBS:  Your Honor --

14         THE COURT:  Whatever you want to submit, I won't

04:41:30  15   encourage anything more because then I'm sure that I will get

16   it.  Send it to that email address.  Give it to them, too.

17   It's benjamin_harris@ilnd.uscourts.gov.  All right.

18         MR. HALE:  Thank you, Your Honor.

19         MS. JACOBS:  Yes, Your Honor.  We gave it to you

04:41:48  20   because we got them today.

21         THE COURT:  No, that's fine.  I'm happy you did.

22         MR. HALE:  Thank you, Your Honor.

23         MS. JACOBS:  Thank you, Your Honor.

24         THE COURT:  Have a nice weekend, everybody.

04:50:12  25        (Recess from 4:41 p.m. to 4:50 p.m.)

1       THE COURT:  We have a note from a juror.  I'll read

2   it.  This is from Jacqueline -- is it Wilson?  Do you have the

3   list of jurors?

4       THE COURT REPORTER:  Williams.

04:50:37    5       THE COURT:  Jacqueline Williams dated today:

6   "Unfortunately, I must ask to be excused from further service

7   as a juror.  I have a senior aunt, Millie Cantrell, age 97 who

8   is now suffering metastatic breast cancer.  Her doctors

9   informed me today that she will require further tests, PET

04:51:00   10   scan, and treatment immediately to begin next week.  I do not

11   have anybody else available to take her, and she has no

12   children.  And the one other niece who assists me with her

13   care is not available next week at all.  I am very sorry that

14   I must ask to be excused as I do not take this responsibility

04:51:23   15   very seriously.  Thank you, Jacqueline Williams."

16       We have -- we have three extra jurors.

17       MS. BONJEAN:  I would object.  Already that venire

18   had no people of color in it as it was, very few people.

19       THE COURT:  I appreciate that, but I don't know

04:51:45   20   what --

21       MS. BONJEAN:  I just want to make a record that this

22   is the one African-American juror.  And we're now in 2020, and

23   we're still having a jury of all while people deciding this

24   case if she leaves.  And, you know, that's troubling to me

04:52:00   25   because that doesn't represent a cross-section of this

492

1  community and this city.

2        And there are experiences that people of color have,

3  particularly in a case like this, that will resonate with her

4  differently than somebody else, which doesn't mean the other

04:52:16    5  jurors aren't perfectly capable to give a fair verdict, but it

6  would be naive to think that Mr. Wrice --

7        THE COURT:  If I don't excuse her, do you want her on

8  the jury when she has this -- I mean, this is the problem.

9  I'm not sure that there is anything we can do.  I mean, I

04:52:36   10  appreciate the fact that this is the only African-American,

11  but I don't know what else we can do.

12        MS. BONJEAN:  I mean, I would maybe, you know --

13        THE COURT:  We can tell her, "No, you can't."

14        MS. BONJEAN:  Well, I'm not suggesting telling her,

04:52:49   15  "No, you can't," but I think it would be useful to, in my

16  experience, to bring -- to talk to her in open court.

17        THE COURT:  Is she still here?

18        THE COURT REPORTER:  I told her to wait.

19        THE COURT:  Bring her in.

04:53:00   20        MS. BONJEAN:  So she understands --

21        THE COURT:  Have her come in.

22        MS. JACOBS:  It's possible, Your Honor, that we can

23  move trial days so that she can do --

24        THE COURT:  Bring her in.

04:54:09   25     (Juror Williams enters the courtroom.)

1     THE COURT:  We got your note.  We're very sorry about

2  your relative.

3     We'd hate to lose you as a juror in the case.  We're

4  just wondering if there's some way maybe we can accommodate

04:54:24    5  you with giving -- like quitting early one day or whatever.

6  Is there anything you can tell us?

7     JUROR WILLIAMS:  Can I come in late on Tuesday?

8  Tuesday is the day for her testing and then after that --

9     THE COURT:  We could -- is it the morning?

04:54:36   10     JUROR WILLIAMS:  Yes.

11     THE COURT:  So you could come in Tuesday -- you can

12  come Monday and then come on Tuesday afternoon?

13     JUROR WILLIAMS:  Yes, sir.

14     THE COURT:  Oh, we can do that.

04:54:45   15     MR. HALE:  That's fine, Judge.

16     THE COURT:  Yes.  Why don't we -- can we do that?

17     JUROR WILLIAMS:  Yes, sir.  That's fine.

18     THE COURT:  Okay.  Great.

19     JUROR WILLIAMS:  Thank you.

04:54:48   20     THE COURT:  Have a nice weekend.

21     JUROR WILLIAMS:  You, too.

22     (Proceedings adjourned from 4:55 p.m. to 10:00 a.m.,

23     February 24, 2020.)

24                    * * * * * * *

25

1    C E R T I F I C A T E

2         We, Kelly Fitzgerald, Joseph Rickhoff, and Judith

3    Walsh, do hereby certify that the foregoing is a complete,

4    true, and accurate transcript of the proceedings had in the

5    above-entitled case before the Honorable HARRY D. LEINENWEBER,

6    one of the judges of said court, at Chicago, Illinois, on

7    February 21, 2020.

8

9    */s/ Kelly Fitzgerald*                    February 22, 2020
     */s/ Joseph Rickhoff*                     February 22, 2020
10   */s/ Judith A. Walsh*                     February 22, 2020
     Official Court Reporters
11   United States District Court
     Northern District of Illinois
12   Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25