IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STANLEY WRICE, Plaintiff, | ) | |
| -vs- | ) | Case No. 14 C 5934 |
| JOHN BYRNE, former Chicago Police Sergeant, et al., | ) | Chicago, Illinois February 25, 2020 12:00 p.m. |
| Defendants. | ) | |

VOLUME 4
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE HARRY D. LEINENWEBER and a jury

APPEARANCES:

For the Plaintiff: MS. JENNIFER A. BONJEAN
MS. ASHLEY BLAIR COHEN
Bonjean Law Group PLLC
467 Saint Johns Place
Brooklyn, NY 11238
(718) 875-1850

MS. HEIDI LINN LAMBROS
1169 S. Plymouth Court, Suite 123
Chicago, IL 60604
(216) 318-4087

For the Individual Defendants: MR. ANDREW M. HALE
MR. SCOTT J. JEBSON
MS. JENNIFER BITOY
MS. AMY A. HIJJAWI
Hale & Monico LLC
53 W. Jackson Boulevard, Suite 330
Chicago, IL 60604
(312) 341-9646

Court Reporter:

KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
Official Court Reporter
United States District Court
219 South Dearborn Street, Suite 1426
Chicago, Illinois 60604
Telephone: (312) 435-5569
Kathleen_Fennell@ilnd.uscourts.gov

APPEARANCES: (Continued)

For Defendant City of Chicago: MS. CARYN L. JACOBS
Department of Law, City of Chicago
121 North LaSalle Street, City Hall
Suite 600
Chicago, IL 60602
(312) 744-5128

Also Present: MR. NICK BENYO
Senior Litigation Consultant
Magna Legal Services

(Proceedings heard in open court; jury out:)

MR. JEBSON: Judge, I was informed that I guess Bobby Joe Williams is running 15 minutes late.

THE COURT: Who?

11:59:20 MR. JEBSON: Bobby Joe Williams.

THE COURT: Well, can we do something else? She can read some of these things then.

Here's the Bobby Joe Williams. That's for your side.

MS. JACOBS: Your Honor, I have a couple of preliminaries I'd like to go over that deal with the -- 11:59:39

THE COURT: You've got to wait for --

MS. JACOBS: -- the witnesses.

THE COURT: See if you can find the plaintiff.

MR. JEBSON: Okay.

11:59:46 THE COURT: Looks like their stuff is here, so --

(Ms. Cohen enters the courtroom.)

THE COURT: All right. The jurors are all here. They're ready to go. You wanted to present something?

MS. JACOBS: Yes, Your Honor. A couple of things.

12:00:16 THE COURT: Wait a minute, just one second. I don't see --

MR. HALE: And, Your Honor, actually what was the estimate for Bobby Joe?

(Ms. Bonjean enters courtroom.)

12:00:24 THE COURT: Here she is.

MS. BONJEAN: Sorry, Judge. Estimate of what?

MR. HALE: Do you know when --

MS. COHEN: Estimate of time. Oh, 15 fifteen minutes.

12:00:31 MS. BONJEAN: Yeah, he's running a little behind. 15 minutes he should be here, Judge. I apologize on his behalf.

THE COURT: Well, you can go ahead and read some of these --

12:00:37 MS. BONJEAN: That's right.

THE COURT: So go ahead. What did you want?

MS. JACOBS: Thank you, Your Honor.

First of all, Bertina Lampkin is being called as a witness today, and I have -- obviously she was our witness for our case. 12:00:50 The plaintiff is calling her in their case.

I would like to do my whole direct today.

THE COURT: Sure.

MS. JACOBS: In other words, not have her recalled.

THE COURT: Right. We'll do that. We'll complete her, 12:01:02 and once you pass beyond the direct-examination, then they can come back, and -- all right.

MS. JACOBS: All right. Relevant to Bertina Lampkin, the plaintiffs yesterday opened the door very, very, very wide to letting in the three armed robbery convictions of Mr. Wrice. 12:01:25 They are making a sentencing disparity argument,

which is that Rodney Benson got three months and poor Mr. Wrice got a hundred years.

I have a -- I have a sentencing transcript which has been marked as an exhibit which I'd like to pass up to Your Honor. The sentencing transcript makes very clear -- hold on one second.

The sentencing transcript makes very clear that one of the main reasons -- one of the major contributors to the sentence, apart from the brutality of the crime, was the three prior armed robberies. It's called a Class X felony, and because they were within a certain time period of the -- of the --

THE COURT: What's your point? What do you want?

MS. JACOBS: My point is that I want -- she's going to be queried today -- well, because of yesterday's questions, I'm going to bring out why Stanley Wrice got a longer sentence.

Stanley Wrice had three armed robbery convictions. The judge is able and, in fact, is required under Illinois law to consider those for two purposes: One, for an extended sentence and, second of all, for consecutive sentences. The judge specifically discussed those and found that he was able to enhance the sentence because of the three armed robbery convictions.

Also, the assistant state's attorney raised the three

armed robbery convictions, seeking both enhancement and seeking consecutive sentences.

So this -- this is clearly relevant now. We -- it was Ms. Bonjean's idea to bring in all the other defendants and to bring up their sentences, and so now this is our defense. The witness is going to be on the stand today, and she can testify to this.

Also, just for the record, I just want to make sure everyone's clear, Stanley Wrice at his criminal trial testified to his three armed robbery convictions on direct-examination by Sidney Jones. The criminal jury hear it:

"Question: Okay, now, Stanley" --

MS. BONJEAN: We stipulate.

THE COURT: He took the stand in the criminal trial, so --

MS. JACOBS: To me the armed robbery conviction should come in for both of those --

THE COURT: Okay. I got your point. How do you respond? We're going to move quickly because I want the jury out here.

MS. BONJEAN: Thank you, Judge.

Yes, of course --

THE COURT: Wait.

Okay. Go ahead.

MS. BONJEAN: I was speaking.

Mr. Wrice's convictions came in at the time because they were within the time period in which they were admissible and they were going to be used to impeach him and his own attorney fronted those prior convictions.

The question of whether Mr. Wrice's sentence is really not at issue. What is at issue is Rodney Benson got a deal. It wasn't so much that he got probation, he got a deal to testify against Stanley Wrice, and they're pointing at Rodney Benson as evidence of guilt. So Rodney Benson says I got a deal for probation to implicate Stanley Wrice, which was all part of this -- I don't even know what to call it -- this ridiculous investigation that went awry and was not about seeking the truth, and that is the purpose for which we brought that out.

THE COURT: Well --

MS. BONJEAN: Now, the whole disparity argument, I don't know what that's relevant to. There's clearly a disparity. And they pled guilty. The three co-defendants pled guilty. Of course, that's relevant.

Their sentences are relevant because they -- they -- the defense is going to rely on Michael Fowler and Rodney Benson as evidence that Stanley did it. So, of course, we have the right to show, oh, well, yeah, they were happy to say whoever did it because they were getting sweet sentences.

THE COURT: The question is she wants to bring out the fact that at the time of sentencing, the -- the sentence was enhanced because of these three prior convictions.

MS. BONJEAN: It wasn't enhanced for those three --

12:05:23 MS. JACOBS: Yes, it was.

THE COURT: Wait. Either it was -- I'm asking her. Either it was or it wasn't.

MS. BONJEAN: I believe he was eligible for an extended sentence because of the brutality and the heinousness 12:05:34 of the crime which was the basis for extending it. I mean, he got more than what the maximum was on a murder back then, which was 40 years, and that was because of the brutality, and I believe there was an aggravating factor as to the -- to, again, the nature of the crime.

12:05:51 It wasn't -- I'm not suggesting that it wasn't brought up in aggravation that he had a prior, prior convictions --

THE COURT: All right. Well --

MS. BONJEAN: -- but I don't think he was extendible 12:05:59 because of the prior convictions.

MS. JACOBS: Your Honor, the Court says, "The defendant in this case is a man who was convicted" --

THE COURT: Where are you reading from?

MS. JACOBS: I'm on Page 5670 or Page 1757.

12:06:10 "The defendant in this case is a man who has been

convicted in the past of a crime which is now a Class X felony. The presentence report reveals that defendant pled guilty to three separate charges of armed robbery and was sentenced."

12:06:24 Then further on he says, "I am satisfied that he is the principal offender in this act" and then -- hold on a sec -- "the provisions in several areas in the statute that are germane to sentencing" --I'm now at Page 5671 -- "I think ought to be mentioned. Law provides that sentences provided 12:06:45 by law under certain circumstances can be extended."

And then he goes on to say that if -- "they provide that the defendant who is convicted of a felony and after having been previously convicted in Illinois of the same or greater class felony within ten years, excluding the time 12:07:03 spent in custody, and such charges are separately brought and tried arise out of different series of acts, Mr. Wrice qualifies for an extended term under that section. The statute further provides when a defendant is convicted of any felony and the Court finds the offense was accompanied by 12:07:22 exceptionally brutal or heinous behavior, that also warrants extension."

We're not arguing that here.

THE COURT: All right.

MS. JACOBS: So basically the judge --

12:07:32 THE COURT: I've read it, so, okay.

MS. BONJEAN: Well, Judge, his prior armed robbery -- again, the basis for the 100-year sentence, I don't know what that possibly could be relevant to --

THE COURT: All right.

12:07:41 MS. BONJEAN: -- and it's obviously highly prejudicial.

THE COURT: Right. Here's what you can do. You can bring out the fact that at the time of sentencing, he had a prior criminal history of three whatever they are and let it 12:07:55 go at that. You're not going to --

MS. JACOBS: Your Honor --

THE COURT: -- you're not going to be enhancing because that's -- that's --

MS. JACOBS: Your Honor, the criminal jury heard the 12:08:05 testimony. We are not retrying Stanley Wrice --

THE COURT: Okay. And that's the ruling, that you can bring out the fact that he had three priors, and that's it.

All right. Are you ready for the jury?

12:08:14 MS. JACOBS: Three prior felonies, Your Honor?

THE COURT: What?

MS. JACOBS: Three prior felonies.

THE COURT: Three priors. If he takes the stand --

MS. JACOBS: Three prior armed robberies.

12:08:19 THE COURT: -- it will come out anyway. If he takes

the stand, it can come out as --

MS. BONJEAN: No, it's not within the time period, Judge. We did a motion *in limine*.

THE COURT: Wait.

12:08:26 MS. JACOBS: We don't need the time period. We're judging the trial back in 1982. In 1982 --

THE COURT: Whatever -- wait a minute. Okay. I've ruled now, and that's the end of it. So you can bring out the fact that there was -- that he had three convictions as
12:08:41 opposed to the others who didn't, so that would make some difference.

MS. JACOBS: Thank you, Your Honor.

MS. BONJEAN: Well, it would except that some of them did have convictions, and so --

12:08:50 THE COURT: Well, that's subject -- they can point out that they were similar or they weren't similar.

Okay. Let's get the jury in. Let's get moving.

MS. JACOBS: Thank you, Your Honor.

MS. BONJEAN: Judge, one other thing, on the
12:09:00 summaries, which I guess we're going to start reading right away --

THE COURT: Yes.

MS. BONJEAN: -- our position is that Bobby Joe Williams' testimony has been heard ad nauseam. This is an
12:09:10 absolutely unnecessary to read another summary. I went

through --

THE COURT: Then don't.

MS. JACOBS: Your Honor --

MS. BONJEAN: I'm not going to.

12:09:14 THE COURT: Don't. They can --

MS. JACOBS: We're going to want to read it in our case.

THE COURT: They can do it in their case, but it seems to me that since everything that he testified to was brought out by both sides as either true or not true, it's totally unnecessary. So I'm not going to have the plaintiff read it in her case, so --

MS. BONJEAN: I also don't think the defendant --

THE COURT: That's the ruling.

12:09:32 MS. BONJEAN: -- at this point, it's so cumulative, and I don't think the defendant should --

THE COURT: That's the ruling.

MS. BONJEAN: Okay.

MS. JACOBS: Your Honor, one other, two other things.

12:09:38 First of all, they had sued Bertina Lampkin in this case originally and then she was dismissed and they amended and did not add her back in. I do not think that is appropriate to bring out on examination.

THE COURT: No, I don't think so either. Don't -- 

12:09:53 well --

MS. BONJEAN: I mean, I'm not sure I think it's inappropriate, given the fact that she has enormous bias and being sued in this case certainly, you know --

THE COURT: Increases her bias.

MS. BONJEAN: Yes.

MS. JACOBS: Your Honor, I think it's just extra noise. They sued her. They had no basis for suing her.

THE COURT: Well, either they did or they didn't --

MS. JACOBS: She was dismissed out because she was a prosecutor.

THE COURT: Either they did or they didn't and --

MS. BONJEAN: We had a basis. She was investigating the case.

THE COURT: It seems to me -- well, what basis would you sue the prosecutor if she was -- in what basis did they sue her?

If they attempted to sue her in her prosecutorial function, then you can't do that. Now, if she -- if they sued her because of some investigative --

MS. BONJEAN: Yes.

THE COURT: -- then she's got a qualified privilege. But she has an absolute privilege, and it seems to me that she probably -- I don't know what she sued her for.

MS. BONJEAN: I'll answer that question.

We sued her under a theory that she was acting in an

investigatory function when she by herself went out and started investigating the case and found Kenny Lewis all on her very own. That was the theory under which. It was based on her acting in an investigatory function.

12:11:02 I fully understand that she has absolute immunity if she's acting in her prosecutorial function. Now, Judge Bucklo disagreed. She dismissed her out, but it was a good-faith argument that we made, and she was -- she lodged a defense to it.

12:11:15 MS. JACOBS: Your Honor --

THE COURT: She was dismissed and is privileged, so I don't think there's any basis to bring that out so we'll leave that out.

Let's get the jury in here and get moving.

12:11:24 MS. JACOBS: Your Honor, I have one last question, which is Ms. Bonjean has been arguing that Kenny Lewis raped Karen Byron. The sole source of that is a deposition testimony of a guy named Michael Fowler who said yes to the question: "So Karen Byron consented to sex with Kenny Lewis,

12:11:47 correct?" Unquote.

No. 1, she shouldn't be allowed to bring in this fact at all. This is a coerced confession, coerced fabricated testimony, that the words that came out of Mr. Wrice's mouth were fabricated.

12:12:04 We are not retrying the case with 30 years later she

found some -- some evidence that she wished she had known back in 1982. This is not a malicious prosecution case, and allowing her to attack the witnesses who testified at trial unrelated to the claims that are made -- being made in this 12:12:26 case, which is that Dignan and Byrne beat --

THE COURT: All right.

MS. JACOBS: -- Bobby Joe Williams and Stanley Wrice is totally inappropriate and prejudice.

THE COURT: All right.

12:12:36 MS. JACOBS: She actually said that they -- that they're trying to frame --

MS. BONJEAN: Can I respond, Judge?

MS. JACOBS: Let me finish.

They're trying to frame Stanley Wrice. That -- this 12:12:45 is not a malicious prosecution case, and to litigate a malicious prosecution case is going to add days to this trial. This is about coerced confession and a fabricated statement.

MS. BONJEAN: Okay. I'd like to respond.

MS. JACOBS: Absolutely no --

MS. BONJEAN: May I respond?

THE COURT: Wait, wait.

THE COURT REPORTER: Stop. One at a time.

THE COURT: I've heard enough. What -- I don't even know what you're talking about now.

12:13:06 MS. BONJEAN: Okay. I don't know what she's talking

about, frankly, because there's a fabricated evidence claim, and they are going to argue that Mr. Wrice would have been convicted alone on Kenny Lewis's testimony.

12:13:20 They are also going to argue that Kenny Lewis's testimony was relevant, reliable, and they're also arguing that Mr. Wrice is guilty in case anyone hasn't been paying attention in this courtroom, that's their whole theory of the case, that Mr. Wrice is guilty, he was properly convicted. We have the right to show he's not guilty.

12:13:33 THE COURT: All right. All right. I agree you have the right to show --

MS. JACOBS: Your Honor --

THE COURT: -- if that's a motion *in limine* --

MS. JACOBS: They're retrying --

12:13:39 THE COURT: That's enough. That's enough. Wait. That's enough. I'm not going to hear any more.

Let's get the jury in here, and you're going to start out, and when is your witness going to get here?

MS. BONJEAN: Should be in about five or ten minutes.

12:13:51 THE COURT: All right. Well, start reading these things so we get the jurors working. It's quarter after 12:00 already.

Yeah, bring the jury in, would you?

(Jury enters courtroom.)

12:15:10 THE COURT: Good afternoon. Please be seated.

Members of the jury, it's my understanding that the witness, Mr. Williams, who was on the stand will be here shortly. He's been detained, but we're going to proceed now to read some of the summaries of the testimony of the witnesses at the time of the criminal trial back in 1982.

You may read the summaries.

MS. COHEN: Charles Wrice testified at plaintiff's criminal trial on May 18th, 1983 to the following:

"My name is Charles Wrice. I am the brother of Stanley Wrice, and on September 8th, 1982, I lived at 7618 South Chappel with my brothers and sisters, Stanley Wrice, Patricia Wrice, Magnolia Wrice and Rose Wrice. I am 24 years old.

"On the morning of September 9th, 1982, I was at 7618 South Chappel. In my house that night for a period of time was my girlfriend Mildred. I stayed in that room almost the entire night. I was in my room with Mildred, and Mildred didn't come out of the room either.

"When I went into my room, my brother Stanley Wrice, my sister Patricia, and Bobby were in the house. At some point in time later that night, Rodney Benson, Michael Fowler and Lee Holmes came into the house and I think so, yes, a person by the name of Kenny Lewis. I didn't really see Kenny Lewis, and my brother Stanley Wrice knew them all. They were his associates. I was not entertaining them. I was in my

bedroom, and Patricia wasn't entertaining them. She was in her bedroom.

"While I was in the house that night, I heard people running up and down the stairs. I came out of my room and went back in, and I continued to hear those people running up and down the stairs, but I never went out of my room again. I fell asleep.

"I didn't burn any paper in the house or see anyone -- any. I didn't smell anything burning from about 1:30 to 3:30 in the morning. I didn't hear anyone scream.

"At around 4:30 a.m. on September 9th, 1982, about four police detectives came in the house I was in along with Stanley, Patricia Wrice and her boyfriend, Bobby Joe Williams, and a girl named Kim. I did not know her last name.

"I was in my room when I heard a knock on the door, and then Kim knocked on my bedroom door and told me that the detectives were there. The police were in our house for close to an hour and a half to two hours. I was handcuffed and taken to the police station with Stanley, Bobby Joe Williams, and Rodney Benson. There was nothing unusual about their condition before we left for the police station.

Once at the police station, I saw that my brother was across the room in the next room from him -- from me. It appears as if Stanley had been crying. I also saw Rodney Benson at the police station when I came out of a room and

talked to the district attorney and it appeared as if he had been crying also.

"When I left the police station with Bobby Joe Williams and Patricia Wrice, Bobby Joe Williams looked as if he had been crying also. At the police station I didn't see Stanley Wrice walking or standing, I didn't see Rodney Benson walking or standing, and I didn't see Bobby Joe Williams walking or standing. The assistant state's attorney tried to talk to me about the case, and I declined to speak to her."

The defendant Stanley Wrice called Charles Wrice -- excuse me -- called Patricia Wrice on May 18, 1983. Sidney Jones, Wrice's counsel, questioned him. She testifies -- testified as follows:

It's wrong here. Questioned her. She testified as follows in summary:

"I am Patricia Wrice and the sister of Stanley Wrice. I live at 7618 South Chappel with my brothers and sisters, Stanley Wrice, Charles Wrice, Magnolia Wrice and Rose Wrice, and I lived there on September 8th and 9th of 1982. On September 8th, 1982, there were numerous people at our house, which was not uncommon. Rodney Benson, Little Mike Fowler and Lee Holmes were all there. Also present was my boyfriend, Bobby Joe Williams, and our two young children and our brother Stanley.

"I heard Bobby Joe tell Rodney Benson that it was his

birthday, and Rodney told him he would buy him a beer for his birthday. Rodney, Bobby Joe and Stanley went to the liquor store sometime around midnight. At about midnight, I was laying in the room asleep and heard Little Mike, who was Michael Fowler, knock on Charles's door and tell him to come here. Charles opened the door and went out to see what he wanted. They was in the kitchen making a lot of noise, and I got up and went in the kitchen.

"I saw Lee Holmes in the kitchen. I can't remember if anyone else was in there. When I walked in the kitchen, I saw Span running down the stairs, Rodney zipping his pants up. Then I heard a lady say, 'Get off of me, you can't fuck, send the next one on.' I then saw Span running from the stairs zipping his pants up. I told all of them who was in the kitchen to get out. Span, Rodney Benson, Michael Fowler. As for the others in the house, Jeffrey was on the house asleep. I can't remember if there was anybody in the house that I told to get out.

"After that, they were all fin to leave. Bobby Joe Williams was in the house at the time. He was in the room. He came in the room with me at first. He was in the kitchen, and then he walked in the room with me and I got up. After I told them to get out, they was leaving, and then Lee Holmes woke up Jeff and he left also.

"At this time, my brother Stanley was in the front

room standing by the window. I then left the kitchen and went into the dining room with Bobby Joe Williams. Stanley was in the dining room with us. I told Bobby Joe to tell them they had to leave, and he said he was going to go tell them they had to leave.

"Stan said he was going to the phone booth to call Jennifer, and Stanley left out the door. Then Bobby Joe told them they had to leave, and they was getting ready to leave, and I went back in the bedroom and Bobby came with me. I was there about 15 minutes, and I heard someone come back in the door which was Rodney Benson. I saw him coming back in the door. Kim was present. I did not say anything to Rodney Benson. He had went through the kitchen and went back upstairs.

"I went back into the room. Bobby Williams was in my bedroom from the time I left the room and saw Rodney Benson going upstairs to when I returned to my room. When I returned to my bedroom, it was just us, and my kids were asleep. One is two years old and one will be one on June 3rd. Bobby Joe Williams is the father. Bobby Joe Williams said they was fin to leave.

"After I returned to my room, after Rodney came in the house, I can't remember how long I stayed in my room. After I returned to my room, I was talking to Bobby Joe. Then I walked out of the room. I was standing by the door, and I

seen Rodney Benson and the guy, another guy, carry a lady out the door. I don't know who this other guy was, and I can't describe the lady except that she's white, I guess.

"Bobby Joe was in the room from the time I left my room till the time I saw Rodney and the other man carry the lady out. I then went back in the room with Bobby. I remained there all night.

"The next thing I remember is the police beating on my bedroom door. I was inside the bedroom. I got up and opened the door and saw policemen. The police were white. They were in plain clothes, and there were four or five of them.

"After I came out of my room, I was taken to 93rd and Cottage Grove. I was not taken there with anybody else. When I got there, I saw Charles Wrice. I did not see Stanley Wrice or Rodney Benson. I saw Bobby Joe Williams at the police station. Before going to the police station, I last saw Bobby sitting on the floor, and there was nothing unusual about him.

"When I saw him next at the police station, he looked like he was crying. He had been crying. I was on the second floor of the police station. I was taken up some stairs. I was placed in a room with the rest of the detectives. The stairs were right across from the room I was sitting in. I was about 15 to 20 feet from the stairs. I was there from about 5:30 to about 3:00 to 4:00 in the evening.

"While there, I heard my -- I heard them beating my brother, Stanley Wrice. I heard Stanley Wrice's voice. I am 20, and my brother is 27 or 28. I have lived with him continuously for most of my life. I recognize his voice. He was hollering. The voice came from the basement. I heard this for about 15, 20 minutes.

"After the voice started -- stopped screaming and hollering, I did not hear my brother again. I heard somebody else hollering, too, but I did not recognize the voice. It was before I heard Stanley hollering.

"I attended South Shore High School until the 11th grade which I completed. I have not taken any G.E.D. courses."

Cross-examination by Assistant State's Attorney Terrence Gillespie in which Patricia Wrice testified in summary:

"Bobby Joe Williams, my boyfriend with whom I have two children, and I live in the first bedroom of the bungalow at 7618 Chappel. My brother Charles lives in the second bedroom of that bungalow at 7618 Chappel. Stanley lives upstairs on the second floor of that bungalow at 76 South Chappel -- 7618 South Chappel.

"On September 18, 1982, there were numerous people at our house, which was not uncommon. That night, Stanley Wrice had a friend over named Span. He had a friend or acquaintance

over named Little Mike Fowler, and he had a friend or acquaintance over named Lee Holmes. Also present was my boyfriend, Bobby Joe Williams, and our two young children and our brother Stanley.

"I heard Bobby Joe tell Rodney Benson that it was his birthday, and Rodney told him he would buy him a beer for his birthday. Bobby Joe and Stanley went to the liquor store sometime around midnight. About an hour later, Bobby Joe and Stanley returned to the house. About an hour later, Bobby Joe came back, and he told me that the police had stopped them because Rodney Benson was talking to a white woman in a parking lot. Bobby Williams told me that Benson was going to drop her off. I was in my bedroom before they came back.

"When I was in the bedroom with Bobby Joe, I heard Michael Fowler, or Little Mike, knock on Charles's door and tell him to come here. I heard Charles open the door and go out to see what they wanted. They were in the kitchen making a lot of noise, so I got out of bed, and I went into the kitchen. I saw Lee Holmes in the kitchen. I noticed Rodney Benson, also known as Span, running down the stairs, zipping his pants up."

MS. BONJEAN: Judge, wasn't this just already read? I mean, I don't want to be repetitive.

THE COURT: This is the cross-examination.

MS. BONJEAN: But it was -- it's the exact same --

it's exactly the same as what was read in the direct.

THE COURT: Well, it was the cross-examination, so you can proceed.

MS. COHEN: "She heard a lady say, 'Get off of me, you can't fuck, send the next one on.' I told Rodney Benson, who I also knew as Span, and Michael Fowler to get out of the house. Jeffrey was also there, but he was asleep on the couch.

"After I told everyone to get out, Lee Holmes woke Jeffrey up. Bobby Joe and I were standing in the dining room with Stanley, and I told Bobby Joe to tell the guys to leave. As the guys were getting ready to leave, Stanley stated that he was going to the pay phone to call Jennifer, and he left out the door.

"Bobby Joe and I went back into the bedroom with our two young kids. About 15 minutes later, I heard Rodney Benson come back into the house and go upstairs. Kim was also in the house at the time when Benson came back in. While I was in the bath -- bedroom, I heard laughing in the kitchen. I heard people running up and down the stairs. The first time I learned that there was a woman on the second floor of my residence was when I heard a woman's voice.

"I remember talking to a detective, and I told him what happened that evening. I did not say that all the dudes were laughing and saying they had a girl upstairs. I only

said they were laughing. I did not hear someone hitting another person upstairs.

"I remember talking to your -- your partner Bertina on April 25th, 1983, and LaBrenda White was present at that conversation also. Ms. Lampkin introduced herself, and she introduced Ms. White, and she said they were both assistant state's attorneys. No, I don't remember if they said they were in charge of prosecuting my brother on this case. That conversation took place in the building across from here. And Ms. Lampkin asked me questions about what happened that night.

"I never told Ms. Lampkin and Ms. White that I heard someone hitting another person upstairs, and I never told them that I heard someone up on the second floor say, 'You are going to suck my dick' or words to that effect. And I never told her that I had a conversation with Lee Holmes in the kitchen immediately after hearing those words 'you are going to suck my dick' and Lee Holmes responding that somebody upstairs was trying to make that woman suck his dick thing -- suck his thing. I never said that to Bertina Lampkin or LaBrenda White.

"I was very concerned about what was going on in my house that evening. I was so concerned I ordered these men to get out of the house. I was so concerned that at one point, I went into the bedroom and started to get dressed. I was going to get dressed, leave the house, walk down to the pay -- pay

phone and call the police.

"During those times that I mentioned to Mr. Jones that I was in the kitchen, I did not smell anything unusual. People's Exhibit No. 1 is my kitchen sink, and that's how it looked on September 9th, 1982. I see a burnt piece of paper in People's Exhibit No. 1. It wasn't there when I walked in the kitchen.

"My brother lived upstairs. People's Exhibit No. 8 is a photograph of the upstairs. The bedroom depicted in People's Exhibit No. 8 --

MR. HALE: Can we pause a second, Your Honor. Is it possible we can put the photographs on the screen as we read the testimony?

MS. BONJEAN: I have no objection if they want to do that.

THE COURT: All right, fine. Go ahead and do it.

MS. COHEN: It's People's Exhibit 1.

THE COURT: It's in evidence. You can show it to the jury.

Go ahead.

MS. COHEN: "People's Exhibit No. 1 is my kitchen sink, and that's how it looked on September 9th, 1982. I seen a burnt piece of paper in People's Exhibit No. 1. It wasn't there when I walked in the kitchen.

"My brother lived upstairs. People's Exhibit No. 8

is a photograph of the upstairs. The bedroom depicted in People's Exhibit No. 8 used to be my bedroom and that Stanley's portion of the attic was not depicted in the photo. There were two bedroom areas in the attic.

"People's Exhibit No. 9 --

THE COURT: Okay.

MS. COHEN: -- "also shows the second floor of my house. This is a photograph from where the bed is looking to the front of the house, and there is no partition dividing those rooms. That is one large room on the second floor of the house.

"I have pretty good hearing. It was so good that I heard this woman make a statement like 'You can't fuck.' She said it loud. And I heard somebody in the basement from the second floor of the police station. I had never been to Area 2 before that morning of September 9th, 1982. When I heard Stanley hollering, the police said that he will be all right. They ain't gonna hurt him too bad. He said there was a basement. He said that's just a funny noise coming from the basement. That's what the police officer said to me.

"I saw Rodney Benson and another guy carrying a white lady out the door. Rodney had one of her arms, and the other guy had the other arm, but her feet weren't off the ground. I did not see the woman's face, and she had a coat on. I didn't notice anything unusual about the woman at that time. She

looked just perfectly normal to me as she was going out the door. I did not notice any burnt paper in the kitchen sink at any point."

Counsel for Stanley Wrice, Sidney Jones, questioned Patricia Wrice on redirect exam. She said in summary:

"The bedroom depicted in People's Exhibit No. 8 used to be her bedroom and that Stanley's portion of the attic was not depicted in the photo. There were two bedroom areas in the attic. People's Exhibit No. 9 shows the other side of the attic, and it is divided by a piece of drywall board that Stanley had put up. Stanley was starting to put up drywall in the room to put in the door over his bedroom. The drywall does not appear in People's Exhibit No. 8.

"I told Ms. Lampkin that I heard the woman say, 'You can't fuck, get off me, bring on the next one.' I can't describe the police officer who told me that I was hearing a funny noise coming from the basement. He was white, plain clothed. We were alone. Before that, I asked him why they was beating my brother. I recognized his voice hollering."

Recross by Assistant State's Attorney Terrence Gillespie. In summary, Patricia Wrice said:

"Charles Wrice was not in the room with me at the police station when I heard the funny noise. I don't know what floor he was on. I did not tell the detectives at the police station on September 9th, 1982, that the woman in the

house said something about 'you can't fuck.'
"After I went to sleep, I later heard someone beating
on my bedroom door. I opened the door and noticed about four
or five plain clothed police officers. I was taken to Area 2
12:35:59 police station at 93rd and Cottage Grove and brought to the
second floor and placed in an interview room. I talked to the
detectives at Area 2 and told them what occurred at my house.
I told the detectives that I heard laughing, but I did not
tell them that I heard someone hitting another person
12:36:20 upstairs.
"I agreed to be interviewed by the prosecutor ASA
Bertina Lampkin on April 25, 1983, and another assistant
state's attorney, LaBrenda White. I never told the assistant
state's attorney that I heard someone hitting another person
12:36:35 upstairs. I did not tell state's attorney that I heard
someone on the second floor say, 'you are going to suck my
dick' or words to that effect. I did not tell her that Lee
Holmes told me in the kitchen that someone was trying to make
the woman suck his thing.
12:36:51 "When I was seated in the interview room at Area 2, I
could see a set of stairs. I did not see my brother while --
while I was in custody, but at a certain point, I could hear
Stanley hollering from the basement area. The hollering
continued for 15 to 20 minutes. I asked an officer why they
12:37:12 were beating my brother. An officer told me that I was just

hearing a funny noise from the basement. The officer said he will be all right. They ain't gonna hurt him too bad.

"I also heard someone else hollering, but I could not recognize the voice. I later saw Bobby Joe Williams, and his eyes looked red like he had been crying."

12:37:30

THE COURT: Read another?

MS. BONJEAN: We have the witness here, Judge, so why don't we call him.

THE COURT: Pardon?

12:37:43

MS. BONJEAN: Our witness is here or the witness is here. Why don't we call him in.

THE COURT: Call who?

MS. BONJEAN: The witness is here.

THE COURT: Oh, fine, yeah, bring him back. That's fine. Finish him up.

12:37:51

Right up here, sir.

Mr. Williams, you're still under oath from yesterday. Do you understand that, sir?

THE WITNESS: Yes.

12:38:38

THE COURT: You may question the witness.

Proceed.

MS. BONJEAN: Thank you, Your Honor.

BOBBY JOE WILLIAMS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN,

REDIRECT EXAMINATION

BY MS. BONJEAN:

12:39:06

Q. Mr. Williams, before we broke today, we were testifying about your conversation with the OPS, or Office of Professional Standards, investigator in 1994, do you recall that?
A. Yes.
Q. Okay. And we have -- plaintiff's exhibit what?
MS. COHEN: 27.
BY MS. BONJEAN:
Q. Plaintiff's Exhibit 27, which is in evidence. I'm going to pull it up for yourself and for the jury.

12:39:14

Now, you spoke to the investigator and the statement is summarized here in this -- in this report that you've looked at, right?
A. Yes.

12:39:30

Q. Now, do you know whether the investigator from OPS sent this memo to the prosecutor's office?
A. I -- I have no idea.
Q. Do you know whether she sent the memo and recommended that the case be reopened or looked at, meaning Stanley Wrice's criminal case?

12:39:48

MR. JEBSON: Objection.
BY THE WITNESS:
A. I have no idea.
MR. JEBSON: Objection. No foundation for these questions.

12:39:53

THE COURT: Overruled.

BY MS. BONJEAN:

Q. Do you have any power to reopen an investigation or prosecution?

12:39:59 A. No.

Q. Do you know whether Stan even had an attorney in 1994?

A. No.

Q. And aside from speaking with Patricia as it related to your kids, how much contact did you even have with the Wrice siblings in 1994?

12:40:17

A. None.

Q. Now, I want to just pull out one section of this because Mr. Jebson asked you whether you had previously identified this -- this object in these vastly different ways in the past, right?

12:40:38

It says in the report here that one of the officers conducted the majority of the interview, and this same officer would ask Mr. Williams a question and if Mr. Williams hesitated with his response, the officer said, "Don't fucking hesitate," and struck Mr. Williams with a "a black flex object with a ball on one end approximately 20 inches long."

12:40:58

Do you see that?

A. Yes.

Q. And you didn't describe it as the size of a pen, did you?

12:41:15 A. I don't remember.

Q. Okay. But here you didn't, right?
A. No.
Q. I mean, at least according to this report, right?
A. No.
12:41:22 Q. Okay. Now, you were contacted again by the office of the special prosecutor in 2005 and asked to come downtown and give a statement, right?
A. Yes.
Q. Okay. I'm going to have you look at the first page, 12:41:48 Plaintiff's 9B for identification purpose.
Okay. Mr. Williams, let me know when you see something on the screen.
A. Yes.
Q. Can you read what is before you and tell me when you have 12:42:13 finished reading this portion of this statement.
A. Okay.
Q. On what date did you go down and make a statement with the office of the special prosecutor?
A. 27th of January.
12:42:29 Q. And what year was that?
A. 2005.
Q. Okay. And did you give a sworn interview?
A. I'm not sure.
Q. Well, why don't you look at that. What does it say?
12:42:39 A. Okay, sworn interview, yes, I'm sorry.

Q. You don't have any reason to doubt this, right?
A. Right, yes.
MS. BONJEAN: Okay. And I'm going to go to the next page and have you pull out, Ashley, the second paragraph, if you would, for Mr. Williams to review.
BY MS. BONJEAN:
Q. Now, Mr. Williams, can you read that paragraph to yourself, please?
A. Yes. Okay.
MR. JEBSON: Judge, I'm going to object to that.
MS. BONJEAN: And -- oh, I'm sorry, do you want to -- just refreshing his recollection at the moment of who interviewed him.
THE COURT: All right. You can -- go ahead, proceed. Let's get --
BY MS. BONJEAN:
Q. Who interviewed you?
A. Tom Reed.
Q. Okay. And what position did Tom Reed hold?
A. The assistant special state's attorney.
Q. Okay. So he identified himself as an assistant special state's attorney, correct?
A. Yes.
Q. Now, Mr. Jebson asked you a lot of questions about this interview and whether you discussed the false testimony that

you gave at Mr. Wrice's trial during this interview, right?
A. Yes.
Q. And he asked you a lot of questions. Now, you never told them about testifying falsely at Mr. Wrice's interview, right?
12:43:59 A. Yes.
Q. And you remember that moment where you said, well, did they ask me about that?
A. Yes.
Q. Okay. So I'd like you now to read the next paragraph to
12:44:19 yourself.
MR. JEBSON: Judge, I'm going to object.
BY MS. BONJEAN:
Q. What -- what did Mr. Reed tell you the purpose of this investigation was?
12:44:30 MR. JEBSON: Objection.
BY MS. BONJEAN:
Q. Or the interview was?
THE COURT: What's the objection?
MR. JEBSON: Judge, have you looked at the screen?
12:44:36 MS. BONJEAN: He knows not to mention any --
MR. JEBSON: Well, how does he know that?
THE COURT: Well, this is to refresh his recollection. It's not evidence.
MR. JEBSON: I understand that, Judge, but --
12:44:47 MS. BONJEAN: Well, they opened the door.

THE COURT: Wait. You can use anything to refresh recollection if it refreshes recollection. It does not -- it's not substantive evidence, so let's proceed.

Ask a question now.

12:44:59

BY MS. BONJEAN:

Q. Sure. Without mentioning any names, Mr. Williams, what did Mr. Reed tell you was the purpose of bringing you downtown to interview you back in 2005?

MR. JEBSON: Same objection.

12:45:12

THE COURT: Overruled.

BY THE WITNESS:

A. Looking into the matters involving allegations of the police.

BY MS. BONJEAN:

12:45:20

Q. And what type of -- what allegations of police?

A. Brutality.

MR. JEBSON: Same objection.

Q. Police brutality?

A. Yes.

12:45:27

Q. For what time period?

MR. JEBSON: Same objection.

BY THE WITNESS:

A. 20-year period.

BY MS. BONJEAN:

12:45:39

Q. Now, if you go down to the next paragraph, it says, if you

could look at the last half of that page and then on to the next page. Please read that to yourself.

A. Okay.

Q. Did you read the top of the next paragraph, please?

12:46:03 MS. BONJEAN: Ashley. No, the first paragraph pull out, please.

THE COURT: Mustn't be one.

BY MS. BONJEAN:

Q. Did Mr. Reed specifically tell you this was not about any criminal case? 12:46:17

A. Yes.

Q. And other than the one ambiguous question that Mr. Jebson pulled out about whether you said something different after the beating or added any facts, did Mr. Reed or Assistant 12:46:32 State's Attorney Reed ever specifically ask you whether you gave false testimony at Mr. Wrice's trial?

MR. JEBSON: Object --

BY THE WITNESS:

A. No.

12:46:39 MR. JEBSON: Judge, objection to the characterization of my ambiguous question. It wasn't ambiguous.

MS. BONJEAN: No, I didn't say his ambiguous question. I said the ambiguous question that he pulled out of this.

12:46:50 THE COURT: Well --

MR. JEBSON: I object to the form of the question.

THE COURT: Leave out -- just the question, whether he said something different, I don't know how that --

BY MS. BONJEAN:

Q. Other than the question -- do you remember the question that Mr. Jebson pulled out of this interview where they -- the assistant state's attorney was asking you about what you -- what was meant by your 1994 interview, their story? Do you remember that? If you don't --

A. No, no.

MS. BONJEAN: Okay. We're not going to relitigate it.

THE COURT: Yeah, let's move on.

MS. BONJEAN: We are going to move on, and we're almost finished here.

BY MS. BONJEAN:

Q. Now, in 2011 -- oh, by the way, do you know whether Assistant State's Attorney Reed ever contacted his colleagues in the Cook County State's Attorney's Office and said, oh, we should probably relook at Stanley Wrice's case, there's some questions. Do you know whether that happened?

A. No.

Q. Okay. Again, do you have any ability to reopen a prosecution or, you know, relook at a case?

A. No.

Q. Now, in 2011, you were approached by some individuals who were reinvestigating the Stanley Wrice matter, right?
A. Yes.
Q. Okay. And did you speak to them?
A. Yes.
Q. And you were shown that affidavit that you eventually signed by Mr. Jebson. Do you remember that?
A. I remember that.
Q. And you were actually asked specifically about the truthfulness of your testimony, right?
A. Yes.
Q. And that's when you executed that affidavit for the first time, right?
A. Yes.
Q. All right. And then you hired an attorney, right?
A. Yes.
Q. Why did you hire an attorney?
MR. JEBSON: Objection. This has been gone into.
THE COURT: Objection sustained. I think we're getting off on a tangent.
BY MS. BONJEAN:
Q. Well, you understood that you were subjecting yourself potentially to perjury charges by admitting that you lied at a trial, right?
MR. JEBSON: Objection.

BY THE WITNESS:
A. Yes.
MR. JEBSON: This was covered.
THE COURT: All right. Let's move on. That can stand.
MS. BONJEAN: Well, he spent an awful lot of time on that affidavit and saying it was the first time, so I'm just trying to rehabilitate and make it clear.
THE COURT: Wait, let's ask questions --
MS. BONJEAN: All right.
THE COURT: -- not comment on your -- the other side's --
BY MS. BONJEAN:
Q. Okay. I want to point out just yesterday you testified that, again, on questioning by Mr. Jebson that you believed you signed -- well, strike that.
On direct-examination, you testified that you thought you signed a statement at the police station. Do you remember when you testified to that?
A. Yes.
Q. And Mr. Jebson confronted you with a little snippet of your deposition testimony, Page 83, Line 5.
Do you remember when he did that? And he said, isn't it true that you said:
"Question: You don't remember signing anything,

right?

"Answer: No, I don't remember"?

A. I don't remember.

Q. Okay. But can you -- can you read what you actually said right before that question was asked?

MS. BONJEAN: Can you pull that out for him, Ash, starting at the bottom.

BY THE WITNESS:

A. I don't know if I signed anything or not.

BY MS. BONJEAN:

Q. Okay. Go to the next page.

A. Like I said, I was disarranged. They had beat me. I don't remember if I signed anything. If I did, I might have signed something just to be released. I don't remember.

Q. Okay. So it's possible you signed something. It's possible you don't, right?

A. Right.

Q. Okay. And, finally, Mr. Williams, how long have you been married to the same woman?

A. 24 years.

Q. Okay. And in 2011, your children were, what, over 30 years old?

A. Yes.

Q. Okay. Were you co-parenting with Patricia when your children are grown adults at that point?

A. No.
Q. Did you agree to come forward and tell the truth so that you could get into the good graces of the Wrice family after your children were well into their 30s?
A. No.
THE COURT: Is that it?
MS. BONJEAN: One last question.
BY MS. BONJEAN:
Q. Is there any personal benefit, personal benefit, to admit that you gave false testimony at a trial?
A. No.
MS. BONJEAN: Nothing further.
THE COURT: Anything further?
MR. JEBSON: Yes, Judge. They introduced a document, and you said I can get into this.
THE COURT: All right. Yeah.

RECROSS-EXAMINATION

BY MR. JEBSON:
Q. Good morning, Mr. Williams.
A. Good afternoon.
Q. Oh, right. Good afternoon. You're right.
MR. JEBSON: Can we please put up Defendants' Exhibit No. 209.
BY MR. JEBSON:
Q. Now, Mr. Williams, you were asked yesterday afternoon and

12:52:12
12:52:29
12:52:48
12:53:06
12:53:27

this morning about this exhibit, and I want to highlight a portion of it. It's the last paragraph, first sentence, please.

You were asked a bunch of questions about this. I'm going to read it to you again. Again, this is from the Office of Professional Standards document in 1994.

"After the officers," and it's in quotations "got their story, they left Mr. Williams in the room for approximately a half hour."

So that's a 1994 document, right?

A. Yes.

Q. And then you would agree that in 2005 when you were interviewed by the special prosecutor, there -- you were asked some questions specifically about this sentence in the 1994 document about after the officers got their story. Do you remember that?

A. Yes.

Q. Okay. So let's look at that question that you were asked in 2005. And this is the 2005 transcript, Page 23, Line 19 to 24, Line 3. And I'm going to read this to you, and I'm going to ask you some questions.

Again, this is a 2005 statement:

"Question: One part of the statement that OPS took down was after the officers 'got their story,' they left Mr. Williams in the room for approximately a half hour.

This 'got their story,' I mean, is your recollection that you told them anything different after you were hit than before you were hit or gave them any additional facts?"

12:53:50 And your answer was: "No, not that I remember."

I correctly read the question and answers from the 2005 sworn interview, right?

A. Yes.

Q. Now, in fact, in 2013, you were asked some questions by Ms. Bonjean when you were under oath. Do you remember that?

12:54:17 A. Somewhat, yes.

Q. Okay. And, in fact, during that hearing, you're under oath, right?

A. Yes.

Q. And you were asked -- she asked you --

12:54:28 MS. BONJEAN: Excuse me, counsel, can you identify what page you're on?

MR. JEBSON: Sure. It's Page 17, Line 4 to 17, Line 18.

BY MR. JEBSON:

12:54:38 Q. So let me start over.

In 2013, Ms. Bonjean asked you if you ever admitted that your criminal trial testimony -- testimony was false prior to you giving the affidavit in 2011, and you said yes, only to an investigator a couple of years ago. Right?

12:55:01 A. Yes.

MS. BONJEAN: That was not read exactly correctly.

BY MR. JEBSON:

Q. And that was in 2013, right?

A. I don't remember was it 2013.

12:55:13 Q. Okay. Let me show it to you.

2013 transcript, Page 17, Line 4 to 17, Line 18.

And I'll just show you the first page where it gives the date.

A. Okay.

12:55:37 Q. Okay? So that was 2013, right?

A. Yes.

Q. So two years before 2013 --

MS. BONJEAN: Can you read the question before that?

MR. JEBSON: Judge, if counsel wants to read other questions --

12:55:47

THE COURT: Well, we're not going to keep going. Read the question before that, please.

MR. JEBSON: Well, what line?

MS. BONJEAN: 24, please.

12:56:05 MR. JEBSON: Okay. Do you mind, Nick, pulling that up, please?

BY MR. JEBSON:

Q. "Question: In fact, you have spoken on a couple of times" -- I'm sorry, let me start over.

12:56:14 MS. BONJEAN: Couple of occasions.

BY MR. JEBSON:
Q. I'm sorry. "In fact, you've spoken on a couple of occasions to investigators from the special prosecutor's office?
12:56:22 "Answer: Yes."
THE COURT: Okay. Go on.
MR. JEBSON: Okay.
BY MR. JEBSON:
Q. So --
12:56:32 THE COURT: Go ahead.
BY MR. JEBSON:
Q. So, sir, when you said that you spoke an investigator two years prior, that would be 2011, right?
A. Yes.
12:56:41 Q. And that's the same year that you signed your affidavit.
A. Yes.
MR. JEBSON: Going back to Exhibit 209, please. And if we can highlight No. 4, please.
BY MR. JEBSON:
12:57:20 Q. This is at the bottom of the page, sir. "Meanwhile, Mr. Williams" -- again I'm reading from the 1994 --
A. Okay.
Q. -- Office of Professional Standards document.
"Meanwhile, Mr. Williams heard Stanley Wrice yelling
12:57:39 and crying out. Mr. Wrice was inside a room a couple of doors

from Mr. Williams."
Do you see that?
A. I see that.
Q. So -- and just so we're clear, you were on the second floor of Area 2.
A. Okay.
Q. That's right?
A. Yes.
Q. So you are telling this jury that you heard Stanley Wrice yelling and crying out a couple of doors down from you when you're on the second floor.
A. Yes.
THE COURT: Anything further?
MR. JEBSON: Very quickly, Judge.
Still in that same document, No. 3, please.
BY MR. JEBSON:
Q. Again, we're still back on this 1994 Office of Professional Standards document.
Ms. Bonjean asked you just a second ago about how you described the length of this black object, and you said here it was approximately 20 inches. Do you see that?
A. Yes.
Q. And you would agree at your deposition, you were asked whether or not it was longer than a pen, and you kind of hesitated and said, "I guess," right?

A. Yes.
Q. Okay.
THE COURT: We went through all that at length in your cross-examination earlier.
12:59:10 MR. JEBSON: Judge, I think that is --
THE COURT: Is that it?
MR. JEBSON: Oh, I have one other question, Judge.
BY MR. JEBSON:
Q. Sir, going back to your 2005 testimony with the special
12:59:20 prosecutor, and Ms. Bonjean just asked you whether or not you were asked certain questions about your allegations.
Isn't it true that after the special prosecutor said, "Well, you claim that you were hit after you were -- did you say anything different before than after you were hit," isn't
12:59:39 it true that a few questions after the special prosecutor asked you: "Is there anything else that you recall that took place involving the detectives and yourself in the interview room?" And your answer to that was: "No, not that I can remember."
12:59:58 A. Yes.
MR. JEBSON: That's all the questions.
THE COURT: You can step down. Call your next witness.
MS. BONJEAN: Judge, can we have a quick sidebar
01:00:05 before --

THE COURT: What?

MS. BONJEAN: Can we have a quick sidebar before Ms. Lampkin takes the stand.

(Proceedings heard at sidebar:)

01:00:20 THE COURT: Is Ms. Lampkin next?

MS. BONJEAN: Yes, she is.

THE COURT: All right. Now, what's your problem?

MS. BONJEAN: Okay. I just want the record to be clear, this Court granted our motion *in limine* to bar 01:00:30 Mr. Wrice's prior armed robbery convictions. It was briefed. It was litigated. This Court barred those prior convictions because they are quite old, and they also have absolutely nothing to do with these allegations other than being rank propensity.

01:00:47 THE COURT: No, it would have to do with the reason for the sentence, the disparity, and I think that that is an issue in the case now, so --

MS. BONJEAN: Okay, and that's fine, Judge, but the issue of the sentencing of Mr. Wrice getting 100 years I 01:01:04 think, you know, it has to be clear that their purpose in wanting to bring this out largely, and maybe it is to explain the sentence, but it's also largely to let this jury know that he has these prior convictions, and I don't think it should be belabored because at some point it just doesn't --

01:01:21 THE COURT: Well, it shouldn't be belabored, and I

think I went through that, that the fact of the matter is that one of the reasons, bases, for a higher sentence is the person's previous criminal record.

MS. BONJEAN: And that's what it should be kept at, 01:01:39 the previous criminal record, not actual convictions.

(Proceedings heard in open court:)

THE COURT: Okay. Bring in the next witness.

MS. BONJEAN: Judge --

(Proceedings heard at sidebar:)

01:01:57 MS. BONJEAN: Ms. Jacobs said, no, I'm bringing out those prior convictions. She just said she's going to violate the Court's order.

MS. JACOBS: Your Honor, you said I could bring out the prior convictions.

01:02:00 THE COURT: The fact that that there were three convictions without -- without -- just what they were for --

MS. JACOBS: Right.

THE COURT: -- and the date of them --

MS. JACOBS: Thank you.

01:02:07 THE COURT: -- and the date of them --

MS. JACOBS: Thank you.

THE COURT: -- and that's it.

MS. BONJEAN: So the type of conviction can come in?

THE COURT: The crime that what he pled guilty to --

01:02:14 MS. BONJEAN: No, he didn't.

MS. JACOBS: Yes. Yes, he did.

MS. BONJEAN: Three armed -- wait, hold on. So wait. Three armed robbery convictions are coming in?

MS. JACOBS: Yes.

THE COURT: Yes.

MS. JACOBS: Thank you.

THE COURT: The fact -- just the fact, the nature of the crime, not anything --

MS. JACOBS: Yes.

01:02:26 (Proceedings heard in open court:)

THE COURT: All right. Bring in the next witness.

(Pause.)

MS. BONJEAN: Ms. Lampkin needs to use the restroom.

THE COURT: Pardon?

01:03:52 MS. BONJEAN: Ms. Lampkin says she needs to use the restroom.

(Pause.)

MS. JACOBS: Your Honor, may the witness have a bottle of water?

01:06:57 THE COURT: Pardon?

MS. JACOBS: May the witness have a bottle of water?

THE COURT: Of course.

THE WITNESS: Thank you.

THE COURT: Please raise your right hand.

01:07:10 (Witness sworn.)

01:07:29

THE COURT: Please be seated.
Ms. Bonjean, you may question the witness.
MS. BONJEAN: Thank you, Your Honor. We'll let her get settled first.
THE WITNESS: There's an exhibit up here, counsel. Do you want this?
MS. BONJEAN: Is that your exhibit?
THE COURT: Just leave it there. They'll pick it up.
MS. BONJEAN: I think it's the defendants' exhibit.
01:07:42 MR. JEBSON: Is it up there?
MS. BONJEAN: Yes.
MR. JEBSON: Yes. Thank you. I think I forgot an exhibit up here. Thank you.
THE COURT: Okay.
MS. BONJEAN: Thank you.

BERTINA LAMPKIN, PLAINTIFF'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MS. BONJEAN:
Q. Ma'am, can you please introduce yourself to the jury.
01:07:54 A. Yes. I'm sorry. I had to get a drink.
My name is Bertina Lampkin.
Q. Are you currently employed, ma'am?
A. Yes, I am.
Q. What type of work do you do?
01:08:04 A. Currently I'm an Appellate Court Justice for the Illinois

Appellate Court. I don't know if you want me to tell how long I've been one or not.
Q. I'll get to that.
A. Okay.
01:08:16 Q. Thank you.
And are you currently a licensed attorney in the state of Illinois also?
A. Yes.
Q. Are you licensed to practice law in any other states, or
01:08:23 just Illinois?
A. In Illinois.
Q. And have you ever been licensed to practice in a state outside of Illinois?
A. No.
01:08:34 Q. Okay. So your entire legal career has been served in the courts of Illinois, is that fair to say?
A. Yes.
Q. Okay. What year did you graduate law school, ma'am?
A. 1974.
01:08:43 Q. And where did you attend law school?
A. I attended DePaul University College of Law.
Q. And what year did you pass the bar upon graduation?
A. I graduated in 1974, and I passed the bar in 1974.
Q. And can you tell the ladies and gentlemen of the jury what
01:09:04 your first job was out of law school?

A. I was hired to be an assistant state's attorney in 1974, October.

Q. Okay. And how long were you employed by the office of the Cook County State's Attorney?

A. From October of 1974 to June of 1985.

Q. Okay. So that's a little under ten years, is that fair to say?

A. No, it's a little over.

Q. A little over ten years, yes. Your math is much better than mine.

Now, when you began working for the Cook County State's Attorney's Office, I assume you started in an assignment and sort of worked your way up, is that fair to say?

A. I started in the appellate division, where I -- excuse me -- where I read briefs and -- and wrote arguments and then argued before the Appellate Court or the Illinois Supreme Court.

Q. Okay. And at some point, you were assigned to the felony trial division, correct?

A. Yes.

Q. Okay. And can you tell the ladies and gentlemen of the jury what it means to be a prosecutor assigned to the felony trial division?

A. Well, first, I was assigned in 1976, and before you become

a felony trial assistant, you'd work in the misdemeanor courtrooms, work in the preliminary hearing courtrooms. And once you got more experience, you'd go to the felony trial court.

01:10:35 And there's a first chair, which is the lead prosecutor in the courtroom. There's a second chair, who's the next senior person. And there's a third chair, who is the least experienced person. So in 1976, I was the least experienced prosecutor in my courtroom.

01:10:55 In those courtrooms, you would try cases where someone could be sent to the penitentiary for a minimum of one year at that time up to the death penalty.

Q. And isn't it a fact that right after Mr. Wrice's trial and subsequent conviction, you were actually promoted and left the 01:11:23 felony trial division; is that right?

A. Yes. I had been in Judge Fitzgerald's courtroom from either the end of 1979 or the beginning of '80 until after I finished Stanley Wrice's case, but I was going to be promoted.

My promotion had nothing to do with this trial. I 01:11:40 was going to be the supervisor of the juvenile delinquency courtroom so that I could train lesser experienced attorneys in how to try felony cases in misdemeanor -- I'm sorry -- in juvenile cases.

Q. Okay. Now in 1985, you left the Cook County State's 01:11:59 Attorney's Office, correct?

A. Correct.
Q. And you went to work for the corporation counsel, right?
A. That is correct.
Q. And the corporation counsel is a division of the City of Chicago, correct?
A. That is correct.
Q. And what does the corporation counsel do?
A. Well, they defend the City, they prosecute for the City, they represent every agency of the City, including the police department, the police board. They sue people civilly on behalf of the City and a lot of other things.
Q. Did you try any cases as an attorney for corp counsel?
A. I tried five juries in two years because I was only in the corporation counsel's office from June of 1985 to June of 1987, when I was appointed a judge.
Q. And did you try any cases involving allegations of misconduct against the Chicago Police Department?
A. Yes, I did.
Q. And fair to say that you represented either the City of Chicago or members of the police department, you were representing the defense in those cases, right?
A. I was also representing the police board.
Q. Okay. But you were representing police officers, correct?
A. I was representing police officers individually or the police department or the board for the five cases that I did,

yes.

Q. Okay. And you then -- you then went -- you were appointed to the court -- Circuit Court of Cook County; is that right?

A. Well, we call it an election, but it's not really an 01:13:40 election where citizens vote for people.

What happens is that we have associate judges, full circuit judges, and then, of course, you go up to the appellate or the Supreme Court.

For associate judges, we are elected by the full 01:14:00 circuit judges. In 1987, there were probably 270 Circuit Court judges, and there were ten openings for the position of associate judge. So 187 people applied for that position.

I was one of the 187 people who applied. They were only going to elect ten of us, and we went around and talked 01:14:28 to the -- all of the full circuit judges and then they voted on us, and so I was one of the people elected, quote/unquote, to be an associate judge.

Q. So you were elected by other judges, right?

A. Yes. I was elected by full circuit judges, all of whom 01:14:49 had themselves been elected.

Q. And that was a very competitive position, right? Sounds like it.

A. Well, I can only say there were 187 people who applied. There was only one bar association who evaluated us at the 01:15:07 time. 16 of the 187 people were rated highly qualified. I

was one of those who was rated highly qualified, and they elected me, yes.

Q. And you were pretty involved in the bar association. We heard about that earlier in testimony, right?

A. Well, I was involved in more than one bar association, so I'm not quite sure what --

Q. Well, were you involved in the Cook County Bar Association?

A. I was involved in the Cook County Bar Association since I was a law student. I began attending their meetings and their affairs and talking to other I would say noteworthy African-American lawyers. The Cook County Bar Association was a predominantly African-American law firm -- I'm sorry -- law association, and a lot of people on that bar association mentored me.

I actually became a secretary or a treasurer and rose to a vice president before I was 35, and I also worked for the Chicago Bar Association. I was a member of the Chicago Bar Association, and there I was a part of the judicial evaluation investigation committee. I worked for them two or three years, and then I was appointed to a vice chair of the hearing division for the Chicago Bar Association.

I did some other things, of course; belonged to other bar associations.

Q. Sure. Sounds like you were very active.

A. I was -- I have been very active my entire life.
Q. And you rose up actually to be a supervisor -- supervisor -- supervising judge in the criminal court buildings of Cook County, correct?
A. I was -- well, I got on the bench in '87. By '89, I was the assistant supervisor of traffic court. By '91, I was the supervisor of the night narcotics court. I was supervisor of the domestic violence courts, and I think in '96 -- '96 or '98, I became supervisor in the felony trial division at 26th and California.
Q. And then eventually you were, I guess, assigned as an Illinois Appellate Court Justice, correct?
A. Yes.
Q. Now, in your time as a Cook County State's Attorney, did you ever learn that you had participated in or been involved in any type of wrongful conviction?
A. I didn't understand what you just said. You walked away from the mic.
Q. Sure. I'll stay in front of it for you.
When you were a -- have you ever learned that during your time as a prosecutor, you ever had any involvement in any case that turned out to be a wrongful conviction other than Mr. Wrice's?
MS. JACOBS: Your Honor, I'm going to object to that.
THE WITNESS: Yeah.

MS. JACOBS: What possible relevance does that have to this case?

THE COURT: I don't think it's relevant either, so objection sustained.

01:17:59 BY MS. BONJEAN:

Q. Okay. Now, you've never held a nongovernmental job; is that right?

A. I have never held a non- --

Q. Nongovernmental job.

01:18:08 A. Oh, yeah. I -- when I was 16 years old, I got a job at Three Sisters Clothing Store, and I worked there until I was 18.

When I graduated from high school, I had a full tuition scholarship to go to Cornell University in Ithaca, New 01:18:27 York, and my dad left my mom with four younger siblings, so I decided not to go away, to stay home with my mother to help with my siblings.

Then I got a job at A&P Food Stores, and I worked for A&P Food Stores for seven years, four years of college and 01:18:43 three years of law school.

Q. All right.

A. And then my first year in the State's Attorney's Office I also worked nights for A&P so I wouldn't have any debt when I got out of school.

01:18:56 Q. Well, in September of 1982, you were assigned to prosecute

the case, the rape and aggravated battery of Karen Byron, correct?
A. Not in September of 1982 I was not.
Q. My apologies.
01:19:09 You were -- the crime itself happened in September of 1982. Subsequent -- well, when were you assigned if not in September of 1982?
A. The case occurred in September of 1982.
Q. Right, September 8th and 9th.
01:19:25 MS. JACOBS: Would you let her finish her answer, please.
BY MS. BONJEAN:
Q. My apologies, Judge. Please go ahead.
A. All right. Well, the case occurred September 8th and 9th.
01:19:36 The four people who were accused were subsequently indicted by a grand jury.
Then it was about a month before the case came before the chief judge in the building where I worked, and then the case would be randomly assigned to one of the, I think, about
01:19:54 30 courtrooms in the building at that time.
The -- I don't know this from memory, I know this from looking at the half-sheet in our file, which indicates that on November the -- I think it was November 8th of 1982, that would have been the first day I knew the case was in my
01:20:14 courtroom.

01:20:24

Q. Okay. So October 1982?
A. I said November --
Q. Oh, November --
A. -- of 1982.
Q. November of 1982 is when you were assigned. Got it.
Have you had a chance to review portions of the criminal record in this case in preparation for your testimony?
A. Yes.
Q. Okay.
A. Some of it. Of course, there are large portions of the record that are not available, but I have been able to look at what is available.
Q. Well, apart from the photographs, what is missing from the record, as far as you know?
A. The -- the half-sheet. Every -- in every courtroom when a case is in a judge's courtroom --
MS. BONJEAN: Judge, I would just ask that she answer the question.
BY MS. BONJEAN:
Q. I'm just wondering what's missing. The half-sheet? What else?
A. Part of -- well, I'm sorry, I was trying to explain to the jury what it was.
There was a half-sheet in the court file. Part of

that half-sheet is missing.

I had a file, and in it I had what we call a blueback that listed every single court date, what was up on that particular day, what we did with each defendant on that 01:21:23 particular day. Lots of those sheets are missing.

There are -- there are some other things that are missing. I can't -- without looking at the entire file, I can't say right now.

Q. Okay. So your bluebacks, which are part of your -- the 01:21:42 prosecutor's personal file, correct, or trial file, right?
A. It is part of the trial file, yes.
Q. Okay. And that's something you make notes on, right?
A. Yes.
Q. Okay. And that's missing; is that correct?
01:21:52 A. Parts of it are missing.
Q. Parts of it are missing. Any idea where they are?
A. I have absolutely no idea where they are.
Q. Okay. Do you know whether parts of that file, that blueback, was ever tendered to any attorneys for Mr. Wrice 01:22:05 during his post-conviction proceedings?
A. There is a -- the court file is available to any lawyer who comes into the courtroom. They can duplicate it. They can look at it. Sometimes they took things out of them that never came back into the court file, so I don't know what 01:22:27 Mr. Wrice would have had.

Q. But the bluebacks aren't part of the court file, are they?
A. You talking about our bluebacks?
Q. You mentioned -- let me finish my question.
You mentioned the bluebacks. That was one thing that you said was missing from the file?
A. Yes. I said part of the bluebacks was missing from the state's attorney's file.
Q. Right. And that's what I was asking you about.
And so you said parts of it were missing from the state's attorney file. I asked you whether that -- whether you know where they were or whether they were ever tendered to the defense, and you said no, right?
A. I don't know.
Q. Okay. But they're not part of the court file, correct?
A. They are not part of the court file.
Q. Apart from what you've identified, have you had the opportunity to read testimony and transcripts from this case?
A. Yes.
Q. Now, you -- you received a subpoena to come testify here today in this matter from me or from the plaintiff, right?
A. Yes.
Q. And you received a letter from me as well, didn't you?
A. Yes.
Q. Asking you to contact me regarding scheduling so I can make sure that you knew when you needed to be in the

courtroom, and you didn't contact me, right?
A. Well, that's not accurate, counsel.
You sent me a letter saying that I needed to be in court on February the 20th and that I could contact you 01:23:44 because -- not to inconvenience me in case I didn't have to come in that day.
Q. Right.
A. I sent you a letter, telling you that I had received your subpoena notifying me to be here on February 20th. You also 01:23:59 sent me a check, and I returned the check to you.
Q. Okay. But you didn't -- you didn't phone call -- you didn't call me, right?
A. No, I did not.
Q. Okay. And I'm not suggesting you had an obligation to. 01:24:10 I'm just saying we haven't -- we didn't speak prior to you coming in here and testifying, right, other than when I've taken your -- examined you from the witness stand, right?
A. I talked to you for two-and-a-half hours under oath, counsel.
01:24:22 Q. Right.
Apart from when you have testified under oath, I didn't prepare you to come testify here today; isn't that right?
A. No, you did not.
01:24:30 Q. And, of course, you know very well that a witness has no

obligation to speak to an attorney who is litigating a case in any respect, correct?
A. Unless the judge orders them to, I would say that is -- that's generally correct.
Q. Well, witness -- even when you were a prosecutor, witnesses, unless they were under some type of court order, wouldn't be obligated to speak to you, right?
A. That's absolutely true.
Q. All right. In fact, there's even a jury instruction about that, isn't there?
A. Yes, there is.
Q. Now, you have talked to defense counsel, though, correct?
A. Yes, I have.
Q. Okay. And have you met either by phone or by telephone with members of the defense team in the last month to prepare for your testimony here today?
A. Yes, I have.
Q. How many times?
A. I saw Mr. -- I can't think of his name, the gentleman on the end.
Q. Mr. Hale?
A. Mr. Hale. I saw him once. I was talking. He probably asked me ten or fifteen minutes' worth of questions. I saw him this morning for about five or ten minutes.
Mr. Jebson, I saw once initially for -- and talked to

him maybe -- maybe 15, 20 minutes. And then he talked to me an additional time, he came and talked to me for about 20 or 30 minutes.

I talked to Ms. Jacobs. I met her sometime in either late January or early February. I had never met her, and so I came in and I talked to her about what I recalled about the case, but I didn't have records.

She then sent me records, and in between reading all of these things that I have to read for my own court call, I read the things that she sent me.

Then I had an opportunity to meet with her again, and I talked to her once or twice on the phone, once to tell me I didn't have to come in, and then I talked to her this morning.

Q. Okay. Now, Mr. Wrice was charged with a number of offenses, including rape and aggravated battery and other related offenses; isn't that correct?

A. Do you want me to say all of them or just say yes to those two?

Q. Well, I just said rape and aggravated battery and a number of related offenses. We could go through them all with the jury, but it's kind of -- the point is he was charged with rape and aggravated battery. They've heard enough -- they've heard a lot about the crimes.

A. All right. Yes. He was charged with rape and aggravated battery among other offenses.

01:27:32

Q. Right. And there were three other defendants who were also charged as well, correct?
A. Yes.
Q. And who are -- who were those people?
A. They were Rodney Benson, Lee Anthony Holmes and Michael Fowler.
Q. And they were all charged with the same offenses, correct?
A. Yes, they were.
Q. And Mr. Wrice was appointed counsel to represent him, a man by the name of Sidney Jones, right?
A. Yes.
Q. And an attorney by the name of Howard Savage was retained by Mr. Benson or hired by Mr. Benson to represent him, correct?
A. I don't know if he hired him or not, but he had private counsel.
Q. Okay.
A. Sidney Jones was private counsel, as was Howard Savage.
Q. But Mr. Jones was appointed by the courts.
A. That's what the half-sheet reflects.
Q. Right.
A. I did not know that of my own knowledge, but that's what's on the half-sheet.
Q. Okay. And you don't know whether -- what the arrangement was between Mr. Benson and Mr. Wrice, correct? Strike that.

With Mr. Benson and Mr. Savage, correct?
A. You mean what he was being paid?
Q. You -- he was a private attorney. You don't know what the circumstances were of how he came to represent Mr. Benson, correct?
A. No, I have no idea.
Q. Now, you were friendly with Mr. Savage; isn't that correct?
A. I was friendly with Mr. Jones and Mr. Savage.
Q. Well, you considered -- you considered Mr. Savage a wonderful defense attorney, right?
A. Yes, I did, as I did Mr. Jones.
Q. And you -- your dad was also a prominent defense attorney, right?
A. I would like to think so, yes.
Q. And your dad also knew Mr. Savage, correct?
A. And he knew Mr. Jones and Mr. Jones's father who was a lawyer. That's how I knew Mr. Jones because our fathers knew each other.
Q. Okay. And Mr. Wrice, you would agree, was -- after he was arraigned was held either without bail or at a bail that he was unable to make, correct?
A. I don't remember what his bail was. I know he remained in custody.
Q. Okay. So he remained in custody throughout the criminal

proceedings, right?
A. That's correct.
Q. And Mr. Benson got bail, correct?
A. Mr. Benson posted bail, yes.
01:29:49 Q. Okay. And he was released from custody some period of time, a short period of time, I would say a month or two, does that sound right, after he was arraigned?
A. I think that's pretty accurate, yes.
Q. You would agree you were the lead prosecutor in the Wrice
01:30:06 case, correct?
A. Yes, I was.
Q. And that means, of course, that you were, I guess, the decisionmaker in terms of how the case would be litigated, right?
01:30:17 A. Well, I had a partner, and my partner and I discussed how we would present the case. I was the most experienced person, and certainly I would have had the final say.
Q. And who was the -- your partner?
A. My partner was Terrence Gillespie.
01:30:35 Q. You were superior to him in at least rank and hierarchy in the office though; is that correct?
A. I was the first chair, and he was the second chair.
Q. So is that a yes?
A. Yes.
01:30:46 Q. All right.

And who was responsible for ensuring that all discovery in the case was tendered or produced to the defense?
A. I would look at the file when a case came in, and I would decide what needed to be ordered. I would order everything that there was to be ordered on a case.
I would actually make a post-it note and put it on the file and either my first chair or my second chair would order the -- the discovery.
When the discovery came in, I would go through the file and make sure that everything was there. And then when the case was up in court, we would tender the discovery to the defense lawyers, and I would normally say it out loud on the record in the courtroom, "Judge, we're tendering to counsel the police reports, the supplementary reports," the -- if somebody was dead, the protocol, any photographs we had, whatever we had. Every single thing that I got was tendered to the defense lawyers.
Q. Okay. So you were responsible.
A. No, because I might not be in the courtroom the day that it was tendered, but I would be responsible for saying to order these things, I would be responsible to make sure they were in the file, and when a case was up on a particular day, maybe Terry would handle the call, maybe my third chair would handle the call, but they would tender the discovery and they would say it on the record.

01:32:31 01:32:44 01:33:01 01:33:15 01:33:33

If a lawyer wasn't in court and they came to our office, we would write it right on our blueback that we tendered A, B, C to that lawyer.
Q. Okay. So --
A. And when I say "we," I mean one of the prosecutors in the courtroom.
Q. So it was a collective responsibility, is that fair to say?
A. Well, I wouldn't let my third chair determine what was needed or my second chair. I would determine what was needed to be ordered. They would do the ordering, and then I would check it. So in that way, it's collective.
Q. Okay. But, again, the importance of handing over discovery in a criminal trial really can't be understated, right? I mean, it's an important obligation on the part of the prosecution, right?
A. It is an obligation. It is the obligation that we tender everything to the defense.
Q. And in a serious criminal prosecution, is it the first chair's responsibility to make sure that the second chair and the third chair and everybody has made sure that all of the discovery that they have that's discoverable goes to the defense?
A. In my courtroom and probably in everybody's courtroom, yes.

Q. All right. Now, when we talk about discovery, this includes material that is actually favorable to the defense, correct? Regardless of whether it helps the prosecution, correct?
01:33:46 A. Of course. We have an obligation to tender what we call *Brady* material, which may be material that would be beneficial to a defendant.
Q. Now, Mr. Wrice and Mr. Benson both filed motions to suppress statements in this case, correct?
01:34:10 A. They both filed motions to suppress statements.
Q. And in those statements -- in that motion, they both alleged through their counsel that they -- that they -- their statements or inculpatory statements were the product of physical coercion, correct?
01:34:29 A. Yes.
Q. Neither Lee Holmes nor Michael Fowler filed a motion to suppress statements; isn't that right?
A. I don't know. I have no recollection of them doing it or not doing it, and I -- I just don't know because I don't have
01:34:44 the court file.
Q. Okay. Well, why don't we take a look at the certified statement of conviction and see if that helps tell us anything.
A. To tell me about the other people?
01:34:52 Q. To see if there was a docket entry where there was a

01:35:28 01:35:44 01:36:11 01:36:23

motion to suppress statements.
A. Yes, certainly.
MS. BONJEAN: This is Defense Exhibit 20.
It can be for ID only.
No, actually, you have no objection, right? It's your exhibit.
MS. JACOBS: Is this the whole document?
MS. BONJEAN: It's the whole certified statement. It's your exhibit, so --
MS. JACOBS: Just one moment, Your Honor.
Can you scroll through it so I can see what else is on it?
THE COURT: To save time, can we stipulate that no such motion was filed? If that's the case, it seems to me it was.
MS. BONJEAN: I can't stipulate to myself.
THE COURT: No, I'm just asking.
MS. JACOBS: Your Honor, I'll take it under advisement. I really have to consider it --
THE COURT: All right.
MS. JACOBS: -- consider whether there's evidence there was such a motion.
THE COURT: All right.
BY MS. BONJEAN:
Q. Are you able to see it, Judge?

01:36:40 A. I see Page 1.
Q. Okay. So we can go through it together, and you can just tell me if there's anything there that refreshes your recollection about whether -- well, first, let's back up a second.
What is a certified statement of conviction or a disposition, this document that's being looked at?
01:36:57 A. This is a document that is generated by the clerk's office for the Circuit Court of Cook County, and it generally will list what all of the charges are with the defendant, and it will generally list what happened on court dates. It's kind of a shorthand.
It indicates who the judge is. Sometimes it will indicate if bond motions are filed. Sometimes it will
01:37:20 indicate if motions are filed. Sometimes it won't.
Q. And if it doesn't, that's typically just because there's a clerk's error, right?
A. I don't know, but I certainly have seen certified statements of convictions that don't have things on them that
01:37:35 actually did happen in the courtroom.
Q. Okay, but, again, if someone files a motion, it's supposed to be on the certified statement of conviction, correct?
A. Absolutely.
MS. BONJEAN: All right. Judge, we would offer the
01:37:44 certified statement of conviction into evidence. It's their

exhibit. They didn't have any objection previously. I don't know why they would have now.

THE COURT: Is there any objection?

MR. JEBSON: No objection.

01:37:55 MS. JACOBS: No objection.

THE COURT: It's admitted. You may publish it, use it.

MS. BONJEAN: Thank you.

(Defendants' Exhibit 20 received in evidence.)

01:38:07 MS. BONJEAN: I'm going to come over here for a second. What is the exhibit number, Ashley?

MS. COHEN: Defendants' 20.

BY MS. BONJEAN:

Q. Okay. I'm having you look at Defendants' Exhibit 20,
01:38:18 Judge, and this is a certified statement of conviction for -- and disposition for Lee Holmes, right?

A. Yes.

Q. And this was one of the co-defendants of Mr. Wrice, correct?

01:38:27 A. That's correct.

Q. Okay. And when you have a chance and you've had a chance to review this, first of all, there's a number of charges that are listed at the top there, correct?

A. Yes.

01:38:35 Q. And those -- those were the charges that Mr. Holmes was

charged with, along with the other co-defendants; is that right?
A. Yes.
Q. All right. And there's nothing on this page that would suggest he filed a motion to suppress statements, right?
Again --
A. Yeah.
Q. -- putting aside maybe there was a mistake somewhere, but at least according to this document, there's nothing, correct?
A. Correct, but I can already see on the front page that there's something missing.
Q. There's something what?
A. Missing.
Q. Oh, what's missing?
A. It says 10-4, appearance filed, but it doesn't say who filed the appearance for Mr. Holmes.
Q. Okay. Well, so somebody didn't put in the attorney's name, right?
A. Correct.
Q. Okay. But there are motions indicated there, correct? Motion defendant continuance?
A. On October the 18th, there was a motion made by the defendant to continue his case.
Q. And on October 4th it says appearance filed, but actually also on October 4th, it says Kenneth L. Gillis. Isn't that

the name of the attorney?
A. No, that's a judge.
Q. Oh, okay.
All right. Let's go to the next page.
A. You know, I'm sorry, at that time Kenneth Gillis was a state's attorney.
Q. Oh, it's a state's attorney.
A. Yes, yes.
Q. It wasn't a judge.
A. So he would have been the state's attorney who was assigned to the chief judge's courtroom at the time of arraignment.
Q. All right. That clears that up. Because I was going to say, it looked like Thomas Fitzgerald was there, too, but -- very good.
A. Can you take it back one thing?
Q. Sure.
A. Just because I want to see if Judge Fitzgerald was there? No, that was not Judge Fitzgerald. Judge Fitzgerald was not sitting in the arraignment court. It was Judge Richard Fitzgerald, and they were not related.
Q. Okay.
A. Richard Fitzgerald was the chief judge at that time.
Q. So this was a different Judge Fitzgerald?
A. Yes.

Q. Thank you.
Next page.
A. If you can just give me a minute to look at it.
Q. Absolutely. Take your time, and you let me know when you've had an opportunity to review that page.
01:40:45
THE COURT: Ms. Bonjean, we're going to need to take a recess pretty soon.
MS. BONJEAN: No problem.
THE COURT: Is this as good a time as any?
01:41:01
MS. BONJEAN: It's as good a time as any.
THE COURT: Okay. We'll take a 15-minute recess, start just before 2:00.
(Recess.)
THE COURT: Please be seated.
01:59:55
Ms. Bonjean, you may continue your direct examination.
MS. BONJEAN: Thank you, Your Honor.
BY MS. BONJEAN:
Q. Ms. Lampkin, we were discussing whether or not Lee Holmes had filed a motion to suppress statements. Did you have a chance to look at the page that was up on the screen?
02:00:05
A. I looked at page 1. Now I'm looking at page 2. It just came back.
Q. Sure.
02:00:30
A. All right. I looked at this sheet, and I know it's wrong

02:00:40 too.
Q. So do you actually think he filed a motion to suppress statements?
A. I don't know. I'm just saying on this page, it goes from November the 8th to May 16, 1983. When every defendant came in front of Judge Fitzgerald, Thomas Fitzgerald, they were arraigned. A plea of not guilty was entered. A motion for discovery was filed by each side. Answers to discovery were filed. None of that is on this sheet.
02:01:05 Q. Okay. So you have identified some motions that you think are missing, right?
A. I know are missing.
Q. Okay. And motion to suppress statement, though, is not reflected here though, correct?
02:01:20 A. From November 8th of --
Q. I'm not saying you're not wrong. I'm just saying is it reflected here?
A. But you're indicating that there may be motions on here. There are no motions on here at all --
02:01:34 Q. Okay.
A. -- filed.
Q. Again, it's a simple question. Does this reflect that a motion to suppress statements was filed?
A. It does not.
02:01:42 Q. Okay. And do you have an independent recollection -- do

you have an independent recollection of Mr. Holmes ever filing a motion to suppress statements?
A. I --
MS. JACOBS: Asked and answered.
02:01:50 THE COURT: It was asked and answered, but she answered again.
BY MS. BONJEAN:
Q. Okay. So let's go to the next page.
A. All right. This is page No. 3.
02:02:20 Q. Let me know when you've had a chance to look at it.
A. All right.
Q. Okay. And, again, nothing at least in this document that would reflect that a motion to suppress statements was filed?
A. No, that's correct, nor any other motions.
02:02:37 Q. Okay. And you actually never litigated a motion to suppress statements as it relates to Lee Holmes, right?
A. I left the building in June of 1983, so I don't know what happened after that.
Q. Okay. But you litigated motions to suppress statements as
02:02:55 to two of the co-defendants, right?
A. I litigated two because Stanley Wrice demanded trial, and I had to do everything within 120 days of his demand for trial.
Q. He demanded trial because he wanted to be brought to
02:03:08 trial, right?

A. He demanded trial, and I had 120 days to litigate his case, so I had to go first on his case. No one else was demanding trial. I needed to get his case started before May 4th of 1983 unless his lawyer agreed to a continuance, and his 02:03:27 lawyer agreed to a short continuance. We started the case I think maybe May 13th.
Q. Okay. And you have reviewed the record in this case to the extent that it exists, correct?
A. Correct.
02:03:40 Q. And in reviewing the record to the extent that it exists, have you seen anything that would suggest there was a motion to suppress statements by Lee Holmes?
A. I haven't -- I haven't reviewed a record that went past Stanley Wrice other than plea transcripts for Lee Holmes and 02:04:02 what's the other -- and Michael Fowler.
Q. Yeah. They all pled guilty, right?
A. Those two people pled guilty, yes.
Q. All three people apart from Mr. Wrice pled guilty, correct?
02:04:11 A. Yes.
Q. Okay. So you wouldn't do a motion to suppress statements after someone pleads guilty, right?
A. Well, Mr. -- as I said, I left in June. Mr. Holmes and Mr. -- what is his name?
02:04:24 Q. Benson?

A. Fowler.
Q. Fowler?
A. No, Fowler pled guilty in December of 1983. I was not there. I came back in -- I think in January of 1984 and took the plea on Rodney Benson.
02:04:36
Q. Okay. So, again, really my only question is is you seem to have a significant familiarity with the record as it exists. Now, have you seen anything that would suggest that there was a motion to suppress statements by Lee Holmes?
02:04:53
MS. JACOBS: Asked and answered. She said she didn't see --
THE COURT: Yeah. She said she hasn't seen anything. She can't, as I understand it, categorically say that there wasn't one.
02:05:03
MS. BONJEAN: Understood. And I'm not asking her to categorize.
THE COURT: That's what I understand her testimony to be.
BY MS. BONJEAN:
02:05:09
Q. Okay. So in Mr. Wrice's and Mr. Benson's motion to suppress statements, they made very specific allegations against Sergeant Byrne and Peter Dignan about the abuse that they experienced, correct?
A. I cannot say that. I know that Rodney Benson filed a motion to suppress statements, and then he later amended it
02:05:24

and made it very specific. I have not seen Stanley Wrice's motion to suppress statements. When you questioned me in 2016, I asked you to show it to me and then I could tell you if it was specific. I never saw one, so I don't know what he did, if it was specific or not.

02:05:45

Q. Okay. Let me make my question a little more precise.

You were present when they testified at the hearing, correct?

A. Yes, I was.

02:05:58

Q. Okay. And there were specific allegations via their testimony against Sergeant Byrne and Peter Dignan, correct?

A. Yes.

Q. Okay. In fact, both of them described being beaten by a -- with a blackjack-type rubber flexible object, right?

02:06:17

MS. JACOBS: Your Honor, I'm going to object to double hearsay here. And, you know, if they want to -- if she wants to put on testimony, that's fine. But to ask her what was said at the suppression hearing is inappropriate.

THE COURT: So she's asking what they -- suggesting

02:06:31

what they described. She, of course, is free to say that's not how they described it or she can't remember, either one, or that that's how they described it. I don't care. Let's --

BY THE WITNESS:

A. Well, they did not say "blackjack," either of them --

02:06:47

BY MS. BONJEAN:

Q. Okay.
A. -- in their testimony. They did describe a rubber-like object. I think one of them said it was solid. And I believe they gave it different lengths, and they said that there was tape on the ends.
Q. They both described the tape, right?
A. Yes.
Q. And they both described --
A. This was not in their -- this is not a printed motion. This is after Rodney Benson testifies. Then Stanley Wrice testifies when they're sitting there in front of each other testifying.
Q. Oh, so it's your position that he just got this from Rodney Benson. Is that what you're saying?
A. I don't know where he got it.
Q. Well, you seem to have some opinions. So it sounds like your position is that he just listened to Rodney Benson and got it, correct?
MS. JACOBS: Objection, Your Honor. Improper question.
THE COURT: Wait a minute.
BY MS. BONJEAN:
Q. Well, ma'am, isn't it true --
THE COURT: Are you withdrawing your question? I asked you to hold on.

MS. BONJEAN: Yeah, I'll withdraw the question.
THE COURT: Fine.
BY MS. BONJEAN:
Q. They both describe going to an area of Area 2 that was abandoned or a secret area outside of the interview rooms at Area 2, correct?
A. They described going to two different floors.
Q. Right.
A. Yes.
02:07:53 Q. Okay. And both of them describe being hit with a flashlight by Sergeant Byrne, right?
A. Yes.
Q. All right. And both men actually sought medical attention at the Cermak Health Centers when they immediately got to Cook County Jail, correct?
A. I don't -- I don't know if they sought medical attention. I know that when they go into the jail they are assessed before they go into the jail by -- I mean, whether they sought it or not, they would be assessed before they were put into the Cook County Jail, possibly.
Q. Okay. And Mr. Wrice was not only assessed when he went into intake, but he also sought out additional medical care from Dr. Stanley Harper. You remember that, correct?
A. I think six days later, yes.
Q. Okay. So a few days later, he got medical care, correct?

A. I wouldn't say he got medical care. He certainly was seen by doctor.
Q. He was seen by a doctor. And he doesn't get to decide when he's going to get to be seen by a doctor. We can agree on that, right?
A. No, I don't know.
Q. Okay. So in all your time working in the Illinois court systems and as a Cook County prosecutor, it's your belief that he possibly as a prisoner could just go decide when he's going to go see a doctor?
A. I didn't say that, Counsel.
Q. Okay. You would agree that as a prisoner, he's at the mercy of the correctional officers of when he gets to see a -- a medical professional, correct?
A. Well, I can only tell you what the ET said. The ET said if there was something seriously wrong with him he would have had him to see a doctor immediately.
Q. Right. Well, if there was something serious, he would have -- like life-threatening, he would have had a doctor see him, correct?
A. He didn't say life-threatening.
Q. Okay. Well, the ET also said he had a number of bruises about his body, correct?
A. He said he did not -- he would put -- he would write down a bruise if he said he had one whether he saw it or not.

02:10:04 That's what he said.
Q. Well, the testimony -- you have a very clear memory of the testimony.
A. I read it when I -- in 2013, and I've read it -- I heard it at the trial.
Q. All right.
A. And I read it for this hearing, yes.
Q. Okay. And so it's -- I'm not really here to, like, debate with you the quality of the evidence, but you would agree that there was medical evidence that was presented at the suppression hearing. That's all I -- whether you believe it or not is beside the point.
A. Counselor, you didn't ask me that. If you asked me if there was medical evidence presented, I would have said yes.
Q. Okay.
A. I did when you asked it that way.
Q. Okay. So they both received medical treatment. That's all I asked. And you would agree with that, correct?
A. You said --
MS. JACOBS: Objection. Asked and answered and mischaracterizes her testimony.
THE COURT: She can answer.
BY THE WITNESS:
A. I didn't say they both received medical treatment. I said they both were seen by a doctor.

BY MS. BONJEAN:
Q. Okay. So you quarrel with the word "treatment"?
A. I'm sorry.
Q. You quarrel with the word "treatment"?
A. I'm trying to remember. If I had the record in front of me, I could -- I think the doctor gave Stanley aspirin and an X-ray.
Q. So what would you do for bruises if not X-rays and aspirin?
MS. JACOBS: Objection, Your Honor. She's not a doctor.
MS. BONJEAN: Well, she certainly has -- we'll move on.
BY MS. BONJEAN:
Q. Ms. Lampkin, isn't it true that Lee Holmes also made a complaint about being beaten with the rubber hose and that complaint was made a day -- while he was still actually in custody?
A. I have no knowledge of that.
Q. Well, let's take a look at it.
Are you familiar -- well, you worked for the City of Chicago. Explain to the ladies and gentlemen of the jury what the Office of Professional Standards is.
A. I don't work for the City of Chicago.
Q. You did work for the City of Chicago, right?

A. Oh, you mean when I was a corporation counsel?
Q. You did work for --
A. Yes.
Q. Yes. So you know what the Office of Professional
02:12:08 Standards is, right?
A. I know what the Office of Professional Standards is. I
don't know if there was an Office of Professional Standards in
'82 and '83. I'm not sure. I know there was some agency that
looked at police cases, yes.
02:12:26 Q. Okay.
A. And it could have been the Office of Professional
Standards. The name changed. And that's the only reason I'm
saying I don't know if it was the name at the time, Counselor.
Q. Okay. Well, I didn't ask you what the name was. I asked
02:12:37 you if you could explain for the ladies and gentlemen what
Office of Professional Standards is, if you could, please,
ma'am.
A. Okay. The Office of Professional Standards was a group of
people. I don't know if they were -- I think there were
02:12:51 civilians on that committee and others. I don't know who was
on the committees. I do know there was some civilians. And
when a complaint was made by a civilian regarding a police
officer, it could have been that the police officer yelled and
screamed at them when they were arrested, or it could have
02:13:13 been that they were hit by a police officer, or it could have

02:13:28
02:13:43
02:14:05
02:14:26
02:14:39

been that they used vulgarity at them. If a person made a formal complaint, then it would be referred to the Office of Professional Standards.

Q. All right. Now, I'm going to have you look at, for identification purposes only, Plaintiff's Exhibit --

MS. COHEN: 28.

BY MS. BONJEAN:

Q. 28, ma'am. And I'm going to have you scroll through it. If you could just read -- we could pull out any portion you can, and let me know when you're done.

A. Counsel, could I see this off the screen? Because I can't --

Q. Let me see if I can -- I can get you a paper copy, but let me see if I can pull out the narrative here.

A. I need to see who it's -- what's under -- that's better, but let's see.

MS. JACOBS: Your Honor, while Ms. Lampkin, Justice Lampkin, is reviewing the document, this document is total hearsay. She should not be asked any questions about the content. The subject of the content is dead, and there is absolutely no hearsay exception to that.

MS. BONJEAN: I'm not eliciting it for its -- I'm not eliciting the substance of it, Judge. I'm asking her if she saw it or had it.

THE COURT: All right. That's fine.

Proceed.

THE WITNESS: I have never seen this.

BY MS. BONJEAN:

Q. Okay. So fair to say, ma'am, that this was not a document you had in your possession at the time you tried the case and prosecuted Mr. Wrice, correct?

A. I have never seen this, Counsel.

Q. Okay. So is that a yes, you didn't have that?

A. Okay. I guess the answer is yes because I have never seen this.

Q. Okay. So if you've never seen it, it means you have never had it to produce to Mr. Wrice, correct?

A. That's correct.

Q. Okay. That's it.

THE COURT: All right. Proceed.

BY MS. BONJEAN:

Q. And, of course, you objected or litigated against the defendant's motion to suppress statements, correct?

A. You said I objected or litigated? I litigated the motion to suppress statements, which was also a motion to quash arrest and a motion to suppress ID.

Q. Okay. Excuse me.

MS. BONJEAN: Could we have a sidebar, please, Judge?

(Sidebar.)

THE COURT: What's the problem?

02:16:15 MS. BONJEAN: She just said a motion to suppress ID which Your Honor already ruled was not coming in, and they obviously did that on purpose.

MS. JACOBS: No, I didn't.

MS. BONJEAN: Yes, you did.

THE COURT: Wait a minute. Say that again. What?

MS. BONJEAN: She just said, I litigated a motion to suppress statements, a motion to quash arrest, and a motion to suppress ID, which we've already discussed earlier when they tried to get it in before, and you told them no, it's not relevant. No ID ever came in.

02:16:26

THE COURT: Okay. Well, there's no -- there's been no testimony --

MS. JACOBS: Don't open the door.

02:16:38 THE COURT: Don't open. Just leave it.

MS. BONJEAN: I can't talk about the motion to suppress statements? Does she not know how to answer a question that's --

THE COURT: Suppressed statements.

02:16:45 MS. JACOBS: You're the one who elicited it.

MS. BONJEAN: I did not.

THE COURT: I know you didn't, but let's just go on. Let's get this over with.

(End of sidebar.)

02:16:55 THE COURT: Proceed.

MS. BONJEAN: Thank you.

BY MS. BONJEAN:

Q. Let's stick to the motion to suppress statements; okay? Okay? That's what I'm asking you about.

02:17:00 A. All right, Counsel.

Q. Thank you.

I asked you about whether or not you objected to or litigated against the motion to suppress statements, right?

A. I litigated a motion to suppress statements.

02:17:17 Q. Right. And you put on a vigorous objection or defense to the motion, correct, the motion to suppress statements, correct?

A. I went forward on the motion to suppress statements. I was required to go forward on it.

02:17:32 Q. Well -- okay. And you defeated the motion, correct?

A. Well, Judge Fitzgerald made the ruling on the motion. I didn't make the ruling. I presented the evidence, and the judge made the ruling.

Q. Right. You as the litigator defeated the motion, correct?

02:17:52 MS. JACOBS: Objection.

BY THE WITNESS:

A. I can't say I defeated a motion.

THE COURT: Wait a minute.

THE WITNESS: I'm sorry.

02:17:57 THE COURT: She litigated the motion, and she lost

the motion.
MS. BONJEAN: No, she didn't lose it. She won it.
BY MS. BONJEAN:
Q. You won the motion, right?
02:18:02 THE COURT: Excuse me. Yeah, she won it.
BY MS. BONJEAN:
Q. You won it, right?
A. Yes.
Q. Okay. That's all I'm trying to get at. You won the motion, right? You got to use your statements at Mr. Wrice's trial, correct?
A. Yes.
Q. And when the judge ruled on the motion to suppress statements, that said Prosecutor Lampkin, you are free to use Mr. Wrice's inculpatory statements against him at his trial, correct? That's the legal effect of it, right?
A. You said that I am able to use his inculpatory statements. It was not an inculpatory statement, and that is not what the judge said.
Q. Oh, it's not an inculpatory statement?
A. It's not an inculpatory statement.
Q. Oh. So were you trying -- were you trying to -- you say -- are you saying it was an exculpatory statement?
A. It was a statement that he made that he was upstairs --
Q. Okay.

A. -- that I used. That is all.
Q. Okay. And an inculpatory statement is a statement that tends to suggest that someone is guilty of the crime, right?
A. Not when you say, I'm there.
02:19:02 Q. Well, what if he testified, I wasn't there when she was raped or burned? If you're presenting evidence that he was there, isn't that inculpatory, Ms. Lampkin?
A. He never said he was there when she was raped --
Q. Right.
02:19:15 A. -- and burned.
Q. He --
A. He said he was there.
Q. Right. He --
A. And that's why I put the statement in because he said he was there. 02:19:24
Q. He --
A. I didn't know what he would testify to when I put the statement in. I didn't know if he was going to put himself upstairs.
02:19:33 Q. Okay.
A. Because I had no idea if he's going to take the stand. The state goes first. He doesn't ever have to testify.
Q. Right. But it's your testimony now that this statement was -- did not help the prosecution?
02:19:49 A. I didn't need the statement, but I didn't know I didn't

02:19:59 02:20:15 02:20:31 02:20:46 02:21:26

need the statement until he took the stand to say he was upstairs.
Q. Yeah, you didn't need the statement, but you still used the statement, ma'am, didn't you?
A. I used the statement before he testified.
Q. That's fine, before or after. You relied on it in your case-in-chief, correct?
A. I put the statement in, yes.
Q. Okay. And this is the same statement that Mr. Wrice's attorney said should be suppressed, correct?
A. Yes.
Q. And it's the same statement that you fought or litigated to introduce at Mr. Wrice's trial, right?
A. Yes, I did.
Q. And it's also the same statement that your trial partner told the jury, just like this one, that he was going to introduce into evidence as evidence against Mr. Wrice, correct?
A. I don't know what -- are you saying in his opening statement?
Q. Let's look at page 901 of the trial transcript.
MS. BONJEAN: And can you pull out the last paragraph so Ms. Lampkin can read what her trial partner said? Last paragraph. We don't have to do the whole thing.
THE WITNESS: This was in the assistant state's

attorney opening statement?

BY MS. BONJEAN:

Q. Right.

A. I've read it, yes.

02:21:33 Q. So to be clear, your trial partner, Terry Gillespie, the assistant state's attorney, told this jury, "Assistant State's Attorney McCurry confronted him with the fact that he had talked to other people. The, defendant Stanley Wrice, that man sitting over there, then told the Assistant State's
02:21:50 Attorney McCurry that he had been upstairs, that he had the iron in his hand, that he did, in fact, burn the victim by dropping the iron on her thigh."

Did I read that correctly, Ms. Lampkin?

A. Yes, you did.

02:21:59 Q. And are you telling the ladies and gentlemen of the jury that that was not an inculpatory statement?

A. This is not evidence, Counsel. This is what the state's attorney said the evidence was going to present -- be in the case. When the statement came into evidence, I don't think it
02:22:19 came in the exact -- the way that Terry said it.

Q. Oh. So Terry was misrepresenting the evidence to the jury?

A. No. In opening statement, a lawyer is supposed to say to the jury what they expect the evidence to show.

02:22:33 Q. And --

A. And the judge --
Q. Go ahead. My apologies.
A. I'm sorry. And the judge instructs the people who are listening to the opening statements that the statements of the lawyers is not to be considered by you as evidence. The evidence which you consider should be the evidence that comes from the witness.
Q. Right. So you're suggesting that Assistant State's Attorney Gillespie didn't have -- misrepresented what his colleague, Assistant State's Attorney McCurry, was going to testify to?
MS. JACOBS: Objection. Also asked and answered.
THE COURT: No, she can answer that.
BY THE WITNESS:
A. He did not -- the way he phrased it was not exactly the way assistant state's attorney --
THE COURT: All right.
MS. BONJEAN: Well, why don't we look at what assistant state's attorney --
MS. JACOBS: Wait. Let her finish her answer.
MS. BONJEAN: Her voice trailed off. I'm sorry. I am very sorry.
BY THE WITNESS:
A. All right. Terry Gillespie did not say this in his opening statement exactly the way that Kenneth McCurry then

testified to the statement.

BY MS. BONJEAN:

Q. Okay. But you would agree that this statement that Mr. Gillespie is telling the jury they're going to hear surely sounds inculpatory, does it not?

A. I would say yes.

Q. Okay. Let's actually look at the statement.

MS. BONJEAN: Page -- Plaintiff's Exhibit for ID 61D.

THE WITNESS: Okay.

BY MS. BONJEAN:

Q. I'll let you take a quick look and then I'll read it to you.

A. It's not here.

Q. No?

A. No.

Q. We can go back to --

MS. JACOBS: What page?

MS. BONJEAN: I'm starting on page 1315.

MS. JACOBS: That's not being shown. Thank you.

MS. BONJEAN: I was going to go back there. Relax.

BY MS. BONJEAN:

Q. Do you have it in front of you?

A. I have page 1315 in front of me.

Q. Okay. Very good.

A. But can I read it first?

02:25:37
02:25:44
02:25:52
02:26:01
02:26:11

Q. Oh, sure. Before I read it to you, take your time.
MS. JACOBS: Your Honor, we have no objection to this being published to the jury.
MS. BONJEAN: That's not -- that's not the reason I'm asking --
THE COURT: Pardon?
MS. BONJEAN: A closing argument? I'm asking her --
MS. JACOBS: We have no objection to -- what I'm saying is we have no objection to --
MS. BONJEAN: Oh, to McCurry's testimony?
MS. JACOBS: -- McCurry's testimony being --
MS. BONJEAN: I don't have any objection to McCurry's testimony. Sure. Bring it in.
THE COURT: All right. Fine. Let's move on. Read exactly what was said and then move on.
BY MS. BONJEAN:
Q. Okay. Ready?
A. You mean from this page?
Q. Sure.
A. This is not his whole testimony.
Q. No, it's not. But Ms. Jacobs wanted to bring it in, so we'll bring it in.
A. I mean, this is not the beginning of his testimony.
Q. I'm aware.
A. Okay. Are you asking me to read it out loud?

02:26:21

02:26:48

02:27:21

02:27:32

02:27:45

Q. No.
A. Okay.
Q. I'm just asking you to let me know when you're done reading it to yourself. I don't think the judge wants us reading the entire testimony in. So I just pulled out --
THE COURT: Just read the part that's relevant.
MS. BONJEAN: Right.
BY MS. BONJEAN:
Q. And just let me know when you're finished with that page.
A. All right. I'm ready. I can't see the bottom number. It looks like -- okay. Now you changed pages. All right. All right.
MS. BONJEAN: Go back to 1315.
BY MS. BONJEAN:
Q. So we'll just start with this relevant -- down at the bottom there:
"Q. What did the defendant tell you happened after he had told you Rodney Benson had sexual intercourse with the woman?"
Next page:
"A. He said that Rodney Benson was slapping and hitting the woman and demanding oral sex while he was having intercourse.
"And then, at that time, Jeff came up with -- with an iron, with a hot iron. I asked him what happened to the

hot iron when Jeff brought it up. He said that Rodney Benson took that iron from Jeff, and he burned the woman over most of her body with the iron.

"Q. What did the defendant tell you happened after he said Rodney Benson burned this woman over most of her body?

"A. He said that he, Stanley Wrice, took the iron from Benson and that he burned the victim. And I asked him how he burned her, and he said that he did it by dropping the iron on the woman's thighs."

Did I read that correctly?

A. Yes, you did.

Q. Okay. And is it still your testimony that that is not an inculpatory statement?

A. What I read this as is him being a hero, taking the iron from Rodney Benson and dropping it on the victim. And later on in this testimony. I think it's restated in a different way than it's said here.

Q. Okay. Mr. Wrice never said he was the hero, did he?

A. I didn't say he said he was a hero.

Q. Okay. And you never argued that Mr. Wrice said he was the hero, correct?

A. I never argued that the -- that this was an inculpatory statement either.

Q. Ma'am, answer my questions. Did Mr. Wrice ever take the

position that, oh, I was the hero, and I dropped the iron because I was taking it away from Jeff Ellis? He never said that, right?

MS. JACOBS: Objection. Asked and answered.

02:29:22 THE COURT: I think she said that that's -- he was not a hero. Let's move on.

MS. BONJEAN: No, she testified that she reads this --

BY MS. BONJEAN:

02:29:28 Q. Let me get this straight. You read this now in, let's see, 2020, right? After my client did 31 years in prison for a crime that he was wrongly convicted for, you read this now as your interpretation it wasn't just inculpatory; you know, I didn't need to use it; is that right?

02:29:48 MS. JACOBS: Objection to the lead-in to the question.

THE COURT: All right. She's testified the way she's testified. The jury heard it. So let's move on.

BY MS. BONJEAN:

02:29:55 Q. You didn't argue that this wasn't inculpatory, correct?

A. I didn't argue that it was inculpatory or exculpatory. I just argued this is what he said.

Q. Okay.

A. That is the only thing I said, this is what he said.

02:30:11 Q. So when you -- as a prosecutor, when you're arguing your

cases in front of a jury, like this jury, your goal is to get a conviction, right?
A. In this case, my goal was to tell -- well, first, he did not take the stand and say he said any of this. He testified 02:30:27 that he was upstairs twice, that he never saw this woman --
Q. Right.
A. -- burned by anyone. I was pointing out and laying out all of the evidence, the absurdity of what he was saying.
Q. Exactly, ma'am. You were using this statement to say that 02:30:45 Mr. Wrice was a liar, correct?
A. No. I was using the witness's testimony, every witness that testified in this case to show that he was lying, not this statement. His testimony on the stand was so ridiculous.
Q. Okay. Well, your opinions --
02:31:02 MS. JACOBS: Hold on.
MS. BONJEAN: Judge, I move to strike.
MS. JACOBS: Judge --
MS. BONJEAN: Move to strike.
THE COURT: Wait. Wait. Hold. She's answered the 02:31:08 question. Let's move on.
MS. BONJEAN: I move to strike her opinion about -- she is not the factfinder. She wasn't the factfinder then. She's not the factfinder now. I move to strike her opinion about the ridiculousness of my client's testimony.
02:31:22 MS. JACOBS: Your Honor, she's been asking her

questions about nothing but her opinion. She just doesn't want to hear the opinion.

THE COURT: She was -- you did ask her her opinion whether it was inculpatory or non inculpatory. I think you -- 02:31:35 the jurors heard her testimony. They've seen what was said at the trial and what the assistant state's attorney who took the statement said. I think you made your point. Let's move on.

MS. BONJEAN: I'm asking that the judge rule that Ms. Lampkin's opinion of -- it is Ms. Lampkin's opinion of 02:31:53 Mr. Wrice's testimony which we could assume is not relevant.

MS. JACOBS: Your Honor, this is argument.

THE COURT: Well, the fact of the matter is you've been asking her opinion, and --

MS. BONJEAN: I have not been asking her opinion.

02:32:03 THE COURT: Her opinion is only relevant to the extent the jurors would find that they believed it to be relevant. So let's move on.

MS. BONJEAN: I'm not sure -- okay, Judge. I've been asking her -- I've been asking her questions about how she 02:32:19 views the statement. I didn't ask her about her opinion of Mr. Wrice's testimony.

THE COURT: She testified how she used it in front of the jury. She said how she used it in the argument. You've presented how it was presented in court and how it was 02:32:32 presented in the argument, how it was presented in the opening

02:32:44 02:32:59 02:33:06 02:33:45 02:33:53

statement. And the jurors have heard all of this, and I think they've got the whole picture. So I think we can move on.

BY MS. BONJEAN:

Q. Okay. You have taken the position here, Ms. Lampkin, that you didn't argue it in your case as an inculpatory statement, right?

A. I never used it as an inculpatory statement.

THE COURT: Okay. That's pretty clear, so let's --

MS. BONJEAN: Well, it's not clear because it's not truthful.

THE COURT: Well, wait. Wait. Wait.

MS. JACOBS: Objection, Your Honor.

THE COURT: That's up to the jury, not you or me or whatever, whether it's truthful or not. It's up to the jury to determine whether that's truthful or not.

MS. BONJEAN: Right. And I would like to show her her own closing arguments.

If you could put up page 1686.

MS. JACOBS: Your Honor -- did you say 1686?

MS. BONJEAN: Yes.

MS. JACOBS: That's Mr. Gillespie's rebuttal argument. That is not Ms. Lampkin's argument.

MS. BONJEAN: Okay. Fair enough. We'll put up Mr. Gillespie's --

THE COURT: Fine. Let's put it up.

BY MS. BONJEAN:
Q. Mr. Gillespie was your trial partner, right?
A. Yes.
Q. Okay. So let's look at his closing argument.
THE COURT: Okay. Here you go.
BY MS. BONJEAN:
Q. Okay. In the middle of the paragraph --
A. Well, can you just give me a minute to read the page, please?
Q. Sure.
THE COURT: Why don't you enhance the area you're --
THE WITNESS: Well, I could see this.
MS. BONJEAN: She wants to read the whole thing, and I would be happy to enhance after she does so.
THE COURT: All right.
THE WITNESS: All right.
MS. BONJEAN: Middle section, Ashley.
BY MS. BONJEAN:
Q. Mr. Gillespie, your trial partner, argued during closing arguments:
"So now we got Sergeant Byrne, and we get Detective Dignan. We also have Detective Dioguardi. Detective Dioguardi you will remember was present for those conversations with Stanley Wrice, when Stanley Wrice said that he took this iron, and he dropped it on the woman, and he

burned her."

Do you see that?

A. Yes.

Q. Okay. So that was argued to the jury in closing arguments at Stanley Wrice's case, correct?

A. That he dropped the iron on the woman, took it and dropped it on her, yes. He said that.

Q. And burned her?

A. And burned her.

Q. He didn't say anything about an accidental drop or anything, right?

A. No, he said dropped an iron on the woman and burned her.

Q. And burned her?

A. Yes.

Q. Okay. And let's go to page 1678.

A. Is this also Terry's closing?

Q. It's the prosecution's closing argument. I think it's Mr. Gillespie. I don't know.

A. Well, I didn't do the --

Q. I'm sorry?

A. I didn't do the last argument. That's why I just wanted to know who I was reading.

Q. He was part of the prosecution team, right?

A. Yes.

Q. Okay.

A. I did the opening close, and he did the rebuttal. That's all I'm going to say.

MS. JACOBS: So there's no misrepresentation, this was Gillespie's argument as well.

02:36:06 MS. BONJEAN: We established that.

THE COURT: This is Gillespie; is that right?

MS. JACOBS: Right. This looks like a sidebar actually.

MS. BONJEAN: Go to the next page, Ash.

02:36:22 THE WITNESS: Yeah, this is a sidebar with the judge.

MS. JACOBS: So 1679?

THE WITNESS: And 1679 is --

MS. BONJEAN: Okay. Hold on. I will get you the right page. Give me one second; okay?

02:36:31 THE WITNESS: Okay.

(Counsel conferring.)

MS. BONJEAN: 1687.

BY MS. BONJEAN:

Q. Bottom paragraph.

02:37:17 A. I have to read things in context, Counsel. I'm sorry. Okay. I see the bottom paragraph. 1687, yes.

Q. Yes. Okay.

A. It's gone off the screen.

Q. I know. We're going to go from 1687 to 1688. Just give

02:38:12 me a second. Technology can be good, and it can be troubling

sometimes.

So let's start on 1687. Mr. Gillespie argued --

MS. BONJEAN: Can you start on 1687?

MS. COHEN: She wants to read.

02:38:36 MS. BONJEAN: Oh, she wants to keep reading?

THE WITNESS: What did you want me to --

BY MS. BONJEAN:

Q. No, I was just waiting -- are you finished?

A. Yes.

02:38:45 Q. Okay. At the bottom of the page, it says, "You could see that in the pitch dark room, now" --

A. Counsel, could you slow it down a little bit?

Q. Sure. Do you want to read it? Why don't you read it.

MS. JACOBS: Well, I think she should read the whole

02:38:58 sentence. She's trying to snippet out --

MS. BONJEAN: No. I said --

THE COURT: She could read whatever she wants to read.

THE WITNESS: You want me to start at 1687?

BY MS. BONJEAN:

Q. Line 18.

A. This is Terry speaking.

Q. Okay. Yeah. Go ahead.

A. All right.

02:39:11 "You could see that in a pitch dark room. Now, not

only do we have Sergeant Byrne and Detective Dignan and Detective Dioguardi and Kenneth Lewis and Bobby Williams, but we have an Assistant State's Attorney McCurry who came in here, and he told you that he observed the defendant, that he didn't see any injuries on the defendant, that the" -- that's the end of -- "that the defendant told him that he picked up that iron, and he dropped it on Karen Byron."

Do you want me to keep going?

Q. No. That he picked up that iron and dropped it on Karen Byron, right?

A. That's what he says. He misstated what McCurry said.

Q. Right. He argued to the jury evidence that came in at Mr. Wrice's trial that Mr. McCurry said that Stanley Wrice admitted to picking up an iron and dropping it on Karen Byron, correct?

A. I just said yes, he misstated the testimony.

Q. Okay.

THE COURT: All right. Let's go. Move on.

BY MS. BONJEAN:

Q. You didn't present that evidence in the hopes of a not guilty verdict for Mr. Wrice, did you?

A. That wasn't evidence. That was a closing argument by a lawyer that was not to be considered as evidence for the jury. The jury was only supposed to consider the evidence that was -- that came from the witness stand. If a state's

attorney misstated evidence or a defense lawyer misstated the evidence, the judge told them disregard anything that the lawyers say that is not based upon the evidence.
Q. Right. And there was no objection and no order -- no objection to that characterization of the evidence, right?
A. There was no objection.
Q. Okay. And we already read McCurry's testimony. We're not going to read it again. But isn't it true the -- well, you didn't present Assistant State's Attorney McCurry's testimony in the hopes of a not guilty verdict for Mr. Wrice, right?
A. I present --
MS. JACOBS: Your Honor, I'm going to object. We've been over this.
THE COURT: I think we've been through this.
BY MS. BONJEAN:
Q. Okay. Well, you could have pled him to probation like the other co-defendants, I guess, if you want to -- if you were rooting for the defense, right?
MS. JACOBS: I object. It's not even a question.
THE COURT: Let's move on, and let's --
MS. BONJEAN: Okay.
THE COURT: Let's get into a new area.
BY MS. BONJEAN:
Q. All right. I wanted to go back to one thing.
You -- did you have any medical records for

Lee Holmes in your possession? You said you didn't have the CR complaint, but did you have any medical records that you recall?

A. One of our -- the court half-sheets -- not the court 02:42:01 half-sheets, but the state's attorney half-sheets reflects that on a date in December of 1992, Lee Holmes --

MS. JACOBS: '82?

THE WITNESS: I'm sorry. Yes. That's the right year. This happened in September, so it would be in December 02:42:16 of '82.

Our half-sheets -- and I mean the state's attorney's half-sheets -- reflects that medical records of Lee Holmes were turned over to Stanley Wrice's attorney.

BY MS. BONJEAN:

02:42:28 Q. Medical records were?

A. That's what it says. MD -- or MED records were turned over to Stanley Wrice's attorney. So he would have had that in December of 1982.

Q. And that's a half-sheets? That's on the half-sheets at 02:42:42 the Cook County state's attorney's blueback?

A. That's on the blueback.

Q. That's one of the portions of the blueback that is in the record, right?

A. Yes.

02:42:51 Q. Okay. And it's your testimony that despite having

obtained medical records for Lee Holmes, you did not actually ever see the complaint register file or the complaint that was filed on behalf of Mr. Holmes; is that right?
A. The half-sheets reflects that that was tendered by another assistant state's attorney. I did not tender it, so I have no recollection of ever seeing it. We weren't preparing for Lee Holmes' trial. If I was preparing for Lee Holmes' trial, I would have read everything that was going on in Lee Holmes's trial.
02:43:30 Q. Okay. And the medical records were produced by another state's attorney? Is that what you're saying?
A. It's on my half-sheets, so --
Q. I'm not doubting you. I'm not doubting you. I'm just asking.
02:43:45 THE COURT: Wait. You're talking over each other. So ask a question, then stop and let her answer.
BY MS. BONJEAN:
Q. The medical records were produced by another state's attorney; is that correct?
02:43:56 A. The half-sheets is in one of the assistant state's attorney's handwriting that was in my courtroom. I was obviously not there, and the state's attorney wrote on that half-sheets that they turned over to -- that Sidney Jones came to our office, and they turned over police reports and medical reports on Lee Holmes.
02:44:21

02:44:26

02:44:55

02:45:06

02:45:27

02:45:44

Q. Okay. So specifically on Lee Holmes?
A. Yes.
Q. Okay.
A. That was the name, Lee Holmes.
Q. And my question is on that blueback that you're referencing, did it indicate that there was Office of Professional Standards reports reflecting a complaint or an investigation that had been initiated by Lee Holmes or his family regarding his interrogation by Byrne and Dignan in connection with this case?
A. It says police reports, medical records. I can't think of -- there's another thing. If you showed it to me, I could certainly tell you.
Q. Well, I don't want to take the time to go looking for the document you're referencing right now, but you seem to have very clear memory of that half-sheets. And I'm asking if your recollection is that the OPS records were reflected in it?
A. There is a C and what looks like either a B or an R. I don't know what was turned over. I don't know what it was. It looks like it -- can I -- if either side would let me see it, I could then say what I think it is.
Q. Okay. Well, do you have a recollection -- we'll find it and look, but you testified previously you had no recollection of seeing that document before, right?
A. I have not seen that document. I personally have not seen

that document. It doesn't mean that we didn't have it in our -- in our file. It doesn't mean that it wasn't produced. I just didn't see it because I was not preparing Lee Holmes's case. I was preparing Stanley Wrice's case because he demanded trial.

02:46:08

Q. But you testified earlier, I have never seen this document?

A. I have never seen that document.

Q. Okay. And you also said earlier that if you tendered something you would put it on the record, right?

02:46:16

A. Right, on the record or on the half-sheets if the lawyer came to our office. There is a notation in December that Stanley Wrice's attorney came to our office, and there's a notation that says police reports, something else, medical records, and CR or CB were turned over to Mr. Jones. If it was CR, it would be complaint register. Complaint register would mean OPS files were given to Mr. Jones on that date.

02:46:36

Q. So you have this clear memory all of a sudden of --

A. It's not a clear memory, Counselor. You didn't ask me if -- you asked me if I had seen that document. I had not. But I did see some of the material on our blueback, and on our blueback, that is indicated. So whether I saw it or not, my partner saw it --

02:46:59

Q. Okay.

A. -- and he tendered it to Mr. Wrice's attorney.

02:47:12

Q. Okay. That's -- that's if, in fact, it's reflected there, right?
A. I believe it says CR or CB. CR stands for complaint register, and it's Lee Holmes' CR that was tendered. Then my partner, one of my partners turned -- gave to Mr. Stanley Wrice's attorney the complaint register or OPS files.
Q. Okay. And CR would have a number after it though, right?
A. No.
Q. Okay.
A. He would just say he tendered the CR. He wouldn't say -- he wouldn't write out OPS complaint register. The half-sheets would have just little notations so we know what occurred. But he clearly said he tendered these things to Stanley Wrice's attorney. I think he said to Mr. Jones.
Q. Okay. So now your recollection is you've seen a half-sheets that shows that the CR or the CB, whatever that is, was tendered, right?
A. It's not now my recollection. When I saw it, that was what I saw.
Q. Okay.
A. You didn't ask me about it. If you had asked me about that rather than whether I had seen that complaint register, I would have said it then.
Q. Okay. Now, you said you wouldn't have been paying

attention to that because you weren't preparing Lee Holmes' case, right?
A. I didn't say I wouldn't be paying attention to it. I said I didn't see the CR.
Q. Okay. We'll look for the half-sheets. Maybe we can look at it again together.
A. Yes, I would love it if you would.
Q. Okay. But as you sit here today, you don't remember ever hearing allegations by Lee Holmes that he had been beaten with a blackjack or bagged? That means suffocated with the bag around him, right?
MS. JACOBS: Your Honor, asked and answered. And I think we should have a sidebar because she's --
THE COURT: We don't need a sidebar. We've been over this. So I'll sustain the objection.
BY MS. BONJEAN:
Q. Now, did Sergeant Byrne tell you that he participated in any coercive interrogations against Mr. Wrice?
A. No, he did not.
Q. And what about Mr. Benson?
A. You mean did he -- did Sergeant Byrne say he did something to Mr. Benson? No, he did not.
Q. Did he tell you he did something to Lee Holmes?
A. He didn't tell me he did anything to anyone.
Q. Okay. And specifically did he ever disclose to you that

02:49:55 02:50:14 02:50:33 02:50:53 02:51:08

he had beat anybody, any of the co-defendants with a rubber hose or blackjack or whatever word you want to use to describe it, did he ever tell you that?
A. We -- no, he didn't. He never told me that.
Q. Okay. And he never told you that -- strike that.
Did Sergeant -- did I say -- I meant to say Sergeant Dignan there, but what about Sergeant Byrne, did he ever tell you that he had used his flashlight as a tool in a coercive interrogation of any of the co-defendants?
A. No, he did not.
Q. And that -- and did Peter Dignan ever tell you that he had bagged Lee Holmes?
A. No, he did not.
Q. Now, and you had no -- you had no knowledge from any other source other than what you have received in the motion to suppress statements from the defendants, but you had not received any information from the detectives that they had participated in any of these coercive interrogations, right?
A. There were only two people that were claimed to have been involved in anything with Mr. Wrice and Mr. Benson. That was Sergeant Byrne and Dignan.
Q. Right.
A. There was never any claim that the other detective, Mr. Dioguardi, did anything to them.
Q. Right. And neither one of those detectives disclosed that

information to you. You were in the dark about that information, correct?

MS. JACOBS: Object to the form of the question.

THE COURT: Well, it's sort of a beating your wife
02:51:20 type --

MS. JACOBS: Beating your wife, correct.

THE COURT: A question about beating your wife.

So rephrase your question.

MS. BONJEAN: Sure.

02:51:27 BY MS. BONJEAN:

Q. You weren't at Area 2 when Mr. Wrice was interrogated, correct?

A. I was not.

Q. Okay. And you were not at Area 2 when Mr. Benson was
02:51:36 interrogated, correct?

A. I was not.

Q. And you were not at Area 2 when Lee Holmes was interrogated, correct?

A. I was not.

02:51:40 Q. Same answer for Michael Fowler, correct?

A. I was not there.

Q. Okay. So if that had happened, if that testimony of Mr. Wrice and Mr. Benson was truthful testimony, would you agree that you were in the dark about it?

02:51:55 MS. JACOBS: Your Honor, I'm going to object to that.

02:52:03 02:52:14 02:52:24 02:52:39 02:52:55

The discussion here --

THE COURT: Objection is sustained.

MS. JACOBS: -- was about several hundred pages long. If she wants to show it --

THE COURT: Wait. I just sustained your objection. If you want me to reverse, keep arguing.

MS. JACOBS: I already won?

THE COURT: All right.

BY MS. BONJEAN:

Q. My point is, though, that neither of these detectives disclosed any wrongdoing to you, correct?

A. It's not -- neither of these detectives. It's a detective and a sergeant. That's why I'm having problems answering your question, Counsel.

Q. Oh, my apologies. I didn't realize that was confusing you.

A. It wasn't confusing me. It was not what were the allegations in this case.

Q. Okay. Well, let me be more precise.

Did either the sergeant or the detective disclose any wrongdoing to you? And when I say "wrongdoing," any misconduct perpetrated in their investigations and interrogations of the defendant or co-defendants, did they do that?

A. They deny doing anything --

Q. Okay.
A. -- to Mr. Wrice or Mr. Benson.
Q. Now, Mr. Wrice's criminal trial commenced in 1983. What month was it, do you recall?
02:53:10 A. It was May.
Q. And did you have knowledge that -- May of 1983, right?
A. Correct.
Q. Did you have knowledge that in January of 1983, just four months before the start of Mr. Wrice's trial, that
02:53:25 Peter Dignan and John Byrne, Sergeant John Byrne, had beaten another African American man by the name Alonzo Smith in a completely unrelated case in the basement of Area 2?
MS. JACOBS: Your Honor, objection for all the reasons we've discussed.
02:53:42 THE COURT: Overruled. She could answer that question. I mean, I haven't --
MS. BONJEAN: We do have a claim based precisely on this question. So --
BY THE WITNESS:
02:53:49 A. I have no knowledge of either Sergeant Byrne or Detective Dignan having beaten anyone in January.
THE COURT: Okay. That's very clear, so you can proceed.
MS. BONJEAN: Well, I'm not done, Judge.
02:54:01 BY MS. BONJEAN:

Q. Did you have knowledge that Alonzo Smith repeatedly denied involvement in the murder of a man named Mr. Fullilove, and that Peter Dignan and John Byrne took him to the basement, and Peter Dignan beat him with a black rubber hose object? Did you have that information at the time of Mr. Wrice's trial?
A. I had no -- I had nothing -- I had never heard of that --
Q. Okay.
A. -- until you said it today, Counsel.
Q. You've never heard that until today?
A. I have not heard that until today.
Q. Okay. And neither one of these detectives themselves disclosed to you -- my apologies, I'm trying to be quick -- but detective and sergeant, neither one of them disclosed to you that Peter Dignan and Sergeant Byrne had beat Mr. Alonzo Smith with a rubber hose and had bagged him in the basement of Area 2, correct?
A. I have not heard that until today.
Q. All right. And that's true even though Alonzo Smith's trial was pending at the same time as Mr. Wrice, right? You had never heard this information, correct?
A. Pending where, Counselor?
Q. In the Circuit Court of Cook County in the building that you worked in.
A. There were 30 something building -- 30 something courtrooms in that building. I had anywhere from 250 to 350

cases on my call. I was required to have two cases ready for trial, for jury trial every Monday with Justice Thomas Fitzgerald. I was working on the cases in my courtroom. I don't think I've ever even heard the person's name that you said until you mentioned it today.
Q. Okay. Just making clear that you didn't have the information to disclose --
THE COURT: That was -- the answer certainly said no, she did not, so let's move on.
MS. BONJEAN: Okay.
BY MS. BONJEAN:
Q. All right. Let's talk about a couple of other things here.
In addition to Mr. Wrice's own words, which were offered as evidence from the prosecution -- you would agree with that? However you characterize it, it was evidence that came in through the prosecution, right?
A. Yes.
Q. Okay. And you also presented two witnesses who pointed the finger at Mr. Wrice, correct?
A. Yes.
Q. And one of those individuals was a person by the name of Kenny Lewis, right?
A. Kenneth Lewis, yes.
Q. And according to you, you did not identify Kenny Lewis as

a witness against Stanley Wrice until a few days before Mr. Wrice's trial, correct?
A. That's correct.
Q. And according to you, you found him because you were randomly knocking on doors all by yourself in the neighborhood less than a week before the trial, right?
A. That's not exactly correct, Counsel. That wasn't what I had said.
Q. What --
A. I said I was preparing for trial.
Q. But when you -- you were preparing for trial by walking around the neighborhood alone, correct?
A. I was preparing for trial. I was in a car. I wanted to go to the scene to where the liquor store was on the corner, to go east a half a block to Chappel to see the parking lot that was between Chappel and Jeffery where the sergeant said that the car was parked. And I then wanted to go by the front of Stanley Wrice's and Patricia and Charles's house to see it. I wanted to go from 76th and Jeffery where the gas station was on the northeast corner where the gentlemen saw the victim, and I wanted to go on the southeast side of Jeffery at 76th and down the alley where she came down to see if I could see houses with cyclone fences and a small window at the top.
And so I did those things in preparation for trial so that when I came to court, I could tell the jury and present

02:58:53
02:59:12
02:59:28
02:59:43
03:00:06

to the jury a visual of the area so they could see where everything was located.
Q. Okay.
A. I then -- when I was on 76th -- I'm sorry -- 75th and Jeffery -- I'm sorry, 76th and Chappel -- I don't know why other than I thought to myself, somebody had to see something. Somebody had to hear something. This was a very middle class, very middle class neighborhood, and I just started knocking on doors.
Q. Okay. How many doors did you knock on?
A. I don't know how many doors I knocked on.
Q. More than one?
A. Yes, certainly, because I started at the corner.
Q. All right. Well, let's -- we have a map. Maybe you could help us.
A. I would never be able to say how many doors I knocked on, but I could certainly look at a map.
Q. We're going to look at Plaintiff's Demonstrative Exhibit A. Okay.
You could orient yourself, Ms. Lampkin.
A. All right.
Q. Do you see the home located at 7618 South Chappel down at sort of the lower quadrant of --
A. Yes.
Q. Okay. That's the Wrice residence, right?

03:00:20
03:00:39
03:00:48
03:01:04
03:01:13

A. Well, that's what you've got it marked. I don't know if that's the Wrice residence or not.
Q. Okay.
A. If this is 76th Street, you've got like seven houses between 76th, 176, 18. That's unusual to get seven houses in that --
Q. Are you suggesting my demonstrative exhibit is inaccurate?
A. I'm not saying if it is. I'm just saying in my experience, you don't get that many houses. That's what your exhibit shows.
Q. Well, you can't tell us it's less than seven houses, right?
A. I can't tell you unless I went back there and counted them today.
Q. Okay. So does the address sound right, 7618 South Chappel, for Mr. --
A. That was the home of Stanley Wrice, Charles Wrice, and Patricia Wrice.
Q. Okay. And do you see where Kenny Lewis's home is located on this map?
A. Yes.
Q. And that address is 7526 South Chappel?
A. Yes.
Q. So tell me if you're able to --
MS. BONJEAN: Is she able to write on this? Is she

able to write on it?

BY MS. BONJEAN:

Q. Show us where you started knocking on doors.

A. I don't know where I started knocking on doors.

03:01:27 MS. BONJEAN: Oh, can you show it to the jury? Sorry.

BY MS. BONJEAN:

Q. I'm sorry. You said you don't remember where you started knocking on doors?

03:01:39 A. I don't remember where I started knocking on doors.

Q. Okay. And you don't know whether you knocked on all the doors between those two houses, right?

A. I don't know where I started, so I couldn't possibly say if I knocked on every one of those doors.

03:01:52 Q. But it was just random that you found him, right?

A. I knocked on the house at 7526 Chappel, and a woman answered the door.

Q. And that --

MS. JACOBS: Your Honor, before we go further, and I 03:02:07 hate to be technical about this, but I have no understanding that this document has ever been authenticated or put into evidence. So I'm not sure we should be publishing it to the jury.

THE COURT: What --

03:02:19 MS. JACOBS: This map. I don't remember anyone

authenticating this map.

MS. BONJEAN: It's for demonstrative purposes. If it doesn't help Ms. Lampkin, if she's saying it doesn't look like it, then --

THE COURT: All right. It doesn't help, so --

BY MS. BONJEAN:

Q. This is inaccurate. Do you have issues with the accuracy of this map?

A. I just said, Counsel, I don't know how many houses are on 76th and Chappel. I know that Jeffery on this map runs east and west -- I'm sorry -- north and south. I know that a block east of Jeffery is Chappel. I know that the liquor store is on the -- is on the corner of 75th and Jeffery on the southeast corner.

Q. Does that look right then?

A. It looked -- I mean, you have it. I'm assuming that -- I'm trying to see if --

Q. You know what, take it down. If it's not helpful, we don't need you looking at it.

My question, though, was you found Mr. Lewis by randomly knocking on doors, correct?

A. I randomly knocked on doors, and a woman answered the door.

Q. Okay. And you didn't bring an investigator with you, right?

A. I don't recall having anyone with me.
Q. You don't -- do you recall an investigator preparing any type of report in connection to your interview or discussion with the woman at the door?
03:03:53 A. If there wasn't an investigator with me, there would be no investigator to prepare a report. Of course no investigator prepared a report of what I did.
Q. Okay.
A. And I -- I mean, I might have -- well, I would have had my
03:04:13 own investigator, not a police officer. The state's attorneys have investigators that can go around with them, but I don't remember an investigator going around with me. I was not at all afraid of this neighborhood.
Q. That's fine. But investigators serve another purpose than
03:04:29 for safety reasons, right?
A. They can serve other purposes, yes.
Q. Right. They can be present when you actually interview witnesses so that you don't make yourself a witness in a case, right?
03:04:40 A. I didn't make myself a witness in the case.
Q. I asked you a different question. I said one of the purposes of an investigator and one of the reasons the Cook County State's Attorney's Office has investigators is so they could accompany attorneys on interviews and witness what
03:04:54 witnesses say, correct?

03:05:07
03:05:28
03:05:37
03:05:49
03:06:05

A. That is how some people have used investigators, yes.
Q. And you've used investigators that way in the past, correct?
A. I don't remember using an investigator to go out and to sit with me with an interview. I normally interview my witnesses in my office, and I would have a lawyer, a prover, to be there with me so when I interview somebody, if they said something different when they were on the stand, then I would have a lawyer to be able to get on the stand and say they are not telling the truth.
Q. Right. And an investigator can serve the same purpose particularly if you're out in the field, right?
A. They certainly can.
Q. So you knocked on this door, and you saw a woman. You met a woman, right?
A. Yes.
Q. And this was Kenny Lewis's mother, correct?
A. I can't say she was Kenny Lewis's mother. I talked to a woman. I told her what I was doing, what I was preparing for, and she said, "My son was there."
Q. Okay. Any reason to believe she would call someone her son who wasn't her son?
A. None whatsoever, but she didn't say she was his mother. She said, "My son was there."
Q. And you could infer maybe that it was his mother if she

called him her son?
A. Yes, I could infer that, Counsel.
Q. Okay. And you told her that you were investigating or preparing for trial? How did you introduce yourself to her?
03:06:20 A. I know I would have told her that my name was Bertina Lampkin, that I was an assistant state's attorney and that I was getting ready to try a case regarding something that had happened. I don't know if I said down at the Wrice house. I don't know if I said in the 7600 block of Chappel. I would 03:06:39 have said something like -- you know, I wouldn't graphically tell her what happened, but I would say something to her. And whatever I said to her about the incident, she said, "My son was there."
(Counsel conferring.)
03:07:00 BY MS. BONJEAN:
Q. But you told her generally what you were there for, correct?
A. I don't know what I said to her. I don't remember everything that I said to her other than that I was preparing 03:07:16 for trial for an incident that had occurred down the block or on 76th and Chappel, maybe.
Q. Okay.
A. But she said to me, "My son was there."
Q. She said, "My son was there," right?
03:07:28 A. She said, "My son was there."

Q. Indicating she knew something about this incident, right?
A. She said, "My son was there."
Q. Her son was at this brutal gang rape and burning of this woman down at the house. She told you that, right?
03:07:42 A. She didn't say that at all. She said, "My son was there."
Q. Okay.
A. And I said, "Who is your son?"
Q. Now, and you said this happened four days beforehand?
A. No, I did not say that.
03:07:55 Q. How long was it?
A. From looking at the transcript, Kenny Lewis testified that I didn't know him before four or five days before the trial. But I had talked to his mother, I don't know how many days before that. Maybe two. Maybe four. I don't know. Once I 03:08:14 talked to his mother and she said her son was there, I said, "Where is your son?" She said, "At work." I asked her what his name was, and I said, "Would you have your son call me?" I gave her my number, either on a card or I wrote it down, and I went back to my office. And I don't know if it was that 03:08:35 day, the next day, or two days later or three days later that Kenneth Lewis called me. But it was certainly, as he said, once we met, he testified three -- I'm sorry -- four or five days thereafter.
Q. So a week or less, right?
03:08:58 A. I can't say quite a week because I'm not sure how long it

03:09:15
03:09:30
03:09:49
03:09:59
03:10:12

took for him to call me, how long it took for him to get to my office to interview him.

Q. What's the outer limits of what it would be?

A. I would probably say seven or eight days.

Q. Okay. A week. Isn't a week seven days? A week or eight days, right?

A. That's my best estimate, Counsel.

Q. All right. Now, Ms. Lampkin, you actually knew Kenny Lewis's name and address five months earlier, right?

A. I had no recollection of Kenny Lewis's name. When you questioned me before, I said I thought I had seen it in a report, but I did not know that his name -- where his -- where I had seen his name.

Q. You previously testified under oath, right?

A. Yes.

Q. At an evidentiary hearing in 2013, correct?

A. Yes.

Q. And you previously testified under oath that you thought you saw his name in a police report, correct?

A. I said -- at first I think I said I saw his name in a report.

Q. A report.

A. Then I said -- and it may have been in response to a question somebody saying a police report. I thought I saw his name, and I think I said I'm almost certain I saw his name in

a police report.
Q. Right.
A. I saw his name somewhere, yes.
Q. Okay. So you saw his name somewhere in a police report. You testified to that, right? Do you believe that to this day?
MS. JACOBS: Your Honor, that mischaracterizes the testimony.
MS. BONJEAN: She just said that.
THE COURT: Wait. Wait. Hold on. Let me see.
Overruled. She may answer.
BY MS. BONJEAN:
Q. Do you believe that to this day?
A. I -- do I believe that -- to this day that I saw his name in a police report?
Q. What's your position today? Do you think you saw it in a police report, you don't think, or you don't know? Just which one is it?
A. I said I thought I saw his name in a report. And I said I was almost certain it was a police report. I subsequently learned I saw his name on an answer to discovery, but I did see his name.
Q. Okay. So let's look at that answer to discovery. You're talking about Mr. Savage's answer to discovery, correct?
A. Yes.

03:12:06
03:12:29
03:12:47
03:13:08
03:13:28

Q. Okay. Take a look at that.
A. All right. Is there more pages or just this one page?
MS. BONJEAN: Go back to the first page.
BY MS. BONJEAN:
Q. Can you tell the ladies and gentlemen of the jury what an answer to discovery is, just generally?
A. All right. Well, by law, the state has to file an answer to discovery listing every witness that they may call in a trial. You could put every police officer that was involved in the case, every doctor, every evidence technician, all of the witnesses. I might have an answer to discovery, like on this case, with 50 witnesses on it because you have to give the other side notice of any possible witness that you would have.
The same goes for the defendant's answer to discovery. He has to list or she has to list every witness they may call. It doesn't mean that you have to call any of them, but you may -- that they may have to call as witnesses.
In addition, under certain circumstances, say if you said you had an alibi defense, you would have to list where the alibi was and who the witnesses were to the alibi. If you didn't list those things on the answer to discovery, then you could not call any of those witnesses.
Q. All right. So the answer to discovery lets the other side know who your witnesses are, right?

A. Or who the potential witnesses are, yes.
Q. Okay. And it also gives the other side the opportunity to investigate and to go talk to those witnesses to find out for yourself what they're going to say, correct?
03:13:42 A. That's correct.
Q. And as a prosecutor, you want to know who the defendant's witnesses are, right?
A. Yes.
Q. And certainly in a case like this where the incident
03:13:51 happened in one location where all the co-defendants allegedly were, you would be interested in knowing who the witnesses are that were identified by Mr. Benson, right?
A. When I was trying Mr. Benson's case, I certainly would.
Q. You would be interested in knowing that for Mr. Wrice's
03:14:09 case.
A. I can -- I can say it this way because I didn't see this answer to discovery, or I did not utilize this answer to discovery. I didn't realize this answer to discovery was in the file until I found Kenny Lewis.
03:14:30 Q. So this was filed on December 23, 1982, right?
A. That is correct.
Q. And when Mr. Savage, the wonderful attorney, defense attorney that you said you respect greatly, he handed you a copy of it, correct?
03:14:46 A. I would have to see the half-sheets from December 23rd to

see if I was there. He would have -- what he was required to do is when he filed this answer to discovery, a copy would go in the court file, a copy would come to the prosecutor, and a copy would be given to all three of the defendants' lawyers.
03:15:08 Q. Right. And this is a very important document because it's the defendants saying these are the witnesses, these are people who have information about this terrible crime that happened, correct?
A. I don't know what they were. These are witnesses that he
03:15:26 may call to testify. That's what it says.
Q. And you had it at least in your court file or -- strike that.
It was filed on December 23, 1982, five months before you were getting ready for Mr. Wrice's trial, right?
03:15:40 A. That is absolutely correct.
Q. Okay. And it's your testimony that even though you had in the court file at your -- at your disposal the name of a witness and his address, it's just a coincidence that you also happened to randomly find him knocking on doors a week before
03:16:00 trial, right?
A. That is absolutely correct. I was preparing for Stanley Wrice's trial. He had witnesses on his answer to discovery. These witnesses were not on his answer to discovery. Rodney Benson was not getting ready to go to
03:16:19 trial. I had just finished motions to quash arrest. I'll

limit it to the motion to suppress statements two days before I started the trial on -- on Stanley Wrice.

Q. Right.

A. So I had not looked at Rodney Benson's case or who his witnesses were. When I was getting ready to prepare for Rodney Benson's case, I would have gone to look at his witnesses. I couldn't call Mr. Benson's witnesses in Mr. Wrice's case unless I had put them on my answer to discovery, and I didn't put them on my answer to discovery until I found Kenny Lewis. When I found Kenny Lewis and I realized that there was this answer to discovery by Mr. Savage, he had six witnesses on his answer. I listed all six of those witnesses on my answer to discovery because I didn't know if they would help my case or not. But if I didn't list them, I couldn't call them.

Q. Right. But your testimony is that it's just a coincidence that you randomly found the person that was already on Mr. Savage's answer; is that right?

THE COURT: She said yes. You asked that question about two minutes ago, and she said yes, it was a coincidence.

BY MS. BONJEAN:

Q. Now, it wasn't Mr. Savage who amended his answer to discovery upon your finding of Kenneth Lewis, right?

A. That is correct.

Q. It was you amending, allegedly you amending your answer to

discovery after finding this, right?
A. I did amend the answer to discovery after I saw Mr. Savage's answer to discovery.
Q. But you testified at your deposition to the opposite of that, right?
A. That is -- well, not exactly the opposite. I think that I said I amended my answer to discovery, and I told Mr. Benson -- Mr. Savage, and he amended his answer to discovery. I was mistaken. I didn't have the documents in front of me. I made a mistake.
Q. Do you remember being asked this question and giving this answer at your deposition, Ms. Lampkin:
"Q. Did you make an attempt to call Mr. Benson as a witness against Stanley Wrice? I know he was still accused at the time, but were there any discussions about him testifying against Stanley Wrice?
"A. I don't recall. I mean, if his lawyer had approached me for that, it certainly would have been something I would have considered. But I don't remember Howard Savage approaching me on that. I remember Mr. Savage amending his answer to discovery on Rodney Benson's case and adding Kenneth Lewis after I told him what Kenneth Lewis said. And so I don't know."
MS. JACOBS: Your Honor, this isn't impeachment. They've already been over this.

THE COURT: I'll let it stand. Let's move on. The jury has now heard both versions.

MS. BONJEAN: Okay.

(Counsel conferring.)

03:19:34 MS. BONJEAN: Hold on one second.

(Counsel conferring.)

MS. BONJEAN: Okay. Thank you.

BY MS. BONJEAN:

Q. Did you interview Kenny Lewis when you had --

03:20:14 A. I'm sorry. I can't hear you, Counsel.

Q. Did you interview Kenny Lewis after he called you at some point?

A. Kenny Lewis came in, and I talked to Kenny Lewis, yes.

Q. Okay. And did he tell you that he had had sex with Karen 03:20:28 Byron up in the attic?

A. No, he did not.

Q. If you knew he was a co-conspirator rather than just a witness, would it have affected your view of what he had to say about what the incident -- what occurred?

03:20:41 MS. JACOBS: Object to form of the question.

THE COURT: Well, she can answer.

BY THE WITNESS:

A. If I knew he was a co-conspirator?

BY MS. BONJEAN:

03:20:49 Q. Yes.

A. Do you mean in everything? I'm not sure what you're saying.
Q. You're not suggesting Ms. Byron was -- had consensual sex up in the attic, are you?
03:20:59 A. No, I am not.
Q. Okay. So if Kenny Lewis had sex with her, that wouldn't have been consensual sex, correct?
A. That would be my position.
Q. So that would qualify him as a co-conspirator in a rape of
03:21:13 Karen Byron, correct?
A. That's correct.
Q. Okay. And did you have that information at the time that you spoke to him?
A. I don't have any information that Kenny Lewis had sex with
03:21:27 Karen Byron.
Q. And he didn't tell you that, correct?
A. He did not tell me that.
Q. Remember during those postconviction proceedings I asked you to see if you could track down that police report? Do you
03:21:39 remember me asking you to do that?
A. I remember you asking me to do that, and I said -- or the state said all the discovery had been tendered to you.
Q. Right. And you have not been able to find that police report, right?
03:21:54 A. I didn't look for it, Counsel.

Q. Kenny Lewis actually didn't testify that Karen Byron was raped, did he?
A. You mean use the word "rape"?
Q. Yeah.
03:22:20 A. Kenny Lewis testified that he saw Rodney Benson having sexual intercourse with the woman. He said that after Rodney Benson got off the woman, Little Mike got on her. And then he said after Little Mike got off of her, the bike rider got on her, and somebody was going toward her face. And then she
03:22:54 started getting beaten, and he went downstairs.
Q. Right. He never said that she was raped or that it was a nonconsensual act. He didn't tell you that, right?
A. He didn't use the word "rape." He didn't use the word "nonconsensual." He said three different men got on this
03:23:18 woman and then got off of this woman.
Q. Right.
A. And then someone went toward her head, and then she started to get beaten.
Q. Okay. And we agree that that constitutes rape. You're
03:23:32 not backing off that. You don't think those were consensual acts, right?
A. I absolutely don't think they were consensual acts.
Q. I want to ask you about Bobby Joe Williams 'testimony, if I could.
03:23:54 A. All right.

03:42:18 — timestamps omitted

THE COURT: Is this a good time to take a recess?
MS. BONJEAN: Sure.
THE COURT: We'll take a 15-minute recess.
(Recess.)
(Proceedings heard in open court. Jury out.)
MS. BONJEAN: I want to make the record perfectly clear that on the issue of Mr. Wrice's criminal background, the Court has now allowed evidence to come in through Ms. Lampkin that Mr. Wrice has been convicted -- had been convicted of three armed robberies prior to this.
And my understanding of the Court's ruling is that because the plaintiff has mentioned Mr. Benson's sentence of probation that somehow this has put a sentencing disparity into play. And I want the record to be clear that our position is not that this is about sentencing. It's not about a sentencing disparity at all. It's about the deal that Rodney Benson says he had which is really a very different issue.
It's not about -- we would never say that a 100-year sentence is inappropriate if the person actually did what Mr. Wrice is convicted of. We're not saying that. We're not even saying that probation would be inappropriate under certain circumstances.
THE COURT: Okay. So you're objecting to that. And your objection is overruled. So we will proceed.

Bring the jury in.
MS. BONJEAN: I'm asking, Judge, can we --
THE COURT: I understand the point.
MS. BONJEAN: Can I get a limiting instruction? It's highly prejudicial to have a jury hear that he has three prior armed robberies. It has nothing to do with this case. It's complete propensity evidence. And it explains the sentencing, which is not at issue. We're not saying he was over-sentenced. We're saying he didn't do it. That's not what we're saying.
MS. JACOBS: Yes.
THE COURT: Well, the implication -- well, okay. The implication is that you did. So anyway, that's the ruling of the Court.
Bring the jury in, please.
MS. BONJEAN: So can we have a limiting instruction?
THE COURT: No, not at this point. We may later.
Judy, bring the jury in, please.
(Proceedings heard in open court. Jury in.)
THE COURT: Please be seated, everybody.
And you may conclude your direct examination of Ms. Lampkin.
MS. BONJEAN: Thank you, Judge.
BY MS. BONJEAN:
Q. Ms. Lampkin, another witness who testified at Mr. Wrice's

criminal trial was Bobby Joe Williams, right?
A. Yes.
Q. Okay. And that was Patricia Wrice's boyfriend and the father of her two kids, correct?
03:46:33 A. Correct.
Q. All right. And prior to Mr. Williams testifying, you had the opportunity to look at the police reports in the case and all of the material that the detectives had prepared about their interviews with Mr. Williams, right?
03:46:49 A. I had an opportunity to look at all of the discovery, yes.
Q. And the Assistant State's Attorney McCurry had also prepared a memorandum of some type as it relates to Bobby Joe Williams' statement; is that right?
A. Probably. I don't remember seeing the state's attorney's
03:47:08 memo in any of the discovery, but the district attorney certainly let me see it.
Q. Okay. You would have looked at any report that memorialized his statements to the police, right?
A. If there was a statement from the state's attorney or
03:47:24 anyone else memorializing, what's --
Q. Bobby Joe.
A. -- Bobby Joe's statement to them, I would have certainly read it.
Q. Okay. Now, you never saw a handwritten statement from
03:47:37 Bobby Joe Williams, like anything that he signed himself,

correct?
A. My understanding is Bobby Joe gave an oral statement.
Q. Right, a statement that Detective Dignan had written down in a police report, correct?
03:47:53 A. There was a synopsis of an interview of Bobby Joe Williams in the police report. I looked at it. It's about three inches wide -- I mean, three inches in total, a synopsis of Bobby Joe Williams' testimony.
MS. BONJEAN: Can we have just -- put it up for
03:48:13 identification purposes?
BY MS. BONJEAN:
Q. Is this what you're referencing --
A. Yes.
Q. -- Ms. Lampkin? Okay.
03:48:32 You can take it down.
So that was a summary of the statement that Bobby Joe Williams purportedly gave to the detectives, Detective Dignan and I believe Dioguardi as well, correct?
A. Correct.
03:48:48 Q. And you had access to that statement when you sat down with Mr. Williams prior to him testifying, right?
A. Certainly.
Q. And you actually did speak to Mr. Williams before he testified, right?
03:48:57 A. I spoke to Mr. Williams at least twice, probably more.

Q. Okay. His memory is a little hazy about that, but you're here testifying to the jury that you did sit down and talk to him prior to his testimony, correct?
A. I know I did. It was on the record. I made a record of the fact that I talked to him at least twice, but I know I talked to him more than twice.
Q. Okay. And he never told you that he was beaten by Detective Dignan or Sergeant Byrne, right?
A. He never did.
Q. And he never told you that the statement that he gave to Detective Dignan or Sergeant Byrne was a false statement, correct?
A. No, he did not.
Q. Okay. And you went through what he -- you prepared him for his testimony, and he gave his testimony, correct?
A. I didn't prepare him for his testimony. I asked him to tell me what happened. He told me what happened. I tried not to stop him. This is on one of the interviews. Then I went back, I asked him questions and had him answer the questions that I asked him so I'd know what he would say. Otherwise, I wouldn't know what he would say when he was on the stand.
Q. Right. But you had the benefit of his statements to the detective -- to the detectives, correct?
A. I had the benefit of, as I said, a synopsis, a three-inch synopsis of his statement.

03:50:35

03:50:53

03:51:06

03:51:26

03:51:38

Q. Three-inch, what do you mean by that?
A. I mean that what the police typed up on that police report, I put my finger on it to see how long it was, and it was this long, which is a little bit shorter than three inches. And he testified on my direct examination for 48 pages. So certainly, everything he said to me was not listed in that three inches.
Q. Right. And a lot of what he said, he doesn't claim was false testimony as well, right?
A. He didn't claim anything was false testimony.
Q. Well, you didn't -- understood. He didn't tell you that it was false testimony. And did he express any reservations to you about testifying?
A. He did not.
Q. Now, so he's -- according to him, if he says that, you just -- that's just not the case. Is that my understanding?
A. If he says that what?
Q. If he says that he expressed reservations about testifying, your memory is that he never expressed any reservations about testifying; is that right?

MS. JACOBS: Objection. I don't think that characterizes the record properly, whether he expressed them to her or just had them.

MS. BONJEAN: He testified. I think the jury remembers what he testified to so...

THE COURT: Overruled.

THE WITNESS: I'm not sure what the question is again.

BY MS. BONJEAN:

03:51:47 Q. We'll move on. Ms. Lampkin, isn't it true that you negotiated a deal with Howard Savage whereby Rodney Benson would testify against Mr. Wrice in exchange for a sentence of probation?

A. Of course not.

03:52:04 Q. You say "of course not," but Mr. Benson was charged with the same crimes that Mr. Wrice was, right?

A. That is correct.

Q. And he did, in fact, get a sentence of probation, correct?

A. That's true.

03:52:18 Q. And that you actually stood up on that guilty plea and ultimately approved his sentence of probation, right?

A. I came back to the building maybe seven, seven months later from juvenile and I -- and he got that sentence from, I think, Judge Hett.

03:52:41 Q. But you signed --

A. I agreed to the sentence.

Q. Right. You agreed to the sentence --

A. Yes.

Q. -- of probation.

03:52:48 And --

A. It wasn't just probation, but it was --
Q. It was like a -- he didn't do any time, right?
A. He did a year of work release which meant he went in jail every day after he worked, and he would be -- if he wasn't working on the weekends, he'd be in the jail on weekends.
Q. Okay. And did you originally agree to a sentence of probation but you got mad because he had made some disparaging comments about the victim in the hallway at 26th Street?
A. Who are you talking about? Mr. Benson?
Q. Yes.
A. I never saw Mr. Benson or heard any remarks of Mr. Benson in the hallway or anywhere else.
Q. Okay. And according to you, you never met with Mr. Benson face to face; is that right?
A. Mr. Benson was in the courtroom with his lawyer, with the other defendants on the days they were all up with their lawyers, with the judge, and either myself would have been in the courtroom or my partner Terry or my third chair. One of us would have been in the courtroom.
So yes, I was in a courtroom at the same time Mr. Benson was there. I have never had a conversation with Mr. Benson nor would I be allowed to have a conversation with Mr. Benson.
Q. Well, did you have a conversation with Mr. Benson and his attorney, Howard Savage, in the offices of the Cook County

state's attorney whereby you agreed to give him a sentence of probation in exchange for his testimony against Mr. Wrice?

A. Absolutely not.

Q. Okay. So Mr. Benson is not being honest about that, right?

03:54:25

A. Mr. Wrice was tried in May. I had him plead guilty in January, six or -- seven or eight months later. How could I be offering him probation to testify in a case that he did not testify in?

03:54:37

Q. Right. He didn't ultimately testify, right?

A. He didn't. He was never asked to testify.

Q. I understand. So you're saying that he's not -- he's being less than truthful about that when he says he had a deal whereby he sat with you in his -- in your office and got a sentence of probation if he agreed to testify against Stanley Wrice?

03:54:53

A. I'm saying he's an outright liar.

Q. Rodney Benson is a liar, right?

A. He's an absolute, total, and complete liar.

03:55:07

Q. Okay. But he did get probation?

A. He got -- I can't remember the amount of probation, but I think 30 months or so with a year of work release. He had no background. And that's what the victim wanted.

Q. Oh, you never testified that's what the victim wanted before, have you?

03:55:25

03:55:43 03:56:07 03:56:23 03:56:41 03:56:49

A. I testified that if I gave that sentence, I probably talked to her about it. Now I know that because I read transcripts. I didn't know that Mr. Fowler and Mr. Benson were pleading guilty because I was gone from the building. When they pled guilty in December of 1983, I have subsequent to the time I was deposed by you for two and a half hours read that transcript.

Terry Gillespie said in front of the judge he had talked to Karen Byron, and Karen Byron was in agreement with the sentence for Lee Holmes and Michael Fowler. Mr. Savage represented that he wanted probation that day. And Mr. Gillespie said, "I won't give that today. I want to talk to Bertina first."

Q. Okay.

A. And so obviously, he talked to me, and I came in a month or so later. And that was the agreement that Terry started working out with Mr. Savage, and I agreed with it.

Q. But and so you would agree then that actually Lee Holmes got probation, too, right?

A. Let me see. Which one is Holmes? Lee Anthony Holmes, he was the one who was 17 --

Q. Right.

A. -- at the time of the offense with no background. Yes, he did.

Q. Well, 17, not much time to have a background, right?

03:57:01 03:57:14 03:57:27 03:57:43 03:57:57

A. I'm sorry? Well --
Q. He was just --
A. Certainly, he could have had a juvenile background.
Q. Well, did you have access to his juvenile background?
A. Certainly, we would have had access to his juvenile background.
Q. Okay. And --
A. The prosecutors, of course, can get the background. And if they had a juvenile background, we have to give it to the defense.
Q. All right. And Mr. Fowler got four years in the Illinois Department of Corrections, correct, because he had a pretty significant background?
A. He didn't have a significant background. He had one prior conviction, and he was on probation for that conviction. And so the judge gave him four years in the Illinois Department of Corrections, Judge Hett. I was not there, but I read the transcript.
Q. And the prosecutor agreed to that. That was a negotiated plea deal. It wasn't Judge Hett giving that, correct?
A. Judge Hett had to agree with the disposition, and he said he would agree with it because somebody else was the major player in this case, not the two of them.
Q. Right. But Judge Hett didn't preside over the case, correct?

A. He heard the factual basis for the plea.
Q. The factual basis that the prosecutor provided to him, correct?
A. That would be the only way he'd get a factual basis.
03:58:06 Q. Right. And so if Rodney Benson testified that, "The prosecution wasn't interested in us or me, they were interested in Stanley Wrice," that's apparently true, right?
A. That is not true, that there was never any discussion with Rodney Benson about him assisting the State or giving him any
03:58:27 kind of deal or anything like that. I have never talked to Rodney Benson. As God is my witness, I have never talked to Rodney Benson.
Q. Okay. Now, Mr. Wrice, of course, was convicted, right?
A. Yes.
03:58:50 Q. And he received a sentence of 100 years, correct?
A. Yes, he did.
Q. And that was partially because of the heinousness of the crime, correct?
A. That was a part of it, yes.
03:59:00 Q. And he also had a criminal background, correct?
A. Yes.
Q. And he had some armed robbery convictions in his background; is that right?
A. He had three armed robbery convictions in his background.
03:59:09 Q. And he pled guilty to all three of those on the same day,

correct?
A. Yes, he did.
Q. And he went to the Illinois Department of Corrections and served his time, right?
A. He went to the Illinois Department of Corrections, and he served the time that -- and then was paroled, yes.
Q. Right, exactly. And so both those things contributed to his 100-year sentence, right?
A. He was extendible. The judge -- and Judge Fitzgerald said why he gave him the sentence.
Q. Right. And both those things were contributing factors, correct?
A. There were other -- yes, those were some of the things that were contributing factors.
Q. Okay. And certainly Stanley Wrice -- strike that.
Karen Byron testified to other men doing a lot of terrible things. Stanley Wrice wasn't responsible for all of that, in your mind, was he?
A. She didn't testify to a lot of people doing a lot of different things to her. She said, "One man got on me. Another man -- that he got off, another man got on me and somebody else got off. Another man got on to me, then got off. Somebody took me by my hair and pulled my hair and pulled my mouth open and put their dick in my mouth and said, 'Suck my dick, bitch.'"

She didn't know who was doing that. And she was beaten about her body. I don't know how many people were beating her. She said she passed out. She had over 100 bruises on her body. So she never knew how many people were on her. She just said she saw a room full of men.
Q. Right. A room full of men.
A. Yes.
Q. And she never identified any of them, correct?
A. Yes, she did identify them originally. She identified one person originally.
Q. Okay. She never testified at trial that any of these people -- she never identified anybody at trial who did this to her, did she?
A. She could not at trial.
MS. BONJEAN: Okay. Judge, I think I'm done with my cross-examination -- or direct examination, but can we have a quick sidebar before we start her...
(Proceedings heard at sidebar:)
THE COURT: Yes.
MS. BONJEAN: I would move for a mistrial based on these clear antics that are going on with Ms. Lampkin trying to get in clearly coached by the defense that Mr. Wrice was identified. He was --
MS. JACOBS: You asked --
MS. BONJEAN: No, no, I didn't.

04:02:04
04:02:14
04:02:22
04:02:30
04:02:44

THE COURT: Wait, wait.

MS. BONJEAN: I didn't. I said she never testified. Nobody -- the woman did not identify her.

THE COURT: Well, if she didn't testify correctly, that's one thing. The motion is denied.

So you're finished with your cross. So we now -- your direct, so we now have the cross.

MS. JACOBS: Your Honor, the question was she never identified --

THE COURT: I just denied the motion.

MS. JACOBS: So can I ask about the ID?

MS. BONJEAN: No.

THE COURT: What?

MS. JACOBS: I want to ask about the ID. She asked --

THE COURT: No, no, we're not going to go into the ID.

MS. JACOBS: She never identified anyone --

MS. BONJEAN: There was no ID.

(Proceedings heard in open court:)

THE COURT: We're not -- proceed with your examination. It's my understanding you're in part calling Ms. Lampkin as your witness also; is that correct?

MS. JACOBS: Yes, Your Honor.

THE COURT: Yes. All right. So we'll conclude with

Ms. Lampkin. Proceed, Ms. Jacobs.

MS. JACOBS: Thank you.

CROSS-EXAMINATION

BY MS. JACOBS:

04:03:10 Q. Ms. Lampkin, good afternoon.
A. Good afternoon.
Q. I know it's been a long day and --
A. I'm fine, counsel.
Q. You're okay?
04:03:18 A. Yes.
Q. I'd like to get a little bit more into your background than Ms. Bonjean got into. Could you tell the jury a little bit about what kind of teaching you do in the law field?
A. All right. Well, I became a judge in 1987. And then from 04:03:42 1987 to 2009, I taught judges across the state of Illinois in various aspects of criminal law and procedure, jury instruction, how to take a guilty plea that was accurate.

I helped to create the capital litigation trial bar which was a bar created to make sure that defendants who were 04:04:11 charged with murder had the best representation that they could have. And then for ten years, I taught lawyers and judges across the state on how to try death penalty cases.

We didn't have DNA when I started as a lawyer. And I think in maybe 1992 as a judge, we started accepting DNA 04:04:37 evidence, and so I taught judges across the state in seminars,

DNA evidence, how you could introduce it into evidence, its reliability, fingerprint evidence, those kind of things.

I taught from 2- -- I'm sorry, from '89 to 2009. And then when I was appointed to the appellate court, I started doing cases from murders to municipal law to tax cases. I had a tremendous amount of other kind of law that I had to read, so I stopped teaching.

And then three years ago, I started teaching at the appellate court level, teaching appellate judges on various aspects of the law. I just finished creating a trial bar for the office of the state appellate. They had about a 3,000-case backlog for the last several years, and I was asked by the Supreme Court for a suggestion of what to do. And I came up with getting a pro bono representation from these bigger law firms to represent them so they get the best kind of reputation -- representation possible.

And it was announced February -- I thought it was going to be here. It was announced February 11th by the Supreme Court that I had -- that they were instituting a new program, and they thanked me for it. I will be -- I will be teaching at the ABA in April on other subjects I taught around the state on different areas.

Q. And you did mention a couple of bar associations. Without going into detail, just what other bar associations and bar councils have you been a member of?

A. Well, besides being a member of the Cook County bar -- and I had two offices, I served in two various offices there -- and the Chicago Bar Association. I'm a member and have been a member of the National Bar Association, the Black Women Lawyers Association, the Women Lawyers Association of the State of Illinois, the Illinois State Bar Association. I'm trying to think if I've got everything.

Q. The National Bar Association?

A. Yes, the National Bar Association, yes.

Q. And what nonlegal activities are you involved in of a religious or charitable nature?

A. All right. Well, I'm a member of the Methodist church.

MS. BONJEAN: Judge, I'm going to object to the references to religion. We know that Ms. Lampkin is a -- takes that, but I don't think it's --

THE COURT: Overruled. Let's move on.

THE WITNESS: Okay.

BY MS. JACOBS:

Q. Just briefly.

A. Oh, certainly. Well, I'm very active in the Methodist church on a local level and a national level and an international level. I've been a delegate to two world conferences for the Methodist denomination. I'm a judge on the Methodist court for the last -- since 1986. I do a lot of speaking at churches and things like that. I could go on, but

I think I'll stop.
Q. Are you a foster parent, also?
A. I was a foster parent, and my foster parent -- I mean, my foster child is like my child. She's 32 with three kids and has my car. So I just gave her my car because hers got destroyed.
Q. And when you said you were familiar with the neighborhood where Stanley Wrice's house was, can you describe how you got that familiarity with that neighborhood near Stanley Wrice's house?
A. Certainly. Between 1976 and -- well, I bought a home in 1981 in Roseland but before then, between '76 and '80, I lived either in Hyde Park at 50th and Blackstone or I lived at 82nd and Jeffery, which is only five blocks up. And I rolled up and down Jeffery every day, back and forth to work.
I was familiar with where the gas stations were. I was familiar where the liquor store was. I had gone to the Brown's Chicken that was on the northeast corner of 75th and Jeffery.
There's a church on Jeffery between 78th and 79th on Jeffery, and it goes over to Chappel. It was a Catholic church. I have someone who I know who sings there. They sang. They cantored there. And I would go to that church on occasion for special things like the Seven Last Words or something like that.

I dated somebody who lived on Jeffery. And I had -- and I had been on Chappel because I know people who live on Chappel.
Q. So when you went to visit the scene of the attack on Karen Byron back in 1983, you were comfortable with the neighborhood?
A. I was very comfortable with the neighborhood. I was familiar with it, and it was a very middle-class neighborhood.
Q. When you worked for the corporation counsel's office, you did civil cases; is that right?
A. I did 1983 actions which are civil suits.
Q. Okay. So that means that's A is suing B for money, correct?
A. Yes.
Q. It doesn't mean it's a criminal case, it's --
A. It is not a criminal case.
Q. Okay. And so in civil cases, are they different from criminal cases in many ways including that in civil cases, you take depositions, correct?
A. Oh, yes. In civil cases, a lawyer can call you into their office and question you under oath as I -- as happened to me in this case. In criminal cases, there is no right to call in a witness and depose them.
Q. So you didn't have the ability to depose any of the four defendants in the Wrice case?

A. Not any of the defendants or any witnesses.
Q. And, in fact, you couldn't force them to talk to you either, could you?
A. I could not force anyone to talk to me.
04:11:13 Q. But you would, if you were -- if there were going to be any kind of--
MS. BONJEAN: Objection. This is her witness. I would object to the leading. It's still her witness.
MS. JACOBS: Your Honor, I'll move on.
04:11:24 THE COURT: Yes.
BY MS. JACOBS:
Q. You've talked about your career. And I don't want to get into your age, but let me just ask you --
A. I don't care.
04:11:31 Q. Let me just ask you this question.
A. I'm 71 so she doesn't have to ask.
Q. Were you as a black woman unique in any way at the time that you started as an assistant state's attorney?
A. Well, in 19- --
04:11:47 MS. BONJEAN: Judge, I don't want to disrespect Ms. Lampkin and I'm sure she was very unique, but I just don't know what this is relevant to.
THE COURT: I -- let's -- you're getting into a lot of areas which probably are not necessary. So bring your remarks to her background to a close, and let's move on.
04:12:01

BY MS. JACOBS:

Q. Did you consider yourself a trailblazer in your career?

A. I considered myself blessed, yes.

Q. Let's turn to some of the questions that you received from Ms. -- Ms. -- I'm sorry -- Bonjean. First of all, she asked you some questions about the suppression trial, the suppression hearing that preceded the trial of Mr. Wrice; is that correct?

A. Yes.

Q. Did Mr. Wrice in that suppression hearing put on any medical evidence?

A. Yes --

MS. BONJEAN: Objection, Judge. We went through this. This was all covered, and she testified extensively about her view of the medical evidence, whether it was --

THE COURT: Well, she can -- this is both cross and direct examination, so she can clarify. Go ahead. Overruled.

THE WITNESS: I'm sorry. I --

BY MS. JACOBS:

Q. Did Mr. Wrice's counsel put on any medical evidence at that suppression hearing?

A. Yes, he did.

Q. And were they the same witnesses who testified at his criminal trial?

A. The same two witnesses testified at trial in front of the

jury.
Q. And did Mr. Jones, Mr. Wrice's counsel, have a full and fair opportunity to cross-examine Rodney Benson at that suppression hearing?
04:13:35 MS. BONJEAN: I'm going to object to a full and fair opportunity. By whose standards? And I don't even know if that's accurate.
THE COURT: I'll sustain the objection to that.
BY MS. JACOBS:
04:13:47 Q. Did Mr. Jones, Sidney Wrice's attorney, have the opportunity --
MS. BONJEAN: Sidney Wrice? It's Stanley Wrice.
BY MS. JACOBS:
Q. I'm sorry. Did Sidney Jones have the opportunity to
04:14:00 cross-examine Rodney Benson at that suppression hearing?
A. Yes, he did.
Q. At the motion to suppress hearing, were any allegations made against you by Stanley Wrice or Rodney Benson?
A. Absolutely not.
04:14:17 Q. Let me ask you a few questions about Rodney Benson. Did you ever tell Rodney Benson or his attorney something like, "We don't want you, we're only interested in Stanley Wrice"?
A. I -- no conversation like that ever happened between me, Mr. Howard Savage, or Mr. Rodney Benson. I never had a
04:14:51 conversation with Rodney Benson, and I never had a

conversation with Howard Savage about using his client to -- and not being interested in him, whatever that was. That never happened.

Q. And let's just be clear. Did Rodney Benson testify at the criminal trial against Stanley Wrice?

04:15:07

A. No, he did not.

Q. Did Michael Fowler testify at the criminal trial against Stanley Wrice?

A. No, he did not.

04:15:16

Q. And did Lee Holmes testify at the criminal trial against Stanley Wrice?

A. No, he did not.

Q. And did any one of those people get a plea agreement with you in which they got a lower sentence in exchange for testifying against Stanley Wrice?

04:15:29

A. Absolutely not.

Q. And all those guilty pleas, when did they occur? The Lee Holmes, the Rodney Benson, and the Michael Fowler guilty pleas, when did they occur in time with respect to Stanley Wrice's trial?

04:15:51

A. Stanley Wrice went to trial in May of 1983. I left the building, left 26th Street and went to supervise juvenile in June. Mike Fowler and Lee Holmes pled guilty in December of 1983, some six or seven months after the trial.

04:16:16

And then I came back in January of '84. I believe it

was January, January or February. I'm pretty sure it was January that I came back in '84 and took the guilty plea with Rodney Benson.

Q. So given that their pleas were after the trial was over and after Stanley Wrice was convicted, would it have been impossible for them to testify for the prosecution against Stanley Wrice?

A. Of course.

Q. Did Rodney Benson ever sign a statement implicating Stanley Wrice?

A. He --

MS. BONJEAN: Objection, Judge. That's likely hearsay, and it's certainly outside the scope, isn't what we discussed on direct.

THE COURT: Well, it's not hearsay. The issue whether he signed a statement implicating -- well, I guess you can get the word implicating. Overruled. He may -- she may answer.

BY THE WITNESS:

A. He filed a motion to sever.

MS. BONJEAN: Judge, a motion to sever, see, this is what I'm talking about. His attorney filed a motion to sever, and the question was did he file -- did he sign a statement implicating Stanley Wrice.

MS. JACOBS: Let's --

MS. BONJEAN: I would like to have a sidebar because --

MS. JACOBS: No, I --

THE COURT: No --

04:17:40 MS. JACOBS: I don't want to go into the motion to sever.

THE COURT: Okay. Leave that out.

BY MS. JACOBS:

Q. Okay. So outside of the motion to sever, did Rodney
04:17:47 Benson ever sign a statement implicating Stanley Wrice?

A. I'm trying to remember. I don't remember him signing a statement. If he did, you can certainly show it to me.

Q. Okay. And did you ever give Rodney Benson or his attorney some kind of script of what you allegedly wanted him to say
04:18:12 about Stanley Wrice?

A. Of course not.

Q. Did you ever talk to Rodney Benson's attorney to convey to him that you wanted Rodney Benson to implicate Stanley Wrice?

A. I did not.

04:18:27 Q. Did you ever talk to Michael Fowler's attorney or to Michael Fowler trying to convey to him that you wanted him to implicate Stanley Wrice?

A. I did not talk to Michael Fowler, and I did not talk to Michael Fowler's attorney about them doing anything in Stanley
04:18:46 Wrice's case.

Q. By the way, prior to Stanley Wrice's trial, did any of the attorneys for those three co-defendants -- Michael Fowler, Rodney Benson, or Lee Holmes -- approach you to try to negotiate some kind of cooperation agreement?
04:19:10 A. I have no recollection of them approaching me to ask me to give them any kind of deal or to use their client as a witness in my case.
Q. All right. Now, let's turn to the trial. At the trial, what were the charges against Stanley Wrice?
04:19:28 A. The charges were rape, deviate sexual assault, attempt murder, unlawful restraint, armed violence, and aggravated battery/great bodily harm, aggravated battery/permanent disfigurement. I think that was it.
MS. JACOBS: And I'd like to have the -- actually, 04:19:59 I'd like to use the -- well, let's put up DX 245 on the screen.
MS. BONJEAN: For ID?
MS. JACOBS: For ID purposes for now. And, I mean, maybe you'll stipulate to this. These are the jury 04:20:15 instructions from the trial.
MS. BONJEAN: The jury instructions?
MS. JACOBS: Yes.
MS. BONJEAN: I think we need to discuss it with the judge.
04:20:25 MS. JACOBS: Okay. So why don't you take a look

at -- is 245 up?
THE WITNESS: It's not on my screen.
MS. JACOBS: Oh, could you switch it?
BY MS. JACOBS:
Q. All right. Now, what I'd like to ask the technician to do is just to page through this to show you what's in here. I'm not asking you necessarily to read the whole document.
A. All right.
MS. JACOBS: So could you page through slowly? Thanks.
THE WITNESS: All right. You can go to the next one.
All right. You can go to the next one.
You can go to the next one. You can go to the next one. You can go to the next one. And you can go to the next one. You can go to the next one. You can go to the next one.
I've read that. You can go to the next one. You can go to the next one. You can go to the next one. You can go to the next one. You can go to the next one.
MS. JACOBS: Next time I'll use paper, Your Honor.
THE COURT: Pardon?
MS. JACOBS: Next time I'll use paper. This is a slower process.
THE WITNESS: I've read that. I'm just perusing this because it's very long.
MS. JACOBS: Okay. You can go fast.

THE WITNESS: Yes. You can go to the next one.
MS. JACOBS: Scroll a little faster.
THE WITNESS: Okay. All right. Now we're to the verdict forms.
All right. These are all verdict forms. I'm reading them. They're two or three lines.
BY MS. JACOBS:
Q. All right. So having perused that quickly, can you tell me what that exhibit is?
MS. BONJEAN: Objection. Judge, you can't have something identified for ID and then start talking about it. She has to lay a foundation for its relevance and everything else before we --
MS. JACOBS: That's how I do that, by asking her what it is.
So go ahead and tell us what it is.
THE COURT: Yes, she can go ahead.
THE WITNESS: These are jury instructions that are given by the judge to the jury on how they are to consider the evidence in relationship to the law and how they are to arrive at their verdict. And after they get those instructions, there are verdict forms for each offense. There's a not guilty verdict form with 12 lines for the jurors to sign, and for each offense, there is a guilty verdict form with 12 lines for the jurors to sign.

04:25:07
All of this is given them -- to them. Otherwise, they wouldn't know how to apply the law to the facts.

BY MS. JACOBS:

Q. Now, was -- are these the jury instructions that were given in the Stanley Wrice case?

A. They are.

Q. And you've recently reviewed the transcript, and you're familiar with the transcript; is that right?

A. Certainly.

04:25:16
MS. JACOBS: Okay. So I'd like to move these into evidence, Your Honor.

MS. BONJEAN: Judge, I don't know that I have an objection, but all the jury instructions coming in, I'm not sure that that -- I think it's kind of confusing because you're the judge giving the law in this case, and -- I don't know.

04:25:32

THE COURT: Well, these are obviously not the instructions for this case, so I'll let -- I'll admit them.

MS. JACOBS: Thank you, Your Honor.

04:25:47
(Defendant's Exhibit 245 received in evidence.)

BY MS. JACOBS:

Q. Now, the trial was in May, in mid-May 1983; is that right?

A. That's correct.

Q. Okay. At that time, was there DNA testing?

04:25:54
A. No, there was not.

Q. Was there videotaped confessions at that time either?
A. No.
Q. Okay. Now, when you went on the site visit to 7618 South Chappel, can you describe the size of that house, please?
04:26:13 A. Oh, certainly this courtroom is a lot bigger than that house.
Q. Would you call it --
A. It wasn't a tiny house. It was a small house, a single-family house that you maybe walked up four or five 04:26:30 stairs and then there's a first level. And above that, there was a pitched attic. It wasn't a full-grown -- I have an attic in my house that's, you know, walls don't go up to the -- up on the side, and that's the way it was, a short pitched attic.
04:26:49 There was a small window in the front, and in the back of the house, there is a window that is longer than tall. And it has a, who knows the dividing -- I don't know what you call it, in the frame. There's one frame but there's a line down the middle that divides the two small panes.
04:27:13 Q. And would you describe the attic as a full-fledged second floor?
A. No, absolutely not.
Q. So it was closer to the first floor than a full-fledged second floor would be; is that right?
04:27:26 A. Yes. It was a pitched attic. There were no tall walls

like a traditional second floor.
Q. And it was on this visit that you knocked on the door, and you've already testified about talking to Kenny Lewis' mother and then getting --
A. That's at a different house, counsel, of course.
Q. Right.
A. Okay.
Q. But it was on the same site visit --
A. Right, yes.
Q. -- that you saw -- that you were at the Lewis house.
Did you construct and manufacture Kenny Lewis as a witness in order to wrongfully convict Mr. Wrice?
MS. BONJEAN: We would stipulate that she did not. That has never been the position.
MS. JACOBS: Well, that's, I'm reading from the --
THE COURT: All right. Take the stipulation.
MS. JACOBS: Thank you, Your Honor.
BY MS. JACOBS:
Q. By the way, had any witnesses, to your knowledge, identified Kenny Lewis as one of the men who burned and beat Karen Byron?
A. No.
Q. Do you have any evidence that he was involved in burning and beating Karen Byron?
A. I have no evidence that Kenny Lewis was involved in this

brutal attack on her, no.
Q. And was there any evidence in your possession at and before and during the trial that Kenny Lewis had had sex with the woman?
A. No, absolutely not.
Q. Now, when you inter -- you eventually met with Kenny Lewis after you spoke to his mother; is that right?
A. Yes.
Q. And he called you; is that right?
A. He called me, and he came in to see me.
Q. Did you have to issue a subpoena?
A. I couldn't issue a subpoena. I could only bring a witness in on a subpoena on a trial date or a hearing date. I couldn't have had sent somebody out to get somebody to come in. They had to come in to see me voluntarily.
Q. And where did you meet with Mr. Lewis?
A. At 26th and California. There's the court building, and next door to the court building there are office buildings. I don't know if they're 12 or 13 feet -- I mean, stories high. My office was on the 11th floor of that building, and Mr. Lewis came to the 11th floor of that building to see me.
Q. And without getting into what he said, when you met with Mr. Lewis at your office, what did you ask him?
A. I'm sure I introduced myself. I thanked him for coming. I'm sure I talked to him about the fact that his mother said

04:30:29 04:30:45 04:31:05 04:31:19 04:31:36

he was at this -- at this -- at the Wrice house.

And I asked him -- well, first, I try to make people comfortable, so I ask them about themselves, how many -- do you live, where do you live, with your mother, your father. And they would tell me that. Do you have sisters and brothers, yes, to make them feel comfortable.

And then I would say, "Can you tell me what you know about this incident?" And I would try not to interrupt them at all. I'd let them tell me everything that they knew.

And after they went through that, then I would go back and I would ask questions. "You said this. Who was there when you -- when this happened? Who was there? What did you do? What didn't you do," that kind of thing. And I would get the person's account as best I could the first time I talked to them. And that's what I did with Kenny Lewis.

Q. So after you got -- so you asked him what happened; is that right?
A. Yes.
Q. Okay. And that's an open-ended question, right?
A. Yes, to ask somebody to tell me what happened, yes.
Q. That's not a leading question like the one I just asked?
A. Exactly.
Q. And -- and before you asked him that question, did you provide him with like copies of the police report or all kinds of documents or pictures or anything?

A. I didn't give Kenny Lewis anything. I asked him to tell me what happened. Now --
Q. And did you try to force-feed him some facts or, like, you need to say this or you need to say that?
04:31:54 A. No, I did not.
Q. And did Kenny Lewis respond to your questions?
A. Yes, he did.
Q. And did he appear to be reluctant to you?
A. He was forthcoming. He just told me everything that he
04:32:12 knew that happened. And then I asked him questions.
Q. And was what he was telling you actually corroborating what was in the police reports that you knew of?
MS. BONJEAN: Objection. Judge, that's --
THE COURT: That is -- you are -- yes.
04:32:30 MS. JACOBS: I'll ask it another way.
THE COURT: Yes, ask it another way.
BY MS. JACOBS:
Q. So when you heard his account, how did it square in your mind with what you knew from your police reports and your
04:32:40 other witnesses?
A. I didn't know if counsel was going to object. I was waiting.
It aligned with a lot of things that people had said had occurred in the case.
04:32:53 Q. Now, did you threaten Mr. Lewis physically or

psychologically?
A. No, I did not.
Q. Did you say you were going to charge him with anything if he didn't do what you wanted him to do?
04:33:06 A. Of course not.
Q. Would it come as a -- would it be accurate to characterize Kenny Lewis as a surprise witness to Mr. Sidney Jones?
A. Well, Kenny Lewis' name, as I said, was on the answer to discovery for Mr. Benson. That answer to discovery would have
04:33:28 been given to Sidney Jones. So I don't know if he was surprised or not.
I had not talked to Kenny Lewis. When I gave Kenny Lewis' name to the lawyers, I would have told the lawyers what Kenny Lewis said. That would have been several days before
04:33:49 trial. If Mr. Jones wanted to go try to talk to Kenny Lewis, he certainly could have done so.
Q. So you knew that Kenny -- you found out that Kenny Lewis' name had been disclosed in Rodney Benson's witness disclosure in December of 1982, right?
04:34:08 A. I found that out in May, yes.
Q. And it was filed in the very same case that Sidney Jones' client, Stanley Wrice, was in; is that right?
A. Of course. It would have been in the same court file. Every filing on the case, I don't care if there's one
04:34:26 defendant or 50 defendants, every filing, every document

that's filed is filed in that case.

It's a court record, a matter of record, and any lawyer on the case can take that file, look at it, take it to their desk, have anything that they have misplaced in there that has been tendered to them and have it re-produced.

Q. And is the document not just filed but it's also served; is that right?

A. Well, as a lawyer, if I file a document and there's three other lawyers, I have to give it to all three lawyers and the Court.

Q. So Sidney Jones would have had access to that document back in December because it would have been filed in his case he was working on and served on him; is that right?

A. Yes.

MS. BONJEAN: We would stipulate that Sidney Jones had the same access as Ms. Lampkin did to that document.

BY MS. JACOBS:

Q. Did anything prevent Mr. Sidney Jones from going and talking to Kenny Lewis himself?

A. Nothing, nothing at all.

Q. Do you have any reason to believe he didn't?

A. I don't know whether he did or he didn't. I know that he had the opportunity to do so.

Q. So just to make the record clear, after you had this meeting with Lewis where he implicated Stanley Wrice, what did

you do vis-à-vis the other lawyers in the case?
A. I told the lawyers what Kenny Lewis had said to me, and then I went in to court and told the Court that I had a witness that I wanted to add to the answers to the discovery.

04:36:07 I saw Rodney Benson's answers to discovery and saw that he had five other witnesses on it. Some of those witnesses, a Kim was on his witness list. A Jeff was on his witness list. A Butch was on his witness list. A Mildred Dyson, I think is the last name, was on his witness list. 04:36:32 Those names, most of those names I had heard no addresses, sometimes no last names. Mr. Benson had for some of them addresses and last names. So I put all of their names on my answer to discovery.

Kim, there was -- as I recall, there was no last name 04:36:54 or address. I don't think Jeff had a last name or address. There was a name and address for Mildred Dyson. And there was a name and address for Kenny Lewis. And I can't think of Butch's last name, but there wasn't any address for Butch.
Q. And that disclosure that you're discussing, that was a 04:37:20 written disclosure that you filed?
A. I had an answer to discovery that I had filed early on in the case. When I found Kenny Lewis in a day in early May, I amended my answer to discovery on the record. I said, "I'm amending my answer to discovery."

04:37:38 And I took that document that I had filed earlier and

in my handwriting, I wrote those names and addresses on my answer to discovery.
Q. And did that happen on May 10th of 1983?
A. I only know that from looking at the court record, but that was the day that I added those names.
Q. And on that same day, were you in court and did you also discuss your disclosures including revealing the name of Kenny witnesses as a witness disclosure?
A. Yes.
Q. Okay. And Sidney Jones, lawyer, was at that hearing; is that right?
A. Yes.
Q. Now, was this disclosure you made on May 10th, 1983, the first time you knew that you might or would call Kenny Lewis as a witness?
A. Well, I knew when I talked to Kenny Lewis, which was prior to that day, that he was going to testify in the case. I put his name on -- I told the lawyers right away, and when we were in court, I put their names on the answer to discovery.
Q. Now, to the best of your knowledge, had any police officers identified Kenny Lewis to you as a witness?
A. No, they had not.
Q. To your knowledge, had any police interviewed Kenny Lewis?
A. There was no indication in any police report that Kenny Lewis had been interviewed.

Q. Do you have any knowledge of Kenny Lewis making any statements to the police?
A. I have no knowledge of him making a statement.
Q. And do you know of any police reports that contain any statements by Kenny Lewis?
A. I have no knowledge of any. I've never seen a police report that has any statement in it of Kenny Lewis.
Q. Did Sidney Jones ever argue at the criminal trial that Kenny Lewis was not in the house on the night of September 8th, 1982, or the morning of September 9th, 1982?
MS. BONJEAN: Objection to what Mr. -- are you talking about in closing arguments? I mean --
MS. JACOBS: At the trial.
THE COURT: You may answer.
BY THE WITNESS:
A. No, he did not.
BY MS. JACOBS:
Q. Are you aware that in this case, it's been alleged that you fabricated this meeting with Mr. Lewis?
A. I'm sorry?
Q. That you fabricated this meeting with Mrs. Lewis.
A. That I fabricated the meeting with Mrs. Lewis?
Q. Yes.
MS. BONJEAN: What was the question? I'm sorry.
THE WITNESS: Am I aware that --

BY MS. JACOBS:
Q. In this case --
A. -- there was an allegation that I --
Q. Fabricated this meeting with Mrs. Lewis.
04:40:10 MS. BONJEAN: I don't know where that allegation is coming from.
MS. JACOBS: Paragraph 42.
THE WITNESS: Kenny --
BY MS. JACOBS:
04:40:17 Q. Are you aware of that allegation?
MS. BONJEAN: Judge, have we made an allegation in this courtroom? I don't think on direct or my examination of Ms. Lampkin, I made that allegation against her.
MS. JACOBS: Well, let me ask the question another
04:40:28 way.
THE COURT: She's not --
MS. JACOBS: I'll rephrase.
THE COURT: She's not aware of any such allegation, so --
04:40:34 MS. JACOBS: I'll just rephrase it.
BY MS. JACOBS:
Q. Did you fabricate your meeting with Kenny Lewis' mother?
A. No, I did not.
And let me just say this because you call her his
04:40:49 mother, too. She said it was her son. I am assuming that was

her son. I call my foster daughter my daughter. She calls me her mom. I am not her mom so...
Q. Your precision does you justice, and you're absolutely right.
So you've heard -- you know who Bobby Joe Williams is, right?
A. Certainly.
Q. And he was a witness in the criminal trial of Stanley Wrice?
A. Yes, he was.
Q. Who questioned him at that trial?
A. I put Bobby Joe Williams on the stand.
Q. And that was before the 12 jurors in that case; is that right?
A. That's correct, and Justice Thomas Fitz -- then Judge Thomas Fitzgerald.
Q. Now, you've already testified in response to Ms. Bonjean's question that you met with Bobby Joe Williams at least twice, maybe more, before you put him on the witness stand; is that right?
A. I said I know at least twice, probably more. I actually know now from reading the transcripts that I met with him at least one more time.
Q. Okay. And what was your purpose in meeting with Bobby Joe Williams?

A. The same thing with any other witness. If you're going to call somebody as a potential witness, I had read that like three-inch recitation in the police report, in the police report. I asked him, come into the office. He came into my office. He sat down in my office.

And the same thing I did as I said with Kenny Lewis, I did with Bobby Joe Williams. I asked him his name, where he lived, who his parents were, if they lived together, if he had siblings, if he worked, if he went to school, that kind of thing.

And then I say, "I know that you've given a statement to the police that you were at the Wrice household. I want to go over what happened that day, so tell me what happened."

And he started to tell me what happened. I try my best and I tried my best not to interrupt him. I let him tell me everything that went on.

And then after he did that, I went back and I asked him in question form or to explain more to me or to -- whatever I needed from him, for him to tell me something I didn't know: Relationships with people, how he knew the parties, who was in the house.

When he said something was happening in a room, who was in that room? Who was in the kitchen? Who was in the dining room? Who was in the living room? Who was upstairs? I would ask him to see what he would tell me and so that I

could prepare him for testifying when he actually came to court.

Q. Do you recall when you first met with him?

A. I don't know what was the first day. I know from looking at my -- the records that I talked to him on April the 25th. That's when we were doing the motions on the case. He and his sister Patricia -- I'm sorry, his girlfriend Patricia Wrice came into my office, and I talked to them. I talked to her first for like an hour and a half, and then I talked to Kenny Lewis after that.

Q. You mean Bobby Joe Williams.

A. Did I say -- yes, I'm sorry. Bobby Joe Williams. Bobby Joe Williams, yes.

Q. Okay. Without knowing the exact date you met with him, it was certainly before trial; is that right?

A. Certainly. And I met with him on the day that he would have testified. And from reading the record, I now know I met with him another time.

Q. So the first time you met with Bobby Joe Williams, do you know approximately how long you would have met with him for?

A. I don't know the first time, but I talked to him so -- no, I can't tell you. I know that I talked to Pat, Patricia Wrice for an hour and a half only because that's what she agreed to when she was testifying. I would have talked to Bobby Joe Williams much longer --

Q. Okay.
A. -- every time I talked to him than I had talked to her.
Q. And at this initial meeting, you recall that you were there, Bobby Joe Williams was there, his -- Pat Wrice was there, his girlfriend, and then a woman named LaBrenda White?
A. Well, you're saying it's the first meeting. If that's the first meeting --
Q. If that's the first meeting.
A. The first time I met with them, I had LaBrenda White, she's another African-American assistant state's attorney. She had been in the building for a shorter period of time.
When I interview people who are related to an alleged offender, I always have what we call a prover in the room, a lawyer so that because I could never testify as to what they said to me if they said something different on the stand.
So I asked LaBrenda White to sit in the room with me while I conducted the interviews so that if, when either Pat or Bobby Joe got on the stand and said something different, I could confront them with the discrepancy, and then I could later on call LaBrenda White to the stand to say, no, this is what they said in that conversation.
Q. And did LaBrenda White testify at trial regarding statements Pat Wrice made?
A. Yes. She contradicted Patricia --
MS. BONJEAN: Judge, the characterization of -- the

jury hears the testimony. They can make their own conclusions.

MS. JACOBS: Your Honor, I was just asking a yes or no question.

BY MS. JACOBS:

Q. So she appeared at trial and testified; is that right?

A. Yes, she did.

Q. And has she become a judge, also?

A. She was a judge for a number of years and then she
04:47:04 retired, and now she's an ordained minister.

Q. By the way, Kenny Lewis, is he alive?

A. To my knowledge, he is not alive.

Q. Okay. And is Karen Byron alive?

A. No, she is not.

04:47:22 Q. And she died well before this case was filed; is that right?

A. Yes.

Q. Okay. Now, in the -- any of the meetings that you had with Bobby Joe Williams, was Detective Dignan present?

04:47:35 A. No.

Q. Was Sergeant Byrne present?

A. No.

Q. Was any other Chicago police officer present?

A. I never interview witnesses in front of police officers.

04:47:47 Q. Okay.

A. I don't even interview police officers at the same time. I interview them separately so people can't say, "Oh, you had them in the room together. You had them make up a story together." I never did that.
Q. Okay. So at the meeting at which Bobby Joe Williams is present with his sister Pat or Patricia --
MS. BONJEAN: Objection. Girlfriend.
MS. JACOBS: Oh, sorry. It says sister.
BY MS. JACOBS:
Q. So Bobby Joe Williams, at the meeting where Bobby Joe Williams is present with his girlfriend Pat, you and LaBrenda are both there, right?
A. Yes.
Q. Did you get the impression during that meeting in any way, shape, or form that Bobby Joe Williams was scared of you?
A. Of course not.
Q. Did you get the impression that you were intimidating him?
A. No.
I actually brought a picture of myself when I was sworn in as a judge. This is four and a half years later. And if you saw the picture, I could not intimidate a child. At 39, I looked like I was 25.
Q. Okay. And can you describe his manner with you when you were talking to him?
A. He -- he was forthcoming in his testimony. I actually

thought he was remorseful when we were talking about what happened because I was proud --

MS. BONJEAN: All these characterizations -- you know what, I'll withdraw it. Go right ahead.

THE COURT: Fine. Proceed.

THE WITNESS: You know, you see somebody and you think, how could they not do something.

MS. BONJEAN: Judge, this is just stream of conscious, like what she's thinking and it's just not --

MS. JACOBS: Well, you interrupted the question. Let me ask the question.

THE COURT: All right.

BY MS. JACOBS:

Q. Did you get -- can you describe Bobby Joe Williams' manner with you? If you have anything to add to what you've already answered, please do.

A. As I said, he was forthcoming to me. He told me what happened without me prodding him. And then I asked him in question and answer form.

Q. What was his demeanor like during that meeting?

A. As I just said, he was very forthcoming, as I said. And I thought he was remorseful. That was my impression.

Q. Now, you know that in this interview, he was essentially incriminating the brother of a woman he had two children with?

A. I know that.

Q. Okay. And did you get any sense from him that -- any sense from him that this was difficult for him or there were any problems with what he was saying?

MS. BONJEAN: Objection. "The sense," "did you have 04:50:44 a feeling?" I think the testimony should be characterizing his demeanor. Those things are --

MS. JACOBS: I'll move on.

THE COURT: Yes, move on. It is pretty subjective.

MR. HALE: Your Honor, I object to the speaking 04:50:56 objections. Counsel's interruptions are speaking objections by themselves.

THE COURT: It's pretty subjective, so why don't you move on.

BY MS. JACOBS:

04:51:03 Q. Let me ask you this: Did Bobby Joe Williams at any time whenever you met with him appear to be reciting things by rote or from memory?

A. He recited them as if he was reliving them to me.

Q. Did he appear to be reciting things mechanically as if he 04:51:26 was trying to remember what someone told him?

A. No, he did not.

Q. Did he -- was what he recited filled with factual inconsistencies?

A. You mean from what was in the police report or what other 04:51:44 people had told me?

MS. BONJEAN: Objection --

BY MS. JACOBS:

Q. Just internally in and of itself as he was talking to you that day.

04:51:51 MS. BONJEAN: Again, objection. I don't want to make a speaking objection but that's --

THE COURT: The objection is that -- the question was, did he, his testimony, was it inconsistent with other witnesses?

04:52:05 MS. JACOBS: No, no. I'll rephrase it, Your Honor. Obviously, I asked a bad question.

BY MS. JACOBS:

Q. When you were in the room with him and he was telling you what happened, was it internally consistent, without reference

04:52:16 to police reports or anything else?

A. He told me what happened in a chronological sense. When I asked him questions, he answered the questions. I didn't get the impression at all that he was making anything up.

Q. Did you ask him leading questions like, "Was Stanley in

04:52:43 the room, or was that the time when Stanley picked up the iron?" Did you ask leading questions like that to him?

A. No. I asked him to tell me what happened, and then when he said, after he had gone through the whole thing, if he said something happened in the kitchen, I'd say, "Who was in the

04:52:59 kitchen?" If he said something happened in the -- they were

in the dining room or the living room, I would say, "Who was there?"

If he said some people were upstairs, I would say, "Who was upstairs? And if they were upstairs, where were you 04:53:13 at that time or where was Patricia at that time or where was Charles," if he knew.

And if he told me, then I brought that out during trial. Repeat: Whatever he told me, I brought out at trial.

Q. Did you tell him to say that Stanley Wrice took an iron 04:53:31 off the stove and went upstairs with it?

A. No, I did not.

Q. Did you tell him to say that Stanley Wrice said, quote, they burned that bitch, unquote?

A. No, I did not.

04:53:42 Q. Did you put any words in his mouth?

A. None whatsoever.

Q. Do you recall that at trial, you questioned Bobby Joe Williams about being questioned by the police at the police station?

04:53:57 A. Yes.

Q. And do you also recall questioning Bobby Joe Williams at the trial, the criminal trial, about being questioned by Assistant State's Attorney McCurry at the police station?

A. Yes, I did.

04:54:12 Q. Did you cover that topic with Bobby Joe Williams in the

meetings that you had with him prior to the trial?
A. Certainly.
Q. At any point when you were discussing with Bobby Joe Williams his meetings with the police and with Assistant State's Attorney McCurry back on September 9th, 1982, at any point did he say to you, "I was beaten"?
A. No, he did not.
Q. At any point did he say to you at that time and on that topic, "I was coerced"?
A. No, he did not.
Q. And at that same time and on those same topics, at any point did he say to you that he was told to lie?
A. No, he did not.
Q. Now, did you meet him again closer to the trial?
A. Yes.
Q. And when was that?
A. I would have talked to him the day before I put him on the stand or the day of depending on when he was going to go on the stand. He was -- my recollection, I think he was the second person that testified. So I clearly would have talked to him the night before or the morning of, more than likely the morning of.
Q. Regarding this meeting, can you recall what happened at that meeting, the one immediately prior to trial with Bobby Joe Williams?

A. I know that I talked to him again about his testimony. I told him where he was going to be, that there was going to be a jury there, where the witness box was so when he came in, he'd know where he would go in the courtroom to be seated.

I told him that the judge would swear him in to tell the truth, and I told him to tell the truth. If he didn't remember something or if he didn't know something, that to say that.

And then I asked him again the questions I'm going to ask you at trial and elicited his answers. And then when he was -- when he was called to testify, he was brought into the courtroom to testify.

Q. Now, at this point, at the point when he's about to go in to testify on the day of trial, did he appear like he was trying to back out?

A. No, he did not.

Q. Did he appear reluctant?

MS. BONJEAN: Judge, I don't know what "appear" means. How about just what he said or did. That's my objection.

BY MS. JACOBS:

Q. Did he express any kind of lack of desire to go and testify?

A. No.

Q. Did he tell you he didn't want to testify?

A. No, he did not.
Q. Did he say anything to you indicating that he was reluctant or didn't want to -- didn't want to testify?
A. He did not say anything like that to me.
04:57:06 THE COURT: Are you going into a new area now?
MS. JACOBS: I'm almost done with Bobby Joe. So we can end now or I can do --
THE COURT: Well, finish.
MS. JACOBS: Finish. Okay.
04:57:16 THE COURT: Yes.
BY MS. JACOBS:
Q. Okay. At any time before you questioned Bobby Joe Williams at the criminal trial, did Bobby Joe Williams tell you that he was beaten by one or more Chicago police officers
04:57:27 or threatened by them?
A. He never told me he was beaten by anyone. He never told me he was threatened by anyone.
Q. And was he ever told by one -- did he ever tell you before trial that one or more Chicago police officers fed him lines?
04:57:43 A. No, he did not.
Q. Did he tell you he planned to lie on the witness stand?
A. No, he did not.
Q. Did he tell you he planned to fabricate his testimony?
A. No, he did not.
04:57:54 Q. Did he tell you that brutality by one or more Chicago

police officers caused him to fabricate testimony and that's what he'd been telling you in all your meetings, was fabrications?
A. He never said anything like that, remotely like that. He did not make any complaints against the police department, the state's attorney, or anyone else.
Q. Did he tell you he lied to the police on September 9th, 1982?
A. No, he did not.
Q. Did he ever tell you, by the way, that he heard Stanley Wrice screaming at the police station?
A. No, he did not.
Q. At any time after the trial to the present date, has Bobby Joe Williams come to you and said that he was force-fed false testimony, was beaten into testimony, was threatened, or that there was any impropriety in any way, shape, or form regarding his trial testimony?
A. No, he did not.
Q. Now, let me ask you about your conduct.
A. I'm sorry?
Q. I'm going to ask you about your conduct.
THE COURT: I think we're going to suspend now --
MS. JACOBS: Okay.
THE COURT: -- until tomorrow.
MS. JACOBS: Thank you, Your Honor.

THE COURT: 10:00 o'clock, members of the jury.

(Proceedings adjourned from 5:00 p.m. to 10:00 a.m.)

C E R T I F I C A T E

We, Kathleen Fennell, Kelly Fitzgerald, and Judith Walsh, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable HARRY D. LEINENWEBER, one of the judges of said court, at Chicago, Illinois, on February 25, 2020.

*/s/ Kathleen Fennell* February 26, 2020

*/s/ Kelly Fitzgerald* February 26, 2020

*/s/ Judith Walsh* February 26, 2020

Official Court Reporters
United States District Court
Northern District of Illinois
Eastern Division