1725

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   STANLEY WRICE,                  )
                                     )
 4                  Plaintiff,       )
     -vs-                            )   Case No. 14 C 5934
 5                                   )
     JOHN BYRNE, former Chicago      )   Chicago, Illinois
 6   Police Sergeant, et al.,        )   March 2, 2020
                                     )   9:40 a.m.
 7                  Defendants.      )
                                     )
 8                            VOLUME 8
 9              TRANSCRIPT OF PROCEEDINGS - TRIAL
        BEFORE THE HONORABLE HARRY D. LEINENWEBER and a jury
10   APPEARANCES:
     For the Plaintiff:     MS. JENNIFER A. BONJEAN
11                          MS. ASHLEY BLAIR COHEN
                            Bonjean Law Group PLLC
12                          467 Saint Johns Place
                            Brooklyn, NY 11238
13                          (718) 875-1850

14                          MS. HEIDI LINN LAMBROS
                            1169 S. Plymouth Court, Suite 123
15                          Chicago, IL  60604
                            (216) 318-4087
16
     For the Individual
17   Defendants:           MR. ANDREW M. HALE
                           MR. SCOTT J. JEBSON
18                         MS. JENNIFER BITOY
                           MS. AMY A. HIJJAWI
19                         MR. SHAWN W. BARNETT
                           Hale & Monico LLC
20                         53 W. Jackson Boulevard, Suite 330
                           Chicago, IL  60604
21                         (312) 341-9646
     Court Reporter:
22
                 KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
23                       Official Court Reporter
                       United States District Court
24            219 South Dearborn Street, Suite 1426
                      Chicago, Illinois  60604
25               Telephone:   (312) 435-5569
                 Kathleen_Fennell@ilnd.uscourts.gov
```

APPEARANCES:   (Continued)

For Defendant
City of Chicago:        MS. CARYN L. JACOBS
                       Department of Law, City of Chicago
                       121 North LaSalle Street,  City Hall
                       Suite 600
                       Chicago, IL  60602
                       (312) 744-5128


Also Present:          MR. NICK BENYO
                       Senior Litigation Consultant
                       Magna Legal Services

1    (Proceedings had in open court.  Jury out.)

2        THE COURT:  Good morning.

3        MR. HALE:  Good morning.

4        MS. BONJEAN:  Good morning.

09:40:05   5        THE COURT:  The jury is coming at 11:00, so there

6    were a number of motions filed overnight, which is not a

7    surprise.  Let's see.

8        The motion to restore, among other material, Sergeant

9    Byrne's criminal trial testimony that he smelled burning odor

09:40:34   10   when he entered the Wrice house.  In the alternative, to bar

11   argument that he did not testify that he smelled such an odor.

12       It would seem to me I've already ruled on this, that

13   I do not think that plaintiff can testify that Byrne did not

14   testify that he smelled burning.

09:40:56   15       MS. BONJEAN:  I am not going to -- you mean I can't

16   argue -- I'm not going to argue what Byrne or Byrne -- what

17   Byrne did or did not smell.

18       THE COURT:  So that motion is denied.  This is about

19   the third time I've done it.

09:41:10   20       MS. JACOBS:  Your Honor, may I just be heard on the

21   rule of completeness?  We never got a chance to argue it.  I

22   brought it up --

23       THE COURT:  Certainly we did.  We argued it about

24   five times.

09:41:18   25       MS. JACOBS:  No, we didn't argue the rule of

1  completeness.

2       THE COURT:  Yes, we did.  Well, anyway, that's the,

3  ruling of the Court on that one.

4       Now, defendants' motion to bar any argument that, 1,

5  either Banks' or Benson's alleged abuse was concealed, *Brady*;

6  2, that Fowler or Holmes were abused or their alleged abuse

7  was concealed, Brady; and, 3, that defendants were accused of

8  or engaged in any abuse or other misconduct prior to Wrice's

9  criminal case, and for curative instructions.

10      MS. JACOBS:  Your Honor --

11      MS. BONJEAN:  So, Judge, I can make this easy.

12      MS. JACOBS:  This is my --

13      MS. BONJEAN:  I can make this easy.  Let me tell you

14  what I'll concede to first before you get to arguing.

15      First, we don't intend to argue that Gregory Banks

16  was concealed.  That is not something --

17      THE COURT:  All right.

18      MS. BONJEAN:  We understand Gregory Banks happened

19  after the conviction.  It's still part of the pattern and

20  practice per *Thompson* and it's relevant, but we're not going

21  to argue that the defendants concealed Gregory Banks' coercive

22  interrogation, A.

23      THE COURT:  All right.

24      MS. BONJEAN:  As to Fowler, we've never -- we have

25  not elicited any testimony about Fowler's abuse, and we don't

1    intend to start in closing arguments.

2              THE COURT:  All right.

3              MS. BONJEAN:  So that's not an issue.

4              As for Holmes, the only thing that was raised

09:43:07    5    regarding that was a question that we asked of Ms. Lampkin.

6    She responded.  But we don't intend to argue that Holmes was

7    concealed either.

8              THE COURT:  All right.

9              MS. BONJEAN:  Okay.  As for the remaining issues,

09:43:20   10    Alonzo Smith was abused before Mr. Wrice's criminal trial, so,

11    of course, that's *Brady*.  I don't know if that's in their --

12    if that's --

13              MS. JACOBS:  It's not in our motion.

14              MS. BONJEAN:  Okay.  I assumed so.  That takes care

09:43:35   15    of that.

16              As for Rodney Benson, we're not saying that that was

17    suppressed, but Rodney Benson testified in the deposition

18    clips that we've provided to the Court that he was abused.

19              THE COURT:  All right.  That motion is moot then.

09:43:46   20              MS. BONJEAN:  Exactly.

21              THE COURT:  All right.  The next motion to admit

22    stipulation regarding Jennifer Scott's age, 14, and Stanley

23    Wrice's age, 25, in 1978.  Stipulation means that plaintiff

24    agrees.  The plaintiff has filed a response that she doesn't

09:44:02   25    agree -- or he doesn't agree, excuse me.

1          MS. JACOBS:  Your Honor, we're asking -- then we're

2     asking for the Court to allow an instruction and for us to

3     read in those ages before we -- before we go to argument.

4          Our reasoning is simple.  The -- leaving out, as the

5     Court knows we vigorously object to leaving out the

6     non-consensual nature of the relationship.  We believe it

7     leaves a huge hole in Ms. Scott's credibility because she was

8     a 14-year-old girl when this started.  She was being violently

9     abused.  She was being beaten, bruised.  She was being

10    attacked.  She was being dragged.  She was being abducted from

11    school.  All of this testimony did not come out, and Stanley

12    Wrice is a very lucky guy it didn't.

13         THE COURT:  Well --

14         MS. JACOBS:  But the fact is it leaves a huge

15    credibility gap as to why she has three children.  And she was

16    finally able -- and this is very common.  I've represented

17    women who have been predated on as young women.

18         This is very common that this is the way young women

19    act when they're being abused, that they keep silent about it.

20    She finally got together with her family, cut the relation

21    off -- relationship off three months before the -- the crime

22    in this case, and at a minimum, at a minimum, Judge, all we're

23    asking for to restore her credibility is the -- on this point

24    is the ages.

25         Ms. Bonjean can be expected to argue that you don't

1  believe her because she had three children with him.

2      THE COURT:  Wait a minute.  You can argue the age.

3  Obviously, she testified that she had the baby when, what, she

4  was 14 --

09:45:50  5      MS. JACOBS:  No, Your Honor, you kept the age out.

6      MS. BONJEAN:  Of course --

7      MS. JACOBS:  You told us we could not to mention the

8  age.

9      THE COURT:  Wait, wait.  I'm asking --

09:45:58  10      MS. BONJEAN:  Judge, you ruled that the age

11  differential between them was not relevant, and the only past

12  misconduct was relevant to the alibi.

13      First of all, they heard plenty.  She said she cut

14  ties with him.  She said all of those things.

09:46:11  15      THE COURT:  That's right.

16      MS. BONJEAN:  Now we're going to get into an

17  absolutely irrelevant age difference -- I mean, how could --

18      THE COURT:  We're not going to get into that --

19      MS. BONJEAN:  And if we were I would want to --

09:46:21  20      THE COURT:  Wait, wait, wait.  I'm about to rule.

21      The motion is denied.

22      Now we go into some of the other matters that were

23  raised.

24      Plaintiff has submitted, I believe, several new

09:46:37  25  instructions, one of which I think the first claim,

1　concealment of exculpatory evidence, that -- exculpatory

2　evidence has been added to the one that was submitted.

3　　　　MS. BONJEAN:  No, Judge, we -- so what we added

4　was -- it's the 7.14 pattern instruction with the language,

09:47:00　5　because this is the type of case, where the fabricated

6　evidence came in through a witness who was not responsible for

7　causing it.  So in many of these cases, as we've cited and

8　given the Court jury instructions, including *Deon Patrick*,

9　*Jacques Rivera*, *Fields*, *Avery*, that there should be language

09:47:21　10　included that Byrne and Dignan knowingly partici- -- I'm

11　sorry -- knowingly fabricated or knowingly participated in

12　fabricating, because they -- it would be a misstatement of the

13　law to suggest that -- and we already know that that's where

14　the defense is leaning because they've elicited testimony that

09:47:40　15　Dignan didn't even testify at trial, and Byrne didn't even

16　testify about the confession, so they can't mislead this jury

17　into believing that because Byrne didn't testify about the

18　confession and Dignan didn't testify at trial that we have no

19　fabrication claim because fabrication is not -- often comes

09:47:58　20　through a witness who didn't actually fabricate the evidence.

21　Sometimes they'll put on an officer to testify who wasn't

22　participating in the beating that preceded, or they'll put on

23　an ASA, like that's what happened in this case.

24　　　　So it is -- this is quite common in the Seventh

09:48:14　25　Circuit, and the jury instructions and the comments to the

1   jury instructions on fabrication claims make clear that

2   fabrication claims are really a new -- newly and always

3   evolving area of the law, and in all of these recent cases

4   from 2015, '16, '17, '18, that language was included, and it's

09:48:35   5   particularly appropriate here because Byrne and Dignan weren't

6   the ones who offered the fabricated testimony to the jury.  It

7   was ASA McCurry.

8          So that's our position on that.  That's the only

9   change at this point.  We've already lodged our objection on

09:48:52   10   the materiality definition.  The Court overruled us.  We're

11   not persisting at this moment --

12          THE COURT:  Well, wait a minute.  The instruction I

13   think that we went through, the plaintiff must prove each of

14   the following things by a preponderance of the evidence:

09:49:07   15          One, Defendant Byrne and/or Dignan knowingly

16   concealed from the prosecutor exculpatory and/or impeachment

17   evidence, and the evidence was not otherwise available to the

18   plaintiff through the exercise of reasonable diligence to make

19   use at his criminal trial, and/or knowingly fabricated

09:49:24   20   evidence that was introduced against plaintiff at the criminal

21   trial.

22          MS. BONJEAN:  Right.  And we -- what we have proposed

23   in this lengthy motion that we filed with exhaustive research

24   and four sets of jury instructions in other fabrication cases

09:49:39   25   is that after the language "knowingly fabricated" that there

1  also be language "or knowingly participated in fabricating."

2        So -- because it would be a misstatement of the law,

3  it would be actually reversible error, from our perspective,

4  if the defendants were to get up and suggest that plaintiff

09:49:56  5  can't meet his burden on fabrication if Byrne and Dignan

6  weren't the ones who introduced it to the jury.

7        MR. BARNETT:  Your Honor, may I be heard?

8        THE COURT:  Yeah.  I'm not sure I'm following that,

9  but go ahead.

09:50:10  10        MR. BARNETT:  Your Honor, we've already resolved this

11  jury instruction issue.  It was agreed -- it was actually the

12  plaintiff's instruction the -- other than the materiality

13  which Your Honor ruled in, so this is the plaintiff trying to

14  add a non-pattern clause into this instruction after the Court

09:50:27  15  has already agreed and accepted this instruction.

16        Now, this -- this instruction is not included in the

17  notes.  It's something that they added at the last minute when

18  they realized that their case wasn't going the way that they

19  want it to, Your Honor.

09:50:43  20        THE COURT:  Wait a minute, I'm not -- I'm trying to

21  figure out what's the difference between plaintiff's proposal

22  and the one that we allegedly agreed upon.

23        MR. BARNETT:  Your Honor --

24        MS. BONJEAN:  So, Judge, the difference is the

09:50:55  25  knowingly -- it's the participation language, which was added,

1735

1   again, in instructions in *Deon Patrick*, *Jacques Rivera*,

2   *Nathson Fields* and *Avery* cases.

3        THE COURT:  No, no, I'm not asking that.  I'm asking

4   what's the difference between --

09:51:10

5        MS. BONJEAN:  Because, Judge, as I explained, Byrne

6   and Dignan, and they've already actually highlighted this

7   point, didn't testify about Mr. Wrice's inculpatory

8   statements.  They didn't get on the stand and say Mr. Wrice

9   confessed to us.  Mr. Wrice inculpated himself to us.

09:51:29

10       It was the assistant state's attorney, who was not

11   part of the coercion, and as the Seventh Circuit has made

12   clear over and --

13       THE COURT:  Wait a minute, are we in coercion or on

14   the fabrication?

09:51:43

15       MS. BONJEAN:  The fabrication, Judge.

16       So what I'm saying is the ASA, the ASA had nothing to

17   do with the fabricated statement, right?  He testified to it,

18   but he had nothing to do with causing it, and in *Whitlock* --

19       THE COURT:  Well, here, it says in the exercise -- to

09:52:07

20   make use and/or knowingly fabricated evidence that was

21   introduced against plaintiff at his criminal trial.  Doesn't

22   have anything to do with the state's attorney.  It has to do

23   with whether or not Byrne and/or Dignan fabricated evidence.

24       MS. BONJEAN:  I understand, but, Judge, and this

09:52:25

25   is -- this is why it's so important that the defendants are

1  going to suggest that Mr. Wrice didn't confess to Byrne and

2  Dignan, he confessed to the assistant state's attorney; and,

3  therefore, therefore, he cannot satisfy his fabrication claim

4  because the assistant state's attorney had nothing to do with

09:52:46  5  creating that or manufacturing that evidence.

6  Mr. McCurry had nothing to do with manufacturing that

7  evidence.  Mr. McCurry got on the stand and testified about

8  it, but he had nothing to do with causing it.  So it is

9  important that we be able to argue to the jury, and they be

09:53:02  10  precluded from misstating the law, that it's enough that these

11  detectives participated in manufacturing this evidence and

12  then the jury -- or then the ASA McCurry is the one who

13  received the evidence.  He didn't cause it.  It's the causal

14  issue, Judge, and this is, again --

09:53:20  15  THE COURT:  Well, it says and/or knowingly

16  fabricated -- that was introduced.  They didn't introduce it.

17  McCurry did, or I suppose you could say the state's attorney

18  introduced it.

19  MS. BONJEAN:  Right, the state's attorney introduced

09:53:37  20  it.

21  THE COURT:  But I don't see how this any way, shape,

22  or form is different.  That's -- I mean --

23  MS. BONJEAN:  Well, because when you hear their

24  closing arguments, Judge, I think you will know because they

09:53:45  25  will get up here, as they did, and say Dignan didn't even

1    testify, Byrne didn't even testify about the statements, so
2    how could they have fabricated evidence?

3              That's what the argument's going to be.

4              THE COURT:  Because the plaintiff testified that they
5    fabricated his testimony, that they told him, they coerced him
6    actually, into fabricating a statement.

7              MS. BONJEAN:  Exactly.

8              THE COURT:  I don't see the point, to be honest with
9    you.

10             MS. BONJEAN:  I mean, Judge, like I said, in multiple
11   fabrication cases where, again, the evidence comes in through
12   a witness who did not cause the fabrication, this language is
13   very customary, and I think it's appropriate here.

14             THE COURT:  Yeah, but the one that fabricates is the
15   one that introduces it to the person who puts it in unless
16   they have evidence -- if McCurry had said, I lied and it was
17   all my doing, that I decided to do it.  I don't see that's a
18   problem.

19             But moving on to the second claim, coerced
20   interrogation claim, there was a big argument which I sided
21   with the defendants, that plaintiff must prove damages and
22   injury.

23             I am, I think, ready to concede that I was wrong and
24   that does not -- damages is not an element, and I would cite
25   to -- where did I put it -- a case that I haven't -- I don't

1   recall being cited before, if I can find -- here it is,

2   Posner's opinion in *Wilson v. City of Chicago*.

3        In that case, Wilson had murdered two police officers

4   and was -- but he was tortured, and the plaintiff argues

5   that -- well, anyway, so they wanted to put in, they wanted to

6   put in all the evidence they could as to how horrible Wilson

7   was, the plaintiff, was, and all -- but the district judge,

8   blah, blah, blah, blah, but even a murderer has right to be

9   free from torture and the correlative right to present his

10  claim of torture to a jury that has not been whipped into a

11  frenzy of hatred.

12        Now, I read that by saying -- in fact, this

13  particular case the defendant had been convicted, and he

14  wasn't seeking damages for wrongful imprisonment because his

15  case was even on appeal.

16        So it seems to me that I think -- I think if he

17  proves he's tortured, then the jury should determine whether

18  or not he was entitled to -- if and what, so I'll turn it back

19  to you guys.

20        MR. JEBSON:  Sure, Judge.

21        We believe that there still is an element of damages.

22  However, if you look at our proposed instruction, that is

23  where we mention the nominal damage.  The damage is the

24  confession.  Assuming it was coerced, the damage is the

25  coerced confession being used against the defendant at the

1  criminal trial.  So that's the damage.  That's why --

2      THE COURT:  Right.

3      MR. JEBSON:  That's why you need the nominal damage

4  language right after that instruction because that is the

5  nominal damage.

6      So the jury -- if -- the jury could find that Stanley

7  Wrice is guilty, and they could also find that a confession

8  was coerced.  So let's say they find that.  Let's say they

9  believe that there was a confession.  They deem it a

10 confession and it was coerced, but they also believe Stanley

11 Wrice was guilty.

12     So the damage is -- it's a nominal damage because his

13 constitutional rights were violated in that his confession was

14 coerced; but because they believe he's still guilty, there is

15 no other damages other than the nominal damages.

16     This is the perfect example why the pattern

17 instruction has this section on nominal damages where the

18 simple fact of violating the Constitution --

19     THE COURT:  We're including nominal damages.

20     MR. JEBSON:  I understand that, Judge, but that's why

21 there still has to be a line that the plaintiff was damaged,

22 and the damage was the confession being used against him at

23 trial.

24     MS. BONJEAN:  Judge, they have zero authority and, in

25 fact, the authority that exists out there in the cases that

09:57:14

09:57:31

09:57:45

09:57:59

09:58:10

1  we've cited and we've provided jury instructions in the *Deon*

2  *Patrick* case, where that had both a fabrication claim and a

3  compelled self-incrimination claim; *Scott* we provided a set of

4  instructions, *Scott vs. City* of Chicago, and *Walden*.

09:58:28  5  Never once has there been nominal damages.  It is --

6  it is actually no authority to say that he's only entitled to

7  nominal damages.

8  You can have emotional trauma from sitting in a

9  courtroom and watching your own words come in against you.

09:58:42  10  Now, I'm not saying, you know, that it's a damages that would

11  amount to the same as 31-year wrongful conviction, but to say

12  it's just nominal, there's no authority for it.

13  And in *Wilson* they certainly didn't give anything

14  like that.  He didn't get that much money.  I think he got

09:59:00  15  40,000 or something.

16  THE COURT:  Well, but the point of the matter is that

17  you can argue that the damages are greater -- this is the same

18  one that you gave me before, isn't it?

19  Yeah, this is the one I got that you got -- wait a

09:59:32  20  minute.

21  This is the second time around?  Oh, let me read

22  this.  This is the *Wilson* case.

23  (Pause.)

24  THE COURT:  Well, the point of the matter is that in

10:00:34  25  the -- in a torture case, the plaintiff proves he was

1  tortured, then he'd be entitled to some compensation.

2  MS. BONJEAN:  Yes, and it's not -- I don't know where

3  the defendants get the idea that it's just nominal.  What they

4  suggest is that because the Constitutional claim didn't become

5  complete until it was introduced at trial that that means it's

6  nominal damages.  No authority whatsoever for it, and their

7  instruction doesn't even cite a single case, not a single

8  example, nothing that would say that this Court should -- in

9  fact, it would be -- it would be very problematic if this

10  Court were to instruct the jury on what the damages should be

11  in a coercive interrogation claim.

12  I can't even imagine -- I have never heard of that in

13  this other, and they haven't either because they haven't cited

14  one.  But we do know in the cases -- and what's interesting in

15  the jury instructions that we offered the judge -- Your Honor

16  in these other cases, the defendants there didn't even make

17  this argument.  It's such a novel argument and kudos to them,

18  I guess, on their novel argument, but it's not even an

19  argument that has been presented, as best as I can tell.

20  It's not up on appeal in the *Deon Patrick* case.  It

21  wasn't raised in the post-trial motions.  It's just a novel

22  argument that has no authority and actually runs afoul of the

23  Seventh Circuit decision in *Wilson* where they did not -- the

24  court in *Wilson* did not direct the jury to find nominal

25  damages.

1     MR. JEBSON:  No one is directing the jury to find

2  nominal damages.

3     THE COURT:  Well, it is if you return a verdict for

4  plaintiff and the plaintiff has failed to prove compensatory

5  damages, then you must award nominal damages, $1.  I don't

6  think --

7     MR. JEBSON:  Judge, what the plaintiff is describing

8  is an excessive force claim.  It is not -- the coercive

9  confession claim is only a claim when the coerced confession

10  is introduced at trial.

11     So in other words, if a police officer beat up

12  someone to the point of death and they finally confessed but

13  that confession was never introduced at trial, they would have

14  an excessive force claim, and they would be entitled to

15  damages for that physical abuse.  It is -- there is no cause

16  of action for coerced confession claim until that confession

17  is used at trial.

18     It's not that that's when the statute of limitations

19  run.  That's the cause of action.  That is one of the

20  necessary elements that makes it a cause of action.  Without

21  the introduction at trial, there is no cause of action, and

22  it's simply an excessive force claim.

23     So they're trying to get excessive force claim

24  damages on a coerced confession claim, and that's simply not

25  the law.

1           MS. BONJEAN:  Judge, we've gone through this.

2    They've lost this argument so many times.  They've raised it

3    in the motions to dismiss and summary judgment, and they don't

4    like the claim.  We get it.  But Judge Bucklo said more than

5    once it is a free-standing claim, period, and it is different

6    from -- we're not arguing an excessive force claim, but there

7    can be damages that are associated with a coerced confession

8    that is used against someone.

9           And, again, in *Wilson*, the Court recognized as much.

10   I just don't know how many times we have to go around and

11   around about this.  They don't like it, but, yes, there are

12   damages associated with taking someone to a basement, beating

13   a confession out of them, and then going into court and using

14   that statement against them.  And whether he's guilty or not,

15   that's a constitutional violation and it does warrant damages,

16   maybe it's not a 31-year wrongful conviction damages, but it's

17   damages beyond nominal damages, and it's up for the jury to

18   decide what it is worth.

19           MR. BARNETT:  Your Honor, that's all argument that

20   the plaintiff is free to make.  The nominal damages, someone's

21   constitutional rights can be violated, and the jury might find

22   you're entitled to $1.  That happens all the time.

23           People -- police officers going in with a no-knock

24   warrant not knocking.  The jury finds you're right, they

25   unreasonably searched the house, but there was drugs in there,

1  so they're entitled to nominal damages.

2  That's all argument that the plaintiff can make, but

3  what she's trying to get, Your Honor, is for the Court to not

4  instruct on nominal damages, which is simply not the law.  It

10:05:09  5  completely disregards binding Seventh Circuit precedent.  It

6  completely disregards and takes away the power of the jury to

7  award nominal damages.  That's absolutely ludicrous.

8  MS. BONJEAN:  Their proposed instruction says you

9  must find nominal damages.  They're the only ones --

10:05:28  10  THE COURT:  That is wrong.  They don't -- there isn't

11  a "must."  They can actually return a zero if they wanted.

12  Here's what I'm going to do.  I'm going to give the

13  second claim coerced interrogation over the objection of the

14  defendants without Paragraph 3, and I'm going to strike the

10:05:48  15  nominal damages.  You can certainly argue nominal damages that

16  if they think that plaintiff was, so we will -- the damages

17  compensatory will no longer have that paragraph.

18  Anything else, the rest of them?

19  MR. BARNETT:  Your Honor, I just want to make sure

10:06:09  20  that you are completely -- you are completely striking any

21  language relating to nominal damages in the compensatory.

22  THE COURT:  Right.  You can argue that.

23  MR. BARNETT:  Okay.

24  THE COURT:  The privilege of self-incrimination

10:06:21  25  protects an individual -- I don't -- that was an instruction,

1    is that --

2         MS. BONJEAN:  Yes, so, Judge, in -- in responding

3    to -- so the proposed instruction that they had offered on the

4    what we've called the coerced interrogation claim, and I think

5    the Court hopefully has my revised Fifth Amendment claim

6    instruction that was attached to the motion to address -- it's

7    essentially the same that we had previously proposed.

8         THE COURT:  Wait a minute.

9         MS. BONJEAN:  But if the Court is giving that

10   instruction over their objection --

11        THE COURT:  Wait a minute.  Which -- the one that --

12   let me see, where is it?

13        MS. BONJEAN:  Judge, it's entitled violation of

14   plaintiff's right against compelled self-incrimination, which

15   is really --

16        THE COURT:  Just a minute.

17        MS. BONJEAN:  -- the -- and if you want a copy, I

18   have right here, Judge.  I don't know if you --

19        THE COURT:  Is that one of the ones that was -- I

20   know I ordered one to be given.

21        MS. BONJEAN:  No, this is the one that we were

22   still -- so where we left it on Friday is --

23        THE COURT:  Oh, we left it?  Okay.

24        MS. BONJEAN:  They had proposed one.

25        THE COURT:  Okay.

1    MS. BONJEAN: And we just were supposed to go back

2  and forth, and obviously we didn't make any headway there,

3  but -- and we filed our motion with additional authority,

4  but -- and it's -- this is the one that I attached to the

5  motion that was filed. I don't know. I have a paper copy

6  here if the Court wants to look at it.

7    It's essentially the same as what we proposed. The

8  title is a little different, but -- because we realized that

9  one of the defendants' arguments -- and you've heard it,

10 you've heard it through Judge Lampkin's testimony: He didn't

11 confess, he didn't confess, as if you have to confess to all

12 elements of every offense to have your Fifth Amendment right

13 against compelled self-incrimination.

14    THE COURT: Well, here's what I -- according to my

15 notes, saying you didn't agree to because the defendant

16 certainly objects, when asked certain questions while

17 testifying in this case and during the prior depositions under

18 oath, plaintiff's -- obviously --

19    MR. BARNETT: I think that's the invocation of the

20 Fifth Amendment.

21    MS. BONJEAN: That's the invocation --

22    THE COURT: Dignan and Byrne asserted their Fifth

23 Amendment right not to incriminate themselves and instead

24 remained silent. You may draw an inference against the

25 defendants Dignan and Byrne as a result of their decision to

1  invoke their Fifth Amendment right instead of testifying, and

2  you may assume but are not required --

3         MR. JEBSON:  I think --

4         THE COURT:  -- that any response that they might have

5  given to the question asked of them would have been

6  unfavorable to them and would have incriminated them.

7         MR. JEBSON:  I think she's talking --

8         MS. BONJEAN:  We're not talking about that one,

9  Judge.  We're not at odds on that.

10        I'm still focused on the claim that we just

11  discussed, the second claim that the Court ruled in our favor,

12  and we had modified that instruction from what we proposed

13  just a little bit, and that was what was attached.

14        THE COURT:  Wait a minute.  Back up now.

15        You're on the second claim still?

16        MS. BONJEAN:  Yes.

17        THE COURT:  Now what's -- what's your point now, the

18  second claim?

19        MS. BONJEAN:  I don't know which version you have in

20  front of you, Judge.

21        THE COURT:  I've got I think the latest one, I think.

22        MS. BONJEAN:  Yes, I just want to make sure that

23  that's the one that is --

24        THE COURT:  Yeah, self-incriminating was used in a

25  criminal proceeding -- each of these -- then you must decide

1748

1   for plaintiff and go on to the consider the question of

2   damages.

3           MS. BONJEAN:  Yes, that's it.

4           THE COURT:  What's the --

10:10:08   5   MS. BONJEAN:  Nothing.  I just wasn't sure what the

6   Court was looking at.  I wanted to make sure you had --

7           THE COURT:  Yeah, now what's --

8           MS. BONJEAN:  So we also proposed a corollary

9   instruction, as the Court is aware, that --

10:10:22   10   MR. BARNETT:  And just for the record, Your Honor --

11          THE COURT:  Wait a minute.

12          MR. BARNETT:  -- the defendant has proposed a counter

13   instruction.  It's Docket No. 567, Page 21.  And this jury

14   instruction, which is entitled second claim, is based on the

10:10:39   15   jury instruction conference on Friday.

16          THE COURT:  I don't see that one.  Do you have an

17   extra copy?

18          MR. BARNETT:  I do have an extra copy.

19          MS. BONJEAN:  This is the one you just overruled, so

10:10:53   20   I don't know --

21          MR. BARNETT:  May I approach?

22          THE COURT:  Yeah.

23          MR. BARNETT:  I'm handing the Court 567, the docket,

24   and for the Court's convenience, and I gave counsel the same

10:11:02   25   one, I've tabbed off 1, 2 and 3, and those are the three

1749

1    claims.

2        THE COURT:  Second claim, coerced claim?

3        MR. BARNETT:  Yes, Your Honor.

4        MS. BONJEAN:  Yes.

5        THE COURT:  That's the one I just said I was ruling

6    in favor of the plaintiff on that.  We've eliminated No. 3.

7        MR. BARNETT:  There is one other issue, Your Honor,

8    and this has to go with 2 of the plaintiff's newly proposed

9    instruction.  The one I believe that she is referring to,

10   which has language taken from *Miranda*, and then also there's

11   another instruction that the plaintiff has proposed that the

12   Court ordered us to shorten and include in the second claim

13   instruction itself.

14       So the defense has, and we took the language from the

15   plaintiff's prior jury instruction that the use in a state

16   criminal trial and all that, we boiled that down to what the

17   issue is.

18       THE COURT:  Wait a minute.  What are we talking about

19   now?  Which instruction?

20       MS. BONJEAN:  So, Judge, we had proposed in our

21   original packet of instructions, it was originally Plaintiff's

22   Instruction No. 23, and it was the instruction that read, "The

23   use in a state criminal trial of a defendant's" --

24       THE COURT:  Oh, okay, I have that.

25       MS. BONJEAN:  Right.  They objected to that.  They --

1   they say that they proposed something else that is not at all

2   consistent with U.S. Supreme Court law going back about

3   40 years.

4               THE COURT:  What is the alternative to this one?

5               MR. BARNETT:  It is Docket 567, Page 21.

6               THE COURT:  Is that in here?

7               MR. BARNETT:  Yes, Your Honor.  I just handed you

8   567.  It's actually Tab No. 2.

9               MS. BONJEAN:  It's the one you just --

10              THE COURT:  Oh, Tab 2.

11              MS. BONJEAN:  The one you just rejected again.

12              THE COURT:  Yeah, that's the one --

13              MR. BARNETT:  Your Honor, but the language from this,

14  a lot of this is overblown rhetoric that is not necessary to

15  the issues at hand.  We actually condensed this and included

16  it in the claim instruction itself as Your Honor ordered.

17              THE COURT:  Where?

18              MR. BARNETT:  It is after 3, it says, "A confession

19  is coerced if it is the result of physical abuse or the threat

20  of physical violence that have overcome the individual free

21  will."

22              MS. BONJEAN:  Well, that's not a correct --

23              THE COURT:  I don't see that.  I don't see that in

24  the number -- wait a minute.

25              MR. BARNETT:  Under No. 3.

1    THE COURT:  Okay.  Confession is coerced if it was

2    the result of physical abuse or threat of physical violence

3    that have overcome the free will.

4    MS. BONJEAN:  That's just really not at all an

10:13:33   5    accurate statement of the law because we all know that

6    under --

7    THE COURT:  It's more than -- yeah, it should be more

8    than physical.

9    MS. BONJEAN:  You can have psychological abuse.  You

10:13:41  10    can have all types of things.

11    MR. BARNETT:  Your Honor, I believe that in this

12    case, the plaintiff testified that he made the statements

13    because of the physical violence.  This is not a situation

14    where the officers used psychological interrogations that

10:13:54  15    violated the Fifth Amendment.

16    THE COURT:  Well, I disagree with that because they

17    told him if he didn't confess, they'd take him down and beat

18    him up more.

19    MR. BARNETT:  And -- and the defense instruction

10:14:05  20    said --

21    THE COURT:  All right.  Physical --

22    MR. BARNETT:  -- the threat of physical violence.

23    MS. BONJEAN:  Right.  It's not just the threat

24    though, Judge.  I mean, all of these men have testified about

10:14:13  25    the fear, the intimidation you fear, the mental --

1752

1           THE COURT:  Result of physical or psychological.

2           MS. BONJEAN:  But, Judge, that can't -- this -- it

3     has to be a separate instruction.  It can't be part of

4     their --

10:14:24    5           THE COURT:  Why not?

6           MS. BONJEAN:  Because you rejected -- they're

7     including it in this -- this claim that you rejected.

8           THE COURT:  What?

9           MR. BARNETT:  Your Honor, you did instruct --

10:14:33    10          MS. BONJEAN:  Please.  It's --

11          THE COURT:  No, no, no, wait.  I'm not following you.

12          Second claim, the one that --

13          MS. BONJEAN:  You gave ours.  You've agreed to give

14    ours.

10:14:43    15          THE COURT:  I did, but I said I'm going to give it

16    without the third paragraph.  A confession is coerced if it is

17    the result of physical or psychological abuse or the threat of

18    physical or psychological abuse --

19          MS. BONJEAN:  Okay --

10:14:58    20          THE COURT:  -- that --

21          MS. BONJEAN:  No, Judge, please --

22          THE COURT:  -- overcomes the -- overcomes the

23    individual's free will.

24          MS. BONJEAN:  Judge, Judge, I have to know which one

10:15:06    25    you're going with because --

1          THE COURT:  I'm going on the one that was submitted

2     by the defendants --

3          MS. BONJEAN:  No --

4          THE COURT:  -- that now is --

10:15:15    5          MS. BONJEAN:  Okay.  We have more problems with it

6     then, Judge.

7          THE COURT:  What?

8          MS. BONJEAN:  Okay.  Please.  You said you were going

9     to submit ours, and then now you're going back to theirs.

10:15:24   10          THE COURT:  No, I said yours to the extent that I'm

11     eliminating --

12          MS. BONJEAN:  But there's a lot of differences in it

13     that need to be addressed.

14          THE COURT:  Well --

10:15:31   15          MS. BONJEAN:  First of all, if you could just put the

16     two claims side by side and then I can go through it and we

17     can get on the same page because, I mean, it's only one of the

18     most important instructions, and it's worthy of time.  I

19     don't -- we need to make sure that we're all on the same page

10:15:46   20     about this instruction.

21          So first of all, what I have proposed, which is the

22     violation of plaintiff's right against compelled

23     self-incrimination, which is the appropriate way to entitle it

24     because it is the right against self compelled -- compelled

10:16:01   25     self-incrimination.  Their --

1754

1        THE COURT:  Here I'm reading your instruction.

2  "Plaintiff claims the Defendants Byrne and Dignan violated his

3  constitutional right against self-incrimination under the

4  Fifth and Fourteenth Amendment to the United States

5  Constitution."

6        MS. BONJEAN:  Correct.

7        THE COURT:  "To succeed on this claim, plaintiff must

8  prove each of the following by a preponderance of the

9  evidence:  One or more of the defendants participated in

10  coercing plaintiff to provide a self-incriminating statement;

11  two, the self-incriminating statement was use in a criminal

12  proceeding."

13        MS. BONJEAN:  Correct.

14        THE COURT:  That's it?

15        MS. BONJEAN:  That is what -- yes, that's it.

16        THE COURT:  Well, okay, then what's the matter with

17  this one?  I mean, it's better than the --

18        MS. BONJEAN:  Because the language they use, which is

19  not -- what they say is Defendant Byrne or Dignan coerced

20  plaintiff to confess to the charged crimes and coerced

21  plaintiff to repeat the confession to another.  That's not

22  what we have to prove.  A confession actually as a matter of

23  law is an admission to every element of every offense.  That's

24  not accurate.

25        THE COURT:  No, I agree with that, but --

1      MS. BONJEAN:  In fact, *Miranda* says even statements

2   that are exculpatory if they're used by the prosecution are

3   incriminating because they, as they did in this case, which is

4   to show that the defendant was a liar, Mr. Wrice was a liar.

5   So it doesn't turn on the word "confession" or how it was

6   obtained --

7      THE COURT:  I agree with her, that it doesn't -- I

8   know there's been a back-and-forth on what is the definition

9   of confession, and one of the definitions is that you

10   inculpate yourself, which is what we've been talking about,

11   inculpating statements, as opposed to confession.

12      I know that the argument's been made over and over

13   again that he never confessed because he never did say that I

14   did all -- you know, that I did everything aspect of it, but

15   he did say he went upstairs and dropped a --

16      MR. BARNETT:  Yes, that's correct, Your Honor.  I

17   think --

18      THE COURT:  Certainly inculpating that he went

19   upstairs.  So that, in and of itself, it seems to me is

20   compelled self-incrimination.

21      MS. BONJEAN:  Right.

22      THE COURT:  So I'm --

23      MR. BARNETT:  Your Honor --

24      MS. BONJEAN:  So if they want to include within our

25   proposed instruction, if we can agree to -- if the Court wants

1    to include this confession -- what a coerced confession is in

2    ours, we can do that.  I have no problem with that.

3         But we cannot use the language about -- that we have

4    to show that he confessed the charged crimes --

10:18:23    5         THE COURT:  All right.

6         MS. BONJEAN:  -- when the U.S. Supreme Court --

7         THE COURT:  The easiest thing for me to do I think at

8    this point is, and I don't see anything particularly wrong

9    with the plaintiff's, so I will give the plaintiff's, as

10:18:35    10   opposed to the one that's proposed that we talked about on

11   Friday night.

12        MR. BARNETT:  Yes.  Your Honor, the -- I think the

13   main issue that we have about this one is that on Friday

14   night, Your Honor -- Your Honor directed us to include

10:18:49    15   language defining and putting in context what a coercion is,

16   and so that is this sentence in the defense, Page 21 of 567.

17        That's, you know, the language that Your Honor wanted

18   included in the coerced interrogation claim or the compelled

19   self-incrimination claim to provide context, and that is the

10:19:15    20   language that Your Honor was -- was discussing just a few

21   moments ago to include on this particular jury instruction.

22        MS. BONJEAN:  I don't know what he's saying.

23        THE COURT:  Wait a minute, wait, wait, wait.  Let me

24   just see.

10:19:50    25        Okay.  I can add a -- after 2 --

1757

1   MS. BONJEAN:  We would propose --

2   THE COURT:  Just a minute.

3   I add this after Paragraph 2 on plaintiff's:

4   "Coercion may be result of physical or psychological abuse or

5   threat of physical or psychological abuse."

6   How's that?

7   MR. BARNETT:  Your Honor, I do believe that the

8   remainder of the defendants' proposed sentence "that have

9   overcome the individual free will."  That is a hallmark of the

10  Fifth Amendment claim.  You have to overbear an individual's

11  free will to make them -- to give them a self-incriminating

12  statement.

13  So I do believe that the latter, that the end of that

14  sentence should be "that have overcome the individual's free

15  will."

16  MS. BONJEAN:  That goes to -- are we defining a

17  voluntary confession there, or are we just defining coercion?

18  So that's the -- he's conflating two issues.

19  THE COURT:  Let me -- I'm just defining coercion.

20  MS. BONJEAN:  So yes.

21  THE COURT:  Here's the instruction.  I'm going to use

22  Plaintiff's 1 and then add the following language after

23  enumerated Paragraph 2:  "Coercion may result" -- "may be the

24  result of physical and/or psychological abuse or the threat of

25  physical or psychological abuse."

1758

1    MS. BONJEAN:  That is acceptable to the plaintiff,

2    since it's just a definition of what constitutes coercion.

3    THE COURT:  Yeah.

4    All right.  So defense objects.  You don't object

5    anymore?

6    MS. BONJEAN:  No.  We're okay with that instruction.

7    THE COURT:  All right.

8    Now -- so your Instruction 23 has been refused.

9    The concealment of exculpatory evidence,

10   fabrication -- my understanding that fabrication has been

11   included in the agreed -- or the instruction that I'm supposed

12   to give, so I don't see any need to change that.

13   Now, conspiracy, what's the problem with the one that

14   we've agreed to?

15   MR. BARNETT:  Your Honor, last night I believe they

16   proposed an entirely different conspiracy claim.

17   What I did in Docket 567, Page 22 of 35, was follow

18   Your Honor's instructions to the letter, modify the jury

19   instruction to include Your Honor's rulings on Friday during

20   the jury instruction, and that is what the defendants' third

21   claim conspiracy element jury instruction is.

22   The plaintiff has proposed a completely new

23   instruction after Your Honor has already agreed and ordered

24   that the prior proposed instruction be given.

25   MS. BONJEAN:  This Court didn't order anything.  I

1   don't know -- that's a very aggressive way of looking at our

2   final pretrial -- our instruction.  We had disagreements, and

3   I was trying to address some of the concerns --

4           THE COURT:  All right.  What's your problem with the

5   one that --

6           MS. BONJEAN:  Well, first of all, I don't believe

7   it's necessary.  They're defining the claims again in a way

8   that is not accurate.  Using coercion to force plaintiff to

9   confess, again, I am -- it's, again, the whole word "confess"

10  is problematic because we don't have to show that.  We have to

11  show self-incriminating statements.

12          I, frankly, think we should take out all of --

13  their -- the description of the claims and just deprive him of

14  his rights under the United States Constitution by one of the

15  prior claims.  We can just refer back to the claims without

16  having us redefine them again in this instruction that may or

17  may not be consistent.

18          THE COURT:  Let's see.  Let's get this down.

19          It could be very easy to --

20          MR. BARNETT:  Your Honor, we can modify the defense

21  proposed instruction to change that from using coercion to

22  force plaintiff to confess to, as Your Honor previously ruled

23  over our objection, to make a self-incriminating statement --

24          THE COURT:  Yeah.

25          MR. BARNETT:  -- we can change that.

1    THE COURT:  Yeah, well, take out -- yeah.  So in the
2  second claim to make self-incriminating statements.
3    MR. BARNETT:  And that statement was introduced
4  against plaintiff in his criminal trial.
10:25:50   5    THE COURT:  Repeat the self -- okay.  And then
6  conspiracy is agreement -- enter an agreement among
7  themselves --
8    MS. BONJEAN:  We object, Judge.
9    So, No. 1 that they have proposed -- well, before we
10:26:16  10  get there, we proposed in our instruction that the language
11  just telling the jury what a conspiracy is, which is an
12  agreement to accomplish an unlawful purpose or to accomplish a
13  lawful purpose by unlawful means, we proposed that language.
14  It's not controversial.  It just kind of tells the jury what
10:26:33  15  it is.  I don't know if they have an objection to that or not.
16    THE COURT:  Yeah, why don't we just do this.  Third
17  claim, conspiracy.  Plaintiff claims that one or more of the
18  defendant officers conspired to deprive him of his rights
19  under the Constitution as -- let's see -- as described in
10:26:56  20  these instructions.
21    MS. BONJEAN:  That's fine, Judge.
22    THE COURT:  Then we -- then I think the rest of the
23  regular -- the instruction that we went through would be okay.
24    MS. BONJEAN:  Well, I don't know which one you're
10:27:14  25  looking at if you're looking at --

1761

1    THE COURT:  I'm looking at the ones in their packet.

2    MS. BONJEAN:  Okay, so, Judge, "Plaintiff was injured

3  as a result" I don't think is accurate.  It's "Plaintiff's

4  constitutional rights were violated as a result."  That is the

5  language -- I don't know where they're getting that "was

6  injured as a result."

7    The issue is whether the conspiracy resulted in the

8  plaintiff's constitutional rights being violated, and then you

9  go to damages.  I don't know what this injury language is.  I

10  think that is not consistent with the law and is certainly not

11  consistent with any conspiracy instructions that I've seen.

12    MR. BARNETT:  This was based on Your Honor's decision

13  in the prior jury instruction.  We can put -- we can change it

14  that "Plaintiff's constitutional rights were violated as a

15  result as described" or something along those lines.

16    THE COURT:  Yeah.

17    MS. BONJEAN:  I mean, we may as well just use the one

18  I proposed then because this is exactly --

19    THE COURT:  Okay, we'll --

20    MS. BONJEAN:  We're not really in that much of

21  agreement, but they're playing with language that is

22  misleading and not consistent with the law.

23    THE COURT:  Okay.  Well, you're winning that one.

24    MS. BONJEAN:  Well --

25    THE COURT:  All right.  Anything else?

10:27:27
10:27:42
10:28:00
10:28:09
10:28:20

1    MS. BONJEAN:  We have proposed, Judge, this

2    instruction that the privilege against self-incrimination

3    protects an individual from being compelled to incriminate

4    himself in any manner.  It does not distinguish degrees of

5    discrimination.

6        I will say this, Judge.  Since the Court is giving

7    our instruction on this compelled self-incrimination, I don't

8    know if it's necessary, but if they misstate the law in

9    closing arguments that somehow there are degrees of

10   incrimination and that he didn't fully confess or something of

11   that nature, we are going to ask that this be given to the

12   jury.

13       THE COURT:  All right.  Well, okay, but it seems,

14   first of all, the second clause, it does not distinguish

15   degrees of incrimination.  I'm not --

16       MS. BONJEAN:  That's right out of *Miranda*.  It's

17   right out of two U.S. Supreme Court cases.

18       THE COURT:  No wonder nobody can understand these.  I

19   can't, but anyway --

20       MS. BONJEAN:  I mean, I --

21       THE COURT:  Well, anyway, I'm not going to give that.

22   You're withdrawing it in favor of what else we've done.

23       MS. BONJEAN:  Right, but I would ask but if they do

24   misstate the law and suggest that he had to confess to all

25   elements of the crime or something of that nature, I may renew

1      my objection.  That's what I wanted to --

2              THE COURT:  Did you get all of this, can you do those

3      for us?

4              THE LAW CLERK:  Sorry?

10:29:37   5          THE COURT:  These three that we've redone.

6              THE LAW CLERK:  Yeah.

7              THE COURT:  All right.  What else have we got?

8              MS. BONJEAN:  My Rule 50 motion, Judge.

9              THE COURT:  Your what?  What's your Rule 50 motion?

10:29:50   10         MS. BONJEAN:  Oh, we filed a Rule 50 motion, Judge.

11             THE COURT:  You want a directed verdict?

12             MS. BONJEAN:  Yes, on the coerced interrogation claim

13     or the compelled self-incrimination claim.

14             THE COURT:  I think those are questions of fact for

10:30:02   15     the jury.  I'm going to refuse the motion.  We'll submit it to

16     the jury.

17             MS. BONJEAN:  That's fine, Judge.  I wanted to.

18             MR. HALE:  I think the last item is, Your Honor, us

19     formally moving some things into evidence.

10:30:13   20         MS. BONJEAN: Oh, yeah.  We have some --

21             THE COURT:  Oh, yeah.  Have you exchanged your list

22     of exhibits, and which ones is there a problem with?

23             MS. BONJEAN:  Ones that were never marked during the

24     trial.

10:30:21   25         THE COURT:  Pardon?

1     MS. BONJEAN:  They're attempting to put in some

2 evidence that was literally never marked or discussed during

3 trial whatsoever.

4     THE COURT:  That doesn't necessarily mean they won't

10:30:31  5 go in, but normally they don't.

6     MS. BONJEAN:  Well, I would have needed the

7 opportunity to examine witnesses with exhibits that they now

8 are trying to put in.

9     THE COURT:  Which ones are we talking about?  Well,

10:30:39  10 here.

11     MR. HALE:  Why don't we start --

12     THE COURT:  Actually, I asked the parties to get

13 together with a list of exhibits that they propose that should

14 go into evidence to the jury and exchange the lists --

10:30:56  15     MS. BITOY:  And we --

16     THE COURT:  -- so that I can be presented with a list

17 showing which ones are objected to and which ones aren't.  Has

18 that been done?

19     MS. BONJEAN:  Yes, that's been done.

10:31:06  20     THE COURT:  Okay.  Can I have those lists?

21     MS. BITOY:  I have a copy.

22    (Tendered.)

23     MS. BONJEAN:  Is that your list?

24     MS. BITOY:  That's what I emailed to you.

10:31:22  25     MS. BONJEAN:  But do you have our objections on it?

1    MS. BITOY:  I haven't received your -- if you emailed

2    it, I haven't received it.

3    THE COURT:  Wait.  They're supposed to have, each

4    list is supposed to have objections on it --

5    MS. BITOY:  Yeah, we didn't receive your objections.

6    THE COURT:  -- so that I can tick them off.

7    MS. BONJEAN:  Hold on one second.  We voiced -- I

8    have to ask Ashley.  Hold on one second, Judge.

9    Judge, if you want to look at their list, we can go

10   through it.  There's just a handful of things that --

11   THE COURT:  Let me see the list, and then you tell me

12   which ones.

13   All right.  Which ones do you claim -- oh, here.

14   MS. BITOY:  So I think the ones that they probably

15   have --

16   THE COURT:  Okay.  The ones that defendants on the

17   box on the left, you're okay with those, plaintiff?

18   MS. BONJEAN:  Correct.

19   THE COURT:  And defendant is okay with those in the

20   box from the plaintiff; is that right?

21   MS. BITOY:  Correct, Your Honor.

22   MS. BONJEAN:  With the --

23   THE COURT:  The proposals, they plan to move into

24   evidence --

25   MS. BITOY:  Right.

1  THE COURT:  -- Benson's motion to sever.

2  MS. BONJEAN:  So that was a motion that they tried to

3  get in through a witness that the Court denied --

4  THE COURT:  What's the relevance of the motion to

5  sever?

6  MS. JACOBS:  Your Honor, the relevance is that

7  they've made a claim that Rodney was beaten to make

8  statements.

9  This is a motion actually filed by Rodney Benson by

10  his counsel to sever the case.  Sidney Jones testified in

11  detail at the trial about what a motion to sever is, and he

12  actually said it's when one guy accuses the other guy and

13  they're cross-accusing, so he's already actually put into

14  evidence that Wrice was incriminating Benson and Benson was

15  incriminating Wrice.

16  They elicited that, and that's what a motion to sever

17  is.  And this is clear, clean evidence that Rodney Benson

18  voluntarily incriminated Wrice and wanted his trial severed,

19  and the severance was granted.

20  So it's -- they're the ones who put Rodney Benson on,

21  Your Honor.  We didn't sponsor Rodney Benson and those guys.

22  THE COURT:  What's the relevance of the motion to

23  sever?

24  MS. BONJEAN:  Judge, this is -- this is their --

25  THE COURT:  I'm asking her what's the relevance of a

1    motion to sever?  What issue in the case?

2                MS. JACOBS:  The relevance --

3                MS. BONJEAN:  They want to put in --

4                THE COURT:  Wait, wait.

10:34:10
5                MS. BONJEAN:  Oh, I'm sorry, I thought you looked at

6    me.  My apologies.

7                THE COURT:  No.

8                MS. JACOBS:  The relevance of the motion to sever,

9    one of the things the plaintiffs have been arguing throughout

10:34:16
10   is how unfair, Stanley got tried first.

11               Well, Stanley got tried first because he demanded

12   trial, and there wasn't a joint trial with Benson because --

13   because he moved to sever the case because Stanley was

14   making -- incriminating him, and he was going to incriminate

10:34:33
15   Stanley.

16               So it's relevant to explain the whole background of

17   how we got to where we were.

18               THE COURT:  I don't think that -- I'll refuse that

19   one.

10:34:43
20               14, guilty plea of Fowler, Benson and Holmes.

21               MS. JACOBS:  Your Honor, this one is right on their

22   exhibit list.

23               THE COURT:  Is it?

24               MS. JACOBS:  They filed a revised exhibit list on

10:34:54
25   February 13, 2020.

1    MS. BONJEAN:  Judge --

2    THE COURT:  Wait, wait, wait.  Is this on your --

3    MS. BONJEAN:  Judge, it's not.  We never used --

4    MS. JACOBS:  PX 24.

10:35:00    5    THE COURT:  Wait.  I'm asking her.  You said it's on

6    her witness list.

7    MS. BONJEAN:  It was on our final pretrial order.  We

8    never used this exhibit, and there's a reason why.  We used,

9    like, maybe two or three exhibits on our entire list.

10:35:11    10    Just because it's on our final pretrial order doesn't

11    obligate us to use it.

12    MS. JACOBS:  Your Honor --

13    MS. BONJEAN:  Please.

14    We didn't use it.  There was a reason we didn't use

10:35:19    15    it, and if it was going to come in as evidence, then we were

16    going to handle things differently.

17    They had every opportunity to put it in if they

18    wanted to.  We didn't want it in --

19    MS. JACOBS:  Your Honor --

10:35:27    20    MS. BONJEAN:  -- we chose not to put in for a reason.

21    MS. JACOBS:  Your Honor, this was on -- I can show --

22    THE COURT:  Okay.  Now, wait, wait.  Don't talk when

23    she's talking, please.

24    All right.  Now --

10:35:35    25    MS. JACOBS:  I can show you it's on her exhibit list

1    from February 13th --

2         THE COURT:  I know.  That doesn't mean -- it wasn't

3    moved into evidence.

4         MS. JACOBS:  We're moving it into evidence now, Your

5    Honor.

6         THE COURT:  Why?

7         MS. JACOBS:  And there was testimony, there was

8    detailed testimony about the plea --

9         THE COURT:  What's on the guilty plea other than the

10   fact that it's --

11        MS. BONJEAN:  Judge, if this was going to come into

12   evidence --

13        THE COURT:  Is it a guilty plea like we get here with

14   an extensive agreement as to the facts?

15        MS. JACOBS:  Your Honor --

16        MS. BONJEAN:  Judge --

17        THE COURT:  Wait, I'm asking --

18        MS. BONJEAN:  The guilty plea was taken by Terry

19   Gillespie.  I would have called Terry Gillespie if I was going

20   to put it in.

21        THE COURT:  Wait, wait, wait.  Is this a written

22   plea?

23        MS. BONJEAN:  No.  It's transcripts of a guilty plea,

24   and it's --

25        THE COURT:  Okay.  That would be a lot of hearsay, so

1   I'll excuse that -- exclude that.

2          Byron's death certificate.  What's the relevance of

3   that?

4          MS. BITOY:  There was no objection on the final

10:36:21  5   pretrial order to that exhibit, so --

6          THE COURT:  I know, but what -- we know she died.  We

7   stipulated to the jury that she's dead.  I don't think we need

8   a death certificate, so that's granted -- I mean that's

9   denied.

10          MS. BITOY:  Okay.

11          THE COURT:  Photo No. 35, what's that?

12          MS. BITOY:  It's Defendant's Exhibit No. 54, which is

13   just a photograph from impounded evidence.  There was no

14   objection to that on the final --

10:36:46  15          MS. BONJEAN:  What is the photograph of?

16          MS. BITOY:  I have to pull it up.

17          THE COURT:  Plaintiff's Exhibit 35.

18          MS. BITOY:  It's People's Exhibit, Your Honor, and

19   that is a -- it's a photo of the picture of the can.

10:36:58  20          MS. BONJEAN:  If it came in at trial, we never voiced

21   an objection to those types of photos.

22          THE COURT:  Okay.  So that one can come in.

23          MS. BONJEAN:  But I would like to see it because I

24   tend to get surprised by things.

10:37:08  25          MS. BITOY:  Yes, we can show.  There's no issue with

1771

1     that.

2              THE COURT:  All right.  Have you got that?

3              MS. BITOY:  Your Honor, we realize that the pictures

4     for Defendants' Exhibit 119, the photographs of Karen Byron,

10:37:24   5     we're just making be a record of that.  We realize that --

6              THE COURT:  I'm not -- I'm refusing --

7              MS. BITOY:  Right.

8              THE COURT:  -- the picture of Karen Byron, as I did

9     during the trial.

10             MS. BITOY:  Right.

11             THE COURT:  124, debris from attic.

12             MS. BITOY:  Right.  This is just more evidence from

13    the criminal trial.

14             THE COURT:  That's in evidence, isn't it?

10:37:39   15            MS. BONJEAN:  Yeah, I wouldn't object to that.

16             THE COURT:  All right.  That one can come in.

17             MS. BITOY:  Okay.

18             THE COURT:  Piece of hanger.

19             MS. BITOY:  That also wasn't objected -- or I'm

10:37:47   20    sorry --

21             THE COURT:  That can come in.

22             MS. BITOY:  -- seems that there wasn't --

23             THE COURT:  Byrne order denying --

24             MS. BITOY:  Right.  We realize that you've rejected

10:37:56   25    that, Your Honor.

|  | 1 | MS. BONJEAN:  They're trying to move in the COI |

1       MS. BONJEAN:  They're trying to move in the COI
2   again.
3       MS. BITOY:  We're just preserving that.
4       THE COURT:  I'm refusing that.  Okay.  Your record is
10:38:04   5   clear.
6       Okay.  So now we -- the exhibits as on this
7   admitted -- listing admitted, plus exhibit -- Defendant
8   Exhibit 54, which is the same as Plaintiff's 35 --
9       MS. BITOY:  Uh-huh.
10:38:17   10       THE COURT:  -- debris from the attic.
11   Defendants' 124, which is the same as Plaintiff's 35, I guess,
12   and the piece of hanger.
13       The rest of the proposals will be refused.
14       Anything else?
10:38:31   15       MS. BONJEAN:  No.  Thank you, Your Honor.
16       THE COURT:  We're going to argue the case in
17   20 minutes.
18       MS. BONJEAN:  Thank you, Judge.
19       MR. JEBSON:  One thing.  Are we going to take a break
10:38:40   20   between --
21       THE COURT:  Well, yeah.  How long is your argument?
22   Plaintiff's argument will be what, how much?  I did not -- I
23   know I'll kick myself, but I'm not imposing limits.
24       MR. HALE:  Definitely get it under five hours.
10:38:55   25       THE COURT:  So when the plaintiff rests -- finishes

1   her argument, we'll take a break.

2          MR. JEBSON:  Okay.

3          THE COURT:  Then we'll hear the defense, and then

4   we'll probably take a break, and then I'll instruct them and

5   then --

6          MS. BONJEAN:  We have the rebuttal.

7          THE COURT:  The plaintiff's rebuttal and then I'll

8   instruct them, and then they'll retire.

9          MR. JEBSON:  Okay.  Thank you.

10         THE COURT:  All right.

11         MS. BONJEAN:  Thank you, Your Honor.

12         MR. JEBSON:  Oh, one other thing.

13         Are we going to get copies of -- clean copies of the

14  jury instructions in case we want to --

15         THE COURT:  Oh, yeah, we need -- can you do that?

16  Give them the -- without -- I think they're relatively clean,

17  but --

18         MR. JEBSON:  Did we get a verdict form?

19         THE COURT:  Well, the verdict form, have you looked

20  at the verdict form?

21         MS. BONJEAN:  Oh.

22         THE COURT:  It was attached to the defendants'.

23         MS. BONJEAN:  I just -- yes.  I haven't had a chance

24  to look at it.  I just got this this morning, so let me -- I'm

25  going to have to -- if the Court could indulge me, I don't

1  want to look at it and waste your time, Judge, looking at it.
2  If I could just take five minutes or so to look at it.
3      THE COURT:  Okay.  Take a couple minutes to look at
4  it.  Sort of what I did --
10:40:11
5      MS. BONJEAN:  I think it's -- this for plaintiff -- I
6  don't know, I have to look at it.  It's a little confusing to
7  me.
8      THE COURT:  Three claims.
9      MS. BONJEAN:  Yeah, there's three claims.
10:40:18
10     THE COURT:  Section 1, and Section 2 is damages.
11     MS. BONJEAN:  Right.
12     THE COURT:  And then --
13     MR. BARNETT:  I wasn't sure how many jurors there
14  were, so --
10:40:28
15     THE COURT:  There's nine.
16     MR. BARNETT:  -- I wasn't sure how many lines to put
17  on the back.
18     THE COURT:  Assuming they all show up, which I
19  expect.  They've been pretty good.
20     MS. BONJEAN:  Yeah.
21     THE COURT:  So it would be the foreman plus eight.
22     MS. BONJEAN:  Let me just take a look, Judge.  I
23  think it's probably okay, but if the Court --
24     THE COURT:  All right.  Take a look at it.
10:41:01
25     MS. BONJEAN:  Okay.

1       (Brief recess.)

2               MS. BONJEAN:   Okay, Judge.   As to the second claim,

3       we -- since we modified the instruction, we're opting for

4       compelled self-incrimination.

10:58:29    5               THE COURT:   All right.

6               MS. BONJEAN:   And I don't think they have an

7       objection.

8               MR. BARNETT:   No objection, Your Honor.   I did e-mail

9       your clerk a Word copy of the jury instructions.

10:58:37   10               THE COURT:   All right.

11               Otherwise okay?

12               MS. BONJEAN:   I think so, Judge.   Unless -- I mean, I

13       think it's pretty simple.

14               THE COURT:   All right.   Okay.

10:58:48   15               MR. BARNETT:   Thank you, Your Honor.

16               THE COURT:   Are you ready to go?

17               MS. BONJEAN:   I am.

18          (Jury enters.)

19               THE COURT:   Good morning, members of the jury.   As I

11:01:57   20       told you Friday, both sides rested, which means you have all

21       the evidence that you're going to receive.

22               We now have the opening statement -- excuse me -- the

23       closing arguments from the lawyers.   At this point they are

24       allowed to argue to you, and they should -- they will use

11:02:14   25       this as their opportunity to discuss the evidence with you and

1   give you suggestions on how you should interpret the evidence

2   and ultimately how you should decide the case.

3           Like opening statements, closing statements are

4   statements of lawyers, and the statements themselves do not

5   constitute evidence.  They can only suggest to you how you

6   should interpret the evidence and to remind you of how the

7   evidence came in.  Obviously if your collective recollection

8   differs from the lawyers, it's your collective recollection

9   that governs the case.

10          After -- the plaintiff will give her argument -- his

11  argument first, and then we'll hear from the defense, and then

12  the plaintiff is entitled to a rebuttal argument.  After that

13  I will instruct you as to the applicable law.  After that you

14  will retire to consider your verdict.

15          So at this point, again, we'll hear the opening --

16  excuse me -- the closing arguments of the attorneys, and

17  because the plaintiff again has the burden, the plaintiff goes

18  first and last.

19          So the plaintiff may give the closing argument on

20  behalf of Mr. Wrice.

21          MS. BONJEAN:  Thank you, Your Honor.

22          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

23          MS. BONJEAN:  Counsel, ladies and gentlemen of the

24  jury.

25          When we started this case about a week and a half

1    ago, I told you that this case was about holding the men
2    responsible who denied Stanley Wrice justice and who in the
3    process denied Karen Byron justice.

4              You had the opportunity to see those men when they
5    took the stand last Friday and they refused to answer a single
6    question about the breathtaking misconduct that they were
7    accused of.  In fact, let's put a picture up of them.

8              Peter Dignan and John Byrne came before this Court
9    and came before you.  And in response to every single question
10   about their involvement in the investigation of Karen Byron's
11   case and Mr. Wrice's case, they invoked their Fifth Amendment
12   rights.  Now, it is true that a criminal defendant has every
13   right to invoke his Fifth Amendment rights to remain silent
14   when he's accused of a crime.  But in a civil case such as
15   this, there are consequences when defendants invoke their
16   Fifth Amendments.  There are consequences, and you are going
17   to receive an instruction from the Court about what those
18   consequences are.  And the consequence of invoking your Fifth
19   Amendment in response to allegations of wrongdoing is that you
20   are free to assume that their responses, their truthful
21   responses, would have been unfavorable to them and would have
22   incriminated them.

23             Let me put that more clearly.  You are free to assume
24   that if they answered those questions honestly, it wouldn't be
25   good for them.  It would be unfavorable, and it would

1　incriminate them, incriminate them in crimes.  And that is

2　extraordinary, ladies and gentlemen.  If you think that is a

3　normal proposition, it is not.  The defendants in this case

4　will not give you one denial, not one.

11:06:29　5　　　　　　　Now, unlike my client, Mr. Wrice, he took the stand,

6　oh, I don't know, the eighth or ninth time in 40 years,

7　subjected to a full day of cross-examination.  He was on the

8　stand for seven or eight hours.  He was subjected to all types

9　of gruelling cross-examination and sometimes mocking

11:06:57　10　cross-examination pointing out every trivial inconsistency out

11　there, and he did this over and over again, and he was

12　accused.  And when he was accused, he said, I did not do that.

13　I did not do that.  He didn't invoke his Fifth Amendment

14　rights.  He denied every allegation that was against him.

11:07:18　15　　　　　　　Meanwhile, these fellas over here grace us with their

16　presence for ten minutes.  They invoke the Fifth Amendment

17　every single time and then they leave.  Probably went out and

18　had a beer and --

19　　　　　　　MR. JEBSON:  Objection.

11:07:34　20　　　　　　　MS. BONJEAN:  -- talked about how --

21　　　　　　　MR. JEBSON:  Objection.

22　　　　　　　MS. BONJEAN:  -- the good old days when you could

23　beat black men in basements and make jokes about the N-word.

24　　　　　　　MR. JEBSON:  Objection.  There's no evidence.

11:07:43　25　　　　　　　THE COURT:  The objection has been made.

1       Overruled.  This is argument.

2       MS. BONJEAN:  And while their own clients, their own

3  clients refuse to take the stand and deny the allegations that

4  have been made against them, they continue to have you believe

5  that this is Stanley Wrice's criminal trial.  Well, it's not

6  his criminal trial.  And lest it be lost on anyone, this man's

7  convictions were reversed.  The state of Illinois dismissed

8  all charges against him.  And that is not going to stop them,

9  of course, for continuing to argue that Mr. Wrice is guilty.

10      But, ladies and gentlemen, where's the evidence?  Did

11  they put on any evidence?  Any case whatsoever?  Other than an

12  ex-girlfriend, the mother of his children who clearly was here

13  to hash out some emotional baggage with Mr. Wrice, but when it

14  came down to the important question of do you remember whether

15  he called you that night, what did she say?  Well, I can't

16  really say.  I don't really recall.  I don't know what her

17  purpose was other than to try to persuade you that, you know,

18  maybe he wasn't the world's best dad at that time and somehow

19  he should go to prison for 31 years for something like that.

20      So it is important, ladies and gentlemen, that you

21  keep your eye on the ball here.  And remember, you are never

22  going to get a verdict form that asks you whether

23  Stanley Wrice is innocent or guilty.  You are not going to get

24  an instruction about whether Stanley Wrice is innocent or

25  guilty.  That is not your job.  That is the job of the

11:08:04
11:08:38
11:08:58
11:09:22
11:09:41

1   criminal courts.  And the way that was resolved is the state

2   of Illinois dismissed all charges against him.

3           Now, the other piece of evidence that they put into

4   this case, in their case is Dr. Nolan Lewis's testimony about

5   Karen Byron's injuries.  And I think I told you right from the

6   get that there will be a lot of emphasis on her injuries and

7   that we don't shy away from that.  But we also are asking you

8   to keep your eye on the ball.  We're not imploring you to

9   forget them or to trivialize them or minimize what happened to

10  her, not at all.  None of us do.  None of us do.  This

11  all-female legal team, our four daughters that we have, we do

12  not trivialize what happened to Ms. Byron.  And do not let

13  them let you think we do because that's not the case.

14          We represent this man because his constitutional

15  rights were violated, and he spent 31 years in prison for a

16  crime he did not commit, and these men, they didn't care about

17  Karen Byron.  They cared more about going in the basement and

18  hashing out their anger against African American men.  That's

19  what they cared about.  They conducted no real investigation.

20  If they cared about Karen Byron, they would have cared about

21  getting the right people.  They would have cared about putting

22  the sociopaths who did that to her in prison, these fellas,

23  right here:  Rodney Benson, who got probation; Lee Holmes, who

24  got probation; Michael Fowler, who got four years in the

25  Illinois Department of Corrections; and Kenny Lewis, a

1  co-conspirator who came in and gave testimony, false testimony

2  against Mr. Wrice.

3          And they can parade around here cavalierly and put

4  Ms. Byron's shoe on the podium and try to force Mr. Wrice to

11:12:12  5  hold her torn underwear.  Those are theatrics.  They are meant

6  to distract you, and they are wrong.  They don't actually

7  honor her at all.  So keep your eye on the ball.

8          And, ladies and gentlemen, there's a quote that I

9  thought was -- I came across not too long ago that made me

11:12:32  10  think of this case.  And it's called, the quote is, "Reason is

11  the first victim of emotion."  And it's okay for us to feel

12  emotion about what has happened to Karen Byron.  It is not

13  okay for us to allow that emotion to overwhelm our reason.

14  That is not okay because you have a job to do here.  And you

11:13:03  15  have done it so well.  You've been great.  And it's important

16  that you understand what you are here to do, which is to hold

17  the defendants responsible for violating Mr. Wrice's

18  constitutional rights in a number of different ways.

19          Now, Stanley Wrice was no angel.  I think you already

11:13:30  20  know that.  We didn't hide from those facts.  No one said he

21  was the model person.  He made mistakes.  He was not a perfect

22  man.  He kept a messy house.  He had parties.  He drank too

23  much.  He smoked too much.  There's no question about all of

24  that.

11:13:46  25          But his life still mattered.  His life still

1  mattered.  He was still the father of three kids.  And, you

2  know, it would be a little difficult to be a great father when

3  you're incarcerated for 31 years, and maybe he wasn't the

4  world's best at the time.  I don't know how much credit you

11:14:04    5  can give Jennifer Scott on anything, frankly, but let's just

6  say she has a bone to pick with him.

7         But people, people evolve, and he wasn't even given

8  that chance.  Everything was taken away from him, every last

9  thing.  When you, as you go into your old age, as I go into my

11:14:30   10  old age, all we have is our memories, our memories of our

11  times with our kids and our barbecues and school plays or, you

12  know, really just the little things, a vacation that you took.

13  You know, this weekend I was preparing for trial, and my -- I

14  have four kids.  My youngest daughter had a middle school

11:14:55   15  debate tournament that I missed, and I felt terrible about it.

16  I felt terrible about it.  And I thought to myself, one of

17  that I'm missing, and I feel so badly about it.  This man

18  missed his entire 30s, missed his entire 40s, missed his

19  entire 50s, essentially came out of prison an old man and is

11:15:19   20  sleeping on his sister's couch in the basement.  They took his

21  life away from him, and his memories aren't of anything during

22  those decades of particularly positive.  It's about being

23  lonely, eating bad food, having to share a cell half the size

24  of this jury box with somebody, not being able to have any

11:15:39   25  freedom, the agony of missing your family, the lack of visits.

1 I mean, it's overwhelming. It's overwhelming. But those are
2 the moments that make up life, and he doesn't have those.
3 He's trying to make up for them now, but he doesn't have
4 those.

5 So now is the time where I thank you for your
6 service. We know that you made sacrifices. We appreciate
7 your patience. You've been far more patient than I have at
8 moments during this case, and hopefully you will forgive that.
9 You know, when you feel as passionate about something,
10 sometimes it comes out. It's the best I can say. And clearly
11 that's what we feel for our client, Mr. Wrice.

12 So I also want to make the point that no matter what
13 the pundits say, and we're in an election year, I still
14 believe we have a great country, a country where Mr. Wrice can
15 come to a jury of his peers to get justice. He can come here,
16 doesn't matter who he is, what status in life he has, he can
17 come here and have a jury of his peers decide whether he's
18 entitled to justice and what that justice is. And that's a
19 wonderful thing.

20 So at this point, I want to start going through the
21 evidence with you and explain to you what you are going to be
22 doing back in that jury room.

23 You're going to be looking at three claims. We have
24 made three claims against the defendant officers, and here
25 they are.

1        The first claim -- and I put it in pretty simple

2    terms, but you'll have a chance to look at the instructions.

3    And we'll go through them, but they come down to this: that

4    Byrne and Dignan violated Mr. Wrice's right to a fair trial.

11:17:46    5    That's the first claim.  The second claim is that Byrne and

6    Dignan violated Mr. Wrice's right against compelled

7    self-incrimination.  That's a fancy way of saying they forced

8    him to make statements against himself.  And that's protected

9    by the Constitution.  And a third claim that Byrne and Dignan

11:18:09    10    conspired to violate Mr. Wrice's constitutional rights.  That

11    is they entered into agreement amongst themselves to violate

12    one of his constitutional rights and that they took actions to

13    do that and that his constitutional rights were, in fact,

14    violated.  So those are the three basic claims that you are

11:18:27    15    going to be considering when you go back to the jury room.

16        I'm going to start with the biggie, which is the due

17    process claim, the fair trial claim, which is the first claim;

18    and noticeably, nothing here about, you know, guilt or

19    innocence or anything like that.  These are the claims that

11:18:45    20    you're going to be considering.

21        So the first claim, which is that Byrne and Dignan

22    violated Mr. Wrice's right to a fair trial, let's look at what

23    that means.

24        (Counsel conferring.)

11:19:00    25        MS. BONJEAN:  Oh, yes.  My colleagues, Ashley and

1 Heidi, I should have introduced them. You've seen them.

2 Ashley is my millennial tech wizard that saves me and is

3 indispensable to me, but she also happens to be a lawyer and

4 is very smart and brings so much to our team; and Heidi, who

11:19:20  5 has represented Mr. Wrice for two decades, she's our appellate

6 mind here. So we work together as a team. And as you can

7 see, we get along very well, and we enjoy each other.

8          So they reminded me that we first should talk about

9 the burden of proof. We have the burden of proof. We as the

11:19:42  10 plaintiffs have to prove to you. But the burden of proof in

11 this case is by a preponderance of the evidence. You of

12 course have heard that in a criminal case you have to prove a

13 crime or prove the elements of a crime beyond a reasonable

14 doubt. We're not in criminal land right now, despite what the

11:20:02  15 defense may have us thinking. We are in civil world. And our

16 burden of proof, we have to prove by a preponderance of the

17 evidence. And what that means is that it is more probably

18 true than not true. That means if you put all of the

19 evidence, all of our evidence over here, and all of their

11:20:27  20 evidence on the other side, we just have to tip the scale a

21 tiny little bit. That's it. Tiny little bit. That's our

22 burden of proof.

23          Now let's look at the claims themselves. Okay. So

24 the first claim. And this is the denial of the right to a

11:20:50  25 fair trial claim, but it's a little bit more specific. And it

1 takes us sometimes forever to unpack these instructions, so I

2 always wonder how the juries do it, but we'll go through it

3 together.

4 This first claim is concealment of exculpatory

11:21:10 5 evidence and/or a fabrication of evidence. It's a two-part

6 claim. And I'll read the first paragraph to you, and you can

7 follow along.

8 "Plaintiff claims that defendants Byrne and Dignan

9 violated his right to a fair trial by failing to disclose

11:21:26 10 exculpatory and/or impeachment evidence that was material to

11 plaintiff's defense in the criminal trial and by fabricating

12 evidence that was used against plaintiff in the criminal

13 trial. To succeed on this claim, plaintiff must prove each of

14 the following things by a preponderance of the evidence."

11:21:52 15 So first let's look at this concealment of

16 exculpatory evidence portion. You heard testimony from

17 Judge Jones and even Judge Lampkin about what exculpatory

18 evidence is. It's evidence -- and there's an instruction that

19 we'll look at that's in this case. You'll get this back in

11:22:12 20 the jury room as well. The definition of exculpatory evidence

21 is evidence that tends to show that the accused is not guilty

22 of the crime. So any evidence that would tend to show that

23 the defendant is not guilty, the criminal defendant is not

24 guilty.

11:22:37 25 But it's not just exculpatory evidence. It's what we

1   call impeachment evidence.  And that is evidence that would

2   have made the jury at the criminal trial less likely to

3   believe a witness who testified against the accused at the

4   criminal trial.  What that means is evidence that would have

11:22:53   5   discredited or called into question the state's witnesses

6   because a defendant is entitled to that evidence.  And we're

7   going to go through examples, but he's entitled to that.  He's

8   entitled to know that when someone comes up and testifies

9   against him and says, you did this, he's entitled to know

11:23:11   10   whether that person, whether there's evidence that would

11   discredit that person or show that he's not being honest.  If

12   he didn't get that, that really wouldn't be fair now, would

13   it?  Because then the jury would be left with a false

14   impression about the strength of that evidence.

11:23:28   15          So sometimes we refer to all of this, and I'm sure

16   you've heard it before, as *Brady* material or exculpatory

17   evidence, impeachment evidence.  Those are the words we sort

18   of use interchangeably.  But these are the definitions you

19   will get from the Court in the jury instructions.

11:23:50   20          So let's go back then to this number one.  So this

21   first thing we have to show is defendant Byrne and/or Dignan

22   knowingly concealed from the prosecutor exculpatory and/or

23   impeachment evidence -- shorthand that *Brady* evidence -- and

24   the evidence was not otherwise available to plaintiff through

11:24:17   25   the exercise of reasonable diligence to make use of at his

Closing Argument - Plaintiff

1788

1 criminal trial.

2 So before I go on, let's just stop right there. What

3 we have to prove is that Byrne and Dignan kept facts secret

4 from not only Mr. Wrice but from the prosecution itself that

11:24:41 5 would have impeached the evidence that came in against his

6 trial, that would have discredited the evidence that came in

7 against him. They kept things secret. They didn't let him

8 get it. And they didn't even let the prosecutor get it. We

9 also have to show that he couldn't have gotten it some other

11:24:58 10 way, it wasn't sort of out there in the public realm, and that

11 he could have made use of it at his criminal trial. So that's

12 one aspect of this fair trial claim.

13 There's another piece, and that is and/or knowingly

14 fabricated -- knowingly fabricated evidence.

11:25:32 15 (Counsel conferring.)

16 MS. BONJEAN: Knowingly fabricated evidence. And

17 what that means, ladies and gentlemen, is that they caused

18 fabricated evidence to come in to trial. They caused evidence

19 to be admitted against Mr. Wrice that was manufactured, that

11:25:55 20 was false. So that's what we have to show first, and we're

21 going to unpack all of that and identify all of the evidence

22 that demonstrates this. But in simple terms, we have to show

23 that they hid things that would have helped his defense and

24 that they manufactured stuff that was introduced against him.

11:26:18 25 So what was that evidence? Okay. Again, these are

1    broad strokes, broad strokes.

2              Exculpatory and impeachment evidence concealed by the

3    defendants: one, the coercive interrogation of Bobby Joe

4    Williams.  Bobby Joe Williams was one of the state's key

5    witnesses.  You know, it wasn't a very overwhelming case of

6    guilt -- and we'll get to that in a little bit -- but Bobby

7    Joe Williams was a star witness.  And what was concealed from

8    Mr. Wrice's attorney and concealed from the prosecution, which

9    is the most important thing, is the manner in which his

10   statements were obtained, this coercive interrogation.

11             And you heard Judge Lampkin say, I didn't know

12   anything about that, and we don't quarrel with that.  We don't

13   believe she did.  We have never taken a position that she knew

14   what Byrne and Dignan did to Bobby Joe Williams.  Whether, you

15   know, she gave a lot of trust in her police officers as a

16   prosecutor and maybe, you know, she should have questioned

17   things, that is, I suppose, you know, 40 years later easy for

18   me to say.  But make no mistake about it, it is not our

19   position and nor do we quarrel with Judge Lampkin's testimony

20   that she didn't know anything about the coercive

21   interrogations that these defendants did.

22             So what else is exculpatory and impeaching evidence?

23   The coercive interrogation of Alonzo Smith.  Now, that was the

24   testimony that was read into evidence because Mr. Smith is

25   unavailable.  Ashley read Mr. Smith's part, and Heidi did the

1    questioning of the attorney.

2            This evidence is extraordinarily important because it

3    mirrored what Mr. Wrice was saying almost to the T, men that

4    do not even know each other.  Alonzo Smith was interrogated by

11:28:40    5    Byrne and Dignan in January of '83, about four months before

6    his trial.  And they used a signature style of interrogation

7    that they used against Mr. Wrice and others, and they did not

8    tell the prosecutor that they had done so.  You remember my

9    questioning of Ms. Lampkin about whether she knew anything

11:29:08    10    about Alonzo Smith, and she said no, of course not.  It's a

11    huge building.  There's cases being tried everywhere.  Again,

12    we do not quarrel with that.  We believe that's absolutely the

13    case.  But imagine what -- imagine what his attorney could

14    have done with that information?

11:29:25    15            So let's go on.  We know about a Polaroid photo of

16    Stanley Wrice that was taken after his beating.  He told you

17    about it.  They took a picture of him.  He said, I've never

18    seen it.  No one has ever seen it.

19            You've heard about -- you've seen another mugshot

11:29:43    20    photo which he has said that wasn't it.  I wasn't wearing the

21    placard.  There was a Polaroid taken of me right before I

22    talked to the assistant state's attorney.

23            And on this point, Alonzo Smith talks about getting

24    his picture taken at that police station too.  He gets an

11:29:58    25    arrest photo taken, and it's taken before his beating, which

1     makes sense.  Mr. Wrice honestly tells you, I don't remember

2     when it was taken.  And that's one of the reasons you know

3     Mr. Wrice is telling the truth.  If he wants to lie, why

4     wouldn't he say, oh, it was definitely taken before I was

5     beaten?  He told you, I don't know when it was taken.  I don't

6     know.  And that's honesty right there because he could have

7     said anything because they certainly didn't bring anybody in

8     to tell us when it was taken.

9              MR. JEBSON:  Objection.  That's shifting the burden,

10    Judge.

11             THE COURT:  Overruled.

12             MS. BONJEAN:  So this is the exculpatory impeachment

13    evidence in broad categories.

14             Now let's go down to the fabricated evidence.  And

15    sometimes there's this overlap between this evidence because

16    there would be a due process violation if they had just

17    concealed the coercive interrogation of Bobby Joe Williams,

18    right?  But there's more.  It produced false testimony from

19    Bobby Joe Williams.  That coercive interrogation produced

20    false testimony from Bobby Joe Williams that was then

21    presented to Mr. Wrice's criminal jury.  And that criminal

22    jury knows nothing what you know about the Bobby Joe Williams

23    interrogation.  They just think there's just some guy coming

24    up there, you know, coming in and testifying.

25             And then the other big piece of fabricated evidence

Closing Argument - Plaintiff

1792

1    is Stanley Wrice's false inculpatory statement himself, which

2    the other side wants to continue to try to tell you it wasn't

3    a confession.  Well, I'm not sure why you would use it at the

4    criminal trial to convict him if it wasn't a quote-unquote

11:31:48    5    confession.  But you are going to hear an instruction later

6    on, it doesn't have to be a confession in the sense of the way

7    we think of it.  Any self-incriminating statement, any

8    inculpatory statement that is used against him, if the

9    prosecution used it to convict him, it qualifies as a

11:32:08    10    self-incriminating statement.  Seems obvious.

11        So these are the broad categories of both the

12    evidence that was secreted or concealed from the defense and

13    the evidence that was manufactured or fabricated.  So let's go

14    on and break it down even further.

11:32:42    15        (Counsel conferring.)

16        MS. BONJEAN:  I'll just use this as a guide for a

17    moment.

18        So I want to talk first about Bobby Joe Williams.

19    And as I pointed out, his coercive interrogation was concealed

11:32:54    20    and also it produced false testimony, so he kind of was in

21    both categories.

22        And Bobby Joe Williams came before you, and he

23    testified.  He clearly did not want to be here, no doubt about

24    it.  But he came here because he was under subpoena but also

11:33:15    25    because he has, for many years now, wanted to be up front

1       about the fact that his testimony was false and how he came to

2       give false testimony.

3               So the first thing I want to point out, which is the

4       most obvious, is that when the defendants in this case, Byrne

11:33:40   5   and Dignan, were asked whether they physically coerced

6       statements from Bobby Joe Williams that they knew to be false

7       by using this unique instrument, they pled the Fifth.  They

8       didn't deny it.  So you could apply, you are free to assume,

9       that if they had answered that honestly, their answer would

11:34:09   10  be, yeah, we did do that.  And they did it with respect to

11      every question about Bobby Joe Williams.

12              His account of what happened to him parallels so many

13      other witnesses you've heard of in this case.  This isn't some

14      giant conspiracy against defendant Byrne and Dignan where all

11:34:36   15  of these men who, with no connection to each other, are

16      meeting up and talking about creating some fabricated story of

17      this black rubber object.  That is what is so incredible.  You

18      know it's true.  You know it's true.  Gregory Banks comes in

19      here and testifies, I've never seen this man in my life, and

11:35:01   20  they're all telling the same story.

21              So Bobby Joe Williams, he tells you -- and I think

22      it's important to try to understand how this all comes to be

23      because it's sort of -- it's kind of mind blowing how this

24      happens.  He gets arrested, and he comes to find out that

11:35:18   25  something absolutely horrendous has happened in this house,

1  horrified.  And he's scared out of his mind.  He's 20 years

2  old.  He's never been in trouble.  He is scared out of his

3  mind.  He's taken to Area 2.  And they're telling him, you did

4  this, or you know who did this, and then they're saying, all

11:35:38  5  you need to do is say Stan did it.  And he keeps telling them,

6  no, I wasn't there.  I didn't see anything like that.  I did

7  not see anything like that.  I cannot implicate Stanley Wrice

8  in this.  I did not see anything of the sort.  And they say,

9  oh, yes, you did.  Yes, you did.

11:35:55  10  Then they start to beat him with this unique black

11  rubber hose object that we've heard about over and over again.

12  And they keep doing it.  And what is most frightening for

13  Bobby Joe Williams, he tells you, is not just the discomfort

14  of being hit with a black rubber hose in your thighs and in

11:36:16  15  your groin area, which, of course, has got to be terrifying,

16  but also the prospect of being charged himself.  If a police

17  officer is willing to hit me with this weird object in the

18  confines of this interview room and this terrible thing

19  happened in the house, I could be subject to being charged.

11:36:33  20  So what does he do?  What he told you he did, which

21  is he went along with what they said.  He ultimately agreed.

22  And they were saying, just say Stan did it.  Just say Stan did

23  it.  They wanted Stan.  They didn't want this 20 year old who

24  they probably believed had nothing to do with it.  They wanted

11:36:50  25  Stan, so they were forcing him to implicate Stan.

1　　　　　And he even told you, I don't know if I signed

2　anything.  I may have signed something just to get out of

3　there that night.  He doesn't remember.  He doesn't remember

4　speaking to an assistant state's attorney.

11:37:06   5　　　　　And the defendants will have you believe that this

6　somehow makes him a liar.  Well, I hesitate to guess that none

7　of them have been put into an interrogation room with Byrne

8　and Dignan as a 20-year-old African American man in 1982

9　where, when you deny involvement, you get a gun shoved in your

11:37:28  10　mouth.  So you can call him a liar all you -- they can call

11　him a liar all they want, but they haven't walked in his

12　shoes.

13　　　　　They could say, oh, it's so implausible he didn't

14　tell anybody.  We know why he didn't tell anybody.  He was

11:37:47  15　frightened out of his mind not just because of the beating.

16　That's missing the point almost.  Of course the beating is

17　terrifying, and it's an unusual beating.  It's an esoteric

18　beating.  You know, it's bizarre.  But it's the idea that

19　these people, these defendants have control over my life.  I

11:38:04  20　have no autonomy.  I can go home and they can come scoop me up

21　at any time.  It's that type of powerlessness.  That's the

22　fear that continues.  It's just not the fear of being beaten.

23　And he told you that.  He may not be as articulate as we would

24　like him to be in explaining these things, but I think you get

11:38:22  25　it.  I think you get it.

1     So he says, yes, I don't know if I signed something.

2   I got out of there that night.  And what we do know from

3   Ms. Lampkin is that she gets a statement and some report

4   somewhere of what he says, the false statement.  She described

11:38:40   5   it as very short.  I don't know.  It may have been short.  Who

6   knows how many lines it is.  And he probably goes home and

7   prays to God no one calls me again.  I just want this to be

8   over.  Sucks for Stan, but every man for himself in this

9   world.

11:38:54   10   And he tells you, I never talked to Stan again.  My

11   relationship with Patricia ends.  Yeah, we have kids together.

12   We have to deal, you know, with parenting.  I don't even tell

13   my mom.  I don't want her to know about this.  I don't tell my

14   siblings.  And they find this absolutely incredible.  It's

11:39:11   15   absolutely understandable when you lived in that community.

16   You have to walk in these men's shoes.  You have to try to a

17   little bit.

18   So he goes home and hopes it goes away, and it

19   doesn't go away.  And he tells you he doesn't remember going

11:39:33   20   and seeing Assistant State's Attorney Lampkin.  And he may

21   not.  You know, trauma is a funny thing.  We talk a lot about

22   trauma, and trauma has a way of messing with our brains.  You

23   know, we understand trauma of women, for instance, who have

24   been raped like Karen Byron.  We understand that their

11:39:50   25   memories are impacted.  And in her case, obviously she has

1    these health conditions that have impacted that, no doubt

2    about it.  But these men suffered trauma too, and that affects

3    the way you remember these things and the details.  You want

4    to block it out.  Same stuff.

5    So what happens?  I have no doubt that he went down

6    and spoke to Ms. Lampkin.  She testified to it.  Again, we

7    don't quarrel with that.  We think she did.  She took him down

8    there.  She met with him.  Her memory of how those interviews

9    went I might disagree with.  She seemed to have a vivid

10   memory.  And I think that she is biased.  And I understand

11   why.  You know, this is her prosecution.  I think she's

12   probably someone who is an honorable person and who doesn't

13   want to be associated.  She wants to believe that she got the

14   right guy.  Understood.  Understood.  But she didn't.

15   And it's not really her fault.  It's the officers'

16   fault because they tainted the entire investigation from top

17   to bottom.  But don't think for one minute that she didn't sit

18   with Bobby Joe Williams with his statement and go through it

19   with him, and he didn't back off it.  That's what happened.

20   You know, there was an examination done by Mr. Jebson

21   where he went through his statement line by line.  That's sort

22   of what they've done with all of these guys and said, did you

23   say this, is this, you know.  And Bobby Joe Williams, you

24   know, told you honestly that his memory about the exact words

25   he used, he can't remember that.  He went in there, and he

1    stuck to his paper.  There was a statement that was given to

2    the prosecutor, and he went with it.  And even her examination

3    of him, and you've heard it through the testimony, was so

4    leading.  So did you see Stanley Wrice up in the bedroom at

5    this point?  Yes.  And you can tell just by listening to it

6    he's not providing details.  He's not testifying -- I mean, I

7    don't think there was a response that was more than three or

8    four words.

9        Did she know?  No.  But you have to understand when

10   he went in there, the state's attorneys and the police are the

11   same in his mind.  I can't back off this statement.  I got to

12   stick with it.  And that's the testimony that he ultimately

13   testified to that came in against him, and it was damning

14   testimony, damning, and it was false.  And his attorney didn't

15   know how it was obtained, and he didn't know it was false.  He

16   didn't know it was fed to him.

17       Imagine what the cross-examination of Bobby Joe

18   Williams would have looked like if Mr. Wrice's attorney had

19   all of that exculpatory/impeaching material.  Isn't it true,

20   sir, that actually when you gave this statement, you were

21   being beaten with a black rubber hose?  Yes.  Isn't it true

22   that Mr. Dignan and Byrne told you that you had to implicate

23   Stanley Wrice or you yourself would be charged?  Yes.  Those

24   would have been -- that would have been the questioning.  You

25   don't think that would make a difference in his case?  Of

 1    course it would have.  No-brainer stuff.

 2          You also got to remember that these officers, before

 3    they even interviewed anybody, had enormous amount of detail

 4    about the crime itself.  They had been in the house.  There

 5    was evidence everywhere.  They had been -- they knew Karen

 6    Byron's injuries.  They had been to the hospital.  There

 7    wasn't, you know, really a mystery of how she was hurt.  We've

 8    heard about these injuries.  You could see them.  He had

 9    talked to Elbert Harris who had seen the victim with Rodney

10    Benson and some of the other -- Bobby Joe Williams and Stan by

11    the liquor store.  They had a whole -- they had already put

12    together a story by that point.  It wouldn't have been hard to

13    do.  They had so much information, which is not always the

14    case.

15          Now, just as an example, Bobby Joe Williams was

16    asked, this little detail, you testified about the red hat,

17    the red hat detail.  And he says, that was a lie.  I have

18    no -- no reason to believe -- I have no idea Stanley, whether

19    he was wearing a red hat.  Well, the police officers like that

20    detail.  Why?  They go upstairs.  They see a red hat next to a

21    fork.  They have that information.  That's how confessions get

22    fabricated.  Isn't it true, Mr. Williams -- you have

23    Mr. Williams in your interrogation room.  You saw Stanley

24    wearing a red hat; is that right?  I didn't see Stanley

25    wearing a red hat.  Yes, you did.  Bam.  Yes, you did.  Don't

Closing Argument - Plaintiff

1800

1    hesitate.  That's what Bobby Joe Williams said.  Okay, okay, I

2    saw him with the red hat.  They write it down in their little

3    report.

4        MR. JEBSON:  Objection, Judge.  That's misstating the

11:44:54    5    evidence in this case.

6        THE COURT:  Overruled.

7        MS. BONJEAN:  You heard the evidence.  If you think

8    I've misstated it, disregard me and go with your recollection.

9    But I can tell you this: their big theme, their big theory is

11:45:04   10    that oh, Mr. Williams, let me get this straight.  So you make

11    this statement, and then eight months later, you're able to

12    repeat it word for word to the assistant state's attorney.

13    It's just not how it happened, and it's not how it happens.

14    He's never said that's how it happens.  It's much more nuanced

11:45:26   15    than that.

16        And these detectives, they take true facts, and they

17    take false facts, and they mend them together.  So

18    Stanley Wrice, for instance, says yeah, we were at the liquor

19    store.  That's a true fact.  That's something that is not in

11:45:39   20    dispute.  And then they throw in a false one.  So it gives it

21    the impression of being truthful because some of it is true.

22    That's what makes it so dangerous and so problematic to defend

23    against.

24        Now, Mr. Williams came forward in 1994.  He was

11:46:09   25    contacted by the Office of Professional Standards.  You saw

1      that.  Let's look at that memo.  Okay.

2              Can you pull up the top for me?

3              This is a memo from January 29, 1994.  It's an

4      interview of Bobby Williams, and he tells you that he's

5      contacted by them.  There's an investigation going on, and he

6      agrees to speak to them.  He's not asked to go speak to them

7      by Stanley Wrice.  There is not -- there is no evidence that

8      there's been any contact.  And I think you believe that.

9      Mr. Wrice said as much.  Bobby Joe said that.  They don't even

10     say that, not a single witness.  It's not as if Bobby Joe

11     Williams is like, oh, let me help my ex-girlfriend's brother

12     out, you know, whatever, how many years later, 11 years later.

13     Let me just go do that.  No.  They contacted him.

14             MR. JEBSON:  Objection.  The first sentence of the

15     document says the exact opposite.

16             THE COURT:  Whatever the evidence is the jury heard

17     it and will see it and they can determine whether -- what's

18     the truth.

19             MS. BONJEAN:  I think Mr. Williams said that they

20     were doing an investigation.  He returned a phone call, which

21     kind of makes sense.  He didn't even know who these people

22     were.  But be that as it may, it's sort of a trivial point.

23             Mr. Williams tells them about his beating.  And look

24     at these details.  I mean, it's really unbelievable.  You

25     would have to believe in some really widespread conspiracy to

1       think that in 1994, he just happens to be making -- telling

2       them about this black flexible object with a ball on one end,

3       approximately 20 inches long that struck in these unique

4       places on his thighs and in his groin notably where you can't

11:48:12    5       see it with the bare eye.  And he tells the story about how he

6       is beaten when they say "don't fucking hesitate" and that is

7       after the officers got their story.  Why is that in quotes?

8       Clearly he's saying it was their story.  In 1994 he's saying

9       this, and he explained to you why he waited until 1994.  I

11:48:37    10      think this is incredible, that in 1994, we have him saying

11      this.

12              And then they cross him on the fact that oh, you

13      didn't go to the prosecutor, and what?  These are the police.

14      They work with the prosecution.  I'm going to go to the

11:48:51    15      prosecutor and they're going to reopen the case?  I gave them

16      the information.  And not even a hint that somehow this was

17      instigated by the Wrice family.

18              And he does it again.  He goes, and he talks to the

19      Office of the Special Prosecutor.  They're investigating.  He

11:49:14    20      goes and he talks to them in 2005.  And they tell him in that

21      investigation, we don't want to talk about the criminal case

22      and that type of stuff.  We just want to know about the

23      beating.  You saw some of that from the transcripts.  He tells

24      them about the beating.  Incredibly consistent.

11:49:37    25              And then in 2011, he finally signs an affidavit in

1 which he expresses in direct language that he testified

2 falsely at Mr. Wrice's trial. Now, he's been brought to task

3 for waiting that long to be more express about it. I say in

4 1994 he was trying to tell them. But even be that as it may,

11:50:04    5 to give false testimony at a trial, I think we all know what

6 that means. That's perjury. That's a crime. It's a hard

7 thing to do, and yet, he did it.

8 And he hired an attorney. And then in 2013 when

9 there was an evidentiary hearing in Mr. Wrice's case, he went

11:50:26    10 and he testified under oath, took the oath and said, I lied at

11 a prior proceeding. Do you know how much courage that takes

12 to say, I lied at a prior proceeding? I committed a crime by

13 giving false testimony. What? And for what? So he could go

14 to the Wrice family barbecues? There's no reason.

11:51:00    15 What did he personally get out of it ever, ever to

16 admit that he lied under oath? And they can say all they

17 want, it's so implausible that he can tell people. It's not

18 implausible. It's very understandable given the climate. All

19 you need to do is think back to Greg -- every time they make

11:51:24    20 that argument, that it's so implausible that they didn't tell

21 somebody, just remember Gregory Banks' testimony that yeah,

22 when I denied it, they shoved a nickel-plated gun in my mouth.

23 If that's the terror you're living in your community, yeah,

24 you do keep your mouth shut until it feels safe not to. And

11:51:47    25 for Mr. Williams, that didn't happen until 1994.

Closing Argument - Plaintiff

1804

1        So what else do we have to show?  We have to show on

2   that claim that Mr. Wrice didn't have access to this

3   information.  Now, he told you, when I was on the stand

4   watching, I knew what happened to me, and I thought maybe

11:52:06   5   that's what happened to him.  I don't know why he's testifying

6   against me.  But he had a feeling that the police -- he knew

7   that they were beating Rodney Benson in the station.  They

8   were beating everybody.  You know, he had a hunch.  He had no

9   way to prove it though.

11:52:22   10       And most importantly the prosecution didn't have that

11   information.  And that's what the instruction tells you, it

12   was concealed from the prosecutor.  So we believe Ms. Lampkin

13   on this point.  She didn't know about it.  And even Sidney

14   Jones said she's the type of prosecutor that I think would

11:52:38   15   have told us.  So I think that's right.

16       And also we know Sidney Jones said that he tried to

17   talk to Bobby Joe Williams, and Bobby Joe Williams wouldn't

18   talk to him.  So Bobby Joe Williams didn't tell him, couldn't

19   get the information directly from Bobby Joe Williams.  And it

11:52:59   20   is simply undisputed that Stanley and Bobby Joe had any

21   contact whatsoever.  So he had no ability to access this

22   information unless those detectives did what the Constitution

23   required them to do, which was to disclose it.  Yes, this is

24   what we did to get the statement from Bobby Joe.  They didn't

11:53:20   25   do that.  They kept it secret.  And that was a violation of

1   his constitutional rights, and that is a big reason why he was

2   wrongfully convicted for this crime.

3        The next big chunk of exculpatory/impeaching *Brady*

4   material, however you want to call it -- you'll be lawyers by

11:53:41    5   the end of this -- is the testimony of Alonzo Smith.  And that

6   was powerful testimony.  I wish you could have heard it from

7   Alonzo's mouth himself.  Instead you had Ashley, but you at

8   least got to hear the words that he previously testified to.

9        And let's just look at this.  It's kind of hard to

11:54:06   10   see, but some of the testimony just so incredibly mirrors what

11   Mr. Wrice testified to and what Gregory Banks testified to.

12   It's incredible.  They had a real *modus operandi*, these guys.

13        Alonzo testified when he was questioned, when Dignan

14   told him he was tired of "fucking around" and that Alonzo

11:54:30   15   needed to tell the truth.  You heard Stan say that before,

16   tell the truth, tell the truth.  And for them the truth isn't

17   the truth.  It's what we want you to be the truth.  He says, I

18   told them that I've been telling the truth in answering all

19   the questions that everyone was asking me.  I was telling the

11:54:45   20   truth all day.  And what happened next?  He took the black

21   stick and hit me between the legs and the groin area and Byrne

22   kicked me in the stomach.

23        And the fact that all of these guys describe this

24   black thing in slightly different ways goes to the credibility

11:55:02   25   of it.  If this is some like big, you know, meeting that

1   happens where, oh, let's just describe it, there would be some

2   more consistency.  But they all describe it in a way that is

3   fairly consistent.

4              And the next things he says is, so after you denied

5   involvement in the crimes, what happened next?  Dignan, he

6   took the black plastic bag that he had in his back pocket and

7   he said, "Well, this is going to be round 2."  And he put it

8   over my head, he took a rubber band out of his pocket and put

9   it on the base of my neck and both of them started beating me.

10             Again, this esoteric style of beating, this isn't

11  your garden variety ass whooping.  This is some really

12  psychologically terrifying stuff.  And when they continue to

13  deny, it escalates.  For Alonzo, it escalated to bagging.  For

14  Stanley, as you recall, it escalated to chaining him above his

15  hands on some bars kicking his legs apart and then beating him

16  in the groin area.  For Bobby Joe, it didn't take that long,

17  right?  20-year-old kid, he's afraid.  He just wants to get

18  out of there.  The black rubber thing that they use -- which

19  isn't in the box of evidence, by the way.  That's not in the

20  box of evidence.  We don't have that.  I can't parade that

21  around for you to see because that was destroyed, I'm sure.

22  That's all it took for Bobby Joe.  But they escalate the

23  violence when the denials continue.  It's part of their *modus*

24  *operandi*.

25             He testifies in response to the question, after you

1   woke up from being passed out on the floor with the bag on

2   your head and you denied that you were involved in the crimes,

3   what happened next?  Dignan said, okay, we're going to the

4   next level, and Dignan put the plastic bag on my head again.

5   Then he put the rubber band back around the base of my neck,

6   and they started beating me again.  And then the next thing I

7   remember is I woke up to a lot of laughter.  Did they say

8   anything to you at the time they were laughing?  They said,

9   What are you doing?  Is this some kind of new N-word African

10  dance you doing?  Just like an N-word laying on the -- laying

11  down on the job or something like.  And they said, I told you

12  not to get out of that chair, and they put me back in the

13  chair.

14          You hear those words, and it hurts more than the

15  testimony about the beating.  It makes your stomach curl that

16  this is the world these men were living in at the time, that

17  these two lunatics that came in here and pled the Fifth would

18  say that.

19          And it corresponds to what Stanley says, being called

20  the N-word.  You heard some testimony from Rodney Benson.  He

21  talks about being called the N-word, and Gregory Banks, same

22  thing, part of their *modus operandi*.  You got to call a lot of

23  people liars to say these officers, these

24  Fifth-Amendment-taking officers are telling the truth.

25  They're not telling anything.  They're actually not denying

1       it.  That's only the lawyers.  Their clients aren't denying
2       anything.

3              We know this goes on.  I won't continue to read
4       Alonzo's testimony.  But eventually, after the second or third
11:58:41   5       bagging, where he sees the blood in the bag and he panics, and
6       he's like, let's talk, whatever you want me to do.  I want to
7       get out of the basement.

8              That's another thing.  The secret locations.  They
9       took Alonzo to the basement.  They took Stanley to the garage.
11:58:59  10       Another signature style of these interrogations.

11             So what's the point of all this?  Well, this guy,
12      Mr. Smith, had this happen to him only -- in January of '83,
13      only months after it happened to Stanley Wrice, and it was
14      before his trial.  What would Mr. Wrice's attorney be able to
11:59:26  15       do with that information?  At Mr. Wrice's criminal trial, he
16      was called a liar over and over again.  You're lying about
17      this.  No defense -- no honorable police officer would do such
18      a thing.  Why believe Stanley Wrice, this lowlife against
19      these decorated police officers?  And he told you from the
11:59:52  20       witness stand, no one is believing me over one of these
21      officers.  I didn't even want to use the N-word on the stand
22      because I felt like I don't have a shot.  No one is believing
23      me.  They're calling me liars.

24             And yet, don't you think Mr. Wrice's defense attorney
12:00:06  25       would have made -- been able to make good use with

1   Alonzo Smith's testimony?  Isn't it possible that a jury who

2   wanted to do a good job might have said, huh, I don't know.

3   Maybe he is telling the truth because it certainly seems like

4   the same exact thing happened with somebody else four months

12:00:25   5   later.  People that have no connection to each other.  Cases

6   that have no relation to each other.  Of course that would

7   have made all the difference in the world, all the difference

8   in the world.  That was suppressed.  That was concealed.  And

9   we have no reason to believe that Ms. Lampkin knew anything

12:00:44   10   about it.

11          And we have also -- you've heard no evidence that

12   Mr. Jones would have been able to find out this information.

13   If Ms. Lampkin couldn't find it out, Mr. Jones, with none of

14   the resources of the state, would have been able to find out

12:00:57   15   that this happened to Alonzo Smith.  Suppressed evidence,

16   exculpatory evidence that should have been given to the

17   prosecution and then there to the defense, that would have

18   made the difference for sure.

19          We talked about -- we talked about also the Polaroid,

12:01:17   20   the Polaroid that Mr. Wrice says were taken of him with the

21   ASA.  We've never seen that Polaroid.  We still don't have it.

22   It would be nice to have, but it's probably with the black

23   flexible rubber object somewhere.

24          MR. JEBSON:  Judge, objection.  There's no evidence,

12:01:35   25   none about this.  This is all manufactured.

1    MS. BONJEAN:  No.  The only thing manufactured --

2    THE COURT:  Wait.  Wait.

3    MS. BONJEAN:  -- is the evidence that was against

4    him.

12:01:42   5    THE COURT:  I'll overrule the objection.  It's the

6    jury to determine what the evidence is.

7    Proceed.

8    MS. BONJEAN:  Thank you, Your Honor.

9    So what's the other big -- we talked about Bobby Joe

12:01:57   10   Williams being -- his testimony being fabricated.  The

11   coercive interrogation was suppressed.  The testimony is

12   fabricated.  We've covered Bobby Joe.

13   Our final piece of big evidence that would have made

14   a difference in this case is Mr. Wrice's own statements, the

12:02:18   15   non-confession confession.  His own statements.  So let's talk

16   about that.

17   Mr. Wrice has, since 1983, been telling this account

18   of what happened to him -- I'm sorry.  1982.

19   Is there something wrong?

12:03:14   20   All the electronics went down in the courtroom.

21   (Off the record.)

22   MS. BONJEAN:  So Stanley Wrice's false inculpatory

23   statements is the other bit of fabricated evidence that was

24   used against him, and it came in through Assistant State's

12:04:06   25   Attorney McCurry.

1      And the defendants have made a point of the fact

2 that, oh, Dignan didn't testify, and Byrne didn't even testify

3 about the statement.  But that's beside the point, absolutely

4 beside the point.  They're the ones that caused the false

12:04:23      5 statement that was then given to the assistant state's

6 attorney who testified to it at trial.  At the end of the day,

7 Mr. Wrice's statements were used against him, and they were

8 false statements produced as a result of physical coercion.

9      And, again, I would like to remind you all that the

12:04:41     10 defendants themselves don't deny any of this, not a thing.

11 When they were asked under oath whether or not -- when Byrne

12 was asked under oath whether or not he repeatedly struck

13 Stanley Wrice with a flashlight on his head, body and groin in

14 the abandoned cell area of Area 2 police station on two

12:05:09     15 separate occasions, he said, I invoke my Fifth Amendment

16 rights.  When he was asked whether he beat Stanley Wrice in

17 the abandoned cell area for the purpose of producing or

18 getting him to falsely confess to a crime to burning Karen

19 Byron, I invoke the Fifth.  Doesn't deny it.  And Dignan did

12:05:33     20 the same thing.  I don't need to belabor this point.  But it

21 is an extraordinary set of circumstances where you are being

22 accused of such horrific things and you're not denying them.

23 So you may assume that their answers to those questions would

24 be, yeah, I did all that.

12:05:52     25      How else -- putting aside the Fifth Amendment, how

1   else do we know Stan's story about this is true?  Well, a

2   number of things.

3        First of all, Byrne, as you know from listening to

4   some of these summaries, denied that there were even these

12:06:06   5   abandoned jail cells.  He called Stanley Wrice a liar, saying

6   oh, this is just a figment of his imagination that these cells

7   existed.  Well, we've showed you pictures of them, and you

8   heard testimony from Lieutenant Crane who said no, they

9   existed.  They weren't supposed to have access to them, but

12:06:25   10  they existed.

11       We also have, again, the unique black instrument.

12  And you can tell -- let's put up that chart with some of

13  the -- this is a nifty chart.  Byrne and Dignan's signature

14  coercive interrogation tactics.  Look at these dates.  So one

12:07:07   15  thing they do is they always take, take the defendant, the

16  criminal defendant -- and they're the defendants here, but

17  take the accused or the person they think did something, or

18  maybe even a witness that they want to inculpate or get to

19  making statements, to another area, to a private area.

12:07:25   20       Stanley is taken to an abandoned cell.  Rodney

21  Benson, you heard his testimony.  He talks about being taken

22  downstairs, not clear whether he's taken to a basement or

23  exactly, but he's not on the second floor.  Alonzo Smith talks

24  about the abandoned basement.  He testified in great detail

12:07:42   25  about the drain and the icebox.  And Stan told you about there

1    being an icebox in the area where he was interviewed.  And

2    then Gregory Banks told you about how he was at first in an

3    interview room with another prisoner, and then he was taken

4    out of there and taken to another location, again, so people

12:07:58    5    can't hear.  Rodney Benson testified about, oh, we take you

6    down here so no one can hear you hollering.

7         What else do we know?  This seems like handcuffed

8    while beaten.  Again, this is not like an excessive force case

9    where there's a struggle and sometimes officers use too much

12:08:18    10    force.  These people are literally handcuffed, sometimes to

11    chairs.  Charles told you about being handcuffed to the chair.

12    I believe Bobby Joe talks about being handcuffed to a ring.

13    Alonzo Smith tells you about handcuffed to a stool.  They're

14    literally handcuffed in a way so that they cannot in any way

12:08:39    15    not only defend themselves but even deflect the blows.  Stan

16    talks about being handcuffed first behind his back and then to

17    some jail cells.

18         What else do we have?  Wow.  Look at this pattern.

19    Byrne, he loves a flashlight.  He loves a flashlight.  That

12:09:00    20    was pretty interesting when Frankie Peters says, oh, he had a

21    flashlight when he was up in the attic.  I didn't have a

22    flashlight, but he did.  And we know Dignan uses the black

23    rubber hose.  Dignan also does the bagging.  Again, quite a

24    pattern amongst people who don't even know each other.

12:09:30    25         So we know Stan.  We know this corroborates Stan.

1       What about the locations of the beatings?  Now, these

2   men are not done then.  They know that if they beat the crap

3   out of their face that they're going to have to go to the

4   lockup, and the lockup people are going to be like, we're not

5   taking that guy.  We're not taking responsibility.  Take him

6   back.

7       So they have to deliver these prisoners in a state

8   that does not immediately show that they've been beaten.  So

9   they do it in a number of ways to conceal their own

10  misconduct.  They beat in the groin area, the extremities and

11  areas where clothing -- and they also know that when you go to

12  Cermak, they don't ask you to take your pants off.  Those

13  doctors at Cermak, it's like they have 40 prisoners, beep,

14  beep, beep, beep.  You know, they're moving them through an

15  assembly line.  They're not doing these very in-depth

16  examinations.  And these officers know that.  Bagging, bagging

17  doesn't leave marks.  Very clever.  Sticking a gun in

18  someone's mouth doesn't leave marks.  Pretty terrifying.  So

19  you can show, this is the state of mind.  They're trying to

20  keep it secret what they're doing so that they can go into

21  court and call people like Stanley Wrice liars when they say,

22  this is what happened to me.

23      What else?  The racial slurs.  Again, you know, for

24  me sometimes that's just the most -- the thing that gets me

25  the most.  It's the dehumanization.  Stanley told you, I

1    didn't even feel like a human.  And it's not just, you know,

2    you're using the N-word.  It's like these terrible, awful

3    things.  And they certainly pled the Fifth when they were

4    asked whether they used that type of language during their

12:11:21    5    interrogations.  But the message is clear.  We don't think

6    you're a human.  We don't think you're a human, so we're going

7    to do whatever we like to you, and you can't say nothing about

8    it.

9        And Stanley told you, I don't know.  They could say

12:11:34    10    anything.  They could shoot me and say I ran.  Notably they

11    kind of did that with Gregory Banks.  They made up this story

12    about how when they took him to the scene, he tried to run.

13    And Greg told you, and I think you believed him right up

14    there, he said, that's not what happened.  They were just

12:11:52    15    trying to explain away the injuries that he did actually have.

16        What else about their signature coercive

17    interrogation techniques and tactics?  Denials, beating, more

18    denials, beating.  Beating escalates until there is

19    cooperation by the person, whether it's a witness or someone

12:12:13    20    that they want to inculpate themselves.

21        Feeding the statements.  Now, Mr. Hale, you saw that

22    deposition where he questioned Alonzo Smith and went through.

23    To me, that's heartbreaking, but he was going through and

24    saying, is this true?  And was this fed to you by the

12:12:34    25    officers?

1    You know, and it just doesn't happen that way

2  exactly.  Mr. Wrice told you how it happened for him.  First

3  of all, before he goes down for the second beating, the ASA is

4  already in the building.  Officers don't have a lot of time,

12:12:53    5  right?  We can't get a movie script going here.  We got to get

6  him back up there and admit.  The ASA is in the building.

7  Mr. Wrice told you, I saw him peek his head in, saw him peek

8  his head in.  And he goes downstairs, and they say, pretty

9  simply, you're going to admit you raped her.  You burned her.

12:13:11   10  You're just going to go up there and admit it.  And he says,

11  I'm not going to, and then the beatings continued.  You're

12  going to say you burned her.  You're going to say you burned

13  the woman.  That's what you're going to do.

14    And eventually he goes up there, and he tells you

12:13:25   15  that he's interviewed by the Assistant State's Attorney

16  McCurry.  And you will notice, if you paid attention to the

17  summaries -- and I know that it's hard when people are just

18  reading at you, but hopefully some of you were able to take

19  some notes.  McCurry is consulting with these officers at the

12:13:39   20  station.  He told you that the detectives say, you know, we're

21  speaking to Rodney.  We're getting information from Rodney.

22  And we're getting information from Patricia and Charles, and

23  they're getting all this information.  So by the time that ASA

24  McCurry sits down with Stanley Wrice, he's asking him

12:13:54   25  questions like did you -- were you upstairs in the attic where

1   the woman was raped?  And Stan tells you that he's agreeing.

2          And Mr. Hale cross-examined Mr. Wrice, and I'm sure

3   they're going to make a big point of this, is that Mr. Wrice

4   denied making the statements.  No.  What he told you was I was

5   not -- those words were not coming out of my mouth.  I'm

6   sitting in this interrogation room.  I'm being asked these

7   questions about my involvement, and I'm agreeing because

8   Dignan is looking right at me, and I do not want to go back

9   into the basement.  That qualifies as a confession or as an

10  inculpatory statement.  Want to know why?  Because they sure

11  as heck used it at his trial.

12         You heard McCurry's testimony.  Stanley put himself

13  up in the bedroom.  Stanley took the iron.  Stanley burned the

14  woman, and he burned her by dropping the iron.  Now, it's a

15  ridiculous confession because it's false.  That's what happens

16  when you beat the crap out of people to get them to say things

17  that you want them to say.  They're not really reliable.  It's

18  not really a good way to investigate a case.  It doesn't lend

19  itself to finding out the truth.  Yes, it's false.  He has a

20  person named Jeff up there.  No one has ever talked about a

21  Jeff.  Didn't stop the prosecution from using it.  Ms. Lampkin

22  told you herself, I used it because I wanted to put him up in

23  that room.  I didn't know he was going to testify.  She said

24  she doesn't need it, she didn't need it now.  You know, that's

25  all 20/20 hindsight.  She sure as heck used it, and that's

1    really the issue here.  She used it, she argued it, and that
2    jury believed it.  Because why?  They had no information about
3    how it was obtained except for Stanley himself.  And he was --
4    his word alone didn't make -- didn't make the cut.  He didn't
5    have all that other evidence that would have corroborated what
6    he said.

12:16:01

7    So we've talked about how these coercive
8    interrogations go, and then the beatings stop when the person
9    either repeats back the statement to an assistant state's
10   attorney or agrees, which is what Stan did.  He agreed.  Yeah,
11   I did that; I did that.

12:16:27

12   What else?  Medical corroboration.  Now, Mr. Wrice
13   does an immediate outcry, and you've seen this document.  So
14   this is on September 10th.  As soon as he can get -- as soon
15   as he gets to Cook County Jail, there's an immediate outcry.
16   And there's a head injury here.  Now, they're going to focus
17   on the fact that five days later, Dr. Harper, who has probably
18   seen 100 patients who has no independent recollection of
19   Stanley Wrice, doesn't see this bruise or doesn't note it, but
20   we know that when he comes in, there's a head injury.  It's
21   marked.  Do you think that -- and they'll say, well, Mr. Wrice
22   said he had a head injury.  That's the only reason he marked
23   it.  He doesn't remember because he doesn't have an
24   independent recollection.  I would -- I would venture to guess
25   that this paramedic would not have checked head injury if he

12:17:03

12:17:25

12:17:43

1       didn't see some evidence of a head injury.  Bruises, trauma,

2       and look at these areas, all of these areas where there are

3       bruises.  He doesn't make any note like, oh, I think the guy

4       is lying to me.  I think he's just trying to create a record,

12:18:08     5  you know, because on the way over here in the paddy wagon, he

6       came up with some great big scheme to try to have a story

7       about why he confessed, or didn't confess, if you ask them.

8       So it's absolutely ridiculous.  This is incredible

9       corroboration.

12:18:27    10          Go to the next page, Ash.

11              And we have other injuries.  And he testifies, we

12      don't ask them to take their -- or they don't take their pants

13      down below their waist, so we take their word for it on what's

14      below there.  But there's other bruising that is seen, and,

12:18:43    15  again, this is one day later.  Mr. Wrice is a somewhat

16      dark-complected person.  Bruises don't show up right away.

17              And also, why do you think they use that black rubber

18      hose?  It's not just because it's like fun.  It's about the

19      types of injuries it leaves.  A hard edge will break more than

12:19:05    20  worse bruising, but that black rubber hose, it hurts like heck

21      I imagine, but it doesn't leave the same type of marks.

22      That's by design.  This is all by design, the bagging, the

23      black rubber hose.  They don't want to get caught.  They want

24      to continue to enjoy beating African American men in the

12:19:24    25  basement of Area 2 as long as they can to close their cases

1    with disregard for the truth and even disregard for the

2    victims in these cases.

3        So we have medical corroboration.  And they can --

4    you know -- like I said, got to have an awful lot of people

12:19:43    5    lying about this stuff to believe that it didn't happen.

6        Rodney Benson, he and Stanley Wrice are like

7    archenemies at this point, but he tells a very similar

8    account.  He talks about Byrne having the flashlight.  Dignan

9    and Byrne, first they had me up on the wall.  They took my arm

12:20:10    10    off the wall and cuffed me to the stool, and oooh, they had

11    fun, in that deep southern accent.  Did they call you the

12    N-word?  Oh, several times, he says.  He says, you know, when

13    people say, how do you remember something like that?  Maybe

14    whoop your ass like that and see how long you remember.  This

12:20:36    15    all rings very true.

16        And he says, I still didn't do it, I still didn't do

17    it, I got my -- I got beat some more.  He tells -- he even

18    talks about the ASA being there but not in the room.  And he

19    denies that he made any statements to the police.  I mean, who

12:21:02    20    knows what Rodney Benson -- you saw Rodney Benson.  Mr. -- the

21    only thing he cared about was making sure they knew he went

22    first.  Eww.  The guy that brought her there, the guy that

23    left with her, the ringleader in all the teenage minions,

24    Mr. I told you people I went first.  Stan didn't go first.  I

12:21:30    25    went first.  That is the despicable human being that was

Closing Argument - Plaintiff

1821

1    responsible for what happened.  And what did he get?

2    Probation.  Now, they can profess that they care so much about

3    Karen Byron.  Everyone cares about Karen Byron.  We don't care

4    about her over here because we want to vindicate our client

12:21:54    5    who did 31 years in prison for something he didn't do.

6    They're perfectly okay with probation for that guy, the guy

7    who admitted to raping her.  I mean, let's not forget about

8    Karen Byron's testimony.  She never said any of it was

9    consensual.  Rodney Benson says, oh, yeah, we just had sex

12:22:16    10    with her, uh-huh.  Michael Fowler, disgusting.  He says, hmm,

11    she called us the N-word, then I choked her, and then

12    Kenny Lewis had sex with her.  When I asked him -- it's so

13    hard to sometimes in those depositions to keep a straight face

14    and just continue to do your job.  But he says, um, yeah, it

12:22:42    15    was consensual sex.  Well, yeah, that makes sense.

16            Rodney Benson and Michael Fowler were two of the

17    culprits.  They pled guilty.  Let's not forget that.

18    Lee Holmes who is not here, he's deceased, pled guilty.  And

19    Kenny Lewis?  Well, apparently made a deal for himself and

12:23:04    20    testified against Mr. Wrice.

21            MR. JEBSON:  Objection.  There's no evidence of that.

22    I move to strike that comment, Judge.

23            THE COURT:  All right.  The jury will remember --

24            MS. BONJEAN:  Well, we have evidence that he was a

12:23:15    25    co-conspirator, right?  I mean, I don't give Mike Fowler much

1    credit as a witness obviously.  I think he's a pathological

2    liar just like Rodney Benson, but it's interesting that he has

3    Kenny Lewis there.  And Kenny Lewis's testimony was so absurd

4    on its face anyways.  It didn't match with anything anyone

12:23:38    5    else was saying.

6        So anyways, the inculpatory statements of Mr. Wrice,

7    they were used by the prosecution.  And I don't know if you

8    remember this when I was examining Ms. Lampkin.  Of course she

9    wanted to back off how important those statements were and

12:23:56    10    characterize them.  You'll get the instructions.  They were

11    inculpatory statements that were introduced.

12        But here's an important point.  It's the only

13    evidence, it was the only evidence that was introduced at his

14    trial that directly had him burning Ms. Byron.  That's why

12:24:15    15    they used it.  Kenny Lewis never testified that he saw Stan

16    burn a woman.  Bobby Joe Williams never said he saw Stan burn

17    the woman.  They both said, oh, I saw him conveniently heating

18    up the iron.  Everyone sees Stan heating up the iron, but no

19    one actually sees the burning.  Well, you know, that's a red

12:24:32    20    flag.  The only person, the only evidence that Stan burned her

21    came from his own mouth, and that's why they used that false

22    confession.  It was very important evidence that that jury

23    heard and relied on.

24        So for them to minimize it now is nonsense.  If you

12:24:50    25    were that criminal jury, you would have found that very

Closing Argument - Plaintiff

1823

1  compelling if you knew nothing about who Byrne and Dignan were

2  as police officers, if you didn't know about their coercive

3  interrogation, coercive interrogation tactics, which brings us

4  to another element of this fair -- of this denial of a fair

12:25:13  5  trial claim that we've been talking about.  This is all this

6  first claim that we've been talking about.  The rest is going

7  to go really fast.  I promise.  But this next slide that I

8  want to show you is another piece of the puzzle that we have

9  to prove.

12:25:30  10      (Counsel conferring.)

11      MS. BONJEAN:  The second element -- go back one

12  second.  I'm sorry.

13      So we've unpacked this one, No. 1, that we have to

14  prove.  And I just laid out all the evidence.  You know what

12:25:43  15  it is at this point.  We also have to prove that this evidence

16  was material. What does "material" mean?  Let's look at the

17  definition.

18      Evidence is "material" if there is a reasonable

19  likelihood that the result in the criminal proceeding would

12:26:02  20  have been different if the evidence had been disclosed or if

21  the fabricated evidence had not been introduced at trial.

22      And when you decide this issue, you consider all of

23  the exculpatory evidence and all of the fabricated evidence

24  and all of it together.  Again, no-brainer stuff.  If that

12:26:25  25  criminal jury knew what you now know about all of that

Closing Argument - Plaintiff

1824

1 evidence, the Bobby Joe Williams, about the suppressed

2 Alonzo Smith testimony, about the circumstances under which

3 Stanley Wrice confessed, if that criminal jury had all that

4 information, they would have rejected the confession, they

12:26:45  5 would have rejected Bobby Joe Williams' testimony, they

6 would -- the result, there's a reasonable likelihood that it

7 would have been different.  We don't have to prove that it

8 would have been different, only a reasonable likelihood that

9 it would have been different.  And can there really be any

12:26:59 10 doubt about that?

11       The evidence against Mr. Wrice was not particularly

12 overwhelming, frankly.  They're going to read to you a long

13 list of witnesses and give the suggestion somehow that there

14 were so many witnesses.  Well, you've heard the summaries.

12:27:18 15 Karen Byron's testimony, which, of course, tells us that how

16 she got to the house, she tells us in her testimony that she

17 was -- she uses the word "sexual intercourse."  I'll use the

18 word "raped" because that's what happened.  She was raped by

19 three different men, and then when a fourth man tried to force

12:27:38 20 her to have oral sex, I think she told Frankie Peters, you'll

21 have to kill me first, something like that, and that is when

22 the burning happened.  That's when it happened.

23       She talks about how, the person who was burning her

24 was, said something about my grandparents are picking cotton,

12:28:01 25 maybe in Arkansas perhaps.  I don't know.  Because that's

1 where Mr. Benson is.  That's where his deposition was.

2 But in any event, Karen Byron's testimony didn't tell

3 us one thing.  It didn't tell us who the perpetrators were.

4 So she gives this information, but she doesn't tell us who the

5 perpetrators are.  We can only imagine why, the state she was

6 in.  I think we know that she was in a completely almost

7 incoherent state.  I think we can assume, and, again, this is

8 argument, you can make your own assumptions, if you even look

9 at the injuries, likely unconscious, you know, some of those

10 imprints, and I think, you know, this is an important reason

11 to think about the injuries, they were so perfect.  This isn't

12 someone who was necessarily -- you know, it was not someone

13 who necessarily was fighting back at that point.  We don't

14 know.  She told you in her own testimony that she passed out.

15 She fainted.  She told Frankie Peters that.  She fainted.

16 Makes sense.  She's not -- not only because of the

17 intoxication but because my goodness, the pain.

18 And this is important because as horrifying as it is,

19 it may explain why no one, no one, not even the state's

20 prosecution witness talked about hearing screaming.  Nobody

21 said that.  It seems implausible, agreed.  I thought at first

22 like, ah, it's crazy.  But the more you look at the facts and

23 you consider her condition and you consider what everyone

24 said, that would explain the lack of at least screaming.

25 George Wilson, you heard some testimony from him.

1  He's the gas station attendant.  He tells you he sees her

2  staggering there.  He gets her help.  That's useful testimony.

3  It doesn't in any way identify who the person is.

4  Elbert Harris, very important testimony.  You saw him

12:30:17  5  come in.  Who does he see with -- who does he see with Karen

6  Byron?  The guy in the red Pinto.  We all know who that is.

7  That's Rodney Benson.  That's Rodney Benson.  It's not even in

8  dispute.  He's the one that preyed on her in her state.

9  But he also has nothing to offer in terms of who

12:30:41  10  actually injured her.  And we know, by the way, that

11  Judge Lampkin told you herself, mere presence in a house is

12  not a crime.  It just isn't.  Mere presence even at a crime

13  scene doesn't make someone responsible.  You have to

14  participate in some way or have knowledge and assist in some

12:31:02  15  way.  So she testified to that.

16  Frankie Peters, Frankie Peters' testimony is helpful

17  because one of their big theories is that how could somebody

18  not have seen anything?  Stanley's story is so ridiculous when

19  he kicks them all out of that dark attic, and she's -- Rodney

12:31:24  20  Benson is taking her out.  He must have seen something.  And

21  what he tells you is I did not see her face.  When I first saw

22  her upstairs, it was pitch black, dark, as everyone has

23  described it.  I didn't notice anything.  I was also

24  preoccupied with trying to get them out of there.  I went and

12:31:39  25  grabbed a hammer.  Rodney Benson was an aggressive guy who was

1    bigger than me.  I didn't pay -- you know, I saw her, but I

2    didn't pay much attention.  Again, pitch black attic, your

3    eyes need to adjust from the little bit of light that's coming

4    in.  By the time he comes back, they're downstairs going out

12:31:56    5    the back porch.  He says Rodney is holding her up.  He doesn't

6    see her face, and he doesn't see the burns.

7         But guess what?  Frankie Peters says the same thing.

8    When she goes to the gas station, the gas station is brightly

9    lit and actually requires her lifting up her shirt for her to

12:32:13   10    see the injuries.

11         So it's just not that crazy after all.  It makes a

12    lot of sense.  Frankie Peters didn't see the injuries until

13    Karen Byron lifted up her shirt and pulled down her pants and

14    showed those injuries.

12:32:29   15         At the criminal trial, there was evidence from Jim

16    Sanders, who is the technician that went up there and got all

17    of that evidence out of the attic, including the beer bottle,

18    the Old Milwaukee beer bottle.  And Stan told you, I could

19    tell you I didn't drink Old Milwaukee, but that would be a

12:32:52   20    lie.  I did.  But what's interesting in that cross-examination

21    was that guess what?  They dusted that beer bottle, and they

22    found prints.  Not connected to Stanley Wrice.  It would be

23    nice to know who they were connected to.  You have to wonder

24    how much effort was put into finding that out though.  We

12:33:07   25    don't know.

1        What else is interesting about that attic?  That

2    attic is so full of evidence, it makes absolutely no sense

3    that someone who would commit this heinous crime in their own

4    home -- which in and of itself is crazy.  You commit this

5    absolutely heinous crime in your own home.  You know you've

6    sent this woman off to the streets allegedly with such

7    injuries that she's definitely ending up in a hospital, and

8    the police are going to be there pretty quickly.  It doesn't

9    take a rocket scientist to have figured thought out.  And you

10    don't bother to pick up the iron?  The shoe?  The underwear?

11    He made no effort.  He went back to the couch.  He didn't even

12    go back up.  It was dark.  That is the actions of someone who

13    is innocent.  People who are guilty leave.  They leave all the

14    evidence behind.  Not my problem.  They didn't take any of it

15    with them.

16        Who else did we hear from at trial?  Sergeant Byrne,

17    who we know is a perjurer when he testified there were no

18    cells there.  But he did tell something that was sort of

19    interesting.  It's just fantastic.

20        Stanley told you, and he said since 1982, Bobby Joe

21    and Patricia were fighting when I got back from the phone

22    booth, and I went in and scooped up their two year old, their

23    toddler, and brought her on the couch with me.  And the

24    defendants are like, oh, yeah, right.  And even Bobby Joe

25    says, I don't remember that.  But you know they're not

1   coordinating.  There are plenty of inconsistencies in their

2   stories.

3          And what did Sergeant Byrne say at trial?  He didn't

4   know it was something he should lie about, I guess.  He

5   said -- he said that he went -- he went in there.  He went

6   into the house and that there was an African American man, a

7   black man sleeping on the couch with a child.  Woof.  Those

8   are those moments you know this man is telling the truth.

9   That little detail, that his archenemy, Sergeant Byrne, forgot

10  to cover up.  It's consistent with what he said, I took her,

11  and I brought her on the couch.  And even Sergeant Byrne said

12  she was there when he went to arrest him, a little girl on the

13  couch, or child on the couch.

14         Who else testified?  Lieutenant Crane who testified

15  that there were, in fact, cells, abandoned cells.  We had

16  Cermak medical paramedics and Dr. Stanley Harper, who -- can

17  you put up Stanley Harper's report real quick?

18         Stanley Harper testified that by the time that he --

19  when he sees Stanley, what is it, six days later, he doesn't

20  notice all the bruises that the paramedics noted.  It's not

21  unusual.  He also testified that bruising can go away after 48

22  hours.  Again, not unusual.  But, again, we have an outcry

23  right there, beaten with a flashlight and a billy club,

24  doctors using those words, all consistent.  I mean, they

25  would -- to think of -- to accept their defense, it's

1    absolutely implausible.  He came up with this giant scheme all

2    by himself that happened to coincide with what other people

3    are saying in unrelated cases?  Of course not.  That's

4    ridiculous.  And they want to minimize his injuries.  Fine.

12:37:14    5    Minimize his injuries.  They're not the same injuries as

6    Karen Byron.  We never said they were.  We're not trying to

7    make equivalencies here.  That's not the point.  The terror

8    isn't just in being hit and bruised.  It's being chained in a

9    basement and having no autonomy and being treated like an

12:37:30    10   animal and being forced to say things against your interest

11   that put you in prison for 31 years.  That's -- it's not --

12   you know, minimize the injuries away if that's what they want

13   to do, but it just misses the point.  Again, keep your eye on

14   the ball.

12:37:51    15   We had testimony at the trial from Patricia and

16   Charles.  They do not implicate Stan in the crimes.  So at the

17   end of the day, the case against Stanley Wrice from the

18   prosecution was Bobby Joe Williams, Kenny Lewis, and Assistant

19   State's Attorney McCurry who testified about the confession,

12:38:20    20   three sources of evidence.  And as we've discussed, the Bobby

21   Joe Williams and the confession, if that criminal jury had

22   heard all of the evidence you've heard that we've gone over

23   this morning, none of that would have been credited, and they

24   would have been left with Kenny Lewis's testimony.  You think

12:38:39    25   they would have -- you think that jury would have been like,

1    oh, that makes sense.  They beat the crap out of Bobby Joe

2    Williams, forced him to lie.  They beat the crap out of

3    Stanley Wrice, forced him to make statements against himself,

4    but sure, let's just credit Kenny Lewis.  No way.  There's a

12:38:57  5    reason Ms. Lampkin used three sources of evidence.  She needed

6    it all to convict him.  In any event, what you now know, there

7    is a reasonable likelihood that the outcome would have been

8    different.

9        And Kenny Lewis's testimony is very suspect.  I wish

12:39:11  10   he was here.  I think we all do.  I think there's a story

11   there apart from the fact that he raped the woman.  You really

12   think the police didn't talk to Kenny Lewis?  You think they

13   didn't talk to Kim?  Come on.  Kenny Lewis lived down the

14   street.  He showed up four days before trial, and his

12:39:37  15   testimony on its face, there's no way the jury even believed

16   it in the first place.  It's completely inconsistent with

17   Bobby Joe Williams.  We talked about this.  Ms. Lampkin even

18   admitted as much.  They had different --

19       MR. JEBSON:  Objection.

12:39:50  20       MS. BONJEAN:  They don't see each other in the attic.

21       MR. JEBSON:  Objection.  That misstates the evidence.

22       THE COURT:  The jury is the determinant of whether

23   the evidence has been misstated.

24       So overruled.

12:40:02  25       MS. BONJEAN:  She acknowledged, I believe -- you

1    know, again, go with your own recollection -- that they don't

2    put each other in the attic when the woman is raped.

3    Problematic.  Not very good testimony.

4         Kenny Lewis testifies about how he's the hero.  He's

5    pulled Stan off her multiple times.  And this 18-year-old kid

6    is pulling Stan off this woman, pulling bottles out of his

7    hand, and he sees Stan just beat her to a pulp.  He thinks

8    she's dead, and he goes out for barbecue with Kim.  He leaves.

9    He goes get something to eat and he comes back, and she's

10   burned from head to toe.  Again, all of these people who don't

11   actually see any burning, but they all, you know, implicate

12   Stan.

13        Kenny Lewis's testimony was trash.  It was trash

14   then, and it's trash now.  And now at least we have some

15   insight into why it was trash, because he raped her.  He was a

16   co-conspirator.  And we don't know -- you cannot rely on this

17   investigation, ladies and gentlemen.  That's part of the

18   problem.  And I'm not saying Ms. Lampkin -- you know,

19   Ms. Lampkin's story about finding him four or five days

20   earlier, if that's her memory, that's her memory.  It seems a

21   little hard for me to believe, but it's beside the point.  You

22   cannot trust those defendants' investigation of anything.

23   They didn't find Kenny Lewis and talk to him?  Sure did.  It

24   would be nice to know what he told them, but we don't know any

25   of that because Kenny Lewis is dead.  There's no way that that

1    jury would have credited Kenny Lewis's testimony alone.  It

2    was trash on its face.  It was conflicting with everything

3    else.  And if that jury knew what you know, there's a

4    reasonable likelihood that the outcome would have been

5    different.  No question about it.

6              MR. JEBSON:  Objection, Judge.  That's not the

7    standard.

8              MS. BONJEAN:  The reasonable likelihood that the

9    outcome would have been different?

10             MR. JEBSON:  It's not the standard of --

11             THE COURT:  The Court will instruct the jury as to

12   the law applicable.

13             So proceed.

14             MS. BONJEAN:  Okay.  We're almost finished here.

15             I want to go through -- oh, and the last -- the last

16   thing we have to prove on this claim is that -- that the

17   plaintiff was damaged as a result.  Well, heck yes he was

18   damaged.  He was convicted, and he went and spent 31 years in

19   prison.  Those are some damages.  His life, his life are his

20   damages, which I'm going to talk about in a minute.  But

21   before we do that, I want to talk about the other two claims

22   that we have.  And there's a lot of overlap.  It won't take so

23   much time.

24             The second that claim we have, it's a separate claim,

25   and it's called the violation of plaintiff's right against

1   compelled self-incrimination.  And to demonstrate this, this

2   is just -- this is that the plaintiff claims that defendants

3   Byrne and Dignan violated his constitutional rights by

4   coercing plaintiff to make self-incriminating statements to

12:43:23   5   the charged crimes.  To succeed on the claim, plaintiff must

6   prove each of the following things by a preponderance of the

7   evidence.  We have to prove two things here on this claim.

8   Defendant Byrne and Dignan coerced plaintiff to make

9   self-incriminating statements, and -- that's actually the

12:43:43   10   wrong --

11        (Counsel conferring.)

12        MS. BONJEAN:  Okay.  Fair enough.  Thought maybe we

13   had the wrong one up there.

14        He coerced plaintiff to make statements and that

12:43:56   15   those statements were then repeated to the prosecutor.  Stan

16   says yes, the prosecutor asked me questions; I said yes.  And

17   that those self-incriminating statements were used against

18   plaintiff at trial.  That's it.

19        Makes you wonder, why are we even here?  Their own

12:44:11   20   clients don't deny any of this.  They invoke the Fifth.  They

21   coerced a statement from him that Mr. Wrice told the state's

22   attorney, and it was used against him at trial, end of story.

23   There's no magic to this.

24        So this one we've proved, and I'm not going to go

12:44:33   25   back through, but we talked about why Stanley's -- why

1       Stanley's testimony about his coerced confession or

2       statements, whatever you want to call it, because whether you

3       call it a confession or not, it's all about the right to

4       self-incrimination.  That's what the Constitution talks about.

12:44:50    5   They don't talk about confessions.  They talk about the right

6       against compelled self-incrimination.  You have a right not to

7       when you are charged as -- in a criminal case not to be used

8       as a witness against yourself.

9           And then finally, the third claim is conspiracy to

12:45:10    10  violate constitutional rights.  And plaintiff claims that the

11      defendants essentially entered into an agreement with each

12      other.  It doesn't have to be like, oh, let's agree, let's

13      sign a contract, but it's an understanding, and that their

14      understanding is that they're going to deprive Mr. Wrice of

12:45:33    15  one of his constitutional rights, whether it be the right on

16      compelled self-incrimination or a right to deny him a fair

17      trial.  But they agreed -- implicitly or expressly they agreed

18      with each other to do that, and they did it.  They did it by

19      the coercive interrogation tactics they used.  They did it by

12:45:55    20  using coercive interrogation tactics against Bobby Joe

21      Williams.  And as a result, his constitutional rights were

22      violated.  It's that simple.

23          We know that they had an understanding.  You saw that

24      chart of all of those cases that you've heard about, their

12:46:16    25  *modus operandi*.  These men didn't need to talk about it,

1   although they probably did.  They knew what their MO was.

2   That was their signature style, and they did it.  They did it

3   in a number of cases.  So that's what the conspiracy claim is.

4           And then let's talk about damages.  First, damages.

5   There are two types of damages.  There are compensatory

6   damages and punitive damages.

7           The compensatory damages are the most important.

8   They're the big damages because those are the damages that

9   make Mr. Wrice whole for what he experienced and what he

10  suffered.  And they're the most important damages.  They are

11  the damages that compensate him for the coercive interrogation

12  he underwent that was used against him.  They compensate him

13  for the trial that was an unfair trial.  And then they

14  compensate him for the result of that unfair trial, which was

15  a wrongful conviction for which he served 31 years.  And this

16  instruction tells you --

17          (Counsel conferring.)

18          MS. BONJEAN:  So what this instruction -- you'll get

19  these instructions.  You are to consider the physical and

20  mental and emotional pain and suffering and loss of normal

21  life that plaintiff has experienced and is reasonably certain

22  to experience in the future.  No evidence of the dollar value

23  of physical or mental and emotional pain and suffering or loss

24  of a normal life has been or needs to be introduced.  There's

25  no exact standard for setting the damages to be awarded on

1 account of these factors. You are to determine an amount that
2 will fairly compensate the plaintiff for the injury he has
3 sustained.

4 If you could give him back his life, he would take
5 it. That's what he wants. He wants his 30s back, he wants
6 his 40s back, and he wants his 50s back. He wants to have
7 memories other than cockroaches in the cell where he slept at
8 night. He wants to have memories other than having to sleep
9 in a bunk 2 feet from a stranger who uses the bathroom in the
10 middle of the night 2 feet from his head. He wants to have
11 family time. He wants time with his kids, yes. He wants time
12 with his siblings who didn't get to see him that much. And
13 it's not their fault. This cross-examination of poor Magnolia
14 Wrice, that somehow she was a bad person, oh, you only went to
15 see him this many times, these are not people with money.
16 These are not people that had money to drive or even had cars.
17 Do you know how hard they make it to see your loved ones in
18 prison?

19 And prison shouldn't be fun. No one is saying it
20 should be. But when you get the wrong guy in there, it is
21 absolutely incredible, the agony, the loneliness. He'll take
22 that if you could give it to him. There isn't going to be a
23 place on your verdict sheet where you could give him back all
24 that. It's just how the system works. The only thing you
25 could give him is money. And in a case of staggering

1   importance like this, I don't think you -- I don't know if you

2   fully understand how staggeringly important -- I don't know if

3   that's a word.  This is an incredibly important case where you

4   have the two defendants pleading the Fifth and not even

5   denying, and a man who has done 31 years in prison, it's not

6   unusual for a million dollars a year in a case like this.

7            MR. JEBSON:  Objection.

8            MS. BONJEAN:  I'll withdraw it.

9            It's not -- you would expect at least a million

10  dollars a year if --

11           MR. JEBSON:  Objection.

12           MS. BONJEAN:  -- you gave your life away.

13           MR. JEBSON:  Objection.

14           THE COURT:  I'll sustain the objection to that.  The

15  jurors would ignore.

16           Proceed.

17           MS. BONJEAN:  Sure.

18           $30 million can't give him back his life, and he

19  would take his life back.  He's going to die an old man and

20  not have those memories that the rest of us have.  It's not

21  unusual.

22           Now, listen, you may say to yourself, maybe -- I

23  don't know.  Maybe he should have kept a tighter ship on his

24  house and maybe he should have, you know, not drank so much

25  and all those things.  That's fine.  You know, I don't know

1   what the discount is for something like that.  But he's still

2   a human being.  He's not an animal.  And he should be fairly

3   compensated for those 31 years that the defendants took from

4   him, took him from his family, his family from him.

12:51:45   5        You should think about what it feels like to sit --

6   starting with the coercive interrogation in that basement,

7   which we've gone over, the trauma of that, how terrorizing, to

8   go to your trial and hear people lying and hearing your own

9   words used against you, officers getting up there and saying

12:52:02   10   you're the liar when they're the ones that are lying.  You

11   know, I know.  I know you have felt this, I have, where

12   somebody tells a little lie about you.  Someone comes up to

13   you at work and says, so and so said you said this.  I didn't

14   say that.  You're furious over something so little.  It makes

12:52:20   15   you mad.  I'm going to find out why that person would say that

16   about me.  Could you imagine sitting there and listening to

17   these people saying that he committed these awful, heinous

18   crimes, and meanwhile, Rodney Benson and Michael Fowler and

19   Lee Holmes are walking around on bond talking about, you know,

12:52:39   20   all this trouble over some white bitch, in the hallway?  You

21   think that didn't happen?  We know Rodney Benson said that.

22        So the trauma of sitting in front of a judge who says

23   you're going to prison for 100 years and waking up every day

24   and going to bed every night for the next 31 years not knowing

12:53:06   25   if you're ever coming home.

1        And then when you come home, life is so hard.  You

2   have no life experience really.  You have no ability to work

3   really.  You know, he told you how he had a job for a little

4   bit with the Chicago Innocence Center.  That went away.  And

5   it's hard to find work.  So he rakes leaves, and he does

6   things to try to keep a little money in his pocket.  And he

7   lives by the grace of his sister who lets him sleep on the

8   couch in the basement.

9        And you can say, they can say he wasn't a great --

10  they could say all they want.  They've been trying.  They've

11  been trying so hard this whole trial to get you to think, oh,

12  he's just a lowlife.  He never claimed to be an angel, but

13  they took away any opportunity.  We all go through

14  self-improvement, all of us.  I am not the person I was 40

15  years ago.  They took that all away after they chained him in

16  a basement, kicked his legs apart so he's folded over in pain

17  where he can't even protect himself; and from there, they

18  lied, put him in prison, and they ruined his life.  There's no

19  amount of money that can undo that hardship, no amount of

20  money.  But we have to try.  And you will have to decide what

21  the appropriate compensatory damages is for something that

22  horrific.

23       And lastly, you'll also have to decide an issue of

24  punitive damages.  And I'm not going to put up the screen.

25  You'll have the instruction on that.  Punitive damages are --

1  well, put it up.

2      (Counsel conferring.)

3      MS. BONJEAN:  Punitive damages are given when the

4  defendants have done something particularly reprehensible.

12:55:28   5  It's more of a deterrent.  You're bad for doing this.  It has

6  nothing to do with making him whole for his damages, but it's

7  about saying -- it's sending a message, a little sting.  You

8  know, we're not asking for huge amounts of money, but a little

9  sting, you know, no more than, I don't know, $100,000, 25,000,

12:55:50  10  $50,000, a sting to say, it's a message that what you did was

11  particularly reprehensible.  So you'll get the instruction on

12  that.

13      I'm going to have a chance to talk to you after the

14  defendants argue their case.  And -- oh.  But the defendants,

12:56:15  15  of course, aren't here.  It will be --

16      MR. JEBSON:  Objection.  It's a motion *in limine*,

17  Judge, clear violation.

18      THE COURT:  The objection is sustained.

19      MS. BONJEAN:  The defendants' attorneys will be

12:56:27  20  arguing the case to you.  You heard from the defendants from

21  the witness stand.  And just remember, whatever they testify,

22  whatever they come here and argue before you, their own

23  clients won't say it.  Their own clients won't say.

24      And I'll leave you with this.  This is what their

12:56:52  25  clients are saying:  I am invoking my right not to answer any

1   questions today to each and every question about whether they

2   concealed evidence, whether they beat people, whether they

3   corrupted this investigation; respectfully, I invoke my Fifth

4   Amendment right, and I will not be answering any questions

12:57:15   5   here today.

6           Ladies and gentlemen, I thank you for your time, your

7   patience.  You've been wonderful.  And I will have a chance to

8   talk to you again, but for now, plaintiff has completed their

9   closing.

12:57:36   10          THE COURT:  Members of the jury, because we've been

11  at it for a couple of hours now, we're going to take a half

12  hour, just a half hour for lunch, and then come back and then

13  we're going to hear the defendants' final argument.

14          (Jury exits.)

15          (Lunch recess had from 12:57 p.m. to 1:30 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3   STANLEY WRICE,                    )
                                       )
 4                    Plaintiff,       )
                                       )
     -vs-                              )   Case No. 14 C 5934
 5                                     )
     JOHN BYRNE, former Chicago        )   Chicago, Illinois
 6   Police Sergeant, et al.,          )   March 2, 2020
                                       )   1:30 p.m.
 7                    Defendants.      )
                                       )
 8                                VOLUME 8
                     TRANSCRIPT OF PROCEEDINGS - TRIAL
 9          BEFORE THE HONORABLE HARRY D. LEINENWEBER and a jury
     APPEARANCES:
10   For the Plaintiff:       MS. JENNIFER A. BONJEAN
                              MS. ASHLEY BLAIR COHEN
11                            Bonjean Law Group PLLC
                              467 Saint Johns Place
12                            Brooklyn, NY 11238
                              (718) 875-1850
13
14                            MS. HEIDI LINN LAMBROS
                              1169 S. Plymouth Court, Suite 123
15                            Chicago, IL  60604
                              (216) 318-4087
16
     For the Individual
17   Defendants:             MR. ANDREW M. HALE
                             MR. SCOTT J. JEBSON
18                           MS. JENNIFER BITOY
                             MS. AMY A. HIJJAWI
19                           MR. SHAWN W. BARNETT
                             Hale & Monico LLC
20                           53 W. Jackson Boulevard, Suite 330
                             Chicago, IL  60604
21                           (312) 341-9646
     Court Reporter:
22
                   KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
23                        Official Court Reporter
                       United States District Court
24              219 South Dearborn Street, Suite 1426
                         Chicago, Illinois  60604
25                   Telephone:  (312) 435-5569
                   Kathleen_Fennell@ilnd.uscourts.gov
```

```
 1   APPEARANCES:   (Continued)

 2   For Defendant
     City of Chicago:        MS. CARYN L. JACOBS
 3                           Department of Law, City of Chicago
                             121 North LaSalle Street,  City Hall
 4                           Suite 600
                             Chicago, IL  60602
 5                           (312) 744-5128

 6
     Also Present:          MR. NICK BENYO
 7                          Senior Litigation Consultant
                            Magna Legal Services
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

01:31:20

01:31:32

01:31:57

01:32:21

01:32:38

1    (Proceedings had in open court.  Jury in.)

2         THE COURT:  Please be seated.

3         Mr. Jebson, you may address the jury on behalf of the

4    defendants.

5         MR. JEBSON:  Thank you.

6         CLOSING ARGUMENT ON BEHALF OF DEFENDANTS

7    BY MR. JEBSON:

8         Stanley Wrice, this man right here (indicating), that

9    has been sitting here for a little over a week, not only

10   violently raped Karen Byron and brutally beat her, he

11   sadistically tortured her.  And no matter how much he doesn't

12   want to say that Karen Byron was tortured, she was tortured.

13   By him.  This man right here (indicating).

14        And don't let his age fool you, or his appearance,

15   because it was a 29-year-old Stanley Wrice up on that picture

16   that raped, beat and burned Karen Byron.  And you saw a little

17   glimpse of Stanley Wrice the other day when he was being

18   cross-examined.  And this is the 65-year-old Stanley Wrice.

19   You remember when Mr. Hale was cross-examining, how angry he

20   got?  And he brought up the fact that with this alleged time

21   that he went to go kick out Rodney Benson, he got a hammer.

22   And Mr. Hale said, were you planning on using that hammer?

23        You know what he said?  You remember.  He said, I was

24   going to knock his brains out.

25        That's what the 65-year-old Stanley Wrice said.  Can

1   you imagine what the 29-year-old Stanley Wrice would do?

2         Well, unfortunately, Karen Byron knows exactly what

3   the 29-year-old Stanley Wrice would do.  Unfortunately, she

4   found out when this man went down to his kitchen and grabbed

5   the family iron.  This one (indicating).  The Wrice family

6   iron.

7         He took his time.  He put it on that stove.  He lit

8   the stove.  And he didn't pick it up right away.  He waited

9   and waited and waited until it was hot enough for his liking.

10  And when it was hot enough for his liking, he went upstairs

11  with this iron, where this poor, helpless woman was laying on

12  the bed after being gang raped.  He took this iron, he went up

13  to her while she was laying on the bed naked, and he pressed

14  it down and down and down on her flesh.

15        Just imagine that.  A heated iron on a human being's

16  flesh, burning the flesh.  And you heard Dr. Nolan.  Burning

17  the skin off.  This is what Stanley Wrice did to Karen Byron.

18        Now, burning a human being with an iron one time is

19  unthinkable.  Unthinkable.  It's something you see in horror

20  movies.  But this guy didn't do it once.  This guy didn't do

21  it twice.  He did it over and over and over again.

22        And what happened when the iron was cooling down

23  after burning this poor woman all over her body?  He went back

24  down to the kitchen and he heated it up again.  Just imagine

25  that.  He has just burned this poor woman over 20 percent of

1  her body, over 80 percent of her back, and he feels the

2  need -- I have not done enough; I have to go back downstairs;

3  I have to reheat the iron, and I'm going to go back upstairs

4  and I'm going to burn her again.

01:35:17

5         But he wasn't done.  After he was done with this, he

6  got this (indicating).  A fork.  And what did he do with this?

7  He heated this up.  And when it was hot enough for Stanley

8  Wrice, he went back upstairs after burning this woman already

9  and he burned her more and more and more.

01:35:48

10        Then he beat her.  And he just didn't beat her.  He

11  pummeled this poor woman.  She had over a hundred bruises.  A

12  hundred bruises on her body.  Just sit back and try to imagine

13  that.  Imagine one bruise.  Imagine two, three, four, five,

14  six, seven, eight, nine, ten, eleven, twelve, thirteen,

01:36:14

15  fourteen, fifteen.  Imagine if I kept on counting to a

16  hundred.  That's how many bruises this guy put on this poor

17  Karen Byron.

18        Beat, burned and bruised.  Why?  Because after she

19  had been gang raped, she had had enough and she didn't want to

01:36:34

20  give anyone oral sex.  His response:  Let me get the Wrice

21  family iron.  Then we'll see what you're going to do.  Then

22  we'll see maybe you'll give some oral head.

23        That's what he did.

24        And what was going on while Stanley Wrice was burning

01:36:57

25  and beating this poor woman?  Laughter.  Laughter.  You heard

1 Karen Byron testify through a summary at the criminal trial.

2 She said she heard laughter as she's being raped, beaten and

3 burned.  That's all you have to know about Stanley Wrice.

4 Laughing.  This was a big joke to Stanley Wrice.

01:37:27

5 And what did he do after he was done beating, burning

6 and raping her?  He threw her outside his house like a piece

7 of trash.  And you heard what happened to Karen Byron when she

8 was thrown out of his house like a piece of trash.  She was on

9 her feet, she was on her legs, she was on her hands, and she

01:37:54

10 was crawling in the filth of an alley after being beaten and

11 burned and raped, crawling and crawling.

12 And the only glimmer of hope Karen Byron saw as she's

13 crawling through this filthy alley is a light from a gas

14 station.  Crawling and crawling.  Just imagine every single

01:38:21

15 hand in front of the other as she's crawling there.

16 She sees this gas station, and she sees George

17 Wilson.  And she asked for his help.  And just imagine this.

18 Beaten, burned and raped, and crawling for your life.  And the

19 only thing that she can think of, the only thing when she sees

01:38:54

20 George Wilson, the only piece of humanity is she asked for a

21 Coke.  A Coke.  When she's about to die, she's asking for a

22 Coke.

23 And what's Stanley Wrice doing as this poor woman is,

24 basically, struggling to keep alive?  He goes in his house

01:39:14

25 after throwing her outside, goes down on his couch, flops his

1    head down on a pillow, and he goes to sleep without a care in

2    the world.  He just flops down, closes his eyes without one

3    thought of the woman that's on that screen.  Not a care in the

4    world.  Just another night, I guess, at the Wrice house.

5            Remember what he said?  Nothing unusual about that

6    night.  Nothing unusual at all.  Didn't hear anything.  Didn't

7    see anything.  Didn't see any injuries on Karen Byron.  I just

8    went to sleep.  As this poor woman is asking for a Coke.

9            And now we're here.  We're here because Stanley Wrice

10   wants you to make him a millionaire.  And did you hear what

11   his attorney said in talking about damages?  A million dollars

12   a year?  Just think about that.  Think about the crimes that

13   Stanley Wrice committed.  And he committed it.  Everyone in

14   this courtroom knows he committed those crimes.

15           MS. BONJEAN:  Objection.  Everyone in this courtroom.

16   He's just testified about something there's no evidence for.

17           THE COURT:  Wait, wait, wait.

18           MR. JEBSON:  There is plenty of evidence.

19           MS. BONJEAN:  Where is it?

20           THE COURT:  Just explain the evidence.  But that's --

21   okay.  Objection sustained on that specific comment.

22   BY MR. JEBSON:

23           She mentioned a million dollars.  $31 million to

24   reward this man for the crimes that he committed.

25           Let's talk about the claims that he's brought in this

01:41:22

01:41:38

01:41:53

01:42:11

 1    case.  He's brought three claims.  He's brought a claim that

 2    he claims that the officers fabricated evidence, withheld

 3    evidence.  That's Claim No. 1.  Claim No. 2, he claims that

 4    the officers coerced a confession out of him.  And Claim No. 3

 5    is a conspiracy claim that these officers conspired together

 6    to coerce a confession out of him or to fabricate or suppress

 7    evidence.

 8            Now, I want to talk about what there is not a claim

 9    about.  There is no claim in this case about an excessive

10    force.  That is not what you are here to decide.  You are not

11    here to decide whether or not Stanley Wrice was beat or -- in

12    that basement.  There's no separate claim --

13            MS. BONJEAN:  Objection.  Misstates the law.

14            MR. JEBSON:  Absolutely not.

15            MS. BONJEAN:  Misstates the law.

16    BY MR. JEBSON:

17            You will see a jury instruction --

18            THE COURT:  I'll instruct as to the law.

19            Continue, counsel.

20    BY MR. JEBSON:

21            She's saying I'm misstating the law.  You're going to

22    see a jury instruction.  And you'll see I'm not misstating the

23    law.  It specifically says that there is no independent claim

24    for excessive force.  That is not a claim in this case.  No

25    matter how much they want you to think so, there is not a

1    claim for excessive force.

2         So, even if Stanley Wrice proves to you -- and I'm

3    going to get to this because that's a complete fraud, too.

4         Even if you believe that he was hit or beat, that is

01:42:28    5    not a claim in this case.  And, again, I refer you to the jury

6    instructions.  It will specifically tell you that.

7         So, let's talk about the claims in this case.  And

8    I'm going to talk about the first one, this fabrication of

9    evidence, suppression of evidence claim.  But I'm going to

01:42:45    10   break it out.  I'm going to talk about these -- the alleged

11   fabrication of evidence claim.

12        So, Ms. Bonjean showed you the jury instruction.  And

13   this is the one that you're going to get.  And there is three

14   things that the plaintiff must prove.  And let me back up for

01:43:06    15   one second.

16        As the Judge told you, the plaintiff is the one that

17   has the burden of proof in this case.  The defendants have no

18   burden at all.  They don't have to prove anything to you.  The

19   burden in this case is entirely on the plaintiff.

01:43:21    20        You see, the way our legal system is set up is that

21   when someone files a lawsuit, when a plaintiff files a lawsuit

22   against a defendant, it is the plaintiff that has to prove

23   their case.  That's the way our legal system works.  Because

24   anyone can file a lawsuit.  Anyone.  And when someone files a

01:43:37    25   lawsuit, the defendant is forced to come in and defend the

1 case.

2          And when someone files a lawsuit, our legal system
3 gives the plaintiff a number of things.  They get to lodge a
4 complaint.  The defendant has to defend themselves.  The
5 plaintiff gets all this; get you, a jury, to hear his or her
6 case.  But the one thing our legal system says in return,
7 we're going to give you all this -- all this -- but you have
8 to do one thing in return.  Just one thing.  Prove your case.

9          So, they have the burden.  So, when you go back to
10 the jury room when you're going through the instructions,
11 please keep that in mind, that he has to prove his entire
12 case.

13          So, in terms of this first claim that the officers
14 fabricated evidence, I'm going to focus on that one first.
15 I'm going to talk about the first piece of evidence that
16 they're claiming that the officers fabricated.

17          And what the claim is in this case, they are claiming
18 that Detective Dignan and Sergeant Byrne fabricated a phoney
19 confession and forced Stanley Wrice to repeat this phoney
20 confession -- what they're calling a confession -- to the
21 assistant state's attorney, McCurry, who then testified at the
22 criminal trial.

23          Again, they're claiming that these officers made up
24 what they're calling the phoney confession and forced Stanley
25 Wrice to repeat what they're calling this confession to the

1 prosecutor, McCurry. So, there's a number of problems that

2 Stanley Wrice has with this, is that this so-called confession

3 is not a confession.

4 And you heard Judge Lampkin said -- you know, the

01:45:33  5 prosecutor -- this wasn't a confession. In fact, she called

6 it a hero statement. So, what I'm going to show you right now

7 is the criminal testimony of Prosecutor McCurry. And you saw

8 this during the trial. This is what he testified to in terms

9 of what Stanley Wrice told him. And you will be the ones to

01:45:56  10 decide whether or not this dropping the iron is a confession

11 or what Judge Lampkin said was a hero statement.

12 So, let's take a look at it. So, if you look at

13 starting at the highlighted portion, I'm going to read to you.

14 And, again, for context, this is the prosecutor, McCurry,

01:46:20  15 testifying at Stanley Wrice's criminal trial.

16 "Question: What did he say?"

17 Meaning what did Stanley Wrice say to you at the

18 police station?

19 "He told me that Lee Holmes was there, along with

01:46:34  20 Rodney Benson and the woman and Michael Fowler, is, I believe,

21 what he said.

22 "Question: Did he tell you what happened next, sir?

23 "Answer: I asked him what was going on when he went

24 up there, and he said that a man had come on a bicycle who was

01:46:54  25 having sexual intercourse with the woman. And I asked him

Closing Argument - Defendants

1854

1     what happened next.  And he said that when the man was

2     finished having sexual intercourse with her, that Rodney

3     Benson had sexual intercourse with the woman.

4          "Question:  What did the defendant tell you happened

01:47:11    5     after he told you that Rodney Benson had sexual intercourse

6     with the woman?

7          "Answer:  He said that Rodney Benson was slapping and

8     hitting the woman and demanding oral sex while he was having

9     intercourse.  And, then, at that time, Jeff came up with an

01:47:31   10     iron -- with a hot iron.  And I asked him what happened to the

11     hot iron when Jeff brought it up.  He said that Rodney Benson

12     took the iron from Jeff and he burned the woman over most of

13     her body with the iron.

14          "Question:  What did the defendant tell you happened

01:47:49   15     after he said Rodney Benson burned this woman over most of her

16     body?

17          "Answer:  He said that he, Stanley Wrice, took the

18     iron from Benson and that he burned the victim.  And I asked

19     him how he burned her.  And he said he did it by dropping the

01:48:06   20     iron on the woman's thighs.

21          "Question:  Did the defendant tell you anything else?

22          "Answer:  At that time, we concluded the interview

23     with him."

24          So, that is what Assistant State's Attorney Kenneth

01:48:23   25     McCurry testified at Stanley Wrice's criminal trial.  That's

1    what they are claiming is this big confession.  The fact that

2    Stanley Wrice said that Benson, some other guy, was having sex

3    with Karen Byron; and, that Benson was burning Karen Byron

4    over her entire body; and, that he, Stanley Wrice,

5    essentially, in an attempt to save Karen Byron, grabbed the

6    iron from Rodney Benson and dropped it, burning her.  That's

7    what they are claiming is this so-called confession that the

8    defendant officers just made up and forced him to say it.

9        Now, I'm going to go through all the reasons why,

10   number one, that is hardly a confession and, number two, how

11   there is no way in the world that it's any way believable that

12   anyone would fabricate that and force him to say to a

13   prosecutor to implicate him.

14       So, let's look at the first problem Stanley Wrice has

15   with his claim.  And that's with his criminal trial testimony.

16       Stanley Wrice testified at his criminal trial, I

17   never confessed.

18       And you heard Mr. Hale -- when he was cross-examining

19   Stanley Wrice, he played a number of testimony of Stanley

20   Wrice, what Stanley Wrice testified to at his criminal trial.

21   And there was one segment that Mr. Hale read to you question

22   and answer where Stanley Wrice said -- this is testimony at

23   his criminal trial -- that he never confessed after he claims

24   the officers allegedly beat him up the first time; that he

25   never confessed after the officers allegedly beat him up the

1   second time; and, that when he went upstairs and spoke to the

2   Assistant State's Attorney McCurry, that he never confessed to

3   him.

4           So, remember, now that he's filing the lawsuit, now

01:50:42   5   he's claiming that he confessed.  So, to believe his claim

6   now, you have to accept the fact that Stanley Wrice lied at

7   his criminal trial when he said he never confessed.

8           But it gets worse because what he said at his

9   criminal trial -- so, he said he never confessed to the

01:51:07   10   officers and to the prosecutor.  And, then, he was asked --

11   again, this is at his criminal trial -- did you say any of

12   these things to McCurry?

13           And you remember Mr. Hale, he went through line by

14   line what the so-called confession was and he asked Stanley

01:51:35   15   Wrice -- this is at the criminal trial -- "Did you tell

16   McCurry that Bicycle Rider was having sex with this woman?"

17           "No."

18           That's what Stanley Wrice said at his criminal trial.

19           Next question:  "Did you tell McCurry that Benson

01:51:49   20   then had sex with the woman?"

21           Stanley Wrice at his criminal trial:  "No."

22           "Did you then tell McCurry that someone came up with

23   an iron and handed it to Benson and Benson burned the woman

24   over her whole body?  Did you tell McCurry that?"

01:52:06   25           Stanley Wrice at his criminal trial said, "No, I

1    didn't tell him that."

2        Then the next question at his criminal trial:  "Did

3    you then say that you grabbed the iron from Benson and then

4    drop it, burning Karen Byron?  Did you tell McCurry that?"

01:52:23    5        Stanley Wrice at his criminal trial:  "I never told

6    him that."

7        And, then, again at his criminal trial:  "Well, did

8    you tell Assistant State's McCurry that the way you burned her

9    was when you pulled the iron from Benson and dropping it on

01:52:37   10    her thigh?  Did you tell McCurry that?"

11        "Answer:  No."

12        That's what he said under oath at his criminal trial.

13    So, keep that in mind as your baseline.  Because now he's

14    claiming the exact opposite.  Now he has claimed, oh, yeah,

01:52:53   15    yeah, I did confess to McCurry.  I did tell -- he said all

16    this and I agreed to all of it.  Yeah, I did tell McCurry

17    that.  Oh, and by the way, the defendants, they made me say

18    all this.  It's all made up.

19        It's his new story.  It's brand new, to get money.

01:53:17   20    He says one thing under oath at his criminal trial, and he's

21    saying something completely different now.  Now he's saying, I

22    did say it to McCurry.  I did say it.

23        And here's the thing.  I'm going to play to you --

24    and you heard this during this trial here -- a portion of

01:53:36   25    Stanley Wrice's deposition in this case.  In this case.  So,

1   it was taken not that long ago.  A few years ago.  And

2   Mr. Hale took that deposition.  And Mr. Hale -- and

3   Ms. Bonjean was there.  So, he was represented by his

4   attorney.

01:53:54
5           During the deposition, Mr. Hale went through every

6   single line of this so-called confession -- but which is a

7   hero statement -- and said to Stanley Wrice, did Dignan or

8   Byrne tell you to say this to the assistant state's attorney?

9           He went through the whole thing.  And for every

01:54:17
10  single part of this so-called confession, he said, no.

11          Did Dignan and Byrne tell you that -- to tell McCurry

12  that the Bicycle Rider was having sex with Karen?

13          Answer:  No.

14          Did Dignan and Byrne tell you to say that Benson was

01:54:33
15  having sex with her?

16          Answer:  No.

17          Did Dignan and Byrne tell you to say that someone --

18  Jeff came up with an iron and gave it to Benson and Benson

19  burned her over her whole body?

01:54:46
20          Answer:  No.

21          And on and on and on.  This is Stanley Wrice at his

22  deposition in this case.  Let's take a look at it.

23      (Said video was played in open court.)

24  BY MR. JEBSON:

01:56:19
25          No to every single question.

1  And now he's claiming in this case that Dignan and

2  Byrne forced him to say each and every one of the things that

3  he just testified under oath at his deposition that they

4  didn't.

01:56:34

5  I mean, this guy lies so much, he can't even keep any

6  story straight.  He doesn't even care.  He'll just lie.  If he

7  thinks it will suit him, he will lie.  And he lied to you over

8  and over and over again.

9  Here's another example while -- why his fabrication

01:56:54

10  claim must be completely rejected.  And this was brought out

11  again during his cross-examination.  During his criminal trial

12  in 1983, his time to make any allegation he wants -- remember,

13  he testified at his criminal trial -- never once, never once

14  during his criminal trial, did he ever say Dignan or Byrne

01:57:21

15  forced me to give this story to the prosecutor.

16  MS. BONJEAN:  Objection.  Misstates the record.

17  MR. JEBSON:  It does not.

18  MS. BONJEAN:  Obscenely.

19  THE COURT:  Wait.

20  MR. JEBSON:  Absolutely not.

21  THE COURT:  The jury will make the determination of

22  what's in the record.

23  BY MR. JEBSON:

24  It absolutely does not misstate everything.  That's

01:57:38

25  exactly what was said at his criminal trial.  He never, ever

Closing Argument - Defendants

1860

1    made that allegation.  In fact --

2             MS. BONJEAN:  Objection, Judge.  This is not even

3    evidence that they have in.  So, I don't even know where

4    they're getting this.

01:57:51    5             THE COURT:  Well, the jurors will remember.

6    BY MR. JEBSON:

7             In fact --

8             THE COURT:  Proceed.

9             MR. JEBSON:  Thank you, Judge.

01:57:56   10    BY MR. JEBSON:

11             This will remind you exactly that this was brought up

12    during his cross-examination.  Mr. Hale played a portion of

13    the plaintiff's deposition where he asked Stanley Wrice, why

14    didn't you make this allegation at your criminal trial?

01:58:12   15             And do you remember what he said?  I'm more

16    articulate now.  That was his explanation for never bringing

17    up this allegation in 1983:  Because I'm more articulate now.

18    Now I can say that these officers forced me to say this to the

19    prosecutor.

01:58:36   20             How hard is it to say a police officer forced me to

21    say something to a prosecutor?  You don't have to be that

22    articulate to say that.  Stanley Wrice had every opportunity

23    in 1983 to tell the jury in his criminal trial the same thing

24    he's claiming right here to you, and he never said it once.

01:58:55   25    And the reason why he never said it once is because it never

1     happened.

2              Here's another reason why his claim is frivolous.

3     And, again, this was brought up in his cross-examination.

4     Mr. Hale brought up another part of his criminal trial

01:59:11     5     testimony where Stanley Wrice was asked if he remembered what

6     Sergeant Byrne said to him before going and talking to the

7     prosecutor.  And Stanley Wrice said -- again, this is a

8     transcript that was read to you.  He said, I don't remember

9     everything.

01:59:29     10             And the question is:  Well, do you remember some

11     things?

12             He said, yes.

13             And, then, the question was:  That Sergeant Byrne

14     told you to tell you the truth?

01:59:38     15             And he said, yes.

16             So, that's one of the things that Stanley Wrice

17     remembers Sergeant Byrne telling him before he was going to go

18     talk to the prosecutor:  Tell the truth.

19             Does that sound like someone that is going to force

01:59:52     20     someone to falsely confess when Stanley Wrice admits that

21     Sergeant Byrne said to him before going talking to the

22     prosecutor, tell the truth?

23             And here is where his whole argument falls apart.  If

24     these defendants were really going to fabricate evidence, if

02:00:16     25     they were really going to make up a phoney confession, and if

1   they're really going to make it up and force Stanley Wrice to

2   go tell the prosecutor a phoney confession, why in the world

3   would they make up this story about someone else having sex

4   with Karen Byron, about someone else burning her, and about

02:00:43   5   him acting as a hero trying to save Karen Byron by grabbing

6   the iron from Rodney Benson and then, essentially,

7   accidentally dropping the iron and burning her in his attempt

8   to save Karen Byron?

9            Now, this is the worst fabrication of all time.  I

02:01:10   10   mean, can you really think of anything that is a worse attempt

11   to frame someone?  To say, listen, you're going to go upstairs

12   and you are going to tell the prosecutor, listen, I saw two

13   other people having sex with Karen Byron and I saw someone

14   else burn her, and I burned her, but I burned her because I

02:01:28   15   grabbed it from the person that was really burning her and I

16   dropped it?

17            Does that sound like a good frame-up job?  Of course

18   not.  It's ridiculous.  It's literally the worst frame-up

19   ever.

02:01:44   20            And here's another reason why his claim is frivolous.

21   And this goes to his own criminal attorney's testimony,

22   Sidney Jones.  Remember he testified -- well, first let's talk

23   about who testified against Stanley Wrice.  Dignan -- Peter

24   Dignan, one of the defendants in this case, didn't even

02:02:08   25   testify at his criminal trial.  Sergeant John Byrne did.  But

1    you heard from his own criminal attorney that Sergeant John

2    Byrne did not testify to anything that would incriminate him.

3    Nothing.

4        So, think about this.  If Peter Dignan and John Byrne

02:02:30    5    are out to frame Stanley Wrice, first of all, both of them

6    would testify and, second of all, they would both say, Stanley

7    Wrice admitted to us, he told us that he burned her.  He told

8    us that he raped her.  He told us that he beat her.

9        I mean, it's pretty simple.  I mean, if these guys

02:02:55    10   are really out to frame Stanley Wrice, isn't that what they

11   would say?

12       Or, if you wanted to believe Stanley Wrice, they

13   would make up this hero statement and say, you have to go tell

14   the prosecutor; and, by the way, when I testify, I'm not even

02:03:12    15   going to say anything to try to incriminate you.

16       MS. BONJEAN:  Objection.  No testimony that Byrne was

17   present in the room when Mr. Wrice confessed.

18       THE COURT:  It's up to the jury.

19   BY MR. JEBSON:

02:03:25    20       Here's what happened, ladies and gentlemen.  There's

21   one thing that both sides can agree on.  This hero statement

22   absolutely was fabricated.  The hero statement never happened.

23   What I mean by that is that Stanley Wrice did not grab the

24   iron from Rodney Benson and then accidentally drop it on Karen

02:03:51    25   Byron.  That never happened.  But the person who fabricated

Closing Argument - Defendants

1864

1       that story is Stanley Wrice.  And here's why he did it.

2               You heard the summary of the prosecutor, Ken McCurry.

3       And he told you that he interviewed Stanley Wrice two times.

4       The first time he goes up and Stanley Wrice denies -- denies

02:04:14    5   -- even being upstairs.  Never went upstairs.  But the

6       prosecutor, McCurry -- and Stanley Wrice doesn't know this --

7       has already talked to some other people, including Rodney

8       Benson.

9               So, during this first interview when Stanley Wrice

02:04:30   10   says, I was never upstairs, McCurry already knows that's a

11      lie.  And McCurry tells Stanley Wrice, you're being charged.

12      And, then, McCurry leaves the room.

13              And Stanley Wrice is thinking, well, I can't go with

14      the "I wasn't upstairs" story anymore because they're on to me

02:04:54   15   because the prosecutor's already talked to other people.  So,

16      they know I was upstairs.  I know what I'm going to do.  I'm

17      going to make up another story where I can admit being

18      upstairs but somehow distance myself from the crime.  So, I

19      know what I'll do.  I'll tell McCurry when he comes back that,

02:05:17   20   you know what, I was upstairs, but I didn't burn her.  What

21      happened was that Benson was burning her and I tried to stop

22      it.  I grabbed --

23              MS. BONJEAN:  Objection.  That's not -- that's just

24      misstating the evidence.

02:05:32   25           THE COURT:  Overruled.  The jury determines that.

1  BY MR. JEBSON:

2       So, I grabbed the iron from him and I dropped it, and

3  that's how I burned her.

4       So, this whole fabricated statement -- this

02:05:46   5  fabricated hero statement -- was absolutely fabricated, but

6  it's fabricated by Stanley Wrice to try to get out of his

7  crime.

8       So, when you go back, when you're going through the

9  jury instructions -- and they are complicated, but you're

02:06:03  10  going to see it's three things they have to prove.  So, when

11  you talk about the fabrication of evidence, the first thing

12  they have to prove is that the officers knowingly fabricated

13  evidence.  So, when you see that, you can cross that off.  He

14  has -- he can never prove that.

02:06:22  15       Now, he's also claiming -- there's a second part of

16  his fabrication claim.  He's claiming that Bobby Joe

17  Williams -- that the officers beat him up and made up this

18  story that incriminated Stanley Wrice and forced him to repeat

19  this story at trial.  So, this is the second part of the

02:06:48  20  fabrication.

21       So, let's talk about what Bobby Joe Williams

22  testified to at the criminal trial.  And you heard Bertina

23  Lampkin.  She said that Bobby Joe Williams' testimony was over

24  40 pages.  40 pages long.  So, Ms. Bonjean, she made it seem

02:07:11  25  like, oh, he was just answering "Yes" or "No" questions.  That

Closing Argument - Defendants

1866

1     wasn't the case.  46 pages.

2             And you also know that it was the state -- the

3     prosecution -- that called him as a witness.  And as you know

4     being a jury in this case, that whoever calls the witness, you

02:07:29    5     can't even ask leading questions.  You can --

6             MS. BONJEAN:  Objection.  Objection.

7             THE COURT:  Overruled.

8             Continue.

9     BY MR. JEBSON:

02:07:37   10             You can only ask open-ended questions.  What happened

11     next?  What did you see?  What did you hear?  You can't spoon

12     feed them.  And are we to believe that Judge Lampkin spoon fed

13     Bobby Joe Williams?

14             So, let's talk about what he testified at the

02:07:56   15     criminal trial, and then we'll go through their claim that

16     that was all fabricated, too.

17             So, he testified that he -- at some point he goes

18     into the kitchen, and he goes upstairs and he sees Rodney

19     Benson having sex with Karen Byron.  He then sees Michael

02:08:13   20     Fowler having sex with Karen Byron.  Comes back downstairs,

21     goes into the bedroom, he says, for less than a half hour.  He

22     comes back and he goes back upstairs, and he sees Stanley

23     Wrice having sex with Karen Byron.  And he says after that,

24     Lee Holmes tells Karen to, set your face out.

02:08:43   25             Remember that phrase, "set your face out"?

1       And, then, Bobby Joe Williams hears smacks and hits

2   and Karen Byron is being hit.  Bobby Joe Williams then goes

3   downstairs.  And, then, shortly after that, he testified that

4   Stanley Wrice comes downstairs.  He says Stanley Wrice comes

5   downstairs, he goes into the kitchen, into the -- past the

6   dining room into the living room, goes now back through the

7   living room, back through the dining room, into the kitchen.

8   He picks up an iron off the hot stove and goes back upstairs.

9       And, then, Bobby Joe says he then goes to bed.  He

10  says he wakes up later, he walks into the dining room and sees

11  Stanley Wrice sitting in a loveseat.  And he testified to the

12  jury in the criminal case that Stanley Wrice said, they had to

13  burn the bitch.

14      Now, again, the testimony goes on and on and on.  And

15  the claim in this case is that the police beat up Bobby Joe

16  Williams and forced him to give this phoney story -- what

17  they're claiming -- at the criminal trial.  But that's not the

18  only thing that Bobby Joe Williams claimed in this case.  And

19  you heard him.

20      He's claiming not only did the defendants threaten

21  him and force him to implicate Stanley Wrice, he's claiming

22  and he claimed -- he's still claiming to this day -- he said

23  in this courtroom that Bertina Lampkin, now the sitting

24  justice of the Illinois appellate court --

25      MS. BONJEAN:  Judge, objection.  She is a witness

1  like anyone else.  And that is inappropriate.

2          THE COURT:  Objection overruled.

3          You may continue.

4  BY MR. JEBSON:

02:10:45   5          Judge Lampkin -- Bobby Joe Williams is claiming that

6  Judge Lampkin threatened Bobby Joe Williams and said, if you

7  don't testify against Stanley Wrice, I'm going to charge you

8  with the raping and burning of Karen Byron.

9          That's what Bobby Joe Williams wants the nine of you

02:11:07   10  to believe.

11          Now, when it comes down to these fairy tales,

12  everything comes down to credibility.  Credibility is

13  everything.  Bobby Joe Williams' credibility is zero.  Let's

14  look at his credibility, what he says happened compared to

02:11:31   15  what Bertina Lampkin said what happened.

16          So, Bobby Joe Williams -- and he's told many stories

17  to you during this trial.  One of them is that when he is --

18  he goes down to the court -- to a room -- a building, and

19  inside that room comes in Prosecutor Bertina Lampkin.  And

02:12:00   20  according to Bobby Joe Williams, he says he tells Bertina

21  Lampkin that he's reluctant to testify against Stanley Wrice.

22  And Bobby Joe Williams wants you all to believe that Bertina

23  Lampkin, the woman you saw testifying here in this case, said,

24  you are going to testify against Stanley Wrice, and if you

02:12:24   25  don't, I'm going to charge you with her rape and burning.

1    So, according to Bobby Joe Williams, well, now I have
2    to implicate Stanley Wrice.  I have no choice.

3    So, he says he parades on, he gets into the witness
4    stand and he gives the police story about what happened, all
02:12:51    5    because, according to him, the officers and Judge Bertina
6    Lampkin threaten him.

7    Now, you are all the judges.  You determine who is
8    credible and who is not.  You saw Bertina Lampkin testify in
9    this case for hours, over two days.  Does she seem like a
02:13:14    10    credible person to you?  Because that's your job.  You have to
11    determine who is more credible, Judge Bertina Lampkin or Bobby
12    Joe Williams.

13    Let's talk about Bobby Joe Williams' multiple
14    stories.  Because that's not the only one.  Because you
02:13:32    15    remember he has two stories regarding Bertina Lampkin.  Story
16    No. 1 is that Bertina Lampkin, she threatened me with rape and
17    burning of Karen Byron if I didn't implicate Stanley Wrice.

18    But there's a second story.  Remember this one?  The
19    surprise courtroom appearance.  That's Bobby Joe's second
02:13:56    20    story.  Remember what he said?  And I brought this out when I
21    was cross-examining him.

22    His second story is that Bertina Lampkin calls him on
23    the phone and says, I want to talk to you.  A couple days
24    later, someone comes and picks him up, drives him down to a
02:14:14    25    building.  He's put into a room.  He has no idea, according to

1    him, that he's going to testify that day.  He says an African

2    American woman comes into the room, introduces herself to him

3    and then just sits down.  Sits down and says nothing.  Sits

4    down and is quiet.

02:14:45    5    So, according to Bobby Joe Williams, she's just

6    sitting there saying nothing.  Doesn't ask him any questions.

7    Doesn't do anything other than sit there until the next thing

8    that happens, according to Bobby Joe Williams, is that he is

9    thrown into this courtroom, just like this.  The surprise

02:15:06    10    courtroom appearance.  He said he had no idea that he was

11    going to testify that day.  He was shocked.  He said he was

12    shocked.  He walked in and he saw the plaintiff there.  He saw

13    a jury there.  He saw a judge there.  He said he's thrown up

14    onto the witness stand and Bertina Lampkin starts asking him

02:15:25    15    questions.  And Bobby Joe Williams says, I just started

16    telling the jury the police story.

17    Is that believable?  Because that is what Stanley

18    Wrice is trying to sell you.  That's the story he wants you to

19    believe.  That Bobby Joe Williams when he testified at the

02:15:48    20    criminal trial, it was all made up.  Either Bertina Lampkin

21    threatened him or she was just a mute and threw him into a

22    courtroom without saying a word.

23    Here's the other thing.  You remember at the very

24    beginning of my cross-examination of Bobby Joe Williams, I

02:16:11    25    said, so you're claiming that these defendants, they beat you

1   up, and they forced you to give this phoney story, and they

2   said, make sure you give this phoney story to implicate

3   Stanley Wrice when you testify at trial?  So, that's September

4   9th, 1982, eight months later.  Eight months we get to Stanley

02:16:34   5   Wrice's criminal trial, in May of 1983.

6       And Bobby Joe Williams admits that these officers

7   have absolutely no contact with him whatsoever.  They don't

8   call him.  They don't go to his work.  They don't try to

9   contact him in any way.  Yet he wants you to believe that they

02:16:56   10   were so dead set on him framing Stanley Wrice that they just

11   let him out the door and just hoped for the best, that when he

12   is finally called to testify, that he will repeat the police

13   story with absolutely no contact with them whatsoever.

14       And remember what Bobby Joe Williams said?  He said

02:17:14   15   that, they beat me up and they wanted me to sign something

16   implicating Stanley Wrice.

17       I brought out when I was cross-examining him that he

18   has admitted under oath in the past that he never signed

19   anything.

02:17:28   20       So, just think about this.  According to Bobby Joe

21   Williams, these officers are going to -- they wanted him to

22   frame Stanley Wrice, but he doesn't sign anything and he's got

23   no contact with him for eight months.

24       So, it's up to you.  Does that make sense?

02:17:45   25       And, then, we get to the famous catch phrase that

1   Bobby Joe Williams had in this trial when I was cross-

2   examining him about the very detailed -- very detailed --

3   testimony that he gave at his criminal trial.  Very detailed.

4           Remember I went through most of his testimony and I

5   said, is that true?  And -- well, let me stop here.

6           Ms. Bonjean has made some comments about that a lot

7   of -- what Bobby Joe admitted on cross-examination that a lot

8   of what he said in the criminal trial was true.  That's

9   actually not the case.

10          See, what Bobby Joe said when I was cross-examining

11  him, what he said was true was simply the fact that he went

12  over to the Wrice house; that he then went to go get beer with

13  Stanley and Rodney; and, that he went back.  But the rest of

14  his testimony, according to him now, it was all lies.

15          So, I went through his testimony.  So, this is -- I

16  said to him the first thing.

17          So, you testified in your criminal trial that you saw

18  Benson having sex with the woman?  I said, was that true when

19  you testified to that?

20          No, that was a lie.

21          Did the police make you say that?

22          They could have made me say that.

23          So, let's stop there.  The police are out to frame

24  Stanley Wrice and part of their story is to make sure Stanley

25  Wrice -- I'm sorry, to make sure that Bobby Joe Williams says

1    that someone else was having sex with Karen Byron?

2         So, then I asked him, I pointed out the next part of

3    the testimony.  During Bobby Joe Williams' testimony, he was

4    asked whether or not he could see the woman's face when Benson

02:19:40    5    was having sex with her.  And he said that he could not see

6    her face.

7         I said, was that true?  He said that wasn't true.

8         I said, did the police make you say that when Benson

9    was having sex with the woman, that you couldn't see her face?

02:19:55    10        They could have made me say that.

11        Another example:  Bobby Joe Williams testified that

12   the woman was not saying anything when Benson was having sex

13   with her.

14        He said that wasn't true either, the police could

02:20:11    15   have made me say that.

16        So, just think about that.  So, eight months prior,

17   according to Bobby Joe Williams, the police could have made me

18   say that the woman wasn't saying anything when Benson was

19   having sex with her.

02:20:27    20        Here's another example.  Bobby Joe Williams testified

21   at the criminal trial he was asked who was upstairs when

22   Benson was having sex with the woman?  And Bobby Joe Williams

23   testified at the criminal trial an unknown guy, Lee, Stanley,

24   and me were upstairs when Benson was having sex.

02:20:51    25        And I said, was that true?  And he said, no.

1   I said, did the police tell you to say that an

2   unknown guy was one of the ones that was up there?  He said,

3   they could have told me that.

4           So, just think about this.  He wants you to believe

02:21:09   5   that eight months prior to the trial, the officers want to

6   make sure that Bobby Joe Williams, when he's giving this

7   so-called fabricated testimony, make sure you say that an

8   unknown guy was upstairs with you.

9           He then testifies in the criminal trial that Little

02:21:33   10   Mike -- Fowler -- was having sex with the woman.  So, now,

11   according to Bobby Joe Williams, part of the big frame-up is

12   for Bobby Joe Williams to say someone else other than Stanley

13   Wrice is having sex with the woman.  That's also part of the

14   police story.

02:21:45   15           And, then, we get into these small little details

16   that Stanley -- that Bobby Joe Williams testifies at the

17   criminal trial.  These are insignificant details to anything.

18   Here's an example.  He said that after -- Bobby Joe Williams

19   testified at the criminal trial that after he saw Benson and

02:22:07   20   Fowler having sex with the woman, that he went downstairs and

21   he went into Patricia's bedroom and he stayed there for less

22   than a half hour.  Again, an insignificant detail.  And he

23   said that was a lie.

24           I said, well, was that part of the police story?  Did

02:22:28   25   the police force you to say that?  Eight months prior did they

1   say, make sure you say you went downstairs, you went into

2   Patricia's bedroom and you were there for less than a half

3   hour?

4          Yep, the police could have made me say that.

5          Is that believable?  And it goes on and on and on.

6          Let me give you a few more examples.  Here's one.

7   So, Bobby Joe Williams says he goes upstairs and he sees

8   Stanley Wrice having sex with the woman and, after Stanley

9   Wrice is having sex, that Lee Holmes told the lady to, set

10  your face out.

11         And I said, is that true?  I asked Bobby Joe

12  Williams, was that true when you told the criminal jury that?

13         He said, no.

14         I said, did the police tell you to make sure you say

15  after you saw Stanley Wrice have sex with Karen Byron, that

16  Lee Holmes said -- told the lady to, set your face out?

17         He said, yep, the police could have told me that.

18         Now, here's the thing about this.  And this really

19  shows how Bobby Joe Williams is lying.  Bobby Joe Williams

20  admitted that he has heard the term "set your face out"

21  multiple times in the past.  So, he admitted that.  That's a

22  phrase that he has heard in the past.  But he wants you all to

23  believe that the police officers eight months ago, that they

24  came up with this phrase "set your face out," even though he's

25  heard it multiple times, that he's to repeat that at Stanley

1  Wrice's criminal trial to falsely implicate him.  That's what

2  Bobby Joe Williams wants you to believe.

3         Now, I'm not going to go through all these, but it's

4  example after example after example of all these insignificant

5  details that Bobby Joe Williams wants you to believe that

6  these officers eight months ago told him to make sure you say

7  as part of the police story.

8         I mean, here's -- just a couple more.  He says he

9  wakes up and he goes into the bathroom, and that you can see

10  into the bathroom and he didn't see anyone in the kitchen.

11         I said, was that true?

12         No.

13         Did the police tell you to say that?

14         They could have.

15         Again, an insignificant detail that he wants you to

16  believe that the police officer went to such trouble to make

17  sure you say that when you went to the bathroom, you looked

18  into the kitchen and you couldn't see anybody.

19         I mean, it goes on and on and on.  But I want to

20  focus on this.  This is something that Bobby Joe Williams said

21  in a kind of -- for a second like I said, did he really just

22  say that?  Bobby Joe Williams testified that when the police

23  allegedly beat him up, that they said to him, we don't want

24  you to say you were an eyewitness to Stanley Wrice burning

25  her; we just want you to say that you heard Stanley Wrice say

1    he burned her.

2           Now, again, does that make sense?  If these

3    defendants were really out to frame Stanley Wrice, why

4    wouldn't they just say, Bobby Joe, you have to say you saw

5    with your own eyes Stanley Wrice burn Karen Byron.

6           Does it make sense that they would say, don't say you

7    saw it; just say you heard it?

8           Here's another reason why we know Bobby Joe Williams

9    is lying; and, that is, why would the defendants fabricate two

10   completely different stories?  What do I mean by that?

11   Stanley Wrice wants you all to believe that these defendants

12   came up with a phoney story for Stanley Wrice to tell the

13   prosecutor.  Again, the dropping the iron story.  Okay?  So,

14   that's Fabrication No. 1 that he wants you to believe.

15          At the same time, he wants you to believe that these

16   officers decided, let's come up with a different fabrication

17   to have Bobby Joe Williams tell the jury.

18          If these defendants were really out to frame Stanley

19   Wrice, why would they have two completely different stories

20   and have two completely different people tell them?  Doesn't

21   make any sense.  If these guys were really out to frame him,

22   they would just make it nice and simple:  Okay, Stanley Wrice,

23   you're going to go tell the prosecutor that you got that iron,

24   you pressed down, you raped her, and you burned her.

25          Bobby Joe, you're going to go tell the prosecutor and

1  you're going to testify at trial that you saw Stanley Wrice

2  rape, beat and burn.

3       But Stanley Wrice wants you to believe something

4  completely different.  He wants you to believe these guys came

02:27:32   5  up with two completely different fabricated stories, and he

6  wants you to believe that you think -- they wanted two people

7  to tell two different stories.

8       But here's where we know the multiple reasons why we

9  know Bobby Joe Williams is lying to you.  You remember how

02:27:51   10  adamant he was that what he testified at the criminal trial

11  was not true?  He kept on saying, I wasn't upstairs.  So, when

12  I told the criminal jury all this stuff about what I saw

13  upstairs, that was all a lie because I was not upstairs.  He

14  said it over and over again:  I was never upstairs, ever.

02:28:17   15       Well, guess who says that Bobby Joe Williams was

16  upstairs?  Stanley Wrice.  Took that stand and was adamant --

17  adamant -- Bobby Joe Williams was upstairs.

18       I can go on.  Unfortunately, I only have a couple

19  hours.  I can go on for five hours just talking about the

02:28:48   20  reasons why Bobby Joe Williams is not believable.  But let's

21  get to some more.

22       He stood by his criminal trial testimony for 29

23  years.  29 years.  He testified in 1983.  It was in 2011, 29

24  years later, that he signed this affidavit saying that it was

02:29:15   25  all lying, it wasn't true.  29 years.

1    Now, you just heard Ms. Bonjean say, well, no, he
2    told the Office of Professional Standards in 1994.  So, let's
3    stop there for one second.  Number one, that's not true.  But
4    let's say it was true.  I'm going to get -- in one second I'm
02:29:38   5    going to show you why that's not true.  But let's assume it is
6    true in 1994.  That's 12 years.  Is standing by your story for
7    12 years, is that really that much better?  Going 12 years,
8    sticking by your story for 12 years?  But it wasn't 12 years.
9    It was 29 years.
02:30:00   10    So, let's talk about this 1994 Office of Professional
11    Standards document that you saw.
12    Now, Ms. Bonjean, in her argument, made a big point
13    that Bobby Joe, he -- they called him.  They called him.  But
14    you looked at the document.  Remember I objected.  I said it's
02:30:27   15    right in the document.
16    But Bobby Joe, what did he say when he called?  If
17    you look at that document, it's full of lies.  Let's go
18    through each of them.
19    First, we know that Bobby Joe Williams was the one
02:30:50   20    who called them.  And what did he say when he called them?  He
21    made up this story about being hit with this black object.  I
22    wonder where he got that story from.  Well, he's sitting right
23    over there (indicating).
24    MS. BONJEAN:  Objection.  Absolutely no evidence to
02:31:07   25    support that.

Closing Argument - Defendants

1880

1    MR. JEBSON:  Judge --

2    MS. BONJEAN:  Zero.

3    MR. JEBSON:  -- the jury --

4    THE COURT:  Objection sustained -- overruled I mean.

5    Excuse.  The jury will siphon what's the accurate testimony.

6    BY MR. JEBSON:

7         Bobby Joe Williams was part of the Wrice family.  You

8    don't think he had contact with Stanley Wrice during those 12

9    years?  And all of a sudden he's calling the Office of

10   Professional Standards in 1994.  And all of a sudden he's

11   making the same allegations.

12        Here's why we know he's lying.  Because he described

13   this object as being 20 inches.  But remember I pointed out

14   when I was cross-examining him, when he was asked, how big was

15   this object?  Was it bigger than -- was it as big as a pen?

16   And he said, I guess.

17        Is a pen 20 inches?  If he was really beat by this

18   object, don't you think he would know whether or not it was 20

19   inches or maybe the size of a pen?

20        But here's another reason why we know that Bobby Joe

21   Williams lied when he called the Office of Professional

22   Standards in 1994.  Because he said -- and it's in that

23   statement -- that he heard Stanley Wrice hollering a couple

24   doors down from him.  And remember, Bobby Joe said he's on the

25   second floor.

1       So, according to this call to OPS -- Office of

2   Professional Standards -- in 1994, Stanley Wrice is a couple

3   doors down.  Stanley Wrice does not claim he was beat on the

4   second floor.  Stanley Wrice says he was in the basement.  But

02:32:43     5   Bobby Joe is telling the Office of Professional Standards he

6   was a couple doors down on the second floor.  Complete lie.

7       That's what happens.  It's the little things that

8   catch up with you.  It's the thing was 20 inches.  A couple

9   doors down.  All lies.

02:33:02    10      And this claim that Bobby Joe Williams told the

11   Office of Professional Standards in 1994 that the officers

12   forced him to give a phoney story, complete bogus.  And you

13   heard it in this trial because I asked Bobby Joe Williams.

14   When I cross-examined him, I pointed out to him -- and I'm

02:33:23    15   going to show you the transcript in one second.

16      I said, Mr. Williams, isn't it true that after this

17   1994 call to OPS in 2005, you spoke to the special prosecutor?

18   And isn't it true that they asked you about this comment in

19   the Office of Professional Standards document about got their

02:33:48    20   story?  And isn't it true that when you're asked about this

21   comment in 2005, you were specifically asked, did you say any

22   things to the detectives, anything different after you claim

23   that you were beat or -- than you did before you were beat, or

24   did you give them any additional information?  And Bobby Joe

02:34:10    25   Williams said, no.

Closing Argument - Defendants

1882

1     So, Bobby Joe Williams is admitting in 2005 that
2 there is no police story.  Let's look at this testimony.
3     Again, this is testimony in this trial.  This is
4 question by me:
5     "Question:  Now, Mr. Williams, you were asked
6 yesterday afternoon and this morning about this exhibit.  And
7 I want to highlight a portion of it.
8     "It's the last paragraph, first sentence, please.
9 You were asked a bunch of questions about this.  I'm going to
10 read it to you again.
11     "Again, this is from the Office of Professional
12 Standards in 1994.
13     "After the officers -- " and it's in quotations --
14 "'got their story,' they left Mr. Williams in the room for
15 approximately a half hour.
16     "So, that's the 1994 document, right?
17     So, I'm confirming with Bobby Joe Williams we're
18 talking about the same document.
19     He says, "Yes."
20     Then I asked him:  "And, then, you would agree that
21 in 2005 when you were interviewed by the special prosecutor,
22 there -- you were asked some questions specifically about this
23 sentence in the 1994 document about after the officers got
24 their story.  Do you remember that?
25     "Answer:  Yes.

1      "Question:  Okay.  So, let's look at that question

2    that you were asked in 2005.  And this is the 2005 transcript.

3    Page 23, Line 19, to 24, Line 3.  And I'm going to read this

4    to you and I'm going to ask you some questions.  Again, this

02:35:48    5    is a 2005 statement."

6      So, this is me now reading to Bobby Joe Williams the

7    2005 statement that he gave regarding the 1994 OPS document.

8      "Question:  One part of that statement that OPS took

9    down was after the officers 'got their story,' they left

02:36:15   10    Mr. Williams in the room for approximately a half hour.  This

11    got their story -- I mean, is your recollection that you told

12    them anything different after you were hit than before you

13    were hit or gave them any additional facts?"

14      "And your answer was:  'No, not that I remember.'"

02:36:33   15      And, then, I said, "I correctly read the question and

16    answers from your 2005 sworn interview, right?

17      "Answer:  Yes."

18      So, he admits -- he admits -- that he said nothing in

19    1994 about this alleged police story that he had to give.

02:36:56   20      And now what you're looking at on the screen is Bobby

21    Joe Williams' affidavit in 2011.  Again, mind you, this is

22    2011.

23      MS. BONJEAN:  Is this in evidence?

24      MR. JEBSON:  Yes.  This was shown to the jury.

02:37:10   25      MS. BONJEAN:  Is it in evidence?

1       MR. JEBSON:  Yes.  I read this to the jury during the
2    trial.
3       He said, "I am coming forward now -- " I'm coming
4    forward now, meaning 2011 " -- because no one ever asked me
5    about my testimony in the Wrice case before.  I did not know
6    who to contact to correct this mistake, and my conscience
7    bothered me when I learned that Mr. Wrice was still wrongfully
8    incarcerated."
9       "I'm coming forward now," meaning in 2011.  So, he's
10   admitting that the first time he's coming forward is 29 years
11   later in 2011.  But here's the part I want to focus on:  "My
12   conscience bothered me when I learned that Mr. Wrice is still
13   wrongfully incarcerated."
14      Did he forget that Stanley Wrice was incarcerated?
15      Now, just think about my conscience was bothered.
16   When people -- when something is on their mind, when their
17   conscience is bothering them, it is constantly on their mind.
18   I mean, every hour something is on your mind.  Your conscience
19   is bothering you.  You want to get rid of this so your
20   conscience no longer bothers you.  It weighs on you, hour
21   after hour.
22      Bobby Joe wants you to believe that his conscience
23   was bothering him in 1983 -- said nothing -- '84 -- said
24   nothing -- '85, '86, '87, '88, '89, '90, '91, '92, '93, '94,
25   '95, '96, '97, '98, '99, 2000, 2001, 2002, 2003, 2004, 2005,

1    2006, 2007, 2008, 2009, 2010, 2011.  Now all of a sudden he's

2    clearing his conscience because it was bothering him for 29

3    years.

4           Let's look at the people that Bobby Joe Williams

02:39:34    5    never said a word to, never said a word about his claim about

6    the police forcing him to give a phoney story.  He's at the

7    police station in September of 1982.  He meets with the

8    state's attorney, McCurry.  He says nothing.  He says nothing

9    to his immediate family.

02:39:57   10           Then we get to Patricia Wrice.  Let's talk about her.

11    This is someone that he has two children with.  So, try to

12    picture this.  He has just implicated Patricia Wrice's

13    brother, Stanley Wrice.  He has two kids with this woman.  And

14    I pointed out in other testimony where he claims he told

02:40:24   15    Patricia Wrice that he was beat, but he never told her that

16    the police forced him to give a phoney story.  Okay?

17           So, right there, he's saying, oh, I was too scared,

18    which we know is bogus because if you're going to tell

19    someone, oh, the police beat me, why in the world would you

02:40:45   20    hold back?  Oh, and by the way, they forced me to implicate

21    your brother.  Does that make sense?

22           Just think how many times that Bobby Joe Williams saw

23    Patricia Wrice, Stanley Wrice's sister, through the years.

24    And you'll be instructed you have to -- you can use your

02:41:10   25    common sense.  Don't you think Patricia Wrice would have said,

1    why are you implicating my brother?  Why are you doing any of

2    this?  Why?

3            If we're to believe Bobby Joe Williams, no one ever

4    says anything, everyone goes on with their life, his

02:41:35    5    conscience is bothering him for 29 years and he says nothing.

6            How about Stanley Wrice?  Stanley Wrice is sitting in

7    prison.  Why not call Stanley Wrice and tell him, listen, I'm

8    really sorry.  I know I sent you away for a hundred years.

9    But the police forced me to give this statement.

02:41:54    10           Or how about this?  How about Stanley Wrice's

11    attorney -- and we know that Bobby Joe Williams knows who

12    Stanley Wrice's attorney is because he saw the testimony.

13    Stanley Wrice's attorney, Sid Jones, called Bobby Joe Williams

14    before the criminal trial to talk to him.  And Bobby Joe

02:42:14    15    Williams said, I'm not talking to you.

16           So, you just go on the list.  He meets with Bertina

17    Lampkin multiple times.  She said more -- at least twice,

18    probably more.  Never says a word.

19           But here's where it really comes through.  So,

02:42:34    20    Stanley Wrice gets out in 2013 and Stanley Wrice sees Bobby

21    Joe Williams at a family barbecue.  And according to Bobby Joe

22    Williams, when he sees Stanley Wrice, Stanley Wrice has --

23    just says -- you know, like pleasantries.

24           Hey, Bobby Joe.

02:42:54    25           Hey Stanley.

1    Glad you're out.

2    And that's it.  That's the entire conversation.

3    So, we're to believe that Bobby Joe Williams tells a

4    phoney story to implicate Stanley Wrice for a hundred years

02:43:05    5    and Stanley Wrice says nothing to Bobby Joe Williams, like why

6    did you testify falsely against me?  Bobby Joe Williams said

7    that Stanley Wrice had no ill will.  The reason why he had no

8    ill will is because what Bobby Joe Williams testified at the

9    criminal trial was a hundred percent accurate, and Stanley

02:43:30    10    Wrice was just happy that Bobby Joe lied and recanted his

11    statement which got him out.  That's why Stanley Wrice didn't

12    show any ill will towards Bobby Joe Williams.

13    So, when you go through the jury instructions, when

14    you get to that fabrication, they haven't proved any of the

02:43:49    15    fabrication.  And because of that, they lose that claim.

16    Now, one of the most important instructions you're

17    going to read is the definition of "material."  And this goes

18    for the fabrication claim and the claim that these defendants

19    suppressed evidence.  And it's so easy to overlook some of

02:44:16    20    these instructions.  But I would ask you when you go back when

21    you see the definition of "material," it's critical for this

22    reason:  Not only does Stanley Wrice have to prove that these

23    defendants knowingly fabricated evidence or suppressed

24    evidence, he has to prove that there's a reasonable likelihood

02:44:39    25    that if this so-called fabricated evidence was taken out of

1    his trial, that the outcome at his criminal trial would have

2    been different.  In other words --

3              MS. BONJEAN:  Misstates the law.

4              MR. JEBSON:  It does not.

02:44:52    5              MS. BONJEAN:  Misstates the law.

6    BY MR. JEBSON:

7              -- that he would have been found not guilty.  That's

8    what he has to prove to you:  That he would have been found

9    not guilty.

02:45:02    10             There is -- first of all, he can't prove that there

11   was anything fabricated or anything suppressed.  But even if

12   we were to suspend reality and assume that he's proven that,

13   he could never prove that if you take those two pieces of

14   evidence out, that the jury would have found him not guilty.

02:45:20    15             MS. BONJEAN:  Judge, that's misstating the law.

16             MR. JEBSON:  It's not, Judge.

17             MS. BONJEAN:  It's the cumulativeness.

18             THE COURT:  Overruled.

19             MS. BONJEAN:  You know it.

02:45:29    20             THE COURT:  Overruled.  The jury will determine what

21   the facts are.

22   BY MR. JEBSON:

23             The one thing Ms. Bonjean did not tell you is that

24   during Stanley Wrice's criminal trial, one of the things that

02:45:42    25   the jury in the criminal trial could have held Stanley Wrice

1   guilty for was under the accountability theory.  And that's on

2   the screen.

3       So, the accountability theory -- I'm going to read it

4   to you.  Again, this is a jury instruction that the jury in

02:45:58   5   Stanley Wrice's criminal trial heard.

6       "A person is legally responsible for the conduct of

7   another person when, either before or during the commission of

8   the offense, and with the intent to promote or facilitate the

9   commission of that offense, that he knowingly solicits, aids,

02:46:17   10   abets, agrees to aid, or attempts to aid the other person in

11   the planning or commission of the offenses."

12      So, what that means is that in order for the jury in

13   his criminal trial to find him guilty, they did not have to

14   find that Stanley Wrice actually burned her or raped her or

02:46:37   15   beat her.  Only that -- they could have found him guilty under

16   this accountability theory that with the intent to promote or

17   facilitate the commission of the offense, he knowingly

18   solicited, aids, abets, or agrees to aid, or attempts to aid

19   the person.

02:46:56   20      Now, mind you, Stanley Wrice is guilty on both

21   accounts.  Not only did he aid and abet other people, he did

22   it himself.

23      So, let's look at the other evidence that the jury in

24   his criminal trial heard that would have found him guilty

02:47:20   25   regardless of any alleged fabricated evidence or alleged

1    evidence that was suppressed.

2         And the first piece of evidence that the criminal

3    jury heard to convict Stanley Wrice was his ridiculous story

4    when he testified.  What did he say in his criminal trial?  He

5    says he never saw Karen Byron naked.  He never had sex with

6    Karen Byron.  He never saw anyone have sex with Karen Byron.

7    He never harmed Karen Byron.  He never saw anyone harm Karen

8    Byron.  He never saw any injuries on Karen Byron.  He never

9    saw anything unusual.  He never heard anything unusual.  He

10   never smelled anything unusual.  It's not my bedroom.

11        Let me stop there.

12        Let me focus on "I didn't see any injuries on Karen

13   Byron."  This is what he told the criminal jury.

14        According to him, he goes up to kick everyone out.

15   He is closer to Karen Byron than I am to you under his

16   testimony.  Way closer.  And keep in mind Karen Byron has been

17   burned over 20 percent of her body.  And you saw those

18   pictures.  Her face is swollen.  There's burn marks.  She's a

19   mess.  She has a hundred bruises over her body.  And Stanley

20   Wrice told the jury in his criminal case that when he kicked

21   everyone out, when he was closer to her than I am to you, that

22   he didn't notice any injuries on her.

23        What do you think the jury in the criminal case

24   thought when they heard that testimony?

25        How about the testimony when he said, I didn't hear

1  anything unusual, see anything unusual, smell anything
2  unusual?

3  Let's talk about the smell.  You heard Dr. Nolan tell
4  you last week that you would definitely smell something.
5  Definitely.  He said it smelled like a barbecue.  Again --

6  MS. BONJEAN:  Objection.  He wasn't there.
7  BY MR. JEBSON:

8  It's exactly what he testified.  He's an expert.  He
9  deals with burn victims all the time.  He said you would
10 definitely smell it.  Again, Stanley Wrice told the criminal
11 jury he was closer to Karen Byron than I am to you and he
12 said, I never smelled anything unusual.

13 How about I never heard anything unusual?  There's a
14 woman being gang raped, repeatedly burned and beaten to the
15 point where there's a hundred bruises.  You think the criminal
16 jury believes Stanley Wrice when he said, I didn't see
17 anything unusual and I didn't hear anything unusual?  They
18 would have convicted him on his ridiculous story.

19 And remember, Bertina Lampkin, she used those words:
20 "His ridiculous story."  Ridiculous.

21 And, then, we get to his alibi.  How about his alibi?
22 He tells the criminal jury, essentially, I wasn't there.  I
23 left my house.  I made the phone call to my fiance.

24 So, he conveniently puts himself outside the house to
25 try to paint the picture to the jury that, I have an alibi.

1      Well, his so-called alibi is sitting in the courtroom
2  when he is on trial, and she is listed as a witness by his
3  attorney.

4      Now, again, you'll be instructed to use your common
02:51:02    5  sense.  If you have an alibi and you say you were talking to
6  your fiance, the alibi, wouldn't you call the alibi to back up
7  your alibi?  I mean, don't you think -- that's certainly
8  something the jury in his criminal trial was thinking.  Well,
9  he's saying there's this alibi and he's saying it's his
02:51:24   10  fiance.  So, obviously, he can have his fiance come in and
11  back up his alibi.

12      Well, we know why she didn't testify.  Because it was
13  all made up.  There's no alibi.  You heard from Jennifer
14  Scott.

02:51:40   15      First of all, did you see her reaction when she was
16  asked, were you ever his fiance?  I mean, she basically like
17  recoiled back in her chair, disgusted by the thought of it.
18  She said that she broke off all contact with him in June of
19  1982.  That's important.  June, 1982, all contact.  But he
02:52:07   20  wants you to believe that in September of 1982, he makes this
21  phone call to Jennifer Scott, this made-up alibi.

22      So, that's Stanley Wrice's ridiculous story he gave
23  to the jury.  That alone would have convicted him.  But that's
24  not all the jury heard.

02:52:30   25      Kenny Lewis.  Now, Ms. Bonjean told you when she got

1    up, she said that Kenny Lewis got a deal from the prosecution.

2    That is an absolute and utter untruth.  It never happened.

3    Completely made up.  There's zero evidence.  You heard from

4    Bertina Lampkin she never, ever, ever said that, ever.  She

5    said that Kenny Lewis was forthcoming, had no contact with the

6    police.  Keep that in mind.  Their whole big theme is that

7    whoever testified against Stanley Wrice, they were forced to

8    because the police got to them.  Kenny Lewis had no contact

9    with the police.  None whatsoever.  Bertina Lampkin found him

10   going door to door, as a good prosecutor, trying to find

11   witnesses.

12        So, this idea that Kenny Lewis was a prosecution

13   witness, got some deal, a complete fabrication.  Please check

14   all your notes.  You will find that nowhere because it never

15   happened.  It's not true.  It's a lie.  It's an absolute lie.

16        And it's funny because they call Michael Fowler to

17   try to dirty up Kenny Lewis.  So, think about this.  This is

18   their witness.  They call --

19        MS. BONJEAN:  Objection.  Not our witness.

20        MR. JEBSON:  They called him.

21        MS. BONJEAN:  It doesn't make it our witness.

22        MR. JEBSON:  They call- --

23        THE COURT:  Well, the jurors will make that

24   determination.

25   BY MR. JEBSON:

Closing Argument - Defendants

1894

1          They go first.  They put on their case.  They played

2     you Michael Fowler's deposition.  Their witness.  So, if

3     you're going to believe Michael Fowler, let's believe Michael

4     Fowler.

02:54:21    5          What did Michael Fowler say?  He said he saw Stanley

6     Wrice come down, heat an iron on the stove and he said, I'm

7     going to go up and burn the woman.

8          That's what Michael Fowler said.  Their witness who

9     says that Stanley Wrice came down to heat up an iron because

02:54:38  10     he was going to go burn the woman.  But they want you to

11     believe this made-up story about Kenny Lewis.

12          Kenny Lewis was forthcoming.  And, again, no lead- --

13     there was no leading questions.  He was put on the stand.  And

14     Bertina Lampkin told you that she didn't ask any leading

02:54:56  15     questions.  She didn't show him any police reports.  She just

16     said, what happened?  And he told the jury and her exactly

17     what he saw.

18          And Bertina Lampkin told you that there was no one

19     else that implicated anyone in these crimes other than Stanley

02:55:22  20     Wrice.  So, this idea that he is some sort of innocent man is

21     a complete joke.

22          You heard the summaries.  And let me just briefly

23     talk about these summaries.  It's really easy to kind of

24     discount summaries.  Like when you hear a summary, you think

02:55:39  25     it's only a summary.  I want to be crystal clear.  These

1    people gave full testimony at his trial.  They went onto the

2    stand and they were asked questions on direct examination and

3    they were cross-examined.  It wasn't like they just got up and

4    read a summary.  These were real witnesses that gave real

5    testimony against Stanley Wrice.

02:55:58

6        So, please don't let the fact that they were read to

7    you in summaries in any way diminish the impact that they had

8    on his criminal trial.

9        Let's look at the other evidence.  What I'm going

10   through, just so you know, this is the testimony of Kenny

02:56:26

11   Lewis.  But you heard the summaries.  So, I'm not going to

12   repeat it to you.

13       Oh, and this -- I will say this.  Ms. Bonjean says

14   that, oh, no one saw -- no one saw -- Stanley Wrice actually

15   burn Karen Byron other than the evidence, the hero statement

02:56:44

16   of him dropping and burning.  Let's be clear.  The fact that

17   no one saw him burn her does not mean he didn't burn her.

18   Because Kenny Lewis said that Stanley Wrice came down and

19   heated a hot spoon on the stove and went upstairs and heard a

20   woman say, why are you burning me?

02:57:14

21       Let's see if I can find that.

22       MS. BONJEAN:  The spoon?

23       MR. JEBSON:  Spoon.

24       MS. BONJEAN:  Which exhibit is that?

25       (Brief pause.)

02:57:33

1    BY MR. JEBSON:

2            "Then I saw Stan coming down the stairs into the

3    kitchen.  I saw Stan take a hot spoon off the stove and the

4    stove was still on and then go upstairs.  Then I heard the

5    woman say, 'Why are you burning me?'  I next heard her falling

6    down the steps.  She had pants and a top on but no shoes.  The

7    next thing I saw, the woman standing on the back porch.  Stan

8    was out there with her.  I heard Stanley tell the woman she

9    was on Yates, and then he slapped her and she fell.  After she

10   fell, I went home.  I did not call the police.  I went to

11   sleep.  I never called the police and was never contacted by

12   any police officer of any kind.  I never saw Stanley Wrice

13   again."

14           That's Kenny Lewis, what they want to discount.

15           Listen to the physical evidence, all in Stanley

16   Wrice's bedroom:  The bra, her panties, shoe, iron, the fork

17   -- with heat damage on it, by the way -- a broken hanger,

18   charred carpet in his bedroom, Stanley Wrice's red hat in his

19   bedroom.

20           And Stanley Wrice's explanation is, well, everyone

21   has red hats.  He's got to be the most unluckiest guy in the

22   world.  All this physical evidence in his bedroom and a red

23   hat right next to the iron -- next to the fork with heat

24   damage on it.  But I guess, according to Stanley Wrice, it's

25   not his hat.  It's someone else because everyone has red hats.

1    The tiny house.  So, that's important because of this

2    idea that Stanley Wrice heard nothing and saw nothing.

3         Remember Charles Wrice?  He said -- I said, how far

4    away is the couch where Stanley Wrice claims he was sleeping

02:59:32    5    to the kitchen?  Ten feet.

6         Ten feet.  From here to this jury room, that's how

7    close the kitchen is.

8         And he told the jury in the criminal case he heard

9    nothing and saw nothing unusual.  Is that believable?  Do you

02:59:48   10    think the jury in the criminal trial thought that was

11    believable?

12         Then we have Karen Byron.  Her injuries.  Look at

13    Karen Byron's -- I know it's tough to look at, but look at her

14    face.  Stanley Wrice is claiming, again, closer than we are,

03:00:16   15    he didn't notice anything; she looked fine.  That's what he

16    told the criminal -- that's what he told the jury in the

17    criminal trial.

18         Patricia Wrice.  Now, this was Stanley Wrice's

19    witness that he called in his case.  That blew up in his face

03:00:36   20    because what did she testify to on cross-examination?  She

21    testified -- and this was through the summary -- that she was

22    so concerned about what was going on in the house that she

23    started to get dressed because she was going to call the

24    police.  That's how -- that's what was going on in that house.

03:01:00   25    That she was going to call the police.

1    But he wants you to believe nothing unusual.  Saw

2  nothing.  Heard nothing unusual.  But she's going to call the

3  police.

4        And Stanley Wrice's big story:  My bedroom is the

5  couch.  Even though Patricia said that Jeff was sleeping on

6  the couch.

7        Another witness that blew up in Stanley Wrice's

8  criminal trial was his own brother, Charles Wrice.  Let's talk

9  about him a second.

10       So, again, try to picture yourself as the jury in the

11 criminal case.  Stanley Wrice calls Charles Wrice as his

12 witness.  During his direct examination, he doesn't give any

13 testimony whatsoever about the incident.  Nothing.  It's only

14 on cross-examination that it's brought out that it's so loud

15 in that house, that Charles Wrice can hear it when he's in his

16 room with the door closed watching TV.  That came out in

17 cross-examination.

18       But, again, Stanley Wrice says nothing unusual.

19       We talked about the phoney alibi.

20       So, let's look at this diagram for a second.  This is

21 the over -- and, again, I'm excluding what they're saying was

22 fabricated.  I'm excluding the Bobby Joe Williams testimony

23 and I'm excluding the hero statement, just for purposes of

24 this argument.  Take that out of the mix.  Look at the

25 overwhelming evidence, ladies and gentlemen, that the jury in

1    his criminal trial heard.  If you pull that out, are we really

2    to believe that the jury would have found him not guilty?

3    There's no way in the world.

4           And the reality is Bobby Joe Williams, he belongs in

03:03:08  5    that circle because what he testified at the criminal trial

6    was absolutely the truth.

7           And let's talk about the statement, the hero

8    statement.  Bertina Lampkin told you that the only reason why

9    she even called McCurry to testify about that statement was

03:03:31  10   because Stanley Wrice in this hero statement put himself

11   upstairs.

12          Now, she explained how this works.  In a prosecution,

13   the state goes first.  The state puts their witnesses on.

14   When the state puts their witnesses on in a criminal case,

03:03:49  15   they have no idea whether or not the criminal defendant -- in

16   this case, Stanley Wrice -- is going to take the stand.  So,

17   Bertina Lampkin when she put McCurry on to testify to this

18   hero statement, she had no idea that Stanley Wrice was going

19   to testify.  So, she put him on for the simple fact that

03:04:06  20   Stanley Wrice said he was upstairs.  Once Stanley Wrice took

21   the stand and admitted to being upstairs, it makes the McCurry

22   statement meaningless.  She no longer needs it.  Stanley Wrice

23   admits he was upstairs.

24          So, this idea that this hero statement was the

03:04:30  25   centerpiece of the conviction is a complete fairy tale.

1           Again, you judge credibility.  That's what Bertina

2   Lampkin told you.  Was she lying to you?  I don't think so.

3           Damages.  One of the elements the plaintiff Stanley

4   Wrice has to prove is damages.  It's the third element for

03:05:00   5   this fabrication claim and suppression of evidence claim.

6   Just let me make it nice and simple.  Guilty people like

7   Stanley Wrice suffer no damages.  He did this disgusting

8   crimes against Karen Byron.  He has no damages.  No matter how

9   you feel about any of those previous elements.  Now, he can't

03:05:27   10   prove them, but it doesn't make a difference because he has no

11   damages, because he's a guilty man.

12           Now, the second part of this claim is that -- this

13   claim that they suppressed evidence.  Let's talk about that.

14   Now, there's overlap.

03:05:47   15           Let's talk about the Polaroid.  Now, it's a good

16   thing we had a break -- a lunch break.  Because I had to add

17   in this slide to my PowerPoint.  This -- the Polaroid slide

18   was not in here this morning.  At lunch I put it in there

19   because I heard about this Polaroid.  I mean, this is news to

03:06:08   20   me.

21           You heard Ms. Bonjean 's opening statement.  Did you

22   hear anything about a Polaroid?  About the officers, I guess,

23   destroying a Polaroid?  It's the first time I ever heard

24   anything about this Polaroid when I was sitting right here.

03:06:22   25   And, again, I'm glad we had this lunch break because I could

1       put it in there because now I can talk about it.

2               So, their theory -- just think this through.  Their

3       theory is that these officers beat up Stanley Wrice, take a

4       Polaroid of him after they beat him up, which shows all -- I

5       guess, all these injuries, and then they get rid of the

6       Polaroid?  Is that what they're claiming?  I mean, does that

7       even make sense?  The officers are going to take a picture of

8       all these alleged injuries and then, oh, okay, well, let's get

9       rid of this.  Because I guess that's what they want you to

10      believe.  So, we can go on from the Polaroid theory.

11              Then we get to the Bobby Joe Williams.  And I've

12      already gone through this at length.  They're claiming that

13      the officers suppressed the fact that they allegedly beat up

14      and made him tell the police story.  We know Bobby Joe

15      Williams has no credibility.  So, they obviously can't

16      believe -- you can't suppress something that never happened.

17              Then we get to -- and you were probably surprised

18      when you heard Alonzo Smith testify, Gregory Banks testify and

19      Rodney Benson.  You're probably thinking, why are we hearing

20      this?  I can tell you why.  Because they want to just distract

21      you from what this guy did to Karen Byron.  So, they bring in

22      Gregory Banks and Alonzo Smith and Rodney Benson to tell these

23      fairy tales about being beat up by the defendants.

24              And I would ask you this:  When you're going back,

25      when you're evaluating the evidence in terms of these

1 allegations that they were beat up by these other people,

2 credibility means everything.  So, let's briefly talk about

3 these three people.

4        So, I have the movie script, the scuffle and the

5 rehearsal.  Who is the movie script?  That's Rodney Benson.

6 Because you remember what Rodney Benson said?  Rodney Benson

7 said -- this is his story.  This is why he has no credibility.

8        He claims that Bertina Lampkin, with his attorney,

9 got together and Bertina Lampkin, the judge, said to Benson,

10 we don't want you.  We want Stanley Wrice.  We want you to

11 implicate him.  Just implicate him and we'll gave you a deal.

12 In fact, we're going to write -- this is Benson saying they

13 wrote it out like a movie script.  Benson's words:  Like a

14 movie script.  And Bertina Lampkin and my attorney, they gave

15 it to me for me to repeat so I get a better deal.

16        Well, first of all, it's so ludicrous.  I mean,

17 remember Bertina Lampkin said, as God is my witness, I never

18 spoke to Rodney Benson.

19        But here's the thing.  Rodney Benson plea agreement

20 was months after Stanley Wrice was convicted.  Why in the

21 world would anyone say to Rodney Benson after Stanley Wrice

22 has been convicted, do this and we'll give you a deal?

23 Stanley Wrice is already convicted.

24        MS. BONJEAN:  He didn't say when that deal was made.

25        MR. JEBSON:  He sure did.

1     MS. BONJEAN:  No, he did not.

2     MR. JEBSON:  He sure did.

3  BY MR. JEBSON:

4     That's the movie script.  So, when you're evaluating

03:09:59   5  Rodney Benson's wild tales, remember the movie script.

6     Let's talk about the scuffle.  The scuffle is Gregory

7  Banks.  And this is the perfect example of why our legal

8  system is so great.  Because without cross-examination, you

9  would hear a one-sided story and you would think, oh, this is

03:10:22   10  all true.

11     So, you hear Gregory Banks tell this story about guns

12  in mouths and bags over head.  Imagine if Mr. Hale never got

13  up and cross-examined him.  He really revealed the true

14  credibility of Gregory Banks.  So, when Gregory Banks is

03:10:43   15  giving this tale, he talked about how -- these horrible

16  injuries he has, right?  So, Mr. Hale gets up, starts asking

17  him questions and he says, were you in a scuffle?

18     He's like, well, yeah.

19     Mr. Hale:  Well, tell me about the scuffle.

03:11:03   20     You know, it was a scuffle.

21     Remember, he didn't want to talk about it.

22     Well, just tell me, describe the scuffle.  Describe

23  it.

24     Well, it was a confrontation.

03:11:12   25     Mr. Hale said, well, was it a physical confrontation?

1       Yeah, it was a physical confrontation.

2       Well, was it a fight?

3       Yeah, it was a fight.

4       Were you throwing punches?

03:11:25  5       Yeah.  Yeah, I was throwing punches.

6       Were you on the ground throwing punches?

7       Yeah.

8       Were you fighting over a gun?

9       Yeah.

03:11:38  10      Did you shoot him?

11      Yeah.

12      And was he killed?

13      Yeah.

14          Can you imagine if Mr. Hale never got up and revealed

03:11:51  15  that Gregory Banks, who claims has all this injuries, right

16  before he was arrested he was in the fight of his life with

17  someone where the other person ends up shot and killed.  Just

18  think of the fight that person gave to Gregory Banks fighting

19  over that gun before he was shot and killed.  Don't you think

03:12:16  20  that could be an explanation for any injuries that he had?

21          Let's talk about the rehearsal.  The rehearsal is

22  Alonzo Smith.  Remember Alonzo Smith said that he was brought

23  down and he was beat up by the defendants, and he said that

24  they beat him up because they wanted him to give -- to

03:12:42  25  implicate himself.  And he said -- again, his words -- we

1    rehearsed it over and over again.  We rehearsed the story.

2         So, then, Alonzo Smith goes and gives a court

3    reported statement to a state's attorney.  And that court

4    reported statement is like an hour long.  And Mr. Hale went

5    through each line.  And for everything in this confession

6    said, well, did the officers make you say this?

7         I don't remember.

8         Did the officers make you say this in the confession?

9         I don't remember.

10        If you remember, he said that to every single

11   question for an hour-long confession.

12        Now, again, he said they rehearsed it.  They

13   rehearsed the confession before.  If you're going to rehearse

14   the confession, aren't you going to remember what the officers

15   said that you have to say?  He couldn't remember a single

16   thing.  This all goes to the credibility.

17        Do you think if the jury -- Mr. Wrice's criminal jury

18   -- heard the Alonzo Smith story, if they heard about the

19   rehearsal or the scuffle or the movie script, do you think

20   they would have come back and said, you know what, we're going

21   to find you innocent, Stanley Wrice?  Do you think that's

22   really what would have happened?

23        I don't care what evidence that they claim that the

24   jury did not hear.  They would have convicted Stanley Wrice no

25   matter what, because he is a guilty man.  So, do not buy any

1  of these arguments.  In fact, Bertina Lampkin, if you

2  remember, shot down every single argument that Ms. Bonjean

3  tried to have -- tried to make her admit to.  Every argument,

4  Bertina Lampkin had an answer to.

03:14:49    5       Now, the next claim is the coerced interrogation

6  claim.  Again, they're claiming that Dignan and Byrne coerced

7  Stanley Wrice to give -- essentially, to confess.  I'm not

8  going to -- I've already gone through this whole hero

9  statement.  Why in the world -- first of all, there's nothing

03:15:15    10  incriminating about that statement.  It's Stanley Wrice trying

11  to put the blame --

12       MS. BONJEAN:  Objection.  Misstates the law.

13       MR. JEBSON:  I said there's nothing incriminating

14  about it.  This is closing argument.

03:15:27    15       THE COURT:  I will instruct the jury as to the law.

16  BY MR. JEBSON:

17       This was no incriminating statement.  This is Stanley

18  Wrice trying to put the blame on someone else and trying to

19  distance himself from the crime and make him look like a hero.

03:15:45    20       Let's talk about Stanley Wrice's claim of physical

21  abuse.  And, again, I want to direct you to the very bottom of

22  this slide.  And this goes back to what I said before.  There

23  is no independent claim of excessive force.  And, again, when

24  you're going through the jury instructions, I ask you to, when

03:16:11    25  you get to that instruction, to read it closely.  There's no

1      independent claim.

2              But let's look at his claim anyway, just to show how

3      unreliable Stanley Wrice is.

4              The mugshot.  Do you remember Stanley Wrice admits

03:16:25    5      the mugshot was taken after he was beat?

6              MS. BONJEAN:  Objection.  That's not --

7              MR. JEBSON:  Yes.  He does.  You can check your

8      notes.

9      BY MR. JEBSON:

03:16:37   10              What Stanley Wrice is claiming is the Polaroid is the

11      picture you saw.  That mugshot is the picture that was taken

12      right after Stanley Wrice was brought upstairs, after he

13      claims he was beat.  And you saw that mugshot.  Do you see any

14      sort of injury anywhere on his body?  If he was beat the way

03:16:56   15      he claims he was beat, don't you think you would see something

16      on his face?

17              He said he was hit in the head with this hard

18      flashlight.  But look at the mugshot.  There is not a mark on

19      him.

03:17:09   20              And that's why Stanley Wrice originally said,

21      incredibly, that's not me.  That was his first defense.  That

22      mugshot, I don't know who that is, but I can promise you that

23      is not me.

24              And the reason why Stanley Wrice said, that's not me,

03:17:29   25      is because he knows that that picture proves that he was never

1     beat.

2            Now, he finally had to admit it was him because it's

3     him.  But his first line of defense was, that's not me.  You

4     must have the wrong picture.  You must have the wrong guy.

03:17:49    5     That's not the way I wore my hair.  That's not me.

6            But it was him.

7            He never complains -- second reason why his claim

8     that he was hit is not credible.  He meets with -- he admits

9     he meets with McCurry.  McCurry in the summary said, I didn't

03:18:08   10    see anything unusual about Stanley Wrice.

11           Stanley Wrice never complained to him, never said a

12    word to him.

13           Now, they put up in their closing argument this

14    paramedic sheet.  And you saw all these lines and made a big

03:18:23   15    deal, oh, look it.  Look at all -- there's a mark on his head.

16    There's a line that goes to his head.

17           But if you remember -- and I know it's tough because

18    there's a lot of summaries that was read to you.  The summary

19    from the paramedic, he said that he marks down on that sheet

03:18:40   20    anything that the person complains of.  So, if they complain

21    that, I have a bruise on my head, he will mark on that

22    sheet -- he'll check it off, bruise on the head, and he'll

23    draw a line.  If he says, I have bruise all over my arms, he

24    will mark it down there.

03:18:56   25           He said in the summary that he cannot even say that

1     he saw any of the marks or bruises that's on that sheet.

2     Again, he only reports what is told to him. In fact, if you

3     remember, in the summary, he said that if he was seriously

4     hurt, their protocol is for him to get medical attention

03:19:15   5     immediately. And we know that's not the case. He didn't see

6     a doctor until five days later.

7           And what did the doctor find when he saw him five

8     days later? Remember, Stanley Wrice's claim, he was beat all

9     over his body and his head. What did the doctor find? One

03:19:33   10   bruise. One bruise. You know where it was? On his shin.

11   And, incredibly, the paramedic sheet doesn't even have a mark

12   on his shin. I have a four-year-old daughter. She has

13   bruises all over her shins. It doesn't take much to get

14   bruises.

03:19:56   15           And you heard Kenny Lewis tell you that he was,

16   essentially, fighting with Stanley Wrice, trying to pull him

17   off when he was beating Karen Byron. He went up there once,

18   pulled her off, went back downstairs, and he had to go back up

19   there a second time. And he was, essentially, struggling with

03:20:16   20   Stanley Wrice three different times.

21           So, if there was any bruises on him, I guess one

22   bruise on the shin -- I mean, you can get a bruise anywhere,

23   but he could have easily got it struggling with Kenny Lewis.

24           The family Wrice testimony is meaningless. And let's

03:20:40   25   talk about quickly Charles Wrice. This is an example how the

1    Wrice family will do anything to try to help Stanley Wrice in

2    this lawsuit.

3          Charles Wrice -- remember this happened in 1982.

4    Charles Wrice testifies at the criminal trial.  Makes no claim

03:21:00  5    that he was ever abused by the police.  Nothing.  It's not

6    till 2016 -- 2016, over 30 years later -- for the first time

7    that he ever makes any complaint that he was beat by the

8    police.

9          Why is he doing that?  To help his brother out.

03:21:21  10   Here's the thing.  I mean, when you lie, it's very easy to

11   catch you in the lie.  Because he told you guys something

12   completely different than what he said in his 2016 deposition.

13   He said here, I was beat by two people.  And I brought his

14   deposition:  Well, here you said you were beat by one.

03:21:40  15         Here he says he was beat -- he never went to the

16   basement.  He was not beat in the basement.  That's what he

17   told you.  In his deposition, he claims he was beat in the

18   basement.

19         And you remember how many times I had to go to the

03:21:53  20   deposition to impeach him.  I mean, it went on for probably an

21   hour.  That's just an example of the Wrice family trying to

22   help Stanley Wrice.

23         And, by the way, where is Patricia Wrice?  Stanley

24   Wrice said that they're a close family.  Where is Patricia

03:22:10  25   Wrice?  Do you think if Patricia Wrice had something helpful

1  for Stanley Wrice, that she'd be here to testify?  She never

2  showed up.  And you can draw --

3          MS. BONJEAN:  Objection.  That is an unfair

4  characterization.

5          THE COURT:  Overruled.

6  BY MR. JEBSON:

7          This is Stanley Wrice's sister, the one who said she

8  was going to call the police at his criminal trial because

9  there was so much going on.  Wonder why she's not testifying

10  in this trial.  I think you can all conclude why.

11          And this idea that just because someone claims that

12  the police beat you up means it's so, just simply isn't the

13  case.  It is a go-to argument by every criminal.  No matter

14  what race you are, no matter what creed you are, if you are

15  arrested, criminals have a no-lose gamble by saying you were

16  beat by the police.  You have nothing to lose.  Just say it.

17  You never know.  Maybe someone will say, well, okay, we

18  believe you, we're going to vacate your conviction.

19          So, you never know.  Just go ahead and claim it.

20  Again, you have nothing to lose.

21          So, simply because people make allegations is

22  meaningless.  You have to look at the credibility of the

23  person.

24          The conspiracy claim is really simple.  The

25  conspiracy is basically -- the claim is that the defendants

1      got together and agreed to commit the other claims.  There's

2      no new claim.  They're not claiming that they committed some

3      different constitutional violation.  They're just saying they

4      got together and agreed to fabricate evidence or to suppress

03:24:07    5      evidence or to coerce to make him give an incriminating

6      statement.  There's no separate claim.  They can't prove the

7      other claims, so they can't prove the conspiracy claim.

8              Now, according to Stanley Wrice, if you believe him,

9      everyone is lying.  Assistant State's Attorney McCurry is

03:24:29    10     lying.  Assistant State's Attorney Lampkin is lying.  Kenny

11     Lewis is lying.  Jennifer Scott's lying.  Patricia Wrice is

12     lying.  Bobby Joe Lewis lied at the criminal trial.  The

13     physical evidence all in his room -- bedroom -- which ties him

14     to the crime is lying.

03:24:44    15             And the one thing I didn't -- I forgot to mention is

16     this.  The torch.  Remember Stanley Wrice -- he's backing away

17     from it now, but in his deposition, he agreed that he used to

18     burn paper to use as a torch.

19             What did Karen Byron say at the criminal trial

03:25:07    20     testimony?  It looked like there was a torch coming towards my

21     face.

22             What a coincidence.  Stanley Wrice uses paper as a

23     torch and that's exactly what Karen Byron saw coming towards

24     her face.

03:25:22    25             Getting back to everyone's lying, according to

1   Stanley Wrice.  Karen Byron's injuries are lying because if

2   you believe her injuries, there's no way he would not notice

3   her if you believe his made-up story when he's kicking

4   everyone out.

03:25:37   5   And you have to believe their own witness, Michael

6   Fowler's lying because Michael Fowler testified that Stanley

7   Wrice came down to the kitchen, heated the iron and said, I'm

8   going to go burn the woman.  Their witness in this trial.

9   Some more ridiculousness from Stanley Wrice.

03:26:02   10   Remember he thought Karen Byron -- it was brought up in his

11   deposition.  When he saw Karen Byron in the hospital room and

12   he says, oh, yeah, I saw her injuries there.  He said, I

13   thought she was drunk and fell down.  That was his story:  I

14   thought she was drunk and fell down.

03:26:23   15   You saw those illustrations.  Does that look like

16   someone had just fallen down because they were drunk?  Because

17   that's the story that he told in his deposition.

18   Some more nonsense from Stanley Wrice.  He would

19   not -- and I touched on this.  He would not admit that Karen

03:26:40   20   Byron was tortured.  I think that says it all.

21   Never contacts Bobby Joe Williams after Bobby Joe

22   Williams testifies.

23   Never confronts Rodney Benson in the paddy wagon.

24   So, they're sitting in the paddy wagon and Stanley Wrice is

03:26:57   25   told that Benson just said that you did it and Stanley Wrice

1 says nothing to Rodney Benson.  The reason why he said nothing

2 to Rodney Benson is because Stanley Wrice did it.

3 Now, I talked about diversions.  These are some other

4 diversions that have been thrown at you.  I'm going to go

03:27:18 5 through each of these.

6 They spent a lot of time about the disproportionate

7 sentences that they said Benson got and Fowler got and Holmes

8 got.  Well, there's a reason why Stanley Wrice got a hundred

9 years and they didn't:  Because Stanley Wrice is 100 percent

03:27:40 10 guilty.  And you also heard one of the -- two other reasons

11 why his sentence was enhanced.  One, because of the

12 viciousness of the crime; and, two, because of Stanley Wrice's

13 three armed robbery convictions.

14 They keep mentioning his conviction was vacated.

03:28:10 15 There is not one judge or jury that has ever found him

16 innocent.  Not one.  So, don't have them try to convince you

17 otherwise.

18 Now, they spent most of their time about the

19 defendants invoking their rights.  I'm going to read to you

03:28:31 20 the jury instruction that you're going to get on this.

21 "When asked certain questions while testifying in

22 this case, defendants Dignan and Byrne asserted their Fifth

23 Amendment right not to incriminate themselves.  You may, but

24 are not required to, draw an adverse inference against

03:28:52 25 defendants Dignan and Byrne and you may, but are not required

1   to, assume that an answer would have been unfavorable to

2   them."

3              So, the key thing is that you may infer.  You don't

4   have to.  You're not required to.

03:29:17   5              Now, everyone has constitutional rights.  Defendant

6   Dignan and Byrne have the absolute right to assert their

7   rights and not answer questions.  And if you notice, the way

8   they answered it, they said, respectfully, I'm invoking my

9   rights not to answer any -- any -- of your questions.

03:29:44   10             So, at that point, Ms. Bonjean could have asked any

11  questions knowing that they're going to assert their rights.

12  So, this idea that no matter -- you know, that they are,

13  essentially, admitting to every question that she asked

14  because they assert their rights is baloney because they said

03:30:04   15  from the get-go, respectfully, I'm asserting my rights and I'm

16  not going to answer any of your questions today.  Any.

17             So, don't buy into this, oh, well, they're definitely

18  guilty because they assert their rights to these specific

19  questions.  Because they already told her, we're going to

03:30:22   20  assert our rights.

21             MS. BONJEAN:  Objection.  They could have answered

22  any question they wanted to.

23  BY MR. JEBSON:

24             So, I ask you to look at this instruction.  They

03:30:32   25  implied that it's somehow, oh, it automatically means that

1   it's an adverse -- that the answer would have been adverse to

2   them.  Look at the instruction.  It's not automatic.

3        Now, you're going to get a verdict form.  It's going

4   to look just like this.  It has the three claims.  So, when

03:31:00   5   you go back to deliberate, you have to check whether or not

6   the plaintiff has proven his case.  Remember, it's his burden.

7   And our position is, based on the evidence in this case,

8   there's no way Stanley Wrice has proven any of his claims.

9        So, the evidence, we believe, supports you checking

03:31:20   10  for the defendants for each of the claim and zero -- zero --

11  goes in the space for damages.

12       Now, you see I have on the screen "two minutes."  I

13  want you to keep in mind how long Stanley Wrice spent burning

14  Karen Byron.  Just think of the amount of burns on her body,

03:31:57   15  how long it would have taken to inflict those wounds and how

16  much pain.  A lot more than two minutes.  Hours.

17       When you go back to that deliberation room, I ask you

18  to take a vote on these claims right away.  And it should take

19  you two minutes.  Two minutes to find against Stanley Wrice.

03:32:25   20  And that is more than Stanley Wrice deserves.  He doesn't even

21  deserve two minutes.  I picked two minutes because I figure

22  that's how long it probably takes for you to get around the

23  table and to say for each claim, has Stanley Wrice proved his

24  claim?  And the answer is no.  Stanley Wrice deserves no more

03:32:45   25  than two minutes of your time.

Closing Argument - Defendants

1917

1     And as you're deliberating, I want you to keep one

2     thing in mind.  And that one thing is this name I have at the

3     end.  This is the last slide I have.  This is the last name I

4     have:  Karen Byron.

03:33:04

5         Now, the victim is often forgotten.  And it's even

6     worse here because, unfortunately, she's not with us anymore.

7     But she was part of this case.  She testified in the criminal

8     trial.  She was the one that was gang raped.  She was the one

9     that was brutalized.  She is the one that was burned over and

03:33:32

10    over again.  So, when you are going through, when you are

11    voting, just because Karen's not here, you have her vote.  You

12    are voting for her.  Please do not forget Karen Byron as you

13    are deliberating this case.

14        This comes down to is this man going to be rewarded

03:34:00

15    for his crimes.  Please don't give this guilty man one cent.

16        Thank you.

17        THE COURT:  Members of the jury, the next step is the

18    plaintiff's rebuttal argument and I will instruct you, the

19    jury.  I think we'll take a ten-minute recess, and then we

03:34:22

20    will finish the case off.

21        (Brief recess.)

22        (Proceedings heard in open court, jury out:)

23        THE COURT:  The one instruction that's not in the

24    packet is the duty to deliberate.  I'm sure somebody submitted

03:45:10

25    it, but somehow it got lost.  Unless it's by agreement you

1     don't need to give it.

2              MR. JEBSON:  I think we should give it.

3              THE COURT:  Pardon?

4              MR. JEBSON:  I think we should give it.  I thought

5     we --

6              THE COURT:  Do you got it?  Who has got the book?  I

7     could read it, and we could just submit it.

8              MR. JEBSON:  We could probably pull it up online.

9              THE COURT:  Somebody pull it up.  I thought I saw it

10    in the original submissions.  Somehow it must have got -- I

11    can't find my copy.  I looked through the plaintiff's

12    submissions.  It was not in there.

13             You know the one I'm talking about?  You have a duty

14    to deliberate, listen to everybody, but don't give up your

15    honest beliefs.

16             MR. JEBSON:  Oh, I thought you were talking about

17    another one.

18             THE COURT:  No, that one.

19             MR. JEBSON:  I think that one is only given if they

20    are having --

21             THE COURT:  That's not entirely true.  If by

22    agreement --

23             MS. BONJEAN:  I thought we had this one.

24             THE COURT:  I thought we did, but it's --

25             MR. BARNETT:  Your Honor, I think you took it out.

1    THE COURT:  Pardon?

2    MR. BARNETT:  I think you took it out and said you

3 wouldn't give it at this time.

4    THE COURT:  What?  I'm talking about -- which one are

5 you talking about?  The one I'm talking about is the duty to

6 deliberate, listen to your -- yeah, that one.

7    MR. BARNETT:  Okay.

8    THE COURT:  I wouldn't have taken that out.  I always

9 give that one.  Here, I can -- is there any objection to

10 giving that one?  I don't think I've ever had a trial I didn't

11 give it.  I think there is some case law.  It should be used

12 in civil cases.  Somewhere in Illinois law it says it's error

13 if it's not given.

14    MS. BONJEAN:  I think we should give it.

15    THE COURT:  All right.  We'll give it and we'll get

16 it typed.

17    Are you ready?  Hold on one second.  I'm going to get

18 my clerk to do it and add it to the packet.

19    All right.  The jury is here.

20    (Jury enters.)

21    THE COURT:  Please be seated.

22    Counsel, you may address the jury.

23    MS. BONJEAN:  Thank you, Your Honor.

24    REBUTTAL ARGUMENT ON BEHALF OF THE PLAINTIFF

25    MS. BONJEAN:  Mr. Jebson got lost on his way here

1   today.  He thought he was at the criminal courthouse.  That's

2   where he apparently intended to go.

3           And he doesn't realize that it takes more than just

4   pointing at somebody to say they're guilty.  It takes

03:49:09   5   evidence.  It takes evidence from the witness stand.  It takes

6   evidence in the form of documents.  It takes some evidence.

7           And what was their evidence of guilt?  I don't know.

8   I heard an angry ex-girlfriend who didn't even break the

9   alibi, who said, I don't remember.  I heard her.  Same woman

03:49:31   10   who said, I had no relationship with him ever at any time, no

11   way, no how, but I do have three kids with him.  So that

12   credible person who, again, was up here simply because she

13   was, you know, I don't know, angry about something, maybe she

14   has a reason to be angry, but it has absolutely nothing to do

03:49:53   15   with anything.  And what you need to know is that she said

16   when she was asked by them, they asked her, Ms. Bitoy asked

17   her, do you remember the call?  She said, I can't really say.

18           She also corroborated what Mr. Jones said, which was

19   yeah, she was in the courtroom.  Remember she denied being in

03:50:12   20   the courtroom?  I was never in that courtroom.  But everyone

21   on the planet says she's in the courtroom, and then she had to

22   admit -- she literally lied three times in the first two

23   minutes she was on the stand.

24           Anyway, she says, you're right.  The attorney never

03:50:28   25   spoke to me.  And that's exactly what Sid Jones said.  He's

1   like, I didn't have an opportunity to speak to her.  I didn't

2   speak to her.

3          So they could call his alibi bogus, which, by the

4   way, he never even called it an alibi.  What type of alibi is

03:50:38   5   it?  He said he was gone for 30 to 45 minutes.  If the man is

6   going to lie about an alibi, make it a good alibi.  I was gone

7   for two hours.  I was gone for three hours.  Instead he says,

8   I was gone for 30 or 45 minutes.  Well, what type of crappy

9   alibi is that?  Maybe that's why Sid Jones didn't pursue it.

03:51:01   10   He's like, eh, it doesn't really prove one thing one way or

11   the other.  That's honesty.  That's saying I'm not going to

12   lie.  And this lady says, I don't know one way or the other.

13          So is that their evidence of guilt?  I don't think

14   so.  It sounds like she should have been, you know, not called

03:51:19   15   because she certainly didn't do -- oh, what Mr. Hale promised

16   you she would say, remember that?  Remember his opening

17   statements?  She's going to come in here and say this and that

18   and this and that.  Nah, she didn't deliver on any of it.  She

19   just, you know, seemed angry that he didn't help out with the

03:51:36   20   kids more.  So that's not evidence of guilt.

21          What's the other, Dr. Nolan Lewis.  That's evidence

22   of guilt?  No, that's evidence of Ms. Byron's injuries.  One

23   thing he did say, though, which was about how you would smell

24   something if you're having flesh burning, and that makes

03:52:00   25   sense, certainly makes sense.  He said, but as soon as the

Rebuttal - Plaintiff

1922

1 person is gone, you wouldn't necessarily smell that.

2      Now, here's something important. Elbert Harris

3 walked through the house. Frankie Peters walked through the

4 house. I asked them, did you smell anything unusual? Neither

03:52:15  5 one of them smelled anything unusual. No one said they

6 smelled anything unusual. And who knows. She's being carried

7 out of the house. There's a bunch of chaos. And Mr. Wrice

8 told you, Mr. Wrice told you, it wasn't unusual for there to

9 be burned paper because we didn't have light upstairs, and

03:52:34  10 sometimes we would roll up some newspapers and get some -- a

11 source of light that way, and that wasn't completely unusual.

12 So to smell maybe some burning paper wouldn't have been

13 unusual.

14      And I love this. I love -- Mr. Jebson, that was

03:52:49  15 quite nice, where he suggests that Mr. Wrice said, I light

16 torches, and remember Karen Byron said something about

17 torches. No, that was the tricky little stuff they do, which

18 is Mr. Hale asking Mr. Wrice during his deposition. Mr. Wrice

19 says honestly, yeah, well, it wouldn't have been unusual.

03:53:07  20 Sometimes we do wrap up some newspapers, and we use it as a

21 light source. And he says oh, kind of like a torch, right?

22 And Mr. Wrice says, yeah, kind of like a torch, I guess. Aha.

23 See, it must have been a torch because Karen Byron said a

24 torch. That's just tricky little piddly nonsense. And you

03:53:28  25 know what? Boy, could you imagine all the tricky little

1    piddly little nonsense I could have done with those defendants

2    if they ever testified nine times?  If they haven't pled

3    the Fifth Amendment for years, no deposition whatsoever

4    because they're pleading the Fifth?

03:53:48    5    Mr. Jebson says, oh, isn't that -- you know, what did

6    he keep saying over and over again?  He said, does that make

7    sense?  Does that make sense?  You know what -- you know who

8    could shed some light on a lot of things, those things that

9    don't make sense?  And I'll agree with him.  A lot of stuff

03:54:09    10   doesn't make sense.  But you know who could shed some light on

11   those things?  I don't know.  The defendants?  Maybe they

12   could shed some light on what happened in the investigation,

13   the guys that conducted the investigation, the guys that

14   conducted the interrogations, the guys that could tell us

03:54:23    15   exactly how these interrogations went, they could shed some

16   light on that.  No, they won't, though, because they won't

17   answer any questions.

18   And Mr. Jebson is right.  You don't have to draw an

19   adverse inference, but why on earth wouldn't you?  They're not

03:54:40    20   pleading the Fifth because it's fun.  They're pleading the

21   Fifth because they're afraid of being charged with crimes,

22   because they committed crimes.

23   MR. JEBSON:  Objection, Judge.

24   MS. BONJEAN:  They did.  It's not just some, oh, he

03:54:56    25   has a Fifth Amendment right.  No, no, no, no.  That's not how

Rebuttal - Plaintiff

1924

1    this works.  There are consequences when you exercise your

2    Fifth Amendment right.  When you're charged with a crime, you

3    get to plead the Fifth because you can't be forced to be a

4    witness against yourself.  That's the rule.  That's what the

03:55:12    5    Constitution says.  But these men aren't charged with crimes.

6    They're just being sued civilly.  And when they invoke their

7    Fifth, what they're saying is if I answer obviously, I'm

8    afraid I will be charged with crimes.

9              MR. JEBSON:  Objection, Judge.  There's no evidence

03:55:25    10    of this.

11              THE COURT:  Overruled.  The jurors heard the

12    evidence.

13              MS. BONJEAN:  So it's very easy to nitpick and

14    cherry-pick off Mr. Wrice's multiple prior depositions.  I

03:55:38    15    don't get the benefit of doing that because these guys won't

16    testify.  They won't tell us anything.  But they certainly

17    could clear up some things, but they're not.

18              So apart from that, I don't know -- they've put on no

19    case.  There's no evidence of guilt.

03:55:57    20              MR. JEBSON:  Objection, Judge.  Objection.  We have

21    no burden.

22              MS. BONJEAN:  I didn't say they have the burden.  I

23    said they put on no case.

24              MR. JEBSON:  Same objection, Judge.  It's burden

03:56:09    25    shifting.

Rebuttal - Plaintiff

1925

1       THE COURT:  Overruled.

2       MS. BONJEAN:  They are saying my client is guilty

3   without providing you with any evidence, period.  You haven't

4   heard any evidence.  They are litigating -- what they want to

03:56:19    5   do, Mr. Jebson wants to be the assistant state's attorney who

6   is going to prosecute Mr. Wrice.  But guess what?  The state

7   of Illinois dismissed the charges.  And to be clear about

8   something, the state of Illinois had every opportunity in the

9   world to retry Mr. Wrice if they believed he was guilty.

03:56:45   10       MR. JEBSON:  Objection.  Improper argument.

11       THE COURT:  Overruled.

12       MS. BONJEAN:  They had every opportunity to, every

13   opportunity to call -- all of the testimony you heard, ladies

14   and gentlemen, by way of summaries, and that prior

03:57:02   15   testimony --

16       MR. JEBSON:  There's no evidence of this, Judge.

17   Objection.

18       THE COURT:  The jurors will determine what the

19   evidence is.

03:57:08   20       MS. BONJEAN:  You heard testimony from the trial.

21   You heard it through summaries.  You know it exists.  Their

22   whole case is reading in prior trial testimony, testimony from

23   a trial that resulted in a conviction that no longer exists.

24   Think about that.  Their whole case is relying on trial

03:57:29   25   testimony that was given at proceedings that resulted in a

1   conviction that no longer exists because it was vacated.  They

2   could say there's never been a court that said he's not

3   innocent.  That man is presumed innocent like everybody else

4   in this courtroom, and they have to prove -- give you some

03:57:50   5   evidence if they're going to suggest otherwise, which they

6   have not done.

7        So back to my point.  The state of Illinois had every

8   opportunity to put in prior trial testimony of Karen Byron,

9   Kenny Lewis --

03:58:07   10        MR. JEBSON:  Same objection, Judge.

11        THE COURT:  Overruled.

12        MS. BONJEAN:  We heard it here.  Why wouldn't they be

13   able to do it there?

14        MR. JEBSON:  Judge, this is so improper.

03:58:14   15        THE COURT:  Overruled.

16        MS. BONJEAN:  They have more evidence today if they

17   believed it.  They have two co-defendants who were there that

18   they could put on if they believed those guys.  Back then they

19   could have called those witnesses because they all enjoyed

03:58:31   20   their Fifth Amendment rights to remain silent.  They could

21   have put on any bit of evidence they wanted to, and the state

22   of Illinois did not do that.  Instead they dismissed the

23   charges against him.

24        So if Mr. Jebson is going to say the man is guilty,

03:58:44   25   they should come on with some evidence, which they have not

1    done.

2         MR. JEBSON:  Judge, this is burden shifting.

3         THE COURT:  Overruled.  She can comment on the

4    evidence.

03:58:56   5    MS. BONJEAN:  Now, I want to talk about what I call

6    their cute argument, the cute little "he didn't confess"

7    argument.  I call it cute because it's they're playing games

8    with words.  They're saying that because Bertina Lampkin says

9    that I didn't consider it a confession in some sense of the

03:59:21   10   word that it wasn't a confession.  It's just bizarre.

11        The hero statement, no one called it a hero statement

12   at the criminal trial.  That's just Mr. Jebson's calling it a

13   hero statement.  But guess what, ladies and gentlemen?  Even

14   if it was a hero statement, even if it was Stanley Wrice's

03:59:41   15   attempt to shift the blame to someone else, the law says that

16   the minute the prosecution uses it to discredit him, uses it

17   in their case to somehow convict him, it becomes an

18   incriminating statement clearly.

19        Ms. Lampkin wasn't using that statement in order to

04:00:04   20   what, to walk him?  So there would be a not guilty verdict?

21   Of course not.  She even told you why she used the statement.

22   I wanted to put him up in the room.  That's incriminating,

23   just being in the room when he said he was never in the room

24   when she was assaulted is incriminating.

04:00:22   25        So it's cute.  It's a cute argument.  But it's --

Rebuttal - Plaintiff

1928

1    finds no support in the law, and you're going to get the

2    instruction on that.  Actually, let's look at it.

3           The question is whether defendant Byrne and Dignan

4    coerced plaintiff to make a self-incriminating statement,

04:00:54   5    self-incriminating.

6           You can take it down.

7           In what world does putting yourself in a room during

8    a gang rape saying that you grabbed an iron and burned

9    somebody by dropping it on her is not incriminating?  It's

04:01:16  10    just -- it boggles the mind.  Of course that's incriminating.

11    It's the reason the prosecution used it against him.  It was

12    the one piece of evidence where he's saying, I was in there

13    with an iron.  You don't get more incriminating than that.

14    And they could try to shake it up and confuse you and make it

04:01:35  15    sound like it's not incriminating, but of course it is.

16           Now, this is what we'll agree on.  It was a bad

17    confession.  It wasn't a good confession.  You know why?

18    Because when you beat confessions out of people, they're

19    usually not very good.  They're not great because it's not a

04:01:53  20    proper way to get evidence.  Someone is being knocked upside

21    the head or knocked in the groin, they're just agreeing to

22    stuff.  Yeah, sure, Jeff was there.  Yeah, sure, I grabbed

23    this.  Yeah, it's not a great confession.

24           Mr. Jebson suggests -- Mr. Jebson's idea of what --

04:02:15  25    you know, this isn't the movies.  This isn't the movies.

1   Coerced confessions aren't like, you know, in *Law & Order*.

2   It's a very different process.

3          And I guess their theory is that everybody is lying.

4   Mr. Wrice is lying about his coercive interrogation.  Rodney

5   Benson is lying.  Bobby Joe Williams is lying.  Gregory Banks

6   is lying.  Alonzo Smith is lying.  Everyone is lying about

7   their coercive interrogation.  How they got it all so similar

8   is such a curiosity.  I was waiting for Mr. Jebson to say that

9   they all like, you know, were in the same book club or

10  something and came together to come up with this idea.  Of

11  course Mr. Wrice was in custody at the time that -- on this

12  case at the time that Alonzo Smith was beaten, coerced, bagged

13  in the basement, so I'm not sure how that would have happened,

14  but they're all lying.  And the Fifth Amendment taking

15  defendants are not saying they're lying, though, so let's be

16  clear about that.  They're not saying they're lying.

17         I want to pull up some testimony -- oh, I know what

18  else.  Mr. Jebson says it's a new claim.  He never made a

19  confession.  Really?  I don't know.  What was that motion to

20  suppress statements he made back in 1982?  It's the most

21  ridiculous thing.  You heard Ms. Lampkin talk about it.  You

22  heard Sid Jones talk about it.  We litigated a motion to

23  suppress statements where he told the jury then -- well, first

24  told the judge and then told the jury, then what he told you

25  in the last week and a half.  Of course this is not a new

1    story.

2         What do you think the evidentiary hearing was about?

3    How do you think we got here if there was no confession?  Of

4    course there was a confession, and ASA McCurry testified to

04:04:34    5    it.  Now, Bertina Lampkin could call it whatever she wants at

6    this point, whatever she wants, but it's not -- she's not

7    being honest about that part of it.  She used that confession

8    to convict him.

9         They continue to make this argument, and they did it

04:05:01    10    with Stanley.  They did it with Bobby Joe.  She did it with

11    Alonzo Smith, this, I asked him, is this statement truthful?

12    I asked Bobby Joe is this -- is this testimony truthful?  He

13    said no.  And then I asked him, did the officers tell you to

14    say this?  And he says, could have been.  They did the same

04:05:26    15    thing with Alonzo.  That's their trick.  You saw that

16    deposition testimony.  They asked Alonzo, is this true?  No,

17    it's not true.  Did Byrne and Dignan expressly tell you to say

18    this?  I don't remember.  Because that's not how it works.

19    It's not how it works.

04:05:46    20         Stan described it for you how it works.  They're down

21    in the basement.  He's not -- in Stan's case, they are not

22    feeding him a movie script.  They don't have a lot of time.

23    They got an assistant state's attorney upstairs, and they got

24    to beat him before the assistant state's attorney gets wise

04:06:05    25    because the assistant state's attorney certainly, you know,

1   wouldn't want to be part of such a thing.  So they're beating

2   him, and they're saying, tell him you raped her, tell him you

3   burned her; tell her you raped her, tell her you burned her.

4   And maybe they're feeding a few little facts, raped her with

5   the iron, tell her that.  Tell the assistant state's attorney

6   that.

7               And he goes up there.  And if you think for one

8   second the assistant state's attorney didn't have all this

9   information, he's not sitting down with Stanley Wrice cold,

10  like okay, just tell me what happened.  That's not how it

11  works.  He testified, as did Byrne, that they were having

12  conversation.  He had spoken to Patricia Wrice.  He had spoken

13  to Charles Wrice.  He had spoken to Rodney Benson.  They come

14  there, and he told you he had questions.  Now, wouldn't it be

15  nice if we had those questions?  But you also heard from

16  Assistant State's Attorney McCurry through his prior

17  testimony, yeah, those notes that I took are gone.  Took no

18  notes.  Well, he said he took notes, but they're missing.

19  They got destroyed.  Who knows what happened to them.  But I

20  did prepare a memorandum, you know, like ten days later.  But

21  the actual questions and answers I asked, they're destroyed.

22  It may be important to keep those.

23              So it would be nice if they had that.  Then maybe

24  they would have an argument, but they don't.  Stanley told you

25  how it happened.  It's just not -- it's not that these

Rebuttal - Plaintiff

1932

1  officers feed these teeny little details.  It's when they're

2  questioned, and when he was questioned, he said yeah, yeah.

3  You can look at Bobby Joe Williams' testimony, and I think we

4  should look at it because he made a big deal about how

04:07:51  5  Bobby Joe just came on the stand and testified eight months

6  later to this elaborate story.  No.

7          You can just do it for me right now, Ash.

8          Not that.  His trial testimony.

9          MR. JEBSON:  Judge, she can't put up the trial

04:08:25  10  testimony.

11          MS. BONJEAN:  I'm not going to put it for the jury,

12  although --

13          THE COURT:  All right.  Let's move on.

14          MS. BONJEAN:  Hold on a second.

04:08:42  15      (Off the record.)

16          MS. BONJEAN:  Okay.  So I was asking him during his

17  testimony about his statement to Ms. Lampkin.  And it went

18  like this:

19          "Question:  Did you come out of the bathroom?

04:09:10  20          "Yes.

21          "Question:  And when you came" -- and this is Bertina

22  Lampkin, Ms. Lampkin asking these questions, these questions,

23  Prosecutor Lampkin.

24          "And when you came out of the bathroom, what room

04:09:20  25  would you have entered?

1    "Answer:  The dining room.

2         "Question:  And when you entered that dining room,

3    Bobby, was there anyone else in the dining room?

4         "Answer:  Yes.

04:09:28    5    "Question:  And who was in that dining room at that

6    time?

7         "Stanley.

8         "And was he awake or asleep?"  She gives him two

9    options, was he awake, or was he asleep.

04:09:38    10    "He was awake."

11         Next question:

12         "What was he doing?

13         "Answer:  Sitting on a loveseat.

14         "Question:  Was there anyone else in the dining room

04:09:47    15    other than yourself and Stanley?

16         "Answer:  No.

17         "Question:  All right.  At that time, did they say --

18    did you say anything to him or did he say anything to you?

19         "He said that they had burned that bitch."

04:10:05    20    And then I asked him:

21         "Do you see that testimony?"

22         Bobby Joe Williams' testimony at the criminal trial

23    consisted of yeses and noes in leading style questions.

24    Whether Sid Jones should have been objecting to them, I don't

04:10:19    25    know.  But this was not someone who took the stand and gave an

Rebuttal - Plaintiff

1934

1　elaborate account of what happened.  He was following the

2　lead, answering yes and no, and giving responses that

3　consisted of no more than three words.

4　　　　　　Now, let's talk about Bobby Joe who they believe has

04:10:38　5　some reason to come in here and, what, help Stanley Wrice?  I

6　don't know.  I feel like if he wanted to help Stanley Wrice,

7　maybe it would have been -- the time to do it would have been

8　before he served 31 years in prison if that was the

9　motivation?

04:10:58　10　　　　　　Also, Mr. Jebson made this big thing about how I

11　somehow misled you about whether -- Mr. Williams called OPS or

12　the vice versa.  Let's look up that testimony.

13　　　　　　And I ask Mr. Williams:

14　　　　　　"Did you tell the investigator about being hit with

04:11:26　15　the black rubber flat object with a ball on the end?

16　　　　　　"Answer:  Yes.

17　　　　　　"And that was in 1994, right?

18　　　　　　"Answer:  I think so.

19　　　　　　"Question:  Was that the first time you told an

04:11:36　20　official about what had happened to you?

21　　　　　　"Yes.

22　　　　　　"And" -- I tried to skip.

23　　　　　　"Did anyone tell you -- had you talked to

24　Stanley Wrice?

04:11:46　25　　　　　　"No.

Rebuttal - Plaintiff

1935

1      "Did anyone from the Wrice family tell you you should

2    talk to this person?

3      "No."

4      And what does he say?  My decision to talk was

04:11:56   5    because they were investigating the detectives.  They were

6    investigating these officers.

7      MR. JEBSON:  Objection.

8      MS. BONJEAN:  That's what he testified to.

9      MR. JEBSON:  No evidence of that, Judge.

04:12:05   10     THE COURT:  The jury determines what the evidence is.

11     MS. BONJEAN:  (Reading:)

12       "Question:  Did you contact that investigator, or did

13    the investigator contact you, or how did that interview come

14    to be, if you remember?

04:12:20   15       "Answer:  They contacted me."

16       That's what he testified to.  And no evidence?  What

17    does the Office of Professional Standards do?  You heard it.

18    They investigate police officers.  It's not a mystery.  So

19    they're doing an investigation, and they contact Bobby Joe

04:12:38   20    Williams.

21       He testified:

22       "I think they contacted me, and I asked them --

23       "And did they tell you what they wanted to interview

24    you for?"

04:12:58   25       Overruled objection.

1     "Answer:  There was an investigation going on with

2     the police officers."

3           He testified to that.  Mr. Jebson will have you

4     believe that Bobby Joe Williams just called up Internal

04:13:12   5     Affairs to try to get his buddy, Stanley Wrice, out of prison.

6     No, that's not what happened.  Internal Affairs or OPS,

7     whatever you want to call it, was investigating the officers.

8     They reached out to Bobby Joe Williams.  They obviously had

9     information, reached out to him, and he provided a statement.

04:13:31  10     That was in 1994.

11           And why 12 years later?  Why?  Remember the whole

12     thing about -- and this -- these men have testified about

13     consistently -- if an officer could put a .45 nickel-plated

14     gun in your mouth at will, you know, you're probably not

04:13:54  15     likely to go around talking about how you were abused.  But

16     once there's an investigation and the officials are paying

17     attention and maybe someone will believe you finally, you have

18     the courage to tell.  And that's exactly what happened.

19           And Mr. Jebson read through all those years that he

04:14:20  20     didn't come forward.  He tried to come forward in 1994.  He

21     talked to -- he talked to another investigating agency, an

22     entirely different one called the Office of the Special

23     Prosecutor in 2005.

24           And oh, by the way, Mr. Jebson mentioned that Charles

04:14:38  25     Wrice didn't tell anybody until 2016.  You heard Charles

1   testify.  He talked to an investigator from the Office of the

2   Special Prosecutor in 2005 when he told his story.  They said,

3   we're interested in Stanley's story.  It's safe now.  People

4   are paying attention.  Officials are now beginning to believe

5   us maybe.

04:15:01

6           MR. JEBSON:  Objection.  Improper argument.

7           THE COURT:  Overruled.

8           MS. BONJEAN:  Bobby Joe Williams, he gave an

9   affidavit, and then he testified at an evidentiary hearing in

10  2013.  And, again, what is in it for him?  Again, to help his

11  buddy out 31 years later?  What type of help is that?  No help

12  at all.

04:15:20

13          And Mr. Wrice told you, and, you know, they can't

14  walk in their shoes, but this is just not -- there's so much

15  shame surrounding this, so much shame about what happened to

16  them in the basement or in the abandoned cell area, shame on

17  so many levels, not only the dehumanization of being chained

18  up to walls and chained to stools and beat and bagged and have

19  guns put in your mouth, what it makes you feel like as a human

20  and as a man.  We don't like to talk about these things.  And

21  then the fear of anybody could come back at any time and

22  charge us with something.  And then the shame of turning on

23  your own, of being in so much fear that you hurt the people

24  that maybe you don't want to hurt because you're not braver or

25  you're just -- fear has overwhelmed you.  Maybe they don't

04:15:48

04:16:10

04:16:31

Rebuttal - Plaintiff

1938

1   understand it.  I'm sure they don't.  But I think you could

2   see it in all of their eyes.

3            And they're not the most verbose people.  Bobby Joe,

4   Charles, Stanley, they're not good at talking about their

04:16:55   5   feelings or what it meant.  But you got glimmers of it.  You

6   saw it.  Gregory Banks told you how it made him feel.

7   Alonzo Smith told you how it feels.  And, again, awful lot of

8   people got to be lying for you to accept this ridic- -- talk

9   about ridiculousness that this wasn't going on?  The pattern

04:17:16   10   is overwhelming, and the cops are taking the Fifth.  You don't

11   need anything more than that to know that it happened.

12            Bobby Joe Williams never -- oh, yes, this chart we've

13   made here, this pattern, an overwhelming pattern of five

14   people who -- two of whom have no contact whatsoever with the

04:17:54   15   other three ever.  What are the odds?  Maybe there's some

16   explanation from the defendants.  Maybe there is, but you're

17   not going to hear it.

18            What else about Bobby Joe?  Again, he committed

19   perjury.  It's a crime.  You know, maybe -- maybe, you know,

04:18:22   20   his conscience was bothering him but also, hmm, I'm going to

21   admit I committed a crime?  Can you put it out of your head

22   until it pops back up?  When something is bothering your

23   conscience, it's not an overwhelming feeling 24/7.  You try to

24   push it out and try to push it out until it pops back up

04:18:43   25   again.  And eventually maybe you get the courage, which he

Rebuttal - Plaintiff

1939

1    did.

2           Finally, let's be clear.  He tries to say it in 1994,

3    and everyone is like, no, don't say that.  He gets the

4    message.

04:18:55    5           And then in 2011, he finally says, you know what?  My

6    conscience has gotten best of me.  What is it in for him?  His

7    children are grown.

8           And did that whole testimony about the barbecue

9    really not make -- not ring true?  Of course it rung true.

04:19:14   10    Mr. Wrice would not have asked Bobby Joe Williams at a

11    barbecue when he got released from prison, which was what?  He

12    was released in 2013.  This barbecue happened in 2017 or '18

13    or whatever the date was, well after that.  Mr. Jebson says

14    it's so ridiculous that he didn't ask Bobby Joe, why did you

04:19:35   15    testify against me, or why did you lie on me?  Well, there's

16    an easy answer to that.  He already knew because Bobby Joe

17    Williams testified in 2013 about why he testified.  He took

18    the stand and explained everything.  Stanley knew.  You don't

19    need to have more conversations about it.  Stanley already

04:19:52   20    knew.  And he didn't harbor any feelings because he knows what

21    it's like to feel that powerlessness and have choices, no

22    choices.  Better man than I, I guess.  Certainly a better man

23    than Mr. Jebson because it sounds like Mr. Jebson wouldn't

24    have understood that.

04:20:07   25           MR. JEBSON:  Judge, the personal attacks are uncalled

1    for.

2            MS. BONJEAN:  I don't mean to personally attack.  I'm

3    just saying that it made sense.  It made sense why they

4    wouldn't have a long, drawn-out conversation.  He says, Stan

04:20:22    5    says, hey, Bobby Joe, obviously it's uncomfortable.  Bobby Joe

6    says, hey, Stan, glad to see you're home.  And then what did

7    Bobby Joe say?  He said, I left because I was uncomfortable.

8    You know how much shame Bobby Joe has that he wasn't man

9    enough in his mind?

04:20:47   10            And, again, the fact that he can't remember exactly

11   how it all unfolded doesn't make it not true.  These are --

12   these are traumatic events, as I've said earlier.  They want

13   to make it this mechanical thing, and it's not.  It's not a

14   mechanical thing.  He said whatever he had to say to get out

04:21:10   15   of that police station.  He hoped it would go away.  It didn't

16   go away.  He finally got called.  Ms. Lampkin is like okay,

17   you're coming to testify.  And he didn't -- he didn't say that

18   Ms. Lampkin threatened to charge him.  What did he say?  It

19   was more nuanced than that.  He said --

04:21:28   20            MR. JEBSON:  Judge -- that's a misstatement of the

21   evidence, Judge.

22            MS. BONJEAN:  What did he say?  He said, I told her I

23   was reluctant to testify.  And she said, well, you should just

24   go on and testify.  You know, there's always charges that are

04:21:40   25   still, you know, potentially pending.  She wasn't like, if you

Rebuttal - Plaintiff

1941

1  don't testify, I'm going to charge you.  He never said that.

2         MR. JEBSON:  Objection.  That's exactly what he said.

3         MS. BONJEAN:  Well, why don't I pull out his

4  testimony.

04:21:53  5         THE COURT:  Let's not argue about the facts if that's

6  what you had your argument for.

7         Are you pretty close?

8         MS. BONJEAN:  A few minutes, Judge.

9         I want to talk about this materiality instruction

04:22:17  10  again because this is important.

11         Evidence is "material" if there is a reasonable

12  likelihood that the result in the criminal proceeding would

13  have been different if the evidence had been disclosed or if

14  the fabricated evidence had not been introduced at trial.

04:22:41  15         So think about this.  If the evidence had been

16  disclosed, all of the exculpatory evidence, we know that it

17  would have discredited Mr. Wrice's incriminating statements.

18  No question about it.  The jury had heard that.

19         We know that if the jury knew that Bobby Joe

04:23:07  20  Williams' testimony was the product of coerced interrogation

21  and had -- was fabricated testimony, they would have -- and of

22  course Alonzo Smith's testimony, they would have had a whole

23  different view of this case.  There's no question about it.  A

24  reasonable likelihood?  Of course there's a reasonable

04:23:31  25  likelihood that they would have looked at this evidence

1    differently with all of the evidence that you now know about

2    what was withheld and about what was fabricated.

3           Mr. Jebson had his little diagram, and he pointed out

4    a number of bits of evidence, and we went through it.  It's

04:23:53    5    all there.  But none of it -- the only other bit of evidence

6    that implicates Stanley Wrice as the offender in this is good

7    old Kenny Lewis, Kenny Lewis who comes out of the woodwork

8    four days before trial.  And, you know, I don't -- I don't --

9    I hesitate to suggest that Ms. Lampkin is remembering this a

04:24:13    10   little differently than how it happened.  But it is a little

11   hard to believe that this very conscientious prosecutor --

12   maybe one of the biggest cases of her life.  She was promoted

13   right after it -- didn't uncover every stone and go

14   investigate every possible witness.  And she admits,

04:24:34    15   Kenny Lewis's name was there in black and white in Rodney

16   Benson's answer.  Howard Savage had already -- Howard Savage,

17   her friend, had already found this witness months before.  Do

18   you think she didn't talk to him when she found out about him?

19   It's hard to believe that that conscientious prosecutor

04:25:05    20   wouldn't have known exactly about Kenny Lewis.  And then

21   somehow, four days before trial, this story implicating Stan

22   comes out.  This guy -- talk about a hero.  This guy is the

23   hero.  He testified at trial that he tried to intervene at

24   least three times to stop Stan from beating her and going and

04:25:30    25   getting bottles.  Again, not corroborated by anybody else,

1    that he literally wrestled the hot iron out of Stan's hand.

2    This is what this guy testified to.  He wrestled the hot iron

3    out of Stanley's hands.  That's what he testified to.  And

4    then he went upstairs and tried to pull Stan off her multiple

5    times.  And he beat her to a pulp and she's laying there, and

6    he thought she was dead.  And he was such a hero that he

7    decided to go out and get barbecue, okay.  Ridiculousness.

8    Talk about ridiculousness.  So he -- and then when he comes

9    back, that's when he notices that she's burned head to toe.

10        But that wasn't enough.  He comes up with this weird

11   statement that then Stan goes down and gets a spoon.  A spoon?

12   Where's the box of evidence because I don't remember there

13   being a spoon in the box of evidence.  Kenny Lewis's statement

14   was uncorroborated by Bobby Joe Williams, any other piece of

15   evidence.  It was on its face implausible.  And had the jury

16   known about all of the shenanigans with this case, they would

17   never have credited Kenny Lewis's testimony.  Never.  We don't

18   even have to show that.  We just have to show that there's --

19        MR. JEBSON:  Judge, that's an improper argument in

20   terms of Kenny Lewis.  There's no argument that the defendants

21   suppressed anything to do with Kenny Lewis.

22        THE COURT:  All right.  Well, the jury has heard the

23   evidence, and they'll decide the case.

24        MS. BONJEAN:  The point is is there a reasonable

25   likelihood that this criminal trial would have shook out

1  differently, reasonable likelihood, if that criminal jury had

2  heard even a fraction of what you all have heard?  Of course.

3  My gosh, I hope so.  I sure hope so.  What type of criminal

4  justice system would we have if that wasn't the case, that if

04:27:44  5  a jury just ignored all that and said, no, I'm just going to

6  convict this guy because those injuries are really bad.  I

7  mean, that's really what -- you know, what the play is here.

8  Stanley clearly testified that the picture that they

9  showed him at his deposition for the first time with the

04:28:06  10  placard around his neck is not the same as the Polaroid.  You

11  heard him.  I don't need to pull up that testimony.  He said,

12  I remember it was a Polaroid.  I could see it come out.  And

13  it wasn't the detectives who took the photo.  It was a

14  uniformed officer, which is something that was done regularly

04:28:22  15  when you took a statement from somebody.  You take a picture

16  with a Polaroid.

17  MR. JEBSON:  Objection.  There's no evidence of that.

18  THE COURT:  Okay.  Let's finish this.

19  MS. BONJEAN:  Sure, Judge.  I'm almost there.

04:28:40  20  So he testified.  He already testified that the

21  mugshot, that they -- and Stanley never -- he said over and

22  over, I don't know when that was taken.  We know Alonzo said

23  it was taken before he was beaten.

24  And on this point of Stanley, when he first gets

04:28:55  25  confronted with this mugshot during his deposition, you know,

1  you could have heard us giggling in the background, yeah, it

2  doesn't even look like him.  And he's like, that's not me.  I

3  don't have corn rows.  It has nothing to do with, like, oh, I

4  don't see an injury here.  He was literally shocked by the

04:29:12   5  picture.  He had never seen the photo, a photo of him from 40

6  years ago.  He hasn't seen it.  The man doesn't even have

7  photos of himself from 40 years ago because he spent 31 years

8  in prison.  This wasn't some big conspiracy.  And then he in

9  his deposition later said, yeah, I guess that is me.  They

04:29:29   10  want to make a big deal about that.  It wasn't any big deal.

11  And, finally, this never complained to Assistant

12  State's Attorney McCurry, yeah, because Dignan was sitting in

13  the room right next to him.  Forget that part.

14  Stan told you that when he was brought to the

04:29:53   15  hospital, he didn't -- he didn't -- she had -- he didn't get

16  that close to her.  He said, I didn't know she had fallen.

17  She was drunk.  He didn't see her burn injuries at that time.

18  They know that.  It's just not fair.

19  And Rodney Benson.  He may be a liar about some

04:30:15   20  things, but he sure sounded pretty truthful about that whole

21  story about the mean state's attorney prosecutor.  He said

22  some unkind words about her.  I won't repeat them.  But we

23  know who he was talking about.  And he said, I had a deal.

24  And they want to say, well, who would make a deal after he

04:30:38   25  testified?  No, the deal was made before.

1    MR. JEBSON:  Objection.  There's no evidence of that,

2    Judge.  That's misstating the evidence.

3    MS. BONJEAN:  Mr. Benson said that.  We could watch

4    the clip.  He said that after we made the rounds and my auntie

5    hired me an attorney, remember all that?  My auntie hired me

6    an attorney.  She was kind of a street person, he said, and

7    she told me, do what Howard Savage says, and you won't see a

8    day in jail.  That's what he said.  And he said he had a

9    meeting with the state's attorney, and there was an agreement

10   that if he testified against Stan, he would get a sentence of

11   probation.

12   Now, it is true that Ms. Lampkin never used him.

13   Wonder why?  Mr. "I was first."  I wouldn't have used him as a

14   witness either.  And maybe that's why she needed Kenny Lewis

15   because she couldn't use Rodney Benson.  I don't know.  But

16   the deal was made before.

17   So with that, ladies and gentlemen, the bottom line

18   is they brought you no evidence.

19   MR. JEBSON:  Objection, Judge.  This is burden

20   shifting.

21   MS. BONJEAN:  They have brought you no evidence of

22   guilt of my client.  They have not.  There is no evidence of

23   guilt.  They are relying on a trial, testimony from a trial

24   from a dead man whose testimony was inherently suspect, a

25   trial that resulted in a conviction that was tossed out.

1       So if you go back to the instructions and you don't

2   take the bait and look at what the actual fabricated evidence

3   was, Bobby Joe Williams' false testimony, which was directly

4   the product of Byrne and Dignan, and the coercive

04:32:26   5   interrogation of Bobby Joe Williams, the coercive

6   interrogation of Alonzo Smith, this Polaroid photo that I'm

7   sure Byrne and Dignan were telling the uniformed officers,

8   jerk, why did you take that picture?  Now I got to get rid of

9   it.

04:32:43   10          MR. JEBSON:  Judge, there's no evidence of this.

11          MS. BONJEAN:  It's a reasonable inference.

12          If they were pleading -- if they weren't pleading the

13   Fifth, I could ask them, but I can't.

14          And Bobby Joe Williams' false testimony implicating

04:32:59   15   Stan and Stanley Wrice's own false inculpatory confession, you

16   look at these things together, not one by one.  You look at

17   all of this cumulatively.  And the question ultimately is on

18   the first claim, if this criminal jury was aware of all this,

19   is there a reasonable likelihood the outcome would have been

04:33:27   20   different?  Yes, no question.

21          And on the second claim, the second claim is like a

22   no-brainer.  All that is is have we shown that the defendants

23   coerced Stanley Wrice into making a self-incriminating

24   statement that was used?  They could play games with words all

04:33:47   25   they want.  You know what Assistant State's Attorney McCurry

1   testified to.  Those were self-incriminating statements.

2   Putting yourself in the room, witnessing other people rape

3   her, burning her, whether it's by dropping, throwing, whatever

4   method that was used, all self-incriminating, and it was

04:34:05    5   introduced.  That's all we have to prove on that claim.  And

6   we know the defendants didn't deny it.

7           And then you have the conspiracy claim.  And, ladies

8   and gentlemen, I will leave you with this.  It takes more than

9   just pointing at this man to say he's guilty, and the mere

04:34:29   10   presence in the house did not make him guilty.  And they have

11   not put on any witnesses from this -- on this witness stand to

12   point the finger out of all those many people that were there,

13   yes, I saw him do this.  No.  They're relying on some --

14           MR. JEBSON:  Objection.  Burden shifting.

04:34:50   15           THE COURT:  Let's finish up.

16           MS. BONJEAN:  They're relying -- what they're saying

17   is Bobby Joe is a liar.  Everyone is a liar, and he's guilty,

18   end of story.  But don't give too much thought to it because

19   once you actually start breaking it down, you realize that

04:35:04   20   there was a wrongful conviction.  It's why the state of

21   Illinois did not retry him.  It's why they dismissed all

22   charges against him.

23           MR. JEBSON:  Objection.  There's no evidence of that,

24   Judge.

04:35:15   25           MS. BONJEAN:  He's out.  He would be in prison still.

1      MR. JEBSON:  Yeah, because the witnesses are dead.

2  That's why.

3      MS. BONJEAN:  Oh.  You heard plenty of testimony --

4      THE COURT:  Let's finish this up.  Come on.

04:35:26   5      MS. BONJEAN:  You heard plenty of testimony from dead

6  witnesses, plenty of witnesses from dead --

7      THE COURT:  Just finish your argument.

8      MS. BONJEAN:  That is a red herring.  Any criminal

9  jury could have heard Karen Byron's testimony read just the

04:35:39   10  way you heard testimony read.  Kenny Lewis's testimony could

11  have been read in.  The state of Illinois didn't believe him

12  either.

13      MR. JEBSON:  Objection.  Judge, objection.

14      MS. BONJEAN:  I have nothing further.

04:35:50   15      THE COURT:  All right.  I have to get one

16  instruction.

17      (Off the record.)

18      THE COURT:  Please be seated.

19      Members of the jury, I'm now going to instruct you as

04:36:36   20  to the law.

21      You have seen and heard all the evidence and the

22  arguments of the attorneys, and I will instruct you on the

23  law.

24      You have two duties as a jury.  Your first duty is to

04:36:44   25  decide the facts from the evidence in the case.  This is your

1    job and yours alone.

2         Your second duty is to apply the law that I give you

3    to the facts.

4         You must -- you must follow these instructions even

5    if you disagree with them.  Each of these instructions is

6    important, and you must follow all of them.

7         Perform these duties fairly and impartially.  Do not

8    allow sympathy, prejudice, fear, or public opinion influence

9    you.  You should not be influenced by any person's race,

10   color, religion, national ancestry, or sex.

11        Nothing I say now and nothing I said or did during

12   the trial is meant to indicate any opinion on my part about

13   what the facts are or about what your verdict should be.

14        In this case, the defendants are former police

15   officers, and plaintiff is a private citizen.  All parties are

16   equal before the law.  All parties are entitled to the same

17   fair consideration.

18        The evidence consists of the testimony of the

19   witnesses, the exhibits admitted into evidence, the summaries

20   of the witnesses from the plaintiff's criminal trial and the

21   parties' stipulations.  The stipulation is an agreement

22   between both sides that certain facts are true or that a

23   person would have given certain testimony.

24        During the trial, certain testimony was presented to

25   you by the reading of depositions and video.  You should give

1    this testimony the same consideration you would give it had

2    the witnesses appeared and testified here in court.

3         Certain evidence has been presented by summaries of

4    testimony presented in prior court proceedings.  The purpose

04:38:29    5    of the summaries was to expedite this proceeding.  These

6    summaries constitute evidence which you should consider along

7    with all the other evidence.

8         Certain things are not to be considered as evidence,

9    and I will list them for you.

04:38:41    10    First, if I told you to disregard any testimony or

11    exhibits or struck any testimony or exhibits from the record,

12    such testimony or exhibits are not evidence and must not be

13    considered.

14         Second, anything that you may have seen or heard

04:38:54    15    outside the courtroom is not evidence and must be entirely

16    disregarded.  This includes any press, radio, or television

17    reports you may have seen or heard.  Such reports are not

18    evidence, and your verdict must not be influenced in any way

19    by such publicity.

04:39:09    20    Third, questions and objection or comments by the

21    lawyers are not evidence.  Lawyers have a duty to object when

22    they believe a question is improper.  You should not be

23    influenced by any objection, and you should not infer from my

24    rulings that I have any view as to how you should decide the

04:39:24    25    case.

1    Fourth, the lawyers' opening statements and closing

2    arguments to you are not evidence.  The purpose of these were

3    to discuss the issues and the evidence.  If the evidence as

4    you remember it differs from what the lawyers said, your

5    memory is what counts.

6    Any notes you have taken during this trial are only

7    aids to your memory.  The notes are not evidence.  If you have

8    not taken notes, you should rely on your independent

9    recollection of the evidence and not be unduly influenced by

10   the notes of other jurors.  Notes are not entitled to any

11   greater weight than the recollections or impressions of each

12   juror about the testimony.

13   In determining whether any fact has been proved, you

14   should consider all of the evidence bearing on the question

15   regardless of who introduced it.

16   You will recall that during the course of this trial,

17   I instructed you that I admitted certain evidence for a

18   limited purpose.  You must consider this evidence only for the

19   limited purpose for which it was admitted.

20   You should use common sense in weighing the evidence

21   and consider the evidence in light of your own observations in

22   life.

23   In our lives we often look at one fact and conclude

24   from it that another fact exists.  In law, we call this an

25   "inference."  The jury is allowed to make reasonable

1    inferences.  Any inference you make must be reasonable and

2    must be based on the evidence in the case.

3          You may have heard the phrases "direct evidence" and

4    "circumstantial evidence."  Direct evidence is proof that does

04:40:50    5    not require an inference, such as the testimony of someone who

6    claims to have personal knowledge of a fact.

7          Circumstantial evidence is proof of a fact or a

8    series of facts that tend to show that some other fact is

9    true.

04:41:01    10          For an example of direct evidence that it is raining

11    is testimony from a witness who says, "I was outside a minute

12    ago, and I saw it was raining."  Circumstantial evidence that

13    it is raining is the observation of someone entering a

14    courtroom carrying a wet umbrella.

04:41:17    15          The law makes no distinction between the weight to be

16    given to either direct or circumstantial evidence.  You should

17    consider -- you should decide how much weight to give to any

18    evidence.  In reaching your verdict, you should consider all

19    the evidence in the case, including the circumstantial

04:41:31    20    evidence.

21          You must decide whether the testimony of each of the

22    witnesses is truthful and accurate in part, in whole, or not

23    at all.  You must decide what weight, if any, you give to the

24    testimony of each witness.

04:41:45    25          In evaluating the testimony of any witness, including

1 any party to the case, you must consider, among other things:

2      - the ability and the opportunity the witness had to

3 see, hear, or know the things that the witness testified

4 about;

04:41:58

5      - the witness's memory;

6      - any interest, bias or prejudice the witness may

7 have;

8      - the witness's intelligence;

9      - the manner of the witness while testifying;

04:42:08

10      - and the reasonableness of the witness's testimony

11 in light of all the evidence in the case.

12      It is proper for a lawyer to meet with any witness in

13 preparation for trial.

14      You may find the testimony of one witness or a few

04:42:25

15 witnesses more persuasive than the -- excuse me.

16      You may find the testimony of one witness or a few

17 witnesses more persuasive than the testimony of a larger

18 number.  You need not accept the testimony of the larger

19 number of witnesses.

04:42:36

20      The law does not require any party to call as a

21 witness every person who might have knowledge of the facts

22 related to this trial.  Similarly, the law does not require

23 any party to present all exhibits or all papers and things

24 mentioned during the trial.

04:42:53

25      When asked certain questions while testifying in this

1  case, defendants Dignan and Byrne asserted their Fifth
2  Amendment right not to incriminate themselves.
3        You may, but are not required to, draw an adverse
4  inference against defendants Dignan and Byrne, and you may,
5  but are not required to, assume that an answer would have been
6  unfavorable to them.
7        When I say a particular party must prove something by
8  a preponderance of the evidence, or when I use the expression
9  "if you find" or "if you decide," this is what I mean:  When
10 you have considered all the evidence in the case, you must be
11 persuaded that it is more probably true than not true.
12       Plaintiff claims the defendants Byrne and Dignan
13 violated his right to a fair trial by failing to disclose
14 exculpatory and/or impeachment evidence that was material to
15 plaintiff's defense in the criminal trial and by fabricating
16 evidence that was used against the plaintiff in the criminal
17 trial.
18       To succeed on this claim, plaintiffs must prove each
19 of the following things by a preponderance of the evidence:
20       1.   Defendant Byrne and/or Dignan knowingly concealed
21 from the prosecutor exculpatory and/or impeachment evidence
22 and the evidence was not otherwise available to plaintiff
23 through the exercise of reasonable diligence to make or use at
24 his trial and/or knowingly fabricated evidence that was
25 introduced against plaintiff at his criminal trial;

1      2.   The evidence was material; and

2      3.   Plaintiff was damaged as a result.

3       Exculpatory evidence is evidence that tends to show

4 that the accused is not guilty of the crime.

04:44:41   5       Impeachment evidence is evidence that would have made

6 the jury at the criminal trial less likely to believe a

7 witness who testified against the accused at the criminal

8 trial.

9       Evidence is material if there is a reasonable

04:44:55   10 likelihood that the result in the criminal proceeding would

11 have been different if the evidence had been disclosed or if

12 the fabricated evidence had not been introduced at trial.

13       If you find that plaintiff has proved each of these

14 things by a preponderance of the evidence, then you must

04:45:09   15 decide for plaintiff and go on to consider the question of

16 damages.

17       If, on the other hand, you find that plaintiff has

18 failed to prove any one of these things by a preponderance of

19 the evidence, then you must decide for defendant, and you will

04:45:19   20 not consider the question of damages.

21       Plaintiff claims that -- the second claim.  Plaintiff

22 claims that defendants Byrne and Dignan violated his

23 constitutional rights by coercing plaintiff to make

24 self-incriminating statements to the charged crimes.

04:45:36   25       To succeed on this claim, plaintiff must prove each

1   of the following things by a preponderance of the evidence:

2         1.   That defendant Byrne and/or Dignan coerced

3   plaintiff to make self-incriminating statements; and

4         2.   The self-incriminating statement was used against

04:45:51  5   plaintiff in the criminal trial; and

6         A statement is coerced if it is the result of

7   physical or psychological abuse or the threat of physical or

8   psychological violence.

9         If you find that plaintiff has proved each of these

04:46:05  10   things by a preponderance of the evidence, then you must

11   decide for plaintiff and go on to consider the question of

12   damages.

13         If, on the other hand, you find that plaintiff has

14   failed to prove any of these things by a preponderance of the

04:46:17  15   evidence against the defendant you are considering, you should

16   find for that defendant and not consider the question of

17   damages as to that defendant on this claim.

18         The third claim, conspiracy.  Plaintiff claims that

19   one or more of the defendant officers conspired to deprive him

04:46:34  20   of his rights under the United States Constitution as

21   described in these instructions.

22         To succeed on this claim as to the particular

23   defendant you are considering, plaintiff must prove each of

24   the following things by a preponderance of the evidence:

04:46:46  25         1.   One or more of the defendants entered into an

1    agreement amongst themselves or with others to deprive

2    plaintiff of his constitutional rights as described in these

3    instructions;

4        2.   An actual deprivation of one or more of

5    plaintiff's constitutional rights resulted from an overt act

6    taken in furtherance of the agreement; and

7        3.   Plaintiff's described constitutional rights were

8    violated.

9        If you find that plaintiff has proved each of these

10   things by a preponderance of the evidence against one or more

11   of the defendant officers, then you should find for plaintiff,

12   against the defendant officers, and go on to consider the

13   questions of damages.

14       If, on the other hand, you find that plaintiff has

15   failed to prove any of these things by a preponderance of the

16   evidence against defendants -- against the defendant you are

17   considering, you should find for that defendant and not

18   consider the question of damages as to that defendant on this

19   claim.

20       If you find in favor of plaintiff, then you must

21   determine the amount of money that will fairly compensate

22   plaintiff for any injury that you find he sustained that

23   is reasonably certain -- and is reasonably certain to sustain

24   in the future as a direct result of the violation of his

25   rights guaranteed by the United States Constitution,

1   specifically that plaintiff was coerced into making a

2   self-incriminating statement and the statement was introduced

3   against him in the criminal trial, and that plaintiff's right

4   to a fair trial was violated through the fabrication and/or

5   concealment of material evidence.  These are called

6   compensatory damages.

7          Plaintiff must prove his damages by a preponderance

8   of the evidence.  Your award -- excuse me -- your award must

9   be based on evidence and not speculation or guesswork.  This

10  does not mean, however, that compensatory damages are

11  restricted to the actual loss of money.  They include both the

12  physical and mental aspects of injury even if they are not

13  easy to measure.

14         You should consider the following type of

15  compensatory damages and no others:

16         1.  The physical and mental and emotional pain and

17  suffering and loss of a normal life that plaintiff has

18  experienced and is reasonably certain to experience in the

19  future.  No evidence of the dollar value of physical or mental

20  and emotional pain and suffering or loss of a life has been or

21  needs to be introduced.  There is no exact standard for

22  setting the damages to be awarded on account of these factors.

23  You are to determine an amount that will fairly compensate the

24  plaintiff for the injury he has sustained;

25         2.  The wages, salary, profits and earning capacity

1    the plaintiff has lost and present value of wages, salary,

2    profits and the earning capacity the plaintiff is reasonably

3    certain to lose in the future because of his inability to

4    work.

5    When I saw -- when I say "present value," I mean the

6    sum of money needed now which, together with what that sum may

7    reasonably be expected to earn in the future, will equal the

8    amounts of those monetary losses at the times in the future

9    that they will be sustained.

10    If you decide for the defendants on the question of

11    liability, then you should not consider the question of

12    damages.

13    Punitive damages.  If you find for plaintiff, you

14    may, but are not required to, assess punitive damages against

15    any or both of the defendants.  The purpose of punitive

16    damages are to punish a defendant for his conduct and to serve

17    as an example or warning to defendants and others not to

18    engage in similar conduct in the future.

19    Plaintiff must prove by a preponderance of the

20    evidence that punitive damages should be assessed against the

21    given defendant.  You may assess punitive damages only if you

22    find that his conduct was malicious or in reckless disregard

23    of plaintiff's rights.

24    Conduct is malicious if it is accompanied by ill will

25    or spite or is done for the purpose of injuring plaintiff.

1        Conduct is in reckless disregard of plaintiff's
2   rights if, under the circumstances, defendant simply did not
3   care about plaintiff's rights.
4        If you find that punitive damages are appropriate,
5   then you must use sound reason in setting the amount of those
6   damages.  Punitive damages, if any, should be in an amount
7   sufficient to fulfill the purposes that I have described to
8   you but should not reflect bias, prejudice or sympathy towards
9   either or any party.
10       In determining the amount of punitive damages, you
11  should consider the following factors:
12           - the reprehensibility of defendant's conduct;
13           - the impact of defendant's conduct on plaintiff;
14           - the relationship between the plaintiff and the
15  defendant;
16           - and the likelihood that the defendant would repeat
17  the conduct if an award of punitive damages is not made;
18           - the relationship -- the defendant's financial
19  condition;
20           - the relationship of any award of punitive damages
21  to the amount of actual damage the plaintiff suffered.
22       You may consider statements given by a party or a
23  witness under oath before trial as evidence of the truth of
24  what he said in the earlier statements as well as in deciding
25  what weight to be given his testimony.

Jury Charge

1962

1    With respect to other witnesses, the law is

2    different.  If you decide that before trial one of these

3    witnesses made a statement not under oath or acted in a manner

4    that is inconsistent with his testimony here in court, you may

04:51:51    5    consider the earlier statement or conduct only in deciding

6    whether his testimony here in court was true and what weight

7    to give to his testimony here in court.

8    In considering prior inconsistent statements or

9    conduct, you should consider whether it was simply an innocent

04:52:05    10    error or an intentional falsehood and whether it concerns an

11    important fact or an unimportant detail.

12    Certain demonstrative exhibits have been shown to

13    you.  These exhibits are used for convenience and to help

14    explain the facts of the case.  They are not themselves

04:52:23    15    evidence or proof of any fact.

16    You must give separate consideration to each claim

17    and each party in this case.  Although there are two

18    defendants, it does not follow that if one is liable then the

19    other is also liable.

04:52:35    20    In considering a claim against a defendant, you must

21    not consider evidence admitted only against the other

22    defendant or as to other claims.

23    Defendants John Byrne and Peter Dignan are being sued

24    as individuals.  Neither the City of Chicago nor the Chicago

04:52:54    25    Police Department are a party to this lawsuit.

1　　　　　Plaintiff must prove by a preponderance of the

2　evidence that John Byrne and Peter Dignan were each personally

3　involved in the conduct that plaintiff complains about.

4　　　　　There is no independent claim against defendants that

04:53:06　5　they used excessive force against the plaintiff or anybody

6　else.  You may only consider evidence of excessive force by

7　the defendants to the extent it relates to the plaintiff's

8　claims that defendants Byrne and Dignan fabricated suppressed

9　material evidence and violated plaintiff's right not to

04:53:23　10　incriminate himself.  You may not award any damages in favor

11　of the plaintiff simply because one -- because you believe one

12　or more defendants used excessive force against the plaintiff

13　or anybody else.  You may only award damages to the plaintiff

14　if he proves all of the necessary elements for the particular

04:53:38　15　claim plaintiff has brought as set out in these instructions.

16　　　　　During your deliberations, you must not communicate

17　with or provide any information to anyone by any means about

18　this case.  You may not use any electronic device or media,

19　such as telephone, a cell phone, smart phone, iPhone,

04:53:57　20　BlackBerry or computer, the Internet, any Internet service or

21　any text or instant messaging service, any Internet chat room,

22　blog or website such as Facebook, LinkedIn, YouTube or Twitter

23　to communicate to anyone any information about this case or to

24　conduct any research about this case until I accept your

04:54:16　25　verdict.  In other words, you cannot talk to anyone on the

1   phone, correspond with anyone or electronically communicate

2   with anyone about this case.  You can only discuss the case in

3   the jury room with your fellow jurors during the

4   deliberations.

04:54:29   5         The following potential witnesses died before they

6   could be deposed in this case:  Kenny Lewis, date of death,

7   September 11, 1997; Kenneth McCurry, date of death, January 7,

8   2011; Karen Byron, date of death, November 30, 2002; and David

9   Dioguardi, July 12, 2016.

04:54:55   10         Upon retiring to the jury room, you must select a

11   presiding juror.  The presiding juror will preside over your

12   deliberations and will be your representative here in court.

13         Forms of verdict have been prepared for you.  And the

14   parties did so, but I will go over them once more.

04:55:13   15         The verdict form, I think it's relatively

16   uncomplicated.  There's three sections.

17         Section 1 lays out the three claims.  First claim,

18   concealment, fabrication of evidence; second claim, coerced

19   incrimination; third claim, conspiracy.  And when you decide

04:55:32   20   unanimously each claim, then you should check the appropriate

21   box or boxes.  For example, if you find that plaintiff has

22   proved all of the elements of the first claim, then you

23   would -- and you would check the box for "plaintiff Wrice."

24   If, however, you find that the plaintiff did not prove all of

04:55:50   25   the elements against one or both of the defendants, then you

1  would check the box on the defendant to which you found that
2  the plaintiff did not prove the case.

3  And the second claim, the same thing.  If you find
4  that plaintiff proved the claim, you would check his box.  If
5  you find that he did not as to each of the defendants, you
6  would consider each defendant and check the box.

7  The same as the third one, again, for plaintiff, for
8  Wrice, defendant Byrne, defendant Dignan.

9  Now, all of your decisions -- before you could check
10  a box, all nine of you have to agree to the -- to the -- that
11  particular issue.  In other words, if you cannot -- if seven
12  of you find in favor of plaintiff on the first claim and two
13  of you do not, you can't check that box until either all of
14  you all agree, or in the event that you can't all agree, that
15  will be another matter.

16  So if you find in favor of defendants against
17  plaintiff on his claims, you do not complete Section 2.  You
18  proceed to Section 3 and sign and date the verdict form.  If
19  you find for plaintiff and against either defendant Byrne or
20  Dignan, then you should continue to Section 2, which is on the
21  second page.

22  Section 2, compensatory damages.  If you find in
23  favor of plaintiff on one or more claims, enter the amount of
24  compensatory damages, and there's a blank with a dollar sign.
25  And you would -- if you find in favor of the plaintiff, you

1   would be -- the nine of you would have to agree as to a dollar
2   amount to insert in that box.

3          And if you found in favor of plaintiff, you then
4   would consider the question of punitive damages and against --
5   there's a separate box for defendant John Byrne and a separate
6   box for Peter Dignan.  You would -- if you find in
7   plaintiff -- believe that punitive damages is appropriate,
8   then you would put the dollar amount that you unanimously
9   agree as to John Byrne and the dollar amount against
10  Peter Dignan.  If you do not feel that punitive damages is
11  appropriate, then you would put zero down.

12         Then, finally, Section 3, you will sign and date
13  below and return the entire verdict to the marshal.  And each
14  of you must sign this verdict form, and the foreman would date
15  it first.  And the foreman would sign it and then the other
16  eight jurors.

17         So, again, just a couple of things.  Every box you
18  check, every dollar amount that you assert on the verdict form
19  must be unanimous.  So you cannot do so until you do so, until
20  you agree.

21         The verdict must represent the considered judgment of
22  each juror.  Your verdict, whether it be for or against the
23  parties, must be unanimous.

24         You should make every reasonable effort to reach a
25  verdict.  In doing so, you should consult with one another,

1　express your own views and listen to the opinions of your
2　fellow jurors.

3　　　　Discuss your differences with an open mind.  Do not
4　hesitate to reexamine your own views and change your opinion
5　if you come to believe it is wrong.  But you should not
6　surrender your honest beliefs about the weight or effect of
7　evidence solely because of the opinions of other jurors or for
8　the purpose of returning a unanimous verdict.

9　　　　All of you should give fair and equal consideration
10　to all the evidence and deliberate with the goal of reaching
11　an agreement that is consistent with the individual judgment
12　of each juror.  You are impartial judges of the facts.

13　　　　And with that, that concludes the recitation of the
14　instructions.  You will now retire to the jury room to
15　consider your verdict.

16　　　　I will send a set of the instructions in together
17　with the verdict form, together with the hard copies of the
18　exhibits that have been introduced into evidence.

19　　　　It would be my feeling that at this date that you
20　should -- after you settle in, you should go home and come
21　back tomorrow.  When would be -- would 9:00 or 10:00 be the
22　easiest time for you to come back?

23　　　　MULTIPLE JURORS:  10:00.

24　　　　THE COURT:  You want to take a vote on it?

25　　　　MULTIPLE JURORS:  10:00.

1968

1    THE COURT:  All right.  10:00.

2    Mr. Marshal, would you please raise your right hand,

3    please.

4    (Court security officer sworn. )

05:00:41    5    THE COURT:  All right.  Would you take the jury back.

6    And in a moment, we'll have the exhibits and the instructions

7    and the verdict form.

8    (Jury exits.)

9    MS. BONJEAN:  There was one typo that I wanted to

05:01:07    10    point out, Judge.

11    THE COURT:  Which one?

12    MS. BONJEAN:  It's the second claim --

13    THE COURT:  Listen up.  There's a typo apparently.

14    Which instruction?

05:01:16    15    MS. BONJEAN:  It was the second claim, the violation

16    of plaintiff's right against self-incrimination.

17    THE COURT:  Hold on.  Let me get it.  Let me see

18    where I put it.  Let's see.  Which claim, second claim?

19    MS. BONJEAN:  Yes, sir.

05:01:47    20    THE COURT:  What was it?

21    MS. BONJEAN:  After the second, there's an "and"

22    there.  And it suggests that there's something else that needs

23    to be proven, but really there's just --

24    THE COURT:  Yeah, the "and" probably shouldn't --

05:02:00    25    MS. BONJEAN:  Yeah, that needs to be taken out.

1969

1          THE COURT:  Counsel, you agree that the "and" --

2          MR. BARNETT:  Yes, Your Honor.

3          THE COURT:  Okay.  I'll just cross it out.

4          MS. BONJEAN:  That's fine.

05:02:08    5          You caught the one that was "saw" when it was

6   supposed to be "say."

7          THE COURT:  Yeah.  I think the rest are pretty good.

8   All right.

9          MS. BONJEAN:  Hold on.  Judge, the verdict form is --

05:02:21    10   is not accurate.

11          The second claim says "coerced incrimination."  I

12   don't know what -- that's not -- it's "compelled

13   self-incrimination."  I don't know.  It says "coerced

14   incrimination."  I don't know what that is.

05:02:36    15          THE COURT:  Let me see.  Hold on a minute.  Second

16   claim?

17          MR. BARNETT:  Your Honor, we would agree that it

18   should read --

19          MS. BONJEAN:  "Compelled self-incrimination."

05:02:50    20          MR. BARNETT:  Yes, Your Honor.  We think that that is

21   accurate.  It should be "compelled or coerced

22   self-incrimination."

23          THE COURT:  Okay.  What do you want me to put on it?

24          MS. BONJEAN:  The title is not -- you got --

05:03:00    25          THE COURT:  Yeah.  Okay.

1   MS. BONJEAN: "Compelled self-incrimination."

2   THE COURT: "Compelled self-incrimination" with a

3   dash between "self-incrimination"?

4   MR. BARNETT: Yes, Your Honor.

05:03:20   5   MS. BONJEAN: Yes.

6   THE COURT: Okay. We'll do that.

7   You got your exhibits?

8   MR. JEBSON: I'm sorry, Judge. One other thing.

9   There was a comment in the closing about the state of

05:03:30   10   Illinois did not believe Kenny Lewis. We would move for a

11   mistrial based on that comment.

12   MS. JACOBS: There were three comments, Your Honor.

13   I was trying to write them up.

14   One of them, if they believed he was not guilty, the

05:03:49   15   state of Illinois could retry him.

16   THE COURT: The jurors heard all the evidence. The

17   motion for directed -- or excuse me -- for a mistrial is

18   denied.

19   All right. Have you got your exhibits?

05:04:00   20   MR. JEBSON: Judge, we would be opposed to certain

21   exhibits going back to the jury as unfairly highlighting

22   certain things.

23   THE COURT: Pardon?

24   MR. JEBSON: We would be opposed to sending

05:04:11   25   everything that was admitted into evidence.

1    THE COURT:  No, no.  Just that list.  You had a list

2    of exhibits.

3        MS. BONJEAN:  Right, that's what we talked about.

4        THE COURT:  We went through that, and I added three

05:04:20    5    more from your list to it.

6        MR. JEBSON:  Well, I don't -- I wasn't --

7        (Counsel conferring.)

8        THE COURT:  That's the stuff that goes back because I

9    specifically said, you know, exchange lists so that -- and

05:04:36    10    there was an objection to -- I authorized I think three of

11    them.

12        MS. BONJEAN:  The photo from the criminal trial.

13        THE COURT:  Two photos and the -- I think it was

14    the --

05:04:49    15        MR. JEBSON:  We would object to the OPS report going

16    back.

17        MS. BONJEAN:  That was admitted into evidence.

18        MR. JEBSON:  I'm talking about going back to the

19    jury.  It's two different things.  It's two different things.

05:04:58    20        THE COURT:  We've already been through this.  I'm not

21    going to go back over it.

22        MS. LAMBROS:  The whole criminal trial record, we

23    never put that in.  We put in a portion.

24        THE COURT:  Anyway, this was supposed to have been

05:05:10    25    completely argued out.  Have you got your exhibits?  Hand them

1    to me.  You want to show it to them?

2           MR. HALE:  It's going to take us a minute to get ours

3    out of the boxes.

4           THE COURT:  How long is it going to take you?

05:05:38   5           MR. JEBSON:  About five minutes.

6      (Off the record.)

7           THE COURT:  Let me get the verdict form.  The

8    correction has been made on the instruction and also the

9    verdict form.

05:08:18  10           MR. HALE:  Judge, we're a little -- there's a few

11   things I think that we didn't have over here.  Is there any

12   objection to us bringing it over before 10:00, before they

13   come back?

14          THE COURT:  Okay.  I'll just tell them that the

05:08:29  15  exhibits -- have you got yours?

16          MS. BONJEAN:  Yes.  I don't know.

17          THE COURT:  You'll have them here a quarter to 10:00?

18          MR. HALE:  Yes, Your Honor.

19          THE COURT:  All right.  So you'll have them over here

05:09:09  20  at quarter to 10:00?

21          MR. HALE:  Yes.

22          MS. BONJEAN:  Yes, sir.

23          THE COURT:  All right.  We'll see you all in the

24   morning.

05:09:15  25         MS. BONJEAN:  Thank you.

1973

1        MR. HALE:  Thank you, Your Honor.

2        MS. BONJEAN:  Thank you, Your Honor.

3        MS. COHEN:  Thank you, Your Honor.

4        (Trial adjourned until 10:00 a.m., 3/3/2020.)

5

6                    C E R T I F I C A T E

7

8        We, Kathleen Fennell, Kelly Fitzgerald, and Joseph

9   Rickhoff, do hereby certify that the foregoing is a complete,

10  true, and accurate transcript of the proceedings had in the

11  above-entitled case before the Honorable HARRY D. LEINENWEBER,

12  one of the judges of said court, at Chicago, Illinois, on

13  March 2, 2020.

14

15  */s/ Kathleen Fennell*                      March 3, 2020

16  */s/ Kelly Fitzgerald*                      March 3, 2020

17  */s/ Joseph Rickhoff*                       March 3, 2020

18  Official Court Reporters
    United States District Court
19  Northern District of Illinois
    Eastern Division

20

21

22

23

24

25