**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STANLEY WRICE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14 C 5934 |
| | ) | |
| -vs- | ) | The Hon. Harry D. Leinenweber |
| | ) | |
| JOHN BYRNE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# <u>DEFENDANTS' MOTION FOR A NEW TRIAL</u>

Caryn L. Jacobs
Managing Deputy Corporation Counsel
City of Chicago Department of Law
121 N. LaSalle Street, Room 600
Chicago, Il 60602

Andrew M. Hale
Scott Jebson
Amy A. Hijjawi
Jennifer Bitoy
HALE & MONICO LLC
53 W. Jackson Blvd., Suite 330
Chicago, IL 60604

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

BACKGROUND ...............................................................................1

ARGUMENT ....................................................................................2

I. This Court erred in instructing the jury on the law applicable to the Second Claim ........ 2

II. Defendants were unfairly prejudiced by this Court's evidentiary rulings. .........................5

    A. The Court erred in barring defendants from introducing Byrne and Dignan's prior testimony. ..............................................................................5

        1. The prior testimony was clearly admissible pursuant to Rule 804. .........................5

        2. The Court erred in denying defendants an opportunity to introduce prior testimony pursuant to Rule 106 .................................6

        3. Byrne's full trial testimony should have been admitted because that is what Wrice's criminal jury heard .............................................................7

        4. Omission of this testimony unfairly prejudiced defendants ..................................8

    B. The Court erred in substituting summaries of criminal trial testimony. ......................8

    C. The Court erred in allowing evidence of Illinois court orders. ...................................10

    D. The Court erred in barring evidence of Wrice's gang affiliation to show his relationship with Benson, Fowler, and Holmes. .....................11

    E. The Court erred in not allowing defendants to rebut evidence of Wrice's rosy character...................................................................12

        1. Jennifer Scott was Wrice's 14-year-old rape victim, not his girlfriend................14

        2. Wrice was not a positive role model but a gang member and violent criminal...........................................................17

    F. The Court erred in barring evidence that Karen Byron identified Wrice. ..................17

    G. The Court erred in allowing other acts evidence for propensity purposes .................20

    H. The jury was erroneously instructed to award duplicative damages ..........................23

III. Wrice's counsel's misconduct contributed to an unfair trial ...........................................23

    A. Wrice's counsel misrepresented facts to discredit Kenny Lewis................................24

    B. Wrice's counsel misrepresented the State's position on Wrice's guilt........................24

    C. Wrice's counsel used this Court's rulings as both a sword and a shield, to egregiously attack the character of Jennifer Scott, Wrice's 14-year-old rape victim who was barred from testifying to the truth....................................................25

    D. Plaintiff's counsel made numerous improper speaking objections.............................26

    E. Plaintiff's counsel alluded to highly inflammatory and unwarranted racist comparisons...................................................................27

CONCLUSION.................................................................................28

## **TABLE OF AUTHORITIES**

**CASES:**

*Adams Laboratories, Inc. v. Jacobs Eng'g Co., Inc.,* 761 F.2d 1218 (7th Cir.1985)................... 31

*Arizona v. Fulminante*, 499 U.S. 279 (1991)..................................................................4

*Carey v. Piphus, 435 U.S. 247 (1978)* .................................................................. 4-5

*Cefalu v. Vill. of Elk Grove, 211 F.3d 416 (7th Cir. 2000)* ...........................................................2

*Cobige v. City of Chicago*, Ill., 651 F.3d 780 (7th Cir. 2011 ...........................................13, 15, 19

*Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009)........................................................ 25

*Jordan v. Binns*, 712 F.3d 1123 (7th Cir. 2013) ......................................................... 19

*Lefkowitz v. Cunningham*, 431 U.S. 801 (1977)............................................................9

*Mayall v. Peabody Coal Co.* 7 F.3d 570 (7th Cir. 1993) ...........................................................26

*Michelson v. United States*, 335 U.S. 469 (1948) ...................................................... 14

*Morales v. Cadena,* 825 F.2d 1095 (7th Cir. 1987).............................................. 15-19

*People v. Hobley*, 159 Ill. 2d 272 (1994) ............................................................... 23

*Schultz v. Thomas*, 832 F.2d 108 (7th Cir. 1987).........................................................12

*Smith v. Gomez*, 550 F.3d 613 (7th Cir. 2008) ........................................................ 25

*Smith v. Hunt*, 707 F.3d 803 (7th Cir. 2013)............................................................ 26

*Soltys v. Costello*, 520 F.3d 737 (7th Cir. 2008) ...................................................... 26

*Specht v. Google, Inc.*, 268 F.R.D. 596 (N.D. Ill. 2010) .............................................28

*United States v. Beasley*, 809 F.2d 1273 (7th Cir. 1987)........................................... 23

*United States v. Butler*, 71 F.3d 243 (7th Cir. 1995) ……………………………………………12

*United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014)……………………………........ 22, 24

*United States v. Lewis*, 954 F.2d 1386 (7th Cir. 1992).................................................7

*United States v. Peterson*, 100 F.3d 7 (2d Cir. 1996) ..................................................6

*United States v. Pizarro*, 717 F.2d 336 (7th Cir. 1983)................................................6

*United States v. Salem,* 578 F.3d 682, 686 (7th Cir.2009) .......................................23

*United States v. Stiger*, 371 F.3d 732 (10th Cir. 2004)......................................... 10-11

*United States v. Walker*, 652 F.2d 708 (7th Cir. 1981).................................................8

*United States v. Wright*, 901 F. 2d 68 (7th Cir. 1990) ............................................. 22

*Walden v. City of Chicago*, 846 F. Supp. 2d 963 (N.D. Ill. 2012) ............................. 31

*Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir 1993) ..................................................4

*Wrice v. Dignan, 93 C 209, 1993 WL 388379* ....................................................... 4-5

iii

**STATUTES:**

Fed. R. Civ. P. 59 ............................................................................................... 1

Fed. R. Evid. 51 ................................................................................................. 25

Fed. R. Evid. 106 ............................................................................................. .7-8

Fed. R. Evid. 404 ........................................................................................... 23-24

Fed. R. Evid. 611 ............................................................................................... 9

Fed. R. Evid. 804 ........................................................................................... 5-6, 9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STANLEY WRICE, | ) | |
| Plaintiff, | ) | Case No. 14 CV 5934 |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN BYRNE, ET AL., | ) | Judge Harry D. Leinenweber |
| Defendants. | ) | |

## DEFENDANTS' MOTION FOR A NEW TRIAL

Defendants John Byrne and Peter Dignan, by their attorneys, move this Court, pursuant to Federal Rule of Civil Procedure 59, for a new trial on Wrice's Compelled Self-Incrimination Claim, identified as Count II in Wrice's First Amended Complaint ("FAC") (Claim II in the instructions submitted to the jury), and the derivative Conspiracy Claim, identified as Count III in the FAC (Claim III in the jury instructions).[1]  In support of this motion, defendants state:

## BACKGROUND

At trial, Wrice presented three claims to the jury: a Due Process Claim for Concealment/Fabricated Confession (Claim I), a Fifth Amendment Claim for Compelled Self-Incrimination (Claim II), and a derivative claim for Conspiracy to violate Wrice's Constitutional Rights as alleged in the Claims I and II (Claim III).  The jury returned a verdict in favor of defendants on the Claim I, finding that Wrice had not proven that there was a "reasonable probability" that he would have been acquitted had his criminal trial been re-tried according to Wrice's specifications.  Put simply, the jury found that Wrice had been rightly found guilty of his atrocious crimes.  But the jury found in favor of Wrice on Claim II (and the derivative Claim III) that his allegedly compelled self-incriminating statement was used at his criminal trial.  The jury awarded $4 million in compensatory damages

---

[1] The present motion is filed in the alternative, in the event this Court denies defendants' separately-filed Motion for Judgment as a Matter of Law.

on Claims I and II as to both defendants, and $600,000 in punitive damages as to each defendant. Defendants did not receive a fair trial on Claims II and III due to court errors and attorney misconduct before the jury and are entitled to a new trial.[2]

## ARGUMENT

Defendants are entitled to a new trial on Claim II because this Court's rulings severely and erroneously impaired their ability to respond to Wrice's allegation that he was compelled to give a statement that was used against him. The Court erred in instructing the jury on the proof required on the Second Claim, as to both liability and damages, making it impossible for the jury to have considered all necessary elements. And the Court excluded evidence, without any legitimate basis, that would have fatally undermined and disproven Wrice's claim that he gave a statement as a result of coercion.

In fact, irrespective of any claim of abuse, Wrice had an improper motive to make a statement minimizing his involvement in the crime after learning from Assistant State's Attorney Kenneth McCurry that he would be charged notwithstanding his prior denials of guilt. No rationale jury could have found otherwise. Yet defendants were consistently barred from introducing evidence of Wrice's state of mind, including that he knew that the victim had identified him as the man who raped and burned her, at the time he gave the alleged "confession" shifting blame to others. Excluding such evidence gave the jury a false view of Wrice's Claim II, and prevented defendants from receiving a fair trial.

## I. This Court erred in instructing the jury on the law applicable to the Second Claim.

The Court's instruction on the elements of Claim II was legally inaccurate in several

---

[2] There could be no finding of conspiracy in the Claim III without proof of the underlying violation in Claim II. *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000). For clarity, defendants' argument addresses Claim II, with the understanding that all arguments apply equally to entitle defendants to a new trial on Count III's allegations of conspiracy as to Count II.

2

respects. The Court rejected defendants' proposed instruction 11-A (Dkt. 567 at 21,) which accurately stated the law, in favor of the following instruction:

> Plaintiff claims that defendants Byrne and Dignan violated his constitutional rights by coercing plaintiff to make self-incriminating statements to the charged crimes. To succeed on this claim, plaintiff must prove each of the following things by a preponderance of the evidence:
>
> 1. That defendant Byrne and/or Dignan coerced plaintiff to make self-incriminating statements; and
>
> 2. The self-incriminating statement was used against plaintiff in the criminal trial; and [sic]
>
> A statement is coerced if it is the result of physical or psychological abuse or the threat of physical or psychological violence.
>
> If you find that plaintiff has proved each of these things by a preponderance of the evidence, then you must decide for plaintiff and go on to consider the question of damages.
>
> If, on the other hand, you find that plaintiff has failed to prove any of these things by a preponderance of the evidence against the defendant you are considering, you should find for that defendant and not consider the question of damages as to that defendant on this claim.

(Trial Transcript, Dkt. 589, at 1956:21 – 1957:17).[3]  This instruction misstated the law as to both liability and damages.  First, the instruction defined coercion inaccurately, rejecting defendants' instruction that "A confession is coerced if it is the result of physical abuse or the threat of physical violence *that have overcome the individual's free will*."  (Dkt. 567 at 21.)  This component was necessary to instruct the jury on whether the statement was in fact coerced. *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991) (issue is whether defendants "will was overborne in such a way as to render his confession the product of coercion"). The omission was based on the Court's erroneous belief that this language related to whether the statement was voluntary, but not whether the statement was coerced. (Dkt. 589 at 1757:7-25). But there is no such distinction, the terms are interchangeable. *Id.* at 287 n.3.  By failing to instruct the jury of the *quantum* of coercion necessary

---

[3] Citations reference page numbers at the top right corner of the transcript.

to prove a claim—enough to "overcome . . . free will"—the Court wrongly allowed the jury to find for Wrice based on less than the legally-required level of coercion.

Second, the Court erroneously concluded that "damages is not an element" of a claim for compelled self-incrimination. (Dkt. 589 at 1737:24.) This violated black-letter law: a plaintiff must prove damages caused by the constitutional violation in *all* Section 1983 claims. *Carey v. Piphus*, 435 U.S. 247, 264 (1978). It was also error to fail to instruct the jury on the availability of nominal damages where (as in this case) proof of damages is lacking.[4] Both rulings were based on the erroneous belief that this was a "torture case" and "in a torture case, [if] the plaintiff proves he was tortured, then he'd be entitled to some compensation." (Dkt. 589 at 1740:24-1741:1). The Court reached this conclusion by adopting Wrice's counsel's unsupported argument that *Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir 1993), somehow created a new cause of action for "torture" that did not require proof of causation or damages. It did not; the term was used only as a shorthand reference to the claim for physical abuse.[5] And the *Wilson* court certainly never opined that damages need not be proven. Thus, this Court's reliance on Wrice's argument, in contravention of controlling Supreme Court precedent requiring proof of causation and damages, *Carey*, 435 U.S. at 264, was reversible error. Freed of his burden of proving damages, Wrice made a "kitchen sink" damages argument for everything from his interrogation to the alleged disparate sentences of his co-defendants. (Dkt. 589 at 1839:6-19). He even argued there was no point to a trial on Claim II, as there was nothing for the jury to decide. (*Id*. at 1834:19:"Makes you wonder, why are we even

---

[4] In fact, there was no evidence of compensatory damages upon which the award could be based. As addressed in Defendants' Motion for Judgment As A Matter of Law, filed on March 31, 2020, incorporated herein by reference, Wrice elicited **no** evidence of the psychological damages he claimed to have experienced when his statement was introduced at trial.

[5] Unlike Wrice, Wilson's claim of physical abuse was not time-barred. *See Wrice v. Dignan*, 93 C 209, 1993 WL 388379 at *2 (N.D. Ill. Sept. 23, 1993) (Conlon J.) (explaining that Ill. Rev. Stat., ch. 110, para. 13–211 was repealed and no longer tolled the statute of limitations during incarceration.).

here?") Nothing in the instructions advised the jury that these damages must be proven, or that nominal damages were a viable alternative absent such proof. The award of compensatory damages is patently unreliable, given that the jury must have included non-compensable damage in its verdict on Claim II.

## II. Defendants were unfairly prejudiced by this Court's evidentiary rulings.

### A. The Court erred in barring defendants from introducing Byrne and Dignan's prior testimony.

This Court erroneously and unfairly prevented defendants from introducing relevant and admissible prior testimony. *See, e.g.*, Fed. R. Evid. 804. Byrne testified under oath that Wrice was not beaten, both in Wrice's criminal trial (Dkt 536 at Def. 5156:2-5208:24,) and at Wrice's Motion to Suppress Hearing, (Transcript of Motion to Suppress Testimony Peter Dignan and John Byrne, Exh. A at 86-87), and Dignan at least had the right to introduce this testimony pursuant to Rule 804. Dignan similarly testified at the Motion to Suppress hearing, thus Byrne had the right to introduce that testimony as well.

#### 1. The prior testimony was clearly admissible pursuant to Rule 804.

Rule 804 provides that prior testimony from a trial or hearing is not excluded from the hearsay rule if the declarant is unavailable under 804(a) and the statement is introduced against a party who had an opportunity and similar motive to examine the testimony in a prior preceding. Both defendants invoked their Fifth Amendment right to remain silent at trial, making each unavailable to the other. Fed. R. Evid. 804 (a) (1). "When the defendant invokes his Fifth Amendment privilege, he has made himself unavailable to *any other party*, but he is not unavailable to himself." *United States v. Peterson*, 100 F.3d 7, 13 (2d Cir. 1996) (emphasis added). A defendant may introduce his co-defendant's prior testimony where one or the other or both elect to assert their Fifth Amendment right at trial. *See United States v. Pizarro*, 717 F.2d 336, 348–49

(7th Cir. 1983) (reversible error to bar defendant from introducing prior testimony of his co-defendant, who invoked his Fifth Amendment right at trial). Thus, unavailability pursuant to Rule 804(a) was established.

Rule 804(b)(1)'s requirements of opportunity and similar motive were also satisfied. Wrice had an opportunity to—and did—cross-examine Byrne and Dignan regarding the circumstances surrounding his arrest. (Dkt. 536 at Def. 5199:21–24, Exh. A at 21-39, 174-215.) The motivation to do so was the same as in this case: to establish that his abuse allegations were true; that his "confession" was involuntary and untrue; and that he was innocent. Having met the requirements for admission of prior testimony under Rule 804(b)(1), at a minimum, Dignan should have been permitted to introduce Byrne's prior testimony, and vice versa. (Dkt. 589 at 230:6 – 235:3, 498:6 – 500:5, 992:17-25).

## 2. The Court erred in denying defendants an opportunity to introduce prior testimony pursuant to Rule 106.

The Court also erred in preventing defendants from admitting Byrne's prior testimony for completeness. Fed. R. Evid 106. The Court actually allowed Wrice to introduce a selective summary of Byrne's criminal trial testimony in which he deleted portions of testimony guided *only* by the self-serving principle that the testimony he deleted was unhelpful to Wrice. The Court recognized that, under Rule 106, "the defendants' [were] entitled to have a limited amount added . . . to whatever extent that statements that are read that need clarification from his testimony and for completeness, then …that can be done." (Dkt. 589 at 499: 15-17; 507:18-20.) However, the Court said that defendants must do it in their case. (Dkt. 589 at 514:7-12.) But when defendants tried to raise the rule of completeness issue in the defense case, the Court inexplicably refused even to listen to argument, claiming wrongly, that it had already ruled. (Dkt. 589 at 1727:20-1728:3.)

The opportunistically-excised testimony was critical to rebut Wrice's testimony of his alleged abuse. For example, plaintiff used Byrne's testimony about who was interviewed, *but deleted his interwoven testimony* about the timing of the interviews.[6] (Dkt. 585-4 at 3-4.) That timing showed that Wrice's story of being taken downstairs twice and beaten for extended periods of time was impossible. (Dkt. 556-1 at 3.) As another example, the excised testimony deleted Byrne's denial of the abuse *elicited by Wrice's own defense counsel*. (*Id*. at 4.) The excised testimony also erroneously deleted such key observations as Byrne's testimony regarding the burning odor in the house. (*Id*. at 2.) This Court erred in denying defendants the opportunity to present Byrne's complete testimony, heard by Wrice's criminal jury, and in so doing denied defendants a fair trial. *See United States v. Walker*, 652 F.2d 708, 711 (7th Cir. 1981) (reversible error to preclude criminal defendant who asserted his Fifth Amendment rights to introduce portions of his testimony which were "relevant to specific elements of the governments proof and explanatory of the excerpts already admitted" pursuant to Rule 106). The Court's ruling allowed Wrice to "paint[] a distorted picture of [Byrne's] prior testimony which he was powerless to remedy without taking the stand." *Id*.

### 3. Byrne's full trial testimony should have been admitted because that is what Wrice's criminal jury heard.

The Court never explained, much less justified, its decision not to admit Byrne's entire criminal trial testimony into evidence. Per Wrice's theory, convicting him by using his

---

[6] A comparison of plaintiff's purported "summary" of Byrne's criminal trial testimony, read at trial (Dkt. # 585-4 at 22-26), with defendants' redline summary highlighting the key deletions (Dkt. 556-1), shows that the summary read to the jury was false. It was misleading even to call what the jury heard a "summary." *It was not a summary*. In fact, a large percentage of the summary was excised for no valid legal reason. Moreover, viewing the portions deleted by Wrice makes clear that the deletions permeated the testimony, which is *exactly* what Rule 106 was designed to prevent. *See United States v. Lewis*, 954 F.2d 1386, 1391 (7th Cir. 1992) ("The rule of completeness is designed to avoid misleading impressions created by taking matters out of context."). This was gross error.

"confession" *at trial* was the *reason* why defendants supposedly abused him. To judge whether that abuse occurred, the jury had to understand what Byrne actually said at trial. Had the jury heard that *actual* testimony, versus the false version cherry-picked by Wrice's counsel, they would have learned that (i) the interviews were too brief to allow multiple trips to the basement; (ii) Byrne himself testified only that Wrice *denied* any involvement in the crime; and (iii) Byrne denied the abuse. No legal principle justified wrongly telling the jury that they heard a "summary" of Byrne's testimony (when they did not), much less the biased excising of that testimony to eliminate evidence favorable to the defense.

### 4. Omission of this testimony unfairly prejudiced defendants.

As described above, the Court's ruling prevented defendants from presenting key evidence in their favor, *i.e.*, that Wrice's version of the abuse was not credible given the timing of the many interviews at the station, which did not allow for multiple visits to the basement to conduct extended beating sessions. The jury also did not hear what the criminal jury heard, such as Byrne's denial of the beatings.

Byrne and Dignan were barred from introducing this proper evidence simply because, 37 years after the criminal trial, they exercised their Fifth Amendment right not to testify at this civil trial. This reason could never have justified the Court's violation of Rule 106, and in any event, Wrice had the chance to cross-examine both men. The Court's ruling also had the effect of improperly punishing defendants for invoking the Fifth Amendment. *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5, (1977) (refusal to waive the privilege cannot "lead[] automatically and without more to imposition of sanctions.") Defendants are entitled to a new trial.

### B. The Court erred in substituting summaries of criminal trial testimony.

The Court's order barring the introduction of the actual criminal trial testimony and limiting it to inadequate summaries, relying on Federal Rule of Evidence 611, constituted

reversible error. Its purpose was *solely* to shorten the trial by a day or two. Requiring Defendants to present trial testimony in summary form prevented the jury from assessing the credibility of these witnesses. (*See* Dkt. 492, incorporated herein.) The need for actual testimony was particularly great where the criminal trial testimony was the only evidence available, as was the case with several key defense criminal trial witnesses: Kenny Lewis, Karen Byron, Kenneth McCurry, John Byrne and David Dioguardi. Rule 804(b)(1) permitted defendants to introduce the entirety of these witnesses' testimony. There was no reason for disallowing this evidence, which prevented the jury from assessing the credibility of these witnesses, all of whom undermined Wrice's testimony about the making of his statement.[7]

At his criminal trial, Wrice testified that he did not make the statement to which ASA McCurry testified (the purported confession), claiming he was "strong enough" to resist the beatings. (Dkt. 589 at 1027:7 – 1028:22 (Bertina Lampkin), 1328:9-16 (Stanley Wrice.) He also denied that defendants fed him those lines. (Dkt. 589 at 1027:7-1028:22, 1328:9-16.) Because this testimony vitiated his confession (*see* Dkt. 499), Wrice's solution in *this* case was to manufacture all-new testimony by saying, for the first time at *this* trial, that *ASA McCurry* fed him the statement and he "agreed" to it. Wrice was allowed to testify for hours, but ASA McCurry's testimony amounted to a five-minute summary. Had his trial testimony come into evidence as the criminal jury heard it, that detail would have wholly undermined Wrice's newly-fabricated testimony that *McCurry* fed him the "confession." (Dkt. 536 at Def. 5214-60.)

---

[7] The Court's failure to admit trial testimony into evidence caused other critical errors. For example, plaintiff's counsel totally misrepresented Williams' testimony at the criminal trial to bolster Wrice's and Williams' allegations of abuse. (Dkt. 589 at 1524:2-14.) Wrice testified: Q. And apart from knowing that he probably had been beaten because you had been beaten or thinking that was a possibility, what else about his testimony made you know that, you know, he had just been forced to do this or you thought he might be forced to do this? A. When I started working on my case, I kept going over his testimony. He always seemed like all he doing is saying yes, no, yes, no. He not -- he wasn't elaborating at all. Q. So, he was, in response to questions, just giving a lot of yes, no --A. Yes. Q. -- short answers? A. Yes.

Nothing in Rule 611 authorizes the substitution of summaries for admissible evidence. To the contrary, that rule allows a party to admit a summary only "if [the] district court previously admitted, at trial, evidence that forms basis of summary." *United States v. Stiger*, 371 F.3d 732,743 (10th Cir. 2004).Defendants' ability to defend this case was severely, and unjustifiably, impaired by the inability to present actual trial testimony, which was necessary to a determination of witness credibility and liability.

### C. The Court erred in allowing evidence of Illinois court orders.

After Wrice was convicted, several post-conviction orders were entered in the Illinois courts: (1) Judge Walsh's order vacating the conviction; (2) the order dismissing the case *nolle prosequi* on the State's motion; and (3) Judge Byrne's order denying the petition for a certificate of innocence. Although none of these orders should have come into evidence,[8] the Court wrongly allowed Wrice to testify to orders *favoring* Wrice by vacating his conviction and dropping the charges.

Thus Wrice was permitted to testify that he had told his story at a court hearing, after which "a circuit court judge made a ruling" reversing his conviction. (Dkt 589 at 1141:13-22.) This testimony in effect told the jury that a judge found Wrice to be innocent and so should they. The same incorrect impression was left by the statement of the case read to the jury. (*Id*. at 15:22-16:3.) Worse, Wrice's counsel falsely stated that the dismissed charges meant guilt or innocence was not at issue, (*id*. at 138:3-7), and argued to the jury that the State of Illinois thought Wrice was innocent. (*id*. at 1925: 6-9; 1926:7-13; *See* Report of proceedings in *Nolle Prosequi* on 12/12/13,

---

[8] Defendants' Reply to Plaintiff's Motion *in Limine* No. 6 (Dkt. 442, incorporated herein by reference) addressed the inadmissibility of all judgments on several grounds including hearsay, relevance, the prejudice in allowing a judicial ruling to invade the province of the jury, and the lengthy distraction which would be required to fully explain the post-conviction proceedings and their meaning.

Dkt. 339-3 at Wrice 4829:18-24); *see* Section III.B below.)

The erroneous admission of evidence that Wrice's conviction was vacated and the charges dropped, and the false impression created by this testimony and argument, was extraordinarily and unduly prejudicial. *See Schultz v. Thomas*, 832 F.2d 108, 110 (7th Cir. 1987.) It allowed the jury to rely on judicial influence and unrebutted[9] mischaracterizations of the state court rulings in considering Wrice's culpability. Wrice's consciousness of his actual guilt was directly relevant to Claim II because it explains why, when he was told he would be charged (Dkt. 589 at 1126:14-15), *he* chose to tell the story about "dropping" an iron on the victim. (Dkt. 589 at 1337:23-1338:4.) His civil trial testimony that he confessed to avoid physical abuse was patently untrue, but the improperly admitted state court orders bolstered his protestations of innocence. This was reversible error; no court or prosecutor ever found Wrice innocent.

### D. The Court erred in barring evidence of Wrice's gang affiliation to show his relationship with Benson, Fowler, and Holmes.

Wrice's gang affiliation was relevant to establish Wrice's relationship with the individuals in his home and rebut Wrice's attempt to disassociate himself from them. Wrice raised the nature of these relationships in his own testimony, and defendants should have been permitted to accurately describe those relationships with the truth about their common gang affiliations.[10] *See United States v. Butler*, 71 F.3d 243, 251 (7th Cir. 1995) (gang affiliation is relevant to establish the relationship between individuals).

As one example, Wrice offered misleading and incomplete testimony regarding his

---

[9] Defendants unsuccessfully sought to bar evidence of the vacated conviction; to admit Judge Walsh's decision **not** to find Wrice was innocent or the transcript wherein the State explained its reasoning for dismissing the charges, or at least (accurately) say the dismissal did not make a finding or guilt or innocence. (*See, e.g.*, Dkt. 589 at 7:10-8:10, 18:1-22:24).

[10] See also Defendant's Response to Plaintiff's Motion *in Limine* Number 15 (Dkt. 417) incorporated herein by reference.

relationships with Rodney Benson, Lee Holmes and Michael Fowler, and completely left out testimony that these individuals were members of the same gang to which he belonged. For example, Wrice denied any relationship with Rodney Benson, claiming he had "just met him" recently. (Dkt. 589 at 1170:10-13.) But Benson was a member of the Gangster Disciples, as was Wrice. As to Lee Holmes and Michael Fowler, Wrice testified that they were not trusted friends and were ten years younger than him, closer in age to his sister. (Dkt. 589 at 1170:21-1171:6.) But Holmes and Fowler were also Gangster Disciples, fellow neighborhood gang members with Wrice. As another example, Wrice portrayed his house as the neighborhood "party" house where anyone could come and commit crimes over which he supposedly had no control. Such testimony would appear ludicrous to a jury allowed to hear that all these men were neighborhood members of the same gang. It would have also rebutted Wrice's attempt to minimize these relationships, thereby bolstering his alibi that he had a beer, made a phone call, and went to sleep while Benson, Fowler, Holmes and a "gaggle of teenagers" with whom Wrice had no relationship, raped and tortured Karen Byron. Wrice's common gang affiliation makes it far less probable that Wrice distanced himself from, rather than participated in, the atrocities committed against Karen Byron. Denying this probative evidence after Wrice opened the door was reversible error, as Wrice's character evidence was fairly rebuttable with contrary character evidence. *Cobige v. City of Chicago*, Ill., 651 F.3d 780, 784 (7th Cir. 2011), as amended on denial of reh'g (Sept. 8, 2011).

### E. The Court erred in not allowing defendants to rebut evidence of Wrice's rosy character.

Wrice brought the issue of his character into this case to show he was not the type of person who would have participated in the gang rape and burning of Karen Byron. *Michelson v. United States*, 335 U.S. 469, 476 (1948) ("character is relevant in resolving probabilities of guilt.") Wrice's claimed innocence was critical to proving that his statement was involuntary, and not the

12

voluntary attempt of a guilty man, knowing he has been caught and was about to be charged, to minimize his involvement in a crime.

Despite Wrice's three armed robbery convictions[11] and gang affiliation, Wrice's family members testified to Wrice's character as a role model and wholesome family man who would be unlikely to be involved in raping and burning Karen Byron. Charles Wrice testified that Wrice "kept me out of a lot of trouble . . . He kept me away from all the negativity out on the street, *all the gangbanging.* He was a great brother." (Dkt. 589, at 352:5-20 (emphasis added).) Wrice's sister, Magnolia Wrice, echoed the sentiment, characterizing their family as "typical *Brady Bunch*."

Wrice testified that at the time of his arrest he had a girlfriend, Jennifer Scott, who was the mother of his three daughters (*id.* at 1156:5-7); that he and Jennifer Scott were in love; that he had asked Jennifer Scott to marry him two months before his arrest, and that she had said "yes" (*id.* at 1377:22-1378:8); and that his arrest was just a few weeks prior to their planned wedding (*id.* at 1386:11-19). His siblings reinforced this image. Magnolia Wrice testified that Scott was Wrice's girlfriend, and that she never saw Wrice and Jennifer Scott fight, rather "they were very playful, no, like a couple."(*Id.* at 212:6-10.) Charles Wrice also referred to Ms. Scott as Wrice's girlfriend and said he never observed Stanley Wrice harm Ms. Scott in any way. (*Id.* at 356:8-11.) Wrice's opening statement used this sham relationship to bolster Wrice's credibility, and evidence that this relationship existed on September 8, 1982 was critical to Wrice's credibility: "He went down to the pay phone to call his girlfriend. His girlfriend Jennifer, who is the mother of his three children. And he was gone for a little bit of time." (Dkt. 589 at 135:1-4; *see also id.* at 1920:7-9 (Wrice's closing argument: "And what was their evidence of guilt? I don't know. I heard an angry ex-

---

[11] Wrice's victims said that he used a gun in these cases, which did not come into evidence.

girlfriend who didn't even break the alibi.").)

Because Wrice introduced positive character evidence to influence the jury's perception of the facts, the opportunity for rebuttal with negative character evidence was not only appropriate, but required. *Cobige*, 651 F.3d at 784-785 (reversible error to exclude negative character evidence to rebut positive character evidence). "The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." *Michelson*, 335 U.S. at 479; *see also Morales v. Cadena,* 825 F.2d 1095, 1100 (7th Cir. 1987) (sexual harassment claim admissible to rebut opinion evidence that defendant was a good supervisor). The door was wide open to evidence that Wrice was not a role model with a bright future, he was a gang member and violent criminal, who raped and beat Jennifer Scott when she was a child.

### 1. Jennifer Scott was Wrice's 14-year-old rape victim, not his girlfriend.

Jennifer Scott would have testified that Wrice was not her boyfriend, he was her abuser and rapist. (Dkt. 345-3 at 24:22-25:2, 16:12-17:3, 34:10-19.) Ms. Scott would have testified that the summer after she graduated from eighth grade, when she was 14 years old, Stanley Wrice (aged 25) sent his little sisters to befriend her and invite her to his house. (*Id*. at 13:6 – 14:7.) After a few visits and while she was still 14 years old, Wrice violently forced her to have sex with him, thereby impregnating her during her freshman year in high school. (*Id*. at 19:11-19.) Ms. Scott would have testified that she never consented to sex with Wrice and that he would lie in wait outside of her school or home and beat her and drag her into his car or down the street to his house where he would force himself sexually on her. (*Id*. at 57:15-22, 60:7-23.) Ms. Scott was also prepared to lay the foundation for a threatening letter she received from Wrice while he was in prison, in which he admitted to having physically abused her and threatened to have his gang retaliate against her. (Dkt. 589 at 1385:4-19; Dkt. 413-4.)

14

Ms. Scott would have further explained that when she stayed at Wrice's house, it was to conceal the bruises on her face from her mother, classmates and teachers (Dkt. 345-3 at 18:6-18, 56:11-15) and that she attended his trial not to support him but because she thought she was going to be called as a witness (*id*. at 68:6-69:10). Further, her failure to testify on Wrice's behalf was not because she "just didn't want to get involved," as Sydney Jones testified, (Dkt. 589 at 554:21-555:6) or that she was barred from testifying (*id*. at 1386:22 – 1387:5, 1388:10-25.) In fact, Wrice's counsel dropped Ms. Scott from the witness list (*id*. at 998:5-999:23 (testimony of Bertina Lampkin)), clearly knowing that she would have rebutted his alibi that, during the crime, he had left the house to call her and that she would have revealed his lies about their relationship.

The Court prevented this courageous woman—who at the age of 17 and after giving birth to a *third* child conceived through violence, had summoned the strength to break all ties with her abuser—from telling the truth.[12] The Court's position on this issue shifted from an understanding of the relevance of Ms. Scott's testimony of the abuse she endured to explain why she broke ties with Wrice and was not on a phone call with him, (Dkt. 482); to allowing Ms. Scott to testify to abuse, but forbidding evidence "of the *fact* that [Ms. Scott's] child[ren] [were] the product of rape", (Dkt. 589 at 225:13 – 226:7); to barring the use of the word "rape" or even "statutory rape," (*id*. at 228:20 – 229:9); to an outright ban on any questioning on Wrice's physical and sexual assault of Ms. Scott, (*id*. at 1620:6-11). These shifting rulings further prejudiced defendants by preventing them from proving up statements made in opening in reliance on the Court's motion *in limine* ruling, and through sustained objections and curative instructions, giving the untrue impression that those statements were baseless.

---

[12] The Court's rulings also prevented cross-examination of Wrice on this subject, leaving defendants with no rebuttal to Wrice's mischaracterization that their relationship as "sometimes we argue and fight."(Dkt. 589 at 1382:18:21, 1383:8-1384:23).

Ms. Scott's testimony was so restricted that she was unable to explain what actually happened and forced to give weak and heavily understated testimony, described by the Court as "that they didn't get along; he certainly wasn't her boyfriend; that she disliked him or whatever." (Dkt. 589 at 1618:21-25.) The Court's rulings effectively and extremely unfairly suppressed the truth. (*Id*. at 1635:2-3 ("If I can't say what I really need to say, I can't – it's –").) Most egregiously, the ruling prevented Miss Scott from explaining how she could possibly have had three children with a man, yet claim she had no romantic relationship with him. On cross-examination, Wrice took full advantage of these restrictions, questioning Ms. Scott regarding the three children she "had with" Wrice (as though those pregnancies were intended or a consequence of a consensual sexual relationship) and her reason for being present at Wrice's criminal trial, knowing full well the Court's order would prevent her from giving a full answer. Ultimately, the jury heard only Wrice's version of the relationship, and his counsel's disparaging and misleading comments:

> And what was their evidence of guilt? I don't know. *I heard an angry ex-girlfriend* who didn't even break the alibi, who said, I don't remember. I heard her. *Same woman who said, I had no relationship with him ever at any time, no way, no how, but I do have three kids with him.* So that credible person who, again, was up here simply because she was, you know, I don't know, angry about something, maybe she has a reason to be angry, but it has absolutely nothing to do with anything.

(*Id*. at 1920:7-15 (emphasis added).) The jury had no context in which to judge Ms. Scott's credibility when she emphatically denied ever being in a relationship with Wrice, and testified that she finally cut all ties with him in June of 1982, three months prior to his purported phone call to her on the night of the crime (which she in fact denied ever occurred) (*Id*. at 1627:6-16.) Ms. Scott's testimony regarding the true nature of the "relationship" was relevant to impeach the false testimony of Wrice and his siblings; refute Wrice's false alibi that he left the house to speak to his beloved fiancé; and, most importantly, to rebut the false inference that Wrice was in a loving relationship and unlikely to have violently raped Karen Byron. Denying Ms. Scott the right to tell

the truth gave Wrice and his family a license to lie. It was a gross miscarriage of justice that buttressed Wrice's credibility, which was the lynchpin of his abuse claims.

### 2. Wrice was not a positive role model but a gang member and violent criminal.

Defendants were erroneously prevented from rebutting Charles Wrice's opinion that Wrice was a "good brother" who kept him "away from all the gangs and negativity" with evidence that Wrice had, in fact, brought the gang home. By eliciting this testimony, Wrice opened the door to evidence of Wrice's true character as a gang member whose gang buddies constantly congregated in his house to drink, smoke, and, in this case, terrorize a woman that they had abducted off the street.

Placing Wrice's character at issue also opened the door to Wrice's violent conduct, as it reflects a very different character than that portrayed by his siblings. While in prison, Wrice stabbed a fellow inmate twenty-one times (resulting in a conviction and consecutive 12-year prison sentence), regularly fought with other inmates, set things on fire, fought with prison officials, and kept drugs and weapons in his cell. (Dkt. 413-1.)Defendants should have been permitted to introduce evidence of these incidents to rebut the positive character evidence introduced by Wrice. *Morales,* 825 F.2d at1100 (sexual harassment claim admissible to rebut opinion evidence that defendant was a good supervisor); *see also Cobige*, 651 F.3d at 784. And at the time of his arrest Wrice admitted to being a heavy drinker, adding credibility to Jennifer Wrice's testimony that he was abusive when he drank. (Dkt. 589 at 1531:5-7; Dkt. 345-3, 78:11-18.) He was also found to have several healed stab wounds. (*Id.* at 1530:13-1531:4.)

### F. The Court erred in barring evidence that Karen Byron identified Wrice.

Karen Byron positively identified Wrice as her attacker within hours of the incident and *before* Wrice was taken to the station house for questioning. This was probative admissible

evidence, and defendants were severely prejudiced by its exclusion.[13]  This Court barred evidence of the hospital identification finding that it was irrelevant because it was not introduced at the criminal trial.  (Dkt. 589 at 562:7-8.) This was an erroneous basis, as the hospital identification was highly probative to show not only that Wrice was guilty, but that defendants Byrne and Dignan *knew* that the victim had identified Wrice as the perpetrator.  It would also have clarified that defendants (and ASA McCurry) had no reason to coerce a confession from Wrice—they had a positive identification from the victim to support probable cause obtained *prior* to Wrice's or any other witness' interview. The identification also would have influenced Wrice's decision to give a statement, knowing he had been identified and was going to be charged.[14]  Not only were defendants denied this highly probative and critical evidence, (*e.g.*, *Id.* at 559:19 – 562:8, 991:12-992:16), but Wrice was permitted to introduce false evidence that Wrice had *not* been identified by Byron at trial, for the purpose of supporting his coercion claim. (*Id.* at 941:11-14 (testimony of Bertina Lampkin).) Ms. Byron's hospital identification would have clearly rebutted this evidence.

Shielded by the Court's order, Wrice's counsel falsely told the jury that Wrice had not been identified by Byron.  (*Id.* at 142:19-21 ("It's just an easy way to close the case, particularly if the victim is not naming who the offenders are or who cannot name the offenders."); *id*. at 142:25 - 143:4 ("the police officers, ... if the victim was not identifying or was unable to testify about who

---

[13] This evidence was admissible through the testimony of Wrice, Sidney Jones, and Bertina Lampkin, as well as the police report in question. This Court ruled that police reports are admissible only "to the extent to which they incorporate firsthand observations of the officer." (Dkt. 482 at 17 (quoting *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013)). The police report documenting the hospital identification meets this standard.  Indeed, Jones moved to keep out Byron's identification of Wrice in connection with the pre-trial suppression hearing, (Motion to Suppress Identification, Exh. B,) but defendants were not allowed to question Jones on this topic.  (Dkt. 589 at 559:19 -562:8).

[14] In fact, Wrice broke down shaking and crying upon being identified.  He was clearly aware that he had been implicated in this horrific crime, already had three felony convictions (and understood the implication of those convictions), and had every reason to voluntarily cook up a statement minimizing his involvement. Indeed, in his motion to suppress the identification, Wrice admitted that Karen Byron identified him. (Exh. B at ¶¶ 1-3).

18

was -- did this, you know, who we going to get? The guy whose house it is, right?").) This misrepresentation permeated the questioning of witnesses regarding being transported to the hospital. (*Id.* at 379:9-15, 473:14-20 (Charles Wrice), 614:11-15 (Bobby Joe Williams), 1420:16-18 (Stanley Wrice).) Evidence of a trip to the hospital, without more, served to falsely imply that an identification had been attempted and failed, consistent with Wrice's false opening statement.

Wrice opened the door to the hospital identification even further in his examinations of Sidney Jones and Bertina Lampkin. Mr. Jones testified: "Q. And when -- at any point did the prosecution say, no, we're not going to use those statements against Wrice? A. I don't recall that that statement was made. *I've been made aware that at some point they said that they were not going to introduce something, but that was only later.*" (*Id.* at 530:11-17.) Mr. Jones was alluding to the prosecution's decision to withdraw evidence of the hospital identification, due to Ms. Byron's failing memory by the time of the criminal trial. (*Id.* at 561:2-562:6.) Defendants were prohibited from following up on this testimony elicited by Wrice, leaving the jury to wonder what was withdrawn by the prosecution. (*Id.* at 562:7-8.)

Then, in his examination of Bertina Lampkin, Wrice directly and unequivocally elicited the following testimony:

> A. ... So she never knew how many people were on her. She just said she saw a room full of men.
>
> Q. Right. A room full of men.
>
> A. Yes.
>
> Q. And she never identified any of them, correct?
>
> A. Yes, she did identify them originally. She identified one person originally.
>
> Q. Okay. She never testified at trial that any of these people -- she never identified anybody at trial who did this to her, did she?
>
> A. She could not at trial.

(*Id.* at 941:4-14.)

19

Relying on Wrice's counsel's misrepresentation of the questions asked, this Court prohibited defense counsel from inquiring further into the identification. This Court believed Wrice's counsel when she not only denied asking the question -- "And she never identified any of them, correct?" – but also falsely accused defense counsel of coaching Ms. Lampkin to volunteer this information. (*Id*. at 941:4-14, 20-25.) Defense counsel's attempt to direct the Court to the door-opening question was flatly rejected, and the Court again erroneously ruled that the hospital identification was inadmissible. (*Id*. at 942:8-17.)

There is no question that the jury's analysis of Wrice's arrest, including the state of mind of the individuals involved, would have been impacted by this crucial evidence. This evidence was highly probative, and made more so by Wrice's witness examinations. Excluding this evidence was reversible error.

**G. The Court erred in allowing other acts evidence for propensity purposes.**

Federal Rule of Evidence 404(b) bars the admission of other acts for propensity purposes, because "evidence that the defendant had previously engaged in a broadly similar [wrongful] activity – . . . has some probative value but [its] admission . . . would tend as a practical matter to deprive a person" of a fair trial. *United States v. Wright*, 901 F. 2d 68, 70 (7th Cir. 1990). The inadmissibility of allegations of abuse by Wrice's co-defendants was extensively briefed in Defendants' motions *in limine* numbers 1 and 2 and their motion to reconsider. (Dkts. 388, 409, 524 incorporated herein by reference.) Defendants explained, inter alia, that such evidence lacked any identifiable non-propensity purpose (including as to Wrice's *Brady* claim), and was plainly inadmissible. *United States v. Gomez*, 763 F.3d 845, 853 (7th Cir. 2014). Nonetheless, this Court ruled that four witnesses could testify regarding their allegations of abuse by defendants: Gregory

Banks, Alonzo Smith, and Wrice's co-defendants.[15]

This Court initially reasoned that the allegations of Banks and Smith were admissible to support Wrice's *Brady* claim for withheld evidence. However, the Court later acknowledged that *Brady* was not a proper purpose to admit Banks' experiences, which occurred after Wrice's trial. (Dkt. 589 at 246:8.) Instead, the Court ruled that Banks' testimony was relevant as evidence that the misconduct alleged by Wrice was "more likely true than not true." (*Id*. at 246:8-10.) As to Smith's allegations, this Court failed to recognize that the alleged abuse was not *Brady* material because they would not have been admitted in Wrice's criminal trial. *United States v. Salem,* 578 F.3d 682, 686 (7th Cir.2009) (evidence which would not have been admissible in criminal trial is not material for *Brady* purposes). As explained in detail in Defendant's Motion *in Limine* Number 1, Smith's allegations did not meet the strict standards for admissibility of this type of evidence in Illinois courts, namely, that the conduct among the incidences involved exactly the same officers and actions. (Dkt. 409 at 11-13); *People v.Hobley*, 159 Ill. 2d 272, 312 (1994). Smith's allegations that he had been repeatedly beaten and suffocated to the point of passing out, (Dkt. 589 at 1562:12-1567:20), and that Dignan told him what to say to the State's Attorney, made him rehearse, and threatened to kill him if he did not comply, (*id*. at 1568:3-1569:12), are not sufficiently similar[16] to Wrice's allegations to have been admissible in the Illinois courts. Because *Brady* was not a viable purpose for introducing Smith's testimony, it could only have been admitted for the same

---

[15] The Court's original motion *in limine* ruling limited the other acts evidence to the allegations of Eric Smith and Alonzo Smith. When Wrice discovered that Eric Smith had been incarcerated since 2018, and this court ruled that his prior testimony was inadmissible, Wrice was permitted to substitute Gregory Banks. This Court also reversed its ruling as to evidence of the abuse allegations of co-defendants Benson, Fowler and Holmes at trial.

[16] No amount of similarity would have made this evidence admissible in this civil case. Similar conduct offered to demonstrate a pattern is inadmissible. *United States v. Beasley*, 809 F.2d 1273, 1278 (7th Cir. 1987); Fed. R. Evid. 404(b).

purpose as Banks' testimony: to make Wrice's allegations of abuse more probable. Rule 404(b) barred Wrice from introducing the allegations of Banks and Smith for this blatant propensity purpose. *Gomez*, 763 F.3d at 853.

The allegations of Wrice's co-defendants, Benson, Holmes and Fowler, were likewise held to be admissible for propensity purposes. Although initially offered as evidence of a *Brady* claim, the Court held *Brady* was inapplicable, yet ruled the alleged conduct admissible for the propensity purpose of bolstering Wrice's claims of abuse. As if this error was not sufficiently prejudicial, it was compounded by permitting Wrice to reference the allegations of two of his co-defendants, Holmes and Fowler,[17] with absolutely no evidentiary basis. (Dkt. 589 at 1728:24 – 1729:1 (Ms. Bonjean: "As to Fowler, we've never –we have not elicited any testimony about Fowler's abuse"); *id*. at 1729:4-5 (Ms. Bonjean: "As for Holmes, the only thing that was raised regarding that was a question that we asked of Ms. Lampkin."); *id at* 874:17-24 (conceding Holmes' complaint to the Office of Professional Standards was inadmissible substantively).)

That is, Wrice questioned witnesses in a manner that presumed the existence of these abuse allegations, despite having no intention of proving up the allegations. Wrice had no admissible evidence that Holmes' alleged abuse, as he was deceased (and, in fact, had never testified as to any such allegations). Yet Wrice told the jury that Holmes had alleged abuse similar abuse when questioning Bertina Lampkin. (*Id.* at 872:15-18 ("Q. Ms. Lampkin, isn't it true that Lee Holmes also made a complaint about being beaten with the rubber hose and that complaint was made a day -- while he was still actually in custody?").) Further, although he offered portions of Fowler's deposition testimony, Wrice had no intention of offering Fowler's testimony regarding his purported abuse because it was patently incredible and would have undermined Wrice's own

---

[17] *See* Dkt. 589 at 149:10-11(Wrice opening: "The same tactics are used with all four men. . .); 533:11-534:20 (questioning Jones); 903:6-905:24 (questioning Lampkin).

allegations of abuse. Wrice should not have been permitted to put these allegations before the jury in this highly prejudicial manner, which not only assumed the accuracy of these allegations, but also shielded these witnesses from cross examination.

The evidence of other acts, as well as Wrice's improper and misleading questioning,[18] was reversible error. The jury was clearly led to believe that they should find that Wrice was abused because Byrne and Dignan had ostensibly abused others, even using a chart of abuse victims in closing. This was not implied, but blatant. Wrice's counsel argued that Wrice's coerced confession story is credible because others told the same story. (Dkt. 589 at 1830:1-3.) This unfairly led to the jury's verdict on Claim II.

### H. The jury was erroneously instructed to award duplicative damages.

Wrice was not entitled to duplicative damages for his Conspiracy Claim. Whatever Wrice's damages for the introduction of his statement at trial, he was entitled to recover for them only once. Wrice was not entitled to recover for the alleged constitutional violation, and separately for conspiring to commit the very same act. *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). Yet the jury was instructed to award damages on both the Self-Incrimination Claim and the superfluous Conspiracy Claim. *Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009). This permitted double recovery for a single injury, and was plain error. Fed. R. Evid. 51.

### III. Wrice's counsel's misconduct contributed to an unfair trial.

Improper remarks made by counsel at trial are reversible error if they were "plainly unwarranted and clearly injurious" such that "the remarks influenced the jury in such a way that substantial prejudice resulted to the opposing party." *Smith v. Hunt*, 707 F.3d 803, 812 (7th Cir.

---

[18] Wrice's counsel improperly asked Stanley Wrice if, at the time of his arrest, he was afraid of being treated like Gregory Banks (a stranger who had not yet been arrested) solely to inflame the jury. (Dkt. 589 at 1245:11-17.)

23

2013) (internal quotations omitted). A new trial is appropriate where improper statements and argument by counsel caused substantial prejudice to the moving party. *Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir. 2008). *See also Mayall v. Peabody Coal Co*. 7 F.3d 570, 573 (7th Cir. 1993) (improper argument warrants a new trial where arguments have influenced the jury in such a way that substantial prejudice resulted to the opposing party) (citations omitted). Wrice's counsel made several inappropriate remarks, which were either not supported by evidence, intended to improperly influence the jury's perception of the evidence, and/or took unfair advantage of this Court's rulings on motions *in limine* to manipulate facts in Wrice's favor.

### A. Wrice's counsel misrepresented facts to discredit Kenny Lewis.

Kenny Lewis was a crucial witness for the state at Wrice's criminal trial and the only witness testifying against Wrice who had no interaction with the police and never recanted his testimony. Mr. Lewis is deceased. Realizing how damning Lewis's testimony was to Wrice's case, Wrice's counsel made statements during closing arguments related to Mr. Lewis that were in no way supported by the evidence. She falsely argued "And Kenny Lewis? Well, apparently made a deal for himself and testified against Wrice." (Dkt. 589 at 1821:18-20.) Nowhere in Kenny Lewis's criminal trial testimony was he questioned about whether he got any deal from the state, nor was there any trial evidence to support this claim. This statement was completely unwarranted and substantially prejudicial to Defendants as it falsely implied that the state's key witness received a plea deal to falsely testify to Wrice's guilt. Defense counsel immediately objected and stated that there was no evidence to support the assertion and moved to strike the comment. The Court failed to rule, and permitted Wrice's counsel to continue with her argument, leaving the jury to wrongly believe the objection was unfounded. (*Id*. at 1821:21-22.)

### B. Wrice's counsel misrepresented the State's position on Wrice's guilt.

Wrice's counsel improperly insinuated in closing that the State of Illinois must not have

believed Mr. Lewis and agreed that Wrice was innocent and that is why it chose not retry him. Wrice's counsel argued, the state of Illinois "dismissed the charges. And to be clear about something, the state of Illinois had every opportunity in the world to retry Wrice *if they believed he was guilty* . . . The State of Illinois had every opportunity to put in prior testimony of Karen Byron, Kenny Lewis - - We heard it here. Why wouldn't they be able to do it there?" (*Id.* at 1925: 6-9; 1926:7-13.) Wrice's counsel also argued "you realize there was a wrongful conviction. It's why the state of Illinois did not retry him. It's why they dismissed all charges against him." (*Id.* at 1948:18-22.) Mr. Jebson objected multiple times to this line of argument, but the Court overruled the objection, and in any event, the jury had already heard the improper argument. (*Id.*)

As described in II.C above, the Court's rulings effectively allowed these misstatements. There was absolutely no evidence presented at trial as to why the State chose not to re-prosecute Wrice. Clearly the special prosecutors would have testified that the only reason they did not retry Wrice was due to the unavailability of witnesses [key witnesses had died], witness' recants, and uncooperative witnesses. (*See* Dkt. 339-3 at Wrice 4829:18-24) Indeed, as this Court and Wrice's counsel knew, the State of Illinois opposed Wrice's petition for a certificate of innocence (which was denied). In an attempt to mislead the jury, Wrice's counsel insinuated that the State of Illinois must have believed Wrice was innocent. This argument was false and fatally prejudiced the defense.

### C. Wrice's counsel used this Court's rulings as both a sword and a shield, to egregiously attack the character of Jennifer Scott, Wrice's 14-year-old rape victim who was barred from testifying to the truth.

Plaintiff's counsel also made improper and false arguments regarding Jennifer Scott. Wrice's counsel argued in closing that Jennifer Scott was just a scorned woman, with an axe to grind. As previously discussed, Ms. Scott was violently raped and beaten from ages 14 to 17 by Wrice. Because the Court barred this evidence, Wrice's counsel attempted to slander Ms. Scott,

denigrating her as "an angry ex-girlfriend" whose denial of the relationship was not credible because she had had three kids with Wrice. (Dkt. 589 at 1920:7-11.)  Despite being fully aware of Ms. Scott's testimony describing her abusive relationship, Wrice's counsel proclaimed that Ms. Scott testified "simply because she was, you know, I don't know, angry *about something*." (*Id.* at 12-15.) In fact, she mocked Ms. Scott's testimony that, as school girl, she had no relationship with Wrice in light of the fact that they had had three children together.  In light of the undisputed fact of Ms. Scott's young age, these false arguments were also disgraceful, misusing this Court's erroneous ruling that Ms. Scott could not tell the truth about her abuse by Wrice.  The evidence would have wholly undermined Wrice's credibility; barring it was reversible error.

### D. Plaintiff's counsel made numerous improper speaking objections.

Wrice's counsel also made numerous speaking objections throughout the trial that were meant to influence the jury, which was improper. *See Specht v. Google, Inc*., 268 F.R.D. 596, 598 (N.D. Ill. 2010) (objections that are argumentative or that suggest an answer to a witness are called "speaking objections" and are improper under Rule 30(c)(2)). For example, during Bobby Joe Williams' cross-examination, Mr. Jebson went through Mr. Williams' criminal trial testimony in which he gave detailed answers to open ended questions. In an attempt to interject Wrice's theory of the case into Williams' cross-examination, that Williams was forced to repeat a false narrative at trial that he simply agreed with, Wrice's counsel made the following objection:

> Q. Well, you would agree that you testified, your testimony at the criminal trial, you gave very specific details in –
>
> Ms. Bonjean: I'm going to object to that mischaracterization of his testimony, his yeses and nos.

(Dkt. 589 at 665:12-15 (Bobby Joe Williams' testimony).)

Wrice's counsel clearly signaled to the jury her belief that Williams only gave "yes" and "no" answers to questions at the criminal trial, which was not only completely inaccurate, but also

improper (and was made possible by this Court's ruling barring admission of the criminal trial testimony). Similarly, during Wrice's cross-examination, Wrice's counsel signaled to the jury that Wrice's testimony was credible regarding key facts. A highly contested issue during the case was where Wrice slept at the time Karen Byron was tortured, thus Wrice's counsel made the following inappropriate speaking objection to signal to the jury that Wrice's testimony should be perceived as consistent:

> Q. Right. But you're telling this jury that you slept downstairs?
> A. I did sleep downstairs.
> Ms. Bonjean: Objection. And he said that at the criminal trial.

(Dkt. 589 at 1303:24-1304:3.) And speaking objections were not the only signals sent by Wrice's counsel; she also signaled Wrice to keep him on script. Most notable was the following exchange wherein Wrice was prompted to give his new story regarding his statement:

> Q. Okay. *Now listen to my question, Stan, okay*?
> A. Okay.
> Q. As they were striking you, what were they saying?
> A. That you're going to go upstairs and talk to a state's attorney, tell him what you did, tell him you did it, tell him you raped her, tell him you burned her.

(*Id.* at 1229:13-18.) Such coaching and speaking objections were improper and highly prejudicial to the defense.

**E. Plaintiff's counsel alluded to highly inflammatory and unwarranted racist comparisons.**

Wrice's counsel improperly implied that Wrice and the other men arrested for the crimes against Karen Byron were targeted because of their race. Such comments were highly inflammatory and prejudicial. During Bobby Joe Williams direct examination Wrice's counsel asked the following question:

> Q. What happens when women are burned with third-degree burns in the attic -- white women are burned with third-degree burns in the attics of African-American

27

men's homes in 1982 in that area?

(Dkt. 589 at 647:5-11.) Defense counsel immediately objected, however the message to the jury was clear: That white police officers routinely beat and framed African American men accused of raping white women. And the Court overruled defendants' objection when Wrice's counsel talked about Dignan and Byrne having a beer and talking about "the good old days when you could beat black men in basements and make jokes about the N-word." (*Id.* at 1778: 15-1779:1.) Such argument was extremely prejudicial to Defendants, in addition to being completely unprofessional.

The above are just examples of misconduct by Wrice's counsel throughout the trial. Standing alone, each instance of misconduct, may not rise to the level of reversal, however, the cumulative damage caused by Wrice's counsel misconduct throughout the trial does. *See Walden v. City of Chicago,* 846 F. Supp. 2d 963, 980 (N.D. Ill. 2012) (*quoting Adams Laboratories, Inc. v. Jacobs Eng'g Co., Inc.,* 761 F.2d 1218, 1227 (7th Cir.1985) (remanding case for new trial due to the cumulative effect of misconduct of attorney for the prevailing party).

## CONCLUSION

Wrice took full advantage of this Court's legal and evidentiary errors, compounding those errors with his counsel's misconduct, leading to a trial which was extremely prejudicial and patently unfair. For the foregoing reasons, defendants respectfully request, in the event that this Court denies defendants' Motion for Judgment As A Matter Of Law, that this Court vacate the judgments against them and award a new trial on Claims II and III.

Date: March 31, 2020                                    Respectfully submitted,


                                                       By: /s/ Andrew M. Hale
                                                           One of the Attorneys for
                                                           Defendants John Byrne and Peter
                                                           Dignan


Caryn L. Jacobs
Managing Deputy Corporation Counsel
City of Chicago Department of Law
121 N. LaSalle Street, Room 600
Chicago, Il 60602

Andrew M. Hale
Scott Jebson
Amy A. Hijjawi
Jennifer Bitoy
HALE & MONICO LLC
53 W. Jackson Blvd., Suite 330
Chicago, IL  60604