**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

STANLEY WRICE,                                    )
                          Plaintiff,              )          Case No. 14 CV 5934
          v.                                      )
                                                  )
JOHN BYRNE, ET AL.,                               )          Judge Harry D. Leinenweber
                          Defendants.             )

# DEFENDANTS' REPLY IN SUPPORT OF
# THEIR MOTION FOR A NEW TRIAL

Caryn L. Jacobs
Managing Deputy Corporation Counsel
City of Chicago Department of Law
121 N. LaSalle Street, Room 600
Chicago, Il 60602


Andrew M. Hale
Scott Jebson
Amy A. Hijjawi
Anne Erickson
Jennifer Bitoy
HALE & MONICO LLC
53 W. Jackson Blvd., Suite 330
Chicago, IL  60604

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .......................................................................................................... 1

LEGAL STANDARD .................................................................................................... 2

ARGUMENT .................................................................................................................. 3

    I.   Multiple errors in jury instructions misled the jury
        and unfairly prejudiced defendants............................................................................ 3

        A.  The harm from the significant jury instruction errors
            was magnified by the fatal weakness of Wrice Claim II................................. 3

        B.  The Court erred in failing to instruct on
            all elements of a self-incrimination claim. ................................................... 5

            1.  The instruction omitted the critical inquiry in all
                coercion cases: whether Wrice's will was overcome ............................... 7

            2.  The jury instruction omitted Wrice's burden to prove
                an injury caused by the alleged constitutional violation
                and failed to advise the jury of the availability of nominal damages.......... 9

        C.  The Court erred in failing to admonish the
            jury not to award duplicative damages for a single injury ............................ 17

    II.   Evidentiary Rulings Ensured that the Jury
         would not Consider Whether Wrice was Actually Coerced ............................. 17

        A.  Barring any evidence of identification by
            Karen Byron was error ............................................................................... 18

        B.  Prior testimony of Byrne and Dignan was admissible ................................... 19

        C.  The Court erred in refusing to consider Byrne's
            prior testimony for completeness and in allowing
            Wrice to read a distorted summary into evidence ......................................... 24

            1.  Court violated Rule 106, requiring a new trial, and erred by
                preventing the civil jury from hearing what the criminal jury heard ........ 24

            2.  The Court's requirement to read summaries instead of
                 transcripts was erroneous......................................................................... 26

        D.  Barring evidence of Wrice's character, as evidenced
            by Wrice's "relationship" with Jennifer Scott, gang
            membership, and history of violence was error.............................................. 28

III.   The Court erred in admitting other acts evidence solely
       to demonstrate that Defendants similarly abused Wrice,
       violating Rule 404(b)'s prohibition against propensity evidence ........................ 29

IV.    Testimony regarding state court orders was erroneously
       admitted to infer Wrice's innocence ................................................................ 32

VI.    Plaintiff's counsel's misconduct contributed to an unfair trial ........................... 33

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Aldridge v. Forest River, Inc.*, 635 F.3d 870 (7th Cir. 2011) ...................................................... 7

*Aliotta v. AMTRAK*, 315 F.3d 756 (7th Cir. 2003) .........................................................6, n. 7

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ...................................................................... 6, 7, 9

*Blackburn v. Alabama,* 361 U.S. 199 (1960) ................................................................... 9, n. 11

*Briggs v. Marshall*, 93 F. 3d 355 (7th Cir. 1996).......................................................... 10

*Brown v. Mississippi,* 297 U.S. 278 (1936) ................................................................... 9, n. 11

*Carey v. Piphus,* 435 U.S. 247 (1978) ......................................................................... 6, 7, 9-12

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ........................................................... 23

*Cobige v. City of Chicago*, 651 F.3d 780 (7th Cir. 2011) ...................................22 n. 27, 28, 29

*Conner v. McBride*, 375 F.3d 643 (7th Cir. 2004) ...................................................... 8

*Culombe v. Connecticut*, 367 U.S. 568 (1961) ............................................................ 8

*Dassey v. Dittmann*, 860 F.3d 933 (7th Cir. 2017) ...................................................... 8

*Davis v. FMC Corp.*, 771 F.2d 224 (7th Cir.1985) ...................................................... 35

*Davis v. Wessel*, 792 F.3d 793 (7th Cir. 2015) ............................................................. 6

*Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000) ...................................... 23

*Duran v. Town of Cicero*, 653 F.3d 632 (7th Cir. 2011) ............................................. 17, 17 n. 21

*Edwards v. Thomas*, 31 F. Supp.2d 1069 (N.D. Ill. Jan. 8, 1999)..................................... 30 n. 37

*EEOC v. AutoZone, Inc.,* 809 F.3d 916 (7th Cir. 2016) ............................................... 6 n. 8

*Fields v. City of Chicago*, 2017 U.S. Dist. LEXIS 146077 (Sept. 11, 2017) .................. 33 n. 41

*Gray v. Lynn*, 6 F.3d 265 (5th Cir. 1993) ................................................................... 16 n. 19

*Harris v. City of Chicago*, No. 14-CV-4391,
2018 U.S. Dist. LEXIS 79707 (N.D. Ill. May 11, 2018) ................................................ 30 n. 37

*Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035 (7th Cir. 2000) ........................ 6 n. 8

*Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332 (7th Cir. 1992) .............. 17 n. 21

*Hill v. City of Chicago*, 2011 WL 3840336 (N.D. Ill. Aug. 30, 2011) ............................ 30 n. 37

*Jimenez v. City of Chicago*, 732 F. 3d 710 (7th Cir. 2013) ............................................. 27, 28

*Jones v. Hamelman*, 869 F.2d 1023 (7th Cir. 1989) ..................................................... 6 n. 7

*Jordan v. Binns*, 712 F.3d 1123 (7th Cir. 2013) ........................................................ 19 n. 25

*Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) .......................................................... 23

*Lynumn v. Illinois*, 372 U.S. 528 (1963) ............................................................................ 7, 29

*Martinez v. City of Chicago*, 900 F.3d 838 (7th Cir. 2018) ...................................................2

*McDonough Power Equip. v. Greenwood*, 464 U.S. 548 (1984) ............................................ 2

*Phillip Morris USA v. Williams*, 549 U.S. 346 (2007) .........................................................32

*Rabon v. Great Sw. Fire Ins. Co.*, 818 F.2d 306 (4th Cir. 1987) ................................. 32 n. 40

*Sansone v. Brennan*, 917 F.3d 975 (7th Cir. 2019) ...............................................................7

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ........................................................8, 9, 9 n. 11

*Shotwell Mfg. Co. v. United States*, 371 U.S. 341 (1963) .....................................................8

*Smith v. Gomez*, 550 F.3d 613 (7th Cir. 2008) ...................................................................17

*Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2009) .....................................17

*Townsend v. Sain*, 372 U.S. 293 (1963) ...............................................................................9

*United States ex rel. Walters v. Reincke*, 323 F. Supp. 434 (D. Conn. 1969) ........................4

*United States v. Beasley*, 809 F.2d 1273 (7th Cir. 1987) .............................................. 30, 31

*United States v. Blanchard*, 542 F.3d 1133 (7th Cir. 2008) ...............................................33

*United States v. Doe*, 226 F.3d 672 (6th Cir. 2000) ...................................................... 4, n.4

*United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) .................................................. 29, 30

*United States v. Haddad,* 10 F.3d 1252 (7th Cir.1993) ................................................ 24 n. 30

*United States v. Holm*, 326 F.3d 872 (7th Cir. 2003) .........................................................10

*United States v. Khan*, 461 F.3d 477 (4th Cir. 2006) ........................................................... 2

*United States v. Lane*, 474 U.S. 438 (1986) ....................................................................... 2

*United States v. LeFevour*, 798 F.2d 977 (7th Cir. 1986) ................................................... 26

*United States v. Lewis*, 641 F.3d 773 (7th Cir. 2011) ........................................................ 23

*United States v. Miller*, 673 F.3d 688 (7th Cir. 2012) ....................................................... 30

*United States v. Olano*, 507 U.S. 725 (1993) ...............................................................17 n. 21

*United States v. Peterson*, 100 F.3d 7 (2d Cir. 1996) ........................................................ 21

*United States v. Pizarro*, 717 F.2d 336 (7th Cir. 1983) ................................. 20, 21-23, 23 n. 28

*United States v. Price*, 516 F.3d 597 (7th Cir. 2008) .................................................. 24 n. 30

*United States v. Prince*, 524 F. App'x 377 (9th Cir. 2013) ................................................. 21

*United States v. Rodriguez*, 627 F.2d 110 (7th Cir. 1980) ........................................... 23 n. 28

*United States v. Thompson*, 359 F.3d 470 (7th Cir. 2004) ................................................. 31

*United States v. Upton*, 512 F.3d 394 (7th Cir. 2008) ................................................... 4, n.4

*United States v. Van Eyl*, 468 F.3d 428 (7th Cir. 2006) .................................................... 24 n. 29

*United States. v. Vargas*, 689 F.3d 867 (7th Cir. 2012) .................................................. 26 n. 32

*Wiedemann v. Galiano*, 722 F.2d 335 (7th Cir.1983) .............................................. 35

*Willis v. Lepine*, 687 F.3d 826 (7th Cir. 2012) ...................................................... 35

*Wilson v. City of Chicago,* 6 F.3d 1233 (7th Cir. 1993) ......................................... 12

*Wrice v. Dignan*, 93 C 209, 1993 WL 388379 (N.D. Ill. Sept. 23, 1993) ....................... 12 n. 15

*Young v. Rabideau*, 821 F.2d 373 (7th Cir. 1987) ........................................................ 22 n. 27

**STATUTES**

Fed. R. Evid. 405 …………………………………………………………………….. 18, 28

Fed. R. Evid. 801 ……………………………………………………………………… 19

Fed. R. Evid. 804 …………………………………………………….......... 19, 21-23

Fed. R. Evid. 403 ……………………………………………………………………. 22

Fed. R. Evid. 404 ……………………………………………………………………. 30

Defendants John Byrne and Peter Dignan, by their attorneys, in support of their motion for a new trial (Dkt. 594 or "Mot.") on Claims II and III, reply as follows:

### INTRODUCTION

Our opening brief demonstrated that the Court erred in instructing the jury on the Fifth Amendment claim (Claim II) by failing to include the legal standard required to find that Wrice's statement—that he dropped the iron on Karen Byron while trying to save her from being burned by Rodney Benson—was *in fact* coerced, and by refusing to instruct the jury on proximate cause and nominal damages. Wrice's response does not even try to justify the faulty instructions. Indeed, he admits that these were in fact required elements of his claim.

Instead Wrice wrongly claims that his testimony about being beaten, standing alone, proved that his "dropped iron" statement was coerced. Not so. Suspects voluntarily make statements, under all manner of circumstances, every day. Wrice himself voluntarily told the police that he had no idea a crime had even occurred, all the while insisting that after having been beaten by the police, he was "strong enough" *not* to say anything inculpatory. (Dkt. 594, 9.) Wrice's defense of the deficient instructions belies common sense and the law.

Wrice's inability to defend the jury instructions in this case confirms what we have said all along: that his case never amounted to anything more than a "stealth" time-barred excessive force case. (Dkt. 589, 35:14-15; Dkt. 59, 2.) To win on Count II, Wrice had to show that Sergeant Byrne and Detective Dignan *actually forced him*, through beatings, to say that he "dropped" an iron on Ms. Byron (which was never the prosecution's theory, Dkt. 589, 1019:19-1020:5). The jury instructions allowed Wrice to win Claim II without proving any coercion, much less proximate causation or damages.

These errors were magnified by flawed evidentiary rulings that buttressed Wrice's all-

new surprise trial testimony (that *ASA Kenneth McCurry* forced him to give the "dropped iron" tale). The Court regularly excluded proof that Wrice knew the evidence against him was strong, "suggest[ing] that [his] decision to make the statement[] was a calculated one, and thereby that his rational intellect and free will had not been overborne." *United States v. Khan*, 461 F.3d 477, 497 (4th Cir. 2006). That is especially so here, where the statement was a clumsy attempt at exculpation ("I tried to save her and dropped the iron") made by a three-time armed robber facing an extended sentence for rape and torture. Compounding those errors, the Court allowed Wrice to use highly prejudicial and inadmissible propensity evidence to attack Defendants' character and buttress his lie that he did not voluntarily offer the infamous "dropped iron" story.

These errors misled the jury about the proof required under Count II, and suppressed evidence critical to the jury's task of reaching a decision on that claim. As a result of these errors, a true Section 1983 claim for compelled self-incrimination was never presented to, or decided by, the jury. Justice mandates a new trial on Claim II and Claim III, since Plaintiff could not prevail on the conspiracy claim without an underlying constitutional violation.

## LEGAL STANDARD

Under Federal Rule 61, only errors that "do not affect any party's substantial rights" do not mandate a new trial. This essentially tracks the harmless error principle. *See generally McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 553 (1984). "[A]ny error which affected the fairness of the trial as a whole by calling into question the reliability of the result" is not harmless and warrants a new trial. *United States v. Lane*, 474 U.S. 438, 455-56, (1986). *See also Martinez v. City of Chi.*, 900 F.3d 838, 844 (7th Cir. 2018) ("new trial is appropriate if . . . the trial was in some way unfair to the moving party.")[1]

---

[1] Wrice's odd and incomprehensible attempt to conflate Rule 61 with a sufficiency-of-the-evidence standard must be rejected. *See* Plaintiff's Response to Motion for a New Trial, Dkt. 609, ("Resp."), 2.

By eliminating key elements of Claim II and gutting our legitimate defenses, the Court's flawed jury instructions and evidentiary rulings easily require a new trial under Rule 61. A verdict was rendered based solely on Wrice's time-barred excessive force evidence. To call the reliability of such a verdict "questionable" is generous. *Lane*, 474 U.S. at 455-56. These mistakes, along with a host of serious evidentiary errors, were not harmless.

## ARGUMENT

**I. Multiple errors in jury instructions misled the jury and unfairly prejudiced defendants.**

### A. The harm from the significant jury instruction errors was magnified by the fatal weakness of Wrice's Claim II.

Analyzing how seriously the Court's errors prejudiced Defendants must begin with the fatal weaknesses in Claim II.[2] For starters, the jury found *for Defendants* on Wrice's claim that he probably would have been acquitted of raping and burning Karen Byron if his allegedly coerced "dropped iron" statement had not come into evidence at his criminal trial (Claim I). The jury necessarily found that the statement that Defendants supposedly took such pains to force out of Wrice was *irrelevant* to the conviction, a finding Wrice does not challenge. That finding, coupled with the statement's exculpatory intent ("I tried to save her") and patent mendacity ("I dropped the iron on her"), alone vitiate any claim that Defendants forced Wrice to say it.

The simple truth, of course, is that *Wrice* came up with this statement on his own, and voluntarily offered it up to ASA Kenneth McCurry in a last-ditch effort to avoid being charged with raping and burning Ms. Byron. Wrice knew at the stationhouse that he had an abundance of incriminating evidence to explain away.[3] Per ASA McCurry, Wrice proffered the account only

---

[2] This verdict on Claims II and II cannot stand. Dkt. 593 (JNOV motion), and reply brief filed today.

[3] He had just come from the hospital, where Ms. Byron had identified him as having raped and burned her, stating that he was "the one who did this to me" (Dkt. 595, 73:11-15) in the presence of detectives as well as impartial hospital staff. (Dkt. 589, 560:21-561:3.) **Wrice himself admitted in writing that Ms. Byron identified him as the perpetrator and tried to suppress that identification.** (Dkt. 594, n.13;

3

after ASA McCurry told Wrice he would be charged despite Wrice's denial that he even knew a crime had occurred. (Dkt. 594, 2.) At that point, Wrice voluntarily floated his "dropped iron" statement, which he thought harmonized the evidence that he was upstairs burning Ms. Byron with his continued denial of the rape and deliberate burning.[4] "[T]hat the end product of the allegedly coercive influences was a denial of guilt" evidences a free will. *See United States ex rel. Walters v. Reincke*, 323 F. Supp. 434, 439 (D. Conn. 1969).

Over the last 38 years, however, Wrice's story was that he never made the "dropped iron" statement, that he was "strong enough" to resist the beatings and not to make *any* statement. (Dkt. 594, 9.) Worse (for Wrice), he admitted that Byrne and Dignan did not "feed" him the "dropped iron" story. (Dkt. 589, 1339:5-20.) Nor was there ever any evidence that Defendants concocted the statement and conveyed it to ASA McCurry; we pointed this out in our opening brief (Dkt. 594, 9) and Wrice had no response. Moreover, **no** rational juror could find that any officer or prosecutor would have made up such a non-confession.

Given the lack of any "confession" in a coerced confession case, we accordingly moved for judgment on Claim II before trial.[5] (See Dkt. 498.) The Court denied the motion, saying we could renew it at the directed verdict stage. Wrice knew then and there that he needed something better to survive a directed verdict on Claim II at trial. (Dkt. 589, 57:22-64:10.) So, after 38

---

Dkt. 596.) The victim and witnesses would have described Wrice breaking down, shaking and crying in Ms. Byron's hospital room after she identified him. (E.g., Dkt. 595, 207:24-208:8.) Wrice knew that Bobby Williams, Patricia Wrice, and Charles Wrice had already been interviewed by ASA McCurry. (Dkt. 589, 1123:20 – 1124:7; 1126:15.) And he knew that Rodney Benson had already implicated him (Dkt. 589, 1212:19-22, 1509:9-10). Wrice also had no idea what forensic evidence might have been uncovered at the scene, specifically whether his fingerprints were on the iron, and needed to account for that possibility.

[4] *See United States v. Upton*, 512 F.3d 394, 400 (7th Cir. 2008) (defendant's "efforts to secure a better deal for himself show that he had a calculating and not a cowed mind at the time of his confession"); *United States v. Doe*, 226 F.3d 672, 680 (6th Cir. 2000) (statement is voluntary if motivated by "a knowing and voluntary desire to offer information to the authorities in the hope of receiving leniency.").

[5] In fact, the Court should have granted judgment on Count II before trial. The Court declined even to consider this motion. (Dkt. 589, 57:22-64:10.)

4

years of saying he never confessed, at our trial, Wrice said that he *did* confess after all! And, given that he had already denied that Byrne and Dignan fed him the "dropped iron" statement to him, Wrice added, also for the first time in 38 years, that *ASA McCurry* made him say the it! (Dkt. 594, 9.)

Clearly, Wrice's about-face could not create a triable fact issue (see Dkt. 593, 3-5), even if the man had a shred of credibility (he does not).[6] In such a deficient case, the legally incomplete and inaccurate jury instructions did fatal harm, compelling the $4 million verdict. The jury was told that if Wrice proved he was physically abused and his statement was admitted at trial, it "must decide for the Plaintiff and go on to consider damages," without considering whether the statement was involuntary, whether its use caused any actual damages, and that nominal damages could be awarded. (Dkt. 589, 1957:10-12.) Under such instructions, once the jury found that Wrice was beaten, there was *no possibility* of a verdict in favor of defendants. A new trial with proper instructions on coercion, causation and damages is required.

**B. The Court erred in failing to instruct on all elements of a self-incrimination claim.**

As we showed in our opening brief (Dkt. 594, 2-5), the Court's instruction on the elements of Claim II eliminated the essential components of a proper instruction on the elements of a Section 1983 claim: the legal standard establishing that a constitutional right was violated (here, that Wrice's will was overcome), an actual injury caused by that overborne will

---

[6] Wrice's "dropped iron" story was a clear lie that was so ludicrous, no rational juror could have thought that it came from any law enforcement source. Wrice lied about his innocence, which both his criminal and this civil juries rejected. His claim that he saw nothing amiss when monstrous crimes were committed for hours in his bedroom, with the odor of burning flesh permeating the house, is laughable. (Dkt. 589, 1374:21-1375:4.) He even denied that he was depicted in his own photograph, a lie so pellucid that he later agreed that the picture *was* him, but lied *again* about why he (supposedly) had not recognized himself. (Dkt. 589, 1348:4-1349:11.) He contradicted his trial and deposition testimony repeatedly. (*E.g.*, Dkt. 589, 1299:8-1300:3; 1303:8-1304:1; 1310:6-19;1348:17-24; 1369:5-18; 1375:23-1376:23; 1390:13-1391:9; 1452:9-21; 1485:14-1488:16.) And his incredible "beating" story was improperly buttressed by erroneous rulings concerning Byrne's prior statements and propensity evidence, see Section II(A), below.

(proximate cause), and a nominal damages option if the jury found that plaintiff suffered no injury beyond the constitutional violation itself.

The result of these omissions was that the Court mandated an award of compensatory damages if the jury found that Wrice was physically abused and made an inculpatory statement. That was 100% wrong. Wrice himself admits that whether his will was overcome *was* the proper legal standard of voluntariness, *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). (Resp., 3), and does not deny that he was required to prove that an unconstitutionally-coerced statement proximately caused him injury. *Carey v. Piphus,* 435 U.S. 247, 264 (1978). (Resp., 4-6.)

Wrice tries to defend the failure to instruct on coercion, causation, and nominal damages by arguing they were "unnecessary" because he was beaten, and that was proof enough to win. (Resp., 3-4.) But this describes an excessive force claim, which Wrice did not have. Without proper instructions, the jury was permitted to award damages for excessive force regardless of whether they thought Byrne and Dignam beat Wrice into making him recite the absurd "dropped iron" tale (which no rational jury could have found) and regardless of whether that caused any actual injury (it did not, see the defense verdict on Claim I).

These omissions could not have been harmless. Even Wrice admits that the elements instruction is "one of the most important instructions." (Dkt. 589, 1753:17-18.) The jury must be accurately instructed on the elements of the claim it is being asked to decide. *Davis v. Wessel*, 792 F.3d 793, 802 (7th Cir. 2015) (constitutionally insufficient elements instruction in Section 1983 action required a new trial).[7] Wrice cites no authority[8] excusing instructions that did not

---

[7] *See also Aliotta v. AMTRAK*, 315 F.3d 756, 759 (7th Cir. 2003) (error to "misstate the law or fail to state it fully" in jury instructions); *Jones v. Hamelman*, 869 F.2d 1023, 1031 (7th Cir. 1989) (Section 1983 is a tort action and requires proof of duty, breach, causation, and actual injury).

[8] Neither *EEOC v. AutoZone, Inc.,* 809 F.3d 916, 921 (7th Cir. 2016), nor *Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1051 (7th Cir. 2000), contained such grave errors. Moreover, in both cases the parties agreed the instructions accurately stated the law. *Autozone*, 809 F. 3d at 921; *Hasham*, 200

6

include the legal standard, that did not require proof of causation or injury, or that made a compensatory damages award mandatory.

Wrice tries to rely on three trial court cases that, he says, "used identical compelled self-incrimination instructions as to what was submitted here, all without objection from the Seventh Circuit." (Resp., 5.)  These cases contain no such holdings.[9]  Nor could they, in any event, overrule *Supreme Court* authority mandating instruction on the elements that we requested and that this Court denied: the legal standard for a constitutional violation, *Fulminante*, 499 U.S. at 288, and an injury proximately caused by the violation. *Carey*, 435 U.S. at 264.

Wrice's coerced confession story is and always was bogus, and the faulty jury instructions forced the counterfactual verdict on Claims II and III.  The jury could not possibly have "had an understanding of the issues" it needed to decide in this case.  *Aldridge v. Forest River, Inc.*, 635 F.3d 870, 876 (7th Cir. 2011).  The deficient instructions easily "could have confused or misled the jury causing prejudice to [Defendants]," warranting a new trial. *Sansone v. Brennan*, 917 F.3d 975, 982 (7th Cir. 2019).

**1. The instruction omitted the critical inquiry in all coercion cases: whether Wrice's will was overcome.**

To prove coercion, Wrice was required to establish that the alleged misconduct had "overcome his free will." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (issue is whether "defendant's will was overborne at the time he confessed"). A coerced confession claim "*always*" asks: "did the governmental conduct complained of 'bring about' a confession 'not

---

F.3d at 1051.  We objected to the deficient instructions here.  (Dkt. 594, 2-3.)

[9] Of the three cases cited by Wrice, *Walden v. City of Chicago,* Dkt. 562-9, 22, properly instructed on the elements of a *Monell* policy claim, on which defendants subsequently prevailed, and the self-incrimination instruction in *Patrick v. City of Chicago*, Dkt. 562-3, 30, included the legal standard of voluntariness and required proof on injury and causation. Only *Scott v. City of Chicago*, Dkt. 562-8, 24, failed to instruct on voluntariness and causation, but defendants prevailed in that case, so there was no appeal and thus no Seventh Circuit holding on point.  Wrice's cases do not justify the errors here.

freely self-determined'?" *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 348 (1963) (emphasis original). These cases highlight the importance of the instruction that this Court refused to give.

In fact, proof of alleged abuse only starts the inquiry. *Culombe v. Connecticut*, 367 U.S. 568, 603 (1961). The fact-finder must also consider the accused's mental state to determine "how the accused reacted" to the abuse to decide whether his will was overborne. *Id.*, 603-604. Wrice's individual characteristics and mental state are thus key factors in determining whether an overborne will caused his statement. *Conner v. McBride*, 375 F.3d 643, 651 (7th Cir. 2004); *see also Dassey v. Dittmann*, 860 F.3d 933, 959 (7th Cir. 2017) (statement is voluntary if "the particular defendant sitting in the interrogation was not, in fact, coerced"). A finding of coercion cannot "turn[] on the presence or absence of a single controlling criterion"; rather, "careful scrutiny of all the surrounding circumstances" is required. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

Wrice does not dispute this law. (Resp., 3.) He argues instead that any instruction on whether the confession was voluntary would have been superfluous because the evidence of physical abuse was "enough." (Resp., 9.) But under Wrice's standard, any use of force entitles a plaintiff to an automatic finding that his/her will was overborne. As shown above and in our opening brief (Dkt. 594, 3), that is not the law. Suspects have innumerable reasons to make *wholly voluntary* statements to the police, particularly where, as here, Wrice designed a statement to exculpate himself. The need to instruct the jury on the meaning of coercion was magnified where, as here, there was a strong possibility that the jury would award money to Wrice solely based on the alleged use of excessive force, ***a claim Wrice did not assert***. Clearly, this jury needed to be instructed on whether Wrice's free will was in fact overcome.

Wrice also argues that voluntariness is somehow divorced from the issue of coercion (Resp., 3.) Wrong again. An involuntary confession and a coerced confession are one and the same. *Fulminante*, 499 U.S. at 287, n.3.[10] Nevertheless, at Wrice's behest, the Court removed the language "that have overcome an individual's free will" from the instruction, leaving the jury with no legal standard by which to judge whether Wrice's statement was in fact coerced. (Dkt. 589, 1957:6-8.) Wrice does not even try to justify persuading the Court to jettison more than eighty years of Supreme Court precedent in these instructions.[11]

Eliminating the legal standard not only removed an element of Wrice's burden of proof, it also rendered our factual argument that Wrice's will *was not* overcome legally meaningless. Black letter law would have directed the jury to determine whether Wrice's decision to make the statement was a calculated move to avoid charges (*i.e.*, his will was *not* overborne). *Townsend v. Sain*, 372 U.S. 293, 307 (1963) (a suspect's will is not overborne if his confession was "the product of a rational intellect and a free will"). By failing to instruct the jury on the legal underpinning for that defense (Dkt. 594, 2-3), the Court's instructions confused and misled the jury into assuming a finding of abuse, alone, mandated a finding of coercion. *Schneckloth*, 412 U.S. at 226-27. The only remedy for this grave error is a new trial. See *Davis*, 792 F.3d at 802.

---

[10] At trial, Wrice objected to the phrase "that have overcome the individual's free will," wrongly claiming that it improperly "conflat[ed]" the issues of voluntary confession and coercion. (Dkt. 589, 1750:18-1757:18; *see al*so Dkt. 567, 21 (Defendants proposed instruction: "A statement is coerced if it is the result of physical or psychological abuse or the threat of physical or psychological violence *that have overcome the individual's free will*.").)

[11] Ever since *Brown v. Mississippi,* involuntariness has been the standard in all coerced confession cases. 297 U.S. 278, 287 (1936); *see also Blackburn v. Alabama,* 361 U.S. 199, 205 (1960) (noting that voluntariness was the standard in *Brown,* as well as "cases by now too well known and too numerous to bear citation"); *Schneckloth*, 412 U.S. 218, 225 ("The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness.").

**2. The jury instruction omitted Wrice's burden to prove an injury caused by the alleged constitutional violation and failed to advise the jury of the availability of nominal damages.**

Supreme Court precedent cannot be more clear: an award of compensatory damages requires "proof that such injury actually was caused." *Carey v. Piphus*, 435 U.S. 247, 264 (1978). Without proof of actual injury, a plaintiff is only "entitled to recover nominal damages not to exceed one dollar." *Id*., 267. Defendants' instructions—which the Court rejected— covered both the glaringly omitted causation element and the failure to back it up with an instruction on what to do when no actual injury was caused (nominal damages).[12]

Wrice's response is silent on our showing that failure to require any proof of injury (the tort element of causation) was reversible error. This concedes the need for a new trial.

Instead Wrice focuses on the omission of a nominal damages instruction. He first tries to make a waiver argument, claiming that Defendants did not cite legal authority on nominal damages or argue prejudice from the lack of such instruction. (Resp., 5.) This is nonsense. Defendant's motion cited and applied Supreme Court precedent, easily surpassing the low bar of providing an "adequate basis on which to follow [Defendants'] argument." *See United States v. Holm,* 326 F.3d 872, 877 (7th Cir. 2003) (single reference in summary of argument, without further argument, did not constitute waiver). Defendants' motion explained that the Court's instructions directly contradicted *Carey*, 435 U.S. at 264, which held that actual injury must be proven to recover compensatory damages, and that nominal damages were appropriate in the

---

[12] Defendants' proposed instructions included the requirements that: "Plaintiff was injured as a result of the confession being used against Plaintiff in the criminal trial" and "If you return a verdict for Plaintiff, but Plaintiff has failed to prove compensatory damages, then you must award nominal damages of $1.00." (Dkt. 567, 21; 23.) Defendants also offered the following instruction to provide context to the issue of damages: "In terms of damages, if you find that ... Plaintiff has proven the first two elements above, but find that, considering all of the other evidence admitted at Plaintiff's criminal trial, that the Plaintiff would have still been found guilty of the crimes he was convicted of, then your damages should be a nominal amount." (Dkt. 560, 20). The Court wrongly rejected all these instructions.

absence of such proof. (Dkt. 594, 4-5.) That a nominal damages instruction was warranted by the evidence is undisputed. *See Briggs v. Marshall*, 93 F. 3d 355, 360 (7th Cir. 1996) (nominal damages instruction is proper if the evidence is such that a jury could find no provable injury).[13]

As to prejudice, Defendants' preference for a nominal damages award of $1, rather than a compensatory damages award of $4 million, was self-evident. Wrice's suggestion that Defendants were required to explain how they were specifically prejudiced "by the lack of the 'nominal damages' language *in the Fifth Amendment instruction*" is absurd. (Resp., 5.) Defendants were prejudiced by the failure to instruct on nominal damages in any form. And the instruction was warranted by the evidence, which Wrice also does not dispute. *See Briggs*, 93 F. 3d at 360 (nominal damages instruction is proper if the evidence is such that a jury could find no provable injury). These arguments are not rendered insufficient simply because Wrice refuses to acknowledge the indistinguishable precedent of *Carey*. 435 U.S. at 264.

Defendants need not have further explained the obvious: that mandated compensatory damages for an injury not caused by the alleged constitutional violation at issue is never an acceptable result. Wrice's argument that the jury could have awarded zero damages, even if possible,[14] misses the point. The Court failed to instruct that only actual injury caused by the violation at issue could be compensated *and* that the law required an award of nominal damages

---

[13] Wrice argues that a nominal damages instruction was not necessary because the instruction was not given in *Patrick* (Dkt. 562-3), *Scott* (Dkt. 562-8), or *Walden* (Dkt. 562-9). Asking the Court to blindly follow the instructions in these cases, without any information on whether or why a nominal damages instruction was or was not given, or even asked for, is no substitute for reasoned argument. *U.S. v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003). Here, we asked for, were entitled to, and were refused a nominal damages instruction. See also note 15 herein, showing these three cases did not mandate a damages award, as was incorrectly done here.

[14] This result was not possible, much less probable, with these instructions. The jury was instructed to award an "amount of money," without qualification (Dkt. 589, 1958:20-21, 1959:23); unlike *Patrick v. City of Chicago*, Dkt. 562-3, 41 (instructing jury to "determine what amount of damages, *if any*, plaintiff is entitled to recover") (emphasis added), or *Scott v. City of Chicago*, Dkt. 562-8, 31 (same), or *Walden v. City of Chicago*, Dkt. 562-9, 27 (same).

if a plaintiff proves a constitutional violation, but fails to prove an injury. *Carey*, 435 U.S. at 266.

The instructions, as a whole, incorrectly instructed the jury to compensate Wrice regardless of whether he was actually injured. As Wrice freely admitted (Resp., 3), this led to an award of limitless damages with no link to the claim at issue. (*See* Dkt. 610, 9 (JNOV Brief).)

Ignoring *Carey*, Wrice's response makes a "Wilson torture" argument, claiming this decision validates the entire instruction. *Wilson v. City of Chicago,* 6 F.3d 1233 (7th Cir. 1993), however, does no such thing. First, Wrice and the Court failed to acknowledge that the "torture claim" discussed in *Wilson* was a claim of excessive force, not a Fifth Amendment claim.[15] Wrice's Claim II was a Fifth Amendment claim; *he had no excessive force claim*. That alone renders *Wilson* inapposite. Second, *Wilson* never held, or even implied, that it was eliminating the burden to prove an actual injury caused by a Fifth Amendment violation before compensatory damages could be awarded. Third, the specific language relied on by Wrice and the Court is that "even a murderer has a right to be free from torture and the correlative right to present *his claim of torture* to a jury." *Id*. at 1236 (emphasis added). The right to present a claim, however, does not equate to a right to recover damages without proof of injury, and nothing in *Wilson* says otherwise.

Wrice was unable to cite any authority for his unsupported argument that some fictional "torture" claim dispensed with Section 1983's requirement to show damages proximately caused by the alleged misconduct. There is none. Deep-rooted tort and Section 1983 precedent says otherwise. *Carey*. 435 U.S. at 264. Remarkably, Wrice's response does not mention *Carey* at all,

---

[15] Wilson's claim was that he was tortured during his interrogation and the Seventh Circuit's opinion addressed *that* claim, not a Fifth Amendment claim. As Wrice is well aware, Wilson was able to recover damages for "torture" because the statute of limitations on his excessive force claim had not expired (it was tolled during his incarceration). *But see Wrice v. Dignan*, 93 C 209, 1993 WL 388379 at *2 (N.D. Ill. Sept. 23, 1993) (Conlon J.) (finding Wrice's excessive force claim time barred). That the Seventh Circuit used the phrase "torture claim" does not mean it could or did overthrow Supreme Court authority or create a new cause of action without a causation requirement.

admitting this error as well. (Resp., 3-6).[16]  A new trial with proper instructions is required.

The Court not only misread *Wilson*, its decision on the instructions was also informed by Wrice's unambiguous statement at the jury instruction conference that wrongful conviction and incarceration damages were not permitted under Claim II.  In other words, neither the Court nor Wrice intended to instruct the jury that such damages were available. Having lost his wrongful conviction claim, however, Wrice now wants to backtrack from the position he took at that instruction conference.  *Now* he is telling the Court that he had no intention of foregoing damages for conviction and incarceration under Claim II, and contends that the jury properly awarded such damages (even while admitting that the jury rejected his due process wrongful conviction claim in Claim I).  In short, Wrice wrongly asserts that he was entitled to two bites at the due process/unfair trial apple. (Dkt. 610, 7; 9-12.)

The Court initially ruled, properly and consistent with *Carey, supra,* that proof of injury "solely limited to the fact that they used the coerced confession" was required for an award of compensatory damages on Claim II. (Dkt. 589, 1698:21-24.) As the Court observed "a guilty person wouldn't be entitled to a million dollars [much less $4 million] just because he—they made him testify when he had a constitutional right, for example, not to testify." (*Id.*, 1696:23-25.) The Court's statement echoed Defendants' concern that Wrice would try to use the Fifth Amendment theory in Claim II as an end-run around the different proof required for the due process/unfair trial claim in Claim I (which Wrice lost).[17]  Defendants' proposed instructions on

---

[16] Wrice's response takes a detour to wax poetic on the availability of a Section 1983 claim for compelled self-incrimination. This superfluous argument latched on to the phrase "new cause of action for torture" in Defendants' brief, as though it were not directly followed by the restrictive clause "*that did not require proof of causation or damages*." *Compare* Resp., 4 with Dkt. 594, 4.  Wrice misrepresented Defendants' statement to avoid directly addressing the error in eliminating the causation, injury and nominal damages instructions.

[17] Defendants objected to any instruction on the self-incrimination claim because it was encompassed in the fabrication claim, and offered an instruction only in the alternative. (Dkt. 560 at 20-21.)

causation, injury, nominal damages, and specifically the proof required to compensate Wrice for conviction and incarceration, were intended to avoid this result. (Dkt. 560, 20, Dkt. 567, 21; 23.)

Rightly recognizing that a due process claim (Claim I) was the only way Wrice could recover damages for his conviction and incarceration, the Court suggested "that the simplest way is to present this as an alternative or the same type of claim as the fabricated one. It was something that was done to get him convicted and which caused him 31 years in prison." (Dkt. 589, 1697:14-17.) Wrice vehemently opposed the Court's suggestion, because of course that theory was already offered under Claim I as a fabricated and coerced confession theory (the claim Wrice lost). (*Id*., 1697:18-1698:6.)

Instead, Wrice argued, Claim II had nothing to do with his conviction or incarceration and was a stand-alone claim. Indeed, when specifically asked by the Court whether he was seeking such damages, Wrice correctly replied "**No ... That's for fabrication [Claim I]**." (Dkt. 589, 1694:22 -1695:4.) He later reiterated that "it's not the 31 years, . . . [b]ecause that's the fabrication claim" (*Id*., 1696:1-7) and further explained that his claim, like that of admitted murderer Andrew Wilson, was a "guilty but coerced" claim, which did not include damages for conviction and incarceration. (*Id*., 1695:11-1696:17.) To be clear, Wrice told this Court that the claim he was submitting as Claim II was that his statement *was true* but coerced:

> THE COURT: In other words, **being forced to give a truthful statement**, would that be a violation?
> MS. BONJEAN: **Yes**. That is a violation of your constitutional rights.
> . . .
> THE COURT: Do you want to present that claim?
> MS. BONJEAN: **Yes, I do**.

(*Id*., 1696:10-17 (emphasis added).)

Based on Wrice's description of his claim, the Court agreed to instruct on this separate coerced confession claim *and* require Wrice to prove damages. (Dkt. 589, 1698:21-25.) Further,

14

the Court understood that a "nominal damages [instruction] is appropriate." (Dkt. 589, 1707:22-23.) That is, the Court recognized that if Wrice's claim was that his confession was true but coerced (as his counsel informed the Court), he would not be allowed to collect incarceration damages; he would be entitled only to nominal damages as a matter of law. And Wrice agreed that as to Claim II, "**it's not millions of dollars. . . and maybe it's nominal damages**. . .There has to be at least nominal damages." (*Id.*, 1697:4-8) (emphasis added). (Now, however, Wrice is trying to justify the millions awarded on Claim I that he had previously disavowed.)

This understanding, which led to the erroneous instruction on Claim II,[18] was short-lived. At the next court date, the Court ruled that neither Section 1983 nor basic tort law applied, because Wrice was asserting a fictional "*Wilson* torture" claim (see pages 12-13 above; *Wilson* was an excessive force case, a claim Wrice did not have). Wrongly believing that "in a torture case, [if] the plaintiff proves he was tortured then he'd be entitled to some compensation" (Dkt. 594, 4), the Court struck Paragraph 3 of Defendants' proposed instruction: "Plaintiff was injured as a result of the confession being used against Plaintiff in the criminal trial." (Dkt. 567, 21; Dkt. 589, 1749:2-6.) This transformed Claim II into the excessive force claim (albeit without proper causation instructions) that Wrice was unable to assert due to missing the limitations period. The Court then abruptly struck nominal damages from both the instruction on Claim II and the pattern instruction on damages while at the same time acknowledging that a nominal damages

---

[18] Again, Defendants objected to any instruction on the self-incrimination claim because it was encompassed in the fabrication claim, and offered an instruction only in the alternative. (Dkt. 560, 20-21.) As discussed in Defendants' reply in support of their motion for judgment as a matter of law, submitting Claim II as a separate claim from Claim I without an instruction that the jury was *required* to find nominal damages for the *per se* violation of the Fifth Amendment that Claim II sought to remedy, allowed Wrice two bites at his unfair trial claim. That itself was error. But having given Wrice this second bite, the Court was required, at a minimum, to include the proximate cause and nominal damages instruction that Defendants' offered.

instruction was properly supported by the evidence.[19] (*Id.*, 1744:12-22.) This was all wrong.

Of course, Wrice lost Claim I, where the jury was properly instructed on the need to prove causation, *i.e.*, materiality and injury. (Dkt. 589, 1956:1-2 (requiring proof that "The evidence is material; and . . . Plaintiff was damaged as a result."); *id.*, 1993:2-3 (verdict for Defendants on Claim I).)[20] Turning to the instruction on Claim II, however, the jury learned that, unlike Claim I, there was no instruction on causation and injury; instead, the instruction on this claim *required* the jury to award damages without regard to whether the constitutional violation at issue caused an actual injury. Nothing moored the jury's damage award, through proximate causation, to any legitimate finding of liability.

This glaring omission in Claim II allowed the jury to improperly award the very incarceration damages that Wrice admitted were unavailable under this claim, and that could not in any event be awarded given the jury's finding on Claim I that Wrice's trial was fair. It also improperly allowed the jury to award damages for the alleged beatings alone, though there was no excessive force claim. Wrice does not dispute that the instructions misled the jury to these impermissible results. Nor does he explain why he should be entitled to damages for an injury that he did not prove when he lost Count I and could not prove without an excessive force claim.

In the end, Wrice cannot identify any instruction which advised the jury that an actual injury resulting from a violation of Wrice's Fifth Amendment rights is a prerequisite to compensatory damages. Nor can Wrice come up with a single case that allows a plaintiff to

---

[19] When asked whether the Court was "completely striking any language relating to nominal damages," the Court responded "You can argue that." (*Id.*, 1744:19-22.) Of course, arguing a legal concept that contradicted the instructions would have been futile, caused more confusion, and undermined defense counsel's credibility with the jury. *Gray v. Lynn*, 6 F.3d 265, 271 (5th Cir. 1993) (jurors cannot be expected to ignore the court's erroneous instructions and rely on counsel's correct statement of the law in closing argument).

[20] The jury did determine that Wrice's alleged coerced statement did not affect his guilty verdict, and thus found for Defendants on Count I.

recover anything other than nominal damages for a violation of the Fifth Amendment without proven actual injury (other than the violation itself). Wrice admits, as he must, that the jury did not "find that the 1983 criminal jury would have acquitted Plaintiff absent the introduction of the coerced confession." (Dkt. 610, 14.) The award cannot stand.

### C. The Court erred in failing to admonish the jury not to award duplicative damages for a single injury.

The jury instructions allowed the jury to award duplicative compensatory damages to which he was not entitled, invalidating the judgment. *Duran v. Town of Cicero*, 653 F.3d 632, 642-43 (7th Cir. 2011) ("A judgment that can be read to allow a plaintiff to recover twice for the same injury contains a manifest error of law."). Having instructed the jury on both Claim II and III, the Court should also have instructed that it could not award damages twice for a single injury. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). Without this caution, the jury was free to arrive at an amount of compensatory damages, then double it because it found Defendants liable on two claims. *See Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 313 (7th Cir. 2009) (recommending clear instructions not to duplicate damages). Wrice does not dispute that the instructions allowed double recovery, invalidating the judgment.[21] At a minimum, this error in the judgment warrants a 50% reduction in the award, per Rule 59(e). *Duran*, 653 F.3d at 643.

---

[21] Wrice's sole argument is waiver. Defendants acknowledge that they did not propose an instruction cautioning against double recovery. *See, e.g., Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1346 (7th Cir. 1992) (jury properly instructed that "if you have occasion to consider damages against [defendant] under more than one of [plaintiff's] claims, you should not make duplicate damages awards for the same injury.") But this was not waiver. *United States v. Olano*, 507 U.S. 725, 733(1993) (waiver is the " intentional relinquishment or abandonment of a known right"). The subject of double recovery never arose at trial, thus there was no intentional waiver. *Id.*; *see also United States v. Richardson*, 238 F.3d 837, 841 (7th Cir. 2001) (forfeiture is "failing to present [an issue] in a timely fashion (or at all)," which is "accidental rather than deliberate"). The invalid judgment cannot stand. *Duran*, 653 F.3d at 642-43.

## II. Evidentiary Rulings Ensured that the Jury would not Consider Whether Wrice was Actually Coerced.

The Court systematically barred Defendants from presenting evidence that would have shown Wrice's voluntary state of mind when he made the "dropped iron" statement. The jury could not assess whether Wrice's statement was coerced, without knowing who *Stanley Wrice* was and how *he* would react to the alleged abuse.[22] *See* Section I(B)(1) herein.

The Court's erroneous evidentiary rulings prevented the jury from hearing what was really on Wrice's mind when he told the "dropped iron" story. For example, Wrice knew that Ms. Byron had identified him as the man who attacked her because she had said it to his face in the hospital before he was questioned; the Court excluded this key fact. The jury also heard a lot of nonsense about Wrice being a "model brother," a member of the "Brady Bunch," and anti-gang, which the Court wrongly prohibited us from refuting through evidence or cross-examination. All of this excluded evidence was highly probative of our theory, that Wrice's "dropped iron" story was not a product of the police, but of Wrice's own scheming mind.

### A. Barring any evidence of identification by Karen Byron was error.

As we explained in our opening brief (Dkt. 594, 17-20), Ms. Byron identified Wrice at the hospital as the man who raped and burned her. There was overwhelming evidence of this fact, including Wrice's own (non-hearsay) admission in a criminal case filing that Ms. Byron had identified him as the perpetrator. (Dkt. 594, n.13 & n.3 herein.) The Court refused to allow us to put that fact into evidence notwithstanding that it was admissible both for its truth *and* to show Wrice's and Defendants' state of mind. On this latter point, Ms. Byron's recognition of Wrice as

---

[22] We were entitled to present evidence of Wrice's state of mind during, and his likely reaction to, the circumstances of the interrogation. (Dkt. 589, 991:12-20.) Such evidence is properly admissible under Federal Rule of Evidence 405 ("(a) When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion . . . When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct.")

18

her torturer strongly motivated him to explain away his presence in the attic holding an iron using the "dropped iron" rationale. This evidence also proved Defendants' lack of motive to coerce the statement, which far understated Ms. Byron's actual accusation against Wrice. And it was admissible to rebut Wrice's false testimony that Ms. Byron did **not** identify him (Dkt. 589, 142:19-21; 142:25-143:4), and because Wrice opened the door to its admission.[23]

Wrice responds that Karen Byron's identification was hearsay and not credible.[24] It was not hearsay, given that Wrice's own criminal court pleadings *admitted that Byron had identified him*. (Dkt. 594, n. 13 & n.3 herein.)[25] It was not hearsay for the additional reason that it was also offered to show Wrice's and Defendants' state of mind. (Dkt. 589 at 991:12-992:16; Dkt. 595, 25:14-26:14; Fed. R. Evid. 801(c).) It was up to the jury to judge the statement's credibility, but the Court never gave the jury that chance. Wrice's tired refrain that this evidence should not come in because the Defendants' took the Fifth, remains meritless, particularly in light of Wrice's judicial admission that Ms. Byron did identify him as her attacker (and Wrice even cross-examined Defendants on this point). (Dkt. 595, 208:15-210:10; 25:14-26:14.) Karen Byron's statement was admissible.

---

[23] Wrice made this statement in opening (Dkt. 589, 142:22-143:4), then elicited testimony from Bertina Lampkin that Karen Byron had originally identified someone, but Defendants could not follow up. (*Id.*, 941:1-942:17.) Wrice opened the door to Ms. Byron's identification with this question. Wrice, his brother Charles, and Bobby Joe Williams testified that they were presented to Ms. Byron at the hospital room. (*Id.*, 1420:16-18; 466:24-468:13; 729:2-25.) The reasonable inference is that an identification was attempted and failed, reinforcing an opening statement by Wrice that misrepresented the facts. (*Id.*, 142:22-143:4.)

[24] This was not the basis for the Court's ruling. The Court excluded the identification because it did not come in at the criminal trial. (*Id.*, 559:9-562:8; 991:12-992:16.)

[25] The evidence was also admissible through police reports, contrary to Wrice's argument, because this observation by the reporting officer was admissible "to the extent to which they incorporate firsthand observation of the officer," *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013), as this Court correctly noted. (Dkt. 482, 17.) The evidence was also admissible non-hearsay, via suppression hearing evidence at which Wrice had the opportunity to cross-examine. (Dkt. 595, 25-26; 74.)

### B. Prior testimony of Byrne and Dignan was admissible.

As showed in our opening brief, under circuit precedent, a defendant is free to offer a co-defendant's prior testimony if that co-defendant is unavailable to defendant (due to the co-defendant's taking the Fifth) and gave sworn testimony that was subjected to cross examination by the plaintiff. (Dkt. 536, 5199:21-5210:19; Dkt. 595, 21-39; 174-215); *see United States v. Pizarro*, 717 F.2d 336, 348-49; Fed. R. Evid. 804.) That means Byrne should have been allowed to offer Dignan's prior testimony and Dignan should have been allowed to offer Byrne's prior testimony, at trial. (Dkt. 589, 233:24-234:21.)

By disallowing this evidence, the Court unfairly deprived each defendant of significant and first-hand exculpatory evidence. Dignan was barred from introducing Byrne's prior testimony at trial and at the motion to suppress hearing that Ms. Byron identified Wrice as the man who raped and burned her and Wrice looked at Ms. Byron and started shaking and crying (*id.*, 73:11-19; 207:24-208:8); that neither man abused Wrice (*id.*, 86:18-88:20); that the timing of the Wrice interview was brief (too short to abuse him in the basement twice) (Dkt. 595:81:20-85:4; 88:21-92:13); and that a burning odor permeated the house (thus giving the lie to Wrice's claim that he never even knew a crime had occurred there) (Dkt. 528, 1250:9-14).[26] (Dkt. 595, 73:11-19; 207:24-208:11; Dkt. 585-4, 22-26.) This testimony was directly relevant to whether Wrice gave the "dropped iron" story as a voluntary statement in his own interest to avoid charges. And it would have corroborated ASA McCurry's testimony regarding the timeline of the interviews, further establishing that there was simply no time for the multiple beatings Wrice

---

[26] Wrice admits that all criminal trial testimony that supported Defendants' theory of the case was intentionally excluded from the Byrne summary used at trial. (Dkt.589, 500:10-501:15.) Thus, introducing Byrne's summary at the civil trial did not negate any prejudice in barring the prior testimony. Indeed, because this summary was so gutted, one-sided, and prejudicial, as discussed below, it made the facts *falsely* appear worse (*e.g.*, that Byrne never denied the beatings at the criminal trial, which was not the case).

described to have occurred.

Dignan's prior testimony was likewise exculpatory evidence available to Byrne. Dignan testified that Wrice was read his Miranda rights twice, which he understood and waived (Dkt. 595, 3:1-5:16); that the order and timing of the interviews was brief (*id.*, 8:12-13:3); that neither he nor Byrne struck or threatened to strike Wrice or Benson (*id.* at 14:6-18:24); and that Ms. Byron identified Wrice as the man who raped and burned her (but failed to identify Bobby Joe Williams or Charles Wrice as perpetrators) (*id.*, 23:14-26:17). Indeed, Dignan testified that, when Wrice walked in her room, Ms. Byron "grabbed my hand. She said, you, you, you. That is him. He raped me and burned me." (*Id.*, 25:14-19.)

Wrice does not dispute that this evidence was highly probative, or that all criteria for admission under Rule 804(b)(1) were met: each declarant was unavailable to his co-defendant, the prior testimony was under oath, and Wrice was the opposing party (and had the opportunity to cross-examine). *Pizarro,* 717 F.2d at 348-49, established that Rule 804(b)(1) applies to the prior testimony of a co-defendant who refuses to testify. There was **zero** legal basis for the Court to refuse to consider this clear application of Rule 804(b)(1). Unavailability under Rule 804(a) was established, the applicability of Rule 804(b)(1) is uncontested, and excluding the prior testimony was reversible error.

Without citation of authority, Wrice's response is essentially that "they should have testified if they want to admit evidence." (Resp., 10.) He is wrong. First, Byrne and Dignan are not a unit, each has individual rights. Dignan could not have put Byrne on the stand and forced him to waive the privilege to give testimony favorable to Dignan, and vice versa. Each defendant is unavailable to his co-defendant. *See United States v. Prince*, 524 F. App'x 377, 379 (9th Cir. 2013) ("Where a witness' unavailability results from an invocation of the privilege against self-

incrimination, the witness is unavailable to both parties"); *United States v. Peterson*, 100 F.3d 7, 13 (2d Cir. 1996) ("By taking the Fifth in the present litigation, the declarant "[makes] himself unavailable to *any other party*") (emphasis added).

Wrice's complaint that each defendant "made himself unavailable" is simply another way of saying that each refused to testify. Prior testimony of a witness who refuses to testify may be admitted by another party under Rule 804(b)(1). Thus, the litany of cases Wrice cites for the proposition that a party cannot make himself unavailable by refusing to testify and introduce his own prior testimony (Resp., 7-8) simply do not apply.

Second, Wrice's suggestion that Byrne and Dignan should have somehow severed their cases is incomprehensible, and unsupported by any authority. Wrice sued Dignan and Byrne as individuals. This was not a criminal trial, and they are not "bound together" such that each is limited to evidence equally available to the other. (Resp., 8.) There is no requirement of antagonistic defenses in Rule 804(b)(1), nor did the Court have the power to add such a requirement. *See Pizarro*, 717 F.2d at 350 (rejecting argument that prior testimony within the bounds of Rule 804(b)(1) could be barred based on limitations not imposed by Congress).

Third, there was nothing unfair about admitting this prior testimony.[27] Wrice had previously cross-examined these men in his criminal case. (Dkt. 589, 1955:3-6.) The Court could easily have instructed the jury on which statements applied to which defendants. The case law cited by Wrice demonstrates that the Court was not required to have done more **than give the**

---

[27] Although Wrice has waived reliance on Rule 403 by not relying on it at trial or in pre-trial motions (and the Court did not conduct a Rule 403 analysis), even this Rule would not warrant exclusion of evidence which is merely unfavorable, not prejudicial. *See Young v. Rabideau*, 821 F.2d 373, 377 (7th Cir. 1987) ("Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403"); *Cobige v. City of Chicago*, 651 F.3d 780, 785 (7th Cir. 2011) (effect resulting from evidence directly related to a disputed issue "is not 'prejudice' at all—not unless we count as 'prejudice' all evidence that undermines the other side's contentions . . . —let alone 'unfair prejudice.'")

**adverse inference instruction** to place Wrice on "equal footing" with Defendants had this testimony been allowed (as it should have been). (Resp., 10.) And the adverse inference instruction given here resolved any "tension between one party's Fifth Amendment rights and the other party's right to a fair proceeding." *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000).

Fourth, neither Byrne nor Dignan could be denied their right to present evidence simply because each refused to testify. The risk that admissible exculpatory evidence will be arbitrarily barred is too high a price to pay for silence. *Lefkowitz v. Cunningham*, 431 U.S. 801, 807 (1977) (confronting an individual with "grave consequences solely because he refused to waive immunity" is unconstitutional). The Court's decision here was not "governed by legitimate trial rules." *United States v. Lewis*, 641 F.3d 773, 785 (7th Cir. 2011). The Court misapplied Rule 804(b)(1) specifically to prevent Defendants from benefitting from excluded evidence. The only reason either Defendant "would have had to take the stand to present his theory of defense," as Wrice suggests (Resp., 15), is that the Court wrongly rejected introduction of admissible evidence. *Id*. ("legitimate trial rules" apply to defendants who invoke the Fifth Amendment). Defendants should not have been required to abandon their Fifth Amendment rights in order to earn the proper application of the Federal Rules of Evidence.

Fifth, there is no denying that Defendants had a right to assert the Fifth Amendment and to introduce admissible evidence of their theory of the case. *Chambers v. Mississippi*, 410 U.S. 284, 302, (1973) ("[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.") They were not required to testify to "cure" the prejudice they suffered by the Court's error. (Resp., 10.) Asserting the Fifth Amendment did not make the error

less harmful, but more so. As in *Pizarro*, where defendant also did not testify,[28] "depriving [each Defendant] of [the other's] [prior] testimony under oath exonerating him from any involvement . . . severely crippled" the defense and was not harmless error. 717 F.2d at 351. This crippling of Defendants' case was clear reversible error here.[29]

### C. The Court erred in refusing to consider Byrne's prior testimony for completeness and in allowing Wrice to read a distorted summary into evidence.

#### 1. Court violated Rule 106, requiring a new trial, and erred by preventing the civil jury from hearing what the criminal jury heard.

In our opening brief, we explained (Dkt. 594, 8-10) that the Court's decision to allow Wrice to introduce a purported "summary" of Byrne's criminal trial testimony that deleted all parts of that testimony that Wrice found damaging to his case was gross error. It was *Wrice* who chose to put Byrne's criminal trial testimony summary into evidence. Having made that decision, he could not willy-nilly gut the so-called summary of everything in the summary that he thought hurt his case. That, however, is exactly what the Court allowed, violating both Rule 106 and due process. This error could not have been harmless; it wrongly prevented a party's exculpatory testimony from coming into evidence.

Wrice's lawless deletions distorted *the facts* of Byrne's testimony, and were so egregious that material from the middle of sentences and paragraphs was excised for no reason other than that Wrice found they undermined his case.[30] Worse, it was a misrepresentation to the jury even

---

[28] See *United States v. Rodriguez*, 627 F.2d 110, 112 (7th Cir. 1980) (addressing prosecutor's comment on Pizarro's silence).

[29] The error in refusing testimony from motion to suppress hearings was not forfeited. Defendants offered Byrne's and Dignan's motion to suppress testimony premised on the same argument that the Court had rejected in the context of Byrne's trial testimony. (Dkt. 589, 992:17-993:5 ("Finally, I would have offered their suppression hearing testimony about . . . the fact that they denied the beatings.").) The Court rejected it. Further argument was unnecessary, as the Court clearly understood Defendants position and made a definitive ruling. *See United States v. Van Eyl*, 468 F.3d 428, 435-36 (7th Cir. 2006). Hence, "the issue was adequately preserved." *Id*.

[30] *See United States v. Haddad,* 10 F.3d 1252, 1258–59 (7th Cir.1993) ("whole statement should be

to present what was read to them as a "summary" of Byrne's testimony; it was no summary at all, as it contained only snippets of his testimony. (Dkt. 556-1(redline showing the key deletions).) So the jury was falsely led to believe that what they heard was everything Byrne had said, which was untrue.

For example, the italicized language was removed from this sentence: "I walked to the kitchen *area and noticed a burning odor, stronger in the kitchen*, and flecks of charred debris on the floor and in the kitchen sink." (Dkt. 556-1, 2.) There is **zero** authority for reading a statement, falsely presented as complete, that contains such material deletions. The gist of the sentence, showing that the burnt flesh smell was so strong, it had reached the first floor, was wrongly deleted. Wrice knew that the home's odor gave the lie to his initial statement that he noticed nothing amiss, and was a factor motivating his decision voluntarily to try to exculpate himself with the "dropped iron" story (harmonizing his innocence with his smelling burnt flesh).

As another example, in a single paragraph describing Wrice's initial denial of liability, Wrice distorted the gist of the paragraph by deleting Byrne's description of Wrice's agreement to speak after being Mirandized. This was highly relevant to the voluntariness of Wrice's statements that day. (*Id.*, 3.)

As a third example, Wrice put Byrne's descriptions of his interviews of Bobby Joe Williams, Wrice, Rodney Benson, and Charles and Patricia Wrice into evidence, but again distorted that description by multiple mid-sentence and mid-paragraph deletions of the timing of those interviews: that Byrne spoke to Williams at 7:30 a.m., Wrice at 8:00 a.m., Benson at 8:30 a.m. and then Charles Wrice, Patricia Wrice at 9:30, and ASA McCurry at 10:30 (after which Byrne had no further conversations with Wrice), and that he saw ASA McCurry go into Wrice's

---

admitted in the interest of completeness and context, to avoid misleading inferences"); *United States v. Price*, 516 F.3d 597, 604-605 (7th Cir. 2008) (Rule 106 designed to avoid "exclusion of that statement . . . likely to create an incomplete, misleading, or distorted picture of the evidence").

room at 1:00 for a few minutes and a non-defendant detective say Wrice wanted to talk again and saw ASA McCurry go back into Wrice's room at 1:35. (Dkt. 556-1, 3-5.) These facts give the lie to Wrice's claim that Defendants had the time to beat most of these people, including himself, for hours, even taking them to other rooms in the stationhouse. The Court wrongly denied all Defendants' efforts to restore the deletions, refusing even to hear argument on the point.[31]

Wrice tries to argue that the rule of completeness does not apply when the statement introduced is hearsay, but that is not the law. Rule 106 applies whenever a statement is admitted, providing that, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." The rule contains no exception for a writing which is hearsay.[32] *United States v. LeFevour*, 798 F.2d 977, 981 (7th Cir. 1986) (Rule 106 allows introduction of inadmissible evidence to correct misimpression);(*See also* Dkt. 501:16-25; 503:6-12.) This was reversible error.

**2. The Court's requirement to read summaries instead of transcripts was erroneous.**

In our opening brief we demonstrated how the use of purported summaries of the criminal trial witnesses (including all of the key prosecution witnesses, now dead) unfairly undermined the credibility of their testimony and allowed Wrice's live witnesses—including wholly improper propensity witnesses—to dominate the trial time and the jury's attention. (Dkt.

---

[31] Regarding Wrice's indefensible deletions from the Byrne's "summary" (it was not a summary), the Court said: "I said that they could put in whatever they want, and you could request – . . . for completion, but it had to be done at the time" of our case. (Dkt. 589, 1584:8-12.) When that time came, and we stepped up in the defense case saying, "We had reserved discussing the further summary which restored the deletions. . . Of Sergeant Byrne," the Court (erroneously) said he had already ruled against us (Dkt. 589, 1670:3-9), even though the Court said we could make our Rule 106 in the defense case, and refused to hear the argument he had earlier invited. (Dkt. 589, 1670:10-12.)

[32] Wrice's reliance on *U.S. v. Vargas*, 689 F.3d 867, 876 (7th Cir. 2012), and *U.S. v. Lewis*, 641 F.3d 773, 785 (7th Cir. 2011), is misplaced. (Resp., 8.) They stand for the proposition that evidence "which is neither explanatory nor relevant to the admitted passages" is not properly admitted under Rule 106. Here the omissions were central to the statement.

594, 6-7.) Those summaries did not reflect direct and cross examination (critical to showing which party elicited the testimony), did not distinguish direct from leading questions (critical to witness credibility), and did not match the Q-and-A format[33] so important to truth-telling that benefited the Wrice's mostly live witnesses. Trials matter; questions and answers matter; summaries are not testimony; summaries are not evidence. The Constitution does not allow trial by summary. Here, Wrice's testimony alone constitutes almost 350 transcript pages; the "summaries" of dead defense witnesses Ms. Byron (the victim), Lewis (an eye witness), and ASA McCurry (who took Wrice's statement) amounted to well under 50 pages. (Dkt. 589, 340-345, 1091-1097, 1123-1130.)  The Court's erroneous summary ruling meant that plaintiff's witnesses dominated the trial, since most of the core defense witnesses were dead.  That was totally unfair.

Wrice's sole response is to say that nothing required the Court to allow the entire transcript to come into evidence, relying on *Jimenez v. City of Chicago*, 732 F. 3d 710 (7th Cir. 2013). (Resp. at 11.) *Jimenez* is off point, ruling only (in *dicta*) that admission of two entire trial transcripts was not necessary to create a context for a *Brady* argument. Here, the transcripts were *affirmative evidence* on Claim II, critical to rebutting Wrice's testimony about having been abused and supporting the fact that Wrice voluntarily offered up his "dropped iron" story to try to harmonize the evidence against him with innocence ("I was trying to save her but I dropped the iron"). That admissible evidence was degraded down to 5-minute summaries. *Jimenez*

---

[33] The Court's refusal to admit criminal trial testimony into evidence allowed Wrice to misrepresent that testimony. As just one example, Wrice argued that Bobby Joe Williams was beaten into implicating Wrice, as evidenced by the prosecutor's leading questions and Williams' purported yes-and-no responses. (see Dkt. 594, n. 7.) The criminal trial transcript conclusively rebuts this claim; Williams testified cogently from memory about Wrice's crimes at the criminal trial. (Dkt. 536:1012:5-1023:7.) The use of summaries allowed Wrice to make this false, unduly prejudicial argument, and given that Williams was one of Wrice's main witnesses, this misrepresentation erroneously buttressed Wrice's own beating claims. The error was not harmless.

27

nowhere allows such a protocol. In any event, even reading all of the criminal trial testimony would have consumed only about one day of trial time. (Dkt. 492, 1.) That evidence, on the very elements of Claim II, was more than required in a case where Wrice sought $30 million in damages.  Dkt. 589, 1838:1-6.) Brevity does not trump due process.]

Finally, Defendants did not insist on admitting the entire trial transcript. We also asked the Court to admit the trial testimony of *at least the core prosecution witnesses*:

> I want to note the irony but also, more importantly, the extreme unfairness in allowing what we consider to be a wholly improper 404(b) witness to come in and testify for 45 minutes to an hour but then to not allow us to read the trial transcript testimony of the victim and at least the key eyewitnesses in this case. They are summarized in five minutes. What you end up is a trial that is completely disproportionate – [counsel cut off] Well, I'm trying to persuade you to let us put the trial transcript in –[counsel cut off] because at least as to our key witnesses – [counsel cut off]

(Dkt. 589, 1112:19-1113:12.)  *Jimenez* is thus inapposite for this additional reason. Reading the testimony of the victim (Karen Byron), the key eye witness (Kenny Lewis), and the State's Attorney (McCurry), for example, would have taken 1-2 hours at most (about 160 trial pages). (Dkt. 536, 911-980, 1050-1102, 1298-1334.) There was no basis for elevating brevity over fairness, truth, and accuracy.

### D. Barring evidence of Wrice's character, as evidenced by Wrice's "relationship" with Jennifer Scott, gang membership, and history of violence was error.

As Defendants explained, (Dkt. 594, 12-17), the jury heard only positive character testimony about Wrice: a loving fiancée, anti-gang brother, role model, and "Brady Buncher" who collapsed as a result of a beating that lefts no marks or injuries (Dkt. 594, 8-9) and gave the "dropped iron" statement.  Wrice understood that his character mattered, and put up family members to lie about his violent and irresponsible life. Defendants should have had an opportunity to respond in kind, *Cobige v. City of Chicago*, 651 F.3d 780, 785 (7th Cir. 2011), but were denied the chance.

Wrice responds that he toned it down and was no "choirboy," but does not deny that he used character evidence to show he was an innocent, defenseless victim. (Resp. at 16.) Character was at issue, particularly as to Claim II, as to which Wrice *should have been required* to prove that his will was overcome. *Lynumn*, 372 U.S. at 534; Section I(B)(1) herein. Defendants should not have been barred from countering this false image with evidence of *the real* Stanley Wrice.

Wrice's response fails to distinguish *Cobige*, which held that negative character evidence is not excludable under Rule 403 where it bears directly on a disputed issue, here Wrice's character. *Cobige v. City of Chicago*, 651 F.3d 780, 785 (7th Cir. 2011). *Barber v. City of Chicago* did not limit *Cobige*, instead distinguishing it because character was not at issue. 725 F.3d 702, 714 (7th Cir. 2013). Character was at issue in this case,[34] and introducing evidence exposing Wrice's character flaws "is not 'prejudice' at all." *Cobige*, 651 F.3d at 785. The evidence should not have been excluded simply because it was too probative of this issue.

The truth about Stanley Wrice is that he was hardened, violent, domineering and accustomed to using, and being the target of, extreme violence in all aspects of his life: on his own, with his gang, and in his relationship with Jennifer Scott. The errors here were not harmless.

### III. The Court erred in admitting other acts evidence solely to demonstrate that Defendants similarly abused Wrice, violating Rule 404(b)'s prohibition against propensity evidence.

The record is unequivocal: other acts evidence was offered, admitted, and argued for an unabashed propensity purpose—to establish that Defendants abused others and were therefore more likely to have also abused Wrice. (Dkt. 594, 20-23; *see* Dkt. 589 at 246:8-10 (ruling that the alleged abuse of others was relevant to show that Wrice's allegations were "more likely true than not true.").) Wrice insisted that the evidence reflected a propensity for abusing suspects,

---

[34] Character evidence, in all forms, is admissible pursuant to Federal Rule of Evidence 405.

arguing that "[b]ecause Plaintiff must demonstrate to the jury that his shocking claims of physical abuse are . . . true, Plaintiff must be permitted to introduce 404(b) evidence" (Dkt. 423, 1) "to corroborate Plaintiff's claims." (Dkt. 471, 11.) That attempt to characterize this as "non-propensity" evidence, without addressing the prevailing legal standard of admissibility, fails.

For nearly a year,[35] Defendants have challenged Wrice to address this issue according to *current* law (*United States v. Gomez*, 763 F.3d 845, 860 (7th Cir. 2014)), by identifying a non-propensity purpose, and explaining how the evidence is relevant to that purpose, "through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case." Wrice dodged the inquiry[36] because the "the real answer is almost certainly that the evidence is probative only of propensity." *United States v. Miller*, 673 F.3d 688, 699 (7th Cir. 2012).

Although Wrice would clearly prefer a return to the days when one could "simply point to a purpose in the 'permitted' list and assert that the other-act evidence is relevant to it"—as evidenced by his persistent reliance on pre-*Gomez* (2014) case law—the Seventh Circuit has expressly rejected this practice. *Gomez*, 763 F.3d at 856. Thus all Wrice's cases[37] (and any pre-*Gomez* case) have no precedential value. *Id.* There is no longer a "similarity prong" in Rule 404(b) analysis. *Compare* Resp., 24 *with Gomez*, 763 F.3d at 854. If anything, greater similarity means greater prejudice, *i.e.*, a greater likelihood that the jury will be influenced by the impermissible propensity inference. No amount of similarity supports using other misconduct for

---

[35] *See, e.g.*, Dkts. 388, 454, 472, 522, and 524.

[36] *See* Dkts. 423, 471, and 513.

[37] *Wilson*, 6 F.3d 1233; *Edwards v. Thomas*, 31 F. Supp.2d 1069 (N.D. Ill. Jan. 8, 1999); *Hill v. City of Chicago*, 2011 WL 3840336 (N.D. Ill. Aug. 30, 2011), all pre-date *Gomez*. Judge St. Eve acknowledged that the analysis in *Hill* is no longer applicable, having been decided "three years before the Seventh Circuit issued the *Gomez* decision—which shifted the Rule 404(b) paradigm." *Harris v. City of Chicago*, No. 14-CV-4391, 2018 U.S. Dist. LEXIS 79707 at *49 (N.D. Ill. May 11, 2018).

propensity purposes. *United States v. Beasley*, 809 F.2d 1273, 1278 (7th Cir. 1987) ("The inference from 'pattern' by itself is *exactly* the forbidden inference that one who [engaged in misconduct] on one occasion must have [engaged in similar conduct] on the occasion [at issue].") (emphasis original)).

Wrice's claim that no harm was done by erroneously introducing this evidence is nonsense. Other bad acts are *among the most potent negative evidence available*, *Gomez,* 763 F.3d at 857 ("other-act evidence almost always carries a risk" of unfair prejudice), and appellate courts routinely reverse erroneous Rule 404(b) decisions. In fighting for the introduction of this evidence, Wrice repeatedly touted how effective this evidence would be to boost Wrice's believability as to his abuse claims, and used it specifically for that purpose. From pre-trial proceedings through closing, the purpose of this evidence, offered "solely for the coercive interrogation claim" (Dkt. 589, 1060:17-19), was so the jury could believe Wrice because he was not the only one.[38]

This error was not harmless. It was designed to make the jurors hate defendants and buttress Wrice, and thus was "an important component" of Wrice's case. *Beasley*, 809 F.2d at 1280 (error in admitting evidence of other acts to show a pattern was not harmless); (*see also* Dkt. 589, 120:5-8; 1793:12-18; 1805:10-1809:5; 1812:11-1818:11.) Moreover, the other acts evidence improperly "appeal[ed] to the jury's sympathies, arouse[d] its sense of horror, and provoke[d] its instinct to punish . . ." *United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004). Undeniably, the hours spent regaling the jury with horror stories of abuse—which

---

[38] *See, e.g.,* Dkt. 589, 120:5-8 ("These officers, you are going to hear, had done this previously. This was not just an isolated case. It wasn't just a unique case. This was part of a practice that they used back in 1982..."); *id.*, 1793:12-18 ("His account of what happened to him parallels so many other witnesses you've heard of in this case. You know it's true. You know it's true.").) Wrice even used a chart in closing argument to emphasize how other acts evidence "so incredibly mirrors what Mr. Wrice testified to." (Dkt. 589, 1805:9-12; *see also Id.*, 1805:10-1809:5, 1812:11-1818:11.) He refused to produce that chart to us, it was so unfairly prejudicial. We have filed a pending motion for its production. (Dkt. 600.)

dwarfed the minutes of reading trial "summaries" of key defense witnesses—allowed the jury to punish Defendants for conduct outside of this litigation. This is never permissible and violated Defendants' due process rights. *See Phillip Morris USA v. Williams*, 549 U.S. 346, 356-357 (2007); *see also* Dkt. 388, 10-15, Dkt. 454, 14-15.[39] The prejudice was palpable and inexcusable. Defendants are entitled to a new trial.

## IV. Testimony regarding state court orders was erroneously admitted to infer Wrice's innocence.

Although none of several post-conviction orders that were entered in the Illinois courts should have come into evidence, the Court wrongly allowed Wrice to testify to certain orders which *favored* Wrice (by vacating his conviction and dropping the charges). (Dkt. 594, 10.) Thus Wrice was permitted to testify that he had told his story to another court, after which "a circuit court judge made a ruling" reversing his conviction. (Dkt 594, 10.) This testimony in effect told the jury that a judge found Wrice to be innocent and so should they.

But Wrice went further. He used the state court rulings to imply his innocence, in his words to establish his "presumption of innocence."[40] (Dkt. 594, 24-25.) **This was contrary to the state court's ruling**, which said "I am going to *deny the claim of actual innocence*" and "I can't sit here and say that evidence in all probability would change a jury's verdict." *See* Reply in support of JNOV, Ex. B at 3-4 (emphasis added) (Wrice's trial counsel was present at this finding). There is no dispute that the evidence and argument was **false and prejudicial.** Worse, Wrice's counsel was present when the court denied a finding of innocence.

---

[39] As if this were not enough prejudice, Wrice proceeded to interject additional allegations of abuse into this case "under the guise of cross-examining" Bertina Lampkin, with absolutely no intention of proving the allegations. (Dkt. 594, 22.) Wrice's tactic placed inadmissible hearsay before the jury, which violates the Rules of Evidence just as plainly as an attempt to directly admit such evidence. *See United States v. Hall*, 989 F.2d 711, 716-17 (4th Cir. 1993).

[40] The presumption of innocence is applicable only in the criminal context, and offered in a civil case serves only to confuse the jury as to the proper standard. *Rabon v. Great Sw. Fire Ins. Co.*, 818 F.2d 306, 310 (4th Cir. 1987).

That this Court referenced state court orders in its statement of the case (which itself left the same incorrect impression as the orders and to which defendants objected (Dkt. 589, 15:13-16:12), does not excuse the error in admitting the testimony, or the misconduct in closing argument. Although Defendants anticipated that Wrice would use this evidence to falsely imply his innocence, the Court apparently did not. (Dkt. 589, 6:24-8:20.) The lack of neutrality in the statement of the case was due in large part to Wrice's insistence that the jury hear only about court orders that suggest innocence, opposing phrasing which "could suggest anything." (*Id.*, 18:1-22:24.) The Court's statement to the jury did not authorize irrelevant hearsay testimony, nor give Wrice license to misrepresent these orders in closing argument.

The prejudice in allowing the jury to infer that a judge (and prosecutor) had determined Wrice was innocent cannot be overstated. As show above, the court *denied a finding of innocence,* and this Court agreed that dismissing the charges was not even an acknowledgement that the confession was material. (Dkt. 589, 1688:10-15.) No inference of innocence can be drawn from a ruling *denying a finding of innocence.* Wrice's counsel simply took advantage of the jury's lack of understanding of the criminal justice system, at a point in the trial where it was no longer possible to rebut the inference with actual evidence,[41] to prejudicially "place[] the weight of the court's authority behind the [Plaintiff's theory of the case]." *United States v. Blanchard,* 542 F.3d 1133, 1150 (7th Cir. 2008). Admitting evidence of the vacated conviction, unchallenged by contrary rulings negating the inference of innocence,[42] and failing to correct

---

[41] Wrice's argument that Defendants could have introduced evidence explaining the vacate order advocates a lengthy sidetrack which *both Defendants and Plaintiff* were trying to avoid by moving *in limine* to exclude court orders. (Dkt. 381, 7; Dkt. 415, 10-11 (citing *Fields v. City of Chicago*, 2017 U.S. Dist. LEXIS 146077 at *36 (Sept. 11, 2017)(introducing court order would "require[] a detailed explanation of the differences between the record in the state court proceeding and the evidence admitted in the present case," resulting in an unnecessary "lengthy sidetrack" from the true issues at trial.").)

[42] Defendants were barred from introducing evidence that in vacating the conviction, Judge Walsh denied the motion based on innocence, and that Judge Byrne denied Wrice a certificate of innocence, believing

counsel's misstatement about innocence, made Wrice's misconduct possible, creating "a significant risk of unfair prejudice to the defendant[s]." *Id.* (noting that court orders are "of dubious relevance" and "the danger of unfair prejudice unquestionably high.")

## VI. Plaintiff's counsel's misconduct contributed to an unfair trial.

In our opening brief (Dkt. 594, 23-28), we showed that Wrice's counsel's misconduct, including making accusations of racism against Defendants and their counsel, violated all principles of a fair trial. In response, Wrice asks this Court to excuse his counsel's outright misrepresentation of facts because her antics were directed to influencing the jury on Claim I, on which Wrice was unsuccessful. Not so. The misconduct was directed to Wrice's credibility and guilt, which were directly relevant to his self-incrimination claim (see page 27 above).

Wrice's counsel's conduct was unethical and plainly intended to improperly influence the jury. Wrice concedes there was absolutely no evidence that Kenny Wrice "made a deal for himself" (Resp., 27), but his counsel said it anyway. Wrice knew the State's Attorney did not drop charges because of a belief that Wrice was innocent (page 4 above), but his counsel said it anyway. As to speaking objections, Wrice cannot deny the record, which shows that his counsel regularly interjected with commentary when Defendants were addressing the jury or examining witnesses, unabashedly coaching witness testimony in the process. (*E.g.*, Dkt. 589, 665:12-15.) And Wrice admits his counsel made inflammatory racist remarks which were completely unrelated to any issue in the case. (Resp., 29.)

By far the most egregious misconduct was Wrice's counsel's attack on Jennifer Scott, both on the witness stand and in closing argument. (Dkt. 594, 14-17; 25-26.) Wrice's counsel was not free to argue that Ms. Scott's testimony denying a "loving" relationship with Wrice (his

---

he was most "likely guilty." (Dkt. 482, 12-13; 21.) In so ruling, the Court referenced the orders as hearsay, which applies equally to exclude the orders which were nonetheless introduced.

and his family's false testimony) was not credible, given that she convinced this Court to *prevent Scott* from testifying about how she did *not* have a loving relationship with Wrice because he had beaten and raped her as a child and teenager. Ms. Scott was prepared to testify to the intricate details of the abuse she suffered at Wrice's hand (*see* Dkt. 589, 1616:1-1618:16), all facts that would have given her testimony unshakeable credibility and undermined all of the character testimony of Wrice and his family members. It also would have corroborated her testimony that she "did not" have a phone call with Wrice on September 9, 1982 (she had cut all ties with him in June 1982), rebutting Wrice's false alibi that he was talking to her, and not raping and burning Ms. Byron, that night. (Dkt. 589, 1627:1-12.) This would have further undermined Wrice's credibility, undermining Claim I. The Court's erroneous limitations on Ms. Scott's testimony (Dkt. 594, 25-26), and Wrice's counsel's abuse of that rule, was reversible error.

Wrice's counsel's unabated misconduct "tainted the trial from opening statements through closing arguments," and so swayed the jury as to deny Defendants a fair trial. *See Walden v. City of Chicago,* 846 F. Supp. 2d 963, 980 (N.D. Ill. 2012) (granting new trial even where the Court admonished counsel); *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) ("[t]he misconduct of counsel justifies a new trial where that misconduct prejudiced the adverse party.' " *Davis v. FMC Corp.*, 771 F.2d 224, 233 (7th Cir.1985) (quoting *Wiedemann v. Galiano*, 722 F.2d 335, 337 (7th Cir.1983)).  A new trial is required.

Date: May 22, 2020                                      Respectfully submitted,

                                                        By:    /s/      *Andrew M. Hale*
                                                               One of the Attorneys for Defendants
                                                               *John Byrne* and *Peter Dignan*

Caryn L. Jacobs
Managing Deputy Corporation Counsel
City of Chicago Department of Law
121 N. LaSalle Street, Room 600
Chicago, Il 60602

Andrew M. Hale
Scott Jebson
Amy A. Hijjawi
Anne Erickson
Jennifer Bitoy
HALE & MONICO LLC
53 W. Jackson Blvd., Suite 330
Chicago, IL  60604

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew Hale, an attorney, hereby certify that on May 22, 2020, I have electronically filed the foregoing document with the Court's CM/ECF system, which simultaneously sent an electronic copy of the same to all counsel of record.

/s/ *Andrew Hale*