IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STANLEY WRICE,

                  Plaintiff,                Case No. 14 C 5934

          v.                      Judge Harry D. Leinenweber

JOHN BYRNE and PETER DIGNAN,

                  Defendants.

## MEMORANDUM OPINION AND ORDER

Following a trial that ended with a partial jury verdict in favor of Plaintiff Stanley Wrice, Defendants John Byrne and Peter Dignan bring the following Motions: for a new trial (Dkt. No. 594); for judgment notwithstanding the verdict (Dkt. No. 593); and to compel Plaintiff to file the demonstrative chart used in his closing argument (Dkt. No. 600). For the reasons stated herein, Defendants' Motions for a New Trial and for Judgment notwithstanding the verdict are denied and their Motion to Compel Plaintiff to file the demonstrative chart used in closing argument is granted.

## I. BACKGROUND

Plaintiff Stanley Wrice was convicted in May 1983 of a violent rape and sentenced to 100 years in prison. He was released in 2013 after a state court judge found that Defendants Byrne and Dignan tortured him into confessing. (*See People v. Wrice*, No. 82-C-8655 (03) (Ill. Cir. Ct. Dec. 10, 2013), Wrice Rule 56.1 Statement, Ex. 2, Dkt. No. 339-2.) Specifically, the state court judge found that Byrne and Dignan committed perjury, and that a witness "found by the special prosecutor to be a credible witness beyond a reasonable doubt" testified to seeing "[Wrice] being brought up

handcuffed [and] he can hardly walk. The medical evidence confirms that he was injured." (*Id.* at 2) Based on this evidence, the judge granted Wrice a new trial, and the State of Illinois moved to dismiss its case against Wrice. *See Wrice v. Burge*, 187 F. Supp. 3d 939, 944 (N.D. Ill. 2015). He filed this federal civil rights lawsuit in 2014. In February 2020, he went to trial against Byrne and Dignan.

Following an acrimonious eight days, Wrice presented three claims to a jury: that Byrne and Dignan (1) violated Wrice's Fourteenth Amendment constitutional right to a fair trial by failing to disclose exculpatory and impeachment evidence material to his criminal defense and by fabricating evidence that was used against him in his criminal trial and resulted in his conviction (Claim I); (2) violated Wrice's right against self-incrimination under the Fifth Amendment by coercing him to make a self-incriminating statement that was used against him at trial (Claim II); and (3) conspired to deprive Wrice of his constitutional rights (Claim III). The jury found for Byrne and Dignan on Claim I but for Wrice on Claims II and III. They awarded Wrice $4,000,000 in compensatory damages and $1,200,000 in punitive damages—$600,000 against each Byrne and Dignan.

Defendants now move for a new trial, judgment notwithstanding the verdict or remittitur, and to compel Wrice to file a demonstrative chart used in his closing argument.

## II. DISCUSSION

### A. Motion for a New Trial Pursuant to Rule 59

Defendants move first for a new trial under FED. R. CIV. P. 59. A court may grant a new trial motion under Rule 59 if "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons

the trial was not fair to the moving party." *Winger v. Winger*, 82 F.3d 140, 143 (7th Cir. 1996) (citing *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 516 (7th Cir. 1993) (internal quotation marks omitted)). The Court "will not set aside a jury verdict if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of evidence to the jury." *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004). Accordingly, the standard to grant a new trial is high, and a court must only grant a Rule 59 motion when "the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (citing *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (internal quotation marks omitted)).

Defendants argue they are entitled to a new trial for three main reasons: (1) the jury instructions regarding the coerced confession claim, Count II, were given in error; (2) the Court made erroneous evidentiary rulings that prejudiced Defendants; and (3) Wrice's counsel's misconduct prejudiced Defendants. The Court addresses each argument as follows.

### 1. Jury Instructions

Defendants argue that the jury instructions as to Count II, the coerced confession claim, contained multiple misstatements of law, prejudiced the Defendants, and improperly led the jury to award damages twice for the same injury. Specifically, Defendants argue that: (1) the instruction for Count II incorrectly defined coercion; (2) the Court erroneously concluded that damages is not an element of Claim II and erred

in not instructing the jury of the possibility of awarding nominal damages; and (3) the jury was erroneously instructed to award duplicative damages, based on an award of damages on Count II and Count III. The Court addresses each of those arguments in turn and finds that the jury instructions as presented were not given in error such that Defendants are entitled to a new trial.

The Court gave the following jury instruction as to Count II:

Plaintiff claims that defendants Byrne and Dignan violated his constitutional rights by coercing plaintiff to make self-incriminating statements to the charged crimes. To succeed on this claim, plaintiff must prove each of the following things by a preponderance of the evidence:

1. That defendant Byrne and/or Dignan coerced plaintiff to make self-incriminating statements; and

2. The self-incriminating statement was used against plaintiff in the criminal trial; and *[sic]*

A statement is coerced if it is the result of physical or psychological abuse or the threat of physical or psychological violence.

If you find that plaintiff has proved each of these things by a preponderance of the evidence, then you must decide for plaintiff and go on to consider the question of damages.

If, on the other hand, you find that plaintiff has failed to prove any of these things by a preponderance of the evidence against the defendant you are considering, you should find for that defendant and not consider the question of damages as to that defendant on this claim.

(Trial Tr. at 1956:21–1957:17, Dkt. No. 589.)

A court considering a challenge to jury instructions reviews the instructions as a whole to determine whether they adequately informed the jury of the applicable law. This involves two steps. First, the court asks

- 4 -

whether the instructions, taken as a whole, misstated or failed to state the law fully. If so, a court must determine whether the instructions confused or misled the jury, thereby causing prejudice. *Aldridge v. Forest River, Inc.*, 635 F.3d 870, 876 (7th Cir. 2011) (also considering "whether the jury had an understanding of the issues.").

Defendants first argue that this instruction incorrectly defined coercion. In rejecting Defendants' proposed instruction that a confession "is coerced if it is the result of physical abuse or the threat of physical violence *that have overcome the individual's free will,*" Defendants argue that the Court committed reversible error. Citing *Arizona v. Fulminante*, Defendants argue that a jury instruction on this issue is invalid without this language. 499 U.S. 279, 288 (1991) (discussing whether "will was overborne in such a way as to render [defendant's] confession the product of coercion.") This language was necessary, Defendants argue, because it informs the jury of the "quantum of coercion necessary" to prove a claim. (Defs.' Mot. for New Trial at 3–4, Dkt. No. 594.) Defendants' arguments are unpersuasive; the instruction did not misstate the law, and even if it did, the misstatement did not confuse or mislead the jury.

Defendants' emphasis on a "quantum" of coercion has an outward, initial appeal, but is semantically meaningless. Defendants argue that the jury needed to know as a matter of law the amount of coercion necessary, but if that is true then the question necessarily follows: what other kinds of coercion are there? That question is hard to answer because coercion necessarily involves an overbearing of will. To coerce is to "compel by force or threat." *Coerce*, Black's Law Dictionary (11th ed. 2019). This definition comports both with what the jury was told and with common sense.

If Wrice was coerced in giving his statement, then his will was necessarily overcome because, if it was not, then his statement would have been given willingly. A willing person need not be compelled. The jury would have understood this, and failure to include the Defendants' proposed language was not error. Indeed, Defendants' own Supreme Court citation makes no mention of the "quantum" concept and instead supports the analysis above. The Supreme Court wrote that the "ultimate test" is "the test of voluntariness." *Arizona*, 499 U.S. at 303 (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). The Supreme Court continued:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Arizona*, 499 U.S. at 303 (citing *Culombe*, 367 U.S. at 602)*.*

The framing of the question is simple: did Wrice will to make his statement? He argues he did not. While the "overborne" language appears in this passage, so does "capacity for self-determination critically impaired," and Defendants do not argue it was error not to include that language. That is because both these things are obviously necessary to find coercion, and they are implied in the very definition of the word. Accordingly, failure to include language was not error, and so Defendants fail to satisfy the first of the two steps, stated above, necessary for a finding of error in jury instructions.

Even if the first step above were met—if the instruction as a whole misstated the law—Defendants would fail at the second step because failure to include this language was not misleading and therefore not prejudicial.

- 6 -

The jury understood the issues, particularly because of the position Defendants took at trial. Wrice claimed Defendants beat him repeatedly until he gave a self-incriminating statement. Defendants claim that Wrice was not beaten at all. Even though the Court finds that the Defendants' proposed overcome will language is unnecessary, it is hard to see how the jury would have found differently even if it had been included in the instructions. The jury found for Wrice because they believed Defendants had beaten him. If, for example, Defendants had admitted to beating Wrice and then, three hours later, apropos of nothing, he gave a self-incriminatory statement, the situation may be different—but even then, however, the argument would not be that his will was not overborne, it would be that he was not coerced at all. It stretches reason to think that the jury believed Wrice when he claimed he had been beaten repeatedly but that, had they only known that the beatings had to overcome his free will, they would have decided differently.

Second, Defendants argue that the Court erroneously concluded that damages is not an element of the claim of compelled self-incrimination and erred in not instructing the jury of the possibility of awarding nominal damages. Defendants argue that nothing in the jury instructions demonstrates that damages must be proven. That is incorrect. The jury instructions explicitly tell the jury to "go on to consider the question of damages" if they find that Wrice's confession was coerced. (*See* Trial Tr. at 1957:9–12.) Defendants discuss at length what the Court had to say about damages outside the presence of the jury, but that is irrelevant to the question whether the instructions misstated the law or were misleading. The Court finds that they were not.

- 7 -

Asking the jury to consider the question of damages signals that damages are an issue; the jury was not told that they had to award Wrice damages, nor that the damages could not be nominal. Telling the jury to consider the question of damages but not telling them that damages is an element of the claim that must be proved is not a material misstatement of the law. It is obvious that if damages are something for the jury to consider, then it is an open question. As to nominal damages, the Court did not err in declining to instruct the jury of the possibility of awarding nominal damages. Indeed, the jury's award of such a large sum provides the strongest evidence—albeit post hoc—that if a nominal damages instruction had been provided, it would not have been heeded. No rational jury would choose to award millions of dollars only because the option to award $1 had not been explicitly placed before them—with the question of damages completely open, the jury could have awarded any amount it deemed necessary to compensate Wrice; that they chose such a large sum belies any argument that they were misled by not being told outright they could award Wrice a low amount, or no amount, of money.

Defendants' reliance on *Davis v. Wessel* is misplaced. 792 F.3d 793 (7th Cir. 2015). In that case, the Seventh Circuit reversed the trial court because the jury instructions misstated an element of a § 1983 claim. There, the instructions used a disjunctive "or" to imply that plaintiff need prove only one element of a claim when the plaintiff needed to prove all three elements. *Id.* at 800–02. Here, all the elements were present, and Defendants' problem with the instructions is that they contained less robust explanations or otherwise omitted unnecessary phrases that Defendants would have liked to insert.

There is no similar implication here. There is no implication that Wrice did not need to show damages or that he did not need to prove the essential elements of his claims. Moreover, in *Davis*, the Seventh Circuit noted the jury's relatively small damages award as evidence that the jury was misled, writing "the jury may well have found [defendants] liable [only] for being negligent or making an accidental mistake, and that is constitutionally insufficient." *Id.* at 802. Here, on the other hand, the jury's award of such a high amount indicates that nominal damages were almost certainly not something the jury would have awarded had the option been presented.

Finally, Defendants argue that the jury was erroneously instructed to award duplicative damages, based on an award of damages on Count II and Count III, the conspiracy claim, when Wrice was not entitled to collect a separate damages award for Count III. The instructions for Count III contained identical "go on to consider the question of damages" language as Count II. (Trial Tr. at 1958:9–13.) Wrice responds that Defendants drafted this language and they therefore cannot complain of an error that they introduced. (*See* Pl.'s Resp. to Defs.' Mot. for New Trial, Dkt. No. 609 (citing Trial Tr. at 1758:15–1761:25 (slightly modifying but accepting in substantial part Defendants' proposed instruction as to Claim III)).) Defendants reply that even if they did introduce the error, it is plain error and the award should at least be reduced by half.

The Court agrees that an award of duplicative damages cannot stand. "A judgment that can be read to allow a plaintiff to recover twice for the same injury contains a manifest error of law." *Duran v. Town of Cicero*, 653 F.3d 632, 642 (7th Cir. 2011) (reversing when judgment allowed

- 9 -

plaintiffs to recover once from an individual officer found liable and again from a municipality). Here, however, neither the judgment nor the verdict form can be reasonably read to allow duplicative recovery. (*See* Amended J., Dkt. No. 627 (judgment entered "in favor of plaintiff(s) Stanley Wrice and against Defendants . . . in the amount of $5,200,000) & Verdict, Dkt. No. 574 (finding for Wrice on Counts II and III and indicating a dollar amount that does not reference either Count in specific)). Defendants complain that the jury was not cautioned to avoid awarding duplicate damages. But even though there was identical "consider the question of damages" language in every Count, this does not necessarily mean that the jury believed it should give a separate damages award for each Count. There is no indication from the jury on any of the forms it returned that it gave an additional award for Count III. Defendants argue the award should be halved, but for this to be proper, the Court would need to assume that the jury picked a number to award for Count II and doubled it for Count III. There is no basis to make this assumption, both because the jury did not indicate the damages allocation and because the jury had no basis to assume that Count III was "worth" as much as Count II. From solely the absence of an instruction not to award duplicative damages for Count III, Defendants urge the Court to find that the jury awarded twice the amount it otherwise would have. Without further evidence, the Court will not so find, and it is not clear that there is any error in the verdict amount. Because the error is not clear, and because Defendants drafted the instruction for Count III and introduced the alleged error, the Court declines to find the instruction faulty and halve Wrice's award.

Accordingly, the Court finds that it did not err in giving the jury instructions—none of the language Defendants complain about materially misstated the law and, if it did, that misstatement or omission did not prejudice Defendants.

### 2. *Evidentiary Rulings*

Next, Defendants argue that the Court made evidentiary rulings that unfairly prejudiced them. They argue that the Court erred in: (1) barring defendants from introducing Byrne and Dignan's prior testimony from Wrice's criminal trial and suppression hearing; (2) substituting summaries for full criminal trial testimony; (3) introducing evidence of Illinois court orders; (4) barring evidence of Wrice's gang affiliation to show his relationship with his former codefendants and otherwise not allowing Defendants to rebut evidence of Wrice's character as testified by his family members; (5) barring evidence that Karen Byron identified Wrice; and (6) improperly allowing other acts evidence for propensity purposes, as prohibited by FED. R. EVID. 404(b).

To succeed, Defendants must first demonstrate that the Court abused its discretion in making a particular evidentiary ruling. Under this standard, there is error if the Court's decision was "based on an erroneous conclusion of law or the record contains no evidence on which the [C]ourt rationally could have based its decision." *Mister v. Northeast Ill. Commuter R.R. Corp.*, 571 F.3d 696, 698 (7th Cir. 2009). Even if the Court abused its discretion, an evidentiary ruling should only be reversed if the erroneous ruling "violated a party's substantial rights." *Smith v. Hunt*, 707 F.3d 803, 808 (7th Cir. 2013). "To meet that threshold, a

significant chance must exist that the ruling affected the outcome of the trial." *Id.*

### a. *Byrne's and Dignan's Prior Testimony*

Defendants claim that the Court erred in barring Defendants from introducing Byrne and Dignan's prior testimony. Byrne testified at Wrice's criminal trial and suppression hearing, and Dignan testified at Wrice's suppression hearing. Defendants argue that the Court should have allowed Byrne to introduce Dignan's prior testimony and allowed Dignan to introduce Byrne's. In making that claim, they argue that: (1) the prior testimony was clearly admissible under Rule 804; (2) the Court erred in denying Defendants an opportunity to introduce their prior testimony pursuant to Rule 106; (3) Byrne's full trial testimony should have been admitted because it is what Wrice's criminal jury heard; and (4) the omission of this testimony unfairly prejudiced Defendants. The Court addresses each of these claims in turn.

First, Defendants argue that Byrne's and Dignan's testimony at Wrice's prior trial was clearly admissible under Rule 804. That rule provides for admission of testimony from a prior trial or hearing if the declarant is unavailable under Rule 804(a) and if the party had an opportunity and similar motive to examine the testimony in a prior proceeding. FED. R. EVID. 804.

The Court excluded Byrne and Dignan's prior testimony because it found that they were not unavailable under Rule 804(a). Specifically, the Court found that Byrne and Dignan were unavailable to parties other than themselves—that is, Wrice could have introduced their testimony if he wished, but Byrne's and Dignan's invocation of the Fifth Amendment and

refusal to testify did not create unavailability allowing them to present their prior testimony to a jury while at the same time refusing to be cross examined about it. Defendants challenge that ruling. They argue that although Byrne was unable to introduce his own prior testimony, he could have introduced Dignan's, and Dignan could have introduced Byrne's. For the following reasons, the Court finds that it did not err in barring Dignan's and Byrne's prior testimony under Rule 804.

An initial note about authority. The parties freely cite out-of-circuit precedent, and the Court is not aware of—nor have the parties cited—any Seventh Circuit case that addresses this issue directly. Defendants cite one Seventh Circuit case that they argue unequivocally supports their position, but for reasons explained below the Court finds that case distinguishable. Finally, out-of-circuit precedent is not binding, though it may be persuasive. Because there seems to be no on-point Seventh Circuit guidance, the Court must rely on the opinions of other jurists, fidelity to the spirit of the rule, and, ultimately, its discretion.

A witness's prior testimony can be introduced as an exception to the rule against hearsay if the witness is "unavailable" under Federal Rule of Evidence 804(a). Rule 804(a) does not apply when "the statement's proponent procured . . . the declarant's unavailability as a witness in order to prevent the declarant from attending or testifying." FED. R. EVID. 804(a). All agree that this means that when a "defendant invokes his Fifth Amendment privilege, he has made himself unavailable to *any other party,* but he is not unavailable to himself." *United States v. Peterson*, 100 F.3d 7, 13

(2d. Cir. 1996) (emphasis added). The *Peterson* court cited a Fifth Circuit case to explain its reasoning:

> The sponsor of a declarant's former testimony may not create the condition of unavailability and then benefit therefrom. The rule [the defendant] relies upon was designed to ensure one access to testimony where, by the actions of the opponent, or at least through no fault of the testimony's proponent, a desired witness becomes unavailable. In the instant case, [the defendant] created his own unavailability by invoking his fifth amendment privilege against self-incrimination.

*Id.* (quoting *United States v. Kimball*, 15 F.3d 54, 55–56 (5th Cir. 1994)); *see also McGahee v. Massey*, 667 F.2d 1357, 1362 (11th Cir. 1982) ("A defendant cannot have it both ways.. . .[He may not] testify in attack . . . and at the same time seek refuge behind the shield of the fifth amendment"); *United States v. Bennett*, 539 F.2d 45, 54 (10th Cir. 1976) ("The right not to testify is clearly his, but the defendant may not invoke that right and avoid facing cross-examination while claiming the right to have his testimony put before the jury."). At least three other circuits have found that the rule's purpose is to prevent a party from benefiting from creating their own unavailability but to allow the adverse party to introduce that testimony if they choose. The Court agrees with these decisions.

Defendants emphasize that the *Peterson* court's statement quoted above is decisive, that the phrase "has made himself unavailable to *any other party*" should be construed literally: "any other party" means any other party, including each Defendant's Co-Defendant. *See Peterson*, 100 F.3d at 13 (emphasis added). But although *Peterson* is persuasive, the Court will not subject an out-of-circuit case to such a close reading, particularly when the facts there do not closely conform with the facts here. In

*Peterson,* a defendant refused to testify at his criminal trial but sought to introduce testimony he had given to a state grand jury. Perhaps most importantly for present purposes, the defendant had no codefendant. The district court declined to allow Peterson to introduce this prior testimony, and the Second Circuit affirmed. Although Peterson could not introduce his testimony, the opposing party could have, if they had wished to.

Defendants' Seventh Circuit case presents roughly the same problem. *See United States v. Pizarro*, 717 F.2d 336 (7th Cir. 1983). That case concerned a consolidated appeal by two codefendants charged with selling heroin to undercover federal agents. Because of various trial errors, one defendant, Rodriguez, was tried twice; the other defendant, Pizarro, was tried three times. At his second trial, Rodriguez testified that a person other than Pizarro was their heroin supplier. Rodriguez refused to testify at Pizarro's third trial because he was receiving death threats. Pizarro sought to introduce this testimony because Rodriguez was unavailable. The Government conceded that Rodriguez was unavailable under FED. R. EVID. 804(a)(1), but the district court excluded the testimony under FED. R. EVID. 804(b)(1). The Seventh Circuit reversed. *See id*. at 348–52. Although the district judge ruled on the basis of 804(b), the opinion contains some discussion of 804(a), but only in the context of whether Rodriguez was responsible for the death threats he received; thus, this discussion is not helpful here, particularly because the facts do not discuss the implications of two codefendants in the same trial proceedings.

*Pizarro* and *Peterson* thus do not solve the problem before the Court because they do not present situations where introducing testimony,

strictly speaking, may conform to the text of the rule but so flagrantly violate its purpose. The *Peterson* defendant had no codefendant and when the Second Circuit wrote "any other party" in reference to who could introduce the defendant's prior testimony, it clearly referred to the prosecution and not to a nonexistent codefendant. Although it is closer factually, *Pizarro* misses the mark too, and for similar reasons. Rodriguez and Pizarro were codefendants who filed a consolidated appeal but appealed on different grounds and were charged with mostly different counts in the indictment; Rodriguez did not appear at the trial in which Pizarro sought to introduce his testimony, had already been convicted, and would not have benefited if Pizarro introduced his testimony to the jury. Here, two defendants accused of committing identical misconduct against the same plaintiff during the same incident are on trial at the same time, using the same lawyers, and putting on the same defense. Byrne and Dignan certainly had a right not to testify, but neither should be able to also obtain the benefit of having prior testimony put in front of the jury while also refusing to submit to cross-examination; this principle holds even though Defendants insist that it was Dignan who sought to introduce Byrne's testimony and Byrne who sought to introduce Dignan's.

Defendants also argue that to consider Byrne and Dignan a "unit" is unfair because each Defendant maintained his individual rights. Although the Court recognizes that *ex post* rationales are less convincing, it is worth mentioning that the outcome of this case belies Defendants' argument on this point. It is obviously true that Defendants each retained their individual rights, but they chose to use the same lawyers, file joint briefings and motions, and present their case together. The jury's verdict

reflects this reality. They were both found not liable on Count I and liable on Counts II and III and were even judged liable for punitive damages in the same amount—$600,000. They did not argue that one defendant was more or less culpable than the other; their defense was one in the same, and it rose or fell as a unit—and, importantly, this was because of a strategic choice Defendants made. This practical reality must be recognized.

Accordingly, the Court correctly found that Wrice, the adverse party, could introduce Defendants' prior testimony because their refusal to testify made them unavailable to Wrice. But Defendants could not use the Fifth Amendment to avoid cross-examination while introducing their prior testimony as part of their own defense and obtaining a benefit. They could not circumvent this prohibition by advocating a hypertechnical reading of the rule.

Next, Defendants argue the Court erred in preventing them from admitting Byrne's prior testimony for completeness pursuant to FED. R. EVID. 106. Defendants point out that the Court recognized that, under Rule 106 "the defendants [were] entitled to have a limited amount added . . . to whatever extent that statements that are read that need clarification from his testimony and for completeness, then . . . that can be done." (Trial Tr. at 499:15-17 & 507:18-20.) The Court said that Defendants must present what they wish to add under Rule 106 when they present their case. However, when Defendants tried to introduce their proposed Rule 106 evidence, the Court rejected their evidence and said it had already ruled. (*Id.* at 1727:20-1728:3.) Defendants argue here that not allowing

introduction of Byrne's testimony for Rule 106 purposes was reversible error. For the following reasons, the Court finds that it was not.

Rule 106 requires that when a party "introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." FED. R. EVID. 106. Rule 106 is meant to remedy "the misleading impression created by taking matters out of context." Rule 106 advisory committee notes. "In addition to being relevant, the remainder of [a statement] should be admitted if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding." *United States v. Lewis*, 954 F.2d 1386, 1392 (7th Cir. 1992) (citing *United States v. Sweiss*, 814 F.2d 1208, 1211–12 (7th Cir. 1987) (internal quotations omitted)).

Defendants specifically argue that three portions of Byrne's testimony should have been introduced. The first was his testimony about the timing of interviews; Defendants argue that this testimony shows that Wrice's story about being taken downstairs twice and beaten for extended periods of time was impossible. Second, Defendants argue that Byrne's denying abusing Wrice should have been introduced. Third, Defendants argue that it was error not to introduce Byrne's observations about smelling a burning odor in Wrice's house.

To the Court, these statements looked—and still look—suspiciously like the kind of substantive testimony that the Court had already ruled could not be introduced; this is particularly true with respect to the

timing of interviews. That testimony does not fall under any of the four elements above because it serves the purpose of "clarifying" only to the extent it allows the jury to hear Byrne's side of the story. The Court properly ruled that Defendants were entitled to introduce any portion of their prior testimony that were necessary for completeness and clarification, but the portions that Defendants sought to introduce under Rule 106 did not serve those purposes. The Court had already ruled that Byrne's prior criminal trial testimony could not be included, and it is clear that this was an attempt by Defendants to put select portions in front of the jury. Because Byrne refused to testify and subject himself to cross-examination, this was impermissible.

Even if these statements should have come in, introducing them would not have made a difference and their exclusion did not create any unfair prejudice to Defendants. With respect to Byrne's denial of abuse, it was obvious to everyone that Defendants' position was that they did not abuse Wrice and that he was not abused. Allowing Byrne's prior testimony where he made his denial would have added little context. A similar logic applies to Byrne's observations about smelling a burning odor in the house: that observation is evidence that Byron was burned, which nobody denies. And with respect to Byrne's testimony about the timing of the interviews, this only supports Defendants' claim that Wrice's story was impossible to the extent that the jury believed Byrne over Wrice. Again, Byrne obviously denies beating Wrice, so it makes sense that he has a story of the interrogation that conflicts with Wrice's. Accordingly, Defendants were not prejudiced by this exclusion—all it does is show further that Byrne is sticking with the same story he told before, and that is hardly notable,

particularly given Defendants' steadfast denials and unwillingness to testify any further about the incident.

Defendants' third and fourth arguments, that the Court had no reason to disallow Byrne's full trial testimony and that the Defendants were prejudiced by the exclusion, are undeveloped and their substance is addressed in full above. But Defendants make two arguments not resolved by the preceding analysis, and the Court addresses them here. Defendants argue that the Court gave no reason for excluding Byrne's testimony and never justified its decision. That is untrue. As explained above, Byrne wanted to introduce his trial testimony through his Co-Defendant, Dignan; this is not allowed under the Federal Rules of Evidence. This was explained time and time again. And, as explained below, the Court's use of summaries was proper. Accordingly, the Court ruled correctly in refusing to admit Byrne's entire criminal trial testimony.

Finally, the Court did not "punish" Defendants for invoking their privilege: it is clear that Defendants wanted it both ways—to refuse to take the stand while introducing their former testimony to the jury and letting it speak for itself. There are rules against this, and the Court enforced them. Defendants' citation to *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977) for the proposition that refusal to waive Fifth Amendment privilege cannot "automatically and without more [lead] to the imposition of sanctions" is inapposite. The Court did not "sanction" Defendants; it enforced a rule of evidence in response to their refusal to testify. Defendants are not entitled to a new trial for this reason.

### b. Testimony Summaries

At trial, the Court did not allow Defendants to read the entire transcript of Wrice's criminal trial—some thousands of pages—aloud to the jury. Instead, the Court ordered the parties to draft summaries of witness testimony. Defendants contend this was error because the jury could not properly assess credibility through summaries and instead needed to hear the verbatim testimony, with all the starts, stops, and sputters of live testimony. They also argue that the Court ordered summaries in order to save a day, or maybe two, of time because Defendants only wanted to read select portions of the transcript and not the whole thing—though, as will be explained below, that is a bizarre argument to make. They assert that was highly prejudicial and constitutes reversible error.

Federal Rule of Evidence 611 allows the court to exercise "reasonable control over the mode and order of examining witnesses and presenting evidence" to make the procedure effective for "determining the truth" and to "avoid wasting time." FED. R. EVID. 611(a)(1)-(2). In a case about an alleged *Brady* violation, a party does not have to "force-feed the jury the original criminal trial in its entirety." *Jimenez v. City of Chicago*, 732 F.3d 710, 719 (7th Cir. 2013). Here, as in *Jimenez,* the criminal trial transcript was clearly relevant and important. But the Court was well within its authority under Rule 611 to expedite the proceedings by ordering the transcript be compressed into summaries.

Defendants were entitled to put on their case, not a theatre production. The Court is responsible for managing its own docket. That includes making decisions about the presentation of evidence that make the best use of the Court's time regarding its busy schedule, and also shows

- 21 -

respect for the members of the jury who sacrifice their own time to perform their civic duty. It was thus within the Court's power to decide that it was not an efficient use of anyone's time to "force-feed" a full trial transcript to the jury.

Defendants argue also that they did not want to read the trial transcript in full—they only wanted to read select portions of it, and that would have added a day, maybe two, to trial. This is news to the Court. To the extent it was an error not to allow abbreviated portions of the transcript, it was self-inflicted on Defendants' part. It really is hard to overstate how often Defendants' counsel overstepped the bounds of decorum and professionalism, particularly in pretrial. Counsel continued speaking and objecting, even on minor points, long after the Court had ruled. If Defendants changed their stance on introducing the criminal trial transcript in its entirety after they had made their initial representations, it was buried in the prolixity.

A good example of this is in Defendants' filed objection to the Court's ordering of summaries, see Dkt. No. 492. Defendants dedicate just two short paragraphs of a 17-page brief to the alternative request; and, in the pretrial conference, Defendants doubled down and insisted that if the Court would not allow the entire transcript to be read, they were at least entitled to send the entire transcript to the jury room. (*See* Pretrial Tr. at 55:14–15, Dkt. No. 511 ("But the jury absolutely has to have the criminal trial record. That's the whole basis of the claim.").) Had Defendants pivoted to the alternative argument once realizing they lost on their main point, the outcome may have been different. Instead, they continued to push on a point they had already lost. Although the Court

seeks to address every meritorious point an advocate makes, it is hard to do when the advocate struggles with concision and respect, presses their main point into oblivion, and pays hardly any attention to their alternative argument.

The Court ordered testimony summaries would be used instead of the whole verbatim criminal trial transcript, and Defendants objected—as they were entitled to do. But then they kept objecting, and objecting more, and did not file their proposed summaries, as the Court ordered them to do, until their very last chance. (*See* Pretrial Tr. at 7:19–23, Dkt. No. 534 ("But the Court ordered summaries, not verbatim transcripts to be submitted. Defendants have not acted in accordance with the Court's clear and unambiguous order. Defendants' refusal to cooperate is difficult for the Court to fully understand.").) Accordingly, the Court finds that it was not error to order testimony summaries, and Defendants were not prejudiced as a result, and if Defendants were prejudiced, it was their own error.

### c.   *Illinois Court Orders*

Next, Defendants argue that the Court erred in allowing evidence of Wrice's state court post-conviction proceedings. Specifically, Defendants argue that the Court erred both in reading a statement of the case to the jury that explained in part the post-conviction posture of Wrice's cases, and in allowing Wrice to testify that "a circuit court judge made a ruling" reversing his conviction. (Trial Tr. at 1141:13–22.) Defendants also argue that Wrice's counsel in closing arguments "falsely stated that the dismissed charges meant guilt or innocence was not an issue," (Defs.' Mot. for New Trial at 14), and that Wrice's counsel created the incorrect

impression that "a judge found Wrice to be innocent and so should they." (*Id*. at 14.) Finally, Defendants take issue with Wrice's assertion that he maintains a presumption of innocence, noting that another state court judge denied Wrice's certificate of innocence petition.

The Court reiterates its finding that it was important for the jury to know why, despite his 100-year prison sentence, Wrice was before them presenting his claims. Defendants' complaint that the Court allowed the *fact* of this state court ruling falls particularly flat because the Court granted Defendants' motion *in limine* to bar the state court judge's specific findings, which were damning for the Defendants. (*See generally People v. Wrice* at 2, Wrice Rule 56.1 Statement ("So I don't think there's any doubt that anybody can make an argument that Area 2 Violent Crimes detectives were not torturing people in Area 2.").) In their reply, Defendants quote Judge Walsh as saying, "I can't sit here and say that evidence in all probability would change a jury's verdict." (Reply to Defs.' Mot. for New Trial at 32, Dkt. No. 624.) This is misleading; Defendants cut the quote mid-sentence. Here is what Judge Walsh actually said: "I can't sit here and say that evidence in all probability would change a jury's verdict *because I don't really know what the rest of the evidence is*." (*Id*. at 4 (emphasis added).) That is, in denying Wrice's claim of actual innocence, Judge Walsh did not state that he did not think Wrice had not proved actual innocence because the claim was meritless; he said that the evidence was incomplete. Judge Walsh was already granting Wrice a new trial anyway, and clearly, he saw the actual innocence claim as redundant. *See People v. Oritz,* 919 N.E.2d 941, 952 (Ill. 2009) (remedy for succeeding on actual innocence claim is new trial). Excluding the

substance of Judge Walsh's findings was an incredibly favorable ruling for Defendants—and they were rightly excluded. At the very least, the jury was entitled to know about the procedural path the case took on the way to this courtroom.

The Court also declines to find error in Wrice's statements during closing arguments that guilt, or innocence was not an issue. First, closing arguments are not evidence, and the jury was so instructed. Moreover, those statements did not create a false impression. The jury had just heard days and days of evidence, illustrating the complicated circumstances of the case. They knew that the question of Wrice's guilt was central to the trial, and they had been told that they were the ultimate factfinders. Defendants took advantage of their own closing arguments to emphasize their theory of Wrice's guilt, so much so that Wrice's counsel felt compelled to say, at the beginning of her rebuttal, that Defendants' counsel "got lost on his way here today. He thought he was at the criminal courthouse. That's apparently where he intended to go." (Trial Tr. at 1919:25–1920:1–2.) And knowledge of the fact that another factfinder reversed Wrice's conviction, without hearing any other details, was not likely to sway them so strongly that they would abdicate their responsibility to come to their own conclusions (and indeed it did not, given that the jury ultimately found for Defendants on Claim I).

It is true that the Seventh Circuit has found it reversible error to put "the weight of [a] court's authority" behind a finding. *United States v. Blanchard*, 542 F.3d 1133, 1150 (7th Cir. 2008). This case dealt with the credibility finding of a particular witness, however, and this case illustrates not why the Court erred in introducing the fact of Judge

Walsh's decision, but why the Court was correct in excluding Judge Walsh's particular findings. In *Blanchard,* the trial judge in a criminal case allowed introduction of comments the judge made during a pretrial suppression hearing. *Id.* at 1140. The judge said that the court "finds this witness not to be credible and that the testimony he has given today is not credible." *Id.* at 1145. In fact, the judge said a lot of things, which included that the judge came to the "undeniable conclusion that [the witness] has not been credible...." *Id.* These comments, put in front of a jury, are devastating, and the Seventh Circuit found it was error to introduce this "judicial testimony" at the trial in violation of FED. R. EVID. 605, which prohibits "a presiding district court judge from testifying at trial as a witness or engaging in equivalent conduct." *Id.* at 1148. If the Court had allowed Judge Walsh's findings that Byrne and Dignan committed perjury or comparing conditions at Area 2 to "the Abu Ghraib facility in Iraq," Defendants would have a stronger case for error. (*See People v. Wrice* at 2, Wrice Rule 56.1 Statement.) This was not "judicial testimony" as described in *Blanchard*, and the Court did not err in informing the jury that Wrice was allowed to pursue his claims in federal court because his state court criminal conviction had been reversed.

Finally, the Court rejects Defendants' argument that it was prejudicial for Wrice to say he is presumed innocent. He no longer stands convicted in a criminal court. He is presumptively innocent, despite Defendants' insistence to the contrary. Defendants point out that Wrice is not innocent because in fact a state court judge denied Wrice's petition for a certificate of innocence. But certificate of innocence proceedings are unique proceedings where the petitioner bears the burden of proof and

whose disposition is left to the discretion of the court hearing the petition. *See* Ill. Comp. Stat. 735 §§ 5/2-702(g) (requiring petitioner to prove innocence by a preponderance of the evidence) & (j) ("The decision to grant or deny a certificate of innocence shall be binding only with respect to claims filed in the Court of Claims and shall not have a res judicata effect on any other proceedings."); *People v. McClinton*, 110 N.E.3d 268, 272 (Ill. App. Ct. 2018) ("Whether or not a petitioner is entitled to a certificate of innocence is generally committed to the sound discretion of the court.") (internal quotation marks omitted). In any case, it is true that there was no *finding* that Wrice was innocent. Nevertheless, a certificate of innocence proceeding is not a criminal proceeding, and Wrice retains his presumption of innocence notwithstanding his certificate of innocence denial.

### d. Gang Affiliation and Character Evidence

Defendants assert that the Court erred in barring evidence of Wrice's alleged gang affiliation and his abuse of his former girlfriend, Jennifer Scott. Alleging that Wrice attempted to distance himself from his former codefendants, Defendants claim it was error to bar them from presenting evidence of Wrice's gang membership in order to show that he did know and associate with his codefendants and to rebut the "rosy" picture painted by his family members who testified at the beginning of the trial. (Defs.' Mot. for New Trial at 12.) Further, Defendants argue it was error to prevent Jennifer Scott from testifying to the abuse she allegedly suffered at Wrice's hands, which Defendants argue was crucial to understanding why she probably would not have spoken to Wrice on the phone the night of the assault and served, essentially, as his alibi.

Courts must exercise caution in introducing evidence of gang activity. There is a "substantial risk of unfair prejudice attached to gang affiliation" because such evidence "is likely to be damaging to a defendant in the eyes of the jury." *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996). The Seventh Circuit thus requires "careful consideration by district courts in determining the admissibility of gang membership and gang activity evidence." *Id.* The Seventh Circuit has ruled that gang evidence has probative value warranting its admission only "under appropriate circumstances." *United States v. Alviar*, 573 F.3d 526, 536 (7th Cir. 2009). These appropriate circumstances include demonstrating "the existence of a joint venture or conspiracy and a relationship among its members." *Id.* (citing *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997)). They also include cases where the "interrelationship between people is a central issue, such as in a conspiracy case." *Alviar*, 573 F.3d at 536 (citing *United States v. Thomas*, 86 F.3d 647, 652 (7th Cir. 1996) (internal quotations omitted)). Although this list of circumstances may not be exhaustive, and these cases are criminal rather than civil, the principle is that evidence of gang membership should not be introduced except in certain circumstances.

Defendants focus on Wrice's attempts to distance himself from his codefendants and on Wrice's sister, Magnolia's, statement that growing up, the Wrice family was a "regular Brady Bunch" and Charles Wrice's assertion that Stanley Wrice was a good brother who tried to keep him out of trouble. Defendants argue that because of these circumstances, the door was wide open for Defendants to introduce evidence of Wrice's gang activity. The Court disagrees, particularly because Wrice admitted to associating with

his former codefendants, Benson, Fowler, and Holmes, and to allowing them to attend frequent parties at his house. Further, Wrice's siblings' statements were relatively benign and ancillary to the issues at trial, even though Wrice's character was important to his claims. If Stanley Wrice had an idyllic early childhood and hoped to keep his younger brother out of trouble at some point, it was also well-established and undisputed that by the time of Byron's assault, Wrice's house had become a party house with Wrice's obvious approval—or at least his acquiescence. It would have been unfairly prejudicial for the Court to allow introduction of gang affiliation and activity to rebut these statements—they were already rebutted by Wrice's own testimony.

Defendants rely heavily on *Cobige v. City of Chicago* for the proposition that it is reversible error to not allow rebuttal evidence when character is put at issue. 651 F.3d 780, 784–85 (7th Cir. 2011) (error to not allow evidence to rebut view of "rosy character" to show damages in wrongful death suit when "Illinois law makes surviving relatives' emotional loss and familial ties relevant to damages."). But that case does not stand for the blanket proposition that an adverse party gets a blank check any time a statement is made about a party's character. In *Cobige*, a district judge disallowed evidence offered to rebut testimony portraying a mother-son relationship as better than it actually was, and that evidence and relationship was directly relevant to damages under Illinois law. That is, the nature of the mother-son relationship was central to the issue of damages. That was not the case here: the Wrice family's relationships with each other in childhood were not central to the claims. There was enough evidence presented of Wrice's relationships with his former codefendants

to show that he knew them, associated with them, and threw parties with them at his house. Moreover, there was enough evidence presented to rebut any supposed rosy picture of Wrice's childhood. (Defendants did in fact introduce the accusation that Wrice raped Jennifer Scott during their cross-examination of Magnolia Wrice. Defendants' counsel asked: "Okay. You don't know that Mr. Wrice raped Jennifer Scott?" (Trial Tr. at 218:9.) The Court instructed the jury to disregard the question, but it cannot be unheard. The point, of course, is that Defendants' bluster about how the jury heard nothing but a bright, inaccurate portrayal of Wrice's childhood and family life is not the truth.)

Finally, Defendants argue that the Court erred in barring evidence of Wrice's alleged rape and physical abuse of Jennifer Scott. Defendants characterize it as absolutely essential that the jury hear of Scott's abuse at Wrice's hands so that they understood why she no longer spoke with Wrice despite having three children with him. This argument gives the jury too little credit. Many people have bad relationships—or no relationships—with a former partner and co-parent. These relationships end or go bad for all kinds of reasons. The Court does not intend to cast doubt on the veracity of Scott's claims, but it is not beyond the jury's ability to understand and believe that Scott, despite having three children with Wrice, probably would not have spoken with him on the night of Byron's assault because by that point she had cut off contact with him. Moreover, Defendants established that Scott and Wrice were not on good terms in their cross examination of Magnolia Wrice; regarding Wrice's children: "And the reason [Wrice's daughter] hadn't seen her father in 31 years is because...Mr. Wrice's daughters with Jennifer Scott were estranged from the Wrice family;

isn't that true?" "Yes, ma'am. We didn't see them at all." "They had no
contact with the Wrice family?" "She had no contact." (*Id.* at 219:9–16.)
Defendants, by their own admission, were clearly more interested in getting
evidence in front of the jury showing that Wrice was a "violent criminal"
who "raped and beat Jennifer Scott when she was a child" (Defs.' Mot. for
a New Trial at 14) and to show the jury that Wrice had a propensity to
harm women. This evidence was unfairly prejudicial and clearly barred.
Although the Defendants were entitled to rebut Wrice's assertions, they
could, and did, accomplish this with evidence that was not unfairly
prejudicial. It was thus not error to exclude evidence of Wrice's alleged
gang affiliation and his abuse of Jennifer Scott.

### e. *Identification Evidence*

Karen Byron allegedly identified Wrice as her assailant at the
hospital before Wrice was taken in for questioning; the Court did not allow
this into evidence, and Defendants argue this was error. The alleged
identification was memorialized in a police report, which is the only
extant evidence that this identification occurred. Because Byron was
experiencing memory problems, she did not testify about the identification
at the state criminal trial, and the state withdrew evidence of the supposed
identification. The Court found that because this evidence was not
introduced at Wrice's criminal trial, it was irrelevant. Defendants argue
that the identification should have been admitted to show Defendants' and
Assistant State's Attorney ("ASA") Kenneth McCurry's state of mind.

The Court previously found that police reports are admissible only
"to the extent to which they incorporate firsthand observations of the
officer." (Mots. in Limine Op. at 17, Dkt. No. 482) (quoting *Jordan v.*

*Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013)). But this principle is based on "the presumption of reliability that serves as the premise for the public-records exception." *Id.* And the public records exception "is justified on the assumption that public officials will perform their duties properly and without bias." *Jordan,* 712 F.3d at 1132 (citing FED. R. EVID. 803(8) advisory committee's notes). If this not a case where that assumption breaks down, it is hard to imagine what is.

The public official who made the report—Byrne—is a defendant in the case who made the only record of this purported identification, which was not introduced at the criminal trial; he also refused to be cross-examined about it at the civil trial. Byron did not testify at the criminal trial about this alleged identification, and she is now dead. The police report therefore lacks any indicia of reliability that would justify putting it before a jury. Defendants argue that they wanted to use the police report to show Byrne's and ASA McCurry's state of mind because they had "no reason to coerce a confession from Wrice" because they had a positive identification; it was also "highly probative" of Wrice's guilt. (Defs.' Mot. for a New Trial at 18.) That is, they wanted to introduce the identification for its truth. It was properly barred.

Finally, Defendants argue that Bertina Lampkin, the prosecuting attorney, or Sidney Jones, Wrice's criminal trial lawyer, could be questioned about this identification. But there is no evidence that they have knowledge of it beyond the police report. Defendants argue that Jones admitted that the identification existed in a court filing and therefore Wrice *admitted that Byron had identified him.*" (Defs.' Reply to Mot. for New Trial at 19 (emphasis in original).) But Wrice's filing argued that

Byron "purported to identify" him and challenged the entire incident as "unconstitutionally suggestive." (*See* Mot. to Suppress at 1, Supp. to Defs.' Mot. for a New Trial, Dkt. No. 596.) This is hardly an admission of an identification or a concession to the purported identification's reliability. And given that there is no other evidence of what transpired in the hospital room where Byron allegedly identified Wrice, the Court properly excluded it.

### f. 404(b) Character Evidence

Next, Defendants argue that the Court erred in allowing evidence that Byrne and Dignan had abused other suspects in their custody. The Court allowed Wrice to put on four witnesses who testified to their allegations of abuse by Byrne and Dignan. Defendants object that introducing this evidence violates Rule 404(b)'s bar on admission of other acts for propensity purposes.

The Court reiterates that these witnesses were properly introduced and were important to Wrice's claims. Defendants have argued over the course of the trial that *Thompson v. City of Chicago*, 722 F.3d 963, 974 (7th Cir. 2013), does not apply but do not even cite it in their 59(a) Motion, and have never convincingly distinguished it. Defendants argue that similar conduct offered to demonstrate a pattern is not admissible and cite pre-*Thompson* Seventh Circuit precedent for the proposition, but their unwillingness to engage with *Thompson* in their briefing is telling. (*See* Defs.' Mot. for a New Trial at 21 (citing *United States v. Beasley*, 809 F.2d 1273, 1278 (7th Cir. 1987)).)

*Thompson* holds that it is an abuse of discretion for a trial court to bar evidence from "citizen witnesses" who can testify to a "pattern of

corruption." *Thompson*, 722 F.3d at 974. As related to a *Brady* claim, this testimony helps "establish that critical impeachment evidence—the officers' involvement in a pattern of [police] misconduct—existed and was deliberately withheld." *Id.* In the end, the Seventh Circuit reversed the district judge who took "a too narrow view of the purpose and probative value of the pattern-of-misconduct evidence, including the testimony of the citizen witnesses who were victims of [police] malfeasance." *Id.* Further, requiring pattern witnesses' cases to have "close factual similarity" to a plaintiff's case "misses the real point of this evidence." *Id.* While it is true that *Thompson* addresses such evidence as it relates to FED. R. EVID. 403 and not 404(b), this does not help Defendants. The Seventh Circuit could have discussed evidence in the context of Rule 404(b), but it didn't, and the logical conclusion from that omission is that the Seventh Circuit did not see a Rule 404(b) problem. If the Seventh Circuit did not find such a problem when considering such a similar question, then neither will the Court.

Defendants again raise their point that Gregory Banks should not have been allowed to testify because Banks was interrogated after Wrice's trial, and it was obviously impossible for anyone to disclose to Wrice an interrogation that had not yet happened. The key is not that Defendants failed to disclose Banks' interrogation, but that Banks' interrogation is just one instance in a long and ongoing pattern that was ultimately not disclosed and should have been. *See Thompson*, 722 F.3d at 974 (district court barring a witness who would testify to events that occurred in 2005 as "just too far removed" "misunderstands the scope of the claimed *Brady* violations. Evidence that [the police officer] engaged in the same kind of

misconduct in 2005 is powerful circumstantial evidence that he was involved in the pattern of abuse . . . dating back to Thompson's arrest in 2002 and trial in 2003.") Wrice was entitled to put on witnesses to show that the practice of abusing suspects in police custody started before Wrice's interrogation and continued after it. That practice was not disclosed at Wrice's criminal trial, and he was entitled to put on witnesses to show it existed in this trial.

### 3. Lawyerly Misconduct

Finally, Defendants argue that Wrice's counsel's misconduct contributed to an unfair trial, mostly during her closing argument. Given Defendants' counsels' own unprofessional behavior over the course of these proceedings, it is a wonder they now choose to throw stones. Nevertheless, the Court considers Defendants' assertions that Wrice's counsel: (1) misrepresented facts to discredit Kenny Lewis; (2) misrepresented the State's position on Wrice's guilt; (3) inappropriately attacked Jennifer Scott's character; (4) made numerous improper speaking objections; (5) alluded to inflammatory and unwarranted racist comparisons; and (6) made improper comments that have a cumulative unfairly prejudicial effect, warranting reversal. For the following reasons, the Court rejects these arguments.

A lawyer's improper remarks during closing argument warrant reversal of the judgment "only if the statement was plainly unwarranted and clearly injurious." *Smith v. Hunt*, 707 F.3d 803, 812 (7th Cir. 2013) (internal quotations omitted). However, the Seventh Circuit "has been loathe [sic] to find that improper comments made during closing argument rise to the level of reversible error." *Id.* (citing *Schandelmeier-Bartels v. Chi. Park*

*Dist.*, 634 F.3d 372, 388 (7th Cir. 2011) ("We have stated repeatedly that improper comments during closing argument *rarely amount to reversible error*.")) (emphasis added). Accordingly, Defendants face an extraordinarily high bar to show that Wrice's counsel's statements at closing argument amount to reversible error.

First, Defendants argue that Wrice's counsel made improper statements related to Kenny Lewis, the only witness at Wrice's criminal trial who had no interaction with the police at the time of the incident. He never recanted his testimony, and he is now dead. During closing argument, Wrice's counsel said "And Kenny Lewis? Well, apparently he made a deal for himself and testified against Wrice." (Def. Mot. for New Trial at 24 (citing Trial Tr. at 1821:18–20).) Defendants' counsel objected, but the Court permitted Wrice's counsel to continue with her argument. Defendants argue that this led the jury to believe false facts and to believe that Defendants' objection to Wrice's counsel's statement was unfounded.

But Lewis's testimony is relevant only to Claim I, on which Defendants prevailed. Defendants could not have experienced substantial prejudice from this comment—they won. Even assuming these comments somehow bore on Wrice's credibility—which Defendants claim is relevant to Claims II and III—there is no way that these comments came close to clearing the extraordinary high bar to warrant a new trial, particularly because the jury was instructed that the closing arguments are not evidence, because Defendants objected to Wrice's characterization of Lewis, and because the Court struck that comment. (*See* Trial Tr. at 1821:19–23 ("Well, apparently he made a deal for himself and testified against Wrice." Defendants'

counsel: "Objection. There's no evidence of that. I move to strike that comment, Judge." The Court: "All right.").)

Second, Defendants argue that Wrice's counsel improperly insinuated that the State of Illinois dismissed the charges against Wrice because they believed he was innocent. Wrice's counsel said that the State "dismissed the charges. And to be clear about something, the state of Illinois had every opportunity in the world to retry Wrice if they believed he was guilty. . .The State of Illinois had every opportunity to put in prior testimony of Karen Byron, Kenny Lewis—we heard it here. Why wouldn't they be able to do it there?" (Trial Tr. at 1925:6–9; 1926:7–13.) Also: "you realize there was a wrongful conviction. It's why the state of Illinois did not retry him. It's why they dismissed all charges against him." (*Id.* at 1948:18–22.) Defendants complain that these statements were misleading and prejudicial.

The Court declines to find that these remarks were unfairly prejudicial. Both sides were very clear about their theories of the case: Wrice never wavered during the trial in his assertion that he was innocent; Defendants were adamant in their belief that Wrice was guilty. It is true that the State of Illinois could have retried Wrice but instead dismissed the charges. And it is a matter of common sense that a sex crimes case where many witnesses—including the survivor—are dead would be extraordinarily difficult to retry more than 30 years later. The jury was instructed that closing arguments are not evidence and would have known that Wrice's counsel did not speak for the State of Illinois. Accordingly, Wrice's counsel did not speak improperly, and there was no unfair prejudice to Defendants based on these comments.

Third, Defendants argue that Wrice's counsel made false arguments regarding Jennifer Scott, portraying Scott in closing arguments as "a scorned woman, with an axe to grind." (Defs.' Mot. for New Trial at 25.) Defendants claim Wrice's counsel made these statements fully aware that Scott and Wrice had three children together and that the relationship had started when Scott was just 14; the Court did not allow evidence of Scott's age when the relationship started, and Wrice improperly used this evidence to both protect his own credibility and damage Scott's. As noted above, the Court properly ruled on Scott's testimony. She was a defense witness who testified against Wrice. The Court recognizes that Scott's testimony and her willingness to speak about her alleged abuse at Wrice's hands is courageous, but Wrice's counsel was allowed to characterize her as scorned. Though Wrice's counsel repeatedly came dangerously close to opening the door here, the Court finds that it was ultimately not unduly prejudicial, nor was it error for the Court to hold to its rulings disallowing Scott's testimony that Wrice abused and raped her.

Fourth, Defendants argue that Wrice's counsel made numerous improper speaking objections that prejudiced Defendants and improperly coached Wrice during his testimony. Defendants assert that during Defendants' counsel's cross-examination of Bobby Joe Williams, Defendants' counsel took Williams through his criminal trial testimony, where he gave answers to open-ended questions. Wrice's counsel objected and said, "I'm going to object to that mischaracterization of his testimony, his yeses and nos." (Def. Mot. for New Trial at 26 (citing Trial. Tr. at 665:12–15, Dkt. No. 589).) Wrice's counsel also objected to the question "But you're telling this jury that you slept downstairs?" with "Objection. And he said that at the criminal

trial." Further, during Wrice's testimony, his counsel said: "Okay. Now listen to my question, Stan, okay?" (Trial Tr. at 1229:13–18.) Defendants claim that this amounted to coaching Wrice and prompting him to "give his new story regarding his statement." (Defs.' Mot. for New Trial at 27.) These objections, Defendants argue, were Wrice's counsel's way to insert her theory of the case inappropriately and mislead the jury.

As with the previous two points, it is difficult to see how this warrants reversal even if these objections are prejudicial. These objections clearly relate to Claim I, on which, again, the jury found for Defendants. Regardless, the speaking objections were not unfairly prejudicial; as Wrice argues, his counsel supplied a factual basis for her objections. This was not error. It is also difficult to see how it was coaching or prompting when Wrice's counsel told Wrice to listen to her question. Defendants present the statement as self-explanatory, but it is not, and the Court declines to give extensive discussion to an argument that Defendants have not developed.

Fifth, Defendants claim that Wrice's counsel improperly implied that Wrice and other men arrested were targeted because of their race. Wrice's counsel asked Bobby Joe Williams during his testimony: "What happens when women are burned with third-degree burns in the attic—white women are burned with third-degree burns in the attics of African American men's homes in 1982 in that area?" (Trial Tr. at 647:5–11.) Defendants immediately objected, but they argue that this question sent a clear and prejudicial message to the jury. Defendants also argue that it was "extremely prejudicial" when the Court overruled their objection to Wrice's counsel's statement where she discussed Byrne and Dignan having a beer and

talking about "the good old days when you could beat black men in basements and make jokes about the N-word." (Defs.' Mot. for New Trial at 27–28.)

Interestingly, Defendants don't argue that these statements are untrue. They label them as "unwarranted" in the section subheading, but do not elaborate or otherwise dispute their veracity; they only call them "inflammatory" and "highly prejudicial," but don't explain why this is so. The Court does not think it obvious why these statements are *unfairly* prejudicial, as is required by Federal Rule of Evidence 403, and will not make Defendants' arguments for them. Wrice was free to advance his case as rooted in racial violence, just as Defendants advanced their case as rooted in gender violence. And Wrice was certainly free to point out that Byrne and Dignan were white while the offenders in this case were all Black, as were the pattern and practice witnesses whom Wrice put on the stand.

Defendants fought hard to keep Jon Burge's name out of the trial, but his presence looms large even as Defendants tried to distance themselves. The systematic abuse of Black suspects held at Area 2 while it was under Burge's control is well-established and has been for many years. *See Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993) (police superintendent Richard Brzeczek "had received many complaints from members of the black community that officers in 'Area 2 Violent Crimes' . . . were abusing suspects; *such abuse was in fact common in Area 2*") (emphasis added). To close, the Court need only reiterate that Rule 403 requires exclusion of evidence if it poses a danger of *unfair* prejudice. *See* FED. R. EVID. 403. In the absence of any satisfactory explanation of why allowing such statements introduced unfair prejudice, the Court cannot find that allowing them constituted error.

Finally, Defendants argue that Wrice's counsel's conduct cumulatively rises to a level warranting reversal. The Court has found that what Defendants find objectionable was not in fact error. And, when remarks were dangerously close to the line, such as in the case of Wrice's counsel's remarks regarding Jennifer Scott, the remarks did not clear the high bar required for reversal. Accordingly, there was no cumulative error.

Therefore, the Court finds that there is no basis to order a new trial under Rule 59(a), and Defendants' Motion for a New Trial is denied.

### B. Motion for Judgment Notwithstanding the Verdict

Next, Defendants move for Judgment Notwithstanding the Verdict pursuant to Rule 50 and ask the Court to enter judgment in their favor on Claims II and III or, in the alternative, remittitur. They claim that: (1) Wrice never actually made a self-incriminating statement; (2) even if he did, Defendants had no hand in Wrice making the statement; (3) even if the evidence supports a Fifth Amendment claim because Defendants coerced Wrice into making a self-incriminatory statement, there was no evidence to support the damages claim; and (4) even if Wrice proved damages, the jury's verdict was excessive and should be reduced.

A district court may enter judgment against a party fully heard on an issue during a jury trial "if a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). The Court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). And while the Court examines the evidence to determine whether the jury's verdict was based on that evidence, the Court "does not make credibility determinations or weigh the evidence."

*Id.* The Court can "strike a piece of evidence from its weighing process only if reasonable persons could not believe it because it contradicts indisputable physical facts or laws." *Meija v. Cook County, Ill.*, 650 F.3d 631, 633 (7th Cir. 2011) (internal quotations omitted). Ultimately, a motion for judgment as a matter of law "can be granted only if the court—after viewing the evidence in the light most favorable to the non-movant—believes that the evidence supports but one conclusion—the conclusion *not* drawn by the jury." *Id.* at 634 (citing *Ryl-Kuchar v. Car Ctrs, Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009)) (internal quotations omitted).

For the following reasons, the Court finds that there was a legally sufficient evidentiary basis for the jury to find that Wrice made an inculpatory statement that was used at trial, the Defendants coerced that statement, Wrice proved his damages, and the damages award was not excessive.

### 1. Wrice's Statement

Defendants first argue that they are entitled to a directed verdict because Wrice testified under oath at his criminal trial that he never made an inculpatory statement to either ASA Kenneth McCurry or to Defendants. At Wrice's criminal trial, ASA McCurry testified that Wrice said that he took an iron from Rodney Benson and dropped it on Karen Byron's thigh, burning her. Wrice testified under oath at his criminal trial that he never made such a statement. In the recent trial, however, Wrice testified seemingly to the contrary and said that ASA McCurry (who predeceased these proceedings) invented the "dropped iron" story and that Wrice agreed to it only to prevent another beating from Byrne and Dignan. Defendants argue that Seventh Circuit case law prohibits any reasonable

jury from crediting this about-face and, for this reason, the Court must direct a verdict for Defendants on Claim II.

In the Seventh Circuit, "litigants cannot create a factual issue requiring trial by contradicting, under oath, a prior sworn statement. . .unless there is a powerful reason such as newly discovered evidence." *United States v. Stewart*, 198 F.3d 984, 986 (7th Cir. 1999); *see also Higgins v. Mississippi*, 217 F.3d 951, 955 (7th Cir. 2000) ("[A] party cannot by affidavit retract damaging admissions without a good explanation."). However, parties can present other evidence contradicting a witness's story, such as documents or other objective evidence. *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997). Alternatively, "the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination." *Id.* The upshot is that a witness cannot make a sworn statement or damaging admission and then create a triable issue by backtracking without good reason or other supporting evidence.

A closer look at the facts in *Stewart, Higgins, and Seshadri* reveals a relevant similarity. In *Stewart,* a criminal defendant wanted to withdraw his plea after learning he would be sentenced to a longer term in prison than he'd originally thought; he admitted to the crime at his plea hearing and swore his lawyer had fully informed him of the consequences of pleading guilty. *Stewart*, 198 F.3d at 985-86. He procured an affidavit from his brother, who took responsibility for some of the drugs and averred he had committed perjury at his plea hearing. *Id.* at 986.

In *Higgins*, a plaintiff alleged a plot against state officials "to kidnap [him] from an Illinois jail and bring him to Mississippi to face criminal prosecution." 217 F.3d at 953. The plaintiff made a written statement in his criminal proceedings in which he admitted he waived extradition; the district court relied on this statement in granting summary judgment for defendants as "inconsistent with [plaintiff's] claim that he had not waived extradition but instead had been kidnapped." *Id.* at 955. The Seventh Circuit found this acceptable, and gave no indication that any other evidence existed to cast doubt on this waiver; the plaintiff "neither questions the authenticity of the statement that he made in the [criminal proceedings] nor offers an explanation for the contradiction, such as that he was coerced to waive extradition." *Id.*

Finally, *Seshadri* concerned a dispute between a professor and his former graduate student where, following a falling-out, the professor accused the graduate student of copyright infringement because the graduate student published an article in the student's name (rather than jointly). 130 F.3d at 799. The professor issued an affidavit claiming that he had written the entire article and sought statutory damages and an injunction prohibiting the student from republishing the article. But "[a]nyone reading the correspondence between [the two] would conclude that the article was indeed a joint work." *Id.* at 803. Every other piece of evidence, too, suggested that the work was a joint work. *See id.* (as "the acknowledged author of the first draft of two sections that occupy almost 5 pages of a 13-page article, as well as of the technical apparatus of the article, which includes a number of complicated graphs, [the student] certainly qualifies as a joint author"). The Seventh Circuit wrote that "we do not

think that an affidavit should be allowed *without explanation* to controvert the affiant's written admissions, albeit made in documents rather than in a deposition." *Id* at 804 (emphasis in original).

What these cases have in common is that each involved a party who, having no other evidence in his favor, tried to save his case simply by attempting without explanation to retract a damaging earlier statement or admission. And if Wrice's testimony were the only thing in this case that mattered, the Defendants would prevail. But things are more complicated. Defendants argue here that: (1) Wrice's new story contradicts his pleadings, where he alleged that his dropped iron statement was constructed and fed to him by Defendants; (2) Wrice unequivocally denied ever making the dropped iron statement to ASA McCurry; and (3) it is "simply unbelievable that ASA McCurry" would have made up this "far-fetched" story and fed it to Wrice. (*See* Defs.' Mot. for J.N.O.V. at 4, Dkt. No. 593.) The problem with Defendants' argument hinges on this third point.

Defendants emphasize that Wrice's inconsistent testimony should be definitive, but Defendants' own arguments are internally inconsistent. Wrice did not testify in a vacuum. If the only evidence at trial were Wrice's previous testimony, where he denied making the dropped iron statement, and his current testimony, where he claims to have made the statement, Defendants might prevail. But Defendants simultaneously argue that Wrice made a statement that he should be stuck with—his denial-and that it is ridiculous to accuse McCurry of lying. There is a binary here: either Wrice made the dropped iron statement to McCurry or he did not.

At the criminal trial, Wrice said he did not make the statement, and McCurry said he did. Now, Wrice says he did make the statement. So, either

McCurry was truthful at the criminal trial and Wrice lied, or Wrice is telling the truth now, consistent with McCurry's testimony at the criminal trial, and if that is the case then Wrice did make the statement to McCurry. Thus, Wrice did not simply make a statement many years ago and attempt to create a triable issue by backtracking; he made inconsistent statements against the backdrop of other contradictory evidence and testimony, and it was the jury's job to make sense of it all. Defendants argue that it is "simply unbelievable" that McCurry would be dishonest and assert that Wrice is obviously the liar, but those credibility determinations belong to the jury, not to the Defendants or, particularly at this stage, to the Court. The jury had evidence upon which to make their credibility determinations, and they made them. Accordingly, the Court declines to find that Defendants are entitled to judgment notwithstanding the verdict on this issue.

### *2. Defendants' Role*

Defendants next argue that even if Wrice did introduce enough evidence of an inculpatory statement, Wrice did not, and cannot, link this theory in any way to Defendants because there was no evidence at trial that Byrne and Dignan had any hand in fabricating the dropped iron story. According to Defendants, Wrice admitted that neither man fed him any of the lines or the concept, and as a result there can be no inference, reasonable or otherwise, that Defendants originated the story because an inference cannot be drawn on nothing.

Wrice responds that his claim does not fail as a matter of law just because he did not testify that Defendants forced him to repeat specific words. The Court agrees. For Defendants to have "caused" this statement, they would have to be the cause in fact—"absent the conduct," the coerced

- 46 -

statement would not have occurred—and the proximate cause of the statement—making the statement is the type of injury that "a reasonable person would see as a likely result" of Defendants' conduct. *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) (citing *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 640 n.1 (7th Cir. 2008)) (internal quotation marks omitted); *see also Tillman v. Burge*, 813 F. Supp. 2d 946, 972 (N.D. Ill. 2011) (finding no reason to dismiss based on whether alleged coerced statements "are cut from whole cloth rather than coerced from the suspect's own mouth."). The jury thus would only have had to find that a statement was made, introduced at Wrice's criminal trial, and that Wrice made that statement because of Defendants' actions.

Defendants' reliance on *Sornberger v. City of Knoxville, Illinois* is misplaced. 434 F.3d 1006 (7th Cir. 2006). *Sornberger* stands for the proposition that the phrase "criminal case, as it is employed in the Self-Incrimination Clause, requires, at the very least, the initiation of a legal proceeding, rather than mere police questioning, before a suspect's self-incrimination rights are implicated." *Id.* at 1024 (internal quotation marks omitted). Of course, a statement procured by coercion must have been introduced at trial, though *Sornberger* does not specify that the statement must have come from the Defendants' own mouth. *See Tillman*, 813 F. Supp. 2d at 972 ("*Sornberger* does not suggest that a Fifth Amendment claim is limited to a particular type of confession. . .").

The jury thus had reasonable basis to believe that Defendants beat Wrice and that when the dropped iron statement came up, he went along with it; the jury could have also inferred that had Wrice not been beaten, he would not have agreed to the statement. Defendants would have the Court

- 47 -

find that Wrice could only win by proving that Defendants fed him the statement, line-by-line, and he repeated it to McCurry. The logical implication of this argument is that if the police are to torture a suspect and order him to make an inculpatory statement to an unknowing prosecutor but do not give the suspect the content of the statement, then the prosecutor (who enjoys absolute immunity) is liable for the coercion and not the police.

That is not what Wrice needed to do. Regardless of what he alleged in his pleadings, he needed to show that Defendants procured through coercion an inculpatory statement that was eventually used at his criminal trial. Even if Defendants did not feed him the exact statement, there was enough evidence for the jury to find that Defendants were instrumental in compelling his assent to, or recitation of, a statement that was eventually introduced against him at his criminal trial. Wrice argues that he was beaten repeatedly, and that the beatings did not stop until he gave a statement. That is enough for the jury to find that Defendants coerced an inculpatory statement, even if they did not give Wrice the exact words.

### 3. Damages

As a threshold matter, Wrice argues that Defendants have waived their right to move for judgment notwithstanding the verdict as to damages because they did not argue it previously in their motion for a directed verdict. "A motion for judgment n.o.v. must be predicated by an appropriate motion for directed verdict." *Morales v. Cadena*, 825 F.2d 1095, 1099 (7th Cir. 1987). Defendants did not argue in their motion for a directed verdict that Wrice did not prove damages. Defendants counter that because they raised this argument in their companion Rule 59 motion, it is not waived.

*See Avery v. City of Milwaukee*, 847 F.3d 433, 438 (7th Cir. 2017) ("the caption on a motion is not essential, but . . . a Rule 59(e) motion can be used to ask that a judgment be set aside in its entirety.") (internal quotation marks omitted). But they did not so argue in their Rule 59 motion. There, they argue that the jury was not properly instructed to consider damages as an element. In their Motion for Judgment Notwithstanding the Verdict, they argue that no rational jury could have found that Wrice proved damages. The latter is a different argument, and it is waived. Nevertheless, for the sake of completeness, the Court will address the issue of damages because it finds that even if the argument were not waived, a rational jury could have found that Wrice showed evidence of damages.

Defendants argue that even if Wrice suffered a Fifth Amendment deprivation at Defendants' hands—namely, the introduction of a coerced statement at his criminal trial—he cannot recover damages because he did not introduce any evidence that the use of the statement injured him. Defendants can make this argument because of the jury's "split" verdict: that Defendants coerced an inculpatory statement that was used at Wrice's trial, but that Wrice would not have been acquitted had that statement not been introduced. Had the jury found that Wrice would have been acquitted in the absence of that statement, his damages would have been obvious: the years he wrongly spent in prison. Wrice could not rely on his years of incarceration because the jury found those years would have spent absent Defendants' wrongdoing. Accordingly, Defendants argue, Wrice cannot recover because he introduces no other evidence of damages on which a reasonable jury could rely in awarding him compensatory damages.

In a § 1983 suit for compensatory damages resulting from the deprivation of a constitutional right, a plaintiff must present evidence of the injury. This is true even in cases where the injury is mental or emotional. *Carey v. Piphus*, 435 U.S. 247, 264 (1978) ("[W]e hold that neither the likelihood of such injury nor the difficulty of proving [injury in § 1983 suit] is so great as to justify awarding compensatory damages without proof that such injury actually was caused."). And the first inquiry in a § 1983 suit is "identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Any compensation for injuries in a § 1983 suit must "be tailored to the interests protected by the particular right in question." *Carey*, 435 U.S. at 259.

A person abused by police during an interrogation has a Fourth Amendment claim for coercive interrogation, regardless whether any evidence obtained from the interrogation is later used at trial. But because that claim does not depend on a defendant's guilt or innocence, it accrues immediately after the interrogation, not when (or if) the defendant's conviction is ultimately reversed or vacated. *See Gonzalez v. Entress*, 133 F.3d 551, 555 (7th Cir. 1998) ("Application of excessive force at a police station . . . is immediately actionable, even if the prosecutor never tries to use the confession at trial."). If Wrice had a Fourth Amendment claim against Byrne and Dignan, it would have accrued in 1983, when he was interrogated; because the statute of limitations is two years, it expired in 1985. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007) (Illinois state statute of limitations of two years applies in § 1983 claims for excessive force); *cf. Moore v. Burge*, 771 F.3d 444, 448 (7th Cir. 2014) (plaintiffs

pursuing excessive force claim against Burge decades after the fact were not diligent in pursuing their claims).

The Fifth Amendment, on the other hand, protects against self-incrimination. *See Chavez v. Martinez*, 538 U.S. 760, 769 (2003) ("mere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness"); *Gonzalez*, 133 F.3d at 555 ("the use of a coerced confession could be a violation separate from the coercion, and efforts by the police to conceal vital facts . . . could be still another violation"). Thus, a coercive interrogation alone does not give rise to a Fifth Amendment claim unless the statement is later used at trial.

Defendants argue that Wrice cannot recover just from being tortured by Byrne and Dignan because those damages relate to his time barred Fourth Amendment claim, and he therefore needed to introduce some other evidence of injury at trial in order to recover damages. Wrice responds by pointing out that the jury was "instructed that it could award compensatory damages, which included an assessment of physical and mental and emotional pain and suffering and loss of normal life that Plaintiff has experienced and is reasonably certain to experience in the future." (Wrice Resp. to Defs.' Mot. for J.N.O.V. at 7, Dkt. No. 610.) The jury could have considered any evidence that Wrice was injured, he responds, including for the coercion that "resulted in a self-incriminating statement that was used to convict [him]." *Id.* Wrice argued to the jury "that there may be psychological pain associated hearing *[sic]* a confession used against you at trial" but contends now that the theory is not exclusive: the jury could have found other reasons to award compensatory damages. *Id.*

Throughout the proceedings Defendants have emphasized that what Wrice is really trying to do is bring an excessive force claim masquerading as a Fifth Amendment Due Process claim. Defendants draw a hard distinction between claims: if Defendants beat Wrice, then he has a time-barred Fourth Amendment claim; and if those beatings produced a confession that was later introduced in a criminal proceeding, then the introduction of the confession at trial—and that introduction alone—is a Fifth Amendment claim. According to Defendants, Wrice cannot recover any damages for being beaten because the Fourth Amendment claim is time-barred, which means that the only evidence of damages that the jury could take into account are any damages Wrice incurred by having his self-incriminating statement introduced at trial, which, Defendants argue, are zero.

To prevail on Claim II, Wrice had to show that his self-incriminating statement was coerced—that his "will [had] been overborne and his capacity for self-determination critically impaired"—and for Claim II to accrue, the coerced statement had to be used at his trial. *Arizona*, 499 U.S. at 303; *Chavez*, 538 U.S. at 767. The heart of Defendants' damages argument is that it is black letter law that Wrice can recover damages for the second component—the introduction of his statement at trial—but not for the first— the coercion. Defendants concede that evidence of the coercion is relevant to the question whether the statement was coerced, but maintain that when it comes to damages, such evidence is not relevant because it relates to a Fourth Amendment claim. This argument rests on the proposition that there can be no—or at least, very limited—overlap between different types of Constitutional claims. Defendants cite no cases supporting their assumption but cite several Supreme Court and Seventh Circuit cases purporting to

support the proposition that Wrice could not introduce as evidence of damages the coercion and could only recover for the introduction of the statement. A close reading of these cases shows that none of them stand for that proposition—in fact, if anything, these cases suggest that it is permissible to introduce the coercion as part of the damages.

In determining whether a statement is compelled, it is necessary to consider "the totality of all the surrounding circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). In Wrice's case, of course, these surrounding circumstances included the conditions of his interrogation. Defendants rely on *Chavez* to argue that the right to be free of a coercive interrogation does not arise, and is not actionable, under the Fifth Amendment. 538 U.S. at 767. But that is not what *Chavez* says. *Chavez* holds that "mere coercion does not violate the text of the Self-Incrimination Clause *absent use of the compelled statements in a criminal case against the witness*." *Id.* (emphasis added). This suggests that once a coerced statement is introduced in a criminal case, the coercive conduct falls under the Fifth Amendment's scope. If this is so, then evidence of the acts that caused the coercion—the beatings—was proper to support damages. (Wrice's claims in this case accrued only after his conviction was reversed because of *Heck v. Humphrey,* which holds that if succeeding in a civil suit would undermine the validity of a plaintiff's conviction, the civil suit can only be brought when the criminal conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. 477, 487 (1994). His coercion claim is proper now even though the jury did not find

that it resulted in his conviction because in Illinois, a self-incriminatory statement obtained through coercion and used as "substantive evidence of his guilt is *never* harmless error," meaning that to succeed on Claim II or III would undermine the integrity of his state court criminal conviction. *People v. Wrice*, 962 N.E.2d 934, 955 (Ill. 2012) (emphasis in original).)

The Seventh Circuit cases Defendants cite to support their position instead support Wrice's position. *See Johnson v. Winstead*, 900 F.3d 428, 438 (7th Cir. 2018); *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014); *Sornberger*, 434 F.3d at 1023–24 & n.11; *Gonzalez*, 133 F.3d at 555. Defendants put these cases forward as holding that any instance of police brutality can *never* be brought under the Fifth Amendment because the exclusive cause of action lies elsewhere. But they do not so hold. Instead, these cases all say that police coercion falls under the Fourth Amendment *except* when the coerced statement is introduced at trial, at which point the Fifth Amendment controls. *See Johnson*, 900 F.3d at 438 (Fourth Amendment applicable to police torture cases and actionable "whether or not a suspect confesses" but that a "Fifth Amendment self-incrimination violation occurs when an unlawfully obtained confession is introduced in a criminal case"); *Moore*, 771 F.3d at 446 (police torture of suspects actionable "whether or not a suspect confesses" and "whether or not any statement is used in evidence at trial"); *Sornberger*, 434 F.3d at 1024–25 (violation of *Miranda* safeguards cannot provide basis of § 1983 liability "*without use of a suspect's statements against him* in a criminal case") (internal quotation marks omitted) (emphasis added); *Gonzalez*, 133 F.3d at 555 (use of a coerced confession at trial "could be" a different violation

from the coercion, but the differences "do not matter when the confession is not introduced at trial."). The implication from the cited cases is that an abusive interrogation is actionable under the Fourth Amendment but, if that abuse results in a confession or statement later used at trial, then that abuse might also be actionable under the Fifth Amendment. Indeed, the very text of the Fifth Amendment supports this reading: "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. *Chavez* clarified that there must be a "criminal case" to trigger the Fifth Amendment's protections, and in such a case, the "compelling"—here, the coercion—is part and parcel to the entire claim, particularly if the person was damaged by being compelled. Practically, this means that Wrice can introduce evidence of abuse to prove damages.

Wrice did that here. He introduced significant evidence regarding the pain and suffering he faced as a result of being beaten by Defendants. Even if he cannot make a claim to the obvious damages of the years of incarceration resulting from the coerced statement, he was entitled to introduce evidence of damages related to his torture at Defendants' hands. Accordingly, even if Defendants' argument regarding damages were not waived, Wrice would still prevail because a rational jury could have found damages for Wrice based on the evidence presented.

### 4. *Excessive Award*

Finally, Defendants claim that both the compensatory and punitive damages awards are excessive and should be reduced.

When determining whether to remit a damages award, courts consider whether: "(1) the award is monstrously excessive; (2) there is no rational

connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015).

Defendants' argument that the damages are monstrously excessive rests on their theory that Wrice can only recover for the emotional damages incurred by hearing his confession introduced at trial. The Court has rejected that theory of damages and declines to find that the award is excessive on those grounds.

Defendants also argue that the award is monstrously excessive because it is much higher than $100,000, an award granted to Andrew Wilson for similar abuses. *See People v. Wilson*, 506 N.E.2d 571 (Ill. 1987). This is related to the final step in the analysis, which is to consider the jury's award to those in similar cases. "This, however, is not as important as the review of the evidence in the case at hand; it offers at best a rough approximation of damage awards." *Adams*, 798 F.3d at 545. Even if Wrice's award were higher than most awards, remittitur is not required. "To require that a jury's damages award be no bigger than previous awards in similar cases would make every such award ripe for remittitur. There must be room for a jury's award to exceed the relevant range of cases when the facts warrant." *Id.*

Defendants cite to only the *Wilson* case, and that is not helpful because it is only one data point. The Court declines to find that the award must be reduced to match it. Given the seriousness of police misconduct, the Court also finds that the award is not a product of the jury's fevered imaginings. This is particularly true because Wrice asked

for a much more substantial amount of money, which he may have gotten had the jury found that the coerced statement resulted in his conviction. Instead, the jury gave him an amount closer to the damages they thought he actually experienced. Because the award bears a rational connection to the evidence, the Court declines to disturb it.

As to punitive damages, Defendants argue that they must be reduced because they are unconstitutionally disproportionate based on Defendants' lower compensatory damages calculation and because they do not serve to deter Defendants since Defendants are retired. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502 (2008) (A "penalty scheme ought to threaten [defendants] with a fair probability of suffering in like degree" for like damage.) The Court previously declined to adopt Defendants' lower compensatory damages calculation and therefore rejects the Defendants' first argument without further discussion.

With respect to deterrence, the Seventh Circuit "takes police brutality very seriously as grounds for punitive damages." *Kuntz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008). The "need to deter such behavior is plain: police brutality is a longstanding problem with which many cities are still coming to grips." *Id*. Defendants' conduct in their "position of public trust justifies a substantial punitive damages award." *Id*. Accordingly, the Court finds that the punitive damages award is justified to deter future misconduct, and that it is not disproportionate relative to the compensatory damages award.

### C. Motion to Compel Plaintiff to File Closing Demonstrative Exhibit

Finally, Defendants move to compel Wrice to file the demonstrative exhibit depicting Byrne's and Dignan's pattern and practice of police misconduct used during Wrice's closing argument. They argue that it is necessary for the Court's review of their new trial motion, where they object to the Court allowing evidence of Byrne and Dignan's abuse of other suspects in their custody. Wrice responds that "this issue has been litigated to death." (Pl.'s Resp. to Defs.' Mot. to File Demonstrative Chart, Dkt. No. 601.) The Court can resolve—and has resolved—the motions without the chart, and the Court would not have found the chart helpful in its analysis. Nevertheless, it would likely serve the appellate court best to have a fuller record of the trial. Accordingly, the Court orders Wrice to file a copy of the chart used during closing argument within thirty (30) days of the publication of this opinion.

## III. CONCLUSION

For the reasons stated herein, Defendants' Motions for a New Trial (Dkt. No. 594) and for Judgment Notwithstanding the Verdict (Dkt. No. 593) are denied. Defendants' Motion to Compel Plaintiff to file the demonstrative chart used in closing argument (Dkt. No. 600) is granted.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 9/21/2020

- 58 -